**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GREGORY GREENE and JOSEPH LACK, individually and on behalf of all others similarly situated, | |
| *Plaintiffs*, | Case No. 1:14-cv-01437 |
| v. | Hon. Gary Feinerman |
| MTGOX INC., a Delaware corporation, MT. GOX KK, a Japanese corporation, TIBANNE KK, a Japanese corporation, MT. GOX NORTH AMERICA, INC., a New York corporation, MIZUHO BANK, LTD., a Japanese financial institution, MARK KARPELES, an individual, GONZAGUE GAY-BOUCHERY, an individual, JED MCCALEB, an individual, and JOHN DOE DEFENDANTS, | Magistrate Judge Susan Cox |
| *Defendants*. | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................... 1

II. FACTUAL AND PROCEDURAL BACKGROUND ............................................. 3

    A. Bitcoin is introduced in 2008 and Mt. Gox erupts with success soon thereafter, emerging as the world's largest Bitcoin exchange. ............................................ 3

    B. Defendants' Terms of Use expressly represent and warrant that Defendants will keep each exchange member's Fiat Currency and bitcoins in the member's account, in the member's name, and on the member's behalf. ................................ 5

    C. February 7-23, 2014: Mt. Gox reveals the loss of hundreds of thousands of bitcoins and tens of millions of dollars of Fiat Currency, blaming, interchangeably, a hack, a theft, a technical issue it termed "transaction malleability," and other potential causes. ............................................................ 5

    D. February 24, 2014: Mt. Gox "goes dark," and Plaintiff Greene files the instant class action three days later, seeking a return of his and the Classes' Fiat Currency and bitcoins, an accounting, and damages. ...................................... 6

    E. February 28, 2014: Mt. Gox KK declares bankruptcy in Japan and files an "emergency" motion for Chapter 15 recognition in Dallas, Texas, together with a declaration from Mark Karpeles. .......................................... 7

    F. On March 11, 2014, the Court grants a TRO freezing the U.S. assets of MtGox Inc., Tibanne KK, and Mark Karpeles, and allows for expedited discovery against Defendants. ................................................................. 8

    G. In accordance with the TRO, Plaintiff issues discovery related to Mt. Gox's U.S. assets to Defendants and third parties that include bitcoin mining pools and hardware sellers. .................................................................................. 9

    H. Greene files his Corrected First Amended Complaint, naming Mizuho Bank, Ltd. and additional defendants, adding Joseph Lack as a named Plaintiff, and including claims for breach of express trust and other causes of action. .................. 10

    I. At the status conference on March 20, 2014, the Court extends the TRO to April 8, 2014 at 11:30 a.m. and grants partial relief from the TRO to allow limited tracing of Defendants' assets. ................................................................... 11

    J. Hours after the March 20, 2014 status, Mt. Gox announces its "discovery" of 200,000 bitcoins—valued between $90,000,000 and $110,000,000 USD. .................... 11

i

K. On March 27, 2014, the Court holds a further status conference at which Mizuho's counsel appears and after which Plaintiffs move to "extend" the TRO against Mr. Karpeles, Tibanne KK, and Mt. Gox Inc. ....................................................................12

L. On April 4, 2014, Karpeles and Tibanne KK appear and, three days later, this Court holds a status and motion hearing, wherein Plaintiffs' Motion to Extend the TRO is granted. ........................................................................................................13

M. As explained in the Expert Report of Emin Gün Sirer, none of the Defendants' explanations for what caused the loss of bitcoins or Fiat Currency are plausible in the absence of fraud or gross negligence. ...............................................................13

III. ARGUMENT ........................................................................................................................14

A. The Court Should Enter a Preliminary Injunction Barring the Mt. Gox Defendants from Dissipating Any Assets Held in the United States. .........................15

1. Plaintiffs' claims are likely to succeed on the merits .............................................16

a. The evidence shows that Plaintiffs can prove the elements of their breach of express trust claims ..................................................................................17

b. Plaintiffs are further likely to prevail against the Mt. Gox Defendants on their claims for breach of fiduciary duty. .......................................................19

c. Plaintiffs are likely to succeed on their claims alleging that the Mt. Gox Defendants violated consumer fraud statutes, including the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 et seq., and the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ................20

d. Plaintiffs' claims for common law fraud are likely to succeed. ............................23

e. Plaintiffs have a high likelihood of success on their claim for an accounting. .....24

f. Plaintiffs' breach of contract claim has a high likelihood of success. .................25

g. Plaintiffs will also succeed on their claim for negligence. ...................................27

h. Plaintiffs can readily meet each of the required elements for conversion and—in the alternative—trespass to chattels. .......................................................28

i. Plaintiffs also have a likelihood of prevailing on their claim for unjust enrichment...............................................................................................................29

2. As was the case with respect to the TRO, Plaintiffs and the putative Class members have no adequate remedy at law.............................................................29

      **3.**   **The harm to the class of not extending the preliminary injunctive relief far outweighs any theoretical harm to Defendants.**......................................................31

      **4.**   **The public interest continues to support preliminary injunctive relief.** ..............32

**B.**  **To the Extent it is Necessary to Avoid Operation of the One-Way Intervention Rule, The Court Should Provisionally Certify the Classes.** ............................................33

**C.**  **The Court Should Also Extend Its Prior Order Allowing Expedited Discovery**........33

**IV.**  **CONCLUSION** ................................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**UNITED STATES SUPREME COURT CASES**

*Deckert v. Independence Shares* Corp., 311 U.S. 282 (1940) ......................................30

**UNITED STATES COURT OF APPEALS CASES**

*Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992) ................................15

*Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841 (7th Cir. 2007) ...........25

*Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940 (7th Cir. 2006) ............15

*Cleary v. Philip Morris Inc.*, 656 F.3d 511 (7th Cir. 2011).........................................29

*CSC Holdings, Inc. v. Redisi*, 309 F.3d 988 (7th Cir. 2002)........................................30

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*,
549 F.3d 1079 (7th Cir. 2008) .......................................................................16

*Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439 (7th Cir. 2009) ................................27

*Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013) .........................................................16

*In re Focus Media Inc.*, 387 F.3d 1077 (9th Cir. 2004).............................................30

*In re McGee*, 353 F.3d 537 (7th Cir. 2003) .........................................................17, 19

*Kennedy Bldg. Assocs. v. CBS Corp.*, 476 F.3d 530 (8th Cir. 2007) ..........................30

*Lambert v. Buss*, 498 F.3d 446 (7th Cir. 2007)...........................................................15

*Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*,
699 F.3d 962 (7th Cir. 2012) .......................................................................16

*Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir. 1984) .......30

*Siegel v. Shell Oil Co.*, 612 F.3d 932 (7th Cir. 2010) .................................................20

*Tanimura & Antle, Inc., v. Packed Fresh Produce, Inc.*, 222 F.3d 132 (3d Cir. 2000)................30

*Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891 (7th Cir. 2001)...........................................32

*United States ex rel Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489 (4th Cir. 1999) ..............30

iv

*Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012)............................................20, 25

**UNITED STATES DISTRICT COURT CASES**

*3Com Corp. v. Electronics Recovery Specialists, Inc.*, 104 F. Supp. 2d 932 (N.D. Ill. 2000) .....24

*Bernina of America, Inc. v. Fashion Fabrics Int'l, Inc.*,
    01 C 585, 2001 WL 128164 (N.D. Ill. Feb. 9, 2001)....................................................................15

*G.M. Sign, Inc. v. Stergo*, 681 F. Supp. 2d 929 (N.D. Ill. 2009) ........................................................28

*Gray v. Orr*, 13 C 8449, 2013 WL 6355918 (N.D. Ill. Dec. 5, 2013) ...........................................15

*H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*,
    No. 2:11- CV-00742, 2011 WL 4368418 (E.D. Wis. Sept. 19, 2011) ...................................15

*In re Destron, Inc.*, 40 B.R. 927 (Bankr. N.D. Ill. 1984).................................................................18

*In re Donlevy*, 342 B.R. 774 (Bankr. N.D. Ill. 2006) ........................................................17, 18, 19

*In re Edgewater Med. Ctr.*, 344 B.R. 864 (Bankr. N.D. Ill. 2006).................................................19

*In re McCook Metals, L.L.C.*, 07 C 0621, 2007 WL 1687262 (N.D. Ill. June 7, 2007) ...............19

*In re Pawlinski*, 170 B.R. 380 (Bankr. N.D. Ill. 1994)..........................................................18, 19

*Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988 (N.D. Ill. 2001)...........................................15

*Minuti v. Johnson*, 02 C 4551, 2003 WL 260705 (N.D. Ill. Feb. 5, 2003)....................................28

*Nelson v. Sotheby's Inc.*, 115 F. Supp. 2d 925 (N.D. Ill. 2000)......................................................28

*Travelers Cas. & Sur. Co. v. Wells Fargo Bank, NA*, 3:09 CV 501 PPS,
    2009 WL 4881079 (N.D. Ind. Dec. 9, 2009) ...................................................................16, 30

**STATE COURT CASES**

*Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428 (1989).....................................24

*Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482 (1996).........................................................24

*General Motors Corp. v. Douglass*, 206 Ill. App. 3d 881 (1st Dist. 1990) ...................................28

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145 (1989) .........................29

*Mann v. Kemper Financial Companies, Inc.*, 247 Ill. App. 3d 966 (1st Dist. 1992)....................24

*Neade v. Portes*, 193 Ill. 2d 433 (2000)......................................................................19

*People ex rel. Hartigan v. Candy Club*, 149 Ill. App. 3d 498 (1st Dist. 1986) ...........................25

## RULES AND REGULATIONS

Fed. R. Civ. P. 23...........................................................................................................33

Fed R. Civ. P. 36.............................................................................................................9

Fed. R. Civ. P. 65..........................................................................................................15

Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 *et seq.* ..............20

California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200. ........................................20

I.      **INTRODUCTION**

In the 28 days following this Court's granting of Plaintiff's Motion for a Temporary

Restraining Order ("TRO") (Dkt. 31), Plaintiffs Gregory Greene and Joseph Lack ("Plaintiffs")

have uncovered meaningful information related to Defendants' assets, their global operations,

and their catastrophic loss of the putative Class members' bitcoins[1] and Fiat Currency[2]. Based

upon substantial facts gathered to date—through the sworn statements of Mark Karpeles himself,

Plaintiffs' expedited discovery, the declarations of putative Class members, the Expert Report of

Cornell Professor Emin Gün Sirer, and Plaintiffs' private investigators—the evidence of record

firmly supports the entry of an order for a preliminary injunction.

Indeed, the facts plainly demonstrate that Plaintiffs enjoy a very high likelihood of

success on all of their claims—particularly those for breach of express trust, breach of fiduciary

duty, fraud, conversion, negligence, for an accounting, and for unjust enrichment—that Class

members will suffer irreparable harm if Defendants Mark Karpeles, Tibanne KK, Mt. Gox Inc.,

Mt. Gox North America, Inc., and Gonzague Gay-Bouchery ("Mt. Gox Defendants" or

"Defendants") are allowed to dissipate whatever assets remain in the United States, that the

balance of harms weighs against Defendants, and that maintaining the asset freeze and expedited

discovery serves the public interest.

Specifically, the evidence Plaintiffs have marshaled to date shows that:

•      Defendants expressly "represented and warrant[ed]" to Plaintiffs and every other
exchange member that they would keep their bitcoins and Fiat Currency in each
member's account, in [each] member's name, and on [each] member's behalf.
(Mt. Gox Terms of Use, Exhibit ("Ex.") 1 at 3.)[3] In material breach of these

---

[1]      For the sake of clarity, "Bitcoin" refers to the digital currency and "bitcoin" (with a lower case
"b") refers to individual unit of the currency itself.
[2]      Fiat Currency refers to money issued by a government (i.e., U.S. dollars).
[3]      All referenced exhibits are attached to the Declaration of Steven Woodrow ("Woodrow Decl."),
filed contemporaneously with this Motion.

warranties, Defendants admit that Mt. Gox, under their exclusive control, either lost or stole hundreds of thousands of bitcoins and tens of millions of dollars.

- Mark Karpeles was a micro-manager. In addition to designing Mt. Gox's back-end coding for the Mt. Gox exchange,[4] he was the only person with access to Mt. Gox's bank accounts, and approved withdrawal requests manually.[5] Employees suspected that Karpeles was commingling company funds with customer deposits, and that customer assets were being used to cover expenses as early as 2012.[6]

- In late February 2014, the exchange suffered a catastrophic collapse. According to Karpeles's declaration submitted in support of the Chapter 15 Bankruptcy petition on February 24, 2014, the exchange "suspended all trading after internal investigations discovered a loss of 744,408 bitcoins." (Declaration of Mark Karpeles ("Karpeles Decl."), Ex. 2 ¶ 9.) Mt. Gox KK's Japanese bankruptcy application further states that on February 24 "it was found" that Mt. Gox's bank accounts at Mizuho Bank Ltd.[7] and others contained a "large shortfall of deposit balances," of around ¥2.8 billion ($27,011,600 USD). (Civil Rehabilitation Proceeding Commencement Application "Commencement Application"), Ex. 3, Sec. 9.1(4) at 9.)

- Karpeles further avers that "as of the present time I believe [the losses or theft were] caused or related to a defect or 'bug' in the bitcoin software algorithm, which was exploited by one or more persons who had 'hacked' the bitcoin network." (Karpeles Decl. ¶ 9.) But as explained in the Expert Report of Emin Gün Sirer, Karpeles's explanations are implausible and fail to account for the missing bitcoins or money. (*See generally* Expert Report of Emin Gün Sirer ("Sirer Report"), Ex. 4.)

- In response to Plaintiff Greene's Complaint and Motion for TRO, this Court froze the U.S. assets of Mt. Gox, Inc., Tibanne KK, and Mark Karpeles. In violation of this Order, someone is using IP addresses owned by Tibanne KK to mine bitcoins in the United States, and is transferring those bitcoins into bitcoin wallets controlled by Karpeles. (Declaration of Steven L. Woodrow ("Woodrow Decl." ¶ 28.)

---

[4]     Robert McMillan, "The Inside Story of Mt. Gox, Bitcoin's $460 Million Disaster," Ex. 5.
[5]     Sophie Knight and Nathan Layne, "Mt. Gox Faced Questions on Handling Client Cash Long Before Bankruptcy Crisis," Ex. 6.
[6]     *Id.*
[7]     Apart from any obligations to freeze any of the other Defendants' U.S. assets and engage in discovery, no relief is sought from Defendants Mizuho Bank, Ltd. or Jed McCaleb by way of this motion. Likewise, because the Court has accepted the Northern District of Texas's provisional stay with respect to the debtor, Mt. Gox KK, no relief herein is presently sought against Mt. Gox KK.

- Karpeles now claims that he has "found" over 200,000 bitcoins (valued at over $110,000,000 USD) in what he has described as "older-format" Bitcoin wallets.[8] Karpeles insists that he notified his attorneys at Baker & McKenzie LLP of this discovery on March 7, 2014 (Woodrow Decl. ¶ 29), but his lawyers failed to so apprise the bankruptcy court in the Northern District of Texas during its March 10, 2014 hearing, or this Court during its March 11, 2014 TRO hearing, (*id.* ¶ 30).

- Mt. Gox still cannot account for 600,000 missing bitcoins and $27,011,600 USD worth of Fiat Currency. Defendants have also ignored Plaintiffs' document requests, interrogatories, deposition notices, and requests for admission. (*Id.* ¶¶ 12, 31.)

- Mt. Gox has allowed consumers to enter account information at www.mtgox.com to check what Mt. Gox claims is its most up-to-date data regarding member bitcoin and Fiat holdings, but the data is incomplete and doesn't account for substantial amounts that Defendants continued to allow to be transferred *into* the exchange throughout January and February of 2014. (*See, e.g.*, Declaration of Jose Fernandez ("Fernandez Decl."), Ex. 7 ¶¶ 3, 12–13.)

These facts show that, at best, Defendants operated Mt. Gox with such a degree of gross incompetence that they were capable of simply "misplacing" and re-finding bitcoins worth between $90,000,000 and $110,000,000 USD in an "older format wallet" and, at worst, that Defendants ran an overtly fraudulent enterprise—misleading exchange members and actively misappropriating their bitcoins and currency. As such, and because the evidence against Defendants since the TRO has only grown more damning, the Court should convert the TRO into a preliminary injunction.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Bitcoin is introduced in 2008 and Mt. Gox erupts with success soon thereafter, emerging as the world's largest Bitcoin exchange.

Bitcoin represents a new digital commodity[9] that functions as a payment system. Bitcoins are created by a complex computer protocol introduced in 2008 by someone known as Satoshi

---

[8]    Catherine Shu, "Mt.Gox Finds 200,000 Bitcoin in an "Old-Format" Digital Wallet." (Woodrow Decl. ¶ 60.)

[9]    On March 25, 2014, the Internal Revenue Service announced that bitcoins are to be treated as property, not as currency, for tax purposes. (*See* Richard Rubin and Carter Dougherty, "Bitcoin is Property, Not Currency, in Tax System: IRS." (Woodrow Decl. ¶ 61).)

Nakamoto.[10] Persons who link their computers to the Bitcoin Network by installing and running the network software are able to "mine" bitcoins by having the computers solve complex algorithms. The system is designed so that the computer that "solves" the next problem is rewarded with the next "block" of bitcoins.[11] Whereas in the past someone with a standard computer could mine bitcoins, given the increasing complexity of the algorithms and the vast number of miners, Bitcoin mining today requires expensive hardware.[12]

In addition to mining, bitcoins may be acquired through "exchanges"—online marketplaces where they can be bought, sold, or traded. Whether mined or acquired through an exchange, all bitcoin transactions are posted on a public ledger known as the "Block Chain." (Woodrow Decl. ¶ 29.)

Launched in 2011, Mt. Gox boasted that at one time it operated the "world's most established Bitcoin exchange," handling "over 80% of all Bitcoin trade" worldwide. (Mt. Gox Landing Page ("Landing Page"), Ex. 8; Corrected First Amended Complaint ("FAC") ¶ 24.) Mt. Gox charged a .6% commission on trades (with discounts for larger orders) and was believed to have significant revenues.[13] By 2013, Mt. Gox was handling millions of dollars worth of Bitcoin transactions daily and holding hundreds of millions of dollars worth of member bitcoins and Fiat Currency.[14]

---

[10]     See Matthew Sparkes, "Who is the Reclusive Billionaire Creator of Bitcoin?" (Woodrow Decl. ¶ 62.)

[11]     Kate Cox, "Bitcoin: What the Heck is it, and How Does it Work?" (Woodrow Decl. ¶ 73). Newly mined blocks currently contain 25 bitcoins, though the Bitcoin system was designed to dwindle exponentially over time. Whenever bitcoins are actively mined, the algorithms necessary to produce them become harder to solve, and bitcoins are therefore harder to mine. In total, only 21 million bitcoins will ever be "created," and the final bitcoin is set to be mined in the year 2140. There are currently about 12.4 million bitcoins in the world.

[12]     As explained below, such computers are offered for sale by Butterfly Labs, one of the third-party respondents of the expedited discovery that has been permitted in this case.

[13]     See Mt. Gox Fee Schedule, (Ex. 24.).

[14]     Sophie Knight and Nathan Layne, "Exclusive: Mt. Gox Faced Questions on Handling Client Cash Long Before Crisis," Ex. 6.

     **B.    Defendants' Terms of Use expressly represent and warrant that Defendants will keep each exchange member's Fiat Currency and bitcoins in the member's account, in the member's name, and on the member's behalf.**

To use the exchange, members were required to register for an account at www.mtgox.com. (FAC ¶ 26.) As part of the process, members would agree to Mt. Gox's "Terms of Use," under which Mt. Gox expressly "represents and warrants that . . . it will hold all monetary sums and all Bitcoins deposited by each Member in its Account, in that Member's name as registered in their Account details, and on such Member's behalf." (Mt. Gox Terms of Use, Ex. 1 at 3.) Following registration, members could trade Bitcoins using Mt. Gox's online trading platform and could "store Bitcoins in a virtual 'vault' for safe keeping." (FAC ¶ 25.) Mt. Gox further represented on its website that members could "quickly and securely trade bitcoins with other people around the world with [their] local currency" and that its website would "always [be] on" so members could "[b]uy and sell Bitcoin 24/7/365 with the world's most sophisticated trading platform." (*Id*.) The Terms of Use further promised that trading could be done "at any time." (Terms of Use at 3.)

     **C.    February 7-23, 2014: Mt. Gox reveals the loss of hundreds of thousands of bitcoins and tens of millions of dollars of Fiat Currency—blaming, interchangeably, a hack, a theft, a technical issue it termed "transaction malleability," and other potential causes.**

In late 2013, users began reporting delays in getting their bitcoins out of Mt. Gox.[15] The issues persisted and, on February 4, 2014, Mt. Gox indicated through its online Support Desk that it was "currently experiencing a problem where some bitcoin withdrawals are not being transferred correctly, affecting a limited number of users." (*See* "Support Desk Updates," Ex. 9.) On February 7, 2014, Mt. Gox announced that "[i]n order for our team to resolve the withdrawal

---

[15]    There had been prior delays with respect to international withdrawals of Fiat Currency for various stated reasons. These new delays concerned even the withdrawal or transfer of Bitcoin. (Woodrow Decl. ¶ 32.)

issue it is necessary for a temporarily [*sic*] pause on all withdrawal requests…" and that "[a]ll bitcoin withdrawal requires will be on pause, and the withdrawals in the system will be returned to your MtGox wallet and can be reinitiated once the issue is resolved." (*Id*.)

On February 10, 2014, the Support Desk stated that Mt. Gox had detected "unusual activity" with respect to its Bitcoin wallets and had been investigating a technical issue it called "transaction malleability." Mt. Gox assured its members that "MtGox will resume bitcoin withdrawals to outside wallets once the issue" had been addressed. (*Id*.) On February 15 or 17, 2014, Mt. Gox announced that it was "going to have a 6-hour downtime" on deposits, and that it would be "doing extensive testing before bitcoin withdrawals are reactivated." (*Id*.) On February 17, 2014, the Support Desk stated: "we have now implemented a solution that should enable withdrawals" and that "Mt. Gox should be able to resume withdrawals soon." (*Id*.) On February 20, 2014, Mt. Gox announced that it had moved offices and that the move and technical challenges had "pushed back [its] progress" but that "[it was] working on re-initiating bitcoin withdrawals." (*Id*.)

On February 23, 2014, Mt. Gox resigned from the board of the Bitcoin Foundation, the industry's lobbying group, and took down all posts from the company's Twitter feed.[16]

**D.    February 24, 2014: Mt. Gox "goes dark," and Plaintiff Greene files the instant class action three days later, seeking a return of his and the Classes' Fiat Currency and bitcoins, an accounting, and damages.**

On February 24, 2014, Mt. Gox suspended all trading entirely, and the exchange website "went dark" a few hours later—returning nothing but a blank page. Rumors swirled on the

---

[16]    *See* Rob Wile, "MtGox Resigns From Bitcoin Foundation, Deletes All Tweets From Twitter Feed," (Woodrow Decl. ¶ 65).

Internet that Mt. Gox had lost over 850,000 bitcoins—valued at over $450 million.[17] The next

day, a message on the Mt. Gox website notified members that a "decision was taken to close all

transactions for the time being."[18]

Two days later, Plaintiff Greene filed the instant lawsuit alleging claims against Mark

Karpeles, Mt. Gox KK, and its parent company, Tibanne KK, for consumer and common law

fraud, negligence, breach of fiduciary duty, breach of contract, unjust enrichment/restitution,

trespass to chattels and conversion, and sought a TRO, preliminary injunction, permanent

injunction, an accounting, and a constructive trust over the Class Members' property. (Dkt. 1.)[19]

E.      **February 28, 2014: Mt. Gox KK declares bankruptcy in Japan and files an
        "emergency" motion for Chapter 15 recognition in Dallas, Texas, together
        with a declaration from Mark Karpeles.**

On February 28, 2014, the day after the instant lawsuit was filed, Mt. Gox KK (a/k/a Mt.

Gox Co. Ltd.) filed a Civil Rehabilitation Proceeding Commencement Application in Japan.

(Commencement Application, Ex. 3.) A translation of the Application shows that Karpeles

claims that a "bug" called "transaction malleability," known by Mt. Gox since "May 2011,"

caused a loss of approximately 750,000 user bitcoins and 100,000 bitcoins owned by Mt. Gox

itself. (*Id*. at 8–9.) The Application also states that on February 24, 2014 "it was found that there

was a large discrepancy in the total of deposit balances at those financial institutions which

managed said deposits compared to the total amount actually deposited by users and that there

was a large shortfall of deposit balances" approximating ¥2.8 billion ($27.1 million). (*Id*. at 9.)

---

[17]     *See* Chris O'Brien, "Mt. Gox files for bankruptcy as 850,000 bitcoins go missing," (Woodrow
Decl. ¶ 66); *see also* Nathaniel Popper and Rachel Abrams, "Apparent Theft at Mt. Gox Shakes Bitcoin
World," (Woodrow Decl. ¶ 67). Such amounts constituted approximately 7% of all bitcoins in existence.
[18]     *See* Adrian Lowery, "Is it the beginning of the end for Bitcoin? Virtual currency in turmoil as
rumoured $375m theft closes major exchange," (Woodrow Decl. ¶ 68).
[19]     For a detailed description of Plaintiff Greene's facts, see Declaration of Gregory Greene ("Greene
Decl."), Ex. 11.

The Application also states that Mt. Gox has ¥6.4 billion ($63.9 million) in liabilities and ¥3.8 billion ($36.65 million) in assets. (*Id*. at 10.)

Plaintiff Greene filed his motion for a TRO on March 4, 2014, seeking, *inter alia*, a freeze of Mt. Gox's U.S. assets, an accounting, and expedited discovery. (Dkt. 8.) In response, in Japan on March 10, 2014, Karpeles sought (and received) appointment as the Foreign Representative of the debtor, arguing that an asset freeze in the U.S. "may have a negative impact on the progress of this civil rehabilitation." (*See* Application for Consent of Supervisor, Ex. 10, at 5.) Karpeles told the Japanese Court that, "the US assets of the rehabilitation debtor consist mainly of cash deposits" seized by the Department of Homeland Security. (*Id*.)

Later that day in the United States, Mt. Gox filed an "emergency" Chapter 15 Petition in the Bankruptcy Court for the Northern District of Texas[20], and obtained a provisional stay of all litigation against it. (*See* NO. 14-31229-sgj15 (Bankr. N.D. Tex.); *see also* Karpeles Decl.) In his declaration filed in support, Karpeles again blamed a "defect or 'bug' in the bitcoin software algorithm, which was exploited by" persons who "had hacked the bitcoin network" for the loss of 744,408 bitcoins. (Karpeles Decl. ¶ 9.) Mt. Gox KK's attorneys at Baker & McKenzie LLP (the same firm representing Mt. Gox in Japan) also asked the Texas court to stay litigation pending against the non-debtor defendants, but the bankruptcy court denied that request.

F.     **On March 11, 2014 the Court grants a TRO freezing the U.S. assets of MtGox Inc., Tibanne KK, and Mark Karpeles, and allows for expedited discovery against Defendants.**

The next day, on March 11, 2014, this Court held a hearing on Plaintiff Greene's motion for a TRO. Although attorneys from Baker & McKenzie LLP appeared on behalf of the debtor

---

[20]     Notably, and contrary to his own sworn assertions made mere hours earlier to the Japanese Court, the Chapter 15 filings claimed that Mt. Gox's primary assets in the United States consisted of "servers" located somewhere in or near the Dallas area. (Woodrow Decl. ¶ 33.) As venue in a Chapter 15 is dependent upon the location of the debtor's main assets, this about-face with respect to the assets appears to have been little more than naked forum shopping.

(Mt. Gox KK), no one appeared on behalf of Tibanne KK, Mt. Gox Inc., or Mr. Karpeles personally. (March 11, 2014 Hearing Transcript ("TRO Hr'g Tr."), Ex. 12, 4:10–18.) Notwithstanding their restricted appearance, Mt. Gox KK's attorneys argued that the bankruptcy stay should be extended to the non-debtor defendants as well.

After considering the arguments and papers, the Court entered an order granting the TRO with respect to the non-debtors and entered a stay of all proceedings against Mt. Gox KK. (Dkt. 33.) In doing so, the Court found that, for the limited purposes of the TRO (i.e., "because the factual predicate [underlying the Court's findings] is almost certainly going to change") (TRO Hr'g Tr, 24:24 – 25:9), Plaintiff had shown that he was likely to succeed on the merits of at least some of his claims, including for an accounting, conversion, and fraud, and that the other requirements of a TRO had been met. (Dkt. 33.) The Court also granted leave to conduct expedited discovery into the Defendants' U.S. assets. (*Id.*)

### G. In accordance with the TRO, Plaintiff issues discovery related to Mt. Gox's U.S. assets to Defendants and third parties that include bitcoin mining pools and hardware sellers.

Following the issuance of the TRO, Plaintiffs' lawyers propounded written discovery— including interrogatories, requests for production, and requests for admission—on all Defendants (except for Mt. Gox KK), seeking information about their U.S. assets. (Woodrow Decl. ¶¶ 2-11.) Plaintiffs also propounded notices of depositions. (*Id.*)  None of the defendants has answered any of the discovery or appeared for any scheduled deposition, despite the fact that this Court required answers on an expedited basis.[21] (Woodrow Decl. ¶ 12.)

---

[21]     Although Plaintiffs served requests to admit on all Defendants pursuant to the TRO, they do not seek to have those as-of-now unanswered requests be deemed admitted at this time and in conjunction with this filing. That said, Plaintiffs reserve all rights to seek those admissions after a more complete response time for the requests has lapsed (i.e., after 30-days, per Fed. R. Civ. P. 36(a)(3)).

Plaintiffs' counsel also served several third parties with subpoenas, including Butterfly Labs, a manufacturer or distributor of bitcoin mining equipment—the supercomputers used in present-day bitcoin mining. Plaintiffs have been informed of several purchases by Karpeles and are in the process of receiving relevant information.

Plaintiffs also served subpoenas on Luke Dashjr and Jason Hughes, the operators of a bitcoin mining pool known as Eligius. (*Id.* ¶ 3.) Using a bitcoin wallet traced directly to Tibanne KK, Plaintiffs' counsel has uncovered certain bitcoin mining activities conducted by Karpeles or others associated with Tibanne KK. (*Id.* ¶ 28.) Further, Plaintiffs have learned that these mined bitcoins are being moved outside of Eligius and are being transferred into wallet addresses owned and controlled by Mt. Gox. Plaintiffs continue to track these bitcoins. (*Id.* ¶¶ 20-29.) Additionally, Tibanne KK or one of its other subsidiaries contracted with Eligius to provide web/data hosting services and private servers. Further discovery is needed to fully identify such activities and assets.

>   **H.    Greene files his Corrected First Amended Complaint, naming Mizuho Bank, Ltd. and additional defendants, adding Joseph Lack as a named Plaintiff, and including claims for breach of express trust and other causes of action.**

On March 14, 2014, Plaintiff filed a First Amended Complaint (Dkt. 36) naming Mizuho Bank, Ltd. ("Mizuho"), Jed McCaleb, Mt. Gox North America, Inc. ("Mt. Gox NA"), and Gonzague Gay-Bouchery as defendants, and adding Joseph Lack as a Plaintiff. Mizuho is a Japanese bank that was used by Mt. Gox to facilitate member transactions through the exchange. Reports indicate that Mr. Karpeles had sole access to his and the companies' Mizuho accounts[22] and that Mizuho had previously sought to close at least some of them. Despite this, Mizuho continued to process transfers into the exchange. In late January 2014, Plaintiff Lack transferred

---

[22]    Sophie Knight and Nathan Layne, "Mt. Gox Faced Questions on Handling Client Cash Long Before Bankruptcy Crisis," Ex. 6.

$40,000 into Mt. Gox by transmitting the funds from his bank account to Mizuho, who has claimed it sent the money on to Mt. Gox—but Mt. Gox has no record of it.[23]

On March 15, 2014 Mt. Gox's lawyers sent an email to Plaintiffs' counsel asserting that the First Amended Complaint violated the automatic stay because it did not expressly state that a provisional stay had been entered as to Mt. Gox KK. Later that day, Plaintiffs filed a Corrected First Amended Complaint, curing that issue and adding additional factual support. (Dkt. 37.)

> **I.    At the status conference on March 20, 2014, the Court extends the TRO to April 8, 2014 at 11:30 a.m. and grants partial relief from the TRO to allow limited tracing of Defendants' assets.**

The Court held a status following the entry of the TRO on March 20, 2014, during which Plaintiffs' counsel updated the Court as to service, discovery, and Plaintiffs' investigation.[24] (Woodrow Decl. ¶ 17.) Mt. Gox chose not to attend. (*Id.*) Plaintiffs' counsel further apprised the Court that minimal assets in the United States had been located and that, given their nature, Plaintiffs needed partial relief from the TRO so that a third party could allow such assets to be traced. (*Id.* at ¶ 18.) The Court granted this partial relief and, since then, Plaintiffs have traced the movement of bitcoins by someone associated with Tibanne KK out of the United States—in violation of the TRO freezing Tibanne KK's U.S. assets. (*Id.* at ¶¶ 28-29.)

> **J.    Hours after the March 20, 2014 status, Mt. Gox announces its "discovery" of 200,000 bitcoins—valued between $90,000,000 and $110,000,000 USD.**

Just hours following the March 20, 2014 status hearing, Mt. Gox, through Karpeles, posted a message on Mt. Gox's website announcing that "on March 7, 2014, MtGox Co., Ltd. confirmed that an old-format wallet which was used prior to June 2011 [...]"and which, MtGox

---

[23]    For a further description of facts pertinent to Plaintiff Lack, *see* Declaration of Joseph Lack ("Lack Decl."), Ex. 13. Although the Mt. Gox website presently allows users to check their Bitcoin and Fiat balances, Lack's shows that he has nothing in the exchange.

[24]    Plaintiffs' counsel further apprised the Court that Plaintiffs' professional asset investigators had been unable to locate any "hard" assets at that time (real property, boats, cars etc.) but that the search continued with respect to Defendants' accounts.

thought, no longer held any bitcoins"]…held a balance of approximately 200,000 BTC (199,999.99 BTC)."[25] Curiously, despite Karpeles's own admission that he discovered these substantial assets on March 7, 2014 (and his assertion that he informed the Japanese Court of their existence on March 10, 2014), his declaration filed in support of the Chapter 15 petition on March 10, 2014 failed to mention this substantial discovery at all. (*See* No. 14-31229-sgj15 (Bankr. N.D. Tex. (Dkt. 7.)) Likewise, his attorneys failed to make *any* mention of this find—worth between $90 million and $110 million USD—during their appearance before this Court on March 11, 2014—despite the fact that their partners in Japan (and their client) had supposedly known of the discovery for at least several days.[26]

### K. On March 27, 2014 the Court holds a further status conference where Mizuho's counsel appears and after which Plaintiffs move to "extend" the TRO against Mr. Karpeles, Tibanne KK, and Mt. Gox Inc.

The Court held a further status conference on March 27, 2014, at which counsel for Plaintiffs as well as for Mizuho appeared. (Woodrow Decl. ¶ 20.)  Plaintiffs' counsel informed the Court about the status of their ongoing investigation and their intention to eventually move for default judgments and class certification against any non-appearing Defendants.[27] (*Id.* ¶ 20.) Mizuho's counsel, for his part, denied that Mizuho was liable to the putative Class members. (*Id.*) Plaintiffs' counsel explained that the allegations against Mizuho center on its facilitation of transfers into Mt.Gox even after it knew that the exchange was insolvent and in beach of its customers' agreements. (*Id.*) The Court set another status on the TRO for April 7, 2014 and

---

[25]     (*See* "March 20, 2014 Announcement," Ex. 14.) As the present-day value of a bitcoin equals approximately $454.20 (USD) the 200,000 bitcoins are currently worth $90,840,000 USD. (*See* http://wwwpreev.com, (Woodrow Decl. ¶ 75).)

[26]     Plaintiffs have also uncovered evidence undercutting Karpeles's assertion that the "old-format wallets" had been used only prior to June 2011. The wallets holding such bitcoins were used throughout 2012 and 2013. (Woodrow Decl. ¶ 29.)

[27]     Plaintiff also informed the Court during the hearing that Plaintiffs' professional asset search service had been unable to locate any bank accounts held by the Defendants or their related entities. (Woodrow Decl. ¶ 21.)

raised a question as to whether the TRO could be extended a second time, past April 8, 2014 at 11:30 am. (*Id.* ¶ 22.) Plaintiffs' counsel informed the Court that Plaintiffs intended to move for a preliminary injunction, (*id.*), and, in anticipation of that motion, filed a motion to "extend" the TRO pursuant to *H-D Michigan, LLC v. Hellenic Duty Free Shops, S.A.*, 694 F.3d 827 (7th Cir. 2012), while the preliminary injunction motion is briefed and decided.

**L.      On April 4, 2014, Karpeles and Tibanne KK appear and, three days later, this Court holds a status and motion hearing, wherein Plaintiffs' Motion to Extend the TRO is granted.**

On April 4, 2014, attorneys from the law firm of Novack & Macey LLP appeared on behalf of Mr. Karpeles and Tibanne KK and, through communications with Plaintiffs' counsel, indicated their intent to contest jurisdiction and service. (*Id.* ¶ 23.) Eric Macey and Amanda Hinkley appeared for Karpeles and Tibanne KK at the April 7, 2014, status and hearing and indicated their intent to file Rule 12 papers contesting jurisdiction and service but otherwise refused to comment upon Plaintiffs' motion to extend the TRO—even after Plaintiffs' counsel offered to, on the record, stipulate to the non-waiver of jurisdictional objections. (*Id.* ¶¶ 24-25.)

At that same hearing, the Court granted Plaintiffs' motion to "extend" the TRO against Mr. Karpeles, Tibanne KK, and Mt. Gox Inc.—i.e., by converting the TRO into a preliminary injunction during the pendency of this Motion. (*Id.* ¶ 26.) Plaintiffs' counsel also explained that they will be filing a Motion for Alternative Service Under Federal Rule 4(f)(3) to serve Karpeles and Tibanne KK through their counsel at Novak and Macey LLP, (*Id.* ¶ 27; Dkt. 54).

**M.      As explained in the Expert Report of Emin Gün Sirer, none of the Defendants' explanations for what caused the loss of bitcoins or Fiat Currency are plausible in the absence of fraud or gross negligence.**

In addition to the other evidence of record obtained to date, Plaintiffs have also engaged an expert to help explain what likely happened at Mt. Gox that led to the disastrous loss of Class

Members' bitcoins and Fiat Currency. Emin Gün Sirer is an expert in distributed systems and virtual currencies, and a professor at Cornell University with substantial experience in crypto-currencies, including Bitcoin.[28] In his report, Dr. Sirer explains that Mt. Gox's excuses for what caused it to lose hundreds of millions of dollars' worth of bitcoins and Fiat Currency are either refuted by available evidence or suggestive of gross incompetence. (Sirer Report at § I.)

Dr. Sirer explains that "transaction malleability"—a computing glitch where someone could claim they didn't get paid their bitcoins and, by virtue of a re-issue of the transaction, essentially get paid twice—could not have possibly lead to such a large number of losses. (*Id*. ¶¶ 4–11 .) Dr. Sirer also explains that, after an investigation of modified transactions on the Bitcoin network, the volume of modified transactions (i.e., "transaction malleability") at most could account for 7,281.58 missing bitcoins. (*Id*. ¶¶ 17–19). Moreover, and critically, Dr. Sirer explains that "It should be evident that absolutely no technical issue pertaining to the Bitcoin protocol can account for the loss of cash balances" of ¥2.8 billion ($27.1 million) that belonged to members. (*Id*. ¶ 24.) As a result, Dr. Sirer concludes that the preponderance of the evidence "points to either severe incompetence at Mt. Gox and/or theft with the aid of an insider." (*Id*. at § I.)

Based on these facts of record—which only bolster the factual record this Court deemed sufficient for both the entry of a TRO and a conversion of that TRO into an interim preliminary injunction—this Court should have little trouble granting a preliminary injunction.

## III.    ARGUMENT

This Court should enter a preliminary injunction—the exact same relief provided by the TRO already entered in this case, which was granted on less substantial evidence—barring Mt.

---

[28]      Notably, on April 6, 2014, Karpeles chatted online—under his IRC handle "MagicalTux"—about both this case and his plans for re-opening the Mt. Gox exchange. With respect to the reopening, Karpeles expressed a need for "having a third party certifying everything is 100% secure," and Dr. Sirer was recommended as a possible source. (Woodrow Decl. ¶ 34.)

Gox Inc., Mt. Gox North America, Inc., Tibanne KK, Mark Karpeles, and Gonzague Gay-Bouchery from dissipating or transferring any assets they hold in the United States during the pendency of this litigation. Additionally, the Court should, as necessary, certify the classes for the purpose of the preliminary injunction and continue the expedited discovery.[29]

### A. The Court Should Enter a Preliminary Injunction Barring the Mt. Gox Defendants from Dissipating Any Assets Held in the United States.

With respect to the Mt. Gox Defendants themselves, the evidence of their wrongdoing has only grown stronger since this Court granted the TRO. While Karpeles and Tibanne KK have now appeared, they are only participating to contest jurisdiction and service, which is being made through the Hague Convention and is the subject of Plaintiffs' Motion for Alternative Service Under Federal Rule 4(f)(3). Defendants have refused to respond to the expedited discovery issued pursuant to the TRO and ignored deadlines and affirmative obligations imposed upon them by the Court. (Woodrow Decl. ¶ 13.) And regarding the merits of Plaintiffs' claims, the evidence—collected through both Plaintiffs' investigation and the analysis of an expert witness—even more strongly supports the injunctive relief previously granted through the TRO and presently sought here. The Court should therefore enter the preliminary injunction against the Mt. Gox Defendants.

As with a temporary restraining order[30], a party seeking a preliminary injunction must demonstrate (1) a likelihood of success on the merits, (2) a lack of an adequate remedy at law,

---

[29] While this Court already extended the relief granted by the TRO for the duration of this motion, (Woodrow Decl. ¶ 26), Plaintiffs here note that the Court may—if necessary—further extend that relief while Plaintiffs effect service on Karpeles and Tibanne through either (i) the Hague Convention, a process recognized to take months, *see H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, No. 2:11- CV-00742, 2011 WL 4368418, at *1–2 (E.D. Wis. Sept. 19, 2011) (granting extension of temporary restraining order "for three or four months," until plaintiffs have effected service pursuant to the Hague Convention), or (ii) Plaintiffs' Motion for Alternative Service Under Federal Rule 4(f)(3), (Dkt. 54).

[30] The elements required for temporary restraining orders and preliminary injunctions are identical. *See Bernina of America, Inc. v. Fashion Fabrics Int'l, Inc.*, No. 01 C 585, 2001 WL 128164, at *1 (N.D.

and (3) that an irreparable harm will result if the injunction is not granted. *See* Fed. R. Civ. P. 65; *see also Lambert v. Buss,* 498 F.3d 446, 451 (7th Cir. 2007); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992); *Gray v. Orr*, 13 C 8449, 2013 WL 6355918 (N.D. Ill. Dec. 5, 2013). If these elements are met, the court then balances the harm to each party. *Abbot Labs*, 971 F.2d. at 11–12, which, in the Seventh Circuit, is done on a "sliding scale…weighting harm to a party by the merit of her case." *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 547 (7th Cir. 2007); *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013); *Gray*, 2013 WL 6355918, at *2 (same) (quoting *Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012)). The Court also considers the public interest.

While this Court expressly noted that the factual and legal findings made when granting Plaintiff Greene's motion for a TRO were "good only for the purposes of [the] TRO and not good for anything else . . . because the factual predicate is almost certainly going to change," (TRO H'rg Tr., Ex. 13, (25:4 – 25:9)), here the evidence remains uncontested and has, in fact, grown more substantial. Given the identical legal standards for TROs and preliminary injunctions, the Court should grant the instant motion with little difficulty.

### 1.     Plaintiffs' claims are likely to succeed on the merits.

As with the TRO, Plaintiffs' claims have a high likelihood of succeeding on their merits—"an admittedly low requirement." *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008); *Travelers Cas. & Sur. Co. v. Wells Fargo Bank, NA*, 3:09 CV 501 PPS, 2009 WL 4881079, at *4 (N.D. Ind. Dec. 9, 2009). As detailed below, Plaintiffs will likely be able to succeed on each of their claims.

---

Ill. Feb. 9, 2001); *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001). Apart from timing, the central difference between the two is that while preliminary injunctions may be appealed, temporary restraining orders cannot—which accounts for the limited 14 or 28-day duration of the latter. *See Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 943 (7th Cir. 2006).

           a.     *The evidence shows that Plaintiffs can prove the elements of their breach of express trust claims.*

First, Plaintiffs will be able to demonstrate that Mt. Gox's Terms created an express trust between Mt. Gox and the Class Members, and that the Mt. Gox Defendants breached that agreement by losing the Class Members' bitcoins and Fiat Currency.

Under Illinois law, an express trust exists where there is (1) intent to create a trust; (2) a definite subject matter or trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specifications of a trust purpose; and (6) delivery of trust property to the trustee. *Adas v. Rutkowski*, 13 C 2517, 2013 WL 6865417, at *4 (N.D. Ill. Dec. 30, 2013). An express trust arises as a result of the manifestation of intent to impose a duty on a party, and if the requisite intent exists, "no particular form of words or conduct is necessary." *See In re Donlevy*, 342 B.R. 774, 781 (Bankr. N.D. Ill. 2006).

In the Seventh Circuit, the "hallmarks" of a trust are "[s]egregation of funds, management by financial intermediaries, and recognition that the entity in control of the assets has at most 'bare' legal title to them." *In re McGee*, 353 F.3d 537, 540–41 (7th Cir. 2003). "These hallmarks, as well as a demonstration of clear intent to create a trust, can distinguish a trust relationship from an ordinary contractual relationship." *In re Berman*, 629 F.3d 761, 769 (7th Cir. 2011); *see also In re Donlevy*, 342 B.R. 774 at 781 ("If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created") (quoting Restatement (Second) of Trusts, § 12, 23)); *In re Pawlinski*, 170 B.R. 380, 389 (Bankr. N.D. Ill. 1994) (citing *In re Destron, Inc.*, 40 B.R. 927 (Bankr. N.D. Ill. 1984)). "It is immaterial," however, "whether the person manifesting the intent calls the relationship a trust or whether she even knows that the relationship she intends to create is called a trust." *U.S. v. Marx*, 844 F.2d 1303, 1307 (7th Cir. 1988); *In re Donlevy*, 342 B.R. 774 at 781.

Here, Mt. Gox's Terms of Use include all of the Seventh Circuit's "hallmarks" of an express trust: through its Terms of Use, Mt. Gox promised to segregate the funds of its exchange members, and, by warranting that members' funds and bitcoins would be held on the members' behalves, Mt. Gox had, at most, "'bare' legal title to them." *See In re McGee*, 353 F.3d at 540–41. And here, Plaintiffs can show that Class Members' agreements with Mt. Gox satisfy the six elements of an express trust—(1) an intent to create a trust: the Terms that warranted the safekeeping of Class Members' currency and bitcoins of each member in that member's account and on that member's behalf; (2) a definite subject matter of trust property: the Fiat Currency and bitcoins deposited by Class Members into Mt. Gox; (3) ascertainable beneficiaries: the Class Members; (4) trustees: the Mt. Gox Defendants; (5) specifications of a trust purpose: to safeguard and segregate the property of Class Members while they sold, purchased, or bought Fiat Currency or bitcoins on the Mt. Gox exchange; and (6) delivery of the trust property to the trustee: the property that Frozen Currency Class Members delivered to Mt. Gox that was never returned. *Cf. In re Donlevy*, 342 B.R. at 781. As such, Plaintiffs will be able to demonstrate that an express trust was created between Class Members and the Mt. Gox Defendants.

Further, the Mt. Gox Defendants breached the trust's terms. As in *Donlevy*, it is plain that Mt. Gox was not granted "unrestricted use of the funds" obtained from exchange members, and was "required to keep the funds separated from [their] own." *See In re Donlevy*, 324 B.R. 774 at 783. Even if the segregation or security of the currency and bitcoins of exchange members became difficult or impossible it was "incumbent upon the trustee [here, Mt. Gox] to seek permission from the trustors [here, the putative Class members] to modify the trust"—which, of course, it never did. *See In re Pawlinski*, 170 B.R. 380 at 390. Hence, once the Defendants failed to safeguard Class Members' bitcoins and Fiat Currency, failed to hold all assets delivered to

them by each Class Member in accounts registered in that Member's name and behalf (as was expressly promised), or otherwise lost those assets, they breached the express trust. As such, the allegations and facts show Plaintiffs' will succeed on their breach of express trust claims.

> b.     *Plaintiffs are further likely to prevail against the Mt. Gox Defendants on their claims for breach of fiduciary duty.*

Plaintiffs will similarly succeed on their claims for breach of fiduciary duty, which under Illinois law require: (1) the existence of a fiduciary duty, (2) a breach of that fiduciary duty, and (3) that such breach proximately caused the alleged injury. *In re McCook Metals, L.L.C.*, 07 C 0621, 2007 WL 1687262, at *4 (N.D. Ill. June 7, 2007) (*citing Neade v. Portes*, 193 Ill.2d 433, 444, 739 N.E.2d 496 (2000)).

Mt. Gox has acted in defalcation of its fiduciary duties to Class Members by failing to appropriately safeguard Class Members' bitcoins and Fiat Currency. Defendants occupied a fiduciary role with respect to Plaintiffs' and the other Class Members' bitcoins and Fiat Currency by virtue of their statement that "MtGox represents and warrants that . . . it will hold all monetary sums and all Bitcoins deposited by each Member in its Account, in that Member's name as registered in their Account details, and on such Member's behalf." (Terms of Use at 4.) The bitcoins and money thus remained the property of the users while held on the exchange. In light of such Terms, Plaintiffs can show that Defendants owed a fiduciary duty to their members, *see In re Edgewater Med. Ctr.*, 344 B.R. 864, 868 (Bankr. N.D. Ill. 2006) (fiduciary duty may arise from contract between parties); *see also In re McGee*, 353 F.3d at 541 (formal separation and ownership rules may give rise to fiduciary obligations.), and that they breached by failing to properly hold funds and bitcoins, neglecting to secure its system, and as Plaintiff Lack's facts demonstrates squarely, continuing to accept large deposits of Fiat Currency and bitcoin into the exchange while Defendants delayed going out of business, (Lack Decl. ¶¶ 3–7). Hence, and

19

because exchange members have lost hundreds of millions of dollars as a result of these breaches, they have a likelihood of succeeding on their breach of fiduciary duty claims.

> c.  *Plaintiffs are likely to succeed on their claims under the Illinois Consumer Fraud and Deceptive Business Practices Act*, 815 ILCS 505 *et seq.*, *and the California Unfair Competition Law*, Cal. Bus. & Prof. Code § 17200.

The facts also show that Plaintiffs have a strong chance of prevailing on their claims under state consumer fraud statutes. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505 *et seq.*, requires that a plaintiff prove: "(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) [that] the unfair or deceptive practice occurred during a course of conduct involving trade or commerce . . . [and (4) that] the defendant's conduct is the proximate cause of the injury." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 573 (7th Cir. 2012) (*citing Siegel v. Shell Oil Co.*, 612 F.3d 932, 934-35 (7th Cir. 2010)).

California's Unfair Competition Law (the "UCL"), applicable to Lack and other California residents, also prohibits "any unlawful, unfair or fraudulent business act" and permits claims "brought 'by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition.'" *In re JPMorgan Chase Bank Home Equity Line of Credit Litig.*, 794 F. Supp. 2d 859, 888 (N.D. Ill. 2011) (quoting Cal. Bus. & Prof. Code §§ 17200, 17204). "[A]llegations that the fraudulent deception was 'actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages' are not necessary." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312, 93 Cal. Rptr.3d 559, 207 P. 3d 20 (2009).

The Mt. Gox Defendants have engaged in a series of deceptive and unfair practices designed to bilk exchange members out of their money and bitcoins, but three stand out: (1) they falsely represented to members their bitcoins and Fiat Currency would be held in a separate

account, in their names and on their behalves, (2) they knowingly misrepresented the security of their system, and (3) they continued to accept deposits into the exchange long after they knew they had lost everything.

First, Defendants falsely represented that they would maintain member bitcoins and Fiat Currency in separate accounts on each member's behalf. These representations were expressly made in Mt. Gox's Terms of Use. (Terms of Use at 4.) At the time these representations were made, Defendants knew they had failed to properly safeguard member bitcoins and money. As for bitcoins, Dr. Sirer explains that it is highly improbable that transaction malleability caused the loss of member bitcoins and that it was more likely a case of either theft with the help of an insider or gross negligence. (Sirer Report, § 1; ¶ 22.) Even if transaction malleability was the cause, Mt. Gox admits that it knew about transaction malleability as an issue as early as May 2011 and that it did nothing to prevent it. (Commencement Application, Ex. 3.) In any case, that by its own admission Mt. Gox didn't know where at least 200,000 BTC were for a period of time going back to the "old format wallet" in use before June 2011, and to the extent any of those bitcoins belong to putative Class members, Defendants must concede that they didn't properly segregate bitcoins or keep them in accounts on behalf of members.

Moreover, transaction malleability offers no explanation for how Karpeles "found" a shortfall of $27.1 million in Mt. Gox's bank account where exchange members' Fiat Currency was supposedly being held. That such vast amounts of bitcoins and Fiat Currency are missing and totally unaccounted for substantially proves that Defendants failed to maintain customer funds as they expressly represented they would.

Second, Defendants significantly misrepresented the security of their system. Mt. Gox's website told members they could "quickly and securely trade bitcoins with other people around

the world with [their] local currency," and that Mt. Gox was "SECURE" and "protected by Prolexic and certified by VeriSign, which means all communications with our servers are encrypted with SSL technology." (Landing Page, Ex. 8.) Again, and assuming transaction malleability—and not outright fraud—was at play, Defendants knew that their system had been affected by transaction malleability at the time they made the representations, and knew that the exchange's system wasn't secure.

Third, the Defendants engaged in a particularly pernicious form of fraud when they continued—for at least a period of months—to accept deposits of large amounts of Fiat Currency and bitcoin into the exchange well after they knew they had lost or stolen their exchange members' property and money.[31] The Defendants announced the supposed malleability issue on February 7, 2014, thus suggesting that it was discovered earlier. And, given his exclusive control over the accounts, Karpeles likely knew that tens of millions of dollars in Fiat Currency had been misappropriated long before. Nevertheless, and even as withdrawals were halted, Defendants continued (with Mizuho's help) to accept transfers into the exchange while repeatedly notifying members that they were planning to restore access in the near future. As a result, Plaintiff Lack and others, like putative class member Jose Fernandez, have collectively lost hundreds of thousands if not millions of dollars.[32]

---

[31]    *See* Sophie Knight and Nathan Layne, "Mt. Gox Faced Questions on Handling Client Cash Long Before Bankruptcy Crisis," Ex. 6.

[32]    In addition to the Support Desk Updates, as late as February 23—the day before Mt. Gox "went dark"—Mt. Gox's customer service representatives assured concerned exchange members that Mt. Gox was "working on to [sic] find an alternate method" to facilitate withdrawals, and that it was "trying to form relationships with several new banking partners" to increase "stability and ability to transmit withdrawals going forward. (Declaration of Jeffrey C. Parker ("Parker Decl."), Ex. 15, at ¶ 7; Declaration of Andrew Van Almen ("Van Almen Decl."), Ex. 16, at ¶ 7.) Likewise, during the week of Mt. Gox's unexpected shutdown, Defendants' leaked internal business plan suggested that Mt. Gox was busily working to fix the "bug" that was affecting it, and that the exchange would be back online in the near future. (*See* Mt. Gox Business Plan Europe, Ex. 17.)

All told, such conduct more than satisfies the ICFA's requirements for deceptive conduct, Mt. Gox's intention that its customer-base rely upon that conduct, and the UCL's requirement that those same customers were likely to be deceived, especially inasmuch as Mt. Gox had a duty to disclose the *actual* condition of the exchange.[33]

As for the ICFA's last element, Plaintiffs will be able to prove that the deceptive and unfair conduct occurred in the course of trade or commerce. Bitcoin represents a new digital marketplace, and with nearly 11 million bitcoins in circulation worldwide, the total worth of the currency exceeds $1 billion.[34] Before its collapse, Mt. Gox was a leader in this space, operating one of the largest exchanges in the world, and even registering as a money services business with the Treasury Department's Financial Crimes Enforcement Network in 2013.[35] As such, Defendants cannot argue that their conduct falls outside the ambit of trade or commerce.

Finally, Defendants obviously caused the loss of millions of dollars and hundreds of thousands of bitcoins belonging to the putative Class members. Because Mt. Gox actively concealed the truth and provided false representations, each putative Class member suffered a total loss regarding their deposited assets. Plaintiffs' statutory fraud claims are likely to succeed.

          **d.**      *Plaintiffs' claims for common law fraud are likely to succeed.*

In a similar vein, Plaintiffs will likely succeed on their common law fraud claims, all of which require that they show: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act;

---

[33]    *See*, *e.g.*, *See Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1095, 1098 (N.D. Cal. 2007) (quoting *LiMandri v. Judkins*, 52 Cal.App.4th 326, 337, 60 Cal.Rptr.2d 539 (1997) (nondisclosure can constitute actionable fraud under the UCL where "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact.").

[34]    *See* Morgan E. Peck, "Bitcoin Hits $1 Billion" (Woodrow Decl. ¶ 72).

[35]    *See* Jeffrey Sparshot, "Bitcoin Exchange Makes Apparent Move to Play by U.S. Money-Laundering Rules," (Woodrow Decl. ¶ 74).

(4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement. *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 496, 675 N.E.2d 584, 591 (1996); *see also Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 546 N.E.2d 580 (1989); *Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003) (citing *Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1341 (7th Cir.1992)).

As explained above, Defendants falsely represented to Plaintiffs and its other users that their money would be separated and that the exchange's system was secure. They also repeatedly misrepresented their intentions to come back online, falsely leading members to continue to transfer amounts into the exchange. Reliance and damages are thus readily shown. Class Members would not have deposited their bitcoins and Fiat Currency with Mt. Gox—nor kept them on the exchange—had they known that, at best, Defendants' security and system management was abysmal and that, at worst, Defendants would simply steal their bitcoins and money. (Greene Decl. ¶ 11; Declaration of Eric P. Amstutz ("Amstutz Decl."), Ex. 18 ¶ 8; Declaration of Dario Di Pardo ("Pardo Decl"), Ex. 19 ¶ 7.) Of course, Plaintiffs and the Class members have been damaged as a result—they have collectively lost hundreds of millions of dollars' worth of Bitcoin and Fiat Currency that unquestionably belong to them.[36]

Accordingly, Plaintiffs' common law fraud claim is also likely to succeed on the merits.

> e.    *Plaintiffs have a high likelihood of success on their claim for an accounting.*

Plaintiffs are also entitled to an accounting. Under Illinois law, to state a claim for an accounting, a plaintiff must allege the absence of an adequate remedy at law and either a breach of a fiduciary relationship, a need for discovery, fraud, or the existence of mutual accounts that are of a complex nature. *3Com Corp. v. Electronics Recovery Specialists, Inc.*, 104 F. Supp. 2d

---

[36]    This is in addition to suffering other damages, such as overpayment of transaction fees and commissions that included security protections that Class members never received.

932, 941 (N.D. Ill. 2000) (citing *Mann v. Kemper Financial Companies, Inc.*, 247 Ill. App. 3d 966, 618 N.E.2d 317, 327 (1st Dist. 1992)); *People ex rel. Hartigan v. Candy Club*, 149 Ill. App. 3d 498, 501 N.E.2d 188, 190 (1st Dist. 1986).

In this case, Plaintiffs can readily demonstrate a likelihood of success for an accounting. As explained above, Mt. Gox had an express trust and fiduciary obligation to maintain each member's bitcoins and Fiat Currency for the member's benefit and on the member's behalf, which Defendants have obviously violated. Likewise, Plaintiffs are likely to succeed on their fraud claims given Mt. Gox's repeated false statements of material fact. Further, as Mt. Gox has effectively shut down and the data posted on the Mt. Gox website is incomplete, Class Members have no way of knowing how much Bitcoin and Fiat Currency Mt. Gox retains with respect to each of their accounts. (*See, e.g.*, Fernandez Decl. ¶¶ 3, 12–13; Lack Decl. ¶ 10.) Plaintiffs and the Class Members are therefore entitled to discovery and an accounting showing the precise amounts of Bitcoin and Fiat Currency (along with the denominations) that Mt. Gox purports to have held on each of their behalves at the time the exchange went offline. Finally, as reports indicate that only Mr. Karpeles had access to the accounts and personally approved all withdrawals manually, he must be made to account for the "large shortfall" of at least $27.1 million in currency he admits is missing.

As such, the instant case is tailor-made for an accounting claim.

        *f.*     *Plaintiffs' breach of contract claim has a high likelihood of success.*

Under Illinois law, the elements for breach of contract are: "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Wigod*, 673 F.3d at 560; *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007).

Plaintiffs will likely succeed in proving that Mt. Gox breached at least four express provisions of its Terms of Use.[37] First, and not to belabor the point, Mt. Gox represented and warranted that it would "hold all monetary sums and all Bitcoins deposited by each Member in its Account, in that Member's name as registered in their Account details, and on such Member's behalf." (Ex. 1 at 4.) This was not done. As evidence suggests Karpeles and Mt. Gox commingled company funds, used customer assets to cover its other expenses,[38] or grossly failed to protect against misappropriation, Defendants breached their Terms.

Second, the Terms of Use provided that members would be able to trade on the exchange "at any time."[39] Defendants breached by unexpectedly shutting down the exchange.

Third, Mt. Gox's website promised members that their transactions would be encrypted and secure (Ex. 8), and its Privacy Policy stated that Mt. Gox had instituted security measures to protect personal information. (Terms of Use, Ex. 1 at 7.) Defendants breached—and have caused the class to suffer hundreds of millions of dollars in damages—by failing to take reasonable measures to protect against the "bug," to the extent that a bug actually effected the exchange.

Fourth, Mt. Gox's Terms provided that "These Terms may be terminated without reason by either party providing the other with reasonable prior notice, receipt of which shall be promptly acknowledged in writing by the other party." (*Id.* at 4.) Rather than provide reasonable notice, Defendants did just the opposite: lulling members into a false sense of security through repeated assurances that they were working to come back online—all while accepting deposits of

---

[37]  *See* Greene Decl. ¶ 2; Lack Decl. ¶ 2; Parker Decl. ¶ 2; Pardo Decl. ¶ 2; Van Almen Decl. ¶ 2; Amstutz Decl. ¶ 3; Declaration of Jonathan Carmel ("Carmel Decl."), Ex. 20, ¶ 2; Declaration of Michael Yablon ("Yablon Decl."), Ex. 21, ¶ 2; Declaration of Dennis Ou ("Ou Decl."), Ex. 22, ¶ 2.
[38]  *See* Sophie Knight and Nathan Layne, "Mt. Gox Faced Questions on Handling Client Cash Long Before Bankruptcy Crisis," Ex. 6.
[39]  *See* Terms of Use, Ex. 1 at 2 ("Members may at any time transfer any amount of Bitcoins to any other Members as well as any other Bitcoin users even if they are not Members…Bitcoin Transfer Transactions may be initiated *at any time* from the following page: https://mtgox.com/index.html) (Emphasis added).

currency and bitcoins *into* the exchange (but not withdrawals), only to then shut down completely without providing *any* advance notice. As a result, Class Members have lost millions.

Plaintiffs are thus likely to succeed on their breach of contract claims.

> g.    *Plaintiffs will also succeed on their claim for negligence.*

Plaintiffs are also likely to succeed on their negligence claims related to the purported security breaches of Mt. Gox's system. To succeed on a negligence claim, "the plaintiff must establish that the defendant owed a duty of care, that the defendant breached that duty, and that the plaintiff incurred injuries proximately caused by the breach." *Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439, 441 (7th Cir. 2009) (internal citation omitted).

In accepting member bitcoins and Fiat Currency for deposit, Mt. Gox assumed a duty to abide by accepted industry standards to safeguard and protect the exchange from security breaches. Defendants fell far short of this duty to the extent it allowed a "bug" to infiltrate its systems and siphon user bitcoins and money for several years. As Plaintiffs' expert explains, properly caring for exchange member bitcoins and Fiat Currency required Defendants to, at the very least, follow rather basic accounting and system management policies that other exchanges have already adopted. (Sirer Report, Ex. 4 ¶ 13, 15.) Had Mt. Gox exercised due care, it wouldn't have lost the Classes' bitcoins and Fiat Currency and, by failing to adhere to industry-standard protocols, (FAC ¶ 109), they have caused Plaintiffs and the Classes to collectively lose hundreds of millions of dollars worth of money and bitcoins.

That Defendants acted with at least a level of gross negligence is further shown by their "discovery" of the equivalent of $90 million to $110 million in bitcoins found in an "older-format wallet." As explained above, Defendants had a duty to safeguard the bitcoins and currency of its members. That such substantial amounts could simply be "found" after Mt. Gox

had already filed for bankruptcy protection speaks volumes as to the level of financial mismanagement and lack of necessary internal controls.

As such, Plaintiffs can demonstrate a likelihood of success on their negligence claims.

> h. *Plaintiffs can readily meet each of the required elements for conversion and—in the alternative—trespass to chattels.*

A trespass to chattels claim requires proof of the following elements: (1) defendant's wrongful assumption of control, (2) plaintiff's right in the property, (3) plaintiff's right to immediate possession, and (4) plaintiff's demand for possession. *Minuti v. Johnson*, 02 C 4551, 2003 WL 260705, at *4 (N.D. Ill. Feb. 5, 2003) (citing *Nelson v. Sotheby's Inc.*, 115 F.Supp. 2d 925, 929 n. 2 (N.D. Ill. 2000)). Similarly, to state a claim for conversion, a plaintiff must demonstrate: (1) unauthorized and wrongful control, dominion, or ownership by defendant over plaintiff's property, (2) plaintiff's right in the property, (3) plaintiff's absolute and unconditional right to the immediate possession of the property, and (4) a demand for possession of the property. *G.M. Sign, Inc. v. Stergo*, 681 F. Supp. 2d 929, 931 (N.D. Ill. 2009) (citing *General Motors Corp. v. Douglass*, 206 Ill. App. 3d 881, 565 N.E.2d 93, 97 (1st Dist.1990)).

Applied here, Plaintiffs will be able to show that Mt. Gox has wrongfully assumed control over the Class Members' bitcoins and currency without authorization, as Plaintiffs deposited currency and bitcoins into the exchange with the expectation that they would eventually be able to withdraw or exchange them. Plaintiffs will also be able to show that members have a right to immediate possession of their bitcoins and currency—indeed, they transferred them to Mt. Gox to hold in trust—and that despite their demand for the return of their Bitcoin and funds immediately, the Defendants refuse to do so. (*See, e.g.,* Parker Decl. ¶ 10, Carmel Decl. ¶ 7.) Accordingly, Plaintiffs are likely to prevail on these claims as well.

          i.      *Plaintiffs also have a likelihood of prevailing on their claim for unjust enrichment.*

Plaintiffs are likely to prevail on their claim for unjust enrichment as well. "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 545 N.E.2d 672, 679 (1989)).

Here, Plaintiffs present their claim for unjust enrichment in the alternative to their breach of contact claim and in the unlikely event the Defendants have any contract defense. Plaintiffs can demonstrate that Defendants have unjustly retained the Bitcoin and Fiat Currency of its members. Defendants were obligated safeguard member Fiat and bitcoins and plainly didn't. As such, a likelihood of success is shown on this claim as well.

Accordingly, Plaintiffs can show a likelihood of success on their key equitable claims. As such, the first element required for the entry of a preliminary injunction is met.[40]

### 2.    As was the case with respect to the TRO, Plaintiffs and the putative Class members have no adequate remedy at law.

Plaintiffs can also show that no adequate remedy at law exists and that they and other Class members stand to suffer irreparable harm if the preliminary injunction isn't granted. As predicted in Plaintiff Greene's original Complaint (*see* Dkt. 1 ¶¶ 113, 121, 153), Mt. Gox has filed for bankruptcy and lacks the financial wherewithal to satisfy a judgment entered against it in favor of the Class members. Likewise, and although less is presently known about Mr. Karpeles's personal finances, it is unlikely that he still possesses *all* of the missing bitcoins and

---

[40]    Given the overwhelming strength of Plaintiffs' claims, for the purposes of brevity Plaintiffs do not at this time analyze their claims for civil conspiracy, RICO, or other causes of action. To the extent the Court desires such analyses, Plaintiffs will happily supply them.

currency (though it is possible he has hidden substantial amounts of both somewhere—a fact presently determinable only through needed further discovery).

Under such circumstances—where a defendant is insolvent and will be unable to satisfy a money judgment—courts have awarded preliminary injunctive relief to prevent further dissipation of any remaining assets. *See Deckert v. Independence Shares* Corp., 311 U.S. 282, 290, 61 S.Ct. 229 (1940) (preliminary injunction of money assets proper where defendant "was insolvent and its assets in danger of dissipation or depletion."); *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (finding money damages inadequate where defendant may become insolvent); *Tanimura & Antle, Inc., v. Packed Fresh Produce, Inc.*, 222 F.3d 132, 139 (3d Cir. 2000) (finding injunction proper where plaintiffs showed that defendants were dissipating trust assets and would be unlikely to have funds to satisfy a judgment); *see also Travelers Cas. & Sur. Co.*, 2009 WL 4881079.

Such relief is available here, especially because Plaintiffs allege claims that sound in equity as opposed to exclusively alleging theories that are based in law. *See, e.g., CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) (finding that a restraint on assets is proper if a suit seeks equitable relief); *United States ex rel Rahman v. Oncology Assocs., P.C.*, 198 F.3d 489, 496-97 (4th Cir. 1999) (holding that *Deckert* still authorizes a district court to preliminarily freeze assets in a case involving equitable claims); *Kennedy Bldg. Assocs. v. CBS Corp.*, 476 F.3d 530, 535 (8th Cir. 2007) ("Here, the underlying relief sought is equitable, rather than legal, so our case involves the use of equity in support of equity, rather than equity in support of a legal remedy."); *In re Focus Media Inc.*, 387 F.3d 1077, 1085 (9th Cir. 2004) (same). As set forth above, Plaintiffs allege equitable claims for breach of trust, breach of fiduciary duty, fraud, an

accounting, unjust enrichment and restitution, and for preliminary and permanent injunctions—all of which seek equitable relief. (*See* FAC. Counts IV, VII-IX & XII.)

Furthermore, Defendants appear to be moving assets or actively commingling them with assets derived from the Mt. Gox exchange. Plaintiffs have traced the movements of new bitcoins being mined on the Eligius Bitcoin mining pool in Florida that are being sent to bitcoin wallets identified as belonging to Mt. Gox. (Woodrow Decl. ¶ 28.) The IP address being used to conduct the mining is registered to Tibanne KK and Mark Karpeles. (*Id.*) As such, either Tibanne KK or Karpeles appears to be mining bitcoins on the Eligius pool and combining them with Mt. Gox KK's assets.[41]

Thus, given that Plaintiffs have plead equitable claims, that Mt. Gox is now officially insolvent, that the remaining Defendants appear unable to satisfy a money judgment for hundreds of millions of dollars, and that someone connected to the Defendants is actively violating the TRO by continuing to mine bitcoins and transfer them outside the United States, Plaintiffs and the putative Class members will be irreparably harmed if the Court denies the preliminary injunction. Accordingly, Plaintiffs satisfy these elements for preliminary injunctive relief as well.

### 3. The harm to the class of not extending the preliminary injunctive relief far outweighs any theoretical harm to Defendants.

Next, the Court must balance the harm to the Class members of denying the injunction against the harm to Mt. Gox should the injunction be granted. As explained above, Plaintiffs and

---

[41]    It is possible that Mt. Gox is merely using Tibanne KK's IP address, which would, in addition to other facts, suggest that these companies are alter egos, together with Karpeles personally. For example, during a hearing before the bankruptcy court in Dallas on April 1, 2014 (during which the Court granted Plaintiff Greene and Lack's Motion to Compel Mr. Karpeles's deposition in the United States) Mt. Gox's lawyers explained that Mt. Gox had no employees—it merely contracted with Tibanne KK to supply employees (April 1, 2014 Bankruptcy Hearing ("BK Hearing"), Ex. 23, 14:12–18.). Of course, any such contract has not been produced. Additionally, it is highly likely that the $27.1 million "shortfall" in currency that "was found" in Mt. Gox's bank accounts is attributable to Mr. Karpeles having sole access to those accounts and using them as his private piggy-bank.

31

the Class members stand to suffer irreparable harm if the preliminary injunction is denied because Mt. Gox is insolvent. On the other hand, freezing Defendants' U.S. assets—which Defendants seem to insist are limited—and continuing to allow expedited discovery causes almost no harm to Tibanne KK, Karpeles, or any other Defendant.[42]

In the Seventh Circuit, the balancing of harms is done on a "sliding scale." That is, "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). Although no case is ever a "slam dunk," it is plain here that Plaintiffs and the Class members' claims are exceptionally strong: Defendants have admittedly either lost or stolen the Classes' money and bitcoins and are retaining them without any right to do so—thereby minimizing the consideration of any countervailing harm to Mt. Gox. As such, the Court should find that the irreparable harm to the Class members far exceeds any supposed harm that Defendants may suffer should the injunction be granted.[43]

### 4.    The public interest continues to support preliminary injunctive relief.

As a final consideration, the public interest weighs in favor of a preliminary injunction. Without such relief, it is unlikely the Class members will be able to recover anything from Mt. Gox as they wait years for a Japanese bankruptcy court to decide the fate of their money and bitcoins. In the interim, Defendants will be free to further dissipate their remaining assets, including by making preferential transfers to Karpeles and payments to its lawyers at Baker &

---

[42]    Indeed, at the recent April 7, 2014 status and motion hearing, counsel for Karpeles and Tibanne KK suggested that any such U.S. assets were seized by the Department of Homeland Security. (*See* Woodrow Decl. ¶ 25.) If true, and as the Court noted, the relief granted by the TRO and sought by this motion would be superfluous and, thus, would hardly cause additional (or any) harm to either Defendant.
[43]    The supposed harm to Defendants is further offset by the $5,000 bond Plaintiff has posted.

McKenzie.[44] Ensuring the safety and protection of U.S. consumers in an international market against rampant fraud and abuse is plainly within the public's interest. Without such protections, U.S. consumers who participate in online markets operated by companies based overseas (but which avail themselves to U.S. consumers) will find themselves at the mercy of foreign courts and laws. At the same time, the public has little interest in allowing foreign companies who transact business within the United States via the Internet to cheat and steal from U.S. consumers with impunity.

In light of the need to protect U.S. consumers from such fraudulent activity, the Court should find that the public interest also weighs in favor of granting the injunction.

**B.      To the Extent It Is Necessary to Avoid Operation of the One-Way Intervention Rule, The Court Should Provisionally Certify the Classes.**

As was the case with the TRO, Plaintiffs again ask that the Court provisionally certify the proposed Classes under Rule 23(b)(2) and 23(b)(3) insofar as it is necessary to avoid operation of the one-way intervention rule. To those ends, Plaintiffs here incorporate both their previous request for provisional certification, (Dkt. 8 at 24–26), and their Motion for Class Certification, (Dkt. 2), and respectfully request that their Motion for Class Certification be granted (again, to the extent the Court deems it necessary) concurrently with the instant filing.

**C.      The Court Should Also Extend Its Prior Order Allowing Expedited Discovery.**

Finally, in conjunction with the TRO this Court allowed Plaintiff Greene to pursue expedited discovery. As those efforts are ongoing and continue to reveal important information, this Court should extend its order allowing such fact-finding.

---

[44]      For example, as detailed in Karpeles' Declaration filed in support of Mt. Gox's Chapter 15 petition, Baker & McKenzie was to receive, through an "entrustement agreement," $75,000 as fees for Mt. Gox's Chapter 15 petition. (Ex. 2 at 33-34.)

## IV.     CONCLUSION

For all of the reasons set forth above, the Court should: (1) grant a preliminary injunction freezing any of the Defendants' assets located in the United States, (2) grant class certification to the extent necessary to avoid application of the one-way intervention rule, (3) extend its order allowing expedited discovery, and (4) award such additional relief as the Court deems necessary, reasonable, and just.

Respectfully submitted,

**GREGORY GREENE and JOSEPH LACK**, individually and on behalf of all others similarly situated,

Dated: April 8, 2014

By:     /s/    Steven L. Woodrow
                One of Plaintiffs' Attorneys

Steven L. Woodrow
swoodrow@edelson.com
Megan Lindsey
mlindsey@edelson.com
EDELSON PC
999 18th Street, Suite 3000
Denver, Colorado 80202
Tel: 303.357.4878
Fax: 303.446.9111

Jay Edelson
jedelson@edelson.com
Christopher L. Dore
cdore@edelson.com
David I. Mindell
dmindell@edelson.com
Alicia Hwang
ahwang@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiffs and the Putative Classes*

## <u>CERTIFICATE OF SERVICE</u>

I, Steven L. Woodrow, an attorney, hereby certify that I served the above and foregoing ***Motion for Preliminary Injunction***, by causing true and accurate copies of such paper to be transmitted to all counsel of record via the Court's CM/ECF electronic filing system on April 8, 14

/s/ Steven L. Woodrow
Steven L. Woodrow

35