# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

| | |
|---|---|
| GREGORY GREENE, individually and on be-half of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>MTGOX INC., a Delaware corporation, MT. GOX KK, a Japanese corporation, TIBANNE KK, a Japanese corporation, and MARK KARPELES, an individual,<br><br>*Defendants.* | Case No. 1:14-cv-01437<br><br>Judge Gary Feinerman<br><br>Magistrate Judge Susan Cox |

**EXPERT REPORT OF EMIN GUN SIRER**

I.       Introduction and Summary

I have been asked to opine on the potential technical explanations for the recent bankruptcy of the Mt.Gox bitcoin exchange. I am a professor at Cornell University, with expertise in distributed systems and virtual currencies. I have followed the statements made by Mark Karpeles in public forums related to the Mt.Gox filing, examined the Mt.Gox code that was

leaked to the public, and read the recent filing by Mt.Gox titled "Notice of Filing of English Translation of Civil Rehabilitation Proceeding Commencement Application" (together, the "Released Documents"). It is my opinion that the Released Documents do not provide an adequate technical description that explains the loss of approximately 850,000 bitcoins as well as a substantial sum of cash holdings from the Mt.Gox exchange. The main technical claim perpetuated by Mt.Gox, that "transaction malleability" played a key role in their bankruptcy, does not have any corroborating evidence. The secondary claim, that Bitcoins simply vanished as a result of transaction malleability, is simply not possible as transactions are independent of the Bitcoin addresses and keys. Overall, the Mt.Gox filing does not provide a comprehensive, technically-backed explanation for why bitcoins and cash are missing. In my opinion, the preponderance of evidence points to either severe incompetence at Mt.Gox and/or theft with the aid of an insider.

## QUALIFICATIONS

1.      I am currently an associate professor at Cornell University, where I have been working since 2001, initially as an assistant professor. I received my undergraduate degree from Princeton University, and my masters and Ph.D. degrees from the University of Washington.  My research focuses on distributed systems, operating systems, and networking, with a particular focus on peer-to-peer systems and virtual currencies. I am the designer and principal investigator behind the Karma virtual currency (Exhibit B), the first peer-to-peer cryptocurrency with a distributed mint, which preceded Bitcoin. With my co-author Ittay Eyal, I co-discovered a fundamental flaw in the Bitcoin mining protocol called Selfish Mining, characterized the vulnerability of the existing Bitcoin system to this attack, and proposed potential fixes to the problem; this work was published and presented at the peer-reviewed Financial Cryptography '14 conference (Exhibit C). I have built and deployed numerous peer-to-peer systems, published more than 70 peer-reviewed articles, widely quoted in the popular press and received various awards, including Popular Science's Brilliant 10 Award.

2.      My CV is attached as Exhibit A. I am paid $650/hour for my legal consulting related to this case.

## DEFINITIONS

1.      Appendix A lists the various sources of information I have used in my analysis. "Mt.Gox Notice" refers to the "Notice of Filing of English Translation of Civil Rehabilitation Proceeding Commencement Application," filed by February 28, 2014 in the Tokyo District Court 20th Civil Chamber on behalf of Mt. Gox Ltd (a/k/a Mt. Gox K.K.).

2.      "Mt.Gox Code" refers to the code purportedly leaked from Mt.Gox and posted at pastebin.com.

3.      "Bitcoins" means and refers to individual units of the Internet commodity available for purchase on the Internet. A unit of this currency is termed a "Bitcoin," and is subdividable into smaller fractions at a granularity of $10^{-8}$.

4.      "Bitcoin address" means and refers to an account number that identifies a particular digital purse that holds bitcoins. Bitcoin addresses are controlled by "private keys," cryptographic keys that can authorize transactions from their corresponding Bitcoin address.

5.      "Bitcoin protocol" means and refers to the protocol for the peer-to-peer exchange of messages to transfer Bitcoins between Bitcoin addresses.

6.      "Bitcoin system," "Bitcoin network" and "network" means and refers to the set of entities that communicate using the Bitcoin protocol and collectively comprise the Bitcoin ecosystem. They include, for instance, clients who hold Bitcoins in Bitcoin addresses, miners who create new Bitcoins using the Bitcoin protocol, and exchanges which may hold clients' Bitcoins on their behalf.

7.     "Bitcoin transaction" means and refers to a cryptographically signed record that authorizes the Bitcoin system to transfer Bitcoins from one Bitcoin address to another. By design of the Bitcoin protocol, Bitcoin transactions from a given Bitcoin address can only be issued by a party in possession of the private key associated with that address.

8.     "The blockchain" means and refers to the distributed, global, append-only ledger, maintained by the Bitcoin protocol, that records the transactions between every Bitcoin address. Any node in possession of the blockchain has the ability to trace the full path of every single unit of Bitcoin currency to the beginning of the Bitcoin system, and thus to determine the net amount of currency at any Bitcoin address.

9.     "Bitcoin miners" refer to specialized nodes on the Bitcoin network that collate transactions and append them to the blockchain, and which are compensated for their activities with transaction fees and block rewards.

10.     "Mt. Gox" or "Defendants" means and refers to the Defendants covered by this order (Mt. Gox Inc., Mt. Gox North Americas Inc., Tibanne KK, Mt. Gox KK, and Mark Karpeles individually) collectively.

11.     "Mark Karpeles" means and refers to Mark Karpeles, the CEO of Mt. Gox and 100% owner of Tibanne KK, which is Mt. Gox KK's parent company and owns 88% of Mt. Gox K.K.

12.     "The Bitcoin exchange known as Mt. Gox" means and refers to the Internet website where individuals, including members of the putative Class in this litigation, could buy, sell, convert, and trade their bitcoins and Fiat Currency.

## ANALYSIS

1.      Mt.Gox has stated in the Mt.Gox Notice that: *"At the start of February 2014, illegal access which abused a bug in the bitcoin base software (the software which manages the transfers, confirmation and mining, etc.) known as 'transaction malleability' resulted in an increase in unconfirmed transactions of bitcoins transfers (bitcoins withdrawals) and it was found that there was a possibility that the abuse of this bug may have resulted in illicit withdrawals of bitcoins."*

2.      Transaction malleability is not a bug that can, by itself, cause Bitcoins to be withdrawn from a bitcoin address.

3.      To be recognized and accepted as valid by the bitcoin network, cryptographic signatures must be generated for each Bitcoin transaction. These signatures are computed over each transaction in a way that protects the critical information in each transaction, which includes source addresses, destination addresses and amounts. A signature can only be generated with the corresponding private key for a source address. Any modifications to the source addresses, destination addresses or amounts will render the transaction invalid.

4.      "Transaction malleability" refers to a particular feature of the bitcoin protocol where a valid transaction, akin to a check or money order, can be modified slightly yet still remain valid in the network. These slight modifications pertain to the syntax of the transaction such as the formatting and padding of certain fields: they are changes that affect the semantics of the transaction, such as changes to the source address, destination address, or the transaction amount, always render a transaction invalid. This process is similar to how paper checks can be

slightly modified, for instance, by a merchant who scribbles on the back, and still be accepted by a bank as long as the date, amount and signature fields are valid. Transaction malleability is the computer equivalent of adding extra zeros to the left of a number field – since such a change does not change the original intent to transfer a given quantity from one specific account to another specific account, the Bitcoin network will rightfully accept the modified transaction.

5.     Transaction malleability cannot be termed a bug or a flaw; it's a characteristic of the protocol that is well known in the Bitcoin community. By its own admission in the Mt.Gox Notice, Mt.Gox was aware of transaction malleability since May 2011 (*"The existence of this bug was known since May 2011"*).

6.     The only impact transaction malleability has on the Bitcoin system is that anyone who issues Bitcoin transactions needs to accept that their transactions may be modified in the network—that is, changed in a way that does not affect the validity of any given transaction but requires the issuer of the transaction to take extra measures to see if their transaction succeeded.

7.     Transaction malleability cannot give rise to situations where hackers can intercept and modify transactions to withdraw more bitcoins than intended. In contrast, in the traditional banking system, an attacker can intercept a check, make copies, forge signatures, change the payee name and address, and use these forged checks to make multiple withdrawals from a given bank account. The Bitcoin network protects against this kind of behavior in two different ways.

8.     First, the Bitcoin protocol prohibits this behavior by ensuring that cryptographic signatures protect the (i) source addresses, (ii) destination addresses, and (iii) amounts named in transactions—all three of which are key features present in any given Bitcoin transaction. A digital signature, also present in every Bitcoin transaction, is affixed by the issuer of the

transaction using the private key for the source address, and protects these critical fields from modification. An attacker who changes the destination address of a Bitcoin transaction (i.e., in an attempt to reroute the destination of a given transaction) will not be able to generate a valid cryptographic signature because he will not possess the private key corresponding to the source address, and therefore such transactions will lack a valid digital signature and will not be accepted by the Bitcoin network. This feature ensures that an attacker cannot modify any critical field and therefore cannot intercept and divert a transaction between two unrelated parties to his own account.

9.      Second, the Bitcoin protocol prohibits attackers from intercepting a transaction destined for his own account, modifying it slightly, and performing multiple withdrawals. The Bitcoin protocol prohibits this behavior by enforcing that every transaction fully spends all the money in the source Bitcoin address. A Bitcoin transaction, in essence, is similar to a check for the full amount in a traditional bank account – it consumes all the bitcoins in the source address, sends a particular value to the destination address, and directs the remainder (the "change") to a new bitcoin address.

10.      The foregoing ensures that Bitcoin transactions cannot be replayed to pay the same party over and over again. Once a transaction is accepted by the Bitcoin network, a second payment from the same issuing principal, such as Mt. Gox, requires a new transaction from a different Bitcoin source address, signed with a different private key.

11.      Consequently, transaction malleability, by itself, could not be an attack vector by which an attacker can perform multiple withdrawals, or reroute Bitcoin transactions to a new destination address. The sole effect of transaction malleability is that a naïve entity that issues a

transaction but does not take prudent measures to determine the fate of this transaction may be led to believe that her transaction did not take place, even though the transaction did take place in a benignly modified form.

12.     Due to these protocols, to use transaction malleability to perform multiple illicit withdrawals to her own account, an attacker would have to (i) get Mt.Gox to issue a transaction to her own address, (ii) modify that transaction in flight before it is seen and accepted by the Bitcoin system by exploiting the transaction's malleability, and then (iii) contact Mt.Gox again to falsely claim that they never received the bitcoins. To succeed, they would have to get Mt.Gox to believe that their issued transaction was not seen by miners, was not incorporated into the blockchain, and thus reissue a brand new transaction to the attacker's account.

13.     This process provides multiple opportunities for Mt.Gox to exercise due diligence and avoid being exploited by an attacker trying to use transaction malleability. The first and foremost protection that Mt.Gox could (and presumably would) provide is to check that the transaction that the attacker claims did not go through and wants to get reissued, indeed, did not go through the system in a slightly modified form. This check is quite easy to do—i.e., by checking the source bitcoin address and seeing how much money is in it; if the transaction did not go through, the value should be positive, and if the transaction was modified due to malleability, it would necessarily be zero. Since Mt.Gox knew about transaction malleability since 2011 by its own admission, and since it has every tool and information available to check bitcoin addresses for the amount of their holdings, this check would be almost trivial to implement. Reissuing transactions without such a check would be a failure to exercise due care.

14.     Further, by design of the Bitcoin protocol, unsuccessful transactions are rare occurrences. Transaction fees attached to transactions act as rewards and as a source of incentive for miners to incorporate those transactions to the blockchain. Rational miners strive to incorporate transactions into the blockchain to maximize their winnings and support the system; it would be counter to their interests to ignore fee-carrying transactions. Further, since a well-known entity such as Mt. Gox would have multiple connections to the Bitcoin network, and since the default Bitcoin protocol implementation widely distributes every transaction among the miners using a "gossip" protocol, a single failure at any one miner should not cause Mt. Gox's transactions to be dropped. The same way a bank might keep track of illegible checks it failed to process, a responsible software service should keep track of the number and amounts of failed transactions. Keeping such statistics on "unsuccessful transactions" (which, in fact, did go through the Bitcoin network, but in modified form due to malleability, and where Mt. Gox was misled into believing that it failed) should have been able to alert the management at Mt.Gox to an exploit or a technical problem.

15.     Finally, Mt.Gox could have kept abreast of any transaction malleability abuse by using an issue tracker, and keeping data on which users have made claims due to purportedly failed transactions (i.e., that could have been caused by attackers abusing Bitcoin transaction malleability as described above). Use of an issue tracker is standard practice at any company that relies critically on software and performs its own software development, let alone one that has bitcoin deposits close to half a billion dollars. Such software would have been able to identify users who are filing high numbers of complaints in order to abuse transaction malleability and trick Mt.Gox into issuing multiple withdrawals.

16.     Some people on the Internet have speculated that Mt.Gox may have neglected to institute the controls mentioned in the two paragraphs above and instead set up the coding of the exchange to automatically issued a second transaction in software every time one of their issued transactions was modified in the network through transaction malleability. If true, in my opinion this would amount to an irresponsibly dangerous coding practice that would plainly violate the duty of care Mt.Gox had with respect to their customers and shareholders. However, in my examination of the purported Mt.Gox code, which took an hour, I saw no indication of such automatic reissues. From what is observable in the Mt.Gox code, and as set forth above, an attacker wishing to take advantage of transaction malleability would need to contact Mt.Gox, whether through the phone, email, or the web, and issue a (false) complaint. This would then provide Mt.Gox with an opportunity to perform the anti-abuse strategies mentioned in the last three paragraphs.

17.     Mt.Gox has further claimed in the Mt.Gox Notice that *"At the start of February 2014, illegal access which abused a bug in the bitcoin base software ... known as "transaction malleability" resulted in an increase in unconfirmed transactions of bitcoins transfers (bitcoins withdrawals) and it was found that there was a possibility that the abuse of this bug may have resulted in illicit withdrawals of bitcoins. On February 10, 2014, the applicant stopped the withdrawal of bitcoins in order to eliminate the impact of this bug and develop and test an upgrade to the software of the applicant."* My colleagues Christian Decker and Roger Wattenhoffer have performed a study (Exhibit D) where they collected a trace of the transactions seen on the Bitcoin network going back to January 2013 and examined how many transactions may have been subject to modifications inside the network prior to Mt.Gox's halting of withdrawals.

18.     Mt. Gox announced that it was suspending withdrawals on February 7, 2014 in Japan with a press release on its website (https://www.mtgox.com/press_release_20140207.html) This press release has since been taken down but its URL nevertheless documents its date. This press release was widely reported in the technical press on February 6, 2014 in the US (Exhibit E). The date difference is due to the difference between US Pacific time and Japanese time zones. Perplexingly, the Mt.Gox Notice claims that the "the applicant stopped the withdrawal of bitcoins" on February 10, 2014.

19.     While Decker and Wattenhoffer's traces show evidence of modified transactions inside the network, the volume of affected transactions is nowhere near the level that would account for the missing 850,000 Bitcoins responsible for Mt.Gox's claimed insolvency. Exhibit D shows that, in the period January 2013 to February 7, 2014, only 1811.58 Bitcoins were involved in modified transactions from any source; and in the period February 8-9, 2014—after Mt. Gox publicly announced it was vulnerable to such a an issue—only 5470 Bitcoins were involved in modified transactions from any source. Even assuming that all of these modified transactions originally came from Mt. Gox, and further assuming that they were all successfully accepted by the Bitcoin network, and further assuming that Mt.Gox permitted withdrawals all the way until February 10, 2014, these modified transactions would permit the attacker to manipulate Mt.Gox to reissue payments for at most 1,811.58 + 5,470 = 7,281.58 BTC, far short of 850,000 BTC.

20.     Mt.Gox has also claimed that hackers may have played a role in the loss of bitcoins from their cold wallet. A cold wallet, by definition, is a Bitcoin address whose private keys are held offline. Bitcoins stored in such an address cannot be exercised in any way, and cannot be transferred to anyone else or to any other address, without someone physically

accessing the private keys and bringing them online, as an "air gap" separates these keys from computer networks. Such cold storage is widely practiced at other Bitcoin exchanges, such as Coinbase and many others, because it renders the Bitcoins stored in the cold wallet absolutely immune to attacks from hackers, whose reach is necessarily limited by the reach of computer networks. The private keys of a cold wallet are typically recorded on a flash drive or CD and stored in bank safe deposit boxes. To guard against media deterioration, as well as natural disasters such as floods, fires, and earthquakes, it would be prudent to store these keys redundantly in multiple physical locations. Transferring money out of a cold wallet requires the physical assistance of someone who has access to these offline private keys that control the cold wallet.

21.     If Mt. Gox's cold wallet contains bitcoins right now, but these bitcoins are not accessible, in my opinion there is only one of two possible explanations: Defendants lost the private keys for their cold wallet and therefore irretrievably lost the ability to control their cold wallet. If true, this would indicate a failure to exercise due duty of care, especially given the enormous number of bitcons are affected.

22.     Otherwise, if the bitcoins are not in the cold wallet right now, then one or more insiders, with access to the physical locations where the private keys are being stored, must have played a role in bringing the contents of the cold wallet back online and allowed them to be spent.

23.     Remarkably, the Mt. Gox Notice is not clear about the fate and disposition of the Bitcoins stored in their cold wallet. The Bitcoin protocol makes it possible for any entity to check

the blockchain for the balances stored at any address. No correspondence from Mt.Gox has enumerated the Bitcoin addresses for their cold wallet.

24.     Finally, the Mt. Gox Notice claims that "*Further, on February 24, it was found that there was a large discrepancy in the total of deposit balances at those financial institutions which managed said deposits compared to the total amount actually deposited by users and that there was a large shortfall of deposit balances (the amounts are still under investigation and will probably change but the amount should be a maximum of JPY 2.8 billion).*" The Defendants provide no explanation for the loss of cash deposits. It should be evident that absolutely no technical issue pertaining to the Bitcoin protocol can account for the loss of cash balances from the company's bank accounts.

25.     Properly caring for exchange member bitcoins and fiat currency required Defendants to follow rather basic accounting and system management policies. These policies cover two kinds of activities: (1) backups, to guard against data loss, and (2) audits, to ensure that the system is operating according to expectations.

26.     It is part of general IT practice that organizations that possess valuable data establish and follow backup policies. A typical backup policy will record full snapshots of critical system state at periodic intervals, typically at monthly or weekly intervals. In cases where the critical system state changes more frequently, the backup system is configured to take "incremental backups," typically on a daily basis. Such backups are often shipped to secure offline facilities for disaster recovery purposes. These practices are common and widespread across not just the computer industry, but also any other industry that houses valuable data; for certain classes of businesses, specific legislation, such as the Sorbanes-Oxley Act and HIPAA,

mandate backups. Specifically at Mt. Gox, it is my opinion that a responsible system administrator would establish processes to back up all private keys, as well as all customer records in a way that can be recovered even after a breach or natural disaster. A backup policy short of this would be a breach of Mt. Gox's responsibilities.

27.     It is also part of general IT practice that organizations establish periodic audits to make sure that their software systems are in synchrony with each other and that they correctly maintain critical invariants. A typical audit policy will go through internal databases and corroborate them with each other and with external facts, in a process known as a "sanity check," thereby ensuring that any flaws in the software can be caught, identified and fixed. Specifically at Mt. Gox, it is my opinion that a basic auditing process would, at a minimum, cross-check the fiat and bitcoin holdings in Mt. Gox's possession against customer balances. Failure to do so would be a breach of Mt. Gox's responsibilities.

28.     Overall, what is remarkable about the Mt.Gox Notice and other statements to date is that it provides no technical detail and no clear explanation for the sheer volume of missing bitcoins and cash holdings. The Defendant's claim that "*there is a high probability that the bitcoins were stolen by the abuse of the above bug* [transaction malleability]" is not backed by a parsimonious explanation, and leaves no room except to conclude that there was either sheer mismanagement or active cooperation with a theft inside the company.

Dated: _April 8, 2014_

_____
Emin Gun Sirer

# Exhibit A

# Emin Gün Sirer

Work Address:  Computer Science Department        Home Address: 107 Kay Street
               4119A Upson, Cornell University                   Ithaca, NY 14850
               Ithaca, NY 14853                                  (206) 876-0134
               (607)-255-7673; fax: (607) 255-4428
               Email: egs@cs.cornell.edu
               WWW: http://www.cs.cornell.edu/People/egs/

**Education**   Ph.D. Thesis: Secure, Efficient and Manageable Virtual Machine Systems.
University of Washington, Ph.D. Computer Science and Engineering, 2002.

University of Washington, M.S. Computer Science and Engineering, 1996.

Princeton University, B.S.E. Department of Computer Science, 1993, *magna cum laude*.

**Awards**   Faculty of the Year Award, Cornell University, 2012.
Excellence in Teaching Award (Kenneth A. Goldman '71). 2010-2011.
Popular Science, Brilliant 10. 2007.
NSF CAREER Award. 2005.
Excellence in Teaching Award (Ralph S. Watts '72). 2002-2003.
Microsoft Fellowship. 1997-1999.
Netscape Bounty. 1997.
IBM Graduate Fellowship. 1994-1996.
Sigma Xi Book Award. Princeton University. 1993.
Young Investigator. Turkish National Science Foundation. 1988.
Honorable Mention. Turkish National Science Fair. 1987 and 1988.

## Professional Experience

| | |
|---|---|
| 7/07 – present | **Cornell University.** Associate Professor. |
| 7/01 – 7/07 | **Cornell University.** Assistant Professor. |
| 1/01 – 7/01 | **Cornell University.** Lecturer. |
| 9/93 – 1/00 | **University of Washington.** Research Assistant. |
| 9/97 – 12/97 | **Appliant, Inc.** Senior Engineer. |
| 6/96 – 9/96 | **Digital Equipment Corporation, Systems Research Center.** Intern. Worked with Dr. Roy Levin and Dr. Allan Heydon on VESTA-II. |
| 6/93 – 8/93 | **AT&T Bell Laboratories, Center-1127.** Consultant. Worked with Dr. David L. Presotto on Plan 9. |
| 6/92 – 8/92 | **Princeton University.** Research Assistant. Worked with Prof. Andrew W. Appel on MIPSI. |
| 1/92 – 6/93 | **Princeton Computer Consulting Agency.** Manager. |
| 6/91 – 8/91 | **NEC Inc.** Intern. Work with Dr. Kornfeld on an innovative 3-D display. |
| 6/86 – 9/89 | **Commodore Business Machines.** Independent Software Developer. |

## Publications

**Journal Papers**

Fred B. Schneider, Kevin Walsh, and Emin Gün Sirer. Nexus Authorization Logic: Design Rationale and Applications. In ACM Transactions on Information and System Security, 14(1), 2011.

Alan Shieh, Andrew Myers, Emin Gün Sirer. A Stateless Approach to Connection-Oriented Protocols. In ACM Transactions on Computer Systems (TOCS), 26(3), 2008.

Emin Gün Sirer. Heuristics Considered Harmful: Using Mathematical Optimization for Resource Management in Distributed Systems. *IEEE Intelligent Systems*, Special Issue on Self-Management through Self-Organization in Information Systems, March/April 2006.

Kevin Walsh, Emin Gün Sirer. Staged Simulation: A General Technique for Improving Simulation Scale and Performance. *ACM Transactions on Modeling and Computer Simulation (TOMACS)*, April 2004.

Jonathan Aldrich, Emin Gün Sirer, Craig Chambers, Susan Eggers. Comprehensive Synchronization Elimination for Java. *Science of Computer Programming*, 47(2-3):91–120, May-June 2003.

**Conference Papers**

Ittay Eyal and Emin Gün Sirer. Majority is not Enough: Bitcoin Mining is Vulnerable. In Proceedings of *Financial Cryptography*, Barbados, March 2014.

Ji Yong Shin, Emin Gün Sirer, Hakim Weatherspoon, and Darko Kirovski. On the Feasibility of Completely Wireless Datacenters. In Proceedings of the Symposium on *Architectures for Networking and Communications Systems*, Austin, Texas, October 2012.

Robert Escriva, Bernard Wong, and Emin Gün Sirer. HyperDex: A Distributed, Searchable Key-Value Store. In Proceedings of the *SIGCOMM Conference*, Helsinki, Finland, August 2012.

Ji Yong Shin, Bernard Wong, and Emin Gün Sirer. Small World Data Centers. In Proceedings of the Symposium on Cloud Computing, Cascais, Portugal, October 2011.

Emin Gün Sirer, Willem de Bruijn, Patrick Reynolds, Alan Shieh, Kevin Walsh, Dan Williams, and Fred B. Schneider. Logical Attestation: An Authorization Architecture for Trustworthy Computing. In Proceedings of the Symposium on Operating Systems Principles, Cascais, Portugal, October 2011.

Ryan S. Peterson, Bernard Wong, and Emin Gün Sirer. A Content Propagation Metric for Efficient Content Distribution. In Proceedings of the SIGCOMM Conference, Toronto, Canada, August 2011.

Alan Shieh, Emin Gün Sirer, and Fred B. Schneider. NetQuery: A Knowledge Plane for Reasoning about Network Properties. In Proceedings of the SIGCOMM Conference, Toronto, Canada, August 2011.

Ryan Peterson and Emin Gün Sirer. AntFarm: Efficient Content Distribution with Managed Swarms. In Proceedings of the Symposium on Networked System Design and Implementation, Boston, Massachusetts, April 2009.

Dan Williams, Patrick Reynolds, Kevin Walsh, Emin Gün Sirer, and Fred B. Schneider. Device Driver Safety Through a Reference Validation Mechanism. In Proceedings of the Symposium on Operating System Design and Implementation, San Diego, California, December 2008.

Bernard Wong, Ivan Stoyanov, and Emin Gün Sirer. Octant: A Comprehensive Framework for the Geolocalization of Internet Hosts. In Proceedings of the Symposium on Networked System Design and Implementation, Cambridge, Massachusetts, April 2007.

Kelvin So and Emin Gün Sirer. Latency- and Bandwidth-Minimizing Optimal Failure Detectors. In Proceedings of the European Conference on Computer Systems, Lisbon, Portugal, March 2007.

Kevin Walsh and Emin Gün Sirer. Experience with an Object Reputation System for Peer-to-Peer Filesharing. In Proceedings of the Symposium on *Networked System Design and Implementation (NSDI)*, San Jose, California, May 2006.

Venugopalan Ramasubramanian, Ryan Peterson and Emin Gün Sirer. Corona: A High Performance Publish-Subscribe System for the World Wide Web. In Proceedings of the Symposium on *Networked System Design and Implementation (NSDI)*, San Jose, California, May 2006.

Venugopalan Ramasubramanian and Emin Gün Sirer. Perils of Transitive Trust in the Domain Name System. In *Proceedings of Internet Measurement Conference (IMC)*, Berkeley, California, October 2005.

Hongzhou Liu, Venugopalan Ramasubramanian, and Emin Gün Sirer. Client and Feed Characteristics of RSS, A Publish-Subscribe System for Web Micronews. In *Proceedings of the Internet Measurement Conference (IMC)*, Berkeley, California, October 2005.

Bernard Wong, Aleksandrs Slivkins, and Emin Gün Sirer. Meridian: A Lightweight Network Location Service without Virtual Coordinates. In Proceedings of the *ACM SIGCOMM Conference*, Philadelphia, Pennsylvania, August 2005.

Hongzhou Liu, Tom Roeder, Kevin Walsh, Rimon Barr, and Emin Gün Sirer. Design and Implementation of a Single System Image Operating System for Ad Hoc Networks. In Proceedings of the *International Conference on Mobile Systems, Applications, and Services (Mobisys)*, Seattle, Washington, June 2005.

Saikat Guha, Rohan Murty, and Emin Gün Sirer. Sextant: A Unified Node and Event Localization Framework Using Non-Convex Constraints. In Proceedings of the *International Symposium on Mobile Ad Hoc Networking and Computing (Mobihoc)*, Urbana-Champaign, Illinois, May 2005.

Alan Shieh, Andrew Myers, Emin Gün Sirer. Trickles: A Stateless Network Stack for Improved Scalability, Resilience and Flexibility. In Proceedings of the Symposium on *Networked System Design and Implementation (NSDI)*, Boston, Massachussets, May 2005.

David Biermann, Emin Gün Sirer, and Rajit Manohar. A Rate-Matching Approach to Dynamic Voltage Scaling. In Proceedings of the *Watson Conference on the Interaction between Architecture, Circuits, and Compilers*, New York, New York, October 2004.

Venugopalan Ramasubramanian and Emin Gün Sirer. The Design and Implementation of a Next Generation Name Service for the Internet. In Proceedings of *The ACM SIGCOMM Conference*, Portland, Oregon, August 2004.

Venugopalan Ramasubramanian and Emin Gün Sirer. Beehive: O(1) Lookup Performance for Power-Law Query Distributions in Peer-to-Peer Overlays. In Proceedings of *Networked System Design and Implementation (NSDI)*, San Francisco, California, March 2004.

Kevin Walsh and Emin Gün Sirer. Staged Simulation for Improving the Scale and Performance of Wireless Network Simulations. In Proceedings of the *Winter Simulation Conference (WSC)*, New Orleans, Louisiana, December 2003.

Venugopalan Ramasubramanian, Zygmunt Haas, and Emin Gün Sirer. SHARP: A Hybrid Adaptive Routing Protocol for Mobile Ad Hoc Networks. In Proceedings of the *International Symposium on Mobile Ad Hoc Networking and Computing (Mobihoc)*, Annapolis, Maryland, June 2003.

Panagiotis Papadimitratos, Emin Gün Sirer, and Zygmunt Haas. Path Set Selection in Mobile Ad Hoc Networks. In Proceedings of the *International Symposium on Mobile Ad Hoc Networking and Computing (Mobihoc)*, Lausanne, Switzerland, June 2002.

Emin Gün Sirer and Ke Wang. A Temporal Logic-Based Access Control Mechanism for Web Services. In Proceedings of the *Symposium on Access Control Models and Technologies (SACMAT)*, Monterey, California, May 2002.

Benjamin Atkin and Emin Gün Sirer. PortOS: An Educational Operating System for the Post-PC Environment. In Proceedings of the *ACM Technical Symposium on Computer Science Education (SIGCSE)*, Cincinnati, Ohio, March 2002.

Emin Gün Sirer, Robert Grimm, Arthur J. Gregory and Brian N. Bershad. Design and Implementation of a Distributed Virtual Machine for Networked Computers. In Proceedings of the *Symposium on Operating Systems Principles (SOSP)*, pages 202–216, Kiawah Island, South Carolina, December 1999.

Emin Gün Sirer and Brian N. Bershad. Using Production Grammars in Software Testing. In Proceedings of the *Conference on Domain-Specific Languages (DSL)*, pages 1–13, Austin, Texas, October 1999.

Jonathan Aldrich, Craig Chambers, Emin Gün Sirer, and Susan Eggers. Eliminating Unnecessary Synchronization from Java Programs. In *Proceedings of the Static Analyses Symposium (SAS)*, pages 19–38, Venice, Italy, September 1999.

Brian N. Bershad, Stefan Savage, Przemyslaw Pardyak, Emin Gün Sirer, Marc Fiuczynski, David Becker, Craig Chambers and Susan Eggers. Extensibility, Safety and Performance in the SPIN Operating System. In Proceedings of the *Symposium on Operating Systems Principles (SOSP)*, pages 267–284, Copper Mountain, Colorado, December 1995.

**Workshop Papers**

Robert Soulé, Shrutarshi Basu, Robert Kleinberg, Emin Gün Sirer, and Nate Foster. Managing the Network with Merlin. In Proceedings of the Workshop on *Hot Topics in Networking*, November 2013.

Alan Shieh, Srikanth Kandula, and Emin Gün Sirer. Sidecar: Building programmable datacenter networks without programmable switches. In Proceedings of the Workshop on Hot Topics in Networks, Monterey, California, October 2010.

Ryan S. Peterson, Bernard Wong, and Emin Gün Sirer. Blindfold: A System to See No Evil in Content Discovery. In Proceedings of the International Workshop on Peer-to-Peer Systems, San Jose, California, April 2010.

Bernard Wong, Ymir Vigfusson, and Emin Gün Sirer. Hyperspaces for Object Clustering and Approximate Matching in Peer-to-Peer Overlays. In Proceedings of the Workshop on Hot Topics in Operating Systems, San Diego, California, May 2007.

Ryan Peterson and Emin Gün Sirer. Going Beyond Tit-for-Tat: Designing Peer-to-Peer Protocols for the Common Good. In Proceedings of the Workshop on Future Directions in Distributed Computing, Bertinoro, Italy, June 2007.

Geolocalization on the Internet through Constraint Satisfaction. Bernard Wong, Ivan Stoyanov, and Emin Gün Sirer. In Proceedings of the Workshop on Real, Large Distributed Systems, Seattle, Washington, November 2006.

Bernard Wong, Ivan Stoyanov and Emin Gün Sirer. Geolocalization on the Internet through Constraint Satisfaction. In Proceedings of the *Workshop on Real, Large Distributed Systems (WORLDS)*, Seattle, Washington, November 2006.

Kevin Walsh and Emin Gün Sirer. Fighting Peer-to-Peer SPAM and Decoys with Object Reputation. In Proceedings of the *Workshop on Economics of Peer-to-Peer Systems (P2PECON)*, Philadelphia, Pennsylvania, August 2005.

Emin Gün Sirer, Sharad Goel, Mark Robson, and Dogan Engin. Eluding Carnivores: File Sharing with Strong Anonymity. In Proceedings of the *European SIGOPS Workshop*, Leuven, Belgium, September 2004.

Dan Williams and Emin Gün Sirer. Optimal Parameter Selection for Efficient Memory Integrity Verification Using Merkle Hash Trees. In Proceedings of the *Network Computing and Applications, Trusted Network Computing Workshop (NCA-TNC)*, Boston, Massachussetts, August 2004.

William K. Josephson, Emin Gün Sirer, and Fred B. Schneider. Peer-to-Peer Authentication With a Distributed Single Sign-On Service. In Proceedings of *International Workshop on Peer-to-Peer Systems (IPTPS)*, San Diego, California, February 2004.

Vivek Vishnumurthy, Sangeeth Chandrakumar, and Emin Gün Sirer. KARMA : A Secure Economic Framework for Peer-To-Peer Resource Sharing. In Proceedings of the *Workshop on Economics of Peer-to-Peer Systems (P2PECON)*, Berkeley, California, June 2003.

Emin Gün Sirer, Arthur J. Gregory, Brian N. Bershad. A Practical Approach for Improving Startup Latency in Java Applications. In Proceedings of *Workshop on Compiler Support for Systems Software (WCSSS)*, Atlanta, Georgia, May 1999.

Emin Gün Sirer, Robert Grimm, Brian N. Bershad, Arthur J. Gregory and Sean McDirmid. Distributed Virtual Machines: A System Architecture for Network Computing. In Proceedings of the *Eighth ACM European SIGOPS Workshop*, pages 13–16, Sintra, Portugal, September 1998.

Emin Gün Sirer. A System Architecture for Next Generation Network Computing *DARPA Graduate Student Workshop*, Rosslyn, Virginia, July 1998.

Emin Gün Sirer, Stefan Savage, Przemyslaw Pardyak, Greg DeFouw and Brian N. Bershad. Writing an Operating System Using Modula-3. In Proceedings of the *First Annual Workshop on Compiler Support for System Software (WCSSS)*, pages 134–140, Tucson, Arizona, February 1996.

Emin Gün Sirer, Marc Fiuczynski, Przemyslaw Pardyak, and Brian N. Bershad. Safe Dynamic Linking in an Extensible Operating System. In Proceedings of the *First Annual Workshop on Compiler Support for System Software (WCSSS)*, pages 141–148, Tucson, Arizona, February 1996.

Brian N. Bershad, Stefan Savage, Przemyslaw Pardyak, David Becker, Marc Fiuczynski, and Emin Gün Sirer. Protection is a Software Issue. In Proceedings of the *Fifth Workshop on Hot Topics in Operating Systems (HOTOS)*, pages 62–65, Orcas Island, Washington, May 1995.

Brian N. Bershad, Craig Chambers, Susan Eggers, Chris Maeda, Dylan McNamee, Przemyslaw Pardyak, Stefan Savage, and Emin Gün Sirer. SPIN - An Extensible Microkernel for Application-specific Operating System Services. In Proceedings of the *Sixth ACM SIGOPS European Workshop*, pages 68–71, Dagstuhl, Germany, September 1994.

**Reports**    Ittay Eyal and Emin Gün Sirer. Majority is not Enough: Bitcoin Mining is Vulnerable In arXiv, November 2013.

Robert Escriva, Bernard Wong, and Emin Gün Sirer. An Introduction to HyperDex and the Brave New World of High Performance, Scalable, Consistent, Fault-tolerant Data Stores. In *;login:*, 3(37):39–49, 2012.

Patrick Reynolds, Oliver Kennedy, Emin Gün Sirer, and Fred B. Schneider. Securing BGP Using External Security Monitors. Cornell University, Computing and Information Science, Ithaca, New York, Technical Report TR2006-2065, 2006.

Ryan Peterson, Venugopalan Ramasubramanian, and Emin Gün Sirer. A Practical Approach to Peer-to-Peer Publish-Subscribe. In *;login:* 31(4):42-46, New York, New York, July 2006.

Bernard Wong and Emin Gün Sirer. ClosestNode.com: An Open-Access, Scalable, Shared Geocast Service for Distributed Systems. In *SIGOPS Operating Systems Review*, 40(1):62-64, January 2006.

Yee Jiun Song, Venugopalan Ramasubramanian and Emin Gün Sirer. Optimal Resource Utilization in Content Distribution Networks. Cornell University, Computing and Information Science Technical Report, TR2005-2004, Ithaca, New York, November 2005.

Kevin Walsh and Emin Gün Sirer. Thwarting P2P Pollution Using Object Reputation. Cornell University, Computing and Information Science Technical Report, TR2005-1980, February 2005.

Venugopalan Ramasubramanian and Emin Gün Sirer. Proactive Caching for Better than Single-Hop Lookup Performance. Cornell University, Computing and Information Science Technical Report, TR2004-1931, Ithaca, New York, February 2004.

Sharad Goel, Mark Robson, Milo Polte, and Emin Gün Sirer. Herbivore: A Scalable and Efficient Protocol for Anonymous Communication. Cornell University, Computing and Information Science Technical Report, TR2003-1890, Ithaca, New York, February 2003.

Rimon Barr, John C. Bicket, Daniel S. Dantas, Bowei Du, T.W. Danny Kim, Bing Zhou, and Emin Gün Sirer. On the Need for System-Level Support for Ad Hoc and Sensor Networks. In *Operating Systems Review*, 36(2):1-5, April 2002.

Brian N. Bershad, Craig Chambers, Susan Eggers, Chris Maeda, Dylan McNamee, Przemyslaw Pardyak, Stefan Savage and Emin Gün Sirer. SPIN - An Extensible Microkernel for Application-specific Operating System Services. In *Operating Systems Review*, 29(1):74–77, January 1995.

Emin Gün Sirer, Rimon Barr, T. W. Danny Kim and Ian Yee Yan Fung. Automatic Code Placement Alternatives for Ad Hoc and Sensor Networks. Cornell University, Computer Science Technical Report 2001-1853, October 2001.

Emin Gün Sirer, Robert Grimm, Arthur J. Gregory, Nathan R. Anderson and Brian N. Bershad. Distributed Virtual Machines: A System Architecture for Network Computing. University of Washington, Computer Science and Engineering Technical Report, UW-CSE-98-09-01, September 1998.

Marc E. Fiuczynski, Wilson Hsieh, Emin Gün Sirer, Przemyslaw Pardyak and Brian N. Bershad. Low-level Systems Programming with Modula-3. In *Threads, Modula-3 Systems Journal*, Volume 3, Fall 1997.

Emin Gün Sirer, Przemyslaw Pardyak and Brian N. Bershad. Strands: An Efficient and Extensible Thread Management Architecture. University of Washington, Computer Science and Engineering Technical Report, UW-CSE-97-09-01, September 1997.

Brian N. Bershad, Craig Chambers, Susan Eggers, Chris Maeda, Dylan McNamee, Przemyslaw Pardyak, Stefan Savage and Emin Gün Sirer. SPIN - An Extensible Microkernel for Application-specific Operating System Services. University of Washington, Computer Science and Engineering Technical Report, UW-CSE-94-03-03, March 1994.

Emin Gün Sirer. Measuring Limits of Fine Grained Parallelism. Princeton University Senior Project, Princeton, New Jersey, June 1993.

**Patents**

Robert Escriva, Bernard Wong, and Emin Gün Sirer. Managing Dependencies Between Operations in a Distributed System. US Patent filed 20012, pending.

Robert Escriva, Bernard Wong, Nicole Caruso, and Emin Gün Sirer. A Process for Storing Multi-Attribute Objects in a Distributed System that Enables Lookup by any Attribute US Patent filed 2010, pending.

Ryan Peterson, Bernard Wong, and Emin Gün Sirer. Efficient Content Distribution With Managed Swarms. US Patent filed 2008, pending.

Emin Gün Sirer and Brian N. Bershad. A Process for Rewriting Executable Content on a Network Server or Desktop Machine in Order to Enforce Site-Specific Properties. US Patent #6865735, filed August 6, 1997, issued February 3, 2005.

Emin Gün Sirer, Sean McDirmid and Brian N. Bershad. Method and Apparatus for Implementing a Virtual Machine on Distributed Service Components. US Patent Application, filed May 14, 1997, pending.

**Software Releases &**

**CobWeb:** An open-access content distribution network, similar to Akamai. Currently receives 10-20 million requests per day.

**Online Services**

**ClosestNode.Com:** An open service that maps a client to a nearby server. In use by research groups at Cornell, Berkeley, CMU, NYU and other schools.

**Credence:** Gnutella LimeWire client for filesharing with reputation management. More than 10,000 downloads since its release.

**Meridian:** Lightweight, scalable network positioning system. Used by CobWeb to direct web clients to the nearest proxy.

**CoDoNS:** Replacement and safety net for the Domain Name Service. Currently supports www.electoral-vote.com, and acts as a backup for all names in DNS.

**SNS:** High performance, scalable wireless network simulator. An extension of the popular ns-2 simulator to increase simulation performance and scale.

**PortOS:** An instructional OS platform for Windows. In use at Cornell and a few schools that rely on the Windows platform for OS instruction.

**Kimera:** Java bytecode verification and disassembly services. Licensed to HP.

**SPIN:** Extensible typesafe standalone operating system.

**MIPSI:** MIPS simulator for instructional use.

| | |
|---|---|
| **Invited Talks &** | High-Performance Peer-to-Peer Overlays, or, Heuristics Considered Harmful.<br>Invited Colloquium: *Rennselaer Polytechnic Institue*, Troy, New York, May 2006. |
| **Keynotes** | Perils of Transitive Trust, or How to 0wn the Internet via DNS.<br>Invited Plenary Talk: *RIPE-52*, Istanbul, Turkey, April 2006. |

Trustworthy Computing with the Nexus Operating System.
Invited Speaker: *UC Berkeley*, Berkeley, California, April 2006.
Invited Speaker: *Carnegie-Mellon University*, Pittsburgh, Pennsylvania, January 2006.

High Performance Peer-to-Peer Systems, or Heuristics Considered Harmful.
Invited Colloquium: *University of Toronto*, Toronto, Canada, January 2006.

Peer-to-Peer: Still Useless?.
Invited Panelist: *Symposium on Operating Principles*, Brighton, United Kingdom, October 2005.

Network Positioning for Wide-Area and Wireless Networks.
Keynote Talk: *LOCALITY Workshop*, Cracow, Poland, September 2005.

Issues in Dependability for Self-Organizing Nomadic Systems.
Invited Talk: *IFIP 10.4 Workgroup Meeting*, Hakone, Japan, July 2005.

Self-Organizing Systems for Robust, Large-Scale Infrastructure Services.
Invited Talk: *University of Maryland*, College Park, Maryland, July 2005.

CoDoNS: A High-Performance, Fault-Resilient Replacement for the Legacy Domain Name Service.
Invited Speaker: *Carnegie Mellon University*, Pittsburgh, Pennsylvania, November 2004.

CoDoNS: A Next Generation Name Service.
Invited Talk: *DNSSEC Steering Committee*, Washington, DC, August 2004.

CoDoNS: A High-Performance, Fault-Resilient Replacement for the Legacy Domain Name Service.
Invited Talk: *Microsoft Research Silicon Valley*, Palo Alto, California, March 2004.
Invited Talk: *Univ. of Pennsylvania*, Philadelphia, Pennsylvania, March 2004.

Operating System Support for Ad Hoc Networks in MagnetOS.
Invited Colloquium: *University of Rochester*, Rochester, New York, September 30, 2002.

Issues in Ubiquitous Computing.
Invited Panelist: *International Performance, Computing and Communications Conference.* Phoenix, Arizona, April 2002.

Extensible Systems.
Invited Panelist: *Eighth ACM SIGOPS European Workshop*, Sintra, Portugal,
September 1998.

**Talks**    High-Performance Peer-to-Peer Overlays, or, Heuristics Considered Harmful.
*University of Michigan*, Ann Arbor, Michigan, June 2006.

Robust and Attack-Resilient Self-Organizing Networks.
*Workshop on the Complex Behavior of Adaptive Network-Centric Systems*, College
Park, Maryland, July 2005.

Trustworthy Computing at Cornell Computer Science.
*TRUST Retreat*, Santa Cruz, California, June 2005.

Some Challenges in Building Internet-Scale Distributed Services.
*Cornell University ACSU Chapter*, April 2005.

Graduate School: The End Game.
*Cornell University Career Talk Series*, Ithaca, New York, October 2004.

Eluding Carnivores: File Sharing with Strong Anonymity.
*European SIGOPS Workshop*, Leuven, Belgium, September 2004.

Self-Organizing Networks.
*NSF STC: TRUST Center Site Visit*, University of California, Berkeley, September
2004.

The Design and Implementation of a Next Generation Name Service for the Internet.
*The ACM SIGCOMM Conference*, Portland, Oregon, August 2004.

Operating Services 7/24: Domain Name Service for the Next Generation Internet.
*Second Planetlab Workshop*, Palo Alto, California, April 2004.

Peer-to-Peer Authentication With a Distributed Single Sign-On Service.
*International Workshop on Peer-to-Peer Systems (IPTPS)*, San Diego, California,
February 2004.

KARMA: A Secure Economic Framework for P2P Resource Sharing.
*Workshop on Economics of Peer-to-Peer Systems (P2PECON)*, Berkeley, California,
June 2003.

Doing Research in a Group Setting.
*Cornell University Career Talk Series*, Ithaca, New York, Spring 2003.

NSF Research Infrastructure Grant: A3 - Anytime, Anywhere, Anything.
*NSF Principal Investigator Meeting*, Snowbird, Utah, Summer 2002.

An Access Control Language for Web Services.
*ACM Symposium on Access Control Models and Technologies (SACMAT)*, Naval
Postgraduate School, Monterey, California, June 3-4, 2002.

MagnetOS: An Operating System for Ad Hoc Networks.
*Symposium on Operating System Principles* WIP Session, Lake Louise, Banff,
Canada, October 2001.

Securing System Code. *Cornell Engineering Society (EGSA)*. Arpil 2001.

SPIN: A Retrospective on an Extensible System. Cornell Brown Bag Lunch, March
2001.

Distributed Virtual Machines: A New System Architecture for Networked Computers University of Pennsylvania, March 2000. University of Colorado, March 2000. Compaq Systems Research Center, March 2000. Dartmouth College, March 2000. University of Utah, April 2000. Oregon Graduate Institue, April 2000. Microsoft Research, April 2000. Massachusetts Institute of Technology, April 2000. Yale University, April 2000. Cornell University, May 2000.

Design and Implementation of a Distributed Virtual Machine for Networked Computers. *Symposium on Operating Systems Principles*, Kiawah Island, South Carolina, December 1999.

Testing Large Systems Using Production Grammars. *Microsoft Research*, Redmond, Washington, November 1999.

Testing Java Virtual Machines. *International Conference on Software Testing And Review*, San Jose, California, November 1999.

Using Production Grammars in Software Testing. *Second Symposium on Domain Specific Languages*, Austin, Texas, October 1999.

A Practical Approach for Improving Startup Latency for Java Applications. *Workshop on Compiler Support for Systems Software*, Atlanta, Georgia, May 1999.

Interaction of I/O and Memory Subsystem Design with Operating Systems. *CSE 548: Advanced Computer Architecture.* Invited Lecture, April 1999.

Distributed Virtual Machines: A System Architecture for Network Computing. *Eighth ACM SIGOPS European Workshop*, Sintra, Portugal, September 1998.

Networks and Operating Systems for Smart Spaces. The results of the operating systems workgroup at the at the *DARPA Graduate Student Workshop*, Rosslyn, Virginia, July 1998.

A System Architecture for Next Generation Network Computing. *DARPA Graduate Student Workshop*, Rosslyn, Virginia, July 1998.

Extensibility, Safety and Performance in the SPIN Operating System. *CSE 590YA: Operating Systems.* Invited Lecture, February 1998.

Verifying Verifiers: Techniques for Building Robust Virtual Machines. *Intel Research Labs*, Portland, Oregon, February 1998.

Verifying Java Verifiers. *Workshop on Security and Languages.* Palo Alto, California, October 1997.

Protection in Operating Systems. *CSE 451: Operating Systems.* Invited Lecture, October 1997.

Project Kimera. *Vortex/Diesel Project Retreat.* Invited Speaker. Blaine, Washington, June 1997.

Security in the Java Virtual Machine. *Seattle Java User's Group.* Invited Speaker. Seattle, Washington, June 1997.

Extensibility, Safety and Performance in the SPIN Operating System. *CSE 551: Advanced Operating Systems.* Guest Lecture, November 1996.

Extensible Routing. *SPIN/Loom Retreat.* Kalaloch Lodge, Olympic Peninsula, Washington, October 1996.

Replicated Web Search Engines. *SPIN/Loom Retreat.* Kalaloch Lodge, Olympic Peninsula, Washington, October 1996.

Synchronization Alternatives for Clusters of Workstations. *SPIN/Loom Retreat.* Kalaloch Lodge, Olympic Peninsula, Washington, October 1996.

Distributed Consensus. *SPIN/Loom Retreat.* Kalaloch Lodge, Olympic Peninsula, Washington, October 1996.

Developing an Operating System in Modula-3. Three paper presentation at the *First Annual Workshop on Compiler Support for System Software*, Tucson, Arizona, February 1996.

**Current Students**

Current Post-Doctoral Fellows:
Patrick Reynolds. Ph.D., Duke University, May 2006. I3P Fellow.

Current Ph.D. Students:
Hongzhou Liu
Ryan Peterson
Alan Shieh
Kevin Walsh
Daniel J. Williams
Bernard Wong

**Ph.D. Students**

Venugopalan Ramasubramanian. "Cost-Aware Resource Management For Decentralized Internet Services." Ph.D., Cornell University, September 2006.

**Academic Committees**

Adam Kravetz, M.Eng., Cornell University, Computer Science. Advisor: Don Greenberg. November 2005.
Vikash Goel, M.Eng., Cornell University, Computer Science. Advisor: Don Greenberg. Centerline Extraction and Analytical Surface Fitting. March 2005.
Martin Roth, Ph.D., Cornell University, Electrical and Computer Engineering. Advisor: Steve Wicker. "Biologically Inspired Ad-Hoc Routing." December 2004.
Yurong Chen, M.S., Cornell University, Electrical and Computer Engineering. Advisor: Steve Wicker. "Power-Aware Ad Hoc Routing." 2002.

**M.Eng. Projects**

Ivan Stoyanov. "Network Location with Octant." May 2006.
Justin Dewitt. "The CorSSO Single System Implementation." May 2005.
Dogan Famer Engin. "A Graphical User Interface for the Herbivore Anonymous Communication System." May 2005.
Vijay Kumar. "Peer-to-Peer Payments with KARMA." December 2004.
Andrew Davis. "The Design and Implementation of a Peer-to-Peer Web Crawler."
Martin Guerrero. "Inferring Software Behavior for Intrusion Detection without Source Code."
Jared Tolman. "Continuous Profiling with Linux."
Hung Tran. "Implementation of the Chord P2P System."
Sergio Wong. "Implementation of the Chord P2P System."
Ka Fa Lau. "Linux Modifications for Continuous Profiling."
Niphon Watcharaphalakorn. "Network Simulation with NS2. 2002.
Charnchai Patthananuphap. "A Crypto Toolkit." 2002.

| | |
|---|---|
| **Sponsored Undergraduate Research** | Ilya Sukhar. CoDoNS.<br>Rohan N. Murty. Sextant & Honeycomb.<br>Mike Jennings. SHARP.<br>Tianyu Xie. Herbivore.<br>Matthew Wachs. MagnetOS.<br>Alex Mouchtchouk. Dynamo.net.<br>Aleksandr Livshin. Dynamo.net.<br>Paul Young. FS-Tracer.<br>Tammy Wu. Java Card Verifier.<br>Ramiro Rodriguez. Intrusion Detection.<br>Nir Etzion. Web Service Security.<br>John Bicket. MagnetOS.<br>Daniel Dantas. MagnetOS.<br>Bowei Du. MagnetOS.<br>Milo Polte. Herbivore.<br>Mark Robson. Herbivore.<br>Annie Wu. Java Card Verification.<br>Kristin Snopkowski. Java Card Programming.<br>Mark Schwesinger. Vulnerability detection.<br>Eric Huestis. Typhonet.<br>Cortney Tompos. Typhonet.<br>Ian Fung. Typhonet.<br>Danny Kim. Ad hoc routing.<br>Bing Zhao. Transparent application partitioning.<br>Daniel Simone. Typhonet. |

| | |
|---|---|
| **Program Committees** | USENIX Annual Technical Conference (USENIX ATC), 2012, Co-Chair.<br>Networked System Design and Implementation (NSDI), 2008, Co-Chair.<br>International Workshop on Peer-to-Peer Systems (IPTPS), 2006, Co-Chair.<br>Workshop on Economics of Peer-to-Peer Systems (P2PECON), 2005, Co-Chair.<br>EuroSys Authoring Workshop, 2006, Organizing Committee. |

Member:
ACM Symposium on Operating System Design and Implementation (OSDI), 2014.
International Workshop on Hot Topics in Networking (Hotnets), 2012.
ACM Symposium on Operating System Design and Implementation (OSDI), 2012.
SIGCOMM Conference, 2012.
ACM Symposium on Networked System Design and Implementation (NSDI), 2012.
European Conference on Computer Sytems (EuroSys), 2012.
SIGCOMM Conference, 2011.
Symposium on Operating System Design and Implementation (OSDI), 2010.
ACM SIGCOMM Conference, 2010.
USENIX Annual Technical Conference (USENIX ATC), 2010.
ACM Symposium on Operating System Principles (SOSP), 2009.
Networking Meets Databases Workshop (NetDB), 2009.
Symposium on Principles of Distributed Computing (PODC), 2008.
ACM Symposium on Networked System Design and Implementation (NSDI), 2008.
European Conference on Computer Systems (EuroSys), 2008.
ACM Symposium on Networked System Design and Implementation (NSDI), 2007.
Usenix Annual Technical Conference (USENIX ATC), 2007.
ACM Symposium on Networked System Design and Implementation (NSDI), 2007.
ACM SIGCOMM Conference, 2006.
Workshop on the Economics of Networked Systems (NetEcon), 2006.
Conference on Middleware, 2006.
ACM Symposium on Networked System Design and Implementation (NSDI), 2006.
ACM Symposium on Operating System Principles (SOSP), 2005.
IEEE Communications Society Conference on Sensor and Ad Hoc Communications and Networks (SECON), 2005.
The Fourth International Workshop on Peer-to-Peer Systems (IPTPS), 2005.
International Conference on Distributed Computing Systems (ICDCS), 2005.
ACM/IEEE/SCS Workshop on Principles of Advanced and Distributed Simulation (PADS), 2005.
IEEE Communications Society Conference on Sensor and Ad Hoc Communications and Networks (SECON), 2004.
Workshop on the Economics of Peer-to-Peer Systems (P2PECON), 2004.

| | |
|---|---|
| **Professional Activities** | Member of ACM, USENIX and IEEE.<br>Referee for ACM Transactions on Computer Systems (TOCS), Symposium on Operating System Principles (SOSP), Symposium on Operating System Design and Implementation (OSDI), Mobihoc, Conference of the IEEE Communications Society (INFOCOM), Oakland Security Conference, International Conference on Architectural Support for Programming Languages and Operating Systems (ASPLOS), Conference on Programming Language Design and Implementation (PLDI), International Symposium on Computer Architecture (ISCA), Symposium on Principles of Distributed Computing (PODC), ACM Surveys, Transactions on Software Engineering and Methodology (TOSEM), ICDCS, DISC, DISCEX, HOTOS, Software: Practice and Experience, and others. |

| **Affiliations** | Electrical and Computer Engineering, Field Member. |
| | Electrical and Computer Engineering, Computer Systems Lab. |
| | TRUST, Team for Research in Ubiquitous Secure Technology, Member. |
| | Information Assurance Institute, Member. |
| | Institute for Information Infrastructure Protection, Cornell Liaison. |
| | Griffiss Institute, Member. |
| | PlanetLab, Cornell PI. |

**University Service**

Academic Oversight Committee for Cornell Tech NYC. 2010-2012.

Cornell Faculty Advisory Board on Information Technology (FABIT). January 2005-2008.

**Funding**

NSA-NICECAP. Co-PI. Nexus Operating System for Trustworthy Computing. Submitted, under review. $1,300,000

NSF-CyberTrust. PI. Nexus: A New Operating System for Trusted Computing, 2006-2008. $400,000.

NSF-CAREER. PI. Building Robust, High-Performance Infrastructure Services through Informed Resource Tradeoffs. 2006-2011.

AFOSR. Co-PI. Team for Research in Ubiquitous Secure Technology.

NSF-STC. Co-PI?. Team for Research in Ubiquitous Secure Technology. September 15, 2005 – September 15, 2010.

Air Force. Member. Information Assurance Institute.

NSF-NETS/NOSS. Co-PI. Ultra Low-Power, Self-Configuring, Wireless Sensor Networks, September 15, 2004 – September 15, 2007.

NSF-CRCD. PI. The Ad Hoc Classroom: Integrating Emerging Wireless Communications and Networking Technologies into Mainstream Computer Science and Electrical Engineering Curricula, 2002-2005. $410,000.

Microsoft, Inc. PI. The Ad Hoc Classroom: Integrating Emerging Wireless Communications and Networking Technologies into Mainstream Computer Science and Electrical Engineering Curricula, 2003. $75,000.

Hewlett-Packard, Inc. PI. The Ad Hoc Classroom: Integrating Emerging Wireless Communications and Networking Technologies into Mainstream Computer Science and Electrical Engineering Curricula, 2002. $20,000.

NSF-ITR. Co-PI. Massively Convergent Computing, 2002-2005. $900,000.

Intel, Inc. Co-PI. PlanetLab: Open Testbed for Planetary-Scale Services, 2002. $10,000.

Microsoft, Inc. Co-PI. Query Caching and Routing for Mobile Ad Hoc Clients in the .NET Framework. 2002. $130,000.

Microsoft, Inc. PI. Assuring the Security of Components in the .NET Framework, 2001-2004. $348,445.

Hewlett-Packard, Inc. PI. Cornell University Interactive Campus, 2001. $212,000.

Schlumberger Inc. PI. Assuring the Security of Java Card Operating Systems Using Automated Techniques, 2001. $30,000.

Microsoft, Inc. PI. Integration of Mobile Devices into the Operating Systems Curriculum, 2000. $20,000.

# Exhibit B

# KARMA : A Secure Economic Framework for Peer-to-Peer Resource Sharing

Vivek Vishnumurthy, Sangeeth Chandrakumar and Emin Gün Sirer

*Department of Computer Science, Cornell University, Ithaca, NY 14853*

## Abstract

*Peer-to-peer systems are typically designed around the assumption that all peers will willingly contribute resources to a global pool. They thus suffer from freeloaders, that is, participants who consume many more resources than they contribute. In this paper, we propose a general economic framework for avoiding freeloaders in peer-to-peer systems. Our system works by keeping track of the resource consumption and resource contribution of each participant. The overall standing of each participant in the system is represented by a single scalar value, called their* karma. *A set of nodes, called a* bank-set, *keeps track of each node's karma, increasing it as resources are contributed, and decreasing it as resources are consumed. Our framework is resistant to malicious attempts by the resource provider, consumer, and a fraction of the members of the bank set. We illustrate the application of this framework to a peer-to-peer filesharing application.*

## 1 Introduction

Recent years have seen the introduction of peer-to-peer systems, whose design relies centrally on exchange of resources between peers. The utility of such systems is proportional to the aggregate amount of resources that the peers are willing to pool together. While many peer-to-peer systems have implicitly assumed that peers will altruistically contribute resources to the global pool and assist others, recent empirical studies have shown that a large fraction of the participants engage in freeloading: 20 to 40% of Napster and almost 70% of Gnutella peers share little or no files [1, 2]. This is not surprising, since there is little concrete incentive for peers to contribute resources.

This paper outlines the design of a peer-to-peer system that incentivizes participating nodes to contribute resources to a global pool, and illustrates how this economic framework can be used in a filesharing system. Our system, called KARMA, is economic, that is, it works by keeping track of the resource purchasing capability of each peer. A *resource* in KARMA can be any-

thing exchanged between two peers, such as files, messages, or the result of a computation. A single scalar value, called *karma*, captures the amount of resources that a peer has contributed and consumed, and represents the user's standing within the global system. Groups of nodes, called *bank-sets*, keep track of the karma belonging to the users. A user is initially awarded a seed amount of karma when he joins the system. The karma balance is adjusted upwards whenever the user contributes resources, and downwards whenever he consumes resources. A transaction is not allowed to proceed if the resource-consumer has less karma than it takes to make the payment for the resources involved. Thus, participants are ultimately forced to achieve parity between the resources they contribute and those they consume.

The economic framework presented in this paper provides the properties of non-repudiation, certification, and atomicity. That is, KARMA protects against malicious providers that promise a resource but do not deliver it completely, against malicious consumers that receive a resource but claim that they did not, and against transient states of the system where participants can observe intermediate states in the process of transferring karma from one account to the other. KARMA uses an atomic transaction scheme that provides the resource consumer with the key to decrypt the resource simultaneously as it provides the provider with a certificate of receipt. Also, KARMA limits the effects of large-scale inflation and deflation by applying periodic corrections to the outstanding karma in the system.

## 2 Overview

In this section, we describe the basic operation of KARMA in the context of a file-sharing application. While file-sharing is useful as a tangible example, we note that the basic transfer protocols in KARMA can be used equally well with other kinds of resources, such as file blocks instead of whole files, messages in a publish-subscribe system, or the results of a computation in a grid computing system.

Three fundamental properties stemming from the peer-to-peer domain guide the design of our system. First,

1



Fig. 1: Overview of system state. $A$ has a balance of $15 karma, and has recently paid $B$ $5 for file $file3$.

since KARMA is designed to complement peer-to-peer systems, the system itself needs to be completely distributed and require no centralized functionality or trust. Second, since there are no failure-proof components in a loosely-organized network of peers, account data needs to be replicated, possibly extensively, to insure against loss and tampering. Third, since a transaction system needs to perform well, the coordination among the replicas must be kept to a minimum. Karma's design strives to achieve these goals.

KARMA relies principally on replication to deter nodes that might try to subvert the protocol. It assumes that there are at least $k$ nodes in the system at all times, and uses protocols to ensure that the system will operate correctly unless a substantial fraction of these nodes are malicious.

### 2.1 Maintenance of Bank-Set Information

KARMA maintains all of its internal state in a peer-to-peer distributed hash table (DHT). The bank-set $Bank_A$ of a node $A$ is a set of $k$ peers that independently maintain the karma balance of that node. KARMA uses the distributed hash table to map nodes to bank-sets. Each participant and each unique peer node are assigned a secure, random identifier in a circular identifier space. The $k$ closest nodes in the identifier space to $HASH(nodeId(A))$ constitute the bank-set of $A$. While any other mapping scheme can be used, this particular approach allows us to layer our implementation on top of an existing DHT like Pastry [3], whose security and resilience to attacks is well-studied [4]. Picking $k$ consecutive hosts for the bank-set allows the secure routing to the bank-set to be performed efficiently.

Each member of $Bank_A$ stores the amount of karma in $A$'s account, signed with $A$'s private key, as well as a transaction log containing recent payments $A$ has made to other nodes. Signing of the balance by $A$ ensures that

the value is tamper-resistant. The transaction log acts as proof of $A$'s payment, and comes into play if the other party in the transaction does not send $A$ the file for which the payment was made. The bank-set corresponding to each node also stores (i) the last used *sequence-number*, which is part of the message sent by a node authorizing its bank-set to transfer karma from its account to the account of some other member, and (ii) the current epoch number. Each epoch spans a fixed length of time, typically several months, and at the end of each epoch, currency adjustments are made so that the per-capita karma in the system is roughly constant, as described in Section 2.3 on inflation and deflation. The sequence number used by a node is incremented after each transaction, and eliminates the possibility of replay attacks. Figure 1 shows a snapshot of KARMA.

### 2.2 Maintenance of File Information

Systems employing KARMA will need to provide their own mechanisms for peering participants to exchange resources, and to agree on a reasonable amount of karma for the requested resource. While KARMA leaves this decision entirely to KARMA-based applications, we illustrate how a typical file transfer application is integrated with KARMA. In a KARMA-based filesharing system, each file is assigned a $fileId$ through some consistent hashing mechanism. The node closest to the $fileId$ serves as a rendezvous point for peers who are offering and seeking that file. When a node $A$ joins the network, it publishes its identifier under the $fileId$ of each file it has available for downloads. A node seeking to download a particular file acquires this list and initiates an auction by asking providers to submit a karma bid to transfer the file in question. It then selects the lowest bidder, though other alternatives, such as second-price auctions are also possible. To reduce communication overhead and ensure freshness, file advertisements are lease-based and expire after a certain amount of time unless refreshed.

### 2.3 Offsetting Inflation and Deflation

With time, the per-capita karma, i.e., the total karma divided by the number of active users varies. It inflates when nodes use up their money and leave the system, and deflates when nodes accrue karma and leave. If uncontrolled, the value of a unit of karma could go out of bounds. To prevent this, the outstanding karma in the system is periodically re-valued so that the per-capita karma is maintained at a constant level. The *Correction Factor*($\rho$) applied to the karma is computed at the end of every epoch, according to $\rho = \frac{Karma_{old}.N_{new}}{Karma_{new}.N_{old}}$, where $Karma_{old}$ is the total karma at the beginning of this epoch and $N_{old}$ is the total active nodes at the beginning of the epoch. At the end of an epoch, each node in

a bank-set transmits to all nodes a message containing (i) the number of nodes in the bank-set that went inactive in this epoch and their unused karma balance, (ii) the number of new nodes that joined the system in this epoch.

When a node receives these messages from all nodes in the system, it computes the current number of nodes in the system ($N_{new}$) and the current total karma in the system ($Karma_{new}$). Using the previously stored values of $Karma_{new}$ and $N_{new}$, the node computes the adjustment to be applied, applies it to accounts for which it is part of the bank-set and increments the epoch number. Because of the distributed nature of the correction, nodes could be in different epochs at the same time. When two such nodes engage in a transaction, appropriate currency conversion is made to maintain consistency. E.g.: if the correction has been applied at the payee's bank-set, but not yet applied at the payer's bank-set, the amount credited to the payee is the amount paid by the payer scaled by the correction factor. This scheme needs $O(N^2)$ messages to be transmitted at the end of each epoch, where $N$ is the number of nodes in the system, but since each epoch typically spans several months, the cost of the global correction does not lead to an unacceptable burden on the network.

## 3 Initialization

This section describes how a new node becomes part of KARMA. When a node enters the overlay, it has to be assigned a bank-set. This assignment has to be performed securely, as manipulating the bank-set assignment may allow a node to adjust its karma balance at will. A cryptographic puzzle ensures that the assignment is random, and limits the rate at which a given node can join the system. To join KARMA, each new node selects a random $K_{public}$ and $K_{private}$ key pair, and a value $x$ such that $MD5(K_{public})$ equals $MD5(x)$ in the lower $n$ digits, where $n$ is a parameter that can be used to limit the difficulty of the puzzle. The nodeId is then set to $MD5(K_{public}, x)$, and the node certifies that it completed this computation by encrypting challenges provided by its bank-set nodes with its private key. Thus each node is assigned an id beyond its immediate control, and acquires a public-private key pair that can be used in later stages of the protocol without having to rely on a public-key infrastructure.

When node $A$ enters the system, its corresponding bank-set members check to see if $A$ was already a member of the system by looking for an entry for $A$ in their databases. Each bank-set node sends to every other member of the bank-set (i) a message with $A$'s account information signed by $A$ and recent transaction history if it finds $A$'s entry (ii) a message indicating that $A$ is a new member if it does not find an entry. These messages

are signed by the private keys of the corresponding bank-set members, and therefore cannot be forged. If a bank-node receives more than $k/2$ such messages agreeing on $A$'s balance and sequence number, it uses the indicated balance for $A$. Otherwise, the bank-node initializes $A$'s account with a system-wide constant amount, and a sequence number of zero. Consequently, the karma assignment is persistent, and previous solutions to the cryptographic puzzle cannot be reused to acquire new karma.

When a new node $N$ comes up, it has to start functioning as a bank node for all nodes whose bank-sets now include $N$. $N$ contacts the relevant bank-nodes, and obtains the required account balances using a majority vote with signed data, similar to the procedure described above. Note that non-malicious members of the bankset engaged in simultaneous karma transfers and are at different stages of the protocol may legitimately disagree on the current value of the account balance. Hence, if a majority consensus on the balance and sequence number is not reached, the newly joining node waits a period of time before selectively polling that account value, until a majority consensus is established.

Handling of a change in the bank-set due to a banknode failure is similar to the case when a new bank-node comes in. When a bank-node $P$ goes down, a new node $R$ becomes part of the bank-set. The underlying DHT detects $P$'s failure, and $R$ initiates a similar discovery mechanism for accounts whose bank-sets now include $R$.

## 4 The Karma-File Exchange

The karma exchange transaction forms the heart of our system. Once a consumer node $A$ selects a provider $B$ according to the procedure outlined in Section 2.2, the file can exchange hands in return for karma. This exchange has to be karma-conserving and fair, that is, filereceiver $A$'s account has to be decremented by the transaction cost and the file-provider $B$'s account incremented by the same amount if and only if $B$ sends $A$ the required file. This is ensured by first making a provable karmatransfer from $A$'s account to $B$'s account, and then making a provable file-transfer from $B$ to $A$.

### 4.1 Karma Transfer

Throughout the Karma transfer protocol, each bank set node acts independently of all other nodes in the same bank set. KARMA takes advantage of the properties of the credit/debit interface to tolerate temporary inconsistencies between bank-set members. This obviates the need for expensive Byzantine consensus protocols.

The karma transfer from $A$ to $B$ is carried out in the following fashion: (see Fig.2) $A$ first sends to $B$ a signed message authorizing $Bank_A$ to transfer a given amount of karma to $B$. $B$ forwards this message to its bank-set, who contact $Bank_A$ in turn. If $A$ has sufficient karma



Fig. 2: Karma-File exchange

in its account to fund the transaction, the amount is deducted from $A$'s account and credited to $B$'s account, and $B$ can proceed with the file-transfer to $A$. For security, the protocol has to take care to see that every one of these messages is authenticated. We now explain how this authentication is carried out at each step of the protocol, and how the protocol operates without the aid of expensive agreement protocols among bank nodes.

The first transfer request sent by $A$ includes the balance $A$ would have at the end of the transaction, and is signed using $A$'s private key. The request includes a unique sequence number to avoid message replay.

$B$ forwards the request along with its own signed balance to $Bank_B$. Each $Bank_B$ node then sends to $Bank_A$ queries that include the original transfer request sent by $A$. $Bank_A$ nodes check if the balance signed by $A$ is indeed the valid balance of $A$, and if so, reply to $Bank_B$ with positive acknowledgements. $Bank_A$ nodes then deduct the given amount from $A$'s account, and inform $A$ of the transfer. $Bank_B$ nodes that get a majority of positive responses from $Bank_A$ credit the amount to $B$'s account, and inform $B$ of the transfer. $B$ can now proceed to transfer the given file to $A$.

Signing of balances by both $A$ and $B$ maintains the invariant that correctly functioning bank-nodes have the latest signed bank-balances corresponding to each of their client nodes, thus preventing malicious bank-nodes from setting balances to arbitrary values.

At every stage of the protocol, bank nodes independently decide whether to proceed with the transaction. It is possible for a bank node to perceive transactions in a different order from other members of the same bank-set. Commutativity of addition guarantees that, once the node stops initiating new transactions and messages have propagated, bank members will agree on the same bank account balance. This observation greatly simplifies the KARMA protocol by obviating costly agreement proto-

cols, though it has a non-intuitive side-effect. A node's account balance at a particular bank-node may temporarily dip below zero, only to be restored when a later credit goes through. For instance, suppose a node with a zero account balance provides a file for $y$ karma, and purchases a file for $x$ karma, where $x < y$. A bank-set member that receives the debit for $x$ before the credit for $y$ informs the corresponding bank-set that the transaction should not continue. But if it is overruled by a majority of its own bank-set who perceived the credit before the debit, it goes through the protocol and locally adjusts the account balance to be $-x$. This accounting trick preserves commutativity when less than $k/2$ of the hosts perceive a different event ordering than the majority of the bank-set and allows the system to make forward progress without blocking.

Since KARMA does not require any distributed coordination between bank-set members, its performance is determined by two factors: (1) the DHT lookup latency for securely mapping a node to its bank-set, and (2) network transmission overhead between a $k$ to $k$ mapping of the provider's and consumer's bank-sets. We rely on the scheme suggested in [4] to perform the mapping securely, tolerating up to a fraction of malicious nodes in the peer-to-peer system. The time required for karma transfer is then reduced, since most messages are transmitted directly between the communicating parties, bypassing the overlay.

The preceding discussion outlined the basics of our approach for accounting for resource usage and contribution in a peer-to-peer system. By keeping track of a virtual currency that corresponds to how well-behaved users are, KARMA can force consumers to achieve parity between resources they consume and provide. However, the KARMA system itself requires the participating nodes to perform work on behalf of other nodes. In particular, each node is faced with the burden of following the protocol and keeping track of account information on behalf of other nodes for which it serves as a bank node. From a game-theoretic perspective, there is no strong incentive for a node to follow the protocol, and KARMA itself may suffer from freeloaders who keep accounts in the system without shouldering its load!

Luckily, the economic framework KARMA implements offers a ready solution: KARMA can compensate bank-set members for taking part in transactions by awarding them with a small amount of karma. However, care must be taken to avoid two potential problems. First, performing more than one transaction in response to a single transaction will create a chain reaction and grind the system to a halt. However, a suitable dampening function, e.g. awarding nodes extra karma only

after a node has performed $10^4$ transactions, can address this problem. Second, providing extra karma to participants will violate the zero-sum properties of karma transactions and exacerbate inflation. While KARMA has mechanisms that compensate for with inflation over large time frames, simply taxing the resource provider, or consumer, or both, might be a simpler solution that preserves the zero-sum property.

## 4.2 File Transfer

We use the Certified Mail Scheme [5] for a provable file transfer mechanism. The proof of delivery here is the receipt for the delivery of the file signed with the receiver's private key. Briefly, the sender first sends the receiver the file encrypted with a secret DES key, and then the sender and the receiver run the protocol, through which the receiver gets the key to decrypt the file if and only if the sender gets the required receipt. This transfer is carried out directly between the two nodes involved, and not over the overlay.

If node $A$ makes a payment to node $B$ for a certain file, but $B$ does not send $A$ the file, $A$ informs $Bank_A$ of this; $Bank_A$ talks to $Bank_B$, and $Bank_B$ asks $B$ to produce the appropriate receipt. Since $B$ did not send $A$ the file, it would not have the required receipt either; so $Bank_B$ would transfer the karma back from $B$ to $A$.

Note that the use of this mechanism is not limited to file-sharing applications alone; it can be used in any scenario where the required resource can be expressed as a sequence of bytes. This sequence of bytes could be the result of a computationally intensive function in a grid-computing system. The same mechanism can still be used to transfer the end result after the karma transfer. The use of a currency independent of any single type of resource enables KARMA to be incorporated into different peer-to-peer applications.

## 5 Possible Attacks

We now present a list of possible attacks that can be launched against the system, and describe how our system handles these attacks.

**Replay Attacks:** Replay attacks are ruled out by the use of sequence numbers and signatures when a node authorizes its bank-set to transfer karma in the first step of the karma transfer protocol, and the verification mechanism employed by any bank-set when some other bank-set wants to deposit karma.

**Malicious Provider**: A provider that accepts payment but fails to complete the transaction can be contested, and the karma repaid back to the consumer.

**Malicious Consumer**: A malicious consumer who fraudulently claims that he did not receive services even though he did is thwarted by the use of certificates. The provider simply provides the certificate to his bank-set

when the transaction is complete.

**Attacks against DHT routing**: A faulty node that is part of the path used to deliver a message sent by a non-faulty node can attempt to disrupt message delivery by dropping the message entirely, or by modifying the contents of the message. Secure routing [4] , with the use of appropriate signing of messages, ensures reliable message delivery even when up to 25% of the nodes in the system do not adhere to the prescribed routing protocol.

**Corrupt Bank-set**: A malicious attacker that acquires a majority of a bank-set can manufacture any amount of karma for the nodes that map to that particular bank-set. The use of the secure entry algorithm, however, ensures that targeting a bank-set is not feasible. Assume that an attacker has compromised 10% of a $10^6$ node network. Denoting by $X$ the number of nodes controlled by the attacker in a $given$ bank-set, we have: $Exp(X) = 6.4$, and the probability of this attacker acquiring the majority of a 64-member bank-set: $P(X > 32) = P(X > (1 + 4)6.4) < (\frac{e^4}{5^5})^{6.4} = 5.6 \times 10^{-12}$. The probability that the attacker controls the majority in $some$ bank-set is less than the above value multiplied by the total number of bank-sets, i.e., $5.6 \times 10^{-6}$. Therefore, the limiting factor to KARMA's tamper-resilience lies in the p2p routing substrate, and not in the higher level protocols.

**Denial of Service Attack**: Malicious nodes that send dummy NACKs to break a karma-transfer are thwarted by the checks employed to see if the NACKs originate from the authentic bank-set.

**Sybil Attacks**: In a peer-to-peer domain without external identifiers, any node can manufacture any number of identities [6]. This is a fundamental problem in any P2P system. The use of an external identifier, such as a credit card number or unique processor id, would address this problem at the loss of privacy. We permit Sybil attacks but limit the rate at which they can be launched through our secure entry algorithm

## 6 Related Work

**Fair-sharing of Resources in P2P Systems:** Ngan et al in [7] present a design that enforces fair-sharing in P2P storage systems. Their goal is to ensure that the diskspace a user is willing to put up for storing other users' files is greater than the space consumed by the user's files on other disks. Whether a user is really storing the files he says he is storing is verified by random audits. This design makes use of the fact that the resource in contention is spatial in nature: any user's claim that he is storing files for other users can be verified after the claim is made. This design cannot be extended to the scenario we are concerned with, namely the contention for temporal resources like bandwidth; here the resource contribution is not continuous across time.

**Micropayment Schemes:** A number of micropayment schemes [8] have been proposed to support lightweight transactions over the internet, such as making a small payment for accessing a page at a restricted site. The primary aim of these schemes is to enable a level of security commensurate with the value of the transaction, while having almost negligible overhead. Some schemes also provide a degree of anonymity to the parties in a transaction via trusted common brokers. Unfortunately, almost all of these schemes require a trusted centralized server. Many micropayment schemes assume the existence of brokers that give out currency to users, and then handle the deposit of currency from the vendors. These assumptions of trusted third parties do not translate well into a peer-to-peer domain.

**Microeconomic Models for Resource Allocation in Distributed Systems:** Various decentralized microeconomic schemes have been proposed to solve resource allocation problems such as load balancing and network flow problems in computer systems [9]. The KARMA economy presented in our paper is similar to the pricing economic models proposed in these systems. In these systems, different resource consumers and resource consumers act as independent agents in a selfish manner to maximize their respective utility values. The proposed strategies that maximize individual utility values can be overlaid on top of the KARMA economy as well.

**Applying Mechanism Design to P2P systems:** Shneidman et al in [10] advocate the use of mechanism design in p2p systems to make users behave in a globally beneficiary manner. KARMA, by tracking each user's resource contribution, aims to do the same.

## 7 Conclusions

In this paper, we propose an economic framework for discouraging freeloader-like behavior in a peer-to-peer system, and provide the design of a file-sharing application based on this framework. In this framework, each node has an associated bank-set that keeps track of the node's karma balance, which is an indicator of its standing within the peer community. The bank-set allows a resource consuming operation by the node only if the node has sufficient karma in its account to allow the operation. Safeguards protect the system against malicious nodes that may attempt to manufacture karma, acquire services from peers without providing them with karma, or acquire karma and refuse to provide services. Built on top of a peer-to-peer overlay, the proposed design can complement other peer-to-peer services and force nodes to achieve a parity between the resources they provide and the resources they consume.

## References

[1] S. Saroiu, P. K. Gummadi, and S. D. Gribble. A measurement study of peer-to-peer file sharing systems. In *Proc. MMCN 2002*, San Jose, January 2002.

[2] E. Adar and B. Huberman. Free riding on Gnutella. *First Monday*, 5(10), October 2000.

[3] A. Rowstron and P. Druschel. Pastry: Scalable, distributed object location and routing for large-scale peer-to-peer systems. In *Proc. IFIP/ACM Middleware 2001*, Heidelberg, Germany, November 2001.

[4] M. Castro, P. Druschel, A. Ganesh, A. Rowstron, and D. Wallach. Secure routing for structured peer-to-peer overlay networks. In *Proc. OSDI02*, Boston, Dec. 2002.

[5] B. Schneier *Applied Cryptography*, John Wiley and Sons, 2nd edition, 1995.

[6] J. Douceur. The Sybil attack. In *Proc. IPTPS 02*, Cambridge, March 2002.

[7] T. Ngan, D. S. Wallach, and P. Druschel. Enforcing Fair Sharing of Peer-to-Peer Resources. In *Proc. IPTPS 03*, Berkeley, February 2003.

[8] P. Wayner. *Digital Cash: Commerce on the Net.*, Morgan Kaufmann, 2nd edition, April 1997. , 1996.

[9] D. F. Ferguson, C. Nikolaou, J. Sairamesh, and Y. Yemini. Economic Models for Allocating Resources in Computer Systems. In S. Clearwater, editor, *Market Based Control of Distributed Systems*. World Scientific Press, 1996.

[10] J. Shneidman, and D. Parkes. Rationality and Self-Interest in Peer to Peer Networks. In *Proc. IPTPS 03*, Berkeley, February 2003.

# Exhibit C

# Majority is not Enough:
# Bitcoin Mining is Vulnerable[*]

Ittay Eyal and Emin Gün Sirer

Department of Computer Science, Cornell University
ittay.eyal@cornell.edu, egs@systems.cs.cornell.edu

**Abstract.** The Bitcoin cryptocurrency records its transactions in a public log called the blockchain. Its security rests critically on the distributed protocol that maintains the blockchain, run by participants called miners. Conventional wisdom asserts that the mining protocol is incentive-compatible and secure against colluding minority groups, that is, it incentivizes miners to follow the protocol as prescribed.

We show that the Bitcoin mining protocol is not incentive-compatible. We present an attack with which colluding miners obtain a revenue larger than their fair share. This attack can have significant consequences for Bitcoin: Rational miners will prefer to join the selfish miners, and the colluding group will increase in size until it becomes a majority. At this point, the Bitcoin system ceases to be a decentralized currency.

Unless certain assumptions are made, selfish mining may be feasible for any group size of colluding miners. We propose a practical modification to the Bitcoin protocol that protects Bitcoin in the general case. It prohibits selfish mining by pools that command less than 1/4 of the resources. This threshold is lower than the wrongly assumed 1/2 bound, but better than the current reality where a group of any size can compromise the system.

## 1 Introduction

Bitcoin [23] is a cryptocurrency that has recently emerged as a popular medium of exchange, with a rich and extensive ecosystem. The Bitcoin network runs at over $42 \times 10^{18}$ FLOPS [9], with a total market capitalization around 12 billion US Dollars as of January 2014 [10]. Central to Bitcoin's operation is a global, public log, called the *blockchain*, that records all transactions between Bitcoin clients. The security of the blockchain is established by a chain of cryptographic puzzles, solved by a loosely-organized network of participants called *miners*. Each miner that successfully solves a cryptopuzzle is allowed to record a set of transactions, and to collect a reward in Bitcoins. The more *mining power* (resources) a miner applies, the better are its chances to solve the puzzle first. This reward structure provides an incentive for miners to contribute their resources to the system, and is essential to the currency's decentralized nature.

The Bitcoin protocol requires a majority of the miners to be *honest*; that is, follow the Bitcoin protocol as prescribed. By construction, if a set of colluding miners comes to command a majority of the mining power in the network,

---

[*] This research was supported by the NSF Trust STC and by DARPA

the currency stops being decentralized and becomes controlled by the colluding group. Such a group can, for example, prohibit certain transactions, or all of them. It is, therefore, critical that the protocol be designed such that miners have no incentive to form such large colluding groups.

Empirical evidence shows that Bitcoin miners behave strategically and form pools. Specifically, because rewards are distributed at infrequent, random intervals, miners form mining pools in order to decrease the variance of their income rate. Within such pools, all members contribute to the solution of each cryptopuzzle, and share the rewards proportionally to their contributions. To the best of our knowledge, such pools have been benign and followed the protocol so far.

Indeed, conventional wisdom has long asserted that the Bitcoin mining protocol is equitable to its participants and secure against malfeasance by a non-majority attacker (Section 7). Barring recently-explored Sybil attacks on transaction propagation [4], there were no known techniques by which a minority of colluding miners could earn disproportionate benefits by deviating from the protocol. Because the protocol was believed to reward miners strictly in proportion to the ratio of the overall mining power they control, a miner in a large pool was believed to earn the same revenue as it would in a small pool. Consequently, if we ignore the fixed cost of pool operation and potential economies of scale, there is no advantage for colluding miners to organize into ever-increasing pools. Therefore, pool formation by honest rational miners poses no threat to the system.

In this paper, we show that the conventional wisdom is wrong: the Bitcoin mining protocol, as prescribed and implemented, is not incentive-compatible. We describe a strategy that can be used by a minority pool to obtain more revenue than the pool's fair share, that is, more than its ratio of the total mining power.

The key idea behind this strategy, called Selfish Mining, is for a pool to keep its discovered blocks private, thereby intentionally forking the chain. The honest nodes continue to mine on the public chain, while the pool mines on its own private branch. If the pool discovers more blocks, it develops a longer lead on the public chain, and continues to keep these new blocks private. When the public branch approaches the pool's private branch in length, the selfish miners reveal blocks from their private chain to the public.

This strategy leads honest miners that follow the Bitcoin protocol to waste resources on mining cryptopuzzles that end up serving no purpose. Our analysis demonstrates that, while both honest and selfish parties waste some resources, the honest miners waste proportionally more, and the selfish pool's rewards exceed its share of the network's mining power, conferring it a competitive advantage and incentivizing rational miners to join the selfish mining pool.

We show that, above a certain threshold size, the revenue of a selfish pool rises superlinearly with pool size above its revenue with the honest strategy. This fact has critical implications for the resulting system dynamics. Once a selfish mining pool reaches the threshold, rational miners will preferentially join selfish miners to reap the higher revenues compared to other pools. Such a selfish mining pool can quickly grow towards a majority. If the pool tips the majority

threshold (due to the addition of malicious actors aimed at undermining the system, rational actors wishing to usurp the currency, perhaps covertly, or due to momentum in pool popularity), it can switch to a modified protocol that ignores blocks generated outside the pool, to become the only creator of blocks and reap all the mining revenue. A majority pool wishing to remain covert may remain a benign monopolist, accepting blocks from third-parties on occasion to provide the illusion of decentralization, while retaining the ability to reap full revenue when needed, as well as the ability to launch double-expenditure attacks against merchants. Either way, the decentralized nature of the currency will have collapsed, and a single entity, the selfish pool manager, will control the system.

Since a selfish mining pool that exceeds threshold size poses a threat to the Bitcoin system, we characterize how the threshold varies as a function of message propagation speed in the network. We show that, for a mining pool with high connectivity and good control on information flow, the threshold is close to zero. This implies that, if less than 100% of the miners are honest, the system may not be incentive compatible: The first selfish miner will earn proportionally higher revenues than its honest counterparts, and the revenue of the selfish mining pool will increase superlinearly with pool size.

We further show that the Bitcoin mining protocol will never be safe against attacks by a selfish mining pool that commands more than 1/3 of the total mining power of the network. Such a pool will always be able to collect mining rewards that exceed its proportion of mining power, even if it loses every single block race in the network. The resulting bound of 2/3 for the fraction of Bitcoin mining power that needs to follow the honest protocol to ensure that the protocol remains resistant to being gamed is substantially lower than the 50% figure currently assumed, and difficult to achieve in practice. Finally, we suggest a simple modification to the Bitcoin protocol that achieves a threshold of 1/4. This change is backwards-compatible and *progressive*; that is, it can be adopted by current clients with modest changes, does not require full adoption to provide a benefit, and partial adoption will proportionally increase the threshold.

In summary, the contributions of this work are:

1. Introduction of the Selfish-Mine strategy, which demonstrates that Bitcoin mining is not incentive compatible (Section 3).
2. Analysis of Selfish-Mine, and when it can benefit a pool (Section 4).
3. Analysis of majority-pool formation in face of selfish mining (Section 5).
4. A simple backward-compatible progressive modification to the Bitcoin protocol that would raise the threshold from zero to 1/4 (Section 6).

We are unaware of previous work that addresses the security of the blockchain. We provide an overview of related work in Section 7, and discuss the implications of our results in Section 8.

## 2    Preliminaries

Bitcoin is a distributed, decentralized crypto-currency [8,7,23,6]. The users of Bitcoin are called *clients*, each of whom can command accounts, known as *addresses*. A client can send Bitcoins to another client by forming a transaction and

committing it into a global append-only log called the *blockchain*. The blockchain is maintained by a network of *miners*, which are compensated for their effort in Bitcoins. Bitcoin transactions are protected with cryptographic techniques that ensure only the rightful owner of a Bitcoin address can transfer funds from it.

The miners are in charge of recording the transactions in the blockchain, which determines the ownership of Bitcoins. A client owns $x$ Bitcoins at time $t$ if, in the prefix of the blockchain up to time $t$, the aggregate of transactions involving that client's address amounts to $x$. Miners only accept transactions if their inputs are unspent.

## 2.1 Blockchain and Mining

The blockchain records the transactions in units of blocks. Each block includes a unique ID, and the ID of the preceding block. The first block, dubbed *the genesis block*, is defined as part of the protocol. A valid block contains a solution to a cryptopuzzle involving the hash of the previous block, the hash of the transactions in the current block, and a Bitcoin address which is to be credited with a reward for solving the cryptopuzzle. This process is called Bitcoin *mining*, and, by slight abuse of terminology, we refer to the creation of blocks as *block mining*. The specific cryptopuzzle is a double-hash whose result has to be smaller than a set value. The problem difficulty, set by this value, is dynamically adjusted such that blocks are generated at an average rate of one every ten minutes.

Any miner may add a valid block to the chain by simply publishing it over an overlay network to all other miners. If two miners create two blocks with the same preceding block, the chain is *forked* into two *branches*, forming a tree. Other miners may subsequently add new valid blocks to either branch. When a miner tries to add a new block after an existing block, we say it *mines on* the existing block. This existing block may be the head of a branch, in which case we say the miner mines on the head of the branch, or simply on the branch.

The formation of branches is undesirable since the miners have to maintain a globally-agreed totally ordered set of transactions. To resolve forks, the protocol prescribes miners to adopt and mine on the longest chain.[1] All miners add blocks to the longest chain they know of, or the first one they heard of if there are branches of equal length. This causes forked branches to be pruned; transactions in pruned blocks are ignored, and may be resubmitted by clients.

We note that block dissemination over the overlay network takes seconds, whereas the average mining interval is 10 minutes. Accidental bifurcation is therefore rare, and occurs on average once about every 60 blocks [12].

When a miner creates a block, it is compensated for its efforts with Bitcoins. This compensation includes a per-transaction fee paid by the users whose trans-

---

[1] The criterion is actually the most difficult chain in the block tree, i.e., the one that required (in expectancy) the most mining power to create. To simplify presentation, and because it is usually the case, we assume the set difficulty at the different branches is the same, and so the longest chain is also the most difficult one.

actions are included, as well as an amount of new Bitcoins that did not exist before.[2]

### 2.2 Pool formation

The probability of mining a block is proportional to the computational resources used for solving the associated cryptopuzzle. Due the nature of the mining process, the interval between mining events exhibits high variance from the point of view of a single miner. A single home miner using a dedicated ASIC is unlikely to mine a block for years [31]. Consequently, miners typically organize themselves into mining *pools*. All members of a pool work together to mine each block, and share their revenues when one of them successfully mines a block. While joining a pool does not change a miner's expected revenue, it decreases the variance and makes the monthly revenues more predictable.

## 3 The Selfish-Mine Strategy

First, we formalize a model that captures the essentials of Bitcoin mining behavior and introduces notation for relevant system parameters. Then we detail the selfish mining algorithm.

### 3.1 Modeling Miners and Pools

The system is comprised of a set of miners $1, \ldots, n$. Each miner $i$ has mining power $m_i$, such that $\sum_{i=1}^{n} m_i = 1$. Each miner chooses a chain head to mine, and finds a subsequent block for that head after a time interval that is exponentially distributed with mean $m_i^{-1}$. We assume that miners are rational; that is, they try to maximize their revenue, and may deviate from the protocol to do so.

A group of miners can form a pool that behaves as single agent with a centralized coordinator, following some strategy. The mining power of a pool is the sum of mining power of its members, and its revenue is divided among its members according to their relative mining power [30]. The *expected relative revenue*, or simply the *revenue* of a pool is the expected fraction of blocks that were mined by that pool out of the total number of blocks in the longest chain.

### 3.2 Selfish-Mine

We now describe our strategy, called Selfish-Mine. As we show in Section 4, Selfish-Mine allows a pool of sufficient size to obtain a revenue larger than its ratio of mining power. For simplicity, and without loss of generality, we assume that miners are divided into two groups, a colluding minority pool that follows the selfish mining strategy, and a majority that follows the honest mining strategy (others). It is immaterial whether the honest miners operate as a single group, as a collection of groups, or individually.

---

[2] The rate at which the new Bitcoins are generated is designed to slowly decrease towards zero, and will reach zero when almost 21 million Bitcoins are created. Then, the miners' revenue will be only from transaction fees.

---

**Algorithm 1:** Selfish-Mine

---

**1** **on** Init
**2**     public chain ← publicly known blocks
**3**     private chain ← publicly known blocks
**4**     $privateBranchLen \leftarrow 0$
**5**     Mine at the head of the private chain.

**6** **on** My pool found a block
**7**     $\Delta_{prev} \leftarrow$ length(private chain) − length(public chain)
**8**     append new block to private chain
**9**     $privateBranchLen \leftarrow privateBranchLen + 1$
**10**    **if** $\Delta_{prev} = 0$ *and privateBranchLen* $= 2$ **then**                          (Was tie with branch of 1)
**11**        publish all of the private chain                                          (Pool wins due to the lead of 1)
**12**        $privateBranchLen \leftarrow 0$
**13**    Mine at the new head of the private chain.

**14** **on** Others found a block
**15**    $\Delta_{prev} \leftarrow$ length(private chain) − length(public chain)
**16**    append new block to public chain
**17**    **if** $\Delta_{prev} = 0$ **then**
**18**        private chain ← public chain                                                      (they win)
**19**        $privateBranchLen \leftarrow 0$
**20**    **else if** $\Delta_{prev} = 1$ **then**
**21**        publish last block of the private chain                          (Now same length. Try our luck)
**22**    **else if** $\Delta_{prev} = 2$ **then**
**23**        publish all of the private chain                                          (Pool wins due to the lead of 1)
**24**        $privateBranchLen \leftarrow 0$
**25**    **else**                                                                            ($\Delta_{prev} > 2$)
**26**        publish first unpublished block in private block.
**27**    Mine at the head of the private chain.

---

The key insight behind the selfish mining strategy is to force the honest miners into performing wasted computations on the stale public branch. Specifically, selfish mining forces the honest miners to spend their cycles on blocks that are destined to not be part of the blockchain.

Selfish miners achieve this goal by selectively revealing their mined blocks to invalidate the honest miners' work. Approximately speaking, the selfish mining pool keeps its mined blocks private, secretly bifurcating the blockchain and creating a private branch. Meanwhile, the honest miners continue mining on the shorter, public branch. Because the selfish miners command a relatively small portion of the total mining power, their private branch will not remain ahead of the public branch indefinitely. Consequently, selfish mining judiciously reveals blocks from the private branch to the public, such that the honest miners will switch to the recently revealed blocks, abandoning the shorter public branch. This renders their previous effort spent on the shorter public branch wasted, and enables the selfish pool to collect higher revenues by incorporating a higher fraction of its blocks into the blockchain.

Armed with this intuition, we can fully specify the selfish mining strategy, shown in Algorithm 1. The strategy is driven by mining events by the selfish pool or by the others. Its decisions depend only on the relative lengths of the selfish pool's private branch versus the public branch. It is best to illustrate the operation of the selfish mining strategy by going through sample scenarios involving different public and private chain lengths.

When the public branch is longer than the private branch, the selfish mining pool is behind the public branch. Because of the power differential between the selfish miners and the others, the chances of the selfish miners mining on their own private branch and overtaking the main branch are small. Consequently, the selfish miner pool simply adopts the main branch whenever its private branch falls behind. As others find new blocks and publish them, the pool updates and mines at the current public head.

When the selfish miner pool finds a block, it is in an advantageous position with a single block lead on the public branch on which the honest miners operate. Instead of naively publishing this private block and notifying the rest of the miners of the newly discovered block, selfish miners keep this block private to the pool. There are two outcomes possible at this point: either the honest miners discover a new block on the public branch, nullifying the pool's lead, or else the pool mines a second block and extends its lead on the honest miners.

In the first scenario where the honest nodes succeed in finding a block on the public branch, nullifying the selfish pool's lead, the pool immediately publishes its private branch (of length 1). This yields a toss-up where either branch may win. The selfish miners unanimously adopt and extend the previously private branch, while the honest miners will choose to mine on either branch, depending on the propagation of the notifications. If the selfish pool manages to mine a subsequent block ahead of the honest miners that did not adopt the pool's recently revealed block, it publishes immediately to enjoy the revenue of both the first and the second blocks of its branch. If the honest miners mine a block after the pool's revealed block, the pool enjoys the revenue of its block, while the others get the revenue from their block. Finally, if the honest miners mine a block after their own block, they enjoy the revenue of their two blocks while the pool gets nothing.

In the second scenario, where the selfish pool succeeds in finding a second block, it develops a comfortable lead of two blocks that provide it with some cushion against discoveries by the honest miners. Once the pool reaches this point, it continues to mine at the head of its private branch. It publishes one block from its private branch for every block the others find. Since the selfish pool is a minority, its lead will, with high probability, eventually reduce to a single block. At this point, the pool publishes its private branch. Since the private branch is longer than the public branch by one block, it is adopted by all miners as the main branch, and the pool enjoys the revenue of all its blocks. This brings the system back to a state where there is just a single branch until the pool bifurcates it again.

## 4 Analysis

We can now analyze the expected rewards for a system where the selfish pool has mining power of $\alpha$ and the others of $(1 - \alpha)$.

Figure 1 illustrates the progress of the system as a state machine. The states of the system represent the lead of the selfish pool; that is, the difference between



**Fig. 1:** State machine with transition frequencies.

the number of unpublished blocks in the pool's private branch and the length of the public branch. Zero lead is separated to states 0 and 0'. State 0 is the state where there are no branches; that is, there is only a single, global, public longest chain. State 0' is the state where there are two public branches of length one: the main branch, and the branch that was private to the selfish miners, and published to match the main branch. The transitions in the figure correspond to mining events, either by the selfish pool or by the others. Recall that these events occur at exponential intervals with an average frequency of $\alpha$ and $(1-\alpha)$, respectively.

We can analyze the expected rewards from selfish mining by taking into account the frequencies associated with each state transition of the state machine, and calculating the corresponding rewards. Let us go through the various cases and describe the associated events that trigger state transitions.

If the pool has a private branch of length 1 and the others mine one block, the pool publishes its branch immediately, which results in two public branches of length 1. Miners in the selfish pool all mine on the pool's branch, because a subsequent block discovery on this branch will yield a reward for the pool. The honest miners, following the standard Bitcoin protocol implementation, mine on the branch they heard of first. We denote by $\gamma$ the ratio of honest miners that choose to mine on the pool's block, and the other $(1-\gamma)$ of the non-pool miners mine on the other branch.

For state $s = 0, 1, 2, \ldots$, with frequency $\alpha$, the pool mines a block and the lead increases by one to $s+1$. In states $s = 3, 4, \ldots$, with frequency $(1-\alpha)$, the honest miners mine a block and the lead decreases by one to $s-1$. If the others mine a block when the lead is two, the pool publishes its private branch, and the system drops to a lead of 0. If the others mine a block with the lead is 1, we arrive at the aforementioned state 0'. From 0', there are three possible transitions, all leading to state 0 with total frequency 1: (1) the pool mines a block on its previously private branch (frequency $\alpha$), (2) the others mine a block on the previously private branch (frequency $\gamma(1-\alpha)$), and (3) the others mine a block on the public branch (frequency $(1-\gamma)(1-\alpha)$).

## 4.1 State Probabilities

We analyze this state machine to calculate its probability distribution over the state space. We obtain the following equations:

$$\begin{cases} \alpha p_0 = (1-\alpha)p_1 + (1-\alpha)p_2 \\ p_{0'} = (1-\alpha)p_1 \\ \alpha p_1 = (1-\alpha)p_2 \\ \forall k \geq 2 : \alpha p_k = (1-\alpha)p_{k+1} \\ \sum_{k=0}^{\infty} p_k + p_{0'} = 1 \end{cases} \tag{1}$$

Solving (1) (See our full report for details [14]), we get:

$$p_0 = \frac{\alpha - 2\alpha^2}{\alpha(2\alpha^3 - 4\alpha^2 + 1)} \tag{2}$$

$$p_{0'} = \frac{(1-\alpha)(\alpha - 2\alpha^2)}{1 - 4\alpha^2 + 2\alpha^3} \tag{3}$$

$$p_1 = \frac{\alpha - 2\alpha^2}{2\alpha^3 - 4\alpha^2 + 1} \tag{4}$$

$$\forall k \geq 2 : p_k = \left(\frac{\alpha}{1-\alpha}\right)^{k-1} \frac{\alpha - 2\alpha^2}{2\alpha^3 - 4\alpha^2 + 1} \tag{5}$$

## 4.2 Revenue

The probability distribution over the state space provides the foundation for analyzing the revenue obtained by the selfish pool and by the honest miners. The revenue for finding a block belongs to its miner only if this block ends up in the main chain. We detail the revenues on each event below.

(a) *Any state but two branches of length 1, pools finds a block.* The pool appends one block to its private branch, increasing its lead on the public branch by one. The revenue from this block will be determined later.



(b) *Was two branches of length 1, pools finds a block.* The pool publishes its secret branch of length two, thus obtaining a revenue of two.



(c) *Was two branches of length 1, others find a block after pool head.* The pool and the others obtain a revenue of one each — the others for the new head, the pool for its predecessor.



(d) *Was two branches of length 1, others find a block after others' head.* The others obtain a revenue of two.



(e) *No private branch, others find a block.* The others obtain a revenue of one, and both the pool and the others start mining on the new head.

(f) *Lead was 1, others find a block.* Now there are two branches of length one, and the pool publishes its single secret block. The pool tries to mine on its previously private head, and the others split between the two heads. Denote by $\gamma$ the ratio of others that choose the non-pool block.

The revenue from this block cannot be determined yet, because it depends on which branch will win. It will be counted later.



(g) *Lead was 2, others find a block.* The others almost close the gap as the lead drops to 1. The pool publishes its secret blocks, causing everybody to start mining at the head of the previously private branch, since it is longer. The pool obtains a revenue of two.



(h) *Lead was more than 2, others win.* The others decrease the lead, which remains at least two. The new block (say with number $i$) will end outside the chain once the pool publishes its entire branch, therefore the others obtain nothing. However, the pool now reveals its $i$'th block, and obtains a revenue of one.



We calculate the revenue of the pool and of the others from the state probabilities and transition frequencies:

$$r_{\text{others}} = \overbrace{p_{0'} \cdot \gamma(1-\alpha) \cdot 1}^{\text{Case (c)}} + \overbrace{p_{0'} \cdot (1-\gamma)(1-\alpha) \cdot 2}^{\text{Case (d)}} + \overbrace{p_0 \cdot (1-\alpha) \cdot 1}^{\text{Case (e)}} \tag{6}$$

$$r_{\text{pool}} = \overbrace{p_{0'} \cdot \alpha \cdot 2}^{\text{Case (b)}} + \overbrace{p_{0'} \cdot \gamma(1-\alpha) \cdot 1}^{\text{Case (c)}} + \overbrace{p_2 \cdot (1-\alpha) \cdot 1}^{\text{Case (g)}} + \overbrace{P[i>2](1-\alpha) \cdot 1}^{\text{Case (h)}} \tag{7}$$

As expected, the intentional branching brought on by selfish mining leads the honest miners to work on blocks that end up outside the blockchain. This, in turn, leads to a drop in the total block generation rate with $r_{\text{pool}} + r_{\text{others}} < 1$. The protocol will adapt the mining difficulty such that the mining rate at the main chain becomes one block per 10 minutes on average. Therefore, the actual revenue rate of each agent is the *revenue rate ratio*; that is, the ratio of its blocks out of the blocks in the main chain. We substitute the probabilities from (2)-(5) in the revenue expressions of (6)-(7) to calculate the pool's revenue for $0 \leq \alpha \leq \frac{1}{2}$:

$$R_{\text{pool}} = \frac{r_{\text{pool}}}{r_{\text{pool}} + r_{\text{others}}} = \cdots = \frac{\alpha(1-\alpha)^2(4\alpha + \gamma(1-2\alpha)) - \alpha^3}{1 - \alpha(1 + (2-\alpha)\alpha)} \ . \tag{8}$$

## 4.3  Simulation

To validate our theoretical analysis, we compare its result with a Bitcoin protocol simulator. The simulator is constructed to capture all the salient Bitcoin mining protocol details described in previous sections, except for the cryptopuzzle module that has been replaced by a Monte Carlo simulator that simulates block discovery without actually computing a cryptopuzzle. In this experiment, we use the simulator to simulate 1000 miners mining at identical rates. A subset of $1000\alpha$ miners form a pool running the Selfish-Mine algorithm. The other miners follow the Bitcoin protocol. We assume block propagation time is negligible compared to mining time, as is the case in reality. In the case of two branches of the same length, we artificially divide the non-pool miners such that a ratio of $\gamma$ of them mine on the pool's branch and the rest mine on the other branch. Figure 2 shows that the simulation results match the theoretical analysis.

## 4.4  The Effect of $\alpha$ and $\gamma$

When the pool's revenue given in Equation 8 is larger than $\alpha$, the pool will earn more than its relative size by using the Selfish-Mine strategy. Its miners will therefore earn more than their relative mining power. Recall that the expression is valid only for $0 \leq \alpha \leq \frac{1}{2}$. We solve this inequality and phrase the result in the following observation:

**Observation 1** *For a given $\gamma$, a pool of size $\alpha$ obtains a revenue larger than its relative size for $\alpha$ in the following range:*

$$\frac{1-\gamma}{3-2\gamma} < \alpha < \frac{1}{2} \ . \tag{9}$$



**Fig. 2:** Pool revenue using the Selfish-Mine strategy for different propagation factors $\gamma$, compared to the honest Bitcoin mining protocol. Simulation matches the theoretical analysis, and both show that Selfish-Mine results in higher revenues than the honest protocol above a threshold, which depends on $\gamma$.



**Fig. 3:** For a given $\gamma$, the threshold $\alpha$ shows the minimum power selfish mining pool that will trump the honest protocol. The current Bitcoin protocol allows $\gamma = 1$, where Selfish-Mine is always superior. Even under unrealistically favorable assumptions, the threshold is never below 1/3.

We illustrate this in Figure 2, where we see the pool's revenue for different $\gamma$ values with pool size ranging from 0 (very small pool) to 0.5 (half of the miners). Note that the pool is only at risk when it holds exactly one block secret, and the honest miners might publish a block that would compete with it. For $\gamma = 1$, the pool can quickly propagate its one-block branch if the others find their own branch, so all honest miners would still mine on the pool's block. In this case, the pool takes no risk when following the Selfish-Mine strategy and its revenue is always better than when following the honest algorithm. The threshold is therefore zero, and a pool of any size can benefit by following Selfish-Mine. In the other extreme, $\gamma = 0$, the honest miners always publish and propagate their block first, and the threshold is at 1/3. With $\gamma = 1/2$ the threshold is at 1/4. Figure 3 shows the threshold as a function of $\gamma$.

We also note that the slope of the pool revenue, $R_{\text{pool}}$, as a function of the pool size is larger than one above the threshold. This implies the following observation:

**Observation 2** *For a pool running the Selfish-Mine strategy, the revenue of each pool member increases with pool size for pools larger than the threshold.*

## 5   Pool Formation

We have shown that once a selfish pool's mining power exceeds the threshold, it can increase its revenue by running Selfish-Mine (Theorem 1). At this point, rational miners will preferentially join the selfish pool to increase their revenues. Moreover, the pool's members will want to accept new members, as this would increase their own revenue (Observation 2). The selfish pool would therefore increase in size, unopposed by any mechanism, towards a majority. Once a miner pool, selfish or otherwise, reaches a majority, it controls the blockchain. The Selfish-Mine strategy then becomes unnecessary, since the others are no longer faster than the pool. Instead, a majority pool can collect all the system's revenue by switching to a modified Bitcoin protocol that ignores blocks generated outside the pool; it also has no motivation to accept new members. At this point, the currency is not a decentralized currency as originally envisioned.

## 6   Hardening the Bitcoin Protocol

Ideally, a robust currency system would be designed to resist attacks by groups of colluding miners. Since selfish mining attacks yield positive outcomes for group sizes above the threshold, the protocol should be amended to set the threshold as high as possible. In this section, we argue that the current Bitcoin protocol has no measures to guarantee a low $\gamma$. This implies that the threshold may be as low as zero, and a pool of any size can benefit by running Selfish-Mine. We suggest a simple change to the protocol that, if adopted by all non-selfish miners, sets $\gamma$ to $1/2$, and therefore the threshold to $1/4$. This change is backward compatible; that is, any subset of the miners can adopt it without hindering the protocol. Moreover, it is progressive; that is, any ratio of the miners that adopts it decreases $\gamma$, and therefore increases the threshold.

### 6.1   Problem

The Bitcoin protocol prescribes that when a miner knows of multiple branches of the same length, it mines and propagates only the first branch it received. Recall that a pool that runs the Selfish-Mine strategy and has a lead of 1 publishes its secret block $P$ once it hears of a competing block $X$ found by a non-pool block. If block $P$ reaches a non-pool miner before block $X$, that miner will mine on $P$.

Because selfish mining is reactive, and it springs into action only after the honest nodes have discovered a block $X$, it may seem to be at a disadvantage. But a savvy pool operator can perform a sybil attack on honest miners by adding a significant number of zero-power miners to the Bitcoin miner network. These virtual miners act as advance sensors by participating in data dissemination, but do not mine new blocks. (Babaioff et al. also acknowledge the feasibility of such a sybil attack [4]). The virtual miners are managed by the pool, and once they hear of block $X$, they ignore it and start propagating block $P$. The random peer-to-peer structure of the Bitcoin overlay network will eventually propagate $X$ to all miners, but the propagation of $X$ under these conditions will be strictly

slower than that of block $P$. By adding enough virtual nodes, the pool operator can thus increase $\gamma$. The result, as shown in Equation 9, is a threshold close to zero.

### 6.2 Solution

We propose a simple, backwards-compatible change to the Bitcoin protocol to address this problem and raise the threshold. Specifically, when a miner learns of competing branches of the same length, it should propagate all of them, and choose which one to mine on uniformly at random. In the case of two branches of length 1, as discussed in Section 4, this would result in half the nodes (in expectancy) mining on the pool's branch and the other half mining on the other branch. This yields $\gamma = 1/2$, which in turn yields a threshold of $1/4$.

Each miner implementing our change decreases the selfish pool's ability to increase $\gamma$ through control of data propagation. This improvement is independent of the adoption of the change at other miners, therefore it does not require a hard fork. This change to the protocol does not introduce new vulnerabilities to the protocol: Currently, when there are two branches of equal length, the choice of each miner is arbitrary, effectively determined by the network topology and latency. Our change explicitly randomizes this arbitrary choice, and therefore does not introduce new vulnerabilities.

## 7   Related Work

Decentralized digital currencies have been proposed before Bitcoin, starting with [11] and followed by peer-to-peer currencies [32,34]; see [22,5] for short surveys. None of these are centered around a global log; therefore, their techniques and challenges are unrelated to this work.

Several dozen cryptocurrencies have followed Bitcoin's success [18,17,33], most prominently Litecoin [21]. These currencies are based on a global log, which is extended by the users' efforts. We conjecture that the essential technique of withholding blocks for selfish mining can be directly applied to all such systems.

It was commonly believed that the Bitcoin system is sound as long as a majority of the participants honestly follow the protocol, and the "51% attack" was the chief concern [23,1,20]. The notion of soundness for a nascent, distributed, Internet-wide, decentralized system implies the presence of incentives for adoption of the prescribed protocol, for such incentives ensure a robust system comprised of participants other than enthusiastic and altruistic early adopters. Felten [15] notes that "there was a folk theorem that the Bitcoin system was stable, in the sense that if everyone acted according to their incentives, the inevitable result would be that everyone followed the rules of Bitcoin as written." Others [25] have claimed that "the well-known argument – never proven, but taken on intuitive faith – that a minority of miners can't control the network is a special case of a more general assumption: that a coalition of miners with $X\%$ of the network's hash power can make no more than $X\%$ of total mining revenues." A survey [5] on the technical features responsible for Bitcoin's success notes that the Bitcoin

design "addresses the incentive problems most expeditiously," while Bitcoin tutorials for the general public hint at incentives designed to align participants' and the system's goals [27]. More formally, Kroll, Davey and Felten's work [19] provides a game-theoretic analysis of Bitcoin, without taking into account block withholding attacks such as selfish mining, and argues that the honest strategy constitutes a Nash equilibrium, implying incentive-compatibility.

Our work shows that the real Bitcoin protocol, which permits block withholding and thereby enables selfish mining-style attacks, does not constitute an equilibrium. It demonstrates that the Bitcoin mining system is not incentive compatible even in the presence of an honest majority. Over 2/3 of the participants need to be honest to protect against selfish mining, under the most optimistic of assumptions.

A distinct exception from this common wisdom is a discussion of maintaining a secret fork in the Bitcoin forums, mostly by users[3] btchris, ByteCoin, mtgox, and RHorning [28]. The approach, dubbed the Mining Cartel Attack, is inferior to selfish mining in that the cartel publishes two blocks for every block published by the honest nodes. This discussion does not include an analysis of the attack (apart from a brief note on simulation results), does not explore the danger of the resulting pool dynamics, and does not suggest a solution to the problem.

The influential work of Rosenfeld [30] addresses the behavior of miners in the presence of different pools with different rewards. Although it addresses revenue maximization for miners with a set mining power, this work is orthogonal to the discussion of Selfish Mining, as it centers around the pool reward system. Both selfish pools and honest pools should carefully choose their reward method. Since a large-enough selfish pool would earn more than its mining power, any fair reward method would provide more reward to its miners, so rational miners would choose it over an honest pool.

Recent work [4] addresses the lack of incentives for disseminating transactions between miners, since each of them prefers to collect the transaction fee himself. This is unrelated to the mining incentive mechanism we discuss.

A widely cited study [29] examines the Bitcoin transaction graph to analyze client behavior. The analysis of client behavior is not directly related to our work.

The Bitcoin blockchain had one significant bifurcation in March 2013 due to a bug [2]. It was solved when the two largest pools at the time manually pruned one branch. This bug-induced fork, and the one-off mechanism used to resolve it, are fundamentally different from the intentional forks that Selfish-Mine exploits.

In a *block withholding attack*, a pool member decreases the pool revenue by never publishing blocks it finds. Although it sounds similar to the strategy of Selfish-Mine, the two are unrelated, as our work that deals with an attack by the pool on the system.

Various systems build services on top of the Bitcoin global log, e.g., improved coin anonymity [22], namespace maintenance [24] and virtual notaries [16,3]. These services that rely on Bitcoin are at risk in case of a Bitcoin collapse.

---

[3] In alphabetical order

## 8 Discussion

We briefly discuss below several points at the periphery of our scope.

*System Collapse* The Bitcoin protocol is designed explicitly to be decentralized. We therefore refer to a state in which a single entity controls the entire currency system as a collapse of Bitcoin.

Note that such a collapse does not immediately imply that the value of a Bitcoin drops to 0. The controlling entity will have an incentive to accept most transactions, if only to reap their fees, and because if it mines all Bitcoins, it has strong motivation that they maintain their value. It may also choose to remain covert, and hide the fact that it can control the entire currency. An analysis of a Bitcoin monopolist's behavior is beyond the scope of this paper, but we believe that a currency that is de facto or potentially controlled by a single entity may deter many of Bitcoin's clients.

*Detecting Selfish Mining* There are two telltale network signatures of selfish mining that can be used to detect when selfish mining is taking place, but neither are easy to measure definitively.

The first and strongest sign is that of abandoned (orphaned) chains, where the block race that takes place as part of selfish mining leaves behind blocks that were not incorporated into the blockchain. Unfortunately, it is difficult to definitively account for abandoned blocks, as the current protocol prunes and discards such blocks inside the network. A measurement tool that connects to the network from a small number of vantage points may miss abandoned blocks.

The second indicator of selfish mining activity is the timing gap between successive blocks. A selfish miner who squelches an honest chain of length $N$ with a chain of length $N+1$ will reveal a block very soon after its predecessor. Since normal mining events should be independent, one would expect block discovery times to be exponentially distributed. A deviation from this distribution would be suggestive of mining activity. The problems with this approach are that it detects only a subset of the selfish miner's behavior (the transition from state 2 to state 0 in the state machine), the signature behavior occurs relatively rarely, and such a statistical detector may take a long time to accrue statistically significant data.

*Measures and Countermeasures* Although miners may choose to collude in a selfish mining effort, they may prefer to hide it in order to avoid public criticism and countermeasures. It is easy to hide Selfish-Mine behavior, and difficult to ban it. A selfish pool may never reveal its size by using different Bitcoin addresses and IP addresses, and by faking block creation times. The rest of the network would not even suspect that a pool is near a dangerous threshold.

Moreover, the honest protocol is public, so if a detection mechanism is set up, a selfish pool would know its parameters and use them to avoid detection. For instance, if the protocol was defined to reject blocks with creation time below a certain threshold, the pool could publish its secret blocks just before this threshold.

A possible line of defense against selfish mining pools is for counter-attackers to infiltrate selfish pools and expose their secret blocks for the honest miners. However, selfish pool managers can, in turn, selectively reveal blocks to subsets of the members in the pool, identify spy nodes through intersection, and expel nodes that leak information.

*Thieves and Snowballs* Selfish mining poses two kinds of danger to the Bitcoin ecosystem: selfish miners reap disproportionate rewards, and the dynamics favor the growth of selfish mining pools towards a majority, in a snowball effect. The system would be immune to selfish mining if there were no pools above the threshold size. Yet, since the current protocol has no guaranteed lower bound on this threshold, it cannot automatically protect against selfish miners.

Even with our proposed fix that raises the threshold to 25%, the system remains vulnerable: there already exist pools whose mining power exceeds the 25% threshold [26], and at times, even the 33% theoretical hard limit. Responsible miners should therefore break off from large pools until no pool exceeds the threshold size.

*Responsible Disclosure* Because of Bitcoin's decentralized nature, selfish mining can only be thwarted by collective, concerted action. There is no central repository, no push mechanism and no set of privileged developers; all protocol modifications require public discussion prior to adoption. In order to promote a swift solution and to avoid a scenario where some set of people had the benefit of selective access, we published a preliminary report [14] and explained both the problem and our suggested solution in public forums [13].

## 9 Conclusion

Bitcoin is the first widely popular cryptocurrency with a broad user base and a rich ecosystem, all hinging on the incentives in place to maintain the critical Bitcoin blockchain. Our results show that Bitcoin's mining protocol is not incentive-compatible. We presented Selfish-Mine, a mining strategy that enables pools of colluding miners that adopt it to earn revenues in excess of their mining power. Higher revenues can lead new miners to join a selfish miner pool, a dangerous dynamic that enables the selfish mining pool to grow towards a majority. The Bitcoin system would be much more robust if it were to adopt an automated mechanism that can thwart selfish miners. We offer a backwards-compatible modification to Bitcoin that ensures that pools smaller than $1/4$ of the total mining power cannot profitably engage selfish mining. We also show that at least $2/3$ of the network needs to be honest to thwart selfish mining; a simple majority is not enough.

*Acknowledgements* We are grateful to Raphael Rom, Fred B. Schneider, Eva Tardos, and Dror Kronstein for their valuable advice on drafts of this paper, as well as our shepherd Rainer Böhme for his guidance.

# References

1. andes: Bitcoin's kryptonite: The 51% attack. https://bitcointalk.org/index.php?topic=12435 (June 2011)
2. Andresen, G.: March 2013 chain fork post-mortem. BIP 50, https://en.bitcoin.it/wiki/BIP_50, retrieved Sep. 2013
3. Araoz, M.: Proof of existence. http://www.proofofexistence.com/, retrieved Sep. 2013
4. Babaioff, M., Dobzinski, S., Oren, S., Zohar, A.: On Bitcoin and red balloons. In: ACM Conference on Electronic Commerce. pp. 56–73 (2012)
5. Barber, S., Boyen, X., Shi, E., Uzun, E.: Bitter to better, how to make Bitcoin a better currency. In: Financial Cryptography and Data Security, pp. 399–414. Springer (2012)
6. Bitcoin community: Bitcoin source. https://github.com/bitcoin/bitcoin, retrieved Sep. 2013
7. Bitcoin community: Protocol rules. https://en.bitcoin.it/wiki/Protocol_rules, retrieved Sep. 2013
8. Bitcoin community: Protocol specification. https://en.bitcoin.it/wiki/Protocol_specification, retrieved Sep. 2013
9. bitcoincharts.com: Bitcoin network. http://bitcoincharts.com/bitcoin/, retrieved Nov. 2013
10. blockchain.info: Bitcoin market capitalization. http://blockchain.info/charts/market-cap, retrieved Jan. 2014
11. Chaum, D.: Blind signatures for untraceable payments. In: Crypto. vol. 82, pp. 199–203 (1982)
12. Decker, C., Wattenhofer, R.: Information propagation in the Bitcoin network. In: IEEE P2P (2013)
13. Eyal, I., Sirer, E.G.: Bitcoin is broken. http://hackingdistributed.com/2013/11/04/bitcoin-is-broken/ (2013)
14. Eyal, I., Sirer, E.G.: Majority is not enough: Bitcoin mining is vulnerable. arXiv preprint arXiv:1311.0243 (2013)
15. Felten, E.W.: Bitcoin research in Princeton CS. https://freedom-to-tinker.com/blog/felten/bitcoin-research-in-princeton-cs/ (November 2013)
16. Kelkar, A., Bernard, J., Joshi, S., Premkumar, S., Sirer, E.G.: Virtual notary. http://virtual-notary.org/, retrieved Sep. 2013
17. King, S.: Primecoin: Cryptocurrency with prime number proof-of-work. http://primecoin.org/static/primecoin-paper.pdf (2013)
18. King, S., Nadal, S.: PPCoin: Peer-to-peer crypto-currency with proof-of-stake. https://archive.org/details/PPCoinPaper (2012)
19. Kroll, J.A., Davey, I.C., Felten, E.W.: The economics of Bitcoin mining or, Bitcoin in the presence of adversaries. In: Workshop on the Economics of Information Security (2013)
20. Lee, T.B.: Four reasons Bitcoin is worth studying. http://www.forbes.com/sites/timothylee/2013/04/07/four-reasons-bitcoin-is-worth-studying/2/ (April 2013)
21. Litecoin Project: Litecoin, open source P2P digital currency. https://litecoin.org, retrieved Sep. 2013
22. Miers, I., Garman, C., Green, M., Rubin, A.D.: Zerocoin: Anonymous distributed e-cash from Bitcoin. In: IEEE Symposium on Security and Privacy (2013)
23. Nakamoto, S.: Bitcoin: A peer-to-peer electronic cash system (2008)
24. Namecoin Project: Namecoin DNS – DotBIT project. https://dot-bit.org, retrieved Sep. 2013
25. Narayanan, A., Miller, A.: Why the Cornell paper on Bitcoin mining is important. https://freedom-to-tinker.com/blog/randomwalker/why-the-cornell-paper-on-bitcoin-mining-is-important/ (November 2013)
26. Neighborhood Pool Watch: October 27th 2013 weekly pool and network statistics. http://organofcorti.blogspot.com/2013/10/october-27th-2013-weekly-pool-and.html, retrieved Oct. 2013
27. Pacia, C.: Bitcoin mining explained like you're five: Part 1 – incentives. http://chrispacia.wordpress.com/2013/09/02/bitcoin-mining-explained-like-youre-five-part-1-incentives/ (September 2013)
28. RHorning, mtgox, btchris, ByteCoin: Mining cartel attack. https://bitcointalk.org/index.php?topic=2227 (December 2010)
29. Ron, D., Shamir, A.: Quantitative analysis of the full Bitcoin transaction graph. In: Financial Cryptography. pp. 6–24 (2013)
30. Rosenfeld, M.: Analysis of Bitcoin pooled mining reward systems. arXiv preprint arXiv:1112.4980 (2011)
31. Swanson, E.: Bitcoin mining calculator. http://www.alloscomp.com/bitcoin/calculator, retrieved Sep. 2013
32. Vishnumurthy, V., Chandrakumar, S., Sirer, E.G.: Karma: A secure economic framework for peer-to-peer resource sharing. In: Workshop on Economics of Peer-to-Peer Systems (2003)
33. Wikipedia: List of cryptocurrencies. https://en.wikipedia.org/wiki/List_of_cryptocurrencies, retrieved Oct. 2013
34. Yang, B., Garcia-Molina, H.: PPay: Micropayments for peer-to-peer systems. In: Proceedings of the 10th ACM conference on Computer and communications security. pp. 300–310. ACM (2003)

# Exhibit D

arXiv:1403.6676v1 [cs.CR] 26 Mar 2014

# Bitcoin Transaction Malleability and MtGox

Christian Decker
ETH Zurich, Switzerland
cdecker@tik.ee.ethz.ch

Roger Wattenhofer
ETH Zurich, Switzerland
wattenhofer@ethz.ch

**Abstract**

In Bitcoin, transaction malleability describes the fact that the signatures that prove the ownership of bitcoins being transferred in a transaction do not provide any integrity guarantee for the signatures themselves. This allows an attacker to mount a malleability attack in which it intercepts, modifies, and rebroadcasts a transaction, causing the transaction issuer to believe that the original transaction was not confirmed. In February 2014 MtGox, once the largest Bitcoin exchange, closed and filed for bankruptcy claiming that attackers used malleability attacks to drain its accounts. In this work we use traces of the Bitcoin network for over a year preceding the filing to show that, while the problem is real, there was no widespread use of malleability attacks before the closure of MtGox.

## 1 Introduction

In recent years Bitcoin [11] has gone from a little experiment by tech enthusiasts to a global phenomenon. The cryptocurrency is seeing a rapid increase in adoption as well as in value. Bitcoin is inching closer to the stated goal of creating a truly decentralized global currency that facilitates international trade.

A major contribution of the success that Bitcoin is having today has to be attributed to the emergence of Bitcoin exchanges. A Bitcoin exchange is a platform that facilitates buying and selling bitcoins for fiat money like US dollars. This enables a larger public to come in contact with bitcoins, increasing their value as a means to pay for goods and services. Exchanges also provide the ground truth for the value of bitcoins by publishing their trade book and allowing market dynamics to find a price for the traded bitcoins. Finally, much of the media attention focuses on the rapid gain in value that these services have enabled.

However, centralized exchanges are also potential points of failure, in a system that is otherwise completely decentralized. Several high value thefts from these services have made the headlines, never failing to predict the impending doom of Bitcoin as a whole. Additionally a small and mostly sentiment driven market, combined with a quick and easy way to buy and sell bitcoins, facilitates flash crashes and rapid rallies for no apparent reason.

1

The first, and for a long time largest, Bitcoin exchange was MtGox. Founded in 2010 it was a first stop for many early adopters. With the creation of other exchanges its monopoly slowly faded, but in February 2014 it still accounted for close to 70% of all bitcoins ever traded. In February 2014 MtGox had to file for bankruptcy and suspend operations following the loss of over 500 million USD worth of bitcoins owned by its customers.

As the principal cause for the loss, MtGox cited a problem in the Bitcoin protocol: *transaction malleability*. A user could request a withdrawal from Mt-Gox to a Bitcoin address. The exchange would then create a corresponding transaction and publish it to the Bitcoin network. Due to the way MtGox tracked confirmation of these transactions it could be tricked, exploiting transaction malleability, into believing the transaction to have failed even though it was later confirmed by the network. MtGox would then credit the amount back to the user's account. Effectively the user would have doubled the withdrawn bitcoins, once from the withdrawal and once on its account on MtGox.

In this work we investigate two fundamental questions: Is transaction malleability being exploited? And is the claim that it has been used to bring down MtGox plausible?

## 2    Transaction Malleability

The Bitcoin network is a distributed network of computer nodes controlled by a multitude of owners. They collectively implement a replicated ledger that tracks the address balances of all users. Each user may create an arbitrary number of addresses that can be used to send and receive bitcoins. An address is derived from an ECDSA key pair that is later used to prove ownership of the bitcoins associated with that address.

The only operation allowed to modify address balances are *transactions*. A transaction is a signed data structure that on the one hand claims some bitcoins associated with a sending address and on the other hand reassigns them to receiving addresses. Transactions are identified by the SHA256 hash of their serialized representation. A transaction consists of one or more *inputs* and an ordered list of one or more *outputs*. An input is used to specify which bitcoins will be transferred, while an output specifies the address that should be credited with the bitcoins being transferred. Formally, an output is a tuple comprising the value that is to be transferred and a *claiming condition*, expressed in a simple scripting language. An input includes the hash of a previous transaction, an index, and a *claiming script*. The hash and index form a reference that uniquely identifies the output to be claimed and the claiming script proves that the user creating the transaction is indeed the owner of the bitcoins being claimed.

### 2.1    Bitcoin Scripts

The scripting language is a, purposefully non-Turing complete, stack-based language that uses single byte opcodes. The use of the scripting language to set

up both the claiming conditions and the claiming scripts allows the creation of complex scenarios for the transfer of bitcoins. For example, it is possible to create multi-signature addresses that require $m$-of-$n$ signatures to spend the associated bitcoins for arbitration purposes. However, the vast majority of transactions use standard scripts that set up a claiming condition requiring the claiming script to provide a public key matching the address and a valid signature of the current transaction matching the public key. For this reason the standard claiming script is generally referred to as *scriptSig* (a script encoding a signature), whereas the standard claiming condition is referred to as *scriptPubKey* (a script requiring a public key and a signature). Figure 1 shows the structure of the standard claiming condition (scriptPubKey) as well as the standard claiming script (scriptSig).

Of particular interest in this work are the OP_PUSHDATA operations which specify a number of following bytes to be pushed as a string on the stack. Depending on the length of the string one of several possible flavors may be used. The simplest is a single byte with value between $0x00$ and $0x4b$, also called OP_0 which simply encodes the length of the string in itself. Additionally, three other operations allow pushing data on the stack, namely OP_PUSHDATA1, OP_PUSHDATA2 and OP_PUSHDATA4, each followed by 1, 2 or 4 bytes, respectively, encoding a little endian number of bytes to be read and pushed on the stack.

In order to verify the validity of a transaction $t_1$ claiming an output of a previous transaction $t_0$ the scriptSig of $t_1$ and the scriptPubKey specified in $t_0$ are executed back to back, without clearing the stack in between. The scriptSig of $t_1$ pushes the signature and the public key on the stack. The scriptPubKey of $t_0$ then duplicates the public key (OP_DUP) and replaces the first copy with its RIPEMD160 hash (OP_HASH160), this 20 byte derivative of the public key is also encoded in the address. The address from the scriptPubKey is then pushed on the stack and the two top elements are then tested for equality (OP_EQUALVERIFY). If the hash of the public key and the expected hash match, the script continues, otherwise execution is aborted. Finally, the two elements remaining on the stack, i.e., the signature and the public key, are used to verify that the signature signs $t_1$ (OP_CHECKSIG).

Notice that, although the scriptSigs are attached to the inputs of the transaction, they are not yet known at the time the signature is created. In fact a signature may not sign any data structure containing itself as this would create a circular dependency. For this reason all the claiming scripts are set to a script consisting only of a single OP_0 that pushes an empty string on the stack. The user signing the transaction then iterates through the inputs, temporarily replaces the scriptSig field with the corresponding scriptPubKey[1] from the referenced output, and creates a signature for the resulting serialized transaction. The signatures are then collected and inserted at their respective positions before broadcasting the transaction to the network.

---

[1]The use of the scriptPubKey in the signed data as placeholder for the scriptSig is likely to avoid collisions.

Listing 1: scriptPubKey

```
OP_DUP
OP_HASH160
OP_PUSHDATA*
<pubKeyHash>
OP_EQUALVERIFY
OP_CHECKSIG
```

Listing 2: scriptSig

```
OP_PUSHDATA*
<sig>
OP_PUSHDATA*
<pubKey>
```

Figure 1: The standard claiming condition and claiming script as used by simple transactions transferring bitcoins to an address backed by a single public key.

The fact that the integrity of the scriptSig cannot be verified by the signature is the source for transaction malleability: the claiming script may be encoded in several different ways that do not directly invalidate the signature itself. A simple example replaces the OP_0 that pushes the public key on the stack with OP_PUSHDATA2 followed by the original length. The claiming script is changed from 0x48<sig>41<pubKey> to 0x4D4800<sig>4D4100<pubKey>. The encoded signature is valid in both cases but the hash identifying the transaction is different.

Besides these changes in the way pushes are encoded, there are numerous sources of malleability in the claiming script. A Bitcoin Improvement Proposal (BIP) by Wuille [13] identifies the following possible ways to modify the signature and therefore exploit malleability:

1. ECDSA signature malleability: signatures describe points on an elliptic curve. Starting from a signature it is trivial to mathematically derive a second set of parameters encoding the same point on the elliptic curve;

2. Non-DER encoded ECDSA signatures: the cryptographic library used by the Bitcoin Core client, OpenSSL, accepts a multitude of formats besides the standardized DER (Distinguished Encoding Rules) encoding;

3. Extra data pushes: a scriptPubKey may push additional data at the beginning of the script. These are not consumed by the corresponding claiming condition and are left on the stack after script termination;

4. The signature and public key may result from a more complex script that does not directly push them on the stack, but calculates them on the fly, e.g., concatenating two halves of a public key that have been pushed individually;

5. Non-minimal encoding of push operations: as mentioned before there are several options to specify identical pushes of data on the stack;

6. Zero-padded number pushes: excessive padding of strings that are interpreted as numbers;

4

7. Data ignored by scripts: if data pushed on the stack is ignored by the scriptPubKey, e.g., if the scriptPubKey contains an OP_DROP, the corresponding push in the scriptSig is ignored;

8. Sighash flags can be used to ignore certain parts of a script when signing;

9. Any user with access to the private key may generate an arbitrary number of valid signatures as the ECDSA signing process uses a random number generator to create signatures;

## 2.2   Malleability attacks

One of the problems that Bitcoin sets out to solve is the problem of *double spending*. If an output is claimed by two or more transactions, these transactions are said to *conflict*, since only one of them may be valid. A *double spending attack* is the intentional creation of two conflicting transactions that attempt to spend the same funds in order to defraud a third party.

Research so far has concentrated on a classical version of the double spending attack. An attacker would create two transactions: (1) a transaction that transfers some of its funds once to a vendor accepting bitcoins and (2) a transaction that transfers those same funds back to itself. The goal would then be to convince the vendor that it received the funds, triggering a transfer of goods or services from the vendor to the attacker, and ensuring that the transaction returning the funds to the attacker is later confirmed. This would defraud the vendor as the transfer to the vendor would not be confirmed, yet the attacker received the goods or services.

A *malleability attack*, while a variant of the double spending attack, is different from the above. The attacker no longer is the party issuing the transaction, instead it is the receiving party. The attacker would cause the victim to create a transaction that transfers some funds to an address controlled by the attacker. The attacker then waits for the transaction to be broadcast in the network. Once the attacker has received a copy of the transaction, the transaction is then modified using one of the above ways to alter the signature without invalidating it. The modification results in a different transaction identification hash. The modified transaction is then also broadcast in the network. Either of the two transactions may later be confirmed.

A malleability attack is said to be successful if the modified version of the transaction is later confirmed. The mechanics of how transactions are confirmed are complex and are out of scope for this work. For our purposes it suffices to say that the probability of a malleability attack to be successful depends on the distribution of nodes in the Bitcoin network first seeing either of the transactions (cf. [4, 5, 6]). So far the attack has not caused any damage to the victim. To be exploitable the victim also has to rely solely on the transaction identity hash to track and verify its account balance. Should a malleability attack be successful the victim will only see that the transaction it issued has not been confirmed, crediting the amount to the attacker or attempting to send another transaction

at a later time. The attacker would have effectively doubled the bitcoins the victim sent it.

It is worth noting that the reference client (Bitcoin Core) is not susceptible to this attack as it tracks the unspent transaction output set by applying all confirmed transactions to it, rather than inferring only from transactions it issued.

# 3   MtGox Incident Timeline

In this section we briefly describe the timeline of the incident that eventually led to the filing for bankruptcy of MtGox. The timeline is reconstructed from a series of press release by MtGox as well as the official filings and legal documents following the closure.

Following several months of problems with Bitcoin withdrawals from users, MtGox announced [10] on February 7 that it would suspend bitcoin withdrawals altogether. The main problem with withdrawals was that the associated Bitcoin transactions would not be confirmed. After this press release it was still possible to trade bitcoins on MtGox, but it was not possible to withdraw any bitcoins from the exchange. Specifically [10] does not mention transaction malleability.

In order to trade on MtGox, users had transferred bitcoins and US dollars to accounts owned by MtGox. Each user would have a virtual account that is credited with the transferred amounts at MtGox. The withdrawal stop therefore denied users access to their own bitcoins. While fiat currency was still withdrawable, such a withdrawal involved a long process that would sometimes fail altogether.

The first press release was followed by a second press release [9] on February 10, 2014. This press release claims that the problem for the non-confirming withdrawal transactions has been identified and names transaction malleability as the sole cause:

> "Addressing Transaction Malleability: MtGox has detected unusual activity on its Bitcoin wallets and performed investigations during the past weeks. This confirmed the presence of transactions which need to be examined more closely.
>
> Non-technical Explanation: A bug in the bitcoin software makes it possible for someone to use the Bitcoin network to alter transaction details to make it seem like a sending of bitcoins to a bitcoin wallet did not occur when in fact it did occur. Since the transaction appears as if it has not proceeded correctly, the bitcoins may be resent. MtGox is working with the Bitcoin core development team and others to mitigate this issue."

Allegedly a user of MtGox would request a withdrawal and listen for the resulting transaction. The transaction would then be intercepted and replaced by a modified version that would then race with the original transaction to be

confirmed. Should the original transaction be confirmed, the user would receive its balance only once, but not lose any bitcoins by doing so. Should the modified transaction be confirmed, then the user would receive the bitcoins twice: once via the modified withdrawal transaction and a second time when MtGox realized that the original withdrawal transaction would not confirm and credit the users account. Implicitly in this press release MtGox admits to using a custom client that tracks transaction validity only via its hash, hence being vulnerable to the transaction malleability attack.

Two more press releases followed on February 17 and February 20, both claiming that the withdrawals would resume shortly and that a solution had been found that would eliminate the vulnerability to malleability attacks. On February 23 the website of MtGox returned only a blank page, without any further explanation, resulting in a trading halt and the complete disappearance of MtGox. Finally on February 28 MtGox announced during a press conference that it would be filing for bankruptcy in Japan and in the USA [7, 8].

## 4 Measurements

Due to the nature of double spending attacks, they may only be detected while participating in the network. As soon as one of the two conflicting transactions is considered to be confirmed the nodes will drop all other conflicting transactions, losing all information about the double spending attack. Malleability attacks being a subset of double spending attacks suffer from the same limitation.

We created specialized nodes that would trace and dump all transactions and blocks from the Bitcoin network. These include all double spending attacks that have been forwarded to any of the peers our nodes connected to. Our collection of transactions started in January 2013. As such we are unable to reproduce any attacks before January 2013. The following observations therefore do not consider attacks that may have happened before our collection started.

Our nodes were instructed to keep connection pools of 1,000 connections open to peers in the Bitcoin network. On average we connected to 992 peers, which at the time of writing is approximately 20% of the reachable nodes. According to Bamert et al. [4] the probability of detecting a double spending attack quickly converges to 1 as the number of sampled peers increases. We therefore feel justified in assuming that the transactions collected during the measurements faithfully reflect the double spending attacks in the network during the same period.

Given the set of all transactions, the first task is to extract all potential double spend attacks. In general double spending attacks can be identified by associating a transaction with each output that it claims. Should there be more than one transaction associated with the same output the transactions conflict. The malleability attack being a specialized case of the double spend attack could also be identified by this generic procedure, however we opted for a simpler process. Removing the signature script from a transaction results in the signed part of the transaction, forcing all malleability attacks to produce the

7

same unique key. The unique key is then used to group transactions together into *conflict sets*.

During the measurement period a total of 35,202 conflict sets were identified, each evidence of a malleability attack. Out of these conflict sets 29,139 contained a transaction that would later be confirmed by a block. The remaining 6,063 transactions were either invalid because they claimed non-existing outputs, had incorrect signatures, or they were part of a further double spending.

The *conflict set value* is defined as the number of bitcoins transferred by any one transaction in the conflict set. The outputs of the transactions in a conflict set are identical, since any change to them would require a new signature. In particular the value of outputs may not be changed. Each transaction in a conflict set therefore transfers an identical amount of bitcoins. Summing the value of all conflict sets results in a total of 302,700 bitcoins that were involved in malleability attacks.

As mentioned in Footnote 1, there are a multitude of ways to use the malleability in the signature encoding to mount a malleability attack. The most prominent type of modification was replacing the single byte OP_0 with OP_PUSHDATA2 which then encodes the length of the data to push on the stack with 2 bytes. The resulting signature script would be 4 bytes longer, because two strings are usually pushed on the stack, but would still encode the same DER encoded signature and the same public key, hence still be valid. A total of 28,595 out of the 29,139 confirmed attacks had this type of modifications. For the remaining 544 conflict sets we were unable to identify the original transactions. All transactions in these conflict sets had genuine signatures with the correct opcodes and did not encode the same signature. We therefore believe these transactions to be the result of users signing raw transactions multiple times, e.g., for development purposes.

In order for a malleability attack to be exploitable two conditions have to be fulfilled: (a) the modified transaction has to be later confirmed and (b) the system issuing the transaction must rely solely on the transaction's original hash to track its confirmation. The first condition can be easily reconstructed from the network trace and the Bitcoin blockchain since only one of the transactions will be included in the blockchain. The second condition is not detectable in our traces since it depends on the implementation of the issuing system. In particular, it is not possible to determine whether two payments with the same value to the same address were intended as two separate payments or whether an automated system issued the second one believing the first to be invalid.

We call a malleability attack successful if it resulted in the modified transaction to be later confirmed in a block, i.e., when condition (a) holds. From the data derived from the attack classification we can measure the rate of successful malleability attacks. Out of the 28,595 malleability attacks that used an OP_PUSHDATA2 instead of the default OP_0 only 5,670 were successful, i.e., 19.46% of modified transactions were later confirmed. Considering the value in malleable transactions the success rate is comparable with 21.36%. This reduces the total profit of the successful attacks from 302,700 to 64,564. The strong bias towards the original transaction is explained by the fact that the

8

 

Figure 2: Malleability attacks during period 1, before the press release blaming transaction malleability as the sole cause of losses.

probability of being confirmed depends on the distribution of the transaction in the network [4]. During a malleability attack the attacker listens for an incoming transaction that match its address, modifies it and redistributes it. In the meantime however the original transaction has been further forwarded in the network and the modified transaction is not forwarded by nodes seeing the original transaction. The attacker must connect to a large sample of nodes in the network for two reasons: (a) intercept the original transaction as soon as possible and (b) compensate the head start that the original transaction has compared to the modified transaction.

So far we assumed that the conflict sets were a direct result of a targeted attack by an attacker against a service. There are however other causes for this kind of conflict that should not go unmentioned. An automated system may inadvertently create, sign a transaction and broadcast a transaction multiple times. Due to a random parameter in the signing process the system would produce a different signature each time, causing the conflict that we detected. This appears to be the case with transactions having conflict set cardinality larger than 2, that would often not be confirmed.

## 4.1 The MtGox Incident

Returning to the specific case of the MtGox incident of February 2014, that eventually lead to the closure and the bankruptcy filing later that same month. In the press release of February 10, the transaction malleability bug was explicitly named as the root cause of the loss. The loss is later detailed as amounting to over 850,000 bitcoins, of which 750,000 bitcoins were customer owned bitcoins that were managed by MtGox. At the time of the first press release bitcoins were trading at 827 US Dollars per bitcoin,[2] resulting in a total value of lost bitcoins of 620 million US Dollars.

Assuming transaction malleability has indeed been used to defraud MtGox, then we should be able to verify the claim by finding the transactions used for

---

[2]Exchange rate taken as the open value on MtGox of February 7, 2014.



Figure 3: Cumulative graph of the number and value of malleability attacks during the time of the press releases.

the attack in our dataset. The above mentioned total amount of 302,700 bitcoins involved in malleability attacks already disproves the existence of such a large scale attack. However, it could well be that malleability attacks contributed considerably in the declared losses.

Reconstructing the timeline of the attacks from the announcements made by MtGox we identify 3 time periods:

- Period 1 (January 2013 — February 7, 2014): over a year of measurements until the closure of withdrawals from MtGox;

- Period 2 (February 8 — February 9, 2014): withdrawals are stopped but no details about the attack known to the public;

- Period 3 (February 10 — February 28): time following the press release blaming transaction malleability as the root cause of the missing bitcoins until MtGox filed for bankruptcy.

Malleability attacks in period 2 and 3 could not contribute to the losses declared by MtGox since they happened after withdrawals have been stopped. Figure 2 visualizes both the number of bitcoins involved in malleability attacks as well as the number of attacks during period 1. During this period a total of 421 conflict sets were identified for a total value of 1,811.58 bitcoins involved in these attacks. In combination with the above mentioned success rate of malleability attacks we conclude that overall malleability attacks did not have any substantial influence in the loss of bitcoins incurred by MtGox.

During period 2, we gathered 1,062 conflict sets, totalling 5,470 bitcoins. A noticeable increase of attacks at 17:00 UTC on February 9, from 0.15 attacks per hour to 132 attacks per hour. While we do not have any information about the time the second press release has been published, the measured increase in attacks at 17:00 UTC and the date on the press release, hints at a time between 0:00 and 2:00 JST. The sudden increase suggests that immediately following the

10

press release other attackers started imitating the attack, attempting to exploit the same weakness that had allegedly been used against MtGox.

After the second press release, in period 3, there is a sudden spike in activity. Between February 10 and 11 we identified 25,752 individual attacks totalling 286,076 bitcoins, two orders of magnitude larger than all attacks from period 1 combined. A second, smaller, wave of attacks starts after February 15, with a total of 9,193 bitcoins. The attacks have since calmed, returning to levels comparable to those observed in period 1, before the press releases. Figure 3 summarizes the situation by plotting the cumulative value and number of malleability attacks in February 2014, i.e., from the end of period 1 to period 3.

The strong correlation between the press releases and the ensuing attacks attempting to exploit the same weakness is a strong indicator that the attacks were indeed triggered by the press releases.

Assuming MtGox had disabled withdrawals like they stated in the first press release, these attacks can not have been aimed at MtGox. The attacks therefore where either attempts to investigate transaction malleability or they were aimed at other businesses attempting to imitate the purveyed attack for personal gain. The sheer amount of bitcoins involved in malleability attacks would suggest that the latter motive was prevalent.

It remains questionable whether other services have been informed by MtGox in time to brace for the sudden increase in malleability attacks. Should this not be the case then the press release may have harmed other businesses by triggering imitators to attack them.

## 5 Related Work

Transaction malleability has been known about since at least 2010, when it was first documented. It has however received very little attention so far as it was categorized as a low priority issue.

Andrychowicz et al. [1, 2] mention transaction malleability as a potential problem in contracts and two party computations based on Bitcoin transactions. These schemes can be used for example to implement a fair coin toss [3], auctions or decentralized voting. Their method to eliminate transaction malleability in their protocols resembles our construction of conflict sets, i.e., eliminating malleable parts of the transaction in the hash calculation. However, they limit their observations to advanced schemes for encoding contracts and two party computations.

A related class of doublespending attacks, which we shall refer to as classical doublespending, has received far more attention. In this class of attacks the transaction issuer creates two transactions to defraud the receiving party. Karame et al. [6] first studied the problem of arising from fast transactions, i.e., accepting non-confirmed transactions. Rosenfeld [12] showed that the success probability of a doublespending attack can be further increased if coupled with computational resources. Bamert et al. [4] later improved the security of

11

accepting fast payments by observing how transactions are propagated in the network.

To the best of our knowledge this paper is the first publication describing transaction malleability and the resulting malleability attack in detail.

## 6   Conclusion

The transaction malleability problem is real and should be considered when implementing Bitcoin clients. However, while MtGox claimed to have lost 850,000 bitcoins due to malleability attacks, we merely observed a total of 302,000 bitcoins ever being involved in malleability attacks. Of these, only 1,811 bitcoins were in attacks before MtGox stopped users from withdrawing bitcoins. Even more, 78.64% of these attacks were ineffective. As such, barely 386 bitcoins could have been stolen using malleability attacks from MtGox or from other businesses. Even if all of these attacks were targeted against MtGox, MtGox needs to explain the whereabouts of 849,600 bitcoins.

## References

[1] Marcin Andrychowicz, Stefan Dziembowski, Daniel Malinowski, and Łukasz Mazurek. Fair two-party computations via the bitcoin deposits. Technical report, Cryptology ePrint Archive, 2013.

[2] Marcin Andrychowicz, Stefan Dziembowski, Daniel Malinowski, and Łukasz Mazurek. How to deal with malleability of bitcoin transactions. *arXiv preprint arXiv:1312.3230*, 2013.

[3] Adam Back and Iddo Bentov. Note on fair coin toss via bitcoin. *arXiv preprint arXiv:1402.3698*, 2014.

[4] Tobias Bamert, Christian Decker, Lennart Elsen, Samuel Welten, and Roger Wattenhofer. Have a snack, pay with bitcoin. In *IEEE International Conference on Peer-to-Peer Computing (P2P), Trento, Italy*, 2013.

[5] Christian Decker and Roger Wattenhofer. Information propagation in the bitcoin network. In *IEEE International Conference on Peer-to-Peer Computing (P2P), Trento, Italy*, September 2013.

[6] G.O. Karame, E. Androulaki, and S. Capkun. Two Bitcoins at the Price of One? Double-Spending Attacks on Fast Payments in Bitcoin. In *Proc. of Conference on Computer and Communication Security*, 2012.

[7] MtGox. Announcement regarding an application for commencement of a prodedure of civil rehabilitation. `https://www.mtgox.com/img/pdf/20140228-announcement_eng.pdf`. [Online; accessed March 19th].

[8] MtGox. Announcement regarding the applicability of us bankruptcy code chapter 15. `https://www.mtgox.com/img/pdf/20140314-announcement_chapter15.pdf`. [Online; accessed March 19th].

[9] MtGox. Mtgox press release about transaction malleability. `https://www.mtgox.com/press_release_20140210.html`, 2014. [Online; accessed February 10th, 2014].

[10] MtGox. Mtgox press release announcing the stop of withdrawals. `https://www.mtgox.com/press_release_20140210.html`, 2014. [Online; accessed February 10th, 2014].

[11] Satoshi Nakamoto. Bitcoin: A peer-to-peer electronic cash system. `https://bitcoin.org/bitcoin.pdf`. [Online; accessed March 26, 2014].

[12] Meni Rosenfeld. Analysis of hashrate-based double spending. `https://bitcoil.co.il/Doublespend.pdf`, 2012. [Online; accessed February 17th, 2014].

[13] Pieter Wuille. BIP 0062: Dealing with Malleability. `https://github.com/bitcoin/bips`, 2014. [Online; accessed March 10th, 2014].

# Exhibit E



News      TCTV      Events

# Mt. Gox Temporarily Pauses Bitcoin Withdrawals

Posted Feb 6, 2014 by *Catherine Shu* (*@catherineshu*)





Mt. Gox has temporarily suspended Bitcoin withdrawals in order to resolve a technical issue, the company said on its site.

The statement posted on Mt. Gox, one of the world's largest Bitcoin exchanges, reads:

*During our efforts to resolve the issue being encountered by some bitcoin withdrawals it was determined that the increase in withdrawal traffic is hindering our efforts on a technical level. As to get a better look at the process the system needs to be in a static state.*

*In order for our team to resolve the withdrawal issue it is necessary to temporarily pause all withdrawal traffic to obtain a clear technical view of the current processes.*

*We apologize for the extremely short notice, but as of now all bitcoin withdrawals will be paused, and withdrawals in the queue will returned to your MtGox wallet and can be re-intiated once the issue is resolved. Customers can still use the trading platform as usual.*

*Our team will be working hard through the weekend and will provide an update on Monday, February 10, 2014 (JST).*

*Again, we apologize for the inconvenience, and ask for your continued patience and support while we work to resolve this issue.*

We've contacted MtGox for more information. The increase in withdrawals may be related investor concern after Apple's decision yesterday to drop Blockchain, the last Bitcoin

wallet app, from the App Store. The price of Bitcoin has dropped steadily over the last day, and is currently $722.86.