## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| GREGORY GREENE and JOSEPH LACK, individually and on behalf of all others similarly situated, | |
| *Plaintiffs*, | Case No. 1:14-cv-01437 |
| v. | Hon. Gary Feinerman |
| MTGOX INC., a Delaware corporation, MT. GOX KK, a Japanese corporation, TIBANNE KK, a Japanese corporation, MT. GOX NORTH AMERICA, INC., a New York corporation, MIZUHO BANK, LTD., a Japanese financial institution, MARK KARPELES, an individual, GONZAGUE GAY-BOUCHERY, an individual, JED MCCALEB, an individual, and JOHN DOE DEFENDANTS, | Magistrate Judge Susan Cox |
| *Defendants*. | |

## PLAINTIFFS' MOTION FOR PRELIMINARY SETTLEMENT APPROVAL

Jay Edelson
jedelson@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiffs Gregory Greene, Joseph Lack, and the Putative Class*

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

    A.   The Advent of Bitcoin............................................................................. 2

    B.   The Rise and Fall of Mt. Gox................................................................. 3

    C.   The Litigation History ............................................................................ 5

    D.   Settlement Discussions and Private Mediation ...................................... 9

III.    TERMS OF THE SETTLEMENT..................................................................... 10

    A.   Presentment and Implementation of the Mt. Gox Reorganization Plan ................... 11

    B.   Complete Cooperation........................................................................... 12

    C.   Releases ................................................................................................ 12

    D.   Attorneys' Fees .................................................................................... 13

IV.     THE PROPOSED CLASS SHOULD BE CERTIFIED...................................... 13

    A.   The Proposed Class is Sufficiently Numerous...................................... 14

    B.   The Claims of the Proposed Class Share Common Questions of Law and Fact. ..... 15

    C.   Plaintiffs' Claims are Typical of the Proposed Class Members' Claims................. 16

    D.   Plaintiffs (and their Counsel) Will Adequately Represent the Class. ...................... 17

    E.   The Proposed Class Satisfies Rule 23(b). ............................................ 18

        1.   Common Questions of Law and Fact Predominate. ..................... 18

        2.   A Class Action is Superior to Other Available Methods of Adjudication.... 19

V.      PLAINTIFFS' COUNSEL SHOULD BE APPOINTED CLASS COUNSEL. .................. 20

VI.     THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL. .......... 22

A.   The Settlement Offer Balanced Against the Likelihood of Recovery Against Mt.

Gox and the Settling Defendants Absent Settlement Weighs Strongly in Favor of

Preliminary Settlement Approval. ...................................................................... 24

B.   The Complexity, Length, and Expense of Continued Litigation Against the Settling

Defendants Favors Approval of the Settlement. ................................................... 27

C.   Competent Counsel Both in the United States and Abroad Support the Settlement. 28

D.   Plaintiffs Have Sufficient Information to Assess the Proposed Settlement............. 28

VII.   THE PROPOSED NOTICE PLAN SHOULD BE APPROVED. ...................................... 29

VIII.  CONCLUSION .............................................................................................................. 31

## TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES**

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (2011) ...............................................................................15

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) .................................................................................19


**UNITED STATES COURT OF APPEALS CASES**

*Armstrong v. Board of Sch. Dirs. of City of Milwaukee,*
    616 F.2d 305 (7th Cir. 1980) .................................................................23, 24

*De La Fuente v. Stokely-Van Camp, Inc.,*
    713 F.2d 225 (7th Cir. 1983) .........................................................................16

*Isby v. Bayh,*
    75 F.3d 1191 (7th Cir. 1996) .................................................................23, 28

*Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co. of Chicago,*
    834 F.2d 677 (7th Cir. 1987) .........................................................................29

*Messner v. Northshore Univ. HealthSystem,*
    669 F.3d 802 (7th Cir. 2012) .................................................................13, 19

*Rosario v. Livaditis,*
    963 F.2d 1013 (7th Cir. 1992) .............................................................15, 16

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.,*
    463 F.3d 646 (7th Cir. 2006) .........................................................................24

*Wigod v. Wells Fargo Bank, N.A.,*
    673 F.3d 547 (7th Cir. 2012) .........................................................................22


**UNITED STATES DISTRICT COURT CASES**

*Boundas v. Abercrombie & Fitch Stores, Inc.,*
    280 F.R.D. 408 (N.D. Ill. 2012) .................................................................14

*Buckley v. Engle,*
    No. 07CV254, 2010 WL 4064985 (D. Neb. Oct. 14, 2010) .........................26

*Cicilline v. Jewel Food Stores, Inc.*,
    542 F. Supp. 2d 831 (N.D. Ill. 2008) ..............................................................19

*Harris v. comScore, Inc.*,
    292 F.R.D. 579 (N.D. Ill. 2013) ..................................................................21

*Heastie v. Cmty. Bank of Greater Peoria*,
    125 F.R.D. 669 (N.D. Ill. 1989) ..................................................................14

*Hinman v. M & M Rental Ctr., Inc.*,
    545 F. Supp. 2d 802 (N.D. Ill. 2008) ..........................................................14

*In re AT&T Mobility Wireless Data Servs. Sales Litig.*,
    MDL No. 2147, 270 F.R.D. 330 (N.D. Ill. 2010) ....................................23, 24, 28, 30

*In re Facebook Privacy Litig.*,
    No. 10-cv-02389 (N.D. Cal. Dec. 10, 2010) ..............................................21

*In re MtGox Co., Ltd.*,
    No. 14-31229-sgj-15 (Bankr. N.D. Tex.) ....................................................6, 9

*In re Netflix Privacy Litig.*,
    No 5:11-cv-00379 (N.D. Cal. Aug. 12, 2011) ............................................21

*In re Processed Egg Prods. Antitrust Litig.*,
    284 F.R.D. 278, 285 (E.D. Pa. 2012) ..........................................................26

*Kessler v. Am. Resorts Int'l*,
    No. 05 C 5944, 2007 WL 4105204 (N.D. Ill. Nov. 14, 2007) ....................24

*Maxwell v. Arrow Fin. Servs., Inc.*,
    No. 03 C 1995, 2004 WL 719278 (N.D. Ill. Mar. 31, 2004) ......................17

*Schmidt v. Smith & Wollensky, LLC*,
    268 F.R.D. 323 (N.D. Ill. 2010) ..................................................................14

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ..................................24, 27, 28, 29, 31

*Streeter v. Sheriff of Cook Cnty.*,
    256 F.R.D. 609 (N.D. Ill. 2009) ..................................................................20

**STATUTES & FEDERAL RULES**

28 U.S.C. § 1715.............................................................................................30

Fed. R. Civ. P. 23 ................................................................................................. *passim*

**OTHER AUTHORITIES**

Alba Conte & Herbert Newberg,
    4 Newberg on Class Actions §11.25 (4th ed. 2002) ......................................... 23

Announcement of Commencement of Bankruptcy Proceedings by Bankruptcy Trustee Nobuaki
    Kobayashi, *available at*
    https://www.mtgox.com/img/pdf/20140424_announce_qa_en.pdf (last accessed April
    28, 2014) ..................................................................................................... 9

*Joyce, et al. v. MtGox Inc.*,
    No. cv-14-500253-00CP (Can. Ont. Sup. Ct. J.) .............................................. 7

Manual for Complex Litigation § 21.632 (4th ed. 2004) ............................................ 23

U.S. Chamber Institute for Legal Reform,
    *The New Lawsuit Ecosystem: Trends, Targets and Players* (Oct. 2013), *available at*
    http://www.instituteforlegalreform.com/uploads/sites/1/The_New_Lawsuit_Ecosystem_
    pages_web.pdf ............................................................................................. 21

Rob Wile, *Bitcoin Enthusiast And Filmaker Has A Theory For Why Mt. Gox Failed*, Business
Insider (Apr. 25, 2014, 12:18 PM), http://www. Businessinsider.com/mtgox-could-have-been-a-
google-of-bitcoin-2014-4 ....................................................................................... 3

## I.  INTRODUCTION

When the Mt. Gox Bitcoin digital currency exchange unexpectedly closed its virtual doors two months ago, exchange members were left unable to access a collective 850,000 bitcoins[1] worth more than $470 million. Shortly after that fateful day, the entity operating the exchange, Mt. Gox KK, filed for bankruptcy protection in Japan and soon after that, the Japanese bankruptcy court began liquidation proceedings. The likely—and unfortunate—result of all that is exchange members would never again see their bitcoins or get their money back.

However, in what can only be described as an extraordinary turn of events, plaintiffs Gregory Green and Joseph Lack, defendants Jed McCaleb and Gonzague Gay-Bouchery, various international creditors, and a group of outside investors came together during a weeklong (at times, day-and-night) mediation presided over by the Honorable Wayne R. Andersen (ret.) to reach multiple class-wide settlements (one here and one in Canada) and a plan to reorganize the Mt. Gox exchange as a going concern.  All told, the settlements and reorganization plan, if first approved by this Court and then the Japanese bankruptcy court, have the potential of more than fully compensating the class, as well as the other exchange members who don't fall within the class, for their losses that resulted from the fall of Mt. Gox.

The settlements and reorganization plan include three key components: First, they call for the immediate distribution to Mt. Gox exchange members of any bitcoins and much of the currency still held by Mt. Gox (which includes at least 200,000 bitcoins worth approximately $116 million).[2] Second, a new exchange will be created, in which old Mt. Gox exchange

---

[1]     For the sake of clarity, "Bitcoin" refers to the digital currency and "bitcoin" (with a lower case "b") refers to individual units of the currency.

[2]     To be clear, all exchange members will recover equally according to their *pro rata* share of the total amount of lost bitcoins and currency—no individual or group of exchange members is put ahead of any other under the settlement or the plan, nor are any creditors who may have claims prejudiced.

members will effectively receive a 16.5% interest—i.e., exchange members will receive 16.5%

of any future dividends paid, 16.5% of the proceeds of any sale of the reorganized exchange, and

16.5% of any common stock issued should the reorganized exchange make an initial public

offering. Third, defendants McCaleb and Gay-Bouchery (former principals at Mt. Gox with

unique insight into the exchange's collapse) have agreed to cooperate with Plaintiffs' continued

litigation against the non-settling defendants, and the reorganized exchange has agreed to

continue to investigate and pursue recovery of the still unaccounted-for bitcoins and currency

against other key players in the collapse for the benefit of exchange members.[3]

    As explained more fully below, the proposed settlement (and reorganization plan) now

before the Court is a more than fair, reasonable and adequate result for the proposed settlement

class and is well within the range of possible approval. Given its substantive terms, the relief

provided to the class and exchange members globally, and the support of an international cast of

interested parties, the Court should not hesitate to grant preliminary—and ultimately, final—

approval to the deal.[4]

## II.    FACTUAL AND PROCEDURAL BACKGROUND[5]

### A.    The Advent of Bitcoin

    Since its inception in late 2008, Bitcoin has quickly evolved from a proof of concept to

the foundation of a new digital marketplace. Like fiat currency[6], Bitcoin can be used to purchase

and sell goods and services through websites and merchants that accept them and is currently

---

[3]    The proposed settlement is contingent on the Japanese bankruptcy court's acceptance of the reorganization plan.

[4]    Approval of similar class settlements is being sought in Canada and other jurisdictions.

[5]    Except where otherwise noted, the procedural and factual background referenced here has been presented to the Court a number of times, most recently through Plaintiffs' Motion for Preliminary Injunction, supporting declaration, and the numerous exhibits attached thereto. (Dkts. 56, 57.)

[6]    Fiat currency refers to money issued by a government (i.e., U.S. Dollars).

used in transactions between millions of people and thousands of businesses around the world. Unlike fiat currency, however, bitcoins do not derive their value from government regulation. Instead, they are "mined" through complex computer algorithms and then bought and sold through private "exchanges." These exchanges accept credit card payments, wire transfers, or other forms of payment in fiat currency in exchange for bitcoins, and facilitate the trading of bitcoins between consumers around the globe. The price of bitcoins fluctuates on these exchanges just like any other currency market. Presently, with nearly 11 million bitcoins in circulation, the total worth of Bitcoin exceeds $1 billion.

### B.    The Rise and Fall of Mt. Gox

Until February of 2014, the Mt. Gox Bitcoin exchange ("Mt. Gox")—with CEO Mark Karpeles at the helm—was one of the largest Bitcoin exchanges in the world, at one time handling over 80% of all Bitcoin trade worldwide. Mt. Gox was also one of the world's largest "digital wallets," holding hundreds of millions of dollars' worth of its members' bitcoins and fiat currency.[7]

Founded in 2010 by settling defendant Jed McCaleb, Mt. Gox was sold to Mark Karpeles in 2011, leaving McCaleb with a 12% stake in the exchange. Mt. Gox quickly emerged as a dominant force in the Bitcoin industry. By April of 2013, Mt. Gox was facilitating transfers of about $20 million in Bitcoin per day—and profiting from a .6% commission charged on each transaction. By December of 2013, Mt. Gox had a customer base of one million members. Mt. Gox was valued by some to be worth $1 billion.[8]

---

[7]    A "digital wallet" or "bitcoin wallet" is a file that contains cryptographic identifiers that enable the transfer of bitcoins, or that allow a Bitcoin holder to prove ownership of bitcoins. Through the use of digital wallets, users are able to deposit and store their bitcoins in accounts held on Bitcoin exchanges.

[8]    *See* Rob Wile, *Bitcoin Enthusiast And Filmaker Has A Theory For Why Mt. Gox Failed*, Business Insider (Apr. 25, 2014, 12:18 PM), http://www.Businessinsider.com/mtgox-could-have-been-a-google-of-bitcoin-2014-4.

In late 2013 to early 2014, however, problems began to surface at Mt. Gox. Members reported long processing delays of weeks, and even months, for simple withdrawal requests. In February 2014, the exchange announced that it had discovered a "bug" in its system and that some bitcoins were missing as a result. The technical issues persisted, and on February 7, 2014, Mt. Gox temporarily paused all withdrawal requests on the exchange, assuring its members that the withdrawals in the system would be "reinitiated once the issue [was] resolved." Three days later, Mt. Gox reported "unusual activity" with respect to its Bitcoin wallets, and stated that it was investigating a technical issue called "transaction malleability," which appeared to involve third-party manipulation of Bitcoin transactions.[9] Despite these issues, Mt. Gox continued to accept member deposits into the exchange—reassuring members that measures were being taken to resolve withdrawal issues and improve transaction speeds.

On February 24, 2014, consumers navigating to the Mt. Gox website found that the exchange—along with its customers' bitcoins and fiat currency—had vanished. Mt. Gox suspended trading on the exchange entirely, and its website "went dark"—returning nothing but a blank page. The next day, a message on the Mt. Gox website notified exchange members that a "decision was taken to close all transactions for the time being."

Four days after Mt. Gox's unexpected collapse, Mt. Gox KK filed for bankruptcy in Japan, stirring rumors and speculation in the Bitcoin community about the fate of the exchange and the money that was lost with it. Mt. Gox would later reveal that it had lost a total of 850,000 bitcoins—worth upwards of $470 million and representing 7% of the total number of bitcoins in circulation worldwide. Shortly thereafter, and, as explained below, apparently in response to

---

[9]     As Mt. Gox would later claim in its bankruptcy filings, these technical issues had afflicted the Mt. Gox exchange for years.

Plaintiffs' efforts (which this Court referred to as a "sting"), Mt. Gox reported that it had "found" 200,000 lost bitcoins (worth approximately $116 million) in an old Bitcoin wallet.

## C.    The Litigation History

Three days after the sudden closure of Mt. Gox, Gregory Greene filed this putative class action against Mark Karpeles, Mt. Gox KK, MtGox Inc., and Tibanne KK. (Dkt. 1.) He subsequently amended his complaint, naming Mizuho Bank, Ltd. ("Mizuho"), Jed McCaleb, Mt. Gox NA, Gonzague Gay-Bouchery, and John Does as additional defendants (collectively, and together with the original defendants, "Defendants"). (Dkt. 36) (the "Complaint".) The Complaint also added Joseph Lack as a plaintiff. (*Id.*)

In the Complaint, Mr. Greene and Mr. Lack (collectively, "Plaintiffs"), alleged that Defendants failed to safeguard and segregate Mt. Gox exchange members' bitcoins and fiat currency as promised in Mt. Gox's Terms of Use (dkt. 37 ¶¶ 113–127, 192–196), and failed to implement industry-standard protocols to detect and prevent the improper access and misuse of exchange members' bitcoins and fiat currency held by Mt. Gox. (*Id.* ¶¶ 106–112.) Plaintiffs further alleged that Defendants (1) continued to accept and deposit wire transfers into Mt. Gox until the exchange shut down, despite their knowledge that exchange members' funds were lost or misappropriated; (2) acted in concert to misappropriate the bitcoins and fiat currency of exchange members; and (3) misrepresented to exchange members that they could securely trade and withdraw their property from Mt. Gox, up until the day it closed. (*Id.* ¶¶ 75–105, 181–191, 197-203.) The Complaint stated causes of action for, among other things, fraud, negligence, breach of fiduciary duty, breach of contract, unjust enrichment, trespass to chattels, conversion, civil conspiracy, and RICO violations. (Dkt. 37.) The Complaint also sought a permanent

injunction, an accounting, and a constructive trust over exchange members' property. (*Id.* ¶¶ 140–155, 168–180.)[10]

The day after the original complaint had been filed, Mt. Gox KK sought bankruptcy protection in Japan and filed a Civil Rehabilitation Proceeding Commencement Application in the Tokyo District Court. Seeking recognition of the Japanese proceedings in the United States, Mt. Gox KK filed an "emergency" Chapter 15 Petition in the Bankruptcy Court for the Northern District of Texas on March 9, 2014, seeking—and obtaining— a provisional stay of all litigation against it. *See In re MtGox Co., Ltd.*, No. 14-31229-sgj15 (Dkt. 13) (Bankr. N.D. Tex.). The Texas bankruptcy court, however, refused to grant provisional relief to the other—non-debtor— Defendants. The next day in Japan, Mr. Karpeles sought (and received) appointment as the Foreign Representative of the debtor Mt. Gox KK.

On March 4, 2014, Plaintiffs[11] filed a Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction, seeking, among other things, a freeze of Defendants' U.S. assets and expedited discovery. (Dkt. 8.) Mt. Gox's response to the sought TRO was swift: just three days after Plaintiffs' filing (i.e., on March 7th), the Mt. Gox Defendants suddenly "found" approximately 200,000 bitcoins in a so-called "older format wallet," which represented over 20% of the 850,000 bitcoins the exchange held at the time of its collapse.[12] On March 11, 2014, this Court held a hearing on Plaintiffs' motion for a TRO, during which it accepted the Texas bankruptcy court's provisional stay with respect to Mt. Gox KK only, entered a TRO freezing

---

[10]     For a complete statement of Plaintiffs' causes of action in this matter, *see* Dkt. 37 ¶¶ 75–213.

[11]     Though Mr. Lack had not yet been added as a plaintiff at that time, for convenience, this brief will use the plural even when discussing the period when Mr. Greene was the only plaintiff.

[12]     While this finding was reported to the Tokyo District Court a few days later on March 10th (i.e., the day before the TRO hearing before this Court), it would not be mentioned to either the larger public or any United States court until *after* Plaintiffs made clear their intention to definitively trace the movement of certain bitcoins by individuals suspected to be working for or in concert with the Defendants.

the U.S. assets of all non-debtor Defendants and allowed expedited discovery with respect to those assets. (Dkt. 33.)

In accordance with the TRO, Plaintiffs' counsel propounded written discovery—including interrogatories, requests for production, and requests for admission—on all Defendants (except for Mt. Gox KK, pursuant to the provisional stay) seeking information about their U.S. assets. Plaintiffs' counsel also served several third parties with subpoenas, including, among others, different manufacturers and distributors of Bitcoin mining equipment and Bitcoin "mining pools." Though MtGox Inc., Mark Karpeles, and Tibanne KK had yet to appear before this Court and failed to respond to Plaintiffs' discovery requests, Plaintiffs' counsel uncovered through third-party subpoenas and private investigators meaningful information about Defendants' assets, their global operations, and the loss of Mt. Gox exchange members' property. Plaintiffs' counsel also retained an expert to investigate and analyze the technical issues (i.e., "transaction malleability") that—according to public statements issued by Mt. Gox—had led to the catastrophic loss of bitcoins and fiat currency held by Mt. Gox.

Around this time, a similar class action was filed in the Superior Court of Ontario against MtGox Inc., Mt. Gox KK, Tibanne KK, Mt. Gox North America ("Mt. Gox NA"), Mizuho, Mark Karpeles, and Jed McCaleb (the "Canadian Action"). Like the instant action, the Canadian Action arose from Mt. Gox's loss of consumer bitcoins and fiat currency, and alleges, among other things, negligence, breach of contract, breach of trust and fiduciary duty, fraudulent misrepresentation, and conversion. *See Joyce, et al. v. MtGox Inc.*, No. cv-14-500253-00CP (Can. Ont. Sup. Ct. J.).

On March 20, 2014, the Court held a status hearing, during which Plaintiffs' counsel updated the Court as to service, discovery, and Plaintiffs' ongoing investigation. At that same

hearing, Plaintiffs also asked the Court for partial relief from the TRO so that the movement of certain bitcoins could be traced—i.e., bitcoins believed to be controlled by the Defendants and moved in violation of the TRO. In response—this time just hours following the status hearing where Plaintiffs requested leave to "trace" these bitcoins—Mt. Gox publicly announced the existence of the 200,000 bitcoins it previously found on March 7th through its website, www.mtgox.com.

On April 2, 2014, Plaintiffs filed a motion to "extend" the TRO by effectively converting it into a preliminary injunction (dkt. 49), which this Court granted. Attorneys from the law firm of Novack & Macey filed appearances on behalf of Mr. Karpeles and Tibanne KK and attended the hearing on the motion to extend the TRO, indicating their intent to contest jurisdiction and sufficiency of service.[13]

On April 8, 2014, Plaintiffs filed a Motion for Preliminary Injunction, seeking, among other things, a continued freeze of Defendants' U.S. assets for the duration of this litigation and an extension of the expedited discovery schedule. (Dkt. 56.) The motion likewise set forth the detailed factual findings of Plaintiffs' discovery efforts, argued the likelihood of prevailing on each of their claims, and sought to preserve the *status quo ante* to ensure that Plaintiffs and the putative class could ultimately recover should they prevail in the litigation. On April 14, 2014, settling defendants Jed McCaleb and Gonzague Gay-Bouchery appeared in this matter through their respective counsel, though counsel for Mr. Gay-Bouchery indicated his intent to contest this

---

[13]    Since the initial filing of Plaintiff Greene's complaint, Plaintiffs hav made reasonable attempts to serve the Complaint and summons on Karpeles and Tibanne through the Hague Convention and by international mail and e-mail, and have completed service of the Complaint and summons via process server on Mt. Gox's U.S. subsidiaries (one of which was authorized to accept service on behalf of Mr. Karpeles). After Tibanne and Karpeles appeared through counsel, however, Plaintiffs filed a Motion to Approve Service by Alternative Means, seeking to serve the Complaint and summons through Defendants' attorneys at Novack & Macey. (Dkt. 54.)

Court's jurisdiction and, potentially, Plaintiffs' Motion for Alternative Service.

Meanwhile, in the Texas bankruptcy court, Plaintiffs moved to compel the deposition of Mr. Karpeles in his capacity as the Foreign Representative of Mt. Gox KK. *See In re MtGox Co., Ltd.*, No. 14-31229-sgj-15 (Dkt. 39) (Bankr. N.D. Tex.). On April 4, 2014, the Bankruptcy Court granted Plaintiffs' motion and ordered that Mr. Karpeles appear for a deposition in Texas. *In re Mt. Gox Co., Ltd.*, No. 14-31229-sgj-15 (Dkt. 72) (Bankr. N.D. Tex.). The day before Mr. Karpeles's deposition was scheduled to take place, however, the Tokyo District Court dismissed Mt. Gox KK's bid for Civil Rehabilitation and transferred control of Mt. Gox KK to a court-appointed Provisional Administrator, Nobuaki Kobayashi. Mr. Karpeles was likewise removed as Mt. Gox KK's foreign representative in the Chapter 15 proceedings. The Tokyo District Court then entered an order for provisional administration, with commencement of bankruptcy proceedings expected to follow. Shortly thereafter, on April 24, 2014, the Tokyo District Court ordered the commencement of bankruptcy proceedings and confirmed the appointment of Mr. Nobuaki Kobayashi as bankruptcy trustee.[14] The court likewise issued a "Cautions" statement to Mt. Gox detailing its obligation to cooperate in the bankruptcy proceedings and with the bankruptcy trustee, and prohibiting the concealment or destruction of any debtor assets.[15]

### D. Settlement Discussions and Private Mediation

In March 2014, Plaintiffs' counsel began discussions about a potential resolution of this case with counsel for Jed McCaleb. (*See* Edelson Decl. ¶ 13.) Plaintiffs' counsel also began settlement negotiations with other Defendants. (*Id.*) These discussions, along with discussions

---

[14] *See* Declaration of Jay Edelson ("Edelson Decl."), a copy of which is attached hereto as Exhibit 1, ¶ 5; *see also* Announcement of Commencement of Bankruptcy Proceedings by Bankruptcy trustee Nobuaki Kobayashi, available online at https://www.mtgox.com/img/pdf/20140424_announce_qa_en.pdf (last accessed April 28, 2014).

[15] *See* Edelson Decl. ¶ 6.

with an outside group of potential investors, Sunlot Holdings Limited ("Sunlot"), culminated in a mediation that spanned the week of April 21. (*Id.* ¶¶ 14–15.)[16]

The mediation—facilitated and presided over by Judge Andersen—involved Mr. McCaleb and Mr. Gay-Bouchery (collectively, the "Settling Defendants"), Sunlot, a putative class of Canadian consumer creditors, and other interested creditors of Mt. Gox KK internationally. *(Id.* ¶ 15.) Over the course of the mediation, the parties coalesced around a negotiated purchase agreement, where Plaintiffs, on behalf of a class of U.S. Mt. Gox exchange members, would support Sunlot's acquisition of Mt. Gox in exchange for a set of terms benefitting and protecting the class. (*Id.* ¶ 16.) Numerous drafts of proposed terms were exchanged and evaluated and—through the mediation process and negotiations with numerous interested international creditors and stakeholders—the parties were able to reach both the terms of a settlement, and the material terms of Sunlot's acquisition of Mt. Gox that would make settlement possible. (*Id.* ¶ 17.) Assuming the enumerated contingencies of the settlement are met, it provides the proposed class here with the greatest opportunity to realize a full recovery of their losses (or more), and Plaintiffs respectfully request that this Court preliminary approve it.[17]

## III.   TERMS OF THE SETTLEMENT

A copy of the settlement agreement (the "Settlement Agreement" or "Agreement") is attached hereto as Exhibit 2. The key terms of the Agreement are briefly set forth below:

---

[16]     Sunlot is composed of a consortium of investors including Brock Pierce (Crypto Currency Partners), William Quigley (Clearstone Venture Partners), and Matthew Roszak (SilkRoad Equity) who collectively manage over one billion dollars of invested capital and have access to significant cash and credit facilities through public and private investment vehicles.

[17]     An identical settlement agreement is being entered into on behalf of a class of Canadian Mt. Gox exchange members. (Edelson Decl. ¶ 18.)

## A. Presentment and Implementation of the Mt. Gox Reorganization Plan

Under the Agreement, the Settling Defendants agree to present, support, get approval of, and implement a plan to reorganize the Mt. Gox exchange (the "Mt. Gox Reorganization Plan" or "Plan") to the Japanese Bankruptcy Court. (Agreement ¶ 2.1.)[18] Pursuant to the Plan, PricewaterhouseCoopers (or an equivalent alternative auditor) will perform an accounting of the Mt. Gox exchange and determine the amount of bitcoins and fiat currency held by each Mt. Gox exchange member at the time it ceased operations. (Plan at 1.) With the exception of a $10 million fiat currency holdback to fund administration and further recovery efforts, all bitcoins and fiat currency currently held by Mt. Gox—including the 200,000 recently discovered bitcoins—will be automatically returned *pro rata* to affected Mt. Gox exchange members' wallets (the "Initial Distribution"). (Plan at 1-3.)

In addition, under the Mt. Gox Reorganization Plan, Sunlot will acquire Mt. Gox and establish a new Bitcoin exchange ("New Gox"). (Plan at 1-2.) Affected Mt. Gox exchange members will be treated, collectively, as if they hold a 16.5% stake in New Gox. Thus, affected Mt. Gox exchange members will be entitled to 16.5% of any dividends paid by Sunlot/New Gox to its stockholders, as well as to 16.5% of the net proceeds received by Sunlot/New Gox shareholders in the event of any subsequent sale of New Gox, all to be paid to individual affected Mt. Gox exchange members *pro rata*. (Plan at 2.) Further, in the event New Gox conducts an initial public offering of common stock, affected Mt. Gox exchange members are entitled to 16.5% of such stock, their *pro rata* share of which each individual affected exchange member can elect to receive either as stock or the equivalent cash value. (Plan at 2.)

---

[18]     A copy of the Mt. Gox Reorganization Plan is attached to the Settlement Agreement as Exhibit A. In the event the Japanese Bankruptcy Court refuses to approve in any material respect the Mt. Gox Reorganization Plan, Plaintiffs have the right to terminate the Settlement Agreement. (Agreement ¶ 6.1.)

Finally, under both the Mt. Gox Reorganization Plan and the Settlement Agreement, Sunlot agrees to use commercially reasonable best efforts to investigate and prosecute civil actions against any person or entity determined to be in any way involved in the loss or theft of Mt. Gox bitcoins and fiat currency, and to return *pro rata* to the affected Mt. Gox exchange members any bitcoins or fiat currency recovered through such investigation and prosecution. (Plan at 3; Agreement ¶¶ 2.2(a), (b).)[19]

Neither the Agreement nor the Plan have any limitation on the amount of bitcoins and/or fiat currency that an affected Mt. Gox exchange member may ultimately recover (*i.e.*, an affected Mt. Gox exchange member's recoupment from the Initial Distribution, payments related to their *pro rata* share of the 16.5% interest in New Gox, and recovery from any subsequent prosecutions by Sunlot are not capped by the amount of the member's initial loss). Further, the Plan states that Mt. Gox exchange members will not receive any preferential treatment over any other putative creditors. (Plan at 1.)

## B.   Complete Cooperation

Both Sunlot and the Settling Defendants agree to provide Plaintiffs and their counsel all reasonably necessary information in their possession or control related to this litigation and Plaintiffs' claims against the non-settling Defendants. (Agreement ¶ 2.2.)

## C.   Releases

In exchange for the relief described above, Settling Defendants, Sunlot, and certain Mt. Gox entities will receive a full release of all claims relating to the collapse of the Mt. Gox exchange. (Agreement ¶¶ 1.28-1.30, 3.)

---

[19]   As an incentive and compensation for investigating and pursuing such claims, Sunlot may retain 10% of any assets recovered. (Plan at 3.)

### D. Attorneys' Fees

The parties agree that proposed class counsel shall be entitled to a fee award in an amount to be determined by this Court upon petition, which will request that any such award be paid out of the proceeds going to the class at the same time and in the same manner as the relief afforded to the class under the Agreement and the Mt. Gox Reorganization Plan. (Agreement ¶ 8.1.)

## IV. THE PROPOSED CLASS SHOULD BE CERTIFIED.

Plaintiffs respectfully request that the following class be certified: Persons in the United States and its territories who had bitcoins or Fiat Currency stored with the Mt. Gox Exchange on February 24, 2014.[20] (Agreement ¶ 1.35.)

To be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b). *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Rule 23(a) requires that (1) the proposed class is so numerous that joinder of all individual class members is impracticable (numerosity), (2) that there are questions of law or fact common to the proposed class (commonality), (3) that the claims of the plaintiff are typical of those of the class (typicality), and (4) that plaintiff will adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition, where, as here certification is sought under Rule 23(b)(3), the proponent of the class must show that (1) the common questions of law or fact predominate over questions affecting only individual class members (predominance), and (2) that a class action is superior to other available methods of resolving the controversy (superiority). Fed. R. Civ. P. 23(b)(3); *Messner*, 669 F.3d at 811. As

---

[20]     Excluded from the class are (1) MTGOX, Inc., Mt. Gox KK, Tibanne KK, Mt. Gox North America, Inc., Mizuho Bank, Ltd., Mark Karpeles, and any entity in which they or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) Persons who execute and file a timely request for exclusion, (4) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims, and (5) the Settling Defendants.

more fully discussed below, the proposed class satisfies all of these requirements, and should therefore be certified.

### A. The Proposed Class is Sufficiently Numerous.

The first requirement of Rule 23(a)—numerosity—is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although there is no "magic number at which joinder is impracticable," a class of at least 40 members is generally sufficient, *Schmidt v. Smith & Wollensky, LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010), and classes numbering in the thousands "clearly" satisfy the numerosity requirement, *Heastie v. Cmty. Bank of Greater Peoria*, 125 F.R.D. 669, 674 (N.D. Ill. 1989).

Here, although Mt. Gox at times had one million members, only approximately 138,000 Mt. Gox account holders had wallets holding bitcoins or fiat currency at the time of closure, and approximately 45,000 of those account holders comprise the proposed class. (Edelson Decl. ¶ 7.) Plaintiffs need not allege the exact number or identity of the class members, and this Court may make common sense assumptions in determining numerosity. *Hinman v. M & M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 805-06 (N.D. Ill. 2008). Further, while courts have read a "definiteness" requirement into the Rule 23(a) prerequisites for class certification, a class is sufficiently definite if its members can be determined by reference to objective criteria. *Id. See also Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 417 (N.D. Ill. 2012). The objective criterion to determine class membership here is whether an individual or entity had bitcoins or fiat currency held by Mt. Gox on February 24, 2014, and a list of such individuals and entities is to be sought from Mt. Gox pursuant to the Mt. Gox Reorganization Plan. *See id.* (holding that where class members could be identified with reference to lists generated by defendant or third parties, the class was sufficiently definite).

Consequently, because the proposed class consists of roughly 45,000 members who can be determined by objective criteria (and ultimately identified by Mt. Gox), the numerosity requirement of Rule 23(a)(1) is satisfied.

**B.     The Claims of the Proposed Class Share Common Questions of Law and Fact.**

The second requirement of Rule 23(a)—commonality—is satisfied where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requires a common contention that is of such a nature that it is capable of class-wide resolution, meaning that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)," *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992), and commonality exists where a plaintiff can show that class members have all "suffered the same injury," *Wal-Mart*, 131 S. Ct. at 2551.

Here, each proposed class member's claims against the Settling Defendants share a common nucleus of operative fact, and each class member suffered the same injury. Specifically, each member of the proposed class had their Mt. Gox account frozen in February—preventing them from withdrawing any bitcoins or fiat currency—shortly before Mt. Gox's website "went dark" and Mt. Gox filed for bankruptcy. Plaintiffs' Complaint alleges that Mt. Gox—including the Settling Defendants—misrepresented their ability to adequately safeguard its customers' bitcoins and fiat currency, failed to do so, and fraudulently concealed the large-scale loss and/or theft of bitcoins. These allegations raise questions of law and fact common to all members of the proposed class, including, among others, (1) whether Mt. Gox engaged in the alleged conduct; (2) whether the Settling Defendants participated in the alleged conduct, and, if so what their role

in the alleged conduct was; (3) whether the alleged conduct was fraudulent; (4) whether the alleged conduct was negligent; (5) whether the alleged conduct breached any express or implied contracts with, or fiduciary duties owed to, Mt. Gox exchange members, and, if so whether the Settling Defendants are bound by such agreements or duties; and (6) whether Mt. Gox principals (including the Settling Defendants) may retain monies paid to or deposited into accounts with Mt. Gox.

These questions are common to every member of the proposed class, and determining the answer to each would resolve—in one stroke—an issue that is central to the validity of every proposed class member's claims, and determining liability for the identical injury suffered by every member of the proposed class. Consequently, the commonality requirement of Rule 23(a)(2) is satisfied. *See Rosario*, 963 F.2d at 1018 (finding commonality satisfied where question at the "heart of [the] case" was whether defendants operated cosmetology schools pursuant to an ongoing scheme to defraud and deceive prospective students).

### C.     Plaintiffs' Claims are Typical of the Proposed Class Members' Claims.

The third Rule 23(a) requirement—typicality—is satisfied where "the claims … of the representative parties are typical of the claims … of the class." Fed. R. Civ. P. 23(a)(3). This factor directs courts to focus on whether Plaintiffs' claims "have the same essential characteristics as the claims of the class at large." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). A plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Id*. That is precisely the situation here.

Plaintiffs, along with every other member of the proposed class, were allegedly subjected to the same common course of conduct by Defendants, including the Settling Defendants.

Settling Defendants, among others, allegedly failed to secure every proposed class member's bitcoins and fiat currency—including Plaintiffs'—and allegedly misrepresented the security and accessibility of the Mt. Gox exchange to every proposed class member—including Plaintiffs. The kind of harm arising out of this alleged conduct was identical with respect to every member of the proposed class, including Plaintiffs, and thus, their claims all share "the same essential characteristics." Consequently, Rule 23(a)(3)'s typicality requirement is satisfied here.

**D.  Plaintiffs (and their Counsel) Will Adequately Represent the Class.**

The final Rule 23(a) requirement—adequacy—requires that Plaintiffs "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement mandates that both Plaintiffs' and their counsel "be able to zealously represent and advocate on behalf of the class as a whole." *Maxwell v. Arrow Fin. Servs., Inc.*, No. 03 C 1995, 2004 WL 719278, *5 (N.D. Ill. Mar. 31, 2004). This means that Plaintiffs must have no antagonistic or conflicting claims with other class members and must have a sufficient interest in the outcome of the case to ensure vigorous advocacy. *Id*. With respect to Plaintiffs' counsel, it means that they must be experienced and qualified and generally be able to conduct the litigation. *Id.* Here, Plaintiffs and their counsel easily satisfy these requirements.

Neither Plaintiff has any conflicting claims with other members of the proposed class, and each has a sufficient stake in the outcome to ensure vigorous advocacy. Shortly before Mt. Gox shut down, Mr. Lack had transferred $40,000 to Mt. Gox to be deposited into his account, and at the time Mt. Gox shut down, Mr. Greene's account contained approximately $25,000 in bitcoins. Plaintiffs Lack and Greene have exactly the same interests as other members of the proposed class in recovering their bitcoins and/or fiat currency and have sufficient amounts at

stake to ensure vigorous advocacy. Plaintiffs' dogged pursuit of their claims across the globe thus far demonstrates as much.

Likewise, Plaintiffs' counsel are well-qualified and experienced members of the plaintiffs' bar who have extensive experience in class actions of similar size, scope, and complexity to the instant action. (Edelson Decl. ¶ 27.) As explained more fully below, *see infra* Part V, Plaintiffs' counsel have regularly engaged in major complex litigation involving both consumer technology and banking issues, have the resources necessary to conduct litigation of this nature, and have frequently been appointed class counsel by courts throughout the country. (Edelson Decl. ¶¶ 29-33.) Further, Plaintiffs' counsel have already diligently investigated and dedicated substantial resources to the claims in this action, and will continue to do so throughout its pendency. (*Id.* ¶ 34.)

Because both Plaintiffs and their counsel have and will continue to zealously represent and advocate on behalf of the proposed class, Rule 23(a)(4)'s adequacy requirement is satisfied here.

**E.      The Proposed Class Satisfies Rule 23(b).**

As noted above, in addition to meeting all four of Rule 23(a)'s prerequisites for certification, a proposed class must also fall within one of the subsections of Rule 23(b). Here, the proposed class falls within Rule 23(b)(3) because the common questions predominate over any individual questions, and a class action is superior to alternative methods of resolving this dispute.

### *1.      Common Questions of Law and Fact Predominate.*

Under the first prong of Rule 23(b)(3)—predominance—this Court must find "that the questions of law or fact common to class members predominate over any questions affecting

only individual members." Fed. R. Civ. P. 23(b)(3). The purpose of the predominance requirement is "to determine whether a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). This requirement is satisfied when "common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Id*. (internal quotations omitted). As the Seventh Circuit has explained:

> If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.

*Id*.

Here, virtually every question in the case is common to all members of the proposed class. The complaint states numerous causes of action against Defendants for fraud, negligence, breaches of contract and fiduciary duty, conversion, and civil conspiracy, among others. Each of these claims arises out of the same alleged conduct of Defendants—including the Settling Defendants—in operating and making representations about the Mt. Gox exchange, and the evidence needed to establish these claims will be the same for every proposed class member. Consequently, the common questions of law and fact predominate over any individual issues here, and the first prong of Rule 23(b)(3) is thus satisfied.

### 2. A Class Action is Superior to Other Available Methods of Adjudication.

Under the second prong of Rule 23(b)(3)—superiority—this Court must find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A class action is usually considered a superior method of adjudicating claims that, like here, involve standardized conduct, even if there are individual

issues that exist among class members such as damages. *Cicilline v. Jewel Food Stores, Inc.*, 542 F. Supp. 2d 831, 838 (N.D. Ill. 2008). In addition, "[t]he class action device is also superior to other methods of adjudication when the judicial economy from consolidation of separate claims outweighs any concern with possible inaccuracies from their being lumped together in a single proceeding for decision by a single judge or jury." *Streeter v. Sheriff of Cook County*, 256 F.R.D. 609, 614 (N.D. Ill. 2009) (internal quotations omitted).

Here, a class action is superior to other available methods of adjudication for precisely these reasons. Because Defendants acted exactly the same with respect to every member of the proposed class, their claims can be fairly and efficiently adjudicated in one action. Absent class treatment, each proposed class member would be required to present the same legal and factual arguments in separate and duplicative proceedings, creating a multiplicity of unnecessary actions at great expense to both the litigants and the judicial system. Further, certifying a class will allow class members to speak with a unified voice in attempting to influence the outcome of events—such as the Japanese bankruptcy proceedings or private negotiations over the fate of the Mt. Gox exchange—that will affect their interests at stake here, rather than forcing them to speak individually, or, more likely, to not be heard at all.

In short, because the proposed class here satisfies each of Rule 23(a)'s prerequisites for class certification, as well as Rule 23(b)(3)'s predominance and superiority requirements, this Court should certify the proposed class.

## V.     PLAINTIFFS' COUNSEL SHOULD BE APPOINTED CLASS COUNSEL.

When certifying a class, a court must also appoint class counsel who will fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(g)(1), (2), (4). In appointing class counsel, the court must consider (1) the work counsel has done in identifying or

investigating potential claims, (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the case, (3) counsel's knowledge of the applicable law, and (4) the resources class counsel has committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Here, as noted above, proposed class counsel has extensive experience prosecuting similar class actions and other complex litigation. Edelson PC has been recognized as a pioneer in both large digital privacy cases involving complicated technological issues as well as large-scale complex banking litigation. For example, in appointing Edelson PC as interim co-lead counsel in a privacy class action against Facebook, the United States District Court for the Northern District of California described the firm as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue." *In re Facebook Privacy Litig.*, No. 10-cv-02389 (N.D. Cal. Dec. 10, 2010)*; see also In re Netflix Privacy Litig.*, No 5:11-cv-00379 (N.D. Cal. Aug. 12, 2011) (appointing Edelson PC interim lead counsel, noting that while two other firms had impressive resumes and litigation experience, Edelson PC's "significant and particularly specialized expertise in electronic privacy litigation and class action renders them superior to represent the putative class."); *Harris v. comScore, Inc.*, 292 F.R.D. 579 (N.D. Ill. 2013) (adversarially certifying what is believed to be the largest digital privacy consumer class action and appointing Edelson PC as class counsel). Edelson PC has also been named a "top national plaintiff's class action firm" in the areas of "technology, privacy, and telecommunications" by the U.S. Chamber Institute for Legal Reform. U.S. Chamber Institute for Legal Reform, *The New Lawsuit Ecosystem: Trends, Targets and Players* at 16 (October 2013) (available at http://www.instituteforlegalreform.com/uploads/sites/ 1/The_New_Lawsuit_Ecosystem_pages_web.pdf).

With respect to banking litigation, Edelson PC has been at the forefront of class action litigation arising in the aftermath of the federal bailouts of too-big-to-fail banks following the 2008 financial crisis, being named as lead counsel in nationwide class actions involving illegal suspensions of home equity lines of credit and the rights of individuals to sue to enforce portions of the federal Home Affordable Modification Program ("HAMP"). (Edelson Decl. ¶ 33.) These actions have led to the restoration of billions of dollars of credit to homeowners (*id.*) and, in the case of the HAMP litigation, caused one Seventh Circuit judge to remark that "[p]rompt resolution of this matter is necessary not only for the good of the litigants but for the good of the Country." *Wigod v. Wells Fargo Bank*, N.A. 673 F.3d 547, 586 (7th Cir. 2012) (Ripple, J. concurring).

In addition, Edelson PC has dedicated significant resources to representing the proposed class, diligently investigating and pursuing the claims here against the Settling Defendants and others. (Edelson Decl. ¶ 34.) Proposed class counsel further spearheaded the settlement efforts here and successfully negotiated a settlement that, as explained below, is a remarkable result for the class.

For all these reasons, this Court should appoint Jay Edelson of Edelson PC as class counsel.[21]

## VI.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL.

A class action may be settled only with this Court's approval. Fed. R. Civ. P. 23(e). District Court review of a proposed class action settlement is a well-established two-step process.

---

[21]    Appointment of Jay Edelson as class counsel is supported by four committees of attorneys working on behalf of affected Mt. Gox exchange members: (1) U.S. Committee led by Robert Clifford of The Clifford Law Offices and Brett Luskin of Law Office of Bret Lusskin, Esq.; (2) the Bankruptcy Committee led by Scott Kitei of Honigman Miller Schwartz and Cohn LLP; (3) the Canadian Committee led by Theodore P. Charney of Charney Lawyers; and (4) the International Committee led by Scott A. Kamber of KamberLaw, LLC. (Edelson Decl. ¶ 35.)

*Armstrong v. Board of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980),

*overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). First, courts

conduct a pre-notification hearing to determine whether the proposed settlement is "within the

range of possible approval." Conte & Newberg, 4 Newberg on Class Actions, §11.25, at 38 – 39

(4th ed. 2002); *Armstrong*, 616 F.2d at 314. The purpose of this preliminary approval hearing is

not to conduct a "fairness hearing," but rather "to ascertain whether there is any reason to notify

the class members of the proposed settlement and to proceed with a fairness hearing."

*Armstrong*, 616 F.2d at 314; Newberg, §11.25, at 38–39. This stage serves as an "initial

evaluation" of the proposed settlement, taking into consideration the written submissions as well

as the informal presentations provided by the settling parties. Manual for Complex Litigation,

§ 21.632 (4th ed. 2004). Upon determining that the settlement proposal is "within the range of

possible approval," the court then proceeds to the second step, a final approval hearing.

Newberg, §11.25, at 38 – 39; *In re AT&T Mobility Wireless Data Servs. Sales Litig.*, MDL No.

2147, 270 F.R.D. 330, 346 (N.D. Ill. 2010). Here, the proposed settlement is well within the

range of possible approval, and this Court should therefore preliminarily approve the settlement,

order the parties to provide notice of the proposed settlement to the class, and set a date for a

final approval hearing.

   "Federal courts naturally favor the settlement of class action litigation." *In re AT&T,* 270

F.R.D. at 345 (quoting *Isby v. Bayh,* 75 F.3d 1191, 1196 (7th Cir. 1996)). Upon a finding that a

proposed settlement is "fair, reasonable, and adequate," strong judicial and public policy favors

the approval of such a settlement. *Isby*, 75 F.3d at 1198. In determining whether the proposed

settlement is fair, reasonable and adequate, courts look to the following factors: (1) the strength

of the plaintiff's case compared to the amount of the settlement offer; (2) an assessment of the

likely complexity of a trial; (3) the length and expense of the litigation; (4) the amount of opposition to settlement among affected parties; (5) the opinion of competent counsel; and (6) the stage of the proceedings and amount of discovery completed at the time of settlement. *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 578 (N.D. Ill. 2011) (citing *Synfuel Techs., Inc. v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir.2006)). Though these factors are ultimately assessed at the fairness hearing that follows preliminary approval of the proposed settlement, a summary version of the same inquiry also takes place at this phase of the approval process. *Kessler v. Am. Resorts Int'l,* 05 C 5944, 2007 WL 4105204, at *5 (N.D. Ill. Nov. 14, 2007) (citing *Armstrong*, 616 F.2d at 314)).

Applying a summary version of the six-factor test here demonstrates that the proposed settlement is "fair, reasonable and adequate" and thus well within the range of approval.

### A. The Settlement Offer Balanced Against the Likelihood of Recovery Against Mt. Gox and the Settling Defendants Absent Settlement Weighs Strongly in Favor of Preliminary Settlement Approval.

The first factor—the strength of Plaintiffs' case compared to the settlement offer—is the most heavily weighted and strongly favors approval here. *See Schulte*, 805 F. Supp. 2d at 578. Courts should be mindful not to reject a settlement solely because it does not provide a complete victory, given that parties to a settlement "benefit by immediately resolving the litigation and receiving some measure of vindication for [their] position[s] while foregoing the opportunity to achieve an unmitigated victory." *In re AT&T*, 270 F.R.D. at 347.

Here, the proposed settlement provides significant relief to class members, especially in light of their chances of ultimate recovery against Mt. Gox and the Settling Defendants absent settlement. Under the proposed settlement, the parties agree to present the Mt. Gox Reorganization Plan to the Japanese bankruptcy court. If the Plan is adopted by that court—and

the proposed settlement is only valid if it is—then class members will receive an immediate distribution of bitcoins and, potentially, fiat currency. As noted above, Mt. Gox holds at least 200,000 bitcoins it recently "found," worth approximately $116 million. Further, class members will receive an interest in the New Gox exchange, entitling them to 16.5% of any dividends, proceeds of sale, and common stock issued in an initial public offering. Finally, Sunlot has agreed to continue to pursue recovery of bitcoins and fiat currency against other responsible parties (distributing 90% of any recovered assets to exchange members), and the Settling Defendants have agreed to cooperate in Plaintiffs' continued litigation against the non-settling Defendants. Receiving an immediate distribution of money, a substantial interest in the new exchange—with no cap on income from such interest, and which thus has the potential to make them more than whole—and an agreement from Sunlot to pursue recovery against other actors and from both Sunlot and settling Defendants to cooperate in Plaintiffs' own continued efforts, provides significant benefits for class members and is an exceedingly good result.

This is especially true given the obstacles that class members would face to ultimate recovery from Mt. Gox and the Settling Defendants in the absence of the proposed settlement. With respect to Mt. Gox, the alternative to the proposed settlement and reorganization is liquidation, which would likely result in recovery for class members and other exchange members—if any—of pennies on the dollar. Thus, it almost goes without saying that the potential to be made more than whole through the proposed settlement via the immediate distribution of bitcoins and currency, continued recovery efforts, and a substantial interest in the New Gox Bitcoin exchange is a far superior result for the class.

With respect to McCaleb and Gay-Bouchery, the alternative to this settlement is lengthy and expensive litigation against two individuals who have insufficient assets to offer meaningful

recovery to the class.[22] Again, as with Mt. Gox, the settlement offers a much better result for the class. In addition to throwing their support behind the Mt. Gox Reorganization Plan, McCaleb and Gay-Bouchery have agreed to cooperate with Plaintiffs as they pursue their claims against the non-settling Defendants. This cooperation alone is beneficial to the class because unlike McCaleb and Gay-Bouchery, the non-settling defendants have significant assets against which the class could potentially recover. Federal courts nationwide have recognized the value of similar agreements to cooperate in approving class action settlements. *See, e.g., In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 278, 285 (E.D. Pa. 2012) (approving a settlement in which the only benefit to the class was defendant's agreement "to cooperate with the [p]laintiffs' preparation for and prosecution of their class action" against remaining defendants by providing relevant documents and witnesses); *Buckley v. Engle*, No. 07CV254, 2010 WL 4064985, at *2 (D. Neb. Oct. 14, 2010) (approving a "proposed settlement [that] provides the important benefit of [defendant]'s cooperation in pursuing recovery from the nonsettling parties" by "providing testimony, documents and information regarding the plaintiffs' claims," given the "prospect that [defendant]'s financial condition would make any judgment against him difficult to collect").

In short, the proposed settlement here—providing immediate partial recovery to the class, agreements to continue recovery efforts and cooperate with Plaintiffs' own recovery efforts against non-settling Defendants, and an ongoing stake in the reorganized Bitcoin exchange, which itself offers the opportunity for more-than-full recovery—is a resounding victory compared to the alternative to settlement, the liquidation of Mt. Gox and continued litigation

---

[22] In addition, while Plaintiffs believe they have a strong case against Gay-Bouchery, the case against McCaleb may be somewhat weaker, as it appears that he received minimal financial benefit, if any, from the collapse of the Mt. Gox exchange, and was not actively involved in the activities of the company during the relevant time.

against two individual defendants lacking significant resources.[23] Consequently, because the proposed settlement offers class members substantial benefits, especially when considered against the alternative, this factor weighs in favor of preliminary approval.

**B.     The Complexity, Length, and Expense of Continued Litigation Against the Settling Defendants Favors Approval of the Settlement.**

The second and third factors—the likely complexity of trial and the length and expense of the litigation—also weigh in favor of approving the proposed settlement here. The proposed settlement "allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation" against the Settling Defendants. *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 586 (N.D. Ill. 2011). Here, settlement is especially favorable due to the complex facts and novel legal issues involved. Plaintiffs' claims will require highly complex investigation and fact-finding to determine what actually took place (i.e., what actually led to and caused the loss of bitcoins and fiat currency and resulted in Mt. Gox's insolvency), and will then require the resolution of novel and complex legal issues involving rights, duties, and best practices as applied to the relatively recent phenomenon of digital currency. (Edelson Decl. ¶ 25.) Additionally, the underlying facts are the subject of litigation in the United States and Canada, bankruptcy proceedings in Japan and related bankruptcy proceedings in the United States. (*Id.* ¶ 26.) Continued litigation against the Settling Defendants would create unnecessary delay and expense in attempting to obtain ultimate recovery for the class from those Defendants, which thus weighs strongly in favor of preliminary settlement approval here.

---

[23]     In addition, as Bitcoin holders, class members have an additional interest in avoiding the liquidiation of the largest Bitcoin exchange because it would undermine public confidence in Bitcoin generally.

### C.    Competent Counsel Both in the United States and Abroad Support the Settlement.

The fifth[24] factor to consider—the opinion of competent counsel—also supports the proposed settlement. When evaluating a proposed settlement, it is appropriate for courts to "give consideration to the opinion of competent counsel that the settlement was fair, reasonable and adequate." *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996). When weighing class counsel's opinion, the Court may consider affidavits, as well as general observations made by class counsel. *Id.*

Here, as noted above, *supra* Part V, Plaintiffs' counsel is recognized as leaders in prosecuting both digital consumer protection litigation and large-scale complex banking litigation. Based on their substantial experience, Plaintiffs' counsel was fully competent to weigh the risks and rewards of further litigation as compared to agreeing to the proposed settlement. As a result, proposed class counsel believes that the proposed settlement is likely the only avenue for substantial class member recovery. (Edelson Decl. ¶¶ 20, 23.)

Consequently, the opinion of counsel factor strongly favors preliminary approval.

### D.    Plaintiffs Have Sufficient Information to Assess the Proposed Settlement.

Finally, the sixth settlement approval factor—the stage of proceedings and amount of discovery completed—also weighs in favor of approval here. This factor is relevant because it determines "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Schulte*, 805 F. Supp. 2d at 587 (internal quotations omitted). The pertinent inquiry is "what facts and information plaintiffs have been provided", and seeks to avoid collusion among the parties, or other failures of class counsel "to get the best agreement possible for their class."

---

[24]    The fourth settlement approval factor—amount of opposition among affected parties—is not typically assessed at the preliminary approval stage, before notice of the settlement has been disseminated. *See In re AT&T*, 270 F.R.D. at 349.

*Id.* at 587-88 (internal quotations omitted). Here, Plaintiffs had sufficient information to evaluate the settlement, did not collude with the Settling Defendants, and ultimately were able to get what can realistically be viewed as the best agreement possible for the class.

Plaintiffs conducted substantial factual investigation (including through the retention of private investigators), and obtained information through investigations performed by the media and members of the Bitcoin community. (Edelson Decl. ¶ 12.) These various fact-finding methods have resulted in the receipt of information from Defendants, declarations from putative class members, the Expert Report of Cornell Professor Emin Gün Sirer, and more. (*Id.* ¶ 12.) Using this information, Plaintiffs were able to spearhead an effort to avoid the liquidation of Mt. Gox and negotiate an extremely valuable settlement for the class. The fact that the result is so beneficial to class members alone suggests that Plaintiffs had sufficient information to fully evaluate the settlement. *Schulte*, 805 F.3d at 588 ("[A]s the Seventh Circuit has suggested, the fact that Class Counsel negotiated a fair settlement is evidence that he had enough information to effectively represent the class.") (citing *Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir. 1987)).

Consequently, the final factor weighs in favor of approval. And thus, as all factors suggest that the proposed settlement is fair, adequate, and reasonable and thus within the range of approval, this Court should grant preliminary approval to the proposed settlement.

## VII.    THE PROPOSED NOTICE PLAN SHOULD BE APPROVED.

When a class is certified under Rule 23(b)(3), the court must direct to class members "the best notice that is practicable under the circumstances" informing them of the nature of the class action and their right to opt-out of the class. Fed. R. Civ. P. 23(c)(2)(B). The best notice practicable includes "individual notice to all members who can be identified through reasonable

effort." *Id.* In addition, where the parties seek to settle a class action, the court must direct notice "in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). The notice of class certification and the notice of settlement may be combined in a single notice directed to class members. *See In re AT&T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 350-51 (N.D. Ill. 2010). Here, the parties have agreed on a notice plan (the "Notice Plan") that satisfies the requirements of Rule 23. The Notice Plan, fully set forth in the Settlement Agreement, is summarized below.

Plaintiffs and the Settling Defendants have agreed to request, within five days, that the Japanese Bankruptcy Court release a list of all names, U.S. mailing addresses, and email addresses associated with each class member registered with the Mt. Gox exchange. (Agreement ¶ 4.2(a).) Using that list, Epiq Systems, Inc. (the "Settlement Administrator") will send a notice directly to each class member by both first class U.S. mail and email. (Agreement ¶¶ 1.33, 4.2(c).) The notice will describe the nature of the action, the claims, and the settlement; provide the class definition; and explain class members' rights to exclude themselves from, comment upon, and/or object to the settlement, and how to exercise those rights. (Agreement ¶ 4.3, Ex. A.) The notice will also provide contact information for class counsel and the Settlement Administrator, as well as the address for a settlement website, which will contain further information about the settlement. (Agreement ¶ 4.2(e), Ex. B.)

The direct notice sent by mail and email to each class member will be supplemented through a press release to local, national, and syndicated news organizations discussing the terms of the Settlement Agreement, as well as advertisement in *Investors Business Daily*. (Agreement ¶¶ 4.2(e), (f).) Finally, pursuant to 28 U.S.C. § 1715, notice of the settlement will be sent within

ten days to the U.S. Attorney General and the attorneys general of each state. (Agreement ¶ 4.2(g).)

Because the Notice Plan calls for individual direct notice to all class members, as well as publication notice generally, it is reasonable and the best notice practicable, and thus satisfies Rule 23's notice requirements. *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 595-96 (N.D. Ill. 2011) (finding Rule 23 notice requirements satisfied where professional class action notification company provided direct notice to virtually all class members; notice was additionally disseminated via the internet, advertisements, and press releases; and settlement administrator established toll-free telephone number to answer questions). Consequently, this Court should approve the proposed Notice Plan.

## VIII.  CONCLUSION

For the reasons discussed above, Plaintiffs respectfully request that this Court enter an order (1) certifying the proposed class, (2) naming Plaintiffs as class representatives, (3) appointing Jay Edelson of Edelson PC as class counsel, (4) granting preliminary approval to the Settlement Agreement, (5) approving the proposed Notice Plan, (6) scheduling a final fairness hearing, and (7) providing such further relief as this Court deems just and proper.[26]

//

//

---

[26]  A proposed preliminary approval order will be submitted with this motion.

Respectfully submitted,

**GREGORY GREENE and JOSEPH LACK**,
individually, and on behalf of a class of similarly
situated individuals,

Dated: April 28, 2014

By:    /s/ Jay Edelson
       One of Plaintiffs' Attorneys

Steven L. Woodrow
swoodrow@edelson.com
Megan Lindsey
mlindsey@edelson.com
EDELSON PC
999 West 18th Street, Suite 3000
Denver, Colorado 80202
Tel: 303.357.4878
Fax: 303.446.9111

Jay Edelson
jedelson@edelson.com
Christopher L. Dore
cdore@edelson.com
David I. Mindell
dmindell@edelson.com
Alicia Hwang
ahwang@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiffs and the Putative Class*