**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GREGORY GREENE and JOSEPH LACK, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No. 14 C 01437 |
| | ) | |
| v. | ) | Judge Gary Feinerman |
| | ) | Magistrate Judge Susan E. Cox |
| MIZUHO BANK, LTD., a Japanese financial institution, and MARK KARPELES, an individual, | ) ) ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**MEMORANDUM OF LAW OF DEFENDANT MIZUHO BANK, LTD. IN
SUPPORT OF ITS MOTION TO DISMISS THE SECOND AMENDED
CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM
<u>OR ALTERNATIVELY FOR *FORUM NON CONVENIENS*</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...........................................................................................................4

ARGUMENT ................................................................................................................8

I.     THE PLAINTIFFS HAVE NOT STATED A CLAIM ......................................................8

     A.     The Plaintiffs Have Not Pleaded A Claim For Tortious Interference With Contract............................................................................................................9

          1.     The Plaintiffs Have Not Adequately Alleged That Mizuho Caused Or Induced Mt. Gox's Breach Of Its Contracts With The Plaintiffs .............10

          2.     Mizuho's Conduct Was Not Tortious Because Mizuho Was Justified In Taking The Actions That The Plaintiffs Have Alleged.........................14

          3.     Neither Of The Plaintiffs Has Pleaded A Claim Because Neither Had Funds On Deposit With Mizuho At The Relevant Time ...........................17

     B.     The Plaintiffs Have Not Pleaded A Claim For Fraudulent Concealment.............18

          1.     The Plaintiffs Have Not Alleged A Relationship Giving Rise To A Duty To Disclose ........................................................................................19

          2.     The Plaintiffs Have Not Alleged That Mizuho Intended To Defraud Them .............................................................................................22

          3.     Mizuho's Alleged Concealment Did Not Cause Any Damages...............23

     C.     The Plaintiffs Have Not Pleaded A Claim For Unjust Enrichment ......................24

     D.     The Plaintiffs Have Not Pleaded A Claim For An Accounting...........................25

II.     THE COURT SHOULD DISMISS THE PLAINTIFFS' CLAIMS ON THE GROUNDS OF *FORUM NON CONVENIENS*...................................................................25

     A.     Japan Provides An Alternative And Adequate Forum..........................................25

     B.     The Private And Public Factors All Weigh Heavily In Favor Of Litigating These Claims In Japan ............................................................................................26

          1.     Private Factors Favor Litigating These Claims In Japan ..........................27

          2.     Public Factors Favor Litigating These Claims In Japan ...........................27

a.     Japan Has A Far Greater Local Interest In This Dispute ...............27

b.     The Application Of Japanese Law In A U.S. Court Would Create Unnecessary Problems........................................................28

c.     Japan's Civil Court System Would Provide A Far More Efficient Path To Resolving This Dispute ....................................30

CONCLUSION.....................................................................................................................30

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Agape Litig.*,
   681 F. Supp. 2d 352 (E.D.N.Y. 2010) ....................................................................21

*Apotex Corp. v. Istituto Biologico Chemioterapico S.P.A.*,
   2003 WL 21780965 (N.D. Ill. July 30, 2003)..................................................26, 29

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................................8

*Bank of Am. Corp. v. Sup. Ct.*,
   198 Cal. App. 4th 862 (Cal. Ct. App. 2011) ..........................................................24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................................8

*Bell Bros. v. Bank One, Lafayette, N.A.*,
   116 F.3d 1158 (7th Cir. 1997) ................................................................................21

*Bonded Fin. Servs. v. Eur. Am. Bank*,
   838 F.2d 890 (7th Cir.1988) ...................................................................................21

*Borsellino v. Goldman Sachs Grp.*,
   477 F.3d 502 (7th Cir. 2007) ....................................................................................9

*Brooks v. Ross*,
   578 F.3d 574 (7th Cir. 2009) ..............................................................................8, 12

*Celebrity Chefs Tour, LLC v. Macy's, Inc.*,
   16 F. Supp. 3d 1141 (S.D. Cal. 2014)................................................................13, 14

*Dollar Tree Stores Inc. v. Toyama Partners*,
   2010 WL 1688583 (N.D. Cal. Apr. 26, 2010) ............................................14, 15, 17

*Durell v. Sharp Healthcare*,
   183 Cal. App. 4th 1350 (Cal. Ct. App. 2010) ........................................................24

*Edu-Sci. (USA) Inc. v. Intubrite LLC*,
   2014 WL 794962 (S.D. Cal. Feb. 27, 2014)...........................................................20

*Eisenberg v. Wachovia Bank, N.A.*,
   301 F.3d 220 (4th Cir. 2002) .............................................................................21, 22

*Fischer v. Magyar Államvasutak Zrt.*,
   777 F.3d 847 (7th Cir. 2015) .................................................................25, 26, 29

*GoldenTree Asset Mgmt. LP v. BNP Paribas S.A.*,
   64 F. Supp. 3d 1179 (N.D. Ill. 2014) ..............................................................27, 30

*Grant v. Aurora Loan Servs.*,
   736 F. Supp. 2d 1257 (C.D. Cal. 2010) ....................................................19, 22, 23

*Haddock v. Countrywide Bank NA*,
   2015 WL 9257316 (C.D. Cal. Oct. 27, 2015).........................................................25

*Halperin v. Int'l Web Servs., LLC*,
   2015 WL 3561509 (N.D. Ill. June 5, 2015) ...........................................................17

*Harris v. France Telecom, S.A.*,
   2011 WL 3705078 (N.D. Ill. Aug. 22, 2011) .......................................27, 28, 29, 30

*Herrejon v. Ocwen Loan Servicing, LLC*,
   980 F. Supp. 2d 1186 (E.D. Cal. 2013)..................................................................25

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
   2014 WL 6845862 (N.D. Ill. Dec. 4, 2014)......................................................14, 15

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
   131 Ill. 2d 145 (1989) .......................................................................................9, 14

*Interpane Coatings, Inc. v. Australia and New Zealand Banking Grp. Ltd.*,
   732 F. Supp. 909 (N.D. Ill. 1990) .....................................................27, 28, 29

*Kamel v. Hill-Rom Co. Inc.*,
   108 F.3d 799 (7th Cir. 1997) ................................................................................25

*Kelco Metals, Inc. v. Morgan*,
   2010 WL 1427583 (N.D. Ill. Apr. 5, 2010) .....................................................28, 29

*Landlock Natural Paving, Inc. v. Desin L.P.*,
   2013 WL 4854361 (N.D. Ill. Sept. 11, 2013) ........................................................24

*Levin v. Citibank, N.A.*,
   2009 WL 3008378 (N.D. Cal. Sept. 17, 2009) ......................................................23

*Los Angeles Mem'l Coliseum Comm'n v. Insomniac, Inc.*,
   233 Cal. App. 4th 803 (Cal. Ct. App. 2015) ....................................................19, 20

*McMahan v. Deutsche Bank AG*,
   938 F. Supp. 2d 795 (N.D. Ill. 2013) ....................................................................19

*Neptuno Treuhand-Und Verwaltungsgesellschaft Mbh v. Arbor*,
    295 Ill. App. 3d 567 (1998) .............................................................................20

*Nguyen v. JP Morgan Chase Bank*,
    2012 WL 294936 (C.D. Cal. Feb. 1, 2012)......................................................25

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
    50 Cal. 3d 1118 (1990) ...............................................................................9, 10

*Philip I. Mappa Ints., Ltd. v. Kendle*,
    196 Ill. App. 3d 703 (Ill. App. Ct. 1990) .......................................................15

*Phillips v. Prudential Ins. Co. of Am.*,
    714 F.3d 1017 (7th Cir. 2013) .............................................................4, 11, 21

*Pirelli Armstrong Tire Corp. Ret. Med. Bens. Trust v. Walgreen Co.*,
    631 F.3d 436 (7th Cir. 2011) .........................................................................23

*Punian v. Gillette Co.*,
    2015 WL 4967535 (N.D. Cal. Aug. 20, 2015) ...............................................24

*R.E. Davis Chem. Corp. v. Diasonics, Inc.*,
    826 F.2d 678 (7th Cir. 1987) .........................................................................17

*Schaffer Family Investors, LLC v. Sonnier*,
    2015 WL 4873542 (C.D. Cal. Aug. 13, 2015)................................................25

*Schmude v. Sheahan*,
    312 F. Supp. 2d 1047 (N.D. Ill. 2004) .............................................................4

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976).........................................................................................17

*Starlite Dev. (China) Ltd. v. Textron Fin. Corp.*,
    2008 WL 2705395 (E.D. Cal. July 8, 2008) ...................................10, 12, 14, 20

*Sterling Fire Restor., Ltd. v. Wachovia Bank N.A.*,
    2012 WL 4932845 (N.D. Ill. Oct. 16, 2012)...................................................17

*Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund*,
    589 F.3d 417 (7th Cir. 2009) .........................................................................26

*Sussman v. Bank of Israel*,
    801 F. Supp. 1068 (S.D.N.Y. 1992), *aff'd*, 990 F.2d 71 (2d Cir. 1993).................28

*Terhune v. Bd. of Educ. of Zion Elem. Sch. Dist. 6*,
    2013 WL 623603 (N.D. Ill. Feb. 20, 2013) ...............................................10, 14

*Thomas v. Farley*,
    31 F.3d 557 (7th Cir. 1994) ...........................................................................................9

*Thomas v. UBS AG*,
    706 F.3d 846 (7th Cir. 2013) .......................................................................................21

*Tzaras v. Evergreen Int'l Spot Trading, Inc.*,
    2003 WL 470611 (S.D.N.Y. Feb. 25, 2003) ................................................................22

*U.S.O. Corp. v. Mizuho Holding Co.*,
    547 F.3d 749 (7th Cir. 2008) .......................................................................................26

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    133 S. Ct. 2517 (2013) .................................................................................................10

*VasoNova Inc. v. Grunwald*,
    2012 WL 4119970 (N.D. Cal. Sept. 18, 2012) ...............................................9, 10, 14

*W. Microtech. Inc. v. Goold Elecs.*,
    1993 WL 424244 (N.D. Ill. Oct. 19, 1993) .................................................................17

*Wynn v. Nat'l Broad. Co.*,
    234 F. Supp. 2d 1067 (C.D. Cal. 2002) .........................................................12, 13, 14, 17

*Yellow Grp. LLC v. Uber Techs. Inc.*,
    2014 WL 3396055 (N.D. Ill. July 10, 2014) ...............................................................10

*Zachman v. Vohra*,
    2015 WL 7423783 (N.D. Ill. Nov. 23, 2015) ..............................................................17

**Statutes**

Cal. Com. Code § 11209 (West 2015) ...................................................................................16

Cal. Com. Code § 11210 (West 2015) ...................................................................................16

Cal. Com. Code § 11403 (West 2015) ...................................................................................16

Cal. Com. Code § 11404 (West 2015) ...................................................................................16

810 Ill. Comp. Stat. Ann. 5/4A-209 (West 2015) ................................................................16

810 Ill. Comp. Stat. Ann. 5/4A-210 (West 2015) ................................................................16

810 Ill. Comp. Stat. Ann. 5/4A-403 (West 2015) ................................................................16

810 Ill. Comp. Stat. Ann. 5/4A-404 (West 2015) ................................................................16

**Other Authorities**

5 Wright & Miller, Fed. Prac. and Proc. § 1785.1 (3d ed. 1998) ....................................................17

Restatement (Second) of Torts §§ 431, 435A (1975) ...................................................................10

Defendant Mizuho Bank, Ltd. ("Mizuho") submits this memorandum of law in support of its motion to dismiss the plaintiffs' Second Amended Class Action Complaint (the "Complaint" or "SAC") for failure to state a claim, or, alternatively, on *forum non conveniens* grounds.[1]

## PRELIMINARY STATEMENT

Plaintiffs Gregory Greene and Joseph Lack took a risk by investing their assets in the virtual currency called bitcoins and becoming members of a Japanese bitcoin exchange called Mt. Gox, where members could buy and deposit their bitcoins. That investment turned out badly when Mt. Gox collapsed in February 2014. According to the plaintiffs, they and the exchange's other members—whom they seek to represent in this putative class action (to the extent they live in the United States)—lost $400 million in value because the owner of the exchange, defendant Mark Karpeles, exploited security "bugs" in Mt. Gox "to steal his users' bitcoins."

Soon after Mt. Gox collapsed, the plaintiffs sued Karpeles and various corporate entities related to Mt. Gox to recover the money they lost. Several weeks later, after Mt. Gox filed for bankruptcy protection (in Japan), the plaintiffs, looking for a deep pocket, amended their complaint to name Mizuho as a defendant. At no time, however, have the plaintiffs alleged, or had even the most far-fetched basis to allege, that Mizuho conspired with Karpeles to pick the plaintiffs' electronic pocket. At no time have they even alleged (nor could they) that they have ever had any contractual or other business relationship with Mizuho. Instead, the plaintiffs weakly contend that Mizuho, by failing to report to them on the status of its private commercial relationship with Mt. Gox, and by narrowing the services it made available to its customer (Mt. Gox) in mid-2013, interfered with their contracts with Mt. Gox, and engaged in "fraudulent

---

[1] Pursuant to the Court's order on the record at the April 16, 2015 hearing and its minute order of December 2, 2015, Mizuho (without waiving any of its defenses) has filed two separate motions to dismiss the Complaint. This is the second motion. Mizuho also moved to dismiss the Complaint for lack of personal jurisdiction on May 14, 2015. (ECF Nos. 148-49.) That motion is pending.

concealment." In truth, Mizuho's only mistake was being unlucky enough to be one of the banks where Karpeles chose to open a deposit account for Mt. Gox.

The question of what obligations a Japanese bank owes to its Japanese customer's customers, and whether the Japanese bank interfered with the Japanese customer's own customer relationships, ought to be governed by Japanese law. But the claims against Mizuho here—for tortious interference with contract, fraudulent concealment, unjust enrichment, and an accounting—are so weak that they are patently insufficient even under the law of the plaintiffs' home states, Illinois and California.

The essence of a tortious interference claim is that the defendants caused the third party (here, Mt. Gox) to breach its contract with the plaintiffs. The breach here is Mt. Gox's failure to return the bitcoins sent to it by Greene and the cash sent to it by Lack. But the plaintiffs tell us why they did not get their investment back, and it has nothing to do with Mizuho: Karpeles stole the money (or, at best, they tell us in the Complaint, he lost it through gross negligence). The plaintiffs, in short, defeat their own claim because they acknowledge that, regardless of what Mizuho did or did not do in mid-2013, Mt. Gox would have collapsed anyway.

Two additional reasons compel the dismissal of the tortious interference claim. First, under the law of either Illinois (Greene's home state) or California (Lack's), any alleged "interference" with the contract in question is not tortious, and hence not the basis of a valid claim, if the defendant's conduct was "justified" because it was pursuing a legitimate business purpose. By the plaintiffs' own account, the restrictions that Mizuho allegedly introduced in mid-2013 were an attempt to protect its reputation by distancing itself from a customer that was publicly reported to be under investigation by government authorities for money laundering. The plaintiffs thus effectively admit that Mizuho's conduct was justified and therefore not actionable.

2

Second, the Court must dismiss the tortious interference cause of action because it does not assert a claim on behalf of either of the named plaintiffs: Greene never sent Mt. Gox any cash, but only bitcoins, so Mizuho, which held Mt. Gox's cash (but not its bitcoins), could not have prevented him from receiving his bitcoins. Lack, according to the Complaint, did not deposit any funds until January 22, 2014, by which time the users' difficulties in withdrawing money from Mt. Gox had been publicly reported, and did not seek to withdraw his money until February 20, 2014, nearly two weeks after Karpeles halted his customers' ability to withdraw money from their accounts. In addition to all the other reasons, Lack cannot show that Mizuho caused his inability to withdraw his money because, by the time of Karpeles's announcement, anything that Mizuho had done months earlier was no longer a significant factor.

The plaintiffs' fraudulent concealment allegations are just as thin. A duty to disclose information, such as Mizuho's alleged decision to stop providing certain services to its customer (Mt. Gox), can only arise from a "fiduciary or fiduciary-like" relationship. The plaintiffs do not and cannot plead anything remotely like that. Mizuho had no commercial or other relationship with the plaintiffs. They were simply Mizuho's customer's customers. In addition, the plaintiffs offer no basis to suggest that Mizuho acted with an intent to defraud them. Each of those factors is enough by itself to support dismissal of the fraudulent concealment claim.

The other two claims in the Complaint are even weaker. Under California law—the only law that is relevant because Greene, the Illinois plaintiff, never sent Mt. Gox any cash—there is no independent cause of action for unjust enrichment or an accounting. Indeed, an accounting is a remedy, not a claim. If all the other causes of action are dismissed, the entire Complaint should be as well (as to Mizuho). A remedy cannot survive if the plaintiffs have not stated a claim.

3

Finally, although the Court need not address this issue if it agrees that the claims are too weak to proceed, this case should be dismissed on *forum non conveniens* grounds. Japan provides an alternative and adequate forum, and all the public and private interest factors weigh in favor of litigating the claims there: that is where the witnesses and documents are, Japan has a far greater interest in the dispute, and the governing law is Japanese.

Because the plaintiffs have failed to state a claim, the Court should dismiss the Complaint in its entirety, with prejudice. In the alternative, the Court should dismiss the case in deference to Japan as the more convenient and appropriate forum.

## BACKGROUND[2]

Mt. Gox was founded in 2009 as an exchange for the "buying and selling [of] bitcoins" that also allowed "customers the ability to securely store Bitcoin[s] in a virtual vault for safe keeping." (SAC ¶ 11.) Bitcoin is a "virtual currency that is created and traded electronically and is accepted as payment by thousands of legal and illegal merchants around the world." (Ex. 1 (*Recording Shows Mizuho Pushed to End Dealings with Mt. Gox*, Wall St. J. (Mar. 5, 2014) (SAC ¶ 26 n.8)).) Before its collapse, Mt. Gox was the "world's biggest bitcoin exchange," and allowed users to buy and sell bitcoins anytime, using the world's most sophisticated trading platform. (Ex. 2 (*Mt. Gox Files Bankruptcy, Says Hackers Stole All Its Bitcoins*, Chicago Tribune (Feb. 28, 2014) (SAC ¶ 41 n.19)).)

Mt. Gox was owned and run by defendant Mark Karpeles, who, "[a]s President, CEO,

---

[2] The facts described in this motion in support of the argument that the plaintiffs have failed to state a claim are taken from the Complaint (including documents incorporated by reference therein) and other information subject to judicial notice, such as documents that the plaintiffs have filed in this proceeding. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017 (7th Cir. 2013); *Schmude v. Sheahan*, 312 F. Supp. 2d 1047 (N.D. Ill. 2004) (collecting cases supporting routine judicial notice of news articles "and court records, among other things"). Mizuho accepts the allegations in these sources solely for purposes of this motion, and does not admit these facts for any other purpose.

and majority shareholder . . . [,] controlled all aspects of Mt. Gox's business from the ground up. In fact, Karpeles was involved in nearly every detail of the Exchange, from the technical . . . to the operational." (SAC ¶ 17.) In short, Karpeles was "the sole controlling force behind Mt. Gox." (SAC ¶ 19.) Mt. Gox operated by having customers sign up for accounts on the exchange. (SAC ¶¶ 12-13.) Once a customer opened a Mt. Gox account, he or she could transfer bitcoins or cash into his or her account to buy, sell, or trade bitcoins. (SAC ¶¶ 11-14.)

Like any other business, Mt. Gox maintained a bank account—indeed, numerous bank accounts. As of February 20, 2014, Mt. Gox "maintained 43 accounts at 14 different banks and payment service providers." (Ex. 3 (Dec. of Nobuaki Kobayashi in Support of the Am. Verified Pet. for Recog. and Ch. 15 Relief ¶ 51, *In re MtGox Co., Ltd.*, ECF No. 127 (Bankr. N.D. Tex. May 23, 2014) (SAC ¶ 68 n.23)).) Mt. Gox has also had several bank accounts located in the United States. (*Id.* ¶ 11; Ex. 4 (*Feds Seize Another $2.1 Million from Mt. Gox, Adding Up to $5 Million*, Tech Crunch (Aug. 23, 2013) (SAC ¶ 26 n.8)).) In addition, Mt. Gox had a bank account at Mizuho in Japan. (SAC ¶ 22.)

In Japan, Mizuho provided Mt. Gox with the services that are part of a typical banking relationship. In addition to holding funds deposited by or for the benefit of Mt. Gox, Mizuho accepted wire transfers from third parties into Mt. Gox's account (SAC ¶¶ 14, 16, 22, 23), and executed Mt. Gox's instructions to transfer funds out of Mt. Gox's account (SAC ¶ 24). Mt. Gox's customers had no relationship, or even any interaction, with Mizuho. They had accounts only with Mt. Gox and other "outside banks." (SAC ¶¶ 12, 23-24.) Mt. Gox's customers deposited funds into their Mt. Gox accounts by instructing those outside banks to send wire transfers to Mizuho with instructions to deposit the funds into Mt. Gox's account. (SAC ¶ 23.) These customers withdrew funds from their accounts at Mt. Gox by submitting withdrawal

requests to Mt. Gox. (SAC ¶ 24.) If Mt. Gox communicated those requests to Mizuho (as opposed to another bank), Mizuho would send funds to the account that Mt. Gox's customers maintained at their own banks. (*Id.*) Mt. Gox also communicated with its customers directly when they raised questions or complaints about their accounts at Mt. Gox. (SAC ¶¶ 33, 60-62.)

In mid-2013, press reports stated "that U.S. authorities were investigating Mt. Gox for business dealings related to money laundering." (SAC ¶ 26.) These regulators were also concerned that bitcoins could be used for "purchases of illicit goods or services" because "[t]ransactions are generally anonymous, presenting opportunities for criminals to move money discreetly." (Ex. 1.) In May and June 2013, the U.S. Department of Homeland Security seized $5 million that Mt. Gox held in Wells Fargo and Dwolla (an online payment company) accounts in the U.S. (Ex. 4.) Around this time, Mt. Gox users, in both the press and online discussion boards, reported "substantial difficulties" in withdrawing cash from their accounts. (SAC ¶ 30.)[3] These reports described alternative ways for withdrawing funds from Mt. Gox. (Exs. 5-6.)

Based on reports like these, Mizuho "fear[ed]" that its banking relationship with Mt. Gox "would expose it to liability and cause significant reputational harm." (SAC ¶ 27.) Mizuho therefore decided "to distance itself from Karpeles and Mt. Gox." (*Id.*) Japanese banking laws, however, did not permit Mizuho to unilaterally close Mt. Gox's account without evidence (which, other than speculative press reports, Mizuho did not have) that Mt. Gox failed to comply with banking regulations. (Ex. 1.) Mizuho therefore "asked Karpeles to end the relationship." (SAC ¶ 27.) When Karpeles refused to close Mt. Gox's account, Mizuho "began implementing a series of new policies" designed to bring its relationship with Mt. Gox to a close in a way that was

---

[3] *See* Ex. 5 (*Withdrawals From Mt. Gox: Growing Pains Or Banking Bottleneck*, CoinDesk (Aug. 12, 2013)); Ex. 6 (*Mt. Gox USD Withdrawals To Take Up To 22 Months*, Bitcoin Mag. (Sep. 20, 2013)) (SAC ¶ 30 n.11).

consistent with Japanese law.  (SAC ¶ 28; Ex. 1.)  These steps included Mizuho's decision "in or around mid-2013" to modify its business relationship with Mt. Gox and stop "processing international wire withdrawals for Mt. Gox altogether."  (SAC ¶ 29.)

Months later, on February 7, 2014, "Karpeles halted his customers' ability to withdraw any form of currency" because he "was purportedly investigating a 'bug' or 'technical malfunction.'"  (SAC ¶ 37.)  A few days later, he claimed to have "detected 'unusual activity'" involving third parties manipulating transactions on the exchange.  (*Id.*)  Mt. Gox's troubles increased when it stopped processing all customer transactions on February 24.  (SAC ¶ 39.)  These problems culminated in Mt. Gox's filing for bankruptcy in Japan on February 28.  (SAC ¶ 40.)  Mt. Gox revealed there that it lost over $450 million worth of bitcoins and these losses "caused" its insolvency.  (SAC ¶¶ 1, 40-41; Ex. 3 ¶ 37.)  According to the plaintiffs, Mt. Gox's customers lost their property as a result of Karpeles's false statements, "gross negligence or outright theft," and other intentional misconduct.  (SAC ¶¶ 1, 41-43.)  Karpeles has since been "arrested in Japan . . . for fraud and embezzlement."  (Ex. 7 (Aug. 2, 2015 Hr'g Tr.) at 4:3-4.)

The Complaint is brought on behalf of two plaintiffs—Gregory Greene and Joseph Lack.  Greene, who is a citizen of Illinois, transacted in only bitcoins, not fiat currency, and thus never sent or received any funds that passed through Mt. Gox's account at Mizuho.  (SAC ¶¶ 4, 46-55.)  Joseph Lack, who is a citizen of California and is the only other plaintiff named in the Complaint, registered for a Mt. Gox account in early 2014 and deposited $40,000 on January 22, 2014.  (SAC ¶¶ 5, 56-57.)  He did so by sending a wire transfer "from his local Wells Fargo bank branch to the account that Mizuho held on behalf of Mt. Gox."  (SAC ¶ 57.)  In February, after a series of communications with Mt. Gox about his account status following Karpeles's disclosures of troubles on the exchange, Lack asked his bank, Wells Fargo, to reverse the wire

transfer that it had sent to Mizuho on his behalf.  (SAC ¶¶ 56-62.)  The plaintiffs have not

alleged that he sought to withdraw any funds before then.  Neither Lack, Greene, nor any other

plaintiff is alleged to have communicated or interacted with Mizuho.

The plaintiffs initially filed this action on February 27, 2014 against Mt. Gox-related

entities and Karpeles, alleging "a massive scheme to defraud millions of consumers into

providing . . . real, paper money in exchange for virtual currency."  (ECF No. 1 ¶ 1.)  Mizuho

was not named as a defendant or even mentioned in that complaint.  On March 11, 2014, the

Court stayed proceedings against the Mt. Gox entity that had filed for bankruptcy in Japan and

entered a temporary restraining order freezing the U.S. assets of other Mt. Gox entities to the

extent that any such assets existed.  (Ex. 8 (Mar. 11, 2014 Hr'g Tr.) at 24:3-27:6.)  Only then, on

March 14, did the plaintiffs amend their complaint and add Mizuho and other parties as

defendants.  (ECF No. 36-37.)  The plaintiffs filed the Second Amended Complaint on April 17,

2015.  This Complaint—the plaintiffs' third attempt to plead claims related to Mt. Gox's

collapse—asserts a different theory of recovery against Mizuho and drops from the case the other

defendants named in the prior complaint other than Karpeles, including certain Mt. Gox entities

that are "no longer viable defendants" as a result of their pending bankruptcy proceedings.  (Mot.

for Leave to File SAC, ECF No. 143 at 1; Ex. 9 (Apr. 16, 2015 Hr'g Tr.) at 12:2-15.)

## ARGUMENT

## I.    THE PLAINTIFFS HAVE NOT STATED A CLAIM

To survive a motion to dismiss under Rule 12(b)(6), the plaintiffs must allege facts that,

if "accepted as true, [ ] 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  After

*Iqbal* and *Twombly*, "abstract recitations of the elements of a cause of action" or "conclusory

legal statements" are insufficient.  *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).  The

Seventh Circuit has made clear that where a plaintiff pleads facts that "show that he has no claim, then he is out of luck – he has pleaded himself out of court. He is not saved by having pleaded a legal conclusion" that is inconsistent with the facts alleged. *Thomas v. Farley*, 31 F.3d 557 (7th Cir. 1994). The plaintiffs have not alleged, and cannot allege, facts that would entitle them to recovery.[4] They have therefore failed to state any claim.[5]

### A. The Plaintiffs Have Not Pleaded A Claim For Tortious Interference With Contract

In order to plead a claim for tortious interference with contract under Illinois law, a plaintiff must adequately allege "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 154-55 (1989) (internal quotation marks omitted). California, applying a similar standard, requires a plaintiff to plead that the defendant's intentional inducement of a third party's breach of its contract with the plaintiff was not justified and that the defendant's wrongful act caused that breach. *VasoNova Inc. v. Grunwald*, 2012 WL 4119970, at *4 (N.D. Cal. Sept. 18, 2012); *Pac. Gas & Elec. Co. v. Bear*

---

[4] The plaintiffs' tortious interference, fraudulent concealment, and unjust enrichment claims are subject to the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure. The plaintiffs' tortious interference claim, which alleges that Mizuho took steps "designed to undermine Mt. Gox's ability to do business" (SAC ¶ 103) and their unjust enrichment claim, which is based on the same underlying allegations as their fraudulent concealment claim (SAC ¶ 113), sound in fraud. *Borsellino v. Goldman Sachs Grp.*, 477 F.3d 502 (7th Cir. 2007). The plaintiffs' claims, which do not even satisfy Rule 8(a), do not come close to alleging the level of "particularity" required by Rule 9(b).

[5] While Japanese law governs the plaintiffs' claims because all of the relevant facts and events alleged in the Complaint occurred in Japan (*see infra* 28-30), the plaintiffs' claims are so weak that they have not pleaded a cause of action under any legal standard. Point I demonstrates why the plaintiffs' claims should be dismissed even under the laws of their respective home states, California and Illinois. Nothing in this brief should be construed as a waiver of Mizuho's right to apply Japanese law to the plaintiffs' claims, for the reasons described below.

*Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990). The plaintiffs' allegation that Mizuho tortiously interfered with their contracts with Mt. Gox fails to satisfy these elements for the following reasons, each of which independently requires the dismissal of the plaintiffs' claim.

1. The Plaintiffs Have Not Adequately Alleged That Mizuho Caused Or Induced Mt. Gox's Breach Of Its Contracts With The Plaintiffs

Under both Illinois and California law, in order to plead that the defendant caused or induced the third party's breach of its contract with the plaintiff, the plaintiff must allege that the third party would have performed its contract absent the defendant's actions. *VasoNova Inc.*, 2012 WL 4119970, at *4 (dismissing claim because the plaintiff failed to "allege that the contract would otherwise have been performed" (internal quotation marks omitted)); *Terhune v. Bd. of Educ. of Zion Elem. Sch. Dist. 6*, 2013 WL 623603, at *4 (N.D. Ill. Feb. 20, 2013) (dismissing claim because defendant's actions did not affect third party's decision to breach its contract with the plaintiff).[6] Not only must a plaintiff plead that the defendant caused the third party to breach its contract with the plaintiff, but the plaintiff must also allege that the defendant's actions caused the plaintiff's damages. *Yellow Grp. LLC v. Uber Techs. Inc.*, 2014 WL 3396055, at *6 (N.D. Ill. July 10, 2014) (dismissing tortious interference claim because the plaintiffs did not plausibly assert any harm stemming from the third party's breach of contract); *Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1126 (tortious interference requires "resulting damages").

The plaintiffs did not—and cannot—plead that Mizuho caused Mt. Gox to breach its contracts with them. According to the plaintiffs, Mt. Gox breached its contracts and caused them

---

[6] *See also Starlite Dev. (China) Ltd. v. Textron Fin. Corp.*, 2008 WL 2705395, at *17 (E.D. Cal. July 8, 2008) (dismissing claim because the plaintiff did not allege that third party "could have completed its contractual obligations . . . absent the [defendant's] alleged interference"); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525 (2013) ("It is thus textbook tort law that an action is not regarded as a cause . . . if the particular event would have occurred without it." (internal quotation marks omitted)); Restatement (Second) of Torts § 431, cmt. a, § 435A, cmt. a (1975).

harm by "depriv[ing] them . . . of the use of their bitcoins and Fiat Currency" and by stealing, losing or misusing their assets. (SAC ¶¶ 77, 108.) The plaintiffs never say how Mizuho's alleged decision to alter its business relationship with Mt. Gox and stop providing international wire transfers could have caused Mt. Gox to steal, lose, or misuse its own customers' assets. As the plaintiffs clearly allege, Mt. Gox collapsed because Karpeles—Mt. Gox's "President, CEO, and majority shareholder" who "controlled all aspects of Mt. Gox's business"—exploited "security bugs" in Mt. Gox in order to "steal his users' bitcoins" and "siphoned" off their funds and bitcoins for personal gain. (SAC ¶¶ 1, 17, 19-21, 91.) The plaintiffs squarely allege that Karpeles "was responsible for the loss of more than $400 million [by Mt. Gox's] users . . . through either gross negligence or outright theft." (SAC ¶ 1.) They further allege their losses were caused by Karpeles's "unlawful conduct." (SAC ¶¶ 77-79.)

In addition, the sources that the plaintiffs cite (and hence incorporate into the Complaint[7]) repeatedly attribute Mt. Gox's loss of customer property to Mt. Gox's theft, misuse of funds, or gross negligence at best.[8] Indeed, Karpeles was "arrested in Japan . . . for fraud and embezzlement"—the same misconduct that the plaintiffs allege here. (Ex. 7 at 4:3-4.) And the plaintiffs' own purported expert, a professor at Cornell specializing in virtual currency systems, concluded that "either severe incompetence at Mt. Gox and/or theft with the aid of an insider"— but not any actions by Mizuho—caused Mt. Gox's loss of customer property. (Pls.' Mot. for

---

[7] *Phillips*, 714 F. 3d at 1019-20 (7th Cir. 2013) (requiring consideration of "documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice").

[8] *See, e.g.*, Ex. 2; Ex. 10 (*Mt. Gox Kept Exchange Open Despite Knowledge of Large-Scale Theft*, Computerworld (Mar. 12, 2014) (SAC ¶ 15 n.6)); Ex. 11 (*Is It The Beginning Of The End For Bitcoin?*, This Is Money (Feb. 25, 2014) (SAC ¶ 39 n.17)); Ex. 12 (*Hackers Call Mt. Gox CEO a Liar*, BGR (Mar. 10, 2014) (SAC ¶ 42 n.20)); Ex. 13 (*Lost in Translation: The Tangled Tale of Mt. Gox's Missing Millions*, PC World (Mar. 7, 2014) (SAC ¶ 43 n.21)) (articles claiming Mt. Gox committed a "tragic violation of [its customers'] trust," its "problems . . . were caused by . . . a lax attitude by Karpeles," "Karpeles lied about the theft of more than $500 million" of bitcoins, and the "problem was clearly caused by" Mt. Gox's mismanagement).

Prelim. Inj., ECF No. 8, Ex. 4 at 2 ¶ 1.)

Thus, the plaintiffs' allegations and the sources they rely upon all point to a single cause for the plaintiffs' inability to recover their money and bitcoins from Mt. Gox—namely, Mt. Gox's and Mark Karpeles' gross negligence and/or fraud. While the plaintiffs vaguely allege that "as a direct consequence of Mizuho Bank's conduct, Karpeles was forced to shut down [Mt. Gox] and file for bankruptcy" (SAC ¶ 106), this wholly conclusory assertion carries no weight because it is inconsistent with the plaintiffs' substantive allegations and not supported by any facts alleged in the Complaint. *Brooks*, 578 F.3d at 581 (holding that "courts should not accept . . . abstract recitations of the elements . . . or conclusory legal statements"); *Wynn v. Nat'l Broad. Co.*, 234 F. Supp. 2d 1067, 1122 (C.D. Cal. 2002) (dismissing tortious interference claim for lack of causation because "conclusory [allegations], unwarranted deductions of fact, or unreasonable inferences" do not suffice).

Not only have the plaintiffs failed to plead any non-conclusory facts even suggesting that Mizuho caused Mt. Gox to lose the plaintiffs' property, but they also have failed to allege that Mt. Gox would have "completed its contractual obligations to [the plaintiffs] absent [Mizuho's] alleged interference," as they are required to plead in a claim for tortious interference with contract. *Starlite*, 2008 WL 2705395, at *17. The only conduct by Mizuho at issue in the Complaint—its alleged decision to stop processing international wire withdrawals for Mt. Gox—dates back to "mid-2013." (SAC ¶ 29.) Yet Mt. Gox did not collapse, and Lack and Greene did not attempt to withdraw any funds, until after *Karpeles* "halted his customers' ability to withdraw any form of currency from Mt. Gox" in February 2014. (SAC ¶¶ 37, 39, 40, 52, 60-62.) Because the plaintiffs have failed to allege that Mt. Gox would have returned funds to the plaintiffs absent Mizuho's alleged interferences, they have not pleaded that Mizuho caused

12

Mt. Gox to breach its contracts with them and their tortious interference claim should be dismissed.  *See Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F. Supp. 3d 1141, 1157-58 (S.D. Cal. 2014) (dismissing claim for failing to allege "why Macy's, rather than other forces, was the cause of said breach(es)"); *Wynn*, 234 F. Supp. 2d at 1122 (breach was allegedly caused by the third parties' "own ageist policies, independent of any behavior on behalf of" the defendants).

The plaintiffs attempt to salvage their claim by making the conclusory assertion that Mizuho "made it impossible for Mt. Gox to fulfill its contractual obligations to Plaintiffs." (SAC ¶ 105).  But that allegation is contradicted by the allegations on which the plaintiffs rely and defies common sense.  According to Mt. Gox's bankruptcy filings (which are cited in the Complaint), as of February 20, 2014—the same day that Lack claims to have tried to recall his funds (*infra* 18)—Mt. Gox "maintained 43 accounts at 14 different banks and payment service providers."  (Ex. 3 ¶ 51.)  Thus, contrary to the plaintiffs' conclusory assertion, Mt. Gox had other bank accounts (in addition to the one with Mizuho) that it could have used to return money to its customers if it wanted to do so.[9]

Mt. Gox could have closed its Mizuho account at any time, withdrawn its money, and then used those funds to pay its customers.  The plaintiffs themselves plead that Mizuho was not only willing to close the Mt. Gox account, but eager for Karpeles to do so.  (SAC ¶ 27.) Karpeles chose not to do so because he was "steal[ing] his users' bitcoins" and "siphon[ing]" off their funds for personal gain.  (SAC ¶¶ 1, 19-21, 91.)  Even according to the plaintiffs' own allegations, therefore, Mizuho did not make it "impossible" for Mt. Gox to return money to its

---

[9]  The existence of additional banking relationships is consistent with the plaintiffs' allegations that Mt. Gox customers experienced only *delays* in withdrawing funds and could request quicker "manual" withdrawals for a five percent fee.  (SAC ¶¶ 29-30 & n.11; Ex. 14 (Dec. of A. Almen, ECF No. 18, Ex. C (SAC ¶ 33 n.13)); Ex. 6.)  Reports that the plaintiffs cite also note that "those looking to withdraw USD from Mt. Gox can easily transfer their [bitcoins] to another exchange and get their cash that way, if they so choose."  (Ex. 5.)

customers.  *See Celebrity Chefs*, 16 F. Supp. 3d at 1157-58 (dismissing claim because "it is just as possible that [the third party] decided on its own to refuse to return" the plaintiff's property).

In sum, under a plain reading of the Complaint, Karpeles' gross negligence or fraud caused Mt. Gox to lose the plaintiffs' funds and bitcoins, and those losses would have occurred regardless of what Mizuho did or did not do.  Courts routinely dismiss tortious interference with contract claims under similar circumstances.  *Id.*; *Wynn*, 234 F. Supp. 2d at 1122; *VasoNova*, 2012 WL 4119970, at *4; *Starlite*, 2008 WL 2705395, at *17; *Terhune*, 2013 WL 623603, at *4.

      2.     Mizuho's Conduct Was Not Tortious Because Mizuho Was Justified In Taking The Actions That The Plaintiffs Have Alleged

The Court should dismiss the plaintiffs' tortious interference claim for a second, independent reason:  the plaintiffs do not (and cannot) plead facts showing that Mizuho's actions were "unjustified" or that Mizuho "intended" to cause Mt. Gox to breach its contract with the plaintiffs.  *HPI*, 131 Ill. 2d at 154-56.[10]

The plaintiffs allege that Mizuho wanted to end its relationship with Mt. Gox in mid-2013 after reports spread that "U.S. authorities were investigating Mt. Gox for business dealings related to money laundering."  (SAC ¶ 26; *see also* Ex. 1 (noting that Mt. Gox was also investigated for the risk of "purchases of illicit goods or services")).)  Mizuho therefore allegedly sought to "distance itself from Karpeles and Mt. Gox" out of fear that being associated with Mt. Gox would expose Mizuho to legal liability and reputational harm.  (SAC ¶ 27.)  Mizuho's seeking to disassociate itself from a party suspected of considerable illegal activity provides an even greater justification than the ordinary business reasons courts typically find to be sufficient

---

[10] *See Dollar Tree Stores Inc. v. Toyama Partners*, 2010 WL 1688583, at *4 (N.D. Cal. Apr. 26, 2010) (dismissing tortious interference claim because the defendant acted "with a legitimate business purpose and was justified in" taking the actions in question); *House of Brides, Inc. v. Alfred Angelo, Inc.*, 2014 WL 6845862, at *9 (N.D. Ill. Dec. 4, 2014) (dismissing tortious interference claim because the plaintiff failed to meet its burden of alleging that the defendant's conduct was improper or unjustified).

grounds to dismiss claims of tortious interference. *House of Brides*, 2014 WL 6845862, at *9; *Philip I. Mappa Ints., Ltd. v. Kendle*, 196 Ill. App. 3d 703, 708-10 (Ill. App. Ct. 1990) (affirming dismissal of tortious interference claim because the complaint contained the legitimate basis for the defendant's actions); *Dollar Tree*, 2010 WL 1688583, at *4 (same).

The plaintiffs have not only failed to allege facts demonstrating that Mizuho's actions were unjustified, but they have also failed to allege any facts from which to infer that Mizuho intended to cause Mt. Gox to break its contracts with its customers. Even assuming the allegations of the Complaint are true, Mizuho acted out of fear of potential liability and reputational harm resulting from being associated with Mt. Gox in light of its legal troubles. Even if Mizuho's actions had a secondary (unintentional) effect of causing "delays" to international wire withdrawals (which Mizuho does not concede), its conduct was not tortious because it was just trying to protect its own reputation and business interests.

The plaintiffs make much of the fact that Mizuho stopped outbound wire transfers, but did not halt inbound wire transfers. But this decision was consistent with Mizuho's effort to protect, and limit the perceived risk to, its reputation. According to documents on which the plaintiffs rely, Mizuho wanted to close Mt. Gox's account, but did not have authority to do so because it did not have proof (as opposed to speculation in the press) of Mt. Gox's wrongdoing. (*See* Ex. 1.) In order to pressure Mt. Gox to close its account, Mizuho altered their business relationship and stopped processing outbound international wire transfers. (SAC ¶¶ 27-29.) The plaintiffs have not alleged, however, that Mizuho had the ability to stop inbound wire transfers.

In addition, the plaintiffs fail to recognize a fundamental distinction between outbound wire transfers, which a bank initiates on behalf of its customer, and incoming wire transfers, which anyone in the world can send to a bank and which are accepted automatically through

mere inaction.  Although Mizuho's obligations would be governed by Japanese law, consider for illustrative purposes the banking laws in Illinois and California.  The relevant statutes, which are modeled on the Uniform Commercial Code, provide that "[i]n the typical case, the beneficiary's bank simply receives payment from the sender of the order [and] credits the account of the beneficiary."  810 Ill. Comp. Stat. Ann. 5/4A-209, Comments 4, 8 (West 2015); Cal. Com. Code § 11209, Comments 4, 8 (West 2015).  The beneficiary's bank cannot reject incoming wire transfers where the bank is part of a funds transfer system that requires it to accept incoming payments.  810 Ill. Comp. Stat. Ann. 5/4A-209, Comment 8 (West 2015); Cal. Com. Code § 11209, Comment 8 (West 2015).  And even where a beneficiary's bank could in theory reject an incoming wire transfer, it will have only a narrow window to do so because it will automatically accept the payment by midnight following the transfer.  810 Ill. Comp. Stat. Ann. 5/4A-403, Comment 2 (West 2015); 5/4A-210, Comment 2 (West 2015); Cal. Com. Code § 11403, Comment 2 (West 2015); § 11210, Comment 2 (West 2015).  Furthermore, if a beneficiary's bank rejects an incoming wire transfer, it subjects itself to potential liability to the sender for use of the sender's funds, and, conversely, to the beneficiary if the bank does not transfer those funds once they have been accepted.  810 Ill. Comp. Stat. Ann. 5/4A-210, Comment 3 (West 2015); 5/4A-404, Comment 3 (West 2015); Cal. Com. Code § 11210, Comment 3 (West 2015); § 11404, Comment 3 (West 2015).

In short, Mizuho had to accept inbound wire transfers unless it affirmatively rejected each individual transfer in a narrow window of time, thereby subjecting itself to a risk of potential liability if the requisite procedures were not followed.  On the other hand, Mizuho could alter its business relationship with Mt. Gox and stop providing outbound wire transfers without violating any banking laws.  The plaintiffs' allegations thus do not plead an intent to cause a breach of

16

their contracts with Mt. Gox. *See R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 826 F.2d 678, 687 (7th Cir. 1987) (more is required "than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another").[11]

In sum, the plaintiffs' tortious interference claim must be dismissed with prejudice because the Complaint explains precisely why Mizuho was justified in acting as it did and shows that Mizuho did not intend to interfere with the plaintiffs' contracts with Mt. Gox.

3.     Neither Of The Plaintiffs Has Pleaded A Claim Because Neither Had Funds On Deposit With Mizuho At The Relevant Time

The plaintiffs' tortious interference claim fails for a third, independent reason—they have not alleged any facts showing that Mizuho interfered with the named plaintiffs' contracts with Mt. Gox. Plaintiffs must allege "that they personally have been injured, not that injury has been suffered by other, unidentified [class] members." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976); *Halperin v. Int'l Web Servs., LLC*, 2015 WL 3561509, at *6 (N.D. Ill. June 5, 2015) (Feinerman, J.); 5 Wright & Miller, Fed. Prac. and Proc. § 1785.1 (3d ed. 1998).

Here, Greene is alleged to have traded only bitcoins, not fiat currency. (SAC ¶¶ 47-55; Ex. 7 at 6:11-7:9.) Any claim that Mizuho's actions prevented the plaintiffs from withdrawing fiat currency therefore does not apply to Greene. Greene's tortious interference claim must be dismissed for this reason alone.

In addition, all of the actions that Mizuho allegedly took to distance itself from Mt. Gox

---

[11] *See Zachman v. Vohra*, 2015 WL 7423783, at *5 (N.D. Ill. Nov. 23, 2015) (defendant "cannot be held liable for the unintended consequences of his actions"); *Sterling Fire Restor., Ltd. v. Wachovia Bank N.A.*, 2012 WL 4932845, at *6 (N.D. Ill. Oct. 16, 2012) (Feinerman, J.) (intentional interference applies only where the defendant intends to cause a breach, but not to negligent interference or where defendant merely did not prevent a third party from breaching its contract); *W. Microtech. Inc. v. Goold Elecs.*, 1993 WL 424244, at *2-3 (N.D. Ill. Oct. 19, 1993) (purchaser's scheme to sell equipment illicitly did not establish an intent to induce the middleman "*not to pay for the goods received*"); *Wynn*, 234 F. Supp. 2d at 1121 (failure to prevent discrimination "does not equate to an intent to cause a breach"); *Dollar Tree*, 2010 WL 1688583, at *3 (no intent where it was not substantially certain that the defendant's actions would cause the other party to breach the contract).

occurred by mid-2013, long before Lack—the only other plaintiff named in the Complaint—attempted to "recall" his deposit into his Mt. Gox account.  (SAC ¶¶ 27-30, 62-63.)  Lack does not claim that he joined Mt. Gox or deposited funds into his account until January 2014, by which time the alleged difficulties with withdrawing funds were well known.  (SAC ¶¶ 30, 57; Exs. 5-6 (describing withdrawal delays in August and September 2013).)  Lack does not allege any further contact with Mt. Gox until February 11, 2014—*after* Karpeles halted withdrawals of fiat currency and reported third parties manipulating transactions—when Lack claims merely to have asked Mt. Gox when his funds would be available.  (SAC ¶¶ 37, 60.)  Lack did not attempt to "recall" his funds until after further communications with Mt. Gox on February 20, at which point he asked his outside bank to reverse the wire transfer that he sent to his Mt. Gox account.  (SAC ¶¶ 62-63.)  By that time, Mt. Gox was on the verge of collapse.  (SAC ¶¶ 39-43.)  It is thus crystal clear from the plaintiffs' allegations that Lack's inability to withdraw his funds from Mt. Gox in late February 2014 resulted from Karpeles's fraud and had nothing to do with Mizuho.[12]

### B.  The Plaintiffs Have Not Pleaded A Claim For Fraudulent Concealment

"In California, plaintiffs alleging fraudulent concealment must plead five elements: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of [it], and (5) as a result of [that] concealment or suppression . . . , the plaintiff must have sustained

---

[12] The Court should not consider the circumstances involving Anthony Motto (whom the plaintiffs referred to in their opposition to Mizuho's motion to dismiss for lack of personal jurisdiction) because he is not named in the Complaint.  At any rate, his claim is even weaker than Lack's claim.  Motto does not allege that he wired funds into his account until February 15, 2014 and does not allege any attempt to withdraw funds.  (ECF No. 151, Ex. C ¶ 4.)

18

damage." *Grant v. Aurora Loan Servs.*, 736 F. Supp. 2d 1257, 1272 (C.D. Cal. 2010).[13] Claims

for fraudulent concealment must be pleaded with specificity under Rule 9(b). *Id.* at 1273;

*McMahan v. Deutsche Bank AG*, 938 F. Supp. 2d 795, 805-06 (N.D. Ill. 2013).

       1.     The Plaintiffs Have Not Alleged A Relationship Giving Rise To A Duty To Disclose

The plaintiffs have not pleaded a claim for fraudulent concealment first and foremost

because a duty to disclose "ordinarily arises only from fiduciary or fiduciary-like relationships."

*Los Angeles Mem'l Coliseum Comm'n v. Insomniac, Inc.*, 233 Cal. App. 4th 803, 832 (Cal. Ct.

App. 2015). In any event, a mere "commercial relationship" is insufficient. *Id.* The Complaint

does not purport to allege a fiduciary or fiduciary-like relationship between Lack (or any

plaintiffs) and Mizuho.

The plaintiffs do not even allege a commercial relationship with Mizuho, which would

still be insufficient even if it were alleged. As the plaintiffs' allegations make clear, they were

Mt. Gox's—not Mizuho's—customers. The Complaint does not allege any interactions between

the plaintiffs and Mizuho, much less a fiduciary-like relationship that could give rise to a duty to

disclose. The plaintiffs had accounts with only Mt. Gox—not Mizuho—and they communicated

with only Mt. Gox, not Mizuho. (SAC ¶¶ 12, 24, 47, 57, 60-63.) When Lack and other plaintiffs

deposited funds into their Mt. Gox accounts, they did so through their "outside banks," such as

Lack's "local Wells Fargo" branch (SAC ¶¶ 23, 57); when he had questions about the status of

his Mt. Gox account, he asked Mt. Gox (SAC ¶¶ 59-60); the plaintiffs' withdrawal requests were

made through Mt. Gox, not Mizuho (SAC ¶ 24); and even when Lack attempted to reverse his

deposit into Mt. Gox's account, he did so through Wells Fargo rather than by contacting Mizuho

---

[13] The plaintiffs acknowledge that their fraudulent concealment claim is brought on behalf of Lack and the putative "Deposit Subclass," but not Greene or the putative "Mt. Gox Class." (SAC ¶ 118; Ex. 7 at 6:11-7:9.) Nonetheless, this claim would also be insufficient under Illinois law, as described below.

(SAC ¶ 62).  All that the plaintiffs allege as to Mizuho is "silence" and inaction toward Mt.

Gox's customers.  (SAC ¶¶ 35, 63, 124.)

The Complaint states that Mizuho's continued acceptance of deposits from Mt. Gox's

customers after Mizuho allegedly stopped allowing withdrawals from Mt. Gox's account gave

rise to a duty to disclose because it "contributed to [the plaintiffs'] misapprehension regarding

their ability to access their deposited money."  (SAC ¶ 121.)  Those allegations, even if true, are

not enough to create a duty to disclose because they do not plead a sufficient relationship

between the parties.  *Los Angeles Mem'l*, 233 Cal. App. 4th at 832; *see also Edu-Sci. (USA) Inc.*

*v. Intubrite LLC*, 2014 WL 794962, at *2 n.3 (S.D. Cal. Feb. 27, 2014) (even if a defendant

"actively conceals a material fact from the plaintiff" or "makes partial representations but also

suppresses some material facts," a duty to disclose still does not arise without a direct

relationship).  For example, in *Los Angeles Memorial*, the court held that the contractual

relationship between an event venue and its customers who promoted music events held at the

venue did not give rise to a duty to disclose a side agreement that the promoters made with the

venue's employee.  233 Cal. App. 4th at 832 n.21.  And the plaintiffs' fraudulent concealment

claim against other defendants who were not parties to that contract was "even more attenuated"

because they "had no cognizable legal relationship with plaintiffs."  *Id*.  The plaintiffs' alleged

connection with Mizuho here is even further attenuated because they do not allege any

interactions with Mizuho.  *See also Edu-Sci.*, 2014 WL 794962, at *2, n.2 (a purchaser of goods

had no duty to disclose its ability to pay to the manufacturer even though the seller was engaged

in a joint venture with, and acted as the U.S. office of, the manufacturer, because the

manufacturer did not transact with the purchaser); *Starlite*, 2008 WL 2705395, at *14-15.[14]

---

[14] The plaintiffs have also not alleged a duty to disclose under Illinois law.  *See Neptuno Treuhand-Und*
*Verwaltungsgesellschaft Mbh v. Arbor*, 295 Ill. App. 3d 567, 573 (1998) (requiring "a special or

Moreover, it is well established that banks acting in their ordinary capacity are not subject to liability to their customers' counterparties. Banks do not owe fiduciary duties to their customers, much less to the further downstream counterparties of those customers. *Phillips*, 714 F.3d at 1024; *Thomas*, 706 F.3d at 853. For example, in *Eisenberg v. Wachovia Bank, N.A.*, the court dismissed a claim that a bank failed to discover a Ponzi scheme, and held, based on cases from eight jurisdictions, that banks owe no duty to non-customers. 301 F.3d 220, 225 (4th Cir. 2002). Such a duty would go against the "normal understanding of the purpose of a bank account and would expose banks to unlimited liability for unforeseeable frauds." *Id.* at 226.[15]

All that the plaintiffs allege as to Mizuho is an ordinary banking relationship between itself and Mt. Gox. According to the plaintiffs, Mizuho held bank accounts on behalf of Mt. Gox (SAC ¶ 22), accepted wire transfers from third parties into Mt. Gox's account (SAC ¶ 23), and executed Mt. Gox's instructions to transfer funds out of Mt. Gox's account (SAC ¶ 24). Although the plaintiffs call Mizuho "Mt. Gox's bank partner in Japan" (SAC ¶ 22), they are just pasting a tendentious label on that relationship in order to imply that Mizuho played some role beyond providing ordinary banking services. Conclusory labels do not meet the heightened pleading standard required by Rule 9(b). To find that Mizuho had a duty to disclose to the customers of its customer (Mt. Gox) "would be contrary to the normal understanding of the purpose of a bank account and would expose banks to unlimited liability for unforeseeable

---

fiduciary relationship"); *Phillips*, 714 F.3d at 1024 (affirming dismissal based on rule that banks do not owe fiduciary duties to depositors); *Thomas v. UBS AG*, 706 F.3d 846, 853 (7th Cir. 2013) (affirming dismissal of fraudulent concealment claim because "a bank is not a fiduciary of its depositors").

[15] *See also Bell Bros. v. Bank One, Lafayette, N.A.*, 116 F.3d 1158, 1160 (7th Cir. 1997) (dismissing negligence claim against bank because "[r]equiring a bank to restrict all deposits until satisfying itself that the depositor is entitled to the money would pour molasses on the gears of commerce"); *Bonded Fin. Servs. v. Eur. Am. Bank*, 838 F.2d 890, 893 (7th Cir.1988) (noting that to hold banks acting as financial intermediaries liable for fraudulent transfer under bankruptcy law would impose "staggering" costs on financial institutions); *In re Agape Litig.*, 681 F. Supp. 2d 352, 360 (E.D.N.Y. 2010) (no duty under New York law for banks "to protect non-customers from a fraud involving depository accounts").

frauds." *Eisenberg*, 301 F.3d at 226.

The case of *Tzaras v. Evergreen Int'l Spot Trading, Inc.*, 2003 WL 470611 (S.D.N.Y. Feb. 25, 2003), is instructive. There, the plaintiff sent a wire transfer into the account at Chase bank for a foreign exchange trading company that turned out to be a fraud. The court dismissed the plaintiff's attempt to hold Chase liable for the trading company's misconduct because the plaintiff "was not a customer of Chase. Chase's involvement extended only insofar as it allowed the wire transfer" into its customer's account. *Id.* at *6 (applying New York law). The *Tzaras* plaintiffs alleged—as the plaintiffs allege here—that Chase was responsible because of actions it had already taken to distance itself from the fraudulent scheme out of "concern[] about certain suspicious transactions." *Id.* at *2. But the court explained that "to hold that banks owe a duty to their depositors' creditors to monitor the depositors' financial activities . . . would be to unreasonably expand banks' orbit of duty." *Id.* (internal quotations omitted). The same is true here. To hold that Mizuho had a duty to communicate to Mt. Gox's tens of thousands of unidentified customers based on negative information that Mizuho was reading in the press and its efforts to distance itself from Mt. Gox would vastly expand a depository bank's responsibilities and erode its obligation of confidentiality to its customers. The Court should instead hold that Mizuho did not have a duty to Mt. Gox's customers, and the plaintiffs' fraudulent concealment claim should be dismissed.

　　　　　　2.　　　The Plaintiffs Have Not Alleged That Mizuho Intended To Defraud Them

The plaintiffs have also failed to allege another essential element of fraudulent concealment—that Mizuho's alleged concealment was done "with the intent to defraud" them. *Grant*, 736 F. Supp. 2d at 1272. As explained above, the Complaint makes clear that Mizuho was acting in its ordinary banking capacity and was seeking to distance itself from Mt. Gox to protect itself from potential liability and reputational harm—all motivations having nothing to do

22

with an intent to harm Mt. Gox's customers. *See Levin v. Citibank, N.A.*, 2009 WL 3008378, at *5 (N.D. Cal. Sept. 17, 2009) (plaintiff failed to plead that Citibank's delay in notifying him of a credit limit reduction was done "with the intent to defraud [him] in any manner").

The plaintiffs claim that Mizuho concealed the status of withdrawals and continued accepting customer deposits "so as to avoid drawing public criticism and further scrutiny from regulatory authorities, as well as to continue profiting from the deposit fees that it collected." (SAC ¶¶ 32, 123-24.) But the plaintiffs do not point to any basis in fact for these completely conclusory allegations, which they resort to pleading "[up]on information and belief." (SAC ¶ 32.) The plaintiffs also conclusorily allege "[u]pon information and belief" that "Mizuho prohibited Mt. Gox from disclosing" the allegedly concealed facts. (SAC ¶¶ 36, 125.) Yet the plaintiffs do not provide even a single fact from which to infer that Mizuho prevented Mt. Gox from disclosing information to its customers, and its allegations fall far short of the "particularity" required for fraud claims (like this one) under Rule 9(b). *Pirelli Armstrong Tire Corp. Ret. Med. Bens. Trust v. Walgreen Co.*, 631 F.3d 436, 446-47 (7th Cir. 2011) (allegations made "on information and belief" do not satisfy Rule 9(b) without corroborating evidence). Moreover, the plaintiffs fail to explain what ability Mizuho had to "prohibit" Mt. Gox from making such a disclosure, particularly when the plaintiffs acknowledge that Mt. Gox could have simply ended its relationship with Mizuho if it chose to do so. (SAC ¶ 27.) The plaintiffs' fraudulent concealment claim must be dismissed because these conclusory and speculative allegations cannot be credited on a fraud claim subject to Rule 9(b)'s pleading standard and, as a result, the plaintiffs have failed to plead the essential element of intent to defraud.

3.    Mizuho's Alleged Concealment Did Not Cause Any Damages

The plaintiffs' fraudulent concealment claim also evaporates for a further reason: they have not alleged any damages "as a result of the concealment." *Grant*, 736 F. Supp. 2d at 1272.

The plaintiffs allege that Mizuho concealed the fact that it "stopped providing cash wire withdrawal services to Mt. Gox and that Deposit Class Members would thereafter be unable to make cash withdrawals from the Exchange." (SAC ¶ 118.) But even if the plaintiffs did not know that Mizuho changed its business relationship with Mt. Gox (and stopped providing outbound wire transfer services), that action was not the cause of the plaintiffs' alleged damages. Those damages occurred as a result of (i) Mt. Gox's decision not to return the plaintiffs' funds through any of its many other banking relationships, (ii) those funds being "misplaced, stolen, lost, or misused" by Mt. Gox, and (iii) Mt. Gox's collapse as a result of those misdeeds. (SAC ¶ 128; *supra* 10-14.) In addition, because Lack did not deposit any funds until early 2014, months later, and did not inquire about them or attempt to withdraw them until after Mt. Gox had already reported problems and was on the verge of bankruptcy, any damages that Lack (the only relevant plaintiff) suffered were caused by Mt. Gox's collapse, rather than any changes in Mizuho's business relationship with Mt. Gox. *Bank of Am. Corp. v. Sup. Ct.*, 198 Cal. App. 4th 862, 873 (Cal. Ct. App. 2011). The plaintiffs' fraudulent concealment claim must be dismissed because they do not allege that the concealment caused any damages.

## C.   The Plaintiffs Have Not Pleaded A Claim For Unjust Enrichment

The plaintiffs' unjust enrichment claim must be dismissed because California law does not recognize an independent cause of action for unjust enrichment.[16] *Durell v. Sharp*

---

[16] The plaintiffs' claim for unjust enrichment would also be insufficient under Illinois law. Illinois law provides that "if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim . . . will stand or fall with the related claim." *Landlock Natural Paving, Inc. v. Desin L.P.*, 2013 WL 4854361, at *5 (N.D. Ill. Sept. 11, 2013) (Feinerman, J.). The plaintiffs' unjust enrichment claim is entirely derivative of their fraudulent concealment claim, alleging that Mizuho "knowingly concealed" that the plaintiffs would not be able to withdraw the funds that they deposited (SAC ¶ 112), and thus must be dismissed for the reasons stated above. For those same reasons, Mizuho's conduct cannot be considered wrongful or unjust under California law, even if the plaintiffs were to repackage their unjust enrichment claim to fit within California law. *Punian v. Gillette Co.*, 2015 WL 4967535, at *13 (N.D. Cal. Aug. 20, 2015) (dismissing unjust enrichment claim because the plaintiff failed to allege underlying claims that formed the basis of this claim).

*Healthcare*, 183 Cal. App. 4th 1350, 1370 (Cal. Ct. App. 2010); *Haddock v. Countrywide Bank NA*, 2015 WL 9257316, at *17 (C.D. Cal. Oct. 27, 2015) (dismissing unjust enrichment claim).

### D.   The Plaintiffs Have Not Pleaded A Claim For An Accounting

Finally, the plaintiffs seek an accounting from Mizuho of their transactions with Mt. Gox. (SAC ¶ 132.)  But under California law, an "accounting is a remedy, not a cause of action." *Schaffer Family Investors, LLC v. Sonnier*, 2015 WL 4873542, at *15 (C.D. Cal. Aug. 13, 2015); *Nguyen v. JP Morgan Chase Bank*, 2012 WL 294936, at *3 (C.D. Cal. Feb. 1, 2012).  The claim for an accounting is thus insufficient on its face.  Moreover, because the plaintiffs' other claims must be dismissed for the reasons described above, the plaintiffs have no basis to obtain any remedy, including an accounting.  *Herrejon v. Ocwen Loan Svc'g, LLC*, 980 F. Supp. 2d 1186, 1207-08 (E.D. Cal. 2013) (dismissing accounting claim because of dismissal of other claims).[17]

## II.   THE COURT SHOULD DISMISS THE PLAINTIFFS' CLAIMS ON THE GROUNDS OF *FORUM NON CONVENIENS*

The case should be dismissed for *forum non conveniens* where, as here, an alternative and adequate forum is available to hear the parties' dispute, and various public and private factors weigh in favor of conducting the litigation in the alternative forum.  *Fischer v. Magyar Államvasutak Zrt.*, 777 F.3d 847, 866 (7th Cir. 2015).

### A.   Japan Provides An Alternative And Adequate Forum

"An alternative forum is available if all parties are amenable to process and are within the forum's jurisdiction."  *Kamel v. Hill-Rom Co. Inc.*, 108 F.3d 799, 803 (7th Cir. 1997).  Mizuho is located in Japan and consents to jurisdiction there.  Japan is also an "adequate" forum because it

---

[17] Nor would an accounting be warranted where the plaintiff seeks a readily ascertainable amount that can be determined in "an ordinary legal action demanding a fixed sum."  *Herrejon*, 980 F. Supp. 2d at 1207-08.  The plaintiffs' claim for an accounting must be dismissed because Lack—the only plaintiff who requests an accounting—paid a straightforward "sum certain" ($40,000) to Mt. Gox.  (SAC ¶ 57.)

has a well developed legal system. In fact, the Seventh Circuit has already held that Japan is an adequate forum when it dismissed a case brought against several Mizuho entities (including Mizuho Bank) for *forum non conveniens* even though there were procedural differences between the Japanese and American legal systems. *U.S.O. Corp. v. Mizuho Holding Co.*, 547 F.3d 749 (7th Cir. 2008); *Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund*, 589 F.3d 417, 421 (7th Cir. 2009) (dismissing claim and holding the Hungarian legal system was an adequate alternative forum). Japan thus provides an available and adequate alternative forum for this litigation.

### B. The Private And Public Factors All Weigh Heavily In Favor Of Litigating These Claims In Japan

The court "must also balance the private interests of the parties and the public interests of the alternative forums." *Fischer*, 777 F.3d at 868. Underlying all of the private and public factors here is the fact that the plaintiffs' claims are grounded in allegations about conduct that occurred in Japan by parties that are located there. Mizuho is a "Japanese financial institution" incorporated in Japan, has its principal place of business there, held Mt. Gox's accounts at its Shibuya Branch in Tokyo, and made all of its decisions concerning Mt. Gox's accounts that form the basis of the plaintiffs' claims in Japan. (SAC ¶¶ 7, 103; ECF No. 149 at 2-3.) Mt. Gox's theft or loss of the plaintiffs' funds and bitcoins also occurred in Japan. Karpeles ran every aspect of Mt. Gox out of its headquarters in Japan, Mt. Gox's Japanese bankruptcy proceeding has been recognized in the U.S. as its foreign main bankruptcy, and Karpeles was arrested in Japan. (SAC ¶¶ 44-45; Ex. 3 ¶¶ 14-17; Ex. 7 at 4:3-4.)

Because the plaintiffs' claims against Mizuho are so rooted in actions that occurred in Japan, there is not even any need to "balance" the private and public factors—they all point in the same direction, toward Japan. *See Apotex Corp. v. Istituto Biologico Chemioterapico S.P.A.*, 2003 WL 21780965, at *8 (N.D. Ill. July 30, 2003).

1.    Private Factors Favor Litigating These Claims In Japan

The most significant private interest "is the attendance of witnesses." *GoldenTree Asset Mgmt. LP v. BNP Paribas S.A.*, 64 F. Supp. 3d 1179, 1195 (N.D. Ill. 2014).  The key witnesses here who have knowledge about the events underlying the plaintiffs' claims, including Karpeles and Mizuho employees involved in decisions about Mt. Gox's account, are all in Japan.  Japan is therefore the more convenient forum for all of these witnesses.  *Id.; Interpane Coatings, Inc. v. Australia and New Zealand Banking Grp. Ltd.*, 732 F. Supp. 909, 916 (N.D. Ill. 1990) (dismissing claim because Australian witnesses would predominate for one of the claims).

The fact that Mizuho's and Mt. Gox's documents are located in Japan and are in Japanese makes Japan an even more convenient forum.  *GoldenTree*, 64 F. Supp. 3d at 1196 (holding that location of key documents in Germany and "likelihood that such evidence will be in German weighs in favor of Germany as the forum").  Thus, the private factors relating to the availability of key evidence strongly weigh in favor of dismissing the claims here for *forum non conveniens*.

2.    Public Factors Favor Litigating These Claims In Japan

Public factors related to efficient judicial administration and the interest of the forum in the dispute also heavily favor dismissing the plaintiffs' claims on *forum non conveniens* grounds. These factors include "the local interest in having localized disputes decided at home"; "the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action [and] the avoidance of unnecessary problems in . . . the application of foreign law"; and "the administrative difficulties stemming from court congestion."  *Harris v. France Telecom, S.A.*, 2011 WL 3705078, at *5 (N.D. Ill. Aug. 22, 2011).

a.    *Japan Has A Far Greater Local Interest In This Dispute*

A foreign forum has substantially more local interest where the conduct and events occurred in that forum.  *Id.* at *6 (dismissing case because "substantially all of th[e] dispute"

27

arose from actions that allegedly occurred in England or France). As explained above, all of Mizuho's, Karpeles's, and Mt. Gox's alleged conduct, decisions, and relationships that form the basis of the plaintiffs' claims are centered in Japan.

In addition, Japan has a strong interest in regulating its banking industry. While California and Illinois have an interest in protecting their residents from harm, that is no more true here than in any case filed by a resident of the United States. That common factor does not stop courts from dismissing cases for *forum non conveniens* where these other factors weigh so heavily in favor of the alternative forum. *Id.* at *1 (plaintiff was a U.S. citizen and resident of Chicago); *Interpane*, 732 F. Supp. at 917 (Wisconsin corporation). Moreover, where, as here, "an American plaintiff chooses to invest in a foreign country and then complains of fraudulent acts occurring primarily in that country, the plaintiff's ability to rely upon citizenship as a talisman against *forum non conveniens* dismissal is diminished." *Sussman v. Bank of Israel*, 801 F. Supp. 1068 (S.D.N.Y. 1992) (dismissing claims brought by American plaintiffs against Israeli bank), *aff'd*, 990 F.2d 71 (2d Cir. 1993), *cited by Harris*, 2011 WL 3705078, at *3.

b.  *The Application Of Japanese Law In A U.S. Court Would Create Unnecessary Problems*

In determining the choice of law for tort claims, Illinois courts consider the (a) place where the injury occurred, (b) place where the conduct causing the injury occurred, (c) relevant jurisdictions of the parties, and (d) place where the relationship between the parties is centered. *Kelco Metals, Inc. v. Morgan*, 2010 WL 1427583, at *5 (N.D. Ill. Apr. 5, 2010). Each of these factors weighs in favor of the application of Japanese law.[18]

The conduct causing the plaintiffs' alleged injury here occurred in Japan. While Mizuho

---

[18] Mizuho thus gives notice, pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, that it intends to raise an issue of foreign law in support of its defense if this case proceeds beyond the pleading stage.

did not cause the plaintiffs' injury for the reasons explained below, Mizuho's allegedly tortious conduct occurred entirely in Japan. Mizuho is incorporated in Japan, has its principal place of business there, and held Mt. Gox's accounts at its Shibuya Branch, located in Tokyo. Moreover, the conduct that truly caused the plaintiffs' alleged injuries—Mt. Gox's theft or loss of the plaintiffs' funds and bitcoins—also occurred in Japan. Karpeles ran every aspect of Mt. Gox out of its headquarters in Japan, Mt. Gox's Japanese bankruptcy proceedings have been recognized in the U.S. as its foreign main bankruptcy, and Karpeles was arrested in Japan.

In this type of situation, courts regularly apply the law of the place where the defendant and other relevant third parties are located. For example, in *Interpane*, the plaintiff, an American corporation, sued the Australian bank of the party that contracted to buy goods from the plaintiff after the bank allegedly released the goods prematurely. In dismissing the case for *forum non conveniens*, the court held that the relationship was centered in Australia because the bank was involved in the transaction by virtue of its status as the bank of the Australian buyer. 732 F. Supp. at 917. Here, too, Mizuho, a Japanese bank, is involved solely as a bank to a Japanese defendant. Similarly, then, Japanese law should apply. *Id.*; *see also Kelco*, 2010 WL 1427583, at *5; *Apotex*, 2003 WL 21780965, at *10; *Fischer*, 777 F.3d at 871.[19]

Even if the plaintiffs' alleged injuries occurred where they were located, courts regularly hold that factor to be insufficient to overcome the application of the law of the place where the injury-causing conduct occurred and where the parties' relationship is centered. *See, e.g.*, *Kelco*, 2010 WL 1427583, at *4-6; *Interpane*, 732 F. Supp. at 917; *Apotex*, 2003 WL 21780965, at *8. Moreover, where, as here, a plaintiff suffers merely financial loss, "the place of loss does not

---

[19] Because this case involves Japanese banking law, the interest in having a forum "at home with the [governing] law" also favors Japan as the proper forum. *Harris*, 2011 WL 3705078, at *5. A Japanese court will be uniquely qualified to apply Japanese banking law to the transactions at issue here.

play so important a role" in the choice of law analysis. *GoldenTree*, 64 F. Supp. 3d at 1197.

c. *Japan's Civil Court System Would Provide A Far More Efficient Path To Resolving This Dispute*

The parties would also be able to engage in a far more efficient proceeding under the Japanese legal system, and thus avoid "administrative difficulties stemming from court congestion." *Harris*, 2011 WL 3705078, at \*5. A 2013 study by the Organisation for Economic Co-operation and Development ("OECD") concluded that Japan was the "best performer" in a cross-country comparison of the length of civil proceedings, with an average length in 2010 of only 107 days. (Ex. 15 (*What Makes Civil Justice Effective?* OECD Econ. Policy Note No. 18, at 2 (June 2013)).) In contrast, civil cases in the Northern District of Illinois have a median duration of approximately 29 months. (Ex. 16 (2015 U.S. District Courts—Median Time Intervals From Filing To Disposition Of Civil Cases).) This factor therefore favors moving these proceedings to Japan. *GoldenTree,* 64 F. Supp. 3d at 1198 (dismissing case in part because the vast majority of cases in district courts in Germany were "resolved within 12 months in comparison to an average time of completion of 24.5 months in this district").

The balance of these various factors that courts consider in doing a *forum non conveniens* analysis is not even close to being in equipoise. *All* of these factors weigh heavily in favor of dismissal so that this case can be litigated in Japan—the location where the key events that form the basis of the plaintiffs' claims allegedly took place.

**CONCLUSION**

For the foregoing reasons, this Court should dismiss the Complaint with prejudice against Mizuho Bank.

30

MIZUHO BANK, LTD.

By:          */s/* Jason A. Frye
                  One of Its Attorneys

Jonathan S. Quinn (#6200495)
jquinn@ngelaw.com
Jason A. Frye (#6292848)
jfrye@ngelaw.com
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street
Chicago, IL  60602-3801
(312) 269-8000

Jerome S. Fortinsky (admitted *pro hac vice*)
jfortinsky@shearman.com
John A. Nathanson (admitted *pro hac vice*)
john.nathanson@shearman.com
Jeffrey J. Resetarits (admitted *pro hac vice*)
jeffrey.resetarits@shearman.com
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

Dated: January 29, 2016

## CERTIFICATE OF SERVICE

I, Jason A. Frye, an attorney, hereby certify that I caused a true and correct copy of the

**Memorandum of Law of Defendant Mizuho Bank, Ltd. in Support of Its Motion to Dismiss**

**the Second Amended Class Action Complaint for Failure to State a Claim or Alternatively**

**for *Forum Non Conveniens*** to be served upon all counsel of record using the Court's CM/ECF

electronic filing system on the 29th day of January, 2016.


       /s/ Jason A. Frye