UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY GREENE and JOSEPH LACK, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| *Plaintiffs,* | ) ) | Case No. 14 C 01437 |
| v. | ) ) ) | Judge Gary Feinerman Magistrate Judge Susan E. Cox |
| MIZUHO BANK, LTD., a Japanese financial institution, and MARK KARPELES, an individual, | ) ) ) ) | |
| *Defendants.* | ) ) ) | |

## DECLARATION OF JEROME S. FORTINSKY

I, JEROME S. FORTINSKY, declare as follows:

I am a member of the firm of Shearman & Sterling LLP, which represents defendant Mizuho Bank, Ltd. in this action. I have been admitted *pro hac vice* in this action and submit this declaration in support of Defendant Mizuho Bank, Ltd.'s Motion To Dismiss The Second Amended Class Action Complaint For Failure To State A Claim Or Alternatively For *Forum Non Conveniens.*

1.      Attached hereto as Exhibit 1 is a true and correct copy of a March 5, 2014 article from the Wall Street Journal's Moneybeat publication entitled *Recording Shows Mizuho Pushed To End Dealings With Mt. Gox*, cited in paragraph 26, footnote 8 of the Second Amended Class Action Complaint (the "Complaint").

2.      Attached hereto as Exhibit 2 is a true and correct copy of a February 28, 2014 article from the Chicago Tribune entitled *Mt. Gox Files Bankruptcy, Says*

*Hackers Stole All Its Bitcoins*, cited in paragraph 41, footnote 19 of the Complaint.

3.    Attached hereto as Exhibit 3 is a true and correct copy of the Declaration Of Nobuaki Kobayashi In Support Of The Amended Verified Petition For Recognition And Chapter 15 Relief, *In re MtGox Co., Ltd.*, ECF No. 127 (Bankr. N.D. Tex. May 23, 2014), cited in paragraph 68, footnote 23 of the Complaint.

4.    Attached hereto as Exhibit 4 is a true and correct copy of an August 23, 2013 article from Tech Crunch entitled *Feds Seize Another $2.1 Million From Mt. Gox, Adding Up To $5 Million*, cited in paragraph 26, footnote 8 of the Complaint.

5.    Attached hereto as Exhibit 5 is a true and correct copy of an August 12, 2013 article from CoinDesk entitled *Withdrawals From Mt. Gox:  Growing Pains Or Banking Bottleneck?*, cited in paragraph 30, footnote 11 of the Complaint.

6.    Attached hereto as Exhibit 6 is a true and correct copy of a September 21, 2013 article from Bitcoin Magazine entitled *Mt. Gox USD Withdrawals To Take Up To 22 Months*, cited in paragraph 30, footnote 11 of the Complaint.

7.    Attached hereto as Exhibit 7 is a true and correct copy of the transcript of the August 2, 2015 hearing that took place before the Court in this action.

8.    Attached hereto as Exhibit 8 is a true and correct copy of the transcript of the March 11, 2014 hearing that took place before the Court in this action, which was attached as Exhibit A to Plaintiffs' Motion To Extend Temporary Restraining Order, ECF No. 49.

9.      Attached hereto as Exhibit 9 is a true and correct copy of the transcript of the April 16, 2015 hearing that took place before the Court in this action.

10.     Attached hereto as Exhibit 10 is a true and correct copy of a March 12, 2014 article from Computerworld entitled *Mt. Gox Kept Exchange Open Despite Knowledge Of Large-Scale Theft*, cited in paragraph 15, footnote 6 of the Complaint.

11.     Attached hereto as Exhibit 11 is a true and correct copy of a February 25, 2014 article from This Is Money entitled *Is It The Beginning Of The End For Bitcoin? Virtual Currency In Turmoil As Rumoured $375M Theft Closes Major Exchange*, cited in paragraph 39, footnote 17 of the Complaint.

12.     Attached hereto as Exhibit 12 is a true and correct copy of a March 10, 2014 article from Boy Genius Report entitled *Hackers Call Mt. Gox CEO A Liar, Say He Still Controls 'Stolen' Bitcoin*, cited in paragraph 42, footnote 20 of the Complaint.

13.     Attached hereto as Exhibit 13 is a true and correct copy of a March 7, 2014 article from PC World entitled *Lost In Translation: The Tangled Tale Of Mt. Gox's Missing Millions*, cited in paragraph 43, footnote 21 of the Complaint.

14.     Attached hereto as Exhibit 14 is a true and correct copy of Exhibit C of the Declaration Of Andrew Van Almen In Support Of Motion For TRO/Preliminary Injunction, ECF No. 18, cited in paragraph 33, footnote 13 of the Complaint.

15.     Attached hereto as Exhibit 15 is a true and correct copy of a June 2013 article by the Organization for Economic Co-operation and Development ("OECD") entitled *What Makes Civil Justice Effective?*

16.     Attached hereto as Exhibit 16 is a true and correct copy of a table produced by

the Administrative Office of the United States Courts entitled *U.S. District*

*Courts—Median Time Intervals From Filing To Disposition Of Civil Cases*

*Terminated, By District And Method Of Disposition, During The 12-Month*

*Period Ending June 30, 2015*, available at

http://www.uscourts.gov/statistics/table/c-5/statistical-tables-federal-

judiciary/2015/06/30 (last accessed Jan. 28, 2015).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on this 28th day of January, 2016 in New York, New York.

Jerome S. Fortinsky

# Exhibit 1



1 of 1 DOCUMENT

Copyright 2014 Factiva ®, from Dow Jones
All Rights Reserved



Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved.

# THE WALL STREET JOURNAL.
The Wall Street Journal Online

March 5, 2014
WSJ.com Edition

**SECTION:** MARKETS

**LENGTH:** 1078 words

**HEADLINE:** Recording Shows Mizuho Pushed to End Dealings With Mt. Gox;
 Bank Wanted the Bitcoin Exchange to Close Its Account

**BYLINE:** Takashi Mochizuki

**BODY:**

    In the months before Mt. Gox's collapse, the bitcoin exchange was coming under increasing pressure from one of its banks, which complained about an unmanageable volume of money transfers and repeatedly asked the exchange to close its account with the bank, people familiar with the situation say.

    Mizuho Bank, which handled international wire transfers and other Mt. Gox business at a branch in Tokyo's Shibuya district, had become worried about Mt. Gox as early as mid-2013, following reports that the U.S. Department of Homeland Security had seized money from a Mt. Gox account at a U.S. bank, these people say.

    The worries show the uneasy relationship between the traditional banking sector and bitcoin-related companies at a time when investigators were poring over virtual-currency transactions for potential evidence of money laundering or purchases of illicit goods or services.

    Bitcoin is a virtual currency that is created and traded electronically and is accepted as payment by thousands of legal and illegal merchants around the world. Transactions are generally anonymous, presenting opportunities for criminals to move money discreetly.

Recording Shows Mizuho Pushed to End Dealings With Mt. Gox; Bank Wanted the Bitcoin Exchange to Close Its Account The Wall Street Journal Online March 5, 2014

Many U.S. banks have steered clear of bitcoin companies, preferring not to invite more regulatory scrutiny than they already were getting in the wake of the Dodd-Frank financial overhaul and other rules stemming from the financial crisis.

Mizuho handled transactions in cash between Mt. Gox and customers who were buying bitcoins from the exchange or selling bitcoins to it for cash. The vast majority were outside Japan, requiring numerous international wire transfers.

Mizuho started having concerns about Mt. Gox's large volumes of money transfers after learning U.S. authorities were investigating whether business dealings involving bitcoin could be linked to money laundering, said one person close to the situation.

That person also confirmed the authenticity of a recording, circulating widely on the Internet through social media, of a conversation in Japanese between an official from Mizuho Bank and Mt. Gox's head, Mark Karpelès, in late January. The tape indicated that Mizuho was stepping up a push to disassociate itself from Mt. Gox.

In the conversation, the bank official repeated a request that Mt. Gox close its account with Mizuho and warned that it might take steps to close it if Mt. Gox refused. Mr. Karpelès said on the tape he wanted to keep the account.

On the tape, the Mizuho official can be heard saying, "As we've been saying many times, we want to close your account."

Mr. Karpelès responds: "I discussed with my lawyers and they said we don't need to close it, so we'd like to keep it."

The bank official then says that while it would like Mt. Gox to close its account voluntarily, "the chance isn't zero that we will leave you no choice."

In mid-2013, after the Department of Homeland Security action, Mt. Gox halted dollar withdrawals temporarily. A person close to Mt. Gox said that move came after Mizuho declined to process withdrawals in dollars.

The snowballing popularity of bitcoin and the resulting growth in Mt. Gox's customer base appear to have raised the volume of money transfers for the bank.

Japanese banks can close accounts only under certain conditions. In the taped conversation, the Mizuho official didn't indicate any specific concern about Mt. Gox's compliance with bank rules. When Mr. Karpelès asked why the bank wanted to close the account, the Mizuho official cited "a collection of various issues."

Asked to comment on the audio file, Mr. Karpelès responded in an email, "This recording was not published by us."

A lawyer in charge of Mt. Gox's filing for bankruptcy protection said on Tuesday, "Our priority right now is to fully cooperate with requests from Japanese and other authorities. Therefore we can't make comments to the media at this moment." He declined to elaborate on which authorities have made requests.

In August 2013, Mt. Gox applied for a license to operate a money-services business in Hong Kong, hoping to move a majority of its banking to the city, the person close to Mt. Gox said. Documents filed with the Hong Kong Customs and Excise Department show that Mt. Gox obtained a license in October in Hong Kong to operate such a business. Mt. Gox lists an address in the city belonging to an office-services provider.

Mr. Karpelès already had a business connection to Hong Kong. In 2011, he registered Tibanne Ltd. in the city, listing the company as having 10,000 Hong Kong dollars (US$1,288) in capital, according to documents filed with the Hong Kong government. It didn't list its intended business activity.

Recording Shows Mizuho Pushed to End Dealings With Mt. Gox; Bank Wanted the Bitcoin Exchange to Close Its Account The Wall Street Journal Online March 5, 2014

On Feb. 7, Mt. Gox halted bitcoin withdrawal requests, blaming a bug in the bitcoin software that it said could make fraudulent withdrawals possible. Even before that, investors were complaining about long delays in getting money transfers processed.

Several people close to Mt. Gox have said a big pile of withdrawal requests grew further as Japanese banks took a weeklong New Year holiday. Mt. Gox investors in Tokyo started noticing delays in dollar withdrawals in December, while yen-withdrawal delays didn't begin until January.

Tang Shunning, a Mt. Gox investor living in Japan, said his requests to withdraw yen from his Mt. Gox bitcoin account took only two days to complete in December, while in early January, two transactions of about ¥100,000 (around US$1,000) each took about a week to clear.

Mr. Tang said he withdrew around ¥6 million in late January, three weeks after he made the request.

According to what he said was a screenshot of his bank transactions, his last withdrawal from Mt. Gox was on Feb. 12, after Mt. Gox had halted bitcoin withdrawals but was still working through its pile of cash-withdrawal requests. Four weeks after he made the withdrawal request, Mr. Tang was able to withdraw ¥8.8 million.

On Feb. 25, a few days before it filed for bankruptcy protection, Mt. Gox halted all transactions.

that Separately, Japan's government was preparing to clarify its view on bitcoin, officials said, though they appeared no closer to declaring a specific agency in charge of overseeing the virtual currency. People familiar with a draft being prepared for a cabinet meeting scheduled for Friday say the government will reaffirm Japan doesn't consider bitcoin a currency, which has been the basis for the argument by the Financial Services Agency, Japan's banking watchdog, that bitcoin shouldn't be subject to its oversight.

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** March 6, 2014

# Exhibit 2

(http://www.chicagotribune.com)

# Mt. Gox files bankruptcy, says hackers stole all its bitcoins

February 28, 2014 | Yoshifumi Takemoto and Sophie Knight | Reuters



Recommend   3       Tweet

194   G+1   0

Shuttered bitcoin exchange Mt. Gox ended weeks of silence over its shutdown by filing for bankruptcy and announcing that it may have lost nearly a half billion dollars in the virtual currency to hackers.

The world's biggest bitcoin exchange blamed "weakness" in its computer system, Mt. Gox's French CEO Mark Karpeles said in Japanese at a news conference at the Tokyo District Court Friday.



(http://www.trbimg.com/img-5310e47f/turbine/sns-rt-cbrea1r0tsn00-...

"First of all, I'm very sorry," he said. "The bitcoin industry is healthy and it is growing. It will continue, and reducing the impact is the most important point."

The collapse caps a tumultuous few weeks in which the company has remained virtually silent after halting trades of the crypto-currency, shaking the nascent but burgeoning bitcoin community.

Angry investors have been seeking answers for what happened to their holdings of cash and bitcoins on the unregulated Tokyo-based exchange.

Gregory Greene, who estimated his bitcoin stake at $25,000, filed a lawsuit in the U.S. District Court in Chicago late on Thursday, saying Mt. Gox had failed "to provide its users with the level of security protection for which they paid."

Baker & McKenzie, a Chicago-based law firm that represents Mt. Gox, declined to comment. It is not yet clear if the firm is representing the exchange in this lawsuit.

Mt. Gox said the exchange, used overwhelmingly by foreigners, had lost 750,000 of its users' bitcoins and 100,000 of its own. At the current bitcoin price of about $565, that would total some $480 million - representing about 7 percent of the estimated global total of bitcoins.

"This may be telling for the level of traceability of the transactions. Bitcoin has been telling us that it is more traceable than cash. The question is, how much more and is there the potential for real recourse in the case of theft," said Moshe Cohen, assistant professor at Columbia Business School in New York.

Mt. Gox said there was a discrepancy of 2.8 billion yen ($27.4 million) in its bank accounts when it checked on Monday. Junko Suetomi, a lawyer with Baker & MacKenzie, said she could not comment on the balances of foreign bank accounts held by the company.

PROBLEM WITH EXCHANGE, NOT BITCOIN

Many bitcoin market participants have said Mt. Gox's problems were specific to the company and were caused by what they said was a lax attitude by Karpeles, while bitcoin itself - free of any central bank control - was still a noble venture.

"If we could agree on legal regulation, we should let (bitcoin and regulators) co-exist," said Keiichi Hida, a bitcoin investor and member of the Japan Digital Money Association. He lost about 100,000 yen worth of bitcoins, but seemed unconcerned as he became interested in the virtual currency as a form of "study".

"We should make it a national project to have bitcoin used nationwide at the time of the 2020 Tokyo Olympics," he said.

Mt. Gox shut its website on Tuesday after freezing withdrawals earlier this month in the wake of a series of technical difficulties.

The exchange had liabilities of $63.67 million, dwarfing its total assets of 3.84 billion yen, the company said. It had 127,000 creditors in bankruptcy, just over 1,000 of whom are Japanese.

The company and Karpeles have said little in the days before Friday's court filing, which is similar to Chapter 11 bankruptcy in the United States, except that they were working with others to resolve their problems.

Another lawyer, Akio Shinomiya at Yodoyabashi and Yamagami, said Mt. Gox wanted to file a criminal complaint against what he said was a hacking attack, but had no specific means of doing so.

"Bitcoin has always been volatile and speculative, said bitcoin user Ken Shishido, who had about a tenth of his bitcoin holdings at Mt. Gox, but has seen the rest of his bitcoins soar tenfold since he began trading 18 months ago.

"It's too bad that this happened, but we have to let it go. And then we study more."

Fortress Investment Group became one of the first big investors to say it had lost money investing in bitcoin. In a regulatory filing with the U.S. Securities and Exchange Commission, the company said it incurred $3.7 million in unrealized losses in 2013.

**_utm_content=thumbnails-f:Below Article Thumbnails - Archives:)**
**_utm_content=thumbnails-f:Below Article Thumbnails - Archives:)**
**_utm_content=thumbnails-f:Below Article Thumbnails - Archives:)**
**From the Web**

(https://ad.doubleclick.net/ddm/clk/299663771;126650239;t?
utm_source=taboola&utm_medium=referral)

**eBook: How Music Kickstarter is Using Community Cloud to Shape the Industry**
**Salesforce**

(https://ad.doubleclick.net/ddm/clk/299663771;126650239;t?
utm_source=taboola&utm_medium=referral)
(https://blog.personalcapital.com/financial-planning-2/real-cost-pet-
ownership/?
utm_source=taboola&utm_medium=cpc&utm_campaign=ContentPromo&ut
tribunedigital-
chicagotribune&utm_content=http%3A%2F%2Fcdn.taboolasyndication.com%

**Tracking The Cost Of Fluffy And Fido**
**Personal Capital**

(https://blog.personalcapital.com/financial-planning-2/real-cost-pet-
ownership/?
utm_source=taboola&utm_medium=cpc&utm_campaign=ContentPromo&ut
tribunedigital-
chicagotribune&utm_content=http%3A%2F%2Fcdn.taboolasyndication.com%
(http://www.mvmtwatches.com/pages/the-wall-2b?
utm_source=taboola&utm_medium=referral)

**This Watch Brand Is Disrupting A $60 Billion Industry**
**MVMT Watches**

(http://www.mvmtwatches.com/pages/the-wall-2b?
utm_source=taboola&utm_medium=referral)
(http://www.smartlifeweekly.com/finance/mortgage-interest-rates-have-no-
where-to-go-but-up?
t202id=63644&c1=tres7&c2=ts9&c3=srps15&utm_source=tribunedigital-
chicagotribune)

**Homeowners Are in for a Big Surprise in 2016**

# Exhibit 3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 15 |
| MtGox Co., Ltd. (a/k/a MtGox KK), | Case No. 14-31229-sgj-15 |
| Debtor in a Foreign Proceeding. | |

## DECLARATION OF NOBUAKI KOBAYASHI IN SUPPORT OF THE
## AMENDED VERIFIED PETITION FOR RECOGNITION AND CHAPTER 15 RELIEF

I, Nobuaki Kobayashi (the "Petitioner"), in my capacity as the bankruptcy trustee and foreign representative of MtGox Co., Ltd., a/k/a MtGox KK (the "Debtor" or "MtGox"), pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct to the best of my knowledge and belief, including based upon my review of the books, records and documents of the Debtor and interviews of the relevant personnel of the Debtor:

1.     I am a resident of Japan and, after receiving an L.L.B. from Chuo University in 1979, have been registered to practice law in Japan since 1983. I am currently a partner at Nagashima Ohno & Tsunematsu ("NO&T"), a Japan-based law firm engaged in the provision of corporate reorganization, insolvency and related services in Japan. Since becoming an attorney at law, I have been a member of the Insolvency Law Study Group of the Tokyo Bar Association, and I was appointed Chairperson in 2002. Since 2013, I have been Chairperson of the Study Committee on the Bankruptcy Law System of the Japan Federation of Bar Associations. I have lectured in a variety of programs and institutions and have delivered lectures on insolvency practice hosted by the Training and Research Institute for Court Officials of the Supreme Court of Japan and attended by Japanese judges. From 2007 to March 2014, I was a Visiting Professor

in insolvency law at Chuo University Law School in Tokyo, Japan. In 2012, I was ranked the fourth most valuable business law attorney in Japan based on a survey conducted by Nikkei.

2. In addition, I have extensive experience in each of Japan's three types of insolvency proceedings, namely: (i) bankruptcy proceedings under the Bankruptcy Act of Japan (the "Bankruptcy Act"); (ii) civil rehabilitation proceedings under Japan's Civil Rehabilitation Act (*Minji Saisei Ho*) (the "JCRA"); and (iii) reorganization proceedings under Japan's Corporate Reorganization Act (*Kaisha Kosei Ho*). Specifically, I have served as: (i) the bankruptcy trustee in approximately 40 Japan bankruptcy proceedings involving companies; (ii) the supervisor in approximately 30 Japan civil rehabilitation proceedings; and (iii) the reorganization trustee in approximately 10 Japan reorganization proceedings.[1] As such, I am fully familiar with Japanese insolvency law and with MtGox's Japan Proceeding (as described below).

3. On April 24, 2014, I was appointed as the bankruptcy trustee of MtGox. As explained in more detail below, MtGox is the subject of a bankruptcy procedure (the "Japan Proceeding") under the Bankruptcy Act,[2] currently pending before the Twentieth Civil Division of the Tokyo District Court in Japan (the "Tokyo Court").

---

[1] I note that I served as the co-trustee and co-foreign representative of Elpida Memory, Inc. ("Elpida") in its reorganization proceedings in Japan and related Chapter 15 case in the U.S. Bankruptcy Court for the District of Delaware. In 2012, the Delaware Bankruptcy Court recognized the Elpida reorganization proceeding as a foreign main proceeding. See In re Elpida Memory, Inc., Case No. 12-10947 (CSS) (Bankr. D. Del. Apr. 24, 2012) [Docket No. 65].

[2] An English translation of the Bankruptcy Act, which was prepared by the Ministry of Justice in Japan, is available at: http://www.japaneselawtranslation.go.jp/law/detail/?re=01&dn=1&x=0&y=0&co=1&ia=03&yo=&gn=&sy=&ht=&no=&bu=&ta=&ky=%E7%A0%B4%E7%94%A3%E6%B3%95&page=29. English translations of the relevant provisions of the Bankruptcy Act referenced in this Declaration are attached hereto as **Exhibit 1**.

2

4.      I submit this declaration in support of the Amended Verified Petition for Recognition and Chapter 15 Relief (the "Amended Petition"),[3] which I, in my capacity as bankruptcy trustee and foreign representative of MtGox, have contemporaneously filed with this Court seeking recognition of the Japan Proceeding as a "foreign main proceeding" or, in the alternative, a "foreign nonmain proceeding," and related relief under Chapter 15 of title 11 of the United States Code (the "Bankruptcy Code").  The facts hereinafter set forth in this declaration are based upon my personal knowledge or, as indicated below, based upon my investigation of the books, records and documents of MtGox and interviews of the relevant personnel of the Debtor.

5.      I respectfully seek entry of an order (the "Recognition Order") recognizing the Japan Proceeding as a "foreign main proceeding" as defined in 11 U.S.C. §§ 1502(4) and 1517(b)(1) or, in the alternative, a "foreign nonmain proceeding" as defined in 11 U.S.C. §§ 1502(5) and 1517(b)(2).  I also request that this Court grant me, as the bankruptcy trustee and foreign representative of the Debtor, (i) authority to conduct necessary discovery pursuant to 11 U.S.C. § 1521(a)(4) and (ii) entrustment of the administration and realization of all of the Debtor's assets within the territorial jurisdiction of the United States, pursuant to 11 U.S.C. § 1521(a)(5).  Under the auspices of the Tokyo Court and with the ancillary assistance of this Court, the ultimate goals of the Japan Proceeding are to liquidate the assets of MtGox in a manner that maximizes the recoveries for all creditors, wherever located, and to determine the current claims that exist to those assets and to make distributions to creditors in accordance with applicable Japanese law.  To effectuate this goal, I respectfully request that this Court grant the relief requested in the Amended Petition.

---

[3]      Any capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Amended Petition.

6.     I am advised by counsel that Chapter 15 recognition requires that a petition be brought by a "foreign representative" of a "foreign proceeding" as such terms are defined in, respectively, sections 101(24) and 101(23) of the Bankruptcy Code.  I am further aware that in order to be recognized under Chapter 15 as a foreign main proceeding or a foreign nonmain proceeding, sufficient evidence must be shown that the foreign proceeding is either pending in the debtor's "center of main interests" ("COMI") or where the debtor has an "establishment," in each case as these requirements have been interpreted for purposes of Chapter 15 recognition.

7.     Part I of this declaration provides evidence regarding the corporate structure of the Debtor, its corporate governance, an overview of its historical business operations and dealings with customers, and the background leading to the commencement of the Japan Proceeding.  Part II provides evidence regarding the Debtor's assets and liabilities and an overview of the claims and causes of action pending against the Debtor.  Part III provides an explanation of the Debtor's need for recognition and the relief being requested.  Part IV highlights the evidence in support of a determination that I am the Debtor's duly authorized foreign representative and that the Japan Proceeding is a foreign proceeding.   Part V highlights the key evidence supporting a determination that the Debtor's COMI is in Japan.

I.     **BACKGROUND TO THE DEBTOR'S JAPAN PROCEEDING**

   A.     **MtGox's Corporate Structure**

8.     On August 9, 2011, the Debtor was organized as a corporation under the laws of Japan for the purpose of constructing, developing and operating information technology systems and Internet websites.  See MtGox's Corporate Registry, attached hereto as **Exhibit 2**.  The Debtor's status as a corporation registered under Japanese law has never changed.

4

9.     The Debtor is a subsidiary of Tibanne Co., Ltd, a/k/a Tibanne KK ("Tibanne"), a Japanese corporation organized in 2009. See Tibanne's Corporate Registry, attached hereto as **Exhibit 3**. Tibanne holds an 88% equity interest (440 shares) in the Debtor. As of the date of the Japan Petition, the remaining 12% equity interest (60 shares) in the Debtor was held by Jed McCaleb, who is believed to have started the Website (defined below) in 2010 and sold it to Tibanne in 2011. See Agreement and Plan of Acquisition dated February 3, 2011, attached hereto as **Exhibit 4**. Subsequently, the Debtor was responsible for operating the Website.

10.     Based on the Debtor's documents and my discussions with the relevant personnel of the Debtor, the Debtor also has two wholly-owned direct subsidiaries – MtGox North America Inc. ("MtGox NA") and MtGox Poland Inc. Sp. z o.o ("MtGox Poland") – and one wholly-owned indirect subsidiary – MtGox Inc., a direct subsidiary of MtGox NA. A copy of the Debtor's corporate organization chart is attached hereto as **Exhibit 5**.

11.     Based upon the Debtor's books and records, MtGox NA is a New York corporation organized on August 26, 2011. It is my understanding and belief that MtGox NA was initially established as a joint venture with a provider of internet-related business services based in the state of Indiana, which joint venture developed MtGox's business by managing the marketing and sales of MtGox's business in the United States.[4] The relevant joint venture agreement was governed by the laws of both Japan and the state of Indiana. Based upon my discussions with relevant MtGox personnel, it is my understanding and belief that MtGox NA opened a U.S. bank account at JP Morgan Chase Bank in 2011 and only accepted money from U.S. customers for one month, but since then has not conducted any other business activities.

---

[4]     The joint venture agreement, as well as certain other agreements referenced herein (including the Outsourcing Agreements (defined below)), are subject to non-disclosure and confidentiality provisions. As to those agreements, I will provide herein general references to the subject matter and governing law, which I understand is the information that may, in certain circumstances, be relevant for purposes of Chapter 15 recognition.

12.     Based upon the Debtor's books and records, MtGox Inc. is a Delaware corporation organized on June 11, 2013. It is my understanding and belief that MtGox Inc. was established for the purpose of registering with the U.S. Financial Crimes Enforcement Network ("FinCEN") as a money transmitter and obtaining necessary state licenses for money transmission. According to the FinCEN registration website, MtGox Inc. received its money services business license from FinCEN on June 27, 2013 but, based on my discussions with the Debtor's relevant personnel, has not yet obtained any state money transmission licenses and has never conducted any business activities.

13.     Based upon the Debtor's books and records, it is my understanding and belief that MtGox Poland is a Polish corporation organized on November 8, 2011. It is my further understanding and belief that MtGox Poland was established in order to own bank accounts for MtGox customers in Europe, and that the only assets of MtGox Poland were those bank accounts. As of the date of this Declaration, substantially all of the funds held in accounts owned by MtGox Poland have been transferred to an account in Japan managed by me, in my capacity as the Debtor's bankruptcy trustee.

**B.     The Debtor's Head Office and Corporate Governance**

14.     The Debtor's registered office and corporate headquarters (the "Head Office") is located at 2-11-5, Shibuya, Shibuya-ku, Tokyo, Japan, and has been at this location since September 2, 2013.[5] See MtGox Corporate Registry, attached hereto as **Exhibit 2**. The Debtor subleases this office space from Tibanne. See Japan Petition (defined below) § 2, ¶ 3, attached

---

[5]     According to the Debtor's Corporate Registry, the Debtor's Head Office has been located at 2-11-5 Shibuya, Shibuya-ku, Tokyo, Japan since September 2, 2013. Although it is not reflected in the Debtor's Corporate Registry, it is my understanding and belief based upon of the relevant agreement that the Debtor's Head Office was temporarily moved back to the Cerulean Tower (defined below) in February 2014. However, this plan was not completed and the Debtor returned to its current location after only one week at the Cerulean Tower.

hereto as **Exhibit 6**. Since the Debtor's inception, the Debtor's Head Office has been located at two other addresses in Tokyo, Japan.[6] See id. Tibanne's registered office has always coincided with the Debtor's Head Office, and is currently located at the Debtor's Head Office. See Tibanne Corporate Registry, attached hereto as **Exhibit 3**. The Debtor does not have any offices or places of business other than the Head Office.

15.     At all times, the Debtor has maintained its statutory books and records at its Head Office in Japan. The Debtor does not have a registered agent, as such agents are not provided for under applicable Japanese corporate laws.

16.     The Debtor's founder, sole director and representative director is, and has always been, Robert Marie Mark Karpeles. See MtGox Corporate Registry, attached hereto as **Exhibit 2**. Mr. Karpeles is also the sole director and representative director of Tibanne. Since the Debtor's inception, Mr. Karpeles has lived at three different addresses, all of which are in Japan.[7] Mr. Karpeles's current address is located at 3-6-28-302 Aobadai, Meguro-ku, Tokyo, Japan. See id. From its inception, the Debtor has been structured as a corporation with a sole director and representative director and has never had a board of directors. As such, there were no board meetings or board communications and all corporate decisions emanated from Mr. Karpeles, in his capacity as the Debtor's sole director and representative director. Under Japanese corporate law, where, as is the case here, a Japanese corporation has only one director and no board of directors, the sole director and representative director of the corporation has the power and

---

[6]     According to the Debtor's Corporate Registry, the Debtor's Head Office was initially located at Cerulean Tower 15F, 26-1 Sakuragaoka-cho, Shibuya-ku, Tokyo, Japan (the "Cerulean Tower") from the date of its establishment to June 24, 2012. From June 25, 2012 through September 1, 2013, the Debtor's Head Office was located at Round-Cross 5F, 2-11-6 Shibuya, Shibuya-ku, Tokyo, Japan.

[7]     According to the Debtor's Corporate Registry, Mr. Karpeles' address was located at 5-24-30 Kugayama, Suginami-ku, Tokyo, Japan from the date of the Debtor's establishment to October 9, 2011. From October 10, 2011 through January 18, 2014, Mr. Karpeles' address was located at Akatsutsumi Terrace House C1, 5-28-8, Akatsutsumi, Setagaya-ku, Tokyo, Japan. Since January 19, 2014, Mr. Karpeles' address has been located at 3-6-28-302 Aobadai, Meguro-ku, Tokyo, Japan.

authority with respect to any matter in relation to the business of the corporation, except such matters that require shareholder approval.

17.     The Debtor's financial statements were prepared (but not audited) by Aoyama & Partners ("A&P"), a Japan-based accounting firm, pursuant to an Advisor Agreement dated February 16, 2010, which agreement is governed by Japanese law. Under the Corporate Act of Japan, the Debtor is not legally obligated to have financial statements audited by a third party.

### C.     Employees

18.     The Debtor does not have, and has never had, any direct employees. Instead, the Debtor's workforce is supplied by the Debtor's parent, Tibanne, through a certain services agreement between the Debtor and Tibanne, dated April 1, 2013 (the "Services Agreement"). A copy of the Services Agreement is attached hereto as **Exhibit 7**. As of the date of commencement of the Japan Proceeding, the Debtor utilized approximately 29 Tibanne employees to perform work on behalf of the Debtor pursuant to the Services Agreement. Those Tibanne employees provided operational services to the Debtor, including: (i) customer support; (ii) business development and marketing; (iii) implementation of anti-money laundering procedures; (iv) website development; (v) monitoring of bitcoin and fiat currency transfers; and (vi) various administrative services, including secretarial, financial, accounting, legal and human resource services. However, since the commencement of the Japan Proceeding, the number of employees working for the Debtor has significantly decreased. Based upon my discussions with the Debtor's relevant personnel, it is my understanding and belief that all of the Tibanne employees that have ever worked for the Debtor performed their work in Japan.

19.     In addition, the Debtor has hired independent contractors to provide certain customer support services pursuant to two outsourcing and service agreements (the "Outsourcing

8

Agreements"). Based upon my review of the Outsourcing Agreements and my discussions with the Debtor's relevant personnel, the Outsourcing Agreements consist of: (i) an agreement with a U.K.-based firm that is governed by Japanese law, pursuant to which two individuals perform work for the Debtor in the United Kingdom; and (ii) an agreement with an India-based firm that is governed by Indian law, pursuant to which approximately 30-40 individuals perform work for the Debtor in India.[8] Additionally, it is my understanding and belief that the Debtor has also utilized the services of an individual who works as an independent contractor in Peru.

D.  **Other Contracts**

20.  In addition to the Services Agreement and the Outsourcing Agreements, other contracts of the Debtor relating to its business include:

- An agreement for "anti-money laundering" services with an England-based company, which agreement is governed by the law of England; and

- An agreement with a Canada-based company for services relating to the design and development of a marketing website, which agreement is governed by the law of the Province of Ontario, Canada.

E.  **The Debtor's Business Operations Prior to the Shutdown of Its Exchange**

21.  The Debtor's main business is the operation of an online exchange (the "MtGox Exchange") for the purchase and sale of bitcoin through the Debtor's website with the domain name http://www.mtgox.com (the "Website"). It is my understanding and belief that the software and Website used to operate the MtGox Exchange were first developed in 2010 by Jed McCaleb, who sold the software, Website domain name rights, and then-existing customer accounts to Tibanne on February 3, 2011. See Agreement and Plan of Acquisition. Based on the

---

[8]  The contracts referenced herein are subject to certain non-disclosure and confidentiality provisions. To the extent that this Court finds it necessary to review these contracts, we can submit them to the Court under seal.

Debtor's records and documents, it is my understanding and belief that Tibanne thereafter granted MtGox the right to operate the MtGox Exchange.

22.     Based upon available public information, it is my understanding and belief that at one time MtGox was reported to be the largest online bitcoin exchange in the world, handling over 80% of all bitcoin trade worldwide, but that is no longer the case.

23.     It is my understanding that bitcoin is a form of digital currency that reportedly was first conceived of in 2008 by a person or group going by the name of Satoshi Nakamoto. Reportedly, the first actual bitcoin was created or "mined" in 2009. I understand there are several ways in which a person can obtain bitcoin, including the following:

- Bitcoins are "created" through a computer software algorithm which, at any point in time, resides on thousands of computers on the Internet. Persons who certify bitcoin transactions over the bitcoin peer-to-peer network are remunerated by the issuance of a fixed number of bitcoins which evolves over time. The certification is done by the solving of an "algorithm" with the use of ever-more powerful computers. These persons are called "miners" and the process of obtaining bitcoin in this fashion is called "mining."

- A person can also obtain bitcoins that have already been mined by buying them from another. These transactions can consist of "one-to-one" transactions between a buyer and seller. In addition, a person can buy or sell bitcoin through an online exchange, such as the MtGox Exchange operated by MtGox on the mtgox.com website. In these exchange transactions, the buyer and seller create accounts at the exchange and then fund the account with currency funds, bitcoin or both. The user can then enter a buy or sell order online and the website will match the buy or sell order with one or more sell or buy orders. The buyer receives an increase in bitcoin in his/her account and the seller receives an increase in currency in his/her account. The bitcoin exchange receives a fee or commission for the transaction.

- A person can also obtain and use bitcoin through commercial or merchant transactions; that is, a person can use bitcoin in certain circumstances to pay for goods and services.

24.     According to a customer list provided to me by the Debtor, the Debtor has approximately 120,000 customers who had a balance in their bitcoin or fiat currency account as of the date of the Japan Petition, and those customers reside in approximately 175 countries

around the world. As of the date of this Declaration, I currently have information on the location of approximately 80,000 customers. Of that amount, I have determined that approximately 30,701 customers are located in the United States, approximately 6,103 are located in the United Kingdom, approximately 5,921 are located in Germany, approximately 2,458 are located in Canada, approximately 2,416 are located in France, approximately 2,284 are located in China, and approximately 1,095 are located in Japan.

25.     The MtGox exchange allowed persons with MtGox accounts to buy and sell bitcoin among themselves. It is my understanding and belief that using the MtGox Exchange generally consisted of a five-step process: (i) opening an account; (ii) verifying the account; (iii) adding funds to the account; (iv) buying and selling bitcoins; and (v) withdrawing funds.[9] To open and use a MtGox account, a prospective customer would fill out an application on the Website.  Based upon my discussions with the Debtor's relevant personnel, it is my understanding and belief that after completing the application, the Website would display standard terms and conditions for use of the MtGox Exchange and the customer would need to click a button indicating that he or she agreed to those terms and conditions before creating an account. Once the account was created, the customer was assigned an account number. When a customer wanted to start buying or selling bitcoin on the MtGox Exchange, he or she would need to fund the account by depositing currency, bitcoin, or both into the account. The Website's "General Information" page (the "General Information Page")[10] answered frequently asked

---

[9]   Copies of the Website screenshots describing each step are attached hereto as **Exhibit 8**, as they appeared on February 21, 2014 and were obtained through the website archiving service known as "Wayback Machine" located at http://www.archive.org.

[10]  A copy of the General Questions Page is attached hereto as **Exhibit 9**, as it appeared on May 1, 2013 and was obtained through the website archiving service known as "Wayback Machine" located at http://www.archive.org.

questions regarding setting up a MtGox account and identified the Debtor as a company based in Japan.

26.    It is my understanding and belief that the MtGox Exchange permitted customers to choose into what kind of account they wanted to transfer their funds, including accounts with payment transfer companies or traditional consumer banks. Once the account was "funded," the account holder would have a "currency balance" in the account, corresponding to the amount of currency he or she had a right to withdraw; and, a "bitcoin balance" in the account, corresponding to the amount of bitcoin he or she had a right to withdraw. Each customer could view his or her account statement on the Website, and it is my understanding and belief, based upon my discussions with the Debtor's relevant personnel, that the Debtor did not deliver paper-based account statements to its customers.

27.    In addition, the account holder would be subject to certain "anti-money laundering" ("AML") procedures. Based upon previous iterations of the Website, the Debtor's AML procedures generally required the verification of customer accounts through the customer's submission of identification documents. The Website's "AML Account Statuses" page (the "AML Page") setting forth the AML verification requirements instructed customers wishing to upgrade their accounts to a "premium account" to mail their identification documents to the Tokyo address of the Debtor's Head Office.[11]

28.    According to the General Questions Page, customers were directed to contact the Debtor for user support issues through the Website at its "Contact Us" page located at http://mtgox.com/contact-us. The General Questions Page also stated that there may be delays in the response time to some user support inquiries because the Debtor is based in Japan.

---

[11]    A copy of the AML Page is attached hereto as **Exhibit 10**, as it appeared on February 21, 2014 and obtained through the website archiving service known as "Wayback Machine" located at http://www.archive.org.

### F.    **Trade Creditors**

29.    Based upon the discussions with the Debtor's appropriate personnel, the Debtor has at least 10 trade creditors, who are owed money for providing goods or services to the Debtor prior to the filing of the Japan Petition.  Of these trade creditors, approximately five have offices located in Japan.  The remaining trade creditors are located in various jurisdictions, including the United States, the United Kingdom, Poland and India.

### G.    **Communications with Customers, Creditors and Other Parties**

30.    Based upon my discussions with the Debtor's relevant personnel and my review of the Debtor's records, the Debtor historically communicated with its customers through electronic means, usually either by e-mail or through the Website.  Furthermore, it is my understanding that the Debtor would send various notices to its customers to provide updates related to its services, such as new options for depositing funds in their MtGox account.  These notices were generally sent to each customer via e-mail and posted to the Website, but it is my understanding and belief that such notices were not delivered by postal mail, telephone or facsimile.

31.    Prior to the shutdown of the MtGox Exchange in February 2014, the Website clearly communicated to customers and other parties that the Debtor is a Japanese company that is located in Japan.  For example, the Website's "Terms of Use" page (the "Terms of Use Page") referred to the Debtor as "a company incorporated under the laws of Japan" and disclosed the address of its Head Office in Tokyo, Japan.[12]  Similarly, the Website's "Privacy Policy" page (the "Privacy Policy Page") also noted the Tokyo address of the Debtor's Head Office along with

---

[12]    A copy of the Terms of Use Page is attached hereto as **Exhibit 11**, as it appeared on February 15, 2014 and obtained through the website archiving service known as "Wayback Machine" located at http://www.archive.org.

13

the Debtor's Tokyo phone number.[13] In addition, the Website's "About Us" page (the "About Us Page") contained a link to the Debtor's official registration at the Tokyo Chamber of Commerce.[14]

32.     Following the shutdown of the MtGox Exchange and filing of the Japan Petition, as described in more detail below, the Debtor continued to use the Website to communicate with customers, creditors and other parties.  On February 28, 2014, the Debtor posted a notice regarding the Debtor's application for commencement of a civil rehabilitation proceeding (the "Civil Rehabilitation Notice").  The Civil Rehabilitation Notice provided the address of the Debtor's Head Office, announced the establishment of a call center (the "Call Center") with a Tokyo telephone number and hours of operation from 10 a.m. to 5 p.m. (Japan time), and urged all creditors to direct their inquiries to the Call Center.  On March 26, 2014, the Debtor posted a notice regarding consultations with local investigating authorities on the disappearance of bitcoins (the "Disappearance Notice").  On March 28, 2014, the Debtor posted a notice regarding the extension of the deadline to submit the examiner's report (the "Examiner's Report Notice").  On April 16, 2014, the Debtor posted a notice regarding dismissal of the Japan Civil Rehabilitation (defined below) (the "Debtor's Dismissal Notice").  Each of the Disappearance Notice, Examiner's Report Notice and Dismissal Notice set forth the address of the Debtor's Head Office in Tokyo, Japan.[15]

---

[13]   A copy of the Privacy Policy Page is attached hereto as **Exhibit 12**, as it appeared on February 15, 2014 and obtained through the website archiving service known as "Wayback Machine" located at http://www.archive.org.

[14]   A copy of the About Us Page is attached hereto as **Exhibit 13**, as it appeared on April 25, 2013 and obtained through the website archiving service known as "Wayback Machine" located at http://www.archive.org.

[15]   A copy of each of the Disappearance Notice, Examiner's Report Notice and Debtor's Dismissal Notice are attached hereto as **Exhibits 14, 15 and 16**, respectively.

33. Upon my appointments as the Debtor's provisional administrator and then as the Debtor's bankruptcy trustee, as described in more detail below, I continued the Debtor's prior practice of communicating to customers, creditors and other parties through the Website. On April 16, 2014, I posted a notice of the Tokyo Court's order dismissing the Japan Civil Rehabilitation and provided answers to frequently asked questions regarding the status of the Debtor's insolvency proceedings in Japan (the "FAQ Notice").[16] In the FAQ Notice, I stated that additional information regarding the Debtor's Japan Proceeding would be posted to the Website and that interested parties should direct their inquiries to the Call Center, which remained at the Tokyo telephone number with operating hours between 10 a.m. and 5 p.m. (Japan time). On April 24, 2014, I posted a notice that the Japan Proceeding had commenced in the Tokyo Court and provided answers to additional frequently asked questions regarding the Japan Proceeding (the "Japan Proceeding Notice").[17] In the Japan Proceeding Notice, I reiterated that interested parties should direct their inquiries to the Call Center, which remained at the Tokyo telephone number with operating hours between 10 a.m. and 5 p.m. (Japan time). Also on April 24, 2014, I posted to the Website a copy of the Bankruptcy Order (defined below) that, among other things, identified my location, as bankruptcy trustee, as being at the location of the Debtor's Head Office in Tokyo, Japan.

34. Additionally, the Debtor's Articles of Incorporation state that the Debtor shall provide "public notice"[18] by publication in the Official Gazette, an official Japanese government

---

[16] A copy of the FAQ Notice is attached hereto as **Exhibit 17**.

[17] A copy of the Japan Proceeding Notice is attached hereto as **Exhibit 18**.

[18] Under applicable Japanese corporate law, certain matters need to be disclosed through a "public notice" as provided in a company's articles of incorporation – in the Debtor's case, the Official Gazette. Generally, these matters include notices of a merger, corporate split and decrease in capital, among other things.

newsletter that provides information related to governmental and corporate actions. See MtGox Articles of Incorporation, Art. 4, attached hereto as **Exhibit 19**.

### H.    The Debtor's Business Challenges

35.    Since the Debtor began operation of the MtGox Exchange several years ago, it is my understanding, based upon discussions with the Debtor's relevant personnel, that the Website has been subject to numerous attempts to breach its security, create denial of service situations, or to otherwise "hack" the system. In certain circumstances such attempts have led to the Debtor shutting down the Website for periods at a time.

36.    According to the Japan Petition (defined below), on or about February 10, 2014, MtGox halted all bitcoin withdrawals by its customers after MtGox was subject to a massive theft or disappearance of bitcoins held by MtGox both on behalf of its customers and itself.

37.    Also according to the Japan Petition, MtGox suspended all trading on February 24, 2014 after internal investigations discovered a loss of approximately 850,000 bitcoins. After filing the Japan Petition, the Debtor conducted an investigation into the bitcoin theft and in the process rescanned certain old-format wallets which were used prior to June 2011. See Announcement Regarding Found Bitcoins, dated March 20, 2014, attached hereto as **Exhibit 20**. On March 7, 2014, the Debtor confirmed that one of these old-format wallets held approximately 200,000 bitcoins and reported the finding to the Tokyo Court and me on March 10, 2014. See id. Taking into account the 200,000 bitcoins that were found, the total number of bitcoins that have disappeared is now estimated to be approximately 650,000. It is my understanding and belief that this loss of bitcoins caused, among other things, MtGox to become insolvent and ultimately led to the Japan Proceeding.

I. **Events Leading to MtGox's Japan Proceeding**

38.    On February 28, 2014, the Debtor, through its prior foreign representative, Mr. Karpeles, filed a petition (the "Japan Petition") for the commencement of a civil rehabilitation proceeding (the "Japan Civil Rehabilitation") in the Tokyo Court pursuant to Article 21(1) of the JCRA, reporting that the Debtor had lost almost 850,000 bitcoins.  The Japan Petition is attached hereto as **Exhibit 6**.

39.    The JCRA is intended to streamline proceedings for the rehabilitation and reorganization.  The JCRA defines its purpose as:

> [B]y formulating, for debtors in financial difficulties, rehabilitation plans as consented to by a number of their creditors and confirmed by the court, to appropriately coordinate the relationships of rights under civil law between such debtors and creditors, with the aim of ensuring the rehabilitation of the debtors' business or economic life.

See JCRA, Art. 1.  As such, the Japan Civil Rehabilitation was commenced with the purpose to formulate a rehabilitation plan as consented to by a requisite number of creditors and confirmed by the court, to appropriately coordinate the relationships of rights between creditors and the debtor, with the aim of ensuring rehabilitation of the Debtor's business or economic life.

40.    In addition to the Japan Petition, the Debtor contemporaneously filed applications for a temporary restraining order and a comprehensive prohibition order, which the Tokyo Court granted by separate orders dated February 28, 2014 (the "Additional Relief Orders").  Also on February 28, 2014, the Tokyo Court entered two separate orders (the "Supervisor and Examiner Orders") appointing me as the Debtor's supervisor and examiner.  Under the Additional Relief Orders, the Debtor was not permitted, among other things, to dispose of its assets, excluding transactions in the ordinary course of business.  Further, under the Supervisor and Examiner Orders, the Debtor was not permitted, among other things, to dispose of its assets, excluding

17

transactions in the ordinary course of business, without my consent as the supervisor and examiner. On March 9, 2014 (March 10, 2014 in Japan), pursuant to the powers conferred upon me by the Supervisor and Examiner Orders, I issued a consent allowing the Debtor to hire Baker & McKenzie LLP to file a Chapter 15 petition for recognition of the Japan Civil Rehabilitation in the United States. That same day, the Tokyo Court approved the Debtor's retention of Baker & McKenzie LLP in order to commence this Chapter 15 case.

41.     On March 9, 2014 (the "Chapter 15 Petition Date"), the Debtor, through its then foreign representative, Mr. Mark Marie Robert Karpeles, commenced this Chapter 15 case by filing a petition in this Court for recognition of the Japan Civil Rehabilitation as a foreign main proceeding and for related relief under Chapter 15.

42.     Since the filing of the Japan Petition, the Debtor commenced an investigation with regard to the circumstances that led to the Japan Civil Rehabilitation. However, in mid-April 2014, the Debtor filed a notice (*joshin-sho*) with the Tokyo Court stating that the investigation would take a long period of time, that there was no specific plan to restart the Debtor's business, and that partly due to the status of the investigation, the process for seeking a buyer in relation to a sale of the Debtor's assets had not commenced, and therefore the Debtor would be unable to prepare a rehabilitation plan. On April 16, 2014, in my capacity as supervisor and examiner, I submitted my own notice (*joshin-sho*) in response to the Debtor's notice, stating that the Debtor's statements were not unreasonable, and that in my opinion it would not be appropriate to grant an order commencing the Japan Civil Rehabilitation. After the Tokyo Court received my notice, the Tokyo Court decided to dismiss the Japan Petition pursuant to Article 25(3) of the JCRA, recognizing that under the circumstances it would be very difficult for the Debtor to

18

successfully prepare and approve a rehabilitation plan or otherwise successfully carry out the Japan Civil Rehabilitation.

43.     Under Article 251(1) of the JCRA, a Japanese court may, by its own authority, grant a provisional administration order when the Japanese court enters an order to dismiss an application for commencement of a civil rehabilitation proceeding.   Additionally, when a Japanese court's order dismissing an application for commencement of a civil rehabilitation becomes final and binding, the court may, by its own authority, decide to commence a bankruptcy procedure against the debtor under the Bankruptcy Act pursuant to Article 250(1) of the JCRA.

44.     As a result, by separate orders dated April 16, 2014, the Tokyo Court entered judgments placing the Debtor in a provisional administration by: (a) dismissing the Japan Petition; (b) appointing me as the Debtor's provisional administrator; (c) prohibiting certain actions by creditors with regard to properties of the Debtor during the interim period following the dismissal and prior to the commencement of a bankruptcy procedure for the Debtor; and (d) prohibiting me, in my capacity as the provisional administrator, from undertaking certain actions with respect to the Debtor's debt, properties and claims.

45.     Subsequently, on April 24, 2014, the Tokyo Court entered an order formally commencing the Debtor's Japan Proceeding and appointing me as bankruptcy trustee (the "Bankruptcy Order").  A certified copy of the Bankruptcy Order along with its certified English translation is attached to the Amended Petition as Exhibit A.

46.     As set forth in Article 1 of the Bankruptcy Act, the purpose of a Japanese bankruptcy procedure under the Bankruptcy Act is to appropriately coordinate the interests of creditors and other interested persons with the aim of ensuring a proper and fair liquidation of the

debtor's property. Furthermore, pursuant to Article 31(1) of the Bankruptcy Act, a bankruptcy trustee is appointed at the same time as the decision to commence a bankruptcy procedure. Pursuant to Article 75 of the Bankruptcy Act, the bankruptcy trustee is under the supervision of the Japanese court. Additionally, Article 78(1) of the Bankruptcy Act provides that the right to administer and dispose of the property of the bankruptcy estate is vested solely in the bankruptcy trustee. Under Article 34(1) of the Bankruptcy Act, the bankruptcy estate encompasses all property held by the debtor at the time of commencement of the bankruptcy procedure, whether located inside or outside of Japan. In addition to the appointment of a bankruptcy trustee, Article 44(1) of the Bankruptcy Act provides that any pending lawsuits relating to the bankruptcy estate in which the debtor is a party are immediately stayed. Article 194(2) of the Bankruptcy Act provides that, distribution with regard to bankruptcy claims will be made on a *pro rata* basis in proportion to the amount of the respective claims. English translations of the Articles of the Bankruptcy Act referenced above are attached hereto as **Exhibit 1**.

47. In order to fully carry out my duties as the Debtor's bankruptcy trustee, I am assisted by other attorneys at the NO&T Tokyo office, and certain of those attorneys have been appointed as deputy trustees.

## II. THE DEBTOR'S ASSETS, LIABILITIES AND LITIGATION

48. Due to the disruption in the affairs of the Debtor following the theft or disappearance of hundreds of thousands of bitcoins on the MtGox Exchange and notwithstanding my diligent (but preliminary) investigation efforts as bankruptcy trustee of the Debtor, a fully comprehensive and accurate description of the Debtor's assets and liabilities is not yet available. I am in the process of conducting an examination into the Debtor's books and records that are accessible to me and have met with relevant parties to obtain information, including the Debtor's

sole director and representative director, Mr. Karpeles, and related counsel who performed services for the Debtor in Japan. A summary of the present status of the assets and liabilities of the Debtor based on such information as is currently available is set forth below.

### A. **The Debtors Assets and Liabilities**

49.     The Debtor reported to have approximately ¥6.5 billion ($63.9 million) in liabilities and approximately ¥3.8 billion ($37.7 million) of assets when it filed the Japan Petition. Subsequently, approximately 200,000 bitcoins were discovered in an old-format wallet. As bankruptcy trustee, I now have exclusive control over those bitcoins. I am currently leading an investigation into the precise amount of the Debtor's assets and liabilities, so these numbers are not yet final and subject to revision.

50.     MtGox has no secured debt.

51.     As of February 20, 2014, prior to filing the Japan Petition, the Debtor maintained 43 accounts at 14 different banks and payment service providers holding funds in various currencies in the total amount of approximately ¥502,705,438 or $4,912,754.[19] Of the Debtor's 43 bank accounts, 39 are located in Japan. In addition, based upon my discussions with the relevant personnel of the Debtor, it is my understanding and belief that (i) currently the Debtor's primary bank for its business operations is Japan Net Bank, Limited, which is located in Japan; and (ii) previously the Debtor's primary banks were Sumitomo Mitsui Banking Corporation and Mizuho Bank, which are also located in Japan. The Debtor's other accounts are located in the Caribbean, Europe and Australia.

---

[19]    In order to simplify reporting in this Declaration, all currencies are translated into Japanese Yen ("JPY") and then into United States Dollars ("USD") using the conversion rate as of February 20, 2014 at 1 USD = 102.3266 JPY.

52.     Since being appointed as the Debtor's bankruptcy trustee, I have made efforts to consolidate the Debtor's worldwide funds in Japan. As part of those efforts, I have opened up a bankruptcy trustee account with Tokyo-Mitsubishi UFJ bank in Tokyo (the "Trustee Account"). As of the date of this Declaration, the Trustee Account holds funds in the aggregate amount of approximately ¥764,985,789 or $7,550,913. The funds in the Trustee Account include substantially all of the funds formerly held by the Debtor's subsidiary MtGox Poland in the aggregate amount of approximately $5 million, which funds I have repatriated to Japan.

53.     On or about May 14, 2013, the United States Department of Homeland Security ("DHS") seized approximately $5 million of cash held in the U.S. bank accounts of Mutum Sigillum LLC ("Mutum"). Based upon my discussions with relevant personnel of the Debtor, it is my understanding and belief that Mutum is not a parent or subsidiary of the Debtor. Instead, it is a company wholly owned by Mr. Karpeles for his personal business. It is my understanding that Mutum had U.S. accounts with Wells Fargo Bank and Dwolla, a payment service provider located in the United States. In order to facilitate trades on the MtGox Exchange, it is my understanding that Mutum funded its Dwolla account from its Wells Fargo account and, after a trade had been made, funds would be transferred from Mutum's Dwolla account to its Wells Fargo account. Based on my discussions with relevant personnel of the Debtor, (i) the funds in Mutum's Dwolla account are all MtGox funds, and (ii) it is unclear whether the funds in Mutum's Wells Fargo account were all MtGox funds, so some or all of those funds may belong to the Debtor. As the Debtor's bankruptcy trustee and foreign representative, I am considering my options for seeking to have these funds returned to the Debtor's bankruptcy estate for distribution to creditors.

54.    In addition to its cash and bitcoin assets, the Debtor owned, as of the date of the filing of the Japan Petition, the following tangible assets:  (i) computer servers that were purchased from Dell and Violin Memory Inc.; (ii) laptop computers; and (iii) "one-time-purchase" or OTP cards and Yubikeys, which are used to keep user passwords secure.  All of these assets are located in Japan.

55.    Other than the servers and laptops mentioned above, it is my understanding, based upon my review of the Debtor's books and records, that the Debtor does not own the computer systems or servers that are used in its business.  Pursuant to the Services Agreement, Tibanne provided the Debtor with the servers and computer systems for the operation of the MtGox Exchange.  It is my further understanding, based upon my consultation with the Debtor's former counsel at Baker & McKenzie LLP, that (i) the Tibanne-owned servers that were used to operate the MtGox Exchange were located in Japan; (ii) Tibanne also leased certain other servers for backup purposes and to assist in transferring bitcoin to and from the Website; (iii) these other servers were, as of the Chapter 15 Petition Date, located in: Dallas, Texas; St. Louis, Missouri; the United Kingdom; France; and Germany;  and (iv) other server-related services were provided by Amazon (EC2) in Japan, Singapore, California and Oregon.

**B.    The U.S. Litigation Matters**

56.    MtGox has been named as a defendant in two pending lawsuits in the United States:  (i) CoinLab, Inc. v. Mt.Gox KK, et al., Case No. 13-0777 (MJP) (W.D. Wash. May 2, 2013) (the "CoinLab Action"); and (ii) Greene v. MtGox Inc., et al., Case No. 14-01437 (GF) (N.D. Ill. Feb. 27, 2014) (the "Class Action," and together with the CoinLab Action, the "U.S. Litigation Matters").  The facts set forth below regarding the U.S. Litigation Matters are based on information supplied to me by my U.S. counsel.

### I.    *The CoinLab Action*

57.     The CoinLab Action was filed in the United States District Court for the Western District of Washington (the "Washington Court") by CoinLab, Inc. ("CoinLab").  I have been advised that the claims asserted by CoinLab arise out of that certain Executive License Agreement for the USA & Canada (the "CoinLab Agreement"), dated November 22, 2012 and entered into between CoinLab on the one hand, and MtGox and Tibanne on the other.  Under the CoinLab Agreement, CoinLab was granted a license to use MtGox's technology to provide bitcoin exchange services for customers in the U.S. and Canada.  As part of the CoinLab Agreement, which is governed by the law of the state of Washington, CoinLab agreed to operate the services in compliance with all applicable laws.

58.     I have been further advised that the facts disclosed and alleged in the Coinlab Action indicate that:  (i) prior to final implementation of the CoinLab Agreement, it was determined that CoinLab was not properly registered or licensed to perform the services called for under the CoinLab Agreement; and (ii) as a result of such nonperformance by CoinLab, MtGox ceased its own performance under the CoinLab Agreement, which was never fully implemented in the first place.

59.     I have also been advised that CoinLab is suing MtGox and Tibanne for alleged breach of the CoinLab Agreement and breach of the implied duty of good faith and fair dealing.  CoinLab is seeking damages of $75,000,000, which includes $50,000,000 arising from a liquidated damages clause in the CoinLab Agreement, as well as accounting and restitution.  In addition, I have been advised that the Debtor has asserted a counterclaim against CoinLab seeking to recover $5.2 million relating to CoinLab's conversion of customer funds.

### 2.    *The Class Action*

60.    On February 28, 2014, individuals by the names of Gregory Greene and Joseph Lack, each individually and on behalf of a putative class of others similarly situated (collectively, the "Class Action Plaintiffs"), filed the Class Action against the Debtor and certain of its affiliates and officers in the United States District Court for the Northern District of Illinois (the "Illinois Court"). I have been advised that the Class Action complaint, as amended, asserts 15 causes of action against the Debtor, including: (i) consumer fraud; (ii) fraud in the inducement; (iii) negligence; (iv) breach of fiduciary duty; (v) breach of contract; (vi) unjust enrichment; (vii) preliminary injunction; (viii) permanent injunction; (ix) trespass to chattels; (x) conversion; (xi) accounting; (xii) constructive trust; (xiii) civil conspiracy; (xiv) breach of express trust; and (xv) breach of the RICO Act.

### III.    THE NEED FOR RECOGNITION

61.    In light of, *inter alia*, the U.S. Litigation Matters, I believe that recognition of the Japan Proceeding as a "foreign main proceeding" will enhance and facilitate my ability to fulfill my duties as the Debtor's bankruptcy trustee to realize and distribute the assets of the Debtor in a fair and orderly manner, in accordance with Japanese insolvency laws. Specifically, foreign main recognition under Chapter 15 will advance my efforts by, among other things: (i) staying litigation against the Debtor in the United States pursuant to the automatic stay of section 362 of the Bankruptcy Code, as made applicable by section 1520(a)(1) of the Bankruptcy Code; (ii) providing protection of the assets and recoveries in the United States that I may realize for creditors; and (iii) providing a means to ensure that assets and recoveries in the United States will be distributed in an orderly and equitable manner through the Japan Proceeding in accordance with the Bankruptcy Act.

## IV. THE PETITIONER AND THE JAPAN PROCEEDING MEET THE REQUIREMENTS OF "FOREIGN REPRESENTATIVE" AND "FOREIGN PROCEEDING" UNDER THE BANKRUPTCY CODE

### A. The Petitioner is a "Foreign Representative" Within the Meaning of Section 101(24) of the Bankruptcy Code

62. I am advised by counsel that "foreign representative" is defined in section 101(24) of the Bankruptcy Code to mean:

> a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

63. It is my opinion that my role as the bankruptcy trustee satisfies the above definition of "foreign representative." As the Debtor's court-appointed bankruptcy trustee, I am duly authorized and empowered by the Tokyo Court under the Bankruptcy Order to administer the liquidation of the Debtors' assets and affairs as well as to act as the duly authorized representative of the Japan Proceeding.

### B. The Japan Proceeding is a "Foreign Proceeding" Within the Meaning of Section 101(23) of the Bankruptcy Code

64. I am advised by counsel that "foreign proceeding" is defined in section 101(23) of the Bankruptcy Code to mean:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the Debtors are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

65. It is my opinion that the Japan Proceeding satisfies the above definition of "foreign proceeding." The Japan Proceeding is a judicial proceeding under the supervision of the

Tokyo Court, in which the rights of creditors vis-à-vis the Debtor will be determined. The Japan Proceeding was commenced pursuant to the Bankruptcy Act, which is a Japanese law relating to insolvency and the winding up of companies. Furthermore, the assets and affairs of the Debtor are subject to my full control and supervision as the court-appointed bankruptcy trustee, and my actions on behalf of the Debtor are subject to the supervision of the Tokyo Court for the purpose of liquidating the Debtor.

## V.      THE DEBTOR'S COMI IS IN JAPAN

66.      I am advised by counsel that, to obtain recognition of the Japan Proceeding as a "foreign main proceeding" under section 1502(4) of the Bankruptcy Code, it must be shown that Japan is the "center of main interests," or COMI, of the Debtors.

67.      I am further advised that an entity's COMI is equivalent to its principal place of business or central place of administration that is ascertainable by third parties. The Debtor's principal place of business is, and always has been, in Japan, and creditors and other third parties have been made aware of that fact. In addition, the Debtor has no place of business outside of Japan. I respectfully suggest that the following facts, among others, demonstrate that the Debtor's COMI is in Japan:

a.      The Debtor is and has always been organized under the laws of Japan, and its registered office is and always has been located in Japan.

b.      The Debtor's Head Office is and always has been located in Japan.

c.      The Debtor's sole director and representative director, Mr. Karpeles, resides, and at all relevant times has resided, in Japan.

d.      The Debtor's only business premises are physically located in Japan. The Debtor does not own, lease or maintain a place of business outside of Japan.

e.      Most of the Debtor's bank accounts are located in Japan, including the primary account for operating its business.

27

f.   The Debtor's books and records are located at its Head Office in Japan.

g.   The Debtor's parent company, Tibanne, provides operational and administrative services to the Debtor, including the provision of the Debtor's primary workforce, in Japan.

h.   The Debtor's Website clearly disclosed to customers and other third parties that the Debtor is a Japanese corporation that is located in Japan.

i.   The Debtor's Website directed customers to communicate with, and send verification documents to, the Debtor through a Tokyo address.

j.   The notices published on the Debtor's Website regarding the Japanese insolvency proceedings prominently identified the Debtor's Tokyo address and requested that inquiries regarding those proceedings be directed to a Call Center located in Tokyo with a Tokyo phone number, and which operates on Japan time.

k.   Upon the filing of the Japan Petition, the Debtor commenced an investigation in Japan with regard to the circumstances that led to the Japan Civil Rehabilitation, which investigation was subject to the oversight of the Tokyo Court.

68.   I am also advised by counsel that, to obtain recognition of the Japan Proceeding as a "foreign nonmain proceeding" under section 1502(5) of the Bankruptcy Code, it must be shown that such proceedings are pending in a country where the debtor has an "establishment." I am further advised that an "establishment" is any place of operations where the debtor carries out nontransitory economic activity.   In the event that the Court does not recognize the Japan Proceeding as a foreign main proceeding, I refer the Court to the facts set forth above as demonstrating that the Debtor carries out nontransitory economic activity, and therefore has an establishment, in Japan.

**WHEREFORE**, I respectfully request that this Court enter an Order, substantially in the form attached to the Amended Petition as **Exhibit E**, granting the relief requested and such other and further relief as may be just and proper, and

28

**WHEREFORE,** I declare under penalty of perjury under the laws of the United States of America that the foregoing is, to the best of my knowledge, information and belief, complete, true and correct.

Executed on this 23 of May, 2014
in Tokyo, Japan.

Nobuaki Kobayashi

# Exhibit List

**Exhibit 1** – Bankruptcy Act of Japan (English translation of cited Articles)

**Exhibit 2** – MtGox Corporate Registry

**Exhibit 3** – Tibanne Corporate Registry

**Exhibit 4** – Agreement of Plan and Acquisition between Tibanne and McCaleb

**Exhibit 5** – Corporate Organizational Chart of MtGox

**Exhibit 6** – Japan Petition with English translation

**Exhibit 7** – Services Agreement between MtGox and Tibanne with English translation

**Exhibit 8** – 5 Steps to Create and Use a MtGox Account

**Exhibit 9** – General Questions Page of the MtGox Website as of May 1, 2013.

**Exhibit 10** – AML Account Statuses Page of the MtGox Website as of February 21, 2014

**Exhibit 11** – Terms of Use Page of the MtGox Website as of February 15, 2014

**Exhibit 12** – Privacy Policy Page of the MtGox Website as of February 15, 2014

**Exhibit 13** – About Us Page of the MtGox Website as of April 25, 2013

**Exhibit 14** – Disappearance Notice dated March 26, 2014

**Exhibit 15** – Examiner's Report Notice dated March 28, 2014

**Exhibit 16** – Debtor's Dismissal Notice dated April 16, 2014

**Exhibit 17** – Announcement of Provisional Administration and FAQs dated April 16, 2014

**Exhibit 18** – Announcement of Japan Proceeding and FAQs dated April 24, 2014

**Exhibit 19** – MtGox Articles of Incorporation

**Exhibit 20** – Announcement of Found Bitcoin dated March 20, 2014

# Exhibit 4

Case: 1:14-cv-01437 Document #: 103-1 Filed: 01/29/16 Page 45 of 188 PageID #:1846



News    Video    Events    CrunchBase

# Feds Seize Another $2.1 Million From Mt. Gox, Adding Up To $5 Million

Posted Aug 23, 2013 by *Romain Dillet* (*@romaindillet*)

**195**
SHARES

        



Bitcoin exchange service Mt. Gox's financial troubles are even more worrying than anticipated. On Monday, GigaOm reported that the U.S. Department of Homeland Security had seized $2.9 million from Mt. Gox's Dwolla account. But The Genesis Block found out that Mt. Gox's Wells Fargo accounts were seized as well, adding $2.1 million to the frozen assets. In total, $5 million was seized as Mt. Gox failed to register in the U.S. as a money transmitting company.

In May, the Department of Homeland Security issued a seizure warrant for Mt. Gox's Dwolla account. As a consequence, its users couldn't use Dwolla anymore to exchange USD to Bitcoins and Bitcoins to USD.

Yet, the most surprising move happened in June, when the company announced that it would suspend U.S. dollar withdrawals. While the feature was supposed to come back two weeks later, withdrawals have been sluggish ever since.

*$2.1 million was seized on June 19, just one day before suspending U.S. withdrawals.*

The latest warrant tells us why Mt. Gox couldn't keep up with demand. $2.1 million was seized on June 19, just one day before suspending U.S. withdrawals. With $5 million in frozen assets, the company simply didn't have enough funds in dollars to convert Bitcoin to USD.

Even when U.S. authorities planned to seize Mt. Gox's Dwolla account, they already stated that Mt. Gox's Wells Fargo accounts were the real issue. In order to accept funds in dollars, the company opened a Wells Fargo business account for Mutum Sigillum LLC (Mt. Gox's American subsidiary). But it declared that Mt. Gox was "a business not engaged in money services."

In particular, president and CEO Mark Karpeles answered 'no' to two important questions: "Do you deal in or exchange currency for your customer?" and "Does your business accept funds from customers and send the funds based on customers' instructions (Money Transmitter)?"

According to the Department of Homeland Security, the Bitcoin exchange service should be considered as a money transmitting company. More recently, New York's top banking regulator confirmed this view — according to New York's Financial Services, all Bitcoin firms should respect the current financial regulatory guidelines to "root out illegal activity."

Here are the seizure warrants obtained by The Genesis Block:

# Exhibit 5

Case: 1:14-cv-01437 Document #: 183-1 Filed: 01/29/16 Page 48 of 188 PageID #:1849

**TRENDING**
State of Bitcoin and Blockchain
2016: Blockchain Hits Critical
Mass

**BITCOIN PRICE INDEX (24H)** 

USD -3.21% ▼
**$381.95**
EUR €348.82

CNY -3.31% ▼
**¥2,535.58**
GBP £265.85

Search

NEWS ▾    PRICE & DATA ▾    GUIDES ▾    EVENTS ▾    RESEARCH ▾    PRESS RELEASES ▾

Advertisement

**LEDGER WALLET**
Hardware Wallet - Smartcard Security for Your Bitcoins
www.ledgerwallet.com

EXCHANGES • FEATURES • MT. GOX

# Withdrawals from Mt. Gox: growing pains or banking bottleneck?

Daniel Cawrey (@danielcawrey) | Published on August 12, 2013 at 12:43 GMT

  🐦    f  8    G+ 7    in 3    reddit 4    ✉

On July 4th, bitcoin investors let out a collective sigh of relief when Mt. Gox finally resumed USD withdrawals. The reason for the hiatus on withdrawals was so Mt. Gox could test out its new transaction system in the face of increased volume. Yet there was a level of exasperation for those looking to cash out of BTC because of the fact that bitcoin at the time was experiencing a low not seen since April.



Despite resuming withdrawals, a number of people have expressed discomfort at the fact that they cannot get their money from Mt. Gox, despite issuing withdrawal requests. I'm also dealing with this issue as well. I sold some bitcoins via Mt. Gox on July 22 and requested a withdrawal, and as of press time I still have not received money in my bank account.

Others, with more substantial sums of money tied up with Mt. Gox, have been expressing their displeasure on Reddit, the Bitcointalk forum and in the comments section of CoinDesk.



Early July BTC prices. The last time bitcoin prices were so low, it was mid-April when Mt. Gox halted trading. Source: Bitcoin Charts

## Can Mt. Gox handle processing so much USD?

Kinnard Hockenhull, founder of the US-based exchange BitBox, believes that Gox's issues stem from its geographical location and the fact that it must cooperate with a banking system that's suspicious of bitcoin. "They are international, that increases the number of intermediates. And Mt. Gox wasn't built to be a financial exchange. The banking industry has not been accepting of bitcoin businesses."



Trading volumes that Mt. Gox has experienced over the past two months. Source: Bitcoin Charts



**consensus 2016**
MAY 2-4, 2016 | NYC
REGISTER BY JANUARY 31ST FOR THE
**EARLY ADOPTER DISCOUNTED RATE**
$999
**REGISTER NOW**

DON'T MISS A SINGLE STORY

Subscribe to our free newsletter and follow us

Email Address                    SUBSCRIBE

🐦  f  G+  ▶  in  📶

## FEATURES

  Don't Listen to the Mainstream Media on Bitcoin or Blockchain

  Is Digital Asset's $50 Million Funding a Blow to Bitcoin? VCs Weigh In

  Bitcoin and the Politics of Non-Political Money

  5 Must-Read Excerpts from the UK Government's Blockchain Report

INDUSTRY PRESS RELEASES

Jan 28 | 14:04    **New Coinsource Bitcoin ATM Locati in San Diego, Las Vegas and Dallas**

It's no surprise then, that when Mt. Gox's bank saw how much money was flowing into and out of its accounts, they contacted regulators. As it turned out, Mt. Gox had failed to register as a money transmission business when it was clear that the company was handling financial transactions made in bitcoins (they have registered since).

This combined with performance issues that the company says it is fixing have created a controversial situation. The question is whether or not Mt. Gox can start to put the drama behind them, as most financial businesses don't normally have this many issues.

## Transaction volume

Mt. Gox still proclaims on its website that "As of July 2011, Mt. Gox handles over 80% of all bitcoin trade". That may have been true back then, but no one can deny how much has changed in the bitcoin universe since 2011. Yet it could just be that the sudden spike in bitcoin interest and the associated increase in transaction volume have contributed to the problems Mt. Gox is dealing with today.



It's no longer 80%, but Mt. Gox's USD transaction volume still dominates the market. Source: Bitcoin Charts

Alistair Cotton, a corporate dealer for Currencies Direct, believes that the problems that have plagued Mt. Gox are battles it is fighting all on its own in uncharted territory. "The real problem the exchange suffers from is fighting these battles by itself, without the safe harbor of a regulator or even laws protecting it. If everyone plays fair, there are real benefits to a lack of regulation and involvement by authorities. But nobody plays fair when there is little chance of getting caught."

## Opportunities for other exchanges

The US dollar is the primary currency exchanged for bitcoin. That means exchanges that are focused on servicing USD customers have an opportunity to garner new business.

"I can only surmise that Mt. Gox may be having issues with its bankers who may be placing daily limits on the amounts of transfers - causing queues to build up. There is no reason to delay withdrawals. Imagine if your bank did this", says Michael Parsons, a bitcoin advisor who writes his own personal blog called BitcoinBytes.



The US dollar is the dominant fiat for exchange into and out of BTC. Source: Bitcoin Charts

Jan 28 | 08:50   **Cetas Announced as the Winner of Most Transformative Use of Blockchains in Citi Mobile Challenge APAC 2015**

Jan 25 | 09:00   **Diginomics Releases Premium Bitco Economics Course**

Jan 21 | 17:50   **BTL Announces Launch of Its Blockchain Remittance Platform (Interbit) at BC Tech Summit**

VIEW MORE     SUBMIT RELEASE

Advertisement


BITQUICK
www.bitquick.co
The premier service that lets you buy bitcoins in just 3 hours.

MUST READ     MOST POPULAR

 **Europol: No Confirmed Evidence Linking Islamic State to Bitcoin**

 **Goldman Sachs Director: Blockchain Provi 'Single Truth' For Banks**

 **You Don't Need to Understand Bitcoin to U it, Study Finds**

 **Bitcoin Social Network DATT Reaches Proc of-Concept Stage**

Got a news tip or guest feature?

**What is Bitcoin?**
's a decentralized digital currency

**How Can I Buy Bitcoins?**
from an exchange or an individual

Advertisement


BITQUICK
www.bitquick.co
The premier service that lets you buy bitcoins in just 3 hours.

1/28/2016　　　　Withdrawals from Mt. Gox: Growing pains or banking bottleneck?

Case: 1:14-cv-01437 Document #: 183-11 Filed: 01/29/16 Page 50 of 188 PageID #:1851

This apparent blockage by banks is not deterring any other exchanges, especially those based in the United States. Coinbase is one of the best known because of its $6.11 million series A funding. BitBox's Hockenhull, whose exchange is FinCEN compliant, believes that bitcoin's game-changing nature is just too disruptive for traditional financial institutions to dismiss. "Bitcoin isn't just money or a way to make money, it's a movement to change the meaning of money."

## The future of Mt. Gox

Just by a measure of their market share, and being one of the earliest exchanges for bitcoin, Mt. Gox has a tremendous competitive advantage. But those looking to withdraw USD from Mt. Gox can easily transfer their BTC to another exchange and get their cash that way, if they so choose.

When Mt. Gox and Dwolla were working together, the system of withdrawals worked fairly well. Now that has changed, it has made withdrawals much harder for Mt. Gox to process. CoinDesk's Emily Spaven reported that BitStamp, a UK-based exchange, has been seeing impressive exchange volume numbers. I've used BitStamp myself; the interface is intuitive and has a zen-like simplicity to it.



Guidelines for international withdrawals from Mt. Gox. A large porportion of transactions for are international since the exchange is based in Japan.
Source: Mt. Gox

I'm sure Mt. Gox is very aware of its competition, and despite its detractors it still has an advantage. This is because of their volume numbers and the fact one can sell bitcoins for the best price on that exchange. The only question is if they can rise to the challenges that they face: a lawsuit from CoinLab, performance issues and the withdrawal issue. There's a lot at stake for them. Yet the opportunity to capitalize upon their past mistakes is there, should they be ready to handle the challenges ahead.

At the time of press, Mt. Gox had not responded to CoinDesk's request for comment.

What do you think about Mt. Gox? Will they be able to continue to be the largest bitcoin exchange in the world, or will their problems continue to plague them indefinitely?

*Featured Image Source: Flickr*

Mt Gox

 Twitter　　 f 8　　 G+ 7　　 in 3　　 reddit 4　　 ✉

**You May Like**　　　　　　　　　　　　　　　Sponsored Links by Taboola

**The Best 10 Sound Bars In 2015 To Choose From**
Comparaboo

**Ron Paul Expects Big Changes Coming For Retirees**
Stansberry Research

**This Tactical Flashlight Is Flying Off Shelves**
G700 Tactical Flashlight

**Why This Industry Is The Next Hot Investment**
TheMoneyStreet.com

**7 Reasons Why Glasses Should be Bought Online - Here's Why!**
GlassesUSA.com

# Exhibit 6

Case: 1:14-cv-01437 Document #: 183-1 Filed: 01/29/16 Page 52 of 188 PageID #:1853



Wall Street | Technical | Exchanges

# Mt. Gox USD Withdrawals To Take Up To 22 Months



*by* Peter N. Steinmetz

12:57 AM Eastern Daylight Time
September 21st, 2013

- Aa +

f SHARE    TWEET    UPVOTE    SHARE    ✉ EMAIL



Since June 2013, the bitcoin exchange Mt. Gox has been struck by severe problems with fiat currency withdrawals. According to their press release of June 20th, cash withdrawals would be suspended for 2

weeks. On July 4th, a press release stated that withdrawals had fully resumed. Despite this positive tone, it was shortly noted by the user community that few withdrawals seemed to be occurring in a timely manner. Queries to Mt. Gox support since that time have normally been answered with a statement that it is taking several weeks for withdrawals and to please be patient.

Unfortunately, as of today, withdrawals of USD via wire transfer are still substantially delayed. Mt. Gox has refused to provide estimates of when these withdrawals might occur. While this has fueled speculation about potential insolvency of Mt. Gox, withdrawals in other currencies appear to be occurring fairly rapidly, with Japanese domestic bank withdrawals often occurring the same day. This argues against the notion of insolvency, but that there is a serious problem with USD withdrawals.

Fortunately, there have been several ongoing threads at bitcointalk.org which permit an estimate of likely delays. On August 29th, user Sturle reported that discussions with Mt. Gox indicated that the processing of international wire transfers "has reached mid June". Looking backward in this discussion, an earlier report on June 19th stated that a USD wire transfer had been completed from 1 week before. Another user had reported that on June 2nd he was making several transfer requests and would report back. As of August 30th, he had only reported that a transfer from June 16th was still "confirmed" but not completed. All of these reports suggest that a serious backlog began around June 12th.

Based on these reports, it would appear that Mt. Gox may have worked from July 4th to August 30th to clear a queue of USD wire transfer requests extending from June 10th (being generous) to June 16th. That is 8 weeks to clear 1 week of the queue of requests. Mt. Gox has stated in both support responses to this author and on IRC that there is a 10 SWIFT transfer per day limit at their bank. So this rate of clearing the queue would imply roughly 80 transfer requests per day being submitted, which seems quite reasonable given an average daily volume of ~$21M. There is uncertainty in these estimates, since there are no reports of completed transactions in 'mid June', just the indirect report of Mt. Gox support. The situation could actually be worse since "mid June" might be June 12th to some.

What does this imply about current requests for withdrawals? There are 12 weeks between mid June and today (September 16th). Thus one would expect a withdrawal request submitted today to be processed in 8 x 12 = 96 weeks, or around June 2015. Now clearly a lot can happen between now and June 2015. Mt. Gox keeps stating that they are working with banking partners and expect things to improve soon. Of course, they've been stating that since June.

Will Mt. Gox be able to establish improved banking relationships? That is unclear. Buttercoin CEO Cedric Dahl stated in an interview with bitcointalk that they had approached 67 different banks attempting to establish a business relationship with a bank for a bitcoin exchange and were unable to do so. The delays in Mt. Gox improving their process also suggest this is a very difficult thing for them to do.

Mt. Gox has unfortunately been opaque regarding these delays. Neither the current delays on USD withdrawals nor the ability to request a quicker "manual" withdrawal for a 5% fee (though only one of these per day may be allowed) is publicised on their site. Thus a new user of bitcoin might well hear that one can sell them on Mt. Gox, look at relative prices, and proceed to sell there, only to find out many weeks later that their USD are effectively stuck in Mt. Gox.

Hopefully users can now realize just how long their USD may be stuck there.

Disclosure: The author owns bitcoins and occasionally trades them at Mt. Gox and other exchanges.

---

**Read More:**    june    gox    withdrawals    usd    more...

---



COMMENT     SHARE     TWEET     UPVOTE     SHARE

EMAIL

**10 Comments**    **Bitcoin Magazine**        1   Login ▾

♥ Recommend     ⤷ Share        Sort by Best ▾

Join the discussion...

**John Jelinek IV** · 2 years ago

# Exhibit 7

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3     GREGORY GREENE and JOSEPH        )
       LACK, individually and on        )
 4     behalf of all others            )
       similarly situated,             )
 5                                       )
                       Plaintiffs,      )
 6                                       )   Case No. 14 C 1437
       -vs-                             )
 7                                       )
       MT. GOX, INC., a Delaware        )
 8     corporation; MT. GOX KK, a       )
       Japanese corporation;           )
 9     TIBANNE KK, a Japanese          )
       corporation; MARK KARPELES,      )
10     an individual; MT. GOX NORTH     )
       AMERICA, INC., a New York        )
11     corporation; MIZUHO BANK,        )
       LTD., a Japanese financial       )
12     institution; GONZAGUE            )
       GAY-BOUCHERY, an individual;     )
13     JED MCCALEB, an individual;      )
       and JOHN DOE DEFENDANTS,        )   Chicago, Illinois
14                                       )   August 2, 2015
                       Defendants.      )   9:35 a.m.
15
                       TRANSCRIPT OF PROCEEDINGS
16               BEFORE THE HONORABLE GARY FEINERMAN

17     APPEARANCES:

18     For the Plaintiffs:      EDELSON, P.C.
                                BY:  MR. ARI J. SCHARG
19                                   MS. ALICIA E. HWANG
                                350 North LaSalle Street, Suite 1300
20                              Chicago, Illinois  60654
                                (312) 589-6370
21
       Court Reporter:
22
                        CHARLES R. ZANDI, CSR, RPR, FCRR
23                          Official Court Reporter
                          United States District Court
24               219 South Dearborn Street, Suite 2128
                          Chicago, Illinois  60604
25                      Telephone:  (312) 435-5387
                  email:  Charles_zandi@ilnd.uscourts.gov
```

1    APPEARANCES:    (Continued)

2    For Defendant Mizuho        SHEARMAN & STERLING, LLP
     Bank, Ltd.:                 BY:   MR. JEROME S. FORTINSKY
3                                       (in person)
                                 MR. JEFFREY RESETARITS
4                                       (via telephone conference call)
                                 599 Lexington Avenue
5                                New York, New York  10022
                                 (212) 848-7116
6
                                 NEAL, GERBER & EISENBERG
7                                BY:   MR. JONATHAN S. QUINN
                                 Two North LaSalle Street
8                                Suite 1700
                                 Chicago, Illinois  60602
9                                (312) 269-8093

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings heard in open court:)

2        THE CLERK:  14 C 1437, Greene versus Mt. Gox.

3    (Telephone call placed.)

4        MR. RESETARITS:  Hello.

5        THE CLERK:  Hi, this is Jackie from Judge Feinerman's

6    chambers.  We're in the courtroom.  State your name for the

7    record.

8        MR. RESETARITS:  Hi.  Jeffrey Resetarits with

9    Shearman & Sterling for Mizuho.

10        MR. SCHARG:  Good morning.

11        THE COURT:  If you're in the courtroom, if you could

12    please speak up and into the microphone.

13        MR. SCHARG:  Ari Sharg on behalf of the plaintiff.

14        MS. HWANG:  Alicia Hwang on behalf of plaintiffs.

15        MR. FORTINSKY:  Jerry Fortinsky also with Shearman &

16    Sterling for defendant Mizuho.

17        MR. QUINN:  Jonathan Quinn from Neal Gerber &

18    Eisenberg on behalf of Mizuho.

19        THE COURT:  Okay.  Mr. Quinn, are you okay?  I saw

20    you trip there.

21        MR. QUINN:  I'm fine.  Thank you, your Honor.

22        THE COURT:  So, we have a fully-briefed motion to

23    dismiss by Mizuho for lack of personal jurisdiction, but let's

24    talk for a moment about our other defendant, Mr. Karpeles.

25    His location now is a little bit more definite?

1    MR. SCHARG:  Yeah.

2    THE COURT:  And if you could get to the microphone.

3    MS. HWANG:  Sure.  He was recently arrested in Japan

4    by the Japanese police for fraud and embezzlement, so I'm

5    assuming his location there is definite.  We don't have his

6    precise address.

7    THE COURT:  Okay.  And is he being detained, or has

8    he been -- do they have bail there?  What's his status?

9    MS. HWANG:  My understanding of the Japanese system

10   is they can hold him without bail for three weeks and question

11   him during that time, and he's being detained under that right

12   now.

13   THE COURT:  I see.  So, is it the plaintiffs' hope --

14   and I don't know whether any of this would be allowable under

15   Japanese law, but is it the plaintiffs' hope that now that

16   they -- Mr. Karpeles may be in one place for a particular

17   period of time, that you're going to try and serve him?

18   MS. HWANG:  Well, under the Hague, it usually takes

19   six to 10 months, so I don't think he will be detained by

20   police for that long.  I'm not sure if we'll be able to

21   discover public records information pertaining to his specific

22   address in Tokyo, but we can definitely get the Hague process

23   started again.

24   THE COURT:  Okay.  And I guess you'll see what the

25   terms of his pretrial release are going to be, whether he has

1   to stay in a particular area.

2           MR. SCHARG:  Yes.  And this is still a pretty recent

3   development as of last week, and we will have more information

4   for the Court soon.  We're still looking into everything.

5           THE COURT:  All right.  Okay.  So, let's talk --

6   unless there's anything else on Karpeles, let's turn to

7   Mizuho's motion.  I have a number of questions that I'd like

8   to ask one side or the other; and if I ask one side, I'll give

9   the other side a chance to chime in.  And then anything else

10  that you'd like to address, I'll -- when I'm done with my

11  questions, please feel free to let me know your thoughts on

12  any other issues.

13          My first question is:  The statute of limitations for

14  the claims against Mizuho, what is the statute?  That's kind

15  of a surprise question, but there's a reason I'm asking it.

16          MR. SCHARG:  I don't know offhand.  We can figure it

17  out if I can walk outside for just a minute.

18          THE COURT:  No, that's okay.  That's okay.  So, it's

19  tortious interference, unjust enrichment, fraudulent

20  concealment, and an accounting.

21          And any thoughts that the statute is less than two

22  years?  Do you think there's any possibility?

23          MR. SCHARG:  No, your Honor.

24          THE COURT:  Okay.  What about from the defendants?

25          MR. FORTINSKY:  I'm not sure offhand, your Honor.  As

1   the Court may recall, we have reserved the right to move to

2   dismiss on other grounds in the event that the Court does not

3   grant the present motion for dismissal on personal

4   jurisdiction grounds, and if that's appropriate, we would

5   address the statute of limitations issues there.

6   THE COURT:  Okay.  But right now, you don't have any

7   knowledge at the tip of your tongue as to what the actual

8   statute of limitations might be?

9   MR. FORTINSKY:  Not at the tip of my tongue or at my

10  fingertips, either.

11  THE COURT:  All right.  So, the complaint alleges --

12  the second amended complaint, which is docket No. 146, alleges

13  that on or shortly -- and this is paragraphs 51 and 52.  On or

14  shortly after February 24th, 2014, Greene logged onto his

15  account and tried to make a withdrawal.  And that was from his

16  Mt. Gox account, because he just had bitcoin?

17  MR. SCHARG:  Yes.

18  THE COURT:  What was he -- when you withdrew bitcoin

19  from Mt. Gox, what do you -- let's say you have a bitcoin

20  deposit at Mt. Gox and you make a withdrawal.  What is it that

21  you're withdrawing?

22  MR. SCHARG:  You're withdrawing bitcoins.

23  THE COURT:  Not fiat currency?

24  MR. SCHARG:  Not fiat currency.

25  THE COURT:  So, when the plaintiff alleges -- the

1    plaintiffs allege in paragraphs 51 and 52 that Greene tried to

2    make a withdrawal, he was trying to make a withdrawal of

3    bitcoin?

4              MR. SCHARG:  Yes.

5              THE COURT:  From Mt. Gox?

6              MR. SCHARG:  Yes.

7              THE COURT:  And not currency from -- not fiat

8    currency from Mizuho?

9              MR. SCHARG:  Yes.  The short answer is yes.

10             THE COURT:  All right.  Any thoughts from the

11   defendants -- from Mizuho on that issue?

12             MR. FORTINSKY:  Well, your Honor, that relates to the

13   point that we've made in our briefs, which is that --

14             THE COURT:  I'm not asking for you to peer around the

15   corner.  I'm just -- do you interpret -- any thoughts on how

16   we understand paragraphs 51 and 52?

17             MR. FORTINSKY:  We have nothing to add.

18             THE COURT:  Okay.  So, plaintiff, Greene is not in

19   the deposit subclass, correct?

20             MR. SCHARG:  That's correct.

21             THE COURT:  Lack is?

22             MR. SCHARG:  Yes.  And --

23             THE COURT:  And if the case gets -- if there's class

24   certification -- if the case goes forward and the class gets

25   certified, Motto would be in the deposit subclass?

1          MR. SCHARG:  Absolutely, yes.

2          THE COURT:  Why is Motto not a named plaintiff?

3          MR. SCHARG:  We didn't think it was necessary at the

4   time that we entered the complaint.  We thought we had

5   personal jurisdiction regardless.  We can easily add him as a

6   named plaintiff if that would be relevant to the analysis.  We

7   just -- we didn't think it was necessary.

8          THE COURT:  Okay.

9          MR. SCHARG:  But he does stand ready and willing to

10  serve as a class representative.

11         MR. FORTINSKY:  Can I address that, your Honor?

12         THE COURT:  Sure.

13         MR. FORTINSKY:  There are two problems with Motto.

14  First -- there are two problems with Motto.  First of all,

15  he's not a plaintiff for purposes of the jurisdictional

16  analysis.

17         THE COURT:  I know that.  You don't need to -- and

18  that's my next question, so --

19         MR. FORTINSKY:  And secondly -- stop me if this is

20  already on your plate, but secondly, Motto, I believe, claims

21  that he joined -- that he wired his money in February, which

22  is long after the decision by Mizuho that plaintiffs challenge

23  to change the terms of the relationship with Mt. Gox.  And so

24  anything that he did or didn't do has no bearing on conduct of

25  Mt. Gox and could not be, as the plaintiffs allege -- it

1    couldn't be that Mizuho is in any way aiming its conduct --

2    even putting aside all of the legal ramifications of that and

3    so on, which perhaps we'll get to, it couldn't be that Mizuho

4    was aiming any of its conduct at Mr. Motto eight months before

5    he had anything to do with Mt. Gox.

6         THE COURT:  But you're taking a very narrow view as

7    to what the alleged scheme was.  It's not just the decision to

8    stop accepting -- stop allowing withdrawals, which was made in

9    2013.  It's keeping that a secret and luring other depositors

10   to continue making deposits, knowing that the money is going

11   to go into Mizuho and not get let out.

12        MR. FORTINSKY:  But, your Honor, there's -- there's

13   no jurisdictional support for that notion that Mizuho kept

14   anything secret, and there was no obligation -- and there was

15   no obligation from Mizuho to make any disclosure to anyone

16   other than its own customer.  Its customer here was Mt. Gox.

17   Mt. Gox --

18        THE COURT:  Now you're arguing the merits, though.

19        MR. FORTINSKY:  But the plaintiffs try to rely on

20   that for jurisdictional purposes.

21        THE COURT:  Right.  And I have to accept -- because

22   there's no evidentiary hearing being requested, I have to

23   accept as true the factual allegations of the complaint, and

24   the allegations are that Mizuho intentionally hid what it was

25   doing with Mt. Gox in order to continue to prompt depositors

1  to deposit money into Mizuho in order to collect the
2  transaction fee.

3      So, it's not just the decision that was made in 2013.
4  It's the concealing of that decision from other people in
5  order to continue to get money and continue to profit from
6  that flow of funds.

7      MR. FORTINSKY:  But the case law says that for
8  purposes of a 12(b)(2) motion like this one, when the
9  defendants put in an affidavit, as we did here, that those
10 facts, are, in fact, what the Court should look to.

11     And what our affidavit shows is that the relationship
12 was only with Mt. Gox, and so where we've shown that the
13 relationship was only with Mt. Gox, then it seems to me that
14 the plaintiffs bear the burden, if they want to support -- for
15 jurisdictional purposes, if they want to use their allegations
16 to support the idea that there was any jurisdiction over
17 Mizuho based on some communication or failure to communicate
18 with the customers of its customer, the burden shifts to them
19 to show that there was some basis to say that there was any
20 obligation to the -- to Mt. Gox's customers.

21     Or to put it differently, the question -- the
22 argument that Mizuho was keeping something secret is premised
23 on the idea that Mizuho had some legal obligation to make
24 disclosures.

25     THE COURT:  And this is why it was a mistake for you

1    to divide up the personal jurisdiction from the 12(b)(6),
2    because I could have actually addressed that had both of them
3    gone forward at the same time.  You're making a 12(b)(6)
4    argument in the context of a 12(b)(2) motion.

5           MR. FORTINSKY:  Well, I would -- I would say a couple
6    of things.  Number one, to the extent that the plaintiffs try
7    to argue that their jurisdiction is supported by intentional
8    or -- I mean, the standard that they've set out includes a
9    prong that says that there has to be intentional conduct.  So,
10   what we're saying is there was no intentional conduct directed
11   at their clients, who are the customers of the bank's
12   customer, and so they cannot legally support the notion that
13   there was any intentional misconduct directed at their
14   clients, the customers of our customer; and, therefore, they
15   do not meet the standard that they themselves set out for
16   supporting jurisdiction, for supporting personal jurisdiction.

17          Even beyond that, the more general and more
18   fundamental point here is that under *Walden*, which is the
19   Supreme Court's most recent decision on personal jurisdiction
20   issues, on -- the minimum contacts that they need to show
21   cannot be based on the defendant's -- cannot be based on the
22   contacts with the plaintiffs, with the plaintiffs' contact
23   with the forum.

24          So, it doesn't really matter whether Motto is -- what
25   contacts Motto has as one person in Illinois.  The more

1    fundamental point is that Mizuho did not have any contacts
2    arising from this jurisdiction.  Everything here took place in
3    Japan.  The plaintiffs' residence in Illinois is not relevant
4    to the jurisdictional analysis; and, therefore, we don't even
5    need to get to all of these issues we're discussing about
6    Mr. Motto.
7          Mizuho is in Japan.  Mt. Gox is in Japan.  Mizuho's
8    conduct was in Japan.  Even Mr. Karpeles, who we were talking
9    about this morning, was arrested in Japan.  There's no
10   personal jurisdiction over Mizuho, which is a worldwide bank
11   at home in Japan that had no contacts with Illinois relevant
12   to this case.  The fact that there's --
13         THE COURT:  Well, let's say that it accepts a deposit
14   from a customer in Illinois.  If Kraft Foods does business in
15   Japan and opens up an account in Mizuho in Tokyo in order to
16   facilitate that business and deposits $50 million and Mizuho
17   accepts it and then Mizuho says, "Sorry, we're taking your
18   money," are you saying that Mizuho would not be subject to
19   personal jurisdiction in Illinois?
20         MR. FORTINSKY:  It depends on whether there were any
21   contacts in Illinois.
22         THE COURT:  It accepted --
23         MR. FORTINSKY:  If Kraft --
24         THE COURT:  "We're happy to take your $50 million.
25   We'll set up an account for you."

1    MR. FORTINSKY:  If Kraft does business in Japan with
2  a Japanese branch of Mizuho, then there's no question that
3  just because Kraft happens to have a residence, let's say, a
4  corporate headquarters in Illinois, that's not enough.
5  There's no jurisdiction over Mizuho.  This is not -- the --
6          THE COURT:  That's a stunning reading of *Walden*.
7          MR. FORTINSKY:  I think absolutely *Walden* --
8          THE COURT:  And it contradicts your reading of
9  *Felland versus Clifton*.
10         MR. FORTINSKY:  Maybe I misunderstood what the Court
11  was saying.
12         THE COURT:  Kraft goes to Mizuho and says, "We'd like
13  to open an account at Mizuho because we're doing a ton of
14  business in Japan, and we'd like to open an account in the
15  Japanese -- in your Tokyo branch."  Mizuho says, "Fine.  Send
16  us your $50 million."  And then Kraft sends the $50 million,
17  and Mizuho says, "Oh, we're keeping your money.  Sorry.  We're
18  draining your account and keeping your money.  You can't
19  withdraw it."
20         Under those circumstances, would Mizuho be subject to
21  suit in Illinois?
22         MR. FORTINSKY:  If it was done by some Kraft entity
23  in Japan, then it would be different, but that -- that example
24  is massively different from what we have here because --
25         THE COURT:  So, you've got to answer my question.

1    Would -- under that hypothetical, would Mizuho be subject to
2    personal jurisdiction in Illinois?

3            MR. FORTINSKY:  Not if it was some Kraft subsidiary
4    in Japan.

5            THE COURT:  I'm not --

6            MR. FORTINSKY:  But if it was Kraft doing business in
7    Japan -- if there's a -- if Kraft and Mizuho have some
8    commercial relationship where there's an interaction between
9    Kraft in Illinois and Mizuho in Japan, then perhaps Mizuho
10   would be subject to jurisdiction because it's selling directly
11   to Kraft in Illinois.  And, you know, there's contacts on both
12   sides, I suppose.  But that's not this case because --

13           THE COURT:  Okay.  So, it doesn't matter -- so,
14   Mizuho couldn't come in in that hypothetical and say, "Look,
15   we got the money in Japan.  The money was in Japan.  All of
16   the decision-makers were in Japan.  Our Chicago branch had
17   nothing to do with this."  All of that would be irrelevant
18   because you had entered into a relationship with Kraft, Mizuho
19   had entered into a relationship with Kraft; and Kraft was in
20   Illinois, and Kraft sent money from Illinois to Mizuho, and
21   there would be personal jurisdiction.

22           So, it can't just be -- you can't rest your personal
23   jurisdiction argument solely on the ground that all the
24   decisions were made in Japan.

25           MR. FORTINSKY:  It's not solely on that ground, but

1   the contacts here that are relevant to this case do not in any

2   way involve anybody in Illinois.  The relationship that Mizuho

3   had was only with Mt. Gox.  It had no relationship whatsoever

4   with anybody in Illinois.  It made corporate decisions about

5   extricating itself from the relationship with Mt. Gox, based

6   on the allegations in the complaint, but that had nothing to

7   do with any individual in Illinois.

8           The --

9           THE COURT:  Well, let's talk about Lack in

10  California.  It did do something with Lack; and the reason I'm

11  focusing on Lack is because he's a named plaintiff, and we're

12  going to get to the named plaintiff versus the absent class

13  member issue in a moment.

14          It accepted money from Lack knowing where he was.

15  And it took the money.  It said -- it didn't say, "No, we're

16  not going to accept this deposit."  It willingly accepted it

17  knowing his address and knowing his information.

18          Why isn't that participating in the creation of a

19  contact with a depositor in California?

20          MR. FORTINSKY:  Your Honor, can I take a step back

21  and perhaps provide a little context?  The questions from the

22  Court presuppose almost a depositor and bank relationship.

23  When I have occasion, rarely, to wire funds, I wire -- and I

24  have to wire funds, let's say, to some -- whoever it is.

25  Maybe if I'm dealing with a bank for my mortgage or something.

1    I'm dealing with my counter party.  My counter party tells me,

2    "If you're going to send me money, here's where you send it

3    to."  And this counter party gives me the name of his bank.

4    It doesn't matter to me what the name of the bank is.  The

5    bank may be Chase or it may be Citibank or whoever, and he

6    gives me the wire information.

7          And I -- from my point of view, I'm sending money to,

8    let's say, Mr. Smith, who is my counter party.  Mr. Smith

9    gives me the name of his bank.  That's just where he has his

10    money.  I'm not interacting with his bank -- from my point of

11    view, I'm not doing business with his bank.  I'm only doing

12    business with his bank incidentally because Mr. Smith tells

13    me, "Here's where you send your money if you want to send me

14    money."  If you want to send money to Mr. Smith, you've got to

15    put it in Mr. Smith's bank account because I can't send it to

16    Mr. Smith by fax.  I've got to put it in some account.

17          And that's all that happened here.  Mr. Lack wasn't

18    doing business with Mr. -- Mizuho any more than I was doing

19    business with -- in that example, with Chase.  It's simply

20    that Mt. Gox said, "You know what, if you're going to send

21    money to Mt. Gox, you've got to send it to whoever has our

22    account."  It happened that Mt. Gox had an account at Mizuho.

23          It can't be right that just because you send money to

24    somebody's bank account, that all of a sudden, the bank is

25    exposed to personal jurisdiction to -- is then subject to

1  personal jurisdiction based on anywhere and everywhere that
2  the sender of the funds happens to reside.  That would create
3  precisely the universal jurisdiction that the Supreme Court
4  rejected in *Walden*, and I believe in similar terms, the
5  Seventh Circuit rejected in *Advanced Tactical Ordinance*.

6        In *Advanced Tactical Ordinance*, the Seventh Circuit
7  warned that the reading that the plaintiffs offer, like the
8  reading proposed by the plaintiffs here, would create *de facto*
9  universal jurisdiction, and that that runs counter to *Walden*.
10  That's what would happen.

11        The plaintiffs' argument is sufficient to basically
12  say that anybody -- that Mizuho is subject to personal
13  jurisdiction based on the residence of anybody who sent money
14  to Mt. Gox and then, when sending money to Mt. Gox, scribbled
15  on the form or wrote on the form that you send it to Mizuho,
16  and -- because that's where they had their bank.  Mizuho is
17  then subject to personal jurisdiction based on where every
18  single depositor in Mt. Gox happened to live.  That's
19  universal jurisdiction or *de facto* universal jurisdiction in
20  the language of the Seventh Circuit.

21        To say that the plaintiffs have jurisdiction --
22  personal jurisdiction here is directly contrary to what the
23  Seventh Circuit said.  It's directly contrary to what the
24  Supreme Court said in *Walden*.

25        THE COURT:  Well, if a defendant has relevant

1   contacts with plaintiffs in every state, then there's personal
2   jurisdiction in every state.

3        MR. FORTINSKY:  But the only contact, the only
4   contact is that one of the -- there are 80,000 -- according to
5   the affidavit from Mr. Kobayashi, there are 80,000 depositors
6   or members of Mt. Gox.  If the contact by Mr. Lack is
7   sufficient, so are the contacts by all of the other 80,000;
8   and, therefore, Mizuho is subject to jurisdiction where those
9   80,000 people may reside, which is -- I think they said
10  perhaps every state and something like 47 countries.

11       That's what this case -- if we lose the personal
12  jurisdiction motion here, we are in effect -- the Court in
13  effect is saying that Mizuho is subject to jurisdiction in all
14  of those 47 countries and all of those states where people
15  reside, because there is nothing that Mr. Lack did by sending
16  money that's different from any one of those other depositors.

17       And in any event, as the court said in *Walden*, the
18  plaintiffs' contacts are not relevant to the jurisdictional
19  analysis.  Mizuho did nothing here other than to simply accept
20  money, as every bank does, from the counter parties of its
21  customer.  And that is not and cannot be enough to support
22  jurisdiction.

23       THE COURT:  But the counter party in your
24  hypothetical is different from the counter party here.
25       MR. FORTINSKY:  Why?

1    THE COURT:  Because in your hypothetical, the counter

2  party isn't a bank; whereas, in this case, the counter party

3  is a bank, kind of, but it's a bank that can handle only fake

4  money and not real money.  When it gets real money, it has to

5  use a real bank.  And so what Mizuho was doing was acting as

6  the real money -- real bank affiliate of Mt. Gox.

7    MR. FORTINSKY:  Your Honor, with respect --

8    THE COURT:  Isn't that -- I'm not saying that's true

9  or not true.  I'm saying:  Isn't that the allegation of the

10  complaint?

11    MR. FORTINSKY:  No.  Your Honor, let's imagine that

12  where I was wiring my funds was a car dealership.  It's a lot

13  of money.  And let's say it's a big purchase on my part.  I'm

14  sending to it a car dealership.  Maybe instead of a car

15  dealership, I was sending it to a mutual fund.  A mutual fund

16  also handles money.  Maybe that's another example.

17    Mt. Gox is not a bank.  Mt. Gox is a business that --

18  is or was a business that like millions of other businesses in

19  the United States needs a bank, and so it has its banking

20  relationship -- in this case, it had a banking relationship

21  with Mizuho, only of course it was in Japan, not in the United

22  States.

23    I don't see how there's any difference between me

24  wiring money to, let's say, a mutual fund.  Maybe I do

25  business with The Hartford Mutual Funds.  I wire money to

1   The Hartford Mutual Funds.  The Hartford Mutual Funds says,
2   "If you want to wire money to us, you actually have to send it
3   to the bank where we do business," and that bank is Chase.

4           Okay.  I send money to Chase, which is where Hartford
5   really happens to do business.  I'm not doing business with
6   Chase.  I'm doing business with Hartford.  Hartford's not a
7   bank.  Mt. Gox is not a bank.

8           Mizuho doesn't assume any greater obligations by
9   virtue -- and is not any more exposed to personal jurisdiction
10  than, let's say, Chase in that example is exposed to personal
11  jurisdiction just because it happens to have a customer, The
12  Hartford, that is in the mutual fund business and, therefore,
13  is in the business of handling money.

14          The alternative, there is no direct contact other
15  than that -- other than that deposit or that wiring of funds
16  to the equivalent of a mutual fund.  To do otherwise is
17  essentially to create the universal jurisdiction that the
18  Seventh Circuit and the Supreme Court said were insufficient.

19          THE COURT:  Okay.  Any -- does plaintiff have -- or
20  do plaintiffs have anything to say about anything that
21  Mr. Fortinsky and I were just discussing?

22          MR. SCHARG:  Just to add, I mean, in that hypo, if
23  Chase was all of a sudden a company that was trying to put The
24  Hartford out of business by killing off all of its customer
25  base and by allowing customers to deposit money even though it

1  knew for a fact that those customers could never thereafter
2  withdraw that money again, and, by the way, Chase could be
3  charging those customers money to deposit the money in the
4  first place, then I guess we'd have a similar issue.  But it's
5  completely different.

6      We're talking about a bank in Japan that was using
7  customers in the United States as a means to hurt Mt. Gox.
8  Regardless of everything that happened on the back end, the
9  fact is that Mizuho still allowed Mt. Gox customers to go to
10 their banks and deposit money to Mizuho with the beneficiary
11 being listed as Mt. Gox.  So, Mizuho has explicit
12 understanding and knowledge that the money coming in can never
13 be withdrawn again.

14     They can -- I mean, if you're asking what could they
15 have done, they could have just shut down the deposit avenue.
16 They could have said, "All right.  We're not going to allow
17 any more customers to deposit money into Mt. Gox."  That would
18 have satisfied everybody.  That would have killed it.  But
19 that's not what they did.  They kept it quiet, and they
20 continued to allow people to deposit money in.  They took a
21 transaction fee on every deposit, and they kept their mouth
22 shut about what was going on.

23           MR. FORTINSKY:  May I respond, your Honor?
24           THE COURT:  Who paid the transaction fee?
25           MR. SCHARG:  The customers, directly to Mizuho.

1          THE COURT:  So, if the customer deposits $1,000,

2     970 -- it's a transaction fee of $30, 970 shows up in the

3     account?

4          MS. HWANG:  I think my understanding is -- my

5     understanding is that Mt. Gox debited the charge from the

6     customer to give to Mizuho.  They didn't pay Mizuho directly.

7     It charged --

8          MR. SCHARG:  In other words, the transaction would

9     have gone through, and then Mizuho would have taken its cut of

10    the money.  We think it was about a $30 transaction fee.

11         THE COURT:  Okay.

12         MR. FORTINSKY:  May I respond?

13         THE COURT:  Sure.

14         MR. FORTINSKY:  A couple of points on this.  First of

15    all, the argument that Mr. Scharg just made does what your

16    Honor said we lawyers shouldn't be doing here, which is to

17    start arguing the merits.  The personal jurisdiction analysis

18    is distinct.  And the fact that there are these other

19    allegations, the substantive allegations of the complaint,

20    those don't go to the question of whether there was personal

21    jurisdiction.  You've got to look at whether -- first, before

22    you get to the substance, you've got to look at whether or not

23    there is personal jurisdiction over Mizuho.

24         THE COURT:  But personal jurisdiction turns on the

25    allegations of what the defendant did.

1     MR. FORTINSKY:  Right.  But the conduct here was --
2 and the plaintiffs do not have -- the plaintiffs do not make
3 any substantive argument to suggest that Mizuho did anything
4 more than to simply accept money that was wired by Mt. Gox's
5 customers.

6     And that's my second point.  The money that was wired
7 to Mizuho, the reason that Mizuho continued to accept that
8 money was nothing other than essentially it was an
9 accommodation because Mt. Gox had already informed its
10 customers that the place to send their money was -- was to
11 Mizuho.  They never had any problem -- there was never any
12 obstacle to Mt. Gox sending that money back to its customers.
13 Mizuho was not creating the obstacle to sending that money
14 back to Mt. Gox's customers.  That was Mt. Gox that was doing
15 that, not Mizuho.  Mizuho --

16     THE COURT:  Doesn't the complaint say otherwise?

17     MR. FORTINSKY:  Well, the -- the complaint talks out
18 of both sides of its mouth.  On the one hand, the complaint
19 says that Mizuho -- you know, they make up this fiction that
20 Mizuho was trying to obtain -- was trying to maintain some
21 part of the relationship because it was interested in getting
22 these *de minimis* fees; but on the other hand, the complaint
23 says squarely that Mizuho was trying to end the relationship
24 and was going to Mt. Gox and trying to end the relationship,
25 not that it was trying to maintain the relationship in any

1    way.  It was trying to end it.  And that's in the complaint.

2        So, the plaintiffs kind of talk out of both sides of

3    their mouth on that, and the -- the question of the

4    defendant's conduct is a question of the defendant's -- for

5    jurisdictional purposes, the question of the defendant's

6    conduct is a question of the defendant's contacts with the

7    forum and conduct in the forum.

8        The allegations that Mr. Scharg was just referring

9    to and that the Court was just referring to are allegations

10   about Mizuho's conduct in Japan.  That does not affect the

11   jurisdictional analysis in Illinois, because, as I said

12   before, that would create, in effect, the kind of universal

13   personal -- universal jurisdiction that both the Seventh

14   Circuit and the Supreme Court have said is insufficient.

15       There was, in any event, no targeting -- the case law

16   discussed in the briefs talks about how -- as in the *Calder*

17   case in the Supreme Court, only if there is an express aiming

18   at the jurisdiction or of the defendant at the plaintiffs in

19   the jurisdiction, only then can there be some kind of

20   jurisdiction -- only then can there be the contacts that

21   suffice for personal jurisdiction.  Here, there's no showing

22   at all of any targeting at Illinois or at Illinois residents.

23       So, the plaintiffs in their brief completely dodge

24   that point, and they say, "Well, in effect, it was sort of

25   aimed at everybody."  But that defeats the whole context of

1     aiming as developed in *Calder* and in the subsequent cases here
2     in the Seventh Circuit and elsewhere.  There was no targeting
3     at Illinois defendants.
4           The cases -- in fact, the cases that present the
5     closest call --
6           THE COURT:  What do you mean by targeting?  You mean
7     that the defendant has to care that somebody's in Illinois as
8     opposed to Indiana?
9           MR. FORTINSKY:  Yes.  It means that --
10          THE COURT:  So, if Kraft sells cheese to Indiana and
11     it's rotten cheese and the consumer in Indiana sues Kraft in
12     Indianapolis, Kraft can defeat personal jurisdiction by
13     saying, "Look, we don't care where Smith lived.  We were going
14     to send the same cheese.  So, we don't care whether he was in
15     Indiana or Michigan or Illinois, and because we don't care
16     that he was in Indiana, there's no personal jurisdiction"?
17          MR. FORTINSKY:  It's not just a matter of caring.
18     It's a matter of conduct.
19          THE COURT:  So, if a manufacturer sends products to
20     50 states and there's an allegation that the product is
21     defective in some way, there's jurisdiction against -- that
22     manufacturer is subject to personal jurisdiction in all
23     50 states, right?
24          MR. FORTINSKY:  If the product is sent separately
25     into each of those 50 states, perhaps.  That would be a

1    different case.  But here, there's no --

2            THE COURT:  And that's the point that I was making

3    earlier, which is you can't just say if the defendant is

4    subject to jurisdiction everywhere that can't be because

5    that's universal jurisdiction.  It depends on what the

6    defendant did.  In the hypo I just gave you, you acknowledge

7    that it's possible that a defendant, based on its conduct, can

8    be subject to personal jurisdiction in all 50 states.

9            MR. FORTINSKY:  But in this case, Mizuho did nothing

10   that was targeted at Illinois.  It didn't send something to

11   Illinois.  It didn't adopt a policy that was aimed at

12   residents of Illinois.  It didn't accept deposits from

13   Illinois.  It only accepted -- it didn't accept anything from

14   Illinois.

15           The conduct in question, like the conduct in some of

16   the similar cases in the Seventh Circuit, was aimed -- was not

17   aimed at Illinois.  The case law is very clear that you have

18   to have some express aiming, as in the *Calder* case in the

19   Supreme Court.  That was conduct that was aimed specifically

20   at California.

21           Like the -- which case was it, the -- there's one --

22   I think maybe it was *Tamburo* -- no, it was the *Fellbaum*

23   case -- *Felland*, I'm sorry, the *Felland* case.  The *Felland*

24   case, the conduct was aimed directly at Wisconsin, and the --

25   and when you look at the personal jurisdiction cases, the

1    cases that are the closest calls are the ones where you don't

2    have a class action.  You have some interaction between

3    somebody who has allegedly been wronged and somebody who

4    allegedly did a wrong.  That's true in *Walden* as well, where

5    it's one person interacting with the other.  Those are the

6    cases where it's hardest to deny that there's some express

7    aiming because the defendant's conduct is aimed directly at

8    the plaintiff.

9           Here, you have a case where there are 80,000

10   plaintiffs potentially, 80,000 members of the class, and you

11   have a single defendant.  And the defendant's conduct is not

12   at all directed at the individuals.  It's directed broadly at

13   the entirety of the class, according to the allegations of the

14   complaint.  There's nothing in the complaint that says that

15   it's focused on Illinois or on the residents of Illinois.

16          That is enough to defeat -- under any standard, that

17   is enough to defeat personal jurisdiction because the Supreme

18   Court again and again, in both -- in -- certainly in *Calder*

19   and in the subsequent cases has required express aiming.

20   That's also in the Seventh Circuit.

21          The standard in *Walden* is actually more stringent

22   than the standard in *Calder*, although to be fair, the Supreme

23   Court makes an effort to harmonize the *Calder* decision with

24   the *Walden* decision.  And in the *Walden* decision, the Supreme

25   Court makes clear that the -- that it's not enough -- you

1  can't look at the plaintiffs' contacts with the jurisdiction.

2  You've got to focus on the defendant's contacts with the

3  jurisdiction.

4        And the defendants here, or at least Mizuho, did not

5  have any contact with Illinois, any contacts arising out of

6  the allegations of the complaint.  To me, that's quite clear,

7  and there's no argument on the other side.

8        THE COURT:  By the way, in your initial brief, you

9  recited the three-part *Felland* test, and then you -- that's on

10  page 8, and then in your reply brief, you criticized the

11  plaintiffs for relying on the three-part *Felland* test.  What's

12  your position on the three-part *Felland* test?

13        MR. FORTINSKY:  The standard is set forth in *Walden*.

14        THE COURT:  So, did you make a mistake in your

15  initial brief?

16        MR. FORTINSKY:  We would have relied more heavily in

17  our initial brief on *Walden*, that's correct, your Honor.

18        THE COURT:  Do you agree with the three-part *Felland*

19  test or not?  Your initial brief says yes.  Your reply brief

20  says no.  I've got to know what your position is.

21        MR. FORTINSKY:  Our position is as stated in the

22  reply brief.  But as we said in the reply brief, even if the

23  Court were not to accept the idea that *Walden* made that

24  *Felland* test stricter, it set a higher test, even if the Court

25  were not to accept that, we would still have more than

1   adequate grounds to dismiss the case on personal jurisdiction
2   grounds because the plaintiffs do not meet the three-part
3   *Felland* test, either.
4           THE COURT:  Okay.
5           MR. FORTINSKY:  And as I said, there is a little --
6   there are signs that the Supreme Court was trying to harmonize
7   its decision in *Walden* with its decision in *Calder*, which is
8   what the *Felland* test was based on.
9           THE COURT:  Okay.
10          MR. SCHARG:  First, at a general level, the whole
11  purpose for Mizuho's policies where they revoked the ability
12  to withdraw money -- they did multiple things.  They made --
13  they required Mt. Gox to submit paper withdrawal statements
14  for a while instead of doing it electronically.  They
15  implemented a series of policies that were designed to put
16  Mt. Gox out of business.
17          They were -- Mizuho was the exclusive banking partner
18  for the United States.  There were no other banks.  The idea
19  that Mizuho did not intend for their conduct and behavior to
20  reach and effect the customers in the United States is crazy.
21  There were 80,000 customers in the United States -- excuse me.
22  There were 30,000 customers in the United States.  These
23  policies were implemented to reach those exact people.  A
24  number of them were in Illinois, the fifth-largest populous
25  state in the country.

1       Behind that, though, every time somebody deposited --

2   somebody deposited money through their bank into Mt. Gox, it

3   necessarily went to Mizuho.  At that point, Mizuho sees and

4   knows and has express knowledge that that individual that is

5   attempting to deposit money at that moment is from Illinois

6   or California or whatever other state that they may be in.

7       The defendants, in their reply, acknowledge that

8   that's what is actually necessary under Illinois state banking

9   laws, that all of this personal information is attached to the

10  wire transfer.

11      Now, at that moment, yes, their conduct is

12  intentionally aimed at that individual.  What they easily

13  could have done was cut off the deposits.  They could have

14  cut off the deposits and not let people submit the deposits.

15  But they didn't do that.  They received -- they received the

16  deposit request with the individual's name and address on it

17  and intentionally made the decision to allow it to go through

18  to Mt. Gox; and then by the way, they took their cut as a

19  result of that transaction.

20      The idea that this was just done willy-nilly and this

21  was just some sort of -- you know, this was just business as

22  usual is not the case at all.  This was business that was done

23  intentionally to destroy Mt. Gox's business so that they would

24  sever their relationship with Mizuho.

25      MR. FORTINSKY:  May I respond, your Honor?

1        THE COURT:  Sure.

2        MR. FORTINSKY:  The argument Mr. Scharg just made is

3  explicitly rejected in *Walden*.  In *Walden*, the court said, the

4  Supreme Court said that a court cannot exercise personal

5  jurisdiction based on the defendant's knowledge that the

6  plaintiff resides in the forum and, quote, "could foresee that

7  its sales and the harm would affect the plaintiff in the

8  forum."

9        What Mr. Scharg is arguing is that Mizuho could

10  foresee that its conduct would affect plaintiffs in Illinois

11  or California.  That's not enough.  That's what *Walden* says.

12  That's not enough.

13        Most of what he said actually was that Mizuho was

14  aiming its conduct at Mt. Gox, which, of course, is in Japan.

15  The policies -- those policies, he said, were aimed at forcing

16  Mt. Gox to take its relationship elsewhere.  That's all aimed

17  at somebody in Japan.

18        What a Japanese bank does to try to affect somebody

19  in -- one of its customers in Japan is not a basis for

20  personal jurisdiction regardless of whether or not the

21  Japanese customer happens to have its own customers outside

22  Japan in the United States.

23        That cannot be enough.  That is a separate -- the

24  plaintiffs have sort of a separate route into jurisdiction

25  based on that -- that's sort of separate, in other words, from

1    the arguments they're trying to make about the wire transfers.
2    We've already discussed the wire transfers already.

3         But even more attenuated is this argument that
4    because the defendant bank has -- is making some effort,
5    allegedly -- I won't get into the merits of this, because
6    we're just dealing with jurisdiction, but it's certainly far
7    from sufficient to say that just because a bank has a customer
8    in Japan and the bank takes some effort -- makes some effort
9    to try to sever its relationship with the bank in Japan, that
10   as a result of that, the bank is then subject to jurisdiction
11   in Illinois just because its customer in Japan happens to have
12   customers as well in Illinois.  That, too, would vastly expand
13   the scope of personal jurisdiction and would vastly expand the
14   circumstances under which a foreign entity would be exposed to
15   suit in the United States.  It would expand it far beyond what
16   the due process clause allows based on what the Supreme Court
17   has said in *Walden* and predecessors.

18        THE COURT:  Okay.  The next issue might be -- might
19   not have the salience that it might otherwise have had because
20   the plaintiff is saying that Motto is ready, willing, and able
21   to be a putative class rep, but the question is:  Are the
22   defendant's contacts with absent class members pertinent to
23   the personal jurisdiction analysis?  The plaintiff says yes,
24   and it cites a couple of cases in footnote 2, and the
25   defendant says no.

1           Is there any binding authority on this issue?

2           MR. SCHARG:  Not in this circuit.  We cited a Sixth

3   Circuit case that seems to be the closest.

4           THE COURT:  And did the Sixth Circuit address the

5   issue, or did it just in passing consider the -- because

6   there's no pin cite, so I didn't quite know where -- where

7   that discussion was.

8           MS. HWANG:  Sure.  We can definitely amend to add the

9   pin cite.  But they did --

10          THE COURT:  You don't need to amend.  All you need to

11  do is tell me.

12          MS. HWANG:  I believe that they did address the issue

13  because supplemental information was submitted in that case.

14          THE COURT:  Right.  But it's one thing for the Sixth

15  Circuit to just rely on the information.  Did the Sixth

16  Circuit say, "Okay.  We have information from absent --

17  regarding absent class members.  We first have to decide

18  whether that's pertinent or not.  We decide that it's

19  pertinent," and then they go on to consider it?

20          Did the Sixth Circuit do that?

21          MS. HWANG:  Sure.  The defendant argued that absent

22  class member information could not be considered, and the

23  Sixth Circuit said that it could and then did consider it.

24          THE COURT:  Okay.

25          MR. FORTINSKY:  Well, I mean, they -- it talks about

1   taking the -- footnote 2 talks about accepting the testimony,
2   and so they had affidavits.  But that is not the same as
3   saying that the absent class members -- that jurisdiction
4   could be based on the location of the absent class members,
5   which I don't believe the Sixth Circuit said.

6           And in any event, I believe the case we cited, and
7   sort of, I think, common sense suggests that a party -- that
8   an individual that is not a party cannot be the basis for the
9   court to exercise jurisdiction.  There is no class certified.
10  The other individual is not a member of the class.  The other
11  individual's not a party to the lawsuit, so the jurisdiction
12  has to be based upon a dispute between the parties to the
13  lawsuit.

14          THE COURT:  Okay.  Do you have any -- do you agree
15  with the plaintiff that the Sixth Circuit takes the contrary
16  view?

17          MR. FORTINSKY:  No, your Honor, but I would have to
18  double-check the opinion to give you a more detailed
19  explanation.

20          THE COURT:  Okay.  The parties also have a footnote
21  battle on the question whether accepting monetary transfers
22  from a person in a particular state qualifies as an in-state
23  contact.  And the plaintiff sets forth its position -- the
24  plaintiffs set forth their position in footnote 7, and Mizuho
25  sets forth its position in footnote 5.

1          And again, any -- any binding authority for purposes

2   of where I sit on that question?

3          MR. SCHARG:  I don't -- I don't think so, no.

4          MR. FORTINSKY:  I'm sorry.  I don't have the footnote

5   7 and footnote 5 in front of me.  Could the Court -- is it

6   short enough to read to us?

7          THE COURT:  Sure.  So, the plaintiff, at page 9,

8   footnote 7, says, "A bank's performance of services, i.e.,

9   fund transfers, can be considered as forum state contacts,

10  particularly when the plaintiffs' claims arise from such

11  services."  And the plaintiffs cite *Peterson versus Islamic*

12  *Republic of Iran*; *Dale versus Banque SCS Alliance*,

13  and those are all French words and I just Anglicized them;

14  *Ulico Casualty Company versus Fleet*.  And then the defendant

15  addressed those authorities in footnote 5 and said that they

16  are distinguishable.

17         MR. FORTINSKY:  Your Honor, we continue to believe

18  they are distinguishable, and I'll just point out that the --

19  the *Peterson* case is specifically, as it's reflected in the

20  plaintiffs' own footnote, says that the bank transferred

21  assets through its correspondent accounts in New York.  In

22  other words, in the plaintiffs' example, the bank in question

23  was -- the bank in question was handling the matter through

24  its New York office, at least in part.

25         That's not true here.  That's an actually

1　illuminating contrast, because Mizuho -- Mizuho -- no Mizuho

2　affiliate in the United States had anything to do with the

3　transaction here.  In the plaintiffs' example, services were

4　provided by the bank in New York, huge difference.

5　　　　　　MR. SCHARG:  There was just a transfer of assets.

6　Excuse me.  There was just a transfer of assets in that case.

7　　　　　　THE COURT:  All right.  Anything that anybody would

8　like to add that we haven't addressed yet this morning?

9　　　　　　MR. SCHARG:  Not from the plaintiffs, your Honor.

10　　　　　　THE COURT:  Okay.  Mizuho?

11　　　　　　MR. FORTINSKY:  I would just add, perhaps at a very

12　general level, that we shouldn't lose sight of what this case

13　is about.  This case really is an effort by people that lost

14　money in the Mt. Gox exchange to recover -- in the class of

15　the Mt. Gox exchange to recover what they lost.  And they are

16　aggrieved by what was done to them, they allege, by Mark

17　Karpeles and originally alleged other people.

18　　　　　　Mizuho is essentially a common carrier that got

19　caught in the middle here and did nothing wrong and is -- is

20　merely paying for the sin of being a perceived deep pocket

21　that had nothing to do with what Mt. Gox did to the

22　plaintiffs.

23　　　　　　MR. SCHARG:  Can I respond to that, please?

24　　　　　　THE COURT:  Sure.

25　　　　　　MR. SCHARG:  The idea that Mizuho did nothing wrong

1    is just insane.  I mean, what they could have --

2              THE COURT:  Well, I don't know if it was insane.

3              MR. SCHARG:  Well, I mean, they actually

4    implemented --

5              THE COURT:  You can say it's wrong, but --

6              MR. SCHARG:  It's wrong.  I apologize.  But they

7    implemented a series of secret policies that were intended --

8    intended to lure United States customers into depositing money

9    even though they knew for a fact that they would never get it

10   back.  What they could have done is just stopped the

11   relationship.  They could have just terminated it and walked

12   away, but that's not what they did.

13             For almost a year, they had this policy where they

14   invited people to submit deposits.  They took a profit from

15   every deposit that was made, and they said nothing about what

16   was happening to the customers.

17             It's wrong what they did, and to suggest otherwise

18   that they were just an innocent bystander in this whole thing

19   is false.

20             MR. FORTINSKY:  May I just respond?

21             THE COURT:  Sure.

22             MR. FORTINSKY:  We shouldn't lose sight of the fact,

23   either, that the plaintiffs here are taking the position that

24   for purposes of the motion, they can rely on their allegations

25   in the complaint.  So, the plaintiffs' lawyer is essentially

1  quoting allegations in the complaint that are mostly coming
2  from their own invention.

3          When they say that things were done in secret, all
4  they mean is that even though Mizuho communicated with its
5  own customer, Mt. Gox, and explained its own policies to
6  Mt. Gox, that their clients never heard what Mizuho told
7  Mt. Gox because Mt. Gox didn't pass them on.  And that's all
8  they mean by secret.  It doesn't mean that Mizuho had any
9  obligation to explain anything to its customer's customer.

10         MR. SCHARG:  They actually did have an obligation;
11  and we'll be happy to brief this on the 12(b)(6), but they do
12  have an obligation when they themselves create a
13  misapprehension of fact, and that was that the money that they
14  were depositing would make it to Mt. Gox and there would be
15  the ability to withdraw later.  That was a serious
16  misapprehension of fact that Mizuho themselves was responsible
17  for in this case.

18         MR. FORTINSKY:  Mizuho never said anything that would
19  create that misapprehension.  That's about the communications
20  between the plaintiffs and Mt. Gox.  Mizuho was an innocent
21  bystander.

22         THE COURT:  All right.  Well, I really appreciate --
23  I really appreciate your briefs.  I appreciate your being with
24  me for the last hour and discussing these issues.  The
25  discussion has been very helpful to me.

1       So, I'm going to -- I'm going to turn to this and

2   hopefully get you a decision sooner rather than later.  Let's

3   set this for the week of September 7th.  It's my aim to get

4   you an answer sooner than that.

5       MR. SCHARG:  Would it be okay if we just push it to

6   the next week?  I'm going to be out that week.

7       THE COURT:  That's fine.

8       THE CLERK:  September 15th, 9:00 a.m.

9       MR. SCHARG:  Thank you.

10      MR. FORTINSKY:  And that will be for a status

11  hearing, your Honor?

12      THE COURT:  It will be a status.  And I'm really --

13  it's my aim to get you a decision before then so we'll know

14  where we are at that point, if anywhere.  Maybe we won't be

15  here.

16      MR. SCHARG:  Thank you, your Honor.

17      MR. FORTINSKY:  Thank you, your Honor.

18      MR. QUINN:  Thank you, your Honor.

19      THE COURT:  Thank you.

20    (Which were all the proceedings heard.)

21                        CERTIFICATE

22    I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.
23

    /s/Charles R. Zandi                  August 7, 2015
24  _____        _____
    Charles R. Zandi                     Date
25  Official Court Reporter

# Exhibit 8

```
  1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
  2                     EASTERN DIVISION

  3
      GREGORY GREENE, individually    )
  4   and on behalf of all others     )
      similarly situated,             )
  5                                   )
                    Plaintiffs,       )
  6                                   )
      -vs-                            )  Case No. 14 C 1437
  7                                   )
      MTGOX, INC., a Delaware         )  Chicago, Illinois
  8   corporation; MT. GOX KK, a      )  March 11, 2014
      Japanese corporation;           )  10:40 a.m.
  9   TIBANNE KK, a Japanese          )
      corporation; and MARK           )
 10   KARPELES, an individual,        )
                                      )
 11                 Defendants.       )

 12                 TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE GARY FEINERMAN
 13

 14   APPEARANCES:

 15   For the Plaintiffs:    EDELSON, P.C.
                             BY:  MR. JAY EDELSON
 16                               MR. STEVEN L. WOODROW
                                  MR. CHRISTOPHER L. DORE
 17                               MS. ALICIA E. HWANG
                             350 North LaSalle Street
 18                          Suite 1300
                             Chicago, Illinois  60654
 19                          (312) 589-6370

 20

 21
      Court Reporter:
 22
                      CHARLES R. ZANDI, CSR, RPR, FCRR
 23                        Official Court Reporter
                         United States District Court
 24              219 South Dearborn Street, Room 2128
                        Chicago, Illinois  60604
 25                  Telephone:  (312) 435-5387
                email:  Charles_zandi@ilnd.uscourts.gov
```

```
 1   APPEARANCES:  (Continued)

 2   For Defendant              BAKER & McKENZIE, LLP
     Mt. Gox KK:                BY:  MR. JOHN M. MURPHY
 3                              300 East Randolph Street
                                Suite 5000
 4                              C/hicago, Illinois  60601-6342
                                (312) 861-8000
 5
                                BAKER & McKENZIE, LLP
 6                              BY:  MR. TOD L. GAMLEN
                                660 Hansen Way
 7                              Palo Alto, California  94304
                                (415) 856-2400
 8
                                BAKER & McKENZIE, LLP
 9                              BY:  MR. JOHN E. MITCHELL
                                2001 Ross Avenue
10                              Suite 2300
                                Dallas, Texas  75201
11                              (214) 978-3037

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings heard in open court:)

2           THE CLERK:  14 C 1437, Greene versus Mt. Gox.

3           MR. EDELSON:  Good morning, your Honor.  Jay Edelson

4    for the plaintiff and putative class.

5           MR. MURPHY:  Good morning, your Honor.  My name is

6    John Murphy.  Yesterday, I filed my appearance as local

7    counsel for Mt. Gox KK, one of the four defendants in the

8    action.

9           I'm here this morning with two of my colleagues,

10   Mr. Tod Gamlen, Mr. John Mitchell, from California and Texas,

11   respectively.  They filed their applications yesterday for

12   *pro hac vice* admission.  They paid their fees.  I'd ask the

13   Court to grant those motions or permit Mr. Mitchell and

14   Mr. Gamlen to present on behalf of our common client this

15   morning.

16          THE COURT:  Any objection?

17          MR. EDELSON:  No objection, your Honor.

18          THE COURT:  Okay.  The Court will grant the motions

19   for leave to appear *pro hac vice*.  I think those are docket

20   Nos. 23 and 25.

21          Anyone else?

22          MR. WOODROW:  Yes, your Honor.  Steven Woodrow for

23   the plaintiff and the putative class.

24          MR. DORE:  Good morning, your Honor.  Chris Dore on

25   behalf of the plaintiff and putative class.

4

1       MS. HWANG:  Alicia Hwang on behalf of the plaintiff

2   and putative class.

3       MR. EDELSON:  And, your Honor, just for the record,

4   our client, Greg Greene, is at counsel's table.

5       MR. GREENE:  Good morning, your Honor.

6       THE COURT:  All right.  Good morning.  So, we have a

7   number of matters before the Court this morning.  All or most

8   are all related to the motion for a TRO and a preliminary

9   injunction.

10      The first order of business is this bankruptcy matter

11  in the Northern District of Texas -- well, actually, let me

12  take care of a preliminary matter.

13      Counsel for Mt. Gox KK, is that right?

14      MR. GAMLEN:  That's correct, your Honor.

15      THE COURT:  Are you appearing on behalf of any of the

16  other defendants?

17      MR. GAMLEN:  No, your Honor, we're not.  We're only

18  appearing on behalf of Mt. Gox KK, the Japanese corporation.

19      THE COURT:  And do you know whether anybody's going

20  to appear on behalf of Karpeles or the two other entities?

21      MR. GAMLEN:  At the hearing this morning, your Honor?

22  At this morning's hearing?

23      THE COURT:  No.  I'm assuming nobody's going to

24  appear for them this morning.  At any point in the near

25  future -- I figure you -- I'm asking you because I'm just

1  guessing that you probably know better than anybody else in

2  this courtroom whether anybody's going to be appearing on

3  behalf of the two related entities and the owner of the

4  Mt. Gox entity that you're representing.

5       MR. GAMLEN:  We don't know the answer to that

6  question, your Honor.  That's a decision they're going to have

7  to make.  That's a decision that those particular defendants

8  will have to make.  We just don't know if they will be

9  appearing or not.

10      THE COURT:  Okay.  Has Karpeles -- how do you

11  pronounce that?  Karpeles?

12      MR. GAMLEN:  Karpeles.

13      THE COURT:  Has he been named as a defendant in any

14  other cases in the United States?

15      MR. GAMLEN:  Not that I'm aware of, your Honor.  The

16  other litigation we're aware of is the *Coin Lab versus Mt. Gox

17  KK* litigation.  He is not a defendant in that case.

18      THE COURT:  Is that the one in Seattle?

19      MR. GAMLEN:  That's correct.

20      THE COURT:  Okay.  He is not a defendant.  What about

21  the two other entities?

22      MR. GAMLEN:  The entity Tibanne KK is a defendant in

23  the Seattle action.

24      THE COURT:  Which one?

25      MR. GAMLEN:  The Seattle action, the *Coin Lab* action.

1    THE COURT:  Right.  And which defendant?

2    MR. GAMLEN:  Tibanne KK.

3    THE COURT:  Oh, Tibanne, T-I-B-A-N-N-E, KK?

4    MR. GAMLEN:  Correct.

5    THE COURT:  And who's representing Tibanne KK in the

6    Seattle action?

7    MR. GAMLEN:  In the Seattle action, our firm is

8    representing Tibanne KK as well as Mt. Gox KK.

9    THE COURT:  Okay.  But you don't know whether Tibanne

10   KK is going to retain Baker in this case?

11   MR. GAMLEN:  We don't know, your Honor.  We

12   represent -- in light of the fact that we represent the debtor

13   in the bankruptcy, that does create potential issues, and they

14   have to be looked into.

15   THE COURT:  Understood.  And what about the Delaware

16   entity, Mt. Gox, Inc.?

17   MR. GAMLEN:  Mt. Gox, Inc., your Honor, is not a

18   defendant or a party -- excuse me, is not a defendant in any

19   litigation we're aware of other than this one.

20   THE COURT:  Okay.  Do the plaintiffs have any

21   insights -- have you heard from any of the other defendants,

22   meaning the two other entities or Mr. Karpeles?

23   And do you want to -- if you want to put your --

24   Mr. Edelson will make -- give you half the podium there.

25   MR. EDELSON:  Of course.  He can have more than half

1    if he wants, your Honor.

2              THE COURT:  Go ahead.

3              MR. EDELSON:  Yeah.  So, our understanding is Baker

4    McKenzie has been representing the interests of all of these

5    parties in Tokyo.  When they were in the bankruptcy court

6    yesterday in Texas, they were representing the interests of

7    the parties.  So, we understand --

8              THE COURT:  Well, you have to be very particular --

9              MR. EDELSON:  I am.

10             THE COURT:  -- when you say the parties.  And I know

11   in the complaint, you allege that all four are the same thing,

12   but let's, just for my purposes so I can keep my score card

13   straight, let's -- when you mention a defendant, please

14   mention the actual defendant.

15             So, the only thing I saw in Texas is Mt. Gox KK.

16             MR. EDELSON:  You're correct, your Honor.  I should

17   be as precise as possible.  I apologize.

18             Yesterday at the hearing -- and Mr. Woodrow can speak

19   more intelligently about this -- Baker McKenzie argued to the

20   court that this whole action with regard to each of the four

21   defendants ought to be stayed.  So, my point was that they

22   were representing all of their interests, each one of them

23   individually.  And they won with respect to Mt. Gox KK.

24             MR. MITCHELL:  Your Honor, may I address that point?

25             THE COURT:  Sure.

1    MR. MITCHELL:  Your Honor, John Mitchell, Baker &
2  McKenzie.

3    That's not correct, your Honor.  We appeared on
4  behalf of Mt. Gox KK as well as Mr. Karpeles, but in his
5  capacity solely as the petitioner to be a foreign
6  representative of a foreign proceeding.  And under
7  Section 1510 of the bankruptcy code, he can appear solely for
8  that purpose, and it's not a general appearance for any other
9  matter.

10    So, it is correct.  We were only representing the
11  estate under the direction of the petitioner, the equivalent
12  of a trustee over an estate, your Honor.

13    Yesterday, what was being argued was that the
14  automatic stay should be extended to third parties for
15  particular reasons, but that doesn't necessarily mean that we
16  were representing those individuals either in this proceeding,
17  in that bankruptcy case, or anywhere else.  It was simply an
18  argument to extend the stay to third parties in addition to
19  Mt. Gox KK, the debtor.

20    THE COURT:  And what did the bankruptcy judge say?

21    MR. MITCHELL:  The bankruptcy judge declined to enter
22  the stay to non-debtor parties, but he did enter an order
23  extending the automatic stay of 11 USC 362 to Mt. Gox KK, your
24  Honor, and its assets, your Honor, as well.

25    But the full effect of 11 USC 362 is in effect with

1  respect to Mt. Gox KK and its assets.

2  THE COURT:  Mr. Edelson, is that your understanding?

3  MR. EDELSON:  Correct, your Honor.

4  THE COURT:  Okay.  So, we have a bankruptcy stay as

5  to Mt. Gox KK, and the stay has not been entered and, in fact,

6  was expressly denied as to the two other entity defendants and

7  Mr. Karpeles, is that right?

8  MR. WOODROW:  That is correct.

9  MR. MITCHELL:  That's correct.

10  THE COURT:  Okay.  So, in light of the bankruptcy

11  stay as to KK, Mr. Edelson, do you agree that the Court cannot

12  proceed on your case or on your motions with respect to the KK

13  entity?

14  MR. EDELSON:  Correct, your Honor.

15  THE COURT:  Okay.  So, the Court is going to stay all

16  proceedings as to only the KK entity.

17  And then the next question is:  What do we do with

18  respect to the other three defendants?  So, do you -- do you

19  believe that the other three defendants have assets in the

20  United States?

21  MR. WOODROW:  Judge, Steven Woodrow.  At this point,

22  your Honor, it is believed that the other three defendants

23  might have assets located within the United States.  As we

24  pled in our complaint at paragraph 12, we believe that the

25  defendants may have been using computer equipment located in

1  Massachusetts.  We also understand that the Department of
2  Homeland Security or another branch of the United States
3  government has seized between 2.1 million and $5 million
4  belonging to potentially Mr. Karpeles himself.

5        THE COURT:  Is that fake money or real money?
6        MR. WOODROW:  It would be fiat currency, your Honor.
7        THE COURT:  Fiat currency?  Okay.

8        MR. WOODROW:  Yes, Judge.  And that would be cash.

9        Really, your Honor, that's part of the reason why
10 we're here is because we need discovery into what assets
11 Mr. Karpeles might have, Karpeles, I apologize, and the other
12 entities that the stay has not been issued as to.

13       THE COURT:  I see.  And as to the other three
14 entities, you're not representing them, so do you have
15 anything to say as to the motion as it is directed to the
16 three defendants whom you are not representing?

17       MR. GAMLEN:  Your Honor, if it would be helpful to
18 the Court in making its decision, I can explain to you the
19 relationship of these four entities that are -- the four named
20 defendants if you think that will help.

21       As the Court recognized, in the complaint, they're
22 all clumped together with no differentiation between them.
23 It's my belief that if the Court understands at least the
24 relationship between them, it might help crystallize his
25 thinking as to what relief, if any, he's going to grant,

1   particularly in light of the bankruptcy proceeding, in light

2   of the fact that there is going to be a recognition hearing on

3   April 1 and 2 down in Dallas, which could shed some further

4   light and crystallization as to, you know, what are the -- to

5   what extent the stay is going to be continued.

6           So, with that, if the Court would like --

7           THE COURT:  And by recognition hearing, you mean the

8   proceeding under Chapter 15 to coordinate the actions in the

9   Northern District of Texas with the Japanese bankruptcy court?

10          MR. GAMLEN:  It would be the recognition of the

11  Japanese proceedings.

12          MR. MITCHELL:  That's correct, your Honor.  There

13  will be a trial on April 1st to determine whether or not the

14  Chapter 15 even should be accepted and whether or not that

15  foreign proceeding should be recognized.

16          And then at that time, as part and parcel of that

17  recognition proceeding, your Honor, under Chapter 15, there's

18  a broad range of relief and remedies that the bankruptcy court

19  can fashion with respect to administering and taking

20  jurisdiction over the assets in the United States and working

21  in conjunction with that proceeding in Tokyo.

22          One thing I would point out is germane to any

23  bankruptcy process, be it 11, 7, or 15, is determining what is

24  or isn't property of the debtor or property of the estate,

25  which it sounds like may be also before your Honor with

1   respect to the non-debtor parties, what is or isn't property
2   of Mt. Gox KK versus other individuals.

3          MR. GAMLEN:  With that understanding, your Honor, if
4   it would help to have an explanation as to the various
5   parties, I'm then happy to give it to you.

6          THE COURT:  I can use all the help I can get, so why
7   don't you go ahead.  And then I'll give plaintiff a chance to
8   weigh in on anything that is said with respect to the other
9   three entities and their relationship to the debtor.

10         MR. GAMLEN:  So, let's start -- as the Court is
11  aware, there's four named defendants.  Let's start with my
12  client, Mt. Gox KK.

13         Mt. Gox KK is the company that operates the Bitcoin
14  exchange and Mt. Gox web site that is the subject of this
15  action.  In our view, it is the main defendant.

16         THE COURT:  If you can speak up just a little bit.
17  Maybe you can grab the microphone, and then when I turn it
18  over to the plaintiff, we'll switch.

19         MR. GAMLEN:  The customers, including the U.S.
20  custom -- including Mr. Greene and the U.S. customers who
21  plaintiffs seek to represent in this action, they are
22  customers of Mt. Gox KK.  They're not customers of Mt. Gox,
23  Inc.  They're not customers of Tibanne KK.  They're not
24  customers of Mark Karpeles.

25         To the extent that the plaintiff or any of the U.S.

1  customers they seek to represent made deposits of currency or

2  Bitcoin, those deposits were made to Mt. Gox KK. And it was

3  Mt. Gox KK or its banks that were the repository of those

4  currency funds and the Bitcoins. Again, it was not Mt. Gox,

5  Inc. It was not Tibanne KK. It was not Mr. Karpeles.

6         To the extent a customer made a withdrawal request

7  for Bitcoin or currency, that request is directed to

8  Mt. Gox KK, not the other defendants.

9         The relief that they are seeking in this action

10 relating to their currency fund, relating to the currency

11 funds and the Bitcoin funds, is relief that basically only

12 Mt. Gox KK can provide.

13        Tibanne KK, another defendant, it is the parent of

14 Mt. Gox KK. It owns 88 percent of the stock of Mt. Gox KK.

15 It does not operate the Bitcoin exchange which is the subject

16 of this litigation.

17        Mr. Karpeles is the CEO and director of Mt. Gox KK.

18 Mt. Gox, Inc., the fourth defendant, is a corporation that was

19 formed under Delaware law in June 2013. It was formed for the

20 purpose of obtaining state and federal licenses and

21 registrations to operate a Bitcoin business in the U.S. and

22 develop banking relationships.

23        It obtained a FinCEN registration in June of 2013.

24 It has not obtained any other licensing. It has never

25 conducted any business because it's just something that does

1   not have the licensing to do so.  It has no assets.  It has no

2   bank accounts.  It has never been involved with the currency

3   and the Bitcoin, which is the subject of this complaint.

4               THE COURT:  Who owns Mt. Gox, Inc.?

5               MR. GAMLEN:  Mt. Gox, Inc., technically is owned as

6   an indirect subsidiary of Mt. Gox KK.

7               THE COURT:  And who owns Mt. Gox -- well, Mt. Gox KK

8   is owned by Tibanne, and Tibanne, I'm assuming, is not

9   publicly traded, is that right?

10              MR. GAMLEN:  Tibanne?  No.

11              THE COURT:  It's a closely-held Japanese corporation?

12              MR. GAMLEN:  Right.  Its sole shareholder is

13  Mr. Karpeles.  The other 12 percent of Mt. Gox KK is owned by

14  a gentleman named Jed McCaleb, who actually developed the

15  Mt.Gox.com web site.

16              THE COURT:  I see.  All right.  Any -- do you want to

17  weigh in on any of that?

18              MR. WOODROW:  Your Honor, just initial impressions,

19  we heard counsel say that the other defendants cannot provide

20  the relief that we're presently seeking today; but with all

21  due respect, that's the discovery that we need to determine.

22              Mr. Karpeles, who counsel admittedly does not

23  represent, we believe that he is behind this fraud, that he

24  has siphoned away tens of millions, if not more, in Bitcoin

25  and fiat currency, and that he could potentially satisfy or

1  provide relief to the class; and that counsel is not in a
2  position to stand before the Court today or advise the Court
3  as to what assets he may or may not have.

4         With respect to Tibanne KK, it has an asset.  It owns
5  88 percent of the debtor.

6         There's also -- we've heard testimony this morning
7  from counsel with respect to Mt. Gox, Inc., and what assets it
8  may have, indicating that it has no assets.  Well, we need the
9  discovery to confirm that, Judge.  We can't just rely on the
10  statements of counsel.

11         THE COURT:  What happens in a Japanese bankruptcy
12  proceeding?  Can the trustee, whoever -- well, is there a
13  trustee?  And if there is a trustee, can the trustee file
14  adversary proceedings or the equivalent of adversary
15  proceedings against individuals or entities whom the trustee
16  believes have received fraudulent transfers from the debtor?

17         MR. EDELSON:  Your Honor, we're in preliminary talks
18  with experts on Japanese bankruptcy law to delve further into
19  those questions.

20         It is our understanding that with respect to your
21  Honor's first question, yes, there is the equivalent of a
22  trustee with respect to the Japanese reorganization that has
23  been appointed by the court and that has approved payments to
24  Baker & McKenzie as counsel with respect to Mt. Gox KK in
25  these proceedings.

1      We are not certain at this point whether the Japanese

2   trustee would have the authority to commence adversary

3   proceedings to stop any preferential transfers.  We're looking

4   into that currently.

5      THE COURT:  Any thoughts on that?

6      And the reason I ask is I don't want to do anything

7   that will get in the way of the Japanese bankruptcy proceeding

8   or, as it may happen, the Chapter 15 proceeding in Dallas.  In

9   other words, I don't want to grab assets that are

10  rightfully -- are subject to being corralled by either the

11  Dallas court or the Tokyo bankruptcy court.

12     MR. WOODROW:  Yes, Judge.  And that issue was in part

13  before the bankruptcy court in Dallas yesterday; and after an

14  hour-long hearing where the court heard arguments not only

15  from counsel and from our side, but from the lawyers in the

16  *Coin Lab* litigation pending in Seattle, the bankruptcy court

17  expressly decided to decline extending the automatic stay with

18  respect to the non-debtor defendants.

19     And while we certainly appreciate the Court wouldn't

20  want to do anything at this point to necessarily deprive the

21  bankruptcy court of any assets, we would still, at a minimum,

22  would like discovery into what those assets might be so we can

23  figure out whether or not Mr. Karpeles is hiding money in the

24  United States.

25     For example, Judge, when the U.S. government seized

1    his bank accounts at Wells Fargo, one was in the name of a

2    corporate entity, and one was in the name of Mr. Karpeles

3    personally.  We have commissioned an international asset

4    search with respect to the defendants.  We expect to have the

5    results of that later in the week or early next week, and that

6    will give us some indication of what can be found through

7    public databases.

8           But in truth, Judge, the person who's going to know

9    the most about what assets Mark Karpeles has is Mr. Karpeles.

10          THE COURT:  Okay.  Go ahead.  If you could let

11   counsel --

12          MR. MITCHELL:  Your Honor, with respect to not

13   extending the stay yesterday, Judge Hale heard that on

14   admittedly 12 hours' notice.  We filed the case very, very

15   late Sunday night.  And so it's not necessarily a given that

16   the stay might ultimately be extended to the third parties.  I

17   just want the Court to understand that was effectively

18   something very similar to an emergency TRO, and the request

19   was made to extend the stay to the third parties.

20          That issue very well could be brought up again later

21   on in the bankruptcy proceeding, and there's a lot of

22   different reasons why a court might extend the stay to third

23   parties.  I'm certainly not suggesting it will happen, but I

24   also don't want the Court to leave today with the impression

25   that it will never be raised again.

1       Secondly, with respect to the Court's concern about

2   what may or may not go on in a Tokyo proceeding, I am no

3   expert in Japanese insolvency law, either.  But what's

4   important is Chapter 15 gives broad equitable relief or

5   rights -- excuse me, broad equitable remedies to the

6   bankruptcy judge to work in conjunction with the Tokyo

7   proceeding.

8       But if anything that is going on or alternatively

9   fails to go on in the Tokyo proceeding that would be contrary

10  to public policy or otherwise, and it's specific in the code,

11  your Honor, would act as a prejudice to U.S. creditors, then

12  the bankruptcy court can fashion the appropriate relief to

13  ensure that U.S. creditors and parties are on the same equal

14  footing with the Japanese creditors or what's going on in the

15  insolvency proceedings.

16      I cannot address whether or not there are preference

17  actions or there are fraudulent transfer actions under

18  Japanese law, but the bankruptcy court is going to be able to

19  take a step back and see what's going on and fashion the

20  appropriate remedies as needed to make sure that the interests

21  of U.S. creditors and U.S. parties are protected.

22      And I think there would be some concern that if this

23  Court goes down a parallel path, that that might -- that might

24  either be duplicative or otherwise interfere with the

25  restructuring proceeding in the Northern District of Texas,

1    which is in its infancy right now.

2            THE COURT:  I see.

3            MR. EDELSON:  Your Honor, may I respond to that?

4            THE COURT:  Of course.

5            MR. EDELSON:  Two issues, I think, that may bear

6    worth noting.  First of all, we're not seeking a permanent

7    injunction here.  We're seeking a TRO just to keep the status

8    quo for the meantime.  If something changes, if the Texas

9    court rethinks its ruling and says there is a stay, obviously

10   that would trump.  We understand that.

11           The big issue, and the reason we understand that the

12   defendant wants just to go through the normal process and go

13   through the Japanese bankruptcy process, the problem, though,

14   is that our allegations claim that Karpeles every day is

15   siphoning funds off and doing who knows what.

16           This is just a massive fraud.  So, every day that we

17   wait, our view is there's going to be less and less money,

18   fewer and fewer assets for us to be able to attach should we

19   be successful at verdict.

20           We also haven't heard any -- it sounds like they're

21   representing some other interests, but the other defendants

22   have not --

23           THE COURT:  By the way, I'm -- I only heard counsel

24   just by way of background.  So far as I'm concerned, nobody's

25   here on behalf of Karpeles or the other two entity defendants.

1   No opposition to the TRO motion has been mounted with respect
2   to Karpeles or the other two entity defendants.
3          And not only that, it's not because Karpeles and the
4   two other entity defendants don't know about this case.  They
5   have deliberately decided not to appear here and oppose, and
6   I'm going to consider the TRO motion in that light.
7          And Mr. -- Mt. Gox KK is here.  Mt. Gox KK is owned
8   88 percent by Tibanne.  Tibanne is owned 100 percent by
9   Karpeles, so Karpeles is essentially paying 88 percent of
10  Baker McKenzie's bills.
11         So he absolutely knows that he could have been here
12  to oppose, and he's not.  And he may have good reasons to, but
13  he's got to take the bitter with the sweet.
14         Go ahead.
15         MR. EDELSON:  Well, your Honor, I was just going to
16  say the same thing, just not artfully so.
17         THE COURT:  You don't have to butter me up,
18  Mr. Edelson.  I'm sure you could say it much better than I
19  just did.
20         Anyway, you were saying?
21         MR. EDELSON:  Truly, that was my last point.
22         THE COURT:  All right.  Anything else?
23         MR. MITCHELL:  Your Honor, to the extent this goes to
24  your question about fraudulent transfers, things of this
25  nature in the Japanese proceeding, what we did file in support

1  of our Chapter 15 petition was one of the orders -- and I have

2  a translation and I'm happy to hand it up to the Court if

3  you'd like me to -- from the Tokyo court.  And basically,

4  there's the effect of a restriction on Mt. Gox KK, the

5  rehabilitation debtor, as they refer to it, broadly

6  restricting transfers of Mt. Gox's property outside of the

7  ordinary course of business.  Transfers of right --

8            THE COURT:  You mean transfers of KK?

9            MR. MITCHELL:  Mt. Gox KK, that's correct, your

10 Honor.  No, it's not directed to Mr. Karpeles individually.

11 But with respect to the assets of KK, there is a broad

12 restriction, I don't know if the right term is injunction, by

13 the Japanese -- the Tokyo district court preventing transfers

14 of any assets of -- or any other use outside the ordinary

15 course of business, of Mt. Gox KK absent the consent of the

16 supervisor.  And the supervisor is the equivalent, loose

17 equivalent of a trustee.

18            THE COURT:  And so if this Court were to do the same

19 thing -- or were to corral the assets of Mr. Karpeles and the

20 other two entities, that wouldn't conflict with the Tokyo

21 court's order.  It would, in fact, be of a piece with the

22 Tokyo court's order, is that right?

23            MR. MITCHELL:  It might be, your Honor.  I guess to

24 answer your question, I read the Tokyo court's order as only

25 applying to Mt. Gox KK.

22

1           THE COURT:  Right.  Okay.

2           MR. GAMLEN:  Just one point, your Honor.  I believe

3   that in light of the stay, I don't know if the Court is

4   suggesting that it would issue any kind of TRO against

5   Mt. Gox KK.

6           THE COURT:  No.  The proceeding as to Mt. Gox KK is

7   stayed, and I'm not going to do anything with respect to KK.

8           Anybody have anything else to say?

9           MR. GAMLEN:  Just one quick clarification, your

10  Honor.

11          THE COURT:  Go ahead.

12          MR. GAMLEN:  When I was giving the background, I did

13  not mention that Mr. Karpeles resides in Tokyo, and that

14  Mt. Gox KK is a Japanese corporation located in Tokyo.

15  Tibanne KK is a Japanese corporation located in Tokyo.

16          THE COURT:  Understood.  And Mr. Karpeles is a

17  citizen of --

18          MR. GAMLEN:  He was born in France.  He lives in

19  Japan.  I don't know whether or not his -- what his actual

20  citizenship would be, but he's never been to the United

21  States, so far as I understand.

22          THE COURT:  Okay.  And -- so, Mt. Gox, Inc., was

23  served through its registered agent, is that right?

24          MR. WOODROW:  Yes, Judge.

25          THE COURT:  And that was in Delaware?

1    MR. WOODROW:  Correct.

2    THE COURT:  Karpeles was served by mail.  I assume

3  you didn't send it ground?

4    MR. WOODROW:  No, Judge.  We sent it international

5  express.  I have the receipt if your Honor would like.

6    THE COURT:  Okay.  Do you know if it hit --

7    MR. WOODROW:  It was scheduled for delivery

8  yesterday, and he certainly has constructive notice of this

9  proceeding, Judge.

10    THE COURT:  Okay.  And what about Tibanne?  How was

11  Tibanne served?

12    MR. WOODROW:  Tibanne was served constructively by

13  e-mail notice to counsel, both Baker McKenzie in the United

14  States as well as Baker McKenzie lawyers in Japan, another

15  Japanese law firm that represents the debtor.  And given that

16  Mr. Karpeles owns 100 percent of Tibanne KK, notice on him

17  should be deemed sufficient for notice on Tibanne KK.

18    THE COURT:  All right.  I'm going to step back for

19  10 minutes and collect my thoughts, and then I'll come out and

20  give you a ruling.  Thank you for -- thank you for the --

21  thank you for the materials, and thank you for your argument

22  here and for bringing the Dallas proceedings to my attention.

23    MR. GAMLEN:  Thank you, Judge.

24   (Recess had.)

25    THE COURT:  Okay.  Good morning.  Again, thanks to

1  counsel for their written submissions and for their
2  presentations here in court.

3        The Court's going to grant in part and deny in part
4  the motion for a TRO and preliminary injunction.  The Court's
5  not going to -- going to deny it with respect to the
6  preliminary injunction in its entirety.  The Court's going to
7  enter a limited TRO with respect to all the defendants other
8  than Mt. Gox KK, for which this action is stayed.

9        The notice provided to the three non-appearing
10  defendants was sufficient.  Mt. Gox, Inc., the Delaware
11  corporation, was served.  And Mr. Karpeles and Tibanne KK
12  certainly have notice of this proceeding through the
13  involvement of Mt. Gox KK.

14        Tibanne is the majority parent of KK, and Karpeles
15  owns 100 percent of Tibanne.  So, they certainly know about
16  this matter, and they've elected not to appear, which is fine.
17  But they had a chance to oppose the TRO, and they didn't.

18        So, I'm making this ruling without the benefit of
19  having argument from the three defendants against whom this
20  action is not stayed.

21        The Court finds that there's a sufficient likelihood
22  of success on the merits to warrant the granting of a TRO in
23  light of the other factors, which I'll get to in a moment.

24        And let me make this perfectly clear.  The Court's
25  operating on a very limited record.  It's hearing from one

25

1 side. So, everything the Court's about to say about the

2 merits is subject to reexamination and revision. This is the

3 most preliminary of findings, and it's good -- these findings

4 are good only for purposes of this TRO and not good for

5 anything else.

6 So, later on in the case, I don't want to hear, "But,

7 Judge, you said such and such in the TRO." I did say it, but

8 it's only for purposes of the TRO because the factual

9 predicate is almost certainly going to change.

10 The statutory fraud, common law fraud, accounting and

11 conversion claims, based upon the facts that are now before

12 the Court, strike the Court as having a sufficient likelihood

13 of success. Mr. Greene's and the putative class members'

14 Bitcoin currency and fiat currency were taken or disappeared

15 or they can no longer access it. And there were -- in the

16 events of late last year and the first couple of months of

17 this year, there certainly were communications from Mt. Gox,

18 and I'm using Mt. Gox collectively at this point, that -- that

19 turned out not to have been true.

20 And I understand that the exchange itself is operated

21 by KK and the web site itself is operated by KK; but the

22 relationship among the four defendants, with the exception of

23 Inc., so I'll just say the relationship between KK, Karpeles,

24 and Tibanne is such that the plaintiffs have made a decent

25 showing at the TRO stage that Karpeles and Tibanne were part

1  of the fraud, were directing the fraud, the alleged fraud, and
2  directed the KK entity to do what it did.

3        Again, there may be facts brought to the Court's
4  attention that warrant a different result; but at this point,
5  based upon what's in front of the Court, the Court finds that
6  a sufficient showing has been made with respect to Karpeles
7  and Tibanne certainly as being engineers of or full
8  participants in the fraud.

9        Mt. Gox, Inc., I'm not so sure about it, but the
10 allegations of the complaint are that all four of the
11 defendants are really one and the same, and there's been no
12 evidence submitted to the contrary, so at this point, I'm
13 going to -- the Court's going to apply the TRO to the Inc.
14 entity as well, Mt. Gox, Inc.

15       In terms of adequate remedy at law and irreparable
16 harm, the currency is gone -- the Bitcoin currency and the
17 fiat currency is gone, or at least it can't be accessed.  And
18 recoupment through the bankruptcy proceeding is not assured
19 and, in fact, is unlikely, given the dollar figures that were
20 presented in the TRO motion in the complaint.  So, it's
21 unlikely that there's an adequate remedy at law, and the
22 plaintiff has made a sufficient showing of irreparable harm at
23 this time.

24       So, the Court's going to grant the following TRO:
25 The assets of the three non-debtor defendants in the United

Case 1:14-cv-01437-DUC Document #: 83-1 Filed: 00/00/00 Page 28 of 388 PageID #:43023
Case 1:14-cv-01437-DUC Document #: 83-1 Filed: 00/00/00 Page 28 of 388 PageID #:43023

27

1  States will be frozen, including any servers or other computer
2  equipment in the U.S., bank accounts, and other assets.
3  Again, this doesn't apply to KK.  It applies only to the three
4  non-debtor defendants.  And it may turn out that there are no
5  such assets, but to the extent that there are assets of the
6  three non-debtor defendants, those are frozen.

7  And in -- part and parcel of that is that the three
8  non-debtor defendants shall not transfer any Bitcoins or
9  currency belonging to Mr. Greene or the putative class members
10  from the United States to any other country.

11  The Court is not going to impose a constructive trust
12  on the Bitcoins and the fiat currency and any of the other
13  assets.  It's just not necessary at this point.  If the assets
14  are frozen, they're frozen.  And if they remain frozen,
15  they'll be there to satisfy any judgment that the plaintiffs
16  may obtain, and that's by no means assured at this point.

17  The plaintiff also asked the Court to direct the
18  defendants to transfer the property -- their property
19  immediately and directly to the plaintiff and the putative
20  class members.  The Court's not going to do that.  I don't
21  know if the plaintiff is going to win this case.  I don't know
22  if class certification is going to be granted.

23  And again, for purposes of the TRO, the freezing of
24  the assets is sufficient to protect the plaintiffs on the back
25  end if, in fact, they end up winning this case.

1    The Court is also going to allow the plaintiff to

2    engage in expedited discovery into the three non-debtor

3    defendants' assets.  And you can proceed with that as soon as

4    you'd like.

5    The TRO will last for 14 days.  And I should say, if

6    it turns out that the bankruptcy court in Dallas or the

7    insolvency court in Japan is starting to corral the assets

8    that are subject to the TRO, I would be inclined to stand down

9    and to defer to whatever's happening in the Tokyo insolvency

10   proceeding or the Dallas Chapter 15 proceeding.

11   And my thoughts on this are informed by the Third

12   Circuit's decision in *In Re: ABC Learning Centers, Ltd.*,

13   728 F.3d 301, at page 310, where the court expressed the

14   importance of not allowing domestic plaintiffs to jump in line

15   ahead of all the other creditors of the bankrupt or the debtor

16   in a foreign insolvency proceeding.

17   That hasn't happened yet, but I know there's going to

18   be further proceedings in Dallas.  There may be further

19   proceedings in Tokyo.  So, you know my thoughts on that; and

20   to the extent that there's a motion to modify or vacate the

21   TRO during the time period in which it remains in effect, I'll

22   certainly be open to that.

23   What about bond?  What are your thoughts on the bond,

24   Mr. Edelson, or any of your colleagues want to field that

25   question?

1    MR. EDELSON:  The -- I guess it's hard to know

2  because we don't know how much they have in assets, so our

3  view would be it should be a *de minimis* bond, if anything, at

4  this point.

5    THE COURT:  And what do you mean by *de minimis*?

6    MR. EDELSON:  Whatever your Honor thinks.

7    THE COURT:  Well, one man's *de minimis* is another

8  man's fortune, so what do you have in mind?

9    MR. EDELSON:  Well, I mean, it's a putative class

10  action, so this is not a wealthy individual, but, your Honor,

11  I have to admit, I hadn't gotten that far, so --

12    THE COURT:  Okay.  Let's make it $5,000 for now.  If

13  it turns out that you find substantial assets here in the

14  United States of the three non-debtor defendants, I'll want to

15  know about that; and I may increase the bond just in case the

16  TRO was -- the relief requested ended up being erroneous in

17  light of subsequent information provided to the Court, and to

18  the extent that the three defendants were unjustifiably

19  injured by the freezing of their assets, it's possible that a

20  larger bond would be appropriate.

21    MR. EDELSON:  We will let your Honor know when we

22  know.

23    THE COURT:  Okay.  All right.  So, where do we go

24  from here?  I guess you're just representing KK, so the case

25  is stayed as to you.

1          So, what are your thoughts on that?

2          MR. WOODROW:  Yes, your Honor.  First, if we could

3   submit a proposed order to the Court outlining your Honor's

4   findings and ordering the expedited discovery.

5          With respect to the expedited discovery, we would

6   like certain truncated notice procedures.  I mean, if we

7   have -- if the TRO is only in place for 14 days and the

8   defendants are given 28 days to answer, that will be too long.

9   So, we are looking at a truncated schedule, which we would

10  submit to your Honor in the proposed order.

11         The other thing, Judge, as a housekeeping matter,

12  every day, we're coming into contact with new revelations and

13  new facts and new potential defendants, including a bank,

14  Mizuho Bank, and potential financial and other professional

15  service providers.  We would like the opportunity to file an

16  amended complaint to get those entities in now as opposed to

17  waiting until later.

18         THE COURT:  What other entities are you talking

19  about?

20         MR. WOODROW:  Specifically, there's Mizuho Bank in

21  Japan, and then we're also looking into whether there are any

22  other accounting or legal firms that would have potential

23  liability.

24         THE COURT:  That's fine.  You can -- the time for

25  filing an amended complaint has not passed, so --

1    MR. WOODROW:  I just wanted to apprise the Court.

2    THE COURT:  That's fine.

3    MR. WOODROW:  Otherwise, your Honor, we would proceed

4  with submitting the bond to the Court and submitting a

5  proposed order within the next 24 hours.

6    THE COURT:  24 hours is fine.

7    Why don't we come in, Jackie, either on March 20th or

8  March 24th.

9    THE CLERK:  We'll set you for -- how about

10  March 20th, 9:30 a.m.

11    THE COURT:  The TRO is set to expire on March 25th at

12  11:30.  Rule 65(b)(2) allows the Court, for good cause, to

13  extend the TRO for another 14 days, and that's something we

14  ought to discuss on the 25th -- I'm sorry, on the 20th.

15    And at that point, you could apprise the Court of

16  whether you've been able to find any assets of the three

17  non-debtor defendants in the United States, in other words,

18  whether the order actually operates on anything or whether it

19  turned out to have been an empty gesture.

20    MR. WOODROW:  Thank you, your Honor.

21    THE COURT:  Anything else?  All right.

22    MR. WOODROW:  Judge, thanks for your time and

23  consideration.

24    MR. EDELSON:  Thanks, your Honor.

25    THE CLERK:  All rise.  Court stands adjourned.

1          THE COURT:  Oh, I'm sorry.  Texas and California

2   counsel, if you're going to be -- if you'd like to appear at

3   any of the hearings, you're welcome to do so.  And if you want

4   to call in, you can just make arrangements with the courtroom

5   deputy.

6          MR. MITCHELL:  We will.  Thank you, your Honor.

7   Appreciate it.

8          MR. GAMLEN:  Thank you, your Honor.

9      (Which were all the proceedings heard.)

10                    CERTIFICATE

11     I certify that the foregoing is a correct transcript from

12   the record of proceedings in the above-entitled matter.

13

14   /s/Charles R. Zandi                March 11, 2014

15   _____           _____
     Charles R. Zandi                  Date
16   Official Court Reporter

17

18

19

20

21

22

23

24

25

# Exhibit 9

1     IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2        EASTERN DIVISION

3 GREGORY GREENE and JOSEPH    )
  LACK, individually and on    )
4 behalf of all others     )
  similarly situated,     )
5            )
       Plaintiffs,  )
6            ) Case No. 14 C 1437
  -vs-         )
7            )
  MT. GOX, INC., a Delaware   )
8 corporation; MT. GOX KK, a   )
  Japanese corporation;    )
9 TIBANNE KK, a Japanese    )
  corporation; MARK KARPELES,  )
10 an individual; MT. GOX NORTH  )
  AMERICA, INC., a New York   )
11 corporation; MIZUHO BANK,   )
  LTD., a Japanese financial  )
12 institution; GONZAGUE    )
  GAY-BOUCHERY, an individual; )
13 JED MCCALEB, an individual;  )
  and JOHN DOE DEFENDANTS,   ) Chicago, Illinois
14            ) April 16, 2015
     Defendants.   ) 9:25 a.m.
15

16      TRANSCRIPT OF PROCEEDINGS
    BEFORE THE HONORABLE GARY FEINERMAN
17

18 APPEARANCES:

19 For the Plaintiffs:  EDELSON, P.C.
           BY: MR. ARI J. SCHARG
20            MS. ALICIA E. HWANG
          350 North LaSalle Street, Suite 1300
21          Chicago, Illinois  60654
          (312) 589-6370
22 Court Reporter:

23     CHARLES R. ZANDI, CSR, RPR, FCRR
       Official Court Reporter
24     United States District Court
   219 South Dearborn Street, Suite 2128
25     Chicago, Illinois  60604
     Telephone:  (312) 435-5387
   email:  Charles_zandi@ilnd.uscourts.gov

```
 1   APPEARANCES:   (Continued)

 2   For the Mt. Gox        BROWN RUDNICK, LLP
     Defendants:            BY:  MR. JACOB T. BEISWENGER
 3                          7 Times Square
     (via telephone         New York, New York  10036
 4   conference call)       (212) 209-4822

 5

 6   For Defendant Mizuho   SHEARMAN & STERLING, LLP
     Bank, Ltd.:            BY:  MR. JEROME S. FORTINSKY
 7                               MR. JEFFREY RESETARITS
     (via telephone         599 Lexington Avenue
 8   conference call)       New York, New York  10022
                            (212) 848-7116
 9
                            NEAL, GERBER & EISENBERG
10                          BY:  MR. JONATHAN S. QUINN
                            Two North LaSalle Street
11                          Suite 1700
                            Chicago, Illinois  60602
12                          (312) 269-8093

13   For Defendant          CHUHAK & TECSON, P.C.
     Gonzague               BY:  MR. DANIEL J. FUMAGALLI
14   Gay-Bouchery:          30 South Wacker Drive
                            Suite 2600
15                          Chicago, Illinois  60606
                            (312) 855-4330
16

17

18

19

20

21

22

23

24

25
```

1     (Proceedings heard in open court:)

2          THE CLERK:  14 C 1437, Greene versus Mt. Gox.

3          MR. SCHARG:  Good morning.  Ari Scharg on behalf of

4     the plaintiffs.

5          MS. HWANG:  Alicia Hwang on behalf of the plaintiffs.

6          MR. FUMAGALLI:  Daniel Fumagalli, Judge, for

7     defendant Gay-Bouchery.

8          THE CLERK:  And I'll have to get a party on the

9     phone.  One second here.

10          MR. QUINN:  Jonathan Quinn on behalf of defendants

11    Mizuho Bank.  My colleagues will be joining me shortly by

12    phone.

13          THE COURT:  Do we have two numbers?

14          THE CLERK:  One was for a Jacob Beiswenger, who just

15    wants to listen in.

16          THE COURT:  Who is that?

17          MS. HWANG:  He is the trustee of Mt. Gox.

18          THE COURT:  And Fortinsky is for Mizuho?

19          MR. QUINN:  Correct.

20          THE COURT:  And we don't have Karpeles, do we?

21          MR. SCHARG:  Not in court, no.

22          MS. HWANG:  Not that we're aware of.

23          THE COURT:  That's K-A-R-P-E-L-E-S.

24          THE CLERK:  I may not be able to connect Jacob, but

25    we'll see.

1          MR. FORTINSKY:  Hello.

2          THE CLERK:  Jerome Fortinsky?

3          MR. FORTINSKY:  Speaking, Jerry Fortinsky, and Jeff

4    Resetarits is with me.

5          THE CLERK:  This is Jackie from Judge Feinerman's

6    chambers.  I'm going to try to connect the Jacob Beiswenger.

7    Hold on.  Okay?

8          MR. FORTINSKY:  Okay.  Thanks.

9          THE CLERK:  Hello?

10         MR. FORTINSKY:  Yes.

11         THE CLERK:  Hold on.  I don't think I'm able to

12   connect him.

13         THE COURT:  Okay.  Does anybody have a -- he's just

14   going to be listening in?  Does anybody have a phone that we

15   could just put on speaker so maybe he can hear?

16         MR. SCHARG:  Sure.

17         MR. FORTINSKY:  Yeah.

18         THE COURT:  We're not talking about you,

19   Mr. Fortinsky.  We're talking about somebody else.

20         MR. FORTINSKY:  Okay.  Good morning, your Honor.

21         THE CLERK:  Hold on.  Okay?

22         THE COURT:  We're going to connect the trustee's

23   lawyer by a different means.

24         THE CLERK:  Jacob?

25         MR. BEISWENGER:  Yes.

1    THE CLERK:  Okay.  You need to speak a little loud

2    because you're on the actual phone; and we have the other

3    parties in the courtroom, and we have someone else on a

4    different line.  Okay?

5         MR. BEISWENGER:  Okay.

6         THE CLERK:  Mr. Fortinsky, can you hear him?

7         MR. FORTINSKY:  Yes, I can.  Thank you.

8         THE CLERK:  Okay.  Great.

9         THE COURT:  So, why don't we -- Mr. Fortinsky, if you

10   could introduce yourself and say who you represent.

11        MR. FORTINSKY:  Sure, your Honor.  This is Jerry

12   Fortinsky with Shearman and Sterling.  I'm on the phone in

13   New York.  I represent Mizuho Bank, Ltd.

14        THE COURT:  Okay.  And then we have -- is it the

15   trustee's lawyer on the phone?

16        MR. BEISWENGER:  Yes.  This is Jacob Beiswenger from

17   Brown Rudnick on behalf of Nobuaki Kobayashi, the Mt. Gox

18   bankruptcy trustee.  I'm just listening in.

19        THE COURT:  I'm sorry?

20        MR. BEISWENGER:  I'm just listening in.

21        THE COURT:  Okay.  You'll just be listening in.  And

22   if everybody in the courtroom could again state your names and

23   who you represent.

24        MR. SCHARG:  Ari Scharg on behalf of the plaintiff.

25        MS. HWANG:  Alicia Hwang on behalf of the plaintiffs.

1    MR. FUMAGALLI: Daniel Fumagalli for Gay-Bouchery.

2    MR. QUINN: Jonathan Quinn on behalf of Mizuho Bank.

3    THE COURT: Good morning. We're here for a status

4 hearing, and we also have a motion for leave to file a second

5 amended complaint. I've read the motion and reviewed the

6 second amended complaint. And let me ask Gay-Bouchery, any

7 objection to the motion?

8    MR. FUMAGALLI: No, Judge, no objection.

9    THE COURT: You don't have to explain. I understand

10 why. How about Mizuho Bank, any objection from Mizuho?

11    MR. FORTINSKY: Yes, your Honor, but we have an

12 understanding with the plaintiffs concerning the next steps.

13 I'd be happy to describe that if the Court would like.

14    THE COURT: Go ahead.

15    MR. FORTINSKY: We believe the appropriate next step

16 is for the -- for us, Mizuho, to file a motion to dismiss on

17 personal jurisdiction grounds. We think for reasons -- I

18 won't explain at length right now, but would be happy to if

19 the Court would like. We believe there's a strong personal

20 jurisdiction issue that defendants have.

21    And, therefore, it's in the interests of both the

22 parties and the Court not to engage in briefing that might

23 turn out to be unnecessary. So, we'd like to, with the

24 Court's -- if the Court consents, put that on the schedule

25 first and then deal with the other issues after that.

1          I should add --

2          THE COURT:  What other issues?

3          MR. FORTINSKY:  Well, the question we sort of left

4 the last time we discussed this was sort of how to coordinate

5 the motion to amend with a motion to dismiss.  And, you

6 know --

7          THE COURT:  How about this way:  I grant the motion

8 to amend, and then you move to dismiss the amended complaint

9 on personal jurisdiction grounds?

10          MR. FORTINSKY:  Mizuho's position has to be that we

11 will not consent to an amendment.  We do not want our -- we do

12 not want to take any position that could be construed either

13 in this country or later in Japan to be any kind of consent to

14 an amendment, consent to being sued in the United States.  So,

15 we do not consent to being sued in the United States.

16          Having said that, our -- we think our opposition to

17 the motion to amend is based on grounds of futility rather

18 than prejudice, which is to say that we think that the grounds

19 for opposing the motion to amend are the same as the grounds

20 for granting the motion to dismiss.

21          THE COURT:  Okay.  So, let's say I agree with you and

22 that I allow the motion to dismiss to go forward.  Wouldn't

23 the plaintiffs then have the ability to amend as of right

24 under 15(a)(1)(B), and then we would just be where we would

25 have been had we done it the easy way?

1       MR. FORTINSKY:  I'm sorry, your Honor.  I'm not sure

2   I got that.  Well, let me say this:  I don't think that the --

3       THE COURT:  Well, let me explain myself.  Under

4   15(a) --

5       MR. FORTINSKY:  Once or maybe twice.

6       THE COURT:  Under 15(a)(1)(B), it says that, "A party

7   may amend its pleading once as a matter of course, if the

8   pleading is one to which a responsive pleading is required,

9   21 days after service of a responsive pleading or 21 days

10  after service of a Rule 12(b) motion."

11      So, if I put the motion to amend on ice and then you

12  move to dismiss, wouldn't the plaintiffs have the right to

13  amend as of right under 15(a)(1)(B); and then you'd just be

14  moving against the amended complaint, and we'd be where we

15  would have been anyway?

16      MR. FORTINSKY:  We have no objection to putting the

17  motion to amend on ice, if that's the proposal.  I think --

18      THE COURT:  No, that's not -- I'm asking you what

19  sense does that make if they're going to be allowed to amend

20  anyway once you file a motion to dismiss?

21      MR. FORTINSKY:  Well, as I was saying, your Honor,

22  they've already amended once as of right, so I'm not sure it's

23  true that they have the right the Court mentioned under

24  Rule 15.

25      But as to the practical side of the question, you

1  know, as I said, we do object to the motion to amend; but we

2  could certainly, I think, combine the motion to amend with a

3  motion to dismiss with no loss in efficiency and first brief

4  the personal jurisdiction motion and then afterwards combine

5  the opposition to the motion to amend with the motion to

6  dismiss.

7       And since, as I said, our grounds for opposing the

8  motion to amend are the same as the grounds for granting the

9  motion to dismiss, there's really no loss of efficiency to do

10 it that way.  It's not as though we're briefing additional --

11 additional things multiple times.

12      THE COURT:  What do the plaintiffs think?

13      MR. SCHARG:  Well, as I -- I spoke with Mizuho's

14 attorneys yesterday, and I told them that anything that they

15 did with respect to the motion for leave, we would certainly

16 not construe in this case as submitting to personal

17 jurisdiction in this court, absolutely not.  Them and the

18 Court has our word on that.

19      I think that probably the most efficient way to move

20 forward is just -- if they're concerned that taking a position

21 on the motion for leave would subject them to personal

22 jurisdiction in other cases, just take no position on the

23 motion.  I believe the Court should grant the motion.  Then we

24 can move forward with briefing personal jurisdiction on the

25 second amended complaint.

1    The allegations in that complaint are somewhat
2  different than the first amended complaint with respect to
3  Mizuho's involvement, so I don't even think that submitting
4  briefs with respect to the older allegations would make that
5  much sense.

6    THE COURT: All right. Anything -- any reply from
7  Mizuho to that point?

8    MR. FORTINSKY: I certainly agree it doesn't make
9  sense to brief allegations that are no longer in place. And I
10  appreciate the statement on the record that the plaintiffs
11  will not use the amendment, even if granted over our objection
12  or even if granted in a way that's construed to be without our
13  objection, will not be used against us here or in Japan.

14    We're happy to do whatever the Court thinks is
15  appropriate. I just do want to make it clear that we are not
16  consenting. We're not consenting to any -- we're not
17  consenting to be in this suit.

18    THE COURT: Understood. And my only goal is to make
19  things go as efficiently and as sensibly as possible so we
20  could address the substantive issues, and I'm including
21  personal jurisdiction as a substantive issue, in the most
22  efficient and sensible way possible. And I think the way to
23  do that is to allow the motion to amend -- grant the motion to
24  amend.

25    And so I am going to grant that motion. And the

1  plaintiffs should file their amended complaint or second

2  amended complaint as a separate docket entry.

3      And I'm granting the motion under 15 -- it's either

4  under 15(a)(1) or 15(a)(2).  If you can -- if this -- if their

5  first amendment doesn't count as the first amendment of right

6  or doesn't foreclose them from doing another amendment of

7  right, then it's under 15(a)(1).  If it turns out that they've

8  already had their first amendment of right, I'll grant the

9  motion under 15(a)(2).

10      This case, although it's a year old, is still in its

11  very early stages because we were on hold for several months

12  pending the possible settlement and pending the plaintiffs'

13  decision as to which claims to go forward on and which

14  defendants to keep in the case.

15      And the Seventh Circuit said that amendments ought to

16  be granted -- ought to be allowed when it makes sense to do

17  so, and we're at the stage of the case where it makes sense to

18  do so.

19      And it will also allow the parties to know what --

20  would allow Mizuho to know what it's aiming at in terms of the

21  allegations of contacts with Illinois.  I think it's all laid

22  out in the second amended complaint, and that's going to be at

23  least part of -- it's going to provide some -- at least some,

24  if not all the data points that the Court's going to be using

25  in assessing whether there's personal jurisdiction over

1    Mizuho.

2         So, I'm going to grant that motion.  What -- in terms
3    of the Mt. Gox entities, Gay-Bouchery, McCaleb, are they
4    dismissed?

5              MR. SCHARG:  Yes.

6              THE COURT:  Okay.  With or without prejudice?

7              MR. SCHARG:  Without.

8              THE COURT:  Okay.  Anything from Gay-Bouchery on
9    that?

10             MR. FUMAGALLI:  I prefer it -- I hadn't talked to
11   counsel, but I prefer it with prejudice; but I don't know --
12   if he said without, we will stick with without, Judge.

13             THE COURT:  Okay.  I'll dismiss all the others
14   without prejudice.  And you haven't answered or moved for
15   summary judgment yet anyway, right?

16             MR. FUMAGALLI:  We have not, Judge.

17             THE COURT:  Okay.  So, they could just do a notice of
18   voluntary dismissal under 41(a)(1)(A)(i) on their own terms,
19   so let's just make it without prejudice.

20             And when -- well first, has anybody heard from
21   Mr. Karpeles?

22             MR. SCHARG:  No.  After the last -- after the
23   January 8th hearing, we --

24             THE COURT:  You're going to have to --

25             MR. SCHARG:  I'm sorry.  After the January 8th

1    hearing, we served all the documents in the docket on Novack

2    and Macey.  We had filed the motion for alternate service, and

3    I think your Honor deferred ruling on that.

4           You know, before that hearing, we had served an

5    agent, I believe, in Texas, one of Mt. Gox -- we served

6    Mt. Gox, Inc.'s, agent -- excuse me, it was Delaware, who was

7    authorized to accept service on behalf of Karpeles and did

8    accept service on behalf of Karpeles; but when Novack and

9    Macey came in, they indicated that they were going to be

10   contesting whether the service was proper.  But now that

11   they're out, I don't believe that there is an objection to

12   whether the service was proper, so --

13          THE COURT:  I guess we'll see.

14          MR. SCHARG:  But given that our motion for

15   alternative service is still pending, I'm just not sure that

16   it's still necessary in light of the fact that we had at least

17   initially served Karpeles in his individual capacity.

18          THE COURT:  Okay.  But the -- no one's heard from

19   him, and there's no -- he hasn't been communicating with any

20   of the lawyers?

21          MR. SCHARG:  Not with us.  I can't speak to whether

22   he's been in touch with his -- with his former attorneys at

23   Novack and Macey.

24          THE COURT:  Okay.  Has he made any -- to the extent

25   you can say, has he made any contact with the lawyers for the

1      other parties?

2              MR. SCHARG:  I'm unaware.

3              THE COURT:  I'm not asking you.  I'm asking the other

4      lawyers.

5              MR. FUMAGALLI:  None at all, Judge, with us.

6              THE COURT:  Okay.  Mr. Fortinsky?

7              MR. FORTINSKY:  No, your Honor.

8              THE COURT:  Okay.  So, when -- so, it sounds like

9      you're going to move to dismiss on personal jurisdiction

10     grounds and maybe others.  When would you like to file your

11     motion?

12             MR. FORTINSKY:  Well, our -- our notion is that we

13     would file a motion to dismiss on personal jurisdiction

14     grounds in four weeks, which is what we discussed yesterday

15     with the plaintiffs' counsel.  And they would then get four

16     weeks to respond, and we would get two weeks to reply.  And

17     then once the Court decides that motion, if there is a need

18     for briefing on the other issues, then we would work out a

19     briefing schedule as appropriate at the time.

20             THE COURT:  What other issues are you referring to?

21             MR. FORTINSKY:  Well, we -- if the Court were to rule

22     that it has personal jurisdiction, we would move to dismiss

23     for failure to state a claim.  We think that the causes of

24     action -- they don't recite the elements.  They don't plead

25     the elements of the causes of action that they are relying on;

1   and on the whole, they simply don't provide a reason to

2   believe that Mizuho did anything wrong.

3           THE COURT:  Okay.  Why don't you do all the arguments

4   at the same time?

5           MR. FORTINSKY:  Well, what we had proposed to the

6   plaintiffs, and the plaintiffs had agreed to, was to do

7   personal jurisdiction first, you know, on the theory that that

8   would be more efficient, because there's, we think, a pretty

9   substantial argument here that the Court simply does not have

10  jurisdiction over this case as pleaded.

11          The Court -- the Supreme Court, as the Court may be

12  aware, has in recent terms narrowed the scope of -- narrowed

13  the grounds on which jurisdiction can be established over a

14  company from out of the country.  And here, we believe that

15  there's no jurisdiction over Mizuho because they would have to

16  show that Mizuho is at home in Illinois, that its unique, its

17  principal domicile is here in Illinois.

18          THE COURT:  So, you're saying that they're going to

19  be arguing general jurisdiction and not specific jurisdiction,

20  is that right?

21          MR. FORTINSKY:  Well, they may be arguing specific

22  jurisdiction as well, but there, too, we think it's pretty

23  clear, this is a -- this is a dispute that arises from

24  Mizuho's relationship with its customer, Mt. Gox, and that

25  relationship was established and served and took place

1  entirely in Japan.

2  And that remains true even if it happens to be true

3  that one of Mt. Gox's customers, one of Mizuho's customer's

4  customers happens to be from the United States.  It doesn't

5  change the fact that the -- the question is whether Mizuho did

6  anything wrong or failed to do anything it was supposed to do,

7  was an issue of what it did or didn't do in Japan vis-a-vis a

8  Japanese customer.  And, therefore, specific jurisdiction is

9  lacking.

10  THE COURT:  Okay.  You make a good point about

11  general jurisdiction, and I'd point you to a decision that the

12  Seventh Circuit issued either yesterday or the day before

13  recognizing exactly what you said, Mr. Fortinsky, that the

14  Supreme Court has narrowed the bounds of general jurisdiction.

15  But we still do have specific jurisdiction, and I think that's

16  where the main fight is going to be.

17  So, plaintiff, I ordinarily don't do serial

18  Rule 12(b)(6) motions, and, in fact, arguably, they're not

19  allowed under Rule 12(h).  But -- I mean, that's not to say

20  that a court can't say, "Well, I'm going to allow it in this

21  situation if it makes sense."  So, let me ask you, do you

22  think that this makes sense?

23  MR. SCHARG:  Well, in the context of the proposal

24  was -- I spoke with counsel yesterday.  We were talking about

25  the case.  He suggested that the successive 12(b) motions was

1  his preference, and I said that I didn't mind.  I mean, as

2  long as the Court is comfortable with that, it's fine.  I

3  would generally prefer to do everything all at once, but I'll

4  leave it to the Court's discretion.

5              MR. QUINN:  Your Honor, if I may --

6              THE COURT:  Go ahead.

7              MR. QUINN:  I believe the conversation between

8  plaintiffs' counsel and Mr. Fortinsky was very much in the

9  spirit of the question you began with, which is efficiency.

10  It's our view that because this jurisdictional issue is such a

11  threshold question, that by resolving it and perhaps resolving

12  it on a slightly more expeditious schedule than the otherwise

13  regular, routine 12(b)(6) schedule, we would avoid the fulsome

14  full-blown 12(b)(6) motion practice that we would otherwise

15  engage in.

16              MR. FORTINSKY:  If I may add one thing, thank you,

17  Mr. Quinn.  We had proposed a briefing schedule that we

18  thought was appropriate to a quick and simpler motion, the

19  four weeks that we mentioned a moment ago.  I think if the

20  Court were to conclude that it would be better to do

21  everything at the same time, then we would respectfully ask

22  for a briefing schedule in which we had, let's say, 60 days to

23  brief the motion, and then we would naturally allow the

24  plaintiffs a similar time for opposition.

25              THE COURT:  I think you guys think this case is a lot

1    more complicated than I think it is; but you know the case

2    better than I do, so you could very well be right.

3          Okay.  We'll have it your way.  We'll do the personal

4    jurisdiction first.  The motion should be filed by May 14th,

5    the response on June 11th, the reply on June 27th.  Let's come

6    in -- I want to give you an answer on this sooner rather than

7    later, so let's come in the week of July 20th.  And it will be

8    my goal to either have a decision before then or to give you a

9    decision on the record the week of June 20th.

10          THE CLERK:  July.

11          THE COURT:  I'm sorry.  July 20th.

12          THE CLERK:  July 22nd, 9:00 a.m.

13          THE COURT:  So, that's July 22nd, 9:00 a.m.  Is that

14   all right with everybody?

15          MR. SCHARG:  Yes, your Honor.

16          THE COURT:  Yes?

17          MR. FORTINSKY:  I'm just checking my calendar.  I

18   think that looks fine.

19          THE COURT:  Does that look fine?

20          MR. FORTINSKY:  Yes.  Thank you, your Honor.

21          MR. SCHARG:  I'd just like to flag one more issue.

22   To the extent that we see the motion and we think that we need

23   some personal-jurisdiction-related discovery, I don't know

24   that we'd have to come in to the Court.  We've had a good

25   relationship between counsel.  And to the extent that we can

1    informally obtain the information that we would want, I think

2    we would try to do that first.  But if we can't, I just want

3    to flag for your Honor that we might come in and ask for a

4    week or two of jurisdictional discovery, some very minor and

5    very narrow interrogatories.

6            THE COURT:  That's fine.  If you have to come to me

7    with it, do so.  If you can work it out yourselves, that's

8    fine, too.

9            MR. SCHARG:  Thank you, your Honor.

10           THE COURT:  Anything else?

11           MR. SCHARG:  That's it from us.

12           THE COURT:  All right.  Thank you.

13           MR. FORTINSKY:  Thank you, your Honor.

14           MR. FUMAGALLI:  Thank you, Judge.

15           MR. QUINN:  Thank you, your Honor.

16       (Which were all the proceedings heard.)

17                         CERTIFICATE

18     I certify that the foregoing is a correct transcript from

19   the record of proceedings in the above-entitled matter.

20

21   /s/Charles R. Zandi                 May 7, 2015

22   _____            _____
     Charles R. Zandi                    Date
     Official Court Reporter
23

24

25

# Exhibit 10



Sign In | Register



NEWS

# Mt. Gox kept exchange open despite knowledge of large-scale theft

Exchange continued to operate and collect transaction fees despite its troubles, U.S. bankruptcy filing suggests

     

21

By Jeremy Kirk

IDG News Service | Mar 12, 2014 9:53 PM PT

Mt. Gox may have collected a large sum in trading fees in the weeks before its closure, even though it was already aware that a vast number of bitcoins had gone missing, its U.S. bankruptcy filing suggests.

A sworn declaration in the filing from Robert Marie Mark Karpeles, Mt. Gox 's CEO, reveals that the Bitcoin exchange knew in early February that its situation was far graver than it had disclosed at the time.

Mt. Gox halted bitcoin withdrawals from its exchange on Feb. 7. It told customers it was investigating possible fraud due to a security issue called transaction malleability, but did not specify at the time how many bitcoins were missing. Buying and selling on the exchange continued until Feb. 25, when its website went dark.

Mt. Gox's first disclosure of the scale of its problems came when it filed for bankruptcy protection in Tokyo District Court three days later, saying 750,000 of its customers' bitcoins were missing, along with 100,000 of its own.

It appears from the U.S. bankruptcy filing that Mt. Gox executives knew the gravity of the company's losses up to 19 days before its public disclosure, but gave traders no reason at the time to believe the exchange might not be solvent.

In the filing, Karpeles states that the withdrawals were halted Feb. 7 due to "the theft or disappearance of hundreds of thousands of bitcoins owned by Mt. Gox customers as well as Mt. Gox itself."

Why Mt. Gox continued to operate the exchange with that knowledge is unclear.

Karpeles did not respond to a request for comment for this article sent to his personal email address.

The impact of Mt. Gox allowing customers to buy and sell bitcoins it suspected it did not have may be revealed by class-action lawsuits, one of which was filed in Chicago on Feb. 27, and another of which is planned in the U.K.

"They took trading fees on assets which didn't exist and accepted deposits when they knew they were insolvent," Aaron G., a Bitcoin investor who did not want his last name used, said via email.A

"The origin of the losses may or may not be incompetence," added Aaron, who has filed a fraud complaint against Mt. Gox with Tokyo police. "But they knew for at least two weeks and kept operating as normal."

After Feb. 7, Mt. Gox was still processing thousands of trades a day, according to Bitcoincharts.com, which records trading volumes for many Bitcoin markets.

An average of 49,912 bitcoins were traded daily on Mt. Gox between Feb. 7 and Feb. 25, at an average weighted price of $380.54 per bitcoin.

Mt. Gox would have charged fees for those transactions, which traders could pay in cash or the equivalent in bitcoins. Mt. Gox had a tiered fee system that rewarded higher-volume traders with lower fees.

The highest fee paid by customers was 0.6% per trade, for volumes amounting to less than 100 bitcoins per month. For example, if a trader sold one bitcoin for $380.54, the fee would have been $2.28. The lowest fee was 0.25% for volumes higher than 500,000 bitcoins per month.

Without figures from Mt. Gox, it's impossible to know exactly how much it collected in fees during the period, but even with the highest discount it would have taken in an average of about $47,500 a day, based on an average of its trading volumes. Over 19 days, that would amount to $902,000.

The fees would have been collected in a mix of cash and bitcoins. If Mt. Gox was indeed selling bitcoins it no longer had, it would mean any fees it collected in bitcoins were worthless.

Since Mt. Gox said it was also missing $27.3 million in cash from customer deposits, it raises the possibility that customers -- despite seeing a cash balance displayed in their account -- might have actually been buying bitcoins that did not exist, with cash that was already long gone.

The Mt. Gox call center, set up after the bankruptcy filing to answer questions from customers, was unable to comment Wednesday on any fees collected. An attorney at one of Mt. Gox's law firms in Tokyo said he was unable to comment.



*Mt. Gox continued to process tens of thousands of transactions a day in the two weeks leading to its collapse, potentially collecting fees.*

(Tim Hornyak in Tokyo contributed to this report.)

*Send news tips and comments to jeremy_kirk@idg.com. Follow me on Twitter: @jeremy_kirk*



**Windows 10 cheat sheet (with video)**

 **View 21 Comments**

# YOU MIGHT LIKE

Sponsored Links by Taboola

**5 Steps to Better Sales Performance [E-Book]**
**Salesforce**

# Exhibit 11

Click here to print



# Is it the beginning of the end for Bitcoin? Virtual currency in turmoil as rumoured $375m theft closes major exchange

By Adrian Lowery

Published: 06:33 EST, 25 February 2014 | Updated: 07:22 EST, 25 February 2014

The credibility of Bitcoin has been dealt a serious blow after a suspected theft of $375m of the virtual currency closed one of the major exchanges through which it is traded.

The website of Tokyo-based Mt.Gox - which allows Bitcoin to be traded for US dollars - was shut down today after it had already halted cash withdrawals in the wake of rumours that hackers had managed to steal 745,000 Bitcoin.

The crisis at Mt.Gox will raise questions over the future of Bitcoin, which had surged in value last year and attracted the global attention of mainstream businesses and investors.



© Photothek via Getty Images

**Bitcoin's value soared to more than $1,000 as more merchants accept it as payment and investors poured money into new bitcoin-related ventures.**

Having traded above $1,000 just three months ago on the back of growing interest, Bitcoin is now down to just over $500 - according to an average price index across exchanges. But last September, a Bitcoin was worth only around $150.

The problems at Mt.Gox had effectively made Bitcoin held there worth less than currency held at other exchanges, so that the price of Mt.Gox Bitcoins was about $232 last night before the exchange closed.

Six other Bitcoin exchanges have distanced themselves from Mt.Gox in an effort to shore up the credibility of Bitcoin.

'This tragic violation of the trust of users of Mt.Gox was the result of one company's actions and does not reflect the resilience or value of Bitcoin and the digital currency industry,' the companies - Coinbase, Kraken, Bitstamp, BTC China, Blockchain and Circle - said in the statement.



How the price of Bitcoin shot up late last year.

'As with any new industry, there are certain bad actors that need to be weeded out, and that is what we are seeing today. Mt. Gox has confirmed its issues in private discussions with other members of the Bitcoin community,' the companies said.

Mt. Gox had once been the largest exchange handling Bitcoins. Earlier in February, it said it was halting withdrawals indefinitely after it detected 'unusual activity.'

On Sunday, Mark Karpeles, chief executive of Mt. Gox, resigned from the board of the Bitcoin Foundation, following a number of technical issues, including a massive cyber attack from unknown sources that has been spamming Bitcoin exchanges.

'There are hundreds of trustworthy and responsible companies involved in Bitcoin. These companies will continue to build the future of money by making Bitcoin more secure and easy to use for consumers and merchants,' the six Bitcoin exchanges said in the joint statement.

Charles Shrem, another prominent member of the Bitcoin Foundation, resigned earlier this year after being arrested in connection with an alleged drug scheme involving his Bitcoin currency exchange.

**WHAT'S HAPPENING WITH BITCOIN, IS IT SAFE AND IS THE BONANZA OVER?**

# What is Bitcoin?

Bitcoins were launched in 2009, offering a currency free from government interference that could be shared instantly online.

Its popularity soared at the end of last year as websites, shops and pubs around the world began accepting it as a form of payment, while US regulators clamped down on those using it to buy drugs and illegal goods.

The value of a single Bitcoin broke through the $1,000 barrier for the first time at the end of November, having been worth around $120 for most of the year.

Bitcoin is now trading around $500.

# What has been happening to Bitcoin?

Earlier this month the Japan-based Mt.Gox exchange said it had noticed a bug that meant transactions could be hacked, so stopped accepting transfers until this was fixed.

But there has been an escalating crisis since then. Mt.Gox's chief executive Mark Karpeles resigned from the Bitcoin Foundation while all the exchange's tweets on its feed followed by more than 27,000 people disappeared.

The website now appears to have been taken down.

Anyone with money stored on the exchange cannot access it, and as the currency is unregulated there is no way of claiming money back unless the company goes bankrupt. Even then there is no guarantee that investors will be able to get their Bitcoins back.

People with money on the exchange have complained at not being able to access their funds while some have protested outside the Mt.Gox offices.

# Are Bitcoins safe?

Bitcoins are inherently volatile as they are not linked to a central bank or other currencies the way that the pound or dollar is. This makes them subject to wild price swings.

These swings were last seen in December when Bitcoins fell from $1,000 to to $870 after the Chinese government began banning use of the virtual currency by official bodies.

The collapse of Mt.Gox has had a similar impact as it was one of the largest exchanges for Bitcoins.

However, the Bitcoin Foundation and other exchanges have distanced themselves from the issues Mt.Gox has been facing.

Explaining the bug that Mt.Gox identified, the Bitcoin Foundation said in a statement: 'There is a small window where transaction IDs can be 'renamed' before being confirmed in the blockchain. This is something that cannot be corrected overnight.

'Therefore, any company dealing with Bitcoin transactions and have coded their own wallet software should responsibly prepare for this possibility and include in their software a way to validate transaction IDs. Otherwise, it can result in Bitcoin loss and headache for everyone involved.'

Other exchanges and digital wallets, where Bitcoins are stored, also issue a statement emphasising the safety of Bitcoins.

The statement, from big Bitcoin players Coinbase, Blockchain, Bitstamp, Circle, Kraken and BTC China, said: 'Bitcoin operators, whether they be exchanges, wallet services or payment providers, play a critical custodial role over the Bitcoin they hold as assets for their customers.

'Acting as a custodian should require a high-bar, including appropriate security safeguards that are independently audited and tested on a regular basis, adequate balance sheets and reserves as commercial entities, transparent and accountable customer disclosures, and clear policies to not use customer assets for proprietary trading or for margin loans in leveraged trading.'

# Should I invest in Bitcoins?

Investing in Bitcoins is not the same as putting money into a share, fund or currency, which will tend to be backed by some solid fundamentals and numbers you can scrutinise.

It is a very volatile investment which is not backed by any regulation so would not be protected by the Financial Services Compensation Scheme. In fact, it's a gamble not an investment.

So far the value of Bitcoins has gone up as people try to get involved. There is a finite number of 21million Bitcoins that can be created and so far 10million have been 'mined'.

The value could go up if something happens to give a spark of confidence, such as more shops or websites accepting them as a form of payment.

On the flipside, there is nothing to say another exchange or wallet won't collapse, sending the price down again.

**HOW IS THE BITCOIN EXCHANGE RATE CALCULATED?**

There are several online exchanges where Bitcoins can be traded such as BitStamp, LocalBitcoins and BTC-E,

All will have different trading fees and provide various currencies.

These platforms help set the price of a Bitcoin and provide an exchange rate against a currency and there are websites such as **Preev** that combine them all to create an overall price.

With standard currency, a fall of the yuan against the pound may not have a big effect on the price of the pound against the dollar, but because Bitcoins are a limited, illiquid form of virtual money, the overall price is easily swayed.

Bitcoins are a relatively small currency that is easily influenced from anywhere in the world, particularly where there is a popular market for Bitcoins such as in China and the US.

Therefore decisions by China, one of the most popular markets for Bitcoins, to **ban financial institutions and clearing houses from using Bitcoins**, can create wild price swings globally.

There is a massive forex market behind standard currency where traders can buy and sell easily and quickly, which creates a stable price.

However, Bitcoins need to be mined first, which is a complicated process and there is not always a buyer available. There will only be a maximum of 21million Bitcoins and so far more than 10million have been mined.



# Comments (201)

Share what you think

# Exhibit 12

# Hackers call Mt. Gox CEO a liar, say he still controls 'stolen' bitcoin

By Zach Epstein (http://bgr.com/author/zach-epstein/) on Mar 10, 2014 at 8:45 AM

LEGAL (HTTP://BGR.COM/LEGAL/)

SHARE THIS STORY

Tweet (https://twitter.com/intent/tweet?url=http%3A%2F%2Fbgr.com%2F2014%2F03%2F10%2Fmt-gox-fraud-accusations-hackers%2F&counturl=http%3A%2F%2Fbgr.com%2F2014%2F03%2F10%2Fmt-gox-fraud-accusations-hackers%2F&text=Hackers+call+Mt.+Gox+CEO+a+liar%2C+say+he+still+controls+%E2%80%98stolen%E2%80%99+bitcoin&via=BGR)

Like (https://www.facebook.com/sharer.php?u=http%3A%2F%2Fbgr.com%2F2014%2F03%2F10%2Fmt-gox-fraud-accusations-hackers%2F&t=Hackers+call+Mt.+Gox+CEO+a+liar%2C+say+he+still+controls+%E2%80%98stolen%E2%80%99+bitcoin)

Share (http://www.linkedin.com/shareArticle?url=http%3A%2F%2Fbgr.com%2F2014%2F03%2F10%2Fmt-gox-fraud-accusations-hackers%2F&title=Hackers+call+Mt.+Gox+CEO+a+liar%2C+say+he+still+controls+%26%238216%3Bstolen%26%238217%3B+bitcoin&source=BGR&mini=true)

Submit (http://www.reddit.com/submit?url=http%3A%2F%2Fbgr.com%2F2014%2F03%2F10%2Fmt-gox-fraud-accusations-hackers%2F&title=Hackers+call+Mt.+Gox+CEO+a+liar%2C+say+he+still+controls+%26%238216%3Bstolen%26%238217%3B+bitcoin)

Shop ▾



## TRENDING


15 paid iPhone apps on sale for free for a limited time (http://bgr.com/2016/01/28/best-free-iphone-apps-ipad-jan-28/)


These are the hottest iPhone 7 concepts we've seen so far (http://bgr.com/2016/01/28/iphone-7-design-concept-videos/)


Hot iPad Air 3 rumor might make you care about tablets again (http://bgr.com/2016/01/28/ipad-air-3-rumor-4k-display/)

## RELATED ARTICLES


Bitcoin creator revealed to be Australian genius Craig Wright; subsequently has house raided by police (http://bgr.com/2015/12/09/bitcoin-creator-craig-wright/)


ISIS parks its cash in Bitcoin, experts say (http://bgr.com/2015/11/25/isis-parks-its-cash-in-bitcoin-experts-say/)


Cops arrest robot after it buys Ecstasy tablets with Bitcoin (http://bgr.com/2015/04/22/robot-buys-ecstasy-with-bitcoin-arrested/)

Anonymous hackers on Sunday claimed to have published evidence that Mt. Gox (http://bgr.com/tag/mt-gox) CEO Mark Karpeles lied about the theft of more than $500 million (http://bgr.com/2014/03/03/mt-gox-statement-bankruptcy-bitcoin/) worth of bitcoin (http://bgr.com/tag/bitcoin). According to the hackers, Karpeles still controls all of the cryptocurrency he says was stolen recently in the biggest heist of bitcoin's brief history (http://bgr.com/2014/03/03/mt-gox-statement-bankruptcy-bitcoin/). Mt. Gox was the world's largest bitcoin exchange until about 850,000 bitcoin were allegedly stolen during a breach, forcing the exchange to shut down and file for bankruptcy protection. According to new claims from anonymous hackers, however, the heist never occurred and Karpeles still controls nearly 1 million bitcoin worth approximately $596 million at Monday's exchange rate.

According to a report from *Forbes* (http://www.forbes.com/sites/andygreenberg/2014/03/09/hackers-hit-mt-gox-exchanges-ceo-claim-to-publish-evidence-of-fraud/), the anonymous hackers took

over Karpeles's blog and published a post supposedly exposing fraud committed by the CEO. The post was also published on Pastebin (http://pastebin.com/8gbUXLN3).

"It's time that MTGOX got the bitcoin communities wrath instead of Bitcoin Community getting Goxed," the hackers wrote. "This release would have been sooner, but in spirit of responsible disclosure and making sure all of ducks were in a row, it took a few days longer than would have liked to verify the data."

The hackers' note was accompanied by a file containing what they claim to be evidence of fraud. They say that they have managed to obtain various personal data belonging to Karpeles, including what they claim to be evidence that Mt. Gox's current bitcoin balance is in fact 951,116, which would mean that the 850,000 bitcoin the exchange claimed was stolen is still in its control.

As *Forbes* noted, however, the evidence may in fact simply reveal remarkably poor accounting practices at Mt. Gox, a former hub for trading "Magic: The Gathering" cards, rather than fraud.

**TAGS:**
**BITCOIN** (HTTP://BGR.COM/TAG/BITCOIN/), **MT. GOX** (HTTP://BGR.COM/TAG/MT-GOX/)
**SOURCE:**
**FORBES** (HTTP://WWW.FORBES.COM/SITES/ANDYGREENBERG/2014/03/09/HACKERS-
HIT-MT-GOX-EXCHANGES-CEO-CLAIM-TO-PUBLISH-EVIDENCE-OF-FRAUD/), **PASTEBIN**
(HTTP://PASTEBIN.COM/8GBUXLN3)

**PROMOTED STORIES**

Recommended by

**YOU MIGHT ALSO LIKE**

**MORE FROM BGR**

**$40 is all you need to give your home
Wi-Fi network a big upgrade**
(http://bgr.com/2015/12/15/wifi-
booster-amazon-sale-tp-link/)

**Did 'The Force Awakens' subtly insult
George Lucas with its opening line?**
(http://bgr.com/2015/12/28/star-
wars-the-force-awakens-george-
lucas/)

**The coolest thing you'll ever buy for
your kitchen is only $44 on Amazon**
(http://bgr.com/2015/12/30/touchless-
garbage-can-amazon-deal/)

**Boeing 777's insane landing in a 75MPH
windstorm is almost too unnerving to
watch**
(http://bgr.com/2015/07/27/boeing-
777-landing-75mph-windstorm-
video/)

**This is easily one of the coolest iPhone
tricks you never knew about**

# Exhibit 13

Home (/)  /  Business Software (/Category/Business-Software/)

# Lost in translation: The tangled tale of Mt. Gox's missing millions



Credit: Tim Hornyak

COMMENTS

By Tim Hornyak (/author/Tim-Hornyak/) and Jeremy Kirk (/author/Jeremy-Kirk/), IDG News Service

Japanese authorities are trying to unravel what happened at Mt. Gox, the popular Bitcoin exchange that collapsed last week, and recent revelations are only serving to thicken the plot, not clarify it.

The tale of the Tokyo-based exchange appears to be like the code its software ran on; the latter was deemed "a spaghetti mess" by a company source who spoke on condition of anonymity.

Mt. Gox filed for bankruptcy protection in the Tokyo District Court on Feb. 28, saying that some 750,000 customer bitcoin and 100,000 of its own bitcoin had vanished, possibly stolen. Based on the valuation of the volatile cryptocurrency at the time of the filing, that is roughly $474 million. An additional ¥2.8 billion (about $28 million) in cash was unaccounted for.

Tokyo police are now scratching their heads. "The National Police Agency seems to lack the ability to analyze the bitcoin trading history of Mt. Gox," a government official told a source probing the investigation.

## Poof!

What really happened? Mt. Gox has never quite escaped the adolescent image associated with its origins as a market for trading cards used in the fantasy game "Magic: The Gathering," even as it changed gears and rocketed to success as the world's largest forum for trading in bitcoin, the digital currency launched in 2009.

The site had 1 million customers as of December 2013, according to a document (http://www.scribd.com/doc/209050732/MtGox-Situation-Crisis-Strategy-Draft) posted on the Web that was purported to be a leaked business plan.

Presiding over it all was CEO Mark Karpeles (pictured below), who uses the online moniker MagicalTux. The attendant image of Karpeles as a stage magician may now inflame Mt. Gox customers who suspect their losses are due to sleight of hand, not sloppiness or outside thieves.


(http://images.techhive.com/images/article/2014/03/karpeles-100249400-orig.jpg)

Mt. Gox CEO Mark Karpeles bowing in traditional Japanese apology on Japanese television after the company's implosion.

In the weeks before it went bust, Mt. Gox suspended bitcoin withdrawals to outside wallets, blaming a bitcoin software bug known as transaction malleability and warning that it could be used for fraudulent purposes.

After all, Mt. Gox had been attacked before. In June 2011, $8.75 million in bitcoin was apparently purloined by hackers using stolen passwords.

In April 2013, Mt. Gox's website was coming under distributed denial-of-service (DDoS) attacks combined with frantic, frequent trades by a surge of new customers as the price of bitcoin climbed as high as $266.

## 'People trust us with a lot of money right now'

At that time, nearly a year ago, Gonzague Gay-Bouchery, Mt. Gox's head of marketing, talked with IDG News Service about the company's travails.

"We don't have a life, and we want to see our kids," he said. "And we want our customers to be very happy."

> Watch: **Mt. Gox protesters still don't have Bitcoin answers (http://www.pcworld.com/video/31041/mt-gox-protestors-still-don-t-have-bitcoin-answers.html)**

The site choked and sputtered, unable to cope with the massive amounts of traffic. Customers became angry, leaving Mt. Gox to attempt to quell a public relations disaster and a very real threat from cyberattackers trying to manipulate bitcoin's market price. Gay-Bouchery detailed Mt. Gox's plans for a faster trading engine that would be resistant to cyberattacks.

"Like everything it takes a lot of time to make something bulletproof," he said. "We cannot release something half-baked."

He acknowledged that Mt. Gox was struggling to cope with new users, which numbered as many as 20,000 a day that month. The company hired more staff to more quickly complete anti-money laundering identity checks on its customers.

"I would really like to stress that people trust us with a lot of money right now," Gay-Bouchery said. "We want to do everything by the book. We may appear slow in many aspects, but we are taking our time to do it right."

In June, Mt. Gox had cut off U.S. dollar withdrawals, prompting widespread concerns over its solvency.

---

## "I watched him [Karpeles] log into his online bank account in real time and saw the balances with my own eyes. They had a huge amount of U.S. dollar liquidity at that time."

---

The following month, around July 2013, Bitcoin entrepreneur Roger Ver visited Mt. Gox's Tokyo headquarters. He published (http://www.youtube.com/watch?v=UP1YsMlrfF0) a video saying he believed the company's withdrawal problems were caused by the "traditional banking system, not because of a lack of liquidity at Mt. Gox."

"The traditional banking partners that Mt. Gox needs to work with are not able to keep up with the demands of the growing bitcoin economy," Ver said at the time.

But on Feb. 25, the day Mt. Gox's website went blank, Ver retracted his earlier statements in another video (http://www.youtube.com/watch?v=GRIJ_jpmwzo).

In an email interview last week, Ver recalled his meeting with Mt. Gox: "I watched him [Karpeles] log into his online bank account in real time and saw the balances with my own eyes. They had a huge amount of U.S. dollar liquidity at that time."

Ver doubts that transaction malleability, a long-known issue that in some cases can be exploited to make fraudulent withdrawals, was the sole cause of Mt. Gox's wipeout.

"The problem was clearly caused by poor code or other mismanagement at Mt. Gox," Ver said.

"I think there was a lack of corporate culture," said a source close to the company who observed obliviousness to major problems. "I just really don't know how they managed to stay open as long as they did."

## Spaghetti code

"The environment was completely dysfunctional," said the company source, who worked at Mt. Gox owner Tibanne. "There was no testing or staging of code. Just development and production. It's a financial exchange and they're handling customer money. At least I would expect a workflow that encompasses these things."

Mt. Gox management ignored warnings that the software platform was "a spaghetti code mess" and showed little interest in cracking down on security flaws, the source said, adding that Karpeles grew bored of run-of-the-mill business tasks.

"Mark loved to circumvent the [development] process because he had direct access to all the servers," the source said. "So whenever he wanted to change something he would just change it on the live side, and that was that."



Karpeles could not be reached for comment. In a statement related to Mt. Gox's bankruptcy filing, the company described problems with the bug in the bitcoin system, saying, "We believe that there is a high probability that these bitcoins were stolen as a result of an abuse of this bug and we have asked an expert to look at the possibility of a criminal complaint and undertake proper procedures."

The errors in the Mt. Gox code likely allowed for bitcoins to be slowly siphoned off the exchange over time without anyone noticing, said the source, who added that one possibility is that the site's cold storage, essentially an offline vault used by bitcoin exchanges, either did not exist or was lost.

"Accounts were being hacked left and right," the source said. "But victims would contact support, made to wait two weeks and nothing would happen."

Mt. Gox's approach to money was equally questionable. Its account with Mizuho Bank was not segregated between customer funds and operational funds, the source said.

This week, an audio recording (https://mega.co.nz/#!jZBQRKyL!2rtW7sDlZ-bcWV30aMCC-A9D8pqCY7PhFgga_pUCJYg) surfaced on the Web that purports to be a conversation held in late January between Karpeles and a Mizuho Bank official, who are speaking in Japanese. After airing his concerns about bitcoin, the official repeats the bank's decision that Mt. Gox's account must be closed.

Instead of becoming alarmed, Karpeles seemed more interested in his pet project to open a Bitcoin Cafe beside the company's headquarters, the source said.

But soon the problems would become too large to ignore.

## Poker faces

Neither Karpeles nor his deputy, Gonzague Gay-Bouchery, outwardly showed signs of worry just two weeks before Mt. Gox filed for bankruptcy protection, said Bruce Fenton, board member of The Bitcoin Association.

---

"I am deeply sorry for causing trouble."

In emails and phone calls, Fenton approached both men around Feb. 14 to discuss a possible investment in Mt. Gox, an effort aimed at sorting out the company's problems. Of top concern was whether Mt. Gox had its bitcoins.

"We asked them flat out if they had [the bitcoins]," Fenton said in a phone interview Tuesday. "Gonzague said they had them."

The talks failed to progress as Mt. Gox's situation deteriorated, Fenton said.

The document titled "Crisis Strategy Draft (http://www.scribd.com/doc/209050732/MtGox-Situation-Crisis-Strategy-Draft)," leaked on Feb. 25, suggests that the company had lost 744,408 bitcoins and outlined an implausible plan for recovery. Many people, including Fenton, felt the document was fake.

Fenton then emailed Karpeles asking about the company's bitcoin holdings. Karpeles didn't directly answer, instead saying there would be an announcement on Feb. 28, the day of its bankruptcy filing at Tokyo District Court.

"I just thought it [Mt. Gox] was profoundly poorly managed," Fenton said.

As a small protest gathered outside the company offices and Mt. Gox suspended withdrawals, management issues couldn't be ignored anymore. As part of his final act in the Mt. Gox drama, Karpeles was bowing in ritual Japanese apology at the bankruptcy press conference.

"I am deeply sorry for causing trouble," he said.

Related:   Business Software (/Category/Business-Software)

Business (/Category/Business)    Security (/Category/Security)

Bitcoin (/Tag/Bitcoin/)

**_utm_content=ab_alternating-thumbnails-a_abp-sc:Below Article Thumbnails:)**
**_utm_content=ab_alternating-thumbnails-a_abp-sc:Below Article Thumbnails:)**
**_utm_content=ab_alternating-thumbnails-a_abp-sc:Below Article Thumbnails:)**
**YOU MAY LIKE**

(https://www.salesforce.com/form/pdf/2015-state-of-sales.jsp?
d=701300000021JNp&nc=701300000021J86&ban=us_taboola&utm_source=taboola&utm_medium=referral)

2,300 Global Sales Leaders Share Their Findings on the State of Sales [eBook]

Salesforce

(https://www.salesforce.com/form/pdf/2015-state-of-sales.jsp?
d=701300000021JNp&nc=701300000021J86&ban=us_taboola&utm_source=taboola&utm_medium=referral)
(https://www.hillaryclinton.com/signup/om-hvf-stand-with-hillary/?utm_medium=om2016&utm_source=tb&utm_campaign=lb-
pp&utm_content=)

Sign up if you agree: I stand with Planned Parenthood.

Hillary Clinton

(https://www.hillaryclinton.com/signup/om-hvf-stand-with-hillary/?utm_medium=om2016&utm_source=tb&utm_campaign=lb-
pp&utm_content=)
(http://www.glassesusa.com/blog/7-reasons-to-buy-glasses-online?affid=tbl-
lp221&utm_source=tbl&utm_medium=synd&utm_campaign=top7&utm_content=morrisontable_top7&&utm_term=top7_idg-
pcworld_7+Reasons+to+Get+Your+Next+Pair+of+Glasses+Online&subid1=top7_idg-
pcworld_7+Reasons+to+Get+Your+Next+Pair+of+Glasses+Online&utm_campaign=top7)

7 Reasons to Get Your Next Pair of Glasses Online

GlassesUSA.com

# Exhibit 14

**Ashley, Jan 26 13:52:**

Dear Valued Customer,

Thank you for the email. We are still facing the delay as we still have a few weeks backlog that we need to clear. We are in talks with various banks in Japan and around the world to make the process smoother. However we do not have an ETA at the moment.

In the mean time if you need the funds urgently we can send through the manual process that will have 5% fees from our bank. Let us know if this will work for you.

Best regards,

MtGox Team
https://www.mtgox.com

[Attention: Please protect your account using OTP to ensure that your funds are safe and secure. Failing to do so makes your information vulnerable to hackers.
Please visit https://mtgox.com/security]

**Cayman Drew, Jan 24 01:00:**

It's been 2 months!!!!!!!!!!!!!!!!!! What happened?

[
R
E
D

[REDACTED]

# Exhibit 15

Please cite this paper as:

OECD (2013), "What makes civil justice effective?", *OECD Economics Department Policy Notes,* No. 18 June 2013.

**ECONOMICS DEPARTMENT POLICY NOTE No. 18**

# WHAT MAKES CIVIL JUSTICE EFFECTIVE?



Economics Department

This document and any map included herein are without prejudice to the status of or sovereignty over any territory, to the delimitation of international frontiers and boundaries and to the name of any territory, city or area.

The statistical data for Israel are supplied by and under the responsibility of the relevant Israeli authorities. The use of such data by the OECD is without prejudice to the status of the Golan Heights, East Jerusalem and Israeli settlements in the West Bank under the terms of international law.

© OECD 2013

You can copy, download or print OECD content for your own use, and you can include excerpts from OECD publications, databases and multimedia products in your own documents, presentations, blogs, websites and teaching materials, provided that suitable acknowledgment of OECD as source and copyright owner is given. All requests for public or commercial use and translation rights should be submitted to *rights@oecd.org*. Requests for permission to photocopy portions of this material for public or commercial use shall be addressed directly to the Copyright Clearance Center (CCC) at info@copyright.com or the Centre français d'exploitation du droit de copie (CFC) at contact@cfcopies.com.

# WHAT MAKES CIVIL JUSTICE EFFECTIVE?

**Main findings**

- In several OECD countries lengthy civil proceedings can be a drag on economic activity. In the OECD area the average length is around 240 days in first instance, but in some countries a trial may require almost twice as many days to be resolved. Final disposition of cases may involve a long process of appeal before the higher courts, which in some cases can last more than 7 years.

- Differences in trial length appear to be more related to the structure of justice spending and the structure and governance of courts than to the sheer amount of resources devoted to justice. Factors associated with shorter trial length include larger shares of the justice budget devoted to court computerisation, the active management of the progress of cases by courts, the systematic production of statistics at the court level, the existence of specialised commercial courts and systems of court governance in which the chief judge has broader managerial responsibilities (e.g. covering supervision of non-judge staff and administration of the budget).

- There is wide scope for further informatisation of court activities in OECD countries. The majority of courts in OECD countries have electronic forms, websites and electronic registers, but many countries either have not yet implemented online facilities and the possibility for lawyers to follow up cases online, or have done so only in a minority of courts. Investments in court computerisation are related with higher productivity of judges (measured as cases solved per judge), especially in countries where computer literacy is widespread facilitating the take-up of ICT-based opportunities.

- Reducing high litigation rates through appropriate policies is a means to increase civil justice efficiency. Good quality regulation, timely and effective implementation of policies, integrity of the public sector and free negotiation of lawyers' fees (as opposed to regulation) could all be important instruments for reducing litigation. And a lower number of new litigation cases per capita – which range across countries from almost ten cases to less than one case in one hundred people – is associated with a significant reduction in the average length of trials.

- In many countries there is potential scope for reducing appeal rates, a simple measure of the predictability of court decisions. Appeal rates are lower in countries where filing an appeal is subject to obtaining permission (leave). However, as restrictions to appeal imposed by law do not explain all of the cross-country differences in appeal rates, there would seem to be scope for increasing predictability of court decisions (leading to lower appeal rates) without tightening restrictions.

**Well-functioning judiciaries are a crucial determinant of economic performance**

1.      Judicial systems serve important purposes in up-holding social values but also in determining economic performance. Well-functioning judiciaries guarantee security of property rights and enforcement of contracts. Security of property rights strengthens incentives to save and invest, by protecting returns from these activities. A good enforcement of contracts stimulates agents to enter into economic relationships, by dissuading opportunistic behaviour and reducing transaction costs. This has a positive impact on growth through various channels: it promotes competition, fosters specialisation in more innovative industries, contributes to the development of financial and credit markets and facilitates firm growth.

**The duration of trials can be very long in some countries and impose heavy costs[1]**

2.      A reasonable length of trials is an important characteristic of good judicial performance, together with independence and fairness of adjudication, predictability of court decisions, and accessibility to the system. Lengthy trials undermine certainty of transactions and investment returns, and impose heavy costs on firms. Moreover, the length of trials is related to other crucial measures of performance such as confidence in the justice system: OECD analyses on surveys of individuals in different countries suggest that a 10% increase in the average length of trials is associated with a decrease of around 2 percentage points in the probability to have confidence in the justice system.

3.      Cross-country differences in average trial length appear to be large, though international comparisons also reflect dissimilarities in the systems and in the way court statistics are collected in different countries. In 2010 the average length of civil proceedings in first instance in the OECD area was around 240 days, but only 107 days in Japan, the best performer. About 420 days were required in Slovenia and Portugal, and 564 days in Italy. The average length of a civil dispute going through all three instances was 788 days, ranging from 368 days in Switzerland to almost 8 years in Italy (Figure 1 and Annex Table).

4.      The costs of accessing the judicial system – as proxied by an estimate of all expenses borne by the litigants in a concrete case to achieve a resolution of their dispute (court fees, expert fees, lawyers' fees) net of the possibility to receive public financial support (legal aid) – vary significantly across countries (Figure 2). With some exceptions (Slovenia), systems characterised by lengthy trials tend to be more costly, suggesting that a reasonable trial length is an important condition for the accessibility of the judicial system (Figure 3).

---

[1]      The data used in this study come primarily from a new OECD dataset and the dataset collected by the European Commission for the Efficiency of Justice (CEPEJ).

**Figure 1. Trials can be very long in several countries**

Distribution of trial length (in days) across countries by type of instance



Note: Trial length is estimated with a formula commonly used in the literature based on incoming, pending and resolved civil justice cases: $[(Pending_{t-1}+Pending_t)/(Incoming_t+Resolved_t)]*365$. Each of the bars illustrates the main summary statistics of the sampled data. The diamond represents the median. The end points of the whiskers represent the minimum and the maximum values in the sample. The spacing between the main parts of the bars illustrates the degree of dispersion and skewness in the data.

Source: OECD and CEPEJ.

**Figure 2. Trial costs vary widely across countries**

Trial cost net of legal aid as a percentage of the value of the claim



Note: The indicator is constructed as the total private cost of trial discounted by the expected probability of receiving legal aid, which is assumed to reset trial costs to zero. The cost of trial (as a percentage of the value of the claim, which is assumed to be equivalent to 200% of income per capita in the country) is taken from the World Bank Doing Business database and encompasses three different types of costs necessary to resolve a specific commercial dispute: court fees, enforcement costs and average lawyers' fees. The reduced number of observations is due to data availability.

Source: OECD, CEPEJ and World Bank.

**Figure 3. Trial costs tend to increase with trial length**

Trial length in days, first instance



Note: Trial length is estimated with a formula commonly used in the literature based on incoming, pending and resolved civil justice cases: [(Pending$_{t-1}$+Pending$_t$)/(Incoming$_t$+Resolved$_t$)]*365. The indicator on the x-axis is a measure of the total cost of trial net of the probability of receiving legal aid. The cost of trial (as a percentage of the value of the claim, which is assumed to be equivalent to 200% of income per capita in the country) is taken from the World Bank Doing Business database and encompasses three different types of costs necessary to resolve a specific commercial dispute: court fees, enforcement costs and average lawyers' fees. The reduced number of observations is due to data availability.

Source: OECD, CEPEJ and World Bank.

## What are the main factors influencing trial length?

5.    The length of trials can be viewed as the result of the interaction between demand and supply of judicial services. Indeed, the inability of the system to resolve in each given period a number of cases equal to that brought to court generates congestion and delays. Accordingly, factors affecting the length of trials can be grouped into two main categories, depending on whether they influence the demand for or the supply of judicial service.

6.    *On the supply side*, some potential influencing factors are: the quantity and quality of financial and human resources devoted to justice; the efficiency of the production process as influenced, among other things, by the degree of task specialisation, the use of techniques for the efficient management of cases, and the diffusion of information and communication technologies (ICT); and the governance structure of the courts including the structure of incentives for judges and judicial staff.

7.    Factors that in principle influence the *demand for judicial services* include those that are internal to the organisation and working of the justice system – such as the costs of accessing the service and the rules for allocating them among the parties (fee-shifting rules), lawyers' fee regulation and the structure of the profession (*e.g.* the number of lawyers), the diffusion of mechanisms of alternative dispute resolution (ADR), and the degree of certainty of the law – and those that are external and related to cultural factors and structural characteristics of the economies.

4

*Cross-country differences in trial length are unrelated to the sheer size of resources devoted to justice*

8.      There is no apparent link between total public spending for justice (as a share of GDP) and the performance of the systems in the data assembled by the OECD: countries with similar spending ratios display very different trial lengths. For instance, Italy, the Slovak Republic, Switzerland and the Czech Republic all allocate around 0.2% of GDP to court budgets, but, while in Switzerland and the Czech Republic the average trial duration is around 130 days, it is 2.7 times larger in the Slovak Republic and even 4 times larger in Italy (Figure 4).

*Larger shares of the justice budget devoted to computerisation are associated with better judicial performance*

9.      Systems devoting a larger share of the justice budget to ICT investment display on average shorter trial length, as well as higher productivity of judges (number of cases disposed of by each judge). The link with productivity is stronger when computer literacy is widespread in the population, ensuring a better take-up of ICT-based facilities: moving from a share of people with basic computer skills of 33% to one of 54%, the responsiveness of judges' productivity to investment in informatisation increases by four times. Thus, investments in computerisation and policies aimed at spreading out computer skills would seem to be complementary vis-à-vis this measure of justice productivity.

**Figure 4. Budget allocated to courts as a percentage of GDP**



Note: The budget includes the amount of financial resources allocated to all courts, excluding resources for legal aid and public prosecution services. The bar height displays the ratio of budget to GDP, in percent. Cross-country comparisons of judicial budgets may be affected by differences in the allocation of tasks related to the functioning of the judiciary between the public judicial system and the private sector.

Source: OECD and CEPEJ.

*Better performance is also supported by active caseflow management and the systematic production of statistics*

10.     A court system with a good degree of informatisation is essential for the development of so-called caseflow management techniques that allow for a smoother functioning of courts. Caseflow

management broadly indicates the set of actions that a court can take to monitor the progress of cases and to make sure that they are managed efficiently. It includes for example the monitoring and enforcement of deadlines, the screening of cases for the selection of an appropriate dispute resolution track, and the early identification of potentially problematic cases. Among the different caseflow management techniques covered in the analysis, the early identification of long or otherwise potentially problematic cases in first instance appears to be associated with shorter trial lengths.

11.      An important condition for the implementation of caseflow management techniques is the systematic collection of detailed statistics on case flows, trial length, judges' workload and other operational dimensions. Recording data on the functioning of courts on a regular basis allows soundly monitoring and managing the performance of judges and staff. With some exceptions (England and Wales, Slovenia), trial length appears to be shorter in systems with a higher production of statistics.

### Task specialisation is associated with shorter trial length

12.      Subject matter specialisation enables judges to acquire detailed knowledge of a given area of law and of the issues that may arise in the related disputes. Furthermore, it favours a more efficient organisation of the work and is likely to guarantee better consistency of decisions. But a potential disadvantage of specialisation is the reduced potential for judges to benefit from knowledge spillovers across different areas (*e.g.* competition and bankruptcy law). Also, specialisation may introduce rigidity in the use of resources, limiting the possibility to reallocate judges from one area to another. Nonetheless, based on OECD data, specialisation in commercial matters – as measured by the presence of specialised commercial courts or sections covering at least three commercial matters – appears to have some association with shorter trial length.

13.      A different kind of specialisation is related to the presence of non-judge staff providing legal assistance to judges. Legal assistance may enhance performance by freeing judges from lower-skill tasks (legal research, drafting of memoranda, case preparation and management), enabling them to concentrate only on adjudication. In the countries covered by OECD data, each professional judge has on average 1.6 legal assistants. This ratio tends to be higher in common and German law countries (2.2 and 2.0 respectively), and lower in Nordic law ones (0.6). The availability of assistance seems to be associated with shorter trial length across all countries.

### Systems in which the chief judge has broader managerial responsibilities also display shorter trial length

14.      The governance structure of courts is a key determinant of performance, since it is the main channel through which incentive schemes can be designed and implemented. An important dimension in this respect is the allocation of responsibilities over jurisdictional and managerial tasks. Jurisdictional tasks are those functional to the adjudicative function *strictu sensu* (rendering and writing judgments) and, hence, are performed by judges. Managerial tasks relate to: the organisation and supervision of judges (*e.g.* office hours, presence in court, case management, hearings calendar); the organisation, supervision and appointment of quasi-judicial officers and administrative staff; the administration of the budget. According to OECD data, countries differ with regard to the delegation of responsibilities over managerial tasks. Some countries (Hungary, Finland, the Czech Republic, Australia, Korea, Germany) assign most of the responsibilities to the Chief judge and an external Body (such as a public agency or a judicial council). This regime appears to be associated with lower average trial length. In other countries (England and Wales, Ireland, Spain, Greece), responsibilities over these tasks lie mainly with a distinct non-judge manager – the Chief administrative officer – and an external Body. In still other countries accountability and authority over most of the tasks are jointly assigned to the Chief judge and the Chief administrative officer, with some of them (Denmark, Poland, Switzerland, Scotland, Slovenia, Sweden) giving predominance to the Chief Judge and others to the Chief administrative officer (Italy, New Zealand, South Africa). Finally, there are countries that display a higher dispersion of responsibilities (the Netherlands, Portugal, Belgium, Mexico, France).

6

***On the demand side, reducing litigation rates would significantly improve civil justice performance***

15.　　Litigation rates (*i.e.* the ratio of the number of new civil cases commenced in a given year to population or GDP) vary considerably across countries, ranging from 0.3 cases in one hundred people in Finland to around four in Italy, Greece, Spain and Czech Republic, and up to almost 10 cases in Russia. Higher litigation is correlated with longer trial length, as illustrated in Figure 5, which shows the estimated reduction in trial length associated with a 20% decrease in the litigation rate. The estimates imply that if the litigation rate in Italy decreased to the OECD average level (corresponding to a reduction of 35%), average trial length would decrease by 10%.

***Good quality regulation, effective implementation of policies, and integrity of the public sector are important instruments for reducing litigation***

16.　　Good-quality regulation and a timely and effective implementation of policies reduce the likelihood of conflicts both between private parties, and between the State and the private sector. By reducing the transparency and certainty of the business environment, the presence of corruption can have an opposite influence on the frequency of disputes. The empirical relevance of these factors for litigation finds support in OECD analysis based on the World Bank indicators of government effectiveness, regulatory quality and integrity of the public administration. For all three indicators, improvements in the scoring are associated with significant reduction in litigation, also taking into account legal origins and differences in GDP.[2]

**Figure 5. Reducing litigation rates would shorten trial length**

Shortening of trial length (in days) resulting from a 20% reduction in per capita litigation



Source: *Palumbo, G., G. Giupponi, L. Nunziata and J. Mora-Sanguinetti* (2013), "Judicial Performance and its Determinants: A Cross-Country Perspective", OECD Economic Policy Paper No. 5.

---

[2]　　Legal origins indicate whether the legal system is based on British common law, or French, German, or Nordic civil law. Common law countries includes: Australia, England and Wales, Ireland, Israel, New Zealand, Northern Ireland, Scotland, and South Africa; French law countries include: Belgium, France, Greece, Italy, Luxemburg, Mexico, the Netherlands, Portugal, Spain, Turkey; German law countries include: Austria, the Czech Republic, Estonia, Germany, Hungary, Japan, Korea, Poland, the Slovak Republic, Slovenia, and Switzerland; Nordic law countries include: Denmark, Finland, Iceland, Norway, and Sweden. Former socialist law includes Russia.

***Free negotiation of lawyers' fees, as opposed to regulation, is associated with lower litigation***

17.     In the market for legal services the client is usually less well informed about the nature of legal problems and their remedies than the lawyer. One implication of this is that the decision of whether to bring a dispute to court is often effectively taken by the lawyer. In taking this decision, lawyers also respond to their incentives as shaped, among other things, by fee regulation. Lawyers' fees may be freely negotiated between lawyers and clients, or regulated by professional associations or by law. Of 35 countries for which information is available, 29% have freely negotiated fees, 40% have fees regulated by law and 31% have fees regulated by the bar association. On average, a regime of freely negotiated fees is characterised by lower litigation as compared with a regime of regulated fees (by the law or the bar), with 0.9 cases in one hundred people versus 2.9, also taking into account legal origin. The relationship could be explained by the fact that the pressure exercised by competition among lawyers constrains their potential rents, thereby reducing the number of cases that the lawyers may find profitable to bring to court (rather than settle).

**Appeal rates, a simple measure of the predictability of court decisions, differ widely across countries**

18.     Predictability of court decisions, that is, the possibility to predict *ex ante* how the law will be applied by the court, is extremely important from an economic perspective. It provides legal certainty and enables economic agents to form expectations about the potential legal and economic consequences of their actions. Predictability of court decisions also influences choices on whether to initiate litigation or appeal judicial outcomes. Measuring predictability *per se* is difficult, but some information can be inferred from appeal rates before higher instances. Generally common-law countries exhibit lower appeal rates (both as a percentage of cases resolved in first instance and of population), and cross-country dispersion of appeal rates is also higher in other legal systems (Figure 6).

19.     Cross-country differences in appeal rates may be explained by restrictions imposed by law. The possibility to file an appeal can be limited to cases with a monetary value of the claim above a given threshold (monetary restrictions), or subject to obtaining permission from the lower or the appellate court (leave to appeal). Monetary restrictions are more common in German and French law countries, while restrictions based on leave to appeal are more frequent in common and Nordic law countries. Restrictions based on leave to appeal reduce significantly the average and cross-country variation of appeal rates (Figure 7). On the contrary, the impact of monetary restrictions is not statistically significant.

20.     Interestingly, wide cross-country differences in appeal rates persist even among countries sharing the same type of restrictions. Since restrictions do not explain all of the cross-country differences in appeal rates, there would seem to be scope for increasing predictability of court decisions (leading to lower appeal rates) without tightening restrictions.

8

**Figure 6. Appeal rates differ significantly across countries and legal origins**

**A. Cases appealed before the second instance as a percentage of cases resolved in first instance**



**B. Cases appealed before the second instance as a percentage of population**



Note: The appeal rate in Panel A is estimated as the ratio of incoming civil cases in second instance to resolved civil cases in first instance in the previous period. The appeal rate in Panel B is estimated as the ratio of incoming civil cases in second instance to population. Included countries are those for which data are available and jurisdiction is reasonably homogeneous. Countries are grouped by legal origins, indicating whether the legal system is based on British common law, or French, German, or Nordic civil law.

Source: OECD and CEPEJ.

**Figure 7. Restrictions to appeal explain only part of the cross-country differences in appeal rates**

Cases appealed before the second instance as a percentage of population by type of restrictions



Note: The chart displays the appeal rate before the second instance by type of restriction (see note to Figure 1 for details on how to interpret the bars). The appeal rate is estimated as the ratio of incoming civil cases in second instance to population. The first plot refers to countries where filing an appeal is subject to obtaining leave from the lower or the appellate court (Leave to appeal), the second plot refers to countries where filing an appeal is limited to cases with a monetary value of the claim above a given threshold (Monetary restrictions), the third plot refers to countries where no restrictions apply (No restrictions). Differences in the distributions of appeal rates without restrictions and with monetary restrictions are not statistically significant Included countries are those for which data are available and jurisdiction is reasonably homogeneous.

Source: OECD and CEPEJ.

10

# ANNEX TABLE

## Measures of trial length

Number of days

| Country | Trial length 1st instance | Trial length 2nd instance | Trial length highest court | Total trial length | Trial length Doing Business |
|---|---|---|---|---|---|
| Australia | 192 | 287 | | | 395 |
| Austria | 129 | | | | 397 |
| Belgium* | 233 | | | | 505 |
| Czech Republic | 135 | 77 | 313 | 524 | 611 |
| Denmark | 199 | 127 | | | 410 |
| England and Wales | 350 | | | | 399 |
| Estonia | 209 | 121 | 92 | 422 | 425 |
| Finland | 219 | 221 | 168 | 609 | 375 |
| France | 274 | 343 | 333 | 950 | 331 |
| Germany | 200 | 207 | | | 394 |
| Greece | 155 | 272 | | | 819 |
| Hungary | 200 | 111 | 142 | 454 | 395 |
| Iceland* | 211 | | | | 417 |
| Ireland* | 270 | | | | 650 |
| Israel | 294 | 359 | | | 890 |
| Italy | 564 | 1113 | 1188 | 2866 | 1210 |
| Japan | 107 | 114 | 146 | 368 | 360 |
| Korea | 144 | 179 | 255 | 579 | 230 |
| Luxembourg | 262 | 555 | | | 321 |
| Mexico | 342 | | | | 415 |
| Netherlands | 305 | | | | 514 |
| New Zealand | 171 | 191 | 286 | 648 | 216 |
| Northern Ireland* | 206 | | | | 399 |
| Norway | 160 | | | | 280 |
| Poland | 167 | 43 | | | 830 |
| Portugal | 425 | 120 | 90 | 635 | 547 |
| Russia* | 176 | | | | 281 |
| Scotland* | 206 | 350 | 350 | 906 | 399 |
| Slovak Republic | 354 | 76 | 194 | 624 | 565 |
| Slovenia | 420 | 103 | 831 | 1354 | 1290 |
| South Africa* | 258 | | | | 600 |
| Spain | 272 | 189 | 316 | 778 | 515 |
| Sweden | 186 | 117 | 225 | 528 | 508 |
| Switzerland | 131 | 142 | 95 | 368 | 390 |
| Turkey* | 212 | | | | 420 |
| | | | | | |
| Common Law | 243 | 297 | 318 | 777 | 494 |
| French | 304 | 432 | 482 | 1307 | 560 |
| German | 200 | 117 | 259 | 587 | 535 |
| Nordic | 195 | 155 | 197 | 568 | 398 |
| Former socialist | 176 | | | | 281 |
| | | | | | |
| Mean | 238 | 236 | 314 | 788 | 506 |

Note: In columns 1-4 trial length is estimated with a formula commonly used in the literature: $(Pending_{t-1}+Pending_t)/(Incoming_t+Resolved_t)*365$. Where information on the number of pending cases was not available but the country was able to provide information on the actual length, the latter was used (England and Wales, Mexico, New Zealand and the Netherlands). For the first instance only, for those countries for which neither the estimated nor the actual length was available, length has been calculated imputing the predicted value of the regression of the estimated length on the DB length (marked by an asterisk). Total length is the sum of trial length across the three instances (available for 16 countries). The DB length (column 4) refers to a hypothetical standardised commercial case in first instance. The table includes total averages and averages by legal origin. See footnote 2 for the classification of countries according to legal origin.

Source: OECD, CEPEJ and World Bank.

# POLICY NOTE SERIES

The full Economics Department Policy Notes series can be consulted at:
www.oecd.org/economy/policynotes

Raising the returns to innovation: structural policies for a knowledge-based economy
Policy Note No. 17

Debt and Macroeconomic stability: The perils of high debt and how to avoid them
Policy Note No. 16, January 2013

Looking to 2060: A Global Vision of Long-Term Growth
Policy Note, No. 15, November 2012

Financial Contagion in the Era of Globalised Banking
Policy Note, No. 14, June 2012

International capital mobility: structural policies to reduce financial fragility
Policy Note, No. 13, June 2012

What are the best policy instruments for fiscal consolidation?
Policy Note, No. 12, April 2012

Fiscal consolidation: How much is needed to reduce debt to a prudent level?
Policy Note, No. 11, April 2012

Managing government debt and assets after the crisis
Policy Note, No. 10, February 2012

Income inequality and growth - The role of taxes and transfers
Policy Note, No. 9, January 2012

Inequality in labour income - What are its drivers and how can it be reduced?
Policy Note, No. 8, January 2012

Recent Developments in the Automobile Industry
Policy Note, No. 7, July 2011

Getting the most out of International Capital Flows
Policy Note, No. 6, May 2011

The persistence of high unemployment: what risks? what policies?
Policy Note, No. 5, April 2011

The Effects of Oil Price Hikes on Economic Activity and Inflation
Policy Note, No. 4, March 2011

The Impact of Structural Reforms on Current Account Imbalances
Policy Note, No. 3, March 2011

Health care systems: Getting more value for money
Policy Note, No. 2, June 2010

Counter Cyclical Economic Policy
Policy Note, No. 1, May 2010

## ECONOMICS DEPARTMENT POLICY NOTES

This series of Policy Notes is designed to make available, to a wider readership, selected studies which the Department has prepared for use within OECD.

Comment on this Policy Note is invited, and may be sent to OECD Economics Department, 2 rue André Pascal, 75775 Paris Cedex 16, France, or by e-mail to giuseppe.nicoletti@oecd.org or giuliana.palumbo@bancaditalia.it.



# Exhibit 16

**Table C-5.**
**U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil Cases**
**Terminated, by District and Method of Disposition,**
**During the 12-Month Period Ending June 30, 2015**

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Before Pretrial | | During or After Pretrial | | Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| **TOTAL** | **216,312** | **8.8** | **46,473** | **5.2** | **139,822** | **8.9** | **27,445** | **13.0** | **2,572** | **25.0** |
| DC | **1,769** | **8.2** | **828** | **5.6** | **899** | **10.0** | **17** | **27.2** | **25** | **44.2** |
| **1ST** | **5,798** | **11.9** | **1,151** | **4.2** | **3,089** | **12.9** | **1,470** | **14.9** | **88** | **25.8** |
| ME | 502 | 7.5 | 159 | 5.9 | 320 | 8.1 | 15 | 21.7 | 8 | - |
| MA | 2,666 | 10.0 | 667 | 3.3 | 729 | 8.3 | 1,222 | 14.8 | 48 | 26.6 |
| NH | 455 | 8.2 | 89 | 3.6 | 228 | 7.5 | 129 | 13.2 | 9 | - |
| RI | 1,324 | 25.5 | 100 | 11.8 | 1,190 | 29.4 | 29 | 14.4 | 5 | - |
| PR | 851 | 12.1 | 136 | 6.1 | 622 | 11.8 | 75 | 21.7 | 18 | 27.8 |
| **2ND** | **21,230** | **9.5** | **3,200** | **4.6** | **12,682** | **9.3** | **5,043** | **12.6** | **305** | **32.4** |
| CT | 1,788 | 9.9 | 477 | 4.5 | 754 | 8.8 | 512 | 18.4 | 45 | 37.1 |
| NY,N | 1,217 | 11.0 | 189 | 3.0 | 684 | 12.3 | 322 | 13.6 | 22 | 36.1 |
| NY,E | 6,827 | 9.6 | 1,375 | 5.5 | 3,881 | 10.1 | 1,477 | 11.8 | 94 | 32.5 |
| NY,S | 9,824 | 8.9 | 928 | 4.1 | 6,111 | 7.9 | 2,656 | 12.1 | 129 | 29.2 |
| NY,W | 1,340 | 10.6 | 212 | 4.8 | 1,045 | 11.7 | 73 | 15.8 | 10 | 43.4 |
| VT | 234 | 10.9 | 19 | 4.1 | 207 | 11.4 | 3 | - | 5 | - |
| **3RD** | **23,880** | **7.2** | **2,684** | **3.9** | **16,185** | **5.9** | **4,774** | **13.7** | **237** | **28.8** |
| DE | 1,818 | 10.8 | 534 | 4.7 | 938 | 12.5 | 311 | 17.2 | 35 | 35.4 |
| NJ | 7,537 | 7.8 | 573 | 3.8 | 3,848 | 4.6 | 3,068 | 15.4 | 48 | 36.3 |
| PA,E | 10,778 | 5.5 | 744 | 3.2 | 8,671 | 4.8 | 1,263 | 9.2 | 100 | 20.3 |
| PA,M | 1,612 | 9.6 | 414 | 6.9 | 1,114 | 9.9 | 55 | 19.1 | 29 | 28.0 |
| PA,W | 1,913 | 6.7 | 282 | 2.5 | 1,603 | 7.7 | 17 | 20.9 | 11 | 21.4 |
| VI | 222 | 13.9 | 137 | 11.7 | 11 | 15.4 | 60 | 15.0 | 14 | 38.2 |
| **4TH** | **22,440** | **10.5** | **2,533** | **5.6** | **18,386** | **11.5** | **1,351** | **10.5** | **170** | **19.2** |
| MD | 3,112 | 7.6 | 433 | 7.3 | 1,967 | 5.8 | 674 | 12.6 | 38 | 24.6 |
| NC,E | 1,253 | 7.9 | 616 | 5.5 | 616 | 10.3 | 11 | 23.2 | 10 | 30.5 |
| NC,M | 665 | 11.6 | 406 | 8.8 | 223 | 16.8 | 33 | 17.3 | 3 | - |
| NC,W | 849 | 8.5 | 214 | 7.2 | 568 | 8.3 | 56 | 16.5 | 11 | 20.3 |
| SC | 2,271 | 9.3 | 161 | 3.9 | 2,052 | 9.7 | 36 | 11.0 | 22 | 29.3 |
| VA,E | 2,132 | 5.3 | 482 | 3.9 | 1,142 | 4.5 | 459 | 7.8 | 49 | 16.0 |
| VA,W | 573 | 10.1 | 131 | 4.5 | 388 | 11.7 | 43 | 11.6 | 11 | 17.2 |
| WV,N | 530 | 11.9 | 54 | 9.0 | 460 | 11.8 | 8 | - | 8 | - |
| WV,S | 11,055 | 15.4 | 36 | 2.1 | 10,970 | 15.4 | 31 | 17.4 | 18 | 20.9 |

## Table C-5. (June 30, 2015—Continued)

| Circuit and District | Total Cases | | No Court Action | | Court Action Before Pretrial | | During or After Pretrial | | Trial | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| **5TH** | **19,401** | **8.5** | **5,357** | **5.9** | **11,317** | **8.4** | **2,413** | **13.0** | **314** | **22.4** |
| LA,E | 2,630 | 10.6 | 148 | 3.1 | 1,361 | 9.0 | 1,072 | 14.7 | 49 | 17.4 |
| LA,M | 624 | 11.2 | 79 | 6.1 | 480 | 10.7 | 43 | 21.8 | 22 | 33.4 |
| LA,W | 1,132 | 12.0 | 286 | 6.5 | 647 | 12.6 | 180 | 18.4 | 19 | 34.6 |
| MS,N | 595 | 10.3 | 164 | 7.6 | 262 | 10.3 | 158 | 12.8 | 11 | 28.3 |
| MS,S | 1,272 | 10.4 | 733 | 9.3 | 487 | 10.9 | 31 | 19.3 | 21 | 21.5 |
| TX,N | 3,294 | 6.4 | 607 | 4.7 | 2,640 | 7.0 | 2 | - | 45 | 25.7 |
| TX,E | 3,165 | 8.1 | 1,101 | 6.6 | 2,012 | 8.8 | 25 | 22.0 | 27 | 22.5 |
| TX,S | 4,535 | 7.2 | 1,577 | 4.7 | 2,084 | 8.1 | 785 | 8.9 | 89 | 21.5 |
| TX,W | 2,154 | 7.1 | 662 | 6.3 | 1,344 | 6.6 | 117 | 15.3 | 31 | 20.1 |
| **6TH** | **19,193** | **12.4** | **7,254** | **11.7** | **8,329** | **12.6** | **3,428** | **12.5** | **182** | **26.8** |
| KY,E | 1,037 | 10.1 | 150 | 7.0 | 872 | 10.3 | 11 | 20.4 | 4 | - |
| KY,W | 1,010 | 8.4 | 233 | 3.2 | 694 | 9.2 | 77 | 14.8 | 6 | - |
| MI,E | 3,742 | 8.6 | 782 | 3.0 | 1,342 | 6.2 | 1,585 | 13.0 | 33 | 20.8 |
| MI,W | 1,062 | 9.0 | 153 | 3.3 | 730 | 9.9 | 174 | 13.2 | 5 | - |
| OH,N | 6,679 | 27.6 | 3,534 | 30.2 | 2,293 | 29.5 | 835 | 10.2 | 17 | 23.0 |
| OH,S | 2,403 | 9.1 | 1,200 | 5.5 | 528 | 11.1 | 648 | 12.6 | 27 | 17.0 |
| TN,E | 1,133 | 13.1 | 378 | 9.7 | 639 | 13.4 | 75 | 21.3 | 41 | 55.5 |
| TN,M | 1,200 | 12.3 | 176 | 6.5 | 990 | 12.8 | 6 | - | 28 | 29.4 |
| TN,W | 927 | 10.6 | 648 | 10.0 | 241 | 10.2 | 17 | 21.8 | 21 | 26.6 |
| **7TH** | **24,336** | **14.9** | **5,460** | **8.9** | **16,827** | **18.5** | **1,879** | **12.1** | **170** | **27.8** |
| IL,N | 8,405 | 7.3 | 2,231 | 4.7 | 5,681 | 8.1 | 408 | 10.5 | 85 | 29.0 |
| IL,C | 697 | 10.8 | 310 | 7.4 | 369 | 13.1 | 10 | 30.2 | 8 | - |
| IL,S | 9,314 | 35.5 | 1,984 | 18.0 | 7,312 | 40.9 | 8 | - | 10 | 26.4 |
| IN,N | 1,914 | 12.2 | 203 | 3.3 | 1,244 | 12.1 | 447 | 16.9 | 20 | 30.6 |
| IN,S | 2,169 | 8.5 | 330 | 4.2 | 1,071 | 6.9 | 753 | 11.3 | 15 | 27.5 |
| WI,E | 1,150 | 6.2 | 222 | 2.9 | 886 | 7.0 | 22 | 9.6 | 20 | 27.9 |
| WI,W | 687 | 8.3 | 180 | 4.0 | 264 | 7.9 | 231 | 10.8 | 12 | 17.2 |
| **8TH** | **11,413** | **7.5** | **4,692** | **3.0** | **5,527** | **9.7** | **1,032** | **13.6** | **162** | **24.4** |
| AR,E | 1,093 | 10.8 | 259 | 12.0 | 804 | 10.5 | 7 | - | 23 | 16.4 |
| AR,W | 847 | 11.9 | 138 | 11.5 | 687 | 11.9 | 4 | - | 18 | 24.7 |
| IA,N | 465 | 5.0 | 154 | 0.9 | 297 | 7.6 | 6 | - | 8 | - |
| IA,S | 494 | 8.4 | 77 | 4.0 | 251 | 5.1 | 158 | 16.4 | 8 | - |
| MN | 3,876 | 2.3 | 1,997 | 1.6 | 1,134 | 4.8 | 714 | 12.4 | 31 | 24.7 |
| MO,E | 1,839 | 8.2 | 753 | 4.4 | 1,064 | 10.4 | 1 | - | 21 | 27.1 |
| MO,W | 1,881 | 9.9 | 1,158 | 8.4 | 582 | 11.3 | 121 | 13.8 | 20 | 23.4 |
| NE | 491 | 7.7 | 34 | 3.9 | 423 | 7.5 | 15 | 20.9 | 19 | 31.6 |
| ND | 192 | 10.0 | 13 | 0.9 | 177 | 10.5 | 0 | - | 2 | - |
| SD | 235 | 8.7 | 109 | 1.1 | 108 | 14.9 | 6 | - | 12 | 27.4 |

## Table C-5. (June 30, 2015—Continued)

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Before Pretrial | | During or After Pretrial | | Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| **9TH** | **32,514** | **7.1** | **8,046** | **4.5** | **20,828** | **7.2** | **3,157** | **13.2** | **483** | **24.6** |
| AK | 261 | 9.4 | 37 | 11.0 | 217 | 9.0 | 0 | - | 7 | - |
| AZ | 2,221 | 7.8 | 136 | 3.0 | 1,615 | 6.5 | 435 | 13.7 | 35 | 28.3 |
| CA,N | 4,431 | 7.8 | 947 | 4.0 | 2,108 | 6.5 | 1,304 | 12.9 | 72 | 31.7 |
| CA,E | 2,651 | 8.5 | 890 | 5.4 | 1,658 | 10.1 | 71 | 17.6 | 32 | 27.7 |
| CA,C | 11,909 | 5.5 | 3,660 | 4.6 | 7,899 | 5.7 | 201 | 14.7 | 149 | 20.1 |
| CA,S | 2,251 | 6.5 | 374 | 3.1 | 1,125 | 5.2 | 714 | 12.7 | 38 | 34.3 |
| HI | 535 | 9.5 | 277 | 8.1 | 209 | 7.3 | 37 | 21.0 | 12 | 23.0 |
| ID | 388 | 10.8 | 19 | 2.3 | 284 | 10.1 | 77 | 18.0 | 8 | - |
| MT | 430 | 9.9 | 138 | 5.0 | 130 | 7.8 | 149 | 14.2 | 13 | 23.4 |
| NV | 2,181 | 9.0 | 269 | 5.5 | 1,748 | 9.7 | 142 | 6.7 | 22 | 34.4 |
| OR | 1,877 | 10.8 | 486 | 6.2 | 1,347 | 11.9 | 11 | 15.6 | 33 | 21.7 |
| WA,E | 631 | 9.9 | 199 | 5.3 | 413 | 10.9 | 7 | - | 12 | 25.3 |
| WA,W | 2,710 | 7.0 | 597 | 2.9 | 2,061 | 7.5 | 3 | - | 49 | 18.9 |
| GUAM | 21 | 20.5 | 7 | - | 8 | - | 5 | - | 1 | - |
| NMI | 17 | 14.8 | 10 | 8.7 | 6 | - | 1 | - | 0 | - |
| **10TH** | **9,764** | **7.4** | **2,931** | **2.2** | **5,528** | **9.6** | **1,160** | **13.5** | **145** | **24.2** |
| CO | 2,502 | 7.8 | 774 | 4.7 | 1,592 | 9.0 | 84 | 19.2 | 52 | 26.2 |
| KS | 2,704 | 2.0 | 1,486 | 1.8 | 1,119 | 5.9 | 77 | 21.3 | 22 | 24.1 |
| NM | 1,031 | 11.2 | 66 | 1.7 | 449 | 9.6 | 501 | 13.1 | 15 | 26.9 |
| OK,N | 670 | 10.7 | 63 | 2.3 | 592 | 11.4 | 12 | 26.7 | 3 | - |
| OK,E | 473 | 13.8 | 25 | 2.6 | 442 | 14.4 | 2 | - | 4 | - |
| OK,W | 1,094 | 7.8 | 274 | 4.4 | 473 | 7.4 | 326 | 10.2 | 21 | 17.2 |
| UT | 1,085 | 12.3 | 179 | 3.7 | 829 | 13.1 | 60 | 24.6 | 17 | 34.6 |
| WY | 205 | 12.2 | 64 | 4.7 | 32 | 13.6 | 98 | 13.3 | 11 | 17.6 |
| **11TH** | **24,574** | **6.6** | **2,337** | **4.4** | **20,225** | **6.3** | **1,721** | **12.8** | **291** | **21.8** |
| AL,N | 1,870 | 11.0 | 48 | 1.4 | 1,773 | 11.0 | 28 | 25.7 | 21 | 27.6 |
| AL,M | 636 | 8.7 | 67 | 4.3 | 530 | 8.5 | 28 | 18.3 | 11 | 14.9 |
| AL,S | 428 | 7.8 | 77 | 3.6 | 335 | 7.8 | 8 | - | 8 | - |
| FL,N | 1,155 | 7.1 | 43 | 4.1 | 1,075 | 7.1 | 14 | 14.7 | 23 | 17.7 |
| FL,M | 6,941 | 8.3 | 523 | 6.0 | 6,182 | 8.1 | 159 | 15.9 | 77 | 21.0 |
| FL,S | 7,998 | 4.7 | 871 | 4.4 | 6,888 | 4.6 | 144 | 8.4 | 95 | 15.6 |
| GA,N | 3,991 | 6.7 | 339 | 2.4 | 2,282 | 4.6 | 1,328 | 12.2 | 42 | 26.6 |
| GA,M | 927 | 12.1 | 205 | 7.2 | 703 | 12.4 | 7 | - | 12 | 23.6 |
| GA,S | 628 | 9.4 | 164 | 8.8 | 457 | 9.6 | 5 | - | 2 | - |

NOTE: Median time intervals are not computed when fewer than 10 cases reported. This table excludes land condemnations, prisoner petitions, deportation reviews, recovery of overpayments, and enforcement of judgments. Includes cases filed in previous years as consolidated cases that thereafter were severed into individual cases. For fiscal years prior to 2001, this table included data on recovery of overpayments and enforcement of judgments.