UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREGORY GREENE and JOSEPH LACK, individually and on behalf of all others similarly situated, ) ) ) Plaintiffs, ) ) vs. ) ) MIZUHO BANK, LTD. and MARK KARPELES, ) ) Defendants. ) | 14 C 1437<br><br>Judge Feinerman |

### MEMORANDUM OPINION AND ORDER

This putative class action, brought by Illinois resident Gregory Greene and California resident Joseph Lack, seeks to hold Mizuho Bank, Ltd. and Mark Karpeles liable for financial losses arising from the demise of the Mt. Gox Bitcoin exchange. Doc. 146. Plaintiffs bring only state law claims, and subject matter jurisdiction lies under the Class Action Fairness Act, 28 U.S.C. § 1332(d). Mizuho has moved to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Doc. 148. The motion is denied, but the denial is conditioned on putative class counsel replacing Greene with a named plaintiff from Illinois who is a member of the Deposit Subclass (of which more later). If a substitute named plaintiff is not named by April 4, 2015, this suit will be transferred to the Central District of California, where Lack resides and, as shown below, where Mizuho is subject to personal jurisdiction.

**Background**

On a Rule 12(b)(2) motion, the relevant background includes the complaint's well-pleaded allegations and the evidentiary materials submitted by both sides. No party has requested an evidentiary hearing, so the court must accept Plaintiffs' factual averments and resolve all genuine factual disputes in Plaintiffs' favor. *See Felland v. Clifton*, 682 F.3d 665, 672

1

(7th Cir. 2012) ("[W]here, as here, the issue [of personal jurisdiction] is raised on a motion to dismiss, the plaintiff need only make a *prima facie* showing of jurisdictional facts. We therefore accept as true all well-pleaded facts alleged in the complaint and resolve any factual disputes in … in favor of the plaintiff.") (citation omitted); *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782-83 (7th Cir. 2003). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Plaintiffs' brief opposing dismissal, so long as those facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted); *see also Defender Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 335 (7th Cir. 2015). The facts are set forth as favorably to Plaintiffs as those materials allow. *See Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 682 (7th Cir. 2014). In so doing, the court does not vouch for the accuracy of those facts. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.,* 610 F.3d 382, 384 (7th Cir. 2010).

Bitcoin is a digital payment system, and bitcoins are the system's unit of account. *See Beyond Silk Road: Potential Risks, Threats and Promises of Virtual Currencies: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs*, 113th Cong. 3-4 (2013) (statement of Jennifer Shasky Calvery), https://perma.cc/2TFX-6BCQ (noting that the Treasury Department classifies Bitcoin as a "decentralized virtual currency"). Bitcoins can be bought and sold on exchanges.

Prior to its collapse and bankruptcy, Mt. Gox was a Bitcoin exchange based in Tokyo, Japan. Doc. 146 at ¶¶ 11, 40. Karpeles was Mt. Gox's President, CEO, and majority shareholder. *Id*. at ¶¶ 6, 17. To fund their activities on the exchange, Mt. Gox users could either

(1) transfer bitcoins directly into their accounts at Mt. Gox or (2) wire fiat currency (government-issued money, like dollars and euros) to Mizuho Bank, which would deposit the money into a bank account it held on behalf of Mt. Gox. *Id*. at ¶¶ 14, 23. Mizuho, which is headquartered in Tokyo, earned service fees from processing those wire deposits. *Id*. at ¶¶ 7, 16. To withdraw fiat currency, a Mt. Gox user would make a request through her account at Mt. Gox, which would send the request, along with the user's banking details, to Mizuho, which in turn would transfer the requested amount to the user's bank. *Id*. at ¶ 24.

Greene, an Illinois resident, opened a Mt. Gox account in 2012 and began trading and selling bitcoins. *Id*. at ¶¶ 4, 46. For over a year, Greene traded bitcoins without problem. *Id*. at ¶¶ 47-49. In November 2013, Greene contacted Mt. Gox customer service after experiencing delays with his transactions. *Id*. at ¶ 49.

Unbeknownst to Greene, Mt. Gox had for several months been under pressure on two fronts. First, exploiting security vulnerabilities that dated from as early as 2011, Karpeles was stealing bitcoins belonging to Mt. Gox users. *Id*. at ¶¶ 19-21. Second, and of particular relevance here, Mizuho was attempting to end its relationship with Mt. Gox. *Id*. at ¶¶ 26-27 (citing Takashi Mochizuki et al., "Recording Shows Mizuho Pushed to End Dealings with Mt. Gox," *Wall St. J.*, Mar. 5, 2014, https://perma.cc/8YDX-V95S). Concerned about a reported U.S. investigation into money laundering on Mt. Gox and wary of potential legal liability or reputational harm, Mizuho pressed Karpeles to close the Mt. Gox bank account at Mizuho. Doc. 146 at ¶¶ 27-28. When Karpeles refused, Mizuho unilaterally took several measures designed to make the banking relationship untenable for Mt. Gox. *Id*. at ¶¶ 28-29, 31. Those measures included limiting the number and amount of Mt. Gox customer withdrawals and refusing to process some wire transfers. *Id*. at ¶¶ 28-29, 31.

By mid-2013, Mizuho was no longer processing any international wire withdrawals for Mt. Gox, meaning that Mt. Gox users who had wired fiat currency to Mizuho for deposit in Mt. Gox's bank account could not withdraw their money. *Id*. at ¶¶ 29, 31. Mizuho's qualms about handling Mt. Gox's business did not extend, however, to *receiving* fiat currency from Mt. Gox users for deposit into the Mt. Gox account. Even as it limited and then barred withdrawals, Mizuho continued to accept deposits from Mt. Gox users, earning revenue from the associated service fees. *Id*. at ¶¶ 31-32. Mizuho prohibited Mt. Gox from disclosing that the withdrawal difficulties were attributable to Mizuho or that Mizuho wanted to terminate its relationship with Mt. Gox. *Id*. at ¶¶ 36, 123, 125. Mizuho knew that if Mt. Gox's members learned of its prohibition on withdrawals of fiat currency from Mt. Gox's Mizuho account, members would stop making deposits and Mizuho would stop collecting the associated fees. *Id*. at ¶ 122.

Lack, a California resident, did not join Mt. Gox until January 22, 2014, about six months after Mizuho had barred all withdrawals from its Mt. Gox account. *Id*. at ¶ 56. He wired $40,000 in fiat currency from his local Wells Fargo branch to Mizuho on February 3, 2014, and Mizuho accepted the transfer. *Id*. at ¶¶ 57, 65. On the wire transfer instructions, Lack listed his individual Mt. Gox account number, and when Mizuho received the wire, it was given Lack's address. *Id*. at ¶ 57; Doc. 151 at 6, 8 & n.6. At the time, Mizuho had not publicly disclosed that it had halted all international wire transfers out of its Mt. Gox account. Doc. 146 at ¶¶ 63-64.

On February 7, 2014, Karpeles halted all Mt. Gox users' ability to withdraw bitcoins from the Mt. Gox Bitcoin exchange. *Id*. at ¶ 37. On February 24, the Mt. Gox website became inaccessible, and on February 28, Mt. Gox filed for bankruptcy protection in Japan. *Id*. at ¶¶ 39-40. Greene was unable to access approximately $25,000 in bitcoins from his Mt. Gox account.

4

*Id*. at ¶ 54. Lack was unable to recover his $40,000 in fiat currency from Mizuho, and that sum was not reflected in his Mt. Gox account. *Id*. at ¶¶ 62, 65-66.

Greene filed this suit against various Mt. Gox entities and Karpeles, Doc. 1, and then in an amended complaint added Lack as a plaintiff and Mizuho (among others) as a defendant, Doc. 37. The case was stayed for some time, Docs. 95, 129, and after a settlement attempt failed, Plaintiffs voluntarily dismissed all defendants other than Mizuho and Karpeles. Doc. 147.

The operative complaint has seven counts. Counts I-III name only Karpeles and need not be discussed. Doc. 146 at ¶¶ 73-99. Count IV is brought by Greene and Lack on behalf of the entire putative class; it alleges that Mizuho, in limiting withdrawals from Mt. Gox's bank account, tortiously interfered with Plaintiffs' agreements with Mt. Gox by undermining Mt. Gox's ability to do business. *Id*. at ¶¶ 100-108. Counts V-VII are brought on behalf only of Lack and the "Deposit Subclass," defined as those class members who deposited fiat currency into their Mt. Gox accounts through Mizuho after Mizuho had stopped processing withdrawals. *Id*. at ¶ 67. The Deposit Subclass does not include those individuals, like Greene, whose Mt. Gox assets consisted solely of bitcoins and who therefore did not deposit fiat currency at Mizuho. *Ibid*. Count V alleges that Mizuho unjustly enriched itself by accepting transaction fees in connection with incoming wire transfers from Deposit Subclass members after it had halted Mt. Gox withdrawals without disclosing that it had done so. *Id*. at ¶¶ 109-116. Count VI alleges that Mizuho fraudulently concealed from Lack and the Deposit Subclass that it had halted such withdrawals. *Id*. at ¶¶ 117-128. Count VII seeks an order "requiring Mizuho to provide a full and complete accounting of all transactions or records relating to the deposit, transfer, and processing of" the Deposit Subclass's assets. *Id*. at ¶¶ 129-132.

**Discussion**

"District courts exercising diversity jurisdiction apply the personal jurisdiction rules of the state in which they are located." *Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 912 (7th Cir. 2015); *see also Kipp v. Ski Enter. Corp. of Wis., Inc.*, 783 F.3d 695, 697 (7th Cir. 2015). The Illinois long-arm statute allows for the exercise of "jurisdiction to the limit set by the Due Process Clauses of the Constitution." *Noboa v. Barcelo Corporacion Empresarial, SA*, 812 F.3d 571, 572 (7th Cir. 2016); *see also* 735 ILCS 5/2-209(c) ("A court may … exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States."); *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800 (7th Cir. 2014) ("[T]o determine whether the district court had personal jurisdiction over [the defendant] we ask 'whether the exercise of jurisdiction comports with the limits imposed by federal due process.'") (quoting *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014)). "The plaintiff bears the burden of establishing personal jurisdiction." *Advanced Tactical*, 751 F.3d at 799. "Where, as here, the district court rules on a defendant's motion to dismiss based on the submission of written materials without holding an evidentiary hearing, the plaintiff need only make out a *prima facie* case of personal jurisdiction." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014) (internal quotation marks and citation omitted).

"Under the Fourteenth Amendment's Due Process Clause, a court may exercise personal jurisdiction over an out-of-state defendant when that defendant has 'minimum contacts with the [forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Philos*, 802 F.3d at 912-13 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (alteration in original) (internal quotation marks omitted). "The defendant's conduct and connection with the forum state must be substantial enough to make it

reasonable for the defendant to anticipate that he could be haled into court there. This purposeful-availment requirement ensures that a defendant's amenability to jurisdiction is not based on 'random, fortuitous, or attenuated contacts,' but on contacts that demonstrate a real relationship with the state with respect to the transaction at issue." *Northern Grain*, 743 F.3d at 492-93 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (internal quotation marks omitted). "While there are two branches of personal jurisdiction theory—general and specific," *Philos*, 802 F.3d at 913, Plaintiffs invoke only specific jurisdiction. Doc. 151 at 6 n.1.

"For a court to exercise specific jurisdiction, the lawsuit must 'result[] from alleged injuries that arise out of or relation to' the defendant's contacts with the forum." *Philos*, 802 F.3d at 913 (quoting *Burger King*, 471 U.S. at 472-73) (alteration in original) (internal quotation marks omitted). "Only intentional contacts by the defendant with the forum jurisdiction can support specific jurisdiction." *Noboa*, 812 F.3d at 572; *see also Walden*, 134 S. Ct. at 1123 ("A forum State's exercise of jurisdiction over an intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum."); *Philos*, 802 F.3d at 913 ("It is the defendant—not the plaintiff or third parties—that must create the contacts in the forum state, and those contacts must be 'with the forum State itself, not … with persons who reside there.'") (quoting *Walden*, 134 S. Ct. at 1122). "The relevant contacts are those that center on the relations among the defendant, the forum, and the litigation." *Advanced Tactical*, 751 F.3d at 801 (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 775 (1984)). "The mere fact that [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction. Furthermore, the relation between the defendant and the forum must arise out of contacts that the defendant *himself* creates with the forum." *Ibid*. (quoting *Walden*, 134 S. Ct. at 1122, 1126) (internal quotation marks and citations omitted,

7

alteration in original). In other words, "the plaintiff cannot be the only link between the defendant and the forum." *Id*. at 802 (internal quotation marks omitted); *see also Noboa*, 812 F.3d at 572. Consistent with these principles, "[s]pecific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Northern Grain*, 743 F.3d at 492.

Under these precedents, Mizuho would be subject to personal jurisdiction in California, where Lack resides. Like the Illinois long-arm statute, "California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (citing *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014), and Cal. Civ. Proc. Code § 410.10). Defining the alleged suit-related conduct here is straightforward. As noted, Lack wired $40,000 in fiat currency directly from his local Wells Fargo branch in California to Mt. Gox's account at Mizuho; in so doing, Lack listed his individual Mt. Gox account number on the wire transfer instructions, which allowed Mizuho to see that the deposit belonged to him, and when Mizuho received the wire, it was given Lack's California address. Doc. 146 at ¶ 57; Doc. 151 at 6, 8 & n.6 (citing 31 C.F.R. § 103.33(g)(1), recodified at 31 C.F.R. § 1010.410(f)(1), for the proposition that "banking regulations required customer addresses to be included on all international wire transfers"); *see Taft v. Agric. Bank of China Ltd.*, __ F. Supp. 3d __, 2016 WL 80209, at *8 (S.D.N.Y. Jan. 6, 2016) (describing the regulation); 1 John K. Villa, *Banking Crimes: Fraud, Money Laundering and Embezzlement* § 6:21 & n.22 (2015) ("[A] bank initiating a wire transfer in the amount of $3,000 or more must keep a record of the name and address of the person requesting the transfer, the date and amount of the transfer, any payment instructions it receives, the beneficiary's bank, and certain other

information about the beneficiary that it receives with the payment order. The bank must include most of this information on the transmittal order.") (footnotes omitted). Mizuho accepted the wire transfer from Lack for deposit into Mt. Gox's Mizuho account and earned a service fee as a result. Doc. 146 at ¶¶ 16, 57, 110. At the same time, Mizuho purposefully did not disclose—neither to the public at large nor directly to Lack—that by then it had halted withdrawals from its Mt. Gox account. *Id*. at ¶¶ 28, 31-32, 34-36, 63, 121-125. Lack alleges plausibly that Mizuho's intentional failure to disclose that it had stopped providing cash wire withdrawal services to Mt. Gox lulled Lack into a false sense of security, inducing him to deposit funds into Mt. Gox's account at Mizuho. *Id*. at ¶¶ 64, 126. Mizuho did this, Lack claims, to earn deposit service fees, thereby committing fraud and unjust enrichment. *Id*. at ¶¶ 31-32, 112, 122-123, 125.

      Although the evidence may prove inaccurate some or all of these alleged facts, and while the alleged facts, assuming their truth, may not add up to an actionable tort, Plaintiffs have made a *prima facie* case for personal jurisdiction in California. *See Philos*, 802 F.3d at 912 ("[T]he party asserting personal jurisdiction need only make out a *prima facie* case.") (internal quotation marks omitted). *Felland v. Clifton*, *supra*, a case on which Mizuho substantially relies, Doc. 149 at 11; Doc. 155 at 14-15, illustrates the point. The plaintiff, an individual named Felland, entered into a contract to purchase a new condominium unit in Mexico from Clifton, an Arizona resident. *Felland*, 682 F.3d at 669. After making the first installment payment, Felland expressed concern about the financing and timeliness of the condominium project, and Clifton sent several communications to Felland in Wisconsin assuring him of the project's health; relying on those assurances, Felland made additional payments. *Ibid*. Clifton's assurances were false, Felland sued him in Wisconsin for intentional misrepresentation and rescission, and the

9

district court dismissed the suit for lack of personal jurisdiction. *Id*. at 669-70. The Seventh Circuit reversed, explaining:

> Felland's complaint alleges that Clifton's repeated communications to his Wisconsin home were part of a deliberate attempt to lull him into a false sense of security and to induce him to make the installment payments. While these communications might not be directly relevant to a simple breach-of-contract claim, they are critical to Felland's claim of intentional misrepresentation. Clifton was aware that Felland lived in Wisconsin, directed multiple communications to him there, and knew that the harm would be felt in Wisconsin. These allegations are sufficient to establish the minimum contacts necessary to satisfy the due-process requirements for jurisdiction over Clifton in Wisconsin.

*Id*. at 670. The Seventh Circuit added that "[i]t is well established that such 'lulling' communications can be considered part of a larger scheme to defraud" and also "are relevant to the evaluation of the defendant's minimum contacts with the forum state for purposes of establishing personal jurisdiction in a case alleging a fraud." *Id*. at 675-76.

It is true that this suit differs from *Felland* in that Clifton directed communications to Felland in Wisconsin, while Mizuho remained silent when knowingly accepting Lack's deposits from California, but that distinction does not warrant a different result. As *Felland* makes clear, "the nature of the purposeful-direction/purposeful-availment inquiry depends in large part on the type of claim at issue." *Id*. at 674. Lack's claim is that Mizuho defrauded him not by making false statements to him, but the opposite—by remaining silent and thereby concealing the truth about Mizuho's "you can deposit to your heart's content, but we won't let you withdraw" policy regarding its Mt. Gox bank account—and then by accepting his deposit (and reaping the associated service fee) with the knowledge of the deposit's California origin and Lack's presence in California. The specific jurisdiction analysis must account for the nature of the torts alleged, unjust enrichment and fraudulent concealment, and the conduct here alleged is sufficient to establish that Mizuho purposefully directed its conduct to California, given that the torts were

completed only when Mizuho knowingly accepted a deposit from a California branch from somebody it knew to be a California resident and placed that deposit into the financial equivalent of a black hole.

The court has no doubt that Mizuho did not *care* that Lack resided in California as opposed to, say, Nebraska or North Carolina. That does not change the fact that Mizuho created the necessary relationship with California by accepting Lack's deposit, knowing that it arrived from a California branch and a California resident, and profiting from the associated fees. *See J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780, 2789 (2011) (plurality opinion) ("[I]t is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment."). In accepting the wire transfer and reaping the fee, Mizuho was not merely "affect[ing] plaintiffs with connections to" California. *Advanced Tactical*, 751 F.3d at 801 (quoting *Walden*, 134 S. Ct. at 1126). Instead, Mizuho's contacts with California were "intertwined with [its] transactions or interactions with" Lack, *Walden*, 134 S. Ct. at 1123, as Mizuho "purposefully exploited the [California] market" by accepting deposits with the attendant fees while concealing its no-withdrawal policy. *Advanced Tactical*, 751 F.3d at 802 (internal quotation marks omitted). Mizuho's relationship with California is not "entirely fortuitous," and it does not "depend[] wholly on activities out of [Mizuho's] control," *id.* at 803 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980)), as Mizuho knew that it was accepting a deposit from a Californian and a California branch.

Nor would exercising personal jurisdiction over Mizuho in California offend traditional notions of fair play and substantial justice. "The following factors are relevant in making this determination: 'the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial

system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies.'" *Felland*, 682 F.3d at 677 (quoting *Burger King*, 471 U.S. at 477). "[A]s is almost always the case," California "has a strong interest in providing a forum for its residents to seek redress for torts inflicted by out-of-state actors and injuries suffered within the state." *Ibid*. Although Mizuho would "face some burden in being forced to defend an action in" California rather than Japan, "out-of-state defendants *always* face such a burden, and there is no suggestion that [Mizuho's] hardship would be any greater than that routinely tolerated by courts exercising specific jurisdiction against nonresidents." *Ibid*. Finally, "[t]here is no compelling reason to assume" either that a suit in California would not serve Lack's interest in obtaining convenient and effective relief or that it would not be the most efficient way to resolve the matter. *Ibid*. More broadly, by entering into a depositary relationship with Mt. Gox, Mizuho certainly had every expectation of accepting wire transfers from Mt. Gox users who wanted to fund their accounts with fiat currency; indeed, accepting those transfers and securing the resulting service fees was no doubt a motivation for Mizuho to enter the Mt. Gox relationship in the first place. Those relationships in turn make it "such that [Mizuho] should reasonably anticipate being haled into court" in the Mt. Gox users' home jurisdictions. *Philos*, 803 F.3d at 913 (quoting *Burger King*, 471 U.S. at 474-75) (internal quotation marks omitted).

In any event, Mizuho has forfeited any argument based on notions of fair play and substantial justice. Its initial brief does not address fair play and substantial justice at all, Doc. 149, and its reply brief notes only that "[b]ecause the plaintiffs have not established that Mizuho Bank had sufficient suit-related contacts with Illinois to meet the standard articulated in *Walden*, or that their claims arose out of Mizuho Bank's contracts with Illinois, 'traditional notions of fair

play and substantial justice' do not provide an independent basis for conferring specific personal jurisdiction over Mizuho." Doc. 155 at 17. (The court does not fault Mizuho for not making a fair play/substantial justice argument as to California, but it did not even make the argument as to Illinois.) This results in a forfeiture. *See Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped."); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance a specific point in support of a general argument."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks omitted)

Contrary to Mizuho's submission, Doc. 189, subjecting it to personal jurisdiction in California is not inconsistent with *Noboa v. Barcelo Corporacion Empresarial*, *supra*. In that case, Noboa used the Orbitz website to book and pay for a stay at a hotel in Mexico owned by Barceló, a Spanish company. 812 F.3d at 572. At the hotel, Noboa signed up for an ecotour with a Mexican company called Rancho Carisuva; during the tour, Noboa's vehicle overturned, killing her, and her executors sued Rancho Carisuva and Barceló in Illinois. *Ibid*. In holding that neither defendant was subject to personal jurisdiction in Illinois, the Seventh Circuit explained:

> Only intentional contacts by the defendant with the forum jurisdiction can support specific jurisdiction. Plaintiffs' complaint does not allege that Rancho Carisuva, the supposedly culpable party, had any accident-related contacts with Illinois. Instead plaintiffs rely on *Noboa's* contacts with Illinois, and

13

> then with Orbitz, which had a contract with Barceló (or one of its subsidiaries or licensees), which led her to a hotel lobby in Baja California, where she met a representative of Rancho Carisuva, which provided defective equipment (or deficient supervision) on a motorized tour. Such contacts are even more attenuated than those deemed insufficient in *Walden,* in which the Court held that Nevada could not exercise jurisdiction over a claim by one of its citizens that a resident of Georgia should have known that his activity in Georgia would injure the Nevadan.

*Ibid*. Here, by contrast, Mizuho is alleged to have had tort-related contacts with California: it knowingly accepted a deposit from a bank it knew to be in California and from somebody it knew to be a California resident, knowing that it would not allow that money to be withdrawn, despite having concealed the no-withdrawal policy for the purpose of enticing such deposits. These facts evidence the requisite contacts with California.

Equally incorrect is Mizuho's contention that the result reached here is inconsistent with *Advanced Tactical Ordnance Systems v. Real Action Paintball*, *supra*. In that case, Advanced Tactical, an Indiana-based manufacturer of nonlethal irritant projectiles, acquired trademarks and other property in a foreclosure sale from PepperBall Technologies, a California company. *Id*. at 798. Prior to the foreclosure, PepperBall purchased its projectile irritants from two different companies: one a half-owner of Advanced Tactical, and the other a Mexican company called APON. *Ibid*. After the foreclosure sale, APON's chief operating officer sold irritant projectiles to Real Action Paintball, a California company. *Id*. at 799. Real Action then touted its acquisition of the "machinery, recipes, and materials once used by PepperBall Technologies," incorrectly and illegally implying, in Advanced Tactical's eyes, that Real Action was now the sole maker of PepperBall irritant projectiles. *Ibid*. After Real Action failed to respond satisfactorily to a cease-and-desist letter, Advanced Tactical sued Real Action in Indiana. *Ibid*. The Seventh Circuit, noting that the "mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction," *id*. at 802 (quoting

*Walden*, 134 S. Ct. at 1126) (alteration in original), held that Real Action was not subject to personal jurisdiction in Indiana.

Unlike Real Action's conduct in *Advanced Tactical*, Mizuho's litigation-specific conduct here was directed at California. As noted, the alleged fraudulent concealment and unjust enrichment torts were completed only when Mizuho accepted a deposit from Lack, whom it knew to be in California, from the California branch of his bank. This contrasts with Real Action, whose only contact with Indiana was that a competitor alleging trademark infringement happened to be based there, and whose alleged infringement did not rely on transactions originating in Indiana. Mizuho's alleged fraudulent concealment became grounds for a legal claim only once Mizuho received Lack's deposit from California and unjustly enriched itself from the deposit that its fraudulent concealment had induced Lack to send.

So Mizuho is subject to personal jurisdiction in California, at least under Seventh Circuit precedent. This case, however, was filed in Illinois. That is important, for Mizuho's relationship with Greene, and thus with Illinois, is considerably less involved than its relationship with Lack, and thus with California. Unlike Lack, Greene does not allege that he sent any wire transfers to Mizuho or that Mizuho received any transaction fees from Greene. Greene concedes this, but retorts that had he known that Mizuho had placed restrictions on Mt. Gox's Mizuho account, he would have withdrawn his bitcoins from Mt. Gox before its demise rendered them inaccessible. Doc. 146 at ¶ 55; Doc. 151 at 10. Greene's sole claim against Mizuho is that the bank tortiously interfered with his consumer agreement with Mt. Gox with "policies designed to undermine Mt. Gox's ability to do business." *Id*. at ¶ 103. Yet Mizuho had no transactional contacts with Greene of the type that it had with Lack; in fact, it had no transactional contacts with Greene at all. The alleged harm to Greene is Mizuho's only contact with Illinois, and that harm is

15

insufficient to establish personal jurisdiction, as "mere injury to a forum resident is not a sufficient connection to the forum." *Walden*, 134 S. Ct. at 1125.

Plaintiffs' contrary arguments fail to persuade. First, Plaintiffs observe that Mizuho operates a branch in Illinois. Doc. 146 at ¶ 3; Doc. 151 at 7. But they do not allege that any of Mizuho's suit-related conduct occurred at on account of that branch. The mere fact that Mizuho operates a branch in Illinois therefore does not confer specific jurisdiction over Mizuho. *See Advanced Tactical*, 751 F.3d at 801 ("For a State to exercise jurisdiction consistent with due process, the defendant's *suit-related* conduct must create a substantial connection with the forum State.") (quoting *Walden*, 134 S. Ct. at 1121) (internal quotation marks omitted).

Second, Plaintiffs observe that many absent members of the Deposit Subclass are Illinois residents. Doc. 151 at 12-16. One such individual, Anthony Motto, avers that he wired money to Mizuho intended for use on Mt. Gox and that Mizuho earned service fees from accepting the deposit. Doc. 151-3. However, "absent class members are not 'parties' before the court in the sense of being able to direct the litigation," *Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 269 (7th Cir. 1998); *see also Day v. Persels & Assocs., LLC*, 729 F.3d 1309, 1316 (11th Cir. 2013); *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012), and when "a district court [does not have] jurisdiction over the claim of the class representative … it [has] no jurisdiction over the class action either even if the claims of some of the members of the class were within its jurisdiction." *Denberg v. U.S. R.R. Ret. Bd.*, 696 F.2d 1193, 1197 (7th Cir. 1983). Specific personal jurisdiction can arise only from the claims of the named plaintiffs, not those of absent class members. *See Senne v. Kan. City Royals Baseball Corp*, 105 F. Supp. 3d 981, 1022 (N.D. Cal. 2015) ("In a purported class action, specific jurisdiction must be demonstrated by the named plaintiffs."); *Sinohui v. CEC Entm't, Inc.*, 2015 WL 848199, at *2

16

(C.D. Cal. Feb. 26, 2015); *AM Trust v. UBS AG*, 79 F. Supp. 3d 977, 986 (N.D. Cal. 2015) ("[C]laims of unnamed class members are irrelevant to the question of specific jurisdiction."); *Ambriz v. Coca Cola Co.*, 2014 WL 296159, at *5-6 (N.D. Cal. Jan. 27, 2014); *cf.* 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1757 (3d ed. 1998) ("The general rule is that only the residence of the named parties is relevant for determining when venue is proper."). Accordingly, the contacts that Mizuho made with Illinois through the absent members of the Deposit Subclass are not sufficient to establish personal jurisdiction over Mizuho in Illinois.

Having concluded under Seventh Circuit precedent that personal jurisdiction lies over Mizuho in California but not Illinois because Lack (a California resident) is a Deposit Subclass member while Greene (an Illinois resident) is not, the court must decide what to do next. The appropriate course is to transfer this case under 28 U.S.C. § 1631 to the Central District of California, where Lack appears to reside, Doc. 17 at 3 (showing that Lack executed his affidavit in Los Angeles), and where Mizuho is subject to personal jurisdiction. Section 1631 provides:

> Whenever a civil action is filed in a court … and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

28 U.S.C. § 1631. The statute has been held to apply not only where subject matter jurisdiction lies in the transferee court but not the transferor court, but also where, as here, the defendant is subject to personal jurisdiction not in the transferor court but in the transferee court. *See Shrader v. Biddinger*, 633 F.3d 1235, 1249 (10th Cir. 2011); *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 109-10 (3d Cir. 2009); *Johnson v. Woodcock*, 444 F.3d 953, 954 n.2 (8th Cir. 2006); *Roman v. Ashcroft*, 340 F.3d 314, 328 (6th Cir. 2003). (No citable Seventh Circuit opinion resolves whether § 1631 applies where the court lacks personal

jurisdiction over the defendant. *Cf. Wade v. Farmers Ins. Grp.*, 1996 WL 508613, at *2 (7th Cir. Aug. 30, 1996) ("Moreover, the court erred in stating that § 1631 permits transfers out of forums of improper *venue*. The court should have stated that the transfer was also authorized under § 1631 since it lacked *personal jurisdiction* over Farmers.").) The interests of justice would be served by a transfer, as there would be no point, other than unnecessarily creating possible statute of limitations issues, to dismissing the suit only to require Lack to refile it in California. *See Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466-67 (1962); *Amity Rubberized Pen Co. v. Mkt. Quest Grp. Inc.*, 793 F.3d 991, 996 (9th Cir. 2015) (noting "that normally transfer will be in the interest of justice because normally dismissal of an action that could be brought elsewhere is time-consuming and justice-defeating") (internal quotation marks omitted); *Moore v. City of Kankakee*, 2015 WL 2455116, at *3 (N.D. Ill. May 22, 2015); *Roberts & Schaefer Co. v. Clyde Bergemann Delta Ducon, Inc.*, 2015 WL 1911108, at *7 (N.D. Ill. Apr. 27, 2015); *Huster v. j2 Global Commc'n, Inc.*, 2014 WL 4699675, at *3 (N.D. Ill. Sept. 19, 2014).

Before transferring the case to California, however, the court will give putative class counsel three weeks to amend the complaint to add an Illinois member of the Deposit Subclass as a named plaintiff. Counsel is being given this opportunity because the Seventh Circuit has long and repeatedly held that if a named plaintiff falls short as a class representative, counsel should be allowed, if it can, to designate a new named plaintiff who fits the bill. *See Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1080-81 (7th Cir. 2013); *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 827 (7th Cir. 2011); *Phillips v. Ford Motor Co.*, 435 F.3d 785, 786 (7th Cir. 2006); *Parks v. Pavkovic*, 753 F.2d 1397, 1404 (7th Cir. 1985). This case differs somewhat from those just cited—Greene's problem is not, for example, that he is inadequate under Rule 23(a)(4) or

18

that his claims are moot under Article III, but rather that his particular claim does not justify exercising personal jurisdiction over Mizuho in Illinois—but the same general principle applies.

## Conclusion

For the foregoing reasons, Mizuho's motion to dismiss for want of personal jurisdiction is conditionally denied, with the condition being that putative class counsel file by April 4, 2016 a third amended complaint naming as a putative class representative an Illinois resident who is a member of the Deposit Subclass. If counsel fails to do so, this case will be transferred to the Central District of California.

March 14, 2016

United States District Judge