**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GREGORY GREENE, JOSEPH LACK, and ANTHONY MOTTO, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>MIZUHO BANK, LTD., a Japanese financial institution, and MARK KARPELES, an individual,<br><br>*Defendants*. | Case No. 1:14-cv-01437<br><br>[Hon. Gary Feinerman]<br><br>Magistrate Judge Susan Cox |

## THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiffs Gregory Greene ("Greene"), Joseph Lack ("Lack"), and Anthony Motto ("Motto") (collectively, "Plaintiffs") bring this Third Amended Class Action Complaint and Demand for Jury Trial against Defendants Mark Karpeles ("Karpeles") and Mizuho Bank, Ltd. ("Mizuho"). Plaintiffs, for their Third Amended Complaint, allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

### NATURE OF THE ACTION

1.      This case involves the demise of the Mt. Gox Bitcoin Exchange ("Mt. Gox" or the "Exchange") and the loss of hundreds of millions of dollars worth of its users' bitcoins and cash ("Fiat") Currency. Defendant Mark Karpeles, who owned and ran Mt. Gox, was responsible for the loss of more than $400 million from users on the Exchange through either gross negligence or outright theft. Plaintiffs bring suit on behalf of a class of similarly situated individuals to recover their resulting losses from Karpeles.

1

2.     Although Karpeles is the most notorious actor in the Mt. Gox collapse, Mt. Gox's banking partner, Defendant Mizuho Bank, bears significant responsibility as well. As discussed below, in mid-2013, Mizuho created a number of artificial hurdles in hopes of forcing Mt. Gox to sever relations with it. The most significant of these hurdles was to stop processing any withdrawal requests made by Mt. Gox users in the United States, thus making it impossible for United States users to withdraw any money from their Mt. Gox accounts. In this sense, Mizuho was like the famous Hotel California, money could check into the bank at any time, but once there, it could never leave.

3.     Mizuho actively hid what it was doing from consumers, knowing that if they knew how broken the banking relationship with Mt. Gox was—and that they would be unable to withdraw their money—no United States user would deposit money into Mt. Gox and Mizuho would be deprived of the transaction fees associated with such deposits. Plaintiffs thus also bring suit on behalf of a subclass of similarly situated individuals who were duped into depositing money into Mt. Gox after Mizuho made the decision to stop allowing withdrawals.

## PARTIES

4.     Plaintiff Gregory Greene is a natural person and citizen of the State of Illinois.

5.     Plaintiff Joseph Lack is a natural person and citizen of the State of California.

6.     Plaintiff Motto is a natural person and citizen of the State of Illinois.

7.     Defendant Mark Karpeles is a natural person and citizen of the country of France. During the events alleged in this Third Amended Complaint, Karpeles served as the Chief Executive Officer of both Mt. Gox KK and its parent company, Tibanne KK. Additionally, Karpeles is the sole shareholder of Tibanne KK. Based on Mt. Gox's own statements, "Mark Karpeles is the President and CEO of both MtGox and Tibanne. Mark providers [sic] overall

2

direction, responsible for supervising main operations and steering the company according to his vision."[1] Through Tibanne KK and the Mt. Gox Exchange, Karpeles conducted business throughout this District, the State of Illinois, and the United States.

8.      Defendant Mizuho Bank is a Japanese financial institution with its principal headquarters located at 1-3-3, Marunouchi, Chiyoda-ku, Tokyo, Japan 100-8210. Mizuho Bank conducts business worldwide, including throughout in this District (where it has branch offices), the State of Illinois, and the United States. Mizuho Bank has received and processed wire money deposits and withdrawals for Mt. Gox customers in this District, the State of Illinois, and the United States.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Classes is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to this action.

10.      This Court has personal jurisdiction over Defendants because they conduct business in this District and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from this District.

11.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from this District.

## COMMON FACTUAL ALLEGATIONS

### *The Mt. Gox Bitcoin Exchange.*

---

[1]      Business Plan MtGox 2014-2017, http://www.scribd.com/doc/209535200/Business-Plan-MtGox-2014-2017 (last accessed March 31, 2016).

12.     Founded in 2009, Mt. Gox at one time claimed to be the "world's most established Bitcoin exchange."[2] In addition to buying and selling bitcoins, Mt. Gox promised its customers "the ability to securely store Bitcoin in a virtual 'vault' for safe keeping"[3] on its servers. It further promised that its website would be "always on" so that users could "[b]uy and sell Bitcoin 24/7/365 with the world's most sophisticated trading platform."[4]

13.     To use Mt. Gox's service, customers were required to sign up for an account at www.mtgox.com and agree to Mt. Gox's Terms of Use, which expressly stated that "MtGox represents and warrants that . . . it will hold all monetary sums and all Bitcoins deposited by each Member in its Account, in that Member's name as registered in their Account details, and on such Member's behalf."[5]

14.     Customers were also asked to verify their accounts by providing Mt. Gox with detailed information, such as their full name, date of birth, country of birth, physical address, and proof of identity (such as a state issued identification card).

15.     To make purchases and trades on the Exchange, users could transfer bitcoins directly into their Mt. Gox accounts or deposit cash into their accounts by wiring money to Mt. Gox's banking partner—Defendant Mizuho Bank. After receiving the funds, Mizuho Bank would transfer the money into an account that it held on behalf of Mt. Gox.

16.     Mt. Gox received a transaction fee for each trade made on the Exchange. Upon information and belief, Mt. Gox made tens of thousands of dollars per day in transaction fees

---

[2]     Archive of Mt. Gox's homepage, http://xena.ww7.be/wsj/Mt.Gox%20-%20Bitcoin%20Exchange.html (last accessed March 31, 2016).
[3]     Archive of Mt. Gox "About Us" page, http://archive.today/8LhUJ (last accessed March 31, 2016).
[4]     *Supra* note 2.
[5]     *See* Terms of Use, Dkt. 11-2 at 3-4.

from customers on its site.[6]

17.    Mizuho likewise received transaction fees—likely of more than $30—on every wire deposit that it processed into the Exchange.

**_Mark Karpeles—The Mastermind Behind Mt. Gox._**

18.    As President, CEO, and majority shareholder of Mt. Gox, Karpeles controlled all aspects of Mt. Gox's business from the ground up. In fact, Karpeles was involved in nearly every detail of the Exchange, from the technical (Karpeles wrote and designed the software used to run Mt. Gox) to the operational (Karpeles handled all of Mt. Gox's third party negotiations and contracts).

19.    Karpeles likewise directed the drafting and dissemination of Mt. Gox's public statements and representations (including those made through its Terms of Use), as well the statements made through Mt. Gox's customer service department. In addition, Karpeles handled all aspects of Mt. Gox's accounting (including its maintenance of user and operational accounts) and banking affairs—personally representing Mt. Gox in its negotiations and discussions with banks and third-party payment processers.

20.    As the sole controlling force behind Mt. Gox and the designer of its software, Karpeles was aware that there were security "bugs" in the system in as early as 2011.[7]

21.    On information and belief, Karpeles exploited the security bugs on the Exchange to steal his users' bitcoins.

22.    In the alternative, rather than correcting the security bugs (or informing users of

---

[6]    _Mt. Gox kept the exchange open despite knowledge of large-scale theft_, http://www.computerworld.com/s/article/9246921/Mt._Gox_kept_exchange_open_despite_kno wledge_of_large_scale_theft?taxonomyId=144&pageNumber=2 (last accessed March 31, 2016).

[7]    _See_ Civil Rehabilitation Commencement Application, Dkt. 57-3 at p. 10 (noting that "[t]he existence of this bug was known since May 2011").

their existence), Karpeles knowingly concealed the defects from the public and falsely assured users that their bitcoins and money were safe in their accounts.

***Mizuho Bank's Banking Relationship With Mt. Gox.***

23.     Defendant Mizuho Bank was Mt. Gox's bank partner in Japan and maintained Mt. Gox's operating accounts. In that capacity, Mizuho Bank facilitated all international cash wire transfers into the Exchange and processed user requests to withdraw cash from the Exchange to their outside banks accounts.

24.     To facilitate wire transfers into the Exchange, Mizuho accepted payments that had been wired by users through their outside banks (e.g. Bank of America). Such wire transfers designated Mt. Gox as the beneficiary of the wire and Mizuho as the beneficiary's bank, and included the Mt. Gox user's account number to which the funds were to be directed. After accepting the wire payment, Mizuho thereafter deposited the funds into its account for Mt. Gox with the funds marked on behalf of the specific depositing Mt. Gox user.

25.     To withdraw cash from the Exchange, Mt. Gox users submitted requests online through their Mt. Gox account. Mt. Gox would compile the requests it received—which included such information as the user's banking details and the amount to be transferred—and provide the requests to Mizuho for processing. After receiving the requests, Mizuho would then transfer out the requested amounts to the user's bank.

26.     Mizuho Bank exclusively processed all bank deposits and withdrawals made by Mt. Gox users located in the United States.

***Mizuho Bank Became Concerned With Karpeles' Business and Implemented New Banking Policies Designed to Coerce Karpeles Into Dissolving Their Partnership.***

27.     Beginning in 2013, Mizuho Bank became increasingly concerned by Mt. Gox's growing transaction volumes amid reports that U.S. authorities were investigating Mt. Gox for

business dealings related to money laundering.[8] At the same time, Mizuho Bank faced its own legal troubles at home, with reports surfacing that the bank had knowingly loaned money to organized crime syndicates and was under investigation by Japan's Financial Services Agency.[9]

28.     Accordingly, due to fears that the partnership would expose it to liability and cause significant reputational harm, Mizuho Bank decided that it wanted to distance itself from Karpeles and Mt. Gox. However, for its own purposes (apparently owing, in part or in whole, to the culture of its home country), Mizuho Bank wanted Karpeles to be the one to officially sever the banking relationship. To that end, Mizuho asked Karpeles to end the relationship. He refused.[10]

29.     In order to pressure Karpeles into rethinking his decision and force an end to the banking relationship, Mizuho began implementing a series of new policies in the beginning of 2013. These new policies—all of which were kept secret from the public—were meant to frustrate and disrupt Mt. Gox's business and relationship with its customers, and included: (i) limiting the number and amount of Mt. Gox customer withdrawals that it would process on a weekly or monthly basis, (ii) removing Mt. Gox's access to Mizuho's automated withdrawal

---

[8]     *Recording Shows Mizuho Pushed to End Dealings With Mt. Gox*, http://online.wsj.com/news/articles/SB10001424052702304732804579420791991665968 (last accessed March 31, 2016); Feds Seize Another 2.1 Million From Mt. Gox, http://techcrunch.com/2013/08/23/feds-seize-another-2-1-million-from-mt-gox-adding-up-to-5-million/ (last accessed March 31, 2016).

[9]     *Mizuho Bank's Yakuza Scandal: More than 30 Execs to be Punished*, http://thediplomat.com/2013/10/mizuho-banks-yakuza-scandal-more-than-30-execs-to-be-punished/ (last accessed March 31, 2016).

[10]    In an audio recording leaked to the press (purportedly of a conversation held between Mark Karpeles and an unnamed Mizuho bank official), Mizuho is heard demanding that Karpeles close Mt. Gox's accounts with Mizuho, stating: "closing the account is actually our demand. We made various judgments and also have a certain policy. It's possible we will forcibly ask you to close your account." *See Mizuho to Mt. Gox: 'Close Your Account'*, http://blogs.wsj.com/moneybeat/2014/03/05/mizuho-to-mt-gox-close-your-account/ (last accessed March 31, 2016).

processes and requiring it to submit user withdrawal requests manually (i.e. by paper), and (iii) refusing to process certain international wire transfer requests. Mizuho likewise drastically raised its banking fees (in some cases, more than tripling its original fees).

30.     Ultimately, in or around mid-2013, Mizuho stopped processing international wire withdrawals for Mt. Gox altogether.

31.     Accordingly, in early to mid 2013, Mt. Gox users began to report substantial difficulties in withdrawing cash from their Mt. Gox accounts—wondering online about the source of the delays.[11]

32.     Mizuho knew that if US customers found out about its new unreasonable banking policies (especially, the fact that withdrawals were no longer allowed), they would no longer continue making deposits into the Exchange and it would cease collecting the associated fees. Nevertheless, Mizuho continued to accept user deposits into the Mt. Gox Exchange (for which it collected fees on each transaction) through its collapse in February 2014.

33.     On information and belief, Mizuho continued accepting customer deposits so as to avoid drawing public criticism and further scrutiny from regulatory authorities, as well as to continue profiting from the deposit fees that it collected.

***Defendants Concealed Mt. Gox's Operational Difficulties and Continued Accepting Cash Deposits.***

34.     In February 2014, Karpeles made numerous representations to the public and to Mt. Gox users that the withdrawal issues were only temporary and that user assets were safe. Karpeles also assured users through the Mt. Gox online Support Desk (which he directed and

---

[11]     *Withdrawals from Mt. Gox: Growing Pains or Banking Bottleneck?*, http://www.coindesk.com/withdrawals-from-mt-gox-growing-pains-or-banking-bottleneck/ (last accessed March 31, 2016); *Mt. Gox USD Withdrawals To Take Up To 22 Months*, https://bitcoinmagazine.com/7064/with-current-processes-mt-gox-usd-withdrawals-could-take-22-months/ (last accessed March 31, 2016).

controlled) that any problems were being dealt with and that there was no cause for alarm.[12] Likewise, users who inquired about withdrawal delays were informed that any withdrawal issues were only temporary and that delays in transaction speeds were merely "due to a change in [Mt. Gox's] banking systems" which had resulted in a "back-log" of requests that needed to be processed."[13] Karpeles even claimed that Mt. Gox was "trying to form relationships with several new banking partners both in Japan and around the world" and "in the process of finalizing even more," meaning that it would "have increased stability and ability to transmit withdrawals going forward."[14]

35.     Both Karpeles and Mizuho knew that these statements were false—withdrawal delays were not due to any "backlog" in the system; they were not minor issues and they were not temporary. Rather, withdrawal delays were due to Mizuho's refusal to process international withdrawal requests and its broader efforts to undermine the banking relationship between it and Mt. Gox.

36.     Although Mizuho knew that Karpeles was making these false and misleading statements to the public and to his Mt. Gox users, it took no action to correct them. Instead, Mizuho concealed that it was the cause of the Mt. Gox withdrawal delays, concealed the fact that it had implemented banking policies designed to disrupt Mt. Gox's business and relationship with its users, and stood silent while allowing the public to continue being duped.

37.     Upon information and belief, Mizuho prohibited Mt. Gox from disclosing that withdrawal difficulties were attributable to Mizuho, or that Mizuho wanted to terminate its banking relationship with Mt. Gox. By continuing to accept deposits, Mizuho further contributed

---

[12]     *See* Support Desk Updates, Dkt. 11-3.
[13]     *See* Declaration of Andrew Van Almen, Dkt. 18, Exs. B-D.
[14]     *Id.* at Ex. D.

to the false narrative that the Mt. Gox Exchange was operating properly and that problems with withdrawals were not serious.

38.     On February 7, 2014, Karpeles halted his customers' ability to withdraw any form of currency from the Mt. Gox website, stating that he was purportedly investigating a "bug" or "technical malfunction" in the Bitcoin network.[15] A few days later, on February 10, 2014, Karpeles claimed that he had supposedly detected "unusual activity" with respect to the Mt. Gox Bitcoin wallets and was investigating a technical issue, called "transaction malleability," which he said involved the ability of third parties to manipulate certain transactions. Karpeles nonetheless assured his customers that "MtGox will resume bitcoin withdrawals to outside wallets once the issue" had been addressed.[16] This statement was also knowingly false, and beyond that, Karpeles concealed the fact that he had been aware of the supposed security "bug" since in 2011.

39.     However, despite that the fact that users were now unable to withdraw any bitcoins or Fiat Currency from their accounts, and even though both Karpeles and Mizuho knew that the withdrawal service would never be restored, both Defendants nonetheless continued to accept and profit from more user deposits.

***Karpeles Shut Down Mt. Gox and Declared Bankruptcy.***

40.     On February 24, 2014, the Mt. Gox website "went dark." Customers who visited the site found nothing but a blank page and were unable to view or access their accounts. A message on the Mt. Gox website later notified members that a "decision was taken to close all transactions *for the time being*."[17] That statement was not true because, at that time, Karpeles

---

[15]     *See* Support Desk Updates, Dkt. 11-3 at 2.
[16]     *Id.* at 7-8.
[17]     *Is it the beginning of the end for Bitcoin? Virtual currency in turmoil as rumored*

was already planning on seeking bankruptcy protection and, on information and belief, was in the process of preparing Mt. Gox's bankruptcy filing.

41.     A few days later, on February 28, 2014, Mt. Gox filed for bankruptcy protection in Japan. In its petition (supported by a declaration from Karpeles), Karpeles revealed that he had known about the security "bug" since May 2011 but that it was not purportedly known "until the end of January 2014 that [the bug] could lead to a large number of unconfirmed transactions and to a risk of illicit withdrawals."[18] The petition further stated that Mt. Gox had discovered "a large discrepancy in the total of deposit balances at those financial institutions which managed said deposits compared to the total amount actually deposited by users and that there was a large shortfall of deposit balances."

42.     During a press conference, Karpeles revealed that Mt. Gox had assets of over $20 million (USD) and liabilities in excess of $65 million (USD)—not including the over $450 million worth of bitcoins it had lost through its supposed security breach.[19]

43.     In the days that followed, rumors likewise circulated that the supposed "hack" of Mt. Gox was an inside job orchestrated by Karpeles, who secretly controlled the stolen bitcoins.[20]

44.     Reports also emerged suggesting that Karpeles grossly mismanaged the Mt. Gox

---

*$375m theft closes major exchange*," http://www.thisismoney.co.uk/money/news/article-2567436/Bitcoin-turmoil-rumoured-375mtheft-closes-major-exchange.html (last accessed March 31, 2016).

[18]     *See* Civil Rehabilitation Commencement Application, Dkt. 57-3 at 10.

[19]     *Mt. Gox files bankruptcy, says hackers stole all its bitcoins*, http://articles.chicagotribune.com/2014-02-28/news/sns-mt-gox-bankruptcy-bitcoins-20140228_1_gox-bitcoin-market-bitcoin-community (last accessed March 31, 2016).

[20]     *Hackers call Mt. Gox CEO a liar, say he still controls 'stolen' bitcoin*, http://bgr.com/2014/03/10/mt-gox-fraud-accusations-hackers/ (last accessed March 31, 2016); *Police: Unlikely Hackers Stole Mt. Gox Bitcoins*, http://bitcoinist.net/police-unlikely-hackers-stole-mt-gox-bitcoins/ (last accessed March 31, 2016).

Exchange by ignoring known security flaws and user reports of hacking, failing to segregate customer and operational funds in Mt. Gox's account, failing to periodically balance and/or reconcile customer and operational funds, and losing user bitcoins that were purportedly stored in its offline storage.[21]

45.     On June 18, 2014, the Bankruptcy Court in the Northern District of Texas officially recognized Mt. Gox's Japanese bankruptcy proceedings as a foreign main proceeding under Chapter 15 of the U.S. Bankruptcy Code, effectively staying all pending litigation against it in the United States. *See In re MtGox*, Case No. 14-31229-sgj15 (Bankr. N.D. Tex.).

46.     Tibanne KK likewise declared bankruptcy in Japan in February 2015, with recognition as a Chapter 15 foreign main proceeding being granted on April 2, 2015. *See In re: Tibanne Co., Ltd., a/k/a KK,* Case No. 15-10255 (REG) (Bankr. S.D.N.Y.).

47.     In September 2015, Karpeles was arrested by Tokyo police and formally charged with fraud and embezzlement in connection to his management of Mt. Gox.[22]

## PLAINTIFFS' FACTUAL ALLEGATIONS

### Facts Relating to Plaintiff Gregory Greene

48.     In late 2011, while searching the Internet for a Bitcoin exchange, Plaintiff Greene navigated to Mt. Gox's website (www.mtgox.com) and read its advertisements about its service, including its representations about the Exchange's security, reliability, and ability to withdraw or deposit bitcoins at any time—substantially similar to the advertisements and representations described in Paragraphs 12-13 above.

---

[21]     *Lost in translation: The tangled tale of Mt. Gox's missing millions*, http://www.pcworld.com/article/2105920/lost-in-translation-the-tangled-tale-of-mt-goxs-missing-millions.html (last accessed March 31, 2016).
[22]     *Mt. Gox CEO charged with embezzling £1.7m worth of bitcoin*, http://www.theguardian.com/technology/2015/sep/14/bitcoin-mt-gox-ceo-mark-karpeles-charged-embezzling (last accessed March 31, 2016).

49.     Relying upon these representations made by Mt. Gox—namely, that it would allow him to "quickly and securely trade bitcoins with other people around the world" and give him "the ability to securely store [his] Bitcoins in a virtual 'vault' for safe keeping"—Greene signed up for an account on Mt. Gox's website in 2012 and began trading and selling Bitcoin.

50.     As a member of Mt. Gox, Greene paid transaction fees to Mt. Gox on every trade that he made, in part, to be able to buy, sell, trade, and withdraw bitcoins, and also, in part, to maintain and protect his bitcoins and Fiat Currency in compliance with industry standards.

51.     In November 2013, Greene began experiencing delays with his bitcoin transactions and complained to Mt. Gox customer service (which was directly controlled by Karpeles). Although customer service helped to resolve his issues, they did not inform Greene that the security of the Mt. Gox system had been compromised or that Karpeles was preparing to shut down the Exchange and file for bankruptcy. Accordingly, in light of the representations that were made to him through the Mt. Gox website and in its Terms of Use and Privacy Policy (and because he had no reason to think otherwise), Greene continued to believe that his bitcoins were stored safely and securely on Mt. Gox's system and permitted them to remain in his account.

52.     On February 5, 2014, Greene logged onto his Mt. Gox account and discovered that certain previously available functions, such as the simple withdrawal of bitcoins, had been restricted or were otherwise inaccessible. He immediately contacted customer service for further information.

53.     On February 10, 2014, customer service—at Karpeles' direction—responded to his inquiry and informed Greene that he was now required to verify his Mt. Gox account by submitting further proof of identification to the site. At Karpeles' direction, customer service concealed the fact that the security of the Mt. Gox system had been compromised and that

Karpeles was preparing to shut down the Exchange and file for bankruptcy. Accordingly, Greene promptly submitted the documents requested, including a copy of his driver's license and proof of address, and on February 24, 2014, was notified that his account had been verified.

54. After being notified of his verification, Greene logged onto his account and tried to make a withdrawal. The transaction did not go through. Rather, and despite not showing any sort of error message, the page simply cleared the inputs.

55. A few hours later, Greene attempted to log onto his account and discovered that Mt. Gox had gone offline, blocking all account access.

56. At the time Mt. Gox shut down, Greene's account contained approximately $25,000 dollars in bitcoins, which he had been unable to withdraw.

57. Had Greene known that Mizuho was interfering with Mt. Gox's ability to service its users, that the security of Mt. Gox had been compromised, or that Karpeles was preparing to go offline and declare bankruptcy, he would not have opened an account with Mt. Gox, would not have deposited or stored his bitcoins on the Mt. Gox Exchange, and/or would have taken immediate steps to withdraw his bitcoins from the Exchange before it went down.

***Facts Relating to Plaintiff Joseph Lack***

58. Plaintiff Lack joined Mt. Gox in early 2014 after reading Mt. Gox's representations about the Exchange's security, reliability, and ability to withdraw or deposit bitcoins at any time (substantially similar to the advertisements and representations described in Paragraphs 12-13 above). To activate his account, he was required to (and did) accept Mt. Gox's Terms of Use, and provided all requested documentation.

59. Upon joining, on January 22, 2014, Lack wire-transferred $40,000 USD to his account at Mt. Gox. To do so, Lack was directed by Defendants to wire the money directly from

his local Wells Fargo bank branch to the account that Mizuho held on behalf of Mt. Gox or its owners. Lack was also directed to list his individual Mt. Gox account number on the wire transfer instructions ostensibly so Mizuho and Mt. Gox could identify the deposit as belonging specifically to him.

60.     Following the transfer, Lack waited several weeks for the money to appear in his Mt. Gox account and for Mt. Gox to acknowledge receipt of his funds.

61.     On February 11, 2014, Lack contacted Mt. Gox regarding his $40,000 and when he would be able to access his money. Mt. Gox responded on February 14, 2014, stating that "withdrawal delays does [sic] not affect transferring funds to your Mtgox [sic] account." It did not answer his specific question regarding the status of his deposit but instead asked for a scanned copy of his wire transfer form. Lack provided this information on February 15, 2014.

62.     Lack continued to wait for the funds to appear in his Mt. Gox account. On February 19, 2014, he contacted Mt. Gox again for a status update, only to be informed, "We continue to check the status of the deposit with our banking team. We will let you know once the funds reaches [sic] your account." Lack responded on February 20, 2014, complaining of these non-responsive emails and demanding to know the location of his money.

63.     Mt. Gox responded on February 20, 2014 stating, "We are yet to receive your deposit. We are facing Bank delays on international deposit and we will surely keep you updated once we receive your deposit."

64.     Upon receiving this message, Lack immediately went to his bank to trace the wire transfer and recall the money.

65.     At no time prior to or during the deposit of his funds, did Mt. Gox or Mizuho notify him that Mt. Gox had suffered any type of "bug," that Mizuho was no longer providing

withdrawal services to Mt. Gox users (and thus, there would be no way for him to make wire withdrawals from the Exchange), or that his money would thereafter be permanently inaccessible.

66.     Had Lack known that Mizuho was interfering with Mt. Gox's ability to service users, that he would not be able to make any cash withdrawals from the Exchange, that the security of Mt. Gox had been compromised, or that Mt. Gox intended to go offline and declare bankruptcy, he would not have opened his account with Mt. Gox or attempted to deposit funds into his Mt. Gox account.

67.     On March 3, 2014, Lack's bank informed him that they were unable to recall the funds since they had already transferred to Mt. Gox on February 3, 2014. His bank provided all the documentation showing that his funds did indeed transfer on February 3, 2014, through Mizuho Bank.

68.     Following bankruptcy, the Mt. Gox website continued to reflect a balance of $0.00 in Lack's Mt. Gox account.[23]

***Facts Relating to Plaintiff Anthony Motto***

69.     Plaintiff Motto joined Mt. Gox in early 2014 after reading Mt. Gox's representations about the Exchange's security, reliability, and ability to withdraw or deposit bitcoins at any time (substantially similar to the advertisements and representations described in Paragraphs 12-13 above). To activate his account, he was required to (and did) accept Mt. Gox's Terms of Use, and provided all requested documentation.

---

[23]     Although the Mt. Gox Exchange no longer functions, the Mt. Gox website (www.mtgox.com) previously permitted users to input their account numbers to verify their account balances for purposes of submitting creditor claims in the bankruptcy. On information and belief (including based on Plaintiff Lack's and Plaintiff Motto's experience), certain user accounts reflect inaccurate account balances.

70. On February 15, 2014, Motto wire-transferred $1,000 USD to his account at Mt. Gox. To do so, Motto was directed by Defendants to wire the money directly from his local J.P. Morgan Chase Bank, N.A. ("Chase") bank account to the account that Mizuho held on behalf of Mt. Gox or its owners. Motto was also directed to list his individual Mt. Gox account number on the wire transfer instructions, which notified Mizuho and Mt. Gox that the deposit belonged specifically to him.

71. Motto's Chase bank account was opened under his name and registered to his home address in Illinois.

72. On February 18, 2014, Motto received confirmation from Chase that Mizuho accepted his deposit. However, though Mizuho accepted and received the deposit, the money did not appear in his Mt. Gox account.

73. On February 19, 2014, Motto contacted Mt. Gox regarding his $1,000 deposit and asked how long it would take for the funds to reach his account. In response, Mt. Gox indicated that it had not yet received the deposit from Mizuho, and asked Motto to confirm that the correct bank name—"Mizuho"—was listed on the wire transfer. Motto confirmed that the information was included and that the wire transaction from his Chase bank account had gone through to Mizuho, and asked that Mt. Gox ensure that the amount be applied to his account.

74. On February 24, 2016, Mt. Gox informed Motto that it would "check with the banking team" regarding his deposit and "let [him] know as soon as possible." Later that day, the Exchange went dark and Motto was no longer able to access his Mt. Gox account.

75. At no time prior to or during the deposit of his funds, did Mt. Gox or Mizuho notify him that Mt. Gox had suffered any type of "bug," that Mizuho was no longer providing withdrawal services to Mt. Gox users (and thus, there would be no way for him to make wire

17

withdrawals from the Exchange), or that his money would thereafter be permanently inaccessible.

76.     Had Motto known that Mizuho was interfering with Mt. Gox's ability to service users, that he would not be able to make any cash withdrawals from the Exchange, that the security of Mt. Gox had been compromised, or that Mt. Gox intended to go offline and declare bankruptcy, he would not have opened his account with Mt. Gox or attempted to deposit funds into his Mt. Gox account.

77.     Following bankruptcy, the Mt. Gox website continued to reflect a balance of $0.00 in Motto's Mt. Gox account. Upon information and belief, Defendants never deposited the funds into Motto's Mt. Gox account.

## CLASS ALLEGATIONS

78.     **Class Definition**: Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of themselves and a Class of similarly situated individuals, defined as follows:

> **Mt. Gox Class**: All persons in the United States who had bitcoins or money stored with Mt. Gox on February 24, 2014.

Plaintiffs Lack and Motto further bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of themselves and a Subclass of similarly situated individuals, defined as follows:

> **Deposit Subclass**: All members of the Mt. Gox Class who deposited money into their Mt. Gox account through Mizuho Bank after the date in which Mizuho Bank stopped processing withdrawals.

(The Class and Subclass are referred to herein as the "Classes".) Excluded from the Classes are (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current and

former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendants, and (5) the legal representatives, successors, or assigns of any such excluded person.

79. **Numerosity**: The exact number of the members of the Classes is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. On information and belief, and according to documents filed by Mt. Gox in support of their bankruptcy petition,[24] there are likely over 1,000 members in each of the respective Classes. Members of the Classes can be identified through Defendants' records.

80. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the members of the putative Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

(a) whether Karpeles adequately managed and safeguarded Plaintiffs' and the members of the Classes' bitcoins and Fiat Currency;

(b) whether Karpeles' conduct constitutes conversion;

(c) whether Karpeles' conduct constitutes negligence;

(d) whether Karpeles' conduct constitutes consumer fraud;

(e) whether Mizuho's conduct constituted fraudulent concealment;

(f) whether Mizuho's conduct constituted tortious interference; and

(g) whether Mizuho was unjustly enriched by its conduct.

---

[24] *See In re MtGox*, Case No. 14-31229-sgj15, Dkt. 127 at 10-11 (Bankr. N.D. Tex.).

81. **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Classes, in that Plaintiffs and the members of the Classes sustained damages arising out of Defendants' uniform wrongful conduct.

82. **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in complex class actions. Plaintiffs have no interest antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs.

83. **Superiority**: This case is appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. The damages suffered by the individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Classes to obtain effective relief from Defendants' misconduct. Even if members of the Classes could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

## FIRST CAUSE OF ACTION
### Conversion/Trespass to Chattels Against Mark Karpeles
### (On Behalf of Plaintiffs and the Mt. Gox Class)

84. Plaintiffs incorporate all allegations as if fully set forth herein.

85.     Plaintiffs and the Mt. Gox Class transferred, maintained, and stored actual bitcoins and Fiat Currency on the Mt. Gox exchange.

86.     Plaintiffs' and the Mt. Gox Class's bitcoins and Fiat Currency are protected property interests.

87.     Karpeles intentionally (or in the alternative, through gross recklessness or negligence) and without authorization or consent, stole, gained accessed to, used, exercised control, dominion, or ownership over, and/or dispossessed Plaintiffs' and the Mt. Gox Class's bitcoins and Fiat Currency.

88.     In doing so, Karpeles intentionally (or, alternatively, through gross recklessness or negligence) intermeddled with, damaged, and/or deprived Plaintiffs and the other members of the Mt. Gox Class of the use of their bitcoins and Fiat Currency.

89.     As a result of Karpeles' interference with Plaintiffs' and the other Mt. Gox Class's use of their bitcoins and Fiat Currency, Plaintiffs and the other members of the Mt. Gox Class have suffered, and will continue to suffer, damages, including in the form of the lost value of their bitcoins and currency.

90.     Plaintiffs and the Mt. Gox Class seek to recover the economic injury and other damages suffered as a result of Karpeles' unlawful conduct, including in the form of the price of the bitcoins and Fiat Currency that were in their Mt. Gox accounts at the time it went dark that is not recoverable under the liquidation proceedings in Mt. Gox's Japanese bankruptcy.

**SECOND CAUSE OF ACTION**
**Negligence Against Mark Karpeles (in the alternative to Conversion)**
**(On behalf of Plaintiffs and the Mt. Gox Class)**

91.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

92.     Karpeles owed Plaintiffs and the Mt. Gox Class a duty of reasonable care to

employ procedures to detect and prevent the improper access and misuse of Plaintiffs' and the Class's bitcoins and Fiat Currency and also to allow them complete access to the same. This duty arose from the legal and industry standards discussed above and Karpeles' relationship with Plaintiffs and the Mt. Gox Class.

93.     Karpeles breached his duty to the Plaintiffs and the Mt. Gox Class by failing to implement industry-standard protocols and exercise reasonable care in maintaining, protecting, accounting for, and safeguarding the Plaintiffs' and the Mt. Gox Class' bitcoins and Fiat Currency within Mt. Gox's control. This included the failure to implement industry-standard accounting procedures or to segregate user accounts from operational funds, as well as the failure to correct security bugs or other vulnerabilities on the Exchange.

94.     Karpeles further acted negligently by failing to implement security procedures to detect and prevent unauthorized access to Plaintiffs' and the Mt. Gox Class' bitcoins and Fiat Currency.

95.     As a result of Karpeles' conduct, Plaintiffs and the Mt. Gox Class suffered economic injury and other damages, in the form of the price of their bitcoins and Fiat Currency that were accessed, frozen, stolen, and/or misused or that are present in their Mt. Gox accounts and which they cannot access.

96.     But for Karpeles' negligence and breach of the duty of reasonable care, Plaintiffs' and the Mt. Gox Class' bitcoins and Fiat Currency would not have been compromised and/or lost. The Plaintiffs' and Class' bitcoins and Fiat Currency were accessed, frozen, stolen, and/or misused as the proximate result of Karpeles' failure to exercise reasonable care in safeguarding such information by adopting, implementing, and maintaining appropriate data management, accounting, and security measures.

97. The injuries to Plaintiffs and the Mt. Gox Class resulting from Karpeles' negligence were reasonably foreseeable, particularly in light of his grossly inadequate accounting, data management, and security processes.

98. Plaintiffs and the Mt. Gox Class seek to recover the economic injury and other damages suffered as a result of Karpeles' unlawful conduct, including in the form of the price of the bitcoins and Fiat Currency that were in their Mt. Gox accounts at the time it went dark that is not recoverable under the liquidation proceedings in Mt. Gox's Japanese bankruptcy.

### THIRD CAUSE OF ACTION
### Consumer Fraud Against Mark Karpeles
### (On behalf of Plaintiffs and the Mt. Gox Class)

99. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

100. As described herein, Karpeles engaged in unlawful, deceptive, and unfair conduct.

101. Through Mt. Gox's online marketing materials and advertisements, including its Terms of Use, Karpeles represented to Plaintiffs and the Mt. Gox Class that Mt. Gox would, *inter alia*, protect their bitcoins and Fiat Currency, and safely and quickly allow them to buy, sell, trade, or withdraw the same.

102. However, as discussed above, Karpeles did not—and never had any intention to—safeguard or protects his users' bitcoins and Fiat Currency or allow Plaintiffs and the members of the Class to buy, sell, and otherwise trade or withdraw the same, and instead, had since 2011, secretly siphoned—or allowed others to siphon—Plaintiffs' and the Class's bitcoins and money from their accounts for his own personal gain.

103. Thus, Karpeles' representations to Plaintiffs and the members of the Mt. Gox Class were knowingly and intentionally false.

104. Knowing that consumers are less likely to do business with companies that fail to

adequately safeguard and hold their bitcoins and Fiat Currency or allow them to buy, sell, trade, or withdraw the same, Karpeles made these false representations with the intention that Plaintiffs and the members of the Class would rely on them in contracting with Mt. Gox and transferring money and Bitcoin into their accounts.

105.    Karpeles additionally made false representations to Plaintiffs and the members of the Class through Mt. Gox's online Support Desk and in its customer service correspondence, which he controlled and directed, as described in Paragraphs 18, 33, and 37 *supra*. In particular, Karpeles falsely claimed that Mt. Gox's withdrawal and deposit issues were only temporary, that withdrawals would soon resume, that he was developing new business relationships with other banks for improved transaction capabilities, and that a security "bug" in Mt. Gox's system was the cause of its suspended withdrawals.

106.    Karpeles further concealed the fact that (i) Mizuho was no longer providing international withdrawal services, and thus, U.S. customers had no means to withdraw deposited cash from the Exchange, (ii) that thousands of user bitcoins had been lost or stolen, and (iii) that he was preparing to shut down the Exchange and file for bankruptcy.

107.    Knowing that users would stop depositing bitcoins and funds in their accounts, and rather, would attempt to withdraw funds or close accounts if made aware of any large-scale loss/theft of coins, Karpeles made the false representations and omissions with the intent that Plaintiffs and the members of the Class would rely on them and continue to deposit money and bitcoins into their Mt. Gox accounts and not attempt to withdraw funds and/or close accounts.

108.    Had Karpeles disclosed Mt. Gox's true practices and intentions, Plaintiffs and the members of the Class would have stopped depositing cash and/or bitcoins into their Mt. Gox accounts, immediately taken all available steps to remove their assets from the Exchange, or

would not have maintained accounts with Mt. Gox at all.

109.     Accordingly, Karpeles' fraudulent conduct caused Plaintiffs and the Class to suffer actual harm in the amount of the difference between the bitcoins or Fiat Currency that was in their Mt. Gox accounts at the time it went dark and the amount that will be actually returned to them under the liquidation proceedings in Mt. Gox's Japanese bankruptcy.

110.     Plaintiffs and the Class seek to recover the economic injury and other damages suffered as a result of Defendant Karpeles' unlawful conduct in the form of the price of the bitcoins and Fiat Currency in their Mt. Gox accounts that cannot be recovered.

**FOURTH CAUSE OF ACTION**
**Tortious Interference With Contract Against Defendant Mizuho Bank**
**(On behalf of Plaintiffs and the Classes)**

111.     Plaintiffs hereby incorporate all allegations as if fully set forth herein.

112.     Plaintiffs each entered into consumer agreements with Mt. Gox wherein Mt. Gox agreed to hold their bitcoins and Fiat Currency in the consumer's account, in the consumer's name, and on the consumer's behalf, and to allow the consumer to safely and quickly buy, sell, trade, or withdraw the same.

113.     Defendant Mizuho had actual knowledge of such customer agreements.

114.     Notwithstanding its knowledge, beginning in early 2013, Mizuho implemented policies designed to undermine Mt. Gox's ability to do business. These policies—which Mizuho kept secret from the public—included (i) limiting the number and amount of user withdrawals that it would process, (ii) refusing access to Mizuho's automated withdrawal processes and requiring Mt. Gox to submit manual withdrawal requests (i.e. by paper), (iii) exponentially increasing its banking fees.

115.     Then, in mid-2013, Mizuho went a step further and decided to stop processing all

withdrawal requests made by any Mt. Gox user in the United States.

116.     Mizuho had actual knowledge that its new policies made it impossible for Mt. Gox to fulfill its contractual obligations to Plaintiffs and the Classes, and directly caused Mt. Gox to breach said contracts.

117.     Further, as a direct consequence of Mizuho Bank's conduct, Karpeles was forced to shut down the Exchange and file for bankruptcy.

118.     Mizuho did not have authority or justification to interfere with Plaintiffs' and the Classes' contracts with Mt. Gox and/or their abilities to enjoy the benefits of their agreements. Rather, as explained in Paragraphs 27-33 *supra*, Mizuho Bank purposefully implemented such policies so as to pressure Mark Karpeles into closing Mt. Gox's account with Mizuho and terminating their business relationship.

119.     As a result of Mizuho's conduct, Plaintiffs and the Classes have suffered damages in the form of the price of the bitcoins and Fiat Currency that were stolen, lost, or misused by Mt. Gox.

### FIFTH CAUSE OF ACTION
### Unjust Enrichment Against Mizuho
### (On Behalf of Plaintiff Lack, Plaintiff Motto, and the Deposit Class)

120.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

121.     Plaintiff Lack, Plaintiff Motto, and the Deposit Class conferred a monetary benefit on Mizuho in the form of fees paid for its deposit services.

122.     Mizuho appreciates or has knowledge of the benefits conferred upon them by Plaintiff Lack, Plaintiff Motto, and the Deposit Class.

123.     Under principles of equity and good conscience, Mizuho should not be permitted to retain the transactions fees paid by Plaintiff Lack, Plaintiff Motto, and the Deposit Class,

because it knowingly concealed material information from them regarding their transaction deposits (i.e., that they would be unable to thereafter withdraw such money from Mt. Gox), which directly resulted in the loss of their monies that they wired to Mt. Gox through Mizuho.

124. Mizuho had a duty to disclose such material information once it stopped processing customer withdrawals.

125. As a result of Mizuho's conduct, Plaintiff Lack, Plaintiff Motto, and the Deposit Class suffered damages in the form of the transaction fees they paid for Mizuho Bank's wire services.

126. Plaintiff Lack, Plaintiff Motto, and the Deposit Class Members have no other adequate remedy at law.

127. Plaintiffs Lack and Motto, individually and on behalf of the Deposit Class, seek restitution of all monies Mizuho has unjustly received as a result of its conduct alleged herein, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable, as well as all other relief the Court deems necessary to make them whole.

**SIXTH CAUSE OF ACTION**
**Fraudulent Concealment Against Mizuho Bank**
**(On Behalf of Plaintiff Lack, Plaintiff Motto, and the Deposit Class)**

128. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

129. Defendant Mizuho Bank concealed from and/or failed to disclose to Plaintiff Lack, Plaintiff Motto, and the Deposit Class Members that it had stopped providing cash wire withdrawal services to Mt. Gox and that Deposit Class Members would thereafter be unable to make cash withdrawals from the Exchange.

130. These omitted and concealed facts were material because a reasonable consumer would have considered them to be important in deciding whether or not to deposit money

through Mizuho Bank into the Mt. Gox Exchange.

131. Mizuho Bank had a duty to disclose such facts because (i) it contributed to Plaintiff Lack, Plaintiff Motto, and Deposit Class Members' misapprehension of material facts relating to their ability to make cash withdrawals from the Mt. Gox Exchange, (ii) it was in a superior position and had exclusive knowledge of the fact that Plaintiff Lack, Plaintiff Motto, and the Deposit Class Members would be unable to withdraw their money from the Mt. Gox Exchange, and (iii) Plaintiff Lack, Plaintiff Motto, and Deposit Class Members could not have reasonably been expected to learn or discover the fact that Mizuho Bank had secretly stopped providing withdrawal services to Mt. Gox and that they would thereafter be unable to make cash withdrawals from the Mt. Gox Exchange.

132. By continuing to facilitate cash deposits into the Exchange even after knowing that it had terminated its withdrawal services to Mt. Gox (and that consumers would thereafter be unable to make cash withdrawals from the Exchange), Mizuho contributed to Plaintiff Lack, Plaintiff Motto, and the Deposit Class's misapprehension regarding their ability to access their deposited money, thus giving rise to a duty to disclose material facts that would correct their misapprehension.

133. Mizuho knew that if United States customers found out about its new unreasonable banking policies (especially, the fact that withdrawals were no longer allowed), they would no longer continue making deposits into the Exchange and Mizuho would cease collecting the associated fees. Despite this knowledge, Mizuho continued to accept user deposits into the Mt. Gox Exchange (for which it collected fees on each transaction) and conceal the truth about its withdrawal policies from Plaintiff Lack, Plaintiff Motto, and the Deposit Class through Mt. Gox's collapse in February 2014.

134.    On information and belief, Mizuho instructed its own employees not to reveal that it had stopped processing withdrawal requests for users in the United States so as to perpetuate the false impression that Mt. Gox was operating normally. Mizuho did this to protect its reputation so it would not be publicly viewed as contributing to the collapse of Mt. Gox.

135.    Although Mizuho knew that Karpeles was making false and misleading statements to the public and to his Mt. Gox users, *see* Paragraphs 34-39 *supra*, it took no action to correct them. Instead, Mizuho concealed that it was the cause of the Mt. Gox withdrawal delays, concealed the fact that it had implemented banking policies designed to disrupt Mt. Gox's business and relationship with its users, and stood silent while allowing the public to continue being duped.

136.    Upon information and belief, Mizuho prohibited Mt. Gox from disclosing that withdrawal difficulties were attributable to Mizuho, or that Mizuho wanted to terminate its banking relationship with Mt. Gox. By continuing to accept deposits, Mizuho further contributed to the false narrative that the Mt. Gox Exchange was operating properly and that problems with withdrawals were not serious.

137.    Plaintiff Lack, Plaintiff Motto, and the Deposit Class did not know that Mizuho had terminated its provision of withdrawal services to Mt. Gox or that Mt. Gox customers would thereafter be unable to make cash withdrawals from the Mt. Gox Exchange. Had Plaintiff Lack, Plaintiff Motto, and the Deposit Class known the above facts, they would not have wired (or continued to wire) money to Mizuho for deposit into the Mt. Gox Exchange.

138.    Plaintiff Lack, Plaintiff Motto, and the Deposit Class justifiably relied on the omissions of Mizuho to their detriment. This detriment is evident from the monies lost by Plaintiff Lack, Plaintiff Motto, and the Deposit Class after being deposited into the Mt. Gox

Exchange.

139.    As a direct and proximate result of Mizuho's concealment and omission of material facts, Plaintiff Lack, Plaintiff Motto, and the Deposit Class have suffered actual damages in the amount of deposited Fiat Currency that was thereafter misplaced, stolen, lost, or misused by Mt. Gox.

## SEVENTH CAUSE OF ACTION
### Accounting Against Defendant Mizuho
### (On Behalf of Plaintiff Lack, Plaintiff Motto, and the Deposit Class)

140.    Plaintiffs incorporate all allegations as if fully set forth herein.

141.    In early February 2014, Mt. Gox halted all transactions on its website and subsequently shut down its service. As a result, Plaintiff Lack, Plaintiff Motto, and the Deposit Class cannot access, view, withdraw, or locate their Fiat Currency.

142.    Because all transaction records relating to the deposits of Plaintiff Lack, Plaintiff Motto, and the Deposit Class's Fiat Currency are exclusively within the control of Mizuho, Plaintiff Lack, Plaintiff Motto, and the Deposit Class have an inadequate legal remedy in that they cannot determine the precise amount of damage that they have suffered as a result of Mt. Gox and Mizuho's conduct or which entity is in possession of their transferred funds. Although there are postings on the Internet of potential holdings, such postings contain inaccuracies and do not reflect the amounts transferred by the Deposit Class through Mizuho. Mizuho is in the best position to confirm the actual amounts deposited.

143.    As a result, Plaintiff Lack, Plaintiff Motto, and the Deposit Class seek an order requiring Mizuho to provide a full and complete accounting of all transactions or records relating to the deposit, transfer, and processing of Plaintiffs' and the Deposit Class' Fiat Currency so they may discern and calculate their damages and the party in possession of their Fiat Currency.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Gregory Greene, Joseph Lack, and Anthony Motto,

individually and on behalf of the Classes, pray for the following relief:

(a)    An order certifying the Classes as defined above, appointing Plaintiffs Greene,

Lack, and Motto as representatives of the Classes, and appointing their counsel as Class Counsel;

(b)    An award of actual and statutory damages;

(c)    An award of restitution for Defendants' wrongful conduct;

(d)    An award of reasonable attorneys' fees and costs;

(e)    An award of punitive or exemplary damages;

(f)    An award of interest;

(g)    Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully submitted,

**GREGORY GREENE, JOSEPH LACK, and
ANTHONY MOTTO**, individually and on behalf
of all others similarly situated,

Dated: April 4, 2016

By:/s/  Alicia E. Hwang
One of Plaintiffs' Attorneys

Jay Edelson
jedelson@edelson.com
Ari J. Scharg
ascharg@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Alicia E. Hwang
ahwang@edelson.com
EDELSON PC
329 Bryant Street, 2C
San Francisco, California 94133
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiffs and the Putative Classes*

## CERTIFICATE OF SERVICE

I, Ari J. Scharg, an attorney, hereby certify that on April 4, 2016, I served the above and foregoing *Plaintiffs' Third Amended Complaint* by causing true and accurate copies of such paper to be transmitted to all counsel of record via the Court's CM/ECF electronic filing system, and to be delivered by way of special process server to the address shown below:

Mark Karpeles
c/o National Corporate Research, Ltd.
615 South Dupont Highway
Dover, Delaware 19901

/s/Alicia E. Hwang