# **EXHIBIT B**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY GREENE and JOSEPH LACK, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 14 C 01437 |
| v. | ) ) | Judge Gary Feinerman |
| | ) | Magistrate Judge Susan E. Cox |
| MIZUHO BANK, LTD., a Japanese financial institution, and MARK KARPELES, an individual, | ) ) ) ) | |
| *Defendants*. | ) ) | |

## SUPPLEMENTAL MEMORANDUM OF LAW OF DEFENDANT MIZUHO BANK, LTD. IN SUPPORT OF ITS MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM OR ALTERNATIVELY FOR *FORUM NON CONVENIENS*

At the April 27, 2016 hearing on the motion to dismiss filed by Mizuho Bank, Ltd. ("Mizuho"), the Court, for purposes of evaluating Mizuho's request for dismissal on *forum non conveniens* grounds, asked whether there is any difference between Japanese law and Illinois law as to the elements of the causes of action asserted by the plaintiffs in the Second Amended Class Action Complaint (the "Complaint"). (*See* Apr. 27, 2016 Tr. at 13:24-14:5; 17:22-18:19; 20:10-14; 21:20-22:18, attached as Exhibit A.) In order to more fully respond to the Court's questions on this subject, Mizuho submits this supplemental memorandum of law and the accompanying declaration of Hirotaka Uranaka ("Uranaka Decl."), who is admitted to practice law in both Japan and New York. (Uranaka Decl. ¶¶ 1, 3, attached as Exhibit B.)

Japanese law provides a means of redress for plaintiffs that prove tortious interference with contract, unjust enrichment or fraudulent concealment, which are the three causes of action that the plaintiffs assert in the Complaint. (*Id.* ¶ 9.) In each instance, however, the formulation of the

cause of action under Japanese law is different from the formulation under Illinois law.  (*Id.*)

For tortious interference with contract, as for other torts, a plaintiff must satisfy the four elements set forth in Article 709 of the Civil Code for a "general tort":  (i) the infringement of a right or legally protected interest; (ii) the defendant's intent or negligence; (iii) damages; and (iv) a causal relationship between the infringement and the damages.  (*Id*. ¶¶ 10-11.)  In order to determine whether the infringement of the right constitutes a tort, judges in Japan must make a determination on a case by case basis taking into consideration the nature and features of the specific contract at issue and the manner of the infringement.  (*Id*. ¶ 12.)  That determination is based on an accumulation of scholarly theories and judicial precedent on how the elements of the tort are to be interpreted and how the principles are to be applied to different types of disputes. (*Id.*)  By comparison, under Illinois law, a plaintiff, as noted in Mizuho's motion to dismiss[1], must prove "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages."  *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 154-55 (1989) (internal quotation marks omitted).

To recover for unjust enrichment under Japanese law, a plaintiff must prove the four elements set forth in Article 703 of the Civil Code:  (i) loss on the part of the plaintiff; (ii) benefit on the part of the defendant; (iii) a causal relationship between the loss and the benefit; and (iv) a lack of legal cause for the benefit.  (Uranaka Decl. ¶ 14.)  A defendant who is unaware of the "lack of a legal cause" owes a duty to return the benefit "to the extent such benefit exists," whereas a defendant who is aware of the "lack of a legal cause" must return the benefit with interest and is

---

[1]  Memorandum of Law of Defendant Mizuho Bank, Ltd. in Support of Its Motion to Dismiss the Second Amended Class Action Complaint for Failure to State a Claim or Alternatively for *Forum Non Conveniens*  ("MTD") (ECF. No. 183.)

obligated to compensate any damages. (*Id.* ¶ 15.) As with the elements of a tort claim, the elements of unjust enrichment are open to interpretation. In addition, a consensus has not yet been reached as to all aspects of the law on unjust enrichment, including, for instance, whether the "causal relationship" must be direct or may be indirect, and the scope of the "to the extent such benefit exists" language. (*Id.* ¶ 16.) In reality, as noted above, judges take into consideration the applicable scholarly theories and judicial precedents on a case by case basis to reach a substantively reasonable conclusion. (*Id.*) By comparison, under Illinois law, a plaintiff must show that the defendant "unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Landlock Natural Paving, Inc. v. Desin L.P.*, 2013 WL 4854361, at *5 (N.D. Ill. Sept. 11, 2013) (Feinerman, J.) (internal quotation marks omitted).

Finally, under Japanese law, the concept of fraudulent concealment can constitute either a tort (for parties not in a contractual relationship) or a breach of contract (for parties in a contractual relationship). (Uranaka Decl. ¶ 17.) Here, the plaintiffs have not asserted any contractual relationship with Mizuho, so the analysis of fraudulent concealment as a tort would be more relevant. To prove the tort of fraudulent concealment, the plaintiffs would have to satisfy the four elements of a general tort set forth in Article 709 of the Civil Code and quoted above. By comparison, under Illinois law, a plaintiff asserting fraudulent concealment must prove: (1) that "the defendant concealed a material fact under circumstances that created a duty to speak"; (2) that "the defendant intended to induce a false belief"; (3) that "the plaintiff could not have discovered the truth through reasonable inquiry or inspection" (or was prevented from doing so); (4) justifiable reliance by the plaintiff; (5) that the plaintiff would have acted differently if he or she was aware of the hidden information; and (6) damages. *D'Attomo v. Baumbeck*, 2015 IL App (2d)

3

140865 ¶ 57. To show circumstances creating a duty to speak, a fraudulent concealment plaintiff must show a fiduciary or confidential relationship with the defendant, either as a matter of law or based on the nature of their relationship. *Id.* ¶¶ 59-60.

In sum, although Illinois law on the causes of action in question has some similarities to Japanese law, it is not the same. The Court therefore cannot avoid the problems of applying Japanese law in a U.S. court merely by assuming that the applicable law is the same in both jurisdictions or by relying on the absence of any demonstration on the record that the laws of the two jurisdictions diverge. On the other hand, as noted in Mizuho's motion to dismiss[2] and discussed at the hearing on April 27, 2016, the Court need not reach the request for dismissal on *forum non conveniens* grounds at all if the Court agrees that, even under the law that the plaintiffs invoke (the law of Illinois), they have—for any of the various independent reasons set forth in the motion to dismiss for each cause of action—failed to even state a claim.

Litigating this case under Japanese law in this Court would pose substantial difficulties. For one thing, as explained by Mr. Uranaka, the application of the general principles of tort and unjust enrichment to the specific claims made by the plaintiffs here would require the Court to locate, analyze and apply the various "scholarly theories and judicial precedents" that courts in Japan use to reach their determination as to a "substantively reasonable conclusion." As a practical matter, that might well mean that the parties would have to submit additional briefing and expert declarations on specific issues throughout the case (and certainly in connection with summary judgment, the jury charge and post-trial motions).

In addition, the Court potentially would have to rely on other Japanese statutes in addition to those that provide the elements of each cause of action. In order to apply the principles set forth above—to determine whether Mizuho, a commercial bank licensed and headquartered in Japan,

---

[2] (MTD at 2-3.)

4

violated the plaintiffs' "legally protected interest" for purposes of the tort statute, for example, or

whether the plaintiffs have shown a "lack of a legal cause" for purposes of the unjust enrichment

law—the Court would need to be familiar with and take into consideration the applicable Japanese

banking regulations. (Uranaka Decl. ¶ 23.) Moreover, in order to understand the "manner of the

infringement" for purposes of analyzing the tortious interference claim, the Court potentially

would need to look to the Japanese criminal law, administrative law and rules as to "public order

and good morals." (*Id.* ¶ 12.) In order to grapple with the duty-to-disclose question for purposes

of the fraudulent concealment claim, the Court potentially would need to look to other statutes that

might provide the source of such a duty (such as the Act on Sales . . . of Financial Instruments, the

Financial Instruments and Exchange Act, or the Building Lots and Buildings Transaction Business

Act). (*Id.* ¶ 20.)

To delve into a multiplicity of Japanese statutes would require this Court to venture far

beyond the role that United States courts typically play, even in cases where one party invokes

Rule 44.1 of the Federal Rules of Civil Procedure ("Determining Foreign Law"). Even though

courts sometimes must consider foreign law on a specific question arising in U.S. litigation, the

scope of the issues requiring the invocation of Japanese law here would be much wider than is

commonly seen in U.S. courts, precisely because, as previously noted, Japanese law properly

governs the claims at issue here. (MTD at 26, 28-30; Reply Mem.[3] at 19.) The plaintiffs' claims

arise out of conduct that occurred entirely in Japan, including an alleged fraud by Mark Karpeles

and Mt. Gox in Japan, a contract between two Japanese corporations (Mt. Gox and Mizuho) that is

governed by Japanese law and establishes the terms of their business relationship, and contracts

between Mt. Gox (a Japanese corporation) and its users, which also ought to be governed by

---

[3] Defendant Mizuho Bank, Ltd.'s Reply Memorandum of Law in Further Support of Its Motion to Dismiss the Second Amended Class Action Complaint for Failure to State a Claim or Alternatively for *Forum Non Conveniens* (ECF. No. 207).

Japanese law.  (*Id.*)  The need for this Court to "delve into the tenets of an unfamiliar legal system"

and make "an expenditure of considerable resources" weighs heavily in favor of dismissal for

*forum non conveniens.  Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847, 871 (7th Cir. 2015)

("the application of foreign law—particularly that of a civil law system—favors dismissal in favor

of a [foreign] forum"); *Apotex Corp. v. Istituto Biologico Chemioterapico S.p.a.*, 2003 WL

21780965, at *8, *10 (N.D. Ill. July 30, 2003).

The holding in *Fischer*, as well as a long line of similar rulings within the Seventh Circuit,

is based on the Supreme Court's explanation that one of the purposes of the *forum non conveniens*

doctrine is "to help courts avoid conducting complex exercises in comparative law" such as

"hav[ing] to compare the rights, remedies, and procedures available under the law that would be

applied in each forum."  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 251 (1981); *see Fischer*, 777

F.3d at 871 (because it was merely "likely" that Hungarian law would apply and "a Hungarian

court would be far better able to apply its own law than any United States court would be,"

dismissal was justified in order to avoid the need for a court to "untangle problems in conflict of

laws, and in law foreign to itself"); *U.S.O. Corp. v. Mizuho Holding Co.*, 547 F.3d 749, 751 (7th

Cir. 2008) (dismissing case because the applicable law was "almost certainly Japanese law, with

which American judges have little familiarity"); *Kamel v. Hill-Rom Co.*, 108 F.3d 799, 805 (7th

Cir. 1997) (district court was "justifiably concerned with presiding over a trial in which it would

have to delve into the tenets of an unfamiliar legal system" concerning claims of tortious

interference with business relations and fraud); *GoldenTree Asset Mgmt. LP v. BNP Paribas S.A.*,

64 F. Supp. 3d 1179, 1197 (N.D. Ill 2014) (same as to German law); *Wozniak v. Wyndham Hotels*

*and Resorts, LLC*, 2009 WL 901134, at*7-*8 (N.D. Ill. Mar. 31, 2009) (dismissing case because of

"Mexico's interests in determining its own tort policy" and "not only would a Mexican court be

more familiar with the relevant Mexican laws, but it would also not require the translation of those laws"); *Apotex Corp.*, 2003 WL 21780965, at *10 (dismissing case for *forum non conveniens* because it was "possible" that Italian law would apply to plaintiffs' claims, including claims for tortious interference with contract, and "[t]he court has an interest in not having to delve into the tenets of an unfamiliar legal system" (internal quotation marks omitted)); *Capital Mkts. Int'l, Ltd. v. Gelderman*, *Inc.*, 1998 WL 473468, at *6 (N.D. Ill. Aug. 7, 1998) (dismissing claims for fraud and tortious interference with prospective economic advantage because "this court is unfamiliar with and has fewer resources to thoroughly research English law"). This Court, in other words, need not make a definitive ruling that Japanese law applies in order to weigh the foreign law concerns here in favor of dismissal for *forum non conveniens*.[4]

For these reasons, and for the reasons set forth in Mizuho's previous submissions, the Court should dismiss the case against Mizuho with prejudice.[5]

---

[4] Separately, at the April 27, 2016 hearing, counsel for the plaintiffs claimed incorrectly that, in *JPMorgan Chase Bank, N.A. v. E.-W. Logistics, L.L.C.*, 9 N.E.3d 104 (Ill. App. Ct. 2014), "it was the bank itself . . . that had the duty to disclose because it was the fraudulent actor." (Ex. A, Apr. 27, 2016 Tr. at 57:25-58:2.) In fact, the court in *JPMorgan Chase* held just the opposite—"under the guaranty, Chase Bank owed no duty to speak"—and dismissed the fraud claims against it. *JPMorgan Chase Bank, N.A.*, 9 N.E.3d at 120.

[5] Because the plaintiffs have in the past brought the pendency of parallel proceedings in Canada to the attention of this Court (*see, e.g.,* Feb. 9, 2016 Tr. at 21:20-25), we note that the plaintiffs in the Canadian action earlier this month voluntarily dismissed their case. In an affidavit in support of dismissal, the plaintiffs' counsel acknowledged as to the claims against Mizuho that approximately 90 percent of the plaintiffs' losses consisted of only bitcoins rather than fiat currency, that Mizuho did not have "any role in storing, transferring or tracing Bitcoins," that Mizuho may not be held liable for the value of lost bitcoins," that "the recoverable damages . . . appear to be too small to warrant the continuation of the proceeding" and that Mizuho had raised a "significant" challenge to the court's jurisdiction to hear the case. (Notice of Motion and Aff. of Brendan O'Grady ¶¶ 17-18, 23, 27-28, *Joyce v. MtGox Inc.*, No. CV-14-500253 (Can. Ont. Sup. Ct. J. May 4, 2016); Decision Granting Motion for Dismissal, *Joyce v. MtGox Inc.*, No. CV-14-500253 (Can. Ont. Sup. Ct. J. May 10, 2016), attached as Exhibit C.)

7

MIZUHO BANK, LTD.

By: _____
One of Its Attorneys

Jonathan S. Quinn (#6200495)
jquinn@ngelaw.com
Jason A. Frye (#6292848)
jfrye@ngelaw.com
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street
Chicago, IL 60602-3801
(312) 269-8000

Jerome S. Fortinsky (admitted *pro hac vice*)
jfortinsky@shearman.com
John A. Nathanson (admitted *pro hac vice*)
john.nathanson@shearman.com
Jeffrey J. Resetarits (admitted *pro hac vice*)
jeffrey.resetarits@shearman.com
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

Dated: May 24, 2016

# **<u>EXHIBIT A</u>**

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
     GREGORY GREENE, JOSEPH LACK,    )
 4   and ANTHONY MOTTO,              )
     individually and on behalf      )
 5   of all others similarly         )
     situated,                       )
 6                                   )
                     Plaintiffs,     )
 7                                   )
     -vs-                            )  Case No. 14 C 1437
 8                                   )
     MIZUHO BANK, LTD., a            )
 9   Japanese financial              )
     institution, and MARK           )
10   KARPELES, an individual,        )  Chicago, Illinois
                                     )  April 27, 2016
11                   Defendants.     )  10:30 a.m.

12                TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE GARY FEINERMAN
13

14   APPEARANCES:

15   For the Plaintiffs:    EDELSON P.C.
                            BY:  MR. ARI J. SCHARG
16                               MR. JOHN AARON LAWSON
                            350 North LaSalle Street
17                          Suite 1300
                            Chicago, Illinois  60654
18                          (312) 239-3362

19

20

21
     Court Reporter:
22
                    CHARLES R. ZANDI, CSR, RPR, FCRR
23                       Official Court Reporter
                     United States District Court
24             219 South Dearborn Street, Room 2128
                       Chicago, Illinois  60604
25                   Telephone:  (312) 435-5387
             email:  Charles_zandi@ilnd.uscourts.gov
```

1    APPEARANCES:   (Continued)

2    For Defendant Mizuho        SHEARMAN & STERLING, LLP
     Bank, Ltd.:                 BY:   MR. JEROME S. FORTINSKY
3                                      MR. JEFFREY RESETARITS (via
                                       telephone conference call)
4                                599 Lexington Avenue
                                 New York, New York  10022
5                                (212) 848-4900

6                                NEAL, GERBER & EISENBERG
                                 BY:   MR. JONATHAN S. QUINN
7                                Two North LaSalle Street
                                 Suite 1700
8                                Chicago, Illinois  60602
                                 (312)  269-8093

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings heard in open court:)

2              THE CLERK:  14 C 1437, Greene versus Mt. Gox.

3              THE COURT:  Do we have anybody on the phone?

4              MR. RESETARITS:  Yes.  Jeff Resetarits with

5      Shearman & Sterling for Mizuho is on the line.

6              MR. SCHARG:  Good morning --

7              THE COURT:  And could you say your name one more

8      time, please.

9              MR. RESETARITS:  Sure.  It's Jeff, last name is

10     Resetarits.

11             THE COURT:  Got it.  Thank you.

12             MR. SCHARG:  Good morning.  Ari Scharg on behalf of

13     the plaintiffs.

14             MR. LAWSON:  Good morning.  Aaron Lawson on behalf of

15     the plaintiffs.

16             MR. FORTINSKY:  Good morning, your Honor.  Jerry

17     Fortinsky with Shearman & Sterling for Mizuho.

18             MR. QUINN:  Good morning, your Honor.  Jonathan Quinn

19     on behalf of defendant Mizuho.

20             THE COURT:  Good morning.  So, if the lawyers want to

21     stand at the podium, you can.  If you want to sit down and

22     talk into the microphones, you can, whatever you feel most

23     comfortable doing.  I'm indifferent to that.

24             So, we have a couple of motions.  One is fully

25     briefed.  One isn't.  Let me do the 1292 motion first, which

1  asks for an interlocutory appeal on the personal jurisdiction
2  ruling.  I'm going to deny that motion, and I'm going to state
3  my reasons on the record.

4         Under 1292, the district court can certify legal
5  questions to the Court of Appeals under particular
6  circumstances.  It has to be a controlling question of law,
7  and it has to be -- there has to be a substantial ground for a
8  difference of opinion.  And then it has to materially advance
9  the ultimate termination of the litigation.

10         And I agree that for both questions presented --
11  well, actually, I'm not sure about that.  So, I'm going to put
12  aside the third prong of the test.  The two questions that
13  Mizuho has proposed for immediate interlocutory review fall
14  short on the first prong and the second prong.

15         So, the first question is:  May a foreign defendant's
16  alleged silence or inaction, in this case when accepting funds
17  for a deposit, constitute intentional contact with the forum
18  state sufficient by itself to support personal jurisdiction
19  consistent with due process?

20         That's not a controlling question of law in this
21  case because it doesn't fit this case.  It doesn't describe
22  what happened or what is alleged to have happened in this
23  case.  And just to make things easier, whenever I say that
24  something happened or that Mizuho did X or Y or the plaintiff
25  did X or Y, I'm not actually saying that Mizuho did X or Y or

1  plaintiff did X or Y.  I'm saying that it's been alleged, that
2  those things have been alleged, and because we're at the
3  pleadings stage, that's my factual predicate.

4        It can't fairly be described as silence or inaction
5  for a bank to take custody of, accept, and profit from bank
6  deposits that are sent to an account in the bank.  That's not
7  inaction.  That is putting out a net, taking what comes in the
8  net, and not giving it back, and profiting from it.

9        It's that conduct that was the basis for my personal
10  jurisdiction ruling, and from where I sit, I don't think that
11  that conduct can fairly be described as silence or inaction.

12        So, the first question is a perfectly good question,
13  and I think it's probably a contestable question; but it's not
14  a controlling question of law in this case because it doesn't
15  fit this case.

16        The second proposed question is:  May a foreign
17  defendant's adoption of a policy that equally affects
18  thousands of individuals around the world or its failure to
19  disclose such a policy to those individuals subject it to
20  personal jurisdiction in each forum state where any of those
21  individuals may be located consistent with due process?

22        That question is a contestable -- no, that question
23  is a controlling question in this case because that describes
24  this case, but it's not a contestable question of law.  And on
25  that point, I'll just say the following:

1          I mean, let's assume that a bank did something that
2    it knew was engaged in -- said, "You know, we're only going to
3    engage in transactions, we're only going to accept deposits
4    from" -- and I know the bank says that they weren't able to
5    accept or not accept, and that's something that's going to
6    come up in the motion to dismiss.  Right now, I'm just talking
7    about the motion -- the personal jurisdiction motion.

8          "We're going to accept deposits only from Texas,
9    Oklahoma, Arkansas, Mississippi, and Alabama," as opposed to a
10   bank that says, "We're going to accept deposits from
11   everywhere."  It can't possibly be that the bank that limits
12   its alleged tortious conduct to those five states are suable
13   in those five states, are subject to personal jurisdiction in
14   those five states, but that banks who are indiscriminate with
15   respect to the states in which they're knowingly doing things
16   and accepting money from can't be sued anywhere other than
17   where that bank is located.

18         In other words, you don't get extra credit, from a
19   personal jurisdiction perspective, by treating people in all
20   50 states in a tortious way, as opposed to limiting your
21   tortious conduct to certain states.

22         And this goes back to a passage in the opinion where
23   I said that I have no doubt that Mizuho didn't care that Lack
24   was from California or Greene and Motto were from Illinois.
25   And I remember having a discussion -- I think I remember

1  having a discussion with Mr. Fortinsky when we argued this

2  motion where I heard him saying, perhaps incorrectly, that

3  after *Walden versus Fiore*, personal jurisdiction requires that

4  the defendant actually care which state the defendant is from

5  and which state they're affecting.

6  And I don't read *Walden versus Fiore* that way, and I

7  think that notion is what underlies the question, the second

8  question that's been presented for a 1292(b) interlocutory

9  appeal.

10  So, let's say I'm a meat -- a hamburger manufacturer

11  in Canada and I know that my hamburgers are tainted, and I

12  just send out my trucks to deliver -- my trucks are delivering

13  those hamburgers in the United States to all 50 states.  I

14  have adopted a policy that equally affects thousands of

15  individuals around the world, or at least in the country; and

16  it really doesn't matter to me whether the trucks are going to

17  North Dakota or Wisconsin or California or Alabama or

18  Mississippi or whatever, but I know that they are, and I know

19  that I'm affecting people in those 50 states.

20  Mizuho's preferred answer to the second question

21  would be, under those circumstances, the Canadian hamburger

22  manufacturer isn't subject to personal jurisdiction in any of

23  those states because it just acted with a shotgun as opposed

24  to with a rifle.  And that -- that's not a contestable

25  question, I don't think.  I don't think it's a close question.

1    So, while it describes this case, it doesn't satisfy the
2    requirements of 1292(b).
3          So, for those reasons, I'm going to deny the motion
4    for an interlocutory appeal, which is docket No. 208.
5          Let's move on to the -- let's move on to the motion
6    to dismiss, which presents meatier issues than the 1292(b)
7    motion.  So, Mizuho had the last word in writing, so let me
8    ask the plaintiffs whether they would feel that there's
9    anything in the reply to which they'd like to respond in a way
10   that they haven't already responded in their opposition brief.
11         MR. LAWSON:  I don't believe so, your Honor.
12         THE COURT:  Okay.  Is there any -- are there any
13   points that you would like to emphasize that you've already
14   put forth in writing?
15         MR. LAWSON:  I don't think so.  I imagine you'll have
16   questions about the choice of law issues that come up.  If
17   not, I think we'd like to talk about them now, but I think
18   that's perhaps the only issue in which we might have anything
19   we'd want to really put forward.
20         THE COURT:  Okay.  Well, tell me what you -- give me
21   your pitch on choice of law.
22         MR. LAWSON:  Okay.  Excuse me.  It seems to us that
23   if Japanese law is going to apply, then a request that you
24   dismiss the case under Illinois law is essentially a request
25   for an advisory ruling; and we're not sure that Rule 44.1

1    allows Mizuho to move to dismiss under one body of law while
2    at the same time reserving their right to contest the
3    allegations under a separate body of law later in the
4    litigation.
5              THE COURT:  Why not?
6              MR. LAWSON:  Well, their argument --
7              THE COURT:  All I have to say is, "Well, I'm not
8    going to dismiss the case because it fails to state a claim
9    under Japanese law," but what stops them later on on summary
10   judgment or in a trial saying, "You know what, Japanese law
11   applies, and here's what Japanese law says on these causes of
12   action"?
13             MR. LAWSON:  Well, I agree that they can do that.  I
14   just don't know that they can ask for your ruling on Illinois
15   law at this point in time.
16             THE COURT:  Why can't they -- why not?
17             MR. LAWSON:  Well, their premise seems to be that the
18   claims are so weak under Illinois law that we can dismiss them
19   and not worry about Japanese law, but --
20             THE COURT:  But you think that Illinois law applies.
21             MR. LAWSON:  We do.
22             THE COURT:  So, they're agreeing with your premise.
23             MR. LAWSON:  Say that again?
24             THE COURT:  You guys are sharing a common premise,
25   which is for purposes of 12(b)(6), what law applies.

1    MR. LAWSON:  I think we think it applies for the
2  entire litigation, but yes.
3          THE COURT:  For purpose of 12(b)(6) --
4          MR. LAWSON:  Yes.
5          THE COURT:  So, you ought to be happy with their
6  assumption for present purposes that Illinois law applies.
7          MR. LAWSON:  Well, inasmuch as -- yes, we do agree
8  that -- we are happy to apply Illinois law at this point.  I
9  just don't think that it makes sense to ask us to litigate
10  under Illinois law now with the assumption that it won't apply
11  later.  But if you disagree, we're not -- I mean, this is not
12  a hill --
13          THE COURT:  It's not that I disagree.  I don't even
14  understand your point.  Why are you even pressing this point?
15  They're agreeing with you with your premise on the 12(b)(6),
16  and you ought to say, "Great, we're fighting it under Illinois
17  law.  That's exactly what we want."
18          MR. LAWSON:  It is what we want.
19          THE COURT:  Later on, you can say -- well, we have to
20  talk about Japanese law versus Illinois law for *forum non*
21  purposes; but assuming we get over that hump, you live to
22  fight -- they live to fight another day, and you don't give
23  anything up.
24          MR. LAWSON:  Sure.  All right.
25          THE COURT:  But what am I missing?

1         MR. LAWSON:  I suppose nothing.  Maybe we're just

2  thinking about this in different ways, and in that case, your

3  way gets to carry the day.

4         THE COURT:  No, but I'm -- I mean, that -- I

5  appreciate that, but if I'm looking at it the wrong way, I

6  want to know that.  And I'm just one person, and sometimes I

7  think of things in a certain way, and I come to believe,

8  either from my own devices or from hearing from counsel, that

9  I ought to be looking at something from a different way.

10        So, I ask in all sincerity.  When I say, "What am I

11  missing," I'm not like Kim Jong Un saying, "What am I

12  missing," and there's only one answer to that.  I'm being

13  sincere.  What am I missing?

14        MR. LAWSON:  I'm not sure you're missing anything.

15        THE COURT:  Okay.  All right.  So -- but what

16  about -- since we're on choice of law, for the *forum non*, why

17  don't you address choice of law for purposes of the *forum non*

18  motion.

19        MR. LAWSON:  Okay.  Our point is that given that

20  this -- we apply Illinois's choice of law rules, the

21  presumption is that Illinois law applies.  And absent, you

22  know, a material conflict -- but even if there were a material

23  conflict, in tort cases, where the injury is felt, where it

24  occurs is generally the jurisdiction that has the greatest --

25  the most significant relationship to a dispute; and in that

1    case, for plaintiff Motto, for plaintiff Greene, that's --

2    those are both Illinois.  So, we think even if there was a

3    material conflict, Illinois law would apply.

4          THE COURT:  I understand that that's true for Greene

5    and -- that may be true for Greene and Motto, but you're

6    seeking to certify a nationwide class.  So, given that we're

7    going to have class members possibly from all 50 states, which

8    does not make this a universal jurisdiction case for purposes

9    of personal jurisdiction; it makes it the case that I

10   described, why -- wouldn't it make more sense to just have a

11   single source of law?

12         MR. LAWSON:  I don't think a nationwide class

13   action -- it might need subclasses to account for minor

14   variations in different states' common law -- would be

15   unmanageable.  And that's a question we can get to at

16   certification.

17         But I can tell you that I've seen nationwide tortious

18   interference class actions, nationwide fraudulent inducement

19   class actions, and they generally do require some finessing;

20   but by and large, the law of most of the common law

21   jurisdictions, it essentially tracks.  They essentially track

22   each other, and I don't think it would present manageability

23   concerns at all.

24         THE COURT:  Okay.  But what -- I mean, what -- what

25   do you have to say about Mizuho's argument that this is one of

1   those situations where the presumption that the forum state's

2   law applies has been overcome, given that this Japanese bank

3   was operating under Japanese banking laws and was dealing with

4   a Japanese account holder?  What are your thoughts on that?

5           MR. LAWSON:  You know, it's still -- it would still

6   at some point be their burden to show that the presumption

7   needs to be rebutted or should be rebutted, is rebutted.  But

8   the --

9           THE COURT:  Well, didn't they make that argument in

10  the *forum non* part of their brief?

11          MR. LAWSON:  Well, I mean, that particular argument

12  still requires a showing of a material conflict.  It isn't

13  rebutted simply because there's conduct in this litigation

14  that is outside the State of Illinois.

15          If Illinois had literally no connection to the

16  dispute, I think that might be one thing; but then I believe

17  the way to address that would be, you know, a venue motion, as

18  actually happened in the Maryland case they cite in their

19  reply.

20          It still -- but they -- you know, there is a

21  connection between Illinois and this dispute, so they'll have

22  to show the material conflict.  It isn't simply rebutted

23  because Mizuho's in Japan.

24          THE COURT:  I see.  I see.  So, what you're saying is

25  that in order for choice of law to even be put on the table,

1    there has to be a showing of a conflict between Illinois law

2    and Japanese law, and because Mizuho has not gotten into the

3    substance of Japanese law, it hasn't established that there's

4    a conflict; and, therefore, at this point, there's no choice

5    of law problem?

6              MR. LAWSON:  Right.

7              THE COURT:  Could you address that point, please?

8              MR. FORTINSKY:  Yes, your Honor.  The case law we

9    cite says that one reason that -- one reason why you should,

10   at least in appropriate circumstances, send the case back to,

11   in this case Japan, is that neither the Court nor in some

12   cases the lawyers are well-equipped to get into the details

13   of the foreign law.

14             So, it's not really -- we should not be having a

15   debate about what Japanese law says.  That's what the case

16   says.  Even beyond that, though, the --

17             THE COURT:  But I think what he's saying is that what

18   difference does it -- if there's no difference, material

19   difference between Japanese law and Illinois law, then we

20   don't need the superior expertise of the Japanese courts,

21   because if they're the same, then I could handle it just as

22   easily as a Japanese court could.

23             MR. FORTINSKY:  Well, in any event, that is not the

24   standard.  The standard is delineated in our briefs, and it

25   turns on, among other things, the convenience to the

1   witnesses, the availability of the evidence, the interests of

2   the respective jurisdictions, and the disposition of the --

3   of the matter.  Those are the criteria.  And on those

4   criteria, clearly, the -- all of the factors here tilt in

5   favor of Japan.

6           One telling sign is what the plaintiffs resort to,

7   their first point virtually is the presumption.  When you're

8   relying on the bare presumption rather than the facts of the

9   case, that sort of tells you that the facts, the details, the

10  guts of the issue is on the other side.

11          And here, what we have is the evidence and the

12  witnesses are in Japan.  Even the plaintiffs' own initial

13  disclosures reflect that.  The plaintiffs, in listing the

14  witnesses for this case, say that in addition to their

15  individual clients, the witnesses will all be agents and

16  employees of Mt. Gox, which is a Japanese institution, a

17  Japanese bitcoin exchange, and the agents and employees of

18  Mizuho Bank, which is also a Japanese institution.  That's who

19  this case will turn on.

20          Yes, there are three individuals who've brought the

21  claim, but once they get done showing us their -- their

22  records reflecting sending the money to Mt. Gox, which is

23  likely to be just a relatively modest number of pages, all of

24  the documents and all of the witnesses are in Japan.

25          Of the sort of three -- in any tortious interference

1  action, in a sense, you have three different locuses of
2  activity.  There is the plaintiff, there is the defendant, and
3  then there is the third party whose contract is allegedly
4  interfered with.

5          And in this case, that's the plaintiff, Mt. Gox, and
6  Mizuho.  Two out of the three, the two of the three that are
7  likely to have the most witnesses and the most documents in
8  this case are in Japan.

9          And the institutional interests of Japan turns on
10 various things, but I think is crystallized in this:  One of
11 the key questions here will be how you balance -- we've
12 presented this before as an argument, but I'm just presenting
13 it here as a question.  What this case will turn on is:  How
14 do you balance the Japanese bank's interest and the Japanese
15 system's interest in preserving the confidentiality between a
16 bank and its customers on the one hand, which standing alone
17 would tell you that Mizuho not only didn't have a right to,
18 but had a duty not to make disclosures to the plaintiffs, how
19 do you balance that against on the other hand the plaintiffs'
20 assertion that there's a duty of disclosure?

21         And the duty of disclosure versus duty of
22 confidentiality is at least in the first instance a question
23 of Japanese -- Japanese law.  It's not a question that really
24 the plaintiffs have even briefed or made any allegations on.
25 It's a question of how do you -- how do you wrestle with those

1    competing considerations?

2         Now, we would tell you that, in fact, there's been no

3    allegation here that Japanese law requires -- has any duty of

4    disclosure.  The plaintiffs have not even shown any duty of

5    disclosure under Illinois law or California law, let alone

6    Japanese law.  So, I don't think when you get to balancing

7    that question it's even a close call.

8         But that whole set of issues turns on what Japanese

9    law says about what banks are required to do.

10        THE COURT:  But doesn't Federal Rule of Evidence 44.1

11   acknowledge a United States federal court's ability to make

12   that determination based on all of the sources that are listed

13   in Rule 44.1?

14        MR. FORTINSKY:  Yes.  When -- yes, that's true.  But

15   the case law also acknowledges in many, many cases, some of

16   which are reflected in our papers, that U.S. judges, with all

17   due respect to the esteemed judges of this court, are less

18   competent to make decisions on foreign law than foreign judges

19   are.  And where there is -- and that is one factor, not the

20   only one, but one of the factors to be considered by the Court

21   in addressing a *forum non conveniens* argument.

22        THE COURT:  You're talking past each other, and all

23   I'm interested in is the part of the *forum non* analysis that

24   turns on the difficulty that a United States court would have

25   applying Japanese law.

1       What the plaintiffs are arguing is that tortious
2   interference law, fraudulent concealment law, unjust
3   enrichment law, there's been no showing by Mizuho that
4   Japanese law is any different from Illinois law regarding
5   the elements of those claims or even whether there are such
6   claims under Japanese or Illinois law.  And I don't hear any
7   push-back from you on this.

8       MR. FORTINSKY:  Let me --

9       THE COURT:  What you're saying is one component of
10  tortious interference law is justification and, you know,
11  having a valid business purpose.  And in order to address
12  that factor of tortious interference law, we'd have to get
13  into the Japanese law of bank disclosure and confidentiality
14  and all of that.

15      So, it seems that you're talking past one another,
16  and so I take it you're not -- you don't take issue, at least
17  at this point, with the plaintiffs' argument that Mizuho has
18  not shown that there's any difference between Japanese law and
19  Illinois law as to the elements of the causes of action.

20      MR. FORTINSKY:  Let me address that in two ways, your
21  Honor.

22      First, the -- showing that there's a conflict of law
23  between Japan and Illinois is not one of the standards, not
24  one of the criteria that we look to in deciding a *forum non*
25  motion.  So, there was no burden on us to brief that law.

1   That's it in a nutshell, your Honor.

2           THE COURT:  You're walking away from your brief,

3   though, on this point, pages 36 -- pages 28 to 29.

4           MR. FORTINSKY:  I'm happy to take a look at that,

5   your Honor, but --

6           THE COURT:  Because you've said that that's one of

7   the elements.  And if you want to walk away from that, that's

8   fine, but I want to make sure that you're -- you actually mean

9   to do that.

10          MR. FORTINSKY:  If you'll show me, your Honor, what

11  passage you're referring to, we can -- I'm glad to address it.

12          THE COURT:  Subsection B on pages 28 to 29, where you

13  talk about the choice of law for tort claims.  And you seem to

14  be arguing that Japanese law would govern the elements of a

15  tortious interference or a fraud claim, and now you're saying

16  that you don't have to show that.

17          MR. FORTINSKY:  You're talking about Point B?

18          THE COURT:  Yes.

19          MR. FORTINSKY:  The point here, your Honor, is that

20  applying Japanese law would create difficulty.  That's the

21  point I just made, that U.S. courts are less competent to

22  address questions of Japanese law.

23          THE COURT:  I get that.

24          MR. FORTINSKY:  It's not about a conflict.

25          THE COURT:  No, I get that.  But is it applying

1    Japanese law in terms of determining the elements of the cause

2    of action, or is it applying Japanese law in determining with

3    respect to one element of the tortious interference claim what

4    Japanese law has to say about depositor confidentiality and

5    the like?

6            MR. FORTINSKY:  I think Japanese law would apply

7    regarding both, your Honor.

8            THE COURT:  Okay.

9            MR. FORTINSKY:  So --

10           THE COURT:  So, in order to make the first argument,

11   which is, there's a difference between Japanese law and

12   Illinois law as to the elements and/or existence of the causes

13   of action, don't you have to tell me about what Japanese law

14   says on those particular subjects?

15           MR. FORTINSKY:  No, your Honor.  This is essentially

16   a dispute that arises in Japan.  Japanese law governs.

17           THE COURT:  I know.  But why is --

18           MR. FORTINSKY:  I don't have in front of me the

19   Japanese law on tortious interference, so if that's the

20   question, I don't have that.

21           THE COURT:  Okay.

22           MR. FORTINSKY:  And I'm not telling you that Japanese

23   tortious interference law -- I'm not describing it to you in

24   its particulars.

25           The point, though, is that the Japanese -- this is an

1  issue that arises in Japan.  If it were sent to Japan, the

2  plaintiffs would have the right to reformulate their complaint

3  under Japanese law.  My understanding is that Japanese law

4  does not necessarily have all the same -- the same causes of

5  action.  They're not on all fours, generally the same

6  concepts, but it's not how you trace this particular element

7  in this cause of action and match it up with that one.

8          So, undoubtedly, if this were repositioned in Japan,

9  if this were refiled in Japan, the -- both the plaintiffs and

10 defendants would have the right and the need to restate their

11 positions a little bit to align with what Japanese law

12 establishes.

13         THE COURT:  But we don't know what the differences

14 are.

15         MR. FORTINSKY:  Yes, that's true, but that's not one

16 of the criteria -- that's not one of the criteria --

17         THE COURT:  And now again you're walking away from

18 the argument that you made --

19         MR. FORTINSKY:  I don't understand that, your Honor.

20         THE COURT:  -- which is that Japanese tortious

21 interference law and fraud law are different; and, therefore,

22 it has to go to a Japanese court rather than an American

23 court.

24         You don't know what Japanese law says about tortious

25 interference or fraud, and because you don't know that -- and

1  I don't blame you for not knowing that.  I don't know that.  I
2  don't know if anybody in this room knows it.  Maybe Mr. Quinn
3  knows it.  But no one in this room knows it, perhaps.  Then I
4  can't say that this case needs to go to Japan because a
5  Japanese court has to -- is in a better position to apply
6  Japanese tortious interference law and Japanese fraud law,
7  because if it's the same as Illinois law, then I could do it
8  just as easily, and that falls out as a factor.

9        Whereas, if Japanese law is very different from
10 Illinois law and I would have a hard time grasping, for some
11 reason, what Japanese law says about those elements, then that
12 would weigh in -- and Japanese law should apply, then that
13 would weigh in favor of a transfer on *forum non conveniens*.

14       But without the essential predicate of knowing
15 whether there's a distinction between Japanese law and
16 Illinois law as to the elements of the various torts being
17 alleged, then that's not really a consideration for *forum non
18 conveniens*.

19       MR. FORTINSKY:  Well, let me throw another
20 consideration into the discussion, your Honor, on that very
21 point.  When we say that courts in the United States are less
22 competent to apply Japanese law, it's not just that the causes
23 of action are different.  Even if we were to assume, in other
24 words, that Japanese law was the same as Illinois law on
25 tortious interference, for example, except that it was in

1  Japanese, that would not completely answer the point because
2  when a court applies the law, it is not simply reading the
3  statute.  It has to apply the case law.  It has to understand
4  the procedural elements of it.  Applying the law isn't just a
5  matter of reading a statute, in other words.

6        And, therefore, to me, I take it as a given or at
7  least I find it persuasive that a Japanese court would be
8  superior to a U.S. court in applying Japanese law to all the
9  circumstances of this case, even if it were to turn out that
10  the fraudulent concealment law and unjust enrichment law and
11  tortious interference law were all precisely the same.

12        The second point I want to make in response, your
13  Honor, is that to me, it would defy belief if it turned out
14  that the law on all those three elements -- there are
15  essentially three causes of action here against Mizuho, the
16  accounting being just a remedy -- but the three causes of
17  action, if it were to turn out that those were all the same,
18  that would be astonishing, especially here where just a few
19  moments ago, the plaintiffs conceded in response to the
20  Court's questions that the laws of the 50 states, they said,
21  were, for the most part, I think was the word that counsel
22  used, the same.

23        Well, the same concern that -- ironically we're now
24  talking here about the same kind of concern we were a few
25  minutes ago, the variety of different state -- different laws

1  in the various jurisdictions.  There's a multiplicity of laws,

2  we know from our general legal experience, across the 50

3  states on all of these causes of action.  There may be a sort

4  of family resemblance between all the different tortious

5  interference claims, but I've litigated in enough

6  jurisdictions to know that there are some differences, I

7  gather everybody in this courtroom has, same kind of thing

8  with fraudulent concealment.

9         That was the consideration we were discussing a few

10  moments ago when the Court correctly pointed out that if the

11  case stays here, we will be dealing with an abundance of

12  different law across 50 jurisdictions.

13         Now, if even within the United States we see that

14  there's this multiplicity of differences -- multiplicity of

15  different causes of action, which the plaintiffs effectively

16  conceded when they said they were, for the most part, the

17  same, which is to say they're not really all the same, then

18  the same thing is undoubtedly true when you cross the ocean

19  and you have -- you have to look at Japanese law.

20         To me, maybe this is unfair to say this, but it feels

21  sort of obvious or instinctive to say that if our laws within

22  the United States are so different, they can't possibly be

23  precisely the same in Japan.

24         But still, my third point is, if the Court would

25  welcome a further submission on Japanese law on this point,

1    we would, of course, be glad to provide it.

2           THE COURT:  All right.  Anything else on choice of

3    law?

4           MR. LAWSON:  No, no.

5           THE COURT:  Okay.  Let's talk about -- you kind of

6    threw it to me, which is fine.  What am I interested in?  I'm

7    interested in causation.  And the question is:  Did Mizuho's

8    conduct cause a loss to either of the depositors here, Lack or

9    Motto, given --

10          MR. LAWSON:  So you're talking about the fraudulent

11   concealment?

12          THE COURT:  And also tortious interference.  Is there

13   causation, given the timing of who did what when and when the

14   deposits were made?

15          MR. LAWSON:  I believe that Mizuho's argument is that

16   the -- that Mt. Gox's problems were out there sort of in the

17   ether.  There had been reporting on them, so that both of

18   these individuals should have known that they weren't getting

19   their money back.

20          You know, I believe a lot of the reporting noted that

21   Mt. Gox was processing withdrawals and deposits slowly, not

22   that they'd shut down completely.

23          But I would also note that in both cases, you know,

24   we allege that neither of the plaintiffs would have

25   deposited -- and this is for the fraudulent concealment

1    specifically, would have deposited had they known that the

2    money was not coming out.  And this sort of -- the black hole

3    character of the Mt. Gox account at the time that they

4    deposited wasn't widely known, if it was known at all.  So I

5    think that shows causation, at least at this stage on that

6    claim.

7             THE COURT:  But given the undisputed timeline

8    established by the pleadings, isn't there an independent, a

9    wholly independent reason why the deposit was not allowed --

10   I'm sorry, the withdrawal was not allowed on February 20th,

11   2014, which is that Karpeles cut off the spigot on

12   February 7th?

13            MR. LAWSON:  Well, I -- his -- I mean, his actions

14   were also taken, I believe, in response to what Mizuho was

15   doing behind the scenes.  That's -- yeah.

16            MR. SCHARG:  Yeah.

17            MR. LAWSON:  So, I don't think that necessarily --

18   also -- I don't think that is a fully superseding cause or

19   anything of that nature.  I think it's still the case that

20   both Mizuho and Mt. Gox were responsible for the understanding

21   of both the plaintiffs that if they put their money into the

22   exchange, they'd be able to trade bitcoin.  They'd be able to

23   withdraw their money at some point.

24            So, I don't think that gives us a complete causation

25   problem.

1    MR. SCHARG:  And I'd like to add something to that

2  also.  The big issue is that Mizuho was the exclusive banking

3  partner for all of the users in the United States.  The big

4  reason why that was so important is because Mizuho knew that

5  given all the heat on Mt. Gox and all of the issues with the

6  press and the regulatory authorities, that there's no way that

7  any other bank would come in and fill their shoes.  There

8  would effectively be no other bank that could ever provide a

9  withdrawal opportunity for users in the United States.  And

10  that's the reason why they are, in particular, responsible for

11  the claims and why there is causation.

12    THE COURT:  But even if -- even if Mizuho didn't have

13  the black hole or the *Hotel California* policy, whatever you

14  want to call it, with respect to deposits and withdrawals,

15  Lack couldn't have withdrawn his money on February 20th for

16  reasons having nothing to do with that policy.

17    MR. SCHARG:  But he also could never have withdrawn

18  his money regardless.  Once it was in, it was gone.  There was

19  no way he would ever be able to withdraw it again.

20    THE COURT:  But there seems to be -- tell me why

21  there isn't a wholly independent cause of his inability to

22  withdraw, that cause being Karpeles saying, "No more

23  withdrawals."

24    MR. SCHARG:  Because those were both issues that led

25  to the ultimate event of Mt. Gox going dark, but the reason

1   Karpeles had to ultimately say, "No more withdrawals," and
2   that the whole thing was going dark to begin with was because
3   their entire business was frustrated by the banking policies
4   imposed by Mizuho.
5           THE COURT:  But is that really the theory of your
6   complaint?
7           MR. SCHARG:  It's not really.  We're kind of going
8   down this road, but the --
9           THE COURT:  I mean, the theory of your complaint is
10  that Karpeles was the principal bad actor because he was
11  stealing.
12          MR. SCHARG:  In a sense, yes.
13          MR. LAWSON:  Right.
14          THE COURT:  But now you're saying that Mizuho made
15  him do it.
16          MR. SCHARG:  No, I'm just saying that the -- that the
17  policies that were implemented by Mizuho -- so, Mizuho
18  recognized that Karpeles was a bad actor and recognized that
19  Mt. Gox, there was a ton of scrutiny.  They didn't want
20  anything to do with Mt. Gox.
21          At the same time, though, they were the only ones
22  that users in the United States could withdraw money through.
23  They were the sole -- they were the portal into Mt. Gox for
24  United States users.  There was never going to be any other
25  portal aside from Mizuho.

1          MR. LAWSON:  Right.  So, our theory isn't that

2 Mizuho's actions caused Karpeles to steal or caused someone

3 else to steal, right, because of course the negligence and the

4 conversion are pleaded in the alternative, but that it's what

5 they were doing behind the scenes that caused him to take the

6 site dark, which is --

7          MR. SCHARG:  Or accelerated the shutdown --

8          THE COURT:  So, what you're saying is Mizuho's

9 banking decisions is what caused Karpeles to halt the

10 withdrawals on February 7th of 2014?

11          MR. SCHARG:  Karpeles -- there were -- I know that he

12 might have announced to the public that he was halting

13 withdrawals, but those withdrawals have already been halted by

14 Mizuho for months and months and months.

15          THE COURT:  So, what is it that Karpeles did on

16 February 7th?

17          MR. SCHARG:  He finally started to, I believe --

18 yeah, he finally announced something on his website that

19 informed the public about what was already going on for the

20 past six or eight months, and explained why they couldn't --

21 explained why, for whatever -- you know, he put it in a

22 certain way; but what he was responding to was outrage over

23 the fact that nobody could withdraw money, and there was

24 increased regulatory scrutiny, and he made a public statement.

25          THE COURT:  But Mizuho didn't have the ability to

1    stop withdrawals of bitcoin --

2              MR. SCHARG:  No.

3              THE COURT:  -- from Mt. Gox.

4              MR. SCHARG:  That's right.

5              THE COURT:  And that's what Karpeles halted on the

6    7th, is that right?

7              MR. SCHARG:  No, I think -- no, he announced that he

8    was halting the ability to withdraw any form of currency.  Go

9    ahead.

10             MR. LAWSON:  You're right, yes.

11             THE COURT:  Including --

12             MR. LAWSON:  Money was already stopped, and he

13   stopped the withdrawal from the wallets, yes, because he said

14   he was investigating -- I mean, I think that when you

15   represent you're investigating a bug, the idea is that you'll

16   finish investigating at some point and you'll go back live.

17   And it was between that point and the time when he actually

18   took the exchange completely dark that both individuals put

19   their money in.

20             And, you know, if -- if you're relying on a -- on the

21   exchange's promise of security, I suppose the fact that there

22   is a bug might spook you; but the fact that it's being

23   investigated probably is an assurance that they're actually

24   looking out for what's going on, whether that happened to be

25   true.  But the fact that they couldn't withdraw their money

1   was never Karpeles's doing.

2          MR. SCHARG:  No.  And to be clear, he only halted the

3   withdrawal at that point.  He didn't announce that it was

4   being shut off completely.

5          THE COURT:  Right.  I mean paragraph 37 -- I'm on the

6   second amended complaint, but I imagine the third amended

7   complaint says the same thing.

8          MR. LAWSON:  It's 38, yeah.

9          THE COURT:  "On February 7, 2014, Karpeles halted his

10  customers' ability to withdraw any form of currency from the

11  Mt. Gox website."  So, that means bitcoin, and it also means

12  real money.

13         MR. SCHARG:  Yeah.  It's perhaps inartfully drafted,

14  just in a sense that these are the manifestations and the

15  representations that he was making to the public.  He made it

16  appear that he was all of a sudden -- that he was all of a

17  sudden halting these withdrawals; but in reality, as we pled,

18  they -- Mizuho had already enacted banking policies six or

19  eight months earlier, the previous year, that made it

20  impossible for United States consumers to withdraw cash from

21  Mt. Gox.

22         THE COURT:  I see.  All right.  Any thoughts on that?

23         MR. FORTINSKY:  Yes, your Honor.  I think at this

24  point, frankly, with all due respect, the plaintiffs are just

25  kind of winging it with regard to their allegations here.  Let

1  me make three principal responses.

2      Number one, the idea that Mizuho caused Mt. Gox to go

3  dark doesn't make any sense because at its worst, what the

4  Mizuho policies did would be to prevent people or delay

5  people, really, from getting their money out.

6      If people can't get their money out, Mt. Gox has more

7  money, not less.  It's not a reason why Mt. Gox would go dark.

8  As we argued in our briefs, common sense is one of the things

9  that the Supreme Court requires of courts when they evaluate

10  these allegations.

11      The -- the idea that Mizuho made it impossible for --

12  and this goes to the tortious interference claim in

13  particular.  The idea that Mizuho made it impossible for

14  Mt. Gox to perform its obligations under the contract also

15  doesn't make any sense, because the -- this is not like a bank

16  where there's a run on the bank and the bank doesn't have all

17  of the money because they lend out as well as accept money

18  from borrowers.  This is a situation where people give their

19  bitcoins and their money to Mt. Gox, and Mt. Gox has it.  When

20  they ask for it back, they have to give it back.

21      When the -- in the plaintiffs' brief, they refer in

22  surprisingly airy terms to this notion that the -- the

23  plaintiffs were not able to enjoy the benefits of their

24  agreement.  What is the benefit in question?  The benefit in

25  question is being able to get your money back when you want

1   it, being able to transfer your money when you want it.

2   Mt. Gox could have given people's money back.  There

3   was no problem in Mt. Gox being able to do that through a

4   variety of means, including through, whether it was other

5   banks or in bitcoin.  What Mt. Gox did was it completely went

6   dark.

7   And the plaintiffs in their -- in their complaint

8   tell you exactly what happened.  They're running away from

9   these allegations now, but it's the heart of the complaint.

10   They tell you what happened.

11   "Mark Karpeles siphoned money, bitcoins and cash, out

12   of the plaintiffs' and the other users' accounts."  They say

13   that in paragraph 91, he siphoned it out.

14   Elsewhere more than once, they say that the problem

15   was Karpeles's theft or his gross negligence.  In other words,

16   it was what Karpeles did.  It wasn't that, "Oh, we're having

17   some problems.  It's sort of sticky.  We can't get it out."

18   They tell you.  They can't run away from these allegations.

19   It's the heart of their complaint that that's what happened

20   here.

21   And in fact, we all know that in real life that's

22   what happened, that Karpeles took the money, or at worst there

23   was a bug and he was grossly negligent for having a messed-up

24   system.  That's what all the articles that they incorporate in

25   the complaint say as well.  So, the notion that somehow Mizuho

1   was the cause of this is just a late-invented fiction.

2           Second point, the heart of the allegations against

3   Mizuho is Mizuho should have told the plaintiffs.  The

4   plaintiffs had a right to know about Mizuho's policy.  Well,

5   to put -- to crystallize what we're trying to say, I could say

6   it this way:  The plaintiffs were on notice.  The plaintiffs

7   knew.

8           Look at the chronology, your Honor.  In May 2013,

9   Homeland Security issues a seizure warrant for one of the

10  Mt. Gox accounts, the Dwolla account.  And at that point,

11  Mt. Gox users could no longer access that.  So, that's the

12  first -- I think the first flare that alerts people that

13  there's an issue.

14          THE COURT:  Well, how do I know from the pleadings

15  that --

16          MR. FORTINSKY:  Well, whether it's the first one or

17  not is not important.  I'm not resting anything on that.

18          But in any event, in June of 2013, Mt. Gox, according

19  to the complaint, announces that it's suspending withdrawals

20  of U.S. dollars.  Mt. Gox says it's suspending it temporarily.

21          At that point, a, quote, person close to Mt. Gox is

22  quoted in the *Wall Street Journal* as saying that it took that

23  step after Mizuho declined to process withdrawals in dollars.

24          THE COURT:  And where in the pleadings does it say

25  that Greene and Lack and Motto read that edition of the *Wall*

1  *Street Journal*?

2        MR. FORTINSKY:  It doesn't say that, your Honor, but

3  it puts them on notice.  And let me put the answer slightly

4  differently.

5        THE COURT:  Where does it say in the complaint that

6  people are presumed to know what's published in the *Wall*

7  *Street Journal*?

8        MR. FORTINSKY:  The complaint doesn't say that, your

9  Honor, but the plaintiffs' grievance is that there was no

10  announcement.  If you posit that Mizuho had done precisely

11  what the plaintiffs now say in retrospect for their

12  convenience Mizuho should have done, what is it that they say

13  now they should have done?  They perhaps should have made an

14  announcement.

15        If they made an announcement, what would they do?

16  They'd put out a press release.  Where would the announcement

17  be covered?  It would be in the *Wall Street Journal*.  It would

18  be in things like the *Bitcoin News* and *Tech Crunch* and *Bitcoin*

19  *Talk*, all of which had, as I could describe for your Honor,

20  detailed descriptions of the delays that Mt. Gox users in the

21  United States were experiencing in trying to get their money

22  out.

23        So, in short, there was -- anybody who's interested

24  in bitcoins who's paying attention would have seen in any of

25  the sources I just mentioned that there were problems in

1  withdrawing -- in withdrawing, starting in June and running
2  straight through.

3       For example, quote, "People have expressed discomfort
4  that they cannot get their money from Mt. Gox despite issuing
5  withdrawal requests."  That's from *Coin Desk*.  "Unfortunately,
6  as of today, withdrawals of U.S. dollars via wire transfers
7  are still substantially delayed."  That's from *Bitcoin*
8  *Magazine*.  "Mt. Gox has refused to provide estimates of when
9  these withdrawals might occur.  There is a serious problem
10 with U.S. withdrawals."

11      These are all form articles that are incorporated by
12 reference in the complaints and made part of the plaintiffs'
13 allegations.  In other words, they acknowledge the Court is
14 entitled to look at this as it evaluates the motion to
15 dismiss.

16      In fact, the Seventh Circuit opinion on this, I
17 believe, was authored by your Honor.  The Court is entitled
18 to take into account these kinds of press releases, articles
19 that are incorporated in the motion to dismiss.

20      As a result, the information that in effect they say
21 should have been out on the market was out on the market, and
22 especially in the bitcoin world by the time Lack and Motto
23 invested.  That was my second point.  The third -- all going
24 to causation.

25      And the third point, which picks up on your Honor's

1    questions, is that the Seventh Circuit case law says that in
2    order to establish causation, in order to establish the
3    elements of the respective causes of action, you have to show
4    that if the conduct of the defendant had not occurred, then
5    the plaintiffs wouldn't have been harmed.  That's how you
6    measure whether there is causation.  In fact, one of the cases
7    refers to that as hornbook law.

8         Here, the harm allegedly comes from the failure of
9    the -- of the inability, rather, of the plaintiffs to withdraw
10   their funds.  The plaintiffs, however, do not allege that
11   Mr. Motto ever, ever tried to withdraw his funds; and they
12   only allege, as the Court pointed out, that Mr. Lack tried to
13   withdraw his funds on February 20th, four days before it goes
14   completely dark and after withdrawals were not possible
15   because across the board, Karpeles had said no to withdrawals.

16        In fact, as to Motto, excuse me -- in fact, as to
17   Motto, not only was he on notice by virtue of all of the
18   articles in the press, but he did not even send his money in
19   until February 15th, which is more than a week after Karpeles
20   had announced that he was halting withdrawals.  So, from his
21   point of view, it was okay that withdrawals were halted, and
22   in fact, the same thing is true of Lack.  They invested their
23   money knowing that there were problems in withdrawals; and, in
24   fact -- in fact, as I said, Motto, invested only after
25   Karpeles himself had halted it.

1        And indeed Motto, as the Court is aware, is the only

2   Illinois resident that's a plaintiff that allegedly sent cash

3   to Mt. Gox through Mizuho.

4        THE COURT:  Okay.  So, what I think you're arguing,

5   and correct me if I'm wrong, is that -- and let's just focus

6   on the deposit subclass -- that the deposit subclass's losses,

7   or at least Motto and Lack's losses, let's focus on them,

8   can't have been caused by anything Mizuho did or did not say

9   because information was out there at all relevant times that

10  withdrawals were not going to be allowed of fiat currency if

11  you make those deposits with Mt. Gox?

12       MR. SCHARG:  Can I make one clarification?

13       THE COURT:  Well, I'm --

14       MR. SCHARG:  Okay.

15       THE COURT:  I just want to know what he's arguing,

16  and then I'm going to give you a chance to address it.

17       MR. FORTINSKY:  That's pretty close to what I said,

18  but it's only one element of it.  One part of it is that

19  there's no causation because the information was already out

20  there.  Another part of it is that there's no causation

21  because there was no attempt to withdraw until after Karpeles

22  himself --

23       THE COURT:  And that was my first question.  I

24  understand.

25       MR. FORTINSKY:  That was an independent basis for the

1    argument.

2              THE COURT:  And I gave the plaintiffs a hard time on

3    that, and what I'm saying is that's kind of a second -- an

4    additional argument.

5              MR. FORTINSKY:  Yeah.  And when you say out there,

6    it's not only that it was out there.  It was in precisely the

7    sources that you would have wanted these kinds of disclosures

8    to be out there in, the *Wall Street Journal*, *Bitcoin News*,

9    *Tech Crunch*, et cetera.  These are the sources where you would

10   want the coverage to be, and that's where it was.

11             MR. SCHARG:  I was just going to say that his

12   position isn't that they were aware that the withdrawals had

13   stopped or that Mark Karpeles had indicated that nobody could

14   thereafter withdraw things.  It was just that the withdrawals

15   were halted or were experiencing delays.

16             To take that and say that that means that people

17   could no longer ever withdraw money from Mizuho is -- is a big

18   stretch.  And that's not what Karpeles said.  That's not what

19   any of those publications that Mr. Fortinsky just mentioned

20   said.

21             And as your Honor alluded to, even if they did say

22   that, what's the relevance?  It's not like our -- we don't

23   allege that the plaintiffs ever read or saw those types of

24   things.  And those types of publications, the *Coin Desk*,

25   et cetera, are more relevant for people that deposited

1    bitcoin, perhaps, but this was a deposit of money.

2         MR. FORTINSKY:  But it was deposited into a bitcoin

3    exchange.  These were people who were investing in bitcoin.

4         THE COURT:  Well, what would -- let's say Mizuho

5    announced -- and I'm assuming that the public announcements

6    are what Mr. Fortinsky says they are rather than what you say

7    they are, and that may be wrong.

8         But on that assumption that it had already been

9    announced that withdrawals were being hindered and/or halted

10   by Mizuho of fiat currency, what would have been added to the

11   informational mix and how if Mizuho itself had announced, "Oh,

12   by the way, that's all true"?  How would that have helped, and

13   by what mechanism -- what plausible mechanism would that have

14   helped Lack and Motto?

15        MR. LAWSON:  Well, I think -- I mean, what I'm

16   hearing is sort of a species of kind of a fraud on the market,

17   sort of the converse of a fraud on the market theory.

18        THE COURT:  Yes, I agree.  And what I'm saying is, in

19   order for there to be causation, it has to be plausible that

20   if only Mizuho had announced somehow, and I'm asking you how,

21   that all of this was true, then Lack and Motto wouldn't have

22   deposited their money.

23        MR. LAWSON:  Right.

24        THE COURT:  So, why would an announcement from Mizuho

25   have made a difference?

1    MR. LAWSON:  You know, I think it would have probably

2    piqued the interest of many of these reporters, right?  A

3    number of the reporters who wrote the stories that

4    Mr. Fortinsky's alluding to are bitcoin traders themselves.

5    One of them actually talks about his ability to get his

6    bitcoin out of Mt. Gox.

7         So, it isn't as though all the information that was

8    out there is pointing in the same direction.  What we might

9    have seen was steadier coverage of what was going on.  We've

10   got a few articles over a long period of time, which is

11   generally sufficient in a fraud on the market context; but

12   there, you're assuming really sophisticated investors, and I

13   don't think that's the standard here.  So, you'd want to see

14   much more, I would think, at the very least.

15        I mean, I think the next step is sort of constructive

16   notice, and I'm not sure that six or so articles over the

17   course of three-quarters of a year is necessarily enough to

18   say that our unsophisticated bitcoin investors are going to be

19   on constructive notice.

20        THE COURT:  I agree with you, and I disagree with

21   Mr. Fortinsky on that point.  My question goes beyond that.

22        MR. LAWSON:  Okay.

23        THE COURT:  Which is you have to show that Mizuho's

24   failure to say, "Oh, yeah, that's right," caused Lack and

25   Motto to make their deposits.  And my question to you is:

1    How?  If Lack and Motto weren't reading the *Wall Street*

2    *Journal*, they weren't taking the Metro North Line, where

3    everybody seems to have *Wall Street Journal*, they weren't

4    reading *Bitcoin News*, how plausibly would Mizuho's

5    announcement have reached Lack and Motto to cause them to make

6    a different decision from the decision that they actually

7    made?  And what did the law obligate Mizuho to do?

8              MR. SCHARG:  Can I -- sorry.

9              THE COURT:  Go ahead.

10             MR. SCHARG:  I was -- to just refocus the argument a

11   little bit, I think that the question is:  What was Mizuho

12   obligated to tell individuals in the U.S. that were depositing

13   money through them into Mt. Gox about the transaction?

14             Because Mizuho had very confidential and one-sided

15   information.  It knew a couple of things.  It knew that it was

16   the only portal into or out of Mt. Gox.  Other people did not

17   know that at the time.  It knew that it had shut off the

18   ability of users in the U.S. to withdraw money.  People didn't

19   know that.  And then, of course, it also took a transaction

20   fee on money that came in.

21             So, it is -- it was incumbent, certainly, on Mizuho

22   to tell people that were depositing money through its portal

23   that they would never be able to -- or at least they presently

24   would not be able to ever withdraw this money.  And it knew

25   that nobody else would step in to become the new banking

1    partner because -- I think the discovery's going to show that,
2    and we have individuals that can speak on that issue.

3            But it knew that it was the only game in town.  There
4    was nobody else.  And they were upset with themselves that
5    they got into that -- they got into the situation.  They
6    wished that they had never done business with Mt. Gox in the
7    first place.

8            But the fact of the matter is that they did, and that
9    they never distanced themselves from Mt. Gox and did not
10   inform people that were depositing money, the probably biggest
11   issue to those people, especially people that are depositing
12   $40,000, "You'll never -- you cannot withdraw this money
13   through us, and there's no end in sight of this -- of the
14   inability to withdraw," that type of policy.

15           THE COURT:  Whether by accident or design, you're
16   avoiding my question.

17           MR. SCHARG:  Oh.

18           THE COURT:  And I'm sure it was by accident.

19           MR. SCHARG:  Then it was, I'm sorry.

20           THE COURT:  What was Mizuho supposed to do, via what
21   medium, to convey the message that you say the prospective
22   depositors deserved?

23           MR. SCHARG:  Well, I think first, they were supposed
24   to stop accepting deposits.  Number two, they should have come
25   out and said what was going on.  They should have been

1    forthcoming with people.

2              THE COURT:  Where?

3              MR. LAWSON:  You could have done it in the same

4    publications, and I don't think -- many of these talk about

5    delays, talk about frustration.  They don't talk about the

6    fact that your money's not coming back.  So, they could have

7    corrected the record in that way.

8              MR. SCHARG:  And let me just make the point, too, and

9    we allege this in the complaint, is that the whole purpose

10   that Mizuho did this behind the scenes, right, is because they

11   wanted Mt. Gox to be the ones that terminated the banking

12   relationship with it.  It did not want to be viewed as the one

13   that terminated or had anything to do with the termination of

14   the banking relationship with Mt. Gox.

15             So, this was part of an intentionally designed

16   strategy to get Mt. Gox to dissolve the partnership.

17             THE COURT:  So, you're saying that Mt. Gox should

18   have done -- I'm sorry, Mizuho should have done two things.

19   One is cut off all deposits all together, and two is make a

20   clarifying announcement that would be broadcast in all the

21   publications that we don't know if Lack or Motto actually

22   read.

23             MR. SCHARG:  And not accept the $30 fee for the

24   deposits, but --

25             THE COURT:  Well, that doesn't matter, because

1    whether they accepted the fee or not, you'd still be mad at
2    them.

3           MR. SCHARG:  Yeah.  I mean, I think what they should
4    have done is not accepted deposits.

5           THE COURT:  Okay.  Let's go there.  What do you make
6    of Mizuho's argument that it was legally prohibited by
7    Japanese law from cutting off the input, the deposits?

8           MR. SCHARG:  I don't make anything of it because
9    there's no evidence to suggest that that's the case.

10          THE COURT:  Okay.  What do you make of their argument
11   that California and Illinois law prohibits -- prohibit a bank
12   from cutting off deposits to one of its current account
13   holders?

14          MR. LAWSON:  I'm not sure we make much of it.  At the
15   last hearing --

16          THE COURT:  Well, because the reason I ask is if
17   you're saying Mizuho should have done X, and they say, "We
18   were legally prohibited from doing X" --

19          MR. LAWSON:  Right.  I understand your concern.  I
20   would note that at the last hearing, Mizuho's lawyers didn't
21   dispute that they could put a freeze on the account, and
22   I'm -- I didn't come -- I haven't come across anything that
23   would suggest that they're unable to.

24          THE COURT:  Okay.  All right.  Any thoughts on any of
25   that?

1        MR. FORTINSKY:  Yes, your Honor.  A few different

2   things.  The -- on the last point, a big part of the concern

3   is that -- for any bank, when you've got a customer who has --

4   a customer that has widely publicized its -- how to go about

5   sending in money by wire transfers, you know, a bank doesn't

6   want to be in a position where it has interfered with its

7   customer's business, just speaking generally, by refusing to

8   accept incoming wire transfers.

9        And as we've outlined in the brief, there are state

10  laws in the U.S. that restrict a bank's ability to reject

11  incoming transfers.

12       THE COURT:  Was Mizuho subject to those state laws?

13       MR. FORTINSKY:  Your Honor, frankly, we think the

14  answer is no because Japanese law applies, and that reinforces

15  the point we've made before about why Japanese law here is

16  dispositive.

17       THE COURT:  So, those California and Illinois

18  statutes didn't govern Mizuho's ability to prohibit deposits

19  into the Mt. Gox account?

20       MR. FORTINSKY:  Right.  We put those in for

21  illustrative purposes on the assumption that the plaintiffs

22  asked us to entertain, in effect, that this case was -- I

23  mean, their position is that this case was governed by the

24  U.S. statutes.

25       But the --

1    THE COURT:  No, see, you're falling into the same

2  mistake that I believe you were falling into earlier, which is

3  it's possible for Japanese law to govern -- to be pertinent to

4  a particular element of a domestic cause of action, an

5  Illinois or a California cause of action.  So, it's not all or

6  nothing.

7    MR. FORTINSKY:  I agree with that, your Honor, yeah,

8  yeah.

9    THE COURT:  Okay.

10    MR. FORTINSKY:  But to address some of the other

11  points, the -- the plaintiffs' response was in part that

12  the -- what Mizuho should have done was to say something, and

13  they acknowledge, it would have been in the same publications,

14  which is to say, it would have been more of the same.  It

15  would not have been fundamentally different.

16    What the plaintiffs do say in response to a series of

17  your Honor's questions is that Mizuho should have disclosed

18  because it knew, variations of this, Mizuho knew that these

19  plaintiffs were never going to be able to get their money out

20  again.  Mizuho knew that Mt. Gox was going to go dark.  Mizuho

21  knew that it was the only portal into or out of Mt. Gox.

22    There's no basis in the complaint to believe that any

23  of those things are true.  Those are just *ipse dixit*.  In

24  other words, the plaintiffs just say it without support.

25  Conclusory allegations are not sufficient to withstand a

1    motion to dismiss, as we've explained in our motion.

2           And, in fact, there's no -- I don't think it was

3    true.  I don't think there's any basis to believe it was true

4    that anybody knew in June or before February that -- anybody

5    other than Karpeles and Mt. Gox knew that nobody was ever

6    going to be able to get money out of Mt. Gox again.

7           That's just something that in retrospect the

8    plaintiffs find it convenient to say because, in fact, Mt. Gox

9    went dark, but they again tell you why that happened.  It

10   happened because Karpeles siphoned money out of Mt. Gox and

11   out of the account; and because of his, quote, "theft," Mizuho

12   had no basis, had no knowledge of any of those things, and had

13   no basis to believe that they might even be happening.  They

14   had no -- all of these things they said Mizuho knew, there's

15   no basis to believe Mizuho knew.

16          What Mizuho allegedly knew was the change in policy

17   that the plaintiffs describe, that the plaintiffs allege in

18   the complaint, and that is exactly what shows up in the *Wall

19   Street Journal* and *Bitcoin News* and the various other

20   publications that they themselves acknowledge were where they

21   would have put the announcements if Mizuho -- that they say

22   Mizuho should have made the additional announcements for.

23          So, also as to the question --

24          MR. SCHARG:  Wait a minute.  We're not saying they

25   should have made additional announcements.  We were discussing

1   the particular question.  What they should have done was

2   terminated the banking relationship with Mt. Gox, instead of

3   putting the burden on everybody in the United States just to

4   try to squeeze Mt. Gox into breaking that relationship for

5   them.  That's what they should have done.

6       And this whole thing is calculated towards that end.

7   The policies were in place because it knew that there were

8   issues with Mt. Gox.

9       MR. FORTINSKY:  Your Honor --

10      THE COURT:  Go ahead.

11      MR. FORTINSKY:  That's different from what they've

12  alleged in the complaint.  In the complaint, what they allege

13  is fraudulent concealment.  That's an allegation about a

14  purported fraud that Mizuho committed.  It can be statements

15  or et cetera that fraudulently deprive people of information.

16      It's not -- it's not -- now they're saying, well,

17  really, the grievance is that they -- that they stayed in

18  business, but that's not what the complaint says.

19      And beyond that, your Honor, even apart from the

20  issues that we've been talking about, the plaintiffs can't put

21  together a convincing or a legally sufficient case on tortious

22  interference because they do not plead anywhere in the

23  complaint and do not offer in their briefs anything in --

24  anything to show that -- anything to satisfy the element of

25  it being unjustified conduct.

1       In other words, the cause of action here is not
2  interference with contract.  It's tortious interference with
3  contract, and a tort obviously is a wrong.  It has to -- they
4  have to plead that the tort -- the alleged tortfeasor not only
5  did some action that interfered with their contract, but that
6  they did it tortiously, that there was something tortious,
7  like defamatory or wrongful or cheating.

8       That's what the case law says.  And that case law is
9  captured in that particular element of the cause of action in
10 Illinois which says that it has to be unjustified conduct.
11 The case we cite is *House of Brides*, but *House of Brides*
12 itself cites a bunch of other cases that say the same thing.
13 I think it's the third element says that it has to be
14 unjustified.

15      And what that means is that the conduct has to be
16 something -- it can't be a business just looking out for its
17 own business interests.  Because after all, in business, lots
18 of other cases will tell you, there are circumstances in which
19 defendants do things that hurt other parties, their rivals,
20 their competitors in business, sometimes their customers when
21 they don't choose to do business with them.  That's not
22 enough.  It has to be something wrongful.

23      And all of the cases -- all of the cases where the
24 court sustains tortious interference claims, there's something
25 by the plaintiffs that shows that the -- that the -- that

1    there was a -- that there was a tort, an injury.  They do not

2    allege anything along those lines.  And there is a right, the

3    court cases say, to protect your own economic interests.

4            The plaintiffs themselves here tell us that the

5    reason Mizuho acted as it did was to protect its reputation.

6    It was concerned about being associated with Mt. Gox.  That's

7    not my testimony.  That's not my allegation.  That's what the

8    plaintiffs tell us.

9            The plaintiffs in their opposition brief go on to

10   say, "Well, you know, maybe they could have done something

11   different," but that's really not germane to the point.  The

12   point is that the reason for Mizuho's action was in order to

13   protect its reputation.

14           Even if later on somebody in retrospect says, "Well,

15   you know, you could have done something different to protect

16   your reputation, or that wasn't sufficient to protect your

17   reputation, or you could have done it a different way," that

18   doesn't matter, because the point is that what Mizuho did, its

19   intention was not to cause anybody any harm, was not -- it's

20   not alleged that they intended to cause anybody any harm.

21   It's merely that they intended to protect their interests,

22   their reputation, Mizuho's reputation in the marketplace.

23           That's not me.  That's the plaintiffs.  That's in the

24   complaint.  And that by itself is sufficient to defeat the

25   plaintiffs' claim.  It's not an affirmative defense.  It's an

1  element of the cause of action; and as with any other element
2  of a cause of action, if you don't plead it, you're subject to
3  being dismissed on a motion to dismiss.

4        The same kind of thing applies with respect to
5  fraudulent concealment.  The additional element in fraudulent
6  concealment that I think really is central, as this
7  unjustified point is for tortious interference, the additional
8  element on fraudulent concealment that's really central but
9  that we haven't really talked about yet is the duty to
10  disclose.

11        The cases are absolutely clear that there is no basis
12  for fraudulent concealment unless the plaintiff first
13  establishes a duty to disclose.  The plaintiffs don't do that
14  here.  The -- in order for there to be a duty to disclose,
15  there needs to be a fiduciary relationship.  Here, the
16  plaintiffs don't allege a commercial relationship between the
17  plaintiffs and Mizuho, let alone a fiduciary relationship.
18  They don't even allege not only a commercial relationship,
19  they don't even allege any contact, any communications between
20  Mizuho and these individual plaintiffs.

21        All they allege is that they transmitted -- they
22  sent -- at least as to the two in the deposit subclass, that
23  they sent wire transfers to Mt. Gox, and that it passed
24  through Mizuho as the receiving bank, just as it passed
25  through Chase or Wells Fargo on the other end as the sending

1   bank.

2         And perhaps to crystallize this, the plaintiffs do
3   not cite a single case in which a bank is held to have a duty
4   to disclose anything other than to its customer.  In this
5   case, they're saying the bank had a duty to disclose something
6   to its customer's customers.  They don't cite even one case
7   that says that.

8         We cite a couple of cases that show otherwise.  There
9   have been various flavors of this argument that have shown up
10  various places.  The *Eisenberg* case which we cite has a
11  collection of cases from, I think, nine jurisdictions, all of
12  which come to the same conclusion, which you can't -- people
13  are always suing banks for all kinds of things.  Things are
14  always going wrong with people's money.  They're always suing,
15  and a bank is always a convenient target because it's a deep
16  pocket, and other reasons.

17        So, there have been other cases where people bring
18  lawsuits where they said, "Oh, the bank had a duty to do
19  something, to disclose something," and in each of those cases,
20  the nine jurisdictions cited in the *Eisenberg* case, the courts
21  give the answer that that's not enough.  There is no duty to
22  disclose.  The same kind of thing is true in the *Tzaras* case,
23  which we describe in our papers as well.

24        The cases that the plaintiffs cite on that point,
25  there are three.  The *Heider* case is different because in that

1   case, the defendant was explicitly told not to make a

2   disclosure and did not make a disclosure even after the

3   plaintiff directly inquired.  It's about an asbestos case, and

4   the facts are very different.

5        The JP Morgan case is different because the --

6   because in that case, JP Morgan moved loan balances into phony

7   accounts in order to conceal what was going on, very different

8   from this case, active conduct by the defendant in order --

9   deceptive conduct.

10        And the *Shrager* case, which they also cite, the

11   ruling was different.  It was not the same kind of case.  The

12   question was a factual question as to whether the

13   conversations -- it was undisputed that there were

14   conversations between the parties, and the question was

15   whether those conversations sufficed to establish a fiduciary

16   relationship, very different because of those factual

17   questions that are not present here.

18        So, for all of those reasons, they have no basis for

19   a claim.

20        While I'm at it, I'll just say briefly on the third

21   point, the unjust enrichment point, which we haven't yet

22   gotten to, either, why they don't satisfy the elements,

23   either.  I'll try to keep this simple.

24        Number one, unjust enrichment is basically about

25   getting something -- keeping money, keeping fees for service

1   you didn't perform.  In this case, there's no allegation that
2   when Motto and Lack sent money in to Mizuho that Mizuho didn't
3   perform the service that it was being paid $13 to perform.

4        Whatever else they may argue about what Mizuho should
5   or shouldn't have done, it's not correct to say that Mizuho
6   did not perform the service of whatever it -- of allowing
7   Mt. Gox to deposit the money.  In fact, they rely on Mizuho's
8   acceptance of the deposit, as the Court did in its opinion, so
9   there's no argument that that was not done.

10       Secondly, they have to argue that the defendant
11  was -- was keeping a fee that it was paid unjustly.  In this
12  case, the fee was paid to Mt. Gox.  There's no -- the
13  plaintiffs' relationship was with Mt. Gox.  Mt. Gox maybe
14  charged fees, but they don't even say that they paid fees to
15  Mt. Gox.  They just speculate that maybe the cost was passed
16  on.

17       That sort of information and belief pleading, as we
18  discussed in our papers and I think is in the *Parrillo* case,
19  is it, is insufficient -- the *Borsellino* and the *Pirelli* cases
20  is insufficient. They don't say that actually Mizuho kept
21  their money.

22       And then thirdly, the basis of the unjust enrichment
23  allegation is the same set of facts that form the facts for
24  the wrongful -- for the fraudulent concealment and tortious
25  interference claims.  It's the same facts.

1        And as this Court held in *Landlock*, if the unjust

2   enrichment claim rests on the same improper conduct alleged in

3   another claim, unjust enrichment will stand or fall with the

4   related claim.  In other words, unjust enrichment can't

5   survive if the court dismisses the other two cases.

6        The plaintiffs' response to that is that, well, here

7   it's a little different because the relief they're asking for

8   is different.  They're only asking for -- in the unjust

9   enrichment claim, they're only asking for the return of the

10  fees, and, therefore, it's not the same as the wrongful -- as

11  the fraudulent concealment and tortious interference claim.

12        That reads the law incorrectly, because as the quote

13  that I just read from your Honor's own opinion said, it's the

14  same improper conduct that's alleged.  The words used in the

15  opinion are improper, it's the same improper conduct, not the

16  same relief.

17        THE COURT:  One second.

18     (Bench conference, not reported.)

19        THE COURT:  Let me ask you to address the

20  relationship component of the fraudulent concealment claim.

21        MR. LAWSON:  Okay.

22        THE COURT:  In other words, what Mizuho's arguing is

23  that there's no duty because there's no --

24        Yeah, if you want to hand him your bottle, he can

25  fill that up.

```
 1              Does anybody else need -- do you guys want some
 2   water?
 3              MR. SCHARG:  No, thank you.
 4              THE COURT:  Are you sure?
 5              MR. SCHARG:  Yes.
 6              THE COURT:  Mr. Quinn, would you like anything?
 7              MR. FORTINSKY:  I'm good.  Thank you, your Honor.
 8              MR. FORTINSKY:  I guess that's a sign that I'm
 9   talking too much, right?
10              THE COURT:  I didn't say it.
11              So, what Mizuho's arguing is that in order for there
12   to be fraudulent concealment, there has to be a duty to
13   disclose.
14              MR. LAWSON:  Right.
15              THE COURT:  And that the relationship, if any,
16   between Mizuho on the one hand and Lack and Motto on the other
17   hand was not the kind of relationship that gives rise to a
18   duty to disclose.  Could you please address that issue.
19              MR. LAWSON:  Yeah, sure.  I'll start with the banking
20   cases.  Most of the cases cited in Mizuho's motion deal with
21   the bank's failure to disclose the fraudulent activity of one
22   of their customers, right?  And that's not our allegation,
23   which is the first reason why those cases are distinguishable.
24              But as Mr. Fortinsky sort of recounted, this is why
25   we cited the JP Morgan case, because in that case, it was the
```

1  bank itself that was -- that had the duty to disclose because

2  it was the fraudulent actor.  And I think that makes the

3  difference under Illinois law.

4          THE COURT:  All right.  And can you remind me what

5  the facts are of -- it's the *JP Morgan versus*

6  *East-West-Logistics* case?

7          MR. LAWSON:  Yeah, I believe that they were -- they

8  were moving money around to hide it, essentially.

9          THE COURT:  JP Morgan -- oh, you mean East-West

10  Logistics was?

11          MR. LAWSON:  Yes.  I believe those are the facts of

12  that case, yeah.

13          THE COURT:  I see.

14          MR. LAWSON:  It's the person -- it's the fraudulent

15  actor who has the duty to disclose, right, which is why the

16  bank doesn't have a duty to disclose the fraudulent activity

17  of its own depositor.  We have no problem with that particular

18  statement of the law.  It's just that in this case, it was the

19  bank's fraud that we are litigating and not -- well, we are

20  also litigating the depositor's, but -- or Mt. Gox's, I

21  suppose, but it isn't as though the bank was blameless here.

22          THE COURT:  I see.  So, what you're saying is that

23  there's no -- there's ordinarily no duty to disclose from the

24  bank to somebody like Lack and Motto; but if the bank is the

25  bad actor, there is a duty to disclose?

1          MR. LAWSON:  Yeah.  If they're either participating
2    or if they're doing something on their own, then, yes, they
3    have the duty.  Because in Illinois you have a duty to
4    disclose if you act deceptively, that's what gives rise to the
5    duty to speak, and that's where the material omission comes
6    from.

7          THE COURT:  I see.  So, what are your thoughts on
8    that, Mr. Fortinsky?

9          MR. FORTINSKY:  There's still no duty to disclose to
10   a third party.  The third party here -- the plaintiffs are a
11   third party to -- and there's no duty to disclose to them.

12         THE COURT:  Are they?  Are they third parties?

13         MR. FORTINSKY:  Well, I guess it depends on how you
14   look at, who you see the first and second parties are.

15         THE COURT:  I don't mean third parties in terms of
16   the plaintiff or defendant in this case.  I mean in terms of
17   the transaction.  Are they third parties, or are they directly
18   involved?  They are sending money to Mizuho.

19         MR. FORTINSKY:  What the plaintiffs are backing into,
20   again, as I've said before, kind of backing into new theories
21   as they go along, what they're backing into is the idea, in
22   effect, that Mizuho committed a fraud.  That's not what they
23   alleged, but that's sort of what they're retreating into, that
24   Mizuho was a participant in some sort of misleading theft of
25   funds or something.  That's not what they allege.

1    Where the -- the essence of the fraudulent

2  concealment focuses on the communication.  Did the -- did the

3  actor conceal information?  What they're now trying to say is

4  essentially that Mizuho participated in a fraud.

5    There's no basis to say Mizuho participated in a

6  fraud; and we get into a little bit of that in our papers,

7  because for a variety of reasons, there's no statement by

8  Mizuho, for example, and there's no inducement by Mizuho to

9  solicit funds from any -- from any plaintiff, from any member

10 of Mt. Gox.  So, there's no allegation of and no actual fraud

11 by Mizuho.

12    The allegation as to JP Morgan is -- there's much

13 more extensive conduct by JP Morgan, where the allegation, at

14 least, was that they were involved in moving money into phony

15 accounts.  I don't know whether that's actually true.  But

16 there's no allegation of similar flavor here as to Mizuho.

17    And I'm not even sure that in that case the ultimate

18 gist of the argument was a duty to disclose issue.  I think

19 the -- you know, the -- sort of the gist of that case rested

20 on sort of the alleged bad conduct.

21    THE COURT:  I see.

22    MR. FORTINSKY:  And I would add that in all of these

23 other cases, there have been a variety of different theories

24 that plaintiffs have tried to try to pin this duty to disclose

25 on banks, and banks from nine different jurisdictions have

1   rejected all of them.

2   THE COURT:  I see.  Okay.  Any final thoughts on that

3   issue?

4   MR. LAWSON:  Well, I would say we do allege a fraud

5   on Mizuho's part.  I think that that's pretty clear.  But

6   other than that -- the reason --

7   THE COURT:  And the fraud is accepting deposits while

8   knowing and not disclosing that --

9   MR. LAWSON:  While knowing, yes.

10   THE COURT:  -- that you can't withdraw it?

11   MR. LAWSON:  You're failing to disclose something

12   material.  And you're right, your Honor, it isn't a third

13   party to this transaction.  Otherwise, the personal

14   jurisdiction ruling would not have come out the way it did.

15   Right?  They're transacting at least in part directly with

16   Mizuho.  So, I think that renders most their cases about

17   disclosing the fraudulent activity of a particular account

18   holder inapposite.

19   THE COURT:  I see.  Okay.  Anything else anybody

20   would like to address, you know, knowing that I've read the

21   briefs?

22   MR. LAWSON:  I think -- I had two points in response

23   to Mr. Fortinsky's earlier presentation.

24   On justification in the tortious interference

25   context, I think it is actually clear.  We cited the three

1   cases that talk about justification as an affirmative defense.
2   I know that the *Nation* opinion from upstairs sort of talks
3   about it as a moving target; but I note in the *Philip Mappa*
4   case, which is the only Illinois state case in the reply, at
5   least, the court talks about because the complaint pleaded
6   justification, the plaintiff needed to show actual malice,
7   which I think sort of highlights the burden-shifting that
8   occurs under Illinois law.  You allege the tortious
9   interference, and in some cases, the justification of the
10   privilege is apparent.

11         And what we say here is there's the allegation that
12   Mizuho had represented that it was trying to protect its
13   reputation, when we now know from the contract that it appears
14   that they could have just ended the relationship without all
15   of this rigmarole.  And so I don't think that that is the kind
16   of complete justification that serves as an affirmative
17   defense that appears on the face of the complaint.

18         But once the tortious interference is alleged, it's
19   the defendant's burden to show justification or privilege, and
20   then the plaintiffs' to come back with actual malice.  I mean,
21   that's the -- I think it's actually a pretty well-established
22   way of doing things, even though the Illinois courts do
23   describe it as -- the third element of the claim as an
24   unjustified interference.

25         And I would note also on the unjust enrichment claim,

1    Mr. Fortinsky described one kind of restitutionary recovery.

2    I think he pretty much spelled out a *quantum meruit* theory.

3    But there are other reasons.  And we do agree that the

4    fraudulent activity sort of is the legal wrong that gives rise

5    to the unjust -- the restitutionary remedy in the unjust

6    enrichment claim.  So, if you don't buy the fraud theory, then

7    yes, both claims do go down.

8          But certain of their defenses to the fraudulent

9    inducement claim I don't think would carry through to the

10   unjust enrichment, which is pleaded separately for a couple of

11   the reasons that Mr. Fortinsky noted; namely that it was a

12   pass-through, so we're talking about a profit from the legal

13   wrong, but which wouldn't necessarily come from the fraudulent

14   inducement recovery itself, which is why they're separate.

15   Also, a little bit of analytic clarity.

16          THE COURT:  Understood.

17          MR. FORTINSKY:  A couple of brief responses, your

18   Honor.  Actually, just one response and two additional points.

19          The *House of Brides* case and the cases it cites show

20   that cases do -- that courts do dismiss claims for tortious

21   interference where the conduct alleged on the face of the

22   claim is justified.  It's not something that has to go to

23   summary judgment and be debated through pleading an

24   affirmative defense.

25          The other point I wanted to come back to is on the

1   *forum non conveniens*.  I would just make the point that here
2   what we have are investors who chose willingly to put their
3   money into a Japanese bitcoin exchange.  And putting aside all
4   of the other factors, that suggests a willingness to engage in
5   Japan.

6          And the case law suggests that the -- that any -- any
7   tilt in favor of the plaintiffs' choice of forum is, under
8   those circumstances, diminished or eliminated.  And I think we
9   cite the case in our briefs.  Because, after all, they've
10  already shown a willingness to go to the other forum for
11  purposes of investment.

12         In fact, if you imagine the situation in reverse and
13  you had a U.S. hedge fund, for example, that attracted the
14  interest of a Japanese investor, and the Japanese investor
15  then tried to -- even though he was bringing claims about the
16  relationship between the hedge fund and hypothetically the
17  hedge fund's U.S. bank, what would we make of an argument that
18  that case ought to be litigated in Japan?

19         I suspect that the U.S. hedge fund and the U.S. bank
20  and even the U.S. courts would agree that that's the sort of
21  case that ought to be litigated here in the U.S.  Well, this
22  is that same case in reverse.

23         I understand there are a lot of factors, but I'm just
24  saying that as to that particular element, the preference that
25  one -- that the plaintiffs ask the Court to give or the

1   presumption that the plaintiffs ask the Court to give to their
2   choice of forum, that ought to be diminished under these
3   circumstances.

4          And one final procedural point that I would raise is
5   that the plaintiffs, in accordance with the Court's recent
6   opinion, filed a new complaint.  Our motion, our notice of
7   motion was addressed to the second amended complaint, although
8   I think both sides recognize that the issues are pretty much
9   the same in the third amended complaint as the second amended
10  complaint, especially in light of the references to Motto
11  before the filing of the new complaint.

12         So, procedurally, I just wanted to raise with the
13  Court the question as to how we ought to proceed in order to
14  ensure that things don't get messed up, because, after all,
15  our motion is directed to the second amended complaint, and
16  the one that's the operative complaint at the moment is the
17  third.

18         THE COURT:  I'll consider the motion to be directed
19  towards the third amended complaint.

20         MR. FORTINSKY:  Thank you, your Honor.

21         THE COURT:  The parties mentioned in one of the
22  filings that they had reached an agreement regarding
23  discovery?

24         MR. SCHARG:  Yes.

25         THE COURT:  Can you just tell me what that is?

1       MR. SCHARG:  Yeah.  We have agreed to -- that Mizuho

2  would begin providing us with the light lift, you know, quote,

3  unquote, light lift documents that they have.  They've already

4  made a production a couple of days ago.  And then we are going

5  to hold off on the heavier issues until you enter a ruling on

6  the motion to dismiss.

7       THE COURT:  All right.  Okay.  And do you agree with

8  that?

9       MR. FORTINSKY:  That's correct, your Honor.

10       THE COURT:  So, why don't I set this for a status

11  hearing -- and there's nothing magic about this date, so if it

12  doesn't work, just say so.  June 2nd at 9:00 o'clock?

13       MR. SCHARG:  I am going to be having a child by at

14  the latest the week before that, so if there's nothing magical

15  about that date, if we could just kick it to the next week.

16       THE COURT:  June 7th?

17       MR. SCHARG:  Thank you.

18       THE COURT:  9:00 o'clock?

19       MR. FORTINSKY:  I'm just checking my calendar, your

20  Honor.

21       MR. SCHARG:  And if it's an issue, then I don't have

22  to be here.  There's other counsel on the case.  But I'd like

23  to be, if possible.

24       THE COURT:  And you can always phone in,

25  Mr. Fortinsky, if you'd like.

1      MR. FORTINSKY:  No, that date looks fine.  Thank you.

2          THE COURT:  Mr. Quinn, is that all right with you?

3          MR. QUINN:  That's fine, your Honor.  Thank you.

4          THE COURT:  Okay.  Well, thank you for your briefs,

5   and thanks for your argument.

6          MR. FORTINSKY:  Thank you, your Honor.

7          MR. SCHARG:  Thank you, your Honor.

8      (Which were all the proceedings heard.)

9                        CERTIFICATE

10    I certify that the foregoing is a correct transcript from

11   the record of proceedings in the above-entitled matter.

12

13   */s/Charles R. Zandi*              *April 28, 2016*

14   _____     _____
     Charles R. Zandi                  Date
     Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25

# **EXHIBIT B**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY GREENE and JOSEPH LACK,  )
individually and on behalf of all others  )
similarly situated,  )
            )
          Plaintiffs,  )  Case No. 14 C 01437
            )
v.  )  Judge Gary Feinerman
            )  Magistrate Judge Susan E. Cox
MIZUHO BANK, LTD., a Japanese financial  )
institution, and MARK KARPELES, an  )
individual,  )
            )
          Defendants.  )
            )

## DECLARATION OF HIROTAKA URANAKA

    I, Hirotaka Uranaka, declare as follows:

    1.    I am an attorney admitted to practice law in Japan. I was admitted to the

Japanese bar and began practicing law in 1997 (Attorney Registration 25144).

    2.    I am a partner in the law firm of Iwata Godo in Tokyo, Japan. At Iwata Godo, I

practice and specialize in commercial litigation. My legal practice includes general corporate

affairs and legal advice on a daily basis to financial institutions (Japanese mega-banks, regional

banks, foreign banks, leasing companies) and to business corporations in a variety of industries.

My representation of and advice to financial institutions covers a wide variety of topics,

including, but not limited to, advice in connection with lawsuits (e.g., complex multi-party

commercial litigation, securities litigation, debt collection), business insolvency, execution of

judgments, and analysis of regulations. A *curriculum vitae* setting forth my professional

qualifications and experience is annexed hereto as Exhibit 1.

1

3.      I am admitted to practice law in New York State, and have been since 2003 (Attorney Registration #4176483).

4.      The information set forth in this declaration is based on my knowledge of Japanese law and experience practicing law in Japan.

5.      I submit this declaration in support of Mizuho Bank, Ltd.'s Motion To Dismiss The Second Amended Class Action Complaint For Failure To State A Claim Or Alternatively For *Forum Non Conveniens* in the above-captioned case.

6.      I understand that the plaintiffs in this case ("Plaintiffs") have asserted three causes of action against Mizuho Bank, Ltd. ("Mizuho"): tortious interference with contract, unjust enrichment, and fraudulent concealment).

7.      In this declaration, I provide a brief overview of the Japanese judicial system and explain the elements of the causes of action available under Japanese law that I consider to be most similar to the causes of action asserted by the Plaintiffs.  I also explain how a Japanese court would analyze the law and apply it to the specific facts of a case.

**Japanese Judicial System and the Civil Code of Japan**

8.      The Constitution of Japan provides that judicial power is independent of legislative and executive powers, and is vested only in a Supreme Court and in such lower courts as are established by law.  These principles are based on the same concept of the "separation of powers" reflected in the U.S. Constitution.[1]  One of the characteristics of the Japanese judicial system that is different from the U.S. judicial system is that Japan has adopted a civil law system.  Under this system, prior judicial decisions do not serve as an official source of law in the sense that they do not on their own have a binding force on the courts (though they

---

[1] For details of the court system in Japan, see Supreme Court website at http://www.courts.go.jp/english/judicial_sys/Court_System_of_Japan/index.html

are strongly relied on in practice by the courts and attorneys in the interpretation and application of statutory law).

9.      In terms of civil litigation, the Civil Code (Act No. 89, April 27, 1896) is the fundamental, comprehensive and substantive statute related to the rights and obligations in civil matters.  Most causes of action in civil lawsuits are prescribed in the Civil Code, and the three causes of action against Mizuho in this case (tortious interference with contract, fraudulent concealment and unjust enrichment) could be formulated as causes of action under the Civil Code as a general tort (Article 709 of the Civil Code), unjust enrichment (Article 703 of the Civil Code), and/or breach of contract (Article 415 of the Civil Code), the requisite elements of which I describe below.  Japanese law provides a means of redress for plaintiffs that prove tortious interference with contract, unjust enrichment or fraudulent concealment, but the formulation of each of these causes of action under Japanese law is different from what I am told is the formulation of each of these causes of action under Illinois law.

**Tortious Interference with Contract**

10.      A person's interference with another's contractual relationship in any form could fall under the general tort prescribed in Article 709 of the Civil Code, which states as follows:

>    "A person who has intentionally or negligently infringed any right of others,
>    or legally protected interest of others, shall be liable to compensate any
>    damages resulting in consequence."

11.      There are four requisite elements for a general tort prescribed in Article 709 of the Civil Code:

(a)   Infringement of a right or legally protected interest

3

The determination of whether or not a right has been infringed is made by comparing the extent of the legal protection of the right and the extent of the illegality of the infringement.

(b)  Defendant's intent or negligence regarding item (a)

"Intent" means a state of mind whereby one acts to knowingly infringe on the rights of another or otherwise with the awareness that facts may arise which will be regarded to be illegal.  "Negligence" means a state of mind where one does not recognize the potential of these facts due to a lack of care.

(c)  Occurrence and amount of damages (damages)

"Damages" includes property damages as well as pain and suffering.

(d)  Causal relationship between item (a) and item (c) (causal relationship)

A "causal relationship" is determined from the viewpoint of whether or not it would be proper to hold an actor responsible for the results (damages) based on the circumstances foreseen or foreseeable to the actor as of the time of the infringement.

12.  In practice, it is understood that the item (a) requirement of an infringement of a right is particularly important and difficult because the court must determine whether or not the infringement on a contractual relationship of another constitutes a tort.  In order to do so, judges make a determination on a case by case basis taking into consideration the nature and features of the specific contract at issue (the extent of the legal protection of the plaintiff's rights under the contract) and the manner of the infringement (whether it is construed as a violation of a criminal law, violation of administrative law, violation of public order and good morals, or like violation, and the degree of such violation).  There is an accumulation of scholarly theories and judicial

4

precedent on how the elements of the tort are to be interpreted and how the principles are to be applied to different types of disputes, and as such, courts seek to apply the law in a manner that is consistent with these theories and precedent.

**Unjust Enrichment**

13.    Article 703 of the Civil Code prescribes the following with regard to unjust enrichment:

> "A person who has benefited (hereinafter, in this Chapter referred to as a "beneficiary") from the property or labor of others without legal cause and has thereby caused loss to others shall assume an obligation to return that benefit, to the extent such benefit exists."

14.    The requisite elements for unjust enrichment as set forth in Article 703 of the Civil Code are as follows:

    (a)  Loss on the part of the plaintiff;

    (b)  Benefit on the part of the defendant;

    (c)  A causal relationship between item (a) and item (b);

    (d)  A lack of a legal cause for item (b).

15.    With regard to the benefit referenced in item (b) above, the scope of a defendant's obligation to return the benefit varies depending on whether or not the defendant was aware of the lack of a "legal cause" referenced in item (d). Defendants who are unaware of a lack of a legal cause owe a duty to return the benefit "to the extent such benefit exists" (Civil Code, Article 703), while defendants who are aware of the lack of a legal cause must return the benefit with interest, and are obligated to compensate any damages (Civil Code, Article 704).

16. As with the elements for general tort, the elements of unjust enrichment are open to interpretation, and there is an accumulation of scholarly theories and judicial precedent on how the elements of unjust enrichment are to be interpreted and how the principles are to be applied to different types of disputes. Although interpretive guidance exists, a consensus has not yet been reached as to all aspects of the law on unjust enrichment, including, for instance, (i) the issue of whether the causal relationship of item (c) above is limited to a direct relationship or whether it may include an indirect relationship, and (ii) the scope of the "to the extent such benefit exists" language, and other important requirements. In reality, judges take into consideration the accumulated scholarly theories and judicial precedents on a case by case basis according to the type of the dispute to reach a substantively reasonable conclusion.

**Fraudulent Concealment**

17. The act of failing to disclose or explain certain facts could constitute breach of contract liability between parties in a contractual relationship (Article 415 of the Civil Code) or could constitute a general tort for a party that is not in a contractual relationship. The requirements for general tort are addressed in items 10 through 12 above, and will not be repeated here.

18. Article 415 of the Civil Code prescribes the following with regard to breach of contract liability:

> "If an obligor fails to perform consistent with the purpose of its obligation, the obligee shall be entitled to demand damages arising from such failure. The same shall apply in cases it has become impossible to perform due to reasons attributable to the obligor."

6

19. The requisite elements for breach of contract in connection with a concealment of information are as follows:

(a) A contractual relationship exists between the plaintiff and defendant;

(b) The defendant owes a contractual or legal duty to disclose or explain facts;

(c) There is a breach of this duty;

(d) Damages are suffered;

(e) There is a causal relationship.

20. The duty to disclose or explain in item (b) is construed to exist in any of the following cases:

(i) If there is an express agreement that such a duty exists in the corresponding contract;

(ii) If such a duty exists by law (Act on Sales, etc. of Financial Instruments[2], Financial Instruments and Exchange Act[3], Building Lots and Buildings Transaction Business Act[4], etc.); or,

(iii) If a duty to explain is construed (by a judge) to exist under the principle of good faith as a duty incidental to the essence of a certain contractual obligation (judicial analysis is required regarding the duty to explain under the principle of good faith since the scope of this duty is difficult to generalize, and an individual examination is needed in each case).

**Practical Application of Law in Japanese Courts**

---

[2] Act No. 101 of May 31, 2000
[3] Act No. 25 of April 13, 1948
[4] Act No. 176 of June 10, 1952

7

21.     As presented above, the requisite elements for tort, unjust enrichment, and breach of contract under the Civil Code have intentionally adopted broad wording to maintain the nature of the Civil Code as general and basic law.

22.     As such, when judges in Japan apply the laws of Japan, in particular the Civil Code, to a particular dispute, often they rely on judicial precedent of the Supreme Court or lower courts regarding the meaning and interpretation of the respective requirements for the cause of action, and the limits on the application thereof, and ordinarily judges require counsel to present relevant rulings to support their arguments.  In addition, consideration is given to the scope of the application of other laws and ordinances so that the scope of the application of the Civil Code does not contradict the scope of the application of other laws and ordinances of Japan.

23.     Further, since Mizuho, one of the defendants in this case, is a licensed commercial bank in Japan which is subject to strict banking regulations of Japan, I believe that the competent court exercising its jurisdiction over this case should be familiar with and take into consideration such Japanese banking regulations when determining whether requisite elements of the causes of actions (e.g., infringement, intent/negligence for tort, a lack of legal cause for unjust enrichment, and disclosure duty for breach of contract concealment, etc.) are met.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 24th day of May 2016 in Tokyo, Japan.

Hirotaka Uranaka

8



**IWATA GODO**
Established 1902

**CURRICULUM VITAE**

**URANAKA, Hirotaka**
Attorney-at-law (Japan and NY)
Partner

*Exhibit 1*

**Practice Areas**
- Commercial Litigation
- Corporate Restructuring & Bankruptcy
- Banking & Finance
- Corporate Law/M&A

**Biography**
Mr. Uranaka's practice mainly focuses on commercial litigation representing Japanese banks and various bankruptcy matters. Also, he routinely represents and provides major Japanese financial institutions and manufacturing companies listed on the Tokyo Stock Exchange with legal advices in financial and corporate areas ranging from various lawsuits (e.g. debt collection; damage compensation for tort and breach of contract, etc.), business insolvency, execution of judgements, analysis of regulations, documentation, corporate restructuring, corporations law and to mergers and acquisitions.

**Experiences**
His experience in handling various litigations includes multi-party lawsuits (by representing plaintiff consumers for class actions), disputes both between companies and against government agencies regarding damage compensation, online defamation, leakage of information, product liability, system development conflict, and overwork death and harassment, international double suits, and recognition and enforcement of foreign judgments in Japan. He also acted as a legal counsel and deputy trustee in high-profile business bankruptcy cases (e.g., Mita Kogyo, Nippon Lease and Nippon Auto Lease).

**Education**
LL.M., New York University, 2002
LL.B., University of Kyoto, 1995

**Bar Admissions**
- Japan (1997)
- New York (2003)

**Recent Publication**
- Q&A for civil rehabilitation proceedings (Economic Legal Research Institute, 2000) (co-author)
- Legal issues posed by electronic commerce – Current situations and challenges (No.1565, 1566, 1570 of Kinyu Homu Jijo, 1999, 2000)
- The status of discussion on rights plan (trust-type and pre-warning-type) (No.602 of Minji Kenshu, 2007)

**Language**
- Japanese (first language)
- English

www.iwatagodo.com I © Iwata Godo 2016 I MARUNOUCHI BLDG. 10th FLOOR, 2-4-1 MARUNOUCHI, CHIYODA-KU, TOKYO 100-6310 JAPAN, TEL: 81-3-3214-6205 FAX: 81-3-3214-6209

# **EXHIBIT C**

Court File No. CV-14-500253-00CP

# ONTARIO
# SUPERIOR COURT OF JUSTICE

**B E T W E E N**

DAVID JOYCE, SANCHO McCANN,
ALEXANDRE PEPIN and PAUL COLLIN

Plaintiffs

and

MTGOX INC., MT. GOX KK, TIBANNE KK, MT. GOX NORTH AMERICA INC.,
MIZUHO BANK, LTD., MARK KARPELES and JED MCCALEB

Defendants

Proceeding under the *Class Proceedings Act, 1992*

## MOTION RECORD
### (Motion for Dismissal)

Date: May 4, 2016

**CHARNEY LAWYERS**
151 Bloor Street W., Ste. 602
Toronto ON   M5S 1P7

Theodore P. Charney
LSUC #26853E
Brendan O'Grady
LSUC #66419D

Tel:    416.964.7950
Fax:    416.964.7416

**Lawyers for the plaintiffs**

TO:

**MCCARTHY TETRAULT LLP**
Suite 5300, TD Bank Tower
Box 48, 66 Wellington Street West
Toronto ON M5K 1E6

Paul Steep
Shane D'Souza

Tel: 416-601-8196
Fax: 416-868-0673

**Lawyers for Mizuho Bank, Ltd.**

-AND-

**LENCZNER SLAGHT ROYCE SMITH GRIFFIN LLP**
130 Adelaide St. W. Suite 2600
Toronto, ON M5H 3P5

Matthew B. Lerner
Tel: 416-865-2940
Fax: 416-865-2840

**Lawyers for Mark Karpeles & Tibanne KK**

Tab 1

Court File No. CV-14-500253-00CP

## ONTARIO
## SUPERIOR COURT OF JUSTICE

BETWEEN

### DAVID JOYCE, SANCHO McCANN,
### ALEXANDRE PEPIN and PAUL COLLIN

Plaintiffs

and

### MTGOX INC., MT. GOX KK, TIBANNE KK, MT. GOX NORTH AMERICA
### INC., MIZUHO BANK, LTD., MARK KARPELES and JED MCCALEB

Defendants

Proceeding under the *Class Proceedings Act, 1992*

### NOTICE OF MOTION

**THE PLAINTIFFS** will make a motion to the Honourable Justice Paul M. Perell on Monday May 10, 2016 at 10:30 a.m, or soon after that time as the motion can be heard, at 130 Queen Street West, Toronto, ON.

**PROPOSED METHOD OF HEARING:**

1.      Orally.

### THE MOTION IS FOR THE FOLLOWING RELIEF:

1.      An Order dismissing the action on consent against the defendants, Mizuho Bank, Ltd and Mark Karpeles on a without costs basis;

2.      Notice of the settlement will be disseminated by:

2

    a.      Email to all putative class members who registered with class counsel;

    b.      Posting to online discussion forums on www.Reddit.com;

    c.      Posting to a dedicated Facebook maintained by class counsel; and

    d.      Requesting that it be posted to www.Wizsec.jp, a prominent website reporting on the subject matter.

3.     Such further and other relief as this Honourable Court deems just.

**THE GROUNDS FOR THIS MOTION ARE:**

1.     The plaintiffs have all consented to dismissing the action on a without costs basis;

2.     There is no prospect of recovering against Mark Karpeles;

3.     The potential damages against Mizuho Bank Ltd do not justify a class action;

4.     The defendant, Mark Karpeles, does not appear to have any responsive insurance coverage or assets against which the class could recover on a judgment;

5.     The defendant, Mizuho Bank Ltd, may not be liable for losses of bitcoins which represent the vast majority of losses sustained by the putative class;

6.     The total value of government-issued currency lost by the putative class for which Mizuho Bank Ltd may be found liable is probably less than $1,000,000; and

7.     Mizuho Bank Ltd is domiciled in Japan and has moved to challenge the jurisdiction of this Court to hear the class action.

8.     Notice to the putative Class of the settlement can be effectively achieved by means proposed by counsel

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the motion:

3

1.      Affidavit of Brendan O'Grady sworn May 4, 2016;

2.      Affidavit of Alexandre Pepin sworn April 27, 2016;

3.      Affidavit of Paul Collin sworn April 27, 2016;

4.      Affidavit of David Joyce sworn April 28, 2016; and

5.      Affidavit of Sancho McCann sworn April 29, 2016.

Date: May 4, 2016

**CHARNEY LAWYERS PC**
151 Bloor St. W, Suite 602
Toronto, ON   M5S 1P7

Tel:  (416) 964-7950
Fax: (416) 964-7416

**Theodore P. Charney**
**(LSUC #26853E)**
**Brendan O'Grady**
**(LSUC #66419D)**

Lawyers for the Plaintiffs

**TO:**        **Paul Steep and Shane D'Souza**

MCCARTHY TETRAULT LLP
Suite 5300, TD Bank Tower
Box 48, 66 Wellington Street West
Toronto ON M5K 1E6

Email:  psteep@mccarthy.ca; sdsouza@mccarthy.ca
Fax No: 416-868-0673

*Lawyers for Mizuho Bank Ltd*

**AND TO:**   **Matthew B. Lerner**
LENCZNER SLAGHT ROYCE
SMITH GRIFFIN LLP
130 Adelaide St. W. Suite 2600
Toronto, ON M5H 3P5

Email:  mlerner@litigate.com
Fax No:  416-865-2840

*Lawyer for Mark Karpeles & Tibanne KK*

| | |
|---|---|
| JOYCE, et al.<br>**Plaintiffs** | *v.* | MTGOX INC., et al.<br>**Defendants** |

Court File No.: CV-14-500253-00CP

*Ontario*
**SUPERIOR COURT OF JUSTICE**
Proceeding commenced at Toronto

**NOTICE OF MOTION**

**CHARNEY LAWYERS**
151 Bloor Street West, Suite 602
Toronto ON M5S 1P7

**Theodore P. Charney**
LSUC No.: 26853E
**Brendan O'Grady**
LSUC No.: 66419D

**Tel:** (416) 964-7950
**Fax:** (416) 964-7416

Lawyer for the Plaintiffs

Tab 2

Court File No. CV-14-500253-00CP

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

**B E T W E E N**

DAVID JOYCE, SANCHO McCANN,
ALEXANDRE PEPIN and PAUL COLLIN

Plaintiffs

and

MTGOX INC., MT. GOX KK, TIBANNE KK, MT. GOX NORTH AMERICA INC.,
MIZUHO BANK, LTD., MARK KARPELES and JED MCCALEB

Defendants

Proceeding under the *Class Proceedings Act, 1992*

**AFFIDAVIT OF BRENDAN O'GRADY**
**Sworn May 4, 2016**
**(Motion for Dismissal)**

I, BRENDAN O'GRADY, of the City of Toronto, in the Province of Ontario,

MAKE OATH AND SAY:

1.     I am an associate with the law firm of Charney Lawyers PC, counsel of record for

the plaintiffs.  As such, I have knowledge of the matters to which I hereinafter depose,

except where the statements are based on information and belief, in which case I have

disclosed the source of the information, and I believe the information to be true.

2

## Introduction

2.    I make this affidavit in support of the plaintiffs' motion for approval of a settlement to this class action whereby the claims against the two remaining defendants, Mizuho Bank, Ltd and Mark Karpeles, are dismissed on consent and on a without costs basis.

## Background Information about The Class Action

3.    This class action arose from the collapse of the MtGox Bitcoin exchange, which was an online marketplace to trade "**bitcoins**", an unregulated digital currency, in exchange for government-issued currency ("**fiat currency**"). Users of the exchange could store their bitcoins in digital vaults maintained by the exchange (although bitcoins were allegedly misappropriated) and user's fiat currency was allegedly stored in the exchange's bank accounts at Mizuho Bank Ltd.

4.    In October 2013, the MtGox Bitcoin exchange abruptly went offline and most of its users have since been unable to retrieve their bitcoins from the exchange. Some users also had fiat currency stored at MtGox that has been irretrievable since the exchange went offline.

3

5.      The class action was commenced on behalf of all Canadian users of the MtGox

Bitcoin exchange in March 2014.The intention was to seek certification for settlement

purposes in order coordinate with a class action for United States class members to make

a joint proposal in bankruptcy proceedings in Japan.

6.      On April 24, 2014, Mt. Gox Co. Ltd. obtained bankruptcy protection in Japan. The

trustee in bankruptcy, Nobuaki Kobayashi, applied to the Ontario Superior Court to stay

the class action against Mt Gox which was granted by Justice Newbould.

7.      The action was certified for settlement purposes by order of Justice Conway dated

September 23, 2014, attached as **Exhibit "A"**.

8.      The Class proposal was rejected by the trustee at which time the plaintiffs applied

for an order setting aside the certification order.

9.      MtGox had no insurance that could respond to the class action. Attached as

**Exhibit "B"** is an email from Canadian counsel for the bankruptcy trustee of MtGox,

dated February 3, 2016, which confirmed that MtGox did not maintain any liability or

director and officer insurance. I believe the contents of this email to be truthful.

10.     The following persons were originally named as defendants:

        (a)     Mt. Gox KK, which is also known as Mt. Gox Co., Ltd ("**MtGox**")

4

    (b)    MtGox Inc, Mt. Gox North America Inc, Tibanne KK, which are corporate entities related to MtGox;

    (c)    Jed McCaleb, the founder and former owner of MtGox;

    (d)    Mark Karpeles, the owner and chief executive of MtGox; and

    (e)    Mizuho Bank Ltd, the banker of MtGox ("**Mizuho Bank**").

11.    The claims against MtGox Inc, Mt Gox KK, Tibanne KK, Mt. Gox North America Inc were discontinued on consent by order of Justice Perell dated November 3, 2015. Claims against Jed McCaleb were also discontinued on consent because he had sold MtGox to Mark Karpeles before the subject time period and had not involvement thereafter with MtGox.

12.    Only claims against Mark Karpeles and Mizuho Bank were maintained. However, for reasons explained below, it is now apparent to my law firm and the representative plaintiffs that the class action is unsustainable.

13.    According to news reports, Tokyo police discovered a massive fraud perpetrated by Mark Karpeles and the majority of users' bitcoins still remain at large. Mark Karpeles was arrested by Tokyo police and, according to his lawyer in these proceedings, remains incarcerated pending trial for offences relating to MtGox.

5

**Mark Karpeles**

14.     I have read in the media and I heard Matthew Lerner, counsel for Mark Karpeles, submit to the Court in a case conference on January 21, 2016 that Mr. Karpeles was at that time incarcerated in Japan. Given Mr. Karpeles's alleged role in a massive, global fraud, I doubt that he has any free assets. It also seems unlikely that he has any assets in Ontario where the plaintiffs and class could recover without engaging in complex and costly, trans-jurisdictional enforcement efforts.

15.     For this reason, it is the opinion of Charney Lawyers PC that, even if judgment is obtained against Mr. Karpeles, it would be difficult if not impossible to recover upon.

**Mizuho Bank**

16.     The four representative plaintiffs advised me and deposed in their affidavits included in this record, and I verily believe, that they all lost Bitcoin in the collapse of MtGox and none lost fiat currency because none had deposited fiat currency into MtGox. They only deposited Bitcoins which they had either purchased or "mined" (i.e. created over time with software).  All of the representative plaintiffs joined this lawsuit in order to recover the lost value of their bitcoins.

6

17.     From my review of media and industry reports, and from conversations with the plaintiffs, I do not believe that Mizuho Bank ever handled Bitcoins, nor had any role in storing, transferring or tracing Bitcoins. Mizuho Bank only handled fiat currency.

18.     For this reason, it is the opinion of Charney Lawyers PC that Mizuho Bank may be held liable for lost currency however Mizuho Bank may not be held liable for the value of lost bitcoins.

**Reported Losses in Canada**

19.     On February 3, 2016, Mr. Charney wrote to Margaret Sims, Canadian counsel for the MtGox Trustee in Bankruptcy, requesting a list of Canadian creditors outlining their total losses. Ms. Sims replied on February 8, 2016 that "the trustee has never agreed to, and does not agree to, providing the requested Canadian creditor list or estimated claim amounts." This correspondence is attached as **Exhibit "C"**.

20.     Charney Lawyers PC created a website for the class action which explains basic information about the litigation. This website also contains a questionnaire which allows putative class members to register their names and contact details, and report their losses and other details relating to their experience with MtGox. I am responsible for monitoring and maintaining the website and the registration system.

21.     One hundred and seven former users of the MtGox have completed the registration questionnaire. These registrants claim to reside in Canada. These registrants claimed to have lost approximately 10,500 Bitcoin. I previously deposed in an Affidavit sworn January 13, 2016 that one bitcoin was at that time worth $614.77 CAD, meaning 10,500 bitcoins were worth approximately $6,460,000 CAD.

22.     Only forty eight registrants claimed to have lost fiat currency. Their reported losses total approximately $126,000 USD, $18,800 CAD and $528,000 in unspecified currency ($672,800 total). Regarding the US currency, after removing two outliers reporting losses of $15,000 and $91,000, the average reported claim is for $1,322 USD. Regarding the Canadian currency, after removing one outlier reporting losses of $9,750, the average reported claim is for $1,500. Regarding the currency not specified to be US or Canadian, after removing outliers reporting losses of $10,000, $11,504, $12,253, $16,000, $33,000, $34,407, $130,000 and $250,000, the average reported claim is for $1,969.19.

23.     Judging from the reported losses of the online registrants and the experiences of the putative representative plaintiffs, and having reviewed extensive media coverage and reports of the bankruptcy trustee, bitcoin losses rather than fiat currency losses appear to represent the majority of losses sustained by the putative class members in the collapse of MtGox. Our one hundred and seven registrants total losses are $7,132,800 but the currency losses are only 10%.

8

24.     According to the Affidavit of Nobuaki Kobayashi, MtGox Trustee in Bankruptcy, sworn September 22, 2014, there are 2,458 known Canadians who has bitcoins or fiat currency deposited with MtGox at the time of Japanese bankruptcy petition.

25.     If we assume that 10% of the creditors lost fiat currency, and accepting that the average fiat currency losses reported to class counsel are commensurate with average losses across the putative class, then the total claims for lost currency is roughly $490,000 as follows:

> 245 users          10% of total Canadian users of MtGox
> × ~ $2000          average reported lost currency
> = ~ $490,000

26.     It therefore appears that the only solvent entity against whom judgment can be recovered, Mizuho Bank, could only be held liable for a fraction of the total losses sustained by the putative class.

**There is a Significant Jurisdiction Challenge**

27.     Mizuho Bank and Mark Karpeles brought a motion to challenge this Court's jurisdiction to hear the class action. Our firm has vigorously defended the motion by filing extensive affidavits, bringing motions and preparing for argument.

28.     I have discussed this motion with Mr. Theodore Charney, senior counsel at

Charney Lawyers PC. We are of the opinion that there is a reasonable prospect that

Mizuho Bank's jurisdiction motion may be dismissed but the motion is not entirely

without merit. Hence there is a risk it may succeed and there is a real prospect of appeals

which will increase costs and legal fees before the certification motion even proceeds, as

well as the ultimate trial of this matter.


**Cost Consequences**


29.     Class counsel provided each representative plaintiff a complete indemnity against

adverse costs awards.



30.     It is the opinion of Charney Lawyers PC that this action is unlikely to settle before

certification.

31.     As a result, there is significant costs exposure in the jurisdiction motion as well as

the certification motion, in addition to likely appeals from each.


**Charney Lawyers PC and the Proposed Representative Plaintiffs Regard the Class

Action as Unsustainable**

32.     I was present during phone calls between Mr. Charney and each of the representative plaintiffs. Mr. Charney explained his view that the resources that must be devoted to this matter, the risks of the case being dismissed and the risks of adverse costs cannot be justified when the amount in issue could be as little as $700,000 in currency.

33.     Mr. Charney explained his view that there is no purpose to prosecuting claims against Mark Karpeles in light of how there is no responsive insurance coverage, the improbability of him having any free assets, and the difficulty in recovering against any assets he may have even if a judgment were to be obtained.

34.     Mr. Charney explained his view that prosecuting claims against Mizuho Bank is not worthwhile because the time, expenses, resources and costs exposure outweighs the potential recovery when Mizuho Bank is likely not responsible for the lost bitcoins which represent most of the losses sustained by the putative class. Mr. Charney further explained how the relative dearth of lost fiat currency reported to class counsel, the serious jurisdiction challenge, and the significant ongoing costs exposure to prosecuting the claims all supported the conclusion that the action should not be maintained.

35.     Each of the representative plaintiffs agreed with these conclusions and consented to dismissing the action on a without costs basis.

36.     To date, Charney Lawyers PC has incurred $13,049.53 in disbursements and docketed in the range of $256,000. Unfortunately, the recoverable damages in this class action appear to be too small to warrant the continuation of the proceeding.

**Notice to the Putative Class**

37.     If this motion is granted, Class Counsel would propose to inform the putative class members about this motion through online means.

38.     I believe that it is reasonable to assume that Bitcoin users tend to be technologically-inclined and aware of online discussions. Online means of informing the putative class of this motion are, in my opinion, the most likely means of reaching the most people.

39.     I would post a notice of this motion, substantially in the form of the draft notice attached as **Exhibit "D"**, on the class action webpage.

40.     I have also maintained a private Facebook group to which some of the putative class members have subscribed. I would post the notice of this motion on the Facebook group webpage.

12

41.     I have seen discussion boards on the website Reddit.com which continue to host active conversations about the collapse of MtGox and resultant lawsuits. I would post notice of this motion on Reddit and similar forums, where the notice may be shared and reposted onto other forums.

42.     One prominent website, Wizsec.jp, has performed detailed forensic investigations of the collapse of MtGox and regularly reports on the Japanese insolvency and related matters. I would contact this website and request that the notice of this motion be posted there.

43.     I would also send notice of this motion via email to all of the registrants.

44.     I swear this affidavit for no improper purpose.


SWORN BEFORE ME at the City of       )
  Toronto, in the Province of Ontario,   )
  this 4th day of May, 2016              )
                                         )
                                         )
_____        _____
Commissioner for taking affidavits           BRENDAN O'GRADY

JOYCE, et al.
**Plaintiffs**

v.

MTGOX INC., et al.
**Defendants**

Court File No.: CV-14-500253-00CP

*Ontario*
**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at Toronto

**AFFIDAVIT OF BRENDAN O'GRADY**
**Sworn May 4, 2016**
**(Motion for Dismissal)**

**CHARNEY LAWYERS**
151 Bloor Street West, Suite 602
Toronto ON M5S 1P7

**Theodore P. Charney**
LSUC No.: 26853E
**Brendan O'Grady**
LSUC No.: 66419D

**Tel:** (416) 964-7950
**Fax:** (416) 964-7416

Lawyer for the Plaintiffs

| | | | **Court File No.:** CV-14-500253-00CP |
|---|---|---|---|

JOYCE, et al.      v.      MTGOX INC., et al.

**Plaintiffs**           **Defendants**

*Ontario*
**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at Toronto

---

**MOTION RECORD**
(Motion for Dismissal)

---

May 10, 2016.

The plaintiffs seek an order dismissing this proposed class action pursuant to s.29 of the <u>Class Proceedings Act</u>, 1992. S.O. 1992 c.6. The action has already been discontinued against all but two defendants who consent to the plaintiffs' motion. Having read the motion record, I am satisfied that pursuant to s.29 of the Act, the motion should be granted as requested. I am also satisfied with the notice plans with the dismissal to take effect on June 17, 2016.

Perell. J.

**CHARNEY LAWYERS**
151 Bloor Street West, Suite 602
Toronto ON M5S 1P7

**Theodore P. Charney**
LSUC No.: 26853E
**Brendan O'Grady**
LSUC No.: 66419D

**Tel:** (416) 964-7950
**Fax:** (416) 964-7416

Lawyer for the Plaintiffs