# EXHIBIT A

<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3

 4    GREGORY GREENE, JOSEPH LACK,    )
      and ANTHONY MOTTO,             )
 5    individually and on behalf     )
      of all others similarly        )
      situated,                      )
 6                                   )
                         Plaintiffs, )
 7                                   )
      -vs-                           )  Case No. 14 C 1437
 8                                   )
      MIZUHO BANK, LTD., a           )
 9    Japanese financial             )
      institution, and MARK          )
10    KARPELES, an individual,       )  Chicago, Illinois
                                     )  April 27, 2016
11                       Defendants. )  10:30 a.m.

12                        TRANSCRIPT OF PROCEEDINGS
                     BEFORE THE HONORABLE GARY FEINERMAN
13

14    APPEARANCES:

15    For the Plaintiffs:    EDELSON P.C.
                             BY:  MR. ARI J. SCHARG
16                                MR. JOHN AARON LAWSON
                             350 North LaSalle Street
17                             Suite 1300
                             Chicago, Illinois  60654
18                             (312) 239-3362

19

20

21
      Court Reporter:
22
                         CHARLES R. ZANDI, CSR, RPR, FCRR
23                          Official Court Reporter
                         United States District Court
24                219 South Dearborn Street, Room 2128
                           Chicago, Illinois  60604
25                       Telephone:  (312) 435-5387
                     email:  Charles_zandi@ilnd.uscourts.gov
</pre>

1    APPEARANCES:   (Continued)

2    For Defendant Mizuho      SHEARMAN & STERLING, LLP
     Bank, Ltd.:               BY:   MR. JEROME S. FORTINSKY
3                                    MR. JEFFREY RESETARITS (via
                                     telephone conference call)
4                              599 Lexington Avenue
                               New York, New York  10022
5                              (212) 848-4900

6                              NEAL, GERBER & EISENBERG
                               BY:   MR. JONATHAN S. QUINN
7                              Two North LaSalle Street
                               Suite 1700
8                              Chicago, Illinois  60602
                               (312)  269-8093
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Proceedings heard in open court:)

2          THE CLERK:  14 C 1437, Greene versus Mt. Gox.

3          THE COURT:  Do we have anybody on the phone?

4          MR. RESETARITS:  Yes.  Jeff Resetarits with

5     Shearman & Sterling for Mizuho is on the line.

6          MR. SCHARG:  Good morning --

7          THE COURT:  And could you say your name one more

8     time, please.

9          MR. RESETARITS:  Sure.  It's Jeff, last name is

10    Resetarits.

11         THE COURT:  Got it.  Thank you.

12         MR. SCHARG:  Good morning.  Ari Scharg on behalf of

13    the plaintiffs.

14         MR. LAWSON:  Good morning.  Aaron Lawson on behalf of

15    the plaintiffs.

16         MR. FORTINSKY:  Good morning, your Honor.  Jerry

17    Fortinsky with Shearman & Sterling for Mizuho.

18         MR. QUINN:  Good morning, your Honor.  Jonathan Quinn

19    on behalf of defendant Mizuho.

20         THE COURT:  Good morning.  So, if the lawyers want to

21    stand at the podium, you can.  If you want to sit down and

22    talk into the microphones, you can, whatever you feel most

23    comfortable doing.  I'm indifferent to that.

24         So, we have a couple of motions.  One is fully

25    briefed.  One isn't.  Let me do the 1292 motion first, which

1   asks for an interlocutory appeal on the personal jurisdiction
2   ruling.  I'm going to deny that motion, and I'm going to state
3   my reasons on the record.

4           Under 1292, the district court can certify legal
5   questions to the Court of Appeals under particular
6   circumstances.  It has to be a controlling question of law,
7   and it has to be -- there has to be a substantial ground for a
8   difference of opinion.  And then it has to materially advance
9   the ultimate termination of the litigation.

10          And I agree that for both questions presented --
11  well, actually, I'm not sure about that.  So, I'm going to put
12  aside the third prong of the test.  The two questions that
13  Mizuho has proposed for immediate interlocutory review fall
14  short on the first prong and the second prong.

15          So, the first question is:  May a foreign defendant's
16  alleged silence or inaction, in this case when accepting funds
17  for a deposit, constitute intentional contact with the forum
18  state sufficient by itself to support personal jurisdiction
19  consistent with due process?

20          That's not a controlling question of law in this
21  case because it doesn't fit this case.  It doesn't describe
22  what happened or what is alleged to have happened in this
23  case.  And just to make things easier, whenever I say that
24  something happened or that Mizuho did X or Y or the plaintiff
25  did X or Y, I'm not actually saying that Mizuho did X or Y or

1  plaintiff did X or Y.  I'm saying that it's been alleged, that

2  those things have been alleged, and because we're at the

3  pleadings stage, that's my factual predicate.

4  It can't fairly be described as silence or inaction

5  for a bank to take custody of, accept, and profit from bank

6  deposits that are sent to an account in the bank.  That's not

7  inaction.  That is putting out a net, taking what comes in the

8  net, and not giving it back, and profiting from it.

9  It's that conduct that was the basis for my personal

10  jurisdiction ruling, and from where I sit, I don't think that

11  that conduct can fairly be described as silence or inaction.

12  So, the first question is a perfectly good question,

13  and I think it's probably a contestable question; but it's not

14  a controlling question of law in this case because it doesn't

15  fit this case.

16  The second proposed question is:  May a foreign

17  defendant's adoption of a policy that equally affects

18  thousands of individuals around the world or its failure to

19  disclose such a policy to those individuals subject it to

20  personal jurisdiction in each forum state where any of those

21  individuals may be located consistent with due process?

22  That question is a contestable -- no, that question

23  is a controlling question in this case because that describes

24  this case, but it's not a contestable question of law.  And on

25  that point, I'll just say the following:

1    I mean, let's assume that a bank did something that
2    it knew was engaged in -- said, "You know, we're only going to
3    engage in transactions, we're only going to accept deposits
4    from" -- and I know the bank says that they weren't able to
5    accept or not accept, and that's something that's going to
6    come up in the motion to dismiss.  Right now, I'm just talking
7    about the motion -- the personal jurisdiction motion.

8        "We're going to accept deposits only from Texas,
9    Oklahoma, Arkansas, Mississippi, and Alabama," as opposed to a
10   bank that says, "We're going to accept deposits from
11   everywhere."  It can't possibly be that the bank that limits
12   its alleged tortious conduct to those five states are suable
13   in those five states, are subject to personal jurisdiction in
14   those five states, but that banks who are indiscriminate with
15   respect to the states in which they're knowingly doing things
16   and accepting money from can't be sued anywhere other than
17   where that bank is located.

18       In other words, you don't get extra credit, from a
19   personal jurisdiction perspective, by treating people in all
20   50 states in a tortious way, as opposed to limiting your
21   tortious conduct to certain states.

22       And this goes back to a passage in the opinion where
23   I said that I have no doubt that Mizuho didn't care that Lack
24   was from California or Greene and Motto were from Illinois.
25   And I remember having a discussion -- I think I remember

1    having a discussion with Mr. Fortinsky when we argued this

2    motion where I heard him saying, perhaps incorrectly, that

3    after *Walden versus Fiore*, personal jurisdiction requires that

4    the defendant actually care which state the defendant is from

5    and which state they're affecting.

6            And I don't read *Walden versus Fiore* that way, and I

7    think that notion is what underlies the question, the second

8    question that's been presented for a 1292(b) interlocutory

9    appeal.

10           So, let's say I'm a meat -- a hamburger manufacturer

11   in Canada and I know that my hamburgers are tainted, and I

12   just send out my trucks to deliver -- my trucks are delivering

13   those hamburgers in the United States to all 50 states.  I

14   have adopted a policy that equally affects thousands of

15   individuals around the world, or at least in the country; and

16   it really doesn't matter to me whether the trucks are going to

17   North Dakota or Wisconsin or California or Alabama or

18   Mississippi or whatever, but I know that they are, and I know

19   that I'm affecting people in those 50 states.

20           Mizuho's preferred answer to the second question

21   would be, under those circumstances, the Canadian hamburger

22   manufacturer isn't subject to personal jurisdiction in any of

23   those states because it just acted with a shotgun as opposed

24   to with a rifle.  And that -- that's not a contestable

25   question, I don't think.  I don't think it's a close question.

1   So, while it describes this case, it doesn't satisfy the

2   requirements of 1292(b).

3         So, for those reasons, I'm going to deny the motion

4   for an interlocutory appeal, which is docket No. 208.

5         Let's move on to the -- let's move on to the motion

6   to dismiss, which presents meatier issues than the 1292(b)

7   motion.  So, Mizuho had the last word in writing, so let me

8   ask the plaintiffs whether they would feel that there's

9   anything in the reply to which they'd like to respond in a way

10  that they haven't already responded in their opposition brief.

11        MR. LAWSON:  I don't believe so, your Honor.

12        THE COURT:  Okay.  Is there any -- are there any

13  points that you would like to emphasize that you've already

14  put forth in writing?

15        MR. LAWSON:  I don't think so.  I imagine you'll have

16  questions about the choice of law issues that come up.  If

17  not, I think we'd like to talk about them now, but I think

18  that's perhaps the only issue in which we might have anything

19  we'd want to really put forward.

20        THE COURT:  Okay.  Well, tell me what you -- give me

21  your pitch on choice of law.

22        MR. LAWSON:  Okay.  Excuse me.  It seems to us that

23  if Japanese law is going to apply, then a request that you

24  dismiss the case under Illinois law is essentially a request

25  for an advisory ruling; and we're not sure that Rule 44.1

1    allows Mizuho to move to dismiss under one body of law while
2    at the same time reserving their right to contest the
3    allegations under a separate body of law later in the
4    litigation.
5              THE COURT:  Why not?
6              MR. LAWSON:  Well, their argument --
7              THE COURT:  All I have to say is, "Well, I'm not
8    going to dismiss the case because it fails to state a claim
9    under Japanese law," but what stops them later on on summary
10   judgment or in a trial saying, "You know what, Japanese law
11   applies, and here's what Japanese law says on these causes of
12   action"?
13             MR. LAWSON:  Well, I agree that they can do that.  I
14   just don't know that they can ask for your ruling on Illinois
15   law at this point in time.
16             THE COURT:  Why can't they -- why not?
17             MR. LAWSON:  Well, their premise seems to be that the
18   claims are so weak under Illinois law that we can dismiss them
19   and not worry about Japanese law, but --
20             THE COURT:  But you think that Illinois law applies.
21             MR. LAWSON:  We do.
22             THE COURT:  So, they're agreeing with your premise.
23             MR. LAWSON:  Say that again?
24             THE COURT:  You guys are sharing a common premise,
25   which is for purposes of 12(b)(6), what law applies.

1  MR. LAWSON:  I think we think it applies for the
2  entire litigation, but yes.
3  THE COURT:  For purpose of 12(b)(6) --
4  MR. LAWSON:  Yes.
5  THE COURT:  So, you ought to be happy with their
6  assumption for present purposes that Illinois law applies.
7  MR. LAWSON:  Well, inasmuch as -- yes, we do agree
8  that -- we are happy to apply Illinois law at this point.  I
9  just don't think that it makes sense to ask us to litigate
10 under Illinois law now with the assumption that it won't apply
11 later.  But if you disagree, we're not -- I mean, this is not
12 a hill --
13 THE COURT:  It's not that I disagree.  I don't even
14 understand your point.  Why are you even pressing this point?
15 They're agreeing with you with your premise on the 12(b)(6),
16 and you ought to say, "Great, we're fighting it under Illinois
17 law.  That's exactly what we want."
18 MR. LAWSON:  It is what we want.
19 THE COURT:  Later on, you can say -- well, we have to
20 talk about Japanese law versus Illinois law for *forum non*
21 purposes; but assuming we get over that hump, you live to
22 fight -- they live to fight another day, and you don't give
23 anything up.
24 MR. LAWSON:  Sure.  All right.
25 THE COURT:  But what am I missing?

1         MR. LAWSON:  I suppose nothing.  Maybe we're just

2  thinking about this in different ways, and in that case, your

3  way gets to carry the day.

4         THE COURT:  No, but I'm -- I mean, that -- I

5  appreciate that, but if I'm looking at it the wrong way, I

6  want to know that.  And I'm just one person, and sometimes I

7  think of things in a certain way, and I come to believe,

8  either from my own devices or from hearing from counsel, that

9  I ought to be looking at something from a different way.

10        So, I ask in all sincerity.  When I say, "What am I

11  missing," I'm not like Kim Jong Un saying, "What am I

12  missing," and there's only one answer to that.  I'm being

13  sincere.  What am I missing?

14        MR. LAWSON:  I'm not sure you're missing anything.

15        THE COURT:  Okay.  All right.  So -- but what

16  about -- since we're on choice of law, for the *forum non*, why

17  don't you address choice of law for purposes of the *forum non*

18  motion.

19        MR. LAWSON:  Okay.  Our point is that given that

20  this -- we apply Illinois's choice of law rules, the

21  presumption is that Illinois law applies.  And absent, you

22  know, a material conflict -- but even if there were a material

23  conflict, in tort cases, where the injury is felt, where it

24  occurs is generally the jurisdiction that has the greatest --

25  the most significant relationship to a dispute; and in that

1    case, for plaintiff Motto, for plaintiff Greene, that's --

2    those are both Illinois.  So, we think even if there was a

3    material conflict, Illinois law would apply.

4           THE COURT:  I understand that that's true for Greene

5    and -- that may be true for Greene and Motto, but you're

6    seeking to certify a nationwide class.  So, given that we're

7    going to have class members possibly from all 50 states, which

8    does not make this a universal jurisdiction case for purposes

9    of personal jurisdiction; it makes it the case that I

10   described, why -- wouldn't it make more sense to just have a

11   single source of law?

12          MR. LAWSON:  I don't think a nationwide class

13   action -- it might need subclasses to account for minor

14   variations in different states' common law -- would be

15   unmanageable.  And that's a question we can get to at

16   certification.

17          But I can tell you that I've seen nationwide tortious

18   interference class actions, nationwide fraudulent inducement

19   class actions, and they generally do require some finessing;

20   but by and large, the law of most of the common law

21   jurisdictions, it essentially tracks.  They essentially track

22   each other, and I don't think it would present manageability

23   concerns at all.

24          THE COURT:  Okay.  But what -- I mean, what -- what

25   do you have to say about Mizuho's argument that this is one of

1    those situations where the presumption that the forum state's
2    law applies has been overcome, given that this Japanese bank
3    was operating under Japanese banking laws and was dealing with
4    a Japanese account holder?  What are your thoughts on that?
5            MR. LAWSON:  You know, it's still -- it would still
6    at some point be their burden to show that the presumption
7    needs to be rebutted or should be rebutted, is rebutted.  But
8    the --
9            THE COURT:  Well, didn't they make that argument in
10   the *forum non* part of their brief?
11           MR. LAWSON:  Well, I mean, that particular argument
12   still requires a showing of a material conflict.  It isn't
13   rebutted simply because there's conduct in this litigation
14   that is outside the State of Illinois.
15           If Illinois had literally no connection to the
16   dispute, I think that might be one thing; but then I believe
17   the way to address that would be, you know, a venue motion, as
18   actually happened in the Maryland case they cite in their
19   reply.
20           It still -- but they -- you know, there is a
21   connection between Illinois and this dispute, so they'll have
22   to show the material conflict.  It isn't simply rebutted
23   because Mizuho's in Japan.
24           THE COURT:  I see.  I see.  So, what you're saying is
25   that in order for choice of law to even be put on the table,

1   there has to be a showing of a conflict between Illinois law

2   and Japanese law, and because Mizuho has not gotten into the

3   substance of Japanese law, it hasn't established that there's

4   a conflict; and, therefore, at this point, there's no choice

5   of law problem?

6           MR. LAWSON:  Right.

7           THE COURT:  Could you address that point, please?

8           MR. FORTINSKY:  Yes, your Honor.  The case law we

9   cite says that one reason that -- one reason why you should,

10   at least in appropriate circumstances, send the case back to,

11   in this case Japan, is that neither the Court nor in some

12   cases the lawyers are well-equipped to get into the details

13   of the foreign law.

14           So, it's not really -- we should not be having a

15   debate about what Japanese law says.  That's what the case

16   says.  Even beyond that, though, the --

17           THE COURT:  But I think what he's saying is that what

18   difference does it -- if there's no difference, material

19   difference between Japanese law and Illinois law, then we

20   don't need the superior expertise of the Japanese courts,

21   because if they're the same, then I could handle it just as

22   easily as a Japanese court could.

23           MR. FORTINSKY:  Well, in any event, that is not the

24   standard.  The standard is delineated in our briefs, and it

25   turns on, among other things, the convenience to the

1   witnesses, the availability of the evidence, the interests of

2   the respective jurisdictions, and the disposition of the --

3   of the matter.  Those are the criteria.  And on those

4   criteria, clearly, the -- all of the factors here tilt in

5   favor of Japan.

6          One telling sign is what the plaintiffs resort to,

7   their first point virtually is the presumption.  When you're

8   relying on the bare presumption rather than the facts of the

9   case, that sort of tells you that the facts, the details, the

10  guts of the issue is on the other side.

11         And here, what we have is the evidence and the

12  witnesses are in Japan.  Even the plaintiffs' own initial

13  disclosures reflect that.  The plaintiffs, in listing the

14  witnesses for this case, say that in addition to their

15  individual clients, the witnesses will all be agents and

16  employees of Mt. Gox, which is a Japanese institution, a

17  Japanese bitcoin exchange, and the agents and employees of

18  Mizuho Bank, which is also a Japanese institution.  That's who

19  this case will turn on.

20         Yes, there are three individuals who've brought the

21  claim, but once they get done showing us their -- their

22  records reflecting sending the money to Mt. Gox, which is

23  likely to be just a relatively modest number of pages, all of

24  the documents and all of the witnesses are in Japan.

25         Of the sort of three -- in any tortious interference

1   action, in a sense, you have three different locuses of
2   activity.  There is the plaintiff, there is the defendant, and
3   then there is the third party whose contract is allegedly
4   interfered with.

5          And in this case, that's the plaintiff, Mt. Gox, and
6   Mizuho.  Two out of the three, the two of the three that are
7   likely to have the most witnesses and the most documents in
8   this case are in Japan.

9          And the institutional interests of Japan turns on
10  various things, but I think is crystallized in this:  One of
11  the key questions here will be how you balance -- we've
12  presented this before as an argument, but I'm just presenting
13  it here as a question.  What this case will turn on is:  How
14  do you balance the Japanese bank's interest and the Japanese
15  system's interest in preserving the confidentiality between a
16  bank and its customers on the one hand, which standing alone
17  would tell you that Mizuho not only didn't have a right to,
18  but had a duty not to make disclosures to the plaintiffs, how
19  do you balance that against on the other hand the plaintiffs'
20  assertion that there's a duty of disclosure?

21         And the duty of disclosure versus duty of
22  confidentiality is at least in the first instance a question
23  of Japanese -- Japanese law.  It's not a question that really
24  the plaintiffs have even briefed or made any allegations on.
25  It's a question of how do you -- how do you wrestle with those

1    competing considerations?

2            Now, we would tell you that, in fact, there's been no

3    allegation here that Japanese law requires -- has any duty of

4    disclosure.  The plaintiffs have not even shown any duty of

5    disclosure under Illinois law or California law, let alone

6    Japanese law.  So, I don't think when you get to balancing

7    that question it's even a close call.

8            But that whole set of issues turns on what Japanese

9    law says about what banks are required to do.

10           THE COURT:  But doesn't Federal Rule of Evidence 44.1

11   acknowledge a United States federal court's ability to make

12   that determination based on all of the sources that are listed

13   in Rule 44.1?

14           MR. FORTINSKY:  Yes.  When -- yes, that's true.  But

15   the case law also acknowledges in many, many cases, some of

16   which are reflected in our papers, that U.S. judges, with all

17   due respect to the esteemed judges of this court, are less

18   competent to make decisions on foreign law than foreign judges

19   are.  And where there is -- and that is one factor, not the

20   only one, but one of the factors to be considered by the Court

21   in addressing a *forum non conveniens* argument.

22           THE COURT:  You're talking past each other, and all

23   I'm interested in is the part of the *forum non* analysis that

24   turns on the difficulty that a United States court would have

25   applying Japanese law.

1  What the plaintiffs are arguing is that tortious

2  interference law, fraudulent concealment law, unjust

3  enrichment law, there's been no showing by Mizuho that

4  Japanese law is any different from Illinois law regarding

5  the elements of those claims or even whether there are such

6  claims under Japanese or Illinois law.  And I don't hear any

7  push-back from you on this.

8            MR. FORTINSKY:  Let me --

9            THE COURT:  What you're saying is one component of

10  tortious interference law is justification and, you know,

11  having a valid business purpose.  And in order to address

12  that factor of tortious interference law, we'd have to get

13  into the Japanese law of bank disclosure and confidentiality

14  and all of that.

15            So, it seems that you're talking past one another,

16  and so I take it you're not -- you don't take issue, at least

17  at this point, with the plaintiffs' argument that Mizuho has

18  not shown that there's any difference between Japanese law and

19  Illinois law as to the elements of the causes of action.

20            MR. FORTINSKY:  Let me address that in two ways, your

21  Honor.

22            First, the -- showing that there's a conflict of law

23  between Japan and Illinois is not one of the standards, not

24  one of the criteria that we look to in deciding a *forum non*

25  motion.  So, there was no burden on us to brief that law.

1    That's it in a nutshell, your Honor.

2         THE COURT:  You're walking away from your brief,

3    though, on this point, pages 36 -- pages 28 to 29.

4         MR. FORTINSKY:  I'm happy to take a look at that,

5    your Honor, but --

6         THE COURT:  Because you've said that that's one of

7    the elements.  And if you want to walk away from that, that's

8    fine, but I want to make sure that you're -- you actually mean

9    to do that.

10        MR. FORTINSKY:  If you'll show me, your Honor, what

11   passage you're referring to, we can -- I'm glad to address it.

12        THE COURT:  Subsection B on pages 28 to 29, where you

13   talk about the choice of law for tort claims.  And you seem to

14   be arguing that Japanese law would govern the elements of a

15   tortious interference or a fraud claim, and now you're saying

16   that you don't have to show that.

17        MR. FORTINSKY:  You're talking about Point B?

18        THE COURT:  Yes.

19        MR. FORTINSKY:  The point here, your Honor, is that

20   applying Japanese law would create difficulty.  That's the

21   point I just made, that U.S. courts are less competent to

22   address questions of Japanese law.

23        THE COURT:  I get that.

24        MR. FORTINSKY:  It's not about a conflict.

25        THE COURT:  No, I get that.  But is it applying

1   Japanese law in terms of determining the elements of the cause

2   of action, or is it applying Japanese law in determining with

3   respect to one element of the tortious interference claim what

4   Japanese law has to say about depositor confidentiality and

5   the like?

6           MR. FORTINSKY:  I think Japanese law would apply

7   regarding both, your Honor.

8           THE COURT:  Okay.

9           MR. FORTINSKY:  So --

10          THE COURT:  So, in order to make the first argument,

11  which is, there's a difference between Japanese law and

12  Illinois law as to the elements and/or existence of the causes

13  of action, don't you have to tell me about what Japanese law

14  says on those particular subjects?

15          MR. FORTINSKY:  No, your Honor.  This is essentially

16  a dispute that arises in Japan.  Japanese law governs.

17          THE COURT:  I know.  But why is --

18          MR. FORTINSKY:  I don't have in front of me the

19  Japanese law on tortious interference, so if that's the

20  question, I don't have that.

21          THE COURT:  Okay.

22          MR. FORTINSKY:  And I'm not telling you that Japanese

23  tortious interference law -- I'm not describing it to you in

24  its particulars.

25          The point, though, is that the Japanese -- this is an

1  issue that arises in Japan.  If it were sent to Japan, the

2  plaintiffs would have the right to reformulate their complaint

3  under Japanese law.  My understanding is that Japanese law

4  does not necessarily have all the same -- the same causes of

5  action.  They're not on all fours, generally the same

6  concepts, but it's not how you trace this particular element

7  in this cause of action and match it up with that one.

8          So, undoubtedly, if this were repositioned in Japan,

9  if this were refiled in Japan, the -- both the plaintiffs and

10  defendants would have the right and the need to restate their

11  positions a little bit to align with what Japanese law

12  establishes.

13          THE COURT:  But we don't know what the differences

14  are.

15          MR. FORTINSKY:  Yes, that's true, but that's not one

16  of the criteria -- that's not one of the criteria --

17          THE COURT:  And now again you're walking away from

18  the argument that you made --

19          MR. FORTINSKY:  I don't understand that, your Honor.

20          THE COURT:  -- which is that Japanese tortious

21  interference law and fraud law are different; and, therefore,

22  it has to go to a Japanese court rather than an American

23  court.

24          You don't know what Japanese law says about tortious

25  interference or fraud, and because you don't know that -- and

1  I don't blame you for not knowing that.  I don't know that.  I
2  don't know if anybody in this room knows it.  Maybe Mr. Quinn
3  knows it.  But no one in this room knows it, perhaps.  Then I
4  can't say that this case needs to go to Japan because a
5  Japanese court has to -- is in a better position to apply
6  Japanese tortious interference law and Japanese fraud law,
7  because if it's the same as Illinois law, then I could do it
8  just as easily, and that falls out as a factor.

9       Whereas, if Japanese law is very different from
10 Illinois law and I would have a hard time grasping, for some
11 reason, what Japanese law says about those elements, then that
12 would weigh in -- and Japanese law should apply, then that
13 would weigh in favor of a transfer on *forum non conveniens*.

14      But without the essential predicate of knowing
15 whether there's a distinction between Japanese law and
16 Illinois law as to the elements of the various torts being
17 alleged, then that's not really a consideration for *forum non*
18 *conveniens*.

19      MR. FORTINSKY:  Well, let me throw another
20 consideration into the discussion, your Honor, on that very
21 point.  When we say that courts in the United States are less
22 competent to apply Japanese law, it's not just that the causes
23 of action are different.  Even if we were to assume, in other
24 words, that Japanese law was the same as Illinois law on
25 tortious interference, for example, except that it was in

1    Japanese, that would not completely answer the point because
2    when a court applies the law, it is not simply reading the
3    statute.  It has to apply the case law.  It has to understand
4    the procedural elements of it.  Applying the law isn't just a
5    matter of reading a statute, in other words.

6         And, therefore, to me, I take it as a given or at
7    least I find it persuasive that a Japanese court would be
8    superior to a U.S. court in applying Japanese law to all the
9    circumstances of this case, even if it were to turn out that
10   the fraudulent concealment law and unjust enrichment law and
11   tortious interference law were all precisely the same.

12        The second point I want to make in response, your
13   Honor, is that to me, it would defy belief if it turned out
14   that the law on all those three elements -- there are
15   essentially three causes of action here against Mizuho, the
16   accounting being just a remedy -- but the three causes of
17   action, if it were to turn out that those were all the same,
18   that would be astonishing, especially here where just a few
19   moments ago, the plaintiffs conceded in response to the
20   Court's questions that the laws of the 50 states, they said,
21   were, for the most part, I think was the word that counsel
22   used, the same.

23        Well, the same concern that -- ironically we're now
24   talking here about the same kind of concern we were a few
25   minutes ago, the variety of different state -- different laws

1    in the various jurisdictions.  There's a multiplicity of laws,

2    we know from our general legal experience, across the 50

3    states on all of these causes of action.  There may be a sort

4    of family resemblance between all the different tortious

5    interference claims, but I've litigated in enough

6    jurisdictions to know that there are some differences, I

7    gather everybody in this courtroom has, same kind of thing

8    with fraudulent concealment.

9              That was the consideration we were discussing a few

10   moments ago when the Court correctly pointed out that if the

11   case stays here, we will be dealing with an abundance of

12   different law across 50 jurisdictions.

13             Now, if even within the United States we see that

14   there's this multiplicity of differences -- multiplicity of

15   different causes of action, which the plaintiffs effectively

16   conceded when they said they were, for the most part, the

17   same, which is to say they're not really all the same, then

18   the same thing is undoubtedly true when you cross the ocean

19   and you have -- you have to look at Japanese law.

20             To me, maybe this is unfair to say this, but it feels

21   sort of obvious or instinctive to say that if our laws within

22   the United States are so different, they can't possibly be

23   precisely the same in Japan.

24             But still, my third point is, if the Court would

25   welcome a further submission on Japanese law on this point,

1    we would, of course, be glad to provide it.

2          THE COURT:  All right.  Anything else on choice of

3    law?

4          MR. LAWSON:  No, no.

5          THE COURT:  Okay.  Let's talk about -- you kind of

6    threw it to me, which is fine.  What am I interested in?  I'm

7    interested in causation.  And the question is:  Did Mizuho's

8    conduct cause a loss to either of the depositors here, Lack or

9    Motto, given --

10          MR. LAWSON:  So you're talking about the fraudulent

11    concealment?

12          THE COURT:  And also tortious interference.  Is there

13    causation, given the timing of who did what when and when the

14    deposits were made?

15          MR. LAWSON:  I believe that Mizuho's argument is that

16    the -- that Mt. Gox's problems were out there sort of in the

17    ether.  There had been reporting on them, so that both of

18    these individuals should have known that they weren't getting

19    their money back.

20          You know, I believe a lot of the reporting noted that

21    Mt. Gox was processing withdrawals and deposits slowly, not

22    that they'd shut down completely.

23          But I would also note that in both cases, you know,

24    we allege that neither of the plaintiffs would have

25    deposited -- and this is for the fraudulent concealment

1    specifically, would have deposited had they known that the
2    money was not coming out.  And this sort of -- the black hole
3    character of the Mt. Gox account at the time that they
4    deposited wasn't widely known, if it was known at all.  So I
5    think that shows causation, at least at this stage on that
6    claim.

7           THE COURT:  But given the undisputed timeline
8    established by the pleadings, isn't there an independent, a
9    wholly independent reason why the deposit was not allowed --
10   I'm sorry, the withdrawal was not allowed on February 20th,
11   2014, which is that Karpeles cut off the spigot on
12   February 7th?

13          MR. LAWSON:  Well, I -- his -- I mean, his actions
14   were also taken, I believe, in response to what Mizuho was
15   doing behind the scenes.  That's -- yeah.

16          MR. SCHARG:  Yeah.

17          MR. LAWSON:  So, I don't think that necessarily --
18   also -- I don't think that is a fully superseding cause or
19   anything of that nature.  I think it's still the case that
20   both Mizuho and Mt. Gox were responsible for the understanding
21   of both the plaintiffs that if they put their money into the
22   exchange, they'd be able to trade bitcoin.  They'd be able to
23   withdraw their money at some point.

24          So, I don't think that gives us a complete causation
25   problem.

1    MR. SCHARG:  And I'd like to add something to that

2  also.  The big issue is that Mizuho was the exclusive banking

3  partner for all of the users in the United States.  The big

4  reason why that was so important is because Mizuho knew that

5  given all the heat on Mt. Gox and all of the issues with the

6  press and the regulatory authorities, that there's no way that

7  any other bank would come in and fill their shoes.  There

8  would effectively be no other bank that could ever provide a

9  withdrawal opportunity for users in the United States.  And

10  that's the reason why they are, in particular, responsible for

11  the claims and why there is causation.

12    THE COURT:  But even if -- even if Mizuho didn't have

13  the black hole or the *Hotel California* policy, whatever you

14  want to call it, with respect to deposits and withdrawals,

15  Lack couldn't have withdrawn his money on February 20th for

16  reasons having nothing to do with that policy.

17    MR. SCHARG:  But he also could never have withdrawn

18  his money regardless.  Once it was in, it was gone.  There was

19  no way he would ever be able to withdraw it again.

20    THE COURT:  But there seems to be -- tell me why

21  there isn't a wholly independent cause of his inability to

22  withdraw, that cause being Karpeles saying, "No more

23  withdrawals."

24    MR. SCHARG:  Because those were both issues that led

25  to the ultimate event of Mt. Gox going dark, but the reason

1   Karpeles had to ultimately say, "No more withdrawals," and
2   that the whole thing was going dark to begin with was because
3   their entire business was frustrated by the banking policies
4   imposed by Mizuho.
5           THE COURT:  But is that really the theory of your
6   complaint?
7           MR. SCHARG:  It's not really.  We're kind of going
8   down this road, but the --
9           THE COURT:  I mean, the theory of your complaint is
10  that Karpeles was the principal bad actor because he was
11  stealing.
12          MR. SCHARG:  In a sense, yes.
13          MR. LAWSON:  Right.
14          THE COURT:  But now you're saying that Mizuho made
15  him do it.
16          MR. SCHARG:  No, I'm just saying that the -- that the
17  policies that were implemented by Mizuho -- so, Mizuho
18  recognized that Karpeles was a bad actor and recognized that
19  Mt. Gox, there was a ton of scrutiny.  They didn't want
20  anything to do with Mt. Gox.
21          At the same time, though, they were the only ones
22  that users in the United States could withdraw money through.
23  They were the sole -- they were the portal into Mt. Gox for
24  United States users.  There was never going to be any other
25  portal aside from Mizuho.

1     MR. LAWSON:  Right.  So, our theory isn't that
2  Mizuho's actions caused Karpeles to steal or caused someone
3  else to steal, right, because of course the negligence and the
4  conversion are pleaded in the alternative, but that it's what
5  they were doing behind the scenes that caused him to take the
6  site dark, which is --

7     MR. SCHARG:  Or accelerated the shutdown --

8     THE COURT:  So, what you're saying is Mizuho's
9  banking decisions is what caused Karpeles to halt the
10  withdrawals on February 7th of 2014?

11     MR. SCHARG:  Karpeles -- there were -- I know that he
12  might have announced to the public that he was halting
13  withdrawals, but those withdrawals have already been halted by
14  Mizuho for months and months and months.

15     THE COURT:  So, what is it that Karpeles did on
16  February 7th?

17     MR. SCHARG:  He finally started to, I believe --
18  yeah, he finally announced something on his website that
19  informed the public about what was already going on for the
20  past six or eight months, and explained why they couldn't --
21  explained why, for whatever -- you know, he put it in a
22  certain way; but what he was responding to was outrage over
23  the fact that nobody could withdraw money, and there was
24  increased regulatory scrutiny, and he made a public statement.

25     THE COURT:  But Mizuho didn't have the ability to

 1   stop withdrawals of bitcoin --

 2          MR. SCHARG:  No.

 3          THE COURT:  -- from Mt. Gox.

 4          MR. SCHARG:  That's right.

 5          THE COURT:  And that's what Karpeles halted on the

 6   7th, is that right?

 7          MR. SCHARG:  No, I think -- no, he announced that he

 8   was halting the ability to withdraw any form of currency.  Go

 9   ahead.

10          MR. LAWSON:  You're right, yes.

11          THE COURT:  Including --

12          MR. LAWSON:  Money was already stopped, and he

13   stopped the withdrawal from the wallets, yes, because he said

14   he was investigating -- I mean, I think that when you

15   represent you're investigating a bug, the idea is that you'll

16   finish investigating at some point and you'll go back live.

17   And it was between that point and the time when he actually

18   took the exchange completely dark that both individuals put

19   their money in.

20          And, you know, if -- if you're relying on a -- on the

21   exchange's promise of security, I suppose the fact that there

22   is a bug might spook you; but the fact that it's being

23   investigated probably is an assurance that they're actually

24   looking out for what's going on, whether that happened to be

25   true.  But the fact that they couldn't withdraw their money

1   was never Karpeles's doing.

2          MR. SCHARG:  No.  And to be clear, he only halted the

3   withdrawal at that point.  He didn't announce that it was

4   being shut off completely.

5          THE COURT:  Right.  I mean paragraph 37 -- I'm on the

6   second amended complaint, but I imagine the third amended

7   complaint says the same thing.

8          MR. LAWSON:  It's 38, yeah.

9          THE COURT:  "On February 7, 2014, Karpeles halted his

10  customers' ability to withdraw any form of currency from the

11  Mt. Gox website."  So, that means bitcoin, and it also means

12  real money.

13         MR. SCHARG:  Yeah.  It's perhaps inartfully drafted,

14  just in a sense that these are the manifestations and the

15  representations that he was making to the public.  He made it

16  appear that he was all of a sudden -- that he was all of a

17  sudden halting these withdrawals; but in reality, as we pled,

18  they -- Mizuho had already enacted banking policies six or

19  eight months earlier, the previous year, that made it

20  impossible for United States consumers to withdraw cash from

21  Mt. Gox.

22         THE COURT:  I see.  All right.  Any thoughts on that?

23         MR. FORTINSKY:  Yes, your Honor.  I think at this

24  point, frankly, with all due respect, the plaintiffs are just

25  kind of winging it with regard to their allegations here.  Let

1  me make three principal responses.

2           Number one, the idea that Mizuho caused Mt. Gox to go
3  dark doesn't make any sense because at its worst, what the
4  Mizuho policies did would be to prevent people or delay
5  people, really, from getting their money out.

6           If people can't get their money out, Mt. Gox has more
7  money, not less.  It's not a reason why Mt. Gox would go dark.
8  As we argued in our briefs, common sense is one of the things
9  that the Supreme Court requires of courts when they evaluate
10 these allegations.

11          The -- the idea that Mizuho made it impossible for --
12 and this goes to the tortious interference claim in
13 particular.  The idea that Mizuho made it impossible for
14 Mt. Gox to perform its obligations under the contract also
15 doesn't make any sense, because the -- this is not like a bank
16 where there's a run on the bank and the bank doesn't have all
17 of the money because they lend out as well as accept money
18 from borrowers.  This is a situation where people give their
19 bitcoins and their money to Mt. Gox, and Mt. Gox has it.  When
20 they ask for it back, they have to give it back.

21          When the -- in the plaintiffs' brief, they refer in
22 surprisingly airy terms to this notion that the -- the
23 plaintiffs were not able to enjoy the benefits of their
24 agreement.  What is the benefit in question?  The benefit in
25 question is being able to get your money back when you want

1    it, being able to transfer your money when you want it.

2           Mt. Gox could have given people's money back.  There
3    was no problem in Mt. Gox being able to do that through a
4    variety of means, including through, whether it was other
5    banks or in bitcoin.  What Mt. Gox did was it completely went
6    dark.

7           And the plaintiffs in their -- in their complaint
8    tell you exactly what happened.  They're running away from
9    these allegations now, but it's the heart of the complaint.
10   They tell you what happened.

11          "Mark Karpeles siphoned money, bitcoins and cash, out
12   of the plaintiffs' and the other users' accounts."  They say
13   that in paragraph 91, he siphoned it out.

14          Elsewhere more than once, they say that the problem
15   was Karpeles's theft or his gross negligence.  In other words,
16   it was what Karpeles did.  It wasn't that, "Oh, we're having
17   some problems.  It's sort of sticky.  We can't get it out."
18   They tell you.  They can't run away from these allegations.
19   It's the heart of their complaint that that's what happened
20   here.

21          And in fact, we all know that in real life that's
22   what happened, that Karpeles took the money, or at worst there
23   was a bug and he was grossly negligent for having a messed-up
24   system.  That's what all the articles that they incorporate in
25   the complaint say as well.  So, the notion that somehow Mizuho

1    was the cause of this is just a late-invented fiction.

2           Second point, the heart of the allegations against

3    Mizuho is Mizuho should have told the plaintiffs.  The

4    plaintiffs had a right to know about Mizuho's policy.  Well,

5    to put -- to crystallize what we're trying to say, I could say

6    it this way:  The plaintiffs were on notice.  The plaintiffs

7    knew.

8           Look at the chronology, your Honor.  In May 2013,

9    Homeland Security issues a seizure warrant for one of the

10   Mt. Gox accounts, the Dwolla account.  And at that point,

11   Mt. Gox users could no longer access that.  So, that's the

12   first -- I think the first flare that alerts people that

13   there's an issue.

14          THE COURT:  Well, how do I know from the pleadings

15   that --

16          MR. FORTINSKY:  Well, whether it's the first one or

17   not is not important.  I'm not resting anything on that.

18          But in any event, in June of 2013, Mt. Gox, according

19   to the complaint, announces that it's suspending withdrawals

20   of U.S. dollars.  Mt. Gox says it's suspending it temporarily.

21          At that point, a, quote, person close to Mt. Gox is

22   quoted in the *Wall Street Journal* as saying that it took that

23   step after Mizuho declined to process withdrawals in dollars.

24          THE COURT:  And where in the pleadings does it say

25   that Greene and Lack and Motto read that edition of the *Wall*

1   *Street Journal*?

2        MR. FORTINSKY: It doesn't say that, your Honor, but
3   it puts them on notice. And let me put the answer slightly
4   differently.

5        THE COURT: Where does it say in the complaint that
6   people are presumed to know what's published in the *Wall*
7   *Street Journal*?

8        MR. FORTINSKY: The complaint doesn't say that, your
9   Honor, but the plaintiffs' grievance is that there was no
10   announcement. If you posit that Mizuho had done precisely
11   what the plaintiffs now say in retrospect for their
12   convenience Mizuho should have done, what is it that they say
13   now they should have done? They perhaps should have made an
14   announcement.

15        If they made an announcement, what would they do?
16   They'd put out a press release. Where would the announcement
17   be covered? It would be in the *Wall Street Journal*. It would
18   be in things like the *Bitcoin News* and *Tech Crunch* and *Bitcoin*
19   *Talk*, all of which had, as I could describe for your Honor,
20   detailed descriptions of the delays that Mt. Gox users in the
21   United States were experiencing in trying to get their money
22   out.

23        So, in short, there was -- anybody who's interested
24   in bitcoins who's paying attention would have seen in any of
25   the sources I just mentioned that there were problems in

1  withdrawing -- in withdrawing, starting in June and running
2  straight through.

3          For example, quote, "People have expressed discomfort
4  that they cannot get their money from Mt. Gox despite issuing
5  withdrawal requests."  That's from *Coin Desk*.  "Unfortunately,
6  as of today, withdrawals of U.S. dollars via wire transfers
7  are still substantially delayed."  That's from *Bitcoin*
8  *Magazine*.  "Mt. Gox has refused to provide estimates of when
9  these withdrawals might occur.  There is a serious problem
10 with U.S. withdrawals."

11         These are all form articles that are incorporated by
12 reference in the complaints and made part of the plaintiffs'
13 allegations.  In other words, they acknowledge the Court is
14 entitled to look at this as it evaluates the motion to
15 dismiss.

16         In fact, the Seventh Circuit opinion on this, I
17 believe, was authored by your Honor.  The Court is entitled
18 to take into account these kinds of press releases, articles
19 that are incorporated in the motion to dismiss.

20         As a result, the information that in effect they say
21 should have been out on the market was out on the market, and
22 especially in the bitcoin world by the time Lack and Motto
23 invested.  That was my second point.  The third -- all going
24 to causation.

25         And the third point, which picks up on your Honor's

1   questions, is that the Seventh Circuit case law says that in
2   order to establish causation, in order to establish the
3   elements of the respective causes of action, you have to show
4   that if the conduct of the defendant had not occurred, then
5   the plaintiffs wouldn't have been harmed.  That's how you
6   measure whether there is causation.  In fact, one of the cases
7   refers to that as hornbook law.

8        Here, the harm allegedly comes from the failure of
9   the -- of the inability, rather, of the plaintiffs to withdraw
10  their funds.  The plaintiffs, however, do not allege that
11  Mr. Motto ever, ever tried to withdraw his funds; and they
12  only allege, as the Court pointed out, that Mr. Lack tried to
13  withdraw his funds on February 20th, four days before it goes
14  completely dark and after withdrawals were not possible
15  because across the board, Karpeles had said no to withdrawals.

16       In fact, as to Motto, excuse me -- in fact, as to
17  Motto, not only was he on notice by virtue of all of the
18  articles in the press, but he did not even send his money in
19  until February 15th, which is more than a week after Karpeles
20  had announced that he was halting withdrawals.  So, from his
21  point of view, it was okay that withdrawals were halted, and
22  in fact, the same thing is true of Lack.  They invested their
23  money knowing that there were problems in withdrawals; and, in
24  fact -- in fact, as I said, Motto, invested only after
25  Karpeles himself had halted it.

1          And indeed Motto, as the Court is aware, is the only

2  Illinois resident that's a plaintiff that allegedly sent cash

3  to Mt. Gox through Mizuho.

4          THE COURT:  Okay.  So, what I think you're arguing,

5  and correct me if I'm wrong, is that -- and let's just focus

6  on the deposit subclass -- that the deposit subclass's losses,

7  or at least Motto and Lack's losses, let's focus on them,

8  can't have been caused by anything Mizuho did or did not say

9  because information was out there at all relevant times that

10 withdrawals were not going to be allowed of fiat currency if

11 you make those deposits with Mt. Gox?

12         MR. SCHARG:  Can I make one clarification?

13         THE COURT:  Well, I'm --

14         MR. SCHARG:  Okay.

15         THE COURT:  I just want to know what he's arguing,

16 and then I'm going to give you a chance to address it.

17         MR. FORTINSKY:  That's pretty close to what I said,

18 but it's only one element of it.  One part of it is that

19 there's no causation because the information was already out

20 there.  Another part of it is that there's no causation

21 because there was no attempt to withdraw until after Karpeles

22 himself --

23         THE COURT:  And that was my first question.  I

24 understand.

25         MR. FORTINSKY:  That was an independent basis for the

1    argument.

2         THE COURT:  And I gave the plaintiffs a hard time on

3    that, and what I'm saying is that's kind of a second -- an

4    additional argument.

5         MR. FORTINSKY:  Yeah.  And when you say out there,

6    it's not only that it was out there.  It was in precisely the

7    sources that you would have wanted these kinds of disclosures

8    to be out there in, the *Wall Street Journal*, *Bitcoin News*,

9    *Tech Crunch*, et cetera.  These are the sources where you would

10   want the coverage to be, and that's where it was.

11        MR. SCHARG:  I was just going to say that his

12   position isn't that they were aware that the withdrawals had

13   stopped or that Mark Karpeles had indicated that nobody could

14   thereafter withdraw things.  It was just that the withdrawals

15   were halted or were experiencing delays.

16        To take that and say that that means that people

17   could no longer ever withdraw money from Mizuho is -- is a big

18   stretch.  And that's not what Karpeles said.  That's not what

19   any of those publications that Mr. Fortinsky just mentioned

20   said.

21        And as your Honor alluded to, even if they did say

22   that, what's the relevance?  It's not like our -- we don't

23   allege that the plaintiffs ever read or saw those types of

24   things.  And those types of publications, the *Coin Desk*,

25   et cetera, are more relevant for people that deposited

1    bitcoin, perhaps, but this was a deposit of money.

2         MR. FORTINSKY:  But it was deposited into a bitcoin

3    exchange.  These were people who were investing in bitcoin.

4         THE COURT:  Well, what would -- let's say Mizuho

5    announced -- and I'm assuming that the public announcements

6    are what Mr. Fortinsky says they are rather than what you say

7    they are, and that may be wrong.

8         But on that assumption that it had already been

9    announced that withdrawals were being hindered and/or halted

10   by Mizuho of fiat currency, what would have been added to the

11   informational mix and how if Mizuho itself had announced, "Oh,

12   by the way, that's all true"?  How would that have helped, and

13   by what mechanism -- what plausible mechanism would that have

14   helped Lack and Motto?

15        MR. LAWSON:  Well, I think -- I mean, what I'm

16   hearing is sort of a species of kind of a fraud on the market,

17   sort of the converse of a fraud on the market theory.

18        THE COURT:  Yes, I agree.  And what I'm saying is, in

19   order for there to be causation, it has to be plausible that

20   if only Mizuho had announced somehow, and I'm asking you how,

21   that all of this was true, then Lack and Motto wouldn't have

22   deposited their money.

23        MR. LAWSON:  Right.

24        THE COURT:  So, why would an announcement from Mizuho

25   have made a difference?

1    MR. LAWSON:  You know, I think it would have probably
2  piqued the interest of many of these reporters, right?  A
3  number of the reporters who wrote the stories that
4  Mr. Fortinsky's alluding to are bitcoin traders themselves.
5  One of them actually talks about his ability to get his
6  bitcoin out of Mt. Gox.

7    So, it isn't as though all the information that was
8  out there is pointing in the same direction.  What we might
9  have seen was steadier coverage of what was going on.  We've
10  got a few articles over a long period of time, which is
11  generally sufficient in a fraud on the market context; but
12  there, you're assuming really sophisticated investors, and I
13  don't think that's the standard here.  So, you'd want to see
14  much more, I would think, at the very least.

15    I mean, I think the next step is sort of constructive
16  notice, and I'm not sure that six or so articles over the
17  course of three-quarters of a year is necessarily enough to
18  say that our unsophisticated bitcoin investors are going to be
19  on constructive notice.

20    THE COURT:  I agree with you, and I disagree with
21  Mr. Fortinsky on that point.  My question goes beyond that.
22    MR. LAWSON:  Okay.
23    THE COURT:  Which is you have to show that Mizuho's
24  failure to say, "Oh, yeah, that's right," caused Lack and
25  Motto to make their deposits.  And my question to you is:

1    How?  If Lack and Motto weren't reading the *Wall Street*

2    *Journal*, they weren't taking the Metro North Line, where

3    everybody seems to have *Wall Street Journal*, they weren't

4    reading *Bitcoin News*, how plausibly would Mizuho's

5    announcement have reached Lack and Motto to cause them to make

6    a different decision from the decision that they actually

7    made?  And what did the law obligate Mizuho to do?

8            MR. SCHARG:  Can I -- sorry.

9            THE COURT:  Go ahead.

10           MR. SCHARG:  I was -- to just refocus the argument a

11   little bit, I think that the question is:  What was Mizuho

12   obligated to tell individuals in the U.S. that were depositing

13   money through them into Mt. Gox about the transaction?

14           Because Mizuho had very confidential and one-sided

15   information.  It knew a couple of things.  It knew that it was

16   the only portal into or out of Mt. Gox.  Other people did not

17   know that at the time.  It knew that it had shut off the

18   ability of users in the U.S. to withdraw money.  People didn't

19   know that.  And then, of course, it also took a transaction

20   fee on money that came in.

21           So, it is -- it was incumbent, certainly, on Mizuho

22   to tell people that were depositing money through its portal

23   that they would never be able to -- or at least they presently

24   would not be able to ever withdraw this money.  And it knew

25   that nobody else would step in to become the new banking

1  partner because -- I think the discovery's going to show that,
2  and we have individuals that can speak on that issue.
3          But it knew that it was the only game in town.  There
4  was nobody else.  And they were upset with themselves that
5  they got into that -- they got into the situation.  They
6  wished that they had never done business with Mt. Gox in the
7  first place.
8          But the fact of the matter is that they did, and that
9  they never distanced themselves from Mt. Gox and did not
10  inform people that were depositing money, the probably biggest
11  issue to those people, especially people that are depositing
12  $40,000, "You'll never -- you cannot withdraw this money
13  through us, and there's no end in sight of this -- of the
14  inability to withdraw," that type of policy.
15          THE COURT:  Whether by accident or design, you're
16  avoiding my question.
17          MR. SCHARG:  Oh.
18          THE COURT:  And I'm sure it was by accident.
19          MR. SCHARG:  Then it was, I'm sorry.
20          THE COURT:  What was Mizuho supposed to do, via what
21  medium, to convey the message that you say the prospective
22  depositors deserved?
23          MR. SCHARG:  Well, I think first, they were supposed
24  to stop accepting deposits.  Number two, they should have come
25  out and said what was going on.  They should have been

1 | forthcoming with people.

2 | THE COURT: Where?

3 | MR. LAWSON: You could have done it in the same
4 | publications, and I don't think -- many of these talk about
5 | delays, talk about frustration. They don't talk about the
6 | fact that your money's not coming back. So, they could have
7 | corrected the record in that way.

8 | MR. SCHARG: And let me just make the point, too, and
9 | we allege this in the complaint, is that the whole purpose
10 | that Mizuho did this behind the scenes, right, is because they
11 | wanted Mt. Gox to be the ones that terminated the banking
12 | relationship with it. It did not want to be viewed as the one
13 | that terminated or had anything to do with the termination of
14 | the banking relationship with Mt. Gox.

15 | So, this was part of an intentionally designed
16 | strategy to get Mt. Gox to dissolve the partnership.

17 | THE COURT: So, you're saying that Mt. Gox should
18 | have done -- I'm sorry, Mizuho should have done two things.
19 | One is cut off all deposits all together, and two is make a
20 | clarifying announcement that would be broadcast in all the
21 | publications that we don't know if Lack or Motto actually
22 | read.

23 | MR. SCHARG: And not accept the $30 fee for the
24 | deposits, but --

25 | THE COURT: Well, that doesn't matter, because

1    whether they accepted the fee or not, you'd still be mad at
2    them.

3             MR. SCHARG:  Yeah.  I mean, I think what they should
4    have done is not accepted deposits.

5             THE COURT:  Okay.  Let's go there.  What do you make
6    of Mizuho's argument that it was legally prohibited by
7    Japanese law from cutting off the input, the deposits?

8             MR. SCHARG:  I don't make anything of it because
9    there's no evidence to suggest that that's the case.

10            THE COURT:  Okay.  What do you make of their argument
11   that California and Illinois law prohibits -- prohibit a bank
12   from cutting off deposits to one of its current account
13   holders?

14            MR. LAWSON:  I'm not sure we make much of it.  At the
15   last hearing --

16            THE COURT:  Well, because the reason I ask is if
17   you're saying Mizuho should have done X, and they say, "We
18   were legally prohibited from doing X" --

19            MR. LAWSON:  Right.  I understand your concern.  I
20   would note that at the last hearing, Mizuho's lawyers didn't
21   dispute that they could put a freeze on the account, and
22   I'm -- I didn't come -- I haven't come across anything that
23   would suggest that they're unable to.

24            THE COURT:  Okay.  All right.  Any thoughts on any of
25   that?

1          MR. FORTINSKY:  Yes, your Honor.  A few different

2    things.  The -- on the last point, a big part of the concern

3    is that -- for any bank, when you've got a customer who has --

4    a customer that has widely publicized its -- how to go about

5    sending in money by wire transfers, you know, a bank doesn't

6    want to be in a position where it has interfered with its

7    customer's business, just speaking generally, by refusing to

8    accept incoming wire transfers.

9          And as we've outlined in the brief, there are state

10   laws in the U.S. that restrict a bank's ability to reject

11   incoming transfers.

12         THE COURT:  Was Mizuho subject to those state laws?

13         MR. FORTINSKY:  Your Honor, frankly, we think the

14   answer is no because Japanese law applies, and that reinforces

15   the point we've made before about why Japanese law here is

16   dispositive.

17         THE COURT:  So, those California and Illinois

18   statutes didn't govern Mizuho's ability to prohibit deposits

19   into the Mt. Gox account?

20         MR. FORTINSKY:  Right.  We put those in for

21   illustrative purposes on the assumption that the plaintiffs

22   asked us to entertain, in effect, that this case was -- I

23   mean, their position is that this case was governed by the

24   U.S. statutes.

25         But the --

1     THE COURT:  No, see, you're falling into the same
2  mistake that I believe you were falling into earlier, which is
3  it's possible for Japanese law to govern -- to be pertinent to
4  a particular element of a domestic cause of action, an
5  Illinois or a California cause of action.  So, it's not all or
6  nothing.

7     MR. FORTINSKY:  I agree with that, your Honor, yeah,
8  yeah.

9     THE COURT:  Okay.

10    MR. FORTINSKY:  But to address some of the other
11 points, the -- the plaintiffs' response was in part that
12 the -- what Mizuho should have done was to say something, and
13 they acknowledge, it would have been in the same publications,
14 which is to say, it would have been more of the same.  It
15 would not have been fundamentally different.

16    What the plaintiffs do say in response to a series of
17 your Honor's questions is that Mizuho should have disclosed
18 because it knew, variations of this, Mizuho knew that these
19 plaintiffs were never going to be able to get their money out
20 again.  Mizuho knew that Mt. Gox was going to go dark.  Mizuho
21 knew that it was the only portal into or out of Mt. Gox.

22    There's no basis in the complaint to believe that any
23 of those things are true.  Those are just *ipse dixit*.  In
24 other words, the plaintiffs just say it without support.
25 Conclusory allegations are not sufficient to withstand a

1   motion to dismiss, as we've explained in our motion.

2          And, in fact, there's no -- I don't think it was

3   true.  I don't think there's any basis to believe it was true

4   that anybody knew in June or before February that -- anybody

5   other than Karpeles and Mt. Gox knew that nobody was ever

6   going to be able to get money out of Mt. Gox again.

7          That's just something that in retrospect the

8   plaintiffs find it convenient to say because, in fact, Mt. Gox

9   went dark, but they again tell you why that happened.  It

10  happened because Karpeles siphoned money out of Mt. Gox and

11  out of the account; and because of his, quote, "theft," Mizuho

12  had no basis, had no knowledge of any of those things, and had

13  no basis to believe that they might even be happening.  They

14  had no -- all of these things they said Mizuho knew, there's

15  no basis to believe Mizuho knew.

16         What Mizuho allegedly knew was the change in policy

17  that the plaintiffs describe, that the plaintiffs allege in

18  the complaint, and that is exactly what shows up in the *Wall

19  Street Journal* and *Bitcoin News* and the various other

20  publications that they themselves acknowledge were where they

21  would have put the announcements if Mizuho -- that they say

22  Mizuho should have made the additional announcements for.

23         So, also as to the question --

24         MR. SCHARG:  Wait a minute.  We're not saying they

25  should have made additional announcements.  We were discussing

1    the particular question.  What they should have done was

2    terminated the banking relationship with Mt. Gox, instead of

3    putting the burden on everybody in the United States just to

4    try to squeeze Mt. Gox into breaking that relationship for

5    them.  That's what they should have done.

6           And this whole thing is calculated towards that end.

7    The policies were in place because it knew that there were

8    issues with Mt. Gox.

9           MR. FORTINSKY:  Your Honor --

10          THE COURT:  Go ahead.

11          MR. FORTINSKY:  That's different from what they've

12   alleged in the complaint.  In the complaint, what they allege

13   is fraudulent concealment.  That's an allegation about a

14   purported fraud that Mizuho committed.  It can be statements

15   or et cetera that fraudulently deprive people of information.

16          It's not -- it's not -- now they're saying, well,

17   really, the grievance is that they -- that they stayed in

18   business, but that's not what the complaint says.

19          And beyond that, your Honor, even apart from the

20   issues that we've been talking about, the plaintiffs can't put

21   together a convincing or a legally sufficient case on tortious

22   interference because they do not plead anywhere in the

23   complaint and do not offer in their briefs anything in --

24   anything to show that -- anything to satisfy the element of

25   it being unjustified conduct.

1          In other words, the cause of action here is not

2   interference with contract.  It's tortious interference with

3   contract, and a tort obviously is a wrong.  It has to -- they

4   have to plead that the tort -- the alleged tortfeasor not only

5   did some action that interfered with their contract, but that

6   they did it tortiously, that there was something tortious,

7   like defamatory or wrongful or cheating.

8          That's what the case law says.  And that case law is

9   captured in that particular element of the cause of action in

10  Illinois which says that it has to be unjustified conduct.

11  The case we cite is *House of Brides*, but *House of Brides*

12  itself cites a bunch of other cases that say the same thing.

13  I think it's the third element says that it has to be

14  unjustified.

15         And what that means is that the conduct has to be

16  something -- it can't be a business just looking out for its

17  own business interests.  Because after all, in business, lots

18  of other cases will tell you, there are circumstances in which

19  defendants do things that hurt other parties, their rivals,

20  their competitors in business, sometimes their customers when

21  they don't choose to do business with them.  That's not

22  enough.  It has to be something wrongful.

23         And all of the cases -- all of the cases where the

24  court sustains tortious interference claims, there's something

25  by the plaintiffs that shows that the -- that the -- that

1  there was a -- that there was a tort, an injury.  They do not
2  allege anything along those lines.  And there is a right, the
3  court cases say, to protect your own economic interests.

4          The plaintiffs themselves here tell us that the
5  reason Mizuho acted as it did was to protect its reputation.
6  It was concerned about being associated with Mt. Gox.  That's
7  not my testimony.  That's not my allegation.  That's what the
8  plaintiffs tell us.

9          The plaintiffs in their opposition brief go on to
10 say, "Well, you know, maybe they could have done something
11 different," but that's really not germane to the point.  The
12 point is that the reason for Mizuho's action was in order to
13 protect its reputation.

14         Even if later on somebody in retrospect says, "Well,
15 you know, you could have done something different to protect
16 your reputation, or that wasn't sufficient to protect your
17 reputation, or you could have done it a different way," that
18 doesn't matter, because the point is that what Mizuho did, its
19 intention was not to cause anybody any harm, was not -- it's
20 not alleged that they intended to cause anybody any harm.
21 It's merely that they intended to protect their interests,
22 their reputation, Mizuho's reputation in the marketplace.

23         That's not me.  That's the plaintiffs.  That's in the
24 complaint.  And that by itself is sufficient to defeat the
25 plaintiffs' claim.  It's not an affirmative defense.  It's an

1  element of the cause of action; and as with any other element
2  of a cause of action, if you don't plead it, you're subject to
3  being dismissed on a motion to dismiss.

4      The same kind of thing applies with respect to
5  fraudulent concealment.  The additional element in fraudulent
6  concealment that I think really is central, as this
7  unjustified point is for tortious interference, the additional
8  element on fraudulent concealment that's really central but
9  that we haven't really talked about yet is the duty to
10  disclose.

11      The cases are absolutely clear that there is no basis
12  for fraudulent concealment unless the plaintiff first
13  establishes a duty to disclose.  The plaintiffs don't do that
14  here.  The -- in order for there to be a duty to disclose,
15  there needs to be a fiduciary relationship.  Here, the
16  plaintiffs don't allege a commercial relationship between the
17  plaintiffs and Mizuho, let alone a fiduciary relationship.
18  They don't even allege not only a commercial relationship,
19  they don't even allege any contact, any communications between
20  Mizuho and these individual plaintiffs.

21      All they allege is that they transmitted -- they
22  sent -- at least as to the two in the deposit subclass, that
23  they sent wire transfers to Mt. Gox, and that it passed
24  through Mizuho as the receiving bank, just as it passed
25  through Chase or Wells Fargo on the other end as the sending

1    bank.

2          And perhaps to crystallize this, the plaintiffs do
3    not cite a single case in which a bank is held to have a duty
4    to disclose anything other than to its customer.  In this
5    case, they're saying the bank had a duty to disclose something
6    to its customer's customers.  They don't cite even one case
7    that says that.

8          We cite a couple of cases that show otherwise.  There
9    have been various flavors of this argument that have shown up
10   various places.  The *Eisenberg* case which we cite has a
11   collection of cases from, I think, nine jurisdictions, all of
12   which come to the same conclusion, which you can't -- people
13   are always suing banks for all kinds of things.  Things are
14   always going wrong with people's money.  They're always suing,
15   and a bank is always a convenient target because it's a deep
16   pocket, and other reasons.

17         So, there have been other cases where people bring
18   lawsuits where they said, "Oh, the bank had a duty to do
19   something, to disclose something," and in each of those cases,
20   the nine jurisdictions cited in the *Eisenberg* case, the courts
21   give the answer that that's not enough.  There is no duty to
22   disclose.  The same kind of thing is true in the *Tzaras* case,
23   which we describe in our papers as well.

24         The cases that the plaintiffs cite on that point,
25   there are three.  The *Heider* case is different because in that

1    case, the defendant was explicitly told not to make a

2    disclosure and did not make a disclosure even after the

3    plaintiff directly inquired.  It's about an asbestos case, and

4    the facts are very different.

5         The JP Morgan case is different because the --

6    because in that case, JP Morgan moved loan balances into phony

7    accounts in order to conceal what was going on, very different

8    from this case, active conduct by the defendant in order --

9    deceptive conduct.

10        And the *Shrager* case, which they also cite, the

11   ruling was different.  It was not the same kind of case.  The

12   question was a factual question as to whether the

13   conversations -- it was undisputed that there were

14   conversations between the parties, and the question was

15   whether those conversations sufficed to establish a fiduciary

16   relationship, very different because of those factual

17   questions that are not present here.

18        So, for all of those reasons, they have no basis for

19   a claim.

20        While I'm at it, I'll just say briefly on the third

21   point, the unjust enrichment point, which we haven't yet

22   gotten to, either, why they don't satisfy the elements,

23   either.  I'll try to keep this simple.

24        Number one, unjust enrichment is basically about

25   getting something -- keeping money, keeping fees for service

1   you didn't perform.  In this case, there's no allegation that

2   when Motto and Lack sent money in to Mizuho that Mizuho didn't

3   perform the service that it was being paid $13 to perform.

4          Whatever else they may argue about what Mizuho should

5   or shouldn't have done, it's not correct to say that Mizuho

6   did not perform the service of whatever it -- of allowing

7   Mt. Gox to deposit the money.  In fact, they rely on Mizuho's

8   acceptance of the deposit, as the Court did in its opinion, so

9   there's no argument that that was not done.

10         Secondly, they have to argue that the defendant

11  was -- was keeping a fee that it was paid unjustly.  In this

12  case, the fee was paid to Mt. Gox.  There's no -- the

13  plaintiffs' relationship was with Mt. Gox.  Mt. Gox maybe

14  charged fees, but they don't even say that they paid fees to

15  Mt. Gox.  They just speculate that maybe the cost was passed

16  on.

17         That sort of information and belief pleading, as we

18  discussed in our papers and I think is in the *Parrillo* case,

19  is it, is insufficient -- the *Borsellino* and the *Pirelli* cases

20  is insufficient. They don't say that actually Mizuho kept

21  their money.

22         And then thirdly, the basis of the unjust enrichment

23  allegation is the same set of facts that form the facts for

24  the wrongful -- for the fraudulent concealment and tortious

25  interference claims.  It's the same facts.

1          And as this Court held in *Landlock*, if the unjust

2   enrichment claim rests on the same improper conduct alleged in

3   another claim, unjust enrichment will stand or fall with the

4   related claim.  In other words, unjust enrichment can't

5   survive if the court dismisses the other two cases.

6          The plaintiffs' response to that is that, well, here

7   it's a little different because the relief they're asking for

8   is different.  They're only asking for -- in the unjust

9   enrichment claim, they're only asking for the return of the

10  fees, and, therefore, it's not the same as the wrongful -- as

11  the fraudulent concealment and tortious interference claim.

12         That reads the law incorrectly, because as the quote

13  that I just read from your Honor's own opinion said, it's the

14  same improper conduct that's alleged.  The words used in the

15  opinion are improper, it's the same improper conduct, not the

16  same relief.

17         THE COURT:  One second.

18    (Bench conference, not reported.)

19         THE COURT:  Let me ask you to address the

20  relationship component of the fraudulent concealment claim.

21         MR. LAWSON:  Okay.

22         THE COURT:  In other words, what Mizuho's arguing is

23  that there's no duty because there's no --

24         Yeah, if you want to hand him your bottle, he can

25  fill that up.

1    Does anybody else need -- do you guys want some
2  water?
3    MR. SCHARG:  No, thank you.
4    THE COURT:  Are you sure?
5    MR. SCHARG:  Yes.
6    THE COURT:  Mr. Quinn, would you like anything?
7    MR. FORTINSKY:  I'm good.  Thank you, your Honor.
8    MR. FORTINSKY:  I guess that's a sign that I'm
9  talking too much, right?
10    THE COURT:  I didn't say it.
11    So, what Mizuho's arguing is that in order for there
12 to be fraudulent concealment, there has to be a duty to
13 disclose.
14    MR. LAWSON:  Right.
15    THE COURT:  And that the relationship, if any,
16 between Mizuho on the one hand and Lack and Motto on the other
17 hand was not the kind of relationship that gives rise to a
18 duty to disclose.  Could you please address that issue.
19    MR. LAWSON:  Yeah, sure.  I'll start with the banking
20 cases.  Most of the cases cited in Mizuho's motion deal with
21 the bank's failure to disclose the fraudulent activity of one
22 of their customers, right?  And that's not our allegation,
23 which is the first reason why those cases are distinguishable.
24    But as Mr. Fortinsky sort of recounted, this is why
25 we cited the *JP Morgan* case, because in that case, it was the

1  bank itself that was -- that had the duty to disclose because
2  it was the fraudulent actor.  And I think that makes the
3  difference under Illinois law.
4          THE COURT:  All right.  And can you remind me what
5  the facts are of -- it's the *JP Morgan versus*
6  *East-West-Logistics* case?
7          MR. LAWSON:  Yeah, I believe that they were -- they
8  were moving money around to hide it, essentially.
9          THE COURT:  JP Morgan -- oh, you mean East-West
10 Logistics was?
11         MR. LAWSON:  Yes.  I believe those are the facts of
12 that case, yeah.
13         THE COURT:  I see.
14         MR. LAWSON:  It's the person -- it's the fraudulent
15 actor who has the duty to disclose, right, which is why the
16 bank doesn't have a duty to disclose the fraudulent activity
17 of its own depositor.  We have no problem with that particular
18 statement of the law.  It's just that in this case, it was the
19 bank's fraud that we are litigating and not -- well, we are
20 also litigating the depositor's, but -- or Mt. Gox's, I
21 suppose, but it isn't as though the bank was blameless here.
22         THE COURT:  I see.  So, what you're saying is that
23 there's no -- there's ordinarily no duty to disclose from the
24 bank to somebody like Lack and Motto; but if the bank is the
25 bad actor, there is a duty to disclose?

1      MR. LAWSON:  Yeah.  If they're either participating
2  or if they're doing something on their own, then, yes, they
3  have the duty.  Because in Illinois you have a duty to
4  disclose if you act deceptively, that's what gives rise to the
5  duty to speak, and that's where the material omission comes
6  from.

7      THE COURT:  I see.  So, what are your thoughts on
8  that, Mr. Fortinsky?

9      MR. FORTINSKY:  There's still no duty to disclose to
10  a third party.  The third party here -- the plaintiffs are a
11  third party to -- and there's no duty to disclose to them.

12      THE COURT:  Are they?  Are they third parties?

13      MR. FORTINSKY:  Well, I guess it depends on how you
14  look at, who you see the first and second parties are.

15      THE COURT:  I don't mean third parties in terms of
16  the plaintiff or defendant in this case.  I mean in terms of
17  the transaction.  Are they third parties, or are they directly
18  involved?  They are sending money to Mizuho.

19      MR. FORTINSKY:  What the plaintiffs are backing into,
20  again, as I've said before, kind of backing into new theories
21  as they go along, what they're backing into is the idea, in
22  effect, that Mizuho committed a fraud.  That's not what they
23  alleged, but that's sort of what they're retreating into, that
24  Mizuho was a participant in some sort of misleading theft of
25  funds or something.  That's not what they allege.

1    Where the -- the essence of the fraudulent

2  concealment focuses on the communication.  Did the -- did the

3  actor conceal information?  What they're now trying to say is

4  essentially that Mizuho participated in a fraud.

5    There's no basis to say Mizuho participated in a

6  fraud; and we get into a little bit of that in our papers,

7  because for a variety of reasons, there's no statement by

8  Mizuho, for example, and there's no inducement by Mizuho to

9  solicit funds from any -- from any plaintiff, from any member

10 of Mt. Gox.  So, there's no allegation of and no actual fraud

11 by Mizuho.

12    The allegation as to JP Morgan is -- there's much

13 more extensive conduct by JP Morgan, where the allegation, at

14 least, was that they were involved in moving money into phony

15 accounts.  I don't know whether that's actually true.  But

16 there's no allegation of similar flavor here as to Mizuho.

17    And I'm not even sure that in that case the ultimate

18 gist of the argument was a duty to disclose issue.  I think

19 the -- you know, the -- sort of the gist of that case rested

20 on sort of the alleged bad conduct.

21    THE COURT:  I see.

22    MR. FORTINSKY:  And I would add that in all of these

23 other cases, there have been a variety of different theories

24 that plaintiffs have tried to try to pin this duty to disclose

25 on banks, and banks from nine different jurisdictions have

1    rejected all of them.

2         THE COURT:  I see.  Okay.  Any final thoughts on that

3    issue?

4         MR. LAWSON:  Well, I would say we do allege a fraud

5    on Mizuho's part.  I think that that's pretty clear.  But

6    other than that -- the reason --

7         THE COURT:  And the fraud is accepting deposits while

8    knowing and not disclosing that --

9         MR. LAWSON:  While knowing, yes.

10        THE COURT:  -- that you can't withdraw it?

11        MR. LAWSON:  You're failing to disclose something

12   material.  And you're right, your Honor, it isn't a third

13   party to this transaction.  Otherwise, the personal

14   jurisdiction ruling would not have come out the way it did.

15   Right?  They're transacting at least in part directly with

16   Mizuho.  So, I think that renders most their cases about

17   disclosing the fraudulent activity of a particular account

18   holder inapposite.

19        THE COURT:  I see.  Okay.  Anything else anybody

20   would like to address, you know, knowing that I've read the

21   briefs?

22        MR. LAWSON:  I think -- I had two points in response

23   to Mr. Fortinsky's earlier presentation.

24        On justification in the tortious interference

25   context, I think it is actually clear.  We cited the three

1  cases that talk about justification as an affirmative defense.
2  I know that the *Nation* opinion from upstairs sort of talks
3  about it as a moving target; but I note in the *Philip Mappa*
4  case, which is the only Illinois state case in the reply, at
5  least, the court talks about because the complaint pleaded
6  justification, the plaintiff needed to show actual malice,
7  which I think sort of highlights the burden-shifting that
8  occurs under Illinois law.  You allege the tortious
9  interference, and in some cases, the justification of the
10  privilege is apparent.

11         And what we say here is there's the allegation that
12  Mizuho had represented that it was trying to protect its
13  reputation, when we now know from the contract that it appears
14  that they could have just ended the relationship without all
15  of this rigmarole.  And so I don't think that that is the kind
16  of complete justification that serves as an affirmative
17  defense that appears on the face of the complaint.

18         But once the tortious interference is alleged, it's
19  the defendant's burden to show justification or privilege, and
20  then the plaintiffs' to come back with actual malice.  I mean,
21  that's the -- I think it's actually a pretty well-established
22  way of doing things, even though the Illinois courts do
23  describe it as -- the third element of the claim as an
24  unjustified interference.

25         And I would note also on the unjust enrichment claim,

1　Mr. Fortinsky described one kind of restitutionary recovery.

2　I think he pretty much spelled out a *quantum meruit* theory.

3　But there are other reasons.  And we do agree that the

4　fraudulent activity sort of is the legal wrong that gives rise

5　to the unjust -- the restitutionary remedy in the unjust

6　enrichment claim.  So, if you don't buy the fraud theory, then

7　yes, both claims do go down.

8　　　　　　But certain of their defenses to the fraudulent

9　inducement claim I don't think would carry through to the

10　unjust enrichment, which is pleaded separately for a couple of

11　the reasons that Mr. Fortinsky noted; namely that it was a

12　pass-through, so we're talking about a profit from the legal

13　wrong, but which wouldn't necessarily come from the fraudulent

14　inducement recovery itself, which is why they're separate.

15　Also, a little bit of analytic clarity.

16　　　　　　THE COURT:  Understood.

17　　　　　　MR. FORTINSKY:  A couple of brief responses, your

18　Honor.  Actually, just one response and two additional points.

19　　　　　　The *House of Brides* case and the cases it cites show

20　that cases do -- that courts do dismiss claims for tortious

21　interference where the conduct alleged on the face of the

22　claim is justified.  It's not something that has to go to

23　summary judgment and be debated through pleading an

24　affirmative defense.

25　　　　　　The other point I wanted to come back to is on the

1  *forum non conveniens*.  I would just make the point that here
2  what we have are investors who chose willingly to put their
3  money into a Japanese bitcoin exchange.  And putting aside all
4  of the other factors, that suggests a willingness to engage in
5  Japan.

6          And the case law suggests that the -- that any -- any
7  tilt in favor of the plaintiffs' choice of forum is, under
8  those circumstances, diminished or eliminated.  And I think we
9  cite the case in our briefs.  Because, after all, they've
10  already shown a willingness to go to the other forum for
11  purposes of investment.

12          In fact, if you imagine the situation in reverse and
13  you had a U.S. hedge fund, for example, that attracted the
14  interest of a Japanese investor, and the Japanese investor
15  then tried to -- even though he was bringing claims about the
16  relationship between the hedge fund and hypothetically the
17  hedge fund's U.S. bank, what would we make of an argument that
18  that case ought to be litigated in Japan?

19          I suspect that the U.S. hedge fund and the U.S. bank
20  and even the U.S. courts would agree that that's the sort of
21  case that ought to be litigated here in the U.S.  Well, this
22  is that same case in reverse.

23          I understand there are a lot of factors, but I'm just
24  saying that as to that particular element, the preference that
25  one -- that the plaintiffs ask the Court to give or the

1  presumption that the plaintiffs ask the Court to give to their
2  choice of forum, that ought to be diminished under these
3  circumstances.

4          And one final procedural point that I would raise is
5  that the plaintiffs, in accordance with the Court's recent
6  opinion, filed a new complaint.  Our motion, our notice of
7  motion was addressed to the second amended complaint, although
8  I think both sides recognize that the issues are pretty much
9  the same in the third amended complaint as the second amended
10 complaint, especially in light of the references to Motto
11 before the filing of the new complaint.

12         So, procedurally, I just wanted to raise with the
13 Court the question as to how we ought to proceed in order to
14 ensure that things don't get messed up, because, after all,
15 our motion is directed to the second amended complaint, and
16 the one that's the operative complaint at the moment is the
17 third.

18         THE COURT:  I'll consider the motion to be directed
19 towards the third amended complaint.

20         MR. FORTINSKY:  Thank you, your Honor.

21         THE COURT:  The parties mentioned in one of the
22 filings that they had reached an agreement regarding
23 discovery?

24         MR. SCHARG:  Yes.

25         THE COURT:  Can you just tell me what that is?

1       MR. SCHARG:  Yeah.  We have agreed to -- that Mizuho
2   would begin providing us with the light lift, you know, quote,
3   unquote, light lift documents that they have.  They've already
4   made a production a couple of days ago.  And then we are going
5   to hold off on the heavier issues until you enter a ruling on
6   the motion to dismiss.

7       THE COURT:  All right.  Okay.  And do you agree with
8   that?

9       MR. FORTINSKY:  That's correct, your Honor.

10      THE COURT:  So, why don't I set this for a status
11  hearing -- and there's nothing magic about this date, so if it
12  doesn't work, just say so.  June 2nd at 9:00 o'clock?

13      MR. SCHARG:  I am going to be having a child by at
14  the latest the week before that, so if there's nothing magical
15  about that date, if we could just kick it to the next week.

16      THE COURT:  June 7th?

17      MR. SCHARG:  Thank you.

18      THE COURT:  9:00 o'clock?

19      MR. FORTINSKY:  I'm just checking my calendar, your
20  Honor.

21      MR. SCHARG:  And if it's an issue, then I don't have
22  to be here.  There's other counsel on the case.  But I'd like
23  to be, if possible.

24      THE COURT:  And you can always phone in,
25  Mr. Fortinsky, if you'd like.

1    MR. FORTINSKY:  No, that date looks fine.  Thank you.

2    THE COURT:  Mr. Quinn, is that all right with you?

3    MR. QUINN:  That's fine, your Honor.  Thank you.

4    THE COURT:  Okay.  Well, thank you for your briefs,

5 and thanks for your argument.

6    MR. FORTINSKY:  Thank you, your Honor.

7    MR. SCHARG:  Thank you, your Honor.

8  (Which were all the proceedings heard.)

9                        CERTIFICATE

10  I certify that the foregoing is a correct transcript from

11 the record of proceedings in the above-entitled matter.

12

13 */s/Charles R. Zandi*              *April 28, 2016*

14 _____        _____
   Charles R. Zandi                Date
   Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25