UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY GREENE, JOSEPH LACK, and ANTHONY MOTTO, individually and on behalf of all others similarly situated, | ) ) ) | 14 C 1437 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | |
| vs. | ) | |
| | ) | |
| MIZUHO BANK, LTD. and MARK KARPELES, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

In this putative class action, Plaintiffs Gregory Greene, Joseph Lack, and Anthony Motto allege that Mizuho Bank, Ltd. and Mark Karpeles are liable for financial losses arising from the demise of the Mt. Gox Bitcoin exchange. Doc. 205. Plaintiffs bring only state law claims, and subject matter jurisdiction lies under the Class Action Fairness Act, 28 U.S.C. § 1332(d). Earlier in the litigation, Mizuho moved to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, and the court denied the motion. Docs. 199-200 (reported at __ F. Supp. 3d __, 2016 WL 946921 (N.D. Ill. Mar. 14, 2016)). Mizuho now moves to dismiss for failure to state a claim under Rule 12(b)(6) or, alternatively, for *forum non conveniens*. Doc. 172. The motion is granted as to Greene's tortious interference claim and Plaintiffs' accounting claim, and otherwise is denied.

### Background

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider

"documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Plaintiffs' brief opposing dismissal, so long as those facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted); *see also Defender Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 335 (7th Cir. 2015). The facts are set forth as favorably to Plaintiffs as those materials allow. *See Pierce v. Zoetis*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at the pleading stage, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.,* 610 F.3d 382, 384 (7th Cir. 2010).

Bitcoin is a digital payment system, and bitcoins are the system's unit of account. *See Beyond Silk Road: Potential Risks, Threats and Promises of Virtual Currencies: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs*, 113th Cong. 3-4 (2013) (statement of Jennifer Shasky Calvery), https://perma.cc/2TFX-6BCQ (noting that the Treasury Department classifies Bitcoin as a "decentralized virtual currency"). Bitcoins can be bought and sold on exchanges.

Prior to its collapse and bankruptcy, Mt. Gox was a Bitcoin exchange based in Tokyo, Japan. Doc. 205 at ¶ 12. Karpeles was Mt. Gox's President, CEO, and majority shareholder. *Id.* at ¶¶ 7, 18. To fund their activities on the exchange, Mt. Gox users could either (1) transfer bitcoins directly into their accounts at Mt. Gox or (2) wire fiat currency (government-issued money, such as dollars and euros) to Mizuho, which would deposit the money into a bank account it held on behalf of Mt. Gox. *Id.* at ¶¶ 15, 24. Mizuho is headquartered in Tokyo and earned service fees from processing those wire deposits. *Id.* at ¶¶ 8, 17. To withdraw fiat currency, a Mt. Gox user would make a request through her account at Mt. Gox, which would

2

send the request, along with the user's banking details, to Mizuho, which in turn would transfer the requested amount to the user's bank. *Id*. at ¶ 25.

Greene, an Illinois resident, opened a Mt. Gox account in 2012 and began trading and selling bitcoins. *Id*. at ¶¶ 4, 49. For over a year, Greene traded bitcoins without incident. *Id*. at ¶¶ 49-51. In November 2013, Greene contacted Mt. Gox customer service after experiencing delays with his transactions. *Id*. at ¶ 51.

Unbeknownst to Greene, Mt. Gox had for several months been under pressure on two fronts. First, exploiting security vulnerabilities that dated from as early as 2011, Karpeles was stealing bitcoins that belonged to Mt. Gox users. *Id*. at ¶¶ 20-22. Second, and of particular relevance here, Mizuho was attempting to end its relationship with Mt. Gox. *Id*. at ¶¶ 27-28 & n.8. Concerned about a reported U.S. investigation into money laundering on Mt. Gox and wary of potential legal liability or reputational harm, Mizuho pressed Karpeles to close the Mt. Gox bank account at Mizuho. *Id*. at ¶¶ 28-29. When Karpeles refused, Mizuho unilaterally took several measures designed to make the banking relationship untenable for Mt. Gox. *Id*. at ¶¶ 29-30, 32. Those measures included limiting the number and amount of Mt. Gox customer withdrawals and refusing to process some wire transfers. *Ibid*.

By mid-2013, Mizuho was no longer processing any international wire withdrawals for Mt. Gox, meaning that Mt. Gox users who had wired fiat currency to Mizuho for deposit in Mt. Gox's account could not withdraw their money. *Id*. at ¶¶ 30, 32. Mizuho's qualms about handling Mt. Gox's business did not extend, however, to *receiving* fiat currency from Mt. Gox users for deposit into Mt. Gox's account. Even as it limited and then barred withdrawals, Mizuho continued to accept deposits from Mt. Gox users, earning revenue from the associated service fees. *Id*. at ¶¶ 17, 32-33. Plaintiffs allege that Mizuho prohibited Mt. Gox from

3

disclosing that the withdrawal difficulties were attributable to Mizuho or that Mizuho wanted to terminate its relationship with Mt. Gox. *Id*. at ¶¶ 37, 136. Mizuho knew that if Mt. Gox's members learned of its prohibition on withdrawals of fiat currency from Mt. Gox's Mizuho account, members would stop making deposits and Mizuho would stop collecting the associated fees. *Id*. at ¶ 133. By August 2013, press reports indicated that Mt. Gox users were suffering significant delays in withdrawing fiat currency, but those reports indicated only that withdrawals were slow, not that they were barred. *Id*. at ¶¶ 27 n.8 (citing Romain Dillet, "Feds Seize Another $2.1 Million from Mt. Gox, Adding Up to $5 Million," *TechCrunch* (Aug. 23, 2013), https://perma.cc/4NUG-XPDC), 31 & n.11 (citing Daniel Cawrey, "Withdrawals from Mt. Gox: Growing Pains or Banking Bottleneck?," *CoinDesk* (Aug. 12, 2013), https://perma.cc/ERP8-GB8F; Peter N. Steinmetz, "Mt. Gox USD Withdrawals to Take Up to 22 Months," *Bitcoin Mag.* (Sept. 21, 2013), https://perma.cc/TH33-24QC).

Lack, a California resident, did not join Mt. Gox until January 22, 2014, about six months after Mizuho had barred all withdrawals from its Mt. Gox account. *Id*. at ¶¶ 5, 58. At the time, Mizuho had not publicly disclosed that it had halted all international wire transfers out of the Mt. Gox account. *Id*. at ¶¶ 65-66. On February 3, 2014, Lack wired $40,000 in fiat currency from his local Wells Fargo branch to Mizuho, and Mizuho accepted the transfer. *Id*. at ¶¶ 59, 67. On February 7, 2014, Karpeles halted all Mt. Gox users' ability to withdraw bitcoins from the Mt. Gox Bitcoin exchange. *Id*. at ¶ 38. On February 20, 2014, after Mt. Gox indicated that it had not yet received his deposit, Lack went to his local bank branch to attempt to trace the wire transfer and recall his deposit. *Id*. at ¶ 64.

Motto, an Illinois resident, joined Mt. Gox in early 2014. *Id*. at ¶¶ 6, 69. On February 15, 2014, eight days after Karpeles halted bitcoin withdrawals, Motto wired $1,000 in fiat

currency from his local Chase bank account to Mizuho, and Mizuho accepted the deposit. *Id.* at ¶¶ 70, 72. When the money did not appear in Motto's Mt. Gox account, Mt. Gox asked Motto to confirm that wire transfer listed the correct bank name ("Mizuho"), which Motto confirmed. *Id.* at ¶ 73. Mt. Gox indicated that it had not yet received Motto's deposit. *Ibid.*

On February 24, 2014, the Mt. Gox website became inaccessible, and on February 28, Mt. Gox filed for bankruptcy protection in Japan. *Id.* at ¶¶ 40-41. Greene was unable to access approximately $25,000 in bitcoins from his Mt. Gox account. *Id.* at ¶ 56. Lack was unable to recover his $40,000 in fiat currency from Mizuho, and that sum was not reflected in his Mt. Gox account. *Id.* at ¶¶ 67-68. Motto was unable to recover his $1,000 in fiat currency from Mizuho, and his Mt. Gox account continued to reflect a balance of $0.00. *Id.* at ¶ 77. All three Plaintiffs allege that had they known that Mizuho had barred all outgoing wire transfers for Mt. Gox users, they would not have made their deposits. *Id.* at ¶¶ 57, 66, 76, 137.

Greene filed this suit against various Mt. Gox entities and Karpeles on February 27, 2014, Doc. 1, and in an amended complaint he added Lack as a plaintiff and Mizuho (among others) as a defendant, Doc. 37. The case was stayed by agreement for some time, Docs. 95, 129, and after a settlement attempt failed, Plaintiffs voluntarily dismissed all defendants other than Mizuho and Karpeles. Doc. 147. A new amended complaint, adding Motto, was filed on April 4, 2016. Doc. 205.

The operative complaint has seven counts. Counts I-III name only Karpeles and need not be discussed. Doc. 205 at ¶¶ 84-110. Count IV is brought by Plaintiffs on behalf of the entire putative class; it alleges that Mizuho, in limiting withdrawals from Mt. Gox's bank account, tortiously interfered with Plaintiffs' contracts with Mt. Gox. *Id.* at ¶¶ 111-119. Counts V-VII are brought on behalf only of Lack, Motto, and the putative "Deposit Subclass," defined as those

class members who deposited fiat currency into their Mt. Gox accounts through Mizuho after Mizuho had stopped processing withdrawals. *Id*. at ¶ 78. The Deposit Subclass does not include those individuals, like Greene, whose Mt. Gox assets consisted solely of bitcoins and who therefore did not deposit fiat currency at Mizuho. *Ibid*. Count V alleges that Mizuho unjustly enriched itself by accepting transaction fees in connection with incoming wire transfers from Deposit Subclass members after it had halted Mt. Gox withdrawals without disclosing that it had done so. *Id*. at ¶¶ 120-127. Count VI alleges that Mizuho fraudulently concealed from the Deposit Subclass that it had halted such withdrawals. *Id*. at ¶¶ 128-139. Count VII seeks an order "requiring Mizuho to provide a full and complete accounting of all transactions or records relating to the deposit, transfer, and processing of" the Deposit Subclass's assets. *Id*. at ¶¶ 140-143.

## Discussion

Mizuho moves to dismiss Counts IV-VII. Doc. 172. Although, as discussed below, Mizuho has raised a choice-of-law issue with regard to *forum non conveniens*, Doc. 183 at 36-38; Doc. 207 at 23, and has given notice pursuant to Rule 44.1 that it intends to raise foreign law at a later stage in the litigation, Doc. 183 at 36 n.18; Doc. 207 at 8, it has not raised the issue as to its Rule 12(b)(6) motion and seeks dismissal of Counts IV-VII under Illinois law. *Id*. at 9 ("Mizuho applies Illinois … law solely for the convenience of effectively resolving its motion to dismiss."). Because Plaintiffs also do not raise a conflict-of-law issue, Illinois law governs the Rule 12(b)(6) motion. *See Fednav Int'l v. Cont'l Ins. Co.*, 624 F.3d 834, 838 (7th Cir. 2010) ("When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits.") (internal quotation marks omitted).

## I.    Tortious Interference with Contract (Count IV)

"To state a claim under Illinois law for tortious interference with contracts, a plaintiff must demonstrate: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *Healy v. Met. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015). Mizuho challenges the third and fourth elements. Doc. 183 at 18-26; Doc. 207 at 9-15.

As to the third element, intentional and unjustified inducement of a breach, Mizuho makes two arguments, which largely fail at the pleading stage. First, Mizuho contends that the complaint's allegations reveal that Mizuho did not induce Mt. Gox to breach its contracts with Plaintiffs, since Mt. Gox ultimately went dark as a result of *Karpeles's* actions and alleged theft, not *Mizuho's* barring of outbound transfers. Doc. 183 at 18-20; Doc. 205 at ¶¶ 20-21, 38, 40; Doc. 207 at 9-10. The court agrees that Plaintiffs have not pleaded "sufficient factual matter" to claim, as the complaint does, *id.* at ¶ 117, that Mizuho's barring of outbound wire transfers forced Karpeles to steal bitcoins, caused Mt. Gox to suffer security vulnerabilities, and led Karpeles to close Mt. Gox. *See Stapleton v. Advocate Health Care Network*, 817 F.3d 517, 521 (7th Cir. 2016) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). That particular charge does not comport with "common sense," which must be applied when determining whether a complaint states a claim. *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 997 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 679).

But that particular charge is not necessary for Plaintiffs' tortious interference claim. "Under Illinois law, liability for tortious interference may … be premised on acts immediately

directed at a third party which cause that party to breach its contract with the plaintiff." *George A. Fuller Co. v. Chi. Coll. of Osteopathic Med.*, 719 F.2d 1326, 1331 (7th Cir. 1983); *see also Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1344-45 (7th Cir. 1992) (noting that tortious interference "encompasses the situation in which the defendant prevents the plaintiff from performing the contract") (internal quotation marks omitted). Here, for several months between its mid-2013 decision to bar outgoing withdrawals from its Mt. Gox bank account and Mt. Gox's February 2014 collapse, Mizuho made it impossible for Mt. Gox to perform on its contracts with its U.S.-based users because, with Mizuho refusing to process outbound wire transfers, U.S. users could not withdraw fiat currency from Mt. Gox. Mizuho retorts that Mt. Gox's performance was not impossible because Mt. Gox maintained upwards of forty accounts at different banks and payment processors, and also because Mt. Gox could have closed its account with Mizuho, withdrawn the money, and then used the funds to pay U.S. depositors either via check or through one of its other bank accounts. Doc. 183 at 21; Doc. 207 at 11-12. That argument fails; accepting at the pleading stage that Mt. Gox could have serviced Lack and Motto through those other accounts, even though nothing in the complaint suggests that it could have, would require drawing factual inferences against Plaintiffs, which on a Rule 12(b)(6) motion the court cannot do. *See Zahn*, 815 F.3d at 1087.

Mizuho next argues that even if it did induce Mt. Gox to breach its contracts with Plaintiffs, Mizuho's conduct was neither intentional nor unjustified. "In our legal system, every person is presumed to intend the natural consequences of his acts." *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 667 (7th Cir. 2013) (internal quotation marks omitted); *see also Trzcinski v. Am. Cas. Co.*, 953 F.2d 307, 313 (7th Cir. 1992) ("[T]he law presumes every man to intend the natural consequences of his acts.") (internal quotation marks omitted); *Miller v. Washington*,

2013 WL 1340590, at *6 (N.D. Ill. Mar. 30, 2013) ("It is a basic principle of Illinois tort law that a person is considered to intend the natural and probable consequences of his actions."). Plaintiffs allege that Mizuho knew that barring outbound wire transfers "would render Mt. Gox incapable of fulfilling its contractual obligations to its American users," Doc. 197 at 17-18, and that is sufficient to plead intent.

Mizuho protests that this is a conclusory assertion, and it enumerates several possibly relevant facts that are absent from the complaint. Doc. 207 at 13 & n.6. But to survive a Rule 12(b)(6) motion, Plaintiffs need not plead every conceivable fact to support a claim; the complaint need only "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Stapleton*, 817 F.3d at 521 (quoting *Iqbal*, 556 U.S. at 678). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Roberts v. City of Chicago*, 817 F.3d 561, 564-65 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). "[A]ll this means is that the plaintiff must include enough details about the subject-matter of the case to present a story that holds together." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 526 (7th Cir. 2015) (internal quotation marks omitted).

This, Plaintiffs have done. The complaint alleges that "Mizuho facilitated all international cash wire transfers into the [Mt. Gox] Exchange and processed user requests to withdraw cash from the Exchange"; that it "exclusively processed all bank deposits and withdrawals made by Mt. Gox users located in the United States"; and that it "knew that if US customers found about … the fact that withdrawals were no longer allowed … they would no longer continue making deposits into the Exchange." Doc. 205 at ¶¶ 23, 26, 32. This factual predicate supports the reasonable inference that Mizuho at the very least knew or expected that

9

its barring of outgoing wire transfers would severely disrupt Mt. Gox's contractual relationships with its American users, including Lack and Motto. *See Hudson Ins. Co. v. City of Chicago Heights*, 48 F.3d 234, 238 (7th Cir. 1995) ("[E]ven if Chicago Heights did not intend the destruction of the buildings through vandalism by third parties, it should have expected the destruction of the buildings and the ultimate damages suffered by the … plaintiffs as the likely consequence of that action."). Indeed, disrupting those relationships was the point of Mizuho's conduct; otherwise, Mizuho's policy of barring withdrawals would not have served its conceded purpose of inducing Mt. Gox to terminate its banking relationship with Mizuho, for, as Mizuho notes, on a strictly financial basis Mizuho's actions arguably enriched Mt. Gox by preventing users from withdrawing their money. Doc. 207 at 9. For these reasons, Plaintiffs have adequately pleaded that Mizuho's conduct was intentional.

As for justification, "Illinois recognizes a conditional privilege to interfere with contracts where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights." *Nation v. Am. Capital, Ltd.*, 682 F.3d 648, 651 (7th Cir. 2012) (internal quotation marks omitted); *see also TABFG, LLC v. Pfeil*, 746 F.3d 820, 825 (7th Cir. 2014) ("The Illinois Supreme Court has recognized a privilege in tortious interference cases where the interest which the defendant was acting to protect is one which the law deems to be of equal or greater value than the plaintiff's contractual rights."). The privilege can include situations in which "a party acts to enhance its own business interests," *Fidelity Nat'l Title Ins. Co. of N.Y. v. Westhaven Props. P'ship*, 898 N.E.2d 1051, 1067-68 (Ill. App. 2007) (internal quotation marks omitted), a category into which Mizuho contends that its efforts to inoculate itself from legal liability and reputational harm from its association with Mt. Gox fall. Doc. 183 at 22-23; Doc. 207 at 14-15. "Illinois courts have been unclear about whether the issue

of conditional privilege is part of the plaintiff's claim—that is, an aspect of the plaintiff's burden to prove that the defendant's interference with his contract was unjustified—or an affirmative defense to be proved by the defendant," *Nation*, 682 F.3d at 651 n.2, and the parties here dispute the issue, Doc. 197 at 22-23; Doc. 207 at 14. But the burden issue is irrelevant on this motion, because the privilege is contingent on the interference being incidental, not intentional. *See Curt Bullock Builders, Inc. v. H.S.S. Dev., Inc.*, 586 N.E.2d 1284, 1290 (Ill. App. 1992) ("If the interference which results is of an incidental nature *rather than an intentional nature*, no tort occurs.") (emphasis added).

Here, Mizuho's interference was not incidental; to the contrary, and as noted, Mizuho intended to disrupt Mt. Gox's relationships with its U.S. users, including Plaintiffs. Further, as discussed below, Mizuho's alleged conduct was inherently wrongful, as it was founded on a tort: fraudulently concealing the fact that Plaintiffs' money, once deposited, could not be recovered. That is more than sufficient to show that Mizuho "committed some impropriety" in interfering with Plaintiffs' contracts with Mt. Gox, which is all that Plaintiffs must plead to allege unjustified conduct. *See Dowd & Dowd, Ltd. v. Gleason*, 639 N.E.2d 358, 371 (Ill. 1998) (showing the defendant's "purposeful interference" in a business relationship is sufficient to state a tortious interference claim).

Mizuho next argues that Illinois and California banking law prohibited it from barring the incoming wire transfers, and as a result its only option to compel Mt. Gox to terminate their relationship was to block international wire withdrawals. Doc. 183 at 23-25. Complying with legal obligations is certainly an interest that the law would deem to be of greater value than Plaintiffs' contractual relationships with Mt. Gox, but that is not what is alleged to have happened here. Far from showing that state banking laws directed its behavior, Mizuho

11

maintains—and it admitted at a hearing on this motion—that its "obligations would be governed by Japanese law." Doc. 183 at 24. Because Mizuho has nowhere shown that *Japanese* law would similarly have prohibited Mizuho from rejecting inbound wire transfers, it has not demonstrated that its conduct was justified.

Mizuho also challenges the fourth element of Plaintiffs' tortious interference claim, that Mizuho's conduct caused Mt. Gox to breach its contracts with Plaintiffs. Specifically, Mizuho contends that Plaintiffs "have not alleged any facts showing that Mizuho interfered with the named plaintiffs' contracts with Mt. Gox." Doc. 183 at 25. For Greene, who traded only bitcoins on Mt. Gox, Mizuho is correct. Greene had no contact with Mizuho, and Plaintiffs do not allege that Greene ever attempted to sell his bitcoins and withdraw fiat currency from Mt. Gox. Greene does not have "a right to relief above a speculative level," and his tortious interference claim is dismissed. *Bravo v. Midland Credit Mgmt., Inc.*, 812 F.3d 599, 601-02 (7th Cir. 2016).

The same is not true for Lack and Motto. Lack joined Mt. Gox on January 22, 2014, approximately six months after Mizuho had barred all withdrawals, and he wired money to Mizuho on February 3, 2014. Doc. 205 at ¶¶ 58-59, 67. Lack did not seek to withdraw his funds until February 20, 2014, *id*. at ¶ 64—nearly two weeks after Karpeles had halted all bitcoin withdrawals, *id*. at ¶ 38, and by which point, Mizuho notes, "Mt. Gox was on the verge of collapse," Doc. 183 at 26. Similarly, Motto did not deposit his funds until after Karpeles had halted withdrawals, and the complaint does not allege that Motto ever attempted to withdraw his deposit. Doc. 205 at ¶¶ 70, 72-74. Mizuho asserts that this timeline shows that Lack and Motto have not plausibly alleged "that they personally have been injured" by Mizuho's conduct. *Lewis*

*v. Casey*, 518 U.S. 343, 357 (1996) (internal quotation marks omitted); *see also Hope, Inc. v. DuPage Cnty.*, 738 F.2d 797, 804 (7th Cir. 1984) (same).

This argument is unpersuasive for two reasons. First, despite the late dates of Lack's and Motto's deposits, they made their transfers with precisely the same (lack of) knowledge about Mizuho's policy that they would have had they made their deposits any other time after Mizuho began barring withdrawals. Press reports indicated that Mt. Gox users were experiencing *difficulties* in withdrawing funds, not that Mt. Gox's banking partner had *halted* outbound wire transfers. Second, Lack's and Motto's Mt. Gox accounts never registered their wire transfers, and the money was never used to purchase bitcoins; in other words, it is not clear whether the money ever actually reached the exchange. As a result, Karpeles's halting bitcoin withdrawals from the Mt. Gox exchange was irrelevant to the fiat currency that Lack and Motto had wired to Mizuho. When Lack attempted to "recall" his wire transfer on February 20, 2014, he would have been unable to withdraw the funds because of Mizuho's policy, not because of Karpeles's actions. Likewise, Motto's Mt. Gox account never registered his funds, and Mt. Gox told Motto that it had not received his deposit from Mizuho. Doc. 205 at ¶ 73. Given these circumstances, Lack's and Motto's losses were a "likely result of [Mizuho's] conduct," and not "so highly extraordinary that imposing liability is not justified." *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1124 (Ill. 2015) (internal quotation marks omitted).

In sum, Mizuho's motion to dismiss the tortious interference claim is granted as to Greene and denied as to Lack and Motto.

## II.     Unjust Enrichment and Fraudulent Concealment (Counts V-VI)

"The elements of a claim of fraudulent misrepresentation in Illinois are: (1) a false statement of material fact (2) known or believed to be false by the party making it; (3) intent to

induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from that reliance." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012) (internal quotation marks omitted). To state a fraudulent concealment claim under Illinois law, "in addition to meeting the elements of fraudulent misrepresentation, a plaintiff must allege that the defendant intentionally omitted or concealed a material fact it was under a duty to disclose to the plaintiff." *Id*. at 571. Moreover, the plaintiff " must state with particularity the circumstances constituting fraud'" under the heightened pleading requirement of Rule 9(b). *Rocha v. Rudd*, __ F.3d __, 2016 WL 3435302, at *5 (7th Cir. June 22, 2016) (quoting Fed. R. Civ. P. 9(b)); *see also United States ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016) (same). Mizuho advances three grounds for dismissing the fraudulent concealment claim.

First, Mizuho contends that Plaintiffs have not alleged a relationship giving rise to a duty to disclose. Doc. 183 at 27-30; Doc. 207 at 15-16. Normally, a "duty to disclose would arise if plaintiff and defendant are in a fiduciary or confidential relationship or in a situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff." *Wigod*, 673 F.3d at 571 (internal quotation marks omitted). Neither of these situations describes Plaintiffs' relationship with Mizuho; Mizuho maintains that it was not even in a commercial relationship with Plaintiffs because they were Mt. Gox's, not Mizuho's, customers. Doc. 183 at 27-28.

However, when Plaintiffs wired money to Mizuho and Mizuho accepted that money, the parties were in a transactional relationship. And Plaintiffs allege more than a mere violation of the duty to disclose. Although "[m]ere silence in a business transaction does not amount to fraud," *Heider v. Leewards Creative Crafts, Inc.*, 613 N.E.2d 805, 814 (Ill. App. 1993), "silence

14

combined with deceptive conduct or the suppression of material facts results in active concealment." *Henderson Square Condo. Ass'n v. LAB Townhomes, L.L.C.*, 16 N.E.3d 197, 120 (Ill App. 2014); *see also Westchester Fire Ins. Co. v. Household Int'l, Inc.*, 167 F. App'x 895, 900 n.3 (3d Cir. 2006) ("Although silence may constitute a misrepresentation under Illinois law, the silence must be accompanied by deceptive conduct or active concealment.") (citing *Heider*, 613 N.E.2d at 814); *cf. United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016) (noting that under the wire fraud statute, "the concept of a misrepresentation is … broad. … It can also include the omission or concealmeant of material information, even absent an affirmative duty to disclose, if the omission was intended to induce a false belief and action to the advantage of the schemer and the disadvantage of the victim") (citations omitted). In the face of such concealment, it becomes "the duty of the party which has concealed information to speak." *Hirsch v. Feuer*, 702 N.E.2d 265, 273 (Ill. App. 1998) (internal quotation marks omitted); *see also Henderson Square*, 16 N.E.3d at 120 (same).

Here, Mizuho stopped processing withdrawals but continued accepting wire transfer deposits (and reaping the associated fees) from Mt. Gox users. It did so in an environment in which press reports discussed delays of, but not absolute bars to, withdrawals of fiat currency from Mt. Gox's accounts. Although Mizuho contends that the existence of these press reports indicates that sufficient information was available to Lack and Motto, the information was at best incomplete and is more accurately characterized as misinformation: none of the articles cited by the complaint, which the court considers on a Rule 12(b)(6) motion, *see Phillips*, 714 F.3d at 1020, mention Mizuho or the total inability of Mt. Gox users to withdraw fiat currency. If anything, the fact that those publications reported on Mt. Gox's withdrawal difficulties indicates that Mt. Gox users were interested in the subject, and so Mizuho's silence as it continued to

accept deposits actually suppressed facts that were salient and material for the depositors—including Lack and Motto. Doc. 205 at ¶¶ 66, 76. Because "[i]ntentional concealment of a material fact is the equivalent of a false statement of material fact," *JPMorgan Chase Bank, N.A. v. E.W. Logistics, L.L.C.*, 9 N.E.3d 104, 120 (Ill. App. 2014), this gave rise to a duty to disclose. *See Hirsch*, 702 N.E.2d at 273.

Mizuho counters that "banks acting in their ordinary capacity are not subject to liability to their customers' counterparties." Doc. 183 at 29. But the cases cited by Mizuho all involve situations in which a bank's customers acted fraudulently but the bank did not. *See Eisenberg v. Wachovia Bank N.A.*, 301 F.3d 220 (4th Cir. 2002) (where a bank was not liable for failing to detect a Ponzi scheme perpetrated by one of its customers); *Bell Bros. v. Bank One, Lafayette, N.A.*, 116 F.3d 1158 (7th Cir. 1997) (where a bank was not liable for RICO claims against a partnership that employed the bank as an escrow agent); *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988) (where a bank was not liable for a fraudulent conveyance perpetrated by a bank customer); *In re Agape Litig.*, 681 F. Supp. 2d 352 (E.D.N.Y. 2010) (where banks were not liable for a Ponzi scheme perpetrated by a customer); *Tzaras v. Evergreen Int'l Spot Trading, Inc.*, 2003 WL 470611 (S.D.N.Y. Feb. 25, 2003) (where a bank was not liable to a depositor for the fraudulent misconduct of the depository). Here, by contrast, the fraudulent concealment claim alleges that *Mizuho* acted fraudulently, and Plaintiffs' allegation that Karpeles did so as well does not undermine the allegations against Mizuho. Plaintiffs are not seeking to hold Mizuho liable for failing to uncover Karpeles's fraud, in which case the general principle about banks and customers' counterparties might apply. Plaintiffs instead seek to hold Mizuho liable for its own fraud. For the same reason, although Mizuho argues that the complaint does not support the notion that Mizuho knew that Karpeles's or Mt.

Gox's communications to Mt. Gox customers were false, Doc. 207 at 18, that is beside the point, because the fraudulent concealment claim does not implicate Karpeles.

Mizuho further protests that holding that it had a duty to communicate to Mt. Gox depositors like Lack and Motto would "erode its obligation of confidentiality to its customers." Doc. 183 at 30. Mizuho neither specifies the bounds of this obligation of confidentiality nor explains why this would trump its legal obligation not to act fraudulently. And because Mizuho does not contend that any applicable banking law or regulation prevented it from revealing that it had barred all outbound wire transfers from the Mt. Gox account, it has forfeited the point for purposes of this motion. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance a specific point in support of a general argument."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and alterations omitted).

Mizuho's second challenge to the fraud claim is that Plaintiffs have not alleged intent to defraud. Doc. 183 at 30-31; Doc. 207 at 17-20. Because the complaint acknowledges that Mizuho was seeking to avoid reputational harm and legal liability in attempting to end its relationship with Karpeles, Mizuho argues, its actions were not motivated by an intent to harm Mt. Gox's customers. Doc. 183 at 30-31. That argument fails at the pleading stage.

For one, Mizuho misstates the governing standard. Under Rule 9(b), "intent … may be alleged generally." Fed. R. Civ. P. 9(b); *see Thulin*, 771 F.3d at 1000. And the issue is not whether Mizuho intended to *harm* Lack and Motto, but whether it "intended to induce [in them] a false belief." *DOD Techs. v. Mesirow Ins. Servs., Inc.*, 887 N.E.2d 1, 11 (Ill. App. 2008). That is precisely what the complaint alleges: that Mizuho, to avoid reputational harm and to continue collecting transaction fees, induced Plaintiffs' false belief that they would be able to withdraw fiat currency from their Mt. Gox accounts, even after Mizuho had halted such withdrawals. Doc. 205 at ¶¶ 32-33, 36-37. Whether or not this allegation ultimately proves to be true, it is plausible, which is all that is required at this stage. *See United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 855 (7th Cir. 2009) ("To say that fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement).").

Mizuho protests that these allegations are made only "on information and belief," Doc. 183 at 31, which the Seventh Circuit has held is insufficient to plead fraud. *Bogina*, 809 F.3d at 370 ("Allegations based on 'information and belief' thus won't do in a fraud case—for 'on information and belief' can mean as little as 'rumor has it that ….'"). But the Seventh Circuit held this in the context of Rule 9(b)'s particularity requirement, not the Rule's allowance of general allegations of intent. *Compare Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011) ("To satisfy the particularity requirement of Rule 9(b) when it made allegations based on information and belief … Pirelli needed corroboration, not just consistency."), *with Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833 (7th Cir. 2007) ("[Rule 9's] heightened pleading requirement does not extend to 'states of mind.'").

Further, the well-pleaded facts support Plaintiffs' allegations by reasonable inference: Mizuho was concerned about reputational harm; Mizuho blocked all outgoing wire transfers; Mizuho did not reveal that it had done so; and Mizuho continued to receive the service fees from processing inbound transfers. Even if Mizuho's "interest in fees, standing alone, [does] not suffice to establish fraudulent intent," *Tricontinental Indus.*, 475 F.3d at 841, the combination of the above-referenced facts does for purposes of Rule 9(b). And while Mizuho contends that is not plausible that "one of Japan's largest banks" would perpetrate a fraud over relatively small wire transfer fees, Doc. 207 at 20, small fees, when aggregated over thousands or tens of thousands of transactions, can add up to large amounts. Likewise, Mizuho argues that if its interest in fees were so significant, it would not have barred outbound transfers, from which it also reaped fees. *Id.* at 19. But the complaint's allegations support the reasonable inference that Mizuho took the path it did to serve two interests: barring international wire withdrawals to induce Mt. Gox to terminate the banking relationship, but permitting incoming transfers to avoid reputational harm and to continue reaping inbound service fees. Doc. 205 at ¶¶ 27-33.

Mizuho argues that Plaintiffs have not explained how Mizuho could or why it would prohibit Mt. Gox from revealing that Mizuho had barred all withdrawals, or how Mizuho knew that Mt. Gox and Karpeles were providing false information to Mt. Gox customers. Doc. 183 at 31; Doc. 207 at 17-18. Mizuho may well be right, but the lack of these explanations does not defeat the fraud claim, as preventing third parties from making disclosures is not an element of fraudulent concealment, *see Wigod*, 673 F.3d at 569, 571, and Karpeles's behavior is not at issue in the fraudulent concealment claim, Doc. 205 at ¶¶ 128-139. Regardless of whether Mizuho prohibited Karpeles or Mt. Gox from revealing the status of the banking relationship, Plaintiffs have alleged a fraudulent concealment claim against Mizuho for its own failure to do so.

Finally, Mizuho contends that Plaintiffs do not adequately plead that its concealment caused their damages, because their ultimate inability to recover their funds resulted from Karpeles's theft, Mt. Gox's failure to return the funds using alternative bank accounts, and the exchange's collapse. Doc. 183 at 31-32; Doc. 207 at 20. This is unpersuasive, because Lack and Motto plausibly allege that they would not have wired funds to Mizuho had they known that Mizuho had barred all international wire withdrawals. Doc. 205 at ¶¶ 66, 76, 137. Because Mizuho did not disclose that it had barred withdrawals, Plaintiffs deposited the funds and then lost them. These "out-of-pocket losses" are "actual damages arising from [Plaintiffs'] reliance on [Mizuho's] fraudulent statement," *Swanson v. Citibank, N.A.*, 614 F.3d 400, 406-07 (7th Cir. 2010), and that is sufficient to forestall dismissal.

Mizuho's sole argument in its initial brief for dismissing the unjust enrichment claim under Illinois law is that the claim rests on the same conduct as the fraudulent concealment claim. Doc. 183 at 32 n.16. "[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011). Because the fraudulent concealment claim stands, the unjust enrichment claim does as well. Mizuho's contention that Plaintiffs have not met the Rule 9(b) standard for the claim, Doc. 207 at 21, is forfeited because Mizuho did not raise it until its reply brief. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue.").

## III.     Accounting (Count VII)

Count VII seeks a "full and complete accounting of all transactions or records relating to the deposit, transfer, and processing of Plaintiffs' and Deposit Class'[s] Fiat Currency." Doc. 205 at ¶ 143. "[A]n accounting is an equitable remedy," *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 801 n.12 (7th Cir. 2011), and "[t]o state a claim for the equitable relief of an accounting, a plaintiff must allege the absence of an adequate remedy at law," *Kempner Mobile Elec., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 715 (7th Cir. 2005); *see also First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985) ("A court may refuse to reward an equitable accounting to a party who has an adequate remedy at law."). "In addition to the absence of an adequate remedy at law, the plaintiff must allege at least one of the following: (1) a breach of a fiduciary relationship, (2) a need for discovery, (3) fraud, or (4) the existence of mutual accounts which are of a complex nature." *Kempner*, 428 F.3d at 715; *see also ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 545 (7th Cir. 2003) (same); *First Commodity Traders*, 766 F.2d at 1011 ("A court will not open an account stated absent a showing of fraud, omission[,] or mistake."). A "district court has broad discretion in deciding whether an accounting is appropriate." *ABM Marking*, 353 F.3d at 545 (internal quotation marks omitted); *see also First Commodity Traders*, 766 F.2d at 1011 ("Because an accounting is an equitable remedy, a court has broad discretion to determine whether it is appropriate to order an accounting.").

Plaintiffs allege that they "have an inadequate legal remedy in that they cannot determine the precise amount of damage that they have suffered as a result of Mt. Gox and Mizuho's conduct or which entity is in possession of their transferred funds." Doc. 205 at ¶ 142. However, "damages in this case are not speculative, and the amount of damages is neither

difficult nor impossible to measure," *Kempner*, 428 F.3d at 715—it is simply the unrecovered

deposits of $40,000 (for Lack) and $1,000 (for Motto). Discovery is ongoing, Docs. 185, 203,

227, and should reveal "all of the accounting information pertinent to [these] claims." *Kempner*,

428 F.3d at 715. Given this, Plaintiffs have made "no showing that the accounts between the

parties are of such a complicated nature that only a court of equity can satisfactorily unravel

them." *Ibid.* (internal quotation marks omitted); *see also First Commodity Traders*, 766 F.2d at

1011 ("During discovery, FCT had full access to Heinold's records and could ascertain the

correct amount of compensation to which FCT was entitled. FCT had an adequate remedy at law

and could not resort to the equitable remedy of an account."). Because Plaintiffs have not

demonstrated that their legal remedies are inadequate, the accounting claim is dismissed.

## IV. *Forum Non Conveniens*

In the alternative to its Rule 12(b)(6) motion, Mizuho argues that this case should be

dismissed under the *forum non conveniens* doctrine. Doc. 183 at 33-38; Doc. 207 at 22-24.

Under this doctrine, "a district court may dismiss a case … when it determines that there are

strong reasons for believing it should be litigated in the courts of another, normally a foreign,

jurisdiction." *Deb v. SIRVA, Inc.*, __ F.3d __, 2016 WL 4245497, at *2 (7th Cir. Aug. 11, 2016)

(internal quotation marks omitted); *see also Volodarskiy v. Delta Airlines, Inc.*, 784 F.3d 349,

353 (7th Cir. 2015) (same). "While many considerations are part of this inquiry, the focus is 'the

convenience to the parties and the practical difficulties that can attend the adjudication of a

dispute in a certain locality.'" *Fischer v. Magyar Államvasutak Zrt.*, 777 F.3d 847, 866 (7th Cir.

2015) (quoting *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007)). A

court considering a *forum non conveniens* motion weighs "a variety of relevant factors," many of

which are "case-specific"; there is no "formula for weighing [the factors] precisely." *Ibid.*

"The doctrine of forum non conveniens … is an exceptional one that a court must sparingly." *Deb*, 2016 WL 4245497, at *2-3 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504 (1947)). The defendant's burden is "heavy," *In re Hudson*, 710 F.3d 716, 718 (7th Cir. 2013) (internal quotation marks omitted), for there is "a presumption in favor of allowing a plaintiff his choice of courts rather than insisting that he choose the optimal forum," and a "case should not be lightly shifted from one court to another, forcing the plaintiff to start over." *Abad v. Bayer Corp.*, 563 F.3d 663, 666 (7th Cir. 2009); *see also Deb*, 2016 WL 4245497, at *3 ("A heavy burden is appropriate, because if the doctrine is successfully invoked, the result is not a transfer to another court but a dismissal, and the plaintiff will not be able to refile his case in any other court if the statute of limitations has run."). "When the plaintiff's choice is not his home forum, … the presumption in the plaintiff's favor 'applies with less force,' for the assumption that the chosen forum is appropriate is in such cases 'less reasonable,'" *Deb*, 2016 WL 4245497, at *3 (quoting *Sinochem Int'l*, 549 U.S. at 430), but that principle does not apply here because Illinois is Motto's home forum.

The Seventh Circuit recently clarified the first stage of the *forum non conveniens* analysis:

> To determine whether a dismissal for forum non conveniens is appropriate, a court must first determine if an alternative and adequate forum is available …. Therefore, the first step in any forum non conveniens inquiry is to determine whether such a place exists. The availability of the forum is really a two-part inquiry involving availability and adequacy. An alternative forum is available if all parties are amenable to process and are within the forum's jurisdiction. An alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly.

*Ibid*. (citations and internal quotation marks omitted); *see also Fischer*, 777 F.3d at 867; *Stroitelstvo Bulg. Ltd. v. Bulgarian-Am. Enter. Fund*, 589 F.3d 417, 421 (7th Cir. 2009) ("A

threshold requirement for any *forum non conveniens* dismissal is the existence of an alternative forum that is both 'available' and 'adequate.'").

Mizuho offers Japan as an alternative forum, Doc. 183 at 33-34, and Plaintiffs do not dispute its availability as a forum or question a Japanese court's potential jurisdiction over this case, Doc. 197 at 33. Plaintiffs do raise issues regarding the availability of class actions under Japanese law, Doc. 197 at 34, 36-37, and such procedural differences are typically considered as part of the adequacy inquiry. *See Fischer*, 777 F.3d at 861. But the Seventh Circuit has held that "the absence of a class action device does not mean as a matter of law that a nation's courts fail to offer effective remedies," *ibid.*; *see also Aguinda v. Texaco, Inc.*, 303 F.3d 470, 478 (2d Cir. 2002) ("While the need for thousands of individual plaintiffs to authorize the action in their names is more burdensome than having them represented by a representative in a class action, it is not so burdensome as to deprive the plaintiffs of an effective alternative forum."); *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India*, 809 F.2d 195, 199 (2d Cir. 1987) (affirming a district court decision in which the "absence in India of a class action procedure comparable to that in federal courts [in the United States] was found not to deprive the plaintiffs of a remedy"), and that Japan is an adequate alternative forum for at least some common law tort claims, *see U.S.O. Corp. v. Mizuho Holding Co.*, 547 F.3d 749, 753-55 (7th Cir. 2008). Further, while Plaintiffs discuss a few ways in which Japan's class action system differs from that of the United States, such as in its requirement that certain state-approved entities commence a class action, Doc. 197 at 36-37, they do not address in detail how those differences would apply to this litigation. Indeed, those state-approved entities, which were established relatively recently, "file class action suits on behalf of consumers" and are "incentivize[d] to bring … more lawsuits" than the class action entities previously available in Japan. Michael J. Madderra, Comment,

"The New Class Actions in Japan," 23 *Pac. Rim. L. & Pol'y J.* 795, 809-10 (2014). Thus,

"[w]hile the lack of an identical class action device may well impose additional burdens on

plaintiffs, the equivalent mechanism in [Japan] does not appear to be so burdensome as to

deprive plaintiffs of an effective remedy." *Fischer*, 777 F.3d at 861; *see also Howe v. Goldcorp*

*Invests., Ltd.*, 946 F.2d 944, 952 (1st Cir. 1991) (Breyer, C.J.) ("Controlling precedent makes

clear … that small differences in standards and procedural differences (such as greater difficulty

in meeting class action requirements …) are beside the point [for *forum non conveniens*].").

Consequently, Japan is an available and adequate alternative forum for this case.

"Where another adequate forum is available, to dismiss on *forum non conveniens* the

district court must also balance the private interests of the parties and the public interests of the

alternative forums and find that those balances favor a different forum." *Fischer*, 777 F.3d at

868. This inquiry requires the consideration of several factors:

> [C]ourts evaluate the private interest by focusing on the (1) relative ease of
> access to sources of proof; (2) availability of compulsory process and costs for
> attendance of witnesses; (3) possibility of view of premises, if appropriate;
> and (4) other practical issues, including ease of enforcement of any ultimate
> judgment. The court must also consider the public interest. Relevant public
> interest factors include the administrative difficulties stemming from court
> congestion; the local interest in having localized disputes decided at home; the
> interest in having the trial of a diversity case in a forum that is at home with
> the law that must govern the action; the avoidance of unnecessary problems in
> conflicts of laws or in the application of foreign law; and the unfairness of
> burdening citizens in an unrelated forum with jury duty.

*Ibid.* (citations and internal quotation marks omitted).

### A.     Private Interest Factors

#### 1.     Ease of Access to Sources of Proof

The ease of access to sources of proof slightly favors dismissal. Mizuho is a Japanese

financial institution headquartered in Japan. It held Mt. Gox's accounts at a branch in Tokyo,

and it made all of its decisions regarding those accounts in Japan. Mt. Gox was also

headquartered in Japan, and the alleged theft of Plaintiffs' bitcoins and Mt. Gox's bankruptcy occurred in Japan. In addition, Karpeles is currently in custody in Japan. Doc. 183-1 at 58-60. Although Plaintiffs, their bank records, and their communications with Mt. Gox are in the United States, Mizuho's records are almost certainly more extensive. As a result, it is likely that more of the witnesses and relevant documentary evidence are in Japan than in Illinois or even the United States. Those documents are likely in Japanese as well. *See Fischer*, 777 F.3d at 870 (noting, in a suit against Hungarian banks, that "it stands to reason that most of the relevant bank records and other documents will be in Hungarian"). Those documents would have to be translated into English, and the witnesses would have to travel to Chicago for trial and might need interpreters. *See U.S.O. Corp.*, 547 F.3d at 751.

Still, Mizuho has identified only one category of documents that it may use to support its defenses, Doc. 197-1 at ¶ 6, which perhaps would limit the expense, effort, and scope of any translation. And Mizuho has neither provided any information about the procedures through which this court or Plaintiffs could seek documents in Japan nor argued that the process would limit this court's access to sources of proof. Any such argument is therefore forfeited for purposes of this motion. *See G & S Holdings*, 697 F.3d at 538; *Milligan*, 686 F.3d at 386; *Judge*, 612 F.3d at 557. Accordingly, while this factor favors dismissal, it does so only slightly.

### 2. Compulsory Process and Costs for Attendance of Witnesses

The second factor, the availability of the compulsory process for the attendance of unwilling witnesses and the costs for attendance of witnesses, is neutral. Mizuho has not argued that procedures are unavailable to require unwilling Japanese witnesses to give video depositions in Japan that later can be used on summary judgment or at trial. More importantly, Mizuho has not argued that its witnesses in Japan would not cooperate with this litigation; in fact, if Mizuho

believes it did nothing wrong, it has every incentive to have its employees cooperate and convey its position. Accordingly, it is unlikely that compelling the attendance of unwilling witnesses in this court would be problematic, and so this factor weighs against dismissal.

The cost for the attendance of witnesses weighs slightly in favor of dismissal. Neither party has provided information about which witnesses are willing to cooperate or about travel costs. Assuming that more of the witnesses are in Japan, it would cost more to fly a greater number of people from Japan to Illinois than to fly a fewer number of people from Illinois to Japan. As a result, this factor weighs in favor of dismissal. Taken together, compulsory process and costs for attendance cancel each other out, and so the second factor as a whole is a wash.

### 3.    Viewing the Premises

Neither party addresses the third private interest factor, viewing the premises.

### 4.    Other Practical Issues

Mizuho does not address the fourth factor, "other practical issues, including ease of enforcement of any ultimate judgment." *Fischer*, 777 F.3d at 868. Plaintiffs maintain that "it would be prohibitively expensive for the plaintiff class members to litigate their claims in Japan." Doc. 197 at 34. Because "the financial hardship of requiring a plaintiff to sue outside of the chosen forum is relevant to the *forum non conveniens* analysis," *Stroitelstvo*, 589 F.3d at 417, this factor weighs slightly against dismissal.

Overall, then, the private interest factors are essentially neutral.

### B.    Public Interest Factors

### 1.    Court Congestion

The first public interest factor, court congestion, favors dismissal. As of December 31, 2015, the median time from filing a civil case to trial in the Northern District of Illinois was 36.7

months.  *See* "Federal Court Management Statistics" at 47, *U.S. Courts*, https://perma.cc/F82K-EDNY.  Mizuho argues that the average length of civil proceedings in Tokyo is only 107 days.  Doc. 183 at 38.  Although Plaintiffs contend that this comparison does not take into account the alleged lack of a class action mechanism in Japan, Doc. 197 at 36, that is more properly an argument against the adequacy of Japan as a forum, which, as discussed above, is unpersuasive.  Because Japanese courts are either less congested or more efficient than courts in this District, this factor slightly favors dismissal.

### 2.    Local Interests in Having Localized Disputes Decided at Home

The second public interest factor, "the local interest in having localized disputes decided at home," *Fischer*, 777 F.3d at 868, is neutral, as both Illinois and Japan have an interest in resolving this dispute locally.  Illinois has such an interest because it is the site of Motto's alleged injuries.  *See Tamburo v. Dworkin*, 601 F.3d 693, 709 (7th Cir. 2010) ("Illinois has a strong interest in providing a forum for its residents and local businesses to seek redress for tort injuries suffered within the state and inflicted by out-of-state actors.").  Japan has an interest in resolving the dispute because Mizuho is a Japanese financial institution, Mt. Gox was a Japanese business, and many of the events that form the basis of Plaintiffs' claims occurred in Japan.  Accordingly, this factor is neutral.

### 3.    Issues of Foreign Law

The next two factors—"the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action," and "the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law," *Fischer*, 777 F.3d at 868; *see also Volodarskiy*, 784 F.3d at 353—are discussed together.  Mizuho contends that Japanese law

governs this suit, Doc. 183 at 36-38; Doc. 207 at 23, while Plaintiffs argue that, under Illinois choice-of-law rules, Illinois law should apply, Doc. 197 at 35-36.  Plaintiffs are correct.

"In most U.S. jurisdictions, even those that use a 'most significant relationship' test to resolve conflict of laws issues in tort suits, there is a practical presumption that the law of the place where the tort occurred ('*lex loci delicti*') governs the substantive questions in the suit." *Abad*, 563 F.3d at 669; *see also Carris v. Marriott Int'l Inc.*, 466 F.3d 558, 560 (7th Cir. 2006) (applying Illinois law and describing *lex loci delicti* as the "default rule" in tort cases even in jurisdictions that have embraced "most significant relationship" or other alternative choice of law rules); *Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 844 (7th Cir. 1999) (same).  According to the Seventh Circuit,

> in the absence of unusual circumstances, the highest scorer on the "most significant relationship" test is—the place where the tort occurred.  For that is the place that has the greatest interest in striking a reasonable balance among safety, cost, and other factors pertinent to the design and administration of a system of tort law.  That is particularly true when the place of the [tortious conduct] is also the place in which the victims were injured and were resident, for that offsets the argument that the jurisdiction of the defendant has an interest in regulating the conduct of its people and firms.  Victim location and injurer location are valid considerations.  But when they point to two different jurisdictions they cancel out, leaving the place where the injury (and hence the tort) occurred as the presumptive source of the law governing the accident.

*Abad*, 563 F.3d at 669-670 (citation and internal quotation marks omitted).  In sum, "the place where the tort occurred is where the injury occurred … rather than where the conduct … that caused the injury occurred; for there is no tort without an injury." *Id*. at 669 (internal quotation marks omitted).

Applying these principles here, Illinois law governs Motto's claims, and California law governs Lack's claims.  Mizuho's conduct occurred in Japan, but Plaintiffs' alleged injuries occurred in Illinois (and California), leaving Illinois (and California) the forum with the most significant relationship to the tort.  If this case is certified as a class action, the parties may ask

the court to certify a different subclass for class members in each jurisdiction in which the law differs in a material way from Illinois and/or California, *see Thomas v. UBS AG*, 706 F.3d 846, 849 (7th Cir. 2013), which would result in the application of other domestic law, but not Japanese law.

Mizuho and Plaintiffs filed supplemental briefs comparing the Japanese and Illinois law governing the torts alleged in this case. Docs. 220, 224. Although Mizuho has demonstrated that Japanese and Illinois tort law are not entirely congruent, Doc. 220 at 1-4, that showing is irrelevant: because Illinois law and California law governs this dispute (at least as to Motto and Lack), this court will not need to apply foreign law at all—but a Japanese court might apply the law of Illinois, California, or possibly other States, which could create difficulties for *that* court (but not this one) in applying foreign law. As a result, both factors relating to foreign law—trying a case in a forum from which the case draws its governing law, and avoiding problems in the application of that law—weigh against dismissal.

### 4. Unfairness of Burdening Forum Citizens with Jury Duty

This factor is neutral, since the citizens of both Japan and Illinois have an interest in this dispute. Neither party claims that it weighs one way or the other.

On balance, then, the public interest factors weigh against dismissal. Because the private interest factors were neutral, the factors as a whole weigh against dismissal. And even if the private interest factors favored dismissal to the same extent that—or even to a slightly greater extent than—the public interest factors weigh against dismissal, a *forum non conveniens* dismissal still would be inappropriate. *See Deb*, 2016 WL 4245497, at *2 ("Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.") (quoting *Gulf Oil*, 330 U.S. at 504) (internal quotation marks omitted); *Clerides v. Boeing Co.*,

534 F.3d 623, 628 (7th Cir. 2008) ("As a general rule, a plaintiff's choice of forum should be disturbed only if the balance of public and private interest factors strongly favors the defendant."); *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 524 (7th Cir. 2001) ("[U]nder the usual analysis, there is a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum …, and this is particularly true where a domestic plaintiff has filed suit in his own home forum.") (internal quotation marks and citation omitted). Accordingly, Mizuho's motion to dismiss for *forum non conveniens* is denied.

## Conclusion

For the foregoing reasons, Mizuho's motion to dismiss is granted in part and denied in part. The motion is granted as to Greene's tortious interference with contract claim against Mizuho and as to Plaintiffs' accounting claim against Mizuho, and otherwise is denied. Mizuho shall answer the surviving portions of the operative complaint by September 16, 2016.

August 26, 2016

_____
United States District Judge