**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

GREGORY GREENE, JOSEPH LACK,
ANTHONY MOTTO, and GREGORY
PEARCE individually and on behalf of all
others similarly situated,

                *Plaintiffs*,

v.

MIZUHO BANK, LTD., a Japanese financial
institution, and MARK KARPELES, an
individual,

                *Defendants*.

Case No. 1:14-cv-01437

Hon. Gary Feinerman

Magistrate Judge Susan Cox

**MEMORANDUM IN SUPPORT OF MOTION BY ANTHONY MOTTO, JOSEPH**
**LACK, and GREGORY PEARCE FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ......................................................................................3

ARGUMENT .............................................................................................................12

I.      The proposed classes meet the requirements of Rule 23(a) ..........................12

      A.      The proposed classes are ascertainable and sufficiently numerous ...............12

      B.      The claims of both classes turn on the resolution of common questions ........14

      C.      Motto, Lack, and Pearce are typical of the classes they seek to represent, and adequate to represent those classes ...........................................................19

II.     The proposed classes meet the requirements of Rule 23(b)(3) .....................23

      A.      The evidence permits a classwide inference of reliance ....................24

            i.      *Courts permit a classwide inference of reliance when such an inference derives from the nature of the alleged misrepresentation* ........................24

            ii.     *The nature of Mizuho's alleged misrepresentation permits a classwide inference of reliance* ...............................................................................27

      B.      Any issue of justification does not preclude certification of the Withdrawal Class ...............................................................................................33

      C.      A class action is a superior way to resolve this controversy ...........................35

CONCLUSION ..........................................................................................................37

# TABLE OF AUTHORITIES

**Cases**

*Abad v. Bayer Corp.*,
563 F.3d 663 (7th Cir. 2009) .........................................................................15

*ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*,
32 N.E.3d 921 (N.Y. 2015)..............................................................................32

*Adams v. Little Missouri Minerals Ass'n*,
143 N.W.2d 659 (N.D. 1966) ..........................................................................25

*Am. Bankers Ins. Co. of Fla. v. Booth*,
830 So. 2d 1205 (Miss. 2002) .........................................................................16

*Am. Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974)..........................................................................................14

*Aranda v. Caribbean Cruise Line, Inc.*,
2017 WL 818854 (N.D. Ill. Mar. 2, 2017)......................................................22

*Arreola v. Godinez*,
546 F.3d 788 (7th Cir. 2008) .................................................................14, 21

*Bell v. PNC Bank, N.A.*,
800 F.3d 360 (7th Cir. 2015) ..........................................................................14

*Bernal v. NRA Grp., LLC*,
318 F.R.D. 64 (N.D. Ill. 2016).......................................................................12

*Birchmeier v. Caribbean Cruise Line, Inc.*,
302 F.R.D. 240 (N.D. Ill. 2014)......................................................................22

*Brodsky v. HumanaDental Ins. Co.*,
2016 WL 5476233 (N.D. Ill. Sept. 29, 2016) ..........................................20, 21

*Butler v. Sears, Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013) .............................................................2, 23, 33

*CalPERS v. ANZ Securities, Inc.*,
137 S. Ct. 2042 (2017).....................................................................................16

*Carlson v. Northrup Grumman Corp.*,
2014 WL 5334038 (N.D. Ill. Oct. 20, 2014)..................................................13

*CE Design Ltd. v. Cy's Crabhouse N., Inc.*,
   259 F.R.D. 135 (N.D. Ill. 2009) .................................................... 19

*CE Design Ltd. v. King Architectural Metals, Inc.*,
   637 F.3d 721 (7th Cir. 2011) ....................................................... 19

*CGC Holdings Co., LLC v. Broad & Cassel*,
   773 F.3d 1076 (10th Cir. 2014) ................................................... 25

*Chapman v. Wagener Equities, Inc.*,
   747 F.3d 489 (7th Cir. 2014) ....................................................... 12

*Chardon v. Fumero Soto*,
   462 U.S. 650 (1983) ..................................................................... 15

*Cognis Corp. v. CHEMCENTRAL Corp.*,
   430 F. Supp. 2d 806 (N.D. Ill. 2006) ........................................... 15

*Community Bank of N. Va., In re*,
   795 F.3d 380 (3d Cir. 2015) ........................................................ 29

*Cook v. Hayden*,
   31 S.E.2d 625 (Va. 1944) ....................................................... 25, 28

*Copper Antitrust Litig., In re*,
   436 F.3d 782 (7th Cir. 2006) .................................................. 16, 32

*Coulter-Owens v. Time, Inc.*,
   308 F.R.D. 524 (E.D. Mich. 2015) ............................................... 22

*Daley v. Aetna Life & Cas. Co.*,
   734 A.2d 112 (Conn. 1999) .......................................................... 34

*De La Fuente v. Stokely-Van Camp, Inc.*,
   713 F.2d 225 (7th Cir. 1983) ....................................................... 19

*Dodona I, LLC v. Goldman , Sachs & Co.*,
   847 F. Supp. 2d 624 (S.D.N.Y. 2012) .......................................... 30

*Dubisky v. United States*,
   62 F.3d 182 (7th Cir. 1995) ......................................................... 35

*Falco v. Nissan N. Am., Inc.*,
   2016 WL 1327474 (C.D. Cal. Apr. 5, 2016) ................................. 18

*First Alliance Mortg. Co., In re*,
    471 F.3d 977 (9th Cir. 2006) ....................................................................27, 29

*Garner v. Healy*,
    184 F.R.D. 598 (N.D. Ill. 1999) .......................................................................27

*Gehrich v. Chase Bank USA, N.A.*,
    316 F.R.D. 215 (N.D. Ill. 2016) .......................................................................19

*Gen. Tel. Co. of the Sw. v. Falcon*,
    457 U.S. 147 (1982) .........................................................................................20

*Gratz v. Bollinger*,
    539 U.S. 244 (2003) .........................................................................................20

*Green v. Wolf Corp.*,
    402 F.2d 291 (2d Cir. 1968) .............................................................................33

*Greene v. Mizuho Bank, Ltd.*,
    206 F. Supp. 3d 1362 (N.D. Ill. 2016) .......................................14, 15, 31, 33

*Gutierrez v. Wells, Fargo & Co.*,
    2009 WL 1247040 (N.D. Cal. May 5, 2009) ...................................................23

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) .....................................................................................30

*Harris v. comScore, Inc.*,
    292 F.R.D. 579 (N.D. Ill. 2013) .......................................................................22

*Johnson v. Yahoo! Inc.*,
    2016 WL 25711 (N.D. Ill. Jan. 4, 2016) ..........................................................22

*Jones Distrib. Co. v. White Consol. Indus., Inc.*,
    943 F. Supp. 1445 (N.D. Iowa 1996) ..............................................................16

*JPMorgan Chase Bank v. Winnick*,
    350 F. Supp. 2d 393 (S.D.N.Y. 2004) ............................................................32

*Keele v. Wexler*,
    149 F.3d 589 (7th Cir. 1998) ...........................................................................20

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ................................................26, 29, 35, 37

*Kohen v. Pac. Inv. Mgmt. Co., LLC*,
    571 F.3d 672 (7th Cir. 2009) ........................................................30

*Lamorte Burns & Co., Inc. v. Walters*,
    770 A.2d 1158 (N.J. 2001).............................................................34

*Liles v. Am. Corrective Counseling Servs., Inc.*,
    231 F.R.D. 565 (S.D. Iowa 2005) ................................................21

*May v. AC & S, Inc.*,
    812 F. Supp. 934 (E.D. Mo. 1993) ..............................................16

*McDonald v. United Air Lines, Inc.*,
    745 F.2d 1081 (7th Cir. 1984) ......................................................33

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008)..........................................................27

*Mednick v. Precor, Inc.*,
    320 F.R.D. 120 (N.D. Ill. 2017)..............................................14, 18

*Mejdrech v. Met-Coil Sys. Corp.*,
    319 F.3d 910 (7th Cir. 2003) ........................................................36

*Melendres v. Arpaio*,
    784 F.3d 1254 (9th Cir. 2015) .................................................20, 21

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ...............................12, 14, 23, 30

*Minter v. Wells Fargo Bank, N.A.*,
    274 F.R.D. 525 (D. Md. 2011)......................................................29

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002).......................................................23

*Morrison v. YTB Int'l, Inc.*,
    649 F.3d 533 (7th Cir. 2011) .................................................20, 36

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) ...............................12, 13, 33, 37

*Navistar Int'l Transp. Corp. v. Vernon Klein Truck & Equipment*,
    919 P.2d 443 (Okla. App. 1994)..................................................34

*NCAA ex rel. Bellarmine Coll. v. Hornung,*
    754 S.W.2d 855 (Ky. 1988) ............................................................35

*Netflix Privacy Litig.*, *In re*,
    Dkt. 59, at 5, No. 5:11-cv-00379 (N.D. Cal. Aug. 12, 2011) ...........22

*Overka v. Am. Airlines, Inc.*,
    265 F.R.D. 14 (D. Mass. 2010) ..........................................17, 18, 36

*Peterson v. H&R Block Tax Servs., Inc.*,
    174 F.R.D. 78 (N.D. Ill. 1997) ...............................................25, 27

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ....................................................................15

*Pollock v. Energy Corp. of Am.*,
    2013 WL 5491736 (W.D. Pa. Sept. 30, 2013) ..................................13

*Poulos v. Caesar's World, Inc.*,
    379 F.3d 654 (9th Cir. 2004) ........................................................28

*Prudential Ins. Co. of Am. Sales Practices Litig., In re*,
    962 F. Supp. 450 (D.N.J. 1997) ...................................................17

*Quinn v. La. Citizens Prop Ins. Corp.*,
    118 So. 3d 1011 (La. 2012) .........................................................16

*Ret. Bd. of the Policeman's Annuity & Ben. Fund of the City of Chicago v.*
    *Bank of New York Mellon*, 775 F.3d 154 (2d Cir. 2014) ..................20

*Rowell v. Franconia Minerals Corp.*,
    572 F. Supp. 2d 1031 (N.D. Ill. 2008) ...........................................15

*Rowell v. Pheobe Putney Mem. Hosp., Inc.*,
    791 S.E.2d 183 (Ga. Ct. App. 2016) ............................................34

*Rosario v. Livaditis*,
    963 F.3d 1013 (7th Cir. 1992) .....................................................18

*Schulken v. Wash. Mut. Bank.*,
    2012 WL 28099 (N.D. Cal. Jan. 5, 2012) ......................................22

*Seekamp v. Fuccillo Automotive Grp., Inc.*,
    2010 WL 980581 (N.D.N.Y. Mar. 15, 2010) ..................................25

*Seekamp v. It's Huge, Inc.*,
    2012 WL 860364 (N.D.N.Y. Mar. 13, 2012) ....................................25, 26, 29

*Simon v. Philip Morris Inc.*,
    124 F. Supp. 2d 46 (E.D.N.Y. 2000) ..............................................................17

*Spinnozi v. ITT Sheraton Corp.*,
    174 F.3d 842 (7th Cir. 1999) ..........................................................................14

*Stanich v. Travelers Indem. Co.*,
    249 F.R.D. 506 (N.D. Ohio 2008) .................................................................18

*State Farm Fire & Cas. Co. v. Owen*,
    729 So. 2d 834 (Ala. 1998) ............................................................................16

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) ..............................................2, 14, 33, 36, 37

*Sullivan v. DB Investments, Inc.*,
    667 F.3d 273 (3d Cir. 2011) (en banc) ..........................................................23

*Thorogood v. Sears, Roebuck & Co.*,
    547 F.3d 742 (7th Cir. 2010) ..........................................................................35

*Tirapelli v. Advanced Equities, Inc.*,
    813 N.E.2d 1138 (Ill. App. Ct. 2004) ...........................................................32

*Torres v. Mercer Canyons, Inc.*,
    835 F.3d 1125 (9th Cir. 2016) ........................................................................30

*Torres v. SGE Mgmt., LLC*,
    838 F.3d 629 (5th Cir. 2016) (en banc) ............................................26, 27, 32

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ...................................................................................29

*Vaught v. Showa Denko K.K.*,
    107 F.3d 1137 (5th Cir. 1997) ........................................................................16

*Vasquez v. Superior Court*,
    484 P.2d 964 (Cal. 1971) ..........................................................................25, 29

*Wade v. Danek Medical, Inc.*,
    182 F.3d 281 (4th Cir. 1999) ..........................................................................15

*Wal-Mart Stores, Inc. v. Dukes*,
　　564 U.S. 338 (2011) .................................................................................. 13, 19, 23

*Walsh v. Ford Motor Co.*,
　　807 F.2d 1000 (D.C. Cir. 1986) ..................................................................... 23

*Waters v. Int'l Precious Metals Corp.*,
　　172 F.R.D. 479 (S.D. Fla. 1996) ..................................................................... 31

**Statutes**

Fed. R. Civ. P. 23 ......................................................................................... *passim*

**Secondary Authorities**

32B Am. Jur. 2d *Federal Courts* § 1754 ............................................................. 36, 37

Advisory Committee Notes to Rule 23(b)(3)—1966 Amendments, 39 F.R.D. 69 (1966) ........... 23

Daniel Cawrey, CoinDesk, "Withdrawals from Mt. Gox: growing pains or banking bottleneck?",
　　goo.gl/aKRZx (Aug. 12, 2013, 12:43 UTC) ........................................................ 31

Milton Friedman & Anna J. Schwartz, MONETARY HISTORY OF THE UNITED STATES (1963) ...... 11

Lloyd Constantine, *et al.*, In re Visa Check/Mastermoney Antitrust Litigation:
　　*A Study in Market Failure in a Two-Sided Market*, 2005 Colum. Bus. L. Rev. 599 ......... 28

Restatement (Second) Conflict of Laws § 148 ......................................................... 15

Restatement (Second) of Torts § 540 ..................................................................... 32

Restatement (Second) of Torts § 551 ..................................................................... 2

Restatement (Second) of Torts § 767 ..................................................................... 34

Richard Nagareda, *Class Certification in the Age of Aggregate Proof*,
　　84 N.Y.U. L. Rev. 97 (2009) ......................................................................... 17

*U.S. v. Vinnik*, No. 16-227, Superseding Indictment (N.D. Cal. Jan. 17, 2017) .............. 4

U.S. Chamber Institute for Legal Reform, *The New Lawsuit Ecosystem: Trends, Targets and
　　Players* at 16 (October 2013), available at http://www.instituteforlegalreform.com/
　　uploads/sites/1/The_New_Lawsuit_Ecosystem_pages_web.pdf ................................ 22

William Rubenstein, *Newberg on Class Actions* § 4:59 .............................................. 37

## INTRODUCTION

Beginning in 2012 individuals interested in investing in bitcoin could wire money to the bank account of Mt. Gox KK, operator of the now-defunct Mt. Gox bitcoin exchange, at Mizuho Bank. Mt. Gox, like any exchange platform, couldn't function without access to the banking system. Without a bank, sellers don't come to the table because they have no way of obtaining the funds they procure in exchange for the assets they sell. Without sellers, buyers don't come to the table. Without buyers, the bank won't come to the table; they have nothing to gain and no service to provide. Mt. Gox was, in other words, like a three-legged stool

But in mid-2013 Mizuho made what for thousands of people was a momentous decision: It decided it no longer wanted Mt. Gox to keep its accounts at Mizuho. Mizuho then embarked on a months-long quest that, ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████ The centerpiece of that campaign was the decision to stop processing international wire withdrawals for Mt. Gox. The whats, whys, and hows of that decision and its aftermath form the basis for the parties' underlying dispute. In brief, Plaintiffs allege, and common evidence will show, that Mizuho unilaterally decided no longer to process outbound international wires, and then worked to ensure that transactional difficulties never were attributed to the bank. In essence, Mizuho removed one leg from the three-legged stool, but did everything in its power to ensure that the buyers and sellers at Mt. Gox remained unaware that the stool could no longer stand. That course of conduct caused thousands of individuals to lose money, and was, as Plaintiffs allege, tortious under theories of fraud and intentional interference with contract.

Movants propose two classes to litigate these claims: a Withdrawal Class to litigate the

intentional-interference claim, and a Deposit Class to litigate the fraud claim. The law of the case correctly dictates that the substantive legal rules governing each proposed class member's claim are determined by the law of the state in which that class member resided when his or her claim accrued. As the Seventh Circuit has made clear, when presented with a request to certify a multistate class, "the critical point is the need for *conduct* common to the class." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (quotation omitted). If common conduct gives rise to "the same kind of claim from class members," *id.*, then certification will ordinarily be appropriate, particularly if the claims are costly to litigate individually. *Id.* at 759-60; *see also Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801-02 (7th Cir. 2013) ("predominance requires a qualitative assessment" and was satisfied due to a single issue of liability, despite differing, and in some cases no, damages).

Mizuho engaged in common conduct towards members of both proposed classes. Consider first the fraud claim. The drafters of the Second Restatement of Torts have observed that individuals have a "known, and reasonable, expectation of disclosure" of facts basic to a given transaction, and that concealing these facts "amount[s] to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap." Restatement (Second) of Torts § 551 cmt. *l*. The evidence shows that is what happened here: American investors who wired money into Mt. Gox's account at Mizuho Bank after June 21, 2013, were walking into a trap: their money could go into Mt. Gox's account at Mizuho, but it could never leave. And by virtue of Mizuho's common conduct, the trap was the same for all class members

Plaintiffs Joseph Lack and Anthony Motto were two of the individuals hoodwinked into investing in bitcoin through Mt. Gox. Many aspects of Lack's and Motto's fraud claim are hotly disputed, but because of Mizuho's common conduct these disputes can be resolved on a

classwide basis. Lack and Motto therefore respectfully move the Court to certify a class of all individuals in the United States (subject to the customary exceptions, and 2 further exceptions, discussed below) who wired fiat currency to Mt. Gox's bank account at Mizuho between June 20, 2013, and February 24, 2014 (the "Deposit Class"), and appoint them as class representatives and their lawyers as class counsel.

Plaintiff Gregory Pearce's claim for intentional interference with contract bears these same features. Pearce invested in bitcoin on the Mt. Gox exchange in late 2013. In October 2013 he needed cash to cover some bills, so he attempted to convert some of his bitcoin holdings back into cash and withdraw it from Mt. Gox's account at Mizuho Bank. His requests, however, went unfilled. His loss, too, can be traced in part to Mizuho's actions in June 2013. Again, the parties have serious disagreements about the merits. But again, these questions of fact—which turn on the conduct of Mizuho—will be resolved, on the basis of common evidence, in the same way for every member of the class. Pearce therefore respectfully moves the Court to certify a class of all individuals (with the same exceptions) who, while residing in the United States, submitted a withdrawal request to Mt. Gox that went unfulfilled between June 20, 2013, and February 24, 2014, and to appoint him as class representative and his counsel as class counsel (the "Withdrawal Class").

For these reasons, and as stated more fully below, Plaintiffs Motto, Lack, and Pearce respectfully request that the Court grant their motion for class certification.

## FACTUAL BACKGROUND

In 2008, an individual or group of individuals going by the alias Satoshi Nakamoto proposed a new cryptographic, peer-to-peer currency, that Nakamoto called "bitcoin." Bitcoin was conceived to eliminate inefficiencies created by using banks as third-party intermediaries by

allowing for verifiable peer-to-peer transactions, eliminating the transaction costs associated with banks, eliminating certain opportunities for rent-seeking, reducing the potential sources for counterparty risk, and increasing transparency. (See Exh. 1, Report of Andrew Rasmussen, at 4-11.) Still, in order to use or invest in bitcoin, one must first obtain it, either by mining it or purchasing it with government-backed currency (known in the bitcoin world as "fiat currency"). And that means any platform for buying and selling bitcoin requires a bank account, and access to the banking system, in order to facilitate and process these transactions.

In 2013 Mt. Gox was one of the largest players in the bitcoin community. Its principal competitor was BTC-e, a mysterious Russian bitcoin exchange. BTC-e's primary selling points were anonymity and simplicity—BTC-e neither verified a user's identity nor instituted any anti-money laundering policies, and so attracted the kind of unsavory activity that gave bitcoin a bad name. *See U.S. v. Vinnik*, No. 16-227, Superseding Indictment ¶ 3 (N.D. Cal. Jan. 17, 2017); Exh. 1, at 15. Mt. Gox's principal selling point was security—Mt. Gox required an extensive verification process, providing at least the illusion of legitimacy and reduced counterparty risk. (Exh. 1, at 14; Exh. 3, Deposition of Anthony Motto, at 87:3-10.) Indeed, all three movants noted in their depositions that Mt. Gox presented at least the appearance of legitimacy: Motto observed that it seemed "regulated" as opposed the "third world" feel of many other exchanges. (Exh. 3, at 196:4-15.) And Lack recounted that Mt. Gox had more extensive security features than other exchanges. (Exh. 4, Deposition of Joseph Lack, at 87:6-25; see also Exh. 5, Deposition of Gregory Pearce, at 30:5 (calling Mt. Gox "professional" compared to other exchanges).)

Although bitcoin's inventors had envisioned bitcoin as "electronic cash," that dream was not meaningfully realized in 2013. Merchant acceptance of bitcoin was slow. The price of bitcoin was incredibly volatile; any price listed in BTC could be obsolete as soon as it was posted, and a

merchant might accidentally sell their goods or services at a steep discount. Without a developed market for goods and services, bitcoin functioned meaningfully only as an investment or store of value. (See Exh. 2, Report of M. Todd Henderson, at 33-34; Exh. 1, at 11-14.)

Still, despite the limited available uses for bitcoin, the user base grew, the price rose, and Mt. Gox processed a sizeable volume of transactions. The need for a bank that could handle dozens of deposits and withdrawals every day drew Mt. Gox to Mizuho Bank, Ltd., one of the largest banks in Japan, where Mt. Gox established deposit accounts in ▮▮▮▮▮▮▮▮. (Exh. 6, Deposition of Yasuo Imaizumi, at 29:23.)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In response, Mt. Gox established an account at Japan Post Bank. Wire withdrawals at Japan Post, however, were limited in two important ways: they could only be done in paper, and international withdrawals had to be routed through DeutscheBank, which required two separate currency exchanges, adding time and expense to any wire withdrawal. (Exh. 7, at Edelson007122.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.))

Prior to May 2013, Mt. Gox permitted users to send money to the exchange through Des Moines-based payment processor Dwolla or through British money-transfer service OK Pay. Those options, however, were foreclosed that month. On May 13, 2013, the federal government seized Mt. Gox's Dwolla account, for failure to register with the appropriate authorities (Exh. 9),

and in late May 2013, OK Pay announced that it would no longer process wires associated with cryptocurrencies, causing Mt. Gox to put significant restrictions on OK Pay-based requests (Exh. 10). Mt. Gox also had a bank account in Poland, but it processed transactions only in Euros or Polish zlotys. (Exh. 7, at Edelson007123.)

That was the situation when Mizuho (now the only route to Mt. Gox for U.S. dollars, ███ ████████████████████████████████████████████████████████████████████ █████) approached Mt. Gox in June 2013 with a different request: Stop sending us wire remittance requests. ███████████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████ But the basis for that argument is shaky. ████████████

██████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

████████████████████████████████████████

███████. Mizuho points out that Mt. Gox was free to choose other banking partners. Dkt. 207, at

15-16. ███████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████ Evidence also suggests that

Mizuho was working outside the bank to make life difficult for Mt. Gox. An email exchange

between an entrepreneur working in bitcoin and a Japanese accounting firm suggests that

Mizuho was using its considerable influence to prevent Mt. Gox from finding any other business

partners—an employee for the accounting firm relayed that the proposed business partnership

was off the table because Mizuho had requested that firms not do business with Mt. Gox or any

related entity. (Exh. 24, Shore_1-16.) Mizuho therefore should have been well aware of Mt.

Gox's *inability* to find new banking partners.

Yet these details were notably absent from the public-facing picture shared with Mt.

Gox's customers. Bitcoin investors were informed on June 21 of a "temporary hiatus" in United

States dollar withdrawals from Mt. Gox (Exh. 25), and then told on July 4 that withdrawals had

resumed (Exh. 26). (And, perhaps not surprisingly, the price of bitcoin on Mt. Gox declined

modestly during this period, and then began to rebound two days after Mt. Gox announced that

withdrawals had resumed. (See Exh. 2 to Henderson Report.)) ████████████████████████

███████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████████

████████████

Mt. Gox's customers certainly noticed that something was up, but given the misleading picture painted by Mt. Gox's public statements they continued trading on the exchange. Relying on Mt. Gox's promise that it would hold funds on behalf of its customers (Exh. 32, Terms of Use; Exh. 5, at 109:6-10), thousands of individuals submitted requests to withdraw their fiat currencies from Mt. Gox's account at Mizuho. Mt. Gox was able to offer a handful of investors relief, though only after extended delay and payment of an increased fee. (Exh. 7, at Edelson007122.) Most, however, were left high and dry. Typical is the experience of Gregory Pearce, who tried for weeks to retrieve the $5,900 he needed for an emergency before throwing in the towel. (Exh. 5, at 82:7-12; Exh. 33, Pearce001455-59.)

Individuals wishing to invest in bitcoin were left to guess, based on the information that *was* publicly available, about the source of Mt. Gox's difficulties and whether investing through Mt. Gox nevertheless was worth it. Without any information about the nature of Mizuho's relationship with Mt. Gox, thousands of individuals, such as Anthony Motto and Joseph Lack, chose to invest in bitcoin through Mt. Gox. That decision, it turned out, was fraught. Motto and Lack lost $1,000 and $40,000 respectively, cash they would not have sent to Mt. Gox's account at Mizuho had the true facts of the relationship between Mizuho and Mt. Gox been known. (Exh. 34, Motto000028; Exh. 35, Lack000013-18.)

Mizuho, of course, was largely indifferent to the plight of Mt. Gox's customers: it cared only about making Mt. Gox go away. ██████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████ The bank, it appears, believed that it could use Mt. Gox's users as a wedge. As the report of Professor Henderson shows, that instinct was correct: The ability to cash out of the market on demand was material to virtually all decisions to invest in bitcoin on Mt. Gox. (Exh. 2, at 27-34.) Indeed, the Court has already noted that widespread coverage of Mt. Gox's transactional issues is itself evidence that the ability to cash out is material to many, if not all, Mt. Gox investors. Professor Henderson confirms that interpretation.

This is doubly so given that, as an investment commodity, bitcoin was speculative, and with speculative investments investors need the ability to time their exit from the market. (Exh. 2, at 29-30.) And with Mt. Gox, while they could time their exit, there was no way to retrieve their money. That is important because while Mt. Gox's internal accounting system would have designated certain funds for particular users, the account itself wasn't segregated, so any user's funds were still at the mercy of the exchange. (Exh. 2, at 32-33; Exh. 1, at 15-16.) And the ability to move bitcoin to a different exchange wasn't much help, because that necessarily entailed taking a loss, since bitcoin on Mt. Gox traded at a premium relative to all other exchanges during the class period. (Exh. 2, at 34; Exh. 5, at 41:13-14, 60:2-4.)

On February 7, 2014, Mt. Gox announced a "temporary suspension" of *bitcoin*, though not currency, withdrawals, precipitating a collapse in the price of bitcoin. (Exh. 36.) Two-and-a

half weeks later, the exchange shuttered for good. Mt. Gox's collapse has left the bitcoin community searching for answers. Dozens of explanations have been proposed. It does appear that bitcoin theft played some role in Mt. Gox's collapse. But the exchange's demise also bears many of the hallmarks of a Depression-era bank failure, in which a bank folds when its assets are too illiquid to meet the demands of its creditors. *See* Milton Friedman & Anna J. Schwartz, MONETARY HISTORY OF THE UNITED STATES 351-57 (1963)

Regardless, two groups of investors, in particular, were harmed by Mizuho's actions. First, anyone who attempted to retrieve fiat currency from their account at Mt. Gox essentially needed to win the lottery to get their money out. Through another account Mt. Gox was able to process a handful of withdrawals, but at a significantly reduced volume relative to what had been processed through Mizuho, and which caused thousands of withdrawal requests to go unfulfilled. The second is those who wished to purchase bitcoin through Mt. Gox. American investors had no choice but to go through Mizuho if they wished to use their fiat currency to purchase bitcoin on the Mt. Gox exchange, but once those individuals had established accounts with Mt. Gox, they could never retrieve money if they desired. Mizuho's failure to disclose its stance towards Mt. Gox substantially affected these individuals' decision to purchase bitcoin on Mt. Gox.

As the foregoing shows, the evidence raises several questions bearing on the merits of these claims. For instance, did Mizuho stop processing outbound international wires due to a voluntary agreement between the parties? Did Mizuho work to conceal material information from class members? Did Mizuho intend to induce a false belief in class members? Did Mizuho understand that its conduct would disrupt Mt. Gox's ability to fulfill its contractual obligations to its customers? If Mizuho's interfering conduct was not a product of fraud, was it nevertheless tortious? But the threads unifying the questions invited by the record is that they can be answered

on the basis of common evidence focused on Mizuho's conduct, and answering them resolves issues central to the claims of everyone in the proposed classes. A factfinder's choice about who to believe regarding the events of June 2013, and how much weight to afford the evidence supporting Plaintiffs' post-June narrative resolves nearly all critical questions presented by the intentional-interference and fraud claims pressed by the classes. As such, these disputes meet the prerequisites for class treatment. The Court should thus grant the motion for class certification.

## ARGUMENT

### I. The proposed classes meet the requirements of Rule 23(a).

"To be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b)." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). "It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Id.*

#### A. The proposed classes are ascertainable sufficiently numerous.

Implicit in Rule 23 is a requirement that any certified class be ascertainable and "defined by objective criteria." *Mullins v. Direct Digital LLC*, 795 F.3d 654, 657 (7th Cir. 2015). Fed. R. Civ. P. 23(a)(1) requires that a proposed, objectively defined, class be so numerous that individual joinder is impractical. A finding of numerosity requires only that the evidence, in light of "common sense assumptions," *Bernal v. NRA Grp., LLC*, 318 F.R.D. 64, 73 (N.D. Ill. 2016), permits a "reasonable" belief that the proposed class contains at least 40 members, *Chapman v. Wagener Equities, Inc.*, 747 F.3d 489, 492 (7th Cir. 2014). Movants satisfy these burdens.

First, it is clear that the classes are ascertainable: each "identif[ies] a particular group, harmed during a particular time frame, … in a particular way." *Mullins*, 795 F.3d at 660. And both classes are defined by objective criteria because they are defined "in terms of conduct (an

objective fact)." *Id.* Experience, moreover, shows that many class members possess records that can establish their membership in the classes, and, of course, bank records can establish membership in the Deposit Class. And, failing that, *Mullins* confirms that the Court has discretion to accept class member affidavits to establish class membership, as well. *Id.* at 672.

And it is clear that each class contains at least 40 members.  If, as expected, most of those wires were sent by individuals residing in the 49 jurisdictions within the Deposit Class, the class easily meets the forty-member threshold. *See Carlson v. Northrup Grumman Corp.*, 2014 WL 5334038, at *10 (N.D. Ill. Oct. 20, 2014) (drawing inferences from available data to find numerosity); *Pollock v. Energy Corp. of Am.*, 2013 WL 5491736, at *4-*5 (W.D. Pa. 2013) (similar).

The evidence shows that around 30% of Mt. Gox's customers were American, . (Exh. 6, at 40:5-14.) Just a few days of activity would be enough to create a sufficiently numerous Withdrawal Class.

If more were needed, evidence from the small slice of the members of the proposed classes who contacted proposed class counsel. In brief, approximately 140 Americans provided Edelson PC with information relevant to membership in the Settlement Class conditionally certified earlier in this case, or a class proposed in the complaint. (Exh. 37, ¶ 3.) Of that population, at least 31 individuals likely can claim membership in the Withdrawal Class and 19 in the Deposit Class. (Id. ¶ 3.) Mizuho has produced communications with three more members

of the Deposit Class. (Id. ¶ 4.) Extrapolating these numbers out to the more than 30,000

Americans who established accounts at Mt. Gox, Dkt. 197, at 4, and it is clear that the total

number of class members numbers in the thousands. Thus, the proposed classes easily satisfy

Fed. R. Civ. P. 23(a)(1). *See Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008).

### B. The claims of both classes turn on the resolution of common questions.

Rule 23(a)(2) requires that a class action contain "questions of law or fact common to the

class." This requirement tests "the capacity of a classwide proceeding to generate common

*answers* apt to drive the resolution of the litigation." *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 374

(7th Cir. 2015) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). As the

Seventh Circuit has elaborated, "the claims must depend upon a common contention that is

capable of class-wide resolution" meaning "that determining the truth or falsity of the common

contention will resolve an issue that is central to the validity of each claim." *Id.* "The critical

point is the need for *conduct* common to members of the class." *Suchanek*, 764 F.3d at 756

(quotation omitted). "Where the same conduct or practice by the defendant gives rise to the same

kind of claims from all class members, there is a common question." *Id.*

Commonality and predominance tend to "overlap." *Bell*, 800 F.3d at 378. The inquiry

into these two elements of the certification analysis begins with the elements of the underlying

claims sought to be litigated by the class. *Messner*, 669 F.3d at 815. In a proposal for multistate

certification, that analysis must ensure that the class members are governed by "the same legal

rules." *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 156 (N.D. Ill. 2017).

As the Court previously determined, "Illinois law governs Motto's claims, and California

law governs Lack's claims." *Greene v. Mizuho Bank, Ltd.*, 206 F. Supp. 3d 1362, 1383 (N.D. Ill.

14

2016).[1] This was correct, and there is no reason to disturb the law of the case. Illinois applies the "most significant relationship" test from the Restatement (Second) of Conflict of Laws. *See id.* Generally, "in the absence of unusual circumstances, the highest scorer on the 'most significant relationship' test is—the place where the tort occurred." *Spinnozi v. ITT Sheraton Corp.*, 174 F.3d 842, 844-45 (7th Cir. 1999). The "place where the tort occurred is where the injury occurred ... rather than where the conduct ... that caused the injury occurred; for there is no tort without an injury." *Abad v. Bayer Corp.*, 563 F.3d 663, 669 (7th Cir. 2009) (quotation and citation omitted). Thus, "[t]he plaintiff's domicile or residence . . . are contacts of substantial significance when [as here] the loss is pecuniary in nature . . . because a financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship." Restatement (Second) of Conflict of Laws § 148, cmt. *i*. Illinois courts therefore apply the law of the plaintiff's domicile to claims both for fraud and intentional interference with contract. *See, e.g.*, *Rowell v. Franconia Minerals Corp.*, 572 F. Supp. 2d 1031, 1038 (N.D. Ill. 2008) ("Under this approach, Illinois law would likely apply to the fraudulent concealment claim since Rowell is a resident of Illinois and was victimized by the alleged fraud in Illinois."); *Cognis Corp. v. CHEMCENTRAL Corp.*, 430 F. Supp. 2d 806, 813 (N.D. Ill. 2006) (concluding that "the law of Ohio, the place of injury, applies to the intentional interference claims"). By extension, the law of the jurisdiction in which each class member's claim accrued will apply to that class member.[2]

---

[1]     As stated more fully in Plaintiffs' latest round of briefing on Mizuho's repeated attempts to dismiss the case on personal-jurisdiction grounds, the Court has jurisdiction to entertain a multistate class by virtue of *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985). (Dkt. 291.)

[2]     Application of home-state law also necessitates, subject to the "federal interest in assuring the efficiency and economy of the class action procedure," *Chardon v. Fumero Soto*, 462 U.S. 650, 661 (1983), application of state limitations periods. Most courts have concluded that the federal interest identified in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), is insufficiently strong to displace any state-law rule to the contrary, i.e., one that denies or limits the availability of tolling. *See Wade v. Danek Medical, Inc.*, 182 F.3d 281, 289 n.11 (4th

As such, Plaintiffs attach a compendium of the relevant, freely available jury instructions from the jurisdictions included within the class. (Exh. 38; Exh. 39.) The verbiage and format differ from state to state, but the same core elements come through in each jurisdiction. For the fraud claim, a plaintiff must prove that the defendant withheld or concealed a material fact, that the defendant intended the plaintiff to rely on the misrepresentation, that plaintiff did so rely, and that plaintiff was thereby harmed. Other instructions agree that "material" facts are those which affect an ordinary person's decisionmaking, and that reliance on the misrepresented information need not be the exclusive motivating force behind a plaintiff's decision (an extension of the general tort-law principle that a plaintiff's harm can have multiple legal causes). And, as the cases say and some instructions imply, the issue in a nondisclosure case whether the defendant has a duty to speak is one for the court. *See State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834, 840-41 (Ala. 1998) (collecting cases holding that "the question of the existence of a duty to disclose is for the court to decide as a matter of law"); *Jones Distrib. Co. v. White Consol. Indus., Inc.*, 943 F. Supp. 1445, 1474 (N.D. Iowa 1996).

Similar agreement among the states marks the interference claim: The defendant must improperly interfere with a third party's ability to fulfill its contract with the plaintiff, to the plaintiff's detriment. The instructions note that the defendant must intend the interference, but all

---

Cir. 1999); *Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1147 (5th Cir. 1997); *see also CalPERS v. ANZ Securities, Inc.*, 137 S. Ct. 2042, 2051 (2017) ("the source of the tolling rule applies in *American Pipe* is the judicial power to promote equity, rather than to interpret and enforce statutory provisions"). State law provides lengthy enough limitations periods or is compatible with the federal interest articulated in *American Pipe* in every jurisdiction but Louisiana and Mississippi. *See In re Copper Antitrust Litig.*, 436 F.3d 782, 796 n.2 (7th Cir. 2006) (opinion of Cudahy, J.) (acknowledging that "a state statute of limitations implicated by a federal class action" may be tolled under *American Pipe*) (citing *May v. AC & S, Inc.*, 812 F. Supp. 934, 939 (E.D. Mo. 1993) (observing that *American Pipe* did not "limit[] its holding to federal statutes of limitations"); *see also Quinn v. La. Citizens Prop. Ins. Corp.*, 118 So. 3d 1011, 1018-20 (La. 2012); *Am. Bankers Ins. Co. of Fla. v. Booth*, 830 So. 2d 1205, 1214 (Miss. 2002).

agree that intent is satisfied if the defendant wants to induce a breach of contract or knows that such a breach is substantially likely to result from its actions. The instructions uniformly require the defendant to know of the contract whose breach they induce, but all clarify that "knowledge" simply requires the defendant to be generally aware of a contractual relationship, not that the defendant be aware of any specific contract. And all agree that basic competitive acts are not tortious, but acts that are otherwise unlawful are, whether or not they are also done for economic reasons. (The order of battle in hashing those arguments out varies by jurisdiction, but that variance is immaterial for present purposes, as explained below.)

Our inclusion of these instructions to demonstrate the general homogeneity of the relevant torts is sure to precipitate a familiar spectacle: "Class counsel inclined to characterize fifty nominally different bodies of state law as all the same in functional terms and defense counsel inclined to catalogue every microscopic jot and tittle of difference." Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 165-66 (2009). We note, therefore, that the two classes advance claims that courts have found appropriate for multistate adjudication because the applicable bodies of substantive state law fall into manageable, predictable patterns. *See, e.g.*, *Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 71 (E.D.N.Y. 2000) ("State laws' elements of a claim for fraudulent concealment, while not uniform in all states, share many attributes."); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 962 F. Supp. 450, 525 (D.N.J. 1997) ("The elements of these common law claims [including fraud] are substantially similar and any differences fall into a limited number of predictable patterns."); *Overka v. Am. Airlines, Inc.*, 265 F.R.D. 14, 20 (D. Mass. 2010) (concluding that the elements of intentional interference with contract in 34 states were generally consistent).

Given this general agreement, Mizuho's common conduct towards members of the class

will generate common answers that will resolve the litigation. The Deposit Class, for instance, will need to litigate whether Mizuho had a duty to speak and whether they breached that duty, but the answers to those questions will resolve questions central to the claims of each Deposit Class Member. *See Stanich v. Travelers Indem. Co.*, 249 F.R.D. 506, 523 (N.D. Ohio 2008) (concluding that questions about whether defendant had a duty to speak and whether it breached that duty were common in case alleging fraudulent omissions). The Class also will need to litigate whether Mizuho acted with the requisite intent, an issue courts regularly conclude is susceptible of classwide adjudication when a fraud claim is premised on a single course of conduct. *See Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992). In much the same way, the Deposit Class will need to litigate whether the allegedly concealed information was material. As before, courts often find that this is an issue amenable to classwide adjudication. *See Falco v. Nissan N. Am. Inc.*, 2016 WL 1327474, at *11 (C.D. Cal. Apr. 5, 2016).

Common questions are legion in the claims of the Withdrawal Class, as well. The truth or falsity of the contention that Mt. Gox's inability to process withdrawal requests is legally attributable to Mizuho and constitutes interference will apply classwide, for instance. So, too, Pearce's contention that Mizuho intended to interfere with Mt. Gox's contractual relationship with its customers. *See Overka*, 265 F.R.D. at 18 (concluding, on the basis of similar questions, that commonality requirement was met in multi-state class action alleging intentional interference with contract).

In short, the laws of the 49 relevant jurisdictions exhibit the kind of uniformity that, when combined with Mizuho's common conduct, permits multistate certification. In other words, in these circumstances, despite the several substantive bodies of applicable law, the class is governed by "the same legal rules." *Mednick*, 320 F.R.D. at 156-57. In the end, of course, Rule

18

23(a)(2) requires only a single common question. *Wal-Mart*, 564 U.S. at 359. As the foregoing demonstrates, Plaintiffs clear this low bar.

> ### C. Motto, Lack, and Pearce are typical of the classes they seek to represent, and adequate to represent those classes.

The requirements of typicality and adequacy, Fed. R. Civ. P. 23(a)(3), (4), often merge. *See CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011). The typicality requirement "primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). This means that the named representative's claim should "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and [be] based on the same legal theory." *Id.* Similarly, the bottom line question in addressing adequacy of representation is whether the interests of the named plaintiffs "coincide with those of the rest of the class." *CE Design Ltd. v. Cy's Crabhouse N., Inc.*, 259 F.R.D. 135, 142 (N.D. Ill. 2009).

There is no doubt that the claims of each proposed representative and of the proposed classes arise from the same course of conduct—Mizuho's decision to block international currency withdrawals out of Mt. Gox's account at the bank, and the public nondisclosure of this change in policy. "Because 'typicality under Rule 23(a)(3) should be determined with reference to the company's actions,'" and Mizuho's actions were identical with respect to each proposed class member, the injuries suffered by virtue of and the claims arising from that identical course of conduct "[are] enough to satisfy the typicality requirement." *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 225 (N.D. Ill. 2016) (quoting *King Architectural Metals*, 637 F.3d at 725).

Mizuho's common course of conduct also means that the interests of the proposed representatives and the proposed classes are aligned. When a party proposes to represent a multi-

19

state class, what is necessary is that "the interests of the absent parties are fairly encompassed within the named plaintiff's claim." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S.147, 160 (1982). In other words, the Court must ask whether the claims of absent class members "implicate a significantly different set of concerns." *Gratz v. Bollinger*, 539 U.S. 244, 265 (2003). "The core question is whether a plaintiff who has a personal stake in proving her own claims against the defendant has a sufficiently personal and concrete stake in proving other, related claims against the defendant." *Ret. Bd. of the Policeman's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 163 (2d Cir. 2014).[3]

Here, in all material respects, the content of the relevant substantive law applicable to the class is "sufficiently similar" that there is no danger that class members from one state will be shortchanged if represented by Motto, Lack, or Pearce. *Policemen's Annuity*, 775 F.3d at 161 (a plaintiff "ha[s] the right incentives" when "the proof contemplated for all of the claims would be sufficiently similar"). Each proposed named plaintiff, of course, suffered the same type of financial injury as did the other members of the classes they propose to represent. "The damages recoverable for the class members' injuries may differ ... but the fact remains that their injuries are the same." *Keele*, 149 F.3d at 593. And the named plaintiffs share with the absent class

---

[3]       The Court in *Gratz* noted some "tension" in the Supreme Court's cases as to whether the ability of a plaintiff to represent plaintiffs with different claims is a matter of Article III standing or satisfaction of Rule 23(a)'s prerequisites. 539 U.S. at 263 & n.15. Most federal courts approach the issue as one of class certification. *See Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015) (collecting cases). The Seventh Circuit hasn't explicitly weighed in, but dicta in recent cases suggests that the Seventh Circuit would agree with the majority approach. *See Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) ("application of choice-of-law principles has nothing to do with *standing*, though it may affect whether a class should be certified"); *but cf. Keele v. Wexler*, 149 F.3d 589, 592-93 (7th Cir. 1998). *Brodsky v. HumanaDental Ins. Co.*, 2016 WL 5476233, at *7-*8 (N.D. Ill. Sept. 29, 2016), treats this as an element of typicality, rather than adequacy, but the bottom line question is the same: does the representative's claim share the "same essential characteristics" as the claims of absent class members?

members an interest in proving Mizuho's liability for those injuries based on the same set of material facts and legal theories. *See Arreola*, 546 F.3d at 798-99. For both proposed classes, the "operative set of concerns," *Melendres*, 784 F.3d at 1264, is identical for all members.

And the question of overlapping legal interests to one side, the proposed representatives have already proven their interest in vigorously representing the class. Each has responded to extensive discovery requests, permitted their personal email accounts to be searched for relevant information, and sat for depositions. The proposed plaintiffs "ha[ve] satisfied [their] burden on this score. Plaintiff[s] ha[ve] demonstrated a sufficient interest in resolution of these claims by participating in discovery, [they] ha[ve] no claims which are antagonistic to those of the class[es] as a whole, and [they] ha[ve] selected experienced and capable class counsel." *Brodsky*, 2016 WL 5476233, at *8.[4]

Edelson PC also is an adequate class counsel. Attorneys at Edelson PC have been litigating this case since just days after the Mt. Gox exchange collapsed. Since that time, they have engineered a creative (if ultimately scuttled) settlement, litigated successfully a number of complex motions, and generally developed a comprehensive body of knowledge relating to the facts and issues present in this case. And perhaps most importantly, Edelson PC was the only law firm willing to bring claims against Mizuho on behalf of American consumers who have been so

---

[4] ███████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████ But Motto has no recollection that he was presented this opportunity, and requests to his bank for documentation ███████████████
████████████████ turned up empty. (Exh. 41, Decl. of Anthony Motto, ¶¶ 4-5.) Further, Motto still has suffered a loss he has an interest in redressing, and which incentivizes him to represent the Deposit Class, ███████████████████████████████████████████
██████████████████. Finally, the evidence shows that Motto already has ████████████
██████████ vigorously represented the proposed class. *See Liles v. Am. Corrective Counseling Servs., Inc.*, 231 F.R.D. 565, 574 (S.D. Iowa 2005) (adequacy satisfied despite concerns about named plaintiff because of her "willing participation in numerous discovery and deposition requests").

severely harmed by Mizuho's conduct. In other words, "class counsel has demonstrated their competence through their submissions and also through their prosecution of this case to date." *Johnson v. Yahoo! Inc.*, 2016 WL 25711, at *6 (N.D. Ill. Jan. 4, 2016).

Edelson PC has been recognized as pioneers in consumer technology class actions and has been named a "top national plaintiff's class action firm" in the areas of "technology, privacy, and telecommunications,"[5] and just recently, by *Law360*, as an *Illinois Powerhouse*—one of only six firms to receive such recognition (and notably the only plaintiffs' firm). And time and again courts have found attorneys at Edelson PC to be an adequate class counsel in a wide variety of consumer-protection cases, including in an adversarial setting across a broad range of claims. *See Coulter-Owens v. Time, Inc.*, 308 F.R.D. 524, 535-36 (E.D. Mich. 2015) (litigation under Michigan law prohibiting certain disclosures); *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 252, 256 (N.D. Ill. 2014) (Telephone Consumer Protection Act); *Harris v. comScore, Inc.*, 292 F.R.D. 579, 587 (N.D. Ill. 2013) (Stored Communications Act, Wiretap Act, Computer Fraud and Abuse Act); *Schulken v. Wash. Mut. Bank*, 2012 WL 28099, at *12 (N.D. Cal. Jan. 5, 2012) (Truth-in-Lending Act); *see also* Exh. 37, Attachment A (Firm Resume). Edelson PC has "significant and particularly specialized expertise in electronic privacy litigation and class actions," *In re Netflix Privacy Litig.*, Dkt. 59, at 5, No. 5:11-cv-00379 (N.D. Cal. Aug. 12, 2011), and as Judge Kennelly has recognized, attorneys at Edelson PC "are experienced and respected members of the plaintiff's class action bar." *Aranda v. Caribbean Cruise Line, Inc.*, 2017 WL 818854, at *4 (N.D. Ill. Mar. 2, 2017). Proposed class counsel is thus adequate.

---

[5]    *See* U.S. Chamber Institute for Legal Reform, *The New Lawsuit Ecosystem: Trends, Targets and Players* at 16 (October 2013), available at http://www.instituteforlegalreform.com/ uploads/sites/1/The_New_Lawsuit_Ecosystem_pages_web.pdf.

III.    **The proposed classes meet the requirements of Rule 23(b)(3).**

A plaintiff seeking to certify a class seeking monetary damages must also satisfy Rule

23(b)(3)'s requirement that common issues predominate. *See Wal-Mart*, 564 U.S. at 362-63.

When the laws of several states will be at issue, a plaintiff seeking to demonstrate that common

issues predominate is also tasked with demonstrating that any variations in state law follow

predictable patterns, such that any material variations can be effectively managed. *See Sullivan v.

DB Investments, Inc.*, 667 F.3d 273, 301-02 (3d Cir. 2011) (en banc); *Walsh v. Ford Motor Co.*,

807 F.2d 1000, 1017 (D.C. Cir. 1986). The discussion in section I.B demonstrates that the

relevant substantive law applicable to the claims of the proposed classes indeed falls into

manageable patterns. *See also Sullivan*, 667 F.3d at 302 ("Where a sufficient constellation of

common issues binds class members together, differences in state law ... likely fall into a handful

of clearly discernible" patterns).

What's more, "individual questions need not be absent" before a class is certified.

*Messner*, 669 F.3d at 815. As *Walsh* observes, a nationwide class action may be maintained even

in the face of "marked" differences in state law so long as the evidence on major factual

questions present in the case is "either identical or virtually so," as it is here. *Walsh*, 807 F.2d at

1017. "The text of Rule 23(b)(3) itself contemplates that ... individual questions will be present.

The rule requires only that those questions not predominate over the common questions affecting

the class as a whole." *Messner*, 669 F.3d at 815. "How many localized fact patterns to accept in

the mix just depends on how problematic the unique questions will be in the context of the

overall case." *Gutierrez v. Wells, Fargo & Co.*, 2009 WL 1247040, at *6 (N.D. Cal. May 5,

2009). Because most, if not all, major issues in this case are susceptible to common proof, and

the costs of litigating against Mizuho are substantial, individual issues are relatively insubstantial

in relation to the broader case. Thus, as explained below, common issues predominate.

### A. The evidence permits a classwide inference of reliance.

Because the claims in this case are predicated on a uniform course of conduct perpetrated by Mizuho, resolution of a number of common questions is likely to substantially advance the litigation. Motto and Lack anticipate, however, that Mizuho will argue that one issue will prevent any litigation of the Deposit Class's claims from promoting the "efficiency," *Butler*, 727 F.3d at 800, that is the touchstone of Rule 23(b)(3): Reliance. Class claims for common-law fraud can be tripped up on the requirement that a plaintiff rely on a fraudulent misrepresentation or omission.

Yet at the same time Rule 23's drafters plainly contemplated that fraud claims would, in some circumstances, proceed on a classwide basis. "A fraud perpetrated on numerous persons by the use of similar misrepresentations," they wrote, "may be an appealing situation for a class action." Advisory Committee Notes to Rule 23(b)(3)—1966 Amendments, 39 F.R.D. 69, 103 (1966). "Fraud actions must therefore be separated into two categories: fraud claims based on uniform misrepresentations made to all members of the class and fraud claims based on individualized misrepresentations. The former are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) (Sotomayor, J.).

The claims here fall into the former category. As courts have consistently recognized, uniformity of misrepresentation permits the class representatives not only to establish intent and materiality on the basis of common evidence, but also to provide circumstantial evidence of reliance that applies on a classwide basis. As explained below, that rule holds true here.

> i. *Courts permit a classwide inference of reliance when such an inference derives from the nature of the alleged misrepresentation.*

Claims involving uniform misrepresentations can be suitable for certification despite the

normally individualized inquiries inherent in a fraud claim because the nature of a given common scheme can permit an inference of reliance. *See Peterson v. H&R Block Tax Servs., Inc.*, 174 F.R.D. 78, 85 (N.D. Ill. 1997). Courts recognize that this type of class-wide inference is particularly reasonable in a financial context, like that presented by this case. *See CGC Holdings Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1089-92 (10th Cir. 2014). As many courts have held, "a transaction may of itself and by itself furnish the most satisfactory proof of fraud." *Cook v. Hayden*, 31 S.E.2d 625, 627 (Va. 1944); *see Vasquez v. Superior Court*, 484 P.2d 964, 972 (Cal. 1971) ("The fact of reliance upon alleged false representations may be inferred from the circumstances attending the transaction which oftentimes afford much stronger and more satisfactory evidence of the inducement which prompted the party defrauded to enter into the contract than his direct testimony to the same effect.") (quotation omitted); *Adams v. Little Missouri Minerals Ass'n*, 143 N.W.2d 659, 683 (N.D. 1966) (same). Thus, the court in *CGC Holdings* reasoned that, "cases involving financial transactions" offer "paradigmatic examples" of circumstances in which the question of reliance can resolved on a classwide basis by resort to circumstantial evidence. *See* 773 F.3d at 1089-90.

A handful of cases show this rule in practice. For instance, in *Seekamp v. It's Huge, Inc.*, 2012 WL 860364 (N.D.N.Y. Mar. 13, 2012), the plaintiff alleged that a car dealership defrauded purchasers by misrepresenting that an "Auto Theft Security Discount Guarantee program" was a warranty when in fact it was an insurance policy that the dealership was not licensed to sell. *See Seekamp v. Fuccillo Automotive Grp., Inc.*, 2010 WL 980581, at *1-*2 (N.D.N.Y. Mar. 15, 2010) (describing allegations). The plaintiff alleged that this conduct was fraudulent because "Defendants intended to misrepresent the ATSD insurance agreement" so as to "profit[] from its illegal sale." *Id.* at *2. Defendants later challenged class certification of this common-law fraud

claim on the ground that common issues did not predominate because different purchasers may have bought the ATSD for different reasons, many unrelated to its status as either a warranty or insurance. 2012 WL 860364, at *10. The court rejected this argument, noting that while "each proposed class member may have opted to purchase the ATSD for different reasons, it is equally clear that every plaintiff would have relied on the implicit representation of the ATSD's legality and beneficialness in deciding whether to purchase it." *Id.*

The analysis in *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004), also is illustrative. In *Klay* 13 individual physicians and five medical associations sued "almost all major health maintenance organizations" for systematic underpayment, which plaintiffs alleged was "the end-product of a decades-long nefarious conspiracy to undermine the American health care system," on behalf of a nationwide class. *Id.* at 1246-49. Rejecting at class certification the defendants' argument that individual reliance issues predominated, the court concluded that "based on the nature of the misrepresentations at issue, circumstantial evidence can be used to show reliance is common to the whole class." *Id.* at 1259. The court observed that "it does not strain credulity" to infer that individual physicians "in entering into contracts with the defendants" relied upon "representations about the defendants' reimbursement practices," practices that "go to the heart of these agreements." *Id.* In other words, "legitimate inferences based on the nature of the alleged misrepresentations at issue" "could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations." *Id.*

The Fifth Circuit's decision in *Torres v. S.G.E. Mgmt., LLC*, 838 F.3d 629 (5th Cir. 2016) (en banc), follows a similar path. The plaintiffs there brought RICO claims related to the defendant's operation of a pyramid scheme, and proposed to prove causation through a classwide

showing of reliance. *Id.* at 633-34. Sitting *en banc*, the Fifth Circuit concluded that certification of the proposed class was appropriate because "a common inference of reliance" was warranted. *Id.* at 641. The court held that putative class representatives may employ such a common inference "when it follows logically from the nature of the scheme, and there is common, circumstantial evidence that class members relied on the fraud." *Id.*; *see also In re First Alliance Mortg. Co.*, 471 F.3d 977, 990-92 (9th Cir. 2006) (explaining that fraud claim involving standardized misrepresentations may be suitable for class treatment, and reiterating that "it is the underlying scheme which demands attention").

*Seekamp*, *Klay*, and *Torres* are consistent with the approach of courts in this circuit. *Peterson* is typical. The fraud there involved the defendant allegedly misrepresenting the availability of a particular service. 174 F.R.D. at 85. In concluding that common issues predominated, the court first focused on the uniform nature of the misrepresentation and then observed, for good measure, that "it is inconceivable that the class members would rationally choose to pay a fee for a service they knew was unavailable." *Id*. And courts in this circuit also recognize that uniform misrepresentations may give rise to a classwide inference of reliance. *See Garner v. Healy*, 184 F.R.D. 598, 602 (N.D. Ill. 1999).

> ii. *The nature of Mizuho's alleged misrepresentation permits a classwide inference of reliance.*

A brace of RICO cases demonstrates the limits of this approach. The Second Circuit's decision in *McLaughlin v. American Tobacco Co.* rejected the plaintiff's attempt to employ a classwide inference of reliance on a nationwide advertising campaign about "light" cigarettes because, as a matter of common sense, the decision to smoke was inherently idiosyncratic. *See* 522 F.3d 215, 222-26 (2d Cir. 2008). The Ninth Circuit's decision in *Poulos v. Caesar's World, Inc.* is similar. The plaintiffs in *Poulos* alleged that gambling-machine operators fraudulently

27

held those machines out as games of chance when, in fact, the outcomes were foreordained. *See* 379 F.3d 654, 659-60 (9th Cir. 2004). The Ninth Circuit rejected the plaintiff's argument that reliance could be inferred on a classwide basis because there was no "obvious link between the alleged misconduct and harm." *Id.* at 665.

Lack and Motto supply what was missing in *McLaughlin* and *Poulos*: evidence establishing a link between the suppressed or omitted information and the harm suffered by class members, and common, circumstantial evidence that class members in fact relied on Mizuho's omissions. Here, the "transaction" entered into by members of the Deposit Class "by itself furnish[es] the most satisfactory proof of fraud." *Cook*, 31 S.E.2d at 627.

The expert opinion of Professor Todd Henderson helps explain why this is so. As Professor Henderson recounts, virtually all transactions on Mt. Gox assumed some measure of liquidity. (Exh. 2, at 33.) At a very basic level, the structure of an exchange like Mt. Gox is what economists term a two-sided market, and such a market doesn't even materialize without withdrawal functionality. (Id. at 29.)[6] And virtually all investment decisions are colored by an assumption of liquidity. As Professor Henderson recounts, during the class period bitcoin meaningfully served only as a store of value or wealth, not as a medium of exchange. (Exh. 2, at 33-34.) By contrast to fiat currencies, which can serve as media of exchange because they are relatively stable and widely accepted, the price of bitcoin varied wildly from one minute to the next, rendering it unattractive to merchants (who might unintentionally sell goods or services at a discount), and very little in the way of goods or services was offered for sale for bitcoin, anyway. (Exh. 2, at 33-34; Exh. 1, at 12-14.) But for an illiquid store of value to be valuable, one of two

---

[6]     *See also* Lloyd Constantine, *et al.*, In re Visa Check/Mastermoney Antitrust Litigation: *A Study in Market Failure in a Two-Sided Market*, 2005 Colum. Bus. L. Rev. 599, 601-03 (discussing the "chicken and egg problem" of two-sided markets).

things generally must be true: it has another use (like a house or car) or has a stable value (like gold). (Exh. 2, at 31-32.) Bitcoin fits neither bill. In fact, bitcoin's volatility only highlights that a rational investor would want the ability to cash out on demand. (Exh. 2, at 31-34.)

Given this background, the analyses in *Seekamp*, *Klay*, and *Torres* demonstrate why reliance can be inferred on a classwide basis for the Deposit Class. Each class member may have chosen to invest in bitcoin for different reasons, but a factfinder legitimately may infer that the information unavailable to the plaintiffs was, due to the nature of the information, material to their decision. *See Klay*, 382 F.3d at 1259; *see also In re First Alliance*, 471 F.3d at 990-91. The ultimate ability of an investor to retrieve their investment is thus analogous to the legality of the ATSD policies at issue in *Seekamp*: Other factors may have influenced an individual class member's decision to invest in Mt. Gox, but it is reasonable to infer that the facts allegedly suppressed by Mizuho played a substantial, if implicit, role in each class member's calculus. *See Seekamp*, 2012 WL860364, at *10. The "circumstances attending the transaction[s]" entered into by Deposit Class members, in other words, are evidence of reliance. *Vasquez*, 484 P.2d at 972.

Proceeding in this manner also accords with *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016). In *Tyson Foods* the plaintiffs had no records to establish a labor-law violation, so proposed to establish, through statistical evidence, a "just and reasonable inference" that the defendant had acted unlawfully. The Court concluded that this was appropriate because an individual plaintiff also would be permitted to rely on statistical evidence in an individual case, and such evidence could "sustain a reasonable jury finding." 136 S. Ct. at 1046-47. That, the Court held, is what matters. *See also In re Cmty. Bank of N. Va.*, 795 F.3d 380, 408 (3d Cir. 2015) (assessing permissibility of class-wide inference of reliance from the standpoint of plaintiffs' theory of liability); *Minter v. Wells Fargo Bank, N.A.*, 274 F.R.D. 525, 546 & n.23 (D.

29

Md. 2011) (same). Similarly here, no class member is required to present his or her own testimony in order to prevail. And the unquantified possibility that Mizuho could demonstrate that a handful of class members didn't rely on the nonexistence of the information Mizuho suppressed does not defeat certification. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014) ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate.").[7]

Mizuho also has suggested that, even assuming class members relied on Mizuho's allegedly fraudulent omissions, any reliance was unjustifiable. Bitcoin is an inherently speculative investment, the argument goes, and Mt. Gox had also acknowledged some withdrawal delays, so anyone who chose to invest through Mt. Gox could not reasonably have expected to recoup their investment. And the argument pairs well with an observation that some jury instructions use the language of "justifiable reliance" and others "reasonable reliance." But this line of argument does not defeat predominance for at least three reasons.

First, the question whether any investor assumed the risk of loss as a general matter is different from the question whether the investor assumed the risk of loss *for this particular reason*. *See, e.g.*, *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 646-48 (S.D.N.Y. 2012) (concluding that public disclosure of some risks associated with a particular investment did not relieve defendant of duty to disclose specific known, but undisclosed, risk);

---

[7] What's more, the "possibility or indeed inevitability" that a portion of the class is unharmed does not preclude certification. *See Kohen v. Pac. Inc. Mgmt. Co., LLC*, 571 F.3d 672, 677 (7th Cir. 2009). An argument that the class includes individuals who did not rely on withdrawal functionality for some reason is an argument about class overbreadth. But all Rule 23 requires is a "class definition [that] is reasonably co-extensive with Plaintiffs' chosen theory of liability." *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1136-37 (9th Cir. 2016); *see Messner*, 669 F.3d at 823-26 & n.12. For the reasons explained above the line, movants offer that here.

30

*Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479, 486 n.3 (S.D. Fla. 1996) (declining to resolve the question of reliance in defendants' favor because document allegedly setting forth risks failed to mention specific risk at issue). An August 2013 article on the website CoinDesk, a popular source for bitcoin-related news, neatly encapsulated the dilemma facing bitcoin investors: "Withdrawals from Mt. Gox," the headline read, "growing pains or banking bottleneck?" *See* Daniel Cawrey, CoinDesk, "Withdrawals from Mt. Gox: growing pains or banking bottleneck?", goo.gl/aKRZx (Aug. 12, 2013, 12:43 UTC). As we now know, the answer was "banking bottleneck." But the source and scope of that "bottleneck" was not known, and the two players who knew the facts weren't talking.

As both Motto and Lack articulated, that misinformation mattered. Motto testified that, for instance, with new products some amount of difficulties are to be expected, but the complete inability to withdraw money through Mt. Gox's principal banking partner is a difficulty far beyond the typical hiccups one might expect. (Exh. 3, at 35:12-18, 177:24-178:16.) Motto averred that these difficulties would have prompted him to find some other way into the exchange, though in 2014 he had no other options. (Exh. 3, at 179:16-22.) Lack noted that, given the spike in the number of bitcoin-denominated transactions in late 2013, some banking backlog would even be expected. (Exh. 4, at 53:13-54:2.) But a backlog caused by a refusal on the bank's part to process transactions is different in kind from a typical logjam. (Exh. 4, at 54:3-24, 163:2-11, 164:20-165:2.) As the Court already has noted, the articles discussing Mt. Gox's transactional difficulties are "more accurately characterized as misinformation" because "none of the articles ... mention Mizuho or the total inability of Mt. Gox users to withdraw fiat currency." *Greene*, 206 F. Supp. 3d at 1375. Not only does that omission mean that publicly available information could not put anyone on notice of *Mizuho's* fraud, the lack of available information

about Mizuho's actions substantially affected the behavior of thousands of individuals.

Second, as a legal matter, any attempt to rely on the distinction between justifiable and reasonable reliance is flawed. As an initial matter, it is "hardly clear" that the two standards present any discernible distinctions. *JPMorgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 405 (S.D.N.Y. 2004); *see Tirapelli v. Advanced Equities, Inc.*, 813 N.E.2d 1138, 1142 n.3 (Ill. App. Ct. 2004) ("the terms 'justifiable' and 'reasonable' with regards to a fraud claim are used interchangeably"). And, to the extent any difference exists, Illinois requires "justifiable" reliance and California requires "reasonable" reliance, so the proposed representatives have an incentive to litigate both standards of reliance.

And in any case, in all jurisdictions, the "justifiability" or "reasonableness" of a given plaintiff's reliance is a question of causation. But the key for breaking the causal chain in a fraud case is knowledge, no matter the language used to articulate the parameters of acceptable reliance. In the language of the Restatement, a plaintiff cannot justifiably rely on an "obvious" misrepresentation or omission. *See* Restatement (Second) of Torts § 540 cmt. a. Mizuho has suggested, again, that the transactional difficulties highlighted by various articles should have been enough to put class members on notice, or at least triggered a duty to inquire. (Exh. 42, at 12.) As before, the problem with this theory is that, so far as Plaintiffs are aware, *nothing* identified *Mizuho*'s fraud. "Such information [was] not readily apparent," *Torres*, 838 F.3d at 643, and Mizuho has "never explained" how a "diligent inquir[y] would have revealed" its actions, *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006). Under whatever standard, this threshold issue remains whether the plaintiff has the means of discovering the truth. *See, e.g.*, *ACA Fin. Guar Corp. v. Goldman, Sachs & Co.*, 32 N.E.3d 921, 922-23 (N.Y. 2015). The evidence shows that *no* member had sufficient means here.

Finally, even if the Court believes that class members must submit for adversarial testing individual evidence of reliance, certification still is warranted. The Seventh Circuit's discussion in *Suchanek* is instructive. *Suchanek* was a consumer-fraud action about misrepresentations in product labeling. 764 F.3d at 754. The court observed that "resolution of the merits may require costly survey evidence and expert testimony," and thus certification may well be appropriate "because no individual plaintiff would be willing to bear [these] costs." *Id.* at 760. The court also observed that resolving these complex common issues would greatly simplify litigation: "if the class prevails on the common issue, it would be a straightforward matter for each purchaser to present her evidence on reliance and causation." *Id.*

The same is true here. The plainly common issues that require a factfinder to determine the legal import of Mizuho's conduct are "central to liability." *Butler*, 727 F.3d at 801-02. If these are resolved in the class's favor, then it becomes a "straightforward matter," *Suchanek*, 764 F.3d at 760, to resolve any remaining individual issues. In other words, "the relative costs of prosecuting the class and individual issues in the case," *id.* at 761, weigh in favor of certifying the class. To the extent individual follow-on proceedings are necessary, *Mullins*, 795 F.3d at 664, confirms that the Court has discretion to employ a special master, representative trials, or other means to ease any administrative burdens. *See also McDonald v. United Air Lines, Inc.*, 745 F.2d 1081, 1087-91 (7th Cir. 1984); *Green v. Wolf Corp.*, 402 F.2d 291, 301 (2d Cir. 1968).

**B.      Any issue of justification does not preclude certification of the Withdrawal Class.**

Gregory Pearce, a Pennsylvania resident, seeks to represent the Withdrawal Class. In the briefing on Mizuho's Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), the Court assessed the extant intentional-interference claims under Illinois law. *See Greene*, 206 F. Supp. 3d at 1372-73. The parties' dispute centered on the question of justification, principally who bore the burden of

proving justification and whether Mizuho's desire to avoid reputational harm justified its actions. Those same questions generally invoke linguistic differences between the jurisdictions in the Withdrawal Class.

But such differences are skin deep. In other words, the content of the intentional-interference tort is consistent across jurisdictions—an improper act that induces another to breach a contractual relationship with a third party—but the language used to describe it is not, with some states using the language of "malice," others "justification," and others demanding only that interference be "improper." The Restatement attempts to cut through the rhetorical excess displayed by some cases, explaining that cases discussing "justification" or "malice" are often simply addressing the basic requirement that the interference be improper. Indeed, the Restatement discusses the terms interchangeably. *See* Restatement (Second) Torts § 767 cmt. c ("The nature of the actor's conduct is a chief factor in determining whether the conduct is improper or not, despite its harm to the other person… Under the same circumstances interference by some means is not improper while interference by other means is improper; and, likewise, the same means may be permissible under some circumstances while wrongful in others. The issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it."). Moreover, those states that still require "malice" have acknowledged that this requirement is not separate from the requirement that the interference be improper, wrongful, or without justification. *See, e.g.*, *Rowell v. Phoebe Putney Mem. Hosp., Inc.*, 791 S.E.2d 183, 185 (Ga. Ct. App. 2016); *Lamorte Burns & Co., Inc. v. Walters*, 770 A.2d 1158, 1170 (N.J. 2001); *Daley v. Aetna Life & Cas. Co.*, 734 A.2d 112, 135 (Conn. 1999); *Navistar Int'l Transp. Corp. v. Vernon Klein Truck & Equipment*, 919 P.2d 443, 447 (Okla. App. 1994); *NCAA ex rel. Bellarmine Coll. v. Hornung*,

754 S.W.2d 855, 859 (Ky. 1988). In other words, at bottom, every court is still asking the same questions. And, given Mizuho's common conduct, those questions will be answered in the same way, with the same evidence, across the Withdrawal Class.

Finally, some states do differ on whether the burden of proof as to justification lies with the plaintiff or the defendant. But "a burden of proof has an impact only if the evidence is in equipoise." *Dubisky v. United States*, 62 F.3d 182, 185 (7th Cir. 1995). There is no need to cross that bridge without some assurance that we will, in fact, get there.

**C.     A class action is a superior way to resolve this controversy.**

Finally, the Court must determine whether or not a class action is a superior method of resolving this controversy. Fed. R. Civ. P. 23(b)(3). A class action is plainly superior here. First, this litigation is now three years old, with more than one year of intense motion practice and discovery undertaken on the claims against Mizuho specifically. The "extent and nature" of this litigation, *id.* at 23(b)(3)(B), thus counsels strongly in favor of certification. Moreover this experience demonstrates that leaving individual class members to pursue their remedies against Mizuho will result in "individual suits each of which would cost orders of magnitude more to litigate than the claims would be worth to the plaintiffs," often just a few thousand dollars. *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 748 (7th Cir. 2010); *see Klay*, 382 F.3d at 1271 (concluding that a class action is generally superior "when the defendants are corporate behemoths with a demonstrated willingness and proclivity for drawing out legal proceedings for as long as humanly possible and burying their opponents in paperwork and filings").

And, as discussed above, there are numerous common issues in this case "the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, so it makes good sense ... to resolve those issues in one fell swoop ... ." *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d

910, 911 (7th Cir. 2003); *see Suchanek*, 764 F.3d at 761 (noting that a class action is usually superior when resolution of common issues is likely to be expensive).

It is, moreover, desirable to concentrate the litigation in this forum. Fed. R. Civ. P. 23(b)(3)(C). Were class members to file individually, Mizuho would be subject to litigation in perhaps every state, and in both state and federal courts, with varying schedules, caseloads, and rules of evidence and procedure. Concentrating litigation in this Court promotes uniformity of result to the benefit of both the classes and the defendant.

Finally, the proposed class action is manageable. *See* Fed. R. Civ. P. 23(b)(3)(D). Given the consistency of the relevant state law, and Mizuho's common conduct, a trial of the classes' claims would be straightforward. So far as the evidence shows, a liability phase would require the parties to litigate the following issues:

- Did Mizuho intend to induce a false belief in class members?
- Did Mizuho actively conceal material information?
- Does the nature of the information concealed by Mizuho give rise to an inference that class members "relied" on the omission?
- Did Mizuho intend to interfere with class members' contracts with Mt. Gox?
- Did Mizuho's decision to refuse to process international wire withdrawals from Mt. Gox's bank account amount to interference with the Withdrawal Class's contracts with Mt. Gox?
- If so, was Mizuho justified in doing so?

"On the basis of these determinations, the Court [can] apply the law of each jurisdiction and decide in which, if any, jurisdictions the [Plaintiffs] prevail." *Overka*, 265 F.R.D. at 20.

A handful of opinions warn that manageability concerns may doom multistate class actions. *See, e.g.*, *Morrison*, 649 F.3d at 536. But that's generally true "only where the attention and resources, which would have to be devoted to strictly administrative matters, will overwhelm any relief ultimately accruing to the plaintiff class." 32B Am. Jur. 2d *Federal Courts* § 1754; *see id.* ("Once a court is convinced that the named plaintiff's claims are of substantial merit and that

36

the class action device is the most practicable method of vindication, it must not allow

encountered procedural difficulties to obviate its responsibility to adjudicate those claims.").

Here, manageability concerns are relatively minor. Indeed, variations in state law—the

cause of most manageability problems—are generally *not* what precludes class treatment of

fraud or intentional-interference claims, but rather factual variations in the claims of individual

plaintiffs. *See* William B. Rubenstein, *Newberg on Class Actions* § 4:59 (5th ed.) ("In short, it is

not the presence of a fraud claim, *per se*, that ensures that common issues will not predominate

but rather fraud cases that involve non-common actions in particular."). Finally, as with the

superiority analysis writ large, the manageability inquiry is comparative. *Suchanek*, 764 F.3d at

761; *see Mullins*, 795 F.3d at 664 ("refusing to certify on manageability grounds alone should be

the last resort"). Rule 23 asks the Court to determine if a class action "will create relatively more

management problems than any of the alternatives." *Klay,* 382 F.3d at 1273. Given the lack of

any practical alternative, the answer to that question plainly is no.

## CONCLUSION

The Court should certify the proposed classes, and appoint Jay Edelson, Rafey S.

Balabanian, Benjamin Thomassen, and Aaron Lawson to represent both classes.

Respectfully submitted,

**ANTHONY MOTTO, JOSEPH LACK,**
and **GREGORY PEARCE** individually and on
behalf of all others similarly situated,

Dated: October 13, 2017

By: /s/ Jay Edelson
    One of Plaintiffs' Attorneys

37

Jay Edelson
jedelson@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian
rbalabanian@edelson.com
J. Aaron Lawson*
alawson@edelson.com
Edelson PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9495
*admitted only in Illinois, supervised by members of
the California Bar

Counsel for Plaintiffs and the Putative Classes

**CERTIFICATE OF SERVICE**

I, J. Aaron Lawson, hereby certify that I served the above and foregoing document by causing true and accurate copies of such paper to be transmitted to all counsel of record via the Court's CM/ECF electronic filing system, and via electronic mail to Mark Karpeles, on September 20, 2017.


/s/ J. Aaron Lawson