**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GREGORY GREENE, JOSEPH LACK, ANTHONY MOTTO, and GREGORY PEARCE, individually and on behalf of all others similarly situated, | |
| *Plaintiffs*, | Case No. 14 C 01437 |
| v. | Judge Gary Feinerman |
| MIZUHO BANK, LTD., a Japanese financial institution, and MARK KARPELES, an individual, | Magistrate Judge Susan E. Cox |
| *Defendants*. | |

**MEMORANDUM OF LAW OF DEFENDANT MIZUHO BANK, LTD.
<u>IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION</u>**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

RELEVANT FACTUAL BACKGROUND ................................................................ 4

    A.     Mt. Gox And Mizuho ....................................................................... 4

    B.     Plaintiff Anthony Motto ................................................................... 9

ARGUMENT ........................................................................................................... 10

I.      The Proposed Class Does Not Satisfy The Requirements Of Rule 23(a) Or Rule 23's Implicit Ascertainability Requirement .......................................... 11

    A.     Motto Has Not Identified Any Question Of Law Or Fact Common To The Proposed Deposit Class ................................................. 11

    B.     The Proposed Deposit Class Definition Is Impermissibly Vague Because It Does Not Identify A Particular Injury Suffered By Purported Class Members ..................................................... 17

    C.     Motto Will Not Adequately Protect The Interests Of The Proposed Deposit Class And His Claims Are Not Typical Of The Claims Of Other Potential Deposit Class Members ......................... 19

II.      The Proposed Class Does Not Satisfy Rule 23(b)(3)'s Predominance And Superiority Requirements ......................................................................... 23

    A.     Questions Common To Deposit Class Members Do Not Predominate Over Questions Affecting Only Individual Class Members ........................................................................................... 24

          1.     Individual Questions Relating To Materiality, Knowledge, Reliance, Causation, and Injury Predominate Over Common Questions (If Any) ......................... 24

          2.     Individual Questions About Damages Will Predominate ................................................................................. 30

          3.     Common Questions Do Not Predominate Because Differing Legal Standards From One Jurisdiction To Another Require Different Inquiries ............................................. 31

    B.     Class Treatment Is Not A Superior Method For Adjudicating The Claims Of The Proposed Deposit Class ........................................... 34

CONCLUSION ....................................................................................................... 35

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bors v. Duberstein*,
  No. 03 C 4636, 2004 WL 1588271 (N.D. Ill. July 15, 2004) .................................................20

*In re Bridgestone/Firestone, Inc.*,
  288 F.3d 1012 (7th Cir. 2002) ......................................................................................34, 35

*Brinker v. Chi. Title Ins. Co.*,
  2012 WL 1081211 (M.D. Fla. Feb. 9, 2012) ...............................................................34

*Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cty*,
  137 S. Ct. 1773 (2017) ..................................................................................................35

*Butler v. Sears, Roebuck & Co.*,
  727 F.3d 796 (7th Cir. 2013) ........................................................................30, 31, 34

*Cates v. Whirlpool Corp.*,
  2017 WL 1862640 (N.D. Ill. May 9, 2017) ...............................................15, 16, 17

*CE Design Ltd. v. King Architectural Metals, Inc.*,
  637 F.3d 721 (7th Cir. 2011) .....................................................................................20, 21

*Clark v. Bumbo Int'l Trust*,
  2017 WL 3704825 (N.D. Ill. Aug. 28, 2017) ..........................................18, 24, 31

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .................................................................................................24, 30, 31

*DeBernardis v. NBTY, Inc.*,
  2018 WL 461228 (N.D. Ill. Jan. 18, 2018) ...............................................................35

*In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*,
  2017 WL 1196990 (N.D. Ill. Mar. 31, 2017)...........................................................35

*Greene v. Mizuho Bank, Ltd.*,
  206 F. Supp. 3d 1362 (N.D. Ill. 2016) .......................................................14, 15, 22

*Jamie S. v. Milwaukee Pub. Schs.*,
  668 F.3d 481 (7th Cir. 2012) .......................................................................................12

*Jenkins v. Macatawa Bank Corp.*,
  2006 WL 3253305 (W.D. Mich. Nov. 9, 2006).......................................................33

*Lipton v. Chattem, Inc.*,
   289 F.R.D. 456 (N.D. Ill. 2013)........................................................19, 20, 21, 24, 34

*Manzo v. Rite Aid Corp.*,
   2002 WL 31926606 (Del. Ch. Dec. 19, 2002).........................................................34

*McDonnell v. Nature's Way Prods., LLC*,
   2017 WL 4864910 (N.D. Ill. Oct. 26, 2017)...........................................................35

*Mednick v. Precor, Inc.*,
   320 F.R.D. 140 (N.D. Ill. 2017)...............................................................................31

*Messner v. Northshore Univ. Healthsystem*,
   669 F.3d 802 (7th Cir. 2012) .......................................................11, 18, 24, 25, 31

*Mullins v. Direct Dig., LLC*,
   795 F.3d 654 (7th Cir. 2015), *cert. denied*, 136 S. Ct. (2016)..........................3, 11, 17, 18, 19

*O'Shea v. Epson Am., Inc.*,
   566 F. App'x 605 (9th Cir. 2014) ............................................................................33

*Parko v. Shell Oil Co.*,
   739 F.3d 1083 (7th Cir. 2014) .................................................................12, 16, 17

*Phelps v. Stomber*,
   883 F. Supp. 2d 188 (D.D.C. 2012)........................................................................34

*Quality Mgmt. & Consulting Servs., Inc.*, 2013 WL 5835915
   (N.D. Ill. Oct. 30, 2013).............................................................................................4

*Retired Chicago Police Ass'n v. City of Chicago*,
   7 F.3d 584 (7th Cir. 1993) ........................................................................................35

*In re Rhone-Poulenc Rorer Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ....................................................................................32

*Romo v. GMRI, Inc.*,
   2014 WL 12588646 (C.D. Cal. Aug. 12, 2014)......................................................16

*Schopp v. Ford Motor Co.*,
   2007 WL 9210309 (Ill. Cir. Ct. 2007) ....................................................................33

*Sjoblom v. Charter Commc'ns, LLC*,
   2007 WL 4560541 (W.D. Wis. Dec. 19, 2007) ........................................................4

*Suchanek v. Sturm Foods, Inc.*,
   764 F.3d 750 (7th Cir. 2014) ............................................................................21, 34

*Szabo v. Bridgeport Mach., Inc.*,
  249 F.3d 672 (7th Cir. 2001) ............................................................11

*In re Teflon Prods. Liab. Litig.*,
  254 F.R.D. 354 (S.D. Iowa 2008) ......................................................34

*Trustees of the Aftra Health Fund v. Biondi*,
  303 F.3d 765 (7th Cir. 2002) ......................................................26, 27

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ......................................................................28

*Waksman v. Cohen*,
  2002 WL 31466417 (S.D.N.Y. Nov. 4, 2002) ....................................34

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .................................................................2, 11, 12

*In re Yasmin & Yaz (Drospirenone) Mktg.*,
  275 F.R.D. 270 (S.D. Ill. 2011) .........................................................34

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................1

Fed. R. Civ. P. 23 .................................................................... *passim*

Defendant Mizuho Bank, Ltd. ("Mizuho") respectfully submits this memorandum of law and the accompanying declarations in opposition to plaintiff Anthony Motto's motion for class certification. Doc. Nos. 294-296.[1] As filed, the motion proposed two classes: a "Deposit Class," represented by plaintiffs Motto and Joseph Lack, to litigate the fraudulent concealment claim against Mizuho, and a "Withdrawal Class," represented by plaintiff Gregory Pearce, to litigate the tortious interference claim against Mizuho. *See* Doc. No. 294 at 1.[2] On December 11, 2017, the Court dismissed plaintiffs Pearce and Lack from the case.[3] Doc. No. 312. As a result, the proposed "Withdrawal Class" no longer has a class representative (Pearce), and Motto cannot pursue the alleged tortious interference claim on behalf of that class. In this brief, we therefore focus on the only remaining claim and proposed class in this case: the alleged fraudulent concealment claim asserted by Motto on behalf of the proposed "Deposit Class." For the reasons explained below, the Court should deny Motto's motion for class certification because he cannot meet the requirements of Rule 23 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Fact and expert discovery in this case have concluded, and each of Motto's allegations in support of his fraudulent concealment claim has proved false. Nonetheless, Motto continues to rely on the same unsupported allegations as the basis for his motion for class certification. While the Court may have been obliged to accept these allegations as true in deciding Mizuho's Rule 12(b)(6) motion to dismiss, it may not do so now. Where factual issues bear on the question of

---

[1] Mizuho continues to contest the Court's jurisdiction over it in this case. Nothing in this opposition should be construed to constitute a waiver of that position, which Mizuho expressly preserves for appeal.

[2] The motion is silent about the unjust enrichment claim, presumably because Motto no longer seeks to pursue that cause of action as a class claim.

[3] On January 24, 2018, Lack and Pearce refiled their suits in the United States District Courts for the Central District of California and Eastern District of Pennsylvania, respectively. *See* Declaration of Jerome S. Fortinsky Exhibits 1 & 2 (exhibits to the Fortinsky Declaration are cited herein as "Ex. __"). Lack purports to sue on behalf of himself and a deposit class, whereas Pearce purports to sue on behalf of himself and a withdrawal class. *Id.*

class certification, as they do here, the Court must "probe behind the pleadings," conduct a

"rigorous analysis," and receive evidence "before coming to rest on the certification question."

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  In deciding this motion, the Court

must determine whether Motto has identified facts, not unsubstantiated allegations, to meet the

requirements of Rule 23.  As explained below, Motto has not met, and cannot meet, this burden.

*First*, the record shows that, during the proposed class period (*i.e.*, June 20, 2013, through

February 24, 2014), Mt. Gox was able to transmit fiat currency to its U.S. customers when they

requested withdrawals, and Mizuho was not the only bank through which Mt. Gox could do so.

In fact, and contrary to the plaintiffs' repeated assertions in filings with this Court, during that

period, Mt. Gox processed 560 withdrawal requests from Mt. Gox's U.S. customers through

Japan Post Bank and sent those customers more than $26.2 million.  For context, Mt. Gox's U.S.

customers deposited only $7.7 million into Mt. Gox's account at Mizuho during the same period.

*Second*, the record contains no evidence to support Motto's claim that Mizuho

"prohibited" Mt. Gox from disclosing that any difficulties in withdrawing funds were attributable

to Mizuho.  The record shows that, during the alleged class period, Mt. Gox communicated

freely with its customers about delays and temporary suspensions of cash withdrawals, including

announcements of (i) a temporary, two-week suspension of U.S. dollar withdrawals on June 20,

2013 (Ex. 3), (ii) resumption of U.S. dollar withdrawals on July 4, 2013, with a two-week

backlog (Ex. 4), and (iii) manual processing of international wire transfers in January 2014 such

that withdrawal might take "4 weeks or more depending the amount" (Ex. 5).  The record

contains no evidence that Mt. Gox consulted with Mizuho about these communications or that

Mizuho had any control over any of Mt. Gox's communications with its customers concerning

withdrawals.

*Third*, the record contains no evidence that Mizuho continued to accept deposits (after it halted withdrawals) in order to continue to collect fees on the deposits. Instead, the record is clear that Mizuho wanted to halt deposits from Mt. Gox's customers at the same time it stopped withdrawals but was advised by its counsel that it could not unilaterally terminate deposits.

The entire case against Mizuho is thus based on the now-debunked false premise that U.S. dollar depositors were "walking into a trap: their money could go into Mt. Gox's account at Mizuho [Bank], but it could never leave." Pl. Br. at 2. Consequently, the members of the proposed class did not, and could not have, suffered any common injury. The record does not support the allegation of a "trap [that] was the same for all class members." *Id*. Motto has therefore failed to identify a common question to be decided in this case.

This significant – and fatal – shortcoming is also reflected in the proposed "Deposit Class" definition, which fails to identify a particular injury allegedly suffered by purported class members.[4] The proposed class definition is therefore impermissibly vague under the Seventh Circuit's class ascertainability standard. *See Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659 (7th Cir. 2015), *cert. denied*, 136 S. Ct. (2016).

And even if any of the foregoing flaws were found insufficient to defeat class certification, the proposed Deposit Class still cannot be certified because the record demonstrates that Motto is unable to fairly and adequately protect the interests of other proposed Deposit Class members. The unique facts surrounding Motto's attempt at funding his Mt. Gox account just days after Mt. Gox announced a suspension of bitcoin withdrawals and days before Mt. Gox's collapse distinguish his claim and defenses from those of other potential class members. The record shows that Motto (unlike other members of the proposed class) (i) was aware that Mt.

---

[4] Motto defines the Deposit Class as "[a]ll individuals who, while residing in the United States, wired fiat currency to Mt. Gox's account at Mizuho Bank between June 20, 2013, and February 24, 2014." Doc. No. 294 at 1.

3

Gox was experiencing delays and temporary suspensions in processing fiat currency and bitcoin withdrawals at the time he made his deposit, (ii) did not intend to withdraw fiat currency from Mt. Gox, (iii) was given an opportunity to cancel his wire transfer to Mt. Gox, and (iv) failed to mitigate any alleged damages. A plaintiff like Motto, whose claims are based on unique and idiosyncratic facts, fails to meet both the adequacy and typicality requirements of Rule 23(a).

Class certification is inappropriate because (a) individual issues relating to several *prima facie* elements of fraudulent concealment predominate over common issues (even assuming there were any), (b) Motto has not sought to articulate a classwide damages theory tied to the alleged theory of liability against Mizuho or demonstrate how damages could be assessed on a classwide basis, and (c) class treatment is not a superior means of adjudicating the claims of class members from 49 different jurisdictions. Accordingly, Motto cannot meet the requirements of Rule 23, and the Court should deny his motion to certify the proposed Deposit Class.

### **RELEVANT FACTUAL BACKGROUND**[5]

**A.    Mt. Gox And Mizuho**

As of the spring of 2013, Mt. Gox and its U.S. subsidiary, Mutum Sigillum LLC, used various banks and payment processors, including Sumitomo Mitsui Bank, Wells Fargo, Dwolla, OKPAY, and Mizuho, to send fiat currency to its customers in the United States.[6] In that period, both the Japanese Financial Services Agency and several banks, including ███████████████

---

[5] The "Factual Background" section in Motto's brief is filled with unsupported assertions based entirely on unreliable and inadmissible sources, including exhibits containing double and triple hearsay. *See, e.g.*, Pl. Br., Exs. 18, 19, and 24 (Doc. Nos. 295-8, 295-9, and 295-10). In ruling on a motion for class certification, a court may not rely on inadmissible hearsay and unreliable evidence. *See, e.g.*, *Quality Mgmt. & Consulting Servs., Inc.*, 2013 WL 5835915, at *4 (N.D. Ill. Oct. 30, 2013) (denying class certification because the plaintiffs' evidence was unreliable); *Sjoblom v. Charter Commc'ns, LLC*, 2007 WL 4560541 (W.D. Wis. Dec. 19, 2007) (rejecting plaintiff's proposition that "affidavits should be held to a lesser standard when they are submitted for purposes other than summary judgment").

[6] Ex. 6 at 2-3; Ex. 7 at 6-7, 9; Ex. 8 at ¶ 36 nn. 46 & 48, ¶ 57.

███████████████████████████████████████, began asking questions or raising

concerns about money transfers involving Mt. Gox.[7]

In May 2013, the U.S. Department of Homeland Security seized $5 million from Mutum

Sigillum's account at Wells Fargo and Dwolla's account at Veridian Credit Union because

Mutum Sigillum and Dwolla were operating as unlicensed money service businesses in violation

of U.S. law.[8]  DHS's actions were widely publicized.[9]

Based on communications with other banks and regulatory actions against Mt. Gox and

its U.S. subsidiary, Mizuho determined that continuing to do business with Mt. Gox created risks

for Mizuho.[10]  As a result, Mizuho tried to terminate its relationship with Mt. Gox by mutual

agreement.[11]  After Mt. Gox refused, Mizuho determined that it did not have legal grounds to

unilaterally reject incoming wire deposits into Mt. Gox's account, but that it could unilaterally

stop handling outbound wires from Mt. Gox's account.[12]  As a result, after meeting with Mt. Gox

and giving it advance warning of its decision, Mizuho stopped handling outbound U.S. dollar

wire transfers for Mt. Gox on June 21, 2013.[13]  Over the next several months, Mizuho repeatedly

requested that Mt. Gox use other banks for customer deposits.[14]  Despite repeatedly telling

Mizuho that it had established new banking relationships for deposits and that it intended to

inform its customers that deposits should be sent to its accounts at the new banks, Mt. Gox failed

to implement this plan and instead repeatedly told Mizuho that it was working on it and needed

---

[7]  *See* Ex. 9 at 46:16-55:12, 92:8-95:7; Ex. 10 at 10-11.

[8]  *See* Exs. 6 & 11.

[9]  *See* Exs. 11 & 12.

[10]  *See* Ex. 13; *see also* Ex. 9 at 46:16-49:16, 96:20-98:23, 143:14-23.

[11]  Ex. 9 at 85:25-86:10.

[12]  *See* Ex. 14; Ex. 9 at 86:18-87:20.

[13]  Ex. 9 at 99:4-11.

[14]  Ex. 10 at 12; Exs. 15-19.

more time.[15]  Mizuho continued to receive inbound cash wire transfers designating Mt. Gox as the beneficiary until Mt. Gox's collapse on February 24, 2014.[16]

Despite its failure to use other banks to receive customer deposits, Mt. Gox did use other banks to send money to customers seeking to make U.S. dollar withdrawals, and it informed Mizuho that it was doing so.[17]  In fact, within days after Mizuho discontinued sending U.S. dollar wire transfers for Mt. Gox (*i.e.*, by June 26, 2013), Mt. Gox was already sending U.S. dollars to its customers in the United States through another bank.[18]  From June 26, 2013 until Mt. Gox's bankruptcy filing in February 2014, Mt. Gox sent at least $26.2 million in U.S. dollar withdrawals to over 500 Mt. Gox users in the U.S. through another bank, Japan Post Bank, and its correspondent bank in the U.S., Deutsche Bank.[19]  For context, during that same period, Mt. Gox users deposited $7.7 million into Mt. Gox's account at Mizuho.[20]  For further context, during a period of similar length before Mizuho discontinued sending U.S. dollar wire transfers for Mt. Gox (*i.e.*, November 30, 2012 to June 13, 2013), Mt. Gox sent $29.4 million to U.S. customers using Mizuho.[21]  Thus, prior to the proposed class period, Mt. Gox sent $29.4 million to U.S. customers using Mizuho; during the proposed class period, Mt. Gox sent $26.2 million to U.S. customers using Japan Post Bank; and during the proposed class period, Mt. Gox's U.S. customers deposited $7.7 million into Mt. Gox.

---

[15] Ex. 10 at 12; Ex. 17; Exs. 19-20.

[16] Ex. 8 ¶ 20 & Ex. 15; Ex. 10 at 12; Ex. 21.

[17] Ex. 9 at 100:1-15; Ex. 22; Ex. 23 at 13-14; Ex. 24.

[18] *See* Ex. 22.

[19] *See id.*; Ex. 8 ¶ 51 & Ex. 6.

[20] *See* Ex. 21; Ex. 40 ¶ 31.

[21] *See* Ex. 40 ¶ 34; Ex. 25; Ex. 8 at Ex. 6.

In addition to withdrawing U.S. dollars directly from Mt. Gox (which Mt. Gox transmitted through Japan Post Bank and perhaps other banks as well),[22] Mt. Gox users in the United States could also get their investments out of Mt. Gox during the class period, in the event Mt. Gox failed or refused to return their fiat currency, by:

- Purchasing bitcoin and transferring it to another exchange, including exchanges in the United States;

- Purchasing bitcoin and transferring it to the Mt. Gox user's private wallet;

- Purchasing bitcoin and transferring it to a third party's wallet in exchange for goods and/or services;

- Purchasing bitcoin and transferring it to a third party such as BitPay, where bitcoin could be converted to fiat currency and used to purchase goods and services; or

- Transferring "trapped bitcoin" (*i.e.*, bitcoin held at Mt. Gox after Mt. Gox suspended bitcoin withdrawals on February 7, 2014) to a third party called Bitcoin Builder, which bought the "trapped bitcoin" at a discount in exchange for unrestricted bitcoin held in a wallet independent of Mt. Gox.[23]

Mt. Gox's response to its customers' withdrawal requests was erratic. On some days during the proposed class period, Mt. Gox honored as many as 19 requests; on others, it did not respond to any.[24] Mt. Gox's approach caused delays, but it regularly updated its customers about those delays and offered an expedited withdrawal service for a five percent fee for those customers that wanted to withdraw their fiat currency more quickly.[25] Specifically, Mt. Gox made the following announcements on its website regarding delays and suspensions in processing withdrawals of both fiat currency and bitcoin:

---

[22] Mt. Gox had bank accounts at Rakuten Bank, Japan Net Bank, Yachiyo Bank, and Resona Bank. *See* Ex. 38 at List of Assets, Item No. 1.

[23] *See* Ex. 8 ¶ 52; Ex. 40 ¶ 13; Ex. 26 at 91-92, 98-100, 112-13.

[24] *See* Ex. 22.

[25] Ex. 27 at Pearce001458.

- June 20, 2013: Mt. Gox suspends U.S. dollar withdrawals temporarily;[26]

- July 4, 2013: Mt. Gox resumes honoring U.S. dollar withdrawal requests, with a two-week backlog;[27]

- January 2014: Mt. Gox announces a "slight backlog" in processing requests for international wire withdrawals and more than four-week delays depending on amount;[28]

- January 31, 2014: Mt. Gox discloses that bitcoin withdrawal delays are reportedly being experienced by some users;[29]

- February 4, 2014: Mt. Gox reports bitcoin withdrawal delays affecting a limited number of users, primarily with larger transactions;[30] and

- February 7, 2014: Mt. Gox temporarily suspends all bitcoin withdrawals.[31]

Mt. Gox never discussed with or previewed for Mizuho any press release or customer communication that addressed withdrawals.[32] Instead, documents the plaintiff relies on show that Mt. Gox did not consult with Mizuho about communications with its customers regarding withdrawals and instead consulted with its lawyers at Baker & McKenzie.[33] In August 2013, Mt. Gox issued a press release effectively blaming Mizuho for delays in depositing money into Mt. Gox.[34] Afterwards, Mizuho disagreed that it was to blame for the delay and expressed its displeasure to Mt. Gox.[35] Mt. Gox ignored Mizuho's concerns.[36]

---

[26] Ex. 3.

[27] Ex. 4.

[28] Ex. 5.

[29] Ex. 28.

[30] Ex. 29.

[31] Ex. 30.

[32] *See* Ex. 9 at 158:5-10; Ex. 17.

[33] Pl. Br., Ex. 7 at Edelson007122.

[34] Ex. 31.

[35] *See* Ex. 9 at 156:4-158:4; Ex. 32.

[36] Motto falsely claims that ██████████████████████████████████ ████████████████ Pl. Br. at 9. This statement is a complete fabrication, and the record contains no support for it. The documents cited by Motto (Pl. Br. at 8-9) deal exclusively with disclosures about

### B.   Plaintiff Anthony Motto

Motto testified that 

. [37]  Motto also testified that

.

Despite this knowledge, on February 18, 2014, Motto instructed JP Morgan Chase Bank to wire

$1,000 U.S. from an account held in the name of Motto's business, Highline Technologies, Inc.,

to Mt. Gox's bank account at Mizuho. [38]

Motto testified that, when he made his deposit,

. [39]  After

Chase Bank confirmed that his wire was completed, Motto contacted Mt. Gox on February 19,

2014 because he did not see his balance reflected in his Mt. Gox account.  Motto's Mt. Gox

account balance remained at zero through February 24, 2014, when Mt. Gox ceased operations. [40]

In response to news of Mt. Gox's bankruptcy filing in Japan, Mizuho adopted a new

policy concerning inbound wire transfers that had not yet been fully processed as of the date of

Mt. Gox's bankruptcy filing. [41]  Pursuant to that policy, before processing those wire transfers,

Mizuho contacted the remitting bank to inquire whether the remitting bank's customer wished to

---

*deposits* and have nothing to do with disclosures about *withdrawals*.  The only evidence in the record contradicts Motto's statement.  Ex. 9 at 157:18-158:4.

[37] Ex. 33 at 77:14-80:1.

[38] Ex. 33 at 82:5-86:23; Ex. 34.

[39] Ex. 33 at 176:21-179:6.

[40] *Id*. at 100:17-101:17; Doc. No. 245 ¶ 74.

[41] Ex. 35 ¶ 3.

cancel or proceed with the wire transfer.[42]  Mizuho followed this policy in connection with

Chase Bank's February 18, 2014 wire transfer relating to Motto's deposit.  Specifically, between

March 7 and April 10, 2014, Mizuho exchanged a series of SWIFT messages with Chase Bank

concerning Highline Technologies' wire transfer instructions.[43]  In a message dated March 7,

2014, Mizuho asked Chase Bank to inform Mizuho by March 14, 2014 whether Chase Bank's

customer wished to either (i) cancel the transaction and have the funds returned, or (ii) have the

funds paid into Mt. Gox's account at Mizuho.[44]  Mizuho's message specifically stated that if

Chase Bank's customer wished to cancel the wire transfer, Chase Bank should inform Mizuho by

means of a cancellation message by March 14, 2014.[45]  Mizuho did not receive a cancellation

message from Chase Bank within the specified time period.[46]  Accordingly, on April 10, 2014,

Mizuho informed Chase Bank that is had credited the funds to Mt. Gox's bank account.[47]

## ARGUMENT

Rule 23(a) sets out four prerequisites that a plaintiff must meet before a court may grant a

request for class certification.  Specifically, the plaintiff must demonstrate the existence of

"questions of law or fact common to the class"; that the claims or defenses of the proposed class

representative "are typical of the claims and defenses of the class"; that the proposed class

representative and its counsel "will fairly and adequately protect the interests of the class"; and

that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P.

23(a)(1)-(4).  If any one of these four requirements is missing, the court cannot certify the class.

---

[42] *Id.* ¶ 4.

[43] *Id.* ¶¶ 6-13, Exs. A-G.

[44] *Id.* ¶ 8, Ex. B.

[45] *Id.*

[46] *Id.* ¶¶ 13-14, Ex. G.

[47] *Id.*

*Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 811 (7th Cir. 2012). In addition, a plaintiff seeking to certify a class must define the proposed class clearly and by means of objective criteria so that the potential members of the class are ascertainable. *Mullins*, 795 F.3d at 659. Failure to meet this implicit ascertainability requirement of Rule 23 also ends the class certification inquiry. *Id.* Finally, once all four requirements of Rule 23(a) are met, and the class is defined clearly and is deemed ascertainable, the plaintiff must then demonstrate that it satisfies one of the subsections of Rule 23(b). *Messner*, 669 F.3d at 811.

In determining whether the requirements for class certification are met, a court "may not simply assume the truth of the matters as asserted by the plaintiff." *Id.* "If there are material factual disputes, the court must 'receive evidence . . . and resolve the disputes before deciding whether to certify the class.'" *Id.* (quoting *Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 676 (7th Cir. 2001)). For the reasons shown below, the proposed Deposit Class fails to meet Rule 23's requirements and cannot be certified.

## I. The Proposed Class Does Not Satisfy The Requirements Of Rule 23(a) Or Rule 23's Implicit Ascertainability Requirement

### A. Motto Has Not Identified Any Question Of Law Or Fact Common To The Proposed Deposit Class

Rule 23(a)(2)'s requirement that a plaintiff identify questions of law or fact common to the members of the proposed class "is easy to misread, since '[a]ny competently crafted class complaint literally raises common questions.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (citation omitted). A "common question" that satisfies Rule 23(a)(2) must depend on a "common contention" that "is capable of class-wide resolution," meaning that "determination of its truth or falsity will resolve an issue that is central to the validity of each [class member's claim] in one stroke." *Id.* at 350. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id.* at 349-50. Moreover, "[w]hat matters to

class certification . . . is not the raising of common 'questions' — even in droves — but rather the capacity of a class[-]wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id*. at 350 (emphasis in original) (citation omitted).

Here, Motto claims that Rule 23(a)(2) is satisfied because the following questions will result in common answers that will resolve the claims of all members of the proposed Deposit Class on a classwide basis: whether Mizuho had a duty to speak, whether it breached that duty, whether it acted with intent, and whether the allegedly concealed information was material. Pl. Br. at 18. Motto is mistaken. These supposed "common questions" are impermissibly superficial because they do nothing more than parrot certain elements of a fraudulent concealment claim. *See Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 497 (7th Cir. 2012) ("superficial common questions—like whether each class member . . . 'suffered a violation of the same provision of law'—are not enough.") (quoting *Wal-Mart*, 564 U.S. at 350). Absent from Motto's motion are any facts to support any of those elements. As described below, when viewed in light of the actual facts in the evidentiary record, as is required for purposes of this motion, Motto's supposedly "common" questions do not yield common answers across all potential Deposit Class members. *See Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014) (question based on false premise cannot satisfy Rule 23(a) commonality requirement).

*First*, the evidence does not support the plaintiff's oft-repeated assertion that, after Mizuho stopped sending wire transfers for Mt. Gox, all money deposited into Mt. Gox by U.S. customers was "trap[ped]" and could never be retrieved. Pl. Br. at 2. In fact, the record shows the opposite. As explained above, Mt. Gox sent more than $26.2 million to over 500 Mt. Gox customers in the U.S. between June 26, 2013 and February 24, 2014, according to business

records produced by Deutsche Bank, which transmitted wire transfers to Mt. Gox's U.S. customers for Japan Post Bank. *See* Ex. 22; Ex. 8 ¶ 51 & Ex. 6. For context, during the same time period, only approximately $7.7 million was deposited by Mt. Gox U.S. customers into Mt. Gox's account at Mizuho. *See* Ex. 21; Ex. 40 ¶ 13. Individuals falling within the definition of the proposed Deposit Class had a variety of other options for withdrawing currency or bitcoin from Mt. Gox, including transferring bitcoin to (i) another exchange, including exchanges in the United States, (ii) a private wallet, (iii) a third party's wallet in exchange for goods or services, (iv) a third party (such as BitPay) where the bitcoin could be converted to fiat currency for buying goods or services,[48] or, (v) after February 7, 2014, a third party called Bitcoin Builder that would buy bitcoin "trapped" in Mt. Gox at a discount in exchange for unrestricted bitcoin. Ex. 7; Ex. 8 ¶¶ 50-53 & Exs. 9-10; Ex. 40 ¶ 13; Ex. 26 at 91-92, 98-100, 112-13. The plaintiff's assertion that Mizuho "was like the famous Hotel California," where the money could come in but "could never leave" (Doc. No. 245 ¶ 2) is not true.

*Second*, the evidence does not support the plaintiff's repeated assertion that Mizuho "prohibited" Mt. Gox from communicating with its customers about withdrawal delays and issues Mt. Gox was experiencing. Doc. No. 245 ¶ 38; Pl. Br. at 8-9. As explained above, Mt. Gox kept its customers apprised of the delays and issues Mt. Gox was experiencing in processing both bitcoin and U.S. dollar withdrawals during the class period, with regular updates posted by Mt. Gox on its website. *See* Relevant Factual Background, Section A, *supra*. The record is clear that Mt. Gox never once consulted with Mizuho about its disclosures regarding withdrawal delays, and Mizuho never "prohibited" or took any action to dictate how or when Mt. Gox communicated with its customers about fiat currency withdrawals. *See* Ex. 9 at 115:1-9, 115:12-

---

[48] ███████████████████████████████████████████ *See* Ex. 36.

18.  Motto misleadingly cites to discussions between Mizuho and Mt. Gox about fiat currency *deposit* delays and contends that those communications somehow support their fraudulent concealment claim.  *See* Pl. Br. at 8-9; Ex. 9 at 155:10-156:17, 129:4-20.  But this case is not about fiat currency *deposits*.  The documents cited by Motto provide no support for his claim that Mizuho concealed information about fiat currency *withdrawals*.[49]

     *Third*, Motto has no factual basis to claim that Mizuho continued to accept fiat currency deposits, even after it stopped handling wire transfers on behalf of Mt. Gox, because it wanted to continue collecting fees on the deposits.  The record is clear that Mizuho wanted to terminate deposits and withdrawals at the same time, but it did not have a legal basis to do so.  The difference in treatment between deposits and withdrawals was unrelated to fees.

     *Finally*, the evidence does not support Motto's allegations that the public reports during the proposed class period were "incomplete" and misleading because none of those reports disclosed that there was an "absolute bar[]" to withdrawing fiat currency.  *Greene v. Mizuho Bank, Ltd.*, 206 F. Supp. 3d 1362, 1375 (N.D. Ill. 2016).  As explained above, the alleged "absolute bar to withdrawing fiat currency" is pure fabrication, and Mizuho was not the only bank that Mt. Gox could or did use to wire funds to its U.S. customers when they requested withdrawals, contrary to what Motto has alleged throughout this case.  Instead, the record is clear that, after Mizuho stopped sending wire transfers on Mt. Gox's behalf, Mt. Gox did what any functioning business would do:  it opened a bank account with another bank (Japan Post Bank) and used it to send over $26 million to its customers (more than five hundred in the U.S.) in response to their withdrawal requests.  To the extent that Mt. Gox was delayed in responding to

---

[49] Motto brazenly asserts that "Mizuho asked Mt. Gox to delete from a proposed public statement that 'Mizuho has stopped processing international withdrawals.'"  Pl. Br. at 9.  But neither of the two documents he cites contained any such statement; each of those documents concerns a proposed public statement about whether Mt. Gox customers would be able to make *deposits* through Mizuho as of November 2013.  *See* Pl. Br., Exs. 30 & 31.

withdrawal requests for its U.S. customers through Japan Post Bank, it disclosed those delays. *See* Relevant Factual Background, Section A, *supra*. Thus, Motto's allegation that public reports about delays withdrawing fiat currency from Mt. Gox were incomplete or misleading (*Greene*, 206 F. Supp. 3d at 1375) is not true.

Motto claims that, although aspects of his fraud claim are "hotly disputed," any disputes can be resolved on a classwide basis because of Mizuho's common conduct. Pl. Br. at 2-3. But this statement presupposes that there are actually material disputes – there are not. Motto has consistently alleged that: (i) by mid-2013, Mt. Gox users could not withdraw any fiat currency from Mt. Gox; (ii) Mizuho prohibited Mt. Gox from disclosing to Mt. Gox users that the withdrawal difficulties were attributable to Mizuho; (iii) Mizuho did not want Mt. Gox to disclose the truth because then Mt. Gox users would stop making deposits and Mizuho would stop collecting fees; and (iv) press reports indicating that Mt. Gox users were suffering significant delays were false because "those reports indicated only that withdrawals were slow, not that they were barred." *Greene*, 206 F. Supp. 3d at 1368-69. Fact discovery is over, and the evidence shows that none of these allegations is true. Because the record shows no evidence of the alleged common injury (*i.e.*, impossibility of withdrawals and misinformation about that in public reports), there are no common issues that need to be resolved, and the motion for class certification should be denied.

This case is very much like *Cates v. Whirlpool Corp.*, 2017 WL 1862640 (N.D. Ill. May 9, 2017), in which class certification was denied because the plaintiffs failed to identify a legally sufficient common question. The claims in that case were brought on behalf of a purported class of retail oven purchasers and were premised on the existence of an alleged common defect in a certain type of Whirlpool oven. In support of their motion for class certification, the plaintiffs

15

identified several allegedly common factual questions, all of which were predicated on the existence of a common defect in the ovens, and legal questions that were so broad and generic as to ask only whether the defendant breached a legal duty or was unjustly enriched. *Id*. at *18. The court found that the factual questions failed to meet the commonality requirement of Rule 23(a) because the plaintiffs offered no credible evidence showing the existence of a uniform defect in all of the ovens, and the legal questions were insufficient or superficial. *Id*. at *18-19; *see also Romo v. GMRI, Inc.*, 2014 WL 12588646, at *13 (C.D. Cal. Aug. 12, 2014) (declining to certify a subclass where the alleged theory of liability was "dependent on multiple layers of required circumstantial evidence" that was insufficient to establish a common unlawful practice).

The Seventh Circuit's decision reversing a district court's class certification order in *Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014), is also instructive. Although the opinion in *Parko* primarily addressed Rule 23(b)(3)'s requirement that common issues predominate, the court noted that it was not "even clear that the plaintiffs ha[d] *identified* a common issue." *Id*. at 1086 (emphasis in original). In that case, the district court certified a class of property owners in a suit against the then-current and former owners and operators of an oil refinery, which allegedly leaked contaminants into the groundwater under the class members' homes. The plaintiffs asserted various tort claims under Illinois law, and sought damages measured primarily by the effect of the groundwater contamination on the value of the class members' properties. *Id*. at 1084. The plaintiffs' expert tried to measure contamination based on contaminant levels in the groundwater beneath the class members' properties, even though their water supply was from an entirely different source. *Id*. at 1086. In that situation, the Seventh Circuit concluded that there would be no common question if the expert's evidence were rejected, because there would be "no basis for the claim that the benzene levels in the groundwater [we]re the common cause

of the [unspecified] loss of property values" alleged by the class, and criticized the district court for not even considering whether there was any sound or convincing evidence of a causal connection between the contaminant levels and the alleged loss in property values. *Id.*

As in the cases discussed above, the foundational premises of Motto's claim against Mizuho are unsupported by evidence, so there is no common question to be decided. Like the courts in *Cates* and *Parko*, the Court should deny the motion for class certification.

### B. The Proposed Deposit Class Definition Is Impermissibly Vague Because It Does Not Identify A Particular Injury Suffered By Purported Class Members

A plaintiff seeking to certify a proposed class in the Seventh Circuit must also satisfy the long-recognized implicit requirement under Rule 23 "that a class must be defined clearly and that membership [must] be defined by objective criteria." *Mullins*, 795 F.3d at 657. Here, Motto proposes to define the "Deposit Class" as "[a]ll individuals who, while residing in the United States, wired fiat currency to Mt. Gox's account at Mizuho Bank between June 20, 2013, and February 24, 2014." *See* Doc. No. 294 at 1. That definition is impermissibly vague and overbroad because it does not specify how proposed Deposit Class members were harmed in a particular way, as required by governing Seventh Circuit precedent, and impermissibly includes many individuals who could not have been harmed at all.

In *Mullins*, the Seventh Circuit explained that a proposed class may fail to meet the "ascertainability" requirement of Rule 23 if the proposed class definition is too vague. *Id.* at 659-60. The Seventh Circuit further explained that, to avoid vagueness, the class definition must identify "a particular group, harmed during a particular time frame, in a particular location, in a particular way." [50] *Id.* at 660.

---

[50] In his brief, Motto argues that the proposed Deposit Class is ascertainable because it is defined by objective criteria. Pl. Br. at 12-13. But, as the *Mullins* court explained, a proposed class must be *both* "defined clearly *and* based on objective criteria." 795 F.3d at 659 (emphasis added). Where, as here, the proposed class definition

17

Here, the proposed class definition for the Deposit Class does not specify how anyone who wired fiat currency into Mt. Gox's account at Mizuho during the proposed class period was harmed in any particular way, much less in a common way. The mere fact that a customer deposited fiat currency into Mt. Gox during the proposed class period does not mean that the customer suffered any harm. The customer might have deposited fiat currency, submitted a withdrawal request, and then received the funds from Mt. Gox in the form a wire transfer sent through Japan Post Bank. Or the customer might have bought bitcoin (as most or all Mt. Gox customers presumably intended) and transferred it to (i) another exchange, (ii) the individual's personal wallet, (iii) a third party's wallet in exchange for goods or services, (iv) a third party where bitcoin could be converted to fiat currency and used to purchase goods or services, or (v) Bitcoin Builder, after Mt. Gox suspended bitcoin withdrawals on February 7, 2014. *See* Ex. 8 ¶ 52; Ex. 26 at 91-92, 98-100, 112-13; Ex. 40 ¶ 13. Individuals who used any of these methods to withdraw fiat currency and/or bitcoin did not suffer any harm.[51] Because the proposed Deposit Class includes individuals who could not have suffered any harm, the class definition is impermissibly vague and overbroad and cannot be certified. *See Clark v. Bumbo Int'l Trust*, 2017 WL 3704825, at *3 (N.D. Ill. Aug. 28, 2017) (declining to certify classes defined overbroadly to include individuals who could not have been harmed); *see also Messner*, 669 F.3d at 824 ("If . . . a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.").

---

fails to specify how the proposed class was harmed *in a particular way*, it cannot be certified even if the proposed class is defined by objective, rather than subjective, criteria. *Id.* at 660.

[51] Motto repeatedly states that Mizuho's actions harmed "thousands" of individuals (Pl. Br. at 1, 9, 31-32), but offers no factual support for this assertion. Motto has no idea how many members of the proposed Deposit Class withdrew fiat currency from Mt. Gox or purchased bitcoin and transferred bitcoin from Mt. Gox. At most, Motto alleges that 19 individuals provided his counsel "with information that, if proven, would establish membership in the Deposit Class." Doc. No. 295-18 at ¶ 5.

18

In addition, even though the Seventh Circuit does not strictly require the proposed class definition to include "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition" (*Mullins*, 795 F.3d at 662 (citations omitted)), this case presents unique difficulties that may preclude any reliable means of identifying members of the proposed Deposit Class who allegedly suffered any (as yet unspecified) injury. In light of Mt. Gox's bankruptcy and Japan's restrictive approach to discovery, the parties have been unable to obtain Mt. Gox's business records, which would identify individuals in the U.S. who actually held bitcoin or U.S. dollars at Mt. Gox at the end of the alleged class period, and show how much was held by each such individual. Mt. Gox's business records were critical in helping the Japanese bankruptcy trustee evaluate the validity of claims. For example, as of September 27, 2017, only approximately 46 billion JPY (or 17.4 percent) of approximately 264 trillion JPY in submitted claims was accepted by the trustee based on his analysis of the claims against Mt. Gox's internal records. *See* Ex. 38 at 2; *see also* Ex. 40 ¶ 18. In addition, of the 24,750 creditors who submitted claims to the bankruptcy trustee, 5,372 (approximately 22 percent) were rejected in whole or in part. *See* Ex. 40 ¶ 19. The high percentage of claims rejected by the bankruptcy trustee suggests that a self-identification process for injured class members in this proceeding is likely to be equally unreliable.

### C. Motto Will Not Adequately Protect The Interests Of The Proposed Deposit Class And His Claims Are Not Typical Of The Claims Of Other Potential Deposit Class Members

The Court should also deny class certification because Motto has not satisfied the adequacy and typicality requirements of Rule 23(a). In *Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 459 (N.D. Ill. 2013) (Feinerman, J.), this Court explained that "[t]he Seventh Circuit has emphasized that a proposed class representative is inadequate if she is subject to *'even an arguable defense'* not applicable to the class as a whole. . . . A named plaintiff who has serious

19

credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative.'" *Id.* (quoting *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) (emphasis added). To render a proposed class representative unsuitable, that class representative's defense "need not be a sure bet," and "the defense need only be 'arguable.'" *Lipton*, 289 F.R.D. at 460. As shown below, the factual record surrounding proposed class representative Motto's claim raises serious concerns about Motto's ability to (i) establish the prima facie elements of his claim, (ii) show that the claims in the complaint were the case of his alleged injury, (iii) defend against a claim that he failed to mitigate damages, and (iv) establish that he is a member of the "Deposit Class" as defined in his motion. Because these concerns differentiate Motto's claim from those of other purported Deposit Class members, Motto is not an adequate class representative and his claims are not typical of the claims of other proposed Deposit Class members. For these reasons alone, the proposed Deposit Class cannot be certified.

*First*, Motto is an inadequate class representative and his claim is not typical of other proposed Deposit Class member's claims because Motto cannot prove, as he must under Illinois law, that (i) he was unaware of the allegedly concealed facts concerning Mt. Gox's U.S. dollar withdrawal delays, *and* (ii) he would have acted differently had he known the concealed fact. *See Bors v. Duberstein*, No. 03 C 4636, 2004 WL 1588271, at *4 (N.D. Ill. July 15, 2004). Motto's deposition testimony is unequivocal on both of these elements and leaves little doubt that he cannot prove these essential elements of fraudulent concealment.

As described above, Motto alleges that he attempted to fund his new Mt. Gox account with a $1,000 deposit made on February 18, 2014, at a time when delays and suspensions in both U.S. dollar and bitcoin withdrawals from Mt. Gox were well known and publicly communicated

20

by Mt. Gox on its website.  *See* Relevant Factual Background, Section B, *supra*.  Motto testified



. Ex. 33 at 176:21-179:6.  Motto specifically testified that

*Id*. at

179:2-6.[52]  In light of this unequivocal testimony, Motto will not be able to prove essential

elements of his fraudulent concealment claim (*i.e.*, that he did not know about the allegedly

concealed facts and would have acted differently if he had known).

At the very least, Motto's claim is "idiosyncratic or possibly unique," and he will be hard

pressed to overcome these unique facts that distinguish his claim from the claims of other

proposed Deposit Class members, particularly those who made deposits much earlier in the

alleged class period.  *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014) ("A

person whose claim is idiosyncratic or possibly unique is an unsuitable class representative.").

Motto's claim is not typical of the claims of other proposed Deposit Class members, and Motto

cannot fairly and adequately protect the interests of absent proposed Deposit Class members as a

class representative.  Indeed, if Motto were appointed class representative, his unique facts

would undermine and potentially sink the claims of differently situated class members along

with his own.  *See Lipton*, 289 F.R.D. at 460 (Feinerman, J.) (proposed class representative failed

to satisfy Rule 23(a)'s adequacy requirement because "she would have to devote substantial

attention to overcoming her deposition testimony, and if she failed to do so, she would sink each

absent class member's claims even though they might have prevailed had a class representative

---

[52] At another point in his testimony, Motto testified ███████████████████████████████
█████████  Ex. 33 at 123:15-16.  Obviously, Motto cannot have it both ways.  This inconsistency in Motto's
testimony also renders him an inadequate class representative because it puts his credibility at issue.  *CE Design*,
637 F.3d at 726 ("A named plaintiff who has serious credibility problems . . . may not be an adequate class
representative.").

without Lipton's baggage been carrying the torch."). Motto thus cannot be an adequate representative of the proposed Deposit Class.

*Second*, Motto faces difficulty in proving, as he must, that his alleged inability to retrieve his alleged $1,000 deposit is attributable to Mizuho's alleged fraud. *See Greene*, 206 F. Supp. 3d at 1374. As explained in the accompanying Declaration of Shuichiro Mita, at the time of Mt. Gox's collapse and bankruptcy filing, Mizuho had not yet credited Mt. Gox's account with the funds wired from Motto's Highline Technologies account at Chase Bank. Ex. 35 ¶ 8. Pursuant to a policy implemented by Mizuho after Mt. Gox's collapse, Mizuho contacted Chase Bank with a request to confirm whether its customer wished to cancel the transfer and have the funds returned (minus a transaction fee), or have the funds paid into Mt. Gox's account. *See* Ex. 35 ¶¶ 4-8, Ex. B. Mizuho's SWIFT message to Chase Bank specifically requested any formal request for cancellation by March 14, 2014. *Id*. Following an exchange of several SWIFT messages during the period from March 7, 2014 through March 24, 2014, Mizuho did not receive a request for cancellation from Chase Bank. *Id*. ¶¶ 9-14 & Exs. C-G.[53] Consequently, on April 10, 2014, Mizuho credited the $1,000 deposit to Mt. Gox's account. *Id*. ¶ 14, Ex. G.

Motto claims he has no recollection of receiving any messages from Chase Bank and that Chase Bank was unable to locate any corroborating documents. Pl. Br. at 21 n.4. Nonetheless, the relevant SWIFT messages are part of the record in this case, and Motto will have to devote substantial attention to addressing the SWIFT messages and proving that Mizuho, rather than Chase Bank (by failing to deliver Mizuho's message to him), caused his alleged loss. Purported Deposit Class members whose deposits were processed and credited before Mt. Gox's collapse,

---

[53] For purposes of evaluating Motto's typicality or adequacy, the Court need not decide whether or how the causation inquiry might be affected by Chase Bank's March 24, 2013 free format SWIFT message suggesting that Mizuho ██████████████████████████████ Ex. 35, Ex. F. The fact that Motto, unlike other potential Deposit Class members, will have to address this issue renders his claim atypical and him an inadequate class representative.

however, will not have to address any issues related to the receipt of similar SWIFT messages. For this reason, too, Motto's claims are atypical of those of the proposed Deposit Class and Motto is an inadequate class representative.

*Third*, Motto is subject to a potentially unique defense that he failed to mitigate damages. Motto testified that ███████████████████████████████████████████ ████████████████████████████████. *See* Ex. 33 at 143-150, 155-56. Potential Deposit Class members who filed timely claims in Mt. Gox's bankruptcy will not be subject to the failure-to-mitigate defense that Motto faces. Consequently, Motto's claim is atypical and he cannot adequately represent the interests of those potential Deposit Class members.

*Finally*, Motto is an inadequate class representative and his claim is atypical because the factual record suggests that Motto does not even qualify as a member of the proposed Deposit Class. The proposed class definition includes only "individuals" in the U.S. who wired fiat currency to Mt. Gox's account at Mizuho during the alleged class period. *See* Pl. Mot. at 1. Motto, however, seeks to base his claim on a wire transfer made from a corporate account held in the name of Highline Technologies, a corporate entity that Motto controlled, not from his individual account. *See* Pl. Br., Ex. 41 (Doc. No. 295-21). This raises a potential question about whether Motto even falls within the proposed Deposit Class definition, and renders him inadequate to represent potential Deposit Class members who clearly do.

Motto thus fails to meet the adequacy and typicality requirements of Rule 23(a)(3) and (4) on several grounds. That alone precludes certification of the proposed Deposit Class.

## II.     The Proposed Class Does Not Satisfy Rule 23(b)(3)'s Predominance And Superiority Requirements

To certify a damages class under Rule 23(b)(3), a plaintiff who meets all four requirements of Rule 23(a) must also show through "evidentiary proof" that "questions of law or

fact common to class members predominate over any questions affecting only individual members" *and* that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Clark v. Bumbo Int'l Trust*, 2017 WL 3704825, at *2 (N.D. Ill. Aug. 28, 2017) (quoting Rule 23(b)(3); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). Motto cannot show that either of these requirements is satisfied here.

### A. Questions Common To Deposit Class Members Do Not Predominate Over Questions Affecting Only Individual Class Members

The predominance requirement of Rule 23(b)(3) overlaps with the commonality requirement of Rule 23(a)(2), but the predominance requirement of Rule 23(b)(3) "is far more demanding." *Messner*, 669 F.3d at 814. Where issues central to establishing liability are necessarily "individual and fact-intensive," the predominance requirement is not satisfied. *Lipton*, 289 F.R.D. at 462 (Feinerman, J.).

#### 1. Individual Questions Relating To Materiality, Knowledge, Reliance, Causation, and Injury Predominate Over Common Questions (If Any)

As the analysis of Motto's inadequacy as class representative illustrated, this case raises a host of individual questions that will need to be determined in assessing whether Deposit Class members can hold Mizuho liable for fraudulent concealment. Several critical elements of fraudulent concealment in Illinois – including whether the allegedly concealed information was material to the class member, whether the class member knew that information before making his or her deposit, whether the class member would have changed his or her behavior if he or she knew the allegedly concealed fact, whether the class member suffered any alleged injury, and if so, whether that injury can be attributed to Mizuho's alleged fraudulent conduct – necessarily will require individual inquiry and result in different answers across different class members. Where, as with each of the foregoing questions, "the members of a proposed class will need to

present evidence that varies from member to member," the question is an individual question.
*Messner*, 669 F.3d at 815.

*Materiality*.  In order to prevail against Mizuho, each potential Deposit Class member will have to prove that the allegedly concealed information (*i.e.*, that as of June 21, 2013 Mizuho was no longer transmitting wire transfers for Mt. Gox) was a material fact, even though (i) Mt. Gox was still honoring U.S. dollar withdrawal requests through Japan Post Bank, (ii) Mt. Gox (and news reports) had disclosed that there were delays in making fiat currency withdrawals, and (iii) Mt. Gox offered expedited fiat currency withdrawals to its U.S. customers for a fee.  As a threshold matter, in light of Mt. Gox's use of Japan Post Bank to send fiat currency to U.S. customers and the public disclosures and media reports about delays, there is no evidence that any material information was withheld.  *See* Pl. Br., Ex. 38 (Doc. No. 295-19) (a fact is material if it would influence the plaintiff's conduct).  But even if the Court were to disagree, the materiality inquiry is still necessarily an individual one because, as described in the accompanying expert report of Bruce Strombom, whether or not it was important to proposed Deposit Class members to know that Mt. Gox was no longer using Mizuho to send fiat currency to the U.S., but instead was using Japan Post Bank, would differ from one customer to another, depending on the customer's individual circumstances, including, for example, how the customer planned to invest on Mt. Gox, what the customer planned to do with his or her bitcoin, and whether it was important to be able to withdraw fiat currency quickly (or at all).  *See* Ex. 40 ¶¶ 42, 48-50.  For example, while some proposed Deposit Class members might have deposited U.S. dollars with the intention to be able to withdraw them later, other proposed Deposit Class members might have deposited fiat currency with Mt. Gox with the intention to purchase bitcoin for use in commercial transactions or intending to transfer the bitcoin out of Mt. Gox.  Like

Motto, these customers would not have cared whether or not Mt. Gox was using Mizuho (or any other bank) to send U.S. dollar wire transfers. *See id.* ¶¶ 39, 48.

*Knowledge*. In Illinois, proposed Deposit Class members will have to prove that they were unaware of the information that was allegedly concealed from them — specifically, their purported inability to withdraw U.S. dollars from Mt. Gox and the identity of the bank or banks handling wire transfers on behalf of Mt. Gox. *See* I.C, *supra*; *see also Trustees of the Aftra Health Fund v. Biondi*, 303 F.3d 765, 777 (7th Cir. 2002). This, too, is an individual inquiry that will not yield uniform answers from each member of the proposed Deposit Class. Indeed, as described above, information about withdrawal delays at Mt. Gox was widely available to Mt. Gox users, including Motto, during the alleged class period. *See* Relevant Factual Background, Section A, *supra*. Further, as Mr. Strombom notes in his report, some Mt. Gox users had individual communications with Mt. Gox about those delays. *See* Ex. 40 ¶¶ 10, 28.

Former plaintiff Gregory Pearce's communications with Mt. Gox are instructive. *See* Ex. 27. ████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████



Mt. Gox went dark three days later.

Although Pearce is not a member of the proposed Deposit Class, his communications with Mt. Gox provide a window into what Mt. Gox told its customers about withdrawal delays, what Mt. Gox customers knew or could have known about delays, and what Mt. Gox customers knew or could have known about how to withdraw their funds from Mt. Gox, for example, by transferring bitcoin out of Mt. Gox or using Mt. Gox's expedited service. Responses to each of these inquiries would vary by individual, and can only be established through individual inquiry.

_Reliance_. To prove fraud in Illinois, individual members of the proposed Deposit Class will have to show either (i) that they justifiably acted in reliance on the facts as known to them, _i.e._, without the benefit of the allegedly concealed information, or (ii) had they known the concealed information, they would have acted differently. _See_ I.C, _supra_; _see also Trustees of the Aftra Health Fund_, 303 F.3d at 777. Motto concedes that reliance ordinarily requires individual proof from each class member. Pl. Br. at 24-25. Nonetheless, in a long and convoluted discourse spanning several pages of his brief, with citation to numerous unrelated, unpersuasive, and unauthoritative court decisions from various jurisdictions primarily outside the

Seventh Circuit,[54] Motto contends that this individual inquiry can be avoided in this case because reliance can be inferred on a classwide basis from the nature of Mizuho's alleged misrepresentation. *Id*. at 24-32. Once again, however, Motto's contention is based on the factually incorrect assertion that Mizuho failed to alert Mt. Gox users of their "complete inability" to withdraw fiat currency from Mt. Gox after Mizuho stopped sending wire transfers on behalf of Mt. Gox. *See id*. at 31-32.

The need for individual inquiry on the essential issue of reliance is demonstrated by Motto's own experience. As noted above, Motto did not rely and could not have relied on the alleged omission, because he admitted that ███████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████ ████████████████████ Ex. 33 at 176-179. Other members of the proposed Deposit Class may have had similar motives or intentions, especially if they, ████████, were aware of the withdrawal delays at Mt. Gox when they deposited into Mt. Gox's account at Mizuho. Ex. 40 ¶ 30. These issues can only be determined through individual inquiry. *Id*. ¶ 31.

*Causation*. Causation is yet another critical element of fraudulent concealment that requires individual inquiry in this case. As Motto's experience shows, the alleged losses of a member of the proposed Deposit Class may not be attributable to Mizuho's alleged fraudulent concealment. In Motto's case, his alleged loss may have been caused, not by Mizuho, but by the fact that (i) his deposit was never credited to his Mt. Gox account, which may be the result of conduct by Mt. Gox; (ii) Mt. Gox went dark on February 24, 2014, which made it impossible for

---

[54] *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016), is entirely inapposite. In that case, the Supreme Court addressed the use of statistical evidence to "fill an evidentiary gap created by the employer's failure to keep adequate records" in a Fair Labor Standards Act case (*id*. at 1047) and has no bearing on when or whether reliance can be inferred on a classwide basis in a fraudulent concealment case.

Motto to purchase bitcoin and transfer the bitcoin out of Mt. Gox, █████████████████ █; (iii) Motto and/or his remitting bank may have neglected an offer by Mizuho to accept a request to cancel his wire transfer and have the money refunded; and (iv) Motto failed to submit a timely bankruptcy claim, ████████████████████████████████████ ████████████████. *See* I.C, *supra*; *see also* Ex. 37 at Pearce001438. For these reasons, Mr. Strombom has opined that Motto's loss of the $1,000 he sought to deposit by wire transfer to Mt. Gox's account at Mizuho is not causally connected to any alleged wrongdoing by Mizuho. Ex. 40 ¶ 53. In addition, as explained by Mr. Strombom, other proposed Deposit Class members may have experienced some or all of the same, similar or other circumstances that would be relevant in determining whether their claimed losses were the result of any alleged wrongdoing by Mizuho. *Id.* ¶¶ 49-52. For example, the proposed Deposit Class members' alleged losses could have been caused by (i) Mt. Gox's decision to send fiat currency to as many as 19 U.S. customers on some days during the proposed class period and none on other days; (ii) Mt. Gox's failure to allocate sufficient resources to processing its customers withdrawal requests; (iii) the order in which Mt. Gox processed its customers' withdrawal requests; (iv) the decision by some proposed Deposit Class members to reject Mt. Gox's offer to expedite the withdrawal request; and (v) the date on which a proposed Deposit Class member deposited his or her fiat currency and the proximity to the date on which Mt. Gox collapsed. Because these circumstances can only be ferreted out by means of individual inquiry (and from evidence not in the record), causation cannot be proved on a classwide basis in this case.

 *Injury*. Injury is, of course, a critical element of the fraudulent concealment claim asserted against Mizuho, but, as explained above, the proposed Deposit Class definition fails to identify any particular harm allegedly suffered by members of the proposed Deposit Class. As

Mr. Strombom's report explains, ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Ex. 40

¶ 32. However, because Motto has not provided any classwide data or even a general methodology for tracing the fiat currency after the initial deposit, this issue is necessarily subject to individual inquiry and the proposed Deposit Class cannot be certified.

2.    <u>Individual Questions About Damages Will Predominate</u>

The proposed Deposit Class also cannot be certified because Motto has not offered any classwide basis on which to calculate and award damages (if any) attributable to the alleged fraudulent concealment.  In *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), the Supreme Court held that, under Rule 23(b)(3), a district court must conduct a rigorous analysis to determine whether the plaintiff has introduced admissible evidence to show that the case is susceptible to awarding damages on a classwide basis.  As the Seventh Circuit explained, "*Comcast* holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges."  *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 799 (7th Cir. 2013) (emphasis in original).

As shown above, Motto's class definition does not even attempt to articulate a classwide injury common to all members of the proposed Deposit Class.  It is therefore not surprising that Motto's class certification motion says nothing at all about how he intends to prove any damages attributable to the alleged fraudulent concealment by Mizuho, nor is it surprising that Motto has not submitted an expert report offering a mechanism for measuring damages based on the theory of liability asserted against Mizuho.  As in *Comcast*, a classwide measure of damages in this case would not match the plaintiff's theory of liability against Mizuho, because, as explained above, the fully developed factual and expert record shows (among other things) that depositors' funds

were not trapped at Mt. Gox's account in Mizuho after Mizuho stopped processing outbound

wire transfer requests for Mt. Gox, Mizuho did not prohibit Mt. Gox from communicating with

its customers about U.S. dollar withdrawals, and Motto and other Mt. Gox customers knew that

Mt. Gox was experiencing multi-week delays in sending fiat currency to its customers in the U.S.

In other words, this is a case in which proposed class members *could not have been*

*harmed* by any alleged conduct by Mizuho.  *See Messner*, 669 F.3d 802, 824 (7th Cir. 2012) (if

"a class is defined so broadly as to include a great number of members who for some reason

could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined

too broadly to permit certification").  Accordingly, because Motto has not articulated and cannot

articulate a theory of damages tied to his alleged theory of liability against Mizuho, nor has he

articulated (or can he articulate) a classwide basis for measuring damages, class certification is

inappropriate under *Comcast*.[55]  *Cf. Clark*, 2017 WL 3704825, at *6 (denying class certification

where the plaintiff did not "advance any damages theory or methodology or even superficially

offer a way of measuring damages").

3.     Common Questions Do Not Predominate Because Differing Legal
       <u>Standards From One Jurisdiction To Another Require Different Inquiries</u>

As Motto concedes, "[i]n a proposal for multistate certification, the commonality and

predominance analysis must ensure that the class members are governed by 'the same legal

rules.'"  Pl. Br. at 14 (quoting *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 156 (N.D. Ill. 2017)).

Here, however, the law on fraudulent concealment varies across the 49 different jurisdictions (48

states and the District of Columbia) that Motto seeks to include in the proposed Deposit Class.

Because a multistate class governed by the laws of 49 jurisdictions nationwide would require

---

[55] The Seventh Circuit has indicated that class certification should not be denied simply because "damages are not identical across all class members" "if issues of liability are genuinely common issues." *Butler*, 727 F.3d at 801. This is not such a case because the plaintiffs have not articulated a theory of liability supported by actual evidence of a common injury.

individual inquiries subject to the vagaries of each jurisdiction's somewhat different legal standards concerning fraudulent concealment, the proposed multistate Deposit Class defeats Rule 23(b)(3)'s predominance requirement and cannot be certified.

Courts in the Seventh Circuit are wary of certifying multistate classes asserting state law claims governed by the laws of the various states. For example, in *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995), the Seventh Circuit directed the district court to decertify a multistate class because of different negligence standards across the states, noting that even if they differ "only in nuance," that "nuance can be important." In that case, the Seventh Circuit identified such nuances in the "differing judicial formulations of the meaning of negligence and subordinate concepts" by comparing the pattern jury instructions for negligence across the various states. *Id.* Here, too, contrary to Motto's facile assertion that "the same core elements come through in each jurisdiction" (Pl. Br. at 16), a review of the pattern jury instructions submitted by Motto shows plainly that the elements differ from state to state, or are subject to differing interpretations or applications. *See* Pl. Br., Ex. 38 (Doc. No. 295-19). For example, based on a review of the survey of jury instructions attached to Motto's motion, the various jurisdictions have different standards for determining:

- When a duty to disclose may arise:

  o In Alaska, California, Colorado, Minnesota, Nevada, North Carolina, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, and Washington, for example, if the defendant is in a fiduciary relationship or relationship of trust and confidence with the plaintiff.

  o In Alabama, Colorado, Minnesota, New York, Oklahoma, South Carolina, and Tennessee, for example, if the defendant has special or superior knowledge.

  o In California, Colorado, Massachusetts, Minnesota, North Carolina, Oklahoma, South Carolina, and Washington, for example, to ensure that a partial disclosure is not misleading.

- o In California, North Carolina, and Pennsylvania, for example, if the defendant intentionally conceals a material fact.

- Whether the plaintiff subjectively or objectively relied on the alleged nondisclosure:

  - o In Florida, Michigan, Virginia, and Vermont, for example, the plaintiff need only prove he or she relied.

  - o In a majority of states, the plaintiff must prove reliance was reasonable or justified.

- Whether the plaintiff's knowledge of the alleged concealed fact, or lack thereof, is a defense or an element of the plaintiff's affirmative claim:

  - o In Arizona, California, Illinois, Idaho, Montana, New Hampshire, South Carolina, Utah, Vermont, and Washington, for example, lack of knowledge is an affirmative element of the plaintiff's claim to be proved by the plaintiff.

  - o In Nevada, for example, knowledge is an affirmative defense for the defendant.

- Whether the plaintiff must prove that he/she could not have discovered the allegedly concealed fact through the exercise of reasonable diligence:

  - o In Kansas and South Carolina, for example, this is an element of the plaintiff's claim.

  - o In Florida, Maine, Massachusetts, New York, and Tennessee, for example, the plaintiff has no duty to investigate.

- Causation:

  - o In Alaska, Arkansas, California, New Jersey, and Utah, for example, the alleged fraud need only be a substantial factor.

  - o In D.C., Idaho, Illinois, Iowa, Missouri, Montana, Nebraska, Ohio, and Oregon, for example, proximate cause is required.

In addition, while a few states may allow reliance to be inferred or presumed in certain circumstances, California, Delaware, the District of Columbia, Florida, Illinois, Iowa, Michigan, and New York, for example, require individual proof of actual reliance on the allegedly concealed information.[56]  *See* Pl. Br., Ex. 38 (Doc. No. 295-19).  All of these differences in the

---

[56] *See, e.g., O'Shea v. Epson Am., Inc.*, 566 F. App'x 605, 606 (9th Cir. 2014) ("Under California law, a plaintiff alleging fraud by omission must establish actual reliance by demonstrating 'that had the omitted information been disclosed, he or she would have been aware of it and behaved differently.'") (citation omitted); *Schopp v. Ford Motor Co.*, 2007 WL 9210309, at *4 (Ill. Cir. Ct. 2007) ("reliance and proximate cause cannot be presumed" for fraudulent omission claim under Illinois law); *Jenkins v. Macatawa Bank Corp.*, 2006 WL 3253305, at *10 (W.D.

fraudulent concealment law of the various jurisdictions preclude certification of a nationwide class. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002); *In re Yasmin & Yaz (Drospirenone) Mktg.*, 275 F.R.D. 270, 276 (S.D. Ill. 2011)).

### B.  Class Treatment Is Not A Superior Method For Adjudicating The Claims Of The Proposed Deposit Class

Motto has not demonstrated the existence of a common issue capable of resolution on a classwide basis, nor has he demonstrated that common questions predominate over issues requiring individual inquiry.  For that reason alone, Motto's proposed Deposit Class is not superior to other methods of adjudication and the class should not be certified.

Motto suggests that even if individual inquiries concerning reliance are needed, the case should still be certified to address common issues.  Pl. Br. at 33.  In this case, however, unlike consumer fraud cases that Motto points to – *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014), and *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013) – there would be no benefit to trying any part of this case as a class action.  Even if Motto could identify a common issue capable of classwide resolution in this case (and he has not), the predominance of the individual issues is overwhelming.  As shown above, virtually every one of the critical elements of a fraudulent concealment claim requires individual inquiry.  In these circumstances, certifying a class to resolve relatively minor common issues would do little to substantially advance the case and is not superior to other methods of adjudication.  *See Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 463 (N.D. Ill. 2013) (Feinerman, J.).

Furthermore, as discussed above, a single nationwide Deposit Class, with state law fraud

---

Mich. Nov. 9, 2006) ("In Michigan, fraud by omission requires proof of individual reliance, so individual questions predominate."); *Waksman v. Cohen*, 2002 WL 31466417, at *5-6 (S.D.N.Y. Nov. 4, 2002) (same under New York law); *Phelps v. Stomber*, 883 F. Supp. 2d 188, 229 (D.D.C. 2012) (same under D.C. law); *Brinker v. Chi. Title Ins. Co.*, 2012 WL 1081211, at *13 (M.D. Fla. Feb. 9, 2012) (same under Florida law); *In re Teflon Prods. Liab. Litig.*, 254 F.R.D. 354, 365 (S.D. Iowa 2008) (same under Iowa law); *Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *4 (Del. Ch. Dec. 19, 2002) (same under Delaware law).

claims governed by the differing laws of 49 jurisdictions, would not be manageable. *See Bridgestone/Firestone*, 288 F.3d at 1018 (holding that a single nationwide class with claims to be adjudicated under the laws of so many jurisdictions is not manageable). Moreover, even if the Court were inclined to consider certifying subclasses for the residents of the various separate jurisdictions, each subclass would have to show that it satisfies all of the Rule 23(a) factors. *See Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 599 (7th Cir. 1993) ("Subclasses must satisfy the class action requirements before they may be certified."). In other words, the plaintiffs would have to show that the numerosity requirement is met for each jurisdiction on its own, and would have to propose a separate state-resident named plaintiff to adequately represent the interests of the members of each potential subclass. *See In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, 2017 WL 1196990, at *47 (N.D. Ill. Mar. 31, 2017). It is doubtful that the plaintiffs could identify enough individuals from each of the separate jurisdictions and find new named plaintiffs to serve as representatives for each potential subclass. In addition, in light of *Bristol-Myers Squibb Co. v. Supreme Court of California, San Francisco County*, 137 S. Ct. 1773 (2017), and this Court's recent decision dismissing the claims of former plaintiffs Lack and Pearce, this Court cannot exercise personal jurisdiction over the claims of out-of-state potential subclass representatives. [57]

For all of these reasons, the proposed Deposit Class fails to meet Rule 23(b)(3)'s superiority requirement and cannot be certified.

## CONCLUSION

For the foregoing reasons, this Court should deny Motto's motion for class certification in its entirety.

---

[57] *See also McDonnell v. Nature's Way Prods., LLC*, 2017 WL 4864910, at *4 (N.D. Ill. Oct. 26, 2017) (no personal jurisdiction over claims of out-of-state putative class members); *DeBernardis v. NBTY, Inc.*, 2018 WL 461228, at *2 (N.D. Ill. Jan. 18, 2018) (same).

MIZUHO BANK, LTD.

By: /s/ Jerome S. Fortinsky
                       One of Its Attorneys

Jonathan S. Quinn (#6200495)
jquinn@ngelaw.com
Jason A. Frye (#6292848)
jfrye@ngelaw.com
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street
Chicago, IL 60602-3801
(312) 269-8000

Jerome S. Fortinsky (admitted pro hac vice)
jfortinsky@shearman.com
John A. Nathanson (admitted pro hac vice)
john.nathanson@shearman.com
Jeffrey J. Resetarits (admitted pro hac vice)
jeffrey.resetarits@shearman.com
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

Dated: February 1, 2018

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorneys hereby certify that on the 1st day of February, 2018, we

caused this **Memorandum Of Law Of Defendant Mizuho Bank, Ltd. In Opposition To**

**Motion For Class Certification** to be served by causing true and accurate copies of such paper

to be transmitted via ECF to all counsel of record,


/s/ Jerome S. Fortinsky


and via electronic mail to Mark Karpeles.


/s/ Chad M. Remus