Exhibit 2

JS-44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Gregory Pearce, individually and on behalf of all others similarly situated

**DEFENDANTS**

Mizuho Bank, LTD, a Japanese financial institution, and Mark Karpeles, an individual

**(b)** County of Residence of First Listed Plaintiff   Chester County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
David S. Senoff, Esq. Anapol Weiss-130 N. 18th St., Ste 1600, Phila., PA 19103; (215) 735-1130

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☒ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other<br><br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br><br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §1332(d)(2)
Brief description of cause:
Fraud relating to foreign bitcoin exchange.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 5,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   January 24, 2018

SIGNATURE OF ATTORNEY OF RECORD   David S. Senoff

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 1295 Clearbrook Road, West Chester, PA 19380

Address of Defendant: 1-3-3 Marunouchi, Chiyoda-ku, Tokyo, Japan 100-8210

Place of Accident, Incident or Transaction: Pennsylvania
                              (Use Reverse Side For Additional Space)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
    (Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))          Yes☐   No☒

Does this case involve multidistrict litigation possibilities?          Yes☒   No☐
RELATED CASE, IF ANY:
Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
                                                                     Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
                                                                     Yes☐   No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
                                                                     Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
                                                                     Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☒ All other Diversity Cases
    (Please specify) fraud

## ARBITRATION CERTIFICATION
(Check Appropriate Category)

I, David S. Senoff , counsel of record do hereby certify:
    ☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
    ☐ Relief other than monetary damages is sought.

DATE: January 24, 2018     *David S. Senoff*          65278
                           Attorney-at-Law           Attorney I.D.#
    NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: January 24, 2018     *David S. Senoff*          65278
                           Attorney-at-Law           Attorney I.D.#

CIV. 609 (5/2012)

Case 2:18-cv-00306-RK   Document 1   Filed 01/24/18   Page 3 of 24

## UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 1295 Clearbrook Road, West Chester, PA 19380

Address of Defendant: 1-3-3 Marunouchi, Chiyoda-ku, Tokyo, Japan 100-8210

Place of Accident, Incident or Transaction:   Pennsylvania

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
   (Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))          Yes☐   No☒

Does this case involve multidistrict litigation possibilities?                                    Yes☒   No☐
*RELATED CASE, IF ANY:*
Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
                                                          Yes☐   No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
                                                          Yes☐   No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
                                                          Yes☐   No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
                                                          Yes☐   No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
      (Please specify) _____

B. *Diversity Jurisdiction Cases:*
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☒ All other Diversity Cases
      (Please specify)   fraud

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*
I, David S. Senoff                           , counsel of record do hereby certify:
   ☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
   ☐ Relief other than monetary damages is sought.

DATE: January 24, 2018          _David S. Senoff_                    65278
                                Attorney-at-Law                   Attorney I.D.#
NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: January 24, 2018          _David S. Senoff_                    65278
                                Attorney-at-Law                   Attorney I.D.#

CIV. 609 (5/2012)

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Gregory Pearce, individually and on behalf of all others similarly situated | : | CIVIL ACTION |
| v. | : | |
| Mizuho Bank, LTD, a Japanese financial institution, and Mark Karpeles, an individual | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.　　　　( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.　　　　( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.　( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.　　　　( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)　　　　(X )

(f) Standard Management – Cases that do not fall into any one of the other tracks.　　　　( )

| | | |
|---|---|---|
| January 24, 2018 | _Davos Sff_ | Plaintiffs |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 735-1130 | (215) 875-7733 | dsenoff@anapolweiss.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA,

GREGORY PEARCE, individually and on
behalf of all others similarly situated,

                      *Plaintiff*,                        Case No.

v.

MIZUHO BANK, LTD., a Japanese financial
institution, and MARK KARPELES, an
individual,

                      *Defendants*.

---

### CLASS ACTION COMPLAINT

Plaintiff, Gregory Pearce ("Plaintiff") brings this Class Action Complaint and Demand

for Jury Trial against Defendants Mark Karpeles ("Karpeles") and Mizuho Bank, Ltd.

("Mizuho"). Plaintiff alleges as follows upon personal knowledge as to himself and his own acts

and experiences, and, as to all other matters, upon information and belief, including investigation

conducted by his attorneys.

### NATURE OF THE ACTION

1.       This case involves the demise of the Mt. Gox Bitcoin Exchange ("Mt. Gox" or the

"Exchange") and the loss of hundreds of millions of dollars worth of its users' bitcoins and cash

("Fiat") Currency. Defendant Mark Karpeles, who owned and ran Mt. Gox, was responsible for

the loss of more than $400 million from users on the Exchange through either gross negligence

or outright theft. Plaintiff brings suit on behalf of a class of similarly situated individuals to

recover their resulting losses from Karpeles.

2.       Although Karpeles is the most notorious actor in the Mt. Gox collapse, Mt. Gox's

banking partner, Defendant Mizuho Bank, bears significant responsibility as well. As discussed below, in mid-2013, Mizuho created a number of artificial hurdles in hopes of forcing Mt. Gox to sever relations with it. The most significant of these hurdles was to stop processing any withdrawal requests made by Mt. Gox users in the United States, thus causing thousands of withdrawal requests submitted to Mt. Gox to go unfulfilled. In this sense, Mizuho was akin to the famous Hotel California, money could check into the bank at any time, but once there, it could never leave. Plaintiff thus also brings suit on behalf of a subclass of similarly situated individuals who attempted, but failed, to withdraw money from their Mt. Gox accounts after Mizuho made the decision to stop allowing withdrawals.

## PARTIES

3.      Plaintiff Gregory Pearce is a natural person and citizen of the State of Pennsylvania.

4.      Defendant Mark Karpeles is a natural person and citizen of the country of France. During the events alleged in this Complaint, Karpeles served as the Chief Executive Officer of both Mt. Gox KK and its parent company, Tibanne KK. Additionally, Karpeles is the sole shareholder of Tibanne KK. Based on Mt. Gox's own statements, "Mark Karpeles is the President and CEO of both MtGox and Tibanne. Mark providers [sic] overall direction, responsible for supervising main operations and steering the company according to his vision." Through Tibanne KK and the Mt. Gox Exchange, Karpeles conducted business throughout this District, the State of Pennsylvania, and the United States.

5.      Defendant Mizuho Bank is a Japanese financial institution with its principal headquarters located at 1-3-3, Marunouchi, Chiyoda-ku, Tokyo, Japan 100-8210. Mizuho Bank conducts business worldwide. Mizuho Bank has received and processed wire money deposits

and withdrawals for Mt. Gox customers residing in this District, the State of Pennsylvania, and the United States.

## JURISDICTION AND VENUE

6.       This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Classes is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to this action.

7.       This Court has personal jurisdiction over Defendants because they conduct business in this District and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from this District.

8.       Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from this District.

## COMMON FACTUAL ALLEGATIONS

*The Mt. Gox Bitcoin Exchange.*

9.       Founded in 2009, Mt. Gox at one time claimed to be the "world's most established Bitcoin exchange." In addition to buying and selling bitcoins, Mt. Gox promised its customers "the ability to securely store Bitcoin in a virtual 'vault' for safe keeping" on its servers. It further promised that its website would be "always on" so that users could "[b]uy and sell Bitcoin 24/7/365 with the world's most sophisticated trading platform."

10.      To use Mt. Gox's service, customers were required to sign up for an account at www.mtgox.com and agree to Mt. Gox's Terms of Use, which expressly stated that "MtGox represents and warrants that . . . it will hold all monetary sums and all Bitcoins deposited by each

Member in its Account, in that Member's name as registered in their Account details, and on such Member's behalf."

11.     Customers were also asked to verify their accounts by providing Mt. Gox with detailed information, such as their full name, date of birth, country of birth, physical address, and proof of identity (such as a state issued identification card).

12.     To make purchases and trades on the Exchange, users could transfer bitcoins directly into their Mt. Gox accounts or deposit cash into their accounts by wiring money to Mt. Gox's banking partner—Defendant Mizuho Bank. After receiving the funds, Mizuho Bank would transfer the money into an account that it held on behalf of Mt. Gox.

13.     Mt. Gox received a transaction fee for each trade made on the Exchange. Upon information and belief, Mt. Gox made tens of thousands of dollars per day in transaction fees from customers on its site.

*Mark Karpeles—The Mastermind Behind Mt. Gox.*

14.     As President, CEO, and majority shareholder of Mt. Gox, Karpeles controlled all aspects of Mt. Gox's business from the ground up. In fact, Karpeles was involved in nearly every detail of the Exchange, from the technical (Karpeles wrote and designed the software used to run Mt. Gox) to the operational (Karpeles handled all of Mt. Gox's third party negotiations and contracts).

15.     Karpeles likewise directed the drafting and dissemination of Mt. Gox's public statements and representations (including those made through its Terms of Use), as well the statements made through Mt. Gox's customer service department. In addition, Karpeles handled all aspects of Mt. Gox's accounting (including its maintenance of user and operational accounts) and banking affairs—personally representing Mt. Gox in its negotiations and discussions with

banks and third-party payment processors.

16.    As the sole controlling force behind Mt. Gox and the designer of its software, Karpeles was aware that there were security "bugs" in the system in as early as 2011.

17.    Rather than correcting the security bugs (or informing users of their existence), Karpeles knowingly concealed the defects from the public and falsely assured users that their bitcoins and money were safe in their accounts.

*Mizuho Bank's Banking Relationship With Mt. Gox.*

18.    Defendant Mizuho Bank was Mt. Gox's bank partner in Japan and maintained Mt. Gox's operating accounts. In that capacity, Mizuho Bank facilitated international cash wire transfers into the Exchange and processed user requests to withdraw cash from the Exchange to their outside bank accounts.

19.    To facilitate wire transfers into the Exchange, Mizuho accepted payments that had been wired by users through their outside banks (e.g. Bank of America). Such wire transfers designated Mt. Gox as the beneficiary of the wire and Mizuho as the beneficiary's bank, and included the Mt. Gox user's account number to which the funds were to be directed. After accepting the wire payment, Mizuho thereafter deposited the funds into its account for Mt. Gox with the funds marked on behalf of the specific depositing Mt. Gox user.

20.    To withdraw cash from the Exchange, Mt. Gox users submitted requests online through their Mt. Gox account. Mt. Gox would compile the requests it received—which included such information as the user's banking details and the amount to be transferred—and provide the requests to Mizuho for processing. After receiving the requests, Mizuho would then transfer out the requested amounts to the user's bank.

21.    In mid-2013, Mizuho Bank was the exclusive processor of all bank deposits and

withdrawals made by Mt. Gox users located in the United States.

***Mizuho Bank Became Concerned With Karpeles' Business and Implemented New Banking Policies Designed to Coerce Karpeles Into Dissolving Their Partnership.***

22.     Beginning in 2013, Mizuho Bank became increasingly concerned by Mt. Gox's growing transaction volumes amid reports that U.S. authorities were investigating Mt. Gox for business dealings related to money laundering. At the same time, Mizuho Bank faced its own legal troubles at home, with reports surfacing that the bank had knowingly loaned money to organized crime syndicates and was under investigation by Japan's Financial Services Agency.

23.     Accordingly, fearing that the partnership would expose it to further regulatory scrutiny and cause significant reputational harm, Mizuho Bank decided that it wanted to distance itself from Karpeles and Mt. Gox. However, for its own purposes, Mizuho Bank wanted Karpeles to be the one to officially sever the banking relationship. To that end, Mizuho asked Karpeles to close Mt. Gox's account at Mizuho. He refused.

24.     In order to pressure Karpeles into rethinking his decision and force an end to the banking relationship, Mizuho began implementing a series of new policies in the beginning of 2013. These new policies—all of which were kept secret from the public—were meant to frustrate and disrupt Mt. Gox's business and relationship with its customers. Chief among these new measures was refusing to process international wire transfer requests.

25.     Ultimately, in June 2013, Mizuho stopped processing international wire withdrawals for Mt. Gox altogether.

26.     Accordingly, in June 2013, Mt. Gox users began to report substantial difficulties in withdrawing cash from their Mt. Gox accounts—wondering online about the source of the delays.

27.     Mizuho knew that if US customers found out about its new unreasonable banking

6

policies (especially, the fact that withdrawals were no longer allowed), they would no longer

continue making deposits into the Exchange and it would cease collecting the associated fees.

Mizuho also harbored concerns that if its banking policies became publicly known, it could

suffer reputational damage or potentially be blamed for losses. Nevertheless, Mizuho continued

to accept user deposits into the Mt. Gox Exchange (for which it collected fees on each

transaction) through its collapse in February 2014.

28.     On information and belief, Mizuho continued accepting customer deposits in

order to further the impression that any withdrawal difficulties were solely attributable to Mt.

Gox, so as to avoid drawing public criticism and further scrutiny from regulatory authorities, as

well as to continue profiting from the deposit fees that it collected.

**Defendants Concealed Mt. Gox's Operational Difficulties and Continued Accepting Cash Deposits.**

29.     In February 2014, Karpeles made numerous representations to the public and to

Mt. Gox users that the withdrawal issues were only temporary and that user assets were safe.

Karpeles also assured users through the Mt. Gox online Support Desk (which he directed and

controlled) that any problems were being dealt with and that there was no cause for alarm.

Likewise, users who inquired about withdrawal delays were informed that any withdrawal issues

were only temporary and that delays in transaction speeds were merely "due to a change in [Mt.

Gox's] banking systems" which had resulted in a "back-log" of requests that needed to be

processed." Karpeles even claimed that Mt. Gox was "trying to form relationships with several

new banking partners both in Japan and around the world" and "in the process of finalizing even

more," meaning that it would "have increased stability and ability to transmit withdrawals going

forward."

30.     Both Karpeles and Mizuho knew that these statements were false—withdrawal

delays were not due to any "backlog" in the system; they were not minor issues and they were not temporary. Rather, withdrawal delays were due to Mizuho's refusal to process international withdrawal requests and its broader efforts to undermine the banking relationship between it and Mt. Gox.

31.      Although Mizuho knew that Karpeles was making these false and misleading statements to the public and to his Mt. Gox users, it took no action to correct them. Instead, Mizuho concealed that it was the cause of the Mt. Gox withdrawal delays, concealed the fact that it had implemented banking policies designed to disrupt Mt. Gox's business and relationship with its users, and stood silent while allowing the public to continue being duped.

32.      Upon information and belief, Mizuho prohibited Mt. Gox from disclosing that withdrawal difficulties were attributable to Mizuho, or that Mizuho wanted to terminate its banking relationship with Mt. Gox. By continuing to accept deposits, Mizuho further contributed to the false narrative that the Mt. Gox Exchange was operating properly and that problems with withdrawals were not serious or attributable in any way to Mizuho.

33.      On February 7, 2014, Karpeles halted his customers' ability to withdraw any bitcoin from Mt. Gox, stating that he was purportedly investigating a "bug" or "technical malfunction" in the Bitcoin network. A few days later, on February 10, 2014, Karpeles claimed that he had supposedly detected "unusual activity" with respect to the Mt. Gox Bitcoin wallets and was investigating a technical issue, called "transaction malleability," which he said involved the ability of third parties to manipulate certain transactions. Karpeles nonetheless assured his customers that "MtGox will resume bitcoin withdrawals to outside wallets once the issue" had been addressed. This statement was also knowingly false, and beyond that, Karpeles concealed the fact that he had been aware of the supposed security "bug" since in 2011.

8

34.     However, despite that the fact that most users were now unable to withdraw any bitcoins or Fiat Currency from their accounts, and even though both Karpeles and Mizuho knew that full withdrawal functionality (which had been made available to Mt. Gox users prior to Mizuho's decision to no longer process withdrawals) would never be restored, both Defendants nonetheless continued to accept and profit from more user deposits.

***Karpeles Shut Down Mt. Gox and Declared Bankruptcy.***

35.     On February 24, 2014, the Mt. Gox website "went dark." Customers who visited the site found nothing but a blank page and were unable to view or access their accounts. A message on the Mt. Gox website later notified members that a "decision was taken to close all transactions *for the time being.*" That statement was not true because, at that time, Karpeles was already planning on seeking bankruptcy protection and, on information and belief, was in the process of preparing Mt. Gox's bankruptcy filing.

36.     A few days later, on February 28, 2014, Mt. Gox filed for bankruptcy protection in Japan. In its petition (supported by a declaration from Karpeles), Karpeles revealed that he had known about the security "bug" since May 2011 but that it was not purportedly known "until the end of January 2014 that [the bug] could lead to a large number of unconfirmed transactions and to a risk of illicit withdrawals." The petition further stated that Mt. Gox had discovered "a large discrepancy in the total of deposit balances at those financial institutions which managed said deposits compared to the total amount actually deposited by users and that there was a large shortfall of deposit balances."

37.     During a press conference, Karpeles revealed that Mt. Gox had assets of over $20 million (USD) and liabilities in excess of $65 million (USD)—not including the over $450 million worth of bitcoins it had lost through its supposed security breach. In later bankruptcy

filings, he revised those figures to $37.7 million (USD) in assets and $63.9 million (USD) in liabilities. *See* Declaration of Robert Marie Mark Karpeles, ¶ 7, ECF No. 3, No. 14-31229-sgj15 (Bankr. N.D. Tex. Mar. 9, 2014).

38.     In the days that followed, reports emerged suggesting that Karpeles grossly mismanaged the Mt. Gox Exchange by ignoring known security flaws and user reports of hacking, failing to segregate customer and operational funds in Mt. Gox's account, failing to periodically balance and/or reconcile customer and operational funds, and losing user bitcoins that were purportedly stored in its offline storage.

39.     On June 18, 2014, the Bankruptcy Court in the Northern District of Texas officially recognized Mt. Gox's Japanese bankruptcy proceedings as a foreign main proceeding under Chapter 15 of the U.S. Bankruptcy Code, effectively staying all pending litigation against it in the United States. *See In re MtGox*, Case No. 14-31229-sgj15 (Bankr. N.D. Tex.).

40.     Tibanne KK likewise declared bankruptcy in Japan in February 2015, with recognition as a Chapter 15 foreign main proceeding being granted on April 2, 2015. *See In re: Tibanne Co., Ltd., a/k/a KK,* Case No. 15-10255-REG (Bankr. S.D.N.Y.).

41.     In September 2015, Karpeles was arrested by Tokyo police and formally charged with fraud and embezzlement in connection to his management of Mt. Gox. To date he has not been convicted or acquitted.

**PLAINTIFF'S FACTUAL ALLEGATIONS**

*Facts Relating to Plaintiff Gregory Pearce*

42.     Plaintiff Pearce joined Mt. Gox in or around November 2013 after reading Mt. Gox's representations about the Exchange's security, reliability, and ability to withdraw or deposit bitcoins and/or Fiat Currency at any time (substantially similar to the advertisements and

representations described in Paragraphs 9-10 above).

43.     Pearce had previously purchased bitcoin on a different exchange, but became frustrated by the customer service provided by that Exchange. After reading the representations referred to in the previous paragraph, he transferred his bitcoin to Mt. Gox. Over the following weeks, Pearce began selling and trading Bitcoin on Mt. Gox.

44.     As a member of Mt. Gox, Pearce paid transaction fees to Mt. Gox on every trade that he made, in part, to be able to buy, sell, trade, and withdraw bitcoins, and also, in part, to maintain and protect his bitcoins.

45.     In January 2014, Pearce converted some of his bitcoin to Fiat Currency with the intention of immediately withdrawing $5,900 USD from his Mt. Gox account.

46.     On January 29, 2014, Pearce submitted a withdrawal request for $5,900 USD from his Mt. Gox account, with instructions to deposit the funds in his U.S. bank account. That same day, Pearce received an email from Mt. Gox confirming that the withdrawal request had been received. Pearce, however, did not receive the withdrawn funds.

47.     On February 10, 2014, Pearce received a message from Mt. Gox customer support indicating that all international withdrawals were delayed.

48.     During this same time, Pearce began reading negative press about the then-current status of the Exchange and, in need of cash to pay bills, attempted to cancel his Fiat Currency withdrawal request and move his entire Bitcoin balance out of Mt. Gox. But his attempts to transfer his Bitcoin balance out of the Exchange failed.

49.     Soon thereafter, the Mt. Gox Exchange went dark.

50.     At no time prior to or during the transfer of his bitcoins into the Exchange, did Mt. Gox or Mizuho notify Pearce that Mt. Gox had suffered any type of "bug," that Mizuho was

no longer providing withdrawal services to Mt. Gox users (and thus, that his withdrawal request might be completely frustrated), or that any funds within the Exchange (bitcoin or Fiat Currency) would be permanently inaccessible.

51.     Had Pearce known that Mizuho was interfering with Mt. Gox's ability to service users, that his ability to make cash withdrawals from the Exchange would be materially compromised, that the security of Mt. Gox had been compromised, or that Mt. Gox intended to go offline and declare bankruptcy, he would not have opened his account with Mt. Gox or transferred bitcoins into the Exchange, and/or would have taken immediate steps to withdraw his bitcoins from the Exchange.

## CLASS ALLEGATIONS

52.     **Class Definition**: Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> **Mt. Gox Class**: All persons in the United States who had bitcoins or money stored with Mt. Gox on February 24, 2014.

Plaintiff further bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of himself and a Subclass of similarly situated individuals, defined as follows:

> **Withdrawal Subclass**: All members of the Mt. Gox Class who initiated a request to withdrawal Fiat Currency from their Mt. Gox account after the date in which Mizuho Bank stopped processing withdrawals, and whose withdrawal request was not fulfilled.

(The Class and Subclass are referred to herein as the "Classes".) Excluded from the Classes are (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and

12

file a timely request for exclusion, (4) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendants, and (5) the legal representatives, successors, or assigns of any such excluded person.

53.    **Numerosity**: The exact number of the members of the Classes is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, and according to documents filed by Mt. Gox in support of their bankruptcy petition, there are likely over 1,000 members in each of the respective Classes. Members of the Classes can be identified through Defendants' records.

54.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the members of the putative Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

      (a)    whether Karpeles adequately managed and safeguarded Plaintiff's and the members of the Classes' bitcoins and Fiat Currency;

      (b)    whether Karpeles' conduct constitutes fraud; and

      (c)    whether Mizuho's conduct constituted tortious interference.

55.    **Typicality**: Plaintiff's claims are typical of the claims of other members of the Classes, in that Plaintiff and the members of the Classes sustained damages arising out of Defendants' uniform wrongful conduct.

56.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Classes, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiff.

57.     **Superiority**: This case is appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. The damages suffered by the individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Classes to obtain effective relief from Defendants' misconduct. Even if members of the Classes could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

### FIRST CAUSE OF ACTION
#### Negligence Against Mark Karpeles
#### (On behalf of Plaintiff and the Mt. Gox Class)

58.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

59.     Karpeles owed Plaintiff and the Mt. Gox Class a duty of reasonable care to employ procedures to detect and prevent the improper access and misuse of Plaintiff's and the Class's bitcoins and Fiat Currency and also to allow them complete access to the same. This duty arose from Karpeles' relationship with Plaintiff and the Mt. Gox Class.

60.     Karpeles breached his duty to the Plaintiff and the Mt. Gox Class by failing to exercise reasonable care in maintaining, protecting, accounting for, and safeguarding the Plaintiff's and the Mt. Gox Class's bitcoins and Fiat Currency within Mt. Gox's control. This

14

included the failure to implement reasonable accounting procedures or to segregate user accounts from operational funds, as well as the failure to correct security bugs or other vulnerabilities on the Exchange.

61.     Karpeles further acted negligently by failing to implement security procedures to detect and prevent unauthorized access to Plaintiff's and the Mt. Gox Class' bitcoins and Fiat Currency.

62.     As a result of Karpeles' conduct, Plaintiff and the Mt. Gox Class suffered economic injury and other damages, in the form of the price of their bitcoins and Fiat Currency that were accessed, frozen, stolen, and/or misused or that are present in their Mt. Gox accounts and which they cannot access.

63.     But for Karpeles' negligence, Plaintiff's and the Mt. Gox Class's bitcoins and Fiat Currency would not have been compromised and/or lost. The Plaintiff's and Class's bitcoins and Fiat Currency were accessed, frozen, stolen, and/or misused as the proximate result of Karpeles' failure to exercise reasonable care in safeguarding such information by adopting, implementing, and maintaining appropriate data management, accounting, and security measures.

64.     The injuries to Plaintiff and the Mt. Gox Class resulting from Karpeles' negligence were reasonably foreseeable, particularly in light of his grossly inadequate accounting, data management, and security processes.

65.     Plaintiff and the Mt. Gox Class seek to recover the economic injury and other damages suffered as a result of Karpeles' unlawful conduct, including in the form of the price of the bitcoins and Fiat Currency that were in their Mt. Gox accounts at the time it went dark that is not recoverable under the liquidation proceedings in Mt. Gox's Japanese bankruptcy.

## SECOND CAUSE OF ACTION
### Fraud Against Mark Karpeles
#### (On behalf of Plaintiff and the Mt. Gox Class)

66.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

67.     As described herein, Karpeles engaged in unlawful, deceptive, and unfair conduct.

68.     Through Mt. Gox's online marketing materials and advertisements, including its Terms of Use, Karpeles represented to Plaintiff and the Mt. Gox Class that Mt. Gox would, *inter alia*, protect their bitcoins and Fiat Currency, and safely and quickly allow them to buy, sell, trade, or withdraw the same.

69.     However, as discussed above, Karpeles did not—and never had any intention to—safeguard or protects his users' bitcoins and Fiat Currency.

70.     Thus, Karpeles' representations to Plaintiff and the members of the Mt. Gox Class were knowingly and intentionally false.

71.     Knowing that consumers are less likely to do business with companies that fail to adequately safeguard and hold their bitcoins and Fiat Currency or allow them to buy, sell, trade, or withdraw the same, Karpeles made these false representations with the intention that Plaintiff and the members of the Class would rely on them in contracting with Mt. Gox and transferring money and Bitcoin into their accounts.

72.     Karpeles additionally made false representations to Plaintiff and the members of the Class through Mt. Gox's online Support Desk and in its customer service correspondence, which he controlled and directed, as described in Paragraphs 15, 29, and 33, *supra*. In particular, Karpeles falsely claimed that Mt. Gox's withdrawal and deposit issues were only temporary, that withdrawals would soon resume, that he was developing new business relationships with other banks for improved transaction capabilities, and that a security "bug" in Mt. Gox's system was

16

the cause of its suspended withdrawals.

73.     Karpeles further concealed the fact that Mizuho was no longer providing international withdrawal services, and thus, U.S. customers had effectively no means to withdraw deposited cash from the Exchange, and that thousands of user bitcoins had been lost or stolen.

74.     Knowing that users would stop depositing bitcoins and funds in their accounts, and rather, would attempt to withdraw funds or close accounts if made aware of any large-scale loss/theft of coins, Karpeles made the false representations and omissions with the intent that Plaintiff and the members of the Class would rely on them and continue to deposit money and bitcoins into their Mt. Gox accounts and not attempt to withdraw funds and/or close accounts.

75.     Had Karpeles disclosed Mt. Gox's true practices and intentions, Plaintiff and the members of the Class would have stopped depositing cash and/or bitcoins into their Mt. Gox accounts, immediately taken any available steps to remove their assets from the Exchange, or would not have maintained accounts with Mt. Gox at all.

76.     Accordingly, Karpeles' fraudulent conduct caused Plaintiff and the Class to suffer actual harm in the amount of the difference between the bitcoins or Fiat Currency that was in their Mt. Gox accounts at the time it went dark and the amount that will be actually returned to them under the liquidation proceedings in Mt. Gox's Japanese bankruptcy.

77.     Plaintiff and the Class seek to recover the economic injury and other damages suffered as a result of Defendant Karpeles' unlawful conduct in the form of the price of the bitcoins and Fiat Currency in their Mt. Gox accounts that cannot be recovered.

### THIRD CAUSE OF ACTION
### Tortious Interference With Contract Against Defendant Mizuho Bank
### (On behalf of Plaintiff and the Withdrawal Subclass)

78.     Plaintiff hereby incorporates all allegations as if fully set forth herein.

79.     Plaintiff entered into consumer agreements with Mt. Gox wherein Mt. Gox agreed to hold their bitcoins and Fiat Currency in the consumer's account, in the consumer's name, and on the consumer's behalf, and to allow the consumer to safely and quickly buy, sell, trade, or withdraw the same.

80.     Defendant Mizuho had actual or constructive knowledge of such customer agreements.

81.     Notwithstanding, in mid-2013, Mizuho went a step further and decided to stop processing all withdrawal requests made by any Mt. Gox user in the United States.

82.     Mizuho knew that its new policies made it virtually impossible for Mt. Gox to fulfill its contractual obligations to Plaintiff and the Classes, and directly caused Mt. Gox to breach said contracts.

83.     Mizuho did not have authority or justification to interfere with Plaintiff's and the Class' contracts with Mt. Gox and/or their abilities to enjoy the benefits of their agreements. Rather, as explained in Paragraphs 22-28, *supra*, Mizuho Bank purposefully implemented such policies so as to pressure Mark Karpeles into closing Mt. Gox's account with Mizuho and terminating their business relationship, and to avoid reputational harm. And Mizuho effectively prevented Withdrawal Class members from taking any steps to mitigate the resulting harm by concealing the actions it was taking.

84.     As a result of Mizuho's conduct, Plaintiff and the Class have suffered damages in the amount of currency they attempted to, but were unable, withdraw from the Exchange.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Gregory Pearce, individually and on behalf of the Classes, pray for the following relief:

(a)      An order certifying the Classes as defined above, appointing Plaintiff as representatives of the Classes, and appointing his counsel as Class Counsel;

(b)      An award of actual damages;

(c)      An award of restitution for Defendants' wrongful conduct;

(d)      An award of reasonable attorneys' fees and costs;

(e)      An award of punitive or exemplary damages;

(f)      An award of interest;

(g)      Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

**GREGORY PEARCE,** individually and on behalf of all others similarly situated,

Dated: January 24, 2018

By: _David B. Senoff_
One of Plaintiffs' Attorneys

David S. Senoff, Esquire
ANAPOL WEISS
130 N. 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: 215.735.1130
Fax: 215.875.7733

Jay Edelson*
jedelson@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300

19

Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian*
rbalabanian@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94109
Tel: 415-212-9300
Fax: 415-373-9435

*Counsel for Plaintiffs and the Putative Classes*

*\*Pro Hac Vice to be Sought*