Exhibit 40

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY GREENE, JOSEPH LACK,
ANTHONY MOTTO, and GREGORY
PEARCE, individually and on behalf of all
others similarly situated,

        Plaintiffs,

        v.

MIZUHO BANK, LTD., a Japanese financial
institution, and MARK KARPELES, an
individual,

        Defendants.

Case No.: 1:14-cv-01437

Hon. Gary Feinerman

Magistrate Judge Susan Cox

**EXPERT REPORT OF BRUCE STROMBOM, PH.D.**

February 1, 2018

CONFIDENTIAL

## TABLE OF CONTENTS

I.    **Qualifications** ................................................................................................ 1

II.   **Assignment** .................................................................................................... 2

III.  **Case Background** ......................................................................................... 2

IV.  **Documents Considered** .............................................................................. 4

V.   **Summary of Opinions** ................................................................................ 4

VI.  **Analysis** ....................................................................................................... 10

     **A.**   **Background** ......................................................................................... 10

     **B.**   **The Plaintiff Has Failed To Provide A Classwide Approach To Calculate Damages Suffered By The Proposed Deposit Class** ..................................... 18

     **C.**   **Any Classwide Theory Of Harm And Approach To Damages Cannot Be Premised On The Assumption That It Was Impossible For All Proposed Deposit Class Members To Retrieve Fiat Currency From Mt. Gox During The Proposed Class Period** ..................................... 18

     **D.**   **The Plaintiff Has Ignored Significant Individual Issues** ......................................... 19

     **E.**   **Mr. Motto's Experiences Highlight The Need For Individual Inquiry** .................. 31

ii                                     CONFIDENTIAL

## I.     Qualifications

1.      My name is Bruce A. Strombom. I am a Managing Principal of Analysis Group, Inc. ("Analysis Group"), an international economic, financial, and strategy consulting firm. Analysis Group employs approximately 800 professionals and has offices in North America, Europe, and Asia.

2.      I have over 30 years of experience in corporate finance and financial and economic analysis. For the past 24 years, I have been employed as a consulting and testifying expert in public policy matters and commercial litigation. My work in commercial litigation has involved analyzing class certification, liability, loss causation, and damages issues on behalf of both plaintiffs and defendants. I have been qualified as an expert and testified in federal courts, United States Tax Court, various state courts, and in arbitrations. Prior to joining Analysis Group, I was Executive Vice President of Business Valuation for a middle-market merger and acquisition firm serving privately held businesses. Earlier, I was a Consulting Manager in the Financial Advisory Services group at the public accounting firm of Price Waterhouse and Senior Financial Analyst with Tribune Newspapers West.

3.      I hold a B.A. in economics from San Jose State University and a Ph.D. in economics from the University of California, Irvine. My graduate education focused on applied microeconomics, industrial organization, and finance.

4.      I have conducted economic analyses related to the appropriateness of class treatment in approximately two dozen cases involving a range of products and markets, including investment products. A current copy of my curriculum vitae is attached as **Appendix A**. It includes, *inter alia*, a list of matters in which I have testified at deposition or trial over the past four years and a list of my publications over the past ten years.

CONFIDENTIAL

5.      Analysis Group is compensated at the rate of $684 per hour for the time I spend on this matter. Analysis Group's compensation is in no way dependent on the nature of my findings or the outcome of this case. I was assisted in the preparation of this report by other professional staff at Analysis Group working under my direction.

## II.     Assignment

6.      I have been engaged as an expert by counsel for Defendant Mizuho Bank, Ltd. ("Mizuho Bank") to examine economic issues related to class certification in the matter *Gregory Greene, Joseph Lack, Anthony Motto, and Gregory Pearce v. Mizuho Bank, Ltd. and Mark Karpeles*, pending in the United States District Court for the Northern District of Illinois Eastern Division, under Case No. 1:14-cv-01437.

## III.    Case Background

7.      I understand that plaintiff Mr. Anthony Motto seeks to represent a proposed class, the "Deposit Class," defined as "[a]ll individuals who, while residing in the United States, wired fiat currency to Mt. Gox's account at Mizuho Bank between June 20, 2013, and February 24, 2014."[1] According to the plaintiff's memorandum supporting his class certification motion, the plaintiff

---

[1]   Excluded from the Deposit Class are "(1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entity's current and former employees, officers, and directors, (2) the Judge to whom this case is assigned and the Judge's immediate family, (3) persons who execute and file a timely request for exclusion from the Class and Subclass, (4) persons who have had their claims in this matter finally adjudicated and/or otherwise released, (5) individuals whose claims accrued while they resided in Louisiana or Mississippi, and (6) the legal representatives, successors, and assigns of any such excluded person." Motion by Anthony Motto, Joseph Lack, and Gregory Pearce for Class Certification, October 12, 2017 ("Class Certification Motion"), p. 1. Although a "Withdrawal Class" was also proposed, I understand that Judge Feinerman dismissed the claims of its representative, Mr. Pearce, for want of personal jurisdiction, leaving only the Deposit Class with Mr. Motto as a proposed class representative. Memorandum Opinion and Order, December 11, 2017, p. 13. I have not been asked to provide any opinions related to the proposed "Withdrawal Class."

2                          CONFIDENTIAL

proposes a "Deposit Class to litigate the fraud claim."[2] The fraud claim arises from an allegation that Mizuho Bank failed to disclose that it was no longer wiring outbound USD transfers on behalf of Mt. Gox and that Deposit Class members would thereafter be unable to make cash withdrawals from Mt. Gox.[3] The Class Certification Memorandum makes the claim that "once those individuals had established accounts with Mt. Gox, they could never retrieve money if they desired," and "American investors who wired money into Mt. Gox's account at Mizuho Bank after June 21, 2013, were walking into a trap: their money could go into Mt. Gox's account at Mizuho [Bank], but it could never leave."[4] As I discuss in further detail below, these allegations are at odds with the evidence in the case. The data produced in this litigation demonstrate that, using Japan Post Bank, Mt. Gox wired $26.2 million between June 20, 2013, and February 24, 2014 ("the proposed Class Period") to users in the United States who requested withdrawals.[5] Over the same period, Mizuho Bank received $7.7 million in inbound wire transfers for Mt. Gox's account.[6]

8.    Plaintiff Mr. Motto seeks to represent the proposed Deposit Class. Mr. Motto testified that he first became aware of Mt. Gox in late 2013 and opened his Mt. Gox account in January 2014.[7] According to documents produced by Mr. Motto, he attempted to fund his Mt. Gox account by wiring

---

[2]    Memorandum in Support of Motion by Anthony Motto, Joseph Lack, and Gregory Pearce For Class Certification, October 13, 2017 ("Class Certification Memorandum"), p. 2.

[3]    The Fourth Amended Class Action Complaint makes similar allegations. Fourth Amended Class Action Complaint, March 7, 2017 ("Complaint"), ¶ 140. *See, e.g.,* Class Certification Memorandum, pp. 2, 11.

[4]    Class Certification Memorandum, pp. 2, 11. *See also* Complaint, ¶¶ 2–3.

[5]    Japan Post Bank first wired fiat currency on behalf of Mt. Gox on June 26, 2013, six days after the start of the proposed Class Period. Japan Post Bank Outbound Wire Data (DB_0000001).

[6]    Mizuho Bank Inbound Wire Data (MIZ_0002568). This file extends beyond the proposed Class Period and contains inbound wires through February 27, 2014. Inbound USD wires from February 25 through February 27, 2014, total to $132,173. I note that the expert report of Mr. Mark T. Williams reports the amount of inbound wires received by Mt. Gox's account at Mizuho Bank over the period from June 14, 2013, to February 27, 2014 to be $8.4 million, which I have confirmed. Expert Report of Mark T. Williams, November 16, 2017 ("Williams Report"), Exhibit 15.

[7]    Deposition of Anthony Motto, July 26, 2017 ("Motto Deposition"), pp. 77–80.

3                          CONFIDENTIAL

$1,000 from a JP Morgan Chase Bank account to Mt. Gox's account at Mizuho Bank on February 18, 2014—eleven days after Mt. Gox announced that it had halted bitcoin withdrawals—and the wire was completed on February 18, 2014.[8] However, according to his account statements and his deposition testimony, the funds were never reflected in Mr. Motto's Mt. Gox account.[9] Following Mt. Gox's bankruptcy, Mr. Motto submitted a bankruptcy claim for $1,000, but I understand that the bankruptcy trustee subsequently rejected this claim.[10]

## IV.    Documents Considered

9.    The documents, materials, and other information that I have considered in forming my opinions are listed in **Appendix B**. My analysis and conclusions are based on the information available at present. If additional information or materials become available, I reserve the right to update my opinions and analysis as appropriate.

## V.    Summary of Opinions

10.    The following is a summary of my opinions to date:

(i)    The plaintiff's claim that Mt. Gox users "could never retrieve money if they desired" and that Mt. Gox users' money was trapped at Mt. Gox are at odds with the evidence produced in this case. Transaction records from Deutsche Bank show that Mt. Gox made 560 outbound wire transfers totaling $26.2 million from Mt. Gox's account at Japan Post Bank to individuals and entities in the United States during the proposed Class Period. By comparison, Mt. Gox transmitted $29.4 million from its account at Mizuho Bank over the period November 30, 2012, to June 13, 2013. Moreover,

---

[8]    Motto Deposition, pp. 82–83; Motto 000202–203 (Motto Exhibit 3).

[9]    Motto Deposition, p. 101, and Exhibit 5.

[10]    List of Bankruptcy Creditors and List of Acceptance or Rejection of Claims (In respect of Bitcoin Exchange-Users of Bankrupt), May 25, 2016, Pearce000025–1446 ("List of Bankruptcy Creditors") at Pearce001438.

CONFIDENTIAL

both plaintiff's expert, Mr. Andrew J. Rasmussen, and defendant's expert, Mr. Mark T. Williams, agree that there were numerous ways for Mt. Gox users to transfer bitcoin out of Mt. Gox during the proposed Class Period.

(ii)    The proposed definition of the "Deposit Class" in the plaintiff's Class Certification Motion and Class Certification Memorandum (collectively referred to as "plaintiff's class certification filings") fails to identify any particular harm suffered by members of the proposed Deposit Class. The plaintiff's class certification filings do not describe the damages suffered by the proposed Deposit Class and fail to describe any approach to calculate damages on a classwide basis. The plaintiff does not present a model or even discuss an approach to calculating damages on a classwide basis that could tie potential damages to Mizuho Bank's alleged liability.

(iii)    Any classwide theory of harm and approach to damages cannot be premised on the assumption that it was impossible for all proposed Deposit Class members to receive fiat currency withdrawals from Mt. Gox during the proposed Class Period. The data produced in the case belie that assumption. Economic damages are calculated as the difference between what actually happened (i.e., the actual world) and a hypothetical but-for world in which there was no alleged wrongdoing. Therefore, a damages approach that is based upon incorrect assumptions about the actual world is not reliable.

(iv)    In light of the evidence showing that it was not impossible to get fiat currency out of Mt. Gox, the plaintiff may argue that Mizuho Bank was nonetheless responsible for the known delays at Mt. Gox in getting fiat currency out. An argument of that nature would raise numerous questions

requiring individual inquiry relevant to liability and damages, which the plaintiff has ignored in his class certification filings, including the following:

(a) Assuming for the sake of argument that some members of the proposed Deposit Class experienced delays in withdrawing fiat currency and that Mt. Gox collapsed before they received their fiat currency, it would be necessary to identify those individuals and the reasons they did not receive their fiat currency from Mt. Gox. Although Mt. Gox was still honoring fiat currency withdrawal requests during the proposed Class Period, it is unclear how many individual withdrawal requests Mt. Gox received, the order in which Mt. Gox chose to process them, whether Mt. Gox dedicated sufficient staff resources to processing the withdrawal requests, whether some withdrawal requests were denied or delayed based on Mt. Gox's policies regarding the amount, timing, or frequency of such withdrawals, whether Mt. Gox offered all proposed Deposit Class members expedited withdrawal processing, whether any proposed Deposit Class members rejected expedited withdrawal processing, and if so, why. Some unfulfilled withdrawal requests may have been delayed because of decisions made by Mt. Gox or members of the proposed Deposit Class themselves.

(b) To the extent the plaintiff seeks to hold Mizuho Bank responsible for Mt. Gox's delays in sending fiat currency to its users, proposed Deposit Class members likely had varying degrees of knowledge of the delays that Mt. Gox users were experiencing in withdrawing USD from Mt. Gox. As described in the Williams Report, before and during the proposed Class Period, the delays in withdrawing USD from Mt. Gox were widely reported and discussed in public media. Some proposed Deposit Class members may have seen this information and wired money to Mt. Gox anyway, and others may not have seen it. In

CONFIDENTIAL

addition, putative class members had individual communications with Mt. Gox. If proof of a fraud claim based on an alleged omission requires the proposed Deposit Class members to prove that they did not know of the alleged omission or justifiably relied on the alleged misrepresentation, an individual assessment of each proposed Deposit Class member's knowledge would be needed. Moreover, if a proposed Deposit Class member knew of the delays and wired fiat currency anyway, the plaintiff's claim that all members of the proposed Deposit Class would not have wired fiat currency to Mt. Gox had Mizuho Bank disclosed it was no longer sending wires on Mt. Gox's behalf is highly implausible.

(c) Members of the proposed Deposit Class wired fiat currency to Mt. Gox for a variety of reasons, based on the individual's planned use of bitcoin. The members of the proposed Deposit Class had multiple ways to get their fiat currency and bitcoin out of Mt. Gox during the proposed Class Period. Some members of the proposed Deposit Class may have withdrawn their fiat currency from Mt. Gox or transferred bitcoin to a personal wallet or used the bitcoin to make purchases. Contrary to plaintiff's allegations, Mt. Gox continued to make USD wire transfers during the proposed Class Period, meaning that members of the proposed Deposit Class could make cash withdrawals from Mt. Gox, in addition to withdrawing their bitcoin through other methods. The fundamental question of what happened to a proposed Deposit Class member's USD or bitcoin purchased with the USD would be relevant in assessing whether the proposed Deposit Class member suffered any injury, and, if so, the damages, if any, he or she suffered.

(d) The importance, if any, that an individual proposed Deposit Class member placed on having Mizuho Bank, as opposed to another bank, wire fiat currency on Mt. Gox's behalf may differ from individual to individual. This factor would be relevant in determining

7

CONFIDENTIAL

whether an individual proposed Deposit Class member can prove he or she would not have wired fiat currency to Mt. Gox had he or she known about withdrawal delays and known that Mt. Gox was using a bank other than Mizuho Bank to wire USD to users that requested withdrawals. For example, Mr. Motto testified that he knew about withdrawal delays but did not care because he never intended to withdraw currency from Mt. Gox.

(e)    It is possible that some members of the proposed Deposit Class never made a withdrawal request. An individual who did not attempt to withdraw fiat currency via a wire transfer would have suffered the consequences of the Mt. Gox bankruptcy had Mizuho Bank provided services as allegedly represented or understood. Those who did not make a withdrawal request were not affected by Mizuho Bank's decision to stop wiring money on Mt. Gox's behalf. Any losses suffered by such a proposed Deposit Class member from not being able to access his or her fiat currency or bitcoin after the bankruptcy would not be linked to Mizuho Bank's alleged misconduct.

(f)    It is likely some members of the proposed Deposit Class have a bankruptcy claim. The Mt. Gox bankruptcy trustee has yet to make payments to those with a bankruptcy claim. Given the large increase in bitcoin's price since the bankruptcy and the amount of bitcoin held by the Mt. Gox bankruptcy estate, it is possible that those with bankruptcy claims, including members of the proposed Deposit Class, will receive payment for 100 percent of the amount of their bankruptcy claims. Those without a bankruptcy claim may have obtained full use of their fiat currency and/or bitcoin by spending or transferring bitcoin out of Mt. Gox or by successfully withdrawing their fiat currency. Others without a bankruptcy claim may not have made a timely claim even though they were eligible or may have made an error in their filings.

8            CONFIDENTIAL

(v)    Mr. Motto's experiences with Mt. Gox illustrate the many areas of individual inquiry that are

relevant to his liability claim and to understanding the cause of any losses he might have suffered.

Mr. Motto testified that he did not care about being able to transfer USD out of Mt. Gox, which

undermines the plaintiff's claim that the ability to get cash out of Mt. Gox was material to all

members of the proposed Deposit Class. Mr. Motto wired USD to Mt. Gox knowing that Mt. Gox

was manually processing fiat currency withdrawal requests and those requests could take up to four

weeks, and knowing that Mt. Gox was not processing bitcoin withdrawals at all. Because he was

not planning on withdrawing USD, and he knew that Mt. Gox was not processing bitcoin

withdrawals, whether Mizuho Bank was wiring money at Mt. Gox's request is not causally linked

to any losses he suffered. Moreover, (1) Mr. Motto's deposit was never credited to his Mt. Gox

account; (2) Mr. Motto may have been offered an opportunity to have his wire transfer to Mt. Gox

refunded; and (3) Mr. Motto's bankruptcy claim was disallowed by the bankruptcy trustee. These

factors are relevant for assessing the cause of any losses he might have suffered. Although Mr.

Motto has not articulated the amount he seeks in damages from Mizuho Bank, Mr. Motto's

presumed loss of $1,000 that was wired to Mt. Gox's Mizuho Bank account is not causally

connected to any alleged wrongdoing by Mizuho Bank based on his individual issues.

CONFIDENTIAL

## VI.    Analysis

### A.    Background

#### 1.    Mt. Gox

11.    Mt. Gox was originally founded in 2007 by Jed McCaleb as a platform used to trade "Magic: the gathering online" trading cards.[11] In 2010, Mr. McCaleb converted Mt. Gox into an exchange that allowed users to buy and sell bitcoin.[12] In March 2011, Mr. McCaleb sold the exchange to Mark Karpeles, who continued to operate it as a bitcoin exchange until February 2014, when the exchange filed for bankruptcy.[13]

#### 2.    Withdrawing Fiat Currency And Bitcoin From Mt. Gox

12.    Users of Mt. Gox were assigned an account status, Level 0 through Level 2, based on the type and quality of identification they provided to Mt. Gox. For example, users who provided no identification were assigned Level 0, while users who provided notarized proof of identification were assigned Level 2. Users with a higher account status, that is, those who provided more detailed information, were subject to increased daily and monthly withdrawal limits.[14] **Table 1** describes the daily and monthly cash withdrawal limits (in USD) as well as bitcoin daily withdrawal limits as of February 2012 and March 2013 by account status.[15] Thus, Mt. Gox users, including members of the proposed Deposit Class, agreed to differing levels of cash and bitcoin withdrawal limits based on the

---

[11]  Mt. Gox is an acronym for "Magic: The Gathering Online Exchange." Cryptos R US Insider, "Newsletter update," September 4, 2017, *available at* https://insider.cryptosrus.com/cryptosrusinsider/Content/newsletters/Newsletter%209-4-2017.pdf; Nathaniel Popper, Digital Gold (New York: Harper, 2015).

[12]  Cryptos R US Insider, "Newsletter update," September 4, 2017, *available at* https://insider.cryptosrus.com/cryptosrusinsider/Content/newsletters/Newsletter%209-4-2017.pdf.

[13]  *Id.;* Reuters, "Mark Karpeles, CEO of Defunct Bitcoin Exchange Mt. Gox, Pleads Not Guilty in a Japanese Court," *Fortune Magazine*, July 11, 2017, *available at* http://fortune.com/2017/07/11/bitcoin-mt-gox-exchange-mark-karpeles-trial/; Complaint, ¶ 42.

[14]  Mt. Gox, "AML Account Statuses," February 1, 2012, *available at* http://web.archive.org/web/20120623073436/https://support.mtgox.com/entries/20919111-aml-account-statuses.

[15]  *Id.*; Mt. Gox, "Mt.Gox announces new withdrawal limit rules for its customers," March 13, 2013, *available at* https://web.archive.org/web/20130502190324/https://mtgox.com/press_release_20130313.html.

CONFIDENTIAL

amount of information they provided to Mt. Gox. In addition, the limits were different if users had

their daily or monthly limits raised prior to the change in March 2013 or not.[16]

**Table 1**
**Withdrawal Limits by Account Status**

| Account Status | Verification Required | Cash Withdrawal Limits | | Bitcoin Daily Withdrawal Limits | |
|---|---|---|---|---|---|
| | | Daily | Monthly | As of February 2012 | As of March 2013 |
| Level 0 ("Unverified") | No verification required | $1,000 | $10,000 | 400 | 100 |
| Level 1 ("Verified") | Government issued identification and proof of residence | $10,000 | $50,000 | 4,000 | 1,000 |
| Level 2 ("Trusted") | Notarized proof of identification | $100,000 | $500,000 | 40,000 | 10,000 |

13. The plaintiff claims that "American investors had no choice but to go through Mizuho

[Bank] if they wished to use their fiat currency to purchase bitcoin on the Mt. Gox exchange, but once

those individuals had established accounts with Mt. Gox, they could never retrieve money if they

desired."[17] Contrary to this claim, and based on my review of the Williams Report and the expert

report and deposition of plaintiff's expert Mr. Rasmussen,[18] it is my understanding that Mt. Gox users

could use one or a combination of the methods described below to withdraw fiat currency or bitcoin

from Mt. Gox:

(i)   **Method 1**: Outbound wire. Under this method, Mt. Gox users, including proposed Deposit Class

   members, could request their fiat currency from Mt. Gox via an outbound cash wire transfer. A Mt.

   Gox user would provide his or her receiving bank information to Mt. Gox, and Mt. Gox would

---

[16]  "Verified and Trusted customers that already have their daily/monthly limit raised will not be affected with this change, however, Verified and Trusted customers that have not yet asked for their withdrawal limit to be raised will then be offered the following limits." Mt. Gox, "Mt.Gox announces new withdrawal limit rules for its customers," March 13, 2013, *available at* https://web.archive.org/web/20130502190324/https://mtgox.com/press_release_20130313.html.

[17]  Class Certification Memorandum, p. 11.

[18]  Williams Report; Expert Report of Andrew J. Rasmussen ("Rasmussen Report"), undated; Deposition of Andrew J. Rasmussen, January 11, 2018 ("Rasmussen Deposition").

CONFIDENTIAL

initiate an international wire transfer with its bank for the corresponding amount. Through

February 24, 2014, Mt. Gox continued to send cash wire transfers through Japan Post Bank and, as

noted in the Williams Report, possibly other banks where Mt. Gox had accounts, including

Rakuten Bank, Japan Net Bank, Yachiyo Bank, and Resona Bank.[19] During the proposed Class

Period, Mt. Gox sent $26.2 million through its account at Japan Post Bank (for a total of 560 wire

transfers) to Mt. Gox users in the United States.[20] By comparison, Mt. Gox sent $29.4 million

through its account at Mizuho Bank from November 30, 2012, through June 13, 2013.[21] During the

proposed Class Period, Mt. Gox received approximately 1,600 wire transfers for a total of $7.7

million through its account at Mizuho Bank.[22]

(ii)    **Method 2**: Purchase bitcoin and transfer it to another exchange.[23] Under this method a Mt. Gox

user, including a proposed Deposit Class member, could purchase bitcoin and request withdrawal

of bitcoin from Mt. Gox. Mt. Gox would then transfer the bitcoin to the Mt. Gox user's wallet

associated with another exchange such as Bitstamp or CampBx. A Mt. Gox user, including a

proposed Deposit Class member, could then sell his or her bitcoin for cash on the second exchange.

(iii)    **Method 3**: Purchase bitcoin and transfer it to a private wallet.[24] In this method, a Mt. Gox user,

including a proposed Deposit Class member, could purchase bitcoin and request a bitcoin

withdrawal from Mt. Gox. Mt. Gox would then transfer the bitcoin to the Mt. Gox user's private

---

[19]  Williams Report, pp. 31–32.

[20]  Japan Post Bank Outbound Wires (DB_0000001).

[21]  Mizuho Bank Outbound Wires (MIZ_0002569).

[22]  Mizuho Bank Inbound Wires (MIZ_0002568).

[23]  *See, e.g.*, Reddit, "One more day without Mt. Gox USD withdrawals. When was the last?" July 15, 2013, accessed January 29, 2018, https://www.reddit.com/r/Bitcoin/comments/1ic2h9/one_more_day_without_mt_gox_usd_withdrawals_when/; Reddit, "When will Mt. Gox resume withdrawals," August 20, 2013, accessed January 29, 2018, https://www.reddit.com/r/Bitcoin/comments/1krdhe/when_will_mtgox_resume_withdrawals/.

[24]  Williams Report, ¶ 52 (no. 3).

        CONFIDENTIAL

wallet, over which the user had personal control. The user, including a proposed Deposit Class member, could then arrange to sell these bitcoin in a private transaction in order to convert his or her holdings to cash.

(iv)  **Method 4**: Purchase bitcoin and transfer it to a third-party's wallet in exchange for goods and services. In this method, a Mt. Gox user, including a proposed Deposit Class member, could request a bitcoin withdrawal from Mt. Gox and provide an address to a third-party's private wallet as consideration for goods or services received.[25]

(v)  **Method 5**: Purchase bitcoin and transfer it to BitPay, a bitcoin payment processor, to purchase a good or service. In this method, a Mt. Gox user, including a proposed Deposit Class member, could request a bitcoin withdrawal from Mt. Gox and provide a bitcoin address to a third-party, including BitPay. The Mt. Gox user could then use these bitcoin to purchase goods and services from a merchant who accepted cash from BitPay.[26]

(vi)  **Method 6**: Transfer "trapped bitcoin" to Bitcoin Builder. After Mt. Gox suspended bitcoin withdrawals, many investors became worried that they would never be able to realize any value from the bitcoin they held at Mt. Gox. In response, a group of investors who believed that Mt. Gox was solvent and would recover from the issues causing the delays started a business called Bitcoin Builder, which purchased bitcoin held at Mt. Gox from Mt. Gox users at a discount and paid the user with bitcoin held externally. In other words, a Mt. Gox user, including a proposed Deposit

---

[25]  *See* Rasmussen Deposition, pp. 91–92 ("Q. So in this particular instance, you sent -- you transferred your Bitcoin to the seller of the PCB board's Bitcoin wallet, and he or she sent you the board? A. Yes, through the mail."), 141–144, and 206–207.

[26]  Nermin Hajdarbegovic, "BitPay Now Processing $1 Million in Bitcoin Payments Every Day," *CoinDesk,* May 28, 2014, *available at* https://www.coindesk.com/bitpay-now-processing-1-million-bitcoin-payments-every-day/. *See also* Rasmussen Deposition, pp. 145–147 ("[Traditional merchants] can actually use Bit Pay, and people can send it there, and that money is converted immediately to fiat currency."), and 206–207.

CONFIDENTIAL

Class member, could sell his or her "trapped bitcoin" at a discount and receive unrestricted bitcoin in return; the bitcoin received as payment for the user's Mt. Gox account would be transferred to a wallet independent of Mt. Gox.[27]

### 3. Events Leading To Mt. Gox's Bankruptcy Filing

14.     In 2013, Mt. Gox experienced several publicly disclosed service disruptions. In May 2013, the United States accused Mt. Gox and its U.S. subsidiary, Mutum Sigillum, LLC, of failing to register as a money transmitting business, and federal agents seized two Mt. Gox bank accounts holding a combined $5 million that Mt. Gox used to pay users in the U.S. when they made withdrawal requests.[28] On June 20, 2013, Mt. Gox announced a halt to USD cash withdrawals.[29] On July 4, 2013, Mt. Gox announced a resumption of USD withdrawals with an estimated two-week backlog.[30] By January 17, 2014, Mt. Gox disclosed on a withdrawal page on its website that it was manually processing international wire transfers and that withdrawals could take four weeks or longer, depending on the amount.[31]

15.     In January 2014, Mt. Gox publicly announced that some users were experiencing delays in withdrawing bitcoin from their Mt. Gox wallets to an external wallet. In this disclosure, Mt. Gox

---

[27]  Joon Ian Wong, "Has This Company Found a Workaround for Mt. Gox Withdrawals," *CoinDesk*, February 21, 2014, *available at* https://www.coindesk.com/has-company-found-workaround-mt-goxwithdrawals/; Bitcoin Builder, "Homepage," accessed January 23, 2018, https://bitcoinbuilder.com/.

[28]  United States District Court District of Maryland, Seizure Warrant, Case #13-1085SAG, May 9, 2013; United States District Court District of Maryland, Seizure Warrant, Case #13-1162-SKG, May 14, 2013; Romain Dillet, "Feds Seize Another $2.1 Million from Mt. Gox, Adding Up To $5 Million," *TechCrunch*, August 23, 2013, *available at* https://techcrunch.com/2013/08/23/feds-seize-another-2-1-million-from-mt-gox-adding-up-to-5-million/.

[29]  Mt. Gox, "Statement Regarding Temporary Hiatus on U.S. Dollar Withdrawals," press release, June 20, 2013, *available at* https://web.archive.org/web/20130811014059/https://www.mtgox.com/press_release_20130620.html.

[30]  Mt. Gox, "Statement on Resumption of Withdrawals and Improved Banking," press release, July 4, 2013, *available at* http://web.archive.org/web/20130810181218/https://www.mtgox.com/press_release_20130704.html.

[31]  Deposition of Joseph Lack, August 2, 2017 ("Lack Deposition"), Exhibit 9. The date of this document is January 17, 2014. It is possible that Mt. Gox disclosed that it was manually processing international wire transfers and that withdrawals could take four weeks or longer earlier than January 17, 2014. I understand there is limited discovery into what Mt. Gox disclosed publicly and to individuals.

CONFIDENTIAL

asserted that only a small number of users were affected.[32] On February 4, 2014, Mt. Gox reiterated that delays in bitcoin withdrawals would persist but would likely only affect large withdrawal requests.[33] On February 7, 2014, Mt. Gox announced that it would "temporarily pause" all bitcoin withdrawals in order to address these issues. Although the announcement did not state when bitcoin withdrawals would resume, it did say that the trading platform would remain open.[34]

16.     On February 10, 2014, Mt. Gox issued an additional press release reiterating that the decision to pause all bitcoin withdrawals was made to allow Mt. Gox personnel the opportunity to correct an error that caused technical issues when attempting to withdraw large sums of bitcoin. In this press release, Mt. Gox said that it had identified a problem with the underlying computer code of the bitcoin network (which it called "transaction malleability").[35] The press release also stated that currency withdrawals were not affected by the issue.[36]

---

[32]   Mt. Gox, "Statement Regarding BTC Withdrawal Delays," press release, January 31, 2014, *available at* https://web.archive.org/web/20140221015148/https://support.mtgox.com/entries/26501000-Statement-Regarding-BTC-Withdrawal-Delays.

[33]   Mt. Gox, "Update- Statement Regarding BTC Withdrawal Delays," press release, February 4, 2014, *available at* https://web.archive.org/web/20140221015147/https://support.mtgox.com/entries/26128504-Update-Statement-Regarding-BTC-Withdrawal-Delays.

[34]   Mt. Gox, "Statement Regarding BTC Withdrawal Delays – UPDATE," press release, February 7, 2014, *available at* https://web.archive.org/web/20140221015146/https://support.mtgox.com/entries/26130949-Statement-Regarding-BTC-Withdrawal-Delays-UPDATE.

[35]   The Mt. Gox announcement stated: "The problem we have identified is not limited to MtGox [sic], and affects all transactions where Bitcoins are being sent to a third party. We believe that the changes required for addressing this issue will be positive over the long term for the whole community. As a result we took the necessary action of suspending bitcoin withdrawals until this technical issue has been resolved. . . . A bug in the bitcoin software makes it possible for someone to use the Bitcoin network to alter transaction details to make it seem like a sending of bitcoins to a bitcoin wallet did not occur when in fact it did occur. Since the transaction appears as if it has not proceeded correctly, the bitcoins may be resent. MtGox is working with the Bitcoin core development team and others to mitigate this issue." *See* Mt. Gox, "Update - Statement Regarding BTC Withdrawal Delays," February 10, 2014, *available at* https://web.archive.org/web/20140221015052/https:// support.mtgox.com/entries/26745970-Update-Statement-Regarding-BTC-Withdrawal-Delays.

[36]   Mt. Gox, "Update - Statement Regarding BTC Withdrawal Delays," February 10, 2014, *available at* https://web.archive.org/web/20140221015052/https:// support.mtgox.com/entries/26745970-Update-Statement-Regarding-BTC-Withdrawal-Delays.

17.     On February 24, 2014, the entire Mt. Gox website went offline, and visitors to the website saw only a blank screen.[37] On February 28, 2014, Mt. Gox filed for bankruptcy protection under Japan's Civil Rehabilitation Law.[38] At the time of the bankruptcy filing, according to Mr. Karpeles, Mt. Gox had lost 850,000 bitcoin (valued at the time at $425 million) to theft, and as a result was unable to fulfill user withdrawal requests.[39] While I understand that the bankruptcy trustee has not reached a conclusion as to the cause of Mt. Gox's bankruptcy, I have seen no indication or allegation that Mt. Gox's relationship with Mizuho Bank was the cause.

### 4.  Bankruptcy Proceedings

18.     I understand that under the terms of Mt. Gox's bankruptcy proceedings, creditors, who include individual members of the proposed Deposit Class, submitted claims for losses incurred as a result of the bankruptcy. These claims (denominated in fiat currency or bitcoin and converted to Japanese Yen ("JPY") using exchange rates as of April 23, 2014) were collected and reviewed by a bankruptcy trustee who issued decisions regarding what portion of each claim to accept.[40] As of

---

[37]  Andy Greenberg, "Bitcoin's Price Plummets As Mt. Gox Goes Dark, With Massive Hack Rumored," *Forbes*, February 25, 2014, *available at* https://www.forbes.com/sites/andygreenberg/2014/02/25/bitcoins-price-plummets-as-mt-gox-goes-dark-with-massive-hack-rumored/#244f48f9ce1f.

[38]  Mt. Gox, "Announcement Regarding An Application For Commencement Of A Procedure Of Civil Rehabilitation," February 28, 2014, *available at* https://www.mtgox.com/img/pdf/20140228-announcement_eng.pdf. I understand the Japanese Civil Rehabilitation Law is similar to Chapter 11 in the US because it allows debtors, or company management, to draft a reconstruction plan. *See* Hiroko Nakata, "Corporate bankruptcy, the Japanese way," *Japan Times*, April 28, 2009, *available at* https://www.japantimes.co.jp/news/2009/04/28/reference/corporate-bankruptcy-the-japanese-way/#.WnB9RainFaQ.

[39]  Yuri Kageyama, "Tokyo Bitcoin Exchange Files for Bankruptcy," *Washington Examiner,* February 28, 2014, *available at* http://www.washingtonexaminer.com/tokyo-bitcoin-exchange-files-forbankruptcy/article/2121182.

[40]  For example, the bankruptcy trustee used an exchange rate of about JPY 50,058 per bitcoin claimed and a rate of JPY 103.64 for every USD claimed. *See* List of Bankruptcy Creditors at Pearce001446.

September 27, 2017, the bankruptcy trustee had accepted claims totaling JPY 46.0 billion,[41] which is equal to approximately $423 million using the exchange rate as of January 30, 2018.[42]

19.     The claims submitted to the bankruptcy trustee contain a large number of claims that were rejected either in whole or in part by the bankruptcy trustee. There were 24,750 creditors who submitted claims to the bankruptcy trustee. Of these, there were 5,372 claims (approximately 22 percent) that were rejected in whole or in part.[43] The rejection of such a large proportion of the claims submitted demonstrates that submitted claims are often unreliable.

20.     It is important to note that, as of September 21, 2017, the Mt. Gox estate is managing 202,185.4 bitcoin and an equal amount of "bitcoin cash."[44] These bitcoin and bitcoin cash were worth $2.34 billion based on prices as of January 30, 2018.[45] Therefore, the value of the Mt. Gox estate may be large enough to compensate claimants in full for their approximately $423 million in accepted claims and provide additional payments as well.[46]

---

[41]  Report to Tokyo District Court, Collegiate Section of 20th Civil Division, September 27, 2017 ("Ninth Creditors' Meeting"), p. 2. This includes JPY 45.6 billion in accepted claims as of May 25, 2016, plus an additional JPY 378.0 million in claims where the trustee changed his decision from a rejection to an acceptance.

[42]  The closing value on January 30, 2018, was 108.78 JPY per USD. Bloomberg, "USDJPY Spot Exchange Rate," accessed January 31, 2018, https://www.bloomberg.com/quote/USD JPY:CUR.

[43]  List of Bankruptcy Creditors.

[44]  Ninth Creditors' Meeting, pp. 1–2. Bitcoin cash is a cryptocurrency that split from bitcoin on August 1, 2017. All holders of bitcoin at the time of the "fork" received one bitcoin cash for each bitcoin they owned. Like bitcoin, bitcoin cash is traded on exchanges. Bitcoincash.org, "FAQ," *available at* https://www.bitcoincash.org/#faq.

[45]  Based on the closing prices of bitcoin and bitcoin cash on January 30, 2018, the USD values were $10,106.30 and $1,470.55, respectively. CoinMarketCap, "Historical data for Bitcoin," accessed January 31, 2018, https://coinmarketcap.com/currencies/bitcoin/historical-data/; CoinMarketCap, "Historical data for Bitcoin Cash," accessed January 31, 2018, https://coinmarketcap.com/currencies/bitcoin/historical-data/. Using these prices, the estate's holdings of bitcoin are valued at $2.04 billion and its holding of bitcoin cash are $297 million.

[46]  Kosaku Narioka, "Former Bitcoin King Is Bankrupt—And He Could Get Rich Again," *Wall Street Journal*, November 9, 2017, *available at* https://www.wsj.com/articles/former-bitcoin-king-is-bankruptand-he-could-get-rich-again-1510223405?mod=e2tw.

CONFIDENTIAL

**B.** **The Plaintiff Has Failed To Provide A Classwide Approach To Calculate Damages Suffered By The Proposed Deposit Class**

21.     Based on my review of the plaintiff's Class Certification Motion, Class Certification

Memorandum, and other filings, I observe that the plaintiff fails to propose or provide an approach to

calculating damages on a classwide basis. The plaintiff provides no methodology or even description

of an approach to calculate damages on a classwide basis for the proposed Deposit Class. Indeed, the

proposed definition of the "Deposit Class" in the plaintiff's class certification filings fails to identify

any harm suffered by members of the proposed Deposit Class. It simply defines the proposed class as

"[a]ll individuals who, while residing in the United States, wired fiat currency to Mt. Gox's account at

Mizuho Bank between June 20, 2013, and February 24, 2014."[47] With no description of the harm

allegedly suffered, it is not surprising that the plaintiff does not present a model or even discuss an

approach to calculating damages on a classwide basis that ties proposed Deposit Class members'

damages to Mizuho Bank's alleged liability. The plaintiff has not shown that damages that measure the

impact of the alleged wrongdoing on each member of the proposed Deposit Class can be calculated on

a classwide basis.

**C.** **Any Classwide Theory Of Harm And Approach To Damages Cannot Be Premised On The Assumption That It Was Impossible For All Proposed Deposit Class Members To Retrieve Fiat Currency From Mt. Gox During The Proposed Class Period**

22.     To calculate economic damages, a damages expert assumes the defendant is found

liable for the alleged wrongdoing and compares the difference in outcomes for a plaintiff between what

actually happened (i.e., the actual world where the defendant is assumed liable for the alleged

wrongdoing) and a "but-for" world where the defendant is assumed not to have committed the alleged

---

[47]   *See* Class Certification Motion, p. 1.

wrongdoing.[48] Properly designed and executed, such an approach will measure the dollar impact (damages) arising from the alleged wrongdoing. It is critical in calculating damages that the actual world and the but-for world be properly described and defined; otherwise, the result does not measure the amount attributable to the alleged wrongdoing.

23.     Here, without articulating a damages theory, the plaintiff claims that in the actual world (i.e., what actually happened) it was impossible for all proposed Deposit Class members to retrieve any fiat currency from Mt. Gox during the proposed Class Period. As I have discussed above, the data produced in the case belie that claim. During the proposed Class Period, Mt. Gox sent 560 USD-denominated international wires transfers, totaling $26.2 million, from its account at Japan Post Bank. Members of the proposed Deposit Class could reasonably be presumed to have received some of these funds, especially since the plaintiff has adduced no evidence to show otherwise. However, if proposed Deposit Class members did receive funds from the $26.2 million in wire transfers sent by Mt. Gox through Japan Post Bank, the actual world is *not* one where it was impossible for all proposed Deposit Class members retrieve fiat currency from Mt. Gox. Therefore, a damages approach that treats the plaintiff's impossibility premise as true would be inaccurate because it could not reliably measure the effect of the alleged wrongdoing.

### D.     The Plaintiff Has Ignored Significant Individual Issues

24.     To the extent the plaintiff argues that fiat currency withdrawals were delayed at Mt. Gox and that those delays caused Mt. Gox users, including proposed Deposit Class members, to lose

---

[48]  Mark A. Allen, Robert E, Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, National Research Council of the National Academies, Washington: The National Academies Press, 2011, pp. 425–502, 430.
Of course, if the defendant is found not liable, the damages calculation is not relevant.

CONFIDENTIAL

money when Mt. Gox went bankrupt, there are numerous questions requiring individual inquiry that would be relevant to liability and damages that the plaintiff has ignored. I discuss examples below.

### 1. Reasons For Not Successfully Wiring Or Delayed Withdrawal Requests

25.     Although Mt. Gox was still honoring certain fiat currency withdrawal requests during the proposed Class Period, it is possible that fiat currency withdrawal requests made by some members of the proposed Deposit Class were not successfully wired or were delayed. However, if this is the case for an individual proposed Deposit Class member, it is critical to understand why. Without access to Mt. Gox's internal records (which I understand are unavailable in this case because of Mt. Gox's bankruptcy), it is impossible to determine and verify how many fiat currency withdrawal requests Mt. Gox received from users, who made them, and how Mt. Gox went about wiring those withdrawal requests during the proposed Class Period. Mt. Gox may have delayed some withdrawal requests for its own reasons, or it may have chosen to limit the number of withdrawal requests it reviewed and honored. Mt. Gox may not have had sufficient staff to wire fiat currency to its users promptly after the users made withdrawal requests.

26.     A review of the transaction records produced by Deutsche Bank shows that on certain days, Japan Post Bank completed a wire transfer for as many as 19 withdrawal requests on behalf of Mt. Gox, whereas on other days none were completed.[49] I am not aware of any evidence in the record—such as a contract between Mt. Gox and Japan Post Bank—that limits the number or USD amounts or number of daily fiat currency withdrawals from Japan Post Bank. As a result, it is plausible that any delays in completing the fiat currency withdrawal requests may have been driven by choices that Mt. Gox made, including the time and resources that it dedicated to completing its users' fiat

---

[49]   Japan Post Bank Outbound Wires (DB_0000001).

currency withdrawal requests. In addition, as discussed in the Williams Report, in the period leading up to its bankruptcy, it is possible that Mt. Gox was incentivized to delay or fail to honor fiat currency withdrawals to forestall its impending insolvency.[50] Moreover, Mt. Gox may have internally prioritized certain fiat currency withdrawal requests over others. Other factors that may have affected whether a withdrawal request was processed include whether a member of the proposed Deposit Class properly completed a withdrawal request or chose to accept Mt. Gox's offer of expedited processing for an additional fee.[51] In short, unprocessed or delayed fulfillment of fiat currency withdrawal requests could have occurred for many and differing reasons unrelated to the alleged misconduct by Mizuho Bank.

### 2. Different Proposed Class Members Had Different Knowledge Of Delays

27.     To the extent the plaintiff claims that proposed Deposit Class members experienced delays in withdrawing fiat currency from Mt. Gox, individual inquiry would be required to determine whether a proposed Deposit Class member can prove he or she would not have wired fiat currency to Mt. Gox had he or she known about withdrawal delays and known that Mt. Gox was using a bank other than Mizuho Bank to send USD wires.

28.     Before and during the proposed Class Period, proposed Deposit Class members received information regarding the ability to withdraw both USD and bitcoin from Mt. Gox from different sources, and this information evolved over time. As discussed above and in the Williams Report, Mt. Gox made several disclosures on its website regarding the ability to deposit or withdraw assets from Mt. Gox. These disclosures include, but are not limited to: a June 20, 2013, announcement that Mt. Gox was halting USD withdrawals for two weeks; a July 4, 2013, announcement that it had a two-week backlog of withdrawals; an August 5, 2013, announcement that it would take between seven

---

[50]   Williams Report, ¶ 19.
[51]   Williams Report, ¶ 52.

CONFIDENTIAL

and ten days for a user's deposit of fiat currency to be credited to his or her account and that Mt. Gox

was in the process of forming relationships with new banking partners; and a February 7, 2014,

announcement that it was halting bitcoin withdrawals.[52] In addition, information was available on Mt.

Gox's website indicating that outbound international wire transfers were being handled manually and

that it could take four weeks or longer to receive a withdrawal.[53] Finally, public sources such as

articles in the popular press, government websites, and chatroom threads openly discussed delays Mt.

Gox users faced in withdrawing USD from Mt. Gox.[54] Some proposed Deposit Class members may

have seen this information and wired fiat currency to Mt. Gox anyway, whereas others might not have

seen it. In addition, proposed Deposit Class members may have had individual communications with

Mt. Gox.

      29.     It is my understanding that, to prove a fraudulent concealment claim, as alleged against

Mizuho Bank in this case,[55] a plaintiff must establish that he or she either did not know the allegedly

concealed information or justifiably relied on the misinformation that was available. This requires an

individual assessment of each proposed Deposit Class member's knowledge to determine whether any

member of the proposed Deposit Class received information about fiat currency withdrawals from an

employee of Mt. Gox, including Mr. Karpeles, or by some other means. Some members of the

---

[52] Mt. Gox, "Statement Regarding Temporary Hiatus on U.S. Dollar Withdrawals," press release, June 20, 2013, *available at* https://web.archive.org/web/20130811014059/https://www.mtgox.com/press_release_20130620.htm; Mt. Gox, "Statement on Resumption of Withdrawals and Improved Banking," press release, July 4, 2013, *available at* http://web.archive.org/web/20130810181218/https://www.mtgox.com/press_release_20130704.html; Mt. Gox, "August 2013 Mt. Gox Status Update," press release, August 5, 2013, *available at* https://web.archive.org/web/20130805084259/https://www.mtgox.com/press_release_20130805.html; Mt. Gox, "Statement Regarding BTC Withdrawal Delays - UPDATE," February 7, 2014, *available at* https://web.archive.org/web/20140221015146/https://support.mtgox.com/entries/26130949-Statement-Regarding-BTC-Withdrawal-Delays-UPDATE.

[53] Lack Deposition, Exhibit 9.

[54] Williams Report, ¶ 61.

[55] Complaint, ¶¶ 139–150.

          CONFIDENTIAL

proposed Deposit Class may not have known that Mizuho Bank was not sending wires on Mt. Gox's behalf, but nonetheless may have known that Mt. Gox users were experiencing significant delays in retrieving fiat currency from their accounts based on the public information discussed above.

30.     If a proposed Deposit Class member knew of the delays and wired fiat currency anyway, the plaintiff's claim that all members of the proposed Deposit Class relied on Mizuho Bank's alleged omission and would not have wired fiat currency to Mt. Gox had Mizuho Bank disclosed it was no longer sending wires on behalf of Mt. Gox is highly implausible. For example, by January 17, 2014, Mt. Gox's website indicated that wire transfers could take "four weeks or more,"[56] and after February 7, 2014, Mt. Gox announced that it had indefinitely halted bitcoin withdrawals.[57] A Mt. Gox user who was aware of these restrictions on withdrawals but still wired fiat currency into Mt. Gox likely was not making a deposit with the expectation of being able to withdraw fiat currency from Mt. Gox quickly. Indeed, this was true of Mr. Motto.[58]

31.     There are probably many proposed Deposit Class members who were aware of these restrictions. Based on data produced in this case, from January 17, 2014, through the end of the proposed Class Period, potential Deposit Class members wired approximately $1.6 million to Mt. Gox, which represents more than 20 percent of the approximately $7.7 million USD wired to Mt. Gox's account at Mizuho Bank during the proposed Class Period.[59] From February 7, 2014, through the end of the Class Period, potential class members wired approximately $1.3 million to Mt. Gox, which represents more than 16 percent of the approximately $7.7 million total USD wired to Mt. Gox's

---

[56]  Motto Deposition, Exhibit 14.

[57]  Mt. Gox, "Statement Regarding BTC Withdrawal Delays - UPDATE," February 7, 2014, *available at* https://web.archive.org/web/20140221015146/https://support.mtgox.com/entries/26130949-Statement-Regarding-BTC-Withdrawal-Delays-UPDATE.

[58]  I discuss this in greater detail in ¶¶ 48–49, *infra*.

[59]  Mizuho Bank Inbound Wire Data (MIZ_0002568).

CONFIDENTIAL

account at Mizuho Bank during the proposed Class Period.[60] Individual inquiry would be required to determine each proposed Deposit Class member's knowledge of the fiat currency withdrawal delays at Mt. Gox.

### 3. Tracing Of Fiat Currency Wired Into Mt. Gox By Proposed Class Members

32.     The whereabouts or disposition of fiat currency after it was received at Mt. Gox is a fundamental question relevant to assessing whether a proposed Deposit Class member suffered any injury attributable to the alleged fraudulent conduct, and if so, the damages he or she incurred. However, the plaintiff has provided no classwide data or even a general methodology for tracing the fiat currency after the initial deposit. Without data or a methodology, individualized inquiry would be required with significant challenges to appropriately trace the fiat currency. The problem of tracing what happened to money deposited at Mt. Gox by members of the proposed Deposit Class is especially acute because individual proposed Deposit Class members may not have an economic incentive to produce records showing that they later withdrew the money, or used it to buy bitcoin, or in some other way received value for the money they deposited, yet they likely will be the only ones in a position to do so (because Mt. Gox's records are not available).

33.     I provide some examples below of how proposed Deposit Class members could have obtained value from their initial deposit of USD to Mt. Gox. Members of the proposed Deposit Class may or may not provide sufficient records to show whether or not and how much of their fiat currency followed one or more of these potential outcomes. The plaintiff has not provided any description of how such fundamental information could be obtained on a classwide basis.

34.     Some members of the proposed Deposit Class may have had Mt. Gox wire fiat currency to them after they made a withdrawal request to Mt. Gox. As discussed in the Williams Report and as

---

[60]   Mizuho Bank Inbound Wire Data (MIZ_0002568).

CONFIDENTIAL

shown in documents and data produced in the litigation, Mt. Gox continued to honor certain fiat currency withdrawal requests during the proposed Class Period by sending wire transfers through Japan Post Bank. Mr. Williams finds, and I have confirmed, that the data produced by Deutsche Bank show that Japan Post Bank sent $26.2 million in USD wire transfers on behalf of Mt. Gox between June 20, 2013, and February 24, 2014, as compared with $29.4 million sent by Mizuho Bank on behalf of Mt. Gox between November 30, 2012, and June 13, 2013.[61] As Mr. Williams notes, it is possible that other banks also sent USD wire transfers for Mt. Gox. This would mean a proposed Deposit Class member could have retrieved his or her fiat currency from Mt. Gox through a wire transfer sent by a bank other than Mizuho Bank.[62] It is not clear how it can be determined from the data available whether the members of the proposed Deposit Class received a portion of the $26.2 million Mt. Gox sent during the proposed Class Period because Mt. Gox's records are unavailable, and plaintiff has offered no method for doing so. Although a proposed Deposit Class member could provide records from his or her bank account, the absence of evidence that the funds were sent to a particular bank account would not demonstrate that the class member did not receive them because the funds could have been wired to a different account.[63] If the Court were inclined to accept a deposition or affidavit or similar proof from members of the proposed Deposit Class, and to the extent the Court would allow Mizuho Bank to investigate the validity of such proffered evidence, it would require individual inquiry, which is not susceptible to classwide evidence.

---

[61]  Mizuho Bank Outbound Wires (MIZ_0002569) and Japan Post Bank Outbound Wire Data (DB_0000001).

[62]  "Funds deposited with Mt. Gox may only be withdrawn to an account held by the originator of those funds located in your country of origin." *See* Mt. Gox, "Withdrawal and Deposit Information," November 8, 2013, *available at* https://web.archive.org/web/20140221015054/https://support.mtgox.com/home?page=3.

[63]  Williams Report, ¶ 52.

CONFIDENTIAL

35.     Some members of the proposed Deposit Class may have wired USD to Mt. Gox and then converted the USD to bitcoin. At that point, as Mr. Williams discusses, they may have transferred the bitcoin to another exchange or a private wallet.[64] They also might have used the bitcoin for a transaction where they received value, as explained in the deposition of Mr. Rasmussen, the plaintiff's expert.[65] Mr. Williams and Mr. Rasmussen both opine that there were legitimate vendors who accepted bitcoin during the proposed Class Period.[66] They both also acknowledge there were illegitimate uses for bitcoin, such as transacting on Silk Road, where bitcoin could be exchanged for weapons, drugs, and prostitution.[67] Members of the proposed Deposit Class may have little incentive to show that their bitcoin was used for legitimate purposes and even less incentive to show it was used for illegitimate purposes. The plaintiff has not explained how he proposes to address such issues on a classwide basis. These issues likely can only be addressed through individual inquiry.

### 4. Proposed Deposit Class Members' Intended Use Of Deposited Fiat Currency And Their Expectations

36.     Individualized inquiry is required to determine whether, as suggested by the plaintiff, a proposed Deposit Class member would not have wired fiat currency to Mt. Gox had he or she known that Mizuho Bank was no longer sending USD wire transfers on behalf of Mt. Gox (i.e., the information the plaintiff alleges Mizuho Bank improperly concealed).[68] The importance of having Mizuho Bank—as opposed to Japan Post Bank—wire fiat currency on behalf of Mt. Gox to proposed Deposit Class members could differ from individual to individual. This could depend on each individual's intended uses or expectations about the service provided by Mt. Gox.

---

[64]  Williams Report, ¶ 52.

[65]  In addition to such transactions being possible during the Class Period, Mr. Rasmussen himself exchanged bitcoin for a printed circuit board in 2013. *See* Rasmussen Deposition, pp. 91–92, 141–144.

[66]  Williams Report, ¶ 26; Rasmussen Report, p. 12; Rasmussen Deposition, pp. 91–92, 141–144.

[67]  Williams Report, ¶ 30; Rasmussen Report, p. 13; Rasmussen Deposition, pp. 57, 166–178.

[68]  Class Certification Memorandum, p. 11.

CONFIDENTIAL

37.     For example, Mr. Motto testified that he never intended to withdraw fiat currency from Mt. Gox: "I wasn't overly concerned about the -- personally, I wasn't concerned about the U.S. withdrawals as -- per se, because I wanted to buy bitcoin. And I would have withdrawn bitcoin. I wouldn't have turned it back into U.S. dollars."[69] Therefore, the ability to retrieve fiat currency from Mt. Gox's account at Mizuho Bank, or any other bank, had no impact on Mr. Motto.

38.     As Mr. Williams notes and as discussed above, during the proposed Class Period, bitcoin could be used in commercial transactions for goods or services (whether legal or otherwise).[70] Some proposed Deposit Class members may have deposited fiat currency with Mt. Gox intending to purchase bitcoin for use in commercial transactions. Others, like Mr. Motto, may have wanted to transfer the bitcoin out of Mt. Gox. Either way, proposed Deposit Class members who planned to use bitcoin in this way had no intention of withdrawing USD from Mt. Gox, and therefore, whether Mizuho Bank was sending wires on behalf of Mt. Gox would have been irrelevant to them.

39.     As Mr. Williams notes, other proposed Deposit Class members may have wanted to invest in bitcoin on a long-term basis, and therefore might have deposited USD with Mt. Gox regardless of whether Mizuho Bank was wiring fiat currency on behalf of Mt. Gox. Those who intended to hold bitcoin for the long term may not have cared whether Mizuho Bank was wiring fiat currency on behalf of Mt. Gox or whether there were delays, because they believed another bank could wire fiat currency on behalf of Mt. Gox when they eventually wanted fiat currency, or they could transfer the bitcoin out of Mt. Gox to another exchange or private wallet. In other words, such proposed Deposit Class members placed little importance on having Mizuho Bank send Mt. Gox's wires.

---

[69]   Motto Deposition, p. 179.
[70]   *See also* Rasmussen Deposition, pp. 57, 91–92, 141–144, and 166–178.

CONFIDENTIAL

40.     To the extent it is relevant to the plaintiff's theories of damages and liability, the type of service expected by proposed Deposit Class members when they wired fiat currency to Mt. Gox may also have varied from individual to individual and may be relevant to assessing whether proposed Deposit Class members can prove they would not have wired funds to Mt. Gox if they knew Mizuho Bank was not wiring fiat currency on behalf of Mt. Gox. The plaintiff's expert, M. Todd Henderson, testified that the withdrawal services provided by Japan Post Bank were "not anywhere close to what was expected by investors,"[71] but neither the plaintiff nor Mr. Henderson provide a means to assess what level of service was "expected" by any proposed Deposit Class member when they wired fiat currency to Mt. Gox. Those expectations may have likely varied from one investor to another. In light of the disclosed delays discussed above, it is reasonable to assume that some members of the proposed Deposit Class could have expected delays, yet wired funds to Mt. Gox anyway.

41.     Mt. Gox users also faced different daily withdrawal limits depending on the amount of information they provided to Mt. Gox, which could also reflect differing expectations of service.[72] A user who opened a Mt. Gox account with a cash balance far in excess of his or her daily cash withdrawal maximum presumably knew he or she could not withdraw the full amount of his or her full balance in a single withdrawal request, whereas a proposed Class Member who opened an account with a cash balance well below his or her daily limit might expect to be able to withdraw his or her full balance in fiat currency in a single transaction.

42.     The plaintiff claims that the question of whether Mizuho Bank concealed material information that it was not processing outbound wire transfers for Mt. Gox is a common classwide

---

[71]   Deposition of M. Todd Henderson, December 21, 2017, p. 101.
[72]   *See* **Table 1**, *supra.*

issue.[73] In my view, however, that question can only be answered through individual inquiry focused on the importance each member of the proposed Deposit Class placed on that information. Assessing whether such knowledge would have changed the Mt. Gox user's behavior (i.e., assessing whether the user would have decided not to wire USD to Mt. Gox had the user known that Mizuho Bank was not wiring fiat currency on behalf of Mt. Gox but that another Japanese bank was) depends in part on the user's intended uses of the bitcoin and whether the user intended to submit a request to Mt. Gox to withdraw USD via wire transfer as well as on the user's expectations about service, among other factors. The plaintiff is silent on how to address such issues on a classwide basis.

### 5. Proposed Class Members' Withdrawal Requests

43.     As I note above, the evidentiary record does not show how many USD withdrawal requests Mt. Gox received during the proposed Class Period, or who made them. It is possible that some members of the proposed Deposit Class did not make any fiat currency withdrawal requests.[74] For them, the fact that Mizuho Bank was not executing wire transfer withdrawals on behalf of Mt. Gox could not have been the direct cause of their losses (if any). Someone who did not request a withdrawal of his or her fiat currency via a wire transfer from Mt. Gox would have suffered the consequences of the Mt. Gox bankruptcy whether or not Mt. Gox in fact provided the withdrawal services that Mt. Gox had represented, or that the individual had understood. There would be no direct causal link between Mizuho Bank's alleged omission and any losses suffered from fiat currency being tied up in the bankruptcy.

---

[73] "Did Mizuho work to conceal material information from class members? . . . But the threads unifying the questions invited by the record is that they can be answered on the basis of common evidence focused on Mizuho's conduct, and answering them resolves issues central to the claims of everyone in the proposed classes." Class Certification Memorandum, pp. 11–12.

[74] For example, Mr. Motto did not make a USD withdrawal request. "I wasn't concerned about the U.S. withdrawals. . . . I would have withdrawn bitcoin. I wouldn't have turned it back into U.S. dollars." *See, e.g.*, Motto Deposition, p. 179.

CONFIDENTIAL

44.     Also, the timing of proposed Deposit Class members' withdrawal requests could be relevant to the question of whether they were damaged by the conduct at issue. For example, someone who deposited fiat currency at Mt. Gox one week before the bankruptcy, despite knowing of withdrawal delays of, say, one month, is not in the same position as a proposed Deposit Class member who did not know of the delays and who made a withdrawal request four months before the bankruptcy. Moreover, it could be relevant for determining any potential damages to know whether a member of the proposed Deposit Class knew of or was offered the opportunity to obtain an expedited withdrawal for a 5 percent fee.[75] This is another issue that would require individual inquiry.

45.     To summarize, the plaintiff has not provided any data or a description of how one might identify and confirm whether (and, if so, when) a proposed Deposit Class member made a fiat currency withdrawal request and whether a proposed Deposit Class member received or knew of the opportunity to withdraw funds on an expedited basis. I am not aware of any data or information produced in the litigation that could help establish this and such questions would therefore require individual inquiry.

### 6.  Proposed Class Members' Bankruptcy Claim

46.     Although I do not have access to relevant records, it is highly likely that not all members of the proposed Deposit Class submitted bankruptcy claims. Furthermore, not all of the submitted claims were accepted by the Japanese bankruptcy trustee. In these respects, members of the proposed class are not all similarly situated. These differences are important because it is possible that proposed Deposit Class members with a recognized bankruptcy claim will receive full repayment. Although the plaintiff does not describe how the proposed Deposit Class members have been harmed, the amount of repayment may be relevant in determining whether an individual was harmed.

---

[75]  Williams Report, ¶ 52.

CONFIDENTIAL

47.     In addition, it may be necessary to ascertain, on an individual basis, why a member of the proposed Deposit Class does not have a recognized bankruptcy claim. For example, a proposed Deposit Class member may not have a bankruptcy claim because he or she no longer held assets at Mt. Gox at the time of the bankruptcy and therefore suffered no injury. In such a case, the lack of a bankruptcy claim may indicate that the proposed Deposit Class member either obtained full use of his or her fiat currency and/or bitcoin, transferred bitcoin out of Mt. Gox, or received a USD wire transfer from Mt. Gox after requesting a withdrawal. Other proposed Deposit Class members may have chosen not to make a bankruptcy claim even though they were eligible, while others may have filed a claim improperly. Such information is relevant to determining damages because it would indicate that the cause of a proposed Deposit Class member's losses was the failure to file or properly file a bankruptcy claim, as opposed to Mizuho Bank's alleged misconduct.

### E.     Mr. Motto's Experiences Highlight The Need For Individual Inquiry

48.     Mr. Motto's experiences with Mt. Gox illustrate the many areas of individual inquiry that I discuss above. Central to the plaintiff's case is the allegation that it was impossible to get fiat currency out of Mt. Gox after Mizuho Bank stopped processing outbound wire transfers.[76] Moreover, the plaintiff also claims that "[t]he ability to cash out of the market on demand was material to virtually all decisions to invest in bitcoin on Mt. Gox."[77] However, Mr. Motto's intentions when opening his account are inconsistent with this because withdrawing fiat currency was not a service Mr. Motto was interested in. In his deposition, Mr. Motto stated, "I wasn't overly concerned about the -- personally, I wasn't concerned about the U.S. withdrawals as -- per se, because I wanted to buy bitcoin. And I

---

[76]   As I have explained above, this is simply not true. The Japan Post Bank data show that Mt.Gox transmitted more than $26 million by wire to U.S. users during the proposed Class Period. *See* ¶ 34, *supra*; Mizuho Bank Outbound Wires (MIZ_0002569); Japan Post Bank Outbound Wire Data (DB_0000001).

[77]   Class Certification Memorandum, p. 10.

CONFIDENTIAL

would have withdrawn bitcoin. I wouldn't have turned it back into U.S. dollars."[78] Thus, Mr. Motto's own experience contradicts his claim that the question of whether Mizuho Bank withheld material information about wire transfers is a common question.[79] While there may be some members of the proposed Deposit Class who cared about withdrawing fiat currency, Mr. Motto testified that he did not care whether he could withdraw USD. The fact that Mizuho Bank was not sending wires on behalf of Mt. Gox would not have affected how Mr. Motto planned to use the money he wired to Mt. Gox, and hence, did not cause his losses.

49.     In his knowledge of the relevant facts and his willingness to take risk, which are relevant factors in assessing liability and measuring damages, Mr. Motto differs from other members of the proposed Deposit Class. Mr. Motto initiated a wire transfer to Mt. Gox's account at Mizuho Bank on February 18, 2014,[80] eleven days after Mt. Gox announced a halt to bitcoin withdrawals. Mr. Motto acknowledged that he read and understood this disclosure prior to wiring USD from a JP Morgan Chase Bank account to Mt. Gox's bank account at Mizuho Bank in February 2014.[81] In other words, when Mr. Motto initiated his wire transfer, he was aware that he could not withdraw bitcoin at that time; members of the proposed Deposit Class who deposited USD before February 7, 2014, would not have been aware of such a disclosure at the time of their deposits. Moreover, Mr. Motto stated in his deposition that as early as January 17, 2014, he "was under the assumption that it could take four weeks or more" to receive a fiat currency withdrawal from Mt. Gox.[82] Despite being

---

[78]  Motto Deposition, p. 179.

[79]  "Did Mizuho work to conceal material information from class members? . . . But the threads unifying the questions invited by the record is that they can be answered on the basis of common evidence focused on Mizuho's conduct, and answering them resolves issues central to the claims of everyone in the proposed classes." Class Certification Memorandum, pp. 11–12.

[80]  The wire was completed on February 18, 2014. Motto Deposition, Exhibit 3.

[81]  Motto Deposition, pp.172–174.

[82]  Motto Deposition, p. 167.

CONFIDENTIAL

aware of these risks associated with using Mt. Gox, Mr. Motto proceeded. This would be a relevant factor in assessing the cause of Mr. Motto's losses.

50. In addition, Mr. Motto's account balance at Mt. Gox as of February 18, 2014, was zero USD and zero bitcoin.[83] According to an email dated February 20, 2014, Mr. Motto inquired with Mt. Gox personnel regarding his deposit. He stated, "Please make sure [the wired fiat currency gets] applied to my account."[84] At his deposition, Mr. Motto testified that he "never saw [his] money in Mt. Gox."[85] In light of this, the cause of any losses that might be claimed by Mr. Motto might be different from the cause of potential losses claimed by a potential Deposit Class member who had money in his or her Mt. Gox account before its collapse.

51. Also, Mr. Motto may have had the opportunity to cancel his USD wire transfer and get his money back. On March 7, 2014, a representative of Mizuho Bank sent a SWIFT message to JP Morgan Chase Bank (Mr. Motto's own bank) regarding Mr. Motto's wire. The message read in part:

> WE HAVE RECEIVED YR A/M MT103. BUT ACCORDING TO NEWS REPORTS, THE BENEFICIARY MT. GOX WHICH IS BIT COIN (sic) EXCHANGE IN JAPAN, IS IN THE SITUATION OF STOP OPERATIONS…PLS REPLY US WHETHER YR CUSTOMER WOULD REQUEST THIS TRANSACTION TO BE CANCELLED OR NOT UNTIL MAR 14, 2014. IN THE CASE OF CANCELLATION, PLS SEND YR CANCELLATION MESSAGE TO US. WE WILL RETURN THE FUND LESS OUR CHARGES.[86]

---

[83]  Motto Deposition, Exhibit 5.
[84]  Motto Deposition, Exhibit 9, p. 1.
[85]  Motto Deposition, p. 124.
[86]  MIZ_0003853 (Class Certification Memorandum, Exhibit 40).

CONFIDENTIAL

Mr. Motto said he did not have any recollection of being offered the opportunity to cancel his wire transfer.[87] Whether a member of the Deposit Class received such an offer or acted upon it may be relevant to determining liability and damages (if any).

52.     Finally, Mr. Motto's $1,000 claim in the bankruptcy was not allowed by the trustee.[88] The reason the claim was denied is not known but it appears that Mr. Motto may have filed his claim late or may not have followed the requirements established by the bankruptcy trustee.[89] As I discussed above, whether a class member has a valid bankruptcy claim and if not, why not, may be relevant to that Deposit Class member's damages (if any).

53.     While Mr. Motto's class certification filings have not articulated a theory or amount of damages sought from Mizuho Bank, the presumed loss of the $1,000 deposit he wired to Mt. Gox, in my view, based on the individual issues discussed above, is not causally connected to any alleged wrongdoing by Mizuho Bank.

Bruce A. Strombom
February 1, 2018

---

[87]  Declaration of Anthony Motto, October 13, 2017 (Class Certification Memorandum, Exhibit 41).
[88]  *See, e.g.,* List of Bankruptcy Creditors at Pearce001438.
[89]  Motto Deposition, pp. 142–157.

CONFIDENTIAL

Appendix A

# BRUCE A. STROMBOM, Ph.D.
## Managing Principal

Phone: (213) 896-4520                                                                   333 S. Hope Street
Fax: (213) 623-4112                                                                            Suite 2700
bruce.strombom@analysisgroup.com                                        Los Angeles, CA 90071

Bruce Strombom is an expert in applied microeconomics, finance, and quantitative and statistical analysis. He provides assistance to attorneys in all phases of pretrial and trial practice, prepares economic and financial models, and provides expert testimony in litigation and public policy matters. Dr. Strombom has conducted assessments of class certification, liability, and damages issues in cases involving antitrust, breach of contract, false advertising, intellectual property, labor and employment, product liability, securities, and general commercial disputes.

Prior to joining Analysis Group, Dr. Strombom was Executive Vice President of a middle-market merger and acquisition firm, where he managed a financial and market research organization that provided valuation and consulting services to over 500 privately held companies annually. Previously, he was Consulting Manager at Price Waterhouse, where he provided litigation support and value enhancement consulting services, and Senior Financial Analyst at the Tribune Company, where he evaluated capital projects and acquisition candidates. Dr. Strombom holds a Ph.D. in economics from the University of California, Irvine, and a B.A. in economics from San Jose State University.

## EDUCATION

Ph.D.                    Economics, University of California, Irvine
                         Fields: Finance and Industrial Organization
                         Thesis: Switching Cost, Price Sensitivity and Health Plan Choice

B.A.                     Economics, San Jose State University, San Jose, CA

## PROFESSIONAL EXPERIENCE

2004 – Present           Managing Principal, Analysis Group, Inc., Los Angeles, CA

1993 – 2004              Senior Associate and Vice President, Analysis Group, Inc., Los Angeles, CA

1992                     Regional General Manager, Prodata, Inc., Sacramento, CA

1985 – 1991              Executive Vice President, Geneva Business Research Corp., Irvine, CA

1983 – 1985              Manager of Consulting Services, Price Waterhouse, Newport Beach, CA

1981 – 1983              Senior Financial Analyst, Tribune Newspapers West, Woodland Hills, CA

CONFIDENTIAL

Appendix A

**SELECT CASE ASSIGNMENTS**

<u>**Class Certification**</u>

- **Benjamin Michael Merryman, et al. v. Citigroup, Inc., et al.**
  *United States District Court, Southern District of New York*
  Evaluate the feasibility of calculating damages on a class-wide basis and rebut plaintiffs' damages calculation in this case involving foreign exchange transactions associated with American Depository Receipts (ADRs) (expert declaration and deposition).

- **Francis Fenwick, et al. v. Ranbaxy Pharmaceuticals, et al**
  *United States District Court, District of New Jersey*
  Evaluate plaintiffs' proposed methodology for identifying class members and calculating damages on a class-wide basis to consumers who purchased generic atorvastatin that may have contained a foriegn material (expert report and deposition).

- **Tom Kondash, et al. v. Kia Motors America, Inc.**
  *United States District Court, Central District of California*
  Evaluate the plaintiffs' proposed method of calculating class-wide damages reuulsting from defendants failure to disclose alleged defects in panoramic sunroofs (expert report).

- **Ronald McAllister, et al. v. The St. Louis Rams, LLC**
  *United States District Court, Eastern District of Missouri, Eastern Division*
  Identify data related to personal seat licenses available to the Rams and evaluate whether those data are suitable for identifying members of the proposed classes, establishing liability and calculating damages on a class-wide basis without individualized inquiry (expert report and deposition).

- **Steve Wildman, et al. v. American Century Services, LLC, et al.**
  *United States District Court, Western District of Missouri*
  In this ERISA class action involving claims that a 401(k) plan sponsor breached fiduciary duties, plan fees were excessive and investment options were imprudent, evaluate whether liability and damages can be determined on a class-wide basis without individualized inquiry (expert report and deposition).

- **In re Asacol Antitrust Litigation**
  *United States District Court, District of Massachusetts*
  Evaluate economic issues related to the ascertainability of the class and evidence that defendant's actions caused class-wide harm and evaluate plaintiffs' damages claims (expert report and deposition).

- **Billy Glenn, et al. v. Hyundai Motor America, et al.**
  *United States District Court, Central District of California*
  Evaluate the plaintiffs' proposed method of calculating class-wide damages and conduct a statistical analysis of the fracture rates of convential and panoramic sunroofs (expert report and deposition).

CONFIDENTIAL

Appendix A

- **Cynthia A. Patterson, et al. v. Fidelity National Title Insurance Company, et al.**
  *Court of Common Pleas of Allegheny County, Commonwealth of Pennsylvania, Civil Division*
  Assess the accuracy of certian data stored in Fidelity's database systems related to real estate
  transactions (expert report and deposition).

- **Paul Butler, et al. v. Porsche Cars North America, Inc.**
  *United States District Court, Northern Cistrict of California*
  Assess whether a common methodology exists to measure the alleged diminution in class vehicles
  had an allegedly defect been disclosed at the time of purchase (expert report).

- **Sjobring v. First American Title Co.**
  *Superior Court of the State of California, County of Los Angeles*
  Assess the feasibility of using defendant's electronic data to prove, on a class-wide basis, whether
  charges exceeded rates filed with the California Department of Insurance (declaration and
  deposition).

- **Alfred Salas and Gloria Ortega v. Toyota Motor Sales, U.S.A. Inc.**
  *United States District Court, Central District of California*
  Evaluate plaintiffs' proposed Benefit of the Bargain Damages Methodology and determine if provides
  a reliable method of calculating class-wide damages without individualized inquiry. (expert report
  and deposition).

- **Galo Coba, et al. v. Ford Motor Company**
  *United States District Court, District of New Jersey*
  Assess whether used car prices provide evidence of diminution in the value of class vehicles due to
  allegedly defective fuel tanks and evaluate plaintiffs' proposed method of calculating class-wide
  damages (expert report and deposition).

- **Alex Ang, et al. v. Bimbo Bakeries USA, Inc.**
  *United States District Court, Northern District of California*
  Evaluate proposed regression-based methods of determining harm to consumers and calculating
  damages resulting from allegedly false and misleading claims appearing on the labels of bread and
  other baked goods (expert report).

- **Patrick Hendricks, et al. v. Starkist Co.**
  *United States District Court, Northern District of California*
  Assess whether members of a putative class can be ascertained and whether the proposed method
  for calculating harm to consumers from underweight products can be applied on a common, class-
  wide basis (expert report and depostion).

- **In re Wellbutrin XL Antitrust Litigation**
  *United States District Court, Eastern District of Pennsylvania*
  Evaluate the ascertainability of members of a class of indirect purchasers given risk-sharing
  arrangements in the distribution of pharmaceuticals and the "pass-on" of health care costs by health
  plans in the form of higher premiums (expert reports and deposition).

CONFIDENTIAL

Appendix A

*Bruce A. Strombom, page 4*

- **Margie Daniel, et al. v. Ford Motor Company**
  *United States District Court, Eastern District of California*
  Evaluate repair costs for fleet vehicles for evidence of excess tire wear and review prices of used car transactions for evidence of excess depreciation in the Ford Focus (expert reports, deposition and testimony at trial).

- **Mylan Pharmaceuticals, Inc., et al. v. Warner Chilcott Public Limited Company, et al.**
  *United States District Court, Eastern District of Pennsylvania*
  Evaluate the relevance of "pass-on" issues to the damages claimed by indirect purchasers of an oral antibacterial drug and whether damages can be determined on a class-wide basis without individualized inquiry (expert reports and deposition).

- **Peter Diamond, et al. v. Porsche Cars North America, Inc.,**
  *Circuit Court of the 11th Judicial Circuit, Miami-Dade County, Florida*
  Evaluate whether quantitative and statistical methods could be used to establish liability and loss causation on a class-wide basis in this case involving allegedly defective headlights in Porsche vehicles (deposition and testimony at hearing).

- **Bruce Levine, et al. v. First American Title Insurance Co.,**
  *United States District Court, Eastern District of Pennsylvania*
  Review and evaluate plaintiffs' proposed method of identifying class members and calculating damages on a class-wide basis (expert report).

- **Jaclyn Santomenno, et al. v. Transamerica Life Insurance Company, et al.**
  *United States District Court, Central District of California*
  In this case involving claims that fees charged by an ERISA retirement plan service provider were excessive, evaluate whether questions related to liability and damages can be addressed on a class-wide basis without individualized inquiry (expert reports and deposition).

- **In re General Motors OnStar Litigation**
  *United States District Court, Eastern District of Michigan*
  Assess whether common proof exists of injury to all members of the putative class and whether damages can be calculated on a class-wide basis without individual inquiry (expert report and deposition).

- **Anthony L. Slapikas, et al. v. First American Title Insurance Company**
  *United States District Court, Western District of Pennsylvania*
  Evaluate the feasibility of identifying on a class-wide basis individuals that were entitled to, but did not receive, either the Reissue Rate or the Refinance Rate based on electronic data maintained in defendant's data processing systems (declaration).

CONFIDENTIAL

Appendix A

- **David Helmer, et al. v. The Goodyear Tire & Rubber Co.**
  *United States District Court, District of Colorado*
  Assess the typicality of class representatives and numerosity of potential class members in this matter related to the manufacturing and distribution of allegedly defective hose used in hydronic heating systems (expert report and testimony at hearing).

- **Miriam Haskins, et al. v. First American Title Insurance Company**
  *United States District Court, District of New Jersey*
  Evaluate the feasibility of ascertaining members of a proposed class using electronic data and calculating damages on a class-wide basis (expert report, deposition and testimony at hearing).

- **Beverly Clark, et al. v. The Prudential Insurance Company of America**
  *United States District Court, District of New Jersey*
  Evaluate whether the existence and extent of damages to members of the proposed class due to the closure of a block of health insurance business can be determined using a common method of proof without individual inquiry (declaration, expert report and deposition).

- **Emily Diaz v. First American Home Buyers Protection Corporation**
  *United States District Court, Southern District of California*
  Evaluate class certification issues including plaintiff's proposed method of calculating economic damages suffered by members of the putative class using a common method of proof (expert report and deposition).

- **Raffone v. First American Title Insurance Company, Inc.**
  *Circuit Court, Nassau County, Florida*
  Assess the feasibility of using the company's electronic data to determine whether consumers were entitled to, but did not receive, discounted prices on a class-wide basis (expert report).

- **Johnette C. Alexander, et al. v. Kia Motors America, Inc., et al.**
  *Superior Court of California, County of Orange*
  Assess damages suffered by class members caused by alleged defective rear seat belt systems in the Kia Sephia (deposition and testimony at trial).

- **Campbell v. First American Title Insurance Company, Inc.**
  *United States District Court, District of Maine*
  Evaluate class certification issues and review the statistical sampling method used by plaintiffs' expert to estimate the frequency of overcharges for title insurance policies issued in refinance transactions (expert report).

- **Daniel Perez, et al. v. First American Title Insurance Company, Inc.**
  *United States District Court, District of Arizona*
  Draw and evaluate a sample of title insurance policy files to determine the frequency of mispricing and assess whether damages can be calculated on a class-wide basis without individual inquiry (expert report and deposition).

CONFIDENTIAL

- **Regina Little, et al. v. Kia Motors America, Inc., et al.**
  *Superior Court of New Jersey – Law Division Union County (expert report and testimony at trial);*
- **Maria Santiago, et al. v. Kia Motors America, Inc., et al.**
  *Superior Court of California, County of Orange (deposition); and*
- **Shamell Samuel-Bassett, et al. v. Kia Motors America, Inc., et al.**
  *Court of Common Pleas of Philadelphia County, Pennsylvania (expert report and testimony at trial)*
  Evaluate class certification issues and estimate excess depreciation of vehicle and other damages suffered by class member as the result of an allegedly defective braking system in the Kia Sephia.

- **Cecil Barret, Jr., et al. v. Option One Mortgage Corp., et al**
  *United States Distric Court, District of Massachusetts*
  Led a case team supporting an Academic Affiliate in evaluating whether plaintiffs' statistical analyses showed a common mode of exercising discretion in loan pricing across brokers and a common disparate impact on minority borrowers.

**General Commercial Litigation**

- **United States of America, Ex Rel. Bruce Jacobs v. Bank of America, et al.**
  *United States District Court, Southern District of Florida*
  Assess whether calcualtions performed by plaintiffs expert provide a reliable estimate of damages from allegedly false claims for FHA insurance recoveries (expert report).

- **Strategic Partners, Inc. v. Vestagen Protective Technologies, Inc.**
  *United States District Court, Central District of California - Western Division*
  Evaluate damages from alleged false advertising under the Lanham Act and unfair business practices in the market for protective medical garments (expert report, deposition and testimony at trial).

- **Carlos McClatchy v. Gary B. Pruitt, et al.**
  *Superior Court of the State of California, City and County of San Francisco*
  Calculate damages to a trust beneficiary from the alleged failure to properly diversify the trust's holdings (deposition and testimony at trial).

- **New Mexico Oncology and Hematology Consultants v. Presbyterian Healthcare Services, et al.**
  *United States District Court, District of New Mexico*
  Evaluate damages to a medical specialty group from alleged unlawful maintenance of monopoly power in the markets for private health insurance and inpatient services and attempted monopolization of the market for a speciality medical service by an integrated health insurer and provider organization (expert reports and depositions).

- **James J. Cotter et al. v Margaret Cotter et al. and Reading International, Inc.**
  *District Court, Clark County, Nevada*
  Evaluate plaintiffs' damages analysis in this shareholder derivative action and address issues of loss causation (expert report and deposition).

CONFIDENTIAL

Appendix A

- **Maricopa County v. Office Depot, Inc.**
  *United States District Court, District of Arizona*
  Calculate damages from the alleged failure to comply with the terms of a contract that guaranteed the plaintiff the lowest prices offered by the defendant (expert report).

- **Patrick Kirk, et al. v. First American Title Insurance Company, et al.**
  *Superior Court of California, County of Los Angeles*
  Evaluate the level and distribution of filed rates and transaction prices for various real estate settlement services in California (declaration, deposition and testimony at trial).

- **Penske Logistics, LLC, et al. v. Freight Drivers and Helpers Local No. 557 Pension Fund**
  *Before Arbitrator Ira F. Jaffe*
  Evaluate economic issues related to the alleged evasion and avoidance of an unfunded pension liability under ERISA (expert report, deposition and testimony at arbitration).

- **Big 5 Sporting Goods Song-Beverly Cases**
  *Superior Court of California, County of Los Angeles*
  Estimate the value of certain ZIP code information collected from customers who made credit card purchases (expert report).

- **UMG Recordings, Inc. v. NBC Universal, Inc., et al.**
  *Superior Court of California, County of Los Angeles*
  Evaluate the reliability and adequacy of data provided by plaintiffs to calculate damages from the destruction of over 100,000 original master audio recordings in a warehouse fire (deposition).

- **Hansen Beverage Company v. Vital Pharmaceuticals, Inc.**
  *United States District Court, Southern District of California*
  Evaluate damages under the Lanham Act from alleged false advertising in the energy drink and energy shot markets (expert report and deposition).

- **State Pipe and Supply, Inc. v. Coutinho & Ferrostal Inc.**
  *United States District Court, Central District of California*
  Calculate damages (a) to the plaintiff from the failure of a steel pipe supplier to deliver products as contracted and (b) to the defendant under a counter-claim assuming proper mitigation (expert report).

- **Classic Concepts v. Linen Source, Inc.**
  *United States District Court, Central District of California*
  Estimate damages related to a claim of copyright infringement (expert report and testimony at trial).

- **In re: Washington Mutual, Inc., et al.**
  *United States Bankruptcy Court, District of Delaware*
  Supported Academic Affiliate in preparing expert report addressing whether securities known as litigation tracking warrants (LTWs) were debt or equity instruments.

CONFIDENTIAL

Appendix A

- **Beverly Kanawi, et al. v. Bechtel Corporation**
  *United States District Court, Central District of California*
  Case team leader in rebutting analyses of seven opposing experts in ERISA case involving claims that 401(k) plan sponsor breached fiduciary duties, plan fees were excessive and investment options were imprudent.

- **City of Los Angeles**
  *Consent Decree with U.S. Department of Justice*
  Evaluate claims of racial profiling by LAPD officers using advanced statistical techniques and data on motor vehicle and pedestrian stops (expert report).

- **New World TMT, Ltd. v. PrediWave Corp., et al.**
  *Superior Court of California, County of Santa Clara*
  Evaluate prices of SDRAM chips and calculate damages from investments, purchases and advances made by New World when a cable television venture in China failed (expert report and deposition).

- **In re: FedEx Ground Package System, Inc., Employment Practices Litigation**
  *United States District Court, Northern District of Indiana*
  In this case involving the alleged misclassification of drivers as independent contractors, led case team supporting two Academic Affiliates who analyzed the functions performed by FedEx drivers, the economic relationships between FedEx, the drivers and customers of FedEx, and transactions involving the sale of routes by drivers.

- **Memory Card International v. Fry's Electronics, Inc., et al.**
  *California Superior Court, County of Orange*
  Estimate damages caused by alleged misappropriation of trade secrets related to computer memory devices (expert report).

- **In re Quanex Corporation and Affiliated Subsidiaries**
  *United States Tax Court*
  Assess the economic substance and business purpose of a transaction establishing a special purpose subsidiary (expert report and testimony at trial).

- **Impact Management Consulting v. National Scrip Center**
  *Arbitration before JAMS*
  Estimate lost profits from the breach of an exclusive marketing agreement (expert report).

- **SEC v. Henry Yuen, et al.**
  *United States District Court, Central District of California, Western Division*
  Provide consulting support on liability issues related to revenue recognition and market acceptance of a new interactive programming guide offered by Gemstar-T.V. Guide International.

- **Rajashree Karwa v. Madison Tyler Holdings, LLC**
  *Arbitration before JAMS*
  Rebut damages claimed by plaintiff related to her termination and removal as a management member of Madison Tyler Holdings without sufficient cause (expert report and deposition).

CONFIDENTIAL

Appendix A

- **Jason Brett, et al. v. The Walt Disney Company, et al.**
  *Superior Court of California, County of Los Angeles*
  Led a case team that gathered information from both electronic and paper sources, interviewed staff members, and created a comprehensive database covering over 8,300 television writers and analyzed the data for evidence of age discrimination.

- **Independent Association of Mailbox Center Owners, Inc., et al. v. Mail Boxes Etc. USA, Inc.**
  *Superior Court of California, County of San Diego*
- **O'Cubed Technology, Inc., et al. v. Mail Boxes Etc., Inc.**
  *Arbitration Before JAMS*
- **Anything Goes, LLC, et al. v. Mail Boxes Etc. USA, Inc.**
  *Superior Court of California, County of Los Angeles*
- **Catherine Thomas, et al. v. Mail Boxes Etc. USA, Inc.**
  *Arbitration before the American Arbitration Association*
- **Morgate LLC, et al. v. Mail Boxes Etc., Inc.**
  *Superior Court of California, County of Los Angeles*
  Case team leader supporting multiple experts in this series of cases brought by franchisees related to the acquisition of franchisor Mail Boxes Etc. USA, Inc. by United Parcel Service, Inc. and conversion of Mail Boxes Etc. stores to The UPS Stores.

- **Microsoft Corp. – Private Antitrust Litigations**
  Consulting support to counsel related to potential overcharges from anticompetitive conduct in markets for PC operating system and application software. Estimated damages exposure in an antitrust action brought by Netscape for alleged anticompetitive conduct in the market for internet browsers.

- **Fredrick W. Penney, et al. v. CLC, Inc.**
  *Arbitration before JAMS*
  Estimate damages suffered by law firms from failure of a prepaid legal services plan to refer members to contracted legal network (deposition and testimony at arbitration).

- **Larry Plancich v. United Parcel Service, Inc.**
  *Superior Court of California, County of San Bernardino (testimony at trial)*
- **Ben Lopez v. United Parcel Service, Inc.**
  *United States District Court, Northern District of California (declaration)*
- **Daniel Kline v. United Parcel Service, Inc.**
  *United States District Court, Northern District of California (declaration)*
- **Gerald Shoemaker v. United Parcel Service, Inc.**
  *United States District Court, District of Idaho (declaration)*
  Analyze time records to determine whether the FLSA Motor Carrier Exemption applied in these wage and hour matters.

CONFIDENTIAL

- **Janice Millius, et al. v. Los Angeles Unified School District**
  *Superior Court of California, County of Los Angeles*
  In this case seeking recovery of unpaid wages and benefits, calculated the difference in cost between bus service provided by district employees and service provided by independent third party vendors (expert report).

- **Robert Kahn v. Financial Management Advisors, Inc.**
  *Arbitration before JAMS*
  Evaluate the equivalence of shares in an S-corporation with membership units in a majority owned subsidiary limited liability corporation (expert report and testimony at arbitration).

- **Kan Di Ki, Inc. v. Timothy B. Ferrigan, et al.**
  *Superior Court of California, County of Fresno*
  Estimate damages from breach of a non-solicitation agreement associated with the sale of a mobile radiology company (expert report and deposition).

- **Gary M. Kawesch, M.D. Inc. v. Antione L. Garabet, M.D., Inc., et al.**
  *United States District Court, Northern District of California*
  Estimate damages resulting from trademark/trade dress infringement by a laser eye surgery provider (expert reports).

- **Consumer Justice Center, et al. v. Brother Industries, Inc., et al.**
  *Superior Court of California, County of Orange*
  Develop, implement and analyze a consumer survey to determine whether product advertising misled consumers about product features.

- **Edison Electric Institute**
  Prepare a white paper on the use of derivative securities to hedge risk in the electric utility industry.

- **Western Filter Corporation v. Vickers Inc.**
  *United States District Court, Central District of California*
  Assess damages resulting from the breach of an alliance agreement involving the sales and marketing of industrial hydraulic equipment (expert report and testimony at arbitration).

- **Ticketmaster LLC v. StubHub, Inc.**
  *Superior Court of California, County of Los Angeles*
  Retained by defendant to evaluate damages from the sale of blocks of "artist hold tickets" on StubHub's internet-based marketplace.

## Valuation

- **In re September 11 Litigation**
  *United States District Court, Southern District of New York*
  Led a case team that supported Academic Affiliate in estimating the value of the 99-year master leasehold interests held by Silverstein Properties and calculate damages from destruction of World Trade Center Towers One, Two, Four, Five and Seven on 9/11.

CONFIDENTIAL

Appendix A

- **Center Partners, Ltd., et al. v. Urban Shopping Centers, L.P, et al.**
  *Circuit Court Cook County, Illinois*
  Value a minority interest with complex allocation and option provisions in a multi-billion dollar limited partnership with investments in regional shopping malls.

- **Gary Pudles v. William Robertshaw, et al.**
  *California Superior Court, County of Orange*
  Value a controlling interest in a software company providing communications, business process automation and performance management applications to businesses (deposition).

- **Sunset Drive Corporation v. City of Redlands**
  *United States District Court, Central District of California*
  Prepare financial projections, value a low- to moderate-income residential development and estimate damages suffered by a developer when defendant blocked construction (expert report and deposition).

- **MVU Investors LLC v. General Electric Corporation**
  *United States District Court, Central District of California*
  Estimate value and calculate damages from the alleged breach of an agreement to purchase a patent portfolio involving MRI technology (expert report).

- **Equipoint Financial Network, Inc. v. Bruce Barnes, et al.**
  *California Superior Court, County of San Diego*
  Review and critique defendants' valuation report and estimate the fair market value of a minority interest in an originator of FHA Home Equity Conversion (reverse) Mortgages (expert report).

- **SOC-SMG Inc. v. Day & Zimmermann, Inc.**
  *Arbitration before JAMS*
  Value two merging businesses and calculate the amount of overpayment in a joint venture transaction caused by misrepresentations and non-disclosure of material adverse events related to procurement of military contracts (expert report and testimony at arbitration).

- **Denise P. Edwards, et al., v. The First American Corporation, et al.**
  *United States District Court, Central District of California*
  Estimate the values of various interests in title insurance agencies acquired by First American to determine if purchase prices exceeded fair market value and constituted kickbacks for referrals of title insurance business under RESPA (expert reports and deposition).

- **Conrad P. Lee Company, et al. v. EPS Solutions Corp., et al.**
  *Arbitration before JAMS*
  Estimate the fair market value of five privately held companies, evaluate factors leading to the failure of a professional services firm and estimate damages resulting from non-disclosures in a roll-up transaction (expert reports, deposition and testimony at arbitration).

CONFIDENTIAL

- **Horowitz Limited Partnership I v. Deloitte and Touche, et al.**
  *American Arbitration Association (expert report and testimony at arbitration);*
- **James Holden and Christine Holden v. Deloitte and Touche, et al.**
  *American Arbitration Association (expert reports, deposition and testimony at arbitration); and*
- **Victor Arias, et al. v. Deloitte and Touche, et al.**
  *American Arbitration Association (expert reports, deposition and testimony at arbitration)*
  Value eight privately held companies, assess loss causation issues and estimate damages resulting from non-disclosures in a roll-up transaction involving over thirty professional service companies.

- **David Salomon v. Michael Gould, et al.**
  *Arbitration before JAMS*
  Review two competing valuations of a securities trading firm engaged in arbitrage in exchange-listed equities, fixed-income products and derivatives using proprietary algorithms and electronic trade execution software (deposition and testimony at arbitration).

- **Peter Vagenas, et al. v. Demetrios Kefallinos, et al.**
  *Arbitration before ADR Services, Inc.*
  Value a fast-food restaurant chain, rebut plaintiffs' damages analysis and estimate damages from alleged infringement of trademark/trade dress (deposition and testimony at arbitration).

- **Marshall Hospital v. Eliot R. Drell, M.D., et al.**
  *Arbitration before JAMS*
  Estimate the fair market value of an Ambulatory Surgery Center and calculate lost profits from termination of a joint venture between a hospital and medical group (deposition and testimony at arbitration).

- **Chinyun Kim v. The Grover Coors Trust, et al.**
  *District Court, Jefferson County, Colorado*
  Provide analytic support to an Academic Affiliate in the valuation of convertible preferred stock in a financial distressed packaging materials manufacturer.

- **California State Auditor**
  At the request of the State Legislature, evaluate the merger of UCSF Medical Center and Stanford Health Services to determine the benefits of integration and assess the relative value of assets contributed by the two organizations.

- **Pacific Coin Management v. BR Telephony Partners, et al.**
  *California Superior Court, County of Los Angeles*
  Estimate damages suffered by the buyer of a pay telephone company from the seller's failure to disclose information allegedly pertinent to the value of the company (expert report, deposition and testimony at trial).

- **Bell and Associates, Inc. v. Fidelity National Information Solutions, Inc., et al.**
  *Superior Court of California, County of Orange*
  Value a start-up internet-based business enterprise and estimate damages caused by the alleged breach of a joint venture agreement (expert report and deposition).

CONFIDENTIAL

Appendix A

- **Gray v. ODS Technology, LP, et al.**
  *United States District Court, Southern District of Florida*
  Value an option to acquire an equity interest in an internet gaming enterprise.

- **In re the Marriage of Downey**
  *California Superior Court, County of Orange*
  Value a manufacturer of commercial and general aviation aircraft cabin interior products (expert report and deposition).

- **California Food Plan, Inc. v. Robert Size, et al.**
  *California Superior Court, County of Orange*
  Value a direct marketing food retailer and analyze alleged excess compensation under a consulting agreement (expert report and deposition).

## Health Care and Health Insurance

- **Lake Travis Transitional LTCH, LLC v. Lakeway Regional Medical Center, LLC, et al.**
  *The District Court of Travis County, Texas, 345th Judicial District*
  Review and evaluate cash flow projections for a start-up long-term care hospital and assess the reasonablness of estimated lost profit damages (deposition and testimony at trial).

- **WellSpan Health, et al. v. Quantum Imaging and Therapeutic Associates, Inc.**
  *Court of Common Pleas of York County, Pennsylvania*
  Calculate damages from the alleged breach of noncompete provisions of employment contracts and unfair competiton realted to provision of radiology and radiation oncology services (expert report).

- **Allegheny General Hospital v. UPMC Health Plan, Inc.**
  *Court of Common Pleas of Allegheny County, Pennsylvania*
  Evaluate methods of calculating "actual costs" incurred by a hospital in providing emergency and other medical services to health plan enrollees (declaration, expert report and deposition).

- **Neurosurgical Specialties of Nepa, Inc., et al. v. Wyoming Valley Health Care System, Inc.**
  *Court of Common Pleas of Luzerne County, Pennsylvania*
  Calculate damages from the alleged breach of contract for neurosurgery services between a medical practice and a hospital (expert report).

- **California State Auditor**
  Several assignments including review of the financial status and future prospects of the Los Angeles County Department of Health Services and review of a decision by CalPERS to limit the hospital network available to health plan enrollees.

- **Nevada Attorney General - Health Plan Merger**
  Retained by Nevada State Attorney General to prepare an expert report and testify concerning market definition and the impact of a proposed health plan merger on competition in health insurance markets. Evaluate possible monopsony power in the market for physician services.

CONFIDENTIAL

Appendix A

- **In re Managed Care**
  *United States District Court, Southern District of Florida*
  Provide expert support to a large commercial health plan in a dispute involving claims adjudication practices, including the use of automated claims review and editing software, and prepare detailed analyses of over 100 million fee-for-service claims.

- **Oncure Medical Corporation v. Mission Hospital Regional Medical Center**
  *Superior Court of California, County of Orange*
  Estimate damages suffered by a radiation therapy provider from the breach of a non-compete agreement and provide assistance in mediation.

- **Unilab Corporation v. Westcliff Medical Laboratories**
  *California Superior Court, County of Los Angeles*
  Estimate damages associated with the acquisition of a medical testing laboratory.

- **Health Net, Inc. v. State Department of Health Services, et al.**
  *Superior Court of California, County of Sacramento*
  Estimate damages suffered by Health Net from the State's failure to properly allocate MediCal managed care enrollees to the health plan (deposition).

- **John Muir Medical Center v. Health Net, Inc.**
  *Arbitration before JAMS*
  Evaluate whether inflation in hospital charges exceeded the amount allowed in a provider services contract (deposition).

- **Sutter Health v. Health Net, Inc.**
  *American Arbitration Association*
  Assess the reasonableness of a hospital's billed charges during contract negotiations with a health plan (expert report and testimony at arbitration).

- **Cost Shifting in Hospital Services**
  For a consortium of community hospitals, compare hospital reimbursement rates paid by government payers (Medicare, Medicaid and County Indigent Programs) with those paid by commercial health plans and estimate the impact of "cost shifting" on health plan premiums and enrollment.

- **Wichita Clinic, P.A., v. Columbia/HCA Healthcare Corporation**
  *United States District Court, District of Kansas*
  Support Academic Affiliate in economic analysis and evaluation of the alleged monopolization of hospital services market.

- **Joan Ned-Sthran v. Methodist Hospitals of Dallas, et al.**
  *United States District Court, Northern District of Texas*
  Evaluate claims of breach of fiduciary duty and damages in ERISA case involving alleged excessive charges for employees' share of health insurance premiums (expert report).

CONFIDENTIAL

- **Vitascan Partners v. G.E. Healthcare Financial Services**
  *Superior Court of California, County of Santa Barbara*
  Evaluate claims that poor performance of EBT scanners caused the failure of plaintiffs' business and estimate damages (deposition and testimony at trial).

- **Commissioner of Corporations of the State of California v. Western Dental Services, Inc.**
  *California Superior Court, County of Orange*
  Support Academic Affiliate in evaluating the statistical sampling methodology used by the Department of Corporations to assess the quality of dental services.

- **MedImmune, Inc., v. Centocor, Inc., et al.**
  *United States District Court, District of Maryland*
  Support an Academic Affiliate in evaluating whether the monoclonal antibody product, Synagis, was commercially successful and whether the patented technology at issue contributed to that success.

## Real Estate and Mortgage Lending

- **Panagiotis Mallios v. Bank of America, NA, et al.**
  *District Court, Clark County, Nevada*
  Estimate damages to borrower when defendant declined to modify a residential mortgage and foreclosed (expert report and testimony at trial).

- **Confidential Assignment – Residential Mortgage Portfolio Valuation**
  Value a multi-billion dollar portfolio of first and second lien residential mortgages for tax purposes.

- **Conley D. Wolfswinkel, et al. v. Joseph Arpaio, et al.**
  *United States District Court, District of Arizona*
  Estimate damages resulting from inability to restructure real estate loans as a result of disruption to plaintiffs' business caused by illegal execution of a search warrant and seizure of company property (expert report and deposition).

- **Eagle Real Estate Group, LLC, et al., v. Kenneth R. Melton, et al.**
  *Superior Court of California, County of Orange*
  Support Academic Affiliate in the valuation of multifamily residential properties and estimation of damages resulting from breach of a partnership agreement.

- **Confidential Assignment – Residential Mortgage Underwriting Standards**
  Evaluate the impact on minority borrowers of changes to underwriting standards of a large residential mortgage lender that were motivated by falling residential real estate values.

- **Carmel Development Company v. Monterra Ranch Properties, LLC, et al.**
  *Superior Court of California, County of Monterey*
  Analyze financial and other records related to a failed residential real estate development and evaluate the amounts properly claimed under mechanics' liens (expert report, depositions and testimony at trial).

CONFIDENTIAL

Appendix A

- **EMC Mortgage Corporation v. Ameriquest Mortgage Corporation**
  *District Court of Denton County, Texas 16th Judicial District*
  Support Academic Affiliate in preparing expert report analyzing how trends in residential real estate prices, loan repurchase obligations and developments in the securities markets interacted to force the closure of many subprime lenders.

- **Capital Funding Group, Inc. v. Credit Suisse Securities LLC, et al.**
  *Circuit Court for Montgomery County, Maryland (expert report, deposition and testimony at trial)*
- **Leonard Grunstein et al. v. Ronald E. Silva, et al.**
  *Court of Chancery of the State of Delaware (expert report and deposition)*
  Evaluate whether defendants used plaintiffs' proprietary information related to HUD-insured refinancing of commercial mortgage backed securities (CMBS) issued in the acquisition of assisted living facilities throughout the U.S.

- **First American Corporation**
  Prepare expert reports and provide testimony before various state regulators concerning competition in markets for title insurance and real estate closing services, variation in real estate conveyance practices across markets and proposed changes in title insurance regulation.

- **Confidential Assignment – Mortgage Default Modeling**
  Using loan servicing data from a national mortgage lender, developed econometric models of residential mortgage defaults to identify the impact of various property, borrower, and loan characteristics on the probability of default.

## SELECTED PAPERS AND PRESENTATIONS

"Using Cash Flows Versus Accrual Net Income," (co-author), *Calculation of Lost Profits Damages – Theory and Practice*, 1st ed., Everett and Kinrich, eds., Valuation Products and Services LLC, Forth, 2018.

"Competition in Title Insurance Markets Since the Great Recession," presented at the National Conference of Insurance Legislators, Summer Meeting, July 11, 2013, Philadelphia, PA.

"Class Certification and Damages Theories: Consumers' Valuation of Un-priced Product Attributes," presented at a Webinar continuing legal education forum sponsored by Ballard Spahr, May 16, 2012.

"Statistical Analyses in Proactive Audits and Employment Litigation," presented at a Webinar continuing legal education forum for attorneys sponsored by Analysis Group, Inc. May 20, 2009.

"The Subprime Mortgage Crisis and Disclosures: What Went Wrong?" presented at a Webinar continuing legal education forum for attorneys sponsored by Analysis Group, Inc., July 29, 2008

"The Subprime Mortgage Crisis and Disclosures: What Went Wrong?" presented at a continuing education forum for attorneys sponsored by Analysis Group, Inc., June 24, 2008, San Francisco, CA.

CONFIDENTIAL

Appendix A

"Subprime Litigation: A Survival Guide," presented at Institutional Investor Legal Forum Summer Roundtable, June 18, 2008, Santa Monica, CA.

"Subprime Lending Litigation," Program Co-chair at a continuing education forum for attorneys sponsored by CLE International, May 8 and 9, 2008, Los Angeles, CA.

"Reductions in Force: Strategies to Minimize Litigation Risk in Downsizing," presented at a continuing education forum for attorneys sponsored by K&L Gates, January 17, 2008, New York, NY.

"Investigation of Racial Profiling by the LAPD – Pedestrian and Motor Vehicle Post-Stop Data Analysis Report," City of Los Angeles, July 2006.

"An Assessment of Competition in California Title Insurance and Escrow Markets," with Bruce Stangle, report prepared for First American Title Insurance Company, August 30, 2006.

"Evaluation of Proposed Regulations for the California Title Insurance and Escrow Industry," with Bruce Stangle, report prepared for First American Title Insurance Company, August 30, 2006.

"Competition and Title Insurance Rates in California," with Bruce Stangle, report prepared for First American Title Insurance Company, January 23, 2006.

"Competition and Title Insurance Prices in California," report/presentation to the National Association of Insurance Commissioners (NAIC), Title Insurance Working Group, June 2006, Washington DC.

"Switching Cost, Price Sensitivity and Health Plan Choice," *Journal of Health Economics* 21, January 2002, p. 89-116.

"Risk Selection Caused by the Correlation of Health Status and Sensitivity to Price," Research in Health Care Financial Management Symposium, August 2001, Best Research Paper Award.

 "Health Status and Consumers' Willingness to Switch Health Plans," American Public Health Association, Annual Meeting, October 1999, Chicago, IL.

"Risk Selection in a Setting of Managed Competition," Western Economics Association, Annual Conference, July 1999, San Diego, CA.

"Policy Options for Reducing Growth in Medicaid Spending for Long-term Care Services," Pfizer, Inc., Health Care Legislation Conference, May 1997, Irvine, CA.

"Regulation of Provider Networks that Bear Insurance Risk," Health Care in Louisiana: Issues and Answers, January 1997.

CONFIDENTIAL

# Appendix B
## Documents Considered

**Bates-Stamped Documents**

- Deutsche Bank data (DB_0000001).
- List of Bankruptcy Creditors and List of Acceptance or Rejection of Claims (In respect of Bitcoin Exchange-Users of Bankrupt), May 25, 2016 (Pearce000025–1446).
- Mizuho Bank Inbound Wire Data (MIZ_0002568).
- Mizuho Bank Outbound Wire Data (MIZ_0002569).
- SWIFT Message from Mizuho Bank to JP Morgan Chase Bank re: Anthony Motto Wire (MIZ_0003853).

**Case Related Materials**

- Declaration of Anthony Motto, October 13, 2017.
- Deposition of Andrew J. Rasmussen and all Exhibits, January 11, 2018.
- Deposition of Anthony Motto and all Exhibits, July 26, 2017.
- Deposition of Joseph Lack and all Exhibits, August 2, 2017.
- Deposition of M. Todd Henderson and all Exhibits, December 21, 2017.
- Expert Report of Andrew J. Rasmussen and backup materials, n.d.
- Expert Report of Mark T. Williams, November 16, 2017.
- Fourth Amended Class Action Complaint, March 7, 2017.
- Memorandum in Support of Motion by Anthony Motto, Joseph Lack, and Gregory Pearce for Class Certification and all Exhibits, October 13, 2017.
- Memorandum Opinion and Order, December 11, 2017.
- Motion by Anthony Motto, Joseph Lack, and Gregory Pearce for Class Certification, October 12, 2017.
- *Wire Transfer Spreadsheet Translations.xlsx.*

**Publicly Available Documents**

- Allen, Mark A., Robert E, Hall, and Victoria A. Lazear. "Reference Guide on Estimation of Economic Damages." *Reference Manual on Scientific Evidence* , Third Edition, Federal Judicial Center, National Research Council of the National Academies, Washington: The National Academies Press, 2011.
- Bitcoincash.org. "FAQ." *Available at* https://www.bitcoincash.org/#faq.
- Bitcoin Builder. "Homepage." *Available at* https://bitcoinbuilder.com/.
- Bloomberg. "USDJPY Spot Exchange Rate." Accessed January 31, 2018, https://www.bloomberg.com/quote/USDJPY:CUR.
- CoinMarketCap. "Historical data for Bitcoin." Accessed January 31, 2018, https://coinmarketcap.com/currencies/bitcoin/historical-data/.
- CoinMarketCap. "Historical data for Bitcoin Cash." Accessed January 31, 2018, https://coinmarketcap.com/currencies/bitcoin/historical-data/.
- Cryptos R US Insider. "Newsletter update." September 4, 2017. *Available at* https://insider.cryptosrus.com/cryptosrusinsider/Content/newsletters/Newsletter%209-4-2017.pdf.
- Dillet, Romain. "Feds Seize Another $2.1 Million from Mt. Gox, Adding Up To $5 Million." *TechCrunch,* August 23, 2013. *Available at* https://techcrunch.com/2013/08/23/feds-seize-another-2-1-million-from-mt-gox-adding-up-to-5-million/.
- Greenberg, Andy. "Bitcoin's Price Plummets As Mt. Gox Goes Dark, With Massive Hack Rumored." *Forbes* , February 25, 2014. *Available at* https://www.forbes.com/sites/andygreenberg/2014/02/25/bitcoins-price-plummets-as-mt-gox-goes-dark-with-massive-hack-rumored/#244f48f9ce1f.
- Hajdarbegovic, Nermin. "BitPay Now Processing $1 Million in Bitcoin Payments Every Day." *CoinDesk* , May 28, 2014. *Available at* https://www.coindesk.com/bitpay-now-processing-1-million-bitcoin-payments-every-
- Kageyama, Yuri. "Tokyo Bitcoin Exchange Files for Bankruptcy." *Washington Examiner,* February 28, 2014. *Available at* http://www.washingtonexaminer.com/tokyo-bitcoin-exchange-files-for-bankruptcy/article/2121182.
- Mt. Gox. "AML Account Statuses." February 1, 2012. *Available at* http://web.archive.org/web/20120623073436/https://support.mtgox.com/entries/20919111-aml-account-statuses.

CONFIDENTIAL

# Appendix B
# Documents Considered

- Mt. Gox. "Announcement Regarding An Application For Commencement Of A Procedure Of Civil Rehabilitation." February 28, 2014. *Available at* https://www.mtgox.com/img/pdf/20140228-announcement_eng.pdf.
- Mt. Gox. "August 2013 Mt. Gox Status Update." Press release, August 5, 2013. *Available at* https://web.archive.org/web/20130805084259/https://www.mtgox.com/press_release_20130805.html.
- Mt. Gox. "Mt.Gox announces new withdrawal limit rules for its customers." March 13, 2013. *Available at* https://web.archive.org/web/20130502190324/https://mtgox.com/press_release_20130313.html.
- Mt. Gox. "Statement on Resumption of Withdrawals and Improved Banking." Press release, July 4, 2013. *Available* at http://web.archive.org/web/20130810181218/https://www.mtgox.com/press_release_20130704.html.
- Mt. Gox. "Statement Regarding BTC Withdrawal Delays." January 31, 2014. *Available at* https://web.archive.org/web/20140221015148/https://support.mtgox.com/entries/26501000-Statement-Regarding-BTC-Withdrawal-Delays.
- Mt. Gox. "Statement Regarding BTC Withdrawal Delays - UPDATE." February 7, 2014. *Available at* https://web.archive.org/web/20140221015146/https://support.mtgox.com/entries/26130949-Statement-Regarding-BTC-Withdrawal-Delays-UPDATE.
- Mt. Gox. "Statement Regarding Temporary Hiatus on U.S. Dollar Withdrawals." Press release, June 20, 2013. *Available at* https://web.archive.org/web/20130811014059/https://www.mtgox.com/press_release_20130620.html.
- Mt. Gox. "Update- Statement Regarding BTC Withdrawal Delays." February 4, 2014. *Available at* https://web.archive.org/web/20140221015147/https://support.mtgox.com/entries/26128504-Update-Statement-Regarding-BTC-Withdrawal-Delays.
- Mt. Gox. "Update- Statement Regarding BTC Withdrawal Delays." February 10, 2014. *Available at* https://web.archive.org/web/20140221015052/https://support.mtgox.com/entries/26745970-Update-Statement-Regarding-BTC-Withdrawal-Delays.
- Mt. Gox. "Withdrawal and Deposit Information." November 8, 2013. *Available at* https://web.archive.org/web/20140221015054/https://support.mtgox.com/home?page=3.
- Nakata, Hiroko. "Corporate bankruptcy, the Japanese way." *Japan Times,* April 28, 2009. *Available at* https://www.japantimes.co.jp/news/2009/04/28/reference/corporate-bankruptcy-the-japanese-way/#.WnB9RainFaQ.
- Narioka, Kosaku. "Former Bitcoin King Is Bankrupt—And He Could Get Rich Again." *Wall Street Journal*, November 9, 2017. *Available at* https://www.wsj.com/articles/former-bitcoin-king-is-bankruptand-he-could-get-rich-again-1510223405?mod=e2tw.
- Popper, Nathaniel. *Digital Gold.* New York: Harper, 2015.
- Reddit. "One more day without Mt Gox USD withdrawals. When was the last?" July 15, 2013. Accessed January 29, 2018, https://www.reddit.com/r/Bitcoin/comments/1ic2h9/one_more_day_without_mt_gox_usd_withdrawals_when/.
- Reddit. "When will Mt.Gox resume withdrawals." August 20, 2013. Accessed January 29 2018, https://www.reddit.com/r/Bitcoin/comments/1krdhe/when_will_mtgox_resume_withdrawals/.
- Report to Tokyo District Court. Collegiate Section of 20th Civil Division. September 27, 2017.
- Reuters. "Mark Karpeles, CEO of Defunct Bitcoin Exchange Mt. Gox, Pleads Not Guilty in a Japanese Court." *Fortune Magazine,* July 11, 2017. *Available at* http://fortune.com/2017/07/11/bitcoin-mt-gox-exchange-mark-karpeles-trial/.
- United States District Court District of Maryland. Seizure Warrant. Case #13-1085SAG. May 9, 2013.
- United States District Court District of Maryland. Seizure Warrant. Case #13-1162-SKG. May 14, 2013.
- Wong, Joon Ian. "Has This Company Found a Workaround for Mt. Gox Withdrawals." *CoinDesk*, February 21, 2014. *Available at* https://www.coindesk.com/has-company-found-workaround-mt-gox-withdrawals/.

CONFIDENTIAL