**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GREGORY GREENE, JOSEPH LACK, ANTHONY MOTTO, and GREGORY PEARCE individually and on behalf of all others similarly situated,

               *Plaintiffs*,

v.

MIZUHO BANK, LTD., a Japanese financial institution, and MARK KARPELES, an individual,

               *Defendants*.

Case No. 1:14-cv-01437

Hon. Gary Feinerman

Magistrate Judge Susan Cox

**REPLY IN SUPPORT OF CLASS CERTIFICATION BY ANTHONY MOTTO**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

I.     **The proposed class presents common questions** ....................................3

II.    **The Deposit Class is appropriately defined** .......................................5

III.   **Motto is an appropriate class representative** ....................................8

IV.   **Common questions predominate** .......................................................11

      A.    **An inference of reliance is consistent with the alleged fraud** ..........................11

            1.    *Knowledge of some delays does not equate to tolerance of all delays* ...............14

            2.    *Differing motivations do not undermine the validity of Motto's proposed inference* ..............17

      B.    **Mizuho has not demonstrated that individualized causation issues are present** ......................19

      C.    **There is no *Comcast* problem** ..........................................21

      D.    **Mizuho's invocation of *Rhone-Poulenc* proves too much** ..............22

      E.    **Mizuho develops no argument that any differences in state law are material** ......................24

CONCLUSION ........................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Amgen, Inc. v. Connecticut Ret. Plans & Trust Funds,*
    568 U.S. 455 (2013)............................................................................16

*Arreola v. Godinez,*
    546 F.3d 788 (7th Cir. 2008) ...........................................................22

*Arwa Chiropractic, P.C. v. Med-Care Diabetic & Med. Supplies, Inc.,*
    322 F.R.D. 458 (N.D. Ill. 2017).......................................................10

*BCS Servs., Inc. v. Heartwood 88, Inc.,*
    637 F.3d 750 (7th Cir. 2011) .............................................................9

*Castano v. Am. Tobacco Co.,*
    84 F.3d 734 (5th Cir. 1996) .............................................................23

*Cates v. Whirlpool Corp.,*
    No. 15-cv-5980, 2017 WL 1862640 (N.D. Ill. May 9, 2017)............5

*Chandler v. Sw. Jeep-Eagle, Inc.,*
    162 F.R.D. 302 (N.D. Ill. 1995)........................................................8

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013)...........................................................3, 6, 21, 22

*Gates v. City of Chicago,*
    No. 04 c 2155, 2011 WL 1811187 (N.D. Ill. May 12, 2011) ...........7

*Greene v. Mizuho Bank, Ltd.,*
    206 F. Supp. 3d 1362 (N.D. Ill. 2016) ............................................14

*Halliburton Co. v. Erica P. John Fund, Inc.,*
    134 S. Ct. 2398 (2014).....................................................................12

*In re Bridgestone/Firestone, Inc.,*
    288 F.3d 1012 (7th Cir. 2002) ....................................................23, 24

*In re IKO Roofing Shingle Prods. Liab. Litig.,*
    757 F.3d 599 (7th Cir. 2014) ...................................................6, 21, 22

*In re Rhone-Poulenc Rorer,*
    51 F.3d 1293 (7th Cir. 1995) ...............................................3, 22, 23, 24

*Johnson v. Yahoo! Inc.*,
No. 14cv2028, 2016 WL 25711 (N.D. Ill. Jan. 4, 2016) ...................................................10

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) ...................................................................................23

*Leon v. Caterpillar Indus., Inc.*,
69 F.3d 1326 (7th Cir. 1995) ..........................................................................................9

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) ..........................................................................................6

*Mednick v. Precor, Inc.*,
320 F.R.D. 140 (N.D. Ill. 2017)..................................................................................7, 24

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) ...............................................................................5, 6, 21

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015) ......................................................6, 22*Rosario v. Livaditis*,
963 F.2d 1013 (7th Cir. 1992) ........................................................................................4

*Shute v. Chambers*,
492 N.E.2d 528 (Ill. App. Ct. 1986) ..............................................................................11

*Suchanek v. Sturm Foods, Inc.*,
764 F.3d 750 (7th Cir. 2014) ...............................................................................4, 5, 24

*Torres v. Mercer Canyons, Inc.*,
835 F.3d 1125 (9th Cir. 2016) ........................................................................................6

*Torres v. SGE Mgmt., LLC*,
838 F.3d 629 (5th Cir. 2016) (en banc) ..................................................................12, 16

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016)................................................................................................12, 14

*United States v. Laraneta*,
700 F.3d 983 (7th Cir. 2012) ........................................................................................21

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)...........................................................................................................4

**Other Authorities**

Fed. R. Civ. P. 17 ..................................................................................................................11

Fed. R. Civ. P. 23 ........................................................................................................ *passim*

805 ILCS 5/12.80 .................................................................................................................11

Advisory Committee Notes to Rule 23(b)(3)—1966 Amendments, 39 F.R.D. 69 (1966) ...........24

## INTRODUCTION

Mizuho's opposition to Plaintiffs' (now Motto's) motion for class certification (the "Opposition") reads like less like an argument against certification and more like an indirect request for summary judgment. Mizuho's principal argument (there is "no evidence" to support liability) is not only wrong (there is plenty of evidence), but it supports, rather than undermines, the case for certification. Indeed, Mizuho's Opposition is most notable for what it does *not* say: That Mizuho's conduct vis-à-vis any class member was unique. For example, there is no evidence that it told some Class members, but not others, about its fraught relationship with Mt. Gox. There is no evidence that it reached out to Class members' banks to warn them that, unless and until Mt. Gox found a replacement bank, the likelihood of currency withdrawals would be akin to winning the lottery. And there is no evidence that Mizuho refused to process any single deposit transferred in by any Class member. So from the perspective of the Class (and in terms of Mt. Gox's relationship with a well-recognized bank), things were par for the course. *That* relationship is at the heart of the instant Motion and, because it did not vary between Class members, provides a common factual core to the issues at hand.

But since Mizuho fired the first shot, the Court should know that Mizuho isn't the only party that feels confident about its case. Consider the following:





These and other facts raise a slew of unresolved legal issues. Chief among them is whether Mizuho had a duty to act and let Class members know that its unilateral business decision (and desire to be rid of Mt. Gox) had hamstrung the Exchange's ability to service its U.S. customers. But the time to resolve the legal and factual questions underlying the merits of this case is not now.

Mizuho's somewhat half-hearted attempts to show that these questions are unfit for class treatment do not withstand scrutiny. Mizuho first says, incredibly, that the case fails to present even a single common issue—factual or legal. But commonality presents a low hurdle, easily satisfied here by the common nucleus of fact underlying the class's claims, particularly as it relates to Mizuho's conduct towards class members. Next, Mizuho raises a bizarre challenge to the class definition, suggesting that it is defective because it fails to specify an injury suffered in common by class members. We have been unable to locate any authority supporting Mizuho's argument (they cite none). And, besides, Motto's proposal satisfies the Seventh Circuit's guidance regarding ascertainable class definitions. Third, Mizuho tries to suggest that Motto's circumstances show his claims are not typical of the Class, and that he cannot serve as an adequate representative. But the factual basis for Mizuho's challenge is faulty, and nothing about

Motto's claims makes him unfit to represent the broader Class.

Mizuho also raises a predominance challenge under Rule 23(b)(3), suggesting that the issues of reliance, damages, and state-to-state legal standards raise too many individual issues. These challenges are also ineffective. The pieces of Mizuho's reliance argument are, themselves, largely based on the speculation of Mizuho's retained experts and cannot account for the undisputed fact that the bank was situated identically between members of the Class, on the one hand, and the Exchange, on the other. For damages, Mizuho invokes *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), faulting Motto for not presenting a classwide method of calculating damages. But Motto's legal theory matches his theory of liability, which is all *Comcast* requires, and the fact that members of the Class must prove up their own damages is no obstacle to certification. Finally, Mizuho cites to *In re Rhone-Poulenc Rorer*, 51 F.3d 1293 (7th Cir. 1995), to suggest that multistate class actions cannot be certified. But that position just misstates the law, and Mizuho doesn't attempt to develop any real argument that, based on the facts of this case, facial differences between states' laws are material and preclude certification.

The motion for class certification should be granted.

## I. The proposed class action presents common questions.

Mizuho opens by arguing that Motto has failed to identify a single common question of law or fact. (Opp. at 11.) The argument is a strange one, and the decision to lead with it is stranger. While the parties obviously disagree as to whether Motto will prevail on his claims— Mizuho devotes most of its brief explaining why it thinks he will not—there is no dispute that, as introduced above, *every* Class member's claim stems from a common factual core. Namely, that Mizuho stood between every Class member and the Exchange and, from that position, affected everyone in the same way. For now, that is all that matters.

Rule 23(a)(2) requires that any class action present common questions. The case law makes clear that this is a low bar and that "even a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Longstanding Seventh Circuit precedent further makes clear that a class action premised on a common nucleus of operative fact will satisfy the commonality requirement. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). And the Seventh Circuit more recently reaffirmed that "the critical point is the need for *conduct* common to the class." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (emphasis in original). Contrary to Mizuho's claim that it is impermissible to look to the elements of a cause of action to identify common questions (Opp. at 12), that is precisely how the analysis of commonality and predominance is required to proceed. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012).

Here, Mizuho does not (and cannot) dispute that Motto's proposed class action turns on its common conduct towards every member of the Class. Indeed, while Mizuho strongly disputes aspects of Motto's underlying theory of the case and his interpretation of the available evidence, (*see*, *e.g.*, Opp. at 12-14), Mizuho offers nothing to suggest that *its* conduct varied, in any way, from depositor to depositor. █████████████████████████████████████████

████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████████████ In short, Mizuho took no steps that would have varied between members of the Class. *That* conduct underlies each Class member's claim and *that* conduct is unmistakably common.

Instead, Mizuho relies almost exclusively on *Cates v. Whirlpool Corp.*, a product liability case. In truth, that case provides a useful contrast. There, the plaintiffs premised a series of common questions on an antecedent showing that the ovens at issue in the case failed based on a common defect. The court concluded that the plaintiffs' evidence came up short on that antecedent point, that is, that the plaintiffs had not proven the existence of a common defect. *Cates v. Whirlpool Corp.*, No. 15-cv-5980, 2017 WL 1862640, at *20 (N.D. Ill. May 9, 2017). With that premise undermined, the plaintiffs' common questions devolved into a list of "superficial" questions about the defendant's compliance with the law. In other words, the plaintiffs there failed to show the existence of any common conduct or common proof about what caused the defect. But Motto supplies precisely what was missing in *Cates*: common conduct on the part of the defendant towards members of the class. *See Suchanek*, 764 F.3d at 756.

## II. The Deposit Class is appropriately defined.

Mizuho next argues that certification is impermissible because the class definition doesn't specify an injury suffered by each class member. (Opp. at 17.) This argument too is bizarre. As the Seventh Circuit has observed, "a class will often include persons who have not been injured by the defendant's conduct." *Messner*, 669 F.3d at 823. It is hard to see how that could be the case if, as Mizuho argues, a proponent of class certification must craft a class definition that requires injury as a condition of membership.

*Messner* shows that the proper inquiry (which is typically considered within the rubric of predominance and not, as Mizuho presents it, as some abstract threshold inquiry) is to determine whether the class includes members who *could not* have been harmed rather than whether it includes members who were not harmed. 669 F.3d at 825. The former is persuasive evidence that

the class definition will not permit class wide litigation of key issues. The latter is unproblematic

so long as the class does not include a "great many" uninjured individuals. *Id.*

The Class is appropriately defined under this framework. In a fraud case, the key is

isolating the individuals who were exposed to the alleged misrepresentation. *See Mazza v. Am.

Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012).[1] Mizuho does not contest that each member of

the proposed class was exposed to the misrepresentations at issue: Mizuho's failure to disclose

its refusal to honor withdrawal requests. The Class is therefore definitionally appropriate.

*Messner*, 669 F.3d at 823-25; *Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1138-39 (9th Cir.

2016). Through its experts, Mizuho counters that some members of the class may have later

discovered the truth, but both experts candidly admitted that they had no evidence that any class

member was aware that Mizuho was no longer processing withdrawals. Thus, the class is also

empirically appropriate. *See Messner*, 669 F.3d at 824-25; *Mercer Canyons*, 835 F.3d at 1135-

37.

Mizuho seems to make this definitional argument not for its own sake, but to tee up its

later argument that *Comcast Corp. v. Behrend* precludes certification here. (Opp. at 30-31.) As

explained more fully below there is no *Comcast* issue: the Class seeks damages incurred when

they deposited money in reliance on Mizuho's alleged omission. The Class is defined to include

only those individuals who could have been harmed by this alleged fraud. That is sufficient. *See

In re IKO Roofing Shingles Prods. Liab. Litig.*, 757 F.3d 599, 603 (7th Cir. 2014) (holding that

---

[1]     Mizuho relies heavily on the statement in *Mullins v. Direct Digital, LLC* that a class must
be limited to "a particular group of individuals … harmed in a particular way … during a
specific period." 795 F.3d 654, 660-61 (7th Cir. 2015). *Mullins* doesn't require that each of these
elements actually appear *in* the class definition, but in any event in a misrepresentations case the
group "harmed in a particular way"—the element Mizuho thinks is missing from Motto's
proposed class—is those who were exposed to the misrepresentation.

"commonality of damages" is not "legally indispensable" and noting that a certification proposal that permitted class members to recover actual damages would pass muster under *Comcast*).

Mizuho also appears to raise this argument as a way to manufacture an opportunity to discuss its view of the record. But Mizuho's repeated suggestion that there is a lack of proof is simply an argument about the weight Mizuho believes a fact finder should afford Motto's evidence. In fact, and as previewed above, there is evidence to support every part of Motto's theory. Mizuho admits that it stopped processing withdrawals, and there is general agreement that class members were unaware of the change. This precipitated significant delays for investors who sought to withdraw currency. ███████████████████

█████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████ And every single plaintiff who has been deposed has testified that the withheld information was material to their decision to invest on Mt. Gox itself, and that they changed position in reliance on the idea that withdrawal functionality was available. (Exh. 50, Motto Dep. 123:15-16; Exh. 51, Lack Dep. 163:2-11; Exh. 52, Pearce Dep. 31:1-9.)

Mizuho's definitional challenges should be rejected.[3]

_____

[2]      In a footnote, Mizuho argues that the Court can disregard portions of Motto's statement of facts because the evidence is hearsay. (Opp. at 4 n.5.) But it isn't settled that the Rules of Evidence even apply at the class-certification stage, *see Mednick v. Precor, Inc.*, 320 F.R.D. 140, 145-46 (N.D. Ill. 2017), and Mizuho certainly hasn't presented a developed argument to exclude the evidence. Mizuho's footnote, moreover, fails to consider whether the evidence is admissible under a hearsay exception, including the residual exception.

[3]      While doing so is not necessary here, the Court of course has discretion to amend the class definition to fit the needs of the case. *Gates v. City of Chicago*, No. 04 C 2155, 2011 WL 1811187, at *2 (N.D. Ill. May 12, 2011) ("Under Rule 23(c)(1)(C), a court retains broad power to modify the definition of a previously certified class at any time before final judgment if it believes that the class definition is inadequate.").

### III.    Motto is an appropriate class representative.

Mizuho next inveighs against Motto's suitability to represent the proposed Deposit Class. The argument is factually unsound.

Mizuho first suggests that Motto wasn't concerned about the ability to withdraw from the Exchange at all, rendering his individual claim supposedly suspect. (Opp. at 20-21.) But the "specific" testimony Mizuho cites is taken out of context and isn't the sweeping contradiction that Mizuho suggests. To start, Mizuho recognizes that Motto first testified that had he known how Mizuho's conduct affected U.S. customers' ability to withdraw cash, he "would have never deposited" in the first place. (Opp. at 21 n.52.) Later, when Mizuho's counsel questioned Motto on what he thought of mishmash of announcements—ranging from the Exchange's processes for processing requests, to withdrawal delays, to technical issues concerning bitcoin transactions—Motto acknowledged that his overall goal in putting money into the Exchange was to buy bitcoin and, thus, he wasn't "overly concerned" with delays in withdrawing cash. (Exh. 50, Motto Dep. 176:21-179:6.) But that position was certainly true of many investors that sought to buy bitcoin on the Exchange (i.e., it is hardly "idiosyncratic or possibly unique"), and neither detracts from Motto's prior testimony nor negates the basic importance of liquidity to investors. *See Chandler v. Sw. Jeep-Eagle, Inc.*, 162 F.R.D. 302, 308-09 (N.D. Ill. 1995) (concluding that class representative who testified that he had relied on defendant's misrepresentation was adequate to represent class, and rejecting defendant's argument because "Southwest reads Chandler's testimony selectively"). (*See also* Exh. 53, Rasmussen Rpt. at 17 (discussing fiat deposit and withdrawal functionality for bitcoin exchanges); Exh. 54, Henderson Rpt. at 14-16 (discussing importance of liquidity to exchanges).)

Mizuho next suggests that Motto is an inadequate representative because, Mizuho says,

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████. (Opp. at 22-23.) The argument is specious.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████ regarding damages, not liability.

And even if this was an argument going to liability, it does not require denying

certification. Mizuho presents this as an issue of intervening cause. ████████████████

███████████████████████ (Opp. at 22.) But assuming the other elements of the

fraud claim, Motto's loss is precisely the type of injury one would expect to result from

Mizuho's actions—that is, a financial loss incurred following detrimental reliance on Mizuho's

alleged omission. *See BCS Servs., Inc. v. Heartwood 88, Inc.*, 637 F.3d 750, 758 (7th Cir. 2011)

("Once a plaintiff presents evidence that he suffered the sort of injury that would be the expected

consequence of the defendant's wrongful conduct, he has done enough to withstand summary

judgment on the ground of absence of causation."). What's more, ████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████ *Leon v. Caterpillar Indus.,*

*Inc.*, 69 F.3d 1326, 1339 (7th Cir. 1995). Notably absent from Mizuho's submission is any

indication about ████████████████████████████████████████████████████████

9

████████████████████████████ Mizuho attempts to paper over this gap in its submission by asserting that the Court need not evaluate the merits of the defense. But that is incorrect. *See Arwa Chiropractic, P.C. v. Med-Care Diabetic & Med. Supplies, Inc.*, 322 F.R.D. 458, 466 (N.D. Ill. 2017) ("If the defense appears to have no or little merit based on the record at the class certification stage, it cannot be the basis for inadequacy because the defense would only minimally, if at all, distract Plaintiff from representing the interests of the broader class."); *Johnson v. Yahoo! Inc.*, No. 14cv2028, 2016 WL 25711, at *5-*6 (N.D. Ill. Jan. 4, 2016) (resolving merits of purported defense raised as attack on proposed representative's typicality).

Mizuho next faults Motto for submitting a late claim in the Japanese bankruptcy proceedings. (Opp. at 23.) But there's no evidence that submitting a claim of any kind (at any time) would have done Motto any good. ████████████████████████████
████████████████████████████████. ████████████████████████████
████████████████████████████████████

████████ This line of speculation hardly demonstrates Motto's unfitness to represent the Class. In point of fact, any claim Motto would make on the bankruptcy estate would have been denied. As Lack testified, the process established by the trustee for exchange creditors required submitting a screenshot of your balance on Mt. Gox. (Exh. 51, Lack Dep. 147:7-22.) Lack himself was unable to successfully do so because the Mt. Gox interface never reflected a balance in his account. (*Id.* 148:18-23.) The same would be true of Motto. As Mizuho concedes, ████████
████████████████████████████████████████████
████████████[4] The Mt. Gox interface, therefore, never would have reflected any kind of

---

[4] ████████████████████████████████████████████████
████████████████████████████████████████████

balance for Motto, and a bankruptcy claim would have gotten him nowhere. We are unaware of any authority for the proposition that failure to take necessarily futile steps in an attempt at mitigation is a defense to any kind of liability.[5]

## IV.  Common questions predominate.

Finally, Mizuho turns to the only truly substantial aspect of its opposition—i.e., that the case fails to meet Rule 23(b)(3)'s requirement that common issues predominate. But Mizuho's arguments about predominance fail to demonstrate that this case does not fall within the class of certifiable fraud cases premised on identical misrepresentations to the proposed class.[6]

### A.  An inference of reliance is consistent with the nature of the alleged fraud.

Motto proposed that the issues of Mizuho's fraud could be tried on a class basis because the claims turn on a common nucleus of operative fact, permitting the answer to several critical



---

[5]  Almost in passing, Mizuho suggests that Motto is an inappropriate representative because his deposit originated from a checking account held in the name of Highline Technologies, Inc., for which Motto was the sole shareholder. (Opp. at 23.) This undeveloped argument can be rejected either as waived or on the merits. Mizuho does not dispute that it was *Motto* that submitted the deposit to *his* personal account at Mt. Gox, for which he had to submit documents to verify his identity. And as sole shareholder, Motto had the authority to divert corporate funds for personal business. And if Highline Technologies *did* hold the claim, the corporation was involuntarily dissolved, and the applicable survival statute would permit Motto to pursue the company's claims on his own behalf if he so desired. 805 ILCS 5/12.80; *see Shute v. Chambers*, 492 N.E.2d 528, 532 (Ill. App. Ct. 1986). Further, if this is indeed a real-party-in-interest objection, Fed. R. Civ. P. 17(a)(3) establishes that the appropriate procedure is to permit Highline Technologies to join or ratify, after which "the action proceeds as if it had been originally commenced by the real party in interest." Motto is the only conceivable individual who could ratify here, so it would be needlessly formalistic to take that step.

[6]  Mizuho's superiority argument is derivative of its predominance argument. Because the bank's predominance argument fails for the reasons stated, its superiority argument lacks merit as well.

questions to be applied classwide—namely whether there was in fact a misrepresentation by omission (i.e., concerning Mizuho's relationship with Mt. Gox, and the effects its action had on the Exchange), and whether Mizuho possessed the requisite intent. (Dkt. 295 at 11-12.) Motto also argued that the omitted information was of a nature such that an inference of reliance on the part of class members is appropriate. (*Id.* at 24.) Although a class member's individual damages would need to be determined on an individual basis, the "aggregation-enabling" issues present in the case, Motto asserted, were more prevalent than the "aggregation-defeating" issues. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). And even though Mizuho may have evidence rendering the proposed inference of reliance inappropriate as to a handful of class members, "[t]hat the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014). Thus, "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 136 S. Ct. at 1045 (quotation omitted).

Whether a classwide inference of reliance is appropriate is the principal point of dispute. Courts have generally held that a classwide inference of reliance is appropriate when "it follows logically from the nature of the scheme" and there is empirical evidence to support the inference. *Torres v. SGE Mgmt., LLC*, 838 F.3d 629, 641 (5th Cir. 2016) (en banc). Motto posited that such an inference was appropriate because Mizuho's goal was to ensure that no one attributed any delays to Mizuho. (Dkt. 295 at 1.) Testimony makes clear that bitcoin investors viewed the possibility that the delays were bank-driven as a risk different in kind, rather than degree, and that the natural result of silence about Mizuho's new stance towards Mt. Gox was to encourage

12

investment in bitcoin on Mt. Gox that would not otherwise have occurred. (*Id.* at 30-31.) And while bitcoin investors may have had varying reasons for investing in the cryptocurrency, given the importance of withdrawal functionality to the existence of a viable exchange and to the value of the investment, any decision to invest in bitcoin assumed, on a very basic level, withdrawal functionality. (Dkt. 295 at 28-29; *see also* Exh. 51, Lack Dep. 162:8-163:11; Exh. 49, Shore Dep. 19:5-10.)

Mizuho's response is twofold. First, it says that to the extent its omission resulted in substantial delays, existing public information about withdrawal delays at Mt. Gox is evidence that class members were wholly unconcerned about the prospect of delays. (Opp. at 27-28.) ███

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████ Mizuho says these facts show that, for example, Motto knew about withdrawal delays but made his deposit anyway, completely unconcerned with the liquidity of his investment. (Opp. at 28.)

Second, Mizuho argues that class members' differing goals for investing means that some class members may not have cared at all about withdrawal functionality—i.e., the fact of delays was not material to their decision to invest—and, thus, there is no classwide basis for reliance. (Opp. at 25-26.) Mizuho highlights two groups of class members in particular: those who purchased bitcoin with the intention to use it to buy goods or services, and those who intended to invest for the long term (or hold a long position). Neither of these groups, Mizuho says, would have needed immediate withdrawal functionality, so its unavailability wouldn't be material. (*Id*.)

Neither argument withstands scrutiny.

### 1. *Knowledge of some delays does not equate to tolerance of all delay.*

Take Mizuho's first position about delays: that Class members just didn't care. (Opp. at 25-26.) The argument goes to the weight any bitcoin investor would have placed on withdrawal functionality. ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████.[7] As Mr. Williams presents it, that is a "fatal similarity" among class members, not a "fatal dissimilarity," and no barrier to certification. *Tyson Foods*, 136 S. Ct. at 1047. Dr. Strombom disagrees with Mr. Williams. ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████

The issue with Dr. Strombom's analysis is that he takes too myopic a view of the information that Mizuho withheld from investors. That Mizuho was no longer processing wire withdrawals was not important for its own sake but because the information would have allowed *all* potential investors to more accurately—and in the same way—assess the risks of the situation. It is undisputed that, between June 2013 and February 2014, there was intense coverage of the delays in websites covering the cryptocurrency ecosystem. As the Court already noted, this widespread coverage, much of which attempts to pinpoint a cause for the delays, is

---

[7] ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

persuasive evidence that individuals who wished to invest in bitcoin (here, Class members) were interested in the delays. *Greene v. Mizuho Bank, Ltd.*, 206 F. Supp. 3d 1362, 1375 (N.D. Ill. 2016). The Plaintiffs testified that the information available left open the possibility that there was an innocent explanation for the delays. (Motto, for example, believed that problems with the Mt. Gox Exchange were the result of technical issues that would be corrected in due course and not, in contrast, reasons to avoid the Exchange or bitcoin investment altogether. (Exh. 50, Motto Dep. 177:13-178:16 ("Q: Why? Weren't . . . you concerned about the problems on the Mt. Gox exchange? A: Yeah. I think it's the same concerns I have for local institutions, too. Just two months ago, Visa was down because of issues. So we all have issues with technology. And, you know, as long as somebody is addressing the issues to correct them, I'm okay. And that's what I was reading, you know.").) But if that possibility was foreclosed (as it would have been had Mizuho's conduct and decisions been made public), the investment calculus changes significantly—which is the entire point of this case. (*See* Exh. 50, Motto Dep. 123:11-16 ("And – even more concerning is . . . later, I was going to withdraw. And had I known I couldn't withdraw, I would never have deposited.").)

And as Drew Rasmussen testified, in the cryptocurrency ecosystem, as in many markets, "liquidity is king." (Exh. 59, Rasmussen Dep. 122:19-123:8.) That meant not only market depth but also bitcoin-to-fiat conversions, which investors would quite reasonably expect from any exchange that also offered them the opportunity to deposit government backed money in the first place. (Exh. 53, Rasmussen Rpt. at 25.) This is the same commonsense point made by Henderson. (Exh. 54, Henderson Rpt. at 14-15.)

Through Dr. Strombom, Mizuho also responds that none of this says anything about the value to class members of having Mizuho specifically, as opposed to some other bank, process

withdrawal requests.[8] (Opp. at 25.) But that misunderstands the situation. Class members weren't

interested in information about Mizuho *qua* Mizuho. 

e—not because it is Mizuho Bank. (Exh. 60, at MIZ_0003208.)

Mizuho next speculates that some individuals may have been aware that Mizuho was not

processing wire withdrawals but chose to invest anyway. (Opp. at 26.) There are two problems

with the argument. First, Mizuho has not shown that any class member actually *did* have

knowledge of the fraud.

That alone dooms Mizuho's argument. *See SGE Mgmt.*,

838 F.3d at 644. As the Fifth Circuit pointed out in *SGE Management*, "sheer speculation" that

class members may have acted despite a fraud "does not cause individualized issues of reliance

to predominate." *Id.* And that is all Mizuho offers here. True, Mizuho's opposition is different

than the one presented in *SGE Management*: Here it is the expert witnesses who do the

speculating rather than the lawyers. *Cf. id.* (chiding defendant for relying on "extra-record

attorney speculation"). But that doesn't fix the problem. Speculation remains speculation. As it

pertains to class members' potential knowledge, "individualized questions of reliance" remain

"far more imaginative than real." *Amgen*, 568 U.S. at 469.

---

[8]     Previewing its position on the merits, Mizuho implies that Mt. Gox and its customers were no worse off with Japan Post Bank. (*See, e.g.*, Opp. at 25.) Not only, as discussed above, does the record evidence cut sharply against any such suggestion, but this argument invites an inquiry into the merits that is inappropriate at this stage. *See Amgen, Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

Mizuho also has not demonstrated that a substantial portion of the class possessed this knowledge. *See SGE Management*, 838 F.3d at 644 (also rejecting similar argument because it applied to only a handful of putative class members).  This means that a class member would have gained the knowledge only through one-on-one interactions, and, given that there is no evidence that anyone was aware of Mizuho's decisions, it seems unlikely that these individual interactions would have informed more than a handful of class members (if any were, in fact, so informed).[9] It is certainly no basis to deny certification.

### 2. *Differing motivations do not undermine the validity of Motto's proposed inference.*

 The existence of these groups, Mizuho and its experts contend, undermines Motto's proposed classwide inference of reliance.

As before, an initial issue is that Mizuho hasn't demonstrated that these groups constitute a sufficiently large portion of the class to destroy predominance. Regarding individuals who may have sought to purchase goods and services, Mizuho relies essentially on anecdata. Mizuho

---

[9] 

highlights, for instance, ███████████████████████████████████
████████████████████ But Rasmussen noted the highly informal nature of his purchase,
which occurred on a one-off basis through an online forum. (Exh. 59, Rasmussen Dep. 91:23-
92:23.) ████████████████████████████████████████████
███ ████████████████████████████████████████████
█████████████████████████. And in any event, Mizuho does not seriously suggest that
there was a developed market for goods or services that could be purchased with bitcoin during
the class period, or that any member of the Class made (or even sought to make) such purchases.
This is just guesswork.

As to those who took long positions on their bitcoin investments, █████████████
████████████████████████████████████████████████████
████████████████████ But Mr. Rasmussen observed that it was not uncommon in the
early days of bitcoin for bitcoin to just be "lost." (Exh. 59, Rasmussen Dep. 52:23-54:1.) Thus,
one cannot say bitcoin that haven't been used in a transaction for a significant period of time are
necessarily being hoarded, or that the lack of any transacting indicates that the individual has
taken a long position. Instead, as Mr. Rasmussen opined, day trading—the focus of exchanges
like Mt. Gox—essentially dominated the bitcoin world in 2013. (Exh. 53, Rasmussen Rpt. ¶ 13.)

More fundamentally, Mizuho has not demonstrated that to the extent individuals in either
of these two categories actually held bitcoin on the Mt. Gox Exchange, they would be
completely unconcerned with withdrawal functionality. At a basic level, of course, a two-sided
market like Mt. Gox would cease to meaningfully exist if exchange participants could not

withdraw currency.[10] And it makes little sense to conclude that withdrawal functionality is of *no* concern to the individuals highlighted by Mizuho, even if it is not top of mind when deciding to invest. Someone who wishes to transact in goods or services, for instance, may well want to sell something at a later date and desire the ability to withdraw fiat currency. An individual who invests with the intent of playing the long game would also reasonably want the ability to liquidate their investment at any time given the cryptocurrency's significant volatility, which means that investor would also be concerned that the exchange was functioning more or less normally. And, like Mr. Pearce, emergencies can arise at any time that require converting bitcoin back into cash, no matter what an individual's initial intentions are. (Exh. 52, Pearce Dep. 81:25-82:12.) The inability to complete that conversion therefore may remain material to all individuals. This all fits with the contemporaneous opinion of Mr. Williams who, during the time period in question, repeatedly implored *all* bitcoin holders to "act quickly and take fleeting profit off the table." (Exh. 58 at 3.) For Mizuho to now claim that entire populations of bitcoin holders didn't care about the ability to make timely cash withdrawals is just not credible.

**B.      Mizuho has not demonstrated that individualized causation issues are present.**

Dr. Strombom also opines that there are individualized causation issues.



██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

Mark Karpeles was at least under the belief that such a limit existed, though as Dr.

Strombom implicitly points out, the transaction data potentially belies Karpeles's statement that

Mt. Gox was limited to 10 wires per day.[11] (███████████████████████████████

████████████████████, where Mr. Karpeles says directly that the Exchange's

ability to process outbound wires to US customers was extremely limited, at least in comparison

to the services Mizuho had provided.) And even if there were no contractual limitation on the

number of daily wires Mt. Gox could send, there were other limitations on Japan Post's ability to

process withdrawals that Dr. Strombom does not address, like the need to submit requests on

paper, stand in line, and the like. ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

---

[11]     But only potentially: ████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████



, which most

certainly attributes blame to more causes than just the most immediate. *See United States v.*

*Laraneta*, 700 F.3d 983, 990 (7th Cir. 2012).

**C.      There is no *Comcast* problem.**

Mizuho also asserts that individualized issues predominate because Motto has not put

forth any classwide method of calculating damages. Mizuho frames this in terms of *Comcast*

*Corp. v. Behrend*, 569 U.S. 27 (2013). But *Comcast* does not impose such a requirement. *In re*

*IKO* confirms that a class action that establishes a defendant's liability and leaves class members

to prove up their own damages—as must be done here, given that all members made investments

at varying amounts—is permissible. *See* 757 F.3d at 603. Indeed, it is hornbook law that

individualized damages calculations never defeat a showing of predominance. *Messner*, 669 F.3d

at 815. Courts allow, of course, that there are instances in which the effort required to make

individualized damages calculations is so overwhelming that it vitiates any benefits accrued by

class treatment. *See Arreola v. Godinez*, 546 F.3d 788, 800-01 (7th Cir. 2008). But Mizuho does

not press that argument here.

As *In re IKO* makes clear, *Comcast* stands only for the proposition that a class's legal

theory must match its theory of liability. Motto's proposal meets that criterion: The class seeks

compensatory damages for losses incurred as a result of Mizuho's fraud. *In re IKO* makes clear that an appropriate compensatory damages theory will satisfy *Comcast*. That ends the matter.

Dr. Strombom, though not Mizuho, hints at an argument that individuals have an incentive to lie about their damages. (Exh. 55, Strombom Rpt. ¶ 19.) But that argument, which will be true of any class action where damages must be established by the class members themselves, was essentially rejected in *Mullins*, which held that courts should employ the tools at their disposal, such as "claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process" rather than denying certification in the face of an unquantified fear of fraud. 795 F.3d at 667-68. And here, there is plenty of documentation to guard against fraud, including the transaction records for transfers facilitated through Japan Post Bank and, potentially, records evidencing payments made pursuant to the Japanese bankruptcy proceedings.

**D.    Mizuho's invocation of *Rhone-Poulenc* proves too much.**

Turning from the factual to the legal, Mizuho observes that Motto proposes to certify a class of individuals from 49 jurisdictions pressing common-law fraud claims. But instead of seriously analyzing whether surface-level differences in state law generate individualized issues here, Mizuho invokes the Seventh Circuit's direction in *In re Rhone-Poulenc Rorer* that federal courts should respect the "nuances" in state negligence law. (Opp. at 31-34.) But *In re Rhone-Poulenc* is likely limited to the mass-tort context, and turns not on differences in state-law but on the need for federal courts to respect state's different policy judgments, concerns that are absent here. Mizuho's invocation of the decision in this context is not well-taken, and, indeed, proves far too much.

22

*Rhone-Poulenc* was a mass tort masquerading as a class action, in which the plaintiffs sought to litigate on behalf of a class of hemophiliacs a series of claims related to HIV-positive blood transfusions. Concluding on the basis of choice-of-law issues that the class was improperly certified, *id.* at 1300-02 (discussing the many variations in negligence law that were implicated by the plaintiffs' theory of liability), the court emphasized the need to respect the differing policy judgments inherent in the formulation of negligence law. Indeed *Rhone-Poulenc* explicitly ties its discussion of "nuance" to the "differing judicial formulations of the meaning of negligence." *id.* at 1300. The Fifth Circuit picked up on this reasoning in *Castano v. American Tobacco Co.*, 84 F.3d 734, 748-49 (5th Cir. 1996), when it concluded that "a mass tort cannot properly be certified without a prior track record of trials," *id.* at 747; *see also In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002) ("Only 'a decentralized process of multiple trials, involving different juries, and different standards of liability, in different jurisdictions' (51 F.3d at 1299) will yield the information needed for accurate evaluation of mass tort claims.").

This reasoning has little apparent application in the fraud context. In the first place, it is not even clear that Motto presents the kind of "novel" theory of liability that troubled the *Rhone-Poulenc* court. There is no question, for instance, about how different states treat the element of intent or materiality, so there is no issue making an "accurate evaluation" of the proposed class's claims. *Bridgestone/Firestone*, 288 F.3d at 1020. Second, the common law of fraud does not embody the same kind of complex policy judgments that imbue the law of negligence. Perhaps for that reason the Eleventh Circuit, in the context of a fraud class action, rejected the notion that a tort theory's "immaturity" could ever be a "legitimate consideration" at class certification. *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1272 (11th Cir. 2004).

The core problem with Mizuho's invocation of *Rhone-Poulenc* is that, in Mizuho's hands, the case essentially stands for the proposition that multistate classes are uncertifiable. Not surprisingly, Mizuho also emphasizes that Seventh Circuit's admonition in *In re Bridgestone/Firestone* that "no class action is proper unless all litigants are governed by the same legal rules." 288 F.3d 1012, 1015 (7th Cir. 2002). But these cases cannot be understood to categorically preclude multistate class treatment without calling into doubt later cases. The result in *Suchanek*, of course, stands as a reminder that multistate class treatment is permissible in appropriate circumstances. And *Mednick* observes that mere invocation of *Bridgestone/Firestone* begs the question whether applicable state laws are sufficiently the "same." 320 F.R.D. at 156. In other words, *Rhone-Poulenc* and *Bridgestone/Firestone* simply say what is always true, it does not set forth any kind of special bar to multistate class treatment.

### E. Mizuho develops no argument that any differences in state law are material.

Mizuho's analysis of the differences in state laws is perfunctory, cataloging surface-level differences in state law without assessing whether those differences would make any difference on the facts of this case. But there is a reason that the drafters of Rule 23 noted that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action." Advisory Committee Notes to Rule 23(b)(3)—1966 Amendments, 39 F.R.D. 69, 103 (1966). As Motto explained in his opening memorandum, questions such as whether a misrepresentation occurred, whether the defendant possessed the requisite intent, and whether the plaintiff relied on that misrepresentation—elements that appear in the common law of each jurisdiction covered by the class definition—don't require a detailed look at a state's law, but only an examination of the parties' conduct. Other questions that *may* generate different answers (namely, whether Mizuho had a duty to speak) are issues of law, resolvable by the Court

before trial. In other words, because a fact finder needs to answer a series of straightforward questions about Mizuho's conduct, surface-level differences in state law do not render Motto's proposed class action unmanageable.

## CONCLUSION

The Court should certify the proposed Deposit Class, appoint Motto to represent it, and appoint the undersigned as Class Counsel.

Respectfully submitted,

**ANTHONY MOTTO, JOSEPH LACK,**
and **GREGORY PEARCE** individually and on behalf of all others similarly situated,

Dated: March 22, 2018

By: /s/_____
   One of Plaintiffs' Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian
rbalabanian@edelson.com
J. Aaron Lawson
alawson@edelson.com
Edelson PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9495

Counsel for Plaintiffs and the Putative Classes

**CERTIFICATE OF SERVICE**

I, J. Aaron Lawson, hereby certify that I served the above and foregoing document by causing true and accurate copies of such paper to be transmitted to all counsel of record via the Court's CM/ECF electronic filing system, and via electronic mail to Mark Karpeles, on March 22, 2018.


/s/ J. Aaron Lawson