UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREGORY GREENE and ANTHONY MOTTO, individually and on behalf of all others similarly situated, | ) ) ) 14 C 1437 |
| Plaintiffs, | ) ) Judge Gary Feinerman |
| vs. | ) |
| MIZUHO BANK, LTD. and MARK KARPELES, | ) ) |
| Defendants. | ) |

### MEMORANDUM OPINION AND ORDER

This putative class action brought by Gregory Greene and Anthony Motto seeks to hold Mizuho Bank, Ltd. and Mark Karpeles liable for financial losses arising from the demise of the Mt. Gox Bitcoin exchange. Doc. 245. Earlier in the litigation, the court denied Mizuho's motion under Federal Rule of Civil Procedure 12(b)(2) to dismiss the claims against it for lack of personal jurisdiction. Docs. 199-200 (reported at 169 F. Supp. 3d 855 (N.D. Ill. 2016)). The court then granted in part Mizuho's Rule 12(b)(6) motion, dismissing Greene's tortious interference claim and the accounting claim brought by all then-named Plaintiffs. Docs. 229-230 (reported at 206 F. Supp. 3d 1362 (N.D. Ill. 2016)). After the Supreme Court issued *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773 (2017), and on Mizuho's motion, the court dismissed all claims brought by the two non-Illinois plaintiffs, Joseph Lack and Gregory Pearce, for lack of personal jurisdiction. Docs. 311-312 (reported at 289 F. Supp. 3d 870 (N.D. Ill. 2017)). Lack and Pearce have since filed suit against Mizuho and Karpeles on in their respective home districts. *See Lack v. Mizuho Bank, Ltd.*, No. 2:18-cv-617 (C.D. Cal. filed Jan. 24, 2018); *Pearce v. Mizuho Bank, Ltd.*, No. 2:18-cv-306 (E.D. Pa. filed Jan. 24, 2018).

With the Rule 12(b) dust now settled, the operative complaint brings three counts against Mizuho, all on behalf of Motto and the putative Deposit Subclass: tortious interference with contract, Doc. 245 at ¶¶ 122-130 (Count IV); unjust enrichment, *id*. at ¶¶ 131-138 (Count V); and fraudulent concealment, *id*. at ¶¶ 139-150 (Count VI). The Deposit Subclass is defined as those members of the Mt. Gox class—itself defined as "[a]ll persons in the United States who had bitcoins or money stored with Mt. Gox on February 24, 2014"—"who deposited money into their Mt. Gox account through Mizuho Bank after the date [when] Mizuho Bank stopped processing withdrawals." *Id*. at ¶ 89. The operative complaint's remaining counts, brought on behalf of Greene, Motto, and the Mt. Gox Class, name only Karpeles as defendant and need not be discussed for present purposes. *Id*. at ¶¶ 95-121.

Motto now moves under Rule 23 to certify the Deposit Subclass. Doc. 294. Because Motto fails on two separate grounds to show that he satisfies the typicality and adequacy requirements of Rules 23(a)(3) and (a)(4), the motion is denied.

## Background

"Unlike a motion under Federal Rule of Civil Procedure 12(b)(6), a motion to certify a class under Rule 23(c) is not one for which the court may simply assume the truth of the matters as asserted by the plaintiff. Instead, if there are material factual disputes, the court must receive evidence and resolve the disputes before deciding whether to certify the class." *Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017) (citation, alterations, and internal quotation marks omitted). Still, "[i]n conducting this analysis, the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012). "The plaintiff bears the burden

of proving by a preponderance of the evidence all necessary prerequisites to the class action." *Priddy*, 870 F.3d at 660.

  A. **Mt. Gox's Relationship with Mizuho**

  Bitcoin is a digital payment system, and bitcoins are the system's unit of account. *See Beyond Silk Road: Potential Risks, Threats and Promises of Virtual Currencies: Hearing Before the S. Comm. on Homeland Sec. & Governmental Affairs*, 113th Cong. 3-4 (2013) (statement of Jennifer Shasky Calvery), https://perma.cc/2TFX-6BCQ (noting that the Treasury Department classifies Bitcoin as a "decentralized virtual currency"). Bitcoins can be bought and sold on exchanges. Founded in 2009, Mt. Gox was a bitcoin exchange based in Tokyo, Japan; it declared bankruptcy and ceased operations in February 2014. Doc. 246 at pp. 4-5, ¶ 13, p. 12, ¶ 41.

  Mizuho is a large Japanese financial institution, with headquarters in Tokyo, Japan. *Id*. at p. 3, ¶ 9. Beginning in September 2012, Mizuho received and processed deposits and withdrawals of fiat currency for United States-based Mt. Gox customers. *Id*. at pp. 7-8, ¶¶ 24-25; Doc. 296 at 14; Doc. 338 at 9; Doc. 339-12. Customers who wished to purchase bitcoins on the exchange using fiat currency would initiate an "inbound" wire transfer to Mizuho to be credited to Mt. Gox's account, while customers' requests to cash out into fiat currency their bitcoin positions would cause an "outbound" wire transfer to be initiated from Mt. Gox's Mizuho account. Doc. 296-2 at 24-28. Mizuho did not play an exclusive role in this regard, as Mt. Gox relied at different points in time on other financial institutions and payment processors, including Japan Post Bank, Dwolla, and OK Pay, to facilitate fiat currency deposits and withdrawals. Doc. 296 at 14; Doc. 338 at 9.

3

In March and April 2013, Japanese regulators and executives of several large multinational banks contacted Mizuho to express concern that Mt. Gox was being used to launder funds connected with criminal activity. Doc. 296 at 15; Doc. 338 at 9-10; Doc. 296-2 at 37, 39-44. The next month, the U.S. Department of Homeland Security seized assets owned by Mt. Gox's American subsidiary for allegedly violating 18 U.S.C. § 1960, which prohibits operating an unlicensed money transmitting business. Doc. 296 at 14-15; Doc. 338 at 10; Doc. 327-6.

In the wake of these events, Mizuho put pressure on Mt. Gox to find another partner bank. Doc. 296 at 14; Doc. 338 at 10; Doc. 296-2 at 58. By late June 2013, Mizuho had stopped processing all international *outbound* wire transfer requests for Mt. Gox customers. Doc. 296 at 15; Doc. 338 at 10; Doc. 295-5 at 3; Doc. 296-2 at 72, 82; 296-5 at 2; Doc. 339-3 at 13. Neither Mizuho nor Mt. Gox announced publicly that Mizuho had stopped processing those outbound wire transfer requests. Doc. 296 at 17-18; Doc. 338 at 12-13; Doc. 295-12; Doc. 296-2 at 95-96; Doc. 296-17 at 2. Mizuho, however, continued to accept and receive international *inbound* wire transfers from Mt. Gox customers until Mt. Gox shut down in February 2014. Doc. 338 at 11; Doc. 339-3 at 13. From June 2013 until February 2014, when Mt. Gox ceased operations and declared bankruptcy, Mt. Gox account holders in the United States could withdraw fiat currency using other intermediaries. Doc. 296 at 14; Doc. 338 at 11; Doc. 295-5 at 3.

**B.  Anthony Motto**

Motto opened an account with Mt. Gox in mid-January 2014. Doc. 339-20 at 11. Approximately a month later, and days before Mt. Gox ceased operations, Motto wired $1,000 in fiat currency from a JPMorgan Chase Bank account he controlled—owned by his company, Highline Technologies—to Mt. Gox's account at Mizuho. Doc. 339-20 at 13; Doc. 339-21; Doc.

4

339-22 at 7. At the time he wired the money, Motto was aware of difficulties, including delays, in Mt. Gox's processing of withdrawal requests. Doc. 339-20 at 30-31. Motto testified, however, that he was not "overly concerned" about those problems. *Id*. at 32-33. As Motto explained, had he decided to make a withdrawal, he "would have withdrawn bitcoin" rather than trying to "turn[]" his investment "back into U.S. dollars"; a withdrawal of bitcoin, as opposed to a withdrawal of fiat currency, would not have required services of a bank like Mizuho. *Id*. at 33. When asked whether his decision to invest in bitcoin on Mt. Gox would have been "impacted" by learning that Mizuho was "no longer processing … fiat currency withdrawal requests," Motto testified that he "would have worked another way to get funds into the Mt. Gox exchange." *Ibid*.

Pursuant to a policy it adopted in late February 2014 after Mt. Gox declared bankruptcy, Doc. 339-22 at pp. 2-3, ¶¶ 3-4, Mizuho contacted Chase on March 7, 2014 using the "SWIFT" interbank messaging system to ask if Motto (as Highline Technologies) "would request this transaction to be cancelled or not," *id*. at 10. The message noted that, "according to news reports, the beneficiary Mt. Gox which is bit coin exchange in Japan, is in the situation of stop operations." *Ibid*. Mizuho promised that "[i]n the case of cancellation," it would "return [Motto's] fund[s] less our charges." *Ibid*. Chase responded on March 10, indicating that it would contact Motto "for additional details" and "advise [Mizuho] upon receipt of [his] reply." *Id*. at 12. Chase messaged Mizuho on March 13 to say that it had received no reply from Motto, and sent a similar message on March 18. *Id*. at 14, 16.

Finally, on March 24, Chase told Mizuho that it had "contacted [Motto] on several occasions requesting further payment details," but to date had not "received a reply." *Id*. at 18. Accordingly, Chase suggested that Mizuho either "contact [Motto] directly or return [his] funds."

5

*Ibid*. On April 10, Mizuho stated that it had credited Motto's funds to Mt. Gox's Mizuho account. *Id*. at 20.

## Discussion

The court's analysis of class certification "is not free-form, but rather has been carefully scripted by the Federal Rules of Civil Procedure." *Chi. Teachers Union, Local No. 1. v. Bd. of Educ.*, 797 F.3d 426, 433 (7th Cir. 2015). To be certified, a proposed class must satisfy the four requirements of Rule 23(a): "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *see Bell v. PNC Bank, N.A.*, 800 F.3d 360, 373 (7th Cir. 2015). If Rule 23(a) is satisfied, the proposed class must fall within one of the three categories in Rule 23(b), which the Seventh Circuit has described as: "(1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because of the risk that the class adjudication would, as a practical matter, either dispose of the claims of non-parties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior." *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011); *see also Bell*, 800 F.3d at 373. Finally, the class must be "identifiable as a class," meaning that the "class definition[] must be definite enough that the class can be ascertained." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006); *see also Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659-61 (7th Cir. 2015).

Motto bears the burden of showing that each requirement is satisfied. *See Priddy*, 870 F.3d at 660; *Chi. Teachers Union*, 797 F.3d at 433; *Messner*, 669 F.3d at 811. As the Seventh

Circuit has explained, "a district court must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010); *see also Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 889-90 & n.6 (7th Cir. 2011). The Seventh Circuit has instructed district courts to exercise "caution" before certifying a class. *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 746 (7th Cir. 2008). Regardless of whether he has satisfied Rule 23's other requirements, Motto has failed to show that his claims are typical of those of the Deposit Subclass under Rule 23(a)(3) or that he is an adequate representative of the Deposit Subclass under Rule 23(a)(4).

"A claim is typical [under Rule 23(a)(3)] if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [the named plaintiff's] claims are based on the same legal theory." *Oshana*, 472 F.3d at 514 (ellipses and internal quotation marks omitted). The typicality inquiry thus assesses the degree of "congruence between the named representative's claim and that of the unnamed members of the class." *Spano*, 633 F.3d at 586; *see also Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) ("[T]he requirement primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large.") (internal quotation marks omitted). "A class is disserved if its representative's claim is not typical of the claims of the class members." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011). The reason is that an atypical class representative's claim may fail even though the "claims of other class members may be valid," thus risking the delay occasioned "by the scramble to find a new class representative." *Ibid*. "Alternatively, a

7

class representative's atypical claim may prevail on grounds unavailable to the other class members, leaving them in the lurch." *Ibid*. Although the typicality and adequacy requirements often "merge[,] … 'typicality … should be determined with reference to the [defendant's] actions, not with respect to particularized defenses it might have against certain class members'… ." *Id*. at 724-25 (quoting *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996)); *see also Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ("[W]e look to the defendant's conduct and the plaintiff's legal theory to satisfy Rule 23(a)(3).").

The adequacy inquiry under Rule 23(a)(4) "consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). The adequacy of exceptionally able class counsel is not challenged, but Motto's adequacy is. Significant for present purposes, the Seventh Circuit has emphasized that a proposed class representative is inadequate if he is subject to "even an arguable defense" not applicable to the class as a whole:

> The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation. The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer. A named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative.

*CE Design*, 637 F.3d at 726 (citations and internal quotation marks omitted); *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014) ("A person whose claim is idiosyncratic or possibly unique is an unsuitable class representative."); *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) (upholding the denial of class certification where the named plaintiffs' claims were "significantly weaker than those of some (perhaps many) other class

8

members," and noting that "named plaintiffs who are subject to a defense that would not defeat unnamed class members are not adequate class representatives"); *Oshana*, 472 F.3d at 514 (same, albeit under Rule 23(a)(3)); *Hardy v. City Optical Inc.*, 39 F.3d 765, 770 (7th Cir. 1994) (same); *Koos v. First Nat'l Bank of Peoria*, 496 F.2d 1162, 1164-65 (7th Cir. 1974) (same). This obstacle to class certification occasionally has been addressed under Rule 23(a)(3), but *CE Design* made clear that adequacy is the proper rubric. *See* 637 F.3d at 724-25.

Motto's adequacy founders on his being subject to particular defenses not applicable to the Deposit Subclass as a whole. Motto's deposition testimony that he would have found a way to invest in bitcoin on the Mt. Gox exchange even had he known that Mizuho stopped processing outbound wire transfers—and that had he sought to withdraw his investment from the exchange, he would have done so in bitcoin, not in fiat currency—would provide Mizuho with serious grounds to attack and defeat his claims at trial, if not at summary judgment.

Proving injury, in the form of either damages or detriment, from Mizuho's conduct is an element of Motto's (and the putative Deposit Subclass's) tortious interference claim, *see Koehler v. Packer Grp., Inc.*, 53 N.E.3d 218, 237 (Ill. App. 2016) (damages), unjust enrichment claim, *see Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 832 (7th Cir. 2016) (detriment) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp.*, Inc., 545 N.E.2d 672, 679 (Ill. 1989)), and fraudulent concealment claim, *see Vandenberg v. Brunswick Corp.*, 90 N.E.3d 1048, 1056 (Ill. App. 2017) (damages). From the outset, the gist of the claims against Mizuho has been that its decision to stop processing outbound wire transfers as of late June 2013 created a "trap" for investors based in the United States: "money could go into Mt. Gox's account at Mizuho, but it could never leave." Doc. 296 at 11. According to the complaint, had investors "kn[own] how broken [Mizuho's] banking relationship with Mt. Gox was—and that

9

they would be unable to withdraw their money—no United States user would deposit money into Mt. Gox and Mizuho would be deprived of the transaction fees associated with such deposits." Doc. 245 at ¶ 3. A straightforward theory of damages or detriment follows: If Mt. Gox's customers would not have invested on the exchange had they been aware of Mizuho's cessation of outbound fiat currency wire transfers, then Mizuho is arguably responsible for the customers' decision to invest and accordingly liable for their lost investment and Mizuho's transaction fees. Doc. 245 at ¶¶ 130 ("As a result of Mizuho's conduct, Plaintiffs and the Classes have suffered damages in the form of the price of the bitcoins and Fiat Currency that were stolen, lost, or misused by Mt. Gox."), 134 ("Under principles of equity and good conscience, Mizuho should not be permitted to retain the transaction[] fees paid by … Plaintiff Motto[] and the Deposit Class, because it knowingly concealed material information from them regarding their transaction deposits (i.e., that they would be unable to thereafter withdraw such money from Mt. Gox), which directly resulted in the loss of their monies that they wired to Mt. Gox through Mizuho."), 150 ("As a direct and proximate result of Mizuho's concealment and omission of material facts, … Plaintiff Motto[] and the Deposit Class have suffered actual damages in the amount of deposited Fiat Currency that was thereafter misplaced, stolen, lost, or misused by Mt. Gox.").

In testifying that the ability to convert his bitcoin investment into fiat currency at any time was *not* material to his investment decision, Motto severely undermined his ability to prove injury from Mizuho's conduct. For starters, Motto admitted that he did not perceive his money to be trapped at all; had he wanted to close his position on the Mt. Gox exchange, he would have done so by withdrawing bitcoin, not fiat currency. Doc. 339-20 at 33. Motto's ability to withdraw bitcoin was not negatively affected by Mizuho's actions, which concerned only fiat

10

currency withdrawals. Moreover, had Motto known that Mizuho stopped processing fiat currency withdrawals, he would have "worked another way to get funds into the Mt. Gox exchange." *Ibid*. While it is possible that some other Mt. Gox investors were of similar mind, Doc. 355 at 13, it is highly likely—as Motto himself alleges in the complaint—that many if not most investors took a different view, Doc. 245 at ¶¶ 144 ("Mizuho knew that if United States customers found out about its new unreasonable banking policies … they would no longer continue making deposits into the Exchange … ."), 148 ("Had … Plaintiff Motto[] and the Deposit Class known [that Mizuho stopped processing outbound wire transfers], they would not have wired (or continued to wire) money to Mizuho for deposit into the Mt. Gox Exchange.").

Motto's testimony thus would allow Mizuho to present a defense applicable only to him, or at most to him and a small subset of other subclass members: that he was not injured by Mizuho's decision to stop processing outbound wire transfers of fiat currency from Mt. Gox's account because he did not rely on the presence of that functionality in deciding to purchase bitcoin on the Mt. Gox exchange. *See Cleary v. Philip Morris, Inc.*, 656 F.3d 511, 519 (7th Cir. 2011) (noting that, under Illinois law, an unjust enrichment plaintiff "'must allege that the defendant has unjustly retained a benefit *to* the plaintiff's detriment,'" and dismissing an unjust enrichment claim against a cigarette manufacturer on the ground that even if the plaintiffs' "legal right to be informed about the nature of cigarettes" was violated, "many of [them] have no regrets about their purchases and would willingly repeat the same transaction … . Since these consumers would have acted no differently had the defendants properly informed them about the true nature of cigarettes, their transfer of money to the defendants in exchange for cigarettes was not to their detriment—and, accordingly, the defendants' continued retention of the money cannot be to their detriment either.") (quoting *HPI Health Care Servs.*, 545 N.E.2d at 678);

11

*Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 893 N.E.2d 981, 994-95 (Ill. App. 2008) (affirming the trial court's ruling for the defendants on a tortious interference claim because the plaintiffs did not show that they lost revenue due to the defendant's actions and thus could not "prov[e] … damages with reasonable certainty") (internal quotation marks omitted)); *DOD Techs. v. Mesirow Ins. Servs., Inc.*, 887 N.E.2d 1, 11 (Ill. App. 2008) (affirming the dismissal of a fraudulent concealment claim, reasoning that because the plaintiff "d[id] not allege that it would not have purchased its chosen insurance had it known of the [allegedly concealed] contingent commissions," it did not sufficiently allege that it had suffered damages in the form of "inflated" premiums). Because that defense is compelling and would make Motto's claims "significantly weaker than those of some (perhaps many) other class members," he is not an adequate class representative. *Randall*, 637 F.3d at 824; *see also CE Design*, 637 F.3d at 726 (holding that the named plaintiff was an inadequate class representative because it had voluntarily given its fax number to be published in a public directory and thus was subject to a unique consent-based defense to its claim under the Telephone Consumer Protection Act, 47 U.S.C. § 227); *Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 460 (N.D. Ill. 2013) ("If Lipton would have bought Dexatrim even if hexavalent chromium had been listed as an ingredient, and if she did not know what hexavalent chromium was at the time, a jury easily could find that she has not proved materiality, causation, reliance, or a connection between the detriment to her and the benefit to Chattem arising from Chattem's alleged misconduct. That obstacle to Lipton's success would not apply to class members who did know what hexavalent chromium was or to those who would not have bought Dexatrim had it been listed as an ingredient. Lipton therefore is an inadequate class representative.") (citing cases).

It is true that Motto testified elsewhere in his deposition that "had [he] known [he] couldn't withdraw, [he] would have never deposited," which appears to contradict the testimony cited above. Doc. 339-20 at 19. And it is possible that if Mizuho "introduced [Motto's] harmful deposition testimony as a party statement under Federal Rule of Evidence 801(d)(2)(A), and then the helpful [to Motto] deposition testimony were introduced under Rule 106, the jury *might* excuse the harmful testimony." *Lipton*, 289 F.R.D. at 460. "But a defense need not be a sure bet to defeat a proposed class representative's adequacy … . There is a substantial risk that [Motto] would be unable to overcome [his] harmful testimony, and it is that risk that makes [him] an inadequate class representative." *Id*. at 460-61 (citing *J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 998-99 (7th Cir. 1980)). Motto "would have to devote substantial attention to overcoming [his harmful] deposition testimony, and if [he] failed to do so, [he] would sink each absent member's claims even though they might have prevailed" with a different class representative, one who did not burden himself or herself with that testimony. *Id*. at 460 (citing cases); *see also Wooley v. Jackson Hewitt, Inc.*, 2011 WL 1559330, at *9 (N.D. Ill. Apr. 25, 2011) ("All this is not to say that Defendants' *in pari delicto* defense against Wooley and Varkey is a sure winner. But the defense is eminently colorable, which is all that Defendants need to show to defeat adequacy under Rule 23(a)(4), for 'even an arguable defense' renders inadequate a proposed class representative.") (quoting *CE Design*, 637 F.3d at 726).

The analysis could stop here, but it bears mention that Motto's claims are "idiosyncratic [and] possibly unique" for a separate reason. *Suchanek*, 764 F.3d at 758. As noted, Mizuho in late February 2014 instituted a policy of notifying counterparties that incoming wire transfers destined for Mt. Gox's account could be unwound, minus a transaction fee, because the exchange was "in the situation of stop operations"; pursuant to that policy, Mizuho contacted

13

Chase in early March so that Chase could contact Motto (as Highline Technologies) to determine whether he wished to cancel his wire transfer and recoup his funds, "less [Mizuho's] charges." Doc. 339-22 at 10. That opportunity was unavailable to members of the Deposit Subclass who invested in Mt. Gox via fiat currency deposits with Mizuho before Mizuho instituted that policy—a group that, given the close timing between Mizuho's implementation of the notification policy and Mt. Gox's bankruptcy, is almost certainly a substantial majority of the Deposit Subclass.

It is possible that a factfinder would discount the import of this evidence. The record as it stands does not suggest that Chase managed to reach Motto, and there consequently is no basis to find that Motto could have taken advantage of the opportunity to cancel. But considered together with Motto's testimony that he would have "worked another way to get funds into the Mt. Gox exchange" even had he known that Mizuho stopped processing outbound wire requests, Doc. 339-20 at 33, evidence regarding Mizuho's notification policy raises additional concerns about Motto's adequacy—and, because it concerns Mizuho's conduct, also his typicality, *see CE Design*, 637 F.3d at 724—as a class representative.

The evidence would give Mizuho a strong basis to assert that, unlike the funds of those Deposit Subclass members who invested in Mt. Gox through Mizuho before it instituted the notification policy, Motto's investment was not "trapped" at all. The SWIFT messages reflect that Mizuho provided, or at least attempted to provide, Motto the chance to unwind his investment and incur only Mizuho's transaction fee. Doc. 339-22. As to Motto, then, Mizuho would be subject to a mini-trial on a theory of liability entirely distinct from the principal liability theory that Motto and the Deposit Subclass has pursued from the outset: whether Mizuho violated Illinois law by taking brief custody of Motto's funds and subjecting him to a

14

small fee for the privilege, even as it tried through Chase to notify him of Mt. Gox's difficulties and to give him the opportunity to unwind the transaction. The key evidence for this theory would overlap only minimally with the evidence relevant to the primary liability issue for the subclass as a whole—showing whether Mizuho deliberately sought to conceal its decision to stop processing outbound wire transfers of fiat currency so as not to jeopardize the fee revenue those transactions generated, while at the same time enabling the bank to distance itself from Mt. Gox. Specifically, the factfinder would have to assess whether Mizuho acted appropriately in failing to undertake additional efforts to contact Motto (that is, in addition to notifying Chase through the SWIFT system) and to offer him a refund inclusive of its service charges. All that has little to do with Mizuho's allegedly unilateral and unpublicized decision to stop processing outbound wire transfers. Because this theory of liability would be relevant to only the likely small subset of Deposit Subclass members who, like Motto, invested in Mt. Gox after Mizuho instituted its notification policy, Motto's claims lack the requisite "congruence" with those of the Deposit Subclass as a whole "to justify allowing [him] to litigate on behalf of the group," and thus are not typical of those of the subclass he seeks to represent. *Spano*, 633 F.3d at 586; *see also Muro*, 580 F.3d at 492 (holding that the named plaintiff could not satisfy Rule 23(a)(3) because "[t]he factual differences between [her] claims and the claims of her fellow putative class members are significant; as a result of these differences, certain provisions of [the applicable law] that apply in [the named plaintiff's] case may not apply to most of her proposed fellow class members").

Moreover, given Motto's testimony that he would have "worked another way to get funds into the Mt. Gox exchange" even had he known about Mizuho's decision to stop processing outbound wire transfers of fiat currency, Doc. 339-20 at 33, Mizuho would be able to raise an additional defense unique to him. Because Motto would have lost his money when Mt. Gox

15

went dark even had he invested his fiat currency through another bank or payment processor, Mizuho could argue that his injury was limited to the difference, if any, between Mizuho's service fees and the counterfactual service or transaction fees that an alternative bank or payment processor would have charged. Accordingly, depending on what the evidence showed as to the relative magnitude of those counterfactual service or transaction fees, Motto might have suffered only minimal losses, or he might have suffered no loss or even gained by investing through Mizuho rather than through one of its competitors, leading to a defense verdict given the lack of injury. *See Chicago's Pizza, Inc.*, 893 N.E.2d at 994-95; *Cleary*, 656 F.3d at 519; *DOD Techs.*, 887 N.E.2d at 11. And for that reason, too, Motto is not an adequate class representative. *See CE Design*, 637 F.3d at 725 ("CE cannot be an adequate representative of the class of unconsenting recipients of King Architectural Metals' faxes if it is subject to a defense that couldn't be sustained against other class members … .").

## Conclusion

Motto's motion for class certification is denied for failure to comply with Rules 23(a)(3) and (a)(4). Given this disposition, there is no need to address whether Motto satisfies the other Rule 23 requirements—requirements that might ultimately be addressed in the Central District of California, where Lack seeks to represent the Deposit Subclass in his newly filed suit. *See Lack*, No. 2:18-cv-617-RGK-GJS, Dkt. 1 at ¶¶ 56-61.

June 7, 2018

United States District Judge