## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| GREGORY GREENE and ANTHONY MOTTO, individually and on behalf of all others similarly situated, | |
| *Plaintiffs*, | No. 1:14-cv-01437 |
| v. | Hon. Gary Feinerman |
| MARK KARPELES, an individual, | Magistrate Judge Susan Cox |
| *Defendant*. | |

### PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Earlier in this litigation, the Court concluded that personal jurisdiction over Defendant Mizuho Bank, Ltd., was proper because Mizuho had remained fraudulently silent about a new policy of prohibiting wire withdrawals from Mt. Gox's bank account hosted by Mizuho while individuals in Illinois had deposited money to that bank account. *See Greene v. Mizuho Bank, Ltd.*, 169 F. Supp. 3d 855, 862-64 (N.D. Ill. 2016). In his motion to dismiss, Defendant Mark Karpeles ("Karpeles") never once mentions the Court's earlier decision or associated reasoning, despite the fact that the case for exercising personal jurisdiction over Karpeles is equally strong, if not stronger, than it was for exercising personal jurisdiction over Mizuho.

Karpeles, for instance, was equally aware of the source of Mt. Gox's banking difficulties. And rather than just stay silent, he made affirmative misrepresentations, and caused other actors at Mt. Gox to make affirmative misrepresentations, that obscured the scope of Mt. Gox's problems. Karpeles also was aware of Mt. Gox's security issues, something else he worked to keep quiet. Karpeles suppressed this information while entering into transactional relationships

1

with individuals he knew or had reason to know lived in Illinois, including Gregory Greene and Anthony Motto. In so doing, he targeted tortious behavior at Illinois, rendering personal jurisdiction in this forum permissible.

In his only real attempt to distinguish the Court's earlier decision, Karpeles invokes the fiduciary-shield doctrine. But "if an employee has control over his own duties, is a decision-maker for the company, and acts in his own personal interest, the fiduciary shield doctrine does not prevent the court from taking personal jurisdiction over that employee." *Walls v. Reinsch*, No. 16-cv-4048, 2018 WL 4591715, at *12 (N.D. Ill. Sept. 25, 2018). The operative complaint and Karpeles's own attestations make clear that, under these exceptions, the fiduciary-shield doctrine does not stand in the way of personal jurisdiction here.

And on top of this, it mustn't be forgotten that this is not Mr. Karpeles's first appearance in this litigation. He appeared through his attorneys in April 2014, ostensibly for the purpose of contesting personal jurisdiction. But he instead lodged objections to the parties' prior efforts to settle the case—conduct that waived Karpeles's ability to now, four years down the road, again seek dismissal on personal jurisdiction grounds.

The motion to dismiss should be denied.

## BACKGROUND

The Court is already deeply familiar with the facts of the case, so only a brief summary is necessary here. Defendant Mark Karpeles developed and operated the Mt. Gox bitcoin exchange, which in its heyday was the largest bitcoin exchange in the world. (Dkt. 245, ¶¶ 1, 13.) As its CEO, Karpeles controlled all aspects of Mt. Gox's day-to-day operations. (*Id*., ¶ 19.) On its website, Mt. Gox, at Karpeles's direction, represented that it would keep users' bitcoins safe, and

promised through its Terms of Use that users could retrieve any bitcoins or cash they had deposited with Mt. Gox. (*Id.*, ¶ 14; dkt. 295, Exh. 1, at 16 n.38.)

These representations were not true. Mt. Gox's troubles began in 2011 when Karpeles discovered an issue with Mt. Gox's code that allowed bad actors to steal bitcoins from supposedly secure bitcoin wallets. (Dkt. 245, ¶ 21.) Karpeles did not disclose this "bug," and Mt. Gox continued to grow, as customers relied on Mt. Gox's promises of safety and security. (Dkt. 245, ¶¶ 23, 35; dkt. 295, Exh. 3, at 196:4-15 (Anthony Motto noting that Mt. Gox appeared "regulated," in stark contrast to other exchanges); dkt. 295, Exh. 5, at 30:5 (Gregory Pearce testifying that Mt. Gox appeared "professional").)

A new issue emerged in 2013. At that point, Karpeles had elected to keep Mt. Gox's deposit accounts at Mizuho Bank. *See Greene v. Mizuho Bank, Ltd.*, No. 14 C 1437, 2018 WL 2735112, at *2 (N.D. Ill. June 7, 2018) (class certification decision). Karpeles had tens of thousands of customers located outside of Japan, and needed a bank that could quickly and efficiently wire money from Mt. Gox's accounts around the globe, and which could accept wire transfers from around the globe. (Dkt. 245, ¶¶ 24-27.) Mizuho Bank, Japan's largest financial institution, fit that bill. But the volume of transactions Mizuho was processing on Mt. Gox's behalf began to worry the bank, and bank representatives asked Karpeles to take Mt. Gox's business elsewhere. *Greene*, 2018 WL 2735112, at *2. To speed the process along, Mizuho then refused to process any outbound international wire requests from Mt. Gox's bank account. *Id.* This new policy caused serious problems for Mt. Gox customers, which were the subject of widespread coverage in cryptocurrency-focused press. (Dkt. 245, ¶ 32 & n.11.) But as the Court has already observed, many of these news reports were unable to correctly diagnose the issues plaguing Mt. Gox. *Greene v. Mizuho Bank Ltd.*, 206 F. Supp. 3d 1362, 1375 (N.D. Ill. 2016).

Case: 1:14-cv-01437 Document #: 393 Filed: 10/16/18 Page 4 of 14 PageID #:6519

And for good reason: neither Karpeles nor Mizuho Bank said anything about Mizuho's new policy regarding Mt. Gox's accounts. (Dkt. 245, ¶¶ 30, 33, 35-36.) And, in fact, Karpeles through several outlets attempted to assure potential Mt. Gox customers that things were fine, and that any issues would soon resolve themselves. (*Id.*, ¶¶ 35, 39, 52, 62, 64, 87.)

Of course, they did not. And in February 2014 Karpeles was forced to shutter the exchange and file for bankruptcy. When he did, thousands of customers were unable to retrieve their bitcoin or currency they had deposited with Mt. Gox. *See Greene*, 2018 WL 2735112, at *2.

Two of those customers were Anthony Motto and Gregory Greene. Greene began using Mt. Gox in 2012. (Dkt. 245, ¶ 50.) In November 2013 he began to experience delays in transaction processing, consistent with news reports from that period. (*Id.*, ¶ 52.) In early February 2014, he noticed that basic functions on the Mt. Gox interface were unavailable. (*Id.*, ¶ 53.) When he informed customer service of these issues, he was asked to, and did, provide documents verifying his identity. (*Id.*, ¶ 54.) Once his identity was verified, Greene tried unsuccessfully to withdraw his bitcoin from the exchange. (*Id.*, ¶ 55.) Hours later, the exchange had gone dark, and Greene was unable to realize the value of the bitcoin he held on the exchange. (*Id.*, ¶¶ 56-58.)

Anthony Motto opened his account in February 2014. (*Id.*, ¶ 70.) On February 15, 2014, he wired $1,000 from his Chase account to Mt. Gox's account at Mizuho. (*Id.*, ¶ 71.) The wire informed the recipient that it originated from a bank in Illinois. (*Id.*, ¶¶ 71-72; *Greene*, 169 F. Supp. 3d at 861.) The money never appeared in Motto's Mt. Gox account before the Exchange went dark. (Dkt. 245, ¶¶ 75-76.)

4

## ARGUMENT

In this diversity case, personal jurisdiction is governed in the first instance by Illinois law. *See* Fed. R. Civ. P. 4(k)(1)(A). Jurisdiction must not only be authorized by Illinois's long-arm statute, but must comport with Due Process. *See Felland v. Clifton*, 682 F.3d 665, 672-73 (7th Cir. 2012). Because Illinois permits the exercise of jurisdiction to the fullest extent permitted by the Constitution, the statutory and constitutional inquiries merge. *See Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017). To establish that the Court may exercise specific personal jurisdiction over a defendant, a plaintiff must show that the defendant has minimum contacts with the forum state, that the plaintiff's claims relate to those contacts, and that the exercise of jurisdiction is reasonable. *See Felland*, 682 F.3d at 673. For tort claims, the minimum contacts analysis looks to whether the defendant "purposefully directed" tortious conduct at the forum state. *See id.* The burden is on the defendant to make a "compelling case" that an otherwise proper exercise of jurisdiction is unreasonable. *Burger King Corp. v. Rudziewicz*, 471 U.S. 462, 477 (1985).

## I.      Plaintiffs' Claims Relate to Karpeles's Minimum Contacts with the Forum State.

The Court previously concluded that personal jurisdiction over Mizuho was permissible in part because the process of depositing money into Mt. Gox's bank account required depositor-plaintiffs to notify Mizuho of their location. *Greene*, 169 F. Supp. 3d at 862. Accepting that deposit while remaining silent about information material to the decision to deposit in the first place created the required minimum contacts with the forum state, and because the claims related to the act of depositing, they specifically relate to those minimum contacts. *Id.* at 862-63. As the Court noted, surely Mizuho did not care where these deposits originated, but the fraudulent acceptance of them still created the necessary relationship with U.S. jurisdictions. *Id.* at 863. By

defrauding individuals that Mizuho knew resided in particular U.S. jurisdictions, Mizuho had aimed its tortious conduct at those states.

All of this is also true of Karpeles. He had a similar ability to ascertain the location of depositors: Through Mt. Gox, Karpeles controlled the account with Mizuho—the route through which all incoming deposits traveled—and any itemized statement would have information about incoming deposits. Thus, Karpeles and Mt. Gox would have been aware of Anthony Motto's residence—regardless of whether his address was listed on any of the documentation he provided Mt. Gox—because it would have been attached to the deposit he wired to Mt. Gox's bank account. *Id.* at 861. Karpeles also had the ability to ascertain the location of plaintiffs who simply moved bitcoin into Mt. Gox because he began insisting that exchange users "verify" their accounts by providing documentation regarding their identity and location. (Dkt. 295, Exhs. 1, 14.) To this end, Gregory Greene was asked to, and did, verify his identity at Mt. Gox's request, including informing the company of his place of residence. (Dkt. 245, ¶ 54.) And Karpeles concealed information not just about the source of Mt. Gox customers' withdrawal difficulties, (*id.*, ¶ 117), but also information about security vulnerabilities in the Mt. Gox software, (*id.*, ¶¶ 21-23). This concealment was fraudulent in part because of statements Mt. Gox already had posted at Karpeles's direction about the safety and security of Mt. Gox, and statements in its Terms of Use promising to safeguard bitcoin and hold it on a customer's behalf. (*Id.*, ¶ 14; Dkt. 295, Exh. 1, at 16 n.38.)

In other words, Karpeles had ample notice that he was transacting with individuals in Illinois, and thus, because he was at the same time withholding and suppressing information material to the decision to invest and/or keep bitcoin and currency stored on Mt. Gox, that he could be haled into an Illinois court. Indeed, Karpeles practically concedes that he had notice,

asserting in his declaration that he had access to information about which of Mt. Gox's customers lived in Illinois (though he makes clear he never bothered to access this information). (Dkt. 392-1, ¶ 13.) Thus, Karpeles knew or should have known that he had customers in Illinois, and knew or should have known that his conduct would cause significant financial losses in Illinois. *See In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 667 (7th Cir. 2013) ("In our legal system, every person is presumed to intend the natural consequences of his acts.") (internal quotations omitted). As the Court already correctly concluded, these actions create the requisite minimum contacts with the state of Illinois. And because the at-issue claims arise from Karpeles's acts to suppress and conceal information material to the investing decision—all the while communicating with Exchange users and encouraging them to invest, verify their information, and the like—the claims at issue arise from Karpeles's minimum contacts with Illinois. *See Greene*, 169 F. Supp. 3d at 862-63; *Felland*, 682 F.3d at 672-74.

Rather than address these facts, which the Court has already concluded are relevant to the minimum-contacts analysis, Karpeles focuses on the fact that the Mt. Gox website is globally accessible and that Mt. Gox did not purchase any advertising specifically directed at Illinois markets. (Dkt. 392, at 7-9.) But the specific-jurisdiction inquiry "depends in large part on the type of claim at issue," here, conversion and fraud. *Felland*, 682 F.3d at 674. The accessibility of Mt. Gox's website is relevant only insofar as it was the avenue for Karpeles, through Mt. Gox, to establish transactional contacts with individuals in Illinois. To the extent that this matters to the analysis at all, the fact that Karpeles structured the website to permit Illinois-based individuals to register accounts at Mt. Gox further supports the exercise of jurisdiction. *See Plixer Int'l. Inc. v. Scrutinizer GmbH*, -- F.3d ---, No. 18-1195, 2018 WL 4357137, at *5 (1st Cir. Sept. 13, 2018) (defendant's "failure to implement [geographic] restrictions" for access to its website "provides

an objective measure of it intent to serve customers" in the forum, and supports the exercise of personal jurisdiction). And, finally, Plaintiffs' claims do not involve any Mt. Gox advertising, so Karpeles's discussion of advertising is beside the point.

While Karpeles recognizes that the case against him involves his alleged fraudulent suppression or concealment of information, (dkt. 392, at 3; *see also* dkt. 245, ¶ 117), his argument ignores this fact and, instead, focuses on alleged affirmative misrepresentations and attempts to draw a distinction between this case and *Felland*, 682 F.3d at 678. (Dkt. 392, at 9-10.) The Court has already addressed, and rejected, the distinction Karpeles attempts to draw. *Felland* involved a scheme centering on affirmative misrepresentations, rather than the silence alleged here. 682 F.3d at 672. "[B]ut that distinction does not warrant a different result." *Greene*, 169 F. Supp. 3d at 862. Intentionally concealing information while stealing from and defrauding individuals known to reside in particular states causes harm in much that same way as the intentional misrepresentations directed towards the state of Wisconsin in *Felland*. Thus, just as in that case and just as this Court already concluded with respect to Mizuho Bank, jurisdiction is proper.

## II.      The Exercise of Jurisdiction Does Not Offend Notions of Fair Play or Substantial Justice.

Karpeles also contends that the exercise of personal jurisdiction does not comport with fair play or substantial justice. (Dkt. 392, at 12.) To prevail on this point, Karpeles bears the burden of presenting a "compelling case" that jurisdiction does not comport with due process. *Burger King*, 471 U.S. at 477. The Court already concluded that jurisdiction over Mizuho was reasonable because domestic jurisdictions have an interest in providing a forum for injured residents, there was no reason to believe that a suit in America would not serve the interests of American depositors or be an efficient way to resolve the instant claims, and, by accepting

deposits from domestic banks, Mizuho was on notice that it might be haled into an American court. *Greene*, 169 F. Supp. 3d at 863. Many of these factors are true here, as well. For instance, Illinois continues to have a significant interest in providing a forum in which its residents can seek redress for injuries. *See Burger King*, 471 U.S. at 473. Karpeles's assertion to the contrary is frivolous. *See Baskin-Robbins Franchising LLP v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 40 (1st Cir. 2016) (rejecting argument that Massachusetts had no interest in dispute brought by injured citizen because it involved an agreement executed in California, governed by Washington law, and requiring performance elsewhere, further noting that forum state's interest "need not be exclusive"). And Motto and Greene have an interest in finding a convenient forum for their claims. Also, just like Mizuho, Karpeles knew that Mt. Gox was accepting deposits from American customers, and thus reasonably should have foreseen that he might be haled into an American court.

Attempting to distinguish the Court's earlier conclusion with respect to Mizuho, Karpeles highlights two facts: (1) He is prohibited by the Japanese government from leaving Japan, and (2) Japanese proceedings relating to the exchange might afford putative class members relief. These two distinctions do not add up to a "compelling case" that jurisdiction would be unreasonable. As to the latter point, the bankruptcy also was in place at the time of the Court's earlier decision on Mizuho's motion. (See dkt. 245, ¶ 42 (bankruptcy petition was filed on February 28, 2014).) Karpeles points out that the structure of the proceeding recently has changed, and expresses optimism that the bankruptcy proceedings might make creditors whole, but these self-serving claims should be viewed with skepticism. (Dkt. 392, at 12-13.) Bu the proceedings in Japan are even older than this lawsuit, and nothing has yet come from them. *Cf. Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 982 (8th Cir. 2015) ("obtaining

relief through litigation in Hong Kong would be burdensome for Creative Calling"). In any event, Karpeles cites nothing to suggest Plaintiffs' *potential* ability to recover through foreign proceedings is preclusive to a finding of jurisdiction here.

As to Karpeles's inability to leave Japan "at this time," (dkt. 392-1, at 3), his history of participating in this case readily shows that he is not prevented from appearing and conducting business in the lawsuit when it suits him. (Karpeles avers that he only became aware of the lawsuit when he "saw a news story about the lawsuit far after it was filed," (*id.*), but attorneys appeared on Karpeles's behalf just 5 weeks after the lawsuit was filed, (dkts. 51-53), he has communicated with counsel for Plaintiffs and counsel for Mizuho Bank over the course of this lawsuit, and Karpeles's decision to challenge the entry of default against him demonstrates that he is receiving notice of documents filed in this case.)

Much of the necessary discovery already was taken from Mizuho, most of the remaining discovery will involve production of electronic documents, and modern advances in travel will make collecting any remaining testimonial evidence relatively easy, despite the distance. Thus, for Karpeles's apparent confinement to Japan to matter, the case would need to reach trial without Japanese authorities lifting or modifying their prohibition on Karpeles's travel. Karpeles himself refrains from speculating about how long these travel restrictions will remain in place. And besides, "[a] party's concern that a forum is particularly unfair or inconvenient 'usually may be accommodated through means short of finding jurisdiction unconstitutional.'" *Felland*, 682 F.3d at 677 (citing *Burger King*, 471 U.S. at 477). Thus, even if Karpeles's forced tenure in Japan dragged on, his physical absence may be accommodated. *See* Fed. R. Civ. P. 43 ("For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location."). In all,

Karpeles's presence in Japan does not create a "compelling case" for refusing to exercise jurisdiction.

### III.     The Fiduciary Shield Doctrine Does Not Preclude Jurisdiction Over Karpeles.

Last, Karpeles contends that the fiduciary shield doctrine prohibits the exercise of jurisdiction over him related to actions taken as Mt. Gox's CEO. (Dkt. 392, at 12-15.) As he sees it, a corporation must be the alter ego of the defendant in order to lose the protections of the fiduciary shield. (*Id.*, at 15.) Not so. While a finding that a defendant *is* the alter ego of a subject entity would of course negate any protections afforded by the fiduciary shield doctrine, *Clipp Designs, Inc. v. Tag Bags, Inc.*, 996 F. Supp. 766, 768 (N.D. Ill. 1998), the doctrine itself is far narrower. "The [fiduciary shield] doctrine does not protect a defendant who has decision-making authority and a financial stake in the company that directed him or her to a jurisdiction." *Mission Measurement Corp. v. Blackbaud, Inc.*, 287 F. Supp. 3d 691, 709 (N.D. Ill. 2017). In *Mission Measurement*, for instance, the court concluded that the fiduciary-shield doctrine did not protect directors and senior level officers who held equity in their company. *Id.* at 709-10. Here, Plaintiffs allege that Karpeles "controlled all aspects of Mt. Gox's business." (Dkt. 245, ¶ 19.) Karpeles himself acknowledges that he was Mt. Gox's president and CEO. (Dkt. 392-1, ¶ 7.) (And although he disputes whether he directed any specific communication made on Mt. Gox's behalf, Karpeles does not dispute that he controlled Mt. Gox's day-to-day operations.) Karpeles also acknowledges that he was the sole shareholder of the entity that held 88% of Mt. Gox's equity. (*Id.*, ¶ 6.) Thus, just as in *Mission Measurement*, the fiduciary-shield doctrine does not preclude jurisdiction over Karpeles. *See* 287 F. Supp. 3d at 709-10. *See also Kelley v. Hein*, No. 17-cv-6636, 2018 WL 4205413, at *2 (N.D. Ill. Sept. 4, 2018) (fiduciary-shield doctrine inapplicable to claims against corporate officers with "discretion over the way the relevant

11

companies operate"); *Orgone Capital III, LLC v. Daubenspeck*, No. 16 C 10849, 2017 WL 3087730, at *7 (N.D. Ill. July 20, 2017) (doctrine does not protect firm principals).

## IV. Karpeles's Earlier Participation in the Case Waived Any Personal Jurisdiction Defense.

Finally, Karpeles's request for dismissal fails because his prior conduct in this case waived the defense asserted here. While Karpeles admittedly has not attempted to defend the claims against him on the merits (the usual conduct that would result in waiver), he hasn't exactly "actively pursed" the defense either. *Lowe v. CVS Pharmacy, Inc.*, 233 F. Supp. 3d 636, 641-42 (N.D. Ill. 2017) (citing *Pierson v. Nat'l Inst. for Labor Relations Research*, No. 15 C 11049, 2016 WL 6093490, at *4 (N.D. Ill. Oct. 17, 2016)). To the contrary, Karpeles first appeared in this case on April 4, 2014. (Dkts. 51-53.) And while he then-promised to assert a personal jurisdiction defense, he waited more than four years before doing so. In the interim, he participated in this case on the sidelines—feeding both Plaintiffs and Mizuho Bank with information as he saw fit—and also lodged an objection to Plaintiffs' and the previously-named Defendants' efforts to reach a class settlement (which Karpeles dropped after negotiating a stay of the case asserted against him). (*See* dkt. 88, ¶ 3.) In all, his conduct waived any ability to seek dismissal on personal jurisdiction grounds at this point. *See White v. Nat'l Football League*, 822 F. Supp. 1389, 1432-33 (D. Minn. 1993) (individuals "appear[ing] to object to settlement . . . submitted to the court's jurisdiction because they have not confined their arguments to the claim that they are beyond the court's jurisdiction" and waived their reserved personal jurisdiction defenses).

**CONCLUSION**

The Court has been down this road before. There's no basis to find that Mizuho was subject to the Court's jurisdiction, but Karpeles is not. The Motion to Dismiss should be denied and Karpeles should be instructed to—finally—answer the claims against him.

Date: October 16, 2018                    Respectfully submitted,

                                          By: /s/ Benjamin S. Thomassen
                                                One of Plaintiffs' Attorneys

                                          Jay Edelson
                                          jedelson@edelson.com
                                          Benjamin S. Thomassen
                                          bthomassen@edelson.com
                                          EDELSON PC
                                          350 North LaSalle Street, 14th Floor
                                          Chicago, Illinois 60654
                                          Tel: 312.589.6370
                                          Fax: 312.589.6378

                                          Rafey S. Balabanian
                                          rbalabanian@edelson.com
                                          J. Aaron Lawson
                                          alawson@edelson.com
                                          EDELSON PC
                                          123 Townsend Street, Suite 100
                                          San Francisco, California 94107
                                          Tel: 415.212.9300
                                          Fax: 415.373.9495

                                          Counsel for Plaintiffs and the Putative Classes

CERTIFICATE OF SERVICE

I, Benjamin S. Thomassen, an attorney, hereby certify that I served the above and foregoing document by causing true and accurate copies of such paper to be transmitted to all counsel of record via the Court's CM/ECF electronic filing system on March 7, 2017.

/s/ Benjamin S. Thomassen