UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY GREENE and ANTHONY MOTTO, individually and on behalf of all others similarly situated, | ) ) ) | 14 C 1437 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | |
| vs. | ) | |
| | ) | |
| MARK KARPELES, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

The court's prior opinions, familiarity with which is assumed, summarize the history of

this diversity suit, which concerns the collapse of the Mt. Gox bitcoin exchange. Docs. 199-200

(reported at 169 F. Supp. 3d 855 (N.D. Ill. 2016)); Docs. 229-230 (reported at 206 F. Supp. 3d

1362 (N.D. Ill. 2016)); Docs. 311-312 (reported at 289 F. Supp. 3d 870 (N.D. Ill. 2017)); Docs.

373-374 (reported at 327 F.R.D. 190 (N.D. Ill. 2018)). As matters now stand, Gregory Greene

and Anthony Motto, the sole remaining plaintiffs, seek on behalf of a putative class to hold Mark

Karpeles, Mt. Gox's principal and the sole remaining defendant, liable for financial losses

allegedly arising from the exchange's collapse. Doc. 245. Karpeles moves under Rule 12(b)(2)

to dismiss for want of personal jurisdiction. Doc. 390. The motion is denied.

**Background**

In resolving a Rule 12(b)(2) motion, the court considers the operative complaint's well-

pleaded allegations and the evidentiary materials submitted by both sides. *See Felland v. Clifton*,

682 F.3d 665, 672 (7th Cir. 2012). The court must also consider "documents attached to the

complaint, documents that are critical to the complaint and referred to in it, and information that

is subject to proper judicial notice," along with additional facts set forth in Plaintiffs' brief opposing dismissal, so long as those facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013). No party has requested an evidentiary hearing, so the court must "accept as true all well-pleaded facts alleged in the complaint and resolve any factual disputes … in favor of" Plaintiffs. *Felland*, 682 F.3d at 672; *see also Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782-83 (7th Cir. 2003). The facts are set forth as favorably to Plaintiffs as those materials permit. *See GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009). In setting forth the facts at this stage, the court does not vouch for their "objective truth." *Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

Karpeles asserts that the averments in his declaration (Doc. 392-1) trump not only contrary allegations in the complaint, but *all* the complaint's allegations. Doc. 394 at 2-4. That is wrong, for evidence submitted by a Rule 12(b)(2) movant trumps only those allegations in the complaint that the evidence contradicts. *See GCIU-Emp'r Ret. Fund*, 565 F.3d at 1020 n.1 (accepting "as true any facts contained in the defendant's affidavits that remain unrefuted by the plaintiff[s]," but also "read[ing] the complaint liberally with every inference drawn in favor of plaintiff[s] and resolv[ing] all factual disputes in favor of plaintiff[s]"); *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987) (explaining in the Rule 12(b)(2) context that "[t]he allegations in [the] complaint are to be taken as true unless controverted by the defendant['s] affidavits; and any conflicts in the affidavits are to be resolved in [the plaintiffs'] favor"), *superseded by statute on other grounds*, Act of Sept. 7, 1989, Pub. Act 86-840, § 1, 1989 Ill. Laws 4629, 4630 (codified at 735 ILCS 5/2-209(c)).

As Karpeles notes, the Seventh Circuit has recognized that "[d]ecisions from other circuits," including the Eleventh, "tend to emphasize that, once the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff[s] must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue Research Found.*, 338 F.3d at 782-83 & n.13. But all that *Purdue Research* meant by this is that a plaintiff must go beyond the pleadings and submit evidence *only* if it wants to dispute evidence submitted by the defendant on a particular factual issue; the passage does not mean that if the defendant submits evidence regarding Factual Issue A, the complaint's allegations regarding Factual Issues B-Z are disregarded for Rule 12(b)(2) purposes unless the plaintiffs submit corroborating evidence. Precedent from the Eleventh Circuit confirms the point. *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1317 (11th Cir. 2006) ("The district court must accept the facts alleged in the complaint as true, *to the extent* they are uncontroverted by the defendant's affidavits.") (emphasis added) (quoting *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990)). Accordingly, the court credits the averments in Karpeles's declaration only where Plaintiffs have not produced contrary evidence, and accepts as true the complaint's allegations insofar as the declaration does not contradict them.

Bitcoin is a digital payment system, and bitcoins are the system's unit of account. *See* U.S. Gov't Accountability Office, GAO-14-496, Virtual Currencies: Emerging Regulatory, Law Enforcement, and Consumer Protection Challenges 5-11 (May 2014), https://www.gao.gov /assets/670/663678.pdf (describing bitcoin as "the most widely used virtual currency"). Bitcoins can be bought and sold on third-party exchanges. *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 229 (E.D.N.Y. 2018) ("Virtual currencies are 'goods' exchanged in a market for a uniform quality and value."); U.S. Gov't Accountability Office, *supra*, at 4, 7 (noting that "exchanges"

can convert "virtual currencies" into "government-issued currencies," also known as fiat currency).

Mt. Gox was an online bitcoin exchange that declared bankruptcy and ceased operations in late February 2014. Doc. 245 at ¶¶ 1, 13, 41-42. Mt. Gox was not registered to transact business in Illinois and never had an Illinois office or Illinois employees. Doc. 392-1 at ¶ 9. Karpeles served as Mt. Gox's President and CEO and was the sole shareholder of Tibanne KK, which held 88% of Mt. Gox's shares. *Id*. at ¶¶ 6-7. Karpeles has never visited and maintains no physical presence in Illinois. *Id*. at ¶¶ 5, 8.

Users could access the Mt. Gox exchange by creating an account on Mt. Gox's website and agreeing to its Terms of Use, which warranted that Mt. Gox would hold all assets in a user's account on the user's behalf. Doc. 245 at ¶ 14; Doc. 11-2 at 4 (providing that "MtGox represents and warrants that: … it will hold all monetary sums and all Bitcoins deposited by each member in its Account, in that Member's name …, and on that Member's behalf"). Although neither Karpeles nor Mt. Gox directed advertising specifically toward Illinois or even the United States, Doc. 392-1 at ¶¶ 10-11, 16, users could view information touting the exchange's sophistication and security on Mt. Gox's website, Doc. 245 at ¶¶ 13, 112. Greene and Motto, both Illinois residents, relied on those representations when they created their Mt. Gox accounts in 2012 and early 2014, respectively. *Id*. at ¶¶ 4, 6, 49-50, 70.

As Mt. Gox's President and CEO, Karpeles "controlled all aspects of Mt. Gox's business from the ground up," including software design and operation, public and customer interactions, and accounting practices. Doc. 245 at ¶¶ 19-21. However, Karpeles was not responsible for "Mt. Gox's day-to-day accounting" and did not personally respond to Motto's and Greene's communications to Mt. Gox. Doc. 392-1 at ¶¶ 15, 17; Doc. 245 at ¶¶ 52-54, 74-75. Karpeles

also never made any specific decision to operate in Illinois and was unaware of which or how many Mt. Gox accounts were associated with Illinois.  Doc. 392-1 at ¶¶ 12, 14.

When creating an online account with Mt. Gox, a user was asked but not required to "verify" his account by providing his address and other personal information.  Doc. 245 at ¶ 15; Doc. 295-1 at 17-18.  Some 7,056, or about 1.5%, of the more than 450,000 addresses associated with Mt. Gox accounts had Illinois zip codes.  Doc. 392-1 at ¶ 13.  Greene did not verify his account when he signed up in 2012.  Doc. 10 at ¶ 2.  Motto, by contrast, verified his account when he signed up in early 2014.  Doc. 245 at ¶ 70 (alleging that Motto provided "all requested documentation" when creating his account); Doc. 295-2 at 15 (Motto testifying: "I was getting verification through Mt. Gox.  I thought I needed verification. … [Y]ou'll probably see emails further up that sa[y], 'Okay.  You've been verified.'").

Upon creating a Mt. Gox account, a user could access the exchange's online platform to deposit fiat currency, trade or purchase bitcoins, or request withdrawals.  Doc. 245 at ¶¶ 16, 26. Mt. Gox earned a transaction fee for each trade made on the exchange.  *Id*. at ¶ 17.  User deposits of fiat currency were held in an account that Mt. Gox maintained with Mizuho Bank, a Japanese financial institution and formerly a defendant in this case.  *Id*. at ¶¶ 24-25.

Around mid-2013, the relationship between Mt. Gox and Mizuho deteriorated, causing users to experience problems withdrawing fiat currency from their accounts.  Doc. 245 at ¶¶ 30-32.  Indeed, Karpeles had become aware as early as May 2011 that the software he designed for the exchange contained security flaws that could permit "unconfirmed transactions," including "illicit withdrawals" from user accounts.  *Id*. at ¶¶ 21, 42 (internal quotation marks omitted). Although Karpeles never diverted assets from Mt. Gox to himself or commingled his personal

assets with Mt. Gox's assets, Doc. 392-1 at ¶¶ 18, 22, he did not fix those security flaws because it was not in his financial interest to do so, Doc. 245 at ¶¶ 22-23, 113.

When Greene informed Mt. Gox's customer service desk in November 2013 that he was experiencing delays on the exchange, his issue was resolved, but he was not told about any underlying problems with the exchange. Doc. 10 at ¶ 4. On February 5, 2014, Greene again complained to Mt. Gox's customer service desk that several functions of the Mt. Gox website, including the ability to withdraw bitcoins, were inaccessible. *Id*. at ¶ 5. Despite growing problems with the exchange's reliability and security, Karpeles repeatedly assured customers and the public that delays in processing transactions were due to a temporary backlog and that users' assets were safe. Doc. 245 at ¶¶ 35, 115-116. On February 7, Karpeles announced that he had temporarily halted withdrawals on the exchange to investigate alleged malfunctions on the website. *Id*. at ¶¶ 35, 39. Notwithstanding his public statements, Karpeles already knew that customers would never be able to make withdrawals from their Mt. Gox accounts and that thousands of user bitcoins had been lost or stolen. *Id*. at ¶¶ 40, 117.

Around February 10, in response to a request from Mt. Gox's customer service, Greene provided Mt. Gox with proof of his Illinois address. Doc. 10 at ¶ 6. On February 15, Motto wired $1,000 to his Mt. Gox account from a bank account registered to his Illinois address. Doc. 245 at ¶¶ 71-72. After Motto noticed that Mizuho had accepted the deposit but that the funds did not appear on Mt. Gox's website, he contacted Mt. Gox's customer service on February 19. *Id*. at ¶¶ 73-74. After confirming the destination and status of the funds transfer, Motto asked Mt. Gox to investigate further. *Id*. at ¶ 74. On February 24, Mt. Gox informed Motto that it was investigating his missing deposit, *id*. at ¶ 75, and it told Greene that his account had been verified, though it did not address his earlier complaint about his inability to make withdrawals,

Doc. 10 at ¶ 6. Greene promptly requested a withdrawal from his account by entering his Illinois address, but the website ignored his request. *Id*. at ¶ 7.

Later on February 24, the Mt. Gox exchange went dark, preventing users from logging into their accounts. Doc. 245 at ¶ 41; Doc. 10 at ¶ 8. The website soon displayed a message stating that a "decision was taken to close all transactions for the time being." Doc. 245 at ¶ 41 (emphasis omitted). Unbeknownst to users, Karpeles was already working on Mt. Gox's bankruptcy filing and had no intention of reopening the exchange. *Ibid*. Mt. Gox declared bankruptcy in Japan on February 28, 2014. *Id*. at ¶¶ 42, 46-47. Mt. Gox's Japanese bankruptcy proceedings are now civil rehabilitation proceedings in which former Mt. Gox accountholders can submit claims for the amounts they lost. Doc. 392-1 at p. 3. In September 2015, Karpeles was arrested by Tokyo police and charged with fraud and embezzlement for his role in Mt. Gox's demise. Doc. 245 at ¶ 48; Doc. 405-5 at 1. Due to those criminal proceedings, Karpeles is currently prohibited from leaving Japan. Doc. 392-1 at p. 3.

## Discussion

Bringing state law claims that sound in conversion/trespass to chattels, negligence, and consumer fraud, the operative complaint alleges that Karpeles intentionally misrepresented the security and stability of the Mt. Gox exchange and that his negligent or intentional failures in designing and operating the exchange allowed the loss of Plaintiffs' assets. Doc. 245 at ¶¶ 95-121. On behalf of a putative class, Plaintiffs seek actual, statutory, and punitive damages, along with prejudgment interest and attorney fees. *Id*. at p. 32. As noted, Karpeles moves to dismiss the suit for lack of personal jurisdiction. Doc. 390.

I.      **Whether Karpeles Waived His Personal Jurisdiction Defense**

Plaintiffs contend as a threshold matter that Karpeles waived his personal jurisdiction defense by engaging in informal discovery and settlement discussions early in the case. Doc. 393 at 12. There is no strict timeframe within which a defendant must raise a personal jurisdiction defense. *See Hedeen Int'l, LLC v. Zing Toys, Inc.*, 811 F.3d 904, 906 (7th Cir. 2016) ("[A] challenge to personal jurisdiction may be asserted either in a responsive pleading filed within 21 days, or in a [Rule 12(b)(2)] motion with no similar time limit specified."). That said, a defendant waives an objection to personal jurisdiction where he "gives a plaintiff a reasonable expectation that he will defend the suit on the merits or … causes the court to go to some effort that would be wasted if personal jurisdiction is subsequently found lacking." *Ibid*.

Plaintiffs' bare assertion in their brief that Karpeles has "participated in this case on the sidelines" since April 2014, Doc. 393 at 12, does not make it so. *See Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015) ("[A]ssertions in briefs are not evidence … ."); *In re Morris Paint & Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985) ("Arguments and factual assertions made by counsel in a brief, unsupported by affidavits, cannot be given any weight."). In fact, the docket reflects that Karpeles's participation in this case has been minimal.

Counsel appeared for Karpeles in April 2014, shortly after suit was filed. Docs. 51-53. Days later, Plaintiffs moved for leave to serve Karpeles by alternative means, noting that he was contesting personal jurisdiction and the validity of service. Doc. 54. At a status hearing that day, Karpeles's counsel indicated that he would move to dismiss under Rules 12(b)(2), (4), and (5). Doc. 59. On the day he was to file both his Rule 12(b) motion and his response to Plaintiffs' motion for alternative service, Karpeles filed an agreed motion for an extension, Doc. 77, and Plaintiffs filed a motion for preliminary settlement approval, Doc. 79, both of which

were granted, Docs. 83, 94, 96.  Plaintiffs also filed a stipulated motion to stay the claims against

Karpeles, Doc. 88, which was granted, Docs. 94-95.  The stipulated motion stated that Karpeles's

agreement to the stipulation "will not be … used against [him] in this litigation in any manner,

including, without limitation, with respect to any defenses or motions [he] may assert based on

lack of personal jurisdiction or inadequate service of process."  Doc. 88 at ¶ 4.

Months later, the proposed settlement fell through, the stay was vacated, and Karpeles's

counsel withdrew.  Doc. 129.  After that, and until Mizuho's recent dismissal from the litigation,

Doc. 387, Plaintiffs focused exclusively on Mizuho and did not press their claims against

Karpeles.  Given this procedural history and his consistent position that the court lacks personal

jurisdiction over him, Karpeles has not waived his right to bring the present motion.  *See*

*Swanson v. City of Hammond*, 411 F. App'x 913, 915-16 (7th Cir. 2011) ("Preliminary litigation

actions … do not waive or forfeit personal-jurisdiction defenses.  To waive or forfeit their

personal-jurisdiction defense, the defendants must create the expectation that they will defend

the suit on the merits.") (citation omitted); *Mobile Anesthesiologists Chi., LLC v. Anesthesia*

*Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010) ("These preliminary

actions [asking for a continuance and an expedited discovery schedule] do not come close to

what is required for waiver or forfeiture."); *cf. Blockowicz v. Williams*, 630 F.3d 563, 566 (7th

Cir. 2010) (holding that the defendant waived a personal jurisdiction defense "by participating in

the district court proceedings, which included both briefing and oral arguments addressing the

merits of the [plaintiffs'] claim").

## II.     Whether Karpeles Is Subject to Personal Jurisdiction

Plaintiffs "ha[ve] the burden of establishing personal jurisdiction."  *John Crane, Inc. v.*

*Shein Law Ctr., Ltd.*, 891 F.3d 692, 695 (7th Cir. 2018).  "[W]here, as here, there has been no

[evidentiary] hearing on the matter," Plaintiffs need only make "a prima facie showing of jurisdiction." *Ibid*.

"District courts exercising diversity jurisdiction apply the personal jurisdiction rules of the state in which they are located," so the court applies Illinois's long-arm statute. *Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 912 (7th Cir. 2015). "The Illinois long-arm statute permits the court to exercise jurisdiction to the full extent permitted by the Due Process Clause of the Fourteenth Amendment." *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017) (citing 735 ILCS 5/2-209(c)). Accordingly, this court must determine "whether the exercise of personal jurisdiction [over Karpeles] would violate federal due process." *Mobile Anesthesiologists*, 623 F.3d at 443.

"Under the Supreme Court's well-established interpretation of the Fourteenth Amendment's due process clause, a defendant is subject to personal jurisdiction in a particular state only if the defendant had certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Ibid*. (internal quotation marks omitted). The Court has "framed the constitutional inquiry in terms of whether the defendant purposefully avails itself of the benefits and protections of conducting activities in the forum state." *Id*. at 444 (internal quotation marks omitted). For a defendant to be subject to personal jurisdiction, his "contacts must not be merely random, fortuitous, or attenuated; rather, the 'defendant's conduct and connection with the forum state' must be such that it should 'reasonably anticipate being haled into court there.'" *Citadel Grp. v. Wash. Reg'l Med. Ctr.*, 536 F.3d 757, 761 (7th Cir. 2008) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). "Personal jurisdiction can be general or specific, depending on the extent of the defendant's contacts." *Mobile Anesthesiologists*, 623 F.3d at 444; *see also Daimler AG v.*

*Bauman*, 571 U.S. 117, 126-28 (2014). Only specific jurisdiction need be considered here, as Plaintiffs do not contend that Karpeles is subject to general jurisdiction in Illinois. Doc. 393 at 5.

"Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities. The exercise of specific jurisdiction must also comport with traditional notions of fair play and substantial justice." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 492 (7th Cir. 2014) (citations and internal quotation marks omitted). When assessing specific jurisdiction, the "relevant contacts" are "the defendant's *suit-related* conduct," which "must create a substantial connection with the forum State." *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014) (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)). "The mere fact that [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction. Furthermore, the relation between the defendant and the forum must arise out of contacts that the defendant *himself* creates with the forum." *Ibid*. (alteration, citation, and internal quotation marks omitted). In other words, "the plaintiff cannot be the only link between the defendant and the forum." *Id*. at 802. Whether the exercise of specific jurisdiction comports with due process turns on the particular facts of the case. *See uBID, Inc. v. GoDaddy Grp.*, 623 F.3d 421, 433 (7th Cir. 2010) ("[T]his is a field of law where the Supreme Court has repeatedly refused opportunities to draw … bright lines.").

Karpeles offers three reasons why he is not subject to specific jurisdiction, which are considered in turn.

## A.      Karpeles's Suit-Related Contacts with Illinois

Karpeles first contends that Plaintiffs' alleged injuries do not arise out of his contacts with Illinois because he never purposefully availed himself of the privilege of doing business here.  Doc. 392 at 7-12.  Although Karpeles never visited Illinois, Doc. 392-1 at ¶¶ 4-5, 8, "the defendant's physical presence in the forum State is not required" to establish specific jurisdiction.  *Brook*, 873 F.3d at 552; *see also uBID*, 623 F.3d at 429 (explaining that whether a defendant maintains a virtual as opposed to a physical presence in the forum State "is not decisive under the flexible jurisdictional analysis that the Supreme Court has applied consistently").

As for a defendant's virtual presence in a forum, neither the Supreme Court nor the Seventh Circuit has articulated a special test to determine the kind of online contacts necessary to establish personal jurisdiction.  *See Walden*, 571 U.S. at 290 n.9 ("We leave questions about virtual contacts for another day."); *Advanced Tactical*, 751 F.3d at 802 ("[T]he traditional due process inquiry is not so difficult to apply to cases involving Internet contacts that courts need some sort of easier-to-apply categorical test.") (alteration and internal quotation marks omitted).  Notably, though, the Seventh Circuit has rejected the notion that an online transaction initiated by an Illinois resident on a non-Illinois defendant's website is a unilateral activity by the Illinois resident that does not connect the defendant to Illinois.  *See uBID*, 623 F.3d at 428 (rejecting the defendant's argument that its sales of domain names to Illinois residents were a function of the buyers' unilateral activity given that the transactions were submitted online and "processed automatically by [the defendant's] servers in Arizona," reasoning that the defendant "itself set the system up this way"); *Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 758 (7th Cir. 2010) (declining to characterize online sales as "unilateral actions by [Illinois] customers" where the

12

defendant "created several commercial, interactive websites through which customers could purchase cigarettes" and "shipped the cigarettes to their various destinations"). Instead, Seventh Circuit precedent "boils down" the minimum contacts inquiry in the online context to the question whether the defendant "purposefully exploited the [Illinois] market beyond simply operating an interactive website accessible in [Illinois] and sending emails to people who happen to live there." *Advanced Tactical*, 751 F.3d at 802 (internal quotation marks and alteration omitted).

Although this inquiry asks whether the defendant "targeted" the forum State, *see Advanced Tactical*, 751 F.3d at 803; *be2 LLC v. Ivanov*, 642 F.3d 555, 559 (7th Cir. 2011), it is not necessary for Karpeles to have singled out Illinois for his business activities. Rather, Karpeles could target Illinois by "purposefully direct[ing his] business activities toward [Illinois] just as [he] had toward all other states." *uBid*, 623 F.3d at 428 (explaining the holding in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)); *see also Hemi*, 622 F.3d at 758 (holding that although the defendant did not "expressly state[] that [it] wanted to do business with Illinois residents, the net result is the same—[the defendant] stood ready and willing to do business with Illinois residents"). This point is confirmed by *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011), where five Justices declined to hold that a foreign defendant selling products through an independent domestic distributor—a level of separation not present here—was subject to specific jurisdiction in the forum State only if it singled out that State when selling to the United States (or the world) as a whole. *See id*. at 890 (Breyer, J., concurring) (declining to adopt the plurality's view that a defendant must "intend to submit to the power of a sovereign" in order to "be said to have targeted the forum," and questioning "what … those standards mean when a company targets the world by selling products from its Web site") (alteration and internal

quotation marks omitted); *id.* at 898 (Ginsburg, J., dissenting) (reasoning that "a foreign manufacturer who targeted the United States (including all the States that constitute the Nation) as the territory it sought to develop" sufficiently targeted the State where the injury occurred); *see also Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 10 (1st Cir. 2018) (joining the Fifth, D.C., and Federal Circuits in deeming Justice Breyer's concurrence in *J. McIntyre* to be the controlling opinion under *Marks v. United States*, 430 U.S. 188, 193 (1977)). Such a rule would lead to the absurd result that a foreign defendant who committed state law torts while conducting business indiscriminately across all fifty States could be subject to jurisdiction in none.

Like the defendants in *uBid* and *Hemi*, who subjected themselves to jurisdiction in Illinois by operating websites that allowed Illinois users to submit payment online in exchange for services or goods, *see uBID*, 623 F.3d at 428 (explaining that "customers go to" the defendant's website, "register for … parked page or cash parking services," and then "pay a fee"); *Hemi*, 622 F.3d at 757 (noting that "the defendant maintained commercial websites through which customers could purchase cigarettes"), Karpeles encouraged users to create and maintain accounts on Mt. Gox's online platform, Doc. 245 at ¶¶ 13-14, 20. As a result, Karpeles—who was responsible for the security of assets that users like Greene and Motto placed with Mt. Gox, Doc. 245 at ¶¶ 19 ("Karpeles controlled all aspects of Mt. Gox's business from the ground up."), 21 ("[Karpeles was] the sole controlling force behind Mt. Gox and the designer of its software … .")—served in a position of trust that gave rise to ongoing obligations toward and interactions with Mt. Gox users and their property. *See uBID*, 623 F.3d at 431 n.3 (explaining in the online context that courts must examine "the nature, quality, and quantity of the contacts, as well as their relation to the forum state") (internal quotation marks omitted); *see also Burger King*, 471 U.S. at 473 ("[W]e have emphasized that parties who reach out beyond

14

one state and create continuing relationships and obligations with the citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities.") (internal quotation marks omitted).

Relying on Karpeles's promises about Mt. Gox's security, Doc. 245 at ¶¶ 13-14; Doc. 11-2, Motto deposited $1,000 into his Mt. Gox account from an Illinois bank account, and Greene amassed $25,000 through online bitcoin transactions from which Mt. Gox earned fees. Doc. 245 at ¶¶ 50, 71-72. Greene and Motto's contacts with the exchange were not random, isolated, or fortuitous, but rather the product of Mt. Gox's virtual presence in Illinois, as some 7,056, or about 1.5%, of the addresses associated with Mt. Gox accounts came from Illinois. Doc. 392-1 at ¶ 13; *see Keeton*, 465 U.S. at 774 ("[R]egular monthly sales of thousands of magazines cannot by any stretch of the imagination be described as random, isolated, or fortuitous."); *uBID*, 623 F.3d at 427 ("All of this marketing has successfully reached Illinois consumers, who have flocked to [the defendant's website] in the hundreds of thousands and sent many millions of dollars to the company each year."); *Hemi*, 622 F.3d at 757-58 (holding that the defendant was subject to personal jurisdiction in Illinois where an in-state user "create[d an] account[]," entered an Illinois zip code, and "purchase[d] cigarettes" through the defendant's website).

Karpeles retorts that unlike the defendant in *Hemi*, which targeted only 49 States for sales, he targeted all fifty States, and that unlike the defendant in *uBID*, he did not blanket Illinois with physical and television advertisements. Doc. 392 at 8. Neither distinction alters the outcome here. Accepting Karpeles's first argument would resurrect the overly stringent targeting requirement rejected by the Seventh Circuit in *uBID*, 623 F.3d at 428, and *Hemi*, 622 F.3d at 758, and, as alluded to above, lead to the absurd result that a defendant conducting business in a handful of States, or even 49 States, is amenable to suit in each of those States, but

that a defendant with substantial business nationwide is amenable to suit only in his home State(s). *See Hemi*, 622 F.3d at 760 ("Hemi wants to have its cake and eat it, too: it wants the benefit of a nationwide business model with none of the exposure."). And although the defendant's "place[ment of] physical ads in particular Illinois venues" was relevant to the jurisdictional analysis in *uBID*, the Seventh Circuit made clear that "the contacts supporting specific jurisdiction can take many different forms." 623 F.3d at 426, 428. In sum, even if the Illinois market was "simply one among many, a place of no particular interest to [him]," Karpeles "purposefully availed [him]self" of that market by operating an exchange that generated thousands of Illinois accounts and by purporting to safeguard the assets of Greene, Motto, and the other Illinois users. *Id*. at 428-29.

Additionally, before Mt. Gox ceased operations on February 24, 2014, Greene and Motto notified the Karpeles-managed user support desk of their Illinois connection. Doc. 10 at ¶ 6 (Greene averring that he provided "proof of [his] address" to Mt. Gox customer service "promptly" after February 10, 2014); Doc. 295-2 at 14-15 (Motto testifying that he "verif[ied]" his Mt. Gox account in early 2014); Doc. 245 at ¶¶ 71-72, 74 (Plaintiffs alleging that Motto communicated with Mt. Gox's customer service about his transfer of funds from Illinois). Even though Greene and Motto (like all users) would be unable to withdraw the sums they had amassed or deposited on the exchange, Karpeles authorized responses from the customer service desk that concealed this reality and implied that the exchange was operating as usual. Doc. 10 at ¶ 6 (Greene averring that on February 24, within hours of when the exchange ceased operations, he was told only "that [his] account had been verified"); Doc. 245 at ¶ 75 (Plaintiffs alleging that on February 24, customer service told Motto that they were investigating his deposit). These communications reinforced Karpeles's public representations that the February 7 halt to

withdrawals and February 24 shutdown were only temporary interruptions. Doc. 245 at ¶¶ 35 ("In February 2014, Karpeles made numerous representations to the public and to Mt. Gox users that the withdrawal issues were only temporary and that user assets were safe."), 41 (alleging that users were notified shortly after the February 24 shutdown that "a decision was taken to close all transactions [on the exchange] *for the time being*") (internal quotation marks omitted).

Karpeles discounts the interactions with Greene and Motto because they occurred after withdrawals from Mt. Gox were halted on February 7. Doc. 392 at 10; Doc. 394 at 4, 6. But under Seventh Circuit precedent, "repeated communications" that continue to conceal the "initial fraud" by "reassur[ing users] that there was no reason to cancel [their deposits] and demand a refund … are relevant to the evaluation of [Karpeles's] minimum contacts with" Illinois. *Felland*, 682 F.3d at 675-76; *see* Doc. 245 at ¶¶ 58 (Plaintiffs alleging that "[h]ad Greene known that … the security of Mt. Gox had been compromised, or that Karpeles was preparing to go offline and declare bankruptcy," Greene "would have taken immediate steps to withdraw" from the exchange), 77 (same, as to Motto). Online communications in furtherance of an allegedly fraudulent scheme can create jurisdictional contacts just like "mailed letters" and "phone calls." *Felland*, 682 F.3d at 676 n.3 (noting that the defendant "purposefully sent these emails to Wisconsin residents knowing that they would most likely be read and have their effect in Wisconsin"); *see also Levin v. Posen Found.*, 62 F. Supp. 3d 733, 740 (N.D. Ill. 2014) ("[E]mails may be properly considered in minimum contacts analyses, especially if they were purposefully sent to a forum resident knowing that they would most likely be read in the forum.") (internal quotation marks omitted).

Although Karpeles did not himself make the alleged misrepresentations to Greene and Motto, it is enough that he (allegedly) directed his agents to do so given that the agents had

notice that the communications concerned Mt. Gox's business with individuals in Illinois. *See Felland*, 682 F.3d at 670-71, 676 (finding personal jurisdiction by imputing to the principal of corporate agents the communications made by those agents); *Jacobson v. Equitable Life Assurance Soc'y*, 381 F.2d 955, 960 (7th Cir. 1967) ("The general rule which imputes an agent's knowledge to the principal is well established.") (internal quotation marks omitted). Accordingly, Karpeles cannot avoid jurisdiction because only his agents knew that the allegedly fraudulent communications he directed them to send Greene and Motto related to Mt. Gox's business in Illinois. *See Felland*, 682 F.3d at 678 ("[The defendant] did not initiate the communications encouraging [the plaintiff] to complete the installment payments, but that fact is irrelevant."). Similarly, that Karpeles did not expect Mt. Gox to have thousands of Illinois accounts and did not care to ascertain the origin of each deposit or communication does not deprive the contacts with Greene and Motto in Illinois of their jurisdictional significance. *See J. McIntyre*, 564 U.S. at 883 (plurality opinion) ("This Court's precedents make clear that it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment."); *uBID*, 623 F.3d at 428 (finding jurisdiction where the defendant "intended to reach as large an audience as possible" and "[t]he evidence shows that [its] … campaign … created substantial business … in Illinois").

In sum, because he "purposefully availed [him]self of the Illinois market … through [his] deliberate and continuous exploitation of that market," *uBID*, 623 F.3d at 429, which in turn gave rise to Mt. Gox's business with and communications to Greene and Motto in Illinois, Karpeles has a constitutionally sufficient connection with Illinois to justify the exercise of specific jurisdiction.

## B.     Traditional Notions of Fair Play and Substantial Justice

Karpeles next argues that forcing him to defend this suit in Illinois would offend "traditional notions of fair play and substantial justice" because he cannot presently leave Japan and because Plaintiffs may participate in Mt. Gox's ongoing Japanese civil rehabilitation proceedings.  Doc. 392 at 12-13.  The factors relevant to the fair play and substantial justice inquiry are: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Felland*, 682 F.3d at 677 (quoting *Burger King*, 471 U.S. at 476).  "[T]hese factors rarely will justify a determination against personal jurisdiction because there are other mechanisms available … to accommodate the various interests at play."  *Hemi*, 622 F.3d at 760 (internal quotation marks omitted); *see also Felland*, 682 F.3d at 677 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.") (quoting *Burger King*, 471 U.S. at 477).

Karpeles does not dispute that "Illinois has a strong interest in providing a forum for its residents … to seek redress for tort injuries suffered within the state and inflicted by out-of-state actors." *Tamburo v. Dworkin*, 601 F.3d 693, 709 (7th Cir. 2010); *see also Felland*, 682 F.3d at 677 (same).  And neither Illinois's nor Plaintiffs' interests are extinguished by the possibility that Mt. Gox's civil rehabilitation proceedings will partially or fully refund Plaintiffs what they lost on the exchange.  Not only is the possibility of full relief in the Japanese proceedings speculative at this point, Doc. 392-1 at p. 3 ("Former Mt. Gox account holders can submit claims for their

lost funds to the civil rehabilitations [sic] proceedings and will *likely* be reimbursed with bitcoin

and bitcoin cash.") (emphasis added), but such relief would not vindicate the same interests as

would Illinois tort law, which allows for the punitive damages that Plaintiffs seek. *See Jendusa-*

*Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012) (distinguishing the "deterrent efficacy of

tort law" from bankruptcy's aim "to grant a fresh start to the honest but unfortunate debtor")

(emphasis and internal quotation marks omitted); *see also* Patrick E. Mears & Hideyuki Sakai,

*Pacific Overtures: Acquisitions of Financially Distressed Company Assets in Japan*, 23 Am.

Bankr. Inst. J. 34, 58 (Oct. 2004) ("[Japanese] civil rehabilitation proceedings are similar to U.S.

chapter 11 cases.").

Additionally, as Karpeles conceded at the motion hearing, it is unclear whether any State

has a stronger claim than Illinois to jurisdiction over Plaintiffs' claims given that Karpeles

operated a worldwide exchange that did not target individual States. As a result, if Illinois could

not exercise jurisdiction over Karpeles, Greene and Motto likely would need to obtain relief in

Japan, which would impose a significant burden on them. *See Felland*, 682 F.3d at 677 (noting

that the plaintiff "might well face a heavier burden if forced to litigate out of state himself

because the defendants are spread across two different jurisdictions, one of which is a foreign

country"); *Creative Calling Solutions, Inc. v. LF Beauty, Ltd.*, 799 F.3d 975, 982 (8th Cir. 2015)

("While defending a suit in Iowa would be burdensome for [the Hong Kong defendant],

obtaining relief through litigation in Hong Kong would be burdensome for [the Iowa plaintiff].").

True enough, Karpeles faces a burden litigating in Illinois because he is presently

confined to Japan. *See Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114

(1987) ("The unique burdens placed upon one who must defend oneself in a foreign legal system

should have significant weight in assessing the reasonableness of stretching the long arm of

personal jurisdiction over national borders.").  But the burden faced by Karpeles—his confinement to Japan—arises from his alleged Mt. Gox-related misconduct.  Doc. 405-5 at 1 ("[Karpeles] faces charges of embezzling … over $3 million[] from the [Mt. Gox] exchange and fraudulently manipulating Mt. Gox data.").  And Karpeles cites no authority for the proposition that confinement in a foreign country for the alleged conduct underlying a civil suit makes litigating that suit in the forum State unconstitutionally unfair, thereby forfeiting the point.  *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 668 n.3 (7th Cir. 2008) ("We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority … forfeits the point.") (internal quotation marks omitted).  Even putting aside forfeiture, "common-sense principle[s]" preclude Karpeles from "tak[ing] advantage of his own [alleged] wrong" to avoid suit in Illinois.  *Streit v. Metro. Cas. Ins. Co.*, 863 F.3d 770, 774 (7th Cir. 2017) (internal quotation marks omitted).  In any event, there are accommodations, including remote depositions under Rule 30(b)(4) and trial testimony by contemporaneous transmission under Rule 43(a), that remain "options to address this concern short of denying personal jurisdiction entirely."  *Felland*, 682 F.3d at 677 n.4.

Although Karpeles mentions the difficulty of "compelling evidence … from a third-party witness in Japan for a case litigated in an American court," Doc. 394 at 12 (internal quotation marks omitted), he forfeited that point for purposes of this motion by not raising it until his reply brief.  *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue.").  In any event, Karpeles's truncated discussion of the issue fails to

show that court could not accommodate the challenges inherent in obtaining evidence in Japan or that any difficulties impose a constitutional impediment to jurisdiction.

In sum, because Karpeles allegedly "set up an expansive, sophisticated commercial venture online" that "conduct[ed] business nationwide and was apparently successful in reaching customers across the country …, [t]here is nothing constitutionally unfair about allowing Illinois, a state with which [Karpeles] had sufficient minimum contacts, to exercise personal jurisdiction over" him. *Hemi*, 622 F.3d at 760; *see also uBID*, 623 F.3d at 433 ("Now [the defendant] is being called to account for alleged harm to an Illinois resident arising directly from the services [it] provides to its Illinois customers … . There is no unfairness in requiring [the defendant] to defend that lawsuit in the courts of this state … .").

### C.  Whether the Fiduciary Shield Doctrine Defeats Personal Jurisdiction

Finally, Karpeles argues that the fiduciary shield doctrine defeats personal jurisdiction over him in Illinois. Doc. 392 at 13-16. "[R]ecognized by the courts of many states including Illinois," the fiduciary shield doctrine "denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal." *Rice v. Nova Biomed. Corp.*, 38 F.3d 909, 912 (7th Cir. 1994) (citing *Rollins v. Ellwood*, 565 N.E.2d 1302, 1318 (Ill. 1990)). The import of the doctrine is that even where, as here, federal due process would permit the exercise of personal jurisdiction over a defendant, the fiduciary shield may preclude it. *See Hardin Roller Corp. v. Universal Printing Mach., Inc.*, 236 F.3d 839, 842 (7th Cir. 2001).

"[T]he central issue under the fiduciary shield doctrine [is] 'whether a defendant's conduct in Illinois was a product of, and was motivated by, his employment situation and not his personal interests.'" *Fletcher v. Doig*, 125 F. Supp. 3d 697, 718 (N.D. Ill. 2014) (quoting *Fernal*

*v. Square D Co.*, 903 N.E.2d 32, 38 (Ill. App. 2009)).  Put another way, if the employee's "action in coming into Illinois … was done solely on behalf of [his employer], he is under the fiduciary shield … regardless of whether he exercised discretion rather than merely carrying out precise orders mechanically." *Rice*, 38 F.3d at 912.  Accordingly, Plaintiffs may overcome the fiduciary shield by showing that Karpeles's presence in Illinois was motivated at least in part by his personal interests. *See Hardin Roller Corp.*, 236 F.3d at 842 ("One of the doctrine's conditions is that the person's business in the [forum] state be *solely* as a fiduciary of another person, who is liable as a principal.") (emphasis added); *Rice*, 38 F.3d at 912-13 (explaining that "[t]he [fiduciary] shield is withdrawn if the agent was acting also or instead on his own behalf" and that personal interest "created or exacerbated the [alleged] harm").

Plaintiffs contend that a senior executive like Karpeles with substantial equity in Mt. Gox had a sufficient personal interest in the firm's actions to overcome the fiduciary shield.  Doc. 393 at 11-12.  Karpeles does not respond to this contention, Doc. 394 at 13-14, thereby forfeiting the point.  *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue … .").  Even putting aside forfeiture, Plaintiffs are correct that Karpeles's substantial equity interest in Mt. Gox—ultimate control of 88% of Mt. Gox's shares—gave him a personal interest in Mt. Gox's actions in Illinois.  *See Mission Measurement Corp. v. Blackbaud, Inc.*, 287 F. Supp. 3d 691, 709-10 (N.D. Ill. 2017) (St. Eve, J.) (holding that the fiduciary shield doctrine did not preclude jurisdiction where the defendants "each had a personal financial interest in [the defendant-corporation's] relationship with the [plaintiff], namely, that they held equity interests in the [defendant-

corporation]" and would "earn at least one percent of the total purchase price" at issue); *Sommese v. Am. Bank & Trust Co.*, 2012 WL 3006824, at *3 (N.D. Ill. July 23, 2012) ("To ascertain whether an individual's personal interests motivated his actions, courts look at a number of factors including the extent to which the individual seeking protection under the doctrine is a shareholder or has a direct financial stake in the corporation's health.") (collecting cases).

Karpeles contends that his fiduciary shield may be overcome only if Plaintiffs show that Mt. Gox was his "alter ego." Doc. 392 at 14-16; Doc. 394 at 13-14. That is wrong, as defeating the fiduciary shield for purposes of exercising personal jurisdiction does not require a plaintiff to show that it could pierce the defendant's employer's corporate veil for purposes of establishing liability. *See Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 903 (2d Cir. 1981) ("The fiduciary shield doctrine … is not concerned with liability. It is concerned with … the fairness of asserting jurisdiction over a person who is acting solely in the interests of another."); *My Canary LLC v. Susieair, LLC*, 2017 WL 622235, at *3 (N.D. Ill. Feb. 15, 2017) ("[I]t is a defendant's suit-related contacts with the forum that create specific jurisdiction, and a finding of personal jurisdiction does not require piercing the corporate veil.") (citation omitted) (citing cases); *see also GCIU-Emp'r Ret. Fund*, 565 F.3d at 1023 ("[J]urisdiction and liability are two separate inquiries.") (internal quotation marks omitted).

Accordingly, Karpeles's ultimate ownership of 88% of Mt. Gox, Doc. 392-1 at ¶ 6, deprives him of the fiduciary shield where, as here, Plaintiffs allege that he propped up Mt. Gox's value through intentionally fraudulent representations that he made and directed, Doc. 245 at ¶ 115. *See My Canary*, 2017 WL 622235, at *3 ("Exceptions to the fiduciary shield are found … where the defendant is a high-ranking company … shareholder with … a direct financial

stake in the company."); *Sommese*, 2012 WL 3006824, at *4 ("[T]he determinative factor in considering whether an individual's pecuniary interests may have motivated [his] actions is the individual's status as a shareholder, not merely as an officer or director.") (internal quotation marks omitted).  Moreover, Plaintiffs' allegations that Karpeles intentionally failed to "safeguard or protec[t] his users' bitcoins and Fiat Currency" and misrepresented the exchange's security for "his own personal gain," Doc. 245 at ¶¶ 112-113, represent another personal interest sufficient to lift the fiduciary shield and to allow the exercise personal jurisdiction over Karpeles in Illinois. *See Rice*, 38 F.3d at 912 (recognizing that "pecuniary" interests are "personal interests" under the fiduciary shield doctrine).

## Conclusion

Karpeles's motion to dismiss for want of personal jurisdiction is denied.  Karpeles shall answer the operative complaint by April 2, 2019.

March 12, 2019

_____
United States District Judge