**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GREGORY GREENE, individually and on
behalf of all others similarly situated,

*Plaintiffs*,

v.

MARK KARPELES, an individual,

*Defendant*.

Case No. 1:14-cv-01437

Hon. Gary Feinerman

Magistrate Judge Susan Cox

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.      **INTRODUCTION** ........................................................................................ 1

II.    **FACTUAL BACKGROUND** ...................................................................... 2

      A.    **Mt. Gox, Mark Karpeles, and the Exchange's unpublicized bitcoins shortages** ........................................................................................ 2

      B.    **Mt. Gox's Terms of Use** ................................................................. 4

      C.    **Gox Bot: Addressing Insolvency with Fraud** .......................... 5

      D.    **The Ongoing Asset Shortages and Misinformation Campaigns** ...................... 7

      E.    **Mr. Greene's Experiences and Allegations** ............................. 9

III.   **ARGUMENT** ........................................................................................ 10

      A.    **The Evidence Creates Triable Fact Issues on Each Element of Plaintiff's Fraud Claim** ....................................................... 11

            1.    **There is sufficient evidence for a jury to conclude that Karpeles knowingly made false statements of material fact** ............................... 12

            2.    **There is sufficient evidence for a jury to conclude that Karpeles intended to deceive Mt. Gox users** ......................................... 15

            3.    **There is sufficient evidence for a jury to conclude that Greene relied on Karpeles's representations and was damaged as a result** ............. 16

      B.    **Karpeles Cannot Invoke Rule 9(b) To Avoid His Own Statements, Testimony, and Admissions** ................................................. 18

IV.    **CONCLUSION** ...................................................................................... 22

2

## **TABLE OF AUTHORITIES**

**United States Supreme Court Cases:**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................. 10

**United States Circuit Court of Appeals Cases:**

*Ash v. Wallenmeyer*,
    879 F.2d 272 (7th Cir. 1989) ..................................................21-22

*Chessie Logistics Co. v. Krinos Holdings, Inc.*,
    867 F.3d 852 (7th Cir. 2017) ...................................................... 19

*Cornielsen v. Infinium Capital Mgmt., LLC*,
    916 F.3d 589 (7th Cir. 2019) ..................................................18-19

*Crichton v. Golden Rule Ins. Co.*,
    576 F.3d 392 (7th Cir. 2009) ...................................................... 12

*Jenson v. Fiserv Tr. Co.*,
    256 F. App'x 924 (9th Cir. 2007) ................................................ 14

*Samuels v. Wilder*,
    871 F.2d 1346 (7th Cir. 1989) ................................................ 19, 20

*Torres v. S.G.E. Mgmt., LLC*,
    838 F.3d 629 (5th Cir. 2016) ...................................................13-14

*Waste Mgmt. Holdings v. Mowbray*,
    208 F.3d 288 (1st Cir. 2000) ...................................................... 11

*Wigod v. Wells Fargo Bank, N.A.*,
    673 F.3d 547 (7th Cir. 2012) ...................................................11-12

**United States District Court Cases:**

*4MVR, LLC v. Warren W. Hill Constr. Co., Inc.*,
    No. 12-10674-DJC, 2016 WL 4775451 (D. Mass. Sept. 13, 2016) ................................ 20

*Alhassid v. Bank of Am., N.A.*,
    2015 WL 11216721 (S.D. Fla. Sept 14, 2015) ................................................ 11

*Audet v. Fraser*,
    332 F.R.D. 53 (D. Conn. 2019) ...................................................... 14

*Dyson, Inc. v. Syncreon Tech. (Am.), Inc.*,
  No. 17 C 6285, 2019 WL 3037075 (N.D. Ill. July 11, 2019) ......................................... 18

*E.I. Du Pont de Nemours & Co. v. Abbott Labs.*,
  No. 90 C 7338, 1992 WL 245642 (N.D. Ill. Sept. 18, 1992) ......................................... 20

*Firstar Bank, N.A. v. Faul Chevrolet, Inc.*,
  249 F. Supp. 2d 1029 (N.D. Ill. 2003) ...................................................... 15, 16

*Hussaini v. G4S Secure Sols. (USA) Inc.*,
  379 F. Supp. 3d 679 (N.D. Ill. 2019) ........................................................... 10

*Khasin v. Hershey Co.*,
  2014 WL 1779805 (N.D. Cal. May 5, 2014) ................................................... 11

*Linkepic Inc. v. Vyasil, LLC*,
  370 F. Supp. 3d 906 (N.D. Ill. 2019) ........................................................... 12

*Mendez v. The Radec Corp.*,
  260 F.R.D. 38 (W.D.N.Y. 2009) ................................................................. 11

*Minter v. Wells Fargo Bank, N.A.*,
  274 F.R.D. 525 (D. Md. 2011) .................................................................. 17

*Oglesby v. Rotche*,
  1994 WL 142867 (N.D. Ill. Apr. 18, 1994) ................................................... 11

*Peterson v. H&R Block Tax Servs., Inc.*,
  174 F.R.D. 78 (N.D. Ill. 1997) ................................................................. 17

*United States ex rel. Landis v. Tailwind Sports Corp.*,
  234 F. Supp. 3d 180 (D.D.C. 2017) ........................................................... 19

**State Supreme Court Cases:**

*Connick v. Suzuki Motor Co. Ltd.*,
  174 Ill. 2d 482 (1996) .......................................................................... 11

**State Appellate Court Cases:**

*Chicago Export Packing Co. v. Teledyne Indus., Inc.*,
  207 Ill. App. 3d 659 (1990) .................................................................... 17

*Chicago Title & Tr. Co. v. First Arlington Nat'l Bank*,
  118 Ill. App. 3d 401 (1983) .................................................................... 15

4

*Cincinnati Ins. Co. v. Guccione*,
    308 Ill. App. 3d 220 (1999) ............................................................................ 15

*Kitzes v. Home Depot USA, Inc.*,
    374 Ill. App. 3d 1053 (2007) .......................................................................... 13

*Miller v. William Chevrolet/GEO, Inc.*,
    326 Ill. App. 3d 642 (2001) ..................................................................... 13, 14

*Schrager v. N. Cmty. Bank*,
    328 Ill. App. 3d 696 (2002) ............................................................................ 16

**Rules and Statutory Provisions:**

Fed. R. Civ. P. 56 ................................................................................................. 10

## I.      INTRODUCITON

From the beginning, this case has centered on Defendant Mark Karpeles's overt misrepresentations that Mt. Gox ("Mt. Gox" or the "Exchange") was a safe and secure bitcoin exchange. As Plaintiff Gregory Greene alleged in his First, Second, Third, and Fourth Amended Complaints, Karpeles represented, through the Mt. Gox Terms of Use (the "Terms of Use" or "TOU"), that the Exchange was a fundamentally safe and secure place to deposit, store, and trade bitcoins and fiat currency with other users. (*See*, *e.g.*, dkt. 36 at ¶¶ 26, 101; dkt. 146 at ¶¶ 12, 90; dkt. 205 at ¶¶ 13, 101; dkt. 245 at ¶¶ 14, 112.) The goal of the Terms of Use was to instill confidence in Exchange members. They represented:

- *All* users' bitcoin and cash deposits on Mt. Gox would be held by the Exchange of such users' behalf;

- *Every* trade initiated on Mt. Gox would involve the exchange of *actual* bitcoins and *actual* cash balances;

- *Every* trade on Mt. Gox would be between anonymous Exchange users (rather than between a user and Mt. Gox itself); and, more generally,

- Mt. Gox would "use all reasonable care and skill" in facilitating trades on the Exchange and would "comply with any and all laws and regulations relating to" running a bitcoin exchange."

(TOU (Ex. J[1]) at PageID#131.)

But as Plaintiff alleged and the undisputed facts now confirm, these basic representations were not true. Mt. Gox did not hold "all" assets deposited by its members because, from the very beginning of Karpeles's tenure as CEO, the Mt. Gox lacked assets to satisfy its users' deposits. This deficit was the result of a series of undisclosed hacks and other data security events leading to the loss of bitcoin from the site. As Karpeles explained, these events and shortages were kept

---

[1]      All references to exhibits refer to exhibits attached to the Declaration of Benjamin S. Thomassen ("Thomassen Decl.") filed contemporaneously herewith.

secret from Mt. Gox users for a simple reason: transparency "would have killed the exchange . . . [because] people wouldn't use Mt. Gox anymore." (Karpeles Dep. Tr. (Ex. A) at 64:11-20.) In addition, Karpeles testified that—contrary to the TOU's various representations and requirements concerning user-to-user trades—he routinely used an automated trading bot to acquire users' bitcoins and cash using completely fake assets created by his own manipulation of the internal Mt. Gox database. This activity not only hid Mt. Gox's ongoing solvency issues, it created the false impression that there was a high demand for bitcoins on the Exchange, which inflated the price of bitcoin on, and drew additional customers to, Mt. Gox. Karpeles kept this activity a secret as well; until, that is, he faced criminal charges for this behavior in 2019.

Essentially none of this is in dispute, yet Karpeles still insists he is entitled to summary judgment on Plaintiff's fraud claim. He is wrong. The undisputed facts confirm that Greene's theory of fraud is sound and well-supported by the evidence and, contrary to Karpeles's passing suggestion, the *pleading* standards of Rule 9(b) do not relieve Karpeles of the consequences of his conduct or give him a pass to ignore his own deposition testimony.

## II. FACTUAL BACKGROUND

### A. Mt. Gox, Mark Karpeles, and the Exchange's unpublicized bitcoins shortages.

In February 2011, Karpeles purchased Mt. Gox from Jed McCaleb, using his wholly owned company Tibanne KK. (Ex. P.) Following the purchase, Karpeles served as the sole officer and director of both Mt. Gox KK and Tibanne KK. (Def. SOF ¶¶ 4-5.) Just before the purchase agreement was signed, however, a hacker stole $50,000 from Mt. Gox. (Pl. SOAF ¶ 10.) The hack alarmed Karpeles because the loss of assets threatened Mt. Gox's ability to satisfy its users' demands. (*Id.* ¶ 11.) Thus, Karpeles emphasized that he "need[ed] to be 100% sure we will be able to answer any withdrawal request from someone who deposited anything . . .." (*Id.*)

2

Karpeles did not disclose the hack or lost assets to Mt. Gox's customers.[2] (Pl. SOAF ¶ 12.) He then signed the purchase agreement on February 3, 2011. (Def. SOF 7; Ex. P.)

On or around March 3, 2011, another hack occurred. This one resulted in the loss of around 80,000-90,000 bitcoins from the Exchange. (Pl. SOAF ¶ 13.) The loss was a tipping point because, after this point "Mt. Gox was short bitcoins" and Karpeles was never "sure that Mt. Gox would be able to answer any withdrawal requests from someone who deposited anything." (*Id.* ¶ 14; *see also* Ex. A at 52:8 – 54:4.) Karpeles agreed that it was "important for users to know about the [bitcoin shortage]," but decided not to say anything because "Mt. Gox wouldn't get any business and would fail. . . ." (*Id.* ¶¶ 15-16.) He also recognized that if users found out about the bitcoin shortage, "it would cause . . . a 'bank run' . . . [where] [e]veryone [would] try to withdraw bitcoins." (*Id.* ¶ 17.) "Bank runs" were the norm for exchanges that announced shortages; users would demand the return of their investments and the affected exchange would fail. (Expert Report of Carol Goforth (Ex. O) ¶¶ 28-32.) But Karpeles kept quiet because, being "short bitcoins," Mt. Gox could not meet such demands from its users. (Ex. A at 69:9-23.) He also knew that disclosing the bitcoin shortage would affect him personally:

> Q: Did you have personal feelings about whether the information should be disclosed?
>
> **A: Well, I come from a security -- an IT security background, so typically I am for this kind of disclosure. But doing so in this specific case would have a lot of negative impacts. Especially should anyone try to sue Jed, Tibanne would be responsible for it so it would not only cause Mt. Gox and but also Tibanne and most likely wouldn't be an easy situation for me either.**
>
> Q Because of your relationship with Tibanne; right?
>
> **A Yes.**

---

[2] It is disputed whether these stolen assets were recovered: Karpeles testified that Mr. McCaleb recovered them but McCaleb says that he made no such efforts. (Ex. A at 44:7-17; McCaleb Decl. ¶ 3.)

(Ex. A 70:2-14; Pl. SOAF ¶ 18.)

So, as a solution, Karpeles decided to keep quiet. (Pl. SOAF ¶ 19.) As time went on, Mt. Gox experienced more incidents that led to the loss of bitcoins. (*Id.* ¶ 22.) But Karpeles's policy of secrecy remained the same: If the customer base didn't know about a given loss of bitcoins, he would keep it a secret. (*Id.* ¶ 23.) On one occasion, however, a hacker's methods were apparent to anyone who was paying attention: He or she accessed Mt. Gox using administrative credentials and placed a fraudulent buy order so large that it caused the price of bitcoin to plummet to nearly nothing. (Pl. SOAF ¶ 20.) Unable to maintain secrecy over this breach, Karpeles reassured Mt. Gox's userbase, first by directing McCaleb to falsely represent to users that "[e]veryone's bitcoins [were] still safe on the site . . . [and that Mt. Gox was] still holding all the coins safely in reserve," (Pl. SOAF ¶¶ 20-21), and then later by assuring users that any lost bitcoins would "be replaced at Mt. Gox's expense." (Ex. O ¶ 34 (internal quotations omitted).) But "[t]here was [never a] corresponding acknowledgment that the BTC and cash balances on the Mt. Gox exchange were already in a deficit position as a result of the 80,000 BTC theft that had occurred March 3, 2011." (*Id.* ¶ 35.)

### B.  Mt. Gox's Terms of Use.

Karpeles directed the drafting and dissemination of Mt. Gox's Terms of Use. (Pl. SOAF ¶ 2.) He explained that developing the Terms of Use was his "priority" for Mt. Gox. (Ex. A at 91:9-24.) Each Mt. Gox customer had to read and agree to the Terms of Use. (Pl. SOAF ¶ 1.) There was only one version that applied to each of Mt. Gox's U.S. customers. (*Id.*)

The Terms of Use explained that Mt. Gox was a safe and secure place to deposit, hold, and trade bitcoins and currency. To that end, the Terms of Use purported to protect both buyers and sellers of bitcoins by **(i)** keeping trades anonymous, (Pl. SOAF ¶ 3); **(ii)** not allowing either

4

party to back out of trade agreements made at an agreed upon price (*e.g.*, in the event of market swings—which were commonplace—before a transaction was complete), (Pl. SOAF ¶ 4); **(iii)** representing that all trades on the Exchange would be "with other Members" and never with Mt. Gox, which guaranteed that buyers and sellers of bitcoin had access to the same, public information (as opposed to Mt. Gox, which had insider information regarding the supply and demand of bitcoin on the site[3]), (Pl. SOAF ¶ 5); **(iv)** requiring all that all trades be made with *real* currency and *real* assets, (Pl. SOAF ¶ 6); **(v)** assuring users that their assets were secure on the Exchange, and could be recovered on demand, (Pl. SOAF ¶ 7); **(vi)** promising that Mt. Gox would "use all reasonable care and skill" in facilitating trades on the Exchange and "comply with any and all laws and regulations relating to" running a bitcoin exchange, (Pl. SOAF ¶ 8); and **(vii)** explaining that Mt. Gox would suspend accounts that contravened the TOU, (Pl. SOAF ¶ 9).

Read as a whole—and contrary to the prior iteration of Mt. Gox, which had no terms of use at all—the Terms of Use presented Mt. Gox as a legitimate and secure place to deposit, store, and trade bitcoins and cash. (*See* Ex. A at 97:19-24 (explaining that the Terms of Use "set the conditions under which customers would interact with Mt. Gox").) Indeed, Karpeles pointed to the TOU as a reason to choose Mt. Gox over its competitors. (*See*, *e.g.*, Ex. G ("[Q:] Does [MtGox] maintain [a] full reserve? (i.e., [MtGox] controls bank accounts with all customer USD funds and controls wallets with 100% of BTC funds. . . [?]) [Karpeles:] **As described in our Terms of Service, customer funds are kept in full**. . . .") (emphasis in original).)

### C.    Gox Bot: Addressing Insolvency with Fraud.

Soon after the March 2011 hack, Karpeles considered options for addressing Mt. Gox's

---

[3]    Early exchanges between Karpeles and McCaleb were full of such insider insights. (*See*, *e.g.*, Ex. L at Greene_001244 ("Mark Karpeles: I don't see [the price of bitcoin] going down to $1.5 this weekend … [Jed McCaleb:] if I sell 20K they will").)

bitcoin deficit. He first wanted to keep quiet and use the fees Mt. Gox earned on trades to buy back the bitcoin deficit. (Pl. SOAF ¶ 27.) But as the price of bitcoin continued to rise, Karpeles decided on another option: he would fill the gap by taking—but not paying for—bitcoins from Mt. Gox's own customers. (*Id.* ¶¶ 28-30.)

Enter Gox Bot. The Exchange had previously used an automated trading account—internally called "Gox Bot"—to buy bitcoins from users. (*Id.* ¶ 26.) When McCaleb ran Mt. Gox, the Gox Bot account was funded with commissions that Mt. Gox earned on trades, which were then used to buy bitcoins on the Exchange. (*Id.*) But once Karpeles took over, he "disabled" the funneling of Mt. Gox's fees to the Gox Bot account. (*Id.* ¶ 28.) Instead, he would "credit" Gox Bot with bitcoin or cash balances by manipulating Mt. Gox's internal database. (*Id.* ¶ 29.) These "loans" continued to skew the amount of actual assets held by Mt. Gox versus the assets reflected in the Exchange's database. (Ex. L at Greene_001260 (Karpeles noting that calculating Mt. Gox's assets would "be a pain" because "goxbot's balance is 'wrong.' ").) With its balance of fake funds, Gox Bot would "purchase" bitcoins from or "sell" bitcoins to Mt. Gox customers. (Pl. SOAF ¶ 30.) It continued to acquire assets from users until Mt. Gox's collapse. (*Id* ¶ 31.)

All this time, Karpeles kept Gox Bot a secret. It was never disclosed to Mt. Gox's customers. (*Id.* ¶ 31.) It is even disputed whether Gox Bot was even known to other Mt. Gox employees. (*Id.* ¶ 32.) Thus, in any given transaction, no user could have known whether he or she was trading his or her *actual* bitcoins or cash with other users and for *actual* cash or bitcoins, or with Gox Bot and its fake cash and bitcoin balances.[4] (*Id.* ¶¶ 3, 5-6, 31.)

Karpeles was unconcerned about this. As he explained, once bitcoins or cash were deposited with Mt. Gox, those assets became "indistinguishable" from any other money in its

---

[4] It is also undisputed that "the Gox Bot activity . . . affected the price of bitcoin on the exchange" (*i.e.*, by increasing the apparent demand for bitcoin on the Exchange). (Goforth Decl. ¶ 43; Pl. SOAF ¶ 34.)

accounts. (Ex. A at 225:8 – 226:12.) Thus, according to Karpeles, from the user's perspective, so long as withdrawal requests never exceeded users' deposits, the currency backing any trade on the Exchange and any bitcoin or cash deficits were immaterial, because any funds, from whatever source, could be used to satisfy a given withdrawal request. (*Id.* at 226:13-227:5.)

### D.     The Ongoing Asset Shortages and Misinformation Campaigns

The ability to manipulate Gox Bot's account balances, among other things, helped Karpeles ignore Mt. Gox's growing cash and bitcoin deficits. Mt. Gox continued to bleed assets after the June 2011 hack that Karpeles acknowledged. In addition to the losses of bitcoin already mentioned (among others (*see*, *e.g.*, Ex. Q)), in May 2013, Mt. Gox's American subsidiary, Mutum Sigillum, LLC, had two accounts seized by the United States because it was using a payment processor that it failed to register with the federal government. The total currency lost was around $5 million. (Exs R, S.) And despite everything laid out so far, this story told by the record in this case is incomplete: When Mt. Gox declared bankruptcy in 2014, in addition to the bitcoin debt of nearly 750,000 BTC that prompted the filing, internal documents suggested that its currency liabilities outstripped its cash on hand by an estimated $33 million.[5] (Ex. U.)

Karpeles's awareness of Mt. Gox's ongoing assert shortage also casts other events in a new light and, when viewed from this perspective, later episodes appear to demonstrate Karpeles's increasing dedication to preserving a façade of safety and security at Mt. Gox and keeping information about Mt. Gox's asset shortfalls from becoming public. On two occasions in 2012, for instance, Karpeles put out so-called "Transparency Reports" purporting to detail Mt. Gox's financial condition. The presentations paint a rosy picture of Mt. Gox by, among other

---

[5]     By no small coincidence, at his criminal trial, Karpeles was found guilty of altering Mt. Gox's electronic records—principally by crediting Gox Bot's account with false currency—to falsely inflate the company's holdings by $33.5 million. (Ex. T.)

things, omitting any information about the Exchange's unresolved bitcoin and cash debts. (*See* Exs V, W.) Both reports also assure users that "Mt. Gox relies on the most advanced standards when it comes to our customers security" including that "90-98% of Bitcoins entrusted to Mt. Gox are stored safely offline." This statement was, at a minimum, reckless: Karpeles acknowledged that he never audited Mt. Gox's offline storage and, indeed, that he designed the system so that it never could be audited, so claims about specific amounts of bitcoin were necessarily impossible to make. (Pl. SOAF ¶ 24.) Indeed, Karpeles publicly admitted that it is "very possible" he never checked Mt. Gox's offline storage because he wanted to hide the Exchange's bitcoin deficit. (*Id.* ¶ 25.) And in any event, more than 20% of Mt. Gox's bitcoin wasn't stored in the cold wallets because Karpeles forgot to move it there. (Ex. A 154:6-12.)

On February 28, 2013, Mt. Gox announced a new partnership with a company called CoinLab, which Karpeles touted as "a huge win" for American and Canadian users. (Ex. Y.) The terms of the agreement called for CoinLab to serve as Mt. Gox's exclusive payment processor for the United States and Canada in exchange for a hefty portion of the transaction fees incurred by North American Mt. Gox users. (*See* Ex. Z.) But the partnership fell apart after Mt. Gox refused to grant CoinLab server access or provide necessary customer information. (Ex. AA at ¶¶ 2, 31-34.) The parties sued and countersued. According to the litigation, the stated reason for Mt. Gox's refusal to deal further with CoinLab was that CoinLab had failed to secure appropriate registration in all fifty states, despite that CoinLab possessed the necessary federal registration. (*Id.* ¶ 16.) The evidence strongly indicates that this explanation was pretextual: For another month, Mt. Gox used a different payment processor that lacked *any* registration as a currency processor. A more plausible explanation is that granting CoinLab the required server access might expose Mt. Gox's precarious financial position, so Karpeles scuttled the deal. And in

8

attempting to rescind the contract with CoinLab, Mt. Gox asked for the return of $63,000 and around 1429 bitcoins. (Ex. AB at 2.) It does not appear that Mt. Gox received those amounts, which added to the Exchange's asset shortfalls.

Shortly after this litigation began, Mt. Gox also ran into trouble with Mizuho Bank. In June 2013, Mizuho terminated Mt. Gox's ability to withdraw currency from its deposit accounts. (Dkt. 374 at 4.) Karpeles acknowledged banking issues and pledged to open new accounts. (Ex. AF.) But all of Mt. Gox's U.S.-based withdrawals were thereafter processed manually through Japan Post Bank, which was nowhere near sufficient to meet demands. (*See*, *e.g.*, dkt. 295-5 at Edelson007121-22.) Karpeles's decision not to open any substitute accounts was never fully explained, but in light the Exchange's asset imbalances, one explanation emerges: he preferred manually initiating withdrawals because that allowed him to monitor the outbound currency flows and ensure that user withdrawal requests never outstripped Mt. Gox's (depleting) assets.

And then there is the existence of Gox Bot itself, which Karpeles refused to acknowledge until his criminal trial several years after the Mt. Gox Exchange's collapse. (SOF ¶ 31.) Following the Exchange's collapse in early 2014, independent researchers concluded, based upon leaked Mt. Gox transactional logs, that there had been suspicious bot-like behavior on Mt. Gox. (Ex. A at 83:3-10; Ex. AC.) Researchers suspected these bots were controlled by Karpeles because the bot used a Mt. Gox account named "MagicalTux," which was Karpeles's online moniker. (Ex. AC at 5.) Despite these public reports and investigations, Karpeles denied the existence of Gox Bot until his criminal trial, where, faced with the evidence collected by Japanese prosecutors, he finally admitted to the Gox Bot's existence and activity. (Ex. AD at 2.)

E.    **Mr. Greene's Experiences and Allegations.**

Gregory Greene joined Mt. Gox in 2012. (Ex. D at Resp. No. 9; dkt. 245 ¶¶ 49-50.) Like

9

every other Mt. Gox customer, Greene reviewed and agreed to the Mt. Gox Terms of Use. (Pl. SOAF ¶ 36; dkt. 245 ¶ 49.) The TOU's representations convinced Greene that the Exchange was secure and he relied on them when deciding to move bitcoins onto Mt. Gox. (Pl. SOAF ¶¶ 36-38; Ex. E at 15:16-24; Ex. F ¶¶ 3-5; dkt. 245 ¶¶ 49-50.) Greene opened an account, purchased bitcoin through a third party, and placed them on the Exchange. (Ex. D at Resp. No. 9.) Greene would not have moved assets onto, or kept them on, Mt. Gox without the TOU's representations of security, nor would he have moved assets onto, or kept them on, Mt. Gox had he known those representations were false. (Pl. SOAF ¶¶ 38-39; Ex. F ¶¶ 3-7; dkt. 245 ¶¶ 58, 119.)

In late 2013, Mr. Greene read that other users were having issues withdrawing bitcoins from the Exchange. (Pl. SOAF ¶ 39.) Concerned, he tried to withdraw everything to a personal bitcoin wallet address. (*Id.*) He was unsuccessful. (*Id.*) As a result, most of his balance was lost when Mt. Gox went offline in February 2014. (Ex. E 33:21 – 33:19; Def. SOF ¶ 39.)

## III. ARGUMENT

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" dispute arises when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. In making this assessment, the Court must "view[] the evidence and draw[] all inferences in favor of" Greene, the nonmoving party. *Hussaini v. G4S Secure Sols. (USA) Inc.*, 379 F. Supp. 3d 679, 682 (N.D. Ill. 2019).

Karpeles is not entitled to summary judgment on Plaintiff's claim for fraud. His own testimony shows that he misrepresented or otherwise withheld material information from Mt.

Gox users pertaining to the Exchange's fundamental security and fitness as a bitcoin exchange. That testimony, standing alone, is sufficient to bring this case to trial. And while Karpeles suggests that his testimony should be ignored, he is wrong. The facts adduced through discovery support the theory that Plaintiff has alleged since the outset of this case: That the representations made in the Mt. Gox Terms of Use were false and that Karpeles concealed information he understood bitcoin users would find material, in order to ensure that Mt. Gox remained a going concern long past the point of insolvency and in an attempt to escape personal liability.[6]

### A. The Evidence Creates Triable Fact Issues on Each Element of Plaintiff's Fraud Claim.

Karpeles implicitly acknowledges that Greene's fraud claim is governed by Illinois law, an admission that is consistent with this Court's earlier rulings. (Dkt. 230 at 29-30.) In Illinois, "the elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co. Ltd.*, 174 Ill. 2d 482, 496 (1996). The law treats the intentional omission or concealment of a material fact as equivalent to a false statement of material fact if the defendant is under a duty to disclose to the plaintiff. *See*

---

[6] By moving for summary judgment before Greene moves for class certification, Karpeles waives the protections of the rule against one-way intervention. *See Oglesby v. Rotche*, 1994 WL 142867, at *3-*4 (N.D. Ill. Apr. 18, 1994); *Khasin v. Hershey Co.*, 2014 WL 1779805, at *3 (N.D. Cal. May 5, 2014) ("Here, it is Defendant who seeks summary judgment prior to a ruling on class certification. Defendant is choosing to waive the potential protection afforded by an early ruling on class certification."); *Mendez v. The Radec Corp.*, 260 F.R.D. 38, 45 (W.D.N.Y. 2009) (noting that a waiver of the one-way intervention rule may be "implied, such as where the *defendant* moves for summary judgment prior to class certification"). But even if waiver were not present here, considerations of "economy and fairness" counsel in favor of staying the motion for summary judgment until after Greene's impending motion for class certification is resolved. *Alhassid v. Bank of Am., N.A.*, 2015 WL 11216721, at *1 (S.D. Fla. Sept 14, 2015); *see Waste Mgmt. Holdings v. Mowbray*, 208 F.3d 288, 299 n.7 (1st Cir. 2000) (suggesting that district courts should "exercise caution" before deciding to resolve summary judgment motions prior to class certification).

*Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012). A duty to disclose applies where there is either a fiduciary relationship or "the defendant makes an affirmative statement that it passes off as the whole truth while omitting material facts that render the statement a misleading 'half-truth,'" *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009), or, similarly, arises when there is "silence *combined* with deceptive conduct," *Linkepic Inc. v. Vyasil, LLC*, 370 F. Supp. 3d 906, 917 (N.D. Ill. 2019).

Even though Plaintiff's ability to access evidence in this case has been severely restricted, Karpeles's deposition testimony and other undisputed evidence show that there is a sufficient basis to present Plaintiff's fraud claim to a jury.

### 1. There is sufficient evidence for a jury to conclude that Karpeles knowingly made false statements of material fact.

The first two elements of fraud—false statements of material fact and defendant's knowledge of their falsity—have ample record support. As detailed above, Karpeles testified that Mt. Gox was effectively insolvent beginning in March 2011. (SOF ¶ 14.) From that point forward, Karpeles understood that covering users' deposits was "impossible." (*Id.* ¶¶ 14-17; Ex. A at 52:8–54:4, 69:1-21, 105:5-15.) But at the same time, Karpeles directed the dissemination of the Terms of Use, which, contrary to the Mt. Gox's actual state of affairs, represented that the Exchange held "*all* monetary sums and *all* Bitcoins deposited by each Member . . . on such Member's behalf." (Ex. J at PageID#131 (emphasis added); *see also* Ex. G (Karpeles emphasizing TOU representation that Mt. Gox customer assets were "kept in full").) Related to the asset shortfall, Karpeles also testified that he regularly acquired bitcoins and fiat currency from Mt. Gox users using fake cash and bitcoin balances. (SOF ¶¶ 26, 29-31; Ex. A at 78:13 – 79:22, 80:16 – 82:3, 239:18 – 240:4.) But again, the Terms of Use explained the opposite, representing that all trades would occur between Exchange users and involve *actual* assets. (SOF

12

¶¶ 5-6.) And Karpeles kept everything a secret: He did not disclose that Mt. Gox was "short" assets or Gox Bot's role in the events. (SOF ¶¶ 12, 19, 23, 31; Ex. O ¶ 35.) Thus, the representations he made via the Terms of Use contained falsehoods or, at the least, half-truths.

Evidence also exists to permit a jury finding of materiality. "A misrepresentation is 'material' if the plaintiff would have acted differently had he been aware of it, or if it concerned the type of information upon which he would be expected to rely when making his decision to act." *Miller v. William Chevrolet/GEO, Inc*., 326 Ill. App. 3d 642, 649 (2001). Materiality is typically judged by an objective standard. *See Kitzes v. Home Depot USA, Inc.*, 374 Ill. App. 3d 1053, 1061 (2007). Here, Karpeles admitted to the materiality of the withheld information and, in turn, the misrepresentations enshrined in the Terms of Use. With respect to Mt. Gox's asset shortfall, Karpeles testified that, if known, the information would (i) cause existing Mt. Gox customers to demand the return of their assets, (ii) cause customers to avoid the Exchange altogether, and, ultimately, (iii) "kill[] the exchange . . . [because] people wouldn't use Mt. Gox anymore." (SOF ¶¶ 15-17; Ex. A 64:11-20, 68:6-24, 69:9-23.) Karpeles's observations are well-taken for several reasons. First, as Karpeles admitted, he did not view the use of fake funds to purchase or sell bitcoin through Gox Bot—conduct that "actively conceal[ed] the true state of the exchange's operations from users" (Goforth Decl. ¶ 43)—as problematic because all users' cash and bitcoins were commingled in central Mt. Gox accounts and withdrawal demands up to a point could be satisfied with any assets from that central pot, regardless of whether a user had sold bitcoin for fake cash. That admission reveals that Mt. Gox was essentially operating as a ponzi scheme, where new users' deposits were used to satisfy older users' withdrawal demands. (*See* Ex. L at GREENE_001256 (Karpeles remarking that Mt. Gox was becoming "a ponzi of its own, [where] the last ones to buy will lose.").) But individuals do not knowingly join ponzi

13

schemes, "[which] are inherently deceptive and operate only by concealing their fraudulent nature." *Torres v. S.G.E. Mgmt., LLC*, 838 F.3d 629, 642 (5th Cir. 2016) (en banc) (discussing pyramid schemes); *see also Jenson v. Fiserv Tr. Co.*, 256 F. App'x 924, 926 (9th Cir. 2007) (discussing ponzi scheme); *Audet v. Fraser*, 332 F.R.D. 53, 81-82 (D. Conn. 2019) (same).

Second, Karpeles understood that the Terms of Use contained "the type of information" one would expect Mt. Gox's users to rely on. Revealing the specific falsehoods within the TOU would have breached the trust that these terms allowed Mt. Gox to forge with its users. (Ex. A at 64:17-65:2; 98:1-5.) For instance, Karpeles conceded that acknowledging that the Exchange had been hacked on several occasions or had a resulting asset shortfall would have "altered" the relationship between Mt. Gox and its users because "knowing whether a network is secure is important to users." (*Id.* at 64:24-66:14.) Karpeles admitted that this holds even for security incidents that are remedied, because "lots of people still [wouldn't] want to use [a] service" due to perceived security weaknesses. (*Id.* at 65:12-21.) Likewise, and consistent with the TOU's representations, Mt. Gox users would have expected that, in making trades, "they were dealing with [] legitimate user[s], with accounts backed by real BTC or fiat currency, and that all transactions reported by the exchange similarly involved or were backed by 'real' assets." (Ex. O ¶¶ 50-51.) But despite understanding the importance of the information to Mt. Gox users, (Ex. A 68:6-24 (agreeing that "it's important for users to know about [the bitcoin shortage]"), Karpeles withheld it. (*Id.* at 52:8 – 54:4.)

Third, history shows that when bitcoin exchange users learned of hacks, user reaction was swift. *See Miller*, 326 Ill. App. 3d at 649-650 (relying on evidence regarding similar purchases to determine that fact was material). As Professor Goforth recounts, on at least four occasions in 2012 and 2013, bitcoin exchanges publicly revealed that they had been hacked and

14

lost assets. (Ex. O ¶¶ 29-32.) In each case, users demanded to retrieve their assets and those demands led in one case to a sale, in another to bankruptcy and other litigation, and in two others to the exchanges ceasing operation. This consistent reaction demonstrates that, no surprise, knowledge of hacks and lost assets is the type of information on which a bitcoin investor would be expected to rely. Indeed, while Greene agreed that no bitcoin exchange would ever be "100% secure," he never would have placed his bitcoins on Mt. Gox had the hacks, bitcoin shortage, or Gox Bot activity been disclosed. (Ex. F ¶¶ 3-7.)

### 2. There is sufficient evidence for a jury to conclude that Karpeles intended to deceive Mt. Gox users.

Likewise, the evidence establishes that the third element of fraud, the defendant's intent to deceive, presents a triable issue. Intent can be proven directly or circumstantially. *Firstar Bank, N.A. v. Faul Chevrolet, Inc.*, 249 F. Supp. 2d 1029, 1044 (N.D. Ill. 2003) (citing *Chicago Title & Tr. Co. v. First Arlington Nat'l Bank*, 118 Ill. App. 3d 401, 410 (1983) (Illinois courts "seldom expect to prove [fraudulent intent] by the admissions of a party and rarely to find direct and positive evidence of the fact."); *Cincinnati Ins. Co. v. Guccione*, 308 Ill. App. 3d 220, 226 (1999) ("Although a party may have no direct evidence of fraudulent intent, circumstantial evidence may give rise to an inference of it. If a reasonable person could draw such an inference, a triable issue exists.").)

Here, Karpeles's fraudulent intent is manifest. He admitted that had users known the truth of Mt. Gox's affairs—that the Exchange lacked assets to satisfy user demands and was using fake funds to acquire such assets from its own customers—"it would have killed the exchange. . . ." (Ex. A at 64:11-20; Pl. SOAF ¶¶ 15-17.) He also admitted that knowing the truth would have been "important for users," but still decided against disclosure because "Mt. Gox wouldn't get any business and would fail" and, on a personal level, he would be sued. (Ex. A at 68:6-24, 70:2-

15

14; Pl. SOAF ¶¶ 15-18.) Thus, by his own admissions, Karpeles wanted Mt. Gox users to believe the Exchange was as he represented in the Terms of Use: safe and secure.[7] To the extent these admissions do not evidence Karpeles's fraudulent intent, they could "lead a reasonable trier of fact to conclude that [the Terms of Use] were [presented to Mt. Gox customers] with fraudulent intent." *Firstar Bank*, 249 F. Supp. 2d at 1044.

Karpeles's differing responses to the early hacks also would allow a jury to infer his desire to prevent users from learning the truth about Mt. Gox's balance sheet. As set forth above, Karpeles generally refused to acknowledge that Mt. Gox had been hacked or lost assets, but on the one instance that a hack and bitcoin loss became public knowledge, he took steps to reassure users (falsely) that Mt. Gox was still financially stable and in possession of users' bitcoins. Karpeles's silence around other hacks stands in stark contrast and, at a minimum, raises a triable issue of fact regarding whether Karpeles's actions were calculated to induce others to act. *See Schrager v. N. Cmty. Bank*, 328 Ill. App. 3d 696, 702-703 (2002) (noting that fraudulent intent encompasses "intent[] to induce the other party to act"). Karpeles's later behavior further bolsters this inference. Karpeles's conduct towards both CoinLab and Mizuho Bank are the actions, it can be inferred, of one who wishes to prevent the world from learning that Mt. Gox was suffering from a severe asset shortfall in order to continue to induce investment on Mt. Gox.

3.  **There is sufficient evidence for a jury to conclude that Greene relied on Karpeles's representations and was damaged as a result.**

The final two elements of Plaintiff's claim for fraud are also satisfied. In terms of

---

[7] Karpeles expressly waived any argument that he was not speaking through Mt. Gox's Terms of Use. (Mot. at 6 ("Putting aside for purposes of this Motion whether Mr. Greene can hold Mr. Karpeles personally liable in this case . . . regarding Mt. Gox's operations. . . .").) And even if he hadn't, there is sufficient evidence to take the issue to trial given that Karpeles specifically directed the drafting and dissemination of the site's terms of use as a personal "priority," (Ex. A at 91:9-24), and generally exerted an extreme amount of control over all of Mt. Gox's operations, (Ex. AE at Resp. No. 12).

reliance, a trier of fact could infer Greene's reliance from the circumstances alone. All agree that any user would wish to know whether he or she is investing on a solvent exchange, one that has been subject to repeated security breaches, or one that is trading with its users using fake assets. Karpeles explicitly acknowledged as much and history backs him up. Courts generally assume a base level of rationality in financial transactions, *see Peterson v. H&R Block Tax Servs., Inc.*, 174 F.R.D. 78, 84-85 (N.D. Ill. 1997), and when "the purported legitimacy" of the defendant is at issue, courts understand that a factfinder reasonably can infer reliance by one who acts to their detriment without full knowledge of the relevant risks, *see Minter v. Wells Fargo Bank, N.A.*, 274 F.R.D. 525, 546 (D. Md. 2011). A jury could conclude that—based on the general agreement that investing on Mt. Gox involved unacceptable, but unknown, risks—the decision to place bitcoin on Mt. Gox evidences reliance on Karpeles's fraudulent statements and conduct.

But there is an easier path here, as well. Consistent with his Complaint, (dkt. 245 ¶¶ 49-50), Greene reviewed the Mt. Gox Terms of Use when creating an account and relied on the representations contained therein when deciding to move and keep assets on the Exchange. (Pl. SOAF ¶¶ 36-38.) Indeed, like every other Exchange user from the United States, he was required to do so as a condition for creating and maintaining his Mt. Gox account. (Pl. SOAF ¶ 1.) And because neither Mt. Gox's bitcoin shortage nor Karpeles's use of Gox Bot to acquire bitcoins and cash from Exchange members were made public, Greene's reliance on the Terms of Use was justified. *See Chicago Export Packing Co. v. Teledyne Indus., Inc.*, 207 Ill. App. 3d 659, 663 (1990) ("it is only where parties do not have equal knowledge or means of obtaining knowledge of the facts which are allegedly misrepresented that a person may justifiably rely on them"). For his part, Karpeles suggests that Greene "does not remember what information on the Mt. Gox website he actually looked at or read." (Def. SOF ¶ 23-25.) But that's not true. Greene testified

that he read the Terms of Use and recalled that Mt. Gox stated it "would hold bitcoin securely for all users[.]" (Ex. E at 15:16-24, 17:18-22; Ex. F ¶¶ 3-5.)

The final element, damages, is also met. Greene moved bitcoins onto Mt. Gox because of the Karpeles's representations that the Exchange was secure. (Pl. SOAF ¶ 38.) Without those representations, he would not have done so and, instead, would have held bitcoins at a personal bitcoin address. (*Id.*; Ex. F ¶¶ 3-7.) Likewise, had Greene known the truth about the Exchange's insolvency, or the truth about Karpeles's plan to effectively steal bitcoins and cash from users via Gox Bot, he never would have held investments on Mt. Gox or would have attempted to move his holdings off the Exchange before it was too late. (Pl. SOAF ¶ 38; Ex. F ¶¶ 3-7.) Indeed, the moment that Greene realized that other users were having issues withdrawing their balances—activity that suggested the Exchange was *not* solvent or secure—he attempted to withdraw as well. (Pl. SOAF ⁍ 39.) But those efforts were unsuccessful and Greene lost nearly all of his holdings once Mt. Gox shut down in February 2014. (Ex. E at 31:23 – 33:19; Def. SOF ¶ 39.)

In sum, the undisputed facts show that triable issues of fact exist as to whether Karpeles is liable to Greene for fraud. Karpeles's motion for summary judgment therefore cannot succeed.

## B. Karpeles Cannot Invoke Rule 9(b) To Avoid His Own Statements, Testimony, and Admissions.

Rather than addressing the facts raised above or their obvious application to the case, Karpeles suggests the Court shouldn't consider them because Rule 9(b) requires that fraud cases be pleaded with particularity. (Mot. at 12.) This is a complete non sequitur. Karpeles makes no attempt to explain how this *pleading* standard affects his motion for summary judgment. Nor could he: The law permits a plaintiff to develop his case in discovery, even when alleging fraud.

"Rule 9(b) is a rule of pleading, not a rule of evidence." *Dyson, Inc. v. Syncreon Tech. (Am.), Inc.*, No. 17 C 6285, 2019 WL 3037075, at *3 (N.D. Ill. July 11, 2019) (citing *Cornielsen*

18

*v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019)). At summary judgment, a plaintiff cannot switch to "completely new" theories of a defendant's fraud. *Samuels v. Wilder*, 871 F.2d 1346, 1350 (7th Cir. 1989); *see also Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017). But he is not limited to the facts in his complaint. Rule 9(b) "was not intended . . . to preclude parties from offering new and specific evidence relevant to their initial claims. . . ." *United States ex rel. Landis v. Tailwind Sports Corp.*, 234 F. Supp. 3d 180, 196 n.9 (D.D.C. 2017) (contrasting *Samuels*, 871 F.2d at 1349–50). Thus, facts adduced in discovery relevant to a plaintiff's theory of fraud are fair game on summary judgment.

Here, Plaintiff set out his theory of fraud in the Second through Fourth Amended Complaints. Specifically, he alleged that "Through Mt. Gox's online marketing materials and advertisements, including its Terms of Use, Karpeles represented to Plaintiffs and the Mt. Gox Class that Mt. Gox would, *inter alia*, protect their bitcoins and Fiat Currency, and safely and quickly allow them to buy, sell, trade, or withdraw the same." (Dkt. 245 ¶ 112.) He alleged that the Terms of Use were required reading for all Mt. Gox customers, (*id.* at ¶¶ 13-14), and specifically referenced those pages discussing the TOU's representations that, *inter alia*, Mt. Gox would hold all users' deposits, that all bitcoin trades would be for actual bitcoins and cash, and that Mt. Gox would not be a counterparty to any trade, (*id.* at n. 5 (citing dkt. 11-2 at 3-4.) And he alleged that these representations were false and made to induce him (and others) to deposit bitcoins and currency when they otherwise would not have done so:

> Knowing that consumers are less likely to do business with companies that fail to adequately safeguard and hold their bitcoins and Fiat Currency or allow them to buy, sell, trade, or withdraw the same, Karpeles made these false representations with the intention that Plaintiffs and the members of the Class would rely on them in contracting with Mt. Gox and transferring money and Bitcoin into their accounts.

(Dkt. 245 ¶ 115.) Likewise, the Complaint discusses Karpeles's early knowledge of security flaws and decision to conceal them. (*Id.* ¶¶ 21, 23.) Greene further alleged Karpeles's reasons for

19

concealing evidence of hacks:

> Knowing that users would stop depositing bitcoins and funds in their accounts, and rather, would attempt to withdraw funds or close accounts if made aware of any large-scale loss/theft of coins, Karpeles made the false representations and omissions with the intent that Plaintiffs and the members of the Class would rely on them and continue to deposit money and bitcoins into their Mt. Gox accounts and not attempt to withdraw funds and/or close accounts.

(*Id.* ¶ 118.)

Far from "alleging completely new claims for fraud," *Samuels*, 871 F.2d at 1350, all of the facts presented here support the same theory that has been pursued all along. Plaintiff still relies on the Mt. Gox Terms of Use to ground his fraud claim against Karpeles but, with information adduced in discovery, provides *additional* facts to demonstrate (i) Karpeles's involvement in drafting the TOU, (ii) how and when the TOU were presented to users, (iii) the depth and breadth of his fraudulent conduct, including to show why and how the TOU were false, (iv) why that falsity mattered, and (v) how Karpeles decided to suppress information about hacks, the resulting shortages of bitcoin and cash, and the fraudulent trading via Gox Bot. In short, Greene's theory of fraud has remained consistent and all of the discovered facts supporting that theory are properly before the Court. *See E.I. Du Pont de Nemours & Co. v. Abbott Labs.*, No. 90 C 7338, 1992 WL 245642, at *2-3 (N.D. Ill. Sept. 18, 1992) (denying motion *in limine* to exclude references to false statements not alleged in answer, reasoning that inclusion of one fraudulent statement satisfied Rule 9(b), and that related statements uncovered in discovery were relevant to originally pleaded theory of fraud); *4MVR, LLC v. Warren W. Hill Constr. Co., Inc.*, No. 12-10674-DJC, 2016 WL 4775451, at *3-*4 (D. Mass. Sept. 13, 2016) (denying, at summary judgment, motion to strike evidence of misrepresentations not specifically alleged in the complaint, noting that the complaint put the defendant on notice that the misrepresentation claim "related to, *inter alia*, Hill Construction's billing practices," that the new evidence was

20

relevant to that theory, that "4 MVR was permitted to elaborate upon those allegations based upon information it obtained during discovery," and that "new details" had "substantial overlap" with the pleaded theory of fraud).

Further, the facts outlined in Professor Goforth's declaration and laid out above cannot be a surprise to Karpeles. Initially, the majority of these facts were within Karpeles's exclusive knowledge long after the operative allegations in this case first were leveled against him.[8] And if that were not enough, discovery has focused on the evidence set out in this opposition, as demonstrated by, for instance, the extensive citations to Karpeles's deposition testimony in this document. Likewise, in written discovery responses identifying facts supporting Karpeles's concealment of information, Greene pointed to interviews Karpeles gave in 2019, where he—for the first time—discussed the same facts raised here, including the March 2011 bitcoin hack/loss and Karpeles's use of Gox Bot to acquire users' assets. (Ex. AE at Resp. No. 15; *see also* Ex. M at Resp. Nos. 2-3 (Karpeles admitting that his statements in his interviews were truthful).) Karpeles had the opportunity to test the same evidence Greene sought and unearthed, or to offer competing evidence. Thus, to the extent Greene's opposition strays from the operative complaint, precedent requires consideration of Greene's factual presentation, even if it adds to what is alleged in the Complaint. *See Ash v. Wallenmeyer*, 879 F.2d 272, 273-75 (7th Cir. 1989).

---

[8] We pause briefly to note the relevant chronology. The original complaint was filed on February 27, 2014, just three days after Mt. Gox's website went offline. (Dkt. 1.) An amended complaint reflecting an updated understanding of the relevant facts was filed as of right on March 14, 2014. (Dkt. 36.) After a proposed settlement was reached and then scuttled, in December 2014, Karpeles's initial attorneys withdrew, citing nonpayment of fees. (Dkt. 121 ¶ 4.) Karpeles did not thereafter participate in the litigation until August 2018. (Dkt. 390 (motion to vacate default judgment).) In the meantime, the litigation progressed against Mizuho Bank and developments in the case on that front precipitated the filing of amended complaints. (Dkts. 146, 205, 245.) Only the first of these amendments, filed in April 2015, contained any substantive revision to allegations relating to Karpeles, but it did not alter the overarching theory of fraud pressed by Greene. (*See* dkt. 143 (motion for leave to amend).) And then the facts noted here primarily come from Karpeles's deposition, which occurred in November 2019.

In *Ash*, the plaintiff, the owner of a trucking company (J&W), hired an individual (Wallenmeyer) and put him in charge of the company. *Id.* at 273. While the owner was away, Wallenmeyer formed a second company ("S.M.F."), and conspired to submit invoices on S.M.F.'s behalf for work done by J&W. *Id.* In exchange for this, Wallenmeyer charged below-tariff rates to the plant, contrary to an agreement he had with the plaintiff. *Id.* The plaintiff discovered the scheme to divert funds to S.M.F. and sued for fraud. *Id.* During discovery, he discovered the underbilling and asked to press that theory. The district court ruled he could not. *Id.* at 273-74. The Seventh Circuit reversed, concluding that the judge should have allowed the plaintiff to present the underbilling theory to the jury, even though it differed from what was originally alleged. *Id.* The plaintiff could not be faulted for omitting the theory from the complaint because the evidence wasn't available until discovery. *Id.* at 274. And although the plaintiff could have amended "to make meticulous compliance with Rule 9(b)," that was unnecessary because "the federal rules do not contemplate that parties will amend their pleadings to reflect new information obtained in the discovery process." *Id.* And since the underbilling theory had featured prominently in discovery, defendants could not claim surprise. *Id.* at 274-75.

This case is easier than *Ash*. Here, unlike in *Ash*, Greene's core theory of fraud has remained consistent across several amended complaints. Greene does not ask the Court to consider a new basis for finding that Karpeles committed fraud, only to consider new details supporting his original theory. This, *Ash* makes clear, is proper. In short, nothing about Rule 9(b) stands as an obstacle to considering the evidence set forth above.

## IV.    CONCLUSION

Karpeles's motion for summary judgment should be denied.

Respectfully submitted,

Dated: February 18, 2020

**GREGORY GREENE**, individually and
on behalf of a class of similarly situated
individuals,


By: /s/Benjamin S. Thomassen
    One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
Edelson PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian
rbalabanian@edelson.com
J. Aaron Lawson
alawson@edelson.com
Edelson PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9495

*Counsel for Plaintiff and the putative class*

23

**CERTIFICATE OF SERVICE**

I, Benjamin S. Thomassen, an attorney, hereby certify that on February 18, 2020, I served the above and foregoing document by causing a true and accurate copy of such paper to be filed and served on all counsel of record via the court's CM/ECF electronic filing system.

/s/ Benjamin S. Thomassen