**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| GREGORY GREENE, individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | Case No. 1:14-cv-01437 |
| v. | Hon. Gary Feinerman |
| MARK KARPELES, an individual, | Magistrate Judge Susan Cox |
| *Defendant*. | |

Pursuant to Local Rule 56.1(b), Plaintiff Gregory Greene hereby provides the following responses to Defendant Mark Karpeles's Statement of Facts and, pursuant to Local Rule 56.1(b)(3)(C), provides additional facts that require denial of Defendant's Motion for Summary Judgment. Plaintiff's responses and additional facts stated herein are based on facts adduced in discovery, or which are otherwise part of the public record.

**PLAINTIFF'S RESPONSES TO KARPELES'S STATEMENT OF MATERIAL FACTS**

1.       This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332(d)(2).

**REPSONSE:** Agreed.


2.       Venue is proper under 28 U.S.C. §§1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

**REPSONSE:** Agreed.


3.       Plaintiff Gregory Greene ("Greene") is a citizen of the State of Illinois.

**REPSONSE:** Agreed.


4.       Defendant Mark Karpeles is the sole shareholder and CEO of Tibanne KK, which owned eighty-eight percent of the shares of Mt. Gox KK.

**RESPONSE:** Agreed.


5.       From 2011 to 2014, Mr. Karpeles was the CEO of Mt. Gox KK.

**RESPONSE:** Agreed.


6.       The Mt. Gox Bitcoin Exchange ("Mt. Gox") was a bitcoin exchange located in Japan that operated from 2009-2014.

**RESPONSE:** Agreed.

7.     In early 2011, Tibanne KK purchased 88% of the shares of Mt. Gox KK from Jed McCaleb, who maintained a 12% interest.

**RESPONSE:** Agreed.


8.     Customers could sign up for an account with Mt. Gox that allowed them to buy, sell, and store bitcoins and fiat currency.

**RESPONSE:** Plaintiff agrees that individuals could sign up for Mt. Gox accounts, which, according to the Mt. Gox Terms of Use, should have allowed users to securely buy, sell, and store bitcoins and fiat currency on Mt. Gox.

But Plaintiff disagrees that the simple signing up for a Mt. Gox account allowed for such activity. Beginning in 2011, Mt. Gox suffered a number of data security incidents that led to the loss of bitcoins and/or fiat currency from Mt. Gox. After these incidents, Mt. Gox did not have enough assets to honor all Mt. Gox user deposits and, thus, users' ability to actually and securely "store bitcoins and fiat currency" on Mt. Gox was compromised. (Plaintiff's L.R. 56.1(b)(3)(C) Statement of Additional Facts ("SOAF")  ¶¶ 10, 13-14.) Further, beginning in 2011, Karpeles used an automated trading bot (called "Gox Bot") to buy and sell bitcoins from and to Mt. Gox customers using fake bitcoins and cash balances. (SOAF  ¶¶ 28-30.) This practice compromised users' ability to actually and securely "buy and sell" bitcoins on Mt. Gox.


9.     Users of Mt. Gox could transfer bitcoins directly into their accounts or deposit cash into their accounts by wiring money to one of Mt. Gox's banking partners.

**RESPONSE:** Plaintiff agrees that, at certain points between 2011 and 2014, users of Mt. Gox could transfer bitcoins directly into their accounts or deposit cash into their accounts by

wiring money to one of Mt. Gox's banking partners. Beginning on or around January 2014, users' ability to make cash deposits via Mt. Gox's banking partners was compromised. (*See*, *e.g.*, dkt. 295-3 (Joseph Lack Dep. Tr.) at 120:4 – 16 (funds wired to Mizuho Bank, Ltd. ("Mizuho Bank" or "Mizuho") were never credited to Lack's Mt. Gox account).)

10.    Users could withdraw cash from the exchange by submitting requests through their Mt. Gox accounts [which] were then sent to one of Mt. Gox's banking partners for processing. (*Id.*)

**RESPONSE:** Plaintiff agrees that, at certain points between 2011 and 2014, users of Mt. Gox could withdraw cash from the Exchange by submitting requests through their Mt. Gox accounts, which were then sent to one of Mt. Gox's banking partners for processing. But beginning on or around June 2013, users'—particularly users from the United States—ability to make cash withdrawals via the Exchange and Mt. Gox's banking partners was compromised because Mt. Gox's primary banking partner, Mizuho Bank, refused to process withdrawal requests. (*See*, *e.g.*, dkt. 295-5 at Edelson007121-22 (email from Karpeles explaining withdrawal limitations).) These events severely compromised users' ability to actually and securely withdraw cash from Mt. Gox.

11.    In 2011, Mt. Gox transferred some Bitcoin to encrypted cold wallets for more secure storage.

**RESPONSE:**  Agreed.

12.    In late 2011, Mt. Gox transitioned to paper wallets, and then to RAID paper

wallets in the middle of 2012 for bitcoin storage, which were more secure than the encrypted cold wallets.

**RESPONSE:** Plaintiff agrees that at some point between 2011 and 2012, Mt. Gox transitioned to a paper cold wallet system. Plaintiff lacks sufficient information to determine how many (if any) bitcoins were actually transferred to the paper cold wallet system. For example, at least 200,000 bitcoins were not transferred. (Mark Karpeles Dep. Tr. (Ex. A[1]) at 154:6 – 155:4.) Plaintiff also disagrees that Mt. Gox's use of paper wallets was "more secure" than encrypted cold wallets, given that the paper and RAID wallets could not be monitored (whereas encrypted cold wallets could). Indeed, bitcoin experts have described the Karpeles's decision to move forward with the transfer as a "fundamental mistake[.]" (Interview with Kim Nilsson (Ex. B) at 15-16 ("Q: So on reflection, what are the key, most fundamental mistakes that Mark made? The most stupid things he did, that could've prevented all this? Kim Nilsson: Well in retrospect, hindsight is always 20/20, but the most egregious 20/20 here would be monitoring the coin holders. Mark has made an argument that he didn't monitor his cold storage because he felt that if you had even the public keys on a live system, that's slightly lowered the security of them in case there was any weakness in key generation. That seems like an extremely specific risk to worry about, while you're basically potentially leaving the door to the vault open and never knowing you have been robbed. The much more natural starting point should have been to just watch your Bitcoins and make sure that you know the first instance if something is wrong.").) To this end, Karpeles himself suggested that the transition to paper wallets was made not for the sake of additional security, but to hide the fact that Mt. Gox had a bitcoin deficit beginning in March 2011. (SOAF ¶ 25.)

---

[1]    All references to exhibits refer to exhibits attached to the Declaration of Benjamin S. Thomassen ("Thomassen Decl."), submitted contemporaneously herewith.

13.     Mt. Gox was the first Bitcoin exchange to use these methods of securing Bitcoin but other exchanges followed these procedures after [Mt. Gox] began using them.

**RESPONSE:** Plaintiff agrees that other bitcoin exchanges have used paper cold wallets system, but lacks sufficient information to either agree or disagree with the timing of such usages. However, Plaintiff is aware of *no* bitcoin exchange that followed Karpeles's example of using completely *unmonitored* cold wallet systems (*i.e.*, where an exchange would attempt to move bitcoins from a "hot" wallet into a "cold" wallet, but make no efforts to ever confirm whether the transfer actually took place), which bitcoin experts have described as a "fundamental mistake[.]" (Ex. B at 15-16.)

14.     In September 2011, someone gained access to one of Mt. Gox's four hot bitcoin wallets and began transferring small amounts of bitcoin out of it.

**RESPONSE:**   Plaintiff acknowledges there are public reports regarding the alleged September 2011 hack of Mt. Gox's hot wallet system, but lacks sufficient information to either agree with or dispute ¶ 14. Information pertaining to the individual that purportedly accessed and transferred bitcoin out of Mt. Gox's hot wallet system (such as, for example, access logs,) is in the possession of either Karpeles, the Japanese public prosecutor, or the Mt. Gox civil rehabilitation trustee. (*See* Ex. A at 232:15 – 233:11.)

15.     At the end of 2013 or in early 2014, Mizuho Bank limited the number and amount of Mt. Gox customer withdrawals that it would process on a weekly or monthly basis due to Mizuho Bank's inability to handle the volume of Mt. Gox customer withdrawals.

**RESPONSE:** Plaintiff agrees that, beginning in June 2013 and continuing through Mt. Gox's collapse in 2014, Mizuho Bank refused to process *any* Mt. Gox customer withdrawals and, in that sense, "limited" its processing of withdrawal requests. (*See*, *e.g.*, dkt. 295-5 at Edelson007121-22 (email from Karpeles explaining withdrawal limitations).). Plaintiff, however, disputes the rationale provided by Karpeles: Mizuho explained that it refused to process Mt. Gox customer withdrawal requests beginning in June 2013 because it wanted to end its business relationship with Mt. Gox, specifically because Mt. Gox was suspected of engaging in or facilitating criminal transactions and Mizuho wanted to distance itself from the company for reputational reasons. (Mizuho Bank Resp. to Pl. Interrog. (Ex. C) at No. 8.)

16.     In mid-2013, Mizuho Bank stopped processing certain international wire withdrawals for Mt. Gox.

**RESPONSE:** Agreed.

17.     Before the Mt. Gox exchange went offline, Mt. Gox successfully created a new banking relationship with Japan Post Bank, which was used for international wires to the United States and some other countries.

**RESPONSE:** Plaintiff agrees that Mt. Gox facilitated some customer cash withdrawals after June 2013. Plaintiff disagrees to the extent ¶ 17 implies that Mt. Gox's relationships with new banks, including Japan Post Bank, were sufficient to process Mt. Gox's customer withdrawal requests. (Dkt. 295-5 at Edelson007121 (Karpeles describing limitations of using Japan Post, including that "the number of transfers we could do per day was limited [and it] would take 2 to 3 hours to send 10 transfers[,]" and all transfers were made via "paper documents"), Edelson007122

(Karpeles describing that transfers to Mt. Gox's U.S. customers through Japan Post "could be processed, at extra cost and in very limited quantity").)

18.     On February 7, 2014, Mt. Gox suspended all Bitcoin withdrawals.

**RESPONSE:** Agreed.


19.     On February 24, 2014, the Mt. Gox website went offline.

**RESPONSE:** Agreed.


20.     Mr. Greene signed up for an account on the Mt. Gox exchange in 2012 and began trading and selling Bitcoin.

**RESPONSE:** Plaintiff agrees that he signed up for a Mt. Gox account in 2012, but never traded or sold bitcoin on the Exchange.  (Greene Resp. to Karpeles Interrog. (Ex. D) at Nos. 9, 11.) Rather, he purchased bitcoin via a third party and then moved that bitcoin onto Mt. Gox. (*Id.* at No. 9.) He did not make any trades. (*Id.*)


21.     Before setting up an account and purchasing bitcoin, Mr. Greene read about a prior attack on the Mt. Gox exchange, by a hacker in 2011, but it didn't have any effect on his decision to purchase bitcoin.

**RESPONSE:** Plaintiff agrees that he read an article in Wired magazine that mentioned Mt. Gox had been hacked in 2011, but did not mention any other security incidents or issues pertaining to Mt. Gox. Plaintiff also agrees that the article did not affect his decision to purchase bitcoin.

22.     Plaintiff bought bitcoin on only two occasions: January 2012 and March 2013.

**RESPONSE:** Agreed.


23.     While the Plaintiff claims to have read some information that was posted on the MtGox.com website prior to creating a Mt. Gox account and purchasing cryptocurrency, he does not remember what information on the Mt. Gox website he actually looked at or read.

**RESPONSE:** Disagreed. Plaintiff testified that he read the Mt. Gox Terms of Use at or around the time he created his account and also generally reviewed the content of the Mt. Gox website. (Greene Dep. Tr. (Ex. E) 15:5-24, 17:9-22; dkt. 245 ¶¶ 13-14, 49-50.) Plaintiff agrees that, during his deposition, he could not recite that information from memory and was not offered the opportunity to review any documents from the Mt. Gox website, including its Terms of Use. (Ex. E at 17:18–18:6; Declaration of Gregory Greene (Ex. F) at ¶ 3.)


24.     Plaintiff believes that he read the terms of service which "probably" included a statement that Mt. Gox would hold bitcoin securely from all users.

**RESPONSE:** Disagreed. Plaintiff testified that he read the Mt. Gox Terms of Use at or around the time he created his account. (Ex. E at 15:5-24, 17:17-22.) The Terms of Use included many statements reflecting that Mt. Gox would hold bitcoin securely for all users. (*See* SOAF ¶¶ 3-9; Ex. F ¶¶ 4-5.) Plaintiff agrees that, during his deposition, he could not recite that information from memory and was not offered the opportunity to review any documents from the Mt. Gox website, including its Terms of Use. (Ex. E at 17:18–18:6; Ex. F at ¶ 3.)

25.     However, Plaintiff does not recall where any Mt. Gox representations regarding securely storing and trading bitcoin were actually located on the Mt. Gox website.

**RESPONSE:** Disagreed. Plaintiff testified that he read the Mt. Gox Terms of Use at or around the time he created his account and that he recalled that the Terms discussed Mt. Gox's security. (Ex. E 15:19–16:2.) The Terms of Use included many statements reflecting that Mt. Gox was a secure place to deposit, hold, and purchase bitcoins and cash. (*See* SOAF ¶¶ 3-9; Ex. F ¶¶ 4-5.) Plaintiff agrees that, during his deposition, he could not recite that information from memory and was not offered the opportunity to review any documents from the Mt. Gox website, including its Terms of Use. (Ex. E at 17:18–18:6; Ex. F at ¶ 3.)

26.     Further, no portion of the Terms of Use stood out to Mr. Greene at the time that he signed up for an account at Mt. Gox or after; in fact, Mr. Greene could not remember any of the Terms of Use at all.

**RESPONSE:** Disagreed. Plaintiff testified that he read the Mt. Gox Terms of Use at or around the time he created his account and that he recalled that the Terms discussed Mt. Gox's security. (Ex. E 15:19–16:2.) The Terms of Use included many statements reflecting that Mt. Gox was a secure place to deposit, hold, and purchase bitcoins and cash, which were critical to Plaintiff's decision to open and maintain a Mt. Gox account (*i.e.*, they "stood out" at the time he read and reviewed them). (*See* SOAF ¶¶ 3-9, 38-39;Ex. F ¶¶ 4-5.) Plaintiff agrees that, during his deposition, he could not recite that information from memory and was not offered the opportunity to review any documents from the Mt. Gox website, including its Terms of Use. (Ex. E at 17:18–18:6; Ex. F at ¶ 3.)

27.    The Mt. Gox terms of service does not make any representations regarding securely holding users' bitcoin.

**RESPONSE:** Disagreed. The Mt. Gox Terms of Use included multiple representations that Mt. Gox was a secure place to deposit, hold, and trade bitcoins. (SOAF ¶¶ 3-9.) Further, Karpeles emphasized these features of Mt. Gox and its Terms when promoting it as a safe and secure bitcoin exchange. (*See*, *e.g.*, September 10, 2012 forum post by Mark Karpeles on bitcointalk.org (Ex. G) ("[Q:] Does [MtGox] maintain full reserve?  (i.e., [MtGox] controls bank accounts with all customer USD funds and controls wallets with 100% of BTC funds.  None of these amounts loaned out. [A:] **As described in our Terms of Service, customer funds are kept in full, and none are loaned.**") (emphasis in original).)


28.    Plaintiff admits that no website or bitcoin exchange, such as Mt. Gox, is 100 percent secure.

**RESPONSE:** Agreed.


29.    Aside from communications with Mt. Gox's customer service, the Plaintiff also does not recall what Mt. Gox information, if any, he actually looked at or read during the time between creating a Mt. Gox account and Mt. Gox going dark.

**RESPONSE:** Disagreed. Plaintiff testified that he read the Mt. Gox Terms of Use at or around the time he created his account and that he recalled that the Terms discussed Mt. Gox's security. (Ex. E 15:19–16:2.) The Terms of Use included many statements reflecting that Mt. Gox was a secure place to deposit, hold, and purchase bitcoins and cash, which were critical to Plaintiff's decision to open and maintain a Mt. Gox account. (*See* SOAF ¶¶ 3-9, 38; Ex. F ¶¶ 4-5.)

Plaintiff also testified that he recalled reviewing posts made by Mark Karpeles on the bitcointalk.org forums, where Karpeles stated that on "numerous occasions indicating that Mt.Gox was solid; that it was secure; and that . . . Mt. Gox was a stable company." (Ex. E at 44:24 – 46:19; *see also* Ex. D at Resp. No. 8.) This included the post attached as Exhibit G. (Ex. F at ¶ 6.)

30.     Mr. Greene does not recall what Support Desk updates were from Mt. Gox, nor does he recall reviewing any sort of blog or updates that was posted directly to Mt. Gox's website.

**RESPONSE:** Plaintiff agrees that, at his deposition, he could not recall any specific "Support Desk updates" from Mt. Gox, or any other specific blog posts or updates that were posted to Mt. Gox's website. However, Plaintiff paid close attention to the Mt. Gox website over this same time period and generally read information as it was posted to the site—including, *inter alia*, any blog posts or updates. (Ex. D at Resp. No. 8.)

31.     Mr. Greene did not have any interactions with Mt. Gox's customer service until he tried to take bitcoins off the exchange in November 2013 and only corresponded with Mt. Gox's customer service via email.

**RESPONSE:** Disagreed. Plaintiff communicated with the Mt. Gox support desk as early as April 7, 2013. (Greene_002317 (Ex. H).) Incidentally, the response he received to that communication purported to come from Mark Karpeles himself. (*Id.*) Plaintiff cannot specifically recall whether he corresponded with Mt. Gox only via email or whether Mt. Gox had an online complaint system that he used. (Ex. E at 34:16-24.)

32.     In November 2013, Mr. Greene was attempting to remove the bitcoins from his Mt. Gox account to a personal address because he knew that other people were having difficulty removing their bitcoins from Mt. Gox. He experienced delays with bitcoin transactions and contacted Mt. Gox's customer service, who helped resolve the issue.

**RESPONSE**:  Disagreed. Plaintiff agrees that he attempted to remove his bitcoins from Mt. Gox because of the issues reported by others, as indicated in ¶ 32. However, Mt. Gox's customer service did not resolve the issue and Plaintiff was not able to remove the majority of his bitcoins from Mt. Gox. (Ex. E at 32:22–33:19.)

33.     From November 2013 to February 2014, the Plaintiff made further attempts to withdraw the remainder of his Bitcoin from Mt. Gox.

**RESPONSE:** Agreed.

34.     On February 5, 2014, Plaintiff contacted Mt. Gox customer support because his account was restricted from accessing funding options.

**RESPONSE:** Agreed.

35.     On February 10, 2014, Mt Gox customer service requested a valid copy of a government issued photo ID and proof of residence due to Plaintiff using or having used BitInstant.

**RESPONSE:** Plaintiff agrees with the characterization of the February 10, 2014 request for his ID and proof of residence, but lacks information as to the actual motivation for the request.

36.     The Plaintiff submitted those documents on February 11, 2014.

**RESPONSE:** Agreed.


37.     On February 14, 2014, Mt Gox customer service requested that the Plaintiff fill out a verification form to complete removing the restrictions on his account.

**RESPONSE:** Agreed.


38.     On February 24, 2014, Mt Gox customer service informed the Plaintiff that his Mt. Gox account had been verified.

**RESPONSE:** Agreed.


39.     At the time Mt. Gox went dark, Mr. Greene had 42.97104 BTC and $2.66 USD in his Mt. Gox account.

**RESPONSE:** Agreed.


40.     The sole damages Mr. Greene is claiming are those lost amounts.

**RESPONSE:** Plaintiff agrees that he seeks the value of the bitcoin and currency that he lost when Mt. Gox went offline in February 2014.


41.     Plaintiff has produced no evidence that Mr. Karpeles stole, gained access to, used, exercised control, dominion, or ownership over, and/or dispossessed Plaintiff's, or any other Mt. Gox user's, bitcoins and Fiat currency.

**RESPONSE:** Plaintiff agrees that he has personally produced no affirmative evidence that Mr. Karpeles stole, gained access to, used, exercised control, dominion, or ownership over, and/or dispossessed Plaintiff's bitcoins and Fiat currency (*i.e.*, beyond Karpeles's use of Gox Bot to acquire Mt. Gox users' bitcoins and cash using fake assets, SOAF ¶¶ 28-30). Such information is in the possession of either Karpeles, the Japanese public prosecutor, or the Mt. Gox civil rehabilitation trustee.

42.     The Mt. Gox rehabilitation trustee approved Plaintiff's claim in full.

**RESPONSE:** Agreed.

43.     Mr. Karpeles did not learn about the bitcoin loss or theft discussed in the Complaint until February 2014.

**RESPONSE:** Plaintiff agrees that Karpeles claims he did not know about certain losses or thefts of bitcoins from Mt. Gox's cold wallets until February 2014. However, Plaintiff disagrees that Karpeles was not aware of any bitcoin losses or thefts from Mt. Gox before February 2014. To the contrary, Karpeles was aware of Mt. Gox's bitcoin losses and thefts beginning in early 2011—amounts that were never recovered and necessarily became part of Mt. Gox's overall bitcoin deficits that were disclosed following the Exchange's collapse. (*See*, *e.g.*, SOAF ¶¶ 13-14, 20, 22, 25.)

44.     Mr. Karpeles did not learn about the hack of the hot bitcoin wallet until two years after Mt. Gox declared bankruptcy.

**RESPONSE:** Plaintiff agrees that Karpeles claims that he did not learn about the hack of the hot bitcoin wallet until two years after Mt. Gox declared bankruptcy.

45.     Karpeles and Mt. Gox fixed any security risks, bugs, or hacks were discovered in Mt. Gox's code whenever they were discovered.

**RESPONSE:** Disagreed. While Plaintiff admits that Karpeles claims to have remedied certain issues with Mt. Gox's underlying code, Karpeles did not "fix" security risks on Mt. Gox whenever they were discovered. To the contrary, Karpeles did not "fix"—but, instead, actively concealed and misrepresented—issues related to Mt. Gox's basic solvency beginning in March 2011 and continuing through February 2014. (*See*, *e.g.*, SOAF ¶¶ 19, 21, 23, 31-32.) That bitcoin deficit represented a severe risk to the security of every Mt. Gox customer's holdings. Likewise, Karpeles introduced additional "security risks" into the Exchange by programming the Gox Bot account to conduct trades with Mt. Gox users using fake bitcoin and cash balances (*i.e.*, contrary to what the Mt. Gox Terms of Use represented to users). (SOAF ¶¶ 29-30.) And as several commentators have pointed out, Karpeles's decision to move Mt. Gox's bitcoins to unmonitored paper wallets was an extreme security risk to Mt. Gox's overall viability and a "fundamental mistake[.]" (Ex. B at 15-16.)

46.     Mr. Karpeles did not steal, gain access to, use, exercise control, dominion, or ownership over, and/or dispossess Plaintiff's, or any other Mt. Gox user's, bitcoins and Fiat currency.

**RESPONSE:** Disagreed. Karpeles gained access to Mt. Gox users' bitcoin and cash holdings via Gox Bot, where he caused users to trade their bitcoin and/or cash to Mt. Gox in

exchange for fake cash and/or bitcoin balances. (SOAF ¶¶ 29-30.) Through that process, Karpeles knowingly "dispossessed" Mt. Gox users of their actual bitcoin and cash balances. (*Id.*) However, Plaintiff admits that additional evidence showing that Karpeles otherwise personally stole, gained access to, used, exercised control, dominion, or ownership over, and/or dispossessed Plaintiff's specific bitcoins and Fiat currency (*e.g.*, by exploiting Mt. Gox's hot wallet system) is in the possession of either Karpeles, the Japanese public prosecutor, or the Mt. Gox civil rehabilitation trustee.

47.     Mr. Karpeles is currently assisting the United States Internal Revenue Service with their investigation into who actually stole the bitcoin from Mt. Gox.

**RESPONSE:** Plaintiff agrees that Karpeles claims he is assisting the United States Internal Revenue Service with respect to certain issues that affected Mt. Gox.

**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS**

1.  Beginning in 2012, Mt. Gox required that its users from the United States read and agree to one version of the Exchange's Terms of Use as a condition of using, or continuing to use, Mt. Gox. (Karpeles Interog. Resp. (Ex. I) at No. 7; Ex. A at 95:8-96:13.)

2.  Karpeles directed the drafting and dissemination of Mt. Gox's Terms of Use ("Terms" or "TOU"), and was otherwise knowledge of their contents. (Ex. A at 96:8–97:18.).

3.  The Terms purported to protect both buyers and sellers on Mt. Gox by keeping trades anonymous. (Mt. Gox Terms of Use (Ex. J) at PageID #:131.)

4.  The Terms purported to protect buyers and sellers on Mt. Gox by preventing either party from backing out of a trade once the price was agreed upon. (*Id.*)

5.  The Terms assured Mt. Gox users that all trades would be made with other Mt. Gox users and not the exchange itself. (*Id.*) No part of the Terms stated that Mt. Gox users may potentially trade with entities that were not subject to the Terms. (*See generally* Ex. J.)

6.  The Terms required all users to warrant that purchases of bitcoin were made with "actual currencies corresponding to actual assets," and that all sales of bitcoin were of "actual Bitcoins." (*Id.* at PageID#:131.)

7.  In the Terms, Mt. Gox promised to "hold all monetary sums and all Bitcoins deposited by each Member in its Account, in that Member's name as registered in their Account details, and on such Member's behalf." (*Id.*)

8.  In the Terms, Mt. Gox promised to "use all reasonable care and skill" in facilitating bitcoin trades. (*Id.*)

9.  Accounts that violated the Terms were subject to suspension. (*Id.*; Ex. A at 98:19 – 99:1.)

10.     In January 2011, an individual or individuals stole $50,000 from an account in Mt. Gox's name with the currency service Liberty Reserve. (Ex. A at 39:2-40:1.)

11.     Mark Karpeles was aware of the $50,000 theft and expressed concern regarding it because he "need[ed] to be 100% sure we will be able to answer any withdraw request from someone who deposited anything." (Jan. 28, 2011 email from Karpeles to McCaleb (Ex. K); Ex. A at 40:23 – 42:20.)

12.     Karpeles did not disclose the $50,000 theft to Mt. Gox users, but is "not sure" whether Mr. McCaleb may have mentioned it on the Mt. Gox forums before he took over the Exchange. (Ex. A 58:20–62:21; 122:16-123:20.)

13.     On or around March 3, 2011, an individual or individuals gained unauthorized access to Mt. Gox and stole 80,000-90,000 bitcoins. (Ex. A at 43:5-23; 44:18-21; Excerpts of Skype chats between Karpeles and McCaleb (Ex. L) at Greene_001241 ("[McCaleb:] ok it is: 94,984 stolen").)

14.     After the March 3, 2011 incident, Mt. Gox did not have enough bitcoins to satisfy user deposits and, from that point onwards, Karpeles was never "sure that Mt. Gox would be able to answer any withdrawal requests from someone who deposited anything." (Ex. A at 52:8–54:8; 105:5-15; *see also* Ex. B at 12 (bitcoin expert opining that, with respect to the $50,000 and 80,000-90,000 bitcoin hack, "[Mt. Gox] would not have had nearly enough to cover any of this. Not even close at any point.").)

15.     Karpeles believed that it was important for any user of a bitcoin exchange to know that his or her bitcoin exchange was short bitcoins. (Ex. A at 68:6-24 ("of course it's important for users to know about this.").)

16.     Karpeles believed that disclosing the March 2011 hack or loss of bitcoins

would cause Mt. Gox to fail because people wouldn't use the Exchange anymore. (Ex. A at 68:6-24.)

17.     Karpeles believed that disclosing the March 2011 hack or loss of bitcoins would cause Mt. Gox to fail because it would cause a "bank run[,]" where users would demand the return of their bitcoins. But Karpeles understood that if users demanded the return of their bitcoins, Mt. Gox would not be able to honor those demands because the Exchange was "short bitcoins." (Ex. A at 69:9-23.)

18.     Karpeles believed that disclosing the March 2011 hack or loss of bitcoins would have detrimental effects for him personally because, as the sole owner of Tibanne KK, he would have been involved in lawsuits.  (Ex. A at 70:2-14.)

19.     Neither the March 2011 hack nor the resulting bitcoin deficit was disclosed to Mt. Gox users. (Ex. A at 123:21-24.)

20.     In or around June 2011, an individual or individuals gained unauthorized access to Mt. Gox using administrative credentials and placed a purchase order for bitcoin so large that it caused the price of bitcoin to plummet, allowing the individual or individuals to withdraw bitcoin from Mt. Gox at a significantly reduced price. This resulted in additional losses of bitcoin from Mt. Gox. (Ex. A at 140:23–143:22.)

21.     On the occasion of the June 2011 hack, Karpeles directed Jed McCaleb to inform users that "[e]veryone's bitcoins [were] safe on the site . . . [and that Mt. Gox was] still holding all the coins safely in reserve," (Ex. L at Greene_001269; Ex. A at 144:19-147:7.)

22.     After the March 3, 2011 incident, and in addition to the June 2011 hack, Mt. Gox experienced other incidents that resulted in the loss of bitcoins. (*See*, *e.g.*, Ex. A at 131:9-133:11 (discussing bitcoins lost through issue with Mt. Gox code; 137:23-140:22 (discussing

bitcoin bounty paid to Mt. Gox hacker after theft of 300,000 bitcoins)); *see also* Ex. B at 12 (discussing Mt. Gox's acquisition of Polish bitcoin exchange and absorbing its 17,000 bitcoin debt).)

23.     So long as they weren't already known to the public, Karpeles did not disclose Mt. Gox's data security incidents or losses of bitcoins to Mt. Gox's users. (*See* Ex. A 140:15-22; 254:13–255:2.)

24.     Karpeles eventually stored Mt. Gox's bitcoins in a "blind" cold wallet system, meaning that no one at Mt. Gox could monitor whether the cold wallets actually contained bitcoins. (Ex. A at 167:4-168:18.)

25.     It is "quite possible" that Karpeles created the "blind" cold wallet system because he didn't want others to know that Mt. Gox had a bitcoin deficit. (Gonon, V. and Sayanoff, X. (2020). *Bitcoin Documentary | The Unbelievable Story Of Mark Karpeles*. [video] Available at: https://youtu.be/1ivWSLQRQp0?t=5284 (Accessed 17 Feb. 2020) ("[Q:] Does the fact that you didn't monitor the bitcoins have anything to do with wanting to hide [the 80-90,000 bitcoin debt] from your employees? [A:] It's possible, I don't remember exactly. [Q:] You have to answer. . . . [A:] Even if we had monitored the bitcoins, we wouldn't have made that public, even within the company. . . . [Q:] Did you create a blind system to avoid telling people that bitcoins were missing? [A:] It might have been conscious or unconscious, but it's very possible."); Karpeles Resp. to Greene Req. to Admit (Ex. M) at No. 2 (Karpeles admitting statements made in the Bitcoin Documentary were true).)

26.     Before Karpeles purchased Mt. Gox, McCaleb used a script to automatically conduct trades on the Exchange (a function McCaleb referred to as "Gox Bot"). That script

purchased bitcoins from other Mt. Gox users with commissions collected by Mt. Gox on user trades. (Ex. A 75:4-16; Declaration of Jed McCaleb (Ex. N) at ¶ 2.)

27.     Karpeles wanted to use the fees Mt. Gox collected on trades to pay back Mt. Gox's bitcoin deficit over time. (Ex A. at 72:14–73:22.)

28.     At some point in 2011, Karpeles "disabled" the feature that credited Mt. Gox's commissions to the Gox Bot account. (Ex. A at 75:19–76:11; 81:13–82:3.)

29.     After Karpeles unlinked Gox Bot's trading activity from the commissions received by Mt. Gox, Karpeles would periodically "credit" Gox Bot's account with fake funds by adjusting Mt. Gox's internal database.  (Ex. A 78:13–79:22; 239:18–240:4; *see also* Ex. L at Greene_001245 ("Mark Karpeles: I . . . did a manual 'loan' [to Gox Bot]").)

30.     Gox Bot would thereafter execute trades with Mt. Gox users using its balance of fake currency or fake bitcoins, depending on whether it was buying or selling bitcoins. (Ex. A at 78:13–79:22; 81:13–82:3; 239:18–240:4.)

31.     Although it continued to trade with users throughout Karpeles's tenure at Mt. Gox, Gox Bot's existence was never disclosed to Mt. Gox's users. (Ex. A at 81:13-83:16; 121:5-14.)

32.     Karpeles either did not disclose or limited disclosing Gox Bot's existence to other Mt. Gox employees. (Gonon, V. and Sayanoff, X. (2020). *Bitcoin Documentary | The Unbelievable Story Of Mark Karpeles*. [video] Available at:

https://youtu.be/1ivWSLQRQp0?t=5063 (Karpeles discussing Gox Bot (referred to publicly as "Willy Bot"), stating that Gox Bot's activity "had to remain secret," and, in response to question asking whether Karpeles told his employees about Willy Bot, stating that "I spoke to almost no one about it."); Ex. M at No. 2.)

33.     Karpeles did not believe Gox Bot was subject to the Terms because it did not use the Mt. Gox website to make trades. (Ex. A at 99:13–100:1.) The Terms do not state that Mt. Gox users may trade with individuals or entities that were not subject to the Terms. (*See generally* Ex. J.)

34.     Gox Bot's activity affected the price of bitcoins on Mt. Gox by changing the perceived demand for bitcoins on Mt. Gox. (Ex. A at 234:18-235:2.) Following Mt. Gox's collapse, many researchers concluded this effect was significant. (Goforth Decl. (Ex. O) ¶ 43.)

35.     Karpeles was criminally convicted of data manipulation in Japan because of his conduct relating to the Gox Bot account. Karpeles does not contest the factual basis of his conviction. (Ex. A at 26:18–28:22.)

36.     Gregory Greene read Mt. Gox's Terms of Use when and after joining the Mt. Gox Exchange. He was required to do so in order to open and maintain a Mt. Gox account. (Ex. E at 15:5-24, 17:18-22; dkt. 245 ¶¶ 13-14, 49-50.)

37.     At his deposition, Mr. Greene generally recalled that the Mt. Gox Terms stated that the Exchange would hold bitcoin securely for its users, but could not recite the Terms from memory and was not given a copy of the Terms to review or refresh his memory. (Ex. E at 15:19-16:2; Ex. F at ¶ 3.)

38.     Having reviewed the terms, Mr. Greene agrees that the representations identified *supra* (SOAF ¶¶ 3-9) represent that Mt. Gox was secure and recalls relying on those representations when opening and maintaining his Mt. Gox account. (Ex. F ¶¶ 3-5.)

39.     Once Greene realized that other Mt. Gox users were having difficulty withdrawing their deposits, he immediately, but unsuccessfully, tried to move his bitcoins

off Mt. Gox and onto a personal bitcoin wallet. (Ex. E at 31:18–33:19.)

Respectfully submitted,

Dated: February 18, 2020

**GREGORY GREENE**, individually and
on behalf of a class of similarly situated
individuals,

By: /s/Benjamin S. Thomassen
    One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
Edelson PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian
rbalabanian@edelson.com
J. Aaron Lawson
alawson@edelson.com
Edelson PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9495

*Counsel for Plaintiff and the putative class*

**CERTIFICATE OF SERVICE**

I, Benjamin S. Thomassen, an attorney, hereby certify that on February 18, 2020, I served the above and foregoing document by causing a true and accurate copy of such paper to be filed and served on all counsel of record via the court's CM/ECF electronic filing system.


/s/ Benjamin S. Thomassen