# Exhibit O

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREGORY GREENE, individually and on behalf of all others similarly situated,<br><br>                            Plaintiff,<br><br>        v.<br><br>MARK KARPELES, an individual,<br><br>                            Defendant. | Case No. 1:14-cv-01437<br><br>Hon. Gary Feinerman<br><br>Magistrate Judge Susan Cox<br><br>DECLARATION OF CAROL GOFORTH<br><br>DEMAND FOR JURY TRIAL |

## DECLARATION OF CAROL R. GOFORTH

I, Carol R. Goforth, declare as follows:

1.  I have been retained by Edelson PC, counsel for plaintiffs in the above captioned matter, as an expert in the regulation of cryptoassets, transactions, and businesses, including bitcoin exchanges. I have been asked to offer my analysis of Mark Karpeles' conduct in operating the Mt. Gox bitcoin exchange, including affirmative statements made during the time in which Mt. Gox operated, various decisions not to disclose certain information, and a range of actions designed to conceal the true state of the exchange from its users. I understand that my declaration may be used in connection with a pending issue of class certification or otherwise in the pending litigation.

2.  My professional billing rate for consultation is $300 per hour. My fees for preparing this report and testifying in this case are not contingent on the outcome of the proceedings or on the opinions presented herein.

1

3.  I am currently a University Professor of Law at the University of Arkansas (Fayetteville) School of Law, a position that I have held since 2012. I also hold the Clayton N. Little Professorship in Law, and have done so since 2000. I am an elected member of the American Law Institute, a member of the Arkansas Bar Foundation, and am licensed to practice law in the state of Oklahoma. I am also a member of the academic faculty network at the Center for Blockchain Excellence at the Sam M. Walton College of Business.

4.  I have been a full time academic for 30 years, and for most of that time I specialized in teaching and researching issues involving corporate law and unincorporated business organizations, securities regulation, corporate compliance, and related matters. More recently, my academic focus has been on cryptoassets and their regulation, in the U.S. and abroad.

5.  I am the author of four published articles dealing with the cryptoassets, and as of the date of this declaration, I have written three additional articles that have been accepted for publication but have not yet appeared in print. I am also the author of what I believe to be the first comprehensive text on regulation of cryptotransactions in the U.S., which is scheduled to be published in March 2020, by West Academic.

6.  I have taught Regulation of Cryptotransactions at the University of Arkansas (Fayetteville) School of Law and a course on the International Regulation of Cryptotransactions at Downing College at the University of Cambridge, U.K., in the summer of 2019.

7.  In 2019, I made presentations at two legal symposia focused on cryptotransactions (one of which also had a focus on cybersecurity), and I gave an invited presentation at the South Dakota School of Law dealing with why regulatory agencies have such an interest in cryptoassets. I am currently scheduled to make an additional presentation in January 2020 on

2

crypto-based businesses at the annual meeting of the Association of American Law Schools. I will also be a panel participant at the 2020 Blockchain Center of Excellence annual conference, discussing state regulation of crypto-based businesses.

8. My professional background is set out in more detail in the C.V. that is attached as Exhibit A to this declaration.

9. In preparation of this declaration, I have relied upon my general knowledge of the law and my specific research into the operation and legal regulation of cryptocurrencies and crypto-based businesses. I have also relied on a wide range of publicly available information about bitcoin and other cryptocurrencies, the crypto community and the way in which members of that community tend to interact with one another and react to publicly available information, the evolving development of crypto-based businesses, and the ways in which crypto exchanges have historically and currently operate. I have spoken with a number of individuals heavily involved in crypto-based businesses relating to a variety of issues concerning cryptoassets and transactions, although with none of them about Mt. Gox or Mark Karpeles in particular. I have also reviewed documents associated with Mark Karpeles and Mt. Gox, both publicly available and some that are associated with this case, which I requested from counsel and have kept confidential as required by the protective order currently in place. In terms of documents related to this case, I have considered the following:

- The original class action complaint;
- The fourth amended class action complaint;
- Mark Karpeles's deposition transcript, including its exhibits; and
- The expert report of Andrew J. Rasmussen.

3

In terms of non-case-related materials, I have cited the specific documents I considered in drafting this declaration in the paragraphs that follow. In addition to background information that I acquired from innumerable sources prior to being retained as a consultant in this matter, I reviewed the sources listed on Exhibit B which is attached to this declaration. To the best of my recollection, that is the complete list of sources I consulted in connection with this service, although I am simultaneously working on academic publications related to the regulation of cryptotransactions.

10. This declaration sets forth a summary of testimony that I would provide if called upon to do so on the issues set out herein. The opinions expressed in this declaration are my own.

**The Rise of Bitcoin; the First Successful Cryptocurrency**

11. In 2008, a person or persons using the pseudonym "Satoshi Nakamoto" published a document titled "*Bitcoin: A Peer-to-Peer Electronic Cash System*" in an online discussion group. In 2009, open-source software relying on the protocols set out in that paper and called bitcoin was released.

12. Bitcoin uses "public key cryptography" to verify transactions, meaning that owners of bitcoin have a publicly disseminated "public key" that is used to authenticate transactions and a private key that serves to verify ownership. The private key can encrypt or decrypt transactions, while the public key authenticates from whom a particular message has originated. In the context of bitcoin, a user's private key is used to encrypt a message that acts as the sender's digital signature. The recipient uses the corresponding public key to decrypt the signature. Although this process demonstrates ownership since only the private key can generate a valid signature, the actual identity of individual users is not readily apparent to others. Because privacy and

4

confidentiality are of special concern in the crypto community, it may be particularly difficult for individuals to identify potential trading partners, particularly as ownership of bitcoin is dispersed around the world.

13. Bitcoin was the first successful cryptocurrency to rely on blockchain technology, fairly quickly gaining a small but world-wide following after its launch in 2009.

14. There is a publicly available record of early market capitalization of bitcoin, showing that by August 19, 2010 the total market capitalization (or the total value in U.S. dollars "of the bitcoin supply then in circulation, as calculated by the daily average market price") was $251,209. A month later, on October 20, 2010, the market capitalization was $883,998. By the end of the year, on December 29, 2010, it was $1,503,040. These numbers can be confirmed by checking the historical information maintained and available at Blockchain, *Market Capitalization*, which is accessible online at https://www.blockchain.com/en/charts/market-cap?timespan=all&showDataPoints=true.

15. Bitcoin valuation has been volatile throughout the course of bitcoin's existence. Initially, this reflected considerable uncertainty about the extent to which bitcoin would gain widespread acceptance as well as a number of other factors. One early problem was the difficulty in finding trading partners.

**Bitcoin Exchanges and Mt. Gox**

16. On March 17, 2010, the first bitcoin exchange, the now-defunct BitcoinMarket.com, began operations. Initial trading was somewhat sporadic, but as interest in bitcoin grew, the need for additional mechanisms to facilitate trading also increased, and additional exchanges began to appear.

5

17. Mt. Gox was launched on July 18, 2010, by Jed McCaleb, as a bitcoin trading exchange and price quoting service. (Mt. Gox had previously existed for another purpose but was converted to function as a bitcoin exchange at that time).

18. Despite public reports suggesting that this occurred in early March 2011, Mark Karpeles closed on the purchase of Mt. Gox from McCaleb in February 2011, using Tibanne Ltd. to acquire the exchange. Karpeles was the sole owner and manager of Tibanne, which apparently operated without any board of directors. (Karpeles Dep. 21:3-6). The relevant purchase agreement did not include any confidentiality provisions, although McCaleb previously requested that Karpeles not disclose that McCaleb was considering selling the exchange. (Karpeles Dep. 61:17-62:21). These details were not publicly disclosed at the time and were not known by me until I read stories about the Mt. Gox bankruptcy and Karpeles' trial in Japan, and confirmed the accuracy of those reports by reading Karpeles' deposition in this case.

19. Mt. Gox grew to become the largest functioning bitcoin exchange in the world, reportedly facilitating upwards of 70% of all transactions in 2013.

**Bitcoin Businesses, Hacks, and User Reactions**

20. Shortly after Karpeles executed the agreement to buy Mt. Gox, there was apparently a hack resulting in the loss of approximately 80,000 BTC from the Mt. Gox exchange. It appears that this theft occurred on March 3, 2011. Although this was not publicly known or known to me at the time, that theft caused the exchange to have fewer BTC than the number of coins reflected in users' accounts. (Karpeles Dep. 53:4-54:8). (This declaration will refer to the March 3, 2011 hack as the "80,000 BTC theft".)

6

21. Karpeles apparently made an intentional decision not to disclose the 80,000 BTC theft to the Mt. Gox community at that time. (Karpeles Dep. 63:5-10). I did not become aware of this decision or the discussions between Karpeles and McCaleb about whether to avoid disclosure of this information until reading Karpeles' deposition.

22. In the spring of 2011, additional bitcoin exchanges were being created around the world. For example, Bitomat went online on April 4, 2011, as the first Polish exchange, allowing BTC to be exchanged for Polish zloty. By July 2011, it was the third largest exchange then in operation.

23. On June 19 or 20, 2011, the Mt. Gox bitcoin exchange was hacked by a person or persons who, according to Karpeles, had gained access to a Mt. Gox account with administrative access privileges. (Karpeles Dep. 141:15-18). The hacker(s) managed to credit their account with a very large number of bitcoins which they used to trigger a plunge in the trading value of bitcoin. Although the price self-corrected, the trader or traders withdrew about 2000 BTC at the artificially reduced price. (This declaration refers to this as the "June 2011 Incident".)

24. The glitch in trading price was immediately visible to the community because the nature of the blockchain is that it is open-source and transparent (although the actual identity of traders is hidden through the use of digital signatures). In order to address the June 11 Incident, Mt. Gox went offline for a short period of time.

25. One source from June 2011 published this explanation of the June 11 Incident and its impact on Mt. Gox and other bitcoin exchanges:

> MtGox, the largest and most influential [exchange] is entirely offline (rolling back the
> hacked exchange.) Virwox has halted BTC trading; BitcoinMarket.com and Tradehill

7

> trading of BTC has ground to a crawl-although it's not disabled, the value of the coins
>
> have changed little and they're very slow to respond to exchange requests; bitmarket.eu
>
> hasn't set any policies, but it's a European market so it's hard for Americans to use.
>
> Finally, Bitomat seems unaffected, but it's in Polish so it's difficult to tell.

Kyt Dotson, *Bitcoin Staggering into New Market Illiquidity in Wake of MtGox*, SiliconeAngle
(June 22, 2011) (archived at https://perma.cc/GEU2-VVFU).

26. Mt. Gox publicly responded by moving 424,242 BTC from "cold storage" to a Mt. Gox
address in a trade announced in order to prove that the exchange still had control over those
coins. This occurred in Block 132749, creating the appearance that Mt. Gox was stable and
reliable, when other exchanges were not.

27. Karpeles has admitted that he needed help in reassuring and "calming" the Mt. Gox and
bitcoin community following the June 2011 Incident. (Karpeles Dep. 145:5-146:17).

28. The need to reassure the community and retain its trust in Mt. Gox was reinforced by
what happened with other bitcoin exchanges and businesses when they experienced and revealed
thefts or hacks resulting in the loss of bitcoins.

29. Bitomat went offline in July 2011 with an announcement that the service had lost access
to a wallet.dat file with approximately 17,000 bitcoins (which would have had a then-current
value of approximately U.S. $220,000). Customers demanding their assets forced the sale of the
exchange.

30. Also in August 2011, a bitcoin service operating under the name "MyBitcoin" declared it
had been hacked, losing approximately 78,000 bitcoins. The loss of that crypto, which would
have been worth about $800,000 at that time, caused that service to be shut down completely.

8

31. Bitcoinica, another bitcoin trading service, was hacked twice in 2012 (once on March 1, 2012, when there was an internal security breach giving a hacker access to a Bitcoinica wallet, and then again on May 11, 2012, when a large number of bitcoins were stolen from a hot wallet). This lead to creditors forcing a receivership under New Zealand law. In addition, these events led to a lawsuit filed in San Francisco in August 2012, based on allegations that the platform neglected its duties, failed to safeguard users' money, and cheated them out of withdrawal requests.

32. In September 2012, Bitfloor, a bitcoin exchange that then claimed to be the fourth largest in the world, also reported being hacked, losing 24,000 bitcoins (worth about U.S. \$250,000 at the then-current market value of BTC). Efforts to recover user trust were unsuccessful, and Bitfloor was forced to cease operations in April 2013.

**Mt. Gox's Bitcoin Deficit**

33. In early September 2011, responding to ongoing expressions of concern from Mt. Gox users and other members of the bitcoin community, Mark Karpeles issued a statement to the press and members of the bitcoin community acknowledging the June 2011 Incident and again trying to reassure the public that Mt. Gox was reliable.

34. In his September 2011, public "clarification" about the June 2011 Incident, Karpeles reassured users that their accounts with the exchange were secure, publicly stating that "the Bitcoins… were not taken from other users' accounts …." Mark Karpeles, *Clarification of Mt. Gox Compromised Accounts and Major Bitcoin Sell-off*, Mt. Gox --- 24/7 Bitcoin Exchange (archived Sept. 19, 2011, and available online at

https://web.archive.org/web/20110919162635/https://mtgox.com/press_release_20110630.html).

9

Karpeles also told the public that the 2000 BTC that had been withdrawn would "be replaced at Mt. Gox's expense. Again, apart from the compromised admin account, no individual user's account was manipulated in any way. All BTC and cash balances remain intact." *Id.*

35. There was no corresponding acknowledgment that the BTC and cash balances on the Mt. Gox exchange were already in a deficit position as a result of the 80,000 BTC theft that had occurred March 3, 2011.

36. The Mt. Gox bitcoin deficit was never fully recovered and was not disclosed to the public until after the exchange's bankruptcy in early 2014. Karpeles was aware of this. (Karpeles Dep. 104:23-105:15).

37. Karpeles also admits that he was aware of several additional incidents that compromised the Mt. Gox bitcoin supply, none of which were disclosed to users prior to the exchange's bankruptcy. (*See*, *e.g.*, Karpeles Dep. 127:3-131:7; 137:6-140:22). Karpeles further declined to disclose the growing BTC and cash deficits to users. (Karpeles Dep. 123:21-24).

38. Despite contemporary public reassurances to the contrary, after March 2011, the deficit was such that Karpeles was never "a hundred percent sure that Mt. Gox would be able to answer any withdrawal requests from someone who deposited anything[.]" (Karpeles Dep. 105:5-15).

**Active concealment of the Bitcoin Deficits with the Gox Bot**

39. Prior to the time when Karpeles purchased the Mt. Gox exchange, Mt. Gox used an automated program known as a "bot" to automatically purchase BTC for the exchange's accounts, using the fees generated by user activity on the platform. (Karpeles Dep. 75:1-76:7). This would have allowed the exchange to maintain a reserve of BTC without compromising the integrity of user's accounts. At this point in time, the bot would have had an account credited

10

with actual funds generated by user fees to back any purchase orders made by the Gox Bot program.

40. At some point in time shortly after Karpeles gained control of the exchange, Karpeles changed the function of the bot (or automated trading program) to making trades with legitimate users using artificially inflated account balances, either in terms of fake BTC or U.S. dollars. Karpeles admits that he caused the "system [to] increase the U.S. dollar balance of the Gox bot account." (Karpeles Dep. 78:13-79:22). He also admits that "sales" from the Gox Bot account did not use actual bitcoins, but also relied on database manipulation. (Karpeles Dep. 239:18-240:3).

41. Reports in the popular press examining some of the pre-bankruptcy trades on the Mt. Gox exchange refer to the "Willy Bot," which was a name given to the botting or automated trading program at some point. Reports detailed earlier periods of suspected automated traded were the work of an automated trading program that some called the "Markus Bot." Karpeles confirmed that both the "Willy" and "Markus" activity reflected activity of the Gox Bot. (Karpeles Dep. 108:9-109:6). This declaration refers to all of the Mt. Gox automated trading programs throughout the life of the exchange as the Gox Bot.

42. According to Karpeles, the purpose of the Gox Bot trades after he assumed control of the bot was to prevent the mounting BTC and currency debts and deficits from destabilizing the exchange. (Karpeles Dep. 73:23-74:13; 78:7-12).

43. The Gox Bot trades also had the effect of actively concealing the true state of the exchange's operations from users, which allowed the exchange to continue to operate. Karpeles acknowledged, for example, that Gox Bot activity would have affected the price of bitcoin on the

11

exchange, given that it would have impacted the apparent demand for (and, thus, price of) bitcoin on Mt. Gox. (Karpeles Dep. 234:18-235:2). Multiple sources analyzing Mt. Gox's records have concluded that Gox Bot's activity was responsible for the abnormally high price of bitcoin on Mt. Gox as compared to other exchanges at the time. *See, e.g., MtGox investigation update and preliminary release*, WizSec Blog (Feb. 14, 2015) (available online at https://blog.wizsec.jp/2015/02/mtgox-investigation-release.html) and *Mt. Gox was riddled with price manipulation, data mining reveals*, MIT Technology Review (Feb. 21, 2019) (available online at https://www.technologyreview.com/s/612967/mt-gox-was-riddled-with-price-manipulation-data-mining-reveals/).

44. As indicated by the contemporaneous impact on other bitcoin exchanges, serious or repeated hacking incidents involving the loss of bitcoins often led to closure of exchanges and other crypto businesses. Avoiding this result for Mt. Gox was the primary motivation for non-disclosure by Karpeles, who in his deposition explained his decision not to disclose the original 80,000 BTC theft as being out of fear that doing so would "potentially ... kill Mt. Gox." (Karpeles Dep. 63:5-64:20).

### What Members of the Mt. Gox Community would have Understood

45. Had the community been aware that there was a sizeable and growing deficit in the BTC and cash balances for the Mt. Gox exchange, it is virtually certain that users would have abandoned Mt. Gox. As explained by Karpeles himself in his deposition, the risk of disclosure was that "people wouldn't use Mt. Gox anymore. ... One point of the most important points for an exchange to continue running, I believe, is trust. One of -- this includes trust that the exchange will not be hacked, in which case disclosing this could have altered this." (Karpeles Dep. 64:19-

12

65:2). He also acknowledged that public knowledge of the deficit would have caused a "bank run," which would have caused Mt. Gox to run out of bitcoins (given that it lacked sufficient assets to cover user deposits) and become bankrupt. (Karpeles Dep. 69:6-23.)

46. The crypto-community was, especially from 2010 to 2014, both fairly tight-knit and quite active on online chat boards and discussion groups. Users tended to monitor information about their purchases and investment in BTC closely and actively, in part because of the volatility of the market and in part because of the lack of governmental oversight and official information, coupled with the history of hacks and businesses going offline. Based on this close scrutiny of the bitcoin market and exchange activity, some users even posited that Mt. Gox might be insolvent following the June 2011 Incident, before Karpeles and others took measures to cause users to believe that Mt. Gox was solvent. *See, i.e.*, Robert McMillan and Cade Meta, *The Rise and Fall of the World's Largest Bitcoin Exchange*, Wired (Nov. 6, 2013) (available online at https://www.wired.com/2013/11/mtgox/ and archived at https://perma.cc/DPK2-BH2F).

47. Users could, however, only communicate information that was accessible to them, and they had no way of knowing when trades were made with accounts that had no real backing, such as those with the Gox Bot. Transactions on exchanges, including Mt. Gox, were anonymous, and legitimate Mt. Gox members could not tell who their exchange partner was. This has also been admitted by Karpeles. (Karpeles Dep. 81:3-12).

48. Users of the Mt. Gox exchange would have understood that in general bitcoin exchanges existed (and still continue to exist) to facilitate the exchange of bitcoins between buyers and sellers. Users would have understood that the exchange was supposed to operate in accordance with certain basic principles that essentially amount to good faith and fair dealing.

13

49. In early 2012, Karpeles created Terms of Use for the Mt. Gox exchange, and the original English version was in place for all English users during the entire life of the exchange. (Karpeles Dep. 94:15-96:7). For users who saw those Terms of Use, there was clear notice that the exchange itself was not going to be a trading partner. (The Terms of Use appear in Doc #: 11-2, Filed: 03/04/14 as Group Exhibit B. They were also introduced as an exhibit in Karpeles' deposition. I did not review the Terms of Use until I was provided with a copy in connection with the preparation of this declaration.)

50. After the Terms of Use were in place, Mt. Gox users agreed that transactions between Mt. Gox and members were prohibited, except for "Purchase Transactions," which essentially allowed members to purchase BTC "gift codes" that could be redeemed by recipients from the exchange. (Doc #: 11-2, Filed: 03/04/14 as Group Exhibit B at p.4). As the Terms of Use state, "Except in the case of Purchase Transactions, Members acknowledge and agree that, when completing Transactions, they are trading with other Members, and Members accept that MtGox acts only as an intermediary in such Transactions and **not as a counterparty to any trade**." (*Id.*, emphasis added.)

51. Even members who did not actually read the Terms of Use would have anticipated that whoever they were dealing with was a legitimate user, with accounts backed by real BTC or fiat currency, and that all transactions reported by the exchange similarly involved or were backed by "real" assets. This would have been consistent with the way that crypto exchanges operate, and it would have been the only basis on which persons would have entrusted their own fiat or BTC to the control of Mt. Gox, since the exchange did not purport to allow anything resembling leverage trading.

14

52. Consistent with this belief, under the Terms of Use, sellers on the Mt. Gox exchange were required to warrant that all bitcoins offered for transfer "correspond to actual Bitcoins," and buyers on the Mt. Gox exchange were required to warrant that "currencies deposited to buy Bitcoins are actual currencies corresponding to actual assets ...." (Doc #: 11-2, Filed: 03/04/14 as Group Exhibit B at p.3).

53. Crypto exchanges generally operated as trusted intermediaries, accepting assets from customers, and then holding them in accounts for each member, with the understanding that the deposited assets would be used only as the customer directed, and returned at the customer's request. This is the way that the Mt. Gox Terms of Use were set up. The Mt. Gox Terms of Use specifically noted that the exchange "will hold all monetary sums and all Bitcoins deposited by each Member in its Account, in that Member's name as registered in their Account details, and on such Member's behalf." (Doc #: 11-2, Filed: 03/04/14 as Group Exhibit B at p.4).

54. Not only is it customary to assume that individuals have read the contracts that they sign (including such documents as the Terms of Use), but even for Mt. Gox users who did not actually read such terms, this would have been the customary way in which crypto exchanges were set up to operate. To the extent that there were deficits in customer accounts that were neither corrected nor disclosed reasonably promptly, this would not have been in accordance with the way that legitimate exchanges operated or operate today. These customary practices are essential because the involvement of an intermediary in a bitcoin trade adds a layer of risk, particularly since trades on the blockchain are irrevocable. The irrevocability of bitcoin transactions leaves parties to an exchange-facilitated trade vulnerable if, for instance, the

15

exchange misappropriates customer assets. Insolvency of an exchange also entails significant added risks for users. Customary practices evolved to deal with these added risks.

55. The pattern of misrepresentations, non-disclosure, and concealment was undoubtedly specifically geared at insuring that the Mt. Gox community of users continued to utilize the exchange. Karpeles acknowledged this directly. (Karpeles Dep. 68:6-24).

## Closure of Mt. Gox

56. Between May and July 2013, the U.S. Department of Homeland Security seized approximately $5,000,000 from the Mt. Gox U.S. subsidiary, on the grounds that the company was operating as an unregistered money transmitter. The subsidiary acted promptly to obtain a money services business license in the U.S., but Mt. Gox was forced to temporarily suspend withdrawals in U.S. dollars. Although withdrawals were supposedly allowed again starting July 4, 2013, complaints and reports from the time suggest that withdrawals in U.S. rarely occurred and were very slow when they did happen.

57. By November 2013, there were reports that customers were experiencing delays of weeks or months in withdrawing cash from their Mt. Gox accounts. A story in Wired Magazine reported that Mt. Gox has "effectively been frozen out of the U.S. banking system because of its regulatory problems." This story is still accessible online. Robert McMillian and Cade Metz, *The Rise and Fall of the World's Largest Bitcoin Exchange*, Wired (Nov. 6, 2013) (available online at https://www.wired.com/2013/11/mtgox/ and archived at https://perma.cc/DPK2-BH2F).

58. At this time Mt. Gox was faced with increasing requests for deposits to be returned, and it was losing ground to other exchanges as bitcoin traders turned elsewhere. When there were delays in obtaining a return of their investments, unhappy customers took to various discussion

16

boards and forums, posting more than 3300 times on a single thread about customer problems on the Bitcoin Talk online forum alone. *See* Joon Ian Wong, *Poll: Are you having Mt. Gox Withdrawal Issues*, CoinDesk (Feb. 4, 2014) (available online at https://www.coindesk.com/poll-mt-gox-withdrawal-issues). The referenced forum thread is still active, with 346 pages of posts as of December 10, 2019. The thread can be accessed online at https://bitcointalk.org/index.php?topic=179586.3980.

59. On February 7, 2014, faced with mounting pressure to address complaints about the inability of users to withdraw amounts from their accounts and having apparently "discovered" a massive years-long hack, Mt. Gox halted all BTC withdrawals, initially claiming that the exchange was trying to obtain a clear technical view of currency processes.

60. On February 10, 2014, Mt. Gox issued a press release claiming that the issue was due to transaction malleability, and that company was working on the problem. On February 17, 2014, an update claimed that the exchange was taking steps to address security issues.

61. On February 24, 2014, the Mt. Gox website went offline completely.

62. A document leaked and uploaded to the internet late on February 24, 2014, purporting to be an internal crisis strategy draft from Mt. Gox, claimed that the company had lost 744,408 bitcoins in a pattern of thefts that had been undiscovered for years. The original leak was in the form of a Tumblr post by Ryan Selkis, a bitcoin entrepreneur under the name "twobitidiot." A reposted copy of the internal document, entitled "*Crisis Strategy Draft*," is still available online at https://www.scribd.com/doc/209050732/MtGox-Situation-Crisis-Strategy-Draft?campaign=VigLink&ad_group=xxc1xx&source=hp_affiliate&medium=affiliate.

17

63. No rational investor would have knowingly chosen to put or keep bitcoin or currency on an exchange with a bitcoin or cash deficit. Accordingly, if there had been a disclosure of the fact that there was a bitcoin deficit after the 80,000 BTC theft in March 2011 that was never recovered, users would have demanded return of their assets long before 2014, and the massive losses that eventually accrued would not have happened. Likewise, if Mt. Gox's bitcoin deficit had been publicly disclosed in or around March 2011, it is my opinion that the exchange would have failed or, at the least, would not have attracted additional investors in 2011 or the years that followed unless and until the deficits were eliminated and the problems that caused the shortfalls resolved. Either way, the losses realized in 2014 would have been avoided.

64. Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.


Executed on December 18, 2019, in Fayetteville, Arkansas, U.S.

Carol R. Goforth

18

# Exhibit A

## To the

## Declaration of Carol Goforth

# CURRICULUM VITA
# CAROL R. GOFORTH

## ADDRESS

318-A Waterman Hall
University of Arkansas School of Law
Fayetteville, AR 72701
479-575-7933
cgoforth@uark.edu

## EDUCATION

**J.D.**, 1984 (**with high honors**)
University of Arkansas School of Law
Class Rank: 1/135; G.P.A.: 3.74/4.25
**B.A.**, Psychology, 1981
University of Arkansas.
Class Rank: 1/491; G.P.A.: 4.00/4.00

## EMPLOYMENT

1993 to present **UNIVERSITY OF ARKANSAS SCHOOL OF LAW**, Fayetteville
I am a full time member of the law faculty, teaching Business oriented classes. I also teach a range of transactional classes offered at the Law School. I focus on closely held businesses, publicly held corporations, transactional skills, and regulation of cryptotransactions.

2012 *Promoted to University Professor in recognition of outstanding service to the Institution as teacher, scholar and leader in service

Aug 2005- *Served as Acting Dean following unexpected passing of Dean Richard
Sept 2005 Atkinson

2002 *Served as Associate Dean for Academic Affairs, acting as Liaison between to 2006 the Law School administration and faculty

2000 *Awarded the Clayton N. Little Professorship in Law

1998 *Became the Arkansas Bar Foundation Professor of Law

1997 *Promoted to Professor of Law

1994 *Hired full-time as Associate Professor of Law

1993 *Hired as Visiting Professor of Law

**EMPLOYMENT** (continued).                                        Page 2

2004-06     **CLINTON SCHOOL OF PUBLIC SERVICE, Little Rock**
            I served as an Inaugural Professor of Public Service and assisted with the curriculum
            planning and development process.

1989-93     **SETON HALL UNIVERSITY SCHOOL OF LAW, Newark, N.J.**
            I began my full time career as an academic at Seton Hall, teaching a tradition business law
            course load involving Corporate Finance; Business Associations; Securities Regulation;
            Advanced Business Planning; Negotiating & Drafting for the Close Corporation, as well
            as the occasional Contracts class.

            1992    *Promoted to Associate Professor of Law

            1989    *Hired as Assistant Professor of Law

1987-88     **UNIVERSITY OF TULSA COLLEGE OF LAW, Tulsa, OK.**
            I taught Appellate Advocacy as an Adjunct Professor

1984-89     **DOERNER, STUART, SAUNDERS, DANIEL & ANDERSON, Tulsa, OK.**
            I was an associate attorney, engaged in the private practice of law emphasizing securities,
            corporate and commercial law, with a transactional focus.

## PUBLICATIONS

Books and Supplements

       REGULATION OF CRYPTOTRANSACTIONS (West Academic, 2020 anticipated publication).

       CHOOSING BETWEEN UNINCORPORATED ENTITIES IN ARKANSAS (2012, Arkansas Law
       Press).

       Michael L. Closen, Gary S. Rosin & Carol R. Goforth, AGENCY & PARTNERSHIP, PROBLEMS
       AND STATUTES (1996 & 1997 Supps.).

       L. BEARD & C. GOFORTH, THE ARKANSAS LIMITED LIABILITY COMPANY (M & M Press,
       1994).

Articles

       *The Case for Preempting State Money Transmission Laws for Crypto-based Businesses,*
       72 ARK. L. REV. __ (2020) (forthcoming, for the symposium issue).

       *Using Cybersecurity Failures to Critique the SEC's Approach to Crypto Regulation,* 64
       S. DAKOTA L. REV. _ *(2020) (forthcoming).* [This was a solicited contribution for their
       Cyber symposium issue.]

       *It's Raining Crypto: The Need for Regulatory Clarification When it Comes to Airdrops,*
       INDIAN J. OF LAW AND TECH, SPECIAL ISSUE ON BLOCKCHAIN POLICY AND REGULATIONS
       ___ (2019) (forthcoming). [This was a solicited contribution.]

**PUBLICATIONS (continued)**                                          Page 3

*U.S. Law: Crypto is Money, Property, a Commodity, and a Security, all at the Same Time,* 49 J. FINANCIAL TRANSACTIONS 102 (2019). [This was a solicited contribution].

*Securities Treatment of Tokenized Offerings under U.S. Law,* 46 PEPPERDINE L. REV. 1 (2019).

*How Blockchain Could Increase the Need for and Availability of Contractual Ordering in Corporations (and other Enterprises),* 94 N. DAKOTA L. REV. 1 (2019).

*The Lawyer's Cryptionary: A Resource for Talking to Clients about Crypto-transactions,* 41 CAMPBELL L. REV. 47 (2019).

*Medical Marijuana in Arkansas: The Perils of Poor Drafting,* 71 U. ARK. L. REV. 647 (2019).

*Using Transactional Exercises for First-year Learning Assessment,* 20 TRANSACTIONS: THE TENN. J. OF BUS. LAW 215 (2019) (with William E. Foster) (forthcoming).

*I understand C and S Corporations, but what are B Corporations?,* ARK. L. NOTES (March 19, 2018), online publication available at http://media.law.uark.edu/arklawnotes.

 *"Making the Case for ULLCA (2013) in Arkansas,"* UALR L. REV. (2018) (forthcoming).

*"Diversity in Law School Faculty Hiring: Why it is a Mistake to Make it all about Race,"* 56 U. LOUISVILLE L. REV. 237 (2018).

*"Prescriptive Writing: Evidence Justifying and Options for Implementing Change,"* 67 J. OF LEGAL ED. 904 (2017).

*"Too Many Cooks Spoil the Cake, and to Many Statutes Spoil the LLC: A Plea for Uniformity,"* 45 SOUTHWESTERN L. REV. 63 (2016).

 *"A Corporation has no Soul, and Doesn't Go to Church: Relating the Doctrine of Piercing the Veil to Burwell v. Hobby Lobby,"* 67 S. CAROLINA L. REV. 73 (2015).

*"Why the Bar Examination fails to raise the Bar,"* 42 OHIO N.U.L. REV 47 (2015).

*"Encouraging Cooperative Learning with a Non-Traditional Examination Process,"* 42 NO. KY L. REV. 47 (2015).

*"Ethical Issues for Transactional Attorneys Here and Abroad,"* 15 TRANSACTIONS: TENN. J. BUS. L. 593 (2014).

*"A Review of Piercing the Veil Cases in Arkansas,"* 2011 ARK. L. NOTES 17.

*"A Corporation Has No Soul"–Modern Corporations, Corporate Governance, and Involvement in the Political Process,* 47 HOUSTON L. REV. 617 (2010).

**PUBLICATIONS (continued)**

*The Model Registered Agents Act–A Word (or two) to the Wise*, 2008 ARK. L. NOTES 43.

*Why Arkansas Should Adopt the Revised Uniform Limited Liability Company Act*, 30 UALR L. REV. 31 (2007).

*The Series LLC, and a Series of Difficult Questions*, 60 ARK. L. REV 385 (2007).

*Time for Another New Business Statute: The Case for the Uniform Limited Partnership Act*, 2004 ARK. LAW NOTES 55.

*Arkansas Code § 18-16-101: A Challenge to the Constitutionality and Desirability of Arkansas' Criminal Eviction Statute*, 2003 ARK. LAW NOTES 21.

*The Case for Expanding Child Support Obligations to Cover Post-Secondary Educational Expenses*, 56 ARK. L. REV. 93 (2003).

*An Overview of Organizational and Ownership Options Available to Agricultural Enterprises, Part I* (Published electronically by the Nat'l Ag. Law. Center) (Summer, 2002).

*An Overview of Organizational and Ownership Options Available to Agricultural Enterprises, Part I* (Published electronically by the Nat'l Ag. Law. Center) (Summer, 2002).

*An Introduction to the Federal Securities Laws As They Might Apply to Agricultural Operations* (Published electronically by the Nat'l Ag. Law. Center) (Summer, 2002).

*Technology Due Diligence–The Need for and benefits of Technology Assessment In Connection with Investment in High-Tech Companies*, 27 RUTGERS COMPUTER & TECHNOLOGY L. J. 165 (2001) (with Ronald R. Goforth).

*A Bad Call: Preemption of State and Local Authority to Regulate Wireless Communication Facilities on the Basis of RadioFrequency Emissions*, 44 NEW YORK LAW SCHOOL L. REV. 311 (2001).

*Application of the Federal Securities Laws to Equity Interest In Traditional and Value-Added Agricultural Cooperatives*, 6 DRAKE J. OF AGRICULTURAL L. 31 (2001).

*Limited Liability for General Partners in Arkansas LLLPs (Limited Liability Limited Partnerships)*, 2001 ARK L. NOTES 47.

*Appropriate Regulation of Antibiotics in Livestock Feed*, 28 BOSTON COLLEGE ENVIRONMENTAL AFFAIRS L. J. 39 (2000) (with Robyn L. Goforth).

**PUBLICATIONS (continued)**                                    Page 5

*A Bad Call: Preemption of State and Local Governmental Authority to Regulate Wireless Communication Facilities on the Basis of Radio Frequency Emissions*, 44 NEW YORK LAW SCHOOL L. REV. 311 (2001).

*Use of Simulations and Client Based Exercises in the Basic Course*, 34 GEORGIA L. REV. 851 (Spring, 2000).

*"The Revised Uniform Partnership Act: Ready or Not, Here it Comes*, 1999 ARK. L. NOTES 47.

*Not in My Back Yard!" Restrictive Covenants as a Basis for Opposing the Construction of Cellular Towers*, 46 BUFFALO L. REV. 705 (1998).

*Treatment of LLC Membership Interests Under the Arkansas Securities Act*, 1998 ARK. L. NOTES 33.

*Reflections on What Lawyers Should Reflect On*, 39 SO. TEX. L. REV. 585 (1998).

*An Update on Arkansas Limited Liability Companies: New Tax Regulations and New State Laws*, 1997 ARK. L. NOTES 11.

*Limited Liability Partnerships: The Newest Game in Town*, 1997 ARK. L. NOTES 25.

*Continuing Obstacles to Freedom of Choice for Management Structure in LLCs*, 1 LEWIS & CLARK J. OF SMALL & EMERGING BUS. L. 165 (1997).

*Limiting The Liability of General Partners in LLPs: An Analysis of Statutory Alternatives*, 75 OR. L. REV. 1139 (1997).

*"What is She?" How Race Matters, and Why it Shouldn't*, 46 DEPAUL U. L. REV. 1 (1996).

*The Rise of the Limited Liability Company: Evidence of a Race Between the States, but Heading Where?* 45 SYRACUSE L. REV. 1193 (1995).

*Limited Liability Partnerships: Does Arkansas Need Another Form of Business Enterprise?* 1995 ARK. L. NOTES 57.

*Why Limited Liability Company Membership Interests Should Not be Treated as Securities and Possible Steps to Encourage this Result*, 45 HASTINGS L.J. 1223 (1994).

*The Arkansas Limited Liability Company: A Call for Clarification*, 1994 ARK. L. NOTES 19.

*Proxy Reform as a Means of Increasing Shareholder Participation in Corporate Governance: Too Little, But Not Too Late*, 43 AM. L. REV. 379 (1993).

**PUBLICATIONS (continued)**

*The Efficient Capital Market Hypothesis--An Inadequate Justification for the Fraud on the Market Presumption,* 27 WAKE FOREST L. REV. 895 (1992).

*Criticizing the Financial Institution Insurance Agencies' Super-Powers,* 22 ARIZ. ST. L.J. 195 (1990).

*Duties Owed by Stockbrokers to Their Customers,* 33 ST. LOUIS L.J. 407 (1989), reprinted in THE SECURITIES L. REV. (1990).

*A Jurisprudential Reflection Upon the Burger Court's Approach to Procedural Due Process,* 42 ARK. L. REV. 837 (1989).

*The Oklahoma Unfair Claims Settlement Practices Act,* 24 TULSA L.J. 373 (1989).

*Sales of Structurally Defective Homes: The Potential Liability of Sellers and Real Estate Brokers,* 41 OKLA. L. REV. 447 (1988).

*The Effect of Mortgage Modifications Upon Priority,* 59 OKLA. BAR J. 2845 (Nov. 1988).

Student Note: *Dickman v. Commissioner: Gift Tax Consequences of Interest Free Loans,* 36 ARK. L. REV. 400 (1983), reprinted in DIGEST OF TAX ARTICLES 28 (April, 1984).

Selected Blog Posts, and Interviews

Jeff Della Rosa, *UA law professor studies crypto regulation,* TALK BUSINESS NET (Oct. 23, 2019) (story based on interview available online at https://talkbusiness.net/2019/10/ua-law-professor-studies-crypto-regulation/).

Max Yakubowski, *Is Bitcoin Protected as Speech Under the 1st Amendment? Experts Answer,* COINTELEGRAPH (Aug. 26, 2019) (interview excerpt available online at https://cointelegraph.com/news/is-bitcoin-protected-as-speech-under-the-1st-amendment-experts-answer).

Max Yakubowski, *Why Is the US Not Yet a Leader in Crypto Regulation? Experts Answer,* COINTELEGRAPH (Aug. 4, 2019) (interview excerpt available online at https://cointelegraph.com/news/why-is-the-us-not-yet-a-leader-in-crypto-regulation-experts-answer).

*US Law: Crypto is Money, Property, a Commodity, and a Security, all at the Same Time,* OXFORD BUS L. BLOG (Dec. 7, 2018), https://www.law.ox.ac.uk/business-law-blog/blog/2018/12/us-law-crypto-money-property-commodity-and-security-all-same-time archived at https://perma.cc/4HKU-YCMY

*A response to Steven Krohn, Security Tokens or Utility Tokens: What's the Difference?,* Medium (Nov. 13, 2018), https://medium.com/@carolgoforth/security-token-vs-utility-token-is-a-false-dichotomy-856e626aae68 archived at https://perma.cc/D5HR-72DP

**PUBLICATIONS (continued)**                                                              Page 7

*Why we should stop talking about "cryptocurrencies,"* MEDIUM (Nov. 8, 2018), https://medium.com/@carolgoforth/why-we-should-stop-talking-about-cryptocurrencies-c543238e9a5c archived at https://perma.cc/39US-FJ8W

*How Blockchain Could Increase the Need for and Availability of Contractual Ordering in Corporations (and other Enterprises),* MACHINE LAWYERING BLOG (Oct. 30, 2018), archived at https://perma.cc/84MU-2U2T

## PROFESSIONAL SERVICE

I served as a member of the Arkansas Bar Foundation's Writing Awards Committee for 2017-18 and 2018-19.

I am the Arkansas Liaison to the Corporate Laws Committee of the American Bar Association, Section of Business Law.

For the past several years, I have been a member of the American Association of Law Schools Committee on Unincorporated Business Entities.

I have been a member of the American Law Institute since 1999 and have participated in a number of Member's Consultative Groups (currently including the Restatement of Corporate Governance).

I was added as an Official Observer to the Uniform Limited Liability Company Act Drafting Committee of the National Conference of Commissioners on Uniform State Laws in June of 2005, and served in that capacity until approval of the ULLCA by NCCUSL.

I was a member of and Region I representative to the Arkansas Mental Health Professional Advisory Committee, from July, 1999 to January 15, 2001.

I was a member of the Board of Directors of the Mental Health Association in Northwest Arkansas, from January, 1998 to December 31, 2000; and chaired their Professional Advisory Committee, 1999-2000.

In 1998 I served as amicus curiae in *Nutek Information Systems, Inc., v. Arizona Corporation Commission,* 1998 WL 767176 (Ariz. App. Div., Nov. 1998), the first federal appellate case to consider when membership interests in a member-managed LLC should be classified as securities under traditional investment contract analysis.

In 1997-98, at the request of Counsel to the Department of Justice of Canada, I provided a written analysis of certain aspects of Arkansas partnership law in connection with *James C. Griffiths v. H.M.T.Q.,* Court No. 96-2205(IT)G, an on-going Canadian investigation.

In 1997-98, I was a member of the Citizen's Advisory Group on Cell Towers, reporting to the Washington County Quorum Court.

In 1998, I worked with the Jurisprudence and Law Reform Committee of the Arkansas Bar Association in connection with its consideration of the Uniform Partnership Act (1996).

## PROFESSIONAL SERVICE  (continued)                                    Page 8

I participated in the drafting process for Arkansas legislation authorizing limited liability partnerships (LLPs) and registered limited liability limited partnerships (LLLPs).

I have been a pro bono volunteer at the local Legal Services office (its name has changed over the years), assisting with legal research and drafting, 1998 to date.

## PROFESSIONAL AFFILIATIONS

Member, Academic Faculty Network, The Center for Blockchain Excellence at the Sam
M. Walton College of Business

National Conference of Commissioners on Uniform State Laws
(formerly an Official Observer to ULLCA Drafting Committee)

American Law Institute
(currently in the Members' Consultative Group on the Restatement of Corporate
Governance; previously served on the Consultative Groups for the Principles of the
Law of Nonprofit Organizations and the Restatement (Third) of Agency)

Association of American Law Schools
(currently a Member of the AALS Committee on Agency, Partnership, LLC and
Unincorporated Entities.)

American Bar Association
(currently the Arkansas Liaison to the Corporate Laws Committee, Business Law
Section)

Arkansas Bar Association
(formerly the Chair of the Corporate and In-House Counsel Section)

Arkansas Bar Foundation
(a Member of the Legal Writing Awards committee-2018 and 2019)

Oklahoma Bar Association
(member)

# Exhibit B

## To the

## Declaration of Carol Goforth

**List of Supplemental Sources Reviewed and Consulted
during the preparation of the declaration to which this Exhibit is attached.**

*This list is in chronological order of the sources, from the most recently released to the oldest of the documents.

*A brief history on Bitcon & Cryptocurrencies,* Ledger (Oct. 23, 2019) (available online at https://www.ledger.com/academy/crypto/a-brief-history-on-bitcoin-cryptocurrencies/).

Andrew Norry, *The History of the Mt Gox Hack: Bitcoin's Biggest Heist*, Blockonomi (June 7, 2019) (available online at https://blockonomi.com/mt-gox-hack/).

Matthew Beedham, *A brief history of Mt. Gox, the $3B Bitcoin tragedy that just won't end,* TheNextWeb (Mar. 14, 2019) (available online at https://thenextweb.com/hardfork/2019/03/14/a-brief-history-of-mt-gox-the-3b-bitcoin-tragedy-that-just-wont-end/).

Darryn Pollock, *The Mess that Was Mt. Gox: Four Years On,* CoinTelegraph (Mar. 9, 2018) (available online at https://cointelegraph.com/news/the-mess-that-was-mt-gox-four-years-on).

David Floyd, *A $480 Million Mystery: The Saga of Mt. Gox,* NASDAQ (Aug. 10, 2015) (available online at https://www.forbes.com/sites/andygreenberg/2014/02/25/bitcoins-price-plummets-as-mt-gox-goes-dark-with-massive-hack-rumored/#22e50b72ce1f).

Luke Parker, *36 Bitcoin exchanges that are no longer with us,* BraveNewCoin (Oct. 22, 2015) (available online at https://bravenewcoin.com/insights/36-bitcoin-exchanges-that-are-no-longer-with-us).

*The Willy Report: proof of massive fraudulent trading activity at Mt. Gox, and how it has affected the price of Bitcoin,* Willy Report (May 25, 2014) (available online at https://willyreport.wordpress.com/2014/05/25/the-willy-report-proof-of-massive-fraudulent-trading-activity-at-mt-gox-and-how-it-has-affected-the-price-of-bitcoin/)

*The Troubling Holes in MTGox's Account of How It Lost $600 Million Bitcoins,* MIT Technology Review (Ap. 4, 2014) (available online at https://www.technologyreview.com/s/526161/the-troubling-holes-in-mtgoxs-account-of-how-it-lost-600-million-in-bitcoins/).

Cameron Winklevoss, *What May Have Happened at Mt. Gox,* WinklevossCapital (Mar. 20, 2014) (available online at https://winklevosscapital.com/what-may-have-happened-at-mt-gox/).

Robert McMillan, The Inside Story of Mt. Gox, Bitcoin's $460 Million Disaster, Wired (Mar. 3, 2014) (available online at https://www.wired.com/2014/03/bitcoin-exchange/).

Andy Greenberg, *Bitcoin's Price Plummets As Mt. Gox Goes Dark, With Massive Hack Rumored*, Forbes (Feb. 25, 2014) (available online at https://www.forbes.com/sites/andygreenberg/2014/02/25/bitcoins-price-plummets-as-mt-gox-goes-dark-with-massive-hack-rumored/#22e50b72ce1f).

Vitalik Buterin, *Bitfloor Shuts Down*, Bitcoin Magazine (Ap. 19, 2013) (available online at https://bitcoinmagazine.com/articles/bitfloor-shuts-down-1366351632).

Adrianne Jeffries, *Bitcoin woes: users file lawsuit over $460k in missing funds,* The Verge (Aug. 10, 2012) (available online at https://www.theverge.com/2012/8/10/3233711/second-bitcoin-lawsuit-is-filed-in-california).

Vitalik Buterin, *Bitcoinica: An Obituary*, Bitcoin Magazine (May 14, 2012) (available online at https://bitcoinmagazine.com/articles/bitcoinica_an_obituary-1336979566).

Kyt Dotson, *Third Largest Bitcoin Exchange Bitomat Lost Their Wallet, Over 17,000 Bitcoins Missing,* SiliconAngle (Aug. 1, 2011) (available online at https://siliconangle.com/2011/08/01/third-largest-bitcoin-exchange-bitomat-lost-their-wallet-over-17000-bitcoins-missing/).

*Topic: mybitcoin down or just me?,* Bitcoin Forum (July 29, 2011) (thread still available online at https://bitcointalk.org/index.php?topic=32900.0).