# Exhibit Z

# EXHIBIT A

# COINLAB, INC.
# &
# MT. GOX KK

## EXCLUSIVE LICENSE AGREEMENT
## FOR THE USA & CANADA

THIS EXCLUSIVE LICENSE AGREEMENT is made as of November 22nd, 2012 (the "**Effective Date**") by and between CoinLab, Inc. ("**CoinLab**"), a Delaware corporation with its principal place of business located at 71 Columbia St., Suite 300, Seattle, WA 98104, Mt. Gox KK ("**MtGox**"), a Japanese corporation with a registered address at Round Cross 5F, Shibuya 2-11-6, Shibuya-ku Tokyo, Japan 150-0002 and Tibanne KK ("**Tibanne**"), a Japanese corporation with a registered address at Round Cross 5F, Shibuya 2-11-6, Shibuya-ku Tokyo, Japan 150-0002 (CoinLab and MtGox being hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**").

WHEREAS, CoinLab is engaged in the operation and development of Bitcoin and other software and technology products, services and platforms;

WHEREAS, MtGox is a Bitcoin exchange and financial services business;

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.  **LICENSE.**

A.  <u>Services</u>. The "**Services**" shall be defined as the digital currency exchange service operated by MtGox on MtGox.com on the Effective Date.

B.  <u>Licensed Materials</u>. The "**Licensed Materials**" shall mean all software, processes, know-how, copyrights, patents, trademarks, trade dress, trade secrets, agreements, policies and any and all other intellectual property that constitutes or is used in providing the Services. The license to use the Licensed Materials granted under this Agreement shall mean the right to access the Licensed Materials in the form made available by MtGox and on the servers made available by MtGox in order to provide the Services, through mtgox.com (the "**MtGox Website**") or through a domain owned by CoinLab (the "**CoinLab Website**"); it shall not mean or include the right to copy, modify, reproduce, adapt or otherwise transform the Licensed Materials in any manner not specifically approved in advance and in writing by MtGox.

C.  <u>License Grant</u>. As of the Effective Date, MtGox and Tibanne grant CoinLab an exclusive, non-transferable royalty-free license to the Licensed Materials for use to provide the Services within the United States of America and Canada (collectively the "**Territory**"), effective during the Term (as defined hereinbelow) and on the terms and conditions set forth in this Agreement. Except as otherwise stipulated in this Agreement, neither MtGox nor Tibanne shall revoke this license and any such revocation shall be deemed a material breach of this Agreement. Furthermore, and subject to all the terms and conditions of this Agreement, the Parties hereby grant each other a nonexclusive, non-transferable, non-sublicensable license to use each Party's trademarks, service marks and other trade dress for the sole purpose of marketing and branding the Services in the Territory.

D.  <u>Cessation of Operations</u>. To ensure continuity of service, in the event the Services can no longer be provided by MtGox or its successors during the Term, MtGox or its successors and Tibanne shall ensure and shall cause that CoinLab shall continue to be granted without interruption the rights defined in the preceding section C for the remaining Term. Further, CoinLab shall be granted a right of first refusal to purchase or license all rights necessary to provide the Services outside the Territory at the conditions stipulated in Section D below.

E.  <u>Right of First Refusal</u>. MtGox, upon receipt during the Term of a bona fide written offer to purchase or license all rights, title or interests to the Services that states the terms and conditions upon which a purchase or license is to be

made, shall give CoinLab sixty days' written notification of MtGox's intention to sell or license the same along with a copy of such bona fide written offer (the "**Sale Notice**"). CoinLab shall have the right to purchase or license the same upon the terms and conditions stated in the bona fide written offer by giving written notification to MtGox of its intention to do so within thirty days after receiving the Sale Notice. The failure of CoinLab to so notify MtGox of a desire to exercise such right of first refusal within the thirty-day period shall result in the termination of this right of first refusal and MtGox shall be entitled to consummate the contemplated sale or license pursuant to the bona fide written offer.

F. <u>Exclusivity</u>.
F.1 During the Term, MtGox and Tibanne shall not grant anyone the right to use the Licensed Materials to provide the Services, or any part thereof, in the Territory. The exclusivity granted herein shall apply strictly to Services targeting the Territory and the CoinLab Customers (as defined below) and advertised and sold as such. It shall not include the provision of Services to users of the Services who, depending on the interpretation or circumstances, may or may not be considered CoinLab Customers.
F.2 During a period of two years from the start of the Term, CoinLab shall not, directly or indirectly (including through legal entities ultimately owned by the same person or persons as CoinLab) provide services similar to the Services on any website. During said two years period, CoinLab may provide the Services to the CoinLab Customers only on the MtGox Website or on a CoinLab Website.

G. <u>Provision of services similar to the Services.</u> Following the end of the two years period stipulated in the preceding paragraph, CoinLab may provide services similar to the Services on a CoinLab Website without using or relying on the Licensed Materials (a "CoinLab Technology Website"); provided, however that, if the CoinLab Technology Website was previously a CoinLab Website, the change of technology shall be clearly advertised sufficiently in advance and the CoinLab Customers shall be given the choice and the opportunity to switch to receiving the Services on a CoinLab Website or the MtGox Website.

H. <u>Advertising.</u> When providing the Services on a CoinLab Website, CoinLab shall affix on the CoinLab Website the words "powered by MtGox" in a clearly visible manner approved in advance by MtGox. CoinLab shall not remove or modify this indication without MtGox' prior approval.

I. <u>Transfer of CoinLab Customers.</u> In the case where CoinLab shall decide to provide the Services on a CoinLab Website and shall transfer the CoinLab Customers from the MtGox to the CoinLab Website, MtGox shall cooperate with CoinLab; provided, however, that the costs incurred by MtGox to make the transfer technically possible shall be borne by CoinLab.

J. <u>Targets.</u> During each year of the Term, CoinLab shall reach the following minimum Revenue:
Year 1: US$ 310,000
Year 2: US$ 341,000 or 110% of the actual Revenue of Year 1, whichever is greater
Year 3: US$ 375,100 or 110% of the actual Revenue of Year 2, whichever is greater
Year 4: US$ 412,610 or 110% of the actual Revenue of Year 3, whichever is greater
Year 5: US$ 453,871 or 110% of the actual Revenue of Year 4, whichever is greater
Year 6: US$ 499,258 or 110% of the actual Revenue of Year 5, whichever is greater
Year 7: US$ 549,184 or 110% of the actual Revenue of Year 6, whichever is greater
Year 8: US$ 604,102 or 110% of the actual Revenue of Year 7, whichever is greater
Year 9: US$ 664,513 or 110% of the actual Revenue of Year 8, whichever is greater
Year 10: US$ 730,964 or 110% of the actual Revenue of Year 9, whichever is greater
Further, no later than 6 months prior to the end of any Term, the Parties shall agree on the minimum Revenue applicable to the next Renewal Term. In case the Parties fail to agree on the minimum Revenue, the applicable minimum Revenue during the next Renewal Term shall amount to the minimum applicable to the last year of the Term increased by 10%.
Any failure by CoinLab to meet the targets for two consecutive years shall be considered a material breach of this Agreement which shall give MtGox the right, at its convenience, either to terminate the exclusivity granted to CoinLab under this Agreement or to terminate this Agreement. In the case where MtGox shall terminate the exclusivity granted to CoinLab this Agreement shall continue to be in effect among the Parties except for this section J.
The obligation to reach the minimum Revenues defined herein shall apply even if CoinLab decides to provide the Services on a CoinLab Website and even if CoinLab decides to provide services similar to the Services on a CoinLab

Technology Website.

J.  Breach of Exclusivity. The Parties agree that any breach of section F shall be considered a material breach of this Agreement.

K.  Liquidated Damages. Both Parties hereby agree that it may be impossible to determine the monetary harm suffered by the non-breaching Party in the event that MtGox breaches section F.1 or in the event that CoinLab breaches section F.2 and that therefore, after careful consideration, the Parties agree that reasonable damages for such breach shall be $50,000,000 USD, an amount the Parties agree is reasonable and fair given the nature of the Agreement.

2.  **OPERATIONAL RESPONSIBILITIES.**

A.  Operations. Following the Transition Period (as defined below), CoinLab shall assume responsibility for managing, and marketing the Services in the Territory in accordance with terms of services (the "ToS") approved in advance and in writing by MtGox. The ToS may only be changed with the prior written consent of MtGox, which shall not be unreasonably withheld unless the change would create significant differences with the Services provided by MtGox. If, upon notice MtGox fails to respond to a consent request under this section within 10 business days, than MtGox shall be deemed to have consented to such changes to the ToS.

B.  Cooperation. MtGox and CoinLab shall cooperate in marketing and promoting the Services as operated by CoinLab including the issuance of a joint press release in form and on a date as mutually agreed upon by the Parties.

C.  Customer Support. Following the Transition Period MtGox shall continue to be responsible for customer support until such time as CoinLab desires to utilize its own customer service resources. For so long as CoinLab shall utilize MtGox provided customer support, CoinLab shall pay to MtGox a pro-rata portion of the customer support direct costs, in any event not less than $2,000.00 USD per month. CoinLab shall have the option to provide direct customer support without compensating MtGox.

D.  Compliance. CoinLab shall operate the Services in the Territory in compliance with all applicable laws after completion of the Transition Period and MtGox shall cooperate fully with CoinLab in achieving such compliance. MtGox shall further provide CoinLab with any information or documents necessary for CoinLab to be compliant with all applicable laws and regulations of the Territory. In addition, MtGox shall deliver a complete copy of all compliance materials and policies to CoinLab before the completion of the Transition Period.

E.  Security. Before completion of the Transition Period, MtGox shall deliver all passwords, Yubikeys, administrative logins and any other security information required so that CoinLab may assume operation of the Services under the terms of this Agreement.

F.  Hosting. Throughout the Term, MtGox shall host and maintain the Licensed Materials, the Service and the MtGox Website. MtGox shall provide the MtGox Website and Services with a minimum of 95% uptime on a monthly basis. If, in any given month during the Term the uptime for the MtGox Website or Services are below 95% then CoinLab may choose to host their own copy of the Licensed Materials.

G.  Database. MtGox shall make available to CoinLab during the Term, on-demand and read-only access to MtGox's databases and other related records and data pertaining to any and all customer accounts managed by CoinLab under the terms of this Agreement. In the case where CoinLab shall manage its own databases of the accounts of the CoinLab Customers, CoinLab shall provide on-demand and read-only access to said databases and other related records and data to MtGox when such data is required for MtGox to provide the Services.

H.  Updates. During the Term, MtGox and Tibanne shall furnish, at no additional charge to CoinLab, any update to the Licensed Materials it may develop which concern a feature or capability that is significant to enhancement or performance of the Licensed Materials. All such updates shall automatically become part of the Licensed Materials and shall be subject to all the terms and conditions of this Agreement. Further, any updates or changes to the Licensed Materials proposed by CoinLab and developed by MtGox or Tibanne shall immediately and automatically be transferred and vested to MtGox or Tibanne as stipulated by MtGox; provided, however, that (i) said updates or

changes shall be immediately integrated into the Licensed Materials and (ii) CoinLab shall cooperate with MtGox and Tibanne in ensuring that the ownership to said updates or changes be vested, transferred and/or registered in favor of MtGox or Tibanne. CoinLab represents and warrants that it shall not make any intellectual property claims with regard to any part of the Licensed Materials including said updates or changes.

I. Autonomy. CoinLab may elect to provide or not provide the Services to any CoinLab Customer in its sole discretion; provided, however, that this shall always be in accordance with the ToS.

### 3. TRANSITION OF CUSTOMER ACCOUNTS

A. CoinLab Customers. "**CoinLab Customers**" shall mean all current and future users of the Services who are citizens of either the United States of America or Canada or that can be identified as such from identification documents provided to MtGox or CoinLab. MtGox agrees not to provide the Services to any CoinLab Customer and CoinLab agrees not provide the Services to any user who is not a CoinLab Customer for the Term. CoinLab and MtGox will implement a process that shall allow users changing their citizenship to become or cease being CoinLab Customers. CoinLab Customers shall include:
  (i) "Current CoinLab Customers" shall mean CoinLab Customers who became users of the Services prior to the end of the Transition Period; and
  (ii) "Future CoinLab Customers" shall mean CoinLab Customers who became users of the Services after the Transition Period.
In addition, "New CoinLab Customers" shall mean persons who became users of services similar to the Services provided on a CoinLab Technology Website.

B. Transition Period. As of the Effective Date MtGox and CoinLab shall cooperate in transferring the Liquidity Funds (as defined below) to accounts controlled by CoinLab at a time as mutually agreed upon by the Parties but no longer than 120 days from the Effective Date (the "**Transition Period**").

C. Liquidity Funds. MtGox agrees to deposit Bitcoin and other funds (however denominated) of the CoinLab Customers identified on the Effective Date in an account or accounts controlled by CoinLab (the "**Liquidity Funds**"), with the understanding that all Bitcoin liabilities shall be funded by MtGox solely in Bitcoin. Such Liquidity Funds shall be deposited before completion of the Transition Period and in accordance with CoinLab's instructions on transaction types, timing of transactions and wire transfer or other deposit instructions.

### 4. REVENUE SHARING AND SERVER USAGE FEES

A. Revenue Sharing. For any revenue that is derived from fees, commissions or other payment charged to CoinLab Customers in relation with the Services during the Term (a "Revenue"), CoinLab shall be entitled:
  (i) for Current CoinLab Customers: 40% of the Revenue to CoinLab and 60% of the Revenue to MtGox;
  (ii) for Future CoinLab Customers and New CoinLab Customers, 90% of the Revenue to CoinLab and 10% of the Revenue to MtGox.

B. Customer Fees. Subject to the provisions of the preceding Section A., CoinLab shall have sole discretion for setting customer fee schedules and managing revenue derived from CoinLab Customers in relation with the Services. MtGox shall make such modifications to the Licensed Materials and the Services to support any customer fee changes and mutually agreed upon revenue opportunities that relate to CoinLab Customers and/or the Services.

C. Payment Terms. CoinLab shall remit to MtGox and/or MtGox shall remit to CoinLab its share of Revenues upon reconciliation as defined in section D.

D. Reconciliation. The Parties shall reconcile Revenue and customer trade imbalances on a weekly basis on an as mutually agreed upon basis, provided that if Revenue and trade imbalances exceed $1,000,000.00 USD in value at any point in time then either Party can request an immediate reconciliation and the other Party shall initiate a transaction to provide funds in equal amount to the imbalance within one business day.

E.  Server usage fees. During the time when the Services shall be provided on the MtGox Website, CoinLab shall pay a server usage fee calculated as shown in Exhibit A hereto (the "**Server Usage Fee**"). The Server Usage Fee may be updated from time to time by Tibanne, provided, however that any changes shall be enforceable against CoinLab only after one month from Tibanne's written notice stipulating the applicable changes.

F.  Prolexic fees. When providing the Services on the MtGox Website, CoinLab shall pay its share of the Prolexic fees paid by MtGox. When the Services shall be provided from a CoinLab Website, CoinLab shall execute its own DDoS protection agreement with Prolexic or any other service provider approved in advance by MtGox. Prolexic or said other service provider's fees shall in this case be paid directly by CoinLab; provided, however that the share of Prolexic or the other service provider's fees corresponding to the share of Revenues earned by MtGox shall be borne by MtGox. CoinLab shall invoice the same on a monthly basis to MtGox.

G.  Records and Audits. During the Term and for a period of one year thereafter, both Parties will maintain complete and accurate books and records regarding calculation of the Revenue, which books and records shall be sufficient to permit the other Party to verify the accuracy of the Revenues recorded. Either Party and/or its designated accounting and legal advisors shall be entitled to audit such books and records no more than once per calendar year and upon reasonable prior written notice to the other Party, provided that any such audit must take place at during normal business hours, and be performed in a manner designed to not unreasonably interfere with normal business operations. Any such audit will be performed at the initiating Party's expense, unless an audit discovers an underpayment of 5% or more for any period, in which event the offending Party will pay the reasonable expenses of any such audit.

H.  Taxes. Each Party shall be responsible for its own taxes including, without limitation, sales, use, property, excise, value added and gross receipts levied under the terms of this Agreement. The Parties agrees to provide all commercially reasonable assistance in determining each Party's tax liability under this Agreement. The Parties further agree to cooperate together to obtain any benefits arising from the application of the tax treaties between any part of the Territory and Japan.

5.  **TERM; TERMINATION.**

A.  Term and Renewal. This Agreement shall commence on the Effective Date and shall continue until ten years following the Effective Date (the "**Initial Term**"). The Agreement will automatically renew for successive additional two year periods ("**Renewal Term**") unless either Party gives notice of non-renewal one year in advance of the end of the current term. The Initial Term and the Renewal Terms are collectively referred to herein as the "**Term**".

B.  Termination for Cause. Either Party may terminate this Agreement if the other Party materially breaches any provision of this Agreement and fails to cure or demonstrate that no such breach has occurred within 30 days of receipt of written notice thereof.

C.  Termination for bankruptcy. Either Party may terminate this Agreement immediately and without notice in the case of a filing by the other Party of any voluntary petition in bankruptcy or liquidation, or the institution of any proceeding in bankruptcy or liquidation against such Party where such proceedings are not dismissed or withdrawn within 60 days thereafter, or the ordering of liquidation to such proceeding under the provision of any reorganization or other statute, or the placing of such Party into receivership on account of any insolvency, where such receivership is not lifted within 60 days thereafter, or where such Party is otherwise divested of its assets for a period of at least 60 days by operation of law, or where such Party makes a general assignment or composition for the benefit of its creditors, provided, however, that the provisions of this paragraph shall not apply to any liquidation entered into by either Party for the purposes of its amalgamation or reconstruction.

D.  Termination for change of control. MtGox and/or Tibanne may terminate this Agreement at any time by written notice with immediate effect in the case of any change of control of CoinLab, where a change a control shall mean the take over of a controlling interest in CoinLab by any third party (where controlling interest shall mean any equity interest or other interest capable of granting said third party significant influence over the management of CoinLab). Provided, however, that this shall clause shall apply only in the case where MtGox and/or Tibanne may reasonably demonstrate that the change of control shall have adverse consequences for the performance of this Agreement by CoinLab or for MtGox.

E.    <u>Post-termination.</u> In the case where this Agreement shall terminate or the Term shall not be renewed for any reason whatsoever, CoinLab stop providing the Services on CoinLab Websites and shall make commercially reasonable efforts to immediately transfer or to cause to transfer all Current CoinLab Customers and Future CoinLab Customers, as well as all funds of the Current CoinLab Customers and the Future CoinLab Customers held by CoinLab to MtGox or any third party designated by MtGox. To that effect, CoinLab shall make available to MtGox or said third party the Licensed Materials and any database or materials used by CoinLab in the provision of the Services. No goodwill of any kind shall be due to CoinLab for the transfer of the Current CoinLab Customers and the Future CoinLab Customers to MtGox. Provided, however, that , during a period of 5 years following the termination or cancellation of this Agreement for any reason whatsoever:

      (i)    the 60/40 Revenue sharing stipulated in Section 4.A shall continue to apply with regard to any Current CoinLab Customers not transferred to MtGox pursuant to this Section E,

      (ii)    the 90/10 Revenue sharing stipulated in Section 4.A shall continue to apply with regard to any Future CoinLab Customers, whether transferred to MtGox pursuant to this Section E or not, and

      (ii)    the 90/10 Revenue sharing stipulated in Section 4.A shall continue to apply with regard to any New CoinLab Customers.

F.    <u>Survival.</u> The payment obligations incurred under Section 4 during the Term (to the extent outstanding), and the provisions of Sections 5(E)(Post-termination), 5(D) (Survival), 6 (Representations and Warranties), 7 (Indemnification), 8 (Confidentiality), 9 (Limitation of Liability), and 10 (Miscellaneous) shall survive any termination or expiration of this Agreement.

**6.    REPRESENTATIONS AND WARRANTIES.**

A.    A breach of the Representations and Warranties below shall constitute a material breach of this Agreement. The Parties and Tibanne represent and warrant for the Term:

    (i)    <u>Licensed Materials.</u> MtGox and Tibanne represent and warrant that: (a) the Licensed Materials are free from, as applicable, significant programming errors and from defects in materials and workmanship; (b) the Licensed Materials shall conform to industry standard requirements for operating the Services; (c) the Licensed Materials shall conform to the highest industry standards for similar materials at the time of delivery; (d) MtGox and/or Tibanne is the sole and exclusive owner or valid license holder of all rights in the Licensed Materials including, without limitation, all copyrights, trade secrets, patent rights and all other proprietary interests therein, and MtGox and/or Tibanne has the right to grant CoinLab all rights granted in this Agreement free and clear of any and all agreements, liens, adverse claims, encumbrances and interests of any third party; and (e) at the best of MtGox and Tibanne's knowledge, the Licensed Materials and the exercise by CoinLab of its rights hereunder with respect to the Licensed Materials will not infringe upon, violate or misappropriate any patent, copyright, trade secret, trademark, contract or other right or interest of any third party.

    (ii)    <u>Service Guidelines.</u> The Parties will perform the Services and their obligations under this Agreement in accordance with the highest industry standards and methods, in strict accordance with this Agreement. The Parties shall ensure that all aspects of its obligations hereunder are performed in compliance with all applicable laws, ordinances, rules and regulations.

    (iii)    <u>Non-Infringement.</u> The Parties, in the course of complying with their obligations and duties under this Agreement, will not violate or infringe in any manner any third party rights, including, without limitation, property rights, copyright, patent, trademark, trade secret or other intellectual property right or right of privacy or publicity.

    (iv)    <u>Legal and Regulatory Compliance.</u> The Parties, have to date and will continue throughout the Term to comply with all statutes, codes, ordinances, laws, regulations, rules, orders and decrees of all governmental authorities (including without limitation federal, state and local governments, governmental agencies and quasi-governmental agencies) having jurisdiction over a Party. The Parties specifically agree to fully cooperate and to obey any instructions or requests made by any competent authority with regard to

money laundering or other criminal activities. Nothing in this Agreement shall be construed as a representation or warranty from MtGox or Tibanne that any transaction contemplated in this Agreement or any transaction contemplated under the Services shall be legally permitted or shall not require an authorization, license or permit under any applicable law.

B.  **Warranty of Authority.** Each Party and Tibanne represent and warrant to the others that it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and has the requisite power and authority to execute and deliver, and to perform its obligations under, this Agreement. Each Party and Tibanne represent and warrant to the other that this Agreement has been duly authorized, executed and delivered by such Party and Tibanne and constitutes a valid and binding obligation of such Party or Tibanne enforceable against such Party or Tibanne according to its terms. MtGox and Tibanne and MtGox NA further represent and warrants that Mark Karpeles has the requisite power and authority to execute this Agreement and bind Tibanne, MtGox KK and MtGox NA to the terms of this Agreement, and CoinLab represents and warrants that Peter Vessenes has the requisite power and authority to execute this Agreement and bind CoinLab, Inc. to the terms of this Agreement.

7. **INDEMNIFICATION.**

A.  The Parties agree to indemnify, defend and hold each other harmless (including any affiliates and their respective officers, directors, employees and agents) from and against any and all losses, costs, obligations, liabilities, damages, actions, suits, causes of action, claims, demands, liens, encumbrances, security interests, settlements, judgments, and other expenses (including but not limited to cost of defense, settlement, and reasonable attorney's fees), of whatever type or nature which are asserted against, incurred, imposed upon or suffered by a Party by reason of, or arising from a third party claim related to: (i) the breach of this Agreement by a Party (its officers, directors, employees, or agents); (ii) the actual or alleged infringement by a Party (its officers, directors, employees, or agents) of any patent, copyright, trademark, trade secret or other property or contract right of any other person; (iii) the actual or alleged failure of a Party to promptly pay sums due third parties; or (iv) the acts or omissions of a Party (its officers, directors, employees, or agents).

B.  The Parties, agree to indemnify, defend and hold each other harmless (including any affiliates and their respective officers, directors, employees and agents) from and against any and all losses, costs, obligations, liabilities, damages, actions, suits, causes of action, claims, demands, liens, encumbrances, security interests, settlements, judgments, and other expenses (including but not limited to cost of defense, settlement, and reasonable attorney's fees), of whatever type or nature which are asserted against, incurred, imposed upon or suffered by a Party by reason of, or arising from the other Party failing to, or past failure to, comply with all statutes, codes, ordinances, laws, regulations, rules, orders and decrees of all governmental authorities (including without limitation federal, state and local governments, governmental agencies and quasi-governmental agencies) having jurisdiction over a Party.

C.  Promptly after learning of the occurrence of any event which may give rise to its rights under the provisions of this Section 7, the indemnified Party will give written notice of such matter to the indemnifying Party. Following receipt of such written notice, indemnifying Party shall, subject to the provisions of this Section 7: (i) promptly assume and diligently conduct the defense of any suit or action to the extent that it relates to any claim as to which indemnity may be sought hereunder, including settlements and appeals; and (ii) pay and discharge any and all settlement amounts, judgments or decrees which may be rendered with respect to such claim. The indemnified Party will reasonably cooperate with indemnifying Party in the defense, appeals and/or settlement of any such matter. The indemnifying Party shall be in charge of and control such defense, appeals and/or settlement and shall have the right to select counsel with respect thereto, provided that the indemnifying Party shall keep the indemnified Party reasonably apprised of all material developments in the matter. The indemnifying Party may not, without the prior written consent of the indemnified Party, enter into any compromise or settlement of any such matter that includes an admission of liability on the part of the indemnified Party. Without limiting the foregoing or releasing any obligation, liability or undertaking of the indemnifying Party, the indemnified Party insofar as its interests are affected, may at its sole discretion and expense, participate in any actions described hereunder using counsel of its own choosing.

8. **CONFIDENTIALITY.**

A. <u>Confidential Information</u>.

(i) **"Confidential Information"** shall mean any and all information not generally disclosed to the public which is accessed or received by either Party as a result of this Agreement, whether furnished before or after the Effective Date of this Agreement and regardless of the manner in which furnished including but not limited to any information concerning the Licensed Materials and information concerning the CoinLab Customers.

(ii) <u>Restrictions on Disclosure/Use</u>. Confidential Information is the sole property of the party disclosing it ("**Disclosing Party**") and constitutes confidential trade secrets of such party. Each Party that receives Confidential Information ("**Receiving Party**") from a Disclosing Party hereunder agrees that, except as required in the performance of the terms of this Agreement, Receiving Party shall not publish, disseminate, copy, reproduce, disclose or make any use of any Confidential Information of the Disclosing Party. Nothing in this Agreement shall be construed to impose a confidentiality obligation upon either party in connection with information which:

(a) was in the public domain at the time of disclosure or thereafter enters the public domain without breach of this Agreement by the Receiving Party;

(b) was known and can be shown to be known to the Receiving Party at the time of disclosure;

(c) is disclosed with the written approval of the Disclosing Party;

(d) was independently developed by the Receiving Party at any time prior to disclosure by the Disclosing Party;

(e) becomes known by legal means to the Receiving Party from a source other than the Disclosing Party without breach of this Agreement by the Receiving Party;

(f) is required by law to be disclosed, but, for this subsection (f) only, Receiving Party shall promptly notify Disclosing Party and shall cooperate with Disclosing Party if it seeks a protective order or other appropriate measures to prevent dissemination of Confidential Information.

B. <u>Standard of Care</u>. A Receiving Party agrees to take at least the same precautions to ensure the protection, confidentiality and security of the Confidential Information entrusted to it and to satisfy its obligations under this Agreement as it would to protect its own Confidential Information but in no event less than a reasonable standard. Receiving Party shall also limit the access to such Confidential Information to only those employees or agents having a need to know and only to the extent needed to carry out the performance of the terms of this Agreement, and such employees or agents shall be instructed concerning their obligations to maintain confidentiality. Receiving Party shall return to Disclosing Party all Confidential Information, or destroy and certify such destruction of all Confidential Information, promptly upon Disclosing Party's request.

C. <u>Damages</u>. Receiving Party acknowledges that monetary damages may not alone be a sufficient remedy for unauthorized disclosure of Confidential Information and that Disclosing Party shall be entitled, without waiving any other rights or remedies, to such injunctive or equitable relief as may be deemed proper by a court of competent jurisdiction. Further, Receiving Party acknowledges and agrees that if there is a breach or threatened breach of the provisions regarding confidentiality Disclosing Party will be irrevocably harmed and entitled to a temporary restraining order, injunction, and/or other equitable relief against the commencement or continuance of such breach without the requirement of posting a bond or proving injury as a condition of relief.

D. <u>Preexisting Knowledge of the Parties</u>. The Parties acknowledge that each Party enters into this Agreement with substantive preexisting knowledge, experience and relationships in the area of Bitcoin and related business models, technology, infrastructure, operations, products and services. Except as specified herein, nothing in this Agreement shall prohibit or place any restrictions on either Party's investments, relationships or initiatives with

respect to Bitcoin.

## 9. LIMITATION OF LIABILITY.

EXCEPT FOR CLAIMS SUBJECT TO INDEMNIFICATION OR ARISING OUT OF A BREACH OF CONFIDENTIALITY OR WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF A PARTY, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, DAMAGES RELATING TO THE LOSS OF PROFITS, INCOME OR GOODWILL, EVEN IF AWARE OF THE POSSIBILITY OF SUCH DAMAGES.

The Parties further confirm that MtGox NA shall sign this Agreement for the sole purpose of confirming its understanding of the contents of this Agreement and that said signature shall not create any obligation whatsoever on MtGox NA.

## 10. MISCELLANEOUS.

A. <u>Notices</u>. Any notice required to be given pursuant to this Agreement shall be in writing and shall be deemed duly given either (i) seven (7) days after the date of mailing if sent by registered or certified mail, return receipt requested, or (ii) five (5) day after the date of mailing if sent by a national overnight courier service, or (iii) the date of sending by email to the email address set forth below, with conforming copy sent concurrently by first class U.S. mail, postage prepaid or national overnight courier service prepaid, to the following address:

If to **CoinLab**:  
CoinLab, Inc.  
To: Peter Vessenes  
71 Columbia St.  
Suite 300  
Seattle, WA 98104  
Email: peter@coinlab.com

If to **MtGox**:  
Mt. Gox KK  
To: Mark Karpeles  
Round Cross 5F, Shibuya 2-11-6, Shibuya-ku Tokyo, Japan 150-0002  
Email: mark@tibanne.com

If to **Tibanne**:  
Tibanne KK  
To: Mark Karpeles

Any Party or Tibanne, by notice given as set forth above, may change the address to which subsequent notices are to be sent to such party.

B. <u>Public Announcements</u>. No Party or Tibanne shall issue any press releases or publicity statements relating to this Agreement without the prior written approval of the other Party, which approval shall not be unreasonably withheld or delayed.

C. <u>Relationship</u>. The Parties and Tibanne understand and acknowledge that they shall perform their duties hereunder as independent contractors, and that this Agreement does not create a joint venture, partnership, employment or agency relationship between the Parties.

D. <u>Assignment</u>. Neither Party shall delegate, subcontract, or assign any of its duties or rights hereunder without the express written consent of the other Party.

E. <u>Governing Law</u>. This Agreement shall be governed, construed and interpreted in accordance with the laws of the State of Washington. The parties hereby irrevocably consent to the personal jurisdiction of and venue in the

state and federal courts located in King County, Washington with respect to any action, claim or proceeding arising out of or relating to this Agreement.

F.  **Amendments.** This Agreement may not be modified except by a writing referencing this Agreement and signed by all the parties hereto.

G.  **Headings.** The headings contained herein are for the convenience of reference only and are not of substantive effect.

H.  **Severability.** If any provision herein shall be deemed or declared unenforceable, invalid or void by a court of competent jurisdiction, the same shall not impair any of the other provisions contained herein which shall be enforced in accordance with their respective terms.

I.  **Entire Agreement.** This Agreement including all applicable exhibits thereto is intended by the Parties as the final and binding expression of their contract and agreement and is a complete and exclusive statement of the terms thereof and supersedes all prior negotiations, representations and agreements including the MOU executed on or about June 5, 2012 by the Parties. Whenever necessary or proper herein, the singular imports the plural or vice versa, and masculine, feminine and neuter expressions are interchangeable.

J.  **Remedies; Waiver.** No failure or delay by either party hereto to exercise any right, power or privilege provided hereunder or under the Agreement or by applicable law shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, or privilege preclude any other or future exercise thereof of the exercise of any other right, power or privilege. The remedies provided herein shall be cumulative and shall not be exclusive of any rights or remedies provided by law.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

Parties:

**COINLAB, INC.:**

Sign: _____
Print: Peter Vessenes
Title: CEO

**MTGOX KK:**

Sign: _____
Mark Karpelès

Representative Director

**TIBANNE CORPORATION**

Sign: _____
Mark Karpelès

Representative Director

Witness:

**MT GOX NA**

Sign: _____
Print: MARK KARPELES
Title: CEO