# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| GREGORY GREENE, individually and on behalf of all others similarly situated, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MARK KARPELES, an individual, )<br>)<br>Defendant. ) | Case No. 14-cv-01437<br><br>Hon. Gary Feinerman<br><br>Magistrate Judge Susan Cox |

**DEFENDANT MARK KARPELES' LOCAL RULE 56.1(a)(3)(B) RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF ADDITIONAL FACTS**

Defendant Mark Karpeles, by and through his attorneys, Pedersen & Houpt, P.C., and for his Response to Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts respectfully states as follows:

1. Beginning in 2012, Mt. Gox required that its users from the United States read and agree to one version of the Exchange's Terms of Use as a condition of using, or continuing to use, Mt. Gox. (Karpeles Interog. Resp. (Ex. I) at No. 7; Ex. A at 95:8-96:13.)

**RESPONSE:** Admitted. Answering further, the Terms of Use do not say that all Mt. Gox members have accepted the terms, as members can also be "any holder of an Account." (Mt. Gox Terms of Use, attached hereto as **Exhibit A**.)

2. Karpeles directed the drafting and dissemination of Mt. Gox's Terms of Use ("Terms" or "TOU"), and was otherwise knowledge [sic] of their contents. (Ex. A at 96:8-97:18.)

**RESPONSE:** Disputed. Karpeles asked employees to work with Mt. Gox's attorneys to draft the Terms. Karpeles made some changes to drafts of the Terms. (Deposition Transcript of Mark Karpeles at 96:14-97:9, attached hereto as **Exhibit B**.)

3. The Terms purported to protect both buyers and sellers on Mt. Gox by keeping trades anonymous. (Mt. Gox Terms of Use (Ex. J) at PageID #:131.)

**RESPONSE:** Disputed. The Terms state that Mt. Gox represented that "all purchase and sale offers, as well as Bitcoin Purchase Transactions, made on the Platform, will be managed in an anonymous manner so that Buyers and Sellers will not know each other." (Ex. A at Page ID # 131.) The Terms do not state that any term was for the protection of buyers or sellers.

4. The Terms purported to protect buyers and sellers on Mt. Gox by preventing either party from backing out of a trade once the price was agreed upon. (*Id.*)

**RESPONSE:** Disputed. The Terms state that Mt. Gox represented that "once offers to buy or sell Bitcoins are matched, such offers may not be withdrawn." (Ex. A at Page ID # 131.) The Terms do not state that any term was for the protection of buyers or sellers.

5. The Terms assured Mt. Gox users that all trades would be made with other Mt. Gox users and not the exchange itself. (*Id.*) No part of the Terms stated that Mt. Gox users may potentially trade with entities that were not subject to the Terms. (See generally Ex. J.)

**RESPONSE:** Disputed. The Terms state that "Members acknowledge and agree that, when completing Transactions, they are trading with other Members, and Members accept that MtGox [*sic*] acts only as an intermediary in such Transactions and not as a Counterparty to any trade." (Ex. A at Page ID # 131.) The Terms further stated that Mt. Gox could use the platform to buy and sell Bitcoin *and* transfer funds and Bitcoins to other members *and* use Bitcoin to purchase specific items: "The Platform, managed by MtGox, allows buyers ('Buyers') and sellers ('Sellers'), to buy and sell the internet commodity known as 'Bitcoin(s')" *and* "It also allows all registered users of the Platform ('Members') to transfer funds and Bitcoins to other Members and to use Bitcoins for purchasing specific items." (*Id.* at Page ID # 129.)

6. The Terms required all users to warrant that purchases of bitcoin were made with "actual currencies corresponding to actual assets," and that all sales of bitcoin were of "actual Bitcoins." (*Id.* at PageID#:131.)

2

**RESPONSE:** Disputed. The Terms required members to warrant that currencies *deposited* to buy Bitcoin "are actual currencies corresponding to actual assets in its bank account and coming from legal sources." (Ex. A at Page ID # 131.) Admitted that the Terms required Members to warrant "that the Bitcoins offered to sell or to transfer correspond to actual Bitcoins." (*Id.*)

7. In the Terms, Mt. Gox promised to "hold all monetary sums and all Bitcoins deposited by each Member in its Account, in that Member's name as registered in their Account details, and on such Member's behalf." (*Id.*)

**RESPONSE:** Admitted.

8. In the Terms, Mt. Gox promised to "use all reasonable care and skill" in facilitating bitcoin trades. (*Id.*)

**RESPONSE:** Admitted.

9. Accounts that violated the Terms were subject to suspension. (*Id.*; Ex. A at 98:19 - 99:1.)

**RESPONSE:** Admitted.

10. In January 2011, an individual or individuals stole $50,000 from an account in Mt. Gox's name with the currency service Liberty Reserve. (Ex. A at 39:2-40:1.)

**RESPONSE:** Admitted.

11. Mark Karpeles was aware of the $50,000 theft and expressed concern regarding it because he "need[ed] to be 100% sure we will be able to answer any withdraw request from someone who deposited anything." (Jan. 28, 2011 email from Karpeles to McCaleb (Ex. K); Ex. A at 40:23 - 42:20.)

**RESPONSE:** Admitted.

12. Karpeles did not disclose the $50,000 theft to Mt. Gox users, but is "not sure" whether Mr. McCaleb may have mentioned it on the Mt. Gox forums before he took over the Exchange. (Ex. A 58:20-62:21; 122:16-123:20.)

**RESPONSE:** Admitted in part, disputed in part as incomplete. Karpeles did not disclose the $50,000 theft because Jed McCaleb ("McCaleb") asked Karpeles to keep anything

3

regarding the purchase of Mt. Gox confidential. (Ex. B at 59:1-61:16.) McCaleb was later able to recover that money. (*Id.* at 229:1-7.) Karpeles believes that McCaleb discussed the $50,000 theft on the Mt. Gox forums but did not completely remember during his deposition. (*Id.* at 122:24-123:9.)

13. On or around March 3, 2011, an individual or individuals gained unauthorized access to Mt. Gox and stole 80,000-90,000 bitcoins. (Ex. A at 43:5-23; 44:18-21; Excerpts of Skype chats between Karpeles and McCaleb (Ex. L) at Greene_001241 ("[McCaleb:] ok it is: 94,984 stolen").)

**RESPONSE:** Admitted

14. After the March 3, 2011 incident, Mt. Gox did not have enough bitcoins to satisfy user deposits and, from that point onwards, Karpeles was never "sure that Mt. Gox would be able to answer any withdrawal requests from someone who deposited anything." (Ex. A at 52:8-54:8; 105:5-15; *see also* Ex. B at 12 (bitcoin expert opining that, with respect to the $50,000 and 80,000-90,000 bitcoin hack, "[Mt. Gox] would not have had nearly enough to cover any of this. Not even close at any point.").)

**RESPONSE:** Admitted that Karpeles was not sure that Mt. Gox would be able to answer withdrawal requests. Karpeles objects to Plaintiff's Exhibit B which is a transcript of an interview that is not testimony given under oath and is not admissible evidence. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) ("It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact.").

15. Karpeles believed that it was important for any user of a bitcoin exchange to know that his or her bitcoin exchange was short bitcoins. (Ex. A at 68:6-24 ("of course it's important for users to know about this.").)

**RESPONSE:** Admitted.

16. Karpeles believed that disclosing the March 2011 hack or loss of bitcoins would cause Mt. Gox to fail because people wouldn't use the Exchange anymore. (Ex. A at 68:16-24.)

**RESPONSE:** Disputed. McCaleb told Karpeles that if Mt. Gox disclosed that Bitcoin was hacked in March 2011 it would "kill" Mt. Gox. (Ex. B at 69:1-8.) Due to McCaleb's statements, Karpeles believed the most likely event would be Mt. Gox's failure, which would have a negative effect on all users of Mt. Gox. (*Id.* at 68:6-24.)

17. Karpeles believed that disclosing the March 2011 hack or loss of bitcoins would cause Mt. Gox to fail because it would cause a "bank run[,]" where users would demand the return of their bitcoins. But Karpeles understood that if users demanded the return of their bitcoins, Mt. Gox would not be able to honor those demands because the Exchange was "short bitcoins." (Ex. A at 69:9-23.)

**RESPONSE:** Admitted.

18. Karpeles believed that disclosing the March 2011 hack or loss of bitcoins would have detrimental effects for him personally because, as the sole owner of Tibanne KK, he would have been involved in lawsuits. (Ex. A at 70:2-14.)

**RESPONSE:** Disputed. Karpeles believed that disclosing the March 2011 hack of bitcoins would have negative impacts on Mt. Gox and Tibanne. (Ex. B at 70:4-14.) Karpeles stated it would not be an easy situation for him. (*Id.*)

19. Neither the March 2011 hack nor the resulting bitcoin deficit was disclosed to Mt. Gox users. (Ex. A at 123:21-24.)

**RESPONSE:** Admitted that Karpeles did not disclose the March 2011 hack because McCaleb asked Karpeles to keep anything regarding the purchase of Mt. Gox confidential. (Ex. B at 59:1-61:16; 124:1-4.)

20. In or around June 2011, an individual or individuals gained unauthorized access to Mt. Gox using administrative credentials and placed a purchase order for bitcoin so large that it caused the price of bitcoin to plummet, allowing the individual or individuals to withdraw bitcoin from Mt. Gox at a significantly reduced price. This resulted in additional losses of bitcoin from Mt. Gox. (Ex. A at 140:23-143:22.)

**RESPONSE:** Disputed. An individual gained access to Jed McCaleb's administrative account, and credited BTC and/or USD to accounts they created, then placed a sale order for

5

Bitcoin so large that it caused the price of Citcoin to plummet:

[Mon Jun 20 03:18:08 2011] **mtgox:** Mark you really need to give me a way to wake you up
[Mon Jun 20 03:18:24 2011] **mtgox:** something terrible went on on the site
[Mon Jun 20 03:23:49 2011] **Mark Karpelès:** someone woke me up already
[Mon Jun 20 03:24:21 2011] **mtgox:** my account was compromised
[Mon Jun 20 03:24:28 2011] **Mark Karpelès:** uh?
[Mon Jun 20 03:24:32 2011] **Mark Karpelès:** how?
[Mon Jun 20 03:24:33 2011] **mtgox:** you need to rool back the whole thing
[Mon Jun 20 03:24:38 2011] **mtgox:** er roll
[Mon Jun 20 03:24:48 2011] **mtgox:** not sure but my totals are wrong now
[Mon Jun 20 03:25:02 2011] **mtgox:** I'm trying to see who did the big sell of
[Mon Jun 20 03:25:06 2011] **mtgox:** sell off
[Mon Jun 20 03:25:14 2011] **mtgox:** and I can't login
[Mon Jun 20 03:25:27 2011] **Mark Karpelès:** I stopped the system right now.

(Portions of electronic communications between Mark Karpeles and Jed McCaleb at Greene_001267, attached hereto as **Exhibit C**; *see also* Ex. B at 141:3-143:16.) A purchase order would not cause the price to plummet. This did not allow the individual to withdraw any bitcoin past the sale order, however, as this order also had the effect of crashing the system long enough for Karpeles to shut down the exchange. (*Id.*)

21. On the occasion of the June 2011 hack, Karpeles directed Jed McCaleb to inform users that "[e]veryone's bitcoins [were] safe on the site . . . [and that Mt. Gox was] still holding all the coins safely in reserve." (Ex. L at Greene_001269; Ex. A at 144:19-147:7.)

**RESPONSE:** Disputed. McCaleb offered to make "PR posts" on the Bitcoin forum and Karpeles accepted that offer:

[Mon Jun 20 05:40:55 2011] **mtgox:** Can I make some PR posts in the forums? Mtgox still has all the BTC/Cash etc everyone calmdown
[Mon Jun 20 05:41:16 2011] **Mark Karpelès:** yes, please
[Mon Jun 20 05:41:19 2011] **Mark Karpelès:** any help is welcome on that

(Ex. C at Greene_001269; Ex. B at 145:13-21.)

22. After the March 3, 2011 incident, and in addition to the June 2011 hack, Mt. Gox experienced other incidents that resulted in the loss of bitcoins. (*See, e.g.,* Ex. A at 131:9-133:11 (discussing bitcoins lost through issue with Mt. Gox code; 137:23-140:22 (discussing

6

bitcoin bounty paid to Mt. Gox hacker after theft of 300,000 bitcoins)); *see also* Ex. B at 12 (discussing Mt. Gox's acquisition of Polish bitcoin exchange and absorbing its 17,000 bitcoin debt).)

**RESPONSE:** Admitted that Mt. Gox experienced other hacks that resulted in the loss of Bitcoin. Karpeles objects to Plaintiff's Exhibit B which is a transcript of an interview that is not testimony given under oath and is not admissible evidence. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) ("It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact.").

23. So long as they weren't already known to the public, Karpeles did not disclose Mt. Gox's data security incidents or losses of bitcoins to Mt. Gox's users. (*See* Ex. A 140:15- 22; 254:13-255:2.)

**RESPONSE:** Admitted that Mt. Gox did not disclose a hack of 300,000 bitcoin that was returned for a 3,000 bitcoin bounty. (Ex. B at 139:11-140:22.) Admitted that if a hack had occurred in the past, Mt. Gox did not disclose it years later. Disputed that the cited deposition testimony says anything about hacks being "already known to the public."

24. Karpeles eventually stored Mt. Gox's bitcoins in a "blind" cold wallet system, meaning that no one at Mt. Gox could monitor whether the cold wallets actually contained bitcoins. (Ex. A at 167:4-168:18.)

**RESPONSE:** Disputed. Mt. Gox began storing some Bitcoin in enclosed encrypted wallets for safer storage in 2011. (Ex. B at 150:2-18). The cold wallets were capable of being monitored but doing so would be a security issue. (*Id.* at 168:11-169:5.)

25. It is "quite possible" that Karpeles created the "blind" cold wallet system because he didn't want others to know that Mt. Gox had a bitcoin deficit. (Gonon, V. and Sayanoff, X. (2020). Bitcoin Documentary I The Unbelievable Story Of Mark Karpeles. [video] Available at: https://youtu.be/1ivWSLQRQp0?t=5284 (Accessed 17 Feb. 2020) ("[Q:] Does the fact that you didn't monitor the bitcoins have anything to do with wanting to hide [the 80-90,000 bitcoin debt] from your employees? [A:] It's possible, I don't remember exactly. [Q:] You have to answer. . . . [A:] Even if we had monitored the bitcoins, we wouldn't have made that public, even within the

7

company. . . . [Q:] Did you create a blind system to avoid telling people that bitcoins were missing? [A:] It might have been conscious or unconscious, but it's very possible."); Karpeles Resp. to Greene Req. to Admit (Ex. M) at No. 2 (Karpeles admitting statements made in the Bitcoin Documentary were true).)

**RESPONSE:** Denied. Plaintiff's statement conflates the notion of the cold wallet system and the separate issue of monitoring.

26. Before Karpeles purchased Mt. Gox, McCaleb used a script to automatically conduct trades on the Exchange (a function McCaleb referred to as "Gox Bot"). That script purchased bitcoins from other Mt. Gox users with commissions collected by Mt. Gox on user trades. (Ex. A 75:4-16; Declaration of Jed McCaleb (Ex. N) at ¶ 2.)

**RESPONSE:** Admitted.

27. Karpeles wanted to use the fees Mt. Gox collected on trades to pay back Mt. Gox's bitcoin deficit over time. (Ex A. at 72:14-73:22.)

**RESPONSE:** Admitted.

28. At some point in 2011, Karpeles "disabled" the feature that credited Mt. Gox's commissions to the Gox Bot account. (Ex. A at 75:19-76:11; 81:13-82:3.)

**RESPONSE:** Admitted.

29. After Karpeles unlinked Gox Bot's trading activity from the commissions received by Mt. Gox, Karpeles would periodically "credit" Gox Bot's account with fake funds by adjusting Mt. Gox's internal database. (Ex. A 78:13-79:22; 239:18-240:4; *see also* Ex. L at Greene_001245 ("Mark Karpeles: I . . . did a manual 'loan' [to Gox Bot]").)

**RESPONSE:** Admitted that Karpeles unlinked the Gox Bot's trading activity from the commissions received by Mt. Gox. Disputed that the Gox Bot used "fake funds." Mt. Gox credited the Gox Bot with U.S. dollar funds which were created as debt for Mt. Gox. (Ex. B at 80:1-15, 239:18-240:7.)

30. Gox Bot would thereafter execute trades with Mt. Gox users using its balance of fake currency or fake bitcoins, depending on whether it was buying or selling bitcoins. (Ex. A at 78:13-79:22; 81:13-82:3; 239:18-240:4.)

**RESPONSE:** Admitted that Gox Bot executed trades with Mt. Gox users. Disputed that the Gox Bot used "fake funds." Mt. Gox credited the Gox Bot with U.S. dollar funds and Bitcoin which were created as debt for Mt. Gox. (Ex. B at 80:1-15, 239:18-240:7.)

31. Although it continued to trade with users throughout Karpeles's tenure at Mt. Gox, Gox Bot's existence was never disclosed to Mt. Gox's users. (Ex. A at 81:13-83:16; 121:5-14.)

**RESPONSE:** Admitted.

32. Karpeles either did not disclose or limited disclosing Gox Bot's existence to other Mt. Gox employees. (Gonon, V. and Sayanoff, X. (2020). Bitcoin Documentary | The Unbelievable Story Of Mark Karpeles. [video] Available at: https://youtu.be/1ivWSLQRQp0?t=5063 (Karpeles discussing Gox Bot (referred to publicly as "Willy Bot"), stating that Gox Bot's activity "had to remain secret," and, in response to question asking whether Karpeles told his employees about Willy Bot, stating that "I spoke to almost no one about it."); Ex. M at No. 2.)

**RESPONSE:** Admitted that Karpeles did not disclose or limited disclosing the Gox Bot to certain Mt. Gox employees in order to comply with McCaleb's request to keep the Gox Bot secret. (Gonon, V. and Sayanoff, X. (2020). Bitcoin Documentary | The Unbelievable Story Of Mark Karpeles. [video] Available at: https://youtu.be/1ivWSLQRQp at 1:24:27-1:25:16; 1:27:44-1:28:21.)

33. Karpeles did not believe Gox Bot was subject to the Terms because it did not use the Mt. Gox website to make trades. (Ex. A at 99:13-100:1.) The Terms do not state that Mt. Gox users may trade with individuals or entities that were not subject to the Terms. (*See generally* Ex. J.)

**RESPONSE:** Disputed. The Terms stated that Mt. Gox members could use the platform to buy and sell Bitcoin *and* transfer funds and Bitcoins to other members *and* use Bitcoin to purchase specific items: "The Platform, managed by MtGox, allows buyers ('Buyers') and sellers ('Sellers'), to buy and sell the internet commodity known as 'Bitcoin(s)'" *and* "It also

allows all registered users of the Platform ('Members') to transfer funds and Bitcoins to other Members and to use Bitcoins for purchasing specific items." (Ex. A at Page ID # 129.)

34. Gox Bot's activity affected the price of bitcoins on Mt. Gox by changing the perceived demand for bitcoins on Mt. Gox. (Ex. A at 234:18-235:2.) Following Mt. Gox's collapse, many researchers concluded this effect was significant. (Goforth Decl. (Ex. O) ¶ 43.)

**RESPONSE:** Disputed. The Gox Bot's impact on the price was minimal and any trading activity whatsoever will have "some small potential impact." (Ex. B at 234:18-235:2.) Karpeles objects to the inclusion of Mr. Greene's expert witness opinion in support of this fact as Professor Goforth's opinion is currently the subject of a motion to strike. This allegation is irrelevant to Mr. Greene's claims.

35. Karpeles was criminally convicted of data manipulation in Japan because of his conduct relating to the Gox Bot account. Karpeles does not contest the factual basis of his conviction. (Ex. A at 26:18-28:22.)

**RESPONSE:** Admitted.

36. Gregory Greene read Mt. Gox's Terms of Use when and after joining the Mt. Gox Exchange. He was required to do so in order to open and maintain a Mt. Gox account. (Ex. E at 15:5-24, 17:18-22; Dkt. 245 ¶¶ 13-14, 49-50.)

**RESPONSE:** Disputed that Mr. Greene read Mt. Gox's Terms of Use when and after joining the Mt. Gox exchange. Mr. Greene created his account between November 23, 2011 and January 12, 2012. (Deposition Transcript of Gregory Greene at 9:1-10:8, 23:1-25:10, attached hereto as **Exhibit D**; "The Rise and Fall of Bitcoin" https://www.wired.com/2011 /11 /mf-bitcoin/, attached hereto as **Exhibit E**; January 5, 2012 E-mail to Greene Confirming BitInstant Order (GREENE_000019-000020), attached hereto as **Exhibit F**.) However, the Mt. Gox Terms of Use were first posted on January 20, 2012. (Ex. B at 94:8-96:11; Ex. A at Page ID # 129.) Therefore, Mr. Greene could not have read and accepted Mt. Gox's Terms of Use before creating

10

his account. Disputed that Mr. Greene has produced any evidence showing that the Terms of Use, or Mt. Gox generally, required someone to re-read the Terms of Use to maintain an account.

37. At his deposition, Mr. Greene generally recalled that the Mt. Gox Terms stated that the Exchange would hold bitcoin securely for its users, but could not recite the Terms from memory and was not given a copy of the Terms to review or refresh his memory. (Ex. E at 15:19-16:2; Ex. F at ¶ 3.)

**RESPONSE:** Disputed. Mr. Greene believed that he read Mt. Gox's "general website" but did not recall "any information about the security of the Mt. Gox website or exchange." (Ex. D at 15:5-18.) Mr. Greene believed he read something "on Mt. Gox's website that said it would hold bitcoin securely for all users" on "the terms of use probably." (*Id.* at 15:19-24.)

38. Having reviewed the terms, Mr. Greene agrees that the representations identified *supra* (SOAF ¶¶ 3-9) represent that Mt. Gox was secure and recalls relying on those representations when opening and maintaining his Mt. Gox account. (Ex. F ¶¶ 3-5.)

**RESPONSE:** Admitted that Mr. Greene now claims that he remembers those terms and relying on them. However, "parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996). Mr. Green's new affidavit directly contradicts his deposition testimony, and therefore his declaration must be disregarded. Disputed that Mr. Greene actually did rely on them as Mr. Greene stated that he had already read about a hack of Mt. Gox before signing up for a Mt. Gox account and that knowledge did not have "any effect on my decision." (Ex. D at 9:16-11:7.) Disputed that Mr. Greene read Mt. Gox's Terms of Use when joining the Mt. Gox exchange. Mr. Greene created his account between November 23, 2011 and January 12, 2012. (Ex. D at 9:1-10:8, 23:1-25:10; Ex. E; Ex. F.) However, the Mt. Gox Terms of Use were first posted on January 20, 2012. (Ex. B at 94:8-96:11.) Therefore, Mr. Greene could not have read and accepted Mt. Gox's Terms of Use before creating his account.

11

Disputed that Mr. Greene has produced any evidence showing that the Terms of Use, or Mt. Gox generally, required someone to re-read the Terms of Use to maintain an account.

39. Once Greene realized that other Mt. Gox users were having difficulty withdrawing their deposits, he immediately, but unsuccessfully, tried to move his bitcoins off Mt. Gox and onto a personal bitcoin wallet. (Ex. E at 31:18-33:19.)

**RESPONSE:** Admitted that this is Mr. Greene's deposition testimony.

Dated: March 13, 2020

Bevin Brennan
Matthew Schmidt
PEDERSEN & HOUPT
161 North Clark Street, Suite 2700
Chicago, Illinois 60601
(312) 641-6888
bbrennan@pedersenhoupt.com
mschmidt@pedersenhoupt.com

*Attorneys for Defendant Mark Karpeles*

Respectfully submitted,
Mark Karpeles,

By:   /s/ Bevin Brennan
         One of His Attorneys