UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY GREENE, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 1437 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| MARK KARPELES, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

The court's prior opinions, familiarity with which is assumed, summarize the history of this suit, which concerns the collapse of the Mt. Gox bitcoin exchange. Docs. 199-200 (reported at 169 F. Supp. 3d 855 (N.D. Ill. 2016)); Docs. 229-230 (reported at 206 F. Supp. 3d 1362 (N.D. Ill. 2016)); Docs. 311-312 (reported at 289 F. Supp. 3d 870 (N.D. Ill. 2017)); Docs. 373-374 (reported at 327 F.R.D. 190 (N.D. Ill. 2018)); Docs. 409-411 (reported at 2019 WL 1125796 (N.D. Ill. Mar. 12, 2019)). As matters now stand, Gregory Greene, the sole remaining plaintiff, seeks on behalf of a putative class to hold Mark Karpeles, Mt. Gox's principal and the sole remaining defendant, liable under a fraud theory for financial losses allegedly arising from Mt. Gox's collapse. Docs. 245, 464. Karpeles moves for summary judgment, Doc. 452, and to strike the expert disclosure of Professor Carol Goforth, Doc. 457. The motions are denied.

### Background

The court recites the material facts as favorably to Greene as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

A.     **Karpeles, Mt. Gox, Hacks, and the Gox Bot**

Karpeles is the sole shareholder and CEO of Tibanne KK. Doc. 466 at p. 2, ¶ 4. In early 2011, Tibanne KK acquired 88% of the shares of Mt. Gox KK from Jed McCaleb, who maintained a 12% interest. *Id*. at p. 3, ¶ 7. Karpeles was the CEO of Mt. Gox KK from 2011 to 2014. *Id*. at p. 2, ¶ 5.

The Mt. Gox bitcoin exchange was located in Japan and operated from 2009 to 2014. *Id*. at p. 2, ¶ 6. Users could create a Mt. Gox account and use it to buy, sell, and store bitcoins and fiat currency. *Id*. at p. 3, ¶ 8. Users also could transfer bitcoins or withdraw cash, and those transactions were processed through one of Mt. Gox's banking partners—though Greene submits that users could not do so in practice or securely. *Id*. at pp. 3-4, ¶¶ 8-10.

Beginning in 2012, Mt. Gox required that its United States users read and agree to its Terms of Use. Doc. 476 at ¶ 1. Karpeles directed the drafting and dissemination of the Terms, and he knew of their contents. *Id*. at ¶ 2. (Karpeles disputes this assertion, *ibid*., but his deposition testimony gives rise to a reasonable inference that the assertion is correct, Doc. 476-2 at 14-15 (96:8-97:18).) The Terms stated that Mt. Gox would maintain the buyer and seller anonymity and that offers could not be withdrawn once a price was agreed upon. Doc. 476 at ¶¶ 3-4. The Terms also stated that Mt. Gox members "agree that, when completing Transactions, they are trading with other Members," and that Mt. Gox could be used to "buy and sell" bitcoins and "allows all registered users of the Platform ('Members') to transfer funds and Bitcoins to other Members and to use Bitcoins for purchasing specific items." *Id*. at ¶ 5 (quoting Doc. 476-1). The Terms required members to warrant that currencies deposited to buy bitcoins "are actual currencies corresponding to actual assets in [the member's] bank account and coming from legal sources" and that "Bitcoins offered to sell or to transfer correspond to actual Bitcoins." *Id*. at ¶ 6

(quoting Doc. 476-1 at 4). Mt. Gox promised in the Terms to "hold all monetary sums and all Bitcoins deposited by each Member in its Account, in that Member's name as registered in their Account details, and on such Member's behalf," and to "use all reasonable care and skill" in facilitating bitcoin trades. *Id*. at ¶¶ 7-8 (quoting Doc. 476-1 at 4). Accounts that violated the Terms were subject to suspension. *Id*. at ¶ 9.

In January 2011, $50,000 was stolen from a Mt. Gox account. *Id*. at ¶ 10. Karpeles was aware of the theft and expressed concern about it, but he did not disclose it to Mt. Gox users. *Id*. at ¶¶ 11-12. In March 2011, an individual or individuals gained unauthorized access to Mt. Gox and stole 80,000 to 90,000 bitcoins. *Id*. at ¶ 13. From that point on, Karpeles was not sure that Mt. Gox would be able to satisfy its users' withdrawal requests. *Id*. at ¶ 14. Karpeles believed it was important for users of a bitcoin exchange to know that the exchange was short bitcoins, but he was concerned that if the hack were disclosed, Mt. Gox likely would fail because disclosing it would lead to users demanding return of their bitcoins, which Mt. Gox could not do. *Id*. at ¶¶ 15-17. Karpeles believed that such a situation would negatively affect Mt. Gox and Tibanne and present a difficult situation for him as Tibanne's sole owner. *Id*. at ¶ 18. Karpeles did not disclose the March 2011 hack. *Id*. at ¶ 19.

In June 2011, there was another hack of Mt. Gox, which caused the price of bitcoin to plummet and additional bitcoins to be lost. *Id*. at ¶ 20. McCaleb asked, and Karpeles agreed, to have McCaleb make "PR posts" on the bitcoin forum. *Id*. at ¶ 21. Mt. Gox experienced other hacks resulting in the loss of bitcoins. *Id*. at ¶ 22. Karpeles did not disclose to Mt. Gox users the full extent of the hacks. *Id*. at ¶ 23.

Before Karpeles purchased (through Tibanne) a majority interest in Mt. Gox, McCaleb used a script—referred to as "Gox Bot"—to automatically conduct trades using commissions

collected by Mt. Gox from user trades. *Id*. at ¶ 26. The Gox Bot continued trading after Karpeles acquired his interest in Mt. Gox, but he wanted to use the user trade commissions to recover the bitcoin deficit caused by the hacks. *Id*. at ¶¶ 27, 31. Some time in 2011, Karpeles disabled the feature that automatically credited Mt. Gox commissions to the Gox Bot account, and instead began manually crediting the account as a "debt for Mt. Gox" and using the credited funds to execute trades. *Id*. at ¶¶ 28-30.

McCaleb had asked Karpeles to keep the Gox Bot secret, and Karpeles never disclosed its existence to Mt. Gox employees or users. *Id*. at ¶¶ 31-32. Karpeles believes that the Gox Bot's trading had only a minimal effect on bitcoin prices, but Greene cites Professor Goforth's declaration for the proposition that the trading significantly impacted bitcoin prices. *Id*. at ¶ 34. Karpeles was convicted in Japan of data manipulation due to conduct relating to the Gox Bot. *Id*. at ¶ 35.

On February 7, 2014, Mt. Gox suspended all bitcoin withdrawals. Doc. 466 at p. 8, ¶ 18. On February 24, 2014, the Mt. Gox website went offline. *Id*. at p. 8, ¶ 19.

**B.  Greene's Mt. Gox Account and Interactions with Mt. Gox**

Greene obtained a Mt. Gox account in early 2012. Doc. 466 at p. 8, ¶ 20; Doc. 476 at ¶ 36. He purchased bitcoin and moved it onto the Mt. Gox exchange. Doc. 466 at p. 8, ¶ 20. Before he obtained his account, Greene had read an article that mentioned a 2011 Mt. Gox hack, but the article did not affect his decision to purchase bitcoin. *Id*. at p. 8, ¶ 21. Greene bought bitcoin twice, in January 2012 and March 2013. *Id*. at p. 9, ¶ 22. He knows that no website or bitcoin exchange, including Mt. Gox, is completely secure. *Id*. at p. 11, ¶ 28.

Greene read the Terms of Use when joining Mt. Gox. Doc. 476 at ¶ 36. (Karpeles disputes this fact, asserting that the Terms were not posted until after Greene created his account.

4

*Ibid*. But Greene testified that he read the Terms when he created an account, Doc. 467-5 at 7 (17:18-22), so the existence of the Terms at that time presents a factual dispute that must be resolved in Greene's favor at this stage.) Specifically, when Greene was creating and maintaining his account, he read and relied on the Terms' representation that Mt. Gox was secure. Doc. 476 at ¶¶ 37-38.

In disputing this last fact, Karpeles acknowledges that Greene avers in his declaration that he relied on the Terms of Use when creating and maintain his account. *Id*. at ¶ 38; Doc. 467-6 at ¶¶ 3-5. Karpeles argues, however, that Greene's declaration "must be disregarded" under the sham affidavit rule because it "contradicts his deposition testimony." Doc. 476 at ¶ 38. The sham affidavit rule provides that a party cannot "submit[] an affidavit that contradicts the party's prior deposition or other sworn testimony," *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020), but cautions that "an affidavit can be excluded as a sham only where the witness has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact," *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 572 (7th Cir. 2015) (internal quotation marks omitted). Put another way, "[a] 'sham affidavit' is an affidavit that it is inadmissible because it contradicts the affiant's previous testimony … unless the earlier testimony was ambiguous, confusing, or the result of a memory lapse." *Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015).

At his deposition, Greene testified that he had read the Terms of Use by the time he signed up for a Mt. Gox account, but that he could not "recall" which Terms stood out to him or "remember" any of them. Doc. 467-5 at 7-8 (17:18-18:10). Greene further testified that he recalled reading, "[o]n the [T]erms of [U]se probably," that Mt. Gox would hold bitcoin securely. *Id*. at 5 (15:19-24). Greene avers in his declaration that he was unable to recite the Terms during his deposition and that he had not been provided with a copy or asked whether

5

reviewing them might refresh his memory. Doc. 467-6 at ¶ 3. Greene further avers that he has since reviewed the Terms and now recalls reading and relying on specific representations therein when opening and maintaining his account. *Id*. at ¶¶ 4-5. Under these circumstances, the sham affidavit rule does not allow the court on summary judgment to disregard his declaration. *See Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019) ("Admitting to a lack of memory is a far cry from admitting that the opposing party's version of events is correct."); *Castro*, 786 F.3d at 571-72 ("Disregarding as a sham every correction of a memory failure or variation in a witness's testimony requires far too much from lay witnesses and would usurp the trier of fact's role in determining which portion of the testimony was most accurate and reliable.") (internal quotations omitted); *Noone v. Presence Hosps. PRV*, 149 F. Supp. 3d 904, 911 (N.D. Ill. 2015) ("[The plaintiff] testified that she could not remember if she and [her supervisor] had discussed her need for FMLA leave, while the affidavit recounts the details of just such a conversation. Because the deposition indicates nothing more than a 'lapse of memory,' the court will consider the affidavit … .") (citation omitted).

In November 2013, upon learning that other Mt. Gox users were having difficulty withdrawing their deposits, Greene tried to move his bitcoins from Mt. Gox to a personal bitcoin wallet, but he was unsuccessful and contacted Mt. Gox customer service. Doc. 476 at ¶ 39; Doc. 466 at p. 13, ¶ 32. Greene made other attempts to withdraw his bitcoins from November 2013 to February 2014, and he contacted Mt. Gox customer service on February 5, 2014 because his account was restricted from accessing funding options. Doc. 466 at p. 13, ¶¶ 33-34. On February 10, 2014, Mt. Gox customer service requested a copy of Greene's ID and proof of residence, which he submitted the following day. *Id*. at pp. 13-14, ¶¶ 35-36. On February 14, 2014, Mt. Gox customer service asked Greene to complete a verification form, and on February

6

24, 2014, it informed Greene that his account had been verified. *Id*. at p. 14, ¶¶ 37-38. When Mt. Gox went offline on February 24, 2014, Greene had 42.97104 BTC and $2.66 USD in his account. *Id*. at p. 14, ¶ 39.

## Discussion

### I. Summary Judgment Motion

The elements of common law fraud under Illinois law are: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1003 (7th Cir. 2018) (quoting *Doe v. Dilling*, 888 N.E.2d 24, 35-36 (Ill. 2008)); *see also Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017) (same). Greene claims that the Mt. Gox Terms of Use falsely represented that Mt. Gox would hold all assets on its users' behalf and that trades would involve actual assets, that Karpeles is responsible for those representations, that Karpeles knew those representations were false and intended to deceive Mt. Gox users, and that Greene relied on those representations in creating his account and moving bitcoin onto Mt. Gox. Doc. 465 at 6, 15-28. Karpeles advances three grounds in seeking summary judgment on Greene's fraud claim. Each fails to persuade.

First, Karpeles contends that the factual record does not support Greene's claim. Doc. 460 at 17-20. Specifically, Karpeles argues that Greene's alleged reliance on the Terms of Use cannot ground the fraud claim because Greene "does not know what information on the Mt. Gox website he actually looked at," *id*. at 17, and because the Terms did not exist when Greene created his account, Doc. 478 at 5. As discussed above, the record yields genuine factual disputes on these matters, so they would be an inappropriate basis on which to rest summary judgment. *See Johnson*, 892 F.3d at 893 ("On summary judgment a court may not make

7

credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.") (internal quotation marks omitted). Karpeles adds that because Greene knew that no bitcoin exchange is completely secure, he could not have been deceived by Karpeles's misrepresentations and, alternatively, that those misrepresentations could not have proximately caused Greene's damages. Doc. 460 at 18, 21-22; Doc. 478 at 26. That contention is a *non sequitur*: Greene did not need to believe that Mt. Gox was 100% infallible in order to have relied to his detriment on representations about its security and operations.

Second, Karpeles argues that Greene's fraud theory is barred because he presented it for the first time in his summary judgment opposition brief. Doc. 478 at 5-6, 14-18. Specifically, Karpeles contends that because the operative complaint alleges that former co-plaintiffs Joseph Lack and Anthony Motto accepted the Terms of Use when opening their Mt. Gox accounts, Doc. 245 at ¶¶ 59, 70, but makes no such allegation regarding Greene, Greene cannot proceed on the theory that he relied on the Terms' representations. Doc. 478 at 7-8. Relatedly, Karpeles challenges Greene's reliance on documents that were not produced in discovery and are arguably inadmissible. *Id*. at 12.

Even disregarding the unproduced and assertedly inadmissible documents, Karpeles's argument fails. Granted, "although a plaintiff generally can alter the legal theories asserted in [his] complaint, [he] cannot alter the factual basis of [his] complaint at summary judgment." *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 541 (7th Cir. 2018) (internal quotations marks omitted); *see also Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment. By then, [the defendant], relying on [the plaintiff]'s second amended complaint, had not received the fair notice required by the federal pleading rules.")

8

(citations and internal quotation marks omitted). That said, a plaintiff has the latitude to refine and develop his legal and factual theories based on the record that emerges in discovery. *See CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729, 743 (7th Cir. 2015) ("CUNA was entitled to refine its rescission theory at summary judgment based on evidence produced in discovery.").

Greene's summary judgment response falls on the permissible side of the line. Along with his erstwhile co-plaintiffs, Greene alleged that "[t]o use Mt. Gox's service, customers were required to sign up for an account at www.mtgox.com and agree to Mt. Gox's Terms of Use, which expressly stated that 'MtGox represents and warrants that … it will hold all monetary sums and all Bitcoins deposited by each Member in its Account.'" Doc. 245 at ¶ 14 (omission in original) (quoting Doc. 11-2 at 3). Although Greene—unlike Lack and Motto—did not specifically allege that he was required to accept and accepted the Terms of Use, he still identified representations in the Terms as a basis for his claims. Specifically, Greene alleged that he read "advertisements about [Mt. Gox's] service, including its representations about the Exchange's security, reliability, and ability to withdraw or deposit bitcoins at any time— substantially similar to the advertisements and representations described in Paragraphs 13-14," and that, relying on the representations about secure storage and trading, Greene created an account. *Id*. at ¶¶ 49-51. Greene further alleged that although he had complained to Mt. Gox customer service in November 2013, he continued to believe that it would hold his bitcoins safely and securely "in light of the representations that were made to him through the Mt. Gox website and in its Terms of Use and Privacy Policy." *Id*. at ¶ 52. Moreover, the fraud claim specifically references representations in the Terms of Use that Mt. Gox would protect users' bitcoins and would "safely and quickly allow them to buy, sell, trade, or withdraw the same." *Id*. at ¶ 112.

In his summary judgment response, Greene focuses on the Terms of Use's representation, identified in the complaint, that Mt. Gox would securely hold all of the users' bitcoins, and also identifies representations that Mt. Gox trades would use actual bitcoins and that Mt. Gox would use "reasonable care and skill" in facilitating trades. Doc. 465 at 6, 9-10. While Greene has expanded on the complaint's allegations concerning the Terms, he is not now seeking "to introduce a new factual basis not previously presented in the pleadings." *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014). Rather, the complaint articulated the gist of the fraud claim, and in opposing summary judgment Greene merely added detail with the aid of discovery. That does not violate the rule against altering the factual basis of a claim on summary judgment. *See CMFG Life Ins.*, 799 F.3d at 743 (holding that the plaintiffs' argument at summary judgment that certain oral representations formed an "independently actionable" basis for their rescission claim was not an impermissible attempt to add a new claim, as those representations were alleged in the complaint and the plaintiffs "refined[d] [their] … theory at summary judgment based on evidence produced in discovery").

Third, while acknowledging that a duty to speak or disclose might have arisen if he "ma[de] an affirmative statement that [he] pass[ed] off as the whole truth while omitting material facts that render[ed] the statement a misleading half-truth," Doc. 478 at 26 (internal quotation marks omitted) (quoting *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 398 (7th Cir. 2009)), Karpeles maintains that "Greene has not identified any statements as 'half-truths,'" *ibid*. Greene's response brief, however, identified representations in the Terms that are allegedly half-truths, including that Mt. Gox held all deposited bitcoins and that trades on Mt. Gox would involve actual assets. Doc. 465 at 17-18. Karpeles does not address those specific statements or argue that they fail to qualify as half-truths, thereby forfeiting any such argument.

10

## II.     Motion to Strike

Karpeles moves to strike the expert disclosure of Professor Goforth. Doc. 457. Although Karpeles initially maintained that Goforth's testimony was irrelevant, his summary judgment reply brief acknowledges that her opinions are relevant insofar as Greene is permitted to proceed on the fraud theory articulated in his summary judgment opposition. Doc. 478 at 6. Because Greene may proceed on that theory, Karpeles's relevance objection is overruled. That said, the court did not rely on Goforth's declaration in denying summary judgment, and Karpeles may raise his other challenges to her opinions ("lack of expertise, reliability, and the impermissibility of testifying to legal conclusions or another's subjective intent, knowledge or behavior," Doc. 457 at 8-9) at the appropriate juncture.

## Conclusion

Karpeles's motion for summary judgment is denied, and his motion to strike Professor Goforth's expert disclosure is denied without prejudice.

June 16, 2020

_____
United States District Judge

11