# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY GREENE, individually and on behalf of all others similarly situated, | ) ) ) | Case No. 14-cv-01437 |
| Plaintiff, | ) ) ) | Hon. Gary Feinerman |
| v. | ) ) | Magistrate Judge Susan Cox |
| MARK KARPELES, an individual, | ) ) ) | |
| Defendant. | ) | |

## DEFENDANT MARK KARPELES' MEMORANDUM IN SUPPORT OF HIS MOTION TO EXCLUDE THE REPORT AND OPINION TESTIMONY OF PLAINTIFF'S EXPERT PROFESSOR CAROL GOFORTH <u>PURSUANT TO FEDERAL RULE OF EVIDENCE 702</u>

Dated: October 6, 2020

Bevin Brennan
Matthew Schmidt
PEDERSEN & HOUPT
161 North Clark Street, Suite 2700
Chicago, Illinois 60601
(312) 641-6888
bbrennan@pedersenhoupt.com
mschmidt@pedersenhoupt.com

*Attorneys for Defendant Mark Karpeles*

Defendant Mark Karpeles, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), submits this Memorandum in support of his Motion to Exclude Plaintiff's Expert Carol Goforth's Report and Opinion Testimony:

**Introduction**

Professor Carol Goforth, a corporate law professor and lawyer, seeks to offer opinions in this case that are primarily nothing more than a narrative cobbled together from the internet and Mr. Karpeles' deposition testimony, which is inadmissible. Professor Goforth has created a story that does not rely on any accepted methodology, experience or expertise at all. In the few instances where she ostensibly has formed an opinion, she even admits that these are not proper expert testimony, going so far as to say that an opinion is based on "common sense" or that others are legal opinions.

All of Professor Goforth's proposed testimony should be excluded for three reasons. First, Professor Goforth cannot testify to hearsay she gathered from the internet and juxtaposed with deposition testimony and other record evidence to form a factual narrative. (Declaration of Carol Goforth ("Declaration" or "Decl.") ¶¶ 11-44, 46-47, 49-50, 52-53, and 55-62 (a copy of which is attached as Exhibit A).) Second, Professor Goforth cannot opine about what Mt. Gox users purportedly "would have" understood and what they "would have done" if they had known certain information. Professor Goforth has no expertise in, conducted no research about, and has no basis to make these speculative "opinions." (*Id.* ¶¶ 43, 45-48, 51, 63.) Third, the remaining portions of Professor Goforth's Declaration and proposed testimony are statements or determinations of law properly left to the Court and the jury. (*Id.* ¶¶ 54.)

The only remaining paragraphs of the Declaration contain Professor Goforth's background, qualifications, the materials upon which she relied and her attestation pursuant to 28

U.S.C. § 1746. (*See* Decl. ¶¶ 1-10; 64.) There is nothing for which Professor Goforth can testify pursuant to Rule 702. She should be precluded from providing any opinion testimony and her Declaration should be stricken, excluded and not considered in any way in this case.

## Legal Standards

As this Court is certainly well aware, Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Courts have summarized these requirements as involving three considerations. For an expert witness to testify, the testimony must (i) be relevant to the issues in the case and (ii) assist the trier of fact, and (iii) the expert must be qualified in the area of the testimony. *See Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012) ("Rule 702 requires that expert testimony be relevant, reliable, and have a factual basis — requirements that must be met before the jury is allowed to hear and perhaps be persuaded by the expert testimony.").[1]

For scientific experts, the court considers factors including "whether or not the theory or technique has been (1) tested, (2) subjected to peer review and publication, (3) analyzed for known or potential error rate, and/or is (4) generally accepted within the specific scientific field." *Id.* at 810, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993).

---

[1] Mr. Karpeles filed a prior Motion to Strike Expert Disclosure of and Preclude Expert Testimony from Carol R. Goforth to preclude Professor Goforth's proposed testimony as irrelevant to the issues raised in the operative Fourth Amended Complaint. [Dkt. No. 457.] The Court denied that motion on June 16, 2020. [Dkt. No. 489.] Mr. Karpeles maintains and does not waive his position that Professor Goforth's proposed testimony is irrelevant to the issues in this case with only a single count remaining for common law fraud.

"[T]he test for reliability for nonscientific experts is flexible." *Ill. Liberty PAC v. Madigan*, No. 12 C 5811, 2015 U.S. Dist. LEXIS 125383, at *14 (N.D. Ill. Sep. 21, 2015), citing *United States v. Romero*, 189 F.3d 576, 584 (7th Cir. 1999). Even for nonscientific experts, however, the *Daubert* principles "apply equally." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013), citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999). "No matter the nature of the witness's expertise, Rule 702 establishes a standard of evidentiary reliability, requires a valid … connection to the pertinent inquiry as a precondition to admissibility, and mandates that the testimony have a reliable basis in the knowledge and experience of [the relevant] discipline." *Id.* (alterations in original, internal quotations omitted).

While an expert may rely on experience alone, an expert must sufficiently explain how they apply their expertise to the facts of the case. *Smith v. Union Pac. R.R.*, No. 11-cv-986, 2017 U.S. Dist. LEXIS 94501, at *17-18 (N.D. Ill. June 20, 2017). "Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) (citation omitted); *see also Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005) ("'expert intuition[]' is neither normal among social scientists nor testable—and conclusions that are not falsifiable aren't worth much to either science or the judiciary" and proposed expert could not rely on variants of "my expertise").

Experts cannot render opinions where they provide "no analysis in making them." *LG Elecs*, 2010 U.S. Dist. LEXIS 91739 at *15, citing *Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997). The expert must connect a conclusion to experience "such that the court can find the conclusion to be a reliable application of that experience." *Levin v. Grecian*, No. 12 C 767, 2013 U.S. Dist. LEXIS 97238, at *19 (N.D. Ill. July 12, 2013), citing *Clark v. Takata Corp.*, 192 F.3d 750, 759 (7th Cir. 1999). "An expert who supplies nothing but

3

a bottom line supplies nothing of value to the judicial process." *Turubchuk v. S. Ill. Asphalt Co.*, 958 F.3d 541, 554-55 (7th Cir. 2020). An expert also cannot just rely on someone else's statements without doing any independent research or otherwise verifying those statements. *See, e.g., Gentieu v. Tony Stone Image/Chicago, Inc.*, 214 F. Supp. 2d 849, 853 (N.D. Ill. 2002).

The district court is a "gate-keeper" for expert testimony. *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007). The "key to the gate … is the soundness and care with which the expert arrived at her opinion: the inquiry must focus ... solely on principles and methodology..." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). The Plaintiff here must demonstrate that the proposed testimony satisfies the standards by a preponderance of the evidence. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

**Argument**

Professor Goforth's proposed testimony should be excluded for three reasons. First, Professor Goforth has no discernable methodology at all, and certainly not anything reliable, as the majority of her Declaration is a factual narrative. Second, her limited opinions are not based on any expertise, but are her subjective and speculative beliefs and impressions. Third, several of Professor Goforth's opinions are statements of law properly left to the Court and/or the jury.

Before addressing these three points, it is important to understand Professor Goforth's credentials. Professor Goforth is a lawyer with undergraduate and law degrees from the University of Arkansas. (Decl. Ex. A.) She has been a law professor since 1989. (*Id.*) Any expertise she possesses is in law and legal theory. She expressly disavowed reliance in this case on any expertise in psychology, her undergraduate major. (Deposition of Carol Goforth ("Dep.") at 8:12-23 (the relevant pages are attached as Exhibit B).) While she has studied cryptocurrency regulations since 2017, she concedes that her opinions here do not involve any particular

4

regulations. (Dep. at 14:7-17:4.) Her proposed testimony is not an admissible expert opinion, but an effort to include argument via an expert unconstrained by the rules of evidence. But Rule 702 provides constraints, and Professor Goforth's proposed testimony runs afoul of them.

## I. PROFESSOR GOFORTH EMPLOYS NO RELIABLE METHODOLOGY TO CREATE A FACTUAL NARRATIVE.

Professor Goforth's proposed opinion testimony in Paragraphs 11-44, 49-50, 52-53, 56-62 of her Declaration should be stricken and any testimony about them excluded, as they constitute an inadmissible narrative summary based on Mr. Karpeles' deposition, information from the internet, and/or paraphrasing the Mt. Gox Terms of Use. In these paragraphs, Professor Goforth creates a purported history of bitcoin and other bitcoin exchanges from the internet and then discusses what Mr. Karpeles said or did, none of which requires any expertise.

Courts have repeatedly held that an expert cannot simply provide a factual narrative. *See, e.g.*, *Baldonado v. Wyeth*, No. 04 C 4312, 2012 U.S. Dist. LEXIS 68691, at *15-16 (N.D. Ill. May 17, 2012) (excluding expert's narrative testimony because "the 'vast majority' of the experts' proffered narratives amount to a summary and statement of the experts' 'advocacy-based interpretation of documents in the record concerning'" the issues); *Smith v. Union Pac. R.R.*, No. 11-cv-986, 2017 U.S. Dist. LEXIS 94501, at *18 (N.D. Ill. June 20, 2017) (excluding expert report that "only offers factual recitations and conclusions without any tangible substantiation."); *see also Hostetler v. Johnson Controls*, No. 3:15-cv-226 JD, 2020 U.S. Dist. LEXIS 151437, at *17 (N.D. Ind. Aug. 21, 2020) ("constructing a factual narrative based upon record evidence is not a role for expert testimony—that's a lawyer's job through the presentation of evidence and through opening statements and closing arguments."); *United States SEC v. ITT Educ. Servs.*, 311 F. Supp. 3d 977, 987 (S.D. Ind. 2018) (excluding expert opinion because "[m]ere narration … fails to fulfill *Daubert*'s most basic requirements.").

5

This prohibition is particularly strong when the narrative is taken from out-of-court statements in the form of internet articles and depositions. An expert opinion cannot consist of "the mere repetition of the out-of-court statements of others, and … an expert witness may not simply summarize the out-of-court statements of others as his testimony." *Olivet Baptist Church v. Church Mut. Ins. Co.*, No. 13 C 1625, 2016 U.S. Dist. LEXIS 25294, at *16 (N.D. Ill. Feb. 29, 2016), citing *United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014) (internal quotation marks and citations omitted). Importantly, a party cannot use a witness's "status as an expert to present hearsay statements to the jury." *LG Elecs v. Whirlpool Corp.*, No. 08 C 242, 2010 U.S. Dist. LEXIS 91739, at *16 (N.D. Ill. Sep. 3, 2010), citing *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005).

Three cases from this District establish that Professor Goforth's narrative is inadmissible. In *Barnett v. City of Chicago*, 969 F. Supp. 1359 (N.D. Ill. 1997), *rev'd in part on other grounds by* 141 F.3d 699 (7th Cir. 1998), the court excluded testimony from a professor on "the history of past redistrictings and the Latino experience in Chicago." *Barnett*, 969 F. Supp. at 1416. The professor's report and testimony were more akin to "a proposed findings [*sic*] of fact summarizing the last 70 years of political history of the City of Chicago" instead of an expert report and "were so conclusory that its value as objective expert opinion was dubious." *Id.* The court "was particularly troubled by [the expert's] research methodology which consisted largely of borrowing excerpts from party depositions in previous litigations and newspaper articles." *Id.*

Similarly, in *LG Elecs v. Whirlpool Corp.*, No. 08 C 242, 2010 U.S. Dist. LEXIS 91739 (N.D. Ill. Sept. 3, 2010), the court excluded portions of an expert's opinion concerning third-party statements regarding steam, reviews of the dryer at issue in magazines, and the use of the

6

term steam in other patents because the expert did not perform any of his own tests or analysis but simply relied on the out-of-court statements of others, including "just reading literature that [he] found on the Internet." *See LG Elecs*, 2010 U.S. Dist. LEXIS 91739 at *14-22.

In *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, No. 02 C 4356, 2010 U.S. Dist. LEXIS 62114 (N.D. Ill. June 23, 2010), the court excluded an expert's opinion where he relied on his "background and experienced based knowledge" but only searched for online, publicly-available information for his opinion on the reasonableness of financial forecasts and only "scanned through" two depositions. 2010 U.S. Dist. LEXIS 62114 at *13-19. The court held that "there is nothing to support [the expert's] methodology … ." *Id.* at *17.

### A. Professor Goforth uses no recognizable methodology to create a factual narrative largely from deposition and internet articles.

Professor Goforth's proposed testimony contains the same flaws as in *Barnett*, *LG Elecs.*, and *Makor*. The majority of Professor Goforth's Declaration relies on out-of-court statements from Mr. Karpeles' deposition and information on the internet to craft a narrative summary:

- The section "The Rise of Bitcoin; the First Successful Cryptocurrency" containing general information on cryptocurrencies is based on various articles and information from the internet. (*See* Decl. ¶¶ 11-15; Dep. at 95:19-96:10.)

- The section "Bitcoin Exchanges and Mt. Gox" containing information on Mt. Gox and other cryptocurrency exchanges is based on Mr. Karpeles' deposition and information from the internet. (*See* Decl. ¶¶ 16-19; Dep. at 96:11-97:8.)

- The section "Bitcoin Businesses, Hacks, and User Reactions" containing information about the collapses of Mt. Gox and other cryptocurrency exchanges is also based on Mr. Karpeles' deposition information from the internet. (*See* Decl. ¶¶ 20-32; Dep. at 97:14-110:16.)

- The section "Mt. Gox's Bitcoin Deficit" contains a summary of certain of Mr. Karpeles' statements and public information regarding Bitcoin losses at Mt. Gox. (*See* Decl. ¶¶ 33-38.) This section is based on Professor Goforth's characterizations of public statements by Mt. Gox, Mr. Karpeles' deposition, and information from the internet. (*See* Dep. at 110:17-112:5.)

7

- The section "Active Concealment of the Bitcoin Deficits with the Gox Bot" contains a summary of bot trading activity on Mt. Gox. (*See* Decl. ¶¶ 39-44.) This section is based on characterizations of Mr. Karpeles' deposition and internet articles. (*See* Dep. at 112:6-125:8.)[2]

- The section "What Members of the Mt. Gox Community would have Understood" includes paragraphs regarding: (1) the Bitcoin community's scrutiny of the market and exchange activity, (*id.* at ¶ 46); (2) the anonymity of trading partners on exchanges (*id.* at ¶ 47);[3] and (3) the supposed purpose of the alleged misrepresentations and nondisclosures of various hacks and the Gox Bot (*id.* at ¶ 55). These statements are based on Mr. Karpeles' deposition, articles and information from the internet and basic non-expert factual information about anonymity of exchanges. (Dep. at 128:11-130:17; 132:15-134:2; 155:3-19.)

- The section "Closure of Mt. Gox" largely contains a summary of the shutting down of Mt. Gox, which is Professor Goforth's summary of reports and other information from the Internet. (*See* Decl. ¶¶ 56-62; Dep. at 156:9-157:6.)

Notably, *none* of these paragraphs employs any particular methodology. All Professor Goforth did was find some articles, postings and information on the internet and read a single deposition in this case to construct a narrative history. Professor Goforth admits that many of these sources are not written by bitcoin or cryptocurrency experts, that she is not familiar with many of the authors or their credentials, and that she had not used most of the cited internet sites in her work. (*See* Dep. at 69:2-70:4; 76:21-77:12; 78:13-20; 79:10-14; 84:5-10; 87:13-23; 90:5-15; Decl. Ex. B.) This is not the methodology or expertise allowed by Rule 702 and *Daubert*.

Perhaps the most telling portion of Professor Goforth's deposition was her outright admission that her "opinion" in Paragraph 26 of her Declaration (about why Mt. Gox had moved certain bitcoins in June 2011) "creat[ed] the appearance that Mt. Gox was stable and reliable, when other exchanges were not" was based on "**common sense.**" (Dep. at 106:3-107:7 (emphasis added).) This is true for all of the Declaration: Professor Goforth is trying to usurp the role of the jury and has provided no admissible expertise. Experts cannot provide a narrative

---

[2] Paragraph 43 also contains an additional opinion regarding the Gox Bot and is addressed in Section II.A.2 below.
[3] Paragraphs 46 and 47 also contain opinions that unquestioningly rely on information from the internet or are non-expert factual representations and are addressed in Section II.A.2 below.

8

summary to try to evade evidentiary rules to recharacterize hearsay information and articles found on the internet and deposition testimony to make conclusions for the trier of fact. *See ITT Educ. Servs.*, 311 F. Supp. 3d at 987; *Hostetler*, 2020 U.S. Dist. LEXIS 151437 at *17; *Olivet Baptist Church*, 2016 U.S. Dist. LEXIS 25294 at *16; *Baldonado*, 2012 U.S. Dist. LEXIS 68691 at *15-16; *Smith*, 2017 U.S. Dist. LEXIS 94501 at *18; *LG Elecs*, 2010 U.S. Dist. LEXIS 91739 at *18. The majority of Professor Goforth's Declaration does just that and should be excluded.

### B. Professor Goforth crafted other portions of her factual narrative by repeating portions of the Mt. Gox Terms of Use.

The section titled "What Members of the Mt. Gox Community would have Understood" includes paragraphs that merely quote and describe the document "Mt. Gox Terms of Use," (*id.* at ¶¶ 49-50, 52-53). Professor Goforth conceded that these paragraphs are merely taken from portions of Mr. Karpeles' deposition and her reading of the text of the Mt. Gox site's Terms of Use. (*See* Dep. at 136:4-137:15; 145:17-147:1.) These paragraphs are another example of Professor Goforth improperly constructing a factual narrative based upon record evidence, *i.e.*, the Mt. Gox Terms of Use. *See Hostetler*, 2020 U.S. Dist. LEXIS 151437 at *17**.**

The Court therefore should strike Paragraphs 11-44, 46-47, 49-50, 52-53, and 55-62 of Professor Goforth's Declaration, and prevent her from testifying about them.[4]

### II. THE FEW OPINIONS THAT PROFESSOR GOFORTH OFFERS ARE NOT BASED ON ANY RECOGNIZED EXPERTISE AND ARE INADMISSIBLE.

That leaves only eight paragraphs, or portions of paragraphs, in Professor Goforth's Declaration. The first seven are unsupported by any methodology and are merely speculation about what a bitcoin user "would have done" or relaying hearsay statements from a few online posters. The last remaining paragraph is a legal conclusion that is not proper expert testimony.

---

[4] For ease of reference, Mr. Karpeles has included a summary chart of these arguments, going paragraph-by-paragraph in Professor Goforth's Declaration, in Exhibit C attached hereto.

        **A.**        **Professor Goforth has no qualifications and no ability to testify to what Mt. Gox users "would have done," nor would this assist the trier of fact.**

The first set of remaining paragraphs are about what Professor Goforth contends Mt. Gox users "would have" done or thought: (1) that Mt. Gox users would have left the exchange if they had known of various hacks and deficits; and (2) what Mt. Gox users would have understood about the exchange. In her deposition, Professor Goforth admitted that she has neither conducted nor reviewed any research on these issues, and these paragraphs are speculation without application of any expertise.

        ***1.***        ***Professor Goforth Cannot Testify About What Mt. Gox Users "Would Have Done."***

Professor Goforth opines that "[n]o rational investor would have knowingly chosen to put or keep bitcoin or currency on an exchange with a bitcoin or cash deficit" and that "had the community been aware that there was a sizeable and growing deficit in the BTC and cash balances for the Mt. Gox exchange, it is virtually certain that users would have abandoned Mt. Gox." (Decl. ¶¶ 45, 63.) Professor Goforth testified these assertions were "a matter of rationality" and her general "understanding of how markets and investors behave," without any further inquiry. (Dep. at 158:11-159:13; 126:22-25.)

However, Professor Goforth's opinion cannot simply be based on her "expert intuition" that no rational person would have kept their bitcoin and fiat currency on Mt. Gox. *Zenith*, 395 F.3d at 418. Professor Goforth relied on contemporaneous hearsay statements on bitcoin message boards instead of doing any actual research or investigation. (Dep. at 83:12-23.) Professor Goforth has not conducted or reviewed any research on the relative rationality of bitcoin investors, as compared to conventional investors, during the time at issue. (Dep. at 127:10-24.) She has not conducted any research on why individuals left their bitcoins on Mt.

10

Gox after numerous hacks were disclosed or why any individuals decided to move their bitcoins off of the Mt. Gox exchange. (Dep. at 83:12-23.)

Professor Goforth admits that none of her research involves studying how consumers react to fraud or surveying actual bitcoin buyers or sellers about what is important to them and further admits that she has no experience working for a cryptocurrency exchange. (Dep. at 13:8-10; 22:3-23.) Professor Goforth's opinion regarding how customers "would" react is not based on any research or scholarship but is a law professor's guess. There is no link between the historical narrative that Professor Goforth provides and her conclusion that no rational person would have left their bitcoin on Mt. Gox outside of her say-so -- precisely the sort of *ipse dixit* that is not permitted in expert testimony. *See Clark*, 192 F.3d at 759. This impermissible bottom line supplies "nothing of value to the judicial process." *Turubchuk*, 958 F.3d 541 at 554-55.

The court should strike paragraphs 45 and 63 of Professor Goforth's report, and prevent her from testifying about those opinions.

> **2.** *Professor Goforth's opinions on what Mt. Gox users would have understood about the exchange are also not supported by any research or investigation or expertise*.

In the next five remaining paragraphs, Professor Goforth admitted that her opinions on what Mt. Gox users "would have understood" regarding the exchange are not based on any research or investigation but rather are her subjective beliefs and impressions (coupled with the same flaw discussed above, namely parroting information from the internet and Mr. Karpeles' deposition with no separate investigation).

<u>Paragraph 43:</u> Professor Goforth summarily concludes in this paragraph that "[t]he Gox Bot trades also had the effect of actively concealing the true state of the operations from users, which allowed the exchange to continue to operate." (Decl. ¶ 43.) This is a legal and bottom-line conclusion without any expertise about the use of the Gox Bot. The remainder of that

11

paragraph provides the alleged support for this conclusion, and this only confirms that she has not applied any expertise: her reading of Mr. Karpeles' deposition testimony and two articles from the internet. (*Id.*) She goes so far as saying that "[m]ultiple sources analyzing Mt. Gox's records" concluded that the Gox Bot was supposedly responsible for the high price of bitcoin on the exchange, but admits that she did not conduct any independent research on that issue. (*Id.*; Dep. at 123:3-6.) Professor Goforth's opinions regarding Gox Bot activity unquestioningly rely solely on deposition testimony and internet articles without any independent research or verification and must be excluded. *See, e.g., Gentieu*, 214 F. Supp. 2d at 853.

Paragraph 46: Professor Goforth contends that, from 2010 to 2014, the cryptocurrency community was "fairly tight-knit and quite active on online chat boards and discussion groups" and that users "tended to monitor information about their purchases and investment in BTC closely and actively." (Decl. ¶ 46.) But Professor Goforth's bottom-line conclusion applies no methodology and is not reliable. She did not compare the number of people buying cryptocurrency with the number of people participating in chatrooms at this time. (Dep. 128:24-129:17.) When asked what "quite active" meant, Professor Goforth admitted that there was no independent standard for that determination. (*Id.* at 129:3-6.) Professor Goforth's opinion as to how closely the cryptocurrency community monitored their purchases and investment also applies no methodology, as it is founded on "publicly available reports combined with [her] impressions" of how markets have acted in other instances. (*Id.* at 129:18-130:7.) This equates to a non-expert reading of voluntary comments by some users in a chatrooms and her "impressions" of how markets work -- with no application of standards, a methodology or expertise. (*Id.* at 130:2-7.) All Professor Goforth is doing is relaying rank hearsay from

12

chatrooms, from her unsubstantiated opinion of increased user activity or her reading of those statements. (*Id.* at 130:8-17.)

She then concludes the paragraph by seeking to introduce hearsay from an article from the internet. (Decl. ¶ 46.) Most tellingly, Professor Goforth admitted that the basis for the last statement in this paragraph is "[a]s far as [she] could tell from, again, the third-party reports, yes. *That's my reading of reports about what happened.*" (*Id.*; Dep. at 130:8-17; 132:2-14 (emphasis added).) The statements in Paragraph 46 involve no expertise, are an improper attempt to introduce hearsay, and must be excluded. *See, e.g., Gentieu*, 214 F. Supp. 2d at 853.

Paragraph 47: Professor Goforth next states that bitcoin exchange users "could only communicate information that was accessible to them, and they had no way of knowing when trades were made with accounts that had no real backing." (Decl. ¶ 47.) As Professor Goforth admits the first clause of that phrase is a tautology, which involves no expertise and applies no standards or methodology. (Dep. at 132:15-133:1.) It would not assist the trier of fact. She proceeds to tie this to Mr. Karpeles' statement in his deposition -- again, a question of fact that is not proper for an expert to just repeat. (Decl. ¶ 47.) This portion is inappropriate argument, not expertise. *See, e.g., Hostetler*, 2020 U.S. Dist. LEXIS 151437 at *17.

Paragraph 48: The first half of this paragraph is a general statement requiring no expertise and which would not assist the trier of fact: what users "would have" understood the purpose of the exchange to be ("to facilitate the exchange of bitcoins between buyers and sellers"). (Decl. ¶ 48.) And the second half invokes the legal concept of "good faith and fair dealing." (*Id.*) While discussed in the next section, Mr. Karpeles addresses the remaining problem with the proposed testimony in this paragraph now to conclude the problems with Paragraph 48: Professor Goforth cannot be an "expert" in legal principles. This is a jury

13

question. (*See* Section II.B, *infra*.) Professor Goforth admitted this is a legal concept, and when asked what the difference between the phrase in a legal context versus a business context, could not provide any difference, saying "hopefully none." (Dep. at 136:4-13.) Any proposed testimony in Paragraph 48 should be excluded.

Paragraph 51: Professor Goforth opines on what "members who did not actually read the Terms of Use would have anticipated" about the exchange. (Decl.¶ 51.) Again, this is sheer speculation under the disguise of expertise. Professor Goforth has not conducted or reviewed any research on the primary concerns of individuals purchasing bitcoin between January 2012 and 2014. (Dep. at 138:23-139:1.) She did not apply any standards, only her belief about how any "rational consumer" would act in making any purchase, including a pair of jeans -- a concept that the jury can readily decide for itself. (*Id.* at 143:11-25.) The opinions in Paragraph 48 are unquestioningly based on Professor Goforth's *ipse dixit* without any independent research or verification and must be excluded. *See, e.g., Gentieu*, 214 F. Supp. 2d at 853.

        **B.**        **Professor Goforth improperly attempts to argue issues of law.**

The remainder of Professor Goforth's Declaration is one paragraph that contains statements of law. Paragraph 54 of her Declaration states that it is "customary to assume that individuals read the contracts that they sign." (Decl. ¶ 54.) This is a legal concept that is the province of the judge. *See United States v. Farinella*, 558 F.3d 695, 700 (7th Cir. 2009). Professor Goforth then goes on to state that any non-disclosure or non-correction of deficits in customer accounts "would not have been in accordance with the way that legitimate exchanges operated or operate today." (Decl. ¶ 54.) When asked the basis for her contentions about customary practices as delineated in Paragraph 54, Professor Goforth testified that this is her legal conclusion about what she contends should have been disclosed:

        Q.        And what's the basis for that obligation to report that deficit?

A. Because it's inconsistent with good faith and fair dealing not to. When you make affirmative statements that contradict it, it's fraudulent.

(Dep. at 150:12-16.)

That is, Professor Goforth's opinion is not based on any expertise, but her reading of information on the internet, and then her conclusion that there was concealment -- the issue her Declaration has injected into this case as the basis of a common law fraud claim. The jury is the entity that will make this determination. Her legal conclusion is not reliable, not based on any methodology and will not assist the trier of fact. Paragraph 54 is likewise inadmissible.

## Conclusion

Professor Goforth's proposed testimony is nothing more than an improper effort to try to use an "expert" to get hearsay and legal conclusions in evidence. This is improper. The Court should preclude Professor Goforth from providing any testimony and her Declaration should be stricken, excluded and not used in any capacity by this Court.

WHEREFORE, Defendant Mark Karpeles respectfully requests that this Honorable Court grant his Motion to Exclude Plaintiff's Expert Carol Goforth's Report and Opinion Testimony and for such other and further relief as this Court deems just in Mr. Karpeles' favor.

Dated: October 6, 2020

Respectfully submitted,

Mark Karpeles

By: /s/ *Bevin Brennan*
One of His Attorneys

Bevin Brennan
Matthew Schmidt
PEDERSEN & HOUPT
161 North Clark Street, Suite 2700
Chicago, Illinois 60601
(312) 641-6888
bbrennan@pedersenhoupt.com
mschmidt@pedersenhoupt.com
*Attorneys for Defendant Mark Karpeles*

15