# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GREGORY GREENE, individually and on
behalf of all others similarly situated,

               *Plaintiffs*,

v.

MARK KARPELES, an individual

               *Defendant*.

Case No. 1:14-cv-01437

Hon. Gary Feinerman

**MEMORANDUM IN SUPPORT OF MOTION BY GREGORY GREENE FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

I.     **INTRODUCTION** ...........................................................................................1

II.    **BACKGROUND** ............................................................................................3

    A.    **The Mt. Gox Terms of Use Were Presented and Agreed to by All Class Members** ....................................................................................3

    B.    **The Terms of Use Mispresented Mt. Gox to all Exchange Users** ......................4

    C.    **Greene's Experience and Claim** .......................................................6

    D.    **The Proposed Class** ........................................................................7

III.    **ARGUMENT** ...................................................................................................8

    A.    **The Proposed Class Meets the Requirements of Rule 23(a)** .............................8

        1.    The proposed Class is sufficiently numerous ................................8

        2.    The claim of the Class turns on the resolution of common questions ........9

            a.    *Class members' claims are governed by the same legal rules* .......9

            b.    *Karpeles's conduct will generate common answers for each Class member's fraud claim* .........................................11

        3.    Greene is typical of the class he seeks to represent, and adequate to represent this Class ..........................................................13

    B.    **The Proposed Class Meets the Requirements of Rule 23(b)(3)** ........................17

        1.    Common issues predominate in this litigation .............................17

            a.    *Courts permit a classwide inference of reliance when such an inference derives from the nature of the alleged misrepresentation* ..............................................18

            b.    *The nature of Karpeles's alleged misrepresentation permits a classwide inference of reliance* ................................21

        2.    A class action is a superior way to resolve this controversy.....................24

IV.    **CONCLUSION** ...........................................................................................25

i

<u>**TABLE OF AUTHORITIES**</u>

**United States Supreme Court Cases:**

*Coopers & Lybrand v. Livesay*,
  437 U.S. 463 (1978)...........................................................................................25

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982)......................................................................................14–15

*Facebook, Inc. v. Patel*,
  140 S. Ct. 937 (2020)........................................................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...............................................................................9, 13, 17

**United States Circuit Court of Appeals Cases:**

*Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities, Inc.*,
  747 F.3d 489 (7th Cir. 2014) ...........................................................................8

*Arreola v. Godinez*,
  546 F.3d 788 (7th Cir. 2008) .........................................................................15

*Beaton v. SpeedyPC Software*,
  907 F.3d 1018 (7th Cir. 2018) .......................................................................16

*Bell v. PNC Bank, N.A.*,
  800 F.3d 360 (7th Cir. 2015) ...........................................................................9

*Butler v. Sears, Roebuck & Co.*,
  727 F.3d 796 (7th Cir. 2013) .....................................................................3, 23

*CE Design Ltd. v. King Architectural Metals, Inc.*,
  637 F.3d 721 (7th Cir. 2011) .........................................................................13

*CGC Holding Co., LLC v. Broad & Cassel*,
  773 F.3d 1076 (10th Cir. 2014) .....................................................................18

*De La Fuente v. Stokely-Van Camp, Inc.*,
  713 F.2d 225 (7th Cir. 1983) ....................................................................13–14

*Green v. Wolf Corp.*,
  406 F.2d 291 (2d Cir. 1968)...........................................................................24

*In re First Alliance Mortg. Co.*,
    471 F.3d 977 (9th Cir. 2006) ....................................................................20, 21, 22–23

*Keele v. Wexler*,
    149 F.3d 589 (7th Cir. 1998) ...................................................................................13, 15

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ..........................................................................0, 21, 22–23

*Mejdrech v. Met-Coil Sys. Corp.*,
    319 F.3d 910 (7th Cir. 2003) ...........................................................................................24

*Melendres v. Arpaio*,
    784 F.3d 1254 (9th Cir. 2015) .........................................................................................15

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ...................................................................................8, 9, 17

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002)......................................................................................17–18

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) ...........................................................................................24

*Patel v. Facebook, Inc.*,
    932 F.3d 1264 (9th Cir. 2019) .........................................................................................16

*Pella Corp. v. Saltzman*,
    606 F.3d 391 (7th Cir. 2010) ...........................................................................................

*Ret. Bd. of the Policeman's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*,
    775 F.3d 154 (2d Cir. 2014)............................................................................................15

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) .........................................................................................12

*Schleicher v. Wendt*,
    618 F.3d 679 (7th Cir. 2010) ...........................................................................................11

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) .................................................................................. *passim*

*Thorogood v. Sears, Roebuck & Co.*,
    547 F.3d 742 (7th Cir. 2008) ...........................................................................................24

*Torres v. S.G.E. Mgmt., L.L.C.*,
    838 F.3d 629 (5th Cir. 2016) ...................................................................19–20

**United States District Court Cases:**

*Aranda v. Caribbean Cruise Line, Inc.*,
    No. 12 C 4069, 2017 WL 818854 (N.D. Ill. Mar. 2, 2017) ........................16–17

*Audet v. Fraser*,
    332 F.R.D. 53 (D. Conn. 2019) ...........................................................20–21, 23

*Beaton v. SpeedyPC Software*,
    No. 13-CV-08389, 2017 WL 4740628 (N.D. Ill. Oct. 19, 2017) ....................16

*Birchmeier v. Caribbean Cruise Line, Inc.*,
    302 F.R.D. 240 (N.D. Ill. 2014)....................................................................16

*Brodsky v. HumanaDental Ins. Co.*,
    No. 1:10-CV-03233, 2016 WL 5476233 (N.D. Ill. Sept. 29, 2016) ..........15–16

*CE Design Ltd. v. Cy's Crabhouse N., Inc.*,
    259 F.R.D. 135 (N.D. Ill. 2009)....................................................................14

*Coulter-Owens v. Time, Inc.*,
    308 F.R.D. 524 (E.D. Mich. 2015) ...............................................................16

*Falco v. Nissan N. Am. Inc.*,
    No. CV1300686DDPMANX, 2016 WL 1327474 (C.D. Cal. Apr. 5, 2016)....................11

*Gehrich v. Chase Bank USA, N.A.*,
    316 F.R.D. 215 (N.D. Ill. 2016)....................................................................14

*Greene v. Karpeles*,
    No. 14 C 1437, 2020 WL 3250715 (N.D. Ill. June 16, 2020) ........................10

*Greene v. Mizuho Bank, Ltd.*,
    206 F. Supp. 3d 1362 (N.D. Ill. 2016) ........................................................9–10

*Hand v. Beach Entm't KC, LLC*,
    456 F. Supp. 3d 1099 (W.D. Mo. 2020) .........................................................16

*Harris v. comScore, Inc.*,
    292 F.R.D. 579 (N.D. Ill. 2013)....................................................................16

*In re Facebook Biometric Info. Privacy Litig.*,
    326 F.R.D. 535 (N.D. Cal. 2018)..................................................................16

*In re MtGox Co., Ltd.*,
    No.14-31229-SGJ (Bankr. N.D. Tex. May 23, 2014)...........................................................8

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*,
    962 F. Supp. 450 (D.N.J. 1997) ...............................................................................10

*Johnson v. Yahoo! Inc.*,
    No. 14 CV 2028, 2016 WL 25711 (N.D. Ill. Jan. 4, 2016)................................16

*Mednick v. Precor, Inc.*,
    320 F.R.D. 140 (N.D. Ill. 2017).................................................................................9

*Rodriguez v. It's Just Lunch, Int'l*,
    300 F.R.D. 125 (S.D.N.Y. 2014) ...............................................................................10

*Seekamp v. Fuccillo Automotive Grp., Inc.*,
    No. 1:09-CV00018LEKDRH, 2010 WL 980581 (N.D.N.Y. Mar. 15, 2010) ..................19

*Seekamp v. It's Huge, Inc.*,
    No. 1:09-CV-00018 LEK, 2012 WL 860364 (N.D.N.Y. Mar. 13, 2012) ..................19, 23

*Schulken v. Washington Mut. Bank*,
    No. 09-CV-02708-LHK, 2012 WL 28099 (N.D. Cal. Jan. 5, 2012) ................................16

**State Supreme Court Cases:**

*Adams v. Little Missouri Minerals Ass'n*,
    143 N.W.2d 659 (N.D. 1966) .....................................................................................18

*Cook v. Hayden*,
    31 S.E.2d 625 (Va. 1944)............................................................................................18

*Vasquez v. Superior Court*,
    484 P.2d 964 (Cal. 1971) ......................................................................................18, 23

**Rules and Statutory Provisions:**

Fed. R. Civ. P. 23 .......................................................................................... *passim*

**Other Authorities:**

*Advisory Committee Notes to Rule 23(b)(3)—1966 Amendments*,
    39 F.R.D. 69 (1966) ...................................................................................................17

## I.    INTRODUCTION

As the Court well knows, this case involves the failure of the Mt. Gox Bitcoin Exchange ("Mt. Gox" or the "Exchange") and the loss of hundreds of millions of dollars' worth of its users' bitcoins and fiat currency. After a series of twists and turns, the case has essentially returned to where it began: Plaintiff Gregory Greene alleges that Defendant Mark Karpeles made a series of overt misrepresentations that created the false impression that Mt. Gox was a safe and secure bitcoin exchange, despite his awareness of serious security flaws and other issues that eventually led to its collapse in February 2014. In the Court's previous memorandum opinion, it concluded that the record yields *at least* a "genuine factual dispute" regarding whether Karpeles's alleged misrepresentations are actionable in fraud. (Dkt. 490 at 7–8.) The present motion concerns not the merits, but how Greene's fraud claims will be further adjudicated. Greene hereby seeks certification of a Class of Mt. Gox users in the United States who had bitcoin or cash holdings on the Exchange when it went dark on February 24, 2014.

Greene's claims are readily amenable to class certification. As explained below, Karpeles's misrepresentations were common to all members of the proposed Class: He directed and participated in the drafting and dissemination of a Terms of Use ("TOU"), which every Mt. Gox user was required to read and agree to, that represented, among other things, Mt. Gox held all assets deposited by its members and that all trades were consummated with other users using real assets. But, as previewed in the Parties' summary judgment briefing, the evidence will show that, from the very beginning of Karpeles's tenure as CEO, Mt. Gox lacked the assets to satisfy its users' deposits as a result of a series of undisclosed hacks and other data-security events leading to the loss of bitcoin from the Exchange. Karpeles kept these security events a secret whenever possible because he understood that disclosing them would lead to the collapse of Mt.

1

Gox. The evidence additionally will show that Karpeles routinely used an automated trading bot to acquire users' bitcoins and cash using fake assets created by his own manipulation of the internal Mt. Gox database. This activity, which affected all Mt. Gox users, not only hid Mt. Gox's ongoing solvency issues, created the false impression that there was a high demand for bitcoins on the Exchange, which inflated the price of bitcoin on, and induced additional customers to join, Mt. Gox and entrust it with their bitcoins and currency.

These misrepresentations form the core of Plaintiff Gregory Greene's fraud claim against Karpeles. And evidence regarding the intent, falsity, and materiality of these misrepresentations applies equally to the claims of every member of Greene's proposed Class. The Terms of Use, for instance, was disseminated and applied to all users of the Exchange, and, therefore, all Class members. The Terms of Use was implemented early in 2012 (shortly after Karpeles took over the operation of the Exchange), and all users were required to assent to it as a condition of using the Exchange, including users that already had created accounts on Mt. Gox by that point. In other words, every member of the proposed Class was exposed to Karpeles's alleged misrepresentations about the safety, security, and operation of the Exchange. Thus, questions about whether these representations were false and whether Karpeles made them with the requisite scienter are common to the proposed Class. Further, as Karpeles's own testimony demonstrates, the alleged misrepresentations were of a type that permit a classwide inference of reliance: Given the centrality of Karpeles's alleged misrepresentations to the decision about where to store bitcoin or cash, a jury could easily find, on a classwide basis, reliance from the circumstances themselves, rendering reliance also a common question.

The evidence therefore establishes that Karpeles engaged in common conduct towards members of the proposed Class. That common conduct, along with general agreement among the

states about the content of a fraud claim, gives rise to "the same kind of claims from all class members[.]" *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). Given that common conduct, as well as the complexity and expense of litigating against Karpeles, class certification is warranted. *Id.* at 759–60; *see also Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801–02 (7th Cir. 2013) ("predominance requires a qualitative assessment" and was satisfied due to a single issue of liability, despite differing, and in some cases, no, damages). Greene therefore respectfully moves the Court to certify the Class defined below under Federal Rule 23(b)(3) and appoint Greene as Class representative and his lawyers as Class counsel.

## II.     BACKGROUND

### A.     The Mt. Gox Terms of Use Were Presented and Agreed to by All Class Members.

Greene's and every other Class member's fraud claim turns on the identical representations that Karpeles made through the Mt. Gox Terms of Use, where Karpeles made allegedly material statements about the basic viability and security of the Exchange. As discussed in other filings, the TOU was Karpeles's "priority" for the Exchange. (Dep. of Mark Karpeles (Ex. A[1]) at 91:9–24.) Beginning in 2012, and under Karpeles's direction, all Mt. Gox users were required to read and agree to the TOU in order to use, or continuing using, Mt. Gox. (*Id.* at 95:8–96:13; Karpeles's Resps. to Pl.'s 1st Interrogs. (Ex. B) at No. 7.) There was only one version of the Terms of Use that applied to each of Mt. Gox's United States customers. (Ex. A at 95:8–96:13.)

The Terms of Use explained the basic operation of the Mt. Gox Exchange. The focus of Greene's claim is on Karpeles's representations that users' assets would be held on the Exchange

---

[1]     All references to Exhibits refer to Exhibits attached to the Declaration of Benjamin S. Thomassen ("Thomassen Decl."), filed herewith.

in full, could be recovered on demand, and that all trades on the Exchange would be made with other users and always involve real fiat currency and real bitcoin. (Terms of Use (Ex. C) at 4.) Read as a whole, the Terms of Use presented Mt. Gox as a legitimate and secure place to deposit, store, and trade bitcoins and fiat currency. (*See* Ex. A at 97:19–24 (explaining that the Terms of Use "set the conditions under which customers would interact with Mt. Gox").) Indeed, Karpeles contemporaneously pointed to the TOU—and the promises made therein—as a reason to choose Mt. Gox over its competitors. (*See, e.g.*, Karpeles's BTC Forum Post (Ex. D) ("[Q:] Does [MtGox] maintain [a] full reserve? (i.e., [MtGox] controls bank accounts with all customer USD funds and controls wallets with 100% of BTC funds. . . [?]) [Karpeles:] **As described in our Terms of Service, customer funds are kept in full**. . . .") (emphasis in original).)

**B.    The Terms of Use Misrepresented Mt. Gox to all Exchange Users.**

Whether the TOU's basic representations about Mt. Gox were false, whether Karpeles made them with the requisite scienter, and whether they were material to and relied upon by Mt. Gox users—as Greene contends here—turns on evidence that is common to the proposed Class. Essentially, Greene's, and every other Class member's, claim turns on evidence about whether the condition of the Exchange (which was identical for all users) matched what Karpeles was saying (which was also identical and identically disseminated).

Greene contends that Karpeles knowingly misrepresented Mt. Gox in material ways. First, despite Karpeles's common representations that the Exchange kept a full reserve of customer bitcoins and cash, Karpeles knew—but kept secret from all Class members and other Mt. Gox users—that it was never true that Mt. Gox held all assets deposited by its customers.

4

(Dkt. 490 at 7.) Common evidence reveals that, before the Terms of Use was even drafted, Mt. Gox was in a deficit position as a result of hacks that resulted in the loss of cash and bitcoin from the Exchange. Indeed, after a March 2012 hack that resulted in the loss of around 90,000 bitcoins from the site, Karpeles understood that "Mt. Gox was short bitcoins" and, moving forward, he was never "sure that Mt. Gox would be able to answer any withdrawal requests from someone who deposited anything." (Ex. A at 43:5–23, 44:18–21, 52:8–54:4, 105:5–15; Karpeles's Email to McCaleb (Ex. E); Karpeles-McCaleb Skype Log (Ex. F) at Greene_001241 (discussing 90K bitcoin hack).) These hacks, and Mt. Gox's resulting asset shortfall, were never disclosed to any of Mt. Gox's users. (Ex. A at 123:21–24, 140:15–22; 254:13–255:2.) Indeed, when Mt. Gox's userbase *did* catch wind of a hack—as happened in mid-2012—Karpeles took steps to assure customers that the Exchange's user-held assets had not been compromised and would be replaced at Mt. Gox's expense. (Ex. F at Greene_001269; Ex. A at 144:19–147:7; Archived Mt. Gox Press Release (Ex. G).) The need for secrecy was paramount: Karpeles understood that if users knew Mt. Gox had an asset shortfall, customers would demand the immediate return of their holdings, which would cause Mt. Gox to collapse. Indeed, Karpeles, (Ex. A at 68:6–24, 69:9–23, 70:2–14), Plaintiff's expert, (Decl. of Carol R. Goforth (Ex. H) ¶¶ 28–32), *and* Defendant's expert, (Dep. of David S. Pelleg (Ex. I) at 209:8–18), all agree on this point.

Second, and despite Karpeles's common representations that all customer trades on the Exchange would be made with other Mt. Gox customers and use real assets, Karpeles used—and kept secret from all Class members and other Mt. Gox users the existence of—a trading bot (referred to by Karpeles as "Gox Bot") that acquired users' bitcoins and cash using non-existent assets. (Ex. A at 72:14–73:22, 75:19–76:11, 78:13–79:22, 81:13–82:3, 239:18–240:4; Ex. F at Greene_001245 ("Mark Karpeles: I . . . did a manual 'loan' [to Gox Bot.]").) Because Karpeles

kept Gox Bot a secret, (Ex. A at 81:13–83:16, 121:5–14), no user could have known, in any given transaction, whether he or she was trading his or her *actual* bitcoins or cash with other users and for *actual* cash or bitcoins (as the TOU described), or with Gox Bot and its fake cash and bitcoin balances. Greene contends that this mattered in several ways to the Class as a whole. Initially, it is yet another way in which the Terms of Use was allegedly misleading. (*See* Ex. C at 4.) And while there is debate about whether users would have cared about the use of trading bots on the Exchange, both sides agree that *no* user would have expected that some trades on Mt. Gox did not correspond to real assets. (Ex. H ¶ 51; Ex. I at 190:7–193:6 (explaining that users on the Mt. Gox Exchange would "expect the exchange to make sure that people did not have the ability to just sell coins they didn't have in their accounts").) But more importantly, Gox Bot's trading activity created a false sense of liquidity on the Exchange and helped Karpeles hide the Exchange's asset deficits. It is undisputed, for instance, that the "Gox Bot activity . . . affected the price of bitcoin on the [E]xchange" (*i.e.*, by affecting the apparent demand for bitcoin on the Exchange). (Ex. H ¶ 43; Ex. A at 234:18–235:2.)[2] This undoubtedly would have induced users to move their bitcoins and cash onto Mt. Gox. Greene also contends that by masking the Exchange's serious issues, the Gox Bot's activity further induced investment on Mt. Gox.

## C. Greene's Experience and Claim.

Greene's central contention is that the representations in the Terms of Use convinced him and others to open and/or keep accounts with Mt. Gox, and to keep their cash and bitcoins on Mt. Gox when they otherwise wouldn't have. Greene himself joined Mt. Gox in early 2012. (Pl.'s Resps. to Karpeles's 1st Interrogs. (Ex. J) at Resp. No. 9; dkt. 245 ¶¶ 49–50; *see also* dkt. 490 at

---

[2] An early exchange between Jed McCaleb and Karpeles demonstrated recognition of precisely this point, as well. (*See, e.g.*, Ex. F at Greene_001244 ("Mark Karpeles: I don't see [the price of bitcoin] going down to $1.5 this weekend . . . [Jed McCaleb]: if I sell 20K they will[.]").)

4.) Like every other Mt. Gox customer, Greene was required to review and agree to the Mt. Gox Terms of Use to use the Exchange. (Dep. of Gregory Greene (Ex. K) at 15:5–24, 17:18–22; dkt. 245 ¶¶ 13–14, 49–50; Decl. of Gregory Greene (Ex. L) ¶¶ 3-5.) The TOU's representations convinced Greene that the Exchange was secure, and he relied on them when deciding to move bitcoins onto, and keep them on, Mt. Gox. (Ex. K at 15:5–16:2, 17:18–22; Ex. L ¶¶ 3–5; dkt. 245 ¶¶ 49–50.) Consistent with Karpeles's, Professor Goforth's, and Mr. Pelleg's understanding about every Mt. Gox user, Greene would not have kept his bitcoins on the Exchange had he known that Mt. Gox had an asset shortfall, or that Mt. Gox was trading with users using fake bitcoin and cash balances. (Ex. K at 31:18–33:19; Ex. L ¶¶ 3–8.) But because he was convinced to keep bitcoins on the Exchange, he—along with everyone else in the Class—lost nearly everything when Mt. Gox went offline in early 2014. (Ex. K 32:22-33:19.)

### D.    The Proposed Class.

Greene's and every other Class member's claim requires proof that Karpeles made material misrepresentations, and that his and others' decisions to keep assets on Mt. Gox constituted detrimental reliance. As explained below, the resolution of those questions will rely entirely on the evidence about Karpeles's conduct discussed above—which does not vary between members of the Class—and, in turn, resolve in one stroke key issues in the claims of each proposed Class member. As such, and as a result of Defendant Karpeles's conduct described above, Plaintiff seeks certification of the following Class:

> **Class Definition:** All persons in the United States who had bitcoins or money stored with Mt. Gox on February 24, 2014.[3]

---

[3]    Excluded from the Class are (1) any named or formerly named Defendant, its agents, subsidiaries, parents, successors, predecessors, and any entity in which it or its parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) all persons who have previously had claims similar to those

As demonstrated below, the proposed Class meets the requisites to certification under Rule 23.

## III.   ARGUMENT

### A.   The Proposed Class Meets the Requirements of Rule 23(a).

 "To be certified, a proposed Class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b)." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). "It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Id.*

1.   The proposed Class is sufficiently numerous.

Fed. R. Civ. P. 23(a)(1) requires that a proposed class be so numerous that individual joinder is impractical. A finding of numerosity requires only that the evidence permits a "reasonable" belief that the proposed class contains at least 40 members. *Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities, Inc.*, 747 F.3d 489, 492 (7th Cir. 2014).

The numerosity requirement is met here. First, the trustee overseeing the Japanese bankruptcy proceedings averred in 2014 that (at least) approximately 30,701 individuals with a bitcoin or cash balance at Mt. Gox at the time the company filed for bankruptcy resided in the United States. *See* Declaration of Nobuaki Kobayashi ¶ 24, *In re MtGox Co., Ltd.*, No.14-31229-SGJ, dkt. 127 (Bankr. N.D. Tex. May 23, 2014). That should be exactly the same population that had bitcoin or cash balances on the Exchange when it went dark.

Second, as explained in an earlier motion for class certification, scores of individuals contacted proposed Class Counsel following the preliminary approval of a class action settlement reached earlier in this case. Of that group, 140 individuals provided Class Counsel with sufficient information to determine that they met the criteria for membership in the aborted settlement

---

alleged herein finally adjudicated or who have released their claims against Mark Karpeles, and (5) the legal representatives, successors, or assigns of any such excluded person.

class, which is identical to the Class proposed in the operative complaint and in the instant motion. (Dkt. 295-18, ¶ 3.) Thus, the proposed Class easily satisfies Fed. R. Civ. P. 23(a)(1).

2. The claim of the Class turns on the resolution of common questions.

Rule 23(a)(2) requires that a class action contain "questions of law or fact common to the class." This requirement tests "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 374 (7th Cir. 2015) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original)). As the Seventh Circuit has elaborated, "the claims must depend upon a common contention that is capable of class-wide resolution" meaning "that determining the truth or falsity of the common contention will resolve an issue that is central to the validity of each claim." *Id.* "The critical point is the need for *conduct* common to members of the class." *Suchanek*, 764 F.3d at 756 (quotation omitted). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Id.*

a. *Class members' claims are governed by the same legal rules.*

The inquiry into the commonality (and predominance) elements of the certification analysis begins with the elements of the underlying claim sought to be litigated by the Class. *Messner*, 669 F.3d at 815. In a proposal for multistate certification, that analysis must ensure that the class members are governed by "the same legal rules." *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 156 (N.D. Ill. 2017).

Illinois law governs Greene's claim. This Court has previously undertaken a choice of law analysis and reached this conclusion because "the place where the tort occurred is where the injury occurred ... rather than where the conduct ... that caused the injury occurred; for there is no tort without an injury." *Greene v. Mizuho Bank, Ltd.*, 206 F. Supp. 3d 1362, 1383 (N.D. Ill.

2016) (internal citations omitted). Additionally, in a recent order, following a concession by Karpeles that local law applies, this Court applied Illinois law to its fraud analysis. *Greene v. Karpeles*, No. 14 C 1437, 2020 WL 3250715, at *3 (N.D. Ill. June 16, 2020).

Looking towards the rest of the Class, it follows that the law of the jurisdiction in which each Class member's claim accrued will apply to that Class member. For the fraud claim at issue here, a survey of relevant jury instructions from the 50 states plus the District of Columbia shows that the same core elements come through in each jurisdiction. (Survey of Jury Instructions (Ex. M).) To state a claim for fraud, in every state, a plaintiff must prove that the defendant made a false statement of material fact that they knew or believed to be false, that the defendant intended to induce the other party to act, that the plaintiff did so rely, and that the plaintiff was thereby harmed. These instructions agree that "material" facts are those which affect an ordinary person's decision-making, and that reliance on the misrepresented information need not be the exclusive motivating force behind a plaintiff's decision (an extension of the general tort-law principle that a plaintiff's harm can have multiple legal causes). Courts have recognized that this general uniformity can render fraud claims appropriate for multistate certification when the claims are premised on common conduct, a point we turn to next. *See, e.g.*, *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 135 (S.D.N.Y. 2014) ("'[D]espite the' possible 'existence of state law variations' among plaintiffs' fraud . . . claims, those claims 'can implicate common issues ... so long as the elements of the claim[s] ... are substantially similar.'"). *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 962 F. Supp. 450, 525 (D.N.J. 1997) ("The elements of these common law claims [including fraud] are substantially similar and any differences fall into a limited number of predictable patterns."); *see also Suchanek*, 764 F.3d at 756 ("The critical point is the need for *conduct* common to members of the class.").

     b. *Karpeles's conduct will generate common answers for each Class*
      *member's fraud claim.*

   Given the general agreement on the substance of the law of fraud, the next question is

whether Karpeles engaged in conduct towards members of the Class that will generate common

answers and resolve issues central to the litigation. The answer is unquestionably yes.

   First, did Karpeles knowingly make false statements of material fact? The answer to this

question turns on Karpeles's drafting and dissemination of the Mt. Gox Terms of Use. Because

this document, and the alleged misrepresentations contained therein, was disseminated to all

members of the proposed Class, evidence showing the truth or falsity of its representations, as

well as Karpeles's mental state when drafting them, will apply classwide. For instance, among

other representations, the Terms of Use states that (i) Mt. Gox maintained a full reserve of its

users' cash and bitcoin holdings, and (ii) all trades on the Exchange would be with other users

and would correspond to actual cash and bitcoins.

   On behalf of the proposed Class, Greene alleges, and the record reflects, that Karpeles

understood that these representations were both false and material.[4] For the first, Karpeles

admitted that, beginning in March 2011 and continuing through the life of Mt. Gox, he

understood that the Exchange was short bitcoins and did not maintain a full reserve. (Ex. A at

52:8–54:8, 105:5–15.) Thus, on this record, this representation remained false for all Class

members at all times. Karpeles also admitted that knowing this information would be material to

all Exchange users. If known, Karpeles explained, users would have demanded their money and

bitcoins back—a prospect that would cause "Mt. Gox [to not] . . . get any business and . . .

---

[4] Courts often find that the issue of materiality is one amenable to classwide adjudication. *See, e.g.*,
*Falco v. Nissan N. Am. Inc.*, No. CV1300686DDPMANX, 2016 WL 1327474, at *11 (C.D. Cal. Apr. 5,
2016); *see also Schleicher v. Wendt*, 618 F.3d 679, 687 (7th Cir. 2010) ("[W]hether a statement is
materially false is a question common to all class members and therefore may be resolved on a class-wide
basis after certification.") (citation omitted).

fail[.]" (*Id.* at 68:6–24, 69:9–23.)

Second, Karpeles admitted that, beginning with his tenure as Mt. Gox's CEO, he programmed the Gox Bot to continuously trade with Mt. Gox users using accounts that were not backed by actual bitcoin or fiat currency balances. (*Id.* at 72:14–73:22, 75:19–76:11, 78:13–79:22, 81:13–82:3, 239:18–240:4.) That decision—which, unbeknownst to any user, permitted (i) trades with Mt. Gox (as opposed to with other Exchange members), and (ii) trades where only one party (the user) was required to "self-credit" with *actual* bitcoin or cash holdings—was contrary to Karpeles's representations in the Terms of Use. (Ex. C at 4.) The record reflects that Gox Bot's functionality remained true throughout Karpeles's tenure as Mt. Gox's CEO, thus the question whether the Terms of Use falsely represented who could be a counterparty to any trade will be the same for any Class member. Because these false representations were made in the same way to Greene and every other member of the Class—*i.e.*, through the requirement that all users review and agree to the TOU as a condition of using the Exchange—a jury will decide whether these statements from Karpeles illustrate that he knew that Mt. Gox's TOU misrepresented the Exchange to *all* Mt. Gox users in a material way.

Next, did Karpeles act with the requisite intent? Scienter is an issue courts regularly conclude is susceptible to classwide adjudication where, like here, a fraud claim is premised on a single course of conduct. *See Rosario v. Livaditis*, 963 F.2d 1013, 1017–18 (7th Cir. 1992). The issue will turn on Karpeles's state of mind when he drafted the Terms of Use. Because that state of mind will be identical for all Class members, the issue is susceptible to classwide resolution. (Looking ahead to the merits, Karpeles already spelled out his intent: the purpose of maintaining the rosy picture of Mt. Gox, spelled out by the Terms of Use, was to avoid the inevitable "bank run" that would have resulted had users known the truth.)

Third, did Class members rely on Karpeles's alleged misstatements? Greene contends that Class members were induced to move money and bitcoins onto Mt. Gox and to keep them there by virtue of Karpeles's misrepresentations. Section III.B.1., *infra*, discusses this issue in depth, and demonstrates that the record establishes a sufficient basis for Greene to argue to the jury, or the Court at summary judgment, that reliance may be inferred classwide from the nature of the misrepresentations themselves.

Finally, were Class members harmed by their reliance on Karpeles's misstatements? The answer is linked to Greene's proof of reliance. If Greene succeeds in convincing the factfinder that Class members kept assets on Mt. Gox in reliance on Karpeles's misrepresentations, then those assets that were lost when the Exchange went dark (as a result of the security and solvency issues masked by Karpeles's allegedly fraudulent conduct) are the measure of damages here for all Class members. All can easily prove whether or not they lost currency when Mt. Gox went offline through paper trails and others financial records. Damages for individual Class members may differ, but this does not preclude class certification because "their injuries are the same." *Keele v. Wexler*, 149 F.3d 589, 593 (7th Cir. 1998).

In the end, of course, Rule 23(a)(2) requires only a single common question. *Wal-Mart*, 564 U.S. at 359. As the foregoing demonstrates, Plaintiff clears this low bar.

        3.     Greene is typical of the class he seeks to represent, and adequate to represent this Class.

The requirements of typicality and adequacy, Fed. R. Civ. P. 23(a)(3), (4), often merge. *See CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011). The typicality requirement "primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). This means that the

named representative's claim should "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and [be] based on the same legal theory." *Id.* Similarly, the bottom-line question in addressing adequacy of representation is whether the interests of the named plaintiffs "coincide with those of the rest of the class[.]" *CE Design Ltd. v. Cy's Crabhouse N., Inc.*, 259 F.R.D. 135, 142 (N.D. Ill. 2009).

There is no doubt that the claims of Greene and of the proposed Class arise from the same course of conduct: Karpeles's decision to misrepresent facts about the security, solvency, and operation of Mt. Gox. Greene and every other Class member reviewed and were required to agree to the Mt. Gox Terms of Use as a condition of using the Exchange. (Ex. K at 15:5–24, 17:18–22; dkt. 245 ¶¶ 13–14, 49–50; Ex. L ¶¶ 3–5.) Greene thereafter relied on the TOU's representations about Mt. Gox when deciding to move bitcoins onto, and keep bitcoins stored on, Mt. Gox. (Ex. K at 15:5–16:2, 17:18–22; Ex. L ¶¶ 3–5; dkt. 245 ¶¶ 49–50.) This experience is typical of every Class member's experience because reviewing the Terms of Use has been a required step in joining or using the Exchange since shortly after Karpeles's acquisition of it. (Ex. A at 99:7-17.) Here, "[b]ecause 'typicality under Rule 23(a)(3) should be determined with reference to the [defendant's] actions,'" and because the Terms of Use for Mt. Gox, a personal project of Karpeles, were identical with respect to each proposed Class member, the injuries suffered by virtue of and the claims arising from that identical course of conduct "[are] enough to satisfy the typicality requirement." *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 225 (N.D. Ill. 2016) (quotation omitted).

Karpeles's common course of conduct also means that the interests of Greene and the proposed Class are aligned. When a party proposes to represent a multi-state class, what is necessary is that "the interests of the absent parties are fairly encompassed within the named

14

plaintiff's claim[.]" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). "The core question is whether a plaintiff who has a personal stake in proving her own claims against the defendant has a sufficiently personal and concrete stake in proving other, related claims against the defendant." *Ret. Bd. of the Policeman's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 163 (2d Cir. 2014). A plaintiff "ha[s] the right incentives" when "the proof contemplated for all of the claims would be sufficiently similar." *Id.* at 161.

Here, as discussed *supra*, the content of the relevant substantive law applicable to the Class is "sufficiently similar" such that there is no danger that Class members from one state will be shortchanged if represented by Greene. Greene also suffered the same type of financial injury as did the other members of the Class. Thus, while "[t]he damages recoverable for the class members' injuries may differ . . . their injuries are the same." *Keele*, 149 F.3d at 593. And Greene shares with the absent Class members an interest in proving Karpeles's liability for these injuries based on the same set of material facts and legal theories. *See Arreola v. Godinez*, 546 F.3d 788, 798–99 (7th Cir. 2008). The "operative set of concerns[,]" *Melendres v. Arpaio*, 784 F.3d 1254, 1263 (9th Cir. 2015), is identical for all (quotation omitted).

Further, Greene has already proven his interest in vigorously representing the Class. He has responded to extensive discovery requests, permitted his personal email accounts to be searched for relevant information, and sat for his deposition. (Thomassen Decl. ¶ 16.) Greene therefore "has satisfied his burden on this score. Plaintiff has demonstrated a sufficient interest in resolution of these claims by participating in discovery, he has no claims which are antagonistic to those of the class as a whole, and he has selected experienced and capable class counsel." *Brodsky v. HumanaDental Ins. Co.*, No. 1:10-CV-03233, 2016 WL 5476233, at *8 (N.D. Ill. Sept. 29, 2016).

Edelson PC also is an adequate class counsel. Attorneys at Edelson PC have been litigating this case since just days after the Mt. Gox Exchange collapsed. Since that time, they engineered a creative (if ultimately scuttled) settlement, litigated successfully a number of complex motions, shouldered the expense and burden of conducting world-wide discovery, and generally developed a comprehensive body of knowledge relating to the facts and issues present in this case. In other words, "class counsel has demonstrated their competence through their submissions . . . and also through their prosecution of this case to date." *Johnson v. Yahoo! Inc.*, No. 14 CV 2028, 2016 WL 25711, at *6 (N.D. Ill. Jan. 4, 2016). Further, numerous courts have found attorneys at Edelson PC to be an adequate class counsel in a wide variety of consumer-protection cases, including on an adversarial basis. *See, e.g.*, *Coulter-Owens v. Time, Inc.*, 308 F.R.D. 524, 535–36 (E.D. Mich. 2015) (Michigan's Protection of Personal Privacy Act); *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 252, 256 (N.D. Ill. 2014) (Telephone Consumer Protection Act); *Harris v. comScore, Inc.*, 292 F.R.D. 579, 587 (N.D. Ill. 2013) (Stored Communications Act, Electronic Communications Privacy Act, Computer Fraud and Abuse Act); *Schulken v. Washington Mut. Bank*, No. 09-CV-02708-LHK, 2012 WL 28099, at *12 (N.D. Cal. Jan. 5, 2012) (Truth in Lending Act); *Hand v. Beach Entm't KC, LLC*, 456 F. Supp. 3d 1099, 1145 (W.D. Mo. 2020) (Telephone Consumer Protection Act); *In re Facebook Biometric Info. Privacy Litig.*, 326 F.R.D. 535, 543 (N.D. Cal. 2018), *aff'd sub nom. Patel v. Facebook, Inc.*, 932 F.3d 1264 (9th Cir. 2019), *cert. denied,* 140 S. Ct. 937 (2020) (Illinois's Biometric Information Privacy Act); *Beaton v. SpeedyPC Software*, No. 13-CV-08389, 2017 WL 4740628, at *5–*6 (N.D. Ill. Oct. 19, 2017), *aff'd* 907 F.3d 1018 (7th Cir. 2018); *see also* (Edelson PC Firm Resume (Ex. N).). As Judge Kennelly has recognized, attorneys at Edelson PC "are experienced and respected members of the plaintiff's class action bar." *Aranda v. Caribbean*

16

*Cruise Line, Inc.*, No. 12 C 4069, 2017 WL 818854, at *4 (N.D. Ill. Mar. 2, 2017). Proposed

class counsel is thus adequate.

### B. The Proposed Class Meets the Requirements of Rule 23(b)(3).

#### 1. Common issues predominate in this litigation.

A plaintiff seeking to certify a class seeking monetary damages must satisfy Rule

23(b)(3)'s requirement that common issues of fact or law "predominate over any questions

affecting only individual members[.]" *See Wal-Mart*, 564 U.S. at 362–63. As the language of the

rule implies, "individual questions need not be absent" before a class is certified. *Messner*, 669

F.3d at 815. "The rule requires only that those questions not predominate over the common

questions affecting the class as a whole." *Id.* Here, as discussed above, most if not all major

issues in this case are susceptible to common proof, and individual issues are relatively

insubstantial in relation to the broader case. Thus, common issues predominate.

Because the claims in this case are predicated on a uniform course of conduct perpetrated

by Karpeles, resolution of the common questions identified above will substantially advance the

litigation. Greene acknowledges, however, that "consumer fraud class actions present problems

that courts must carefully consider before granting certification[.]" *Pella Corp. v. Saltzman*, 606

F.3d 391, 393 (7th Cir. 2010). The critical issue, of course, is class member reliance. Rule 23's

drafters anticipated this issue: "[A] fraud perpetrated on numerous persons by the use of similar

misrepresentations[,]" they wrote, "may be an appealing situation for a class action[.]" Advisory

Committee Notes to Rule 23(b)(3)—1966 Amendments, 39 F.R.D. 69, 103 (1966). "Fraud

actions must therefore be separated into two categories: fraud claims based on uniform

misrepresentations made to all members of the class and fraud claims based on individualized

misrepresentations. The former are appropriate subjects for class certification because the

standardized misrepresentations may be established by generalized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) (Sotomayor, J.).

The claims here fall into the former category. As courts have consistently recognized, uniformity of misrepresentation permits the class representatives not only to establish intent and materiality on the basis of common evidence, but also to provide circumstantial evidence of reliance that applies on a classwide basis. As explained below, that rule holds true here.

> a. *Courts permit a classwide inference of reliance when such an inference derives from the nature of the alleged misrepresentation.*

Claims involving uniform misrepresentations can be suitable for certification when the nature of a given common scheme can permit an inference of reliance, particularly in a financial context like the one presented by this case. *See CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1089–92 (10th Cir. 2014). As many courts have held, "a transaction may of itself and by itself furnish the most satisfactory proof of fraud[.]" *Cook v. Hayden*, 31 S.E.2d 625, 627 (Va. 1944) (quotation omitted); *see Vasquez v. Superior Court*, 484 P.2d 964, 972 (Cal. 1971) ("The fact of reliance upon alleged false representations may be inferred from the circumstances attending the transaction which oftentimes afford much stronger and more satisfactory evidence of the inducement which prompted the party defrauded to enter into the contract than his direct testimony to the same effect.") (quotation omitted); *Adams v. Little Missouri Minerals Ass'n*, 143 N.W.2d 659, 683 (N.D. 1966) (same). Thus, "cases involving financial transactions" offer "paradigmatic examples" of circumstances in which the question of reliance can resolved on a classwide basis through circumstantial evidence. *See CGC Holding*, 773 F.3d at 1089–90; *see also Peterson v. H&R Block Tax Servs., Inc.*, 174 F.R.D. 78, 85 (N.D. Ill. 1997) (finding that "reliance is … apparent in the case" because the "it is inconceivable" that class members would have acted as they did absent the defendant's alleged misrepresentations).

A handful of cases show this rule in practice. For instance, in *Seekamp v. It's Huge, Inc.*, No. 1:09-CV-00018 LEK, 2012 WL 860364 (N.D.N.Y. Mar. 13, 2012), the plaintiff alleged that a car dealership defrauded purchasers by misrepresenting that an "Anti-Theft Security Discount" ("ATSD") guarantee program was a warranty when, in fact, it was an insurance policy that the dealership was not licensed to sell. *See Seekamp v. Fuccillo Automotive Grp., Inc.*, No. 1:09-CV00018LEKDRH, 2010 WL 980581, at *1–2 (N.D.N.Y. Mar. 15, 2010) (describing allegations). The plaintiff alleged that this conduct was fraudulent because "Defendants intended to misrepresent the ATSD insurance agreement" so as to "profit[] from its illegal sale." *Id.* at *2. Defendants later challenged class certification of this common-law fraud claim on the ground that common issues did not predominate because different purchasers may have bought the ATSD for different reasons, many unrelated to its status as either a warranty or insurance. *It's Huge*, 2012 WL 860364, at *9–10. The court rejected this argument, noting that while "each proposed class member may have opted to purchase the ATSD for different reasons, it is equally clear that every plaintiff would have relied on the implicit representation of the ATSD's legality and beneficialness in deciding whether to purchase it." *Id.* at *10.

The Fifth Circuit's decision in *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629 (5th Cir. 2016) (en banc), follows a similar path. The plaintiffs there brought RICO claims related to the defendant's operation of a pyramid scheme and proposed to prove causation through a classwide showing of reliance. *Id.* at 633–34. The Fifth Circuit concluded that certification of the proposed class was appropriate because "a common inference of reliance" was warranted. *Id.* at 641–43. The court held that putative class representatives may employ such a common inference "when it follows logically from the nature of the scheme, and there is common, circumstantial evidence that class members relied on the fraud." *Id.* at 641; *see also In re First Alliance Mortg. Co.*, 471

19

F.3d 977, 990–92 (9th Cir. 2006) (explaining that fraud claim involving standardized misrepresentations may be suitable for class treatment and reiterating that "[i]t is the underlying scheme which demands attention"); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004) (finding that reliance presented a common issue in RICO case where "[i]t does not strain credulity" to infer that class members "in entering into contracts with the defendants" relied upon "representations about the defendants' reimbursement practices[,]" practices that "go to the heart of these agreements," thus ""legitimate inferences based on the nature of the alleged misrepresentations at issue" "could lead a reasonable factfinder to conclude … that each individual plaintiff relied on the defendants' representations").

*Audet v. Fraser* is similar to the aforementioned cases and deals specifically with defrauded cryptocurrency investors. *See* 332 F.R.D. 53 (D. Conn. 2019). There, a putative class of investors brought a class action against multiple limited liability companies for allegedly violating state and federal securities laws and committing common-law fraud. *Id.* at 58. The LLCs sold various products and services related to cryptocurrency, including, pertinently, "Hashlets," which purported to give investors a stake in the LLCs' digital currency mining operations, and a virtual currency called "Paycoin." *Id.* at 60–61. The plaintiffs alleged that these sales were fraudulent. As to the Hashlets, the plaintiffs alleged something like a traditional Ponzi scheme, in which new investors' money was used to compensate old investors. *Id.* at 60. The plaintiffs also alleged that the LLCs induced investment in Paycoin by falsely representing that the price of Paycoin would not drop below $20 per coin, that banks and investment firms were providing financial backing, and that well-known merchants like Amazon would accept Paycoin. *Id.* at 60–62. In determining that the plaintiffs could potentially prove reliance through circumstantial classwide proof, the court reasoned that "the nature of the alleged

misrepresentations permits a common inference of reliance" because any investor would have sought to make a profit on these investments, and these alleged misrepresentations concerned the products' profitability. *Id.* at 81. The court also noted that it was reasonable to believe, in light of the fact that the LLCs had no established track record, that the alleged misrepresentations were "critical to any investor's decision to purchase such untested products." *Id.*

> b.  *The nature of Karpeles's alleged misrepresentation permits a classwide inference of reliance.*

The misrepresentations in the Mt. Gox Terms of Use concern, like the misrepresentations in *Seekamp*, *Torres*, and *Audet*, the type of information that substantially influenced consumers in their decisions to move assets to Mt. Gox and to keep them there. While true that each Class member in this case may have chosen to invest in bitcoin for different reasons, a factfinder may infer that the information available to Greene and other Class members—namely, the Terms of Use—was, due to the nature of the information, material to their decision. The "underlying scheme," *First Alliance*, 471 F.3d at 991, was one in which these misrepresentations were made in order to induce individuals to move their assets to Mt. Gox. Given "the nature of the alleged misrepresentations at issue," a "reasonable factfinder [could] conclude … that each individual plaintiff relied on [Karpeles's] misrepresentations." *Klay*, 382 F.3d at 1259.

The expert opinion of Professor Carol R. Goforth helps explain why this is so. Because bitcoin transactions written to the blockchain are irrevocable, trust is one of—if not the most— important factor with any bitcoin transaction. (Ex. H ¶ 54.) Thus, while a bitcoin holder may feel comfortable with an over-the-counter trade with a known acquaintance, transferring bitcoins or other assets to an intermediary—such as Mt. Gox—"adds a layer of risk" because, *inter alia*, the exchange might be insolvent, insecure, or just dishonest. (*Id.*; *see also id.* ¶ 53 (explaining that "[c]rypto exchanges generally operated as trusted intermediaries . . . .").) For this reason,

exchange users reacted swiftly to news that an exchange might have bitcoin deficits, which prompted the "bank runs" that Karpeles himself was so worried about. (Ex. A at 68:6–24, 69:9– 23, 70:2–14.) Indeed, as Professor Goforth explains, several of Mt. Gox's contemporaries met that fate when they reported being hacked. (Ex. H, ¶¶ 30-32.) For that reason, "[h]ad the community been aware that there was a sizeable and growing deficit in the [bitcoin] and cash balances for the Mt. Gox [E]xchange, it is virtually certain that users would have abandoned Mt. Gox." (Ex. H ¶ 45; *see also* Ex. I at 209:8–18 (Karpeles's expert agreeing that public knowledge of a hack would have triggered a bank run).) Similarly, Professor Goforth opined that even users who did not read the Terms of Use would have anticipated that whoever they were dealing with was a legitimate user, with accounts backed by real bitcoin or fiat currency, and that all transactions reported by the Exchange similarly involved or were backed by "real assets." (Ex. H ¶ 51 (quotation omitted).) This was also emphasized by Karpeles's expert: While he speculated that few actually read the Terms of Use, he testified all would have felt comfortable on the Exchange because of their assumptions that *every* user had to "self credit" for transactions, which should have guaranteed that the Exchange was solvent and that all transactions were made with and for real bitcoins and cash. (Ex. I at 38:9–21 ("I have to self credit to get there and, therefore, I know that everyone else has to do that, therefore, I know that they have enough financial resources to settle my trade[.]"); *see also id.* at 190:7–193:6.)

Given this background, the analyses in *Seekamp*, *Torres*, and *Audet* demonstrate why reliance can be inferred on a classwide basis here. Each Class member may have chosen to invest in bitcoin for different reasons, but a factfinder legitimately may infer that the information available to the Class members was, due to the nature of the information, material to their decision. *See Klay*, 382 F.3d at 1259; *see also In re First Alliance*, 471 F.3d at 990–92. In the

22

same way that investors in *Audet* relied on the representation that their bitcoin investments would be backed by a bank when deciding to invest in bitcoin, the Class in this case relied on the representation that all assets would be kept on the Exchange. *Audet*, 332 F.R.D. at 59–62. Further, the ultimate ability of an investor to trust that their assets are backed by real currency is thus analogous to the legality of the ATSD policies at issue in *Seekamp*: Other factors may have influenced an individual Class member's decision to invest in Mt. Gox, but it is reasonable to infer that the facts allegedly suppressed—and affirmatively misrepresented—by Karpeles played a substantial, if implicit, role in each Class member's calculus. *See Seekamp*, 2012 WL 860364, at *10. The "circumstances attending the transaction[s]" entered into by the Class members, in other words, are evidence of reliance. *Vasquez*, 484 P.2d at 972.

Finally, even if the Court believes that Class members must submit for adversarial testing individual evidence of reliance, certification still is warranted. *See Suchanek*, 764 F.3d at 760. In *Suchanek*, a consumer-fraud action about misrepresentations in product labeling, the court vacated a district court's finding that individual issues predominated, observing that "resolution of the merits may require costly survey evidence and expert testimony," and thus certification may well be appropriate "because no rational individual plaintiff would be willing to bear [these] costs[.]" *Id.* at 760. The court further observed that resolving these complex common issues would greatly simplify litigation: "if the class prevails on the common issue, it would be a straightforward matter for each purchaser to present her evidence on reliance and causation." *Id.*

The same is true here. The plainly common issues are "central to liability." *Butler*, 727 F.3d at 801–02. If these are resolved in the Class's favor, then it becomes a "straightforward matter[,]" *Suchanek*, 764 F.3d at 760, to resolve any remaining individual issues. In other words, "the relative costs of prosecuting the class and individual issues in the case[,]" *id.* at 761, weigh

23

in favor of certifying the class. To the extent individual follow-on proceedings are necessary, *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 664 (7th Cir. 2015), confirms that the Court has discretion to employ a special master, representative trials, or other means to ease any administrative burdens. *See id.*; *see also Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968).

        2.      A class action is a superior way to resolve this controversy.

Finally, the Court must determine whether or not a class action is a superior method of resolving this controversy. Fed. R. Civ. P. 23(b)(3). A class action is plainly superior here.

This litigation is now six years old, with more than two years of complex motions practice and discovery undertaken on the claims against Karpeles specifically. The "extent and nature" of this litigation, *id.* at 23(b)(3)(B), thus counsels strongly in favor of certification. Moreover, this experience demonstrates that leaving individual Class members to pursue relief against Karpeles will result in "individual suits each of which would cost orders of magnitude more to litigate than the claims would be worth to the plaintiffs[,]" often just a few thousand dollars. *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 748 (7th Cir. 2008).

And, as discussed above, there are numerous common issues in this case, "the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense . . . to resolve those issues in one fell swoop . . . ." *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003); *see Suchanek*, 764 F.3d at 760 (noting that a class action is usually superior when resolution of common issues is likely to be expensive).

It is, moreover, desirable to concentrate the litigation in this forum. Fed. R. Civ. P. 23(b)(3)(C). Were Class members to file individually, Karpeles would be subject to litigation in perhaps every state, and in both state and federal courts, with varying schedules, caseloads, and rules of evidence and procedure. Concentrating litigation in this Court promotes uniformity of

result to the benefit of both the Class and Defendant.

Finally, the proposed class action is manageable. *See* Fed. R. Civ. P. 23(b)(3)(D). Given the consistency of the relevant state law, and Karpeles's common conduct, a trial of the Class's claims would be straightforward. Any factual findings would apply classwide, and a claims process would be straightforward.

Greene is sensitive to the fact that some recovery may be had in the Mt. Gox Japanese bankruptcy proceedings. But those proceedings should not prevent certification here. The bankruptcy is nearly as old as this litigation, but nearly three times longer than the specific litigation against Karpeles. Yet there is no end in sight for the bankruptcy proceedings. After several years, the trustee converted the proceeding to a "rehabilitation" proceeding, with the apparent goal of making more assets available to creditors. But he has now received six extensions of the deadline to submit a rehabilitation plan (including as recently as October 15, 2020, extending the new deadline to December), and there is every reason to believe he will seek a seventh. To be sure, a complete recovery in the bankruptcy proceedings—*i.e.*, for those Class members that submitted and had their claims approved in full—may affect recovery here, but unless and until it appears that will actually happen, it cannot be said that this class action is inferior. And because any certification decision is "inherently tentative[,]" *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.11 (1978), if the Japanese proceedings reach a conclusion, the Court's findings regarding superiority can be revisited.

## IV. CONCLUSION

The Court should certify the proposed Class, and appoint Jay Edelson, Rafey S. Balabanian, Benjamin Thomassen, and Aaron Lawson to represent the Class.

Respectfully submitted,

**GREGORY GREENE** individually and on behalf of all others similarly situated,

Dated: October 30, 2020

By: /s/ Benjamin S. Thomassen
       One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian
rbalabanian@edelson.com
J. Aaron Lawson
alawson@edelson.com
Edelson PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9495

Counsel for Plaintiff and the Putative Class