**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GREGORY GREENE, individually and on
behalf of all others similarly situated,

              *Plaintiffs*,

v.

MARK KARPELES, an individual

              *Defendant*.

Case No. 1:14-cv-01437

Hon. Gary Feinerman

**OPPOSITION OF GREGORY GREENE TO MOTION TO EXCLUDE EXPERT
REPORT AND TESTIMONY OF PROFESSOR CAROL R. GOFORTH**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

ARGUMENT ................................................................................................................4

I.      **Professor Goforth Is Qualified to Provide Expert Testimony in this Case** .................6

II.     **Professor Goforth's Testimony Is Reliable and Will Assist the Trier of Fact** ............7

      A.    **Professor Goforth may offer a discussion of various factual matters as part of her expert opinion** ................................................................................7

           *1.*   *An expert may rely on facts in the case in developing her opinion, and may recount those facts, particularly if the expert uses their specialized knowledge to put them into context* ................................................7

           *2.*   *An expert may rely on any materials that would be relied upon by experts in the relevant discipline, even if they would be inadmissible* ..................10

      B.    **Experts may give opinions on straightforward matters so long as they use their specialized knowledge in reaching their conclusions** ............................13

      C.    **A single stray statement of law that is not on an issue that will be the subject of jury instructions is not a basis for exclusion** ................................15

CONCLUSION ................................................................................................................15

**TABLE OF AUTHORITIES**

**United States Supreme Court Cases**

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999) ...................................................................................................5

**United States Appellate Court Cases**

*Crisostomo v. Stanley,*
    857 F.2d 1146 (7th Cir. 1988) ....................................................................................6

*Gayton v. McCoy,*
    593 F.3d 610 (7th Cir. 2010) ..................................................................................5, 6

*In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988,*
    37 F.3d 804 (2d Cir. 1994) .......................................................................................12

*Lawson v. Trowbridge,*
    153 F.3d 368 (7th Cir. 1998) .................................................................................8, 13

*Manpower, Inc. v. Ins. Co. of Pa.,*
    732 F.3d 796, 808 (7th Cir. 2013) ...........................................................................12

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.,*
    877 F.2d 1333 (7th Cir. 1989) ..................................................................................15

*Smith v. Ford Motor Co.,*
    215 F.3d 718 (7th Cir. 2000) .................................................................................6, 12

*Tilstra v. BouMatic LLC,*
    791 F.3d 749 (7th Cir. 2015) ....................................................................................12

*United States v. Brownlee,*
    744 F.3d 479 (7th Cir. 2014) ....................................................................................11

*United States v. Hall,*
    93 F.3d 1337 (7th Cir. 1996) ....................................................................................13

*United States v. Sinclair,*
    74 F.3d 753 (7th Cir. 1996) ......................................................................................15

*ViaMedia, Inc. v. Comcast Corp.,*
    951 F.3d 429 (7th Cir. 2020) ..........................................................................8, 13, 14

*Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.,*
    521 F.3d 790 (7th Cir. 2008) ....................................................................................14

**United States District Court Cases**

*Alfa Corp. v. OAO Alfa Bank*,
    475 F. Supp. 2d 357 (S.D.N.Y. 2007) ....................................................................11, 12

*Aponte v. City of Chicago*,
    2011 WL 1838773 (N.D. Ill. May 12, 2011) ...................................................................7

*Barnett v. City of Chicago*,
    969 F. Supp. 1359 (N.D. Ill. 1997) ..................................................................................9

*Gentieu v. Tony Stone Images/Chicago, Inc.*,
    214 F. Supp. 2d 849 (N.D. Ill. 2002) ..............................................................................8

*Hostetler v. Johnson Controls, Inc.*,
    2020 WL 4915668 (N.D. Ind. Aug. 21, 2020) ............................................................7, 8

*In re Ethicon, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*,
    2014 WL 186872 (S.D.W. Va. Jan. 15, 2014) ..............................................................12

*In re Fluidmaster Inc., Water Connector Components Prod. Liab. Litig.*,
    2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ................................................................13

*In re Ocean Bank*,
    481 F. Supp. 2d 892 (N.D. Ill. 2007) ............................................................................15

*In re Welding Fume Prod. Liab. Litig.*,
    2005 WL 1868046 (N.D. Ohio Aug. 8, 2005) ...........................................................9, 12

*Jackson v. City of Pittsburgh*,
    2010 WL 3222137 (W.D. Pa. Aug. 13, 2010) ..............................................................14

*LG Elecs. v. Whirlpool Corp.*,
    2010 WL 3397358 (N.D. Ill. Aug. 24, 2010) ................................................................12

*LG Elecs. v. Whirlpool Corp.*,
    2010 WL 3613814 (N.D. Ill. Sept. 3, 2010) .................................................................11

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    2010 WL 2607241 (N.D. Ill. June 23, 2010) ................................................................11

*Newman ex rel. Newman v. McNeil Consumer Healthcare*,
    2013 WL 9936293 (N.D. Ill. Mar. 29, 2013) ...............................................................10

*Schall v. Suzuki Motor of Am., Inc.*,
    2020 WL 1159756 (W.D. Ky. Mar. 10, 2020) ................................................................8

*Smith v. Union Pac. R. R.*,
    2017 WL 2656583 (N.D. Ill. June 20, 2017) ....................................................... 5

*Sommerfield v. City of Chicago*,
    254 F.R.D. 317 (N.D. Ill. 2008) ..................................................................... 13

*ViaMedia, Inc. v. Comcast Corp.*,
    335 F. Supp. 3d 1036 (N.D. Ill. 2018) .............................................................. 8

*Voilas v. Gen. Motors Corp.*,
    73 F. Supp. 2d 452, 461 (D.N.J. 1999) .............................................................. 9

**Other Authorities**

Fed. R. Evid. 702 ................................................................................. *passim*

Fed. R. Evid. 703 ................................................................................. 8, 12

Victor J. Gold,
    29 Fed. Prac. & Proc. *Evidence* § 6264.1 (2d ed. 2020) ...................................... 6

## INTRODUCTION

The gist of Plaintiff Gregory Greene's claim is that Defendant Mark Karpeles misrepresented the safety and security of Mt. Gox by making certain representations in the site's Terms of Use—specifically, that Mt. Gox held all users' assets (when it did not) and that all trades on Mt. Gox would be with other users using real assets (when they were not). Greene claims that these misrepresentations induced him and others to entrust Mt. Gox with cash and bitcoins when they otherwise would not have. He contends this claim is litigable on a class basis because the nature of the misrepresentations permits a jury to infer reliance on a classwide basis.

The expert opinion of Professor Carol R. Goforth addresses this latter piece of the puzzle. Professor Goforth has three decades' worth of academic expertise in the structuring and function of commodities and securities markets and, for the last few years, has applied that expertise to cryptocurrencies. Based on that expertise, and buttressed by the historical record, Professor Goforth opines that Karpeles's misrepresentations concern the type of information that bitcoin investors would consider critical to their decision about where to buy cryptocurrencies or store their assets. She ultimately concludes that absent Karpeles's misrepresentations, any rational user would have abandoned Mt. Gox long before it collapsed.

Karpeles moves to exclude this opinion, but his arguments are not persuasive. Initially, Karpeles challenges the inclusion of a narrative background section in Professor Goforth's report, but the Rules permit—and indeed require—Professor Goforth to state the facts she considered and the basis for her opinions. Further, this narrative goes beyond the facts in the record because Professor Goforth's specialized knowledge helps put the facts at issue here into context. Karpeles also suggests that Professor Goforth's opinions are not grounded in her expertise, but this is plainly untrue. Karpeles is thus left to pick nits (including by noting that she

1

references an uncontroversial legal principle), but he identifies no issue worthy of excluding Professor Goforth's testimony. The motion should be denied.

## BACKGROUND

Carol R. Goforth is a University Professor and the Clayton N. Little Professor of Law at the University of Arkansas (Fayetteville) School of Law. (Ex. A[1] (Decl. of Carol R. Gofoth ¶ 3).) She is also a member of the faculty network at the Center for Blockchain Excellence at the Sam M. Walton School of Business, also at the University of Arkansas. (*Id.*) Professor Goforth specializes in business associations and securities regulation, and has become a leading expert on the regulation of cryptoassets and transactions. (*Id.* ¶ 4.) She practiced for five years with a focus on securities, corporations, and commercial law, before accepting a position as an Assistant Professor with a similar focus. (CV (attached to Ex. A) at 2.) Goforth spent the next three decades with a teaching and research focus on securities law and business associations. (*Id.* at 1.)

Beginning in 2018, she turned her focus to cryptocurrencies and the regulation of cryptotransactions. (Ex. B (Excerpts from the Dep. of Carol R. Goforth), 14:10-11.) This research builds on her previous expertise in securities law. (*Id.* 15:22-17:4.) As she puts it, "underlying the predicate for that expertise [in cryptocurrencies] … is my familiarity with the securities laws [and] the way in which other kinds of exchanges are operated[.]" (*Id.* 20:11-21.) In the past three years, she has authored more than a half-dozen law review articles on the subject of crypto-currency and cryptoasset regulation. (Ex. A ¶ 5.) She also has authored several blog posts on similar subjects, including on the Oxford Business Law Blog, which is published by the law faculty at Oxford University in the United Kingdom. (CV (attached to Ex. A) at 6.) She also is the author of the first comprehensive textbook in the crypto space, *Regulation of*

---

[1]     All references to Exhibits refer to Exhibits to the declaration of J. Aaron Lawson, filed herewith.

*Cryptotransactions*, which was published by West earlier this year. (*Id.* at 2.) She has designed and taught two classes on cryptocurrencies, accepted multiple speaking engagements dealing with cryptocurrencies, and has recently been contacted by a crypto exchange to serve on its board of advisors. (Ex. A, ¶¶ 6-7; Ex. B, 22:7-11.)

In this case, Professor Goforth relied on this extensive background knowledge, as well as several case-specific documents, principally the deposition transcript of Mark Karpeles and the Mt. Gox Terms of Use, to form her opinions. She opines that "[h]ad the [bitcoin] community been aware of the sizable and growing deficit in the BTC and cash balances for the Mt. Gox bitcoin exchange, it is virtually certain that users would have abandoned Mt. Gox." (Ex. A, ¶ 45.) "No rational investor would have knowingly chosen to put or keep bitcoin or currency on an exchange with a bitcoin or cash deficit." (*Id.* ¶ 63.) Thus, losses that were eventually suffered "would have been avoided" had Mt. Gox's issues been timely disclosed. (*Id.*)

This opinion is based on Professor Goforth's understanding of the regulation of securities and commodities exchanges, and of cryptotransactions, and is buttressed by her read of the historical record. (*See*, *e.g.*, Ex. B, 29:1-11; 29:23-30:3; 33:10-34:1; 39:11-40:24; 55:19-57:13.) Her report begins with a focused background on bitcoin, sourced principally from contemporary internet reports. As she explains, the early price of bitcoin was volatile for several reasons. (Ex. A, ¶ 15.) Exchanges arose from an increased need for platforms to "facilitate trading" as interest in bitcoin grew. (*Id.* ¶ 16.) But when exchanges proved to be vulnerable to hacks or thefts, or announced related shortfalls in customer-held assets, they invariably shut down as users demanded the return of their assets. (*Id.* ¶¶ 29-32.) This behavior can be straightforwardly explained: Like traditional markets, an exchange functions as a "trusted intermediar[y]" in a trade. (*Id.* ¶ 53.) For bitcoin, the existence of a third-party in a transaction adds a layer of risk,

particularly given that moving bitcoins onto an exchange is written to the blockchain and irrevocable. (*Id.* ¶ 54.) Thus, users would have expected that third-party (i.e., the exchange) to act honestly and in good faith. (*Id.* ¶¶ 53-54.) Goforth reached this conclusion based on her study of bitcoin markets and users, and, more broadly, her 30 years of experience and understanding of traditional markets and exchanges. (*See*, *e.g.*, Ex. B, 109:5-21; 174:4-175:16.)

Given this background, Professor Goforth also recounts relevant facts about Karpeles's operation of the Mt. Gox Exchange. Her report highlights the instances in which he concealed evidence of the theft of assets from Mt. Gox. (Ex. A, ¶¶ 20-27; 33-38.) This discussion draws heavily on Karpeles's deposition. Professor Goforth also opines that the Terms of Use would have reinforced the appearance of Mt. Gox as a "trusted intermediary," and given users confidence that the Exchange would operate on principles that "essentially amount to good faith and fair dealing." (*Id.* ¶¶ 48-52; *see* Ex. B, 137:18-21 (noting that the Terms of Use "further confirms what I had already come to conclude" and were "a confirmation of ordinary practice").)

In light of her background knowledge regarding exchanges and exchange regulation, her understanding of the historical record, and her informed interpretation of the Terms of Use and Karpeles's testimony, Professor Goforth reached the conclusion set out above, that "it is virtually certain" that investors would have moved their assets off Mt. Gox were they fully informed of the Exchange's security issues and resulting asset deficits. (Ex. A, ¶¶ 45, 63.)

## ARGUMENT

Fed. R. Evid. 702 governs the admissibility of expert testimony. The Rule provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

      (c)      the testimony is the product of reliable principles and methods; and

      (d)      the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 establishes a "gatekeeping" role for the district judge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The Court has "considerable leeway" in performing this role. *Id.* "The objective of that requirement is to ensure the reliability and relevancy of expert testimony[,] … to make certain that an expert … employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

The Rule 702 inquiry proceeds in two steps. First, the Court asks whether the expert is qualified to testify as to the matters in question, and then whether her proposed testimony is reliable and relevant. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). As to qualification, the issue is whether the expert is qualified to provide her specific opinions. *See id.* An expert may be qualified by, among other things, knowledge or education. *See* Fed. R. Evid. 702. As to reliability, the test for reliability of nonscientific experts is "flexible." *Kumho*, 526 U.S. at 150. When an expert offers an opinion based on nonscientific expertise, the bottom-line question is whether she draws upon that expertise in offering her opinion on a relevant matter. *See Gayton*, 593 F.3d at 617; *see also Kumho*, 526 U.S. at 150 ("In other cases, the relevant reliability concerns may focus on personal knowledge or experience."). No one disputes relevance here.

"The rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee Notes—2000 Amendments. The "question of whether the expert is credible or whether his theories are correct … is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." *Smith v. Union Pac. R. R.*, 2017 WL 2656583, at *3 (N.D. Ill. June 20, 2017). Indeed, "[d]eterminations on admissibility should not

supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton*, 593 F.3d at 616.

## I.     Professor Goforth Is Qualified to Provide Expert Testimony in this Case.

Karpeles develops no challenge to Professor Goforth's qualifications, but a brief word about them is still in order. Fed. R. Evid. 702 allows for experts to be qualified by "academic expertise," which is what Professor Goforth offers here. *See Smith v. Ford Motor Co.*, 215 F.3d 718 (7th Cir. 2000) ("extensive academic … expertise is certainly sufficient to qualify a potential witness as an expert") (citations and quotations omitted); *Crisostomo v. Stanley*, 857 F.2d 1146, 1153 n.18 (7th Cir. 1988) (medical doctor qualified by academic training to give expert opinion in pharmacology even though that was not his area of practice); Victor J. Gold, 29 Fed. Prac. & Proc. *Evidence* § 6264.1 (2d ed. 2020) ("Common indicia of expertise include membership in learned or professional societies and authorship of books and articles in the field.").

Professor Goforth plainly has the academic expertise to qualify as an expert in exchanges, cryptocurrencies, and crypto transactions, which she used to formulate her opinions. (Ex. B 164:3-16.) Indeed, she is one of the leading academics in the field. Although cryptocurrencies have been the subject of serious academic inquiry for less than a decade, Professor Goforth is steeped in the literature that does exist surrounding cryptocurrencies. (*Id.* 52:3-7.) Her work is, in a very literal sense, pioneering in this nascent field. This academic expertise is doubly important here because, as Professor Goforth acknowledged, "there [aren't] a lot of concrete, reputable studies" in existence concerning cryptocurrencies. (*Id.* 56:10-17.) Part of her expertise, then, is separating fact from potential fiction when researching cryptocurrencies. (*See*, *e.g.*, *id.* 110:2-16.)

There can be no reasonable dispute that Professor Goforth is qualified.

## II.     Professor Goforth's Testimony Is Reliable and Will Assist the Trier of Fact.

Karpeles seeks to exclude Professor Goforth's testimony because, he says, (1) any factual narrative in Professor Goforth's is improper, (2) the opinions expressed by Professor Goforth are inadmissible because they are not based on any expertise, and (3) Professor Goforth offers statements of law that experts are not qualified to provide. This line of argument misunderstands the applicable law and severely misrepresents Professor Goforth's opinions.

### A.     Professor Goforth may offer a discussion of various factual matters as part of her expert opinion.

First, Karpeles takes issue with Professor Goforth's discussion of factual sources, from the record in this case and elsewhere, suggesting that this discussion either is not the subject of expert testimony or renders her opinion unreliable. (Dkt. 502, at 5-9.) Karpeles is wrong on both fronts and misses a key and permissive purpose of Professor Goforth's testimony.

> *1.     An expert may rely on facts in the case in developing her opinion, and may recount those facts, particularly if the expert uses their specialized knowledge to put them into context.*

Karpeles is incorrect that an expert opinion cannot include a factual narrative. His cases stand for a much narrower point: An expert cannot simply summarize the evidence *in the record* and offer their lay interpretation of those facts. As one of Karpeles's cases explains, "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative *based on record evidence*." *Hostetler v. Johnson Controls, Inc.*, 2020 WL 4915668, at *5 (N.D. Ind. Aug. 21, 2020) (emphasis added). That is the role of lawyers. In other words, "expert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Aponte v. City of Chicago*, 2011 WL 1838773, at *2 (N.D. Ill. May 12, 2011).

But this does not mean that experts are barred from relying on, recounting, or

contextualizing facts that are part of the record. *Hostetler* itself notes that "an expert could draw on her experience to provide insight that would be helpful in understanding the course of events." 2020 WL 4915668, at *5; *see also* Fed. R. Evid. 703 (establishing that an expert can rely on facts "in the case"); *Gentieu v. Tony Stone Images/Chicago, Inc.*, 214 F. Supp. 2d 849, 851 (N.D. Ill. 2002) (acknowledging that a proper subject of expert testimony would be to provide "fact-based background information … that would be useful to aid the jury in understanding the evidence properly admitted in the case"). Indeed, as the Seventh Circuit recently explained, one permissible purpose of expert testimony is to put litigated facts "into context" using the expert's specialized knowledge. *ViaMedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 484 (7th Cir. 2020) (citing *Lawson v. Trowbridge*, 153 F.3d 368, 376 (7th Cir. 1998)).

*ViaMedia* was an antitrust case. *Id.* at 434. One part of the claim was that the defendant was closing off advertising markets to the plaintiff by means of a tying agreement. *Id.* at 444-46. The plaintiff offered an expert who opined that the defendant's steps to preclude the plaintiff from these markets was "integral" to the agreement and left the plaintiff unable to compete. *Id.* at 484. The district court excluded this opinion, concluding that it was merely a "lay interpretation" of the evidence, and that the expert had asserted that his conclusions were "a matter of economics" without "undertak[ing] any expert assessment [to] arriv[e] at that conclusion." 335 F. Supp. 3d 1036, 1065 (N.D. Ill. 2018). The Seventh Circuit reversed. While agreeing that the expert "did summarize and repeat some relevant facts, he drew significantly on his expertise to 'add something'—context and supporting information—to the record." 951 F.3d at 484; *see also, e.g.*, *Schall v. Suzuki Motor of Am., Inc.*, 2020 WL 1159756, at *6 (W.D. Ky. Mar. 10, 2020) ("It is also proper for Dr. Balk to consider documentary evidence … and to interpret and summarize the information he collected through this process to assist the jury in determining whether

Defendants breached their post-sale duty to warn of the defect."); *In re Welding Fume Prod. Liab. Litig.*, 2005 WL 1868046, at *16-17 (N.D. Ohio Aug. 8, 2005) (expert testimony proper where expert had "sufficient expertise … as a general matter" to "review publicly available medical and scientific literature" about welding fumes and "internal documents regarding the same subject" and analyze them to "allow the trier of fact to better understand what the documents do (and don't) mean"); *Voilas v. Gen. Motors Corp.*, 73 F. Supp. 2d 452, 461 (D.N.J. 1999) (disagreeing that expert's report "is unreliable because he employed no particular methodology, but merely reviewed GM's own analyses of disposition plans. Indeed, an experienced economist's clarification and summary of a large corporation's business plans could certainly prove helpful to the average juror … even if doing so does not require employing any particular methodology but simply a straightforward review of the corporation's data.").[2]

Professor Goforth's testimony here is similar: It provides context that will allow the jury to understand the legal import of Karpeles's misrepresentations. Professor Goforth discusses the history of bitcoin exchanges, including why they arose and why some failed. She connects this background to Mt. Gox, explaining the steps that were taken (*e.g.*, via the Terms of Use and Gox Bot) to show that Mt. Gox could serve as the "trusted intermediary" bitcoin users required, and that Mt. Gox suffered many of the issues as other early exchanges that failed. (*See*, *e.g.*, Ex. B 137:22-138:11.) Goforth notes, however, that Karpeles prevented Mt. Gox's failings from

---

[2]     Karpeles's principal case for the notion that "narrative" expert testimony must be excluded is fully consistent with *ViaMedia*. Indeed, that case, *Barnett v. City of Chicago*, does not even involve the exclusion of expert testimony. The opinion to which Karpeles cites (969 F. Supp. 1359 (N.D. Ill. 1997)) recites the district court's findings of fact and conclusions of law after a bench trial, and the portion of the opinion relied upon by Karpeles (page 1416) contains a discussion of the testimony of expert Paul Kleppner (meaning it was not excluded, even after the trial). The court noted that Kleppner's testimony "summariz[ed] the last 70 years of political history of the City of Chicago," which summary the judge thought was "not objective" and "less than complete," and which the judge found "so conclusory that its value as an objective expert opinion was dubious." 969 F. Supp. at 1416. "Dubious," but admissible.

becoming public. (*See*, *e.g.*, *id.* 119:22-121:15.) She opines that had Karpeles been forthcoming, it is "virtually certain" that Mt. Gox would have met the fate of its flawed contemporaries, and class members' losses would have been avoided. (*Id.* 126:22-127:4.) Goforth presents her conclusion as informed by three decades' worth of research of traditional markets and buttressed by the historical record. (Ex. B 29:1-11; 158:11-159:3; 163:24-164:16; 174:12-175:16.) Goforth's testimony will help the jury understand why Karpeles's misstatements mattered and his motive for making them, issues going to the heart of the class's claim. It also provides circumstantial evidence that class members relied on the misrepresentations to their detriment.

Further, her report does not merely provide a factual narrative reconstructed from the record. Indeed, as Karpeles's lawyer explored, Professor Goforth frequently interprets the record evidence in light of her understanding of markets and market behavior, and of the historical record. Pressed on the statements in her report, Goforth confirmed that she was "editorializing" on available facts based upon her "view of general market behavior," that is, the subject in which she has specialized knowledge. (*Id.* 124:6-17; *see also id.* 130:2-17 (interpreting public information based upon expertise); 156:13-23 (describing "analysis of public reports".) Her bottom line is informed by her understanding of securities markets and buttressed by historical evidence that is not in the record. Bringing that specialized knowledge to bear on the facts here is what expert testimony is for. *See Newman ex rel. Newman v. McNeil Consumer Healthcare*, 2013 WL 9936293, at *6 (N.D. Ill. Mar. 29, 2013) (admitting expert testimony where specialized knowledge was gained through work as a consultant and researcher, noting that "Dr. Plunkett's knowledge of the regulatory landscape and the mechanisms that the FDA relies on to perform its duties allows her to interpret and analyze the information in the documents").

> 2. *An expert may rely on any materials that would be relied upon by experts in the relevant discipline, even if they would be inadmissible.*

10

Karpeles also complains that Professor Goforth may not rely on facts gleaned from articles published on the internet. Here again, Karpeles misrepresents the applicable rule. As the Seventh Circuit said in *United States v. Brownlee*, "it's true that the entirety of an expert's testimony cannot be the mere repetition of the out-of-court statements of others, and that an expert witness may not simply summarize the out-of-court statements of others as his testimony. But the key words are 'mere' and 'simply.'" 744 F.3d 479, 482 (7th Cir. 2014). *Brownlee* itself noted that it will often be permissible for an expert to repeat verbatim what third parties have said; indeed *Brownlee*'s conclusion was that it had been an abuse of discretion *not* to let the expert quote a particular conversation in the context of that case. *See id.* What *Brownlee* makes clear is that an expert must add something and cannot simply repeat others.

Karpeles pretends there is a special rule against an expert's use of internet-based sources (Dkt. 502, at 6), but that rule does not appear in any case. "An expert witness is permitted to rely on *any* evidence … that experts in the witness's area of expertise customarily rely on." *Brownlee*, 744 F.3d at 481-82 (emphasis added). Karpeles does not argue that cryptocurrency experts do not rely on internet reporting about cryptocurrency. And given that the field is very technology-forward, it would be unusual for relevant materials *not* to come from the internet.

The cases cited by Karpeles to support his supposed rule deal instead with an expert's reliance on insufficient facts or data. *See LG Elecs. v. Whirlpool Corp.*, 2010 WL 3613814, at *5 (N.D. Ill. Sept. 3, 2010) (expert could not testify to other companies' use of the word "steam" in adverting without verifying how the relevant appliances worked); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 2010 WL 2607241, at *5 (N.D. Ill. June 23, 2010) (expert's internet searches did not establish full universe of publicly available information during the class period). These cases do not establish any rule specific to the use of internet sources. *See Alfa Corp. v. OAO Alfa Bank*,

475 F. Supp. 2d 357, 361-62 (S.D.N.Y. 2007) ("[I]t is not clear that internet sources in general, or the ones cited by Mr. Muravnik in particular, are inherently unreliable. … Here, even if the expert's opinion were largely or entirely based upon Wikipedia and other internet sites—which it is not—the analogous solution would be to permit Mr. Muravnik to testify and to allow the parties to apply the tools of the adversary system to his report."). Neither does Karpeles's contention that the materials are hearsay carry weight. *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). Besides, he does not identify facts from these sources that he contends are wrong.[3]

In any event, "the reliability of the data itself is not the subject of the *Daubert* inquiry." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013). "The soundness of the factual underpinnings of the expert's analysis" is a matter for the trier of fact. *Smith*, 215 F.3d at 718. Karpeles may argue at trial that the basis for Goforth's opinion is reason to doubt her conclusions, but that goes to weight, not admissibility.[4]

---

[3] To the extent Professor Goforth's analysis builds on facts in the record, Greene agrees that those facts should be presented to the jury through percipient witnesses, in particular Mark Karpeles. *See, e.g.*, *LG Elecs. v. Whirlpool Corp.*, 2010 WL 3397358, at *6 (N.D. Ill. Aug. 24, 2010). But that wouldn't prevent Professor Goforth from highlighting what she considers the most relevant parts of his testimony and explaining why. *See In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804, 826 (2d Cir. 1994) ("Expert testimony may be based on other testimony or evidence obtained at trial."). As to the historical facts relies upon by Professor Goforth, they are appropriately part of her testimony because there are no percipient witnesses available to establish those facts. *See In re Welding Fume Prod. Liab. Litig.*, 2005 WL 1868046, at *17 n.31. Any challenge to her recitation of those facts is better left for a pre-trial motion *in limine* or trial objection. *See In re Ethicon, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, No. 2:12-CV-4301, 2014 WL 186872, at *16 (S.D.W. Va. Jan. 15, 2014) ("These statements provide the factual basis for Dr. Margolis's opinions and are therefore helpful for the jury to understand Dr. Margolis's opinions. Further, if Ethicon contends that certain statements are inadmissible hearsay, it may object to them at trial. A *Daubert* motion is not the proper method of excluding hearsay.").

[4] Karpeles argues that an expert cannot, under any circumstances, rely on the work of others without independently verifying it. (Dkt. 502 at 4.) That is incorrect: "[A]n expert witness is not required to verify all the facts on which he relies." *Tilstra v. BouMatic LLC*, 791 F.3d 749, 753 (7th Cir. 2015).

**B. Experts may give opinions on straightforward matters so long as they use their specialized knowledge in reaching their conclusions.**

Second, Karpeles is wrong that Professor Goforth's opinions are not the product of her expertise. Professor Goforth's bottom line is that no rational investor would have kept assets on Mt. Gox had they been informed of the state of the Exchange. Karpeles seeks to exclude this as a "common sense" conclusion. (Dkt. 502, at 8.) And while Greene agrees that this opinion is derived straightforwardly from the facts in the case and from the additional context Professor Goforth provides, that does not mean that it isn't properly the subject of expert testimony.

First, a "court is not compelled to exclude the expert just because the testimony may, to a greater or lesser degree, cover matters that are within the average juror's comprehension." *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996). "An expert's opinion may 'overlap[ ] with the jurors' own experiences' or 'cover matters that are within the average juror's comprehension,'" so long as the expert also brings to bear their specialized knowledge. *ViaMedia*, 951 F.3d at 484; *see also In re Fluidmaster Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990, at *8 (N.D. Ill. Mar. 31, 2017) ("Thus, the fact that some of the underlying premises of Dr. Rao's opinion may, in part, be derived from generally known facts does not remove his opinions from the 'specialized knowledge' encompassed by Rule 702.").

Next, expert opinions need not be "earth-shattering." *Lawson*, 153 F.3d at 376 (affirming decision to admit expert testimony that, *inter alia*, concealed knives in bars are dangerous). Indeed, "even when jurors are well-equipped to make judgments based on their own knowledge and experience, expert testimony can still be helpful by bringing specialized knowledge that could lend support to a jury's inference and generally be helpful to the jury." *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 337 (N.D. Ill. 2008).

Professor Goforth's opinion does *at least* that much. True enough, a jury may look at Karpeles's testimony and conclude that his misrepresentations were material and made to induce users to keep assets at Mt. Gox. But that does not mean that Professor Goforth adds nothing. She brings critical background information about what bitcoin investors expected from exchanges, what happened to other exchanges in analogous situations, and how those expectations sync up with the expectations of investors involved in more traditional exchanges. (*See*, *e.g.*, Ex B 163:17-164:16 (explaining that while average people could form opinions as to the importance of Karpeles's actions, Professor Goforth's knowledge, background, and research provides important context).) At the very least, this testimony "could lend support to a jury's inference." *Id*.

Karpeles's insistence that Professor Goforth employs "[no] particular methodology" also falls flat. (Dkt. 502, at 8.) "In a case such as this, where an expert is proffered to testify regarding non-scientific matters, the relevant reliability concerns will focus upon personal knowledge and experience of the witness and the methodology used will be applying that experience [or knowledge] to the facts of the case." *Jackson v. City of Pittsburgh*, 2010 WL 3222137, at *4 (W.D. Pa. Aug. 13, 2010) (citation omitted). An expert who applies their non-scientific expertise to the facts of the case has used a permissible methodology. *See ViaMedia*, 951 F.3d at 484.

Karpeles strains to fit Professor Goforth's opinions within the rule that "an expert's *ipse dixit* is inadmissible." *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008). (Dkt. 502, at 10-14.) The argument goes nowhere. Professor Goforth sets forth the historical information she considers relevant and draws a line from that to the circumstances present here, before extrapolating to reach her own opinion, which she shows is consistent with the historical record from that time. This is a far cry from the type of bare-bones reports properly excluded as mere *ipse dixit*. In *Wendler & Ezra*, for instance, an expert reported the output of a

14

software program, but "did not state, however, what software had been employed, how it worked, what data had been provided to the program, and what if anything had been done to" rule out an obvious alternative explanation. *Id.* Similarly, in *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333, 1339 (7th Cir. 1989), the court held properly excluded a bare bones expert declaration that "presented nothing but conclusions—no facts, no hint of an inferential process … ." But that is not what Goforth presents here: Her report is chock full of relevant facts—indeed, Karpeles moves to exclude 45 paragraphs of her report simply because they include facts. And the "inferential process" employed by Professor Goforth is apparent from her report. This is nothing like the bare-bones affidavits found to be unhelpful to a jury.

### C. A single stray statement of law that is not on an issue that will be the subject of jury instructions is not a basis for exclusion.

Last, Karpeles's complains that Professor Goforth includes a single statement of law in paragraph 54 of her report. (Dkt. 502, at 14-15.) The sentence in question reads: "Not only is it customary to assume that individuals have read the contracts they sign (including such documents as the Terms of Use), but even for Mt. Gox users who did not actually read such terms, this would have been the customary way in which crypto exchanges were set up to operate." And while "[e]xpert testimony as to legal conclusions that will determine the outcome of a case is inadmissible," *In re Ocean Bank*, 481 F. Supp. 2d 892, 898 (N.D. Ill. 2007), there can be no suggestion that this brief legal aside will determine the outcome of the case. Nor does it cover an area "on which the judge will instruct the jury." *United States v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996). Goforth's inclusion of an uncontested legal principle within a broader discussion of why Karpeles's conduct mattered is not a basis for exclusion under Rule 702.

### CONCLUSION

The motion to exclude should be denied.

Date: November 10, 2020                    By: /s/J. Aaron Lawson
                                               One of Plaintiff's Attorneys

                                           Jay Edelson
                                           jedelson@edelson.com
                                           Benjamin S. Thomassen
                                           bthomassen@edelson.com
                                           Edelson PC
                                           350 North LaSalle Street, 14th Floor
                                           Chicago, Illinois 60654
                                           Tel: 312.589.6370
                                           Fax: 312.589.6378

                                           Rafey Balabanian
                                           rbalabanian@edelson.com
                                           J. Aaron Lawson
                                           alawson@edelson.com
                                           Edelson PC
                                           123 Townsend Street, Suite 100
                                           San Francisco, California 94107
                                           Tel: 415.212.9300
                                           Fax: 415.373.9495

                                           *Counsel for Plaintiff*