# EXHIBIT B



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS





NAEGELI
DEPOSITION & TRIAL



(800) 528-3335

NAEGELIUSA.COM

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY GREENE, individually
and on behalf of all others
similarly situated,

      Plaintiff,

vs.                    Case No. 14-CV-01437

MARK KARPELES, an individual,

      Defendants.

_____

REMOTE DEPOSITION BY VIDEOCONFERENCE OF

CAROL R. GOFORTH

TAKEN ON
TUESDAY, JULY 7, 2020
9:26 A.M.

GOFORTH RESIDENCE
562 NORTH CEDAR RIDGE LANE
FAYETTEVILLE, ARKANSAS 72704

**2**

```
1                APPEARANCES
2
3  APPEARING ON BEHALF OF THE PLAINTIFF CAROL
   GOFORTH VIA
4  VIDEOCONFERENCE:
5  BENJAMIN S. THOMASSEN, ESQUIRE
6  EDELSON, P.C.
7  350 NORTH LASALLE STREET, 14TH FLOOR
8  CHICAGO, ILLINOIS  60654
9  (312) 589-6370
10 (312) 589-6378 Fax
11 bthomassen@edelson.com
12
13 APPEARING ON BEHALF OF THE DEFENDANT VIA
   VIDEOCONFERENCE:
14 BEVIN BRENNAN, ESQUIRE
15 PEDERSEN & HOUPT
16 161 NORTH CLARK STREET, SUITE 2700
17 CHICAGO, ILLINOIS 60601
18 (312) 641-6888
19 (312) 641-6895 Fax
20
21 ALSO PRESENT:
22 Tom Hazelhurst, Naegeli Zoom Technician
23 Roseanne Leverich, Zoom Technician
24
25
```

**4**

```
1              INDEX OF EXHIBITS
2  Exhibit                    Page
3
4  A    DECLARATION              13
5
6  B    MARK KARPELES DEPOSITION      52
7
8  D    ARTICLE ON BITCOIN EXCHANGE    68
9
10 F    ARTICLE ON BITCOIN HEIST       70
11
12 G    CRYPTO REGULATION        71
13
14 J    ARTICLE ABOUT MOUNT GOX        79
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1           EXAMINATION INDEX
2                Page
3
4  EXAMINATION BY MS. BRENNAN        6
5
6  EXAMINATION BY MR. THOMASSEN        171
7
8  FURTHER EXAMINATION BY MS. BRENNAN    176
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

```
1  REMOTE DEPOSITION BY VIDEOCONFERENCE OF
2           CAROL R. GOFORTH
3              TAKEN ON
4        TUESDAY, JULY 7, 2020
5              9:26 A.M.
6
7      THE COURT REPORTER:  It is my pleasure to
8  serve as a professional reporter in today's matter.
9  I would like to stipulate on the record that the
10 testimony will be captured by a professional digital
11 reporter and that all present agreed this method of
12 preserving today's record.
13      The testimony will be transcribed and
14 certified.
15      Ms. Brennan, do you agree?
16      MS. BRENNAN:  I do.
17      THE COURT REPORTER:  And Mr. Thomassen, do
18 you agree, sir?
19      MR. THOMASSEN:  Yes.
20      THE COURT REPORTER:  Thank you.
21      Ms. Goforth, can I please have you raise
22 your right hand.
23      Do you solemnly swear or affirm under
24 penalty of perjury that the testimony about to
25 provide will be the truth, the whole truth and
```

**6**

1  nothing but the truth?
2      THE WITNESS:  I do.
3      THE COURT REPORTER:  Thank you. You may
4  proceed.
5      MS. BRENNAN:  Counsel, thank you.
6  CAROL R. GOFORTH, having been duly sworn, was
7  examined and testified as follows:
8  EXAMINATION
9  BY MS. BRENNAN:
10     Q.  Good morning, Professor Goforth. I know
11  we've sort of met via video zoom.
12         My name is Bevin Brennan and I represent
13  the defendant, Mark Karpeles, in this case.  Have
14  you -- I know you're a lawyer.  Have you taken
15  depositions before?
16     A.  I have participated in the taking of at
17  least one deposition, but it would have been thirty
18  years ago, more than 30 years ago.
19     Q.  And have you been deposed yourself before?
20     A.  No.
21     Q.  Okay, then I'll go through some basic
22  ground rules, which I suspect you're aware of, but
23  just so we're all on the same page.
24         First of all, obviously, this is a little
25  bit different situation doing it by video, so and

**7**

1  with maps and all that, so if at any time you can't
2  hear me clearly or you don't understand what I'm
3  asking, if you could just let me know that I can
4  either repeat the question or rephrase it as you
5  needed.
6         Does that make sense?
7     A.  Yes.
8     Q.  Okay.  And if -- and obviously, again, I
9  know we're recording this from Zoom perspective, but
10  obviously, you need to answer questions audibly
11  because the court reporter will take it down and he
12  can't take down, you know, shakes of the head, not
13  to the head. That sort of stuff. Does that work?
14     A.  Yes.
15     Q.  Okay.  And, finally, I sometimes lose
16  track of time.  You know, I try to go about an hour
17  at a time and give you a break to get to -- you
18  know, walk around, stretch your legs, that sort of
19  thing.
20         But if at any time, either you need a
21  break or I'm running long, either you or your
22  counsel to let me know that and I we'll answer the
23  pending question and take a break.  Does that work?
24     A.  Yes. With the caveat that if something
25  happens because I am in the unusual situation of

**8**

1  being at my home, if someone comes to the door, my
2  dogs are going crazy, I will let you know that I
3  need to step away.  I don't want to try to answer
4  while I'm distracted.
5     Q.  That's fine.  Again, you know, we
6  understand that this is a little bit of a different
7  situation than normal, and, obviously we're going to
8  accommodate real life events, so that's not a
9  problem.
10     A.  Thank you.
11     Q.  Okay. Okay.
12         Professor Goforth, I'm going to start
13  asking you a little bit about your background. Your
14  undergraduate degree was in psychology; is that
15  right?
16     A.  Yes.
17     Q.  Okay.  But that's not your area of
18  expertise, correct?
19     A.  Correct.
20     Q.  Currently.  And you're not claiming any
21  expertise in psychology as the basis for your
22  opinions in this case, are you?
23     A.  No.
24     Q.  You've been a law professor at the
25  University of Arkansas since 1993; is that correct?

**9**

1     A.  I have been employed as a professor or an
2  associate professor or visiting professor since that
3  time at the University of Arkansas.  The title of
4  professor needs something a little different in
5  academia than just -- you know.
6     Q.  I understood.
7         But you've worked her way up to a full
8  professor, correct?
9     A.  Yes.
10     Q.  Because you started as a visiting
11  professor, right?
12     A.  Visiting or visiting associate.  I forget
13  the title they gave me, it was for one year.
14     Q.  Okay.  And then the next year you became
15  an associate professor of law in 1994?
16     A.  Correct.  That was the promotion for being
17  hired onto the tenure track.
18     Q.  And then you became a tenured professor of
19  law in 1997, correct?
20     A.  Correct.
21     Q.  And your primary focus is on a
22  transactional classes, correct?
23     A.  My teaching focuses is on transactions and
24  business organizations and securities, so yes.
25     Q.  And you focus on closely-held businesses,

**10**

1  correct?
2      A.   That is one of the areas that I focus my
3  teaching on, yes.
4      Q.   And another area that you focus on are
5  publicly-held corporations, correct?
6      A.   Yes.
7      Q.   And a third area that you focus on are
8  transactional skills, right?
9      A.   Yes.
10     Q.   And what do you mean by "transactional
11 skills"?
12     A.   How to interact with clients, how to
13 communicate with them, how to draft different kinds
14 of legal documents in the business representation
15 context, how to counsel, how to negotiate, what
16 business, arbitration and mediation consist of.
17     Q.   And then you've also begun to focus on the
18 regulation of crypto transactions, correct?
19     A.   In my teaching, yes.
20     Q.   Outside of teaching, are there areas that
21 you focus on in your research or studies?
22     A.   Yes.  I am engaged in substantial
23 scholarships, so I do a lot of research and reading
24 and writing of topics that are of interest to me and
25 that I believe are important, and I try to be

**11**

1  involved in public service as well.
2      Q.   Let's go to your research and reading of
3  areas of interest.  What would those areas be
4  currently?
5      A.   Currently, it focuses on cryptoasset,
6  cryptoasset regulation, the changes in crypto, not
7  the underlying software, but the products that are
8  being developed in the way that is being framed by
9  and changed and impacted by regulation and the way
10 that regulation is impacted by behaviors and changes
11 in the crypto community.
12     Q.   Okay, let's start with -- what do you mean
13 by the products that are being offered in the crypto
14 space?
15     A.   Things I ke the development of privacy
16 coins and increasing emphasis on different aspects
17 either as a way of evading some of the regulations
18 or as complying with some of the regulations.  So
19 the development of things like truly securitized
20 tokens. Tokens that would have been formerly
21 securities, would have been stock, would have been
22 an equity interest, but are now being put on the
23 blockchain, like, Overstock's tZERO.  That's an
24 example of something that is done in compliance.
25             And then the increasing efforts of

**12**

1  particularly Monero to make it harder for folks to
2  trace who's making what sales to whom.
3      Q.   I think you said something about you're
4  also doing research into certain behavior with
5  respect to crypto transactions; is that right?
6      A.   Right.  And part of that is what I was
7  just talking about.  The development of assets that
8  are designed to either comply with that evolving
9  regulation or to evade it.  And then the patterns of
10 people who are engaging in fraud, the kinds of fraud
11 that are happening, the kinds of businesses that are
12 being hacked, and the response to those hackings,
13 the regulatory response, that the public response,
14 that type of behavior.
15     Q.   The first part about the behaviors that
16 you just ta ked about, were you talking about the
17 development of certain kind of assets and addressing
18 regulatory.  Would that be done by the by business
19 entities involved in crypto transactions?
20     A.   Yes.  That's what I was ta king about,
21 yes.
22     Q.   Okay.  And then you reference work you've
23 done with respect to fraud.  Who -- which side of
24 the transaction do you conduct your research or
25 analysis with respect to the fraud?

**13**

1      A.   It's not a binary choice.  I look at the
2  way regulators react to reported incidents of fraud.
3  I look to the way customers, consumers, advocates
4  react to it.
5            I look at the type of behaviors that those
6  engaged in the fraud have been involved in.   I
7  don't take a side.
8      Q.   Okay.  Have you done any studies into how
9  customers react to fraud?
10     A.   No.
11     Q.   Have you done any studies of particular
12 people who are the perpetrators of the fraud?
13     A.   None of my research focuses on
14 individuals. It's a group patterns that I look at
15 information about.
16             (Whereupon, Exhibit A was identified for
17 the record.)
18     Q.   If I could ask you to pull up from that
19 pile. Exh bit A, what should be a copy of your
20 report?
21     A.   Yes.  Excuse me.  I have Exhibit A in
22 front of me now.
23     Q.   Okay.  You see that you were retained, if
24 you look at that first paragraph, as an expert in
25 the regulation of cryptoassets, transactions and

---

**14**

1 businesses, correct?

2    A.   Yes.

3    Q.   When did you start your scholarship into

4 that area?

5    A.   What do you mean by "start" my

6 scholarship?

7    Q.   Sure.  When did you start looking into or

8 start doing research with respect to cryptoassets or

9 crypto transactions?

10    A.   Particularly with regard to crypto that

11 would have been in 2018?

12    Q.   Were there any regulations of crypto

13 transactions in 2013?

14    A.   I should probably clarify.  My area of

15 expertise is the U.S. law, and actually there were

16 lots of regulations, we just didn't know how the

17 agencies were going to apply them to crypto. So the

18 answer is, yes, there were lots of regulations.

19    Q.   And were those regulations, just general

20 SEC-type regulations, or were there particular

21 regulations specifically designed with

22 cryptocurrency in mind?

23    A.   Other than at the state level, we still

24 don't have specific regulations targeted to crypto,

25 our agencies are working with the regulations,

---

**15**

1 exactly the same regulations that were in place in

2 2013.

3    Q.   Were there any state level regulations

4 specific to cryptocurrency in 2013?

5    A.   I don't know.

6    Q.   And same question, do you know of any

7 state level crypto transaction or cryptocurrency

8 regulations at the state level in 2014?

9    A.   I don't know the dates of when some of

10 this specific state regulations were first put in

11 place.  I don't claim to be an expert at the

12 individual state level.

13    Q.   And in your actual report, you don't cite

14 to any particular regulations as a basis for any of

15 your opinions, correct?

16    A.   That is correct.

17    Q.   So as we get into your report, is it fair

18 to say that your report does not rely on any

19 regulations that were in place in 2013 or 2014?

20    A.   Not exactly.

21    Q.   Why not?

22    A.   In the course of my 30 years of teaching

23 and working with securities laws and securities

24 regulation and the regulation of conventional

25 securities exchanges, the patterns of regulations

---

**16**

1 that have developed respond to patterns of fraud and

2 patterns of behavior by Main Street investors --

3 that is just ordinary folks -- and the need to

4 protect them sometimes from their own ignorance and

5 their own foolishness.  And they need to react to

6 the kinds of fraud that conventionally happen.

7        Those regulations are underlying my

8 understanding of what happens when you have an

9 unregulated or an environment that is perceived as

10 being unregulated, even if the regulations are in

11 existence.

12        So it's not completely accurate to say

13 that I'm not relying on the existence of any

14 regulation that is in the background of my mind.

15    Q.   What particular regulations are in the

16 background of your mind when you formed your

17 opinions in this case?

18    A.   It's not particular regulations.  It is

19 the general way in which margin trading and custody

20 rules and similar requirements that have long been

21 in place or regulated exchanges either under the

22 Commodities Exchange Act, and the CFTC rules, or

23 under the Securities Exchange Act, and its rules.

24        So it's just the general patterns of the

25 way in which regulatory agencies have said, if

---

**17**

1 you're going to engage in exchanging these

2 commodities or securities, these are minimum

3 standards of behavior. And it's not specific rules

4 that I was thinking about. It's the general context.

5    Q.   What particular standard from that context

6 applied to your opinions in this case?

7    A.   Could you rephrase that?  I'm not --

8 again, not entirely sure what you're asking.

9    Q.   Sure.

10        You testified that there are certain

11 standards that apply based on sort of a general

12 understanding of regulations for exchanges?

13    A.   Correct.

14    Q.   Okay, what types of standards are you

15 talking about?

16    A.   The custody rules.

17    Q.   How do they apply to this report?

18    A.   Okay, well, I'm going to take custody

19 rules as an example.

20        Custody rules require if you're operating

21 a regulated exchange, when you take an asset of your

22 clients, a client of the exchange, and you are

23 waiting for your client to tell you what to do with

24 that asset, you will maintain that asset safely as a

25 fiduciary, and that is understood as the way an

18

1 exchange operates.
2        If you trust the exchange with your
3 property, they are going to treat it as your
4 property and hold it safely and do with it as you
5 tell them to do. So that's part of the general way
6 in which regulated exchanges operate.
7        There are rules regarding disclosure of
8 material fact and obligations to report things that
9 happen that are material to the nature of your
10 business to the regulator through transparency in
11 the way that you operate. Those are the kinds of
12 requirements I had in mind.
13    Q. You know they're legal concepts, correct.
14    A. They're legal requirements. And the rules
15 are framed in terms of the law, yes.
16    Q. Going back to your background, you were a
17 professor at Seton Hall before the University of
18 Arkansas, correct?
19    A. Yes. Again, an assistant professor, and
20 then -- I was not a full -- I did not go up to the
21 process at Seton Hall. So I was hired on the team
22 back there, I did not become a full professor there.
23    Q. Understood. And, obviously, you didn't --
24 that was from 1989 to 1993?
25    A. Correct.

19

1    Q. And so there was no cryptocurrency then,
2 right?
3    A. No there must not.
4    Q. And then I won't go through the rest of
5 your background, but I presume during your time as
6 being an adjunct law professor at the University of
7 Tulsa and then private practice in Tulsa in the
8 '80s, there was also nothing about cryptocurrency at
9 that time, right?
10    A. You are correct.
11    Q. Have you ever been accepted as an expert
12 in any other case before?
13    A. No.
14    Q. Have you ever been offered as an expert in
15 any other case?
16    A. Not to my knowledge.
17    Q. Okay, if I could ask you to look at
18 Exhibit A, again, in that first paragraph.
19        The first sentence reads, I have been --
20 quote, I have been retained by Edelson, P.C.,
21 counsel for plaintiff and the above-captioned matter
22 as an expert in the regulation of cryptoassets,
23 transactions and businesses, including bitcoin
24 exchanges, end quote. Do you see that?
25    A. Yes.

20

1    Q. Is that an accurate description of the
2 expertise that you've been retained for in this
3 case?
4    A. I don't know if that's the only thing that
5 they retained me. That was my understanding from my
6 communication with them that that's what they were
7 retaining me for.
8    Q. As you sit here today, are you aware of
9 any other area of expertise that you that you are
10 going to be basing your testimony on?
11    A. Well, one of the things that -- I
12 previously communicated this to Mr. Thomassen,
13 underlying the predicate for that expertise, which
14 is my familiarity with the securities laws, the way
15 in which other kinds of exchanges are operated, the
16 predicate for that expertise is sort of embedded in
17 that as well.
18        So it's not just the regulation. It's
19 the. expertise in the things that lead me to be able
20 to understand and explain and evaluate the
21 regulations.
22        But what led him, I think, to hire me was
23 the scholarship in the area of regulation because
24 we'd never met before. He contacted me and asked me
25 if I would be interested in participating as an

21

1 expert in this case.
2    Q. What are the other things that lead you to
3 your beliefs in this case that you just talked
4 about? You said there are other things that lead you
5 to believe or make certain analysis, what does that
6 mean?
7    A. I don't think it is possible to be an
8 expert or to claim to be an expert in crypto
9 regulation without first understanding what
10 cryptoassets are, and what the environment in which
11 they operate is, and how people have developed are
12 continuing to develop, sometimes are manipulating
13 and continuing to manipulate the reaction to this
14 new technology.
15        I specifically do not include any
16 expertise in, you know, the programing or the
17 hardware or the software or cryptography. I'm not
18 an expert in those areas. That's not what I mean.
19    Q. So your area of research, for instance,
20 includes whether bitcoins should be treated as
21 securities, right?
22    A. Yes.
23    Q. I'm sorry. What was that answer?
24    A. I'm sorry. Yes.
25    Q. And it also involves things like how ICOs

22

1 should be treated, right?
2     A.  Yes.
3     Q.  None of your research involves surveying
4 actual bitcoin buyers or sellers for what is
5 important to them, right?
6     A.  Correct.
7     Q.  And you've never worked for a crypto
8 currency exchange, right?
9     A.  I have recently been contacted by one to
10 serve as they're on their board of advisors. But
11 that is a position that has not yet started.
12     Q.  Can you tell me who that is or is that
13 confidential?
14     A.  I'm sorry at this point, I'd have to ask
15 them if I could tell you.
16     Q.  When were you asked to do that?
17     A.  About two weeks ago.
18     Q.  Okay.  So that's brand new?
19     A.  It's brand new.
20     Q.  I think you already pointed out, but
21 you've never run a crypto currency exchange
22 yourself, right?
23     A.  Never.
24     Q.  If I could ask you to go back to your
25 report -- and we'll obviously be looking at the

23

1 report a lot.  So if and when we get to the other
2 exhibits, I just ask that you keep this nearby
3 because this will be the one that we're going to
4 refer to a lot.
5     A.  Okay.
6     Q.  Okay. All right.  If I could ask you to
7 look at the second sentence in that, in paragraph 1,
8 which says, quote, I have been asked to offer my
9 analysis of Mark Karpeles' conduct in operating the
10 Mt. Gox bitcoin exchange, including affirmative
11 statements made during the time in which Mt. Gox
12 operated, various decisions not to disclose certain
13 information, and a range of actions designed to
14 conceal the true state of the exchange from its
15 users, end quote.  Do you see that sentence?
16     A.  Yes, I do.
17     Q.  Okay.  Was that the full extent of what
18 you were asked to opine on in this case?
19     A.  I believe so.
20     Q.  And more specifically, what were you
21 asked? What conduct were you asked to look at?
22     A.  When I was hired, I wasn't told
23 specifically what conduct.  I was not given access
24 to Mr. Karpeles' deposition until after I had
25 agreed, and after I signed the confidentiality

24

1 agreement.
2     So at the time I agreed to become a
3 participant here, I didn't have a specific
4 understanding of what his conduct was.  It was after
5 --
6     THE COURT REPORTER:  I'm sorry, what was
7 the very end of that, Ms. Goforth?
8     A.  It was after that.
9     THE COURT REPORTER:  Thank you.
10     Q.  When were you given a more specific
11 assignment of what conduct to look into with respect
12 to this engagement?
13     A.  When the information was forwarded to me
14 after I had said, yes, I'd like to be involved --
15 although at that point I had retained, of course,
16 the right to decide that, no, there's nothing here.
17 So it was as I was provided information in
18 connection with the deposition and that's -- oh, the
19 deposition testimony, I think, that's the conduct
20 that I was relying on predominantly.
21     Q.  Okay.  When you say the deposition
22 testimony, you mean Mr. Karpeles' deposition
23 testimony?
24     A.  I'm sorry. Yes, that is what I meant.
25     Q.  And when you were provided with Mr.

25

1 Karpeles', deposition testimony, were you given any
2 indication of what conduct you should focus on or
3 did you look at it yourself to see what conduct you
4 believed to be an issue?
5     MR. THOMASSEN:  I just would interject and
6 remind the witness not to stray into communications
7 with counsel about things like relevance, that sort
8 of thing.  But the identification of facts,
9 assumptions, that sort of thing is totally fine to
10 discuss.
11     A.  I don't recall being told to focus on
12 anything in particular.  I read through the
13 deposition myself to figure out what was important.
14     I can't swear under oath that something
15 wasn't pointed out to me.  But if it was, I don't
16 recall it.
17     Q.  And upon reviewing Mr. Karpeles'
18 deposition, did anything in particular stand out to
19 you as raising issues in your mind?
20     MR. THOMASSEN:  Object to form.
21     A.  I'm sorry.
22     Q.  I'll rephrase it.  Sure.
23     You were retained to provide an opinion on
24 your analysis of Mr. Karpeles' conduct in operating
25 the Mount bitcoin exchange, correct?

**26**

1    A.  Yes.

2    Q.  And upon reviewing Mr. Karpeles'

3  deposition, testimony, was there particular conduct

4  from that deposition that you believed was improper?

5    A.  Yes.

6    Q.  And what did you determine from reading

7  Mr. Karpeles' deposition was not proper conduct.

8    A.  Wow.  There was -- he was incredibly

9  candid, in my opinion, about the things he knew and

10  intentionally did not disclose.  And the time at

11  which he knew things and the way in which he then

12  publicly described what he knew to be happening when

13  his public description did not match the facts, as

14  he said he knew them.

15        There were multiple times during the

16  deposition when he made reference to specific

17  findings, determination why we are missing this many

18  bitcoin, there was a hack on this day, here's our

19  strategy of not telling fo ks because we don't want

20  them to sue me, and we don't want them to abandon

21  the exchange.

22        So it jumped out to me how often he

23  admitted that that's what he was doing.

24    Q.  When you looked at those -- and I know

25  you've summarized them.  But when you looked at the

**27**

1  issues of when, in your opinion, Mr. Karpeles failed

2  to disclose certain information, was there a

3  particular regulation that you believe that Mr.

4  Karpeles violated?

5    A.  The opinion that I render is not based on

6  any particular regulation.  And I did not and have

7  not taken the time to go back and figure out what

8  regulations would be violated.

9        I'm sorry. Did you say something?

10    Q.  No.

11    A.  There wasn't a particular regulation in

12  mind.

13    Q.  Was there a particular standard in mind

14  when you came to that determination?

15    MR. THOMASSEN:  Object to form.  I don't

16  know what determination you're talking about.

17    MS. BRENNAN:  I'm sorry.  What was the end

18  of that?

19    MR. THOMASSEN:  You said, when you came to

20  that determination, I just don't know what you're

21  referring to.

22    MS. BRENNAN:  I'll clarify.

23    Q.  When you came to the determination that

24  Mr. Karpeles failed to disclose certain information

25  that you believe he should have disclosed, what

**28**

1  standard were you applying to make that analysis?

2    A.  What reasonable people would have

3  understood as being part of what was communicated

4  from somebody who was acting in good faith,

5  honestly.

6    Q.  And where does that standard come from?

7    A.  Where does the standard of reasonable

8  expectations come from?

9    Q.  Yes.

10    A.  That is the opinion that I rendered.  I

11  mean, my opinion is that based on what happened, no

12  reasonable person would have left their bitcoin in

13  this exchange if they had known the truth that was

14  being concealed from them.  I mean, that is my

15  professional opinion, so I guess that's my standard.

16    Q.  Is that based on any research that you've

17  done?

18    A.  Did I research my professional opinion?

19  I'm sorry.  I'm not sure what you mean.

20    Q.  Sure.  I mean, you said that it's based on

21  your standard of what reasonable people would have

22  understood him to -- should have disclosed.  Where

23  does that standard come from?

24        Where does your standard of what a

25  reasonable person would have thought come from?

**29**

1    A.  Based on five years of practice involving

2  securities work, 30 years of teaching involved in

3  securities and transactions and market behavior, and

4  based on my understanding and the historical data

5  surrounding what happened in other bitcoin exchanges

6  when the information was honestly disclosed, what

7  happened to those exchanges?

8        And based on Mark Karpeles' statements

9  that, oh, I knew that if I said this, they would

10  leave.  They would sue me.  They would -- this would

11  crash my exchange.

12    Q.  What information about other exchanges was

13  important to that opinion?

14    A.  Do you mean other crypto exchanges?

15    Q.  Yes?

16    A.  Oh, boy.  Look, I'm not 100 percent on the

17  names.  In 2011, Bitomat -- I think that's the

18  correct name of the exchange -- announced that it

19  had not been able to protect and keep track of its

20  customers assets that caused that exchange to fall.

21        Bitcoinica, MyBitcoin followed in 2011,

22  2012. Also in 2012, there was that Bitfloor.

23        I mean, it is a repeated pattern that

24  where a exchange fails to keep accurate control,

25  fails to demonstrate that they are a safe and secure

30

1  place to put your assets, people will move their
2  assets out of that exchange and put it some -- put
3  them somewhere else.
4      Q.   With respect to the other exchanges, had
5  any of them reported that they had been hacked at
6  any point in time?
7      A.  Yes.
8      Q.   And what happens when any of those
9  exchanges was hacked, from a market perspective?
10     A.  That caused folks to begin pulling their
11  bitcoin out.
12        And I forget which one of them -- one of
13  the cases, there was a promise that they'd fixed the
14  problem. The withdrawal slowed. The second hack or
15  the second loss. And then the fo ks took -- it
16  failed. And that's the one that resulted in private
17  litigation in San Francisco and, you know, forced
18  insolvency of the exchange.
19        So when you have lack of security, a lack
20  of protection for the assets and a lack of candor
21  about what's going on, people pull their assets out.
22     Q.   Now, Mt. Gox did report some hacks, didn't
23  they?
24     A.  Yes.
25     Q.   And you didn't see the behavior that you

31

1  just described when Mt. Gox disclosed other hacks,
2  right?
3      A.  Well, Mt. Gox reported a hack. They said
4  it was a hack of their assets and they falsely said
5  that no customers' account was compromised. That it
6  was only their assets that had been lost. And that
7  they had replenished those accounts -- their own
8  trading accounts -- not trading -- their own active
9  accounts -- their own assets. So it had been
10  replenished, so that nobody should worry.
11        So, yes, they disclosed a hack but the
12  accuracy of even that disclosure does not appear to
13  have matched what was happening.
14     Q.   Do you believe that any holder of
15  cryptocurrency on an exchange believes that it's 100
16  percent secure?
17     A.  No. Well, no rational -- no rational
18  investor.
19     Q.   I want to go back to paragraph 1, where
20  you say you've been asked to offer your analysis of
21  this conduct and specifically, quote, including
22  affirmative statements made during the time in which
23  Mt. Gox operated, various decisions not to disclose
24  certain information in a range of actions designed
25  to conceal the true state of the exchange from its

32

1  users. Do you see that?
2      A.  Yes.
3      Q.   What's your basis for any expertise in
4  decisions not to disclose certain information?
5      A.  Expertise in decisions not to disclose.
6      Q.   Right. Correct.
7      A.  I don't have any expertise and when to
8  decide not to disclose.
9      Q.   Okay. Then what expertise do you have
10  with respect to analyzing a range of actions
11  designed to conceal the truth state of the exchange
12  from its users?
13     A.  Honestly, I'm not sure what you're asking.
14     Q.   In your report, you said you've been asked
15  to offer your analysis of Mark Karpeles' conduct in
16  operating the Mt. Gox bitcoin exchange, including
17  affirmative statements made during the time in which
18  Mr. Gox operated. Do you see that first part?
19     A.  Yes.
20     Q.   What expertise do you have to analyze Mr.
21  Karpeles' conduct specifically regarding affirmative
22  statements made during the time in which Mt. Gox
23  operated?
24     A.  I was not so much hired to analyze what
25  conduct he took as to analyze the consequences of

33

1  the conduct that he took. And so if my statement is
2  misleading, I'm sorry.
3        But I opined on and what I thought my
4  expertise was being sought for was whether or not
5  his conduct in doing and in not doing these things -
6  - and I don't have -- I don't claim to understand
7  why he did things and why he didn't do things, or,
8  you know, which media he used to accomplish certain
9  disclosures. That's not my expertise.
10        My expertise was in the consequence of my
11  analysis of what that did, what that did to
12  customers, what that did to the environment, the
13  crypto environment.
14     Q.   What do you mean by "what that did to the
15  crypto environment"?
16     A.  The crypto environment, the way in which
17  crypto is -- the bitcoin, the security of bitcoin on
18  the Mt. Gox exchange was understood. The perception
19  of Mt. Gox as the place to put your bitcoin, the
20  place that is secure and well-run to a perception in
21  the community that, while they don't know what
22  they're doing, they're stealing our money. They've
23  mismanaged. We're not getting our assets back.
24  What's going on? How long have they known? That
25  pattern of behavior and reaction from the crypto

**34**

1 community.
2  Q.  And how did you determine the reaction
3 from the crypto community?  And by that, I mean,
4 what sources of information did you look at?
5  A.  There is -- and it is still active.  There
6 is a particular website that -- and I cited this --
7 and I'm afraid I can't give you the exact name right
8 now, although I could find it in my deposition -- in
9 my Declaration.
10  There is a website that has ongoing dialog
11 and commentary dating back from before the closure
12 of Mt. Gox from Mt. Gox users in the three months
13 leading up to the closure.  I read through a lot of
14 those comments.  That's really what I was focusing
15 on.
16  Q.  Do you look at message boards normally in
17 your research?
18  A.  Only when specific questions come up.
19  Q.  As you sit here today, other than this
20 engagement, do you recall using a message board as
21 support for any of your research?
22  A.  Yes.
23  Q.  When was that?
24  A.  I wrote an article on airdrops, which is a
25 particular kind of dissemination vehicle for crypto.

**35**

1 And I wanted to see how fo ks were understanding and
2 what they were saying about airdrops.  And I wanted
3 to see how folks were determining which airdrops
4 were legitimate, which were fishing, which involved
5 a scam.
6  So I looked at a number of Telegram
7 accounts and excerpts that were linked in other
8 reports, you know, online posts and medium and
9 similar sources to figure out what folks in the
10 crypto community, again, were saying about these.
11  The other time that I can recall doing it
12 is when I was trying to make sure that I understood
13 the kinds of fraudulent behavior that were currently
14 going on for an article I'm currently writing.
15  And, again, that involves me looking at
16 message boards to figure out who is complaining
17 about stay away from this site, stay away from this
18 ICO, stay away from this.
19  And what sorts of things were tipping them
20 off to the probability that a certain offering was
21 illegitimate.  Things like, yes, they've only got
22 seven likes and it's all from the same source or
23 they've got 85 likes, but it's verbatim with same
24 grammatical errors.  That kind of comment.
25  So those are the ones that I can think of.

**36**

1 But it was specific issues that I went there for.
2  Q.  Okay.  And you don't know any of the
3 particular posters on those message boards, correct?
4  A.  Almost without exception, they are
5 pseudonymous.  So they use some clever little name.
6 I have no idea who -- I don't have any idea who any
7 of them are, for sure.
8  I've read reports on So-and-So posts under
9 this name, but I don't -- I don't know that to be
10 true.
11  Q.  People who post on message boards self-
12 select and choose to post on them, correct?
13  MR. THOMASSEN:  Object to form.
14  A.  As far as I know, that is correct.  I'm not
15 aware of any message -- any I'm not aware of anyone
16 being compelled.  I mean, it's entirely poss ble but
17 I'm not aware of anybody being compelled.
18  Q.  Do you know of -- do you know what
19 percentage of holders of cryptoassets post on
20 message boards?
21  A.  At what point in time?
22  Q.  Well, let's start with 2013.
23  A.  At that point, crypto was held by
24 relatively few people.  We're talking thousands, not
25 tens of thousands of fo ks -- well, tens of

**37**

1 thousands, but not hundreds of thousands.  And
2 probably a sizable minority were, if not active,
3 they were engaged.  That was a tighter-knit
4 community.
5  So particularly the people who were in
6 Europe and Americas, I would say, you know -- 20
7 percent as a guess.  That's not under oath, and that
8 is a guess.
9  Q.  You've never done it -- I'm sorry.  Keep
10 going.  I'm sorry.  I thought you were done?
11  A.  I'm sorry.  Now, the percentage would be
12 relatively minuscule.
13  Q.  You've never seen a study that describes
14 what percentage of people participate and
15 investments for 2013, right?
16  A.  I have seen reports, but not any kind of
17 underlying reputable study or survey.  It's just
18 these reports of guesstimates of how many people
19 were -- and that is in large measure what I base my
20 guess on.
21  That's not an expert opinion.  That is my
22 guess.  And it is based on a wide number of people
23 saying that, oh, it was such a tight-knit community
24 back then.  So it is second-hand, definitely.
25  Q.  Who said that it was a tight-knit

38

1  community.
2      A.  Virtually, all kinds of people.  I mean,
3  the folks who I do know who have said it or who have
4  had it reported that they have said it by what I
5  would consider reputable sources include Vitor
6  Butalin (phonetic), the founder of -- or one of the
7  co-founders of Ethereum. He ta ks about the way in
8  which crypto has evolved.
9          That sort of seems to be conventional
10  wisdom in the message boards and reports and the
11  ongoing articles on crypto about how tight-knit it
12  was when it was starting and how exciting it was
13  that this was going to be a new democratic process.
14      Q.  Have you talked to any of the current or
15  former plaintiffs in this case?
16      A.  No, not to my knowledge.
17      Q.  Do you know if they knew each other prior
18  to this litigation?
19      A.  The plaintiffs?  Yes.
20      Q.  I'm sorry.  I thought there was only one
21  plaintiff now.  Do you mean former plaintiffs?
22          I don't -- no, I have no idea.  I don't
23  even know who the fellow plaintiffs were.  So I
24  can't -- I'm sorry.  I don't know.
25      Q.  Okay.  In your report, if we could go to

39

1  paragraph 9?
2      A.  Yes.
3      Q.  And you say, quote, In preparation of this
4  Declaration, I have relied upon my general knowledge
5  of the law and my specific research into the
6  operation and legal regulation of cryptocurrencies
7  and crypto-based businesses, correct?
8      A.  Yes.
9      Q.  What general aspects of the law did you
10  rely upon?
11      A.  Predominantly the securities and
12  commodities regulation and exchange regulation and
13  requirements. And then, you know -- so much of what
14  I've researched in crypto, I could read and not
15  understand, except for the fact that I know how to
16  read statutes, and regulations, and rules, and
17  releases, and I know what they mean and what their
18  relationship is to each other. So there is that
19  tremendous reservoir of just knowing what legal
20  materials are and what they mean.
21      Q.  How about your specific research into the
22  operation and legal regulation of cryptocurrency and
23  crypto-based businesses?
24      A.  I'm sorry.  What about it?
25      Q.  Why did you rely on with respect to that

40

1  portion of the statement?
2          You say that I've relied upon my specific
3  -- if I take out the "general knowledge of the law"
4  part, it would read, I relied upon -- space -- my
5  specific research into the operation and legal
6  regulation of cryptocurrencies and crypto-based
7  businesses.
8      A.  In order to write the first article that I
9  wrote, focusing on crypto, I read more than a
10  thousand posts and shorter articles and every
11  published Law Review article I could find dealing
12  with cryptoassets and crypto-based businesses.
13          So my research for those articles included
14  gaining an understanding and appreciation of what
15  crypto was, how it had evolved, how it had affected
16  markets and participants in the market, how
17  regulators were responding, both at the state level
18  and the national level in the United States and
19  around the world, and how these crypto businesses
20  were responding.
21          That research, which was the predicate for
22  those articles, played into my being able to form an
23  opinion as to the impact -- the consequences of the
24  behavior I analyzed in this case.
25      Q.  Have you done any research into

41

1  characteristics of bitcoin buyers themselves in
2  2013?
3      A.  Yes, in the sense that I have read a lot
4  about who were the most active and the largest
5  public figures in bitcoin.  So reading a lot about
6  the influence of libertarian thought and how many of
7  the major players -- and people who spoke without
8  relying on pseudonyms in articles and other posts
9  and advertisements, and who came up repeatedly as
10  major investors or backers of bitcoin -- what they
11  had said about the environment and the community.
12          So, yes, I did research that revealed
13  patterns of behavior.  If that is what you wanted to
14  know.
15      Q.  How many of those figures -- when you say
16  the major backers who are public figures, how many
17  people is that?
18      A.  So much of what I read was talking about
19  them as a group, that I don't have a specific
20  number.  As far as identifiable people, you know, a
21  handful back then.
22          And then the information about people
23  whose real identities I don't know, but whose
24  pseudonyms were attributed with certain remarks.
25          So I don't know who Satoshi Nakamoto was,

50

1 buying despite hacks on exchanges.
2    Q.  Have you seen any articles with respect to
3 the time frame of 2013 or 2014 that bitcoin users --
4 excuse me -- bitcoin buyers acted differently than
5 purchasers of more established securities?
6    A.  Yes.
7    Q.  And what did you see on that topic?
8    A.  That they were not concerned about whether
9 or not they'd been passed on by a regulator because
10 they believe they were exempt, so they didn't look
11 at, you know, whether or not it had been rubber-
12 stamped by any government approval.
13       In fact, the very fact that it had not
14 been subject to government approval was often seen
15 as a positive, which would not be the case for a
16 conventional security.
17       The fact that everybody thought this --
18 everybody who was involved in bitcoin thought that
19 blockchain, as an idea, was so important and being
20 proven that it worked and functioned was such an
21 important thing, that they really wanted to be part
22 of that community and part of that movement.
23       So the buying of bitcoin and the desire to
24 be bitcoin participants and active, that I saw a
25 fair bit on and I haven't seen similar, oh, I've got

51

1 to buy stock because it's a thing.
2    Q.  Okay. Let's go back to paragraph 9 in your
3 report.
4       MS. BRENNAN:  Actually, do give you a
5 break?
6       We've been going a little over an hour.
7       THE WITNESS:  I'm fine if you're fine.
8       MS. BRENNAN:  I'm fine. But like I said,
9 I tend to go over and I know sometimes people get
10 tired.  Maybe for another half hour or so?
11       THE WITNESS:  That's fine with me.
12    Q.  Okay.  Let's go back to paragraph 9 and
13 the sentence that is 2, and that reads, quote, I
14 have also relied on a wide range of publicly
15 available information about bitcoin and other
16 cryptocurrencies, the crypto community, and the way
17 in which members of that community tend to interact
18 with one another and react to publicly available
19 information, the evolving development of crypto-
20 based businesses and the ways in which crypto
21 exchanges have historically and currently operated.
22 Do you see that?
23    A.  Yes.
24    Q.  Okay.  Are the all the sources of the
25 information that underlie that sentence, are those

52

1 listed either in the report or in the Exh bit B that
2 we just looked at listing the articles?
3    A.  No.  I mean, that is part of my broad-
4 based understanding and literally a thousand
5 articles on various topics that touch on that I've
6 read.  It's just that I can't identify them
7 particularly.
8       I mean, I can -- yes, I read that one,
9 yes, I read that one, no, no, no, yes, yes, that
10 kind of thing, but --
11    Q.  As you sit here today, as you sit here
12 today, is there anything that you can think of that
13 you would say, oh, I wish I meant to include this or
14 anything that you is missing from being from being
15 listed in your report somewhere?
16    A.  No, there's nothing specific.
17    Q.  The part about, you relied on a wide range
18 of public information -- and I want to focus on the
19 part that says, quote:  The crypto-community and the
20 way in which members of that community tend to
21 interact with one another and react to publicly
22 available information.  Do you see that part?
23    A.  Yes.
24    Q.  Is part of the source for that the message
25 boards that we talked about?

53

1    A.  Yes.
2    Q.  Okay.  What other sources underly that
3 sentence?
4    A.  Coin Market Cap, which shows daily trading
5 volumes and pricing.  And you can go back and take
6 historical snapshots of dates between 2013 and today
7 and figure out what happened on individual dates
8 with regard to that and other assets as well --
9 other crypto assets.
10    Q.  Okay.  Any other sources for that -- that
11 you looked at for that portion of paragraph 9?
12    A.  Well, again, the general articles that
13 talk about that.
14    Q.  And those would be the ones that are
15 listed in your report, correct?
16    A.  And the ones that just form part of my
17 background, predicate and knowledge.  L ke some of
18 the ones that would have said -- would have ta ked
19 about the sense of community and how many of them
20 were libertarians and how influential the anti-
21 government, anti-big business movement was among
22 founders.
23       And those aren't necessarily the sources
24 that I have listed here exclusively.  I mean, again,
25 there were so many thick -- I had a sabbatical that

54

1  I spent just (inaudible).  I mean, that's what I
2  did.  And some of that knowledge is relevant to a
3  lot of this.
4      Q.  Let's start with Coin Market Cap.  Is that
5  a website or a --
6      A.  Yes.
7      Q.  -- a publication.
8          A website?
9      A.  There's a website.  You can go
10  coinmarketcap.com.
11     Q.  Is that generally accepted as an
12  authoritative website for trading in crypto assets?
13     A.  No.  There are a number of different
14  exchanges that set their own prices or have prices
15  that are slightly different.  Nothing -- none of my
16  research was so concerned with, you know, the price
17  to the penny that I cared about, the minute
18  differences in trading price between this exchange
19  and that exchange.
20         So it's not like everybody goes and uses
21  Coin Market Cap.  Coin Market Cap takes information
22  from exchanges and picks the average, and that's
23  what gets sort of automatically reported on a real-
24  time basis.
25         But it's not -- it's not the trading site

55

1  itself for people who -- that's not where you go to
2  trade.  That's where you go to get historical
3  information.
4      Q.  How about in your area of research?  Do
5  researchers look at message boards as being
6  authorities on any issue?
7      A.  Authorities for what people are saying
8  about particular topics.
9      Q.  And the general --
10     A.  I was going to say, if I go to FaceBook,
11  FaceBook isn't an authoritative source on anything
12  except it's the place to go if you want to find what
13  people are saying about -- what they're talking
14  about on FaceBook.
15         So you go to message boards to see what
16  are people saying.  That is the original source for
17  where people say what they say since it's an online
18  community.
19     Q.  And then the general articles that you
20  relied upon, are those articles in peer reviewed
21  publications?
22     A.  No, almost without exception.
23         Now, there are a few of them that are peer
24  reviewed.  But even law reviews, you know, are not
25  peer reviewed for the most part.  They are student

56

1  selected and student edited and they're written by
2  academics.  They're not the scientific publications.
3          And most of the thousands of articles that
4  I read were not even law review.  They were posts by
5  folks who claimed an expertise or claimed, you know,
6  here's the definition of what this is, here's how
7  this works, here's how this problem came up, here's
8  an analysis of who Satoshi Nakamoto might really be,
9  and it's just people guessing.
10         And it's not that any one of those would
11  be authoritative.  It's when you see the same idea
12  repeated over and over that it gains weight.  It's
13  one of the things about making crypto research so
14  hard. It's very hard to figure out exactly who is
15  saying what.  And there isn't a lot of concrete,
16  reputable studies like I think you were thinking of
17  when you talk about research.
18     Q.  And then the last part in paragraph 9, to
19  the left where the second sentence says, "the
20  evolving development of crypto based businesses."
21  What do you mean by that?
22     A.  When you had bitcoin and bitcoin first hit
23  the scene, the only way in which to transact in
24  bitcoin was peer to peer.  You had to find somebody
25  who would accept the bitcoin that you wanted to

57

1  transfer.  And so the development of exchanges, and
2  the growth of exchanges, and the regulatory
3  reaction, and the increasing sophistication of
4  wallet services, and what's expected from wallet
5  services.
6          And then the advent of alt coins, which
7  actually came about before you had the exchanges.
8  The alt coins were pretty fast alternatives to
9  bitcoin.  So that I'm talking about the development
10  of new businesses based on this block-chain-based
11  crypto currency and other crypto assets, and the
12  entire development of a wider crypto-based set of
13  businesses.
14     Q.  Do you have an opinion on whether or not
15  crypto businesses are more secure today than they
16  were in 2013?
17     A.  It depends on which business you're
18  talking about.
19     Q.  What do you mean by that?
20     A.  There were very few wallet services, for
21  example, back in 2013.  There were wallets that you
22  could buy, and the wallets weren't very secure.
23         We certainly have better security for
24  wallets now.  But now there's so much more money in
25  wallets. They are a larger target for hackers.  So

106

1        What's the source for that statement?
2     A.  I don't remember.
3     Q.  What about the trade would create "the
4  appearance that Mt. Gox was stable and reliable when
5  other changes were not?"
6     A.  400,000 classic bitcoin, that's a huge
7  volume. They are proving that they still have this
8  much -- we're holding your assets. We've got it
9  safe. It's in cold storage. Look here. We can
10  prove we can move around. We control it there.
11        Nobody is -- we're not vulnerable to
12  hacks. We're not vulnerable to losing our -- the
13  bitcoin that you give us is invulnerable. It's in
14  cold storage. Nobody can access it.
15        It creates the appearance that there is so
16  much bitcoin there that this is the place to put
17  your bitcoin. It's safe and secure. We've got lots
18  to back you up.
19     Q.  Is that reported anywhere?
20     A.  You asked what my understanding -- I'm
21  sorry. I thought you asked what my understanding of
22  what that meant and why that would create the
23  appearance.
24     Q.  I did ask that. I did ask that.
25        I have a different question, which is, is

107

1  that your own hypothesis? Is that reported
2  somewhere? Where did that come from?
3     A.  That is my explanation of how it would
4  create the appearance. That's my explanation.
5     Q.  And on what basis do you make that
6  explanation?
7     A.  Common sense.
8     Q.  Paragraph 27 is "Karpeles has admitted
9  that he needed help in reassuring and 'calming' the
10  Mt. Gox and bitcoin community following the June
11  2011 Incident." This is based solely on your reading
12  of Mr. Karpeles' testimony, correct?
13     A.  I believe so, yes.
14        (Whereupon, Exhibit B was identified for
15  the record.)
16     Q.  If I could ask you to look in the stack,
17  Exhibit B, which should be Mr. Karpeles' deposition
18  transcript. And this is the source of the statement
19  in paragraph 27, correct?
20     A.  Yes. Yes, this is.
21     Q.  Okay. And this is your paraphrasing of
22  his testimony on page 145, line 5 through page 146,
23  paragraph 17, correct?
24     A.  Can you just let me check to make sure it
25  wasn't a typo? I mean, that's certainly what I

108

1  said.
2     Q.  Sure. Take your time.
3     A.  Thank you. Yes.
4     Q.  Okay. And it is actually Mr. McCaleb who
5  was talking about trying to calm people down,
6  correct?
7     A.  It is Jed who says, "Everyone calm down."
8  And then Karpeles says, "Yes, please. Any help is
9  welcome on that." So, it's both.
10        The initial statement was from Jed, but
11  the response, Yes, help, is from Karpeles.
12     Q.  Yeah, this is just your takeaway from Mr.
13  Karpeles' deposition, correct?
14     A.  Yes.
15     Q.  Then in paragraph 28 of your Declaration,
16  you write, "the need to reassess," I'm sorry, are
17  you back on it?
18     A.  Are we coming back to this? Do I need to
19  mark this particular part of the deposition?
20     Q.  Yeah, that would be Exhibit B, and I would
21  keep that one close at hand. I think the other ones
22  were probably -- if I go back to them, I'd be
23  surprised, but that's the more --
24     A.  I just need to move stuff out of the way.
25  Thank you.

109

1     Q.  Yep.
2     A.  I'm sorry, I interrupted. Please, go
3  ahead.
4     Q.  No worries.
5        Paragraph 28, you say that, "The need to
6  reassure the bitcoin community and retain its trust
7  in Mt. Gox was reinforced by what happened with
8  other bitcoin exchanges and businesses when they
9  experienced and revealed thefts or hacks resulting
10  in the loss of bitcoins," correct?
11     A.  Yes.
12     Q.  And the basis for that statement is the
13  public information about Bitomat, MyBitcoin,
14  Bitcoinica, and Bitfloor, correct?
15     A.  Yes. And then my background experience
16  and things that happened with other kinds of
17  exchanges that were not secure and not trustworthy
18  outside of crypto.
19     Q.  What exchanges are those?
20     A.  Historically, the exchanges for
21  securities.
22     Q.  And any particular incidents?
23     A.  No particular incidents, no.
24     Q.  I believe you testified that your interest
25  in cryptocurrency began in 2018, correct?

110

1     A.   Right.
2     Q.   And so, the information in paragraph 29
3  through 32 of your Declaration are based on public
4  information or public reporting about these other
5  exchanges, correct?
6     A.   Correct.
7     Q.   You didn't do any investigation into the
8  accuracy of these statements, correct?
9     A.   Other than making sure they were reported
10 in multiple sources and that it's consistent with
11 what was generally said from other publicly
12 available sources, no.
13       I didn't take just one article and say,
14 ah-ha, that's it.  But I did do an investigation,
15 just not original research into the records from
16 many of these exchanges.
17    Q.   The next section on page 9 that starts at
18 paragraph 33, has the heading "Mt. Gox's Bitcoin
19 Deficit," correct?
20    A.   Yes.
21    Q.   Is it fair to say that paragraph 33 is
22 your characterization of public statements from Mt.
23 Gox?
24    A.   Yes.
25    Q.   And that statement was issued by Mr.

111

1  Karpeles, as CEO of Mt. Gox, correct?
2     A.   It was certainly issued while he was in
3  charge of Mt. Gox.
4     Q.   Do you know who drafted that statement?
5     A.   No, I do not.
6     Q.   And then in paragraph 34, this is a quote
7  from a public statement also from Mt. Gox, correct?
8     A.   Yes.  Well, it's at Mt. Gox.
9     Q.   In paragraph 35 you note, quote, There was
10 no corresponding acknowledgment that the BTC and
11 cash balances on the Mt. Gox exchange were already
12 in a deficit position as a result of the 80,000 BTC
13 theft that had occurred March 3rd, 2011."  Do you
14 see that?
15    A.   Yes.
16    Q.   And so, what you're noting here is that
17 there's something that's not in the public domain,
18 correct?
19    A.   Yes.
20    Q.   There's no expertise in finding that
21 something didn't even exist, is there?
22    A.   Other than the ability to review what is
23 there and understand what is disclosed, no.
24    Q.   And then in paragraph 36 and 37 are your
25 paraphrasing of more deposition testimony from Mr.

112

1  Karpeles, correct?
2     A.   Yes.
3     Q.   And the same is true for paragraph 38,
4  correct?  That's just from Mr. Karpeles' deposition?
5     A.   Yes.
6     Q.   Okay.  So then the next section on page 10
7  is entitled, "Active Concealment of the Bitcoin
8  Deficits with the Gox Bot."  The first sentence is,
9  again, information that you pulled from Mr.
10 Karpeles' deposition, correct?
11    A.   Yes.
12    Q.   And then the second sentence reads, quote,
13 This would have allowed the exchange to maintain a
14 reserve of BTC without compromising the integrity of
15 user's accounts."  What do you mean by that
16 sentence?
17    A.   That the exchange is buying bitcoin but
18 it's not using any of its customers funds to do so,
19 and it's not trading with the customers.  It is just
20 sort of an automated, anybody, anywhere and we can
21 buy these, put an offer, and is buying it without
22 taking anything from the customer's accounts to do
23 so.
24    Q.   Is there anything wrong with that, in your
25 opinion?

113

1     A.   No.  Not materially wrong.
2     Q.   Why do --
3     A.   I mean, you could lie.  I don't know that
4  they did.  But you could have lied about it at the
5  time and that would have been wrong, but I don't
6  think it would have had a material impact on the
7  integrity of the exchange, so long as the bot is
8  simply automatically purchasing for the exchange,
9  not using any customer accounts, not pretending to
10 have transactions that aren't real.  That kind of
11 thing.
12    Q.   And the final sentence said that, quote,
13 At this point in time, the bot would have had an
14 account credited with actual funds generated by user
15 fees to back any purchase orders made by the Gox Bot
16 program," correct?
17    A.   Yes.
18    Q.   What does that mean?
19    A.   That in order to avail yourself the
20 benefit of trading via the Mt. Gox exchange, you had
21 to pay the exchange fee for them facilitating the
22 transaction. The fee would go into a separate Mt.
23 Gox account and Mt. Gox would use that fund --
24 through its automated trading program, its bot, to
25 buy new bitcoins.  They aren't taking money directly

118

1  correct?
2     A.  Yes.
3     Q.  Now, in that paragraph, you say that after
4  Mr. Karpeles, quote, assumed control of the bot --
5  strike that.
6        You write "According to Karpeles, the
7  purpose of the Gox Bot trade after he assumed
8  control of the bot, was to prevent the mounting BTC
9  and currency debts and deficits from destabilizing
10 the exchange," right?
11    A.  Yes.  That's what I said, yes.
12    Q.  They weren't actually missing bitcoins,
13 right?
14    A.  The exchange was missing a huge volume of
15 bitcoins at that time.
16    Q.  So in that testimony, though, Mr. Karpeles
17 wasn't testifying about an actual bitcoin deficit,
18 was he?
19    A.  Yes, I believe he was.
20    Q.  Let's take a look at that testimony.  We
21 can start on page 73.
22        In either of those portions of Mr.
23 Karpeles testimony, does he talk about a bitcoin
24 deficit?
25    A.  If you look on page 73, there is a

119

1  question on line 19, "So your idea was eventually
2  Mt. Gox would make enough in bitcoin fees to cover
3  the 80,000 Bitcoin gap"?  That's a bitcoin deficit.
4        And the response is, "Hopefully."  And
5  then he says -- well, did that happen?
6        Well, then if price increased, then it
7  would get to 800,000, then it would reach over a
8  million dollars."  And that's a deficit because of
9  the bitcoin deficit.
10    Q.  You're going above the citation in your
11 report, correct?
12    A.  Well, I didn't cite the question, I cited
13 the -- yeah, if the 80,000 Bitcoins was closed, the
14 price moved to go to 800,000, those are amounts that
15 are the deficit.  To put that in context, you do
16 have to read what was said before;
17 But he's talking about an 80,000 Bitcoin deficit
18 ballooning to 800,000.  That's a bitcoin deficit.
19    Q.  Okay.  That's your reading of his
20 testimony, right?
21    A.  Yes, that's my reading of his testimony.
22    Q.  Okay.  Back to your Declaration, you
23 state, "The Gox Bot trades also had the effect of
24 actively concealing the true state of the exchanges
25 operations from users, which allowed the exchange to

120

1  continue to operate."  What do you mean by that?
2     A.  If you hadn't had the Gox Bot making
3  trades, it would have been apparent that the
4  exchange was not as active as it was, did not have
5  its own -- the volume of its own funds, did not have
6  enough money to cover the amounts that should have
7  been deposited with it.
8        But by having trades appear to be going
9  on, it looks I ke there's enough value there that it
10 can legitimately sustain what people have put in.
11 When the bot is actually trading, really, really
12 buying stuff that's not the problem.  It is when it
13 converts to these pretend trades that make it look
14 like there really is a sizable amount of bitcoin
15 there that in reality is not there.
16        So they're pretending to sell and
17 pretending to buy, boosts the price of bitcoin,
18 boosts demand, boosts visibility and makes it look
19 like this exchange has all of the bitcoin that
20 people have contr buted to it.  And if they weren't
21 doing that, it would have been obvious that they
22 didn't have that bitcoin and there would have
23 essentially been a run on the bank.  That's what I
24 mean by that.
25    Q.  What's your basis for making that -- all

121

1  that -- those leaps of what would have happened, and
2  what would have been seen, and would have been
3  shown?
4     A.  What happened with other exchanges and
5  confirmed by Karpeles' testimony, too.  That's
6  exactly what he says he was trying to prevent.  That
7  if he had not done this, that's what would have
8  happened.
9     Q.  Did any other exchanges use a bot similar
10 to the Gox Bot?
11    A.  As a means of hiding what they were doing?
12 Not to my knowledge.
13        But the other exchanges that I know about
14 didn't successfully hide what they were doing, and
15 they went under.
16    Q.  What did the other exchanges go under for
17 that you're comparing this to?
18    A.  Thefts that then could not be covered by
19 the exchange -- that the exchange didn't have enough
20 resources left to cover what the customers thought
21 they had put into the exchange.
22    Q.  Is it your opinion that all users of the
23 Mt. Gox exchange were watching the operations that
24 they exchanged, as you describe them, the number of
25 trades, the prices, all that?

122

1    A.   No.
2    Q.   Do you know what percentage would have
3    paid attention to that?
4    A.   There's a difference between paying
5    attention to it and watching it.  And I assume that
6    when you said "watching," you meant, l ke day-to-day
7    following the trades, looking -- being a very active
8    monitor, and paying attention to it.
9         I bet most of these people -- most of them
10   were generally following, generally aware of the
11   price of bitcoin.  And if there had been a run on
12   the Mt. Gox, they would have heard about it.  Even
13   if they weren't closely following the individual
14   trades.
15   Q.   Are you aware of any articles that suggest
16   that the Willy Bot or Gox Bot had a minimal effect
17   on pricing of bitcoin?
18   A.   I think I did read a couple that suggests
19   there was not much of a correlation between the Gox
20   Bot and the overall price.  The trades didn't
21   correlate to price changes.
22   Q.   But wasn't it just your testimony that if
23   the Gox Bot hadn't existed, there would have been an
24   effect on the price that would have shown people the
25   truth of the exchange?

123

1    A.   Yes, I had problems with the articles that
2    I read, but I do think I read a couple.
3    Q.   Have you done any independent analysis of
4    the effects of the Gox Bot on pricing of bitcoin in
5    2013 or 2014?
6    A.   No.
7    Q.   Did you consider in your analysis, any of
8    the information about the price of bitcoin being
9    most heavily affected in 2013 by activity coming out
10   of China?
11   A.   I don't recall.  I honestly don't recall.
12   Q.   Okay, if we stick to paragraph 43, the
13   next sentence you write, "Karpeles acknowledged, for
14   example, that Gox Bot activity would have affected
15   the price of bitcoin on the exchange, given that it
16   would have impacted the apparent demand for (and,
17   thus, the price of) bitcoin on Mt. Gox," right?
18        And that's not quite what Mr. Karpeles
19   testified to, is it?
20   A.   I'll have to -- I don't remember.
21   Q.   He actually testified that it would have a
22   minimal impact, correct?
23   A.   I don't remember.  Do you want me to look
24   it up?
25   Q.   Yeah, if you can look at his testimony on

124

1    pages 234 and 235.
2    A.   Yes.
3    Q.   He said the impact would be minimal,
4    correct?
5    A.   Yes.
6    Q.   He didn't say anything about impact on
7    higher demand, did he?
8    A.   Not there, no.
9    Q.   Is that your editorializing?
10   A.   Yes.
11   Q.   And that's based on what?
12   A.   My understanding of what people would have
13   reacted to if they had known the truth.
14   Q.   And did you conduct research into what
15   they would have or is this just your view of general
16   market behavior?
17   A.   My view of general market behavior.
18   Q.   And then the end of that paragraph just
19   reiterates what a couple of articles analyzing Mt.
20   Gox's records concluded, correct?
21   A.   Yes.
22   Q.   And, again, you didn't do any independent
23   research on their conclusions, correct?
24   A.   Correct.
25   Q.   Paragraph 44, this is a summation of the

125

1    other exchanges going under based on hacking
2    incidents, correct?  That's the first sentence?
3    A.   The first sentence, yes.
4    Q.   And then the second sentence is your
5    characterization of Mr. Karpeles' testimony,
6    correct?
7    A.   And a quote from that testimony, yes.
8    Q.   Yes, correct.
9         MS. BRENNAN:  We've been going for about
10   another hour and a half.  Do you guys want to take a
11   quick maybe, like, a 30-minute break for lunch and
12   then wrap this up in hopefully a couple hours?
13        I think the court reporter's fingers need
14   it probably more than anybody.  So why don't we plan
15   to come back at about -- is 1:15 too quick for
16   people?  Does that give you enough time?
17        THE COURT REPORTER:  Yes, thanks.
18        MS. BRENNAN:  Okay.  Great.  We'll see you
19   all then.
20        THE COURT REPORTER:  We are off the record
21   at 12:38.
22        (Whereupon, there was a recess.)
23        THE COURT REPORTER:  We are back on the
24   record at 1:17.
25   BY MS. BRENNAN:

126

1    Q.  Professor Goforth, I think we left off on
2  page 12 of your Declaration.  And the next section
3  above paragraph 45 reads, "What Members of the Mt.
4  Gox Community would have Understood."
5      What basis do you have to opine on what
6  somebody would have understood?
7    A.  I did that with the assumption of
8  rationality.
9    Q.  Any other background or experience?
10    A.  Only in observing what people in similar
11  situations did.
12      MR. THOMASSEN:  What paragraph are we on?
13      MS. BRENNAN:  Sure.  45, on page 12.
14      MR. THOMASSEN:  Thank you.
15    Q.  So in paragraph 45, the first sentence
16  reads, "Had the community been aware that there was
17  a sizable and growing deficit in the BTC and cash
18  balances for the Mt. Gox exchange, it is virtually
19  certain that users would have abandoned Mt. Gox."
20  Do you see that?
21    A.  Yes.
22    Q.  And what basis do you believe, "it is
23  virtually certain that users would have abandoned
24  Mt. Gox?"
25    A.  It is a matter of rationality.  It's the

127

1  opinion that I have.  It's the opinion that Mark
2  Karpeles had.  It is what happened in other
3  incidents where a crypto exchange was shown to be
4  unreliable about keeping depositors' assets safe.
5    Q.  Why did you qualify that with, "it is
6  virtually certain"?
7    A.  Well, because it's always the theoretical
8  possibility that this is populated with irrational
9  people.
10    Q.  Have you ever seen or done any research
11  with respect to whether or not bitcoin investors in
12  the 2011 to 2014 timeframe -- whether or not they
13  are more or less rational than a more conventional
14  investor?
15    A.  No.
16    Q.  That was a bad question on my part.  You
17  didn't do any research into that, correct?
18    A.  I did not do any research into the
19  relative rationality of bitcoin investors in the
20  2013 2012 timeframe.
21    Q.  And you haven't seen any other studies
22  about that, correct?
23    A.  I have not seen any other studies on that
24  topic either.
25    Q.  And then the next sentences are just your

128

1  paraphrasing of some deposition testimony from Mr.
2  Karpeles, correct?
3    A.  I think I quoted it, rather than
4  paraphrased it.
5    Q.  Sure.  I mean, there's certain parts that
6  are quoted and certain parts that are not quotes,
7  correct?
8    A.  The next sentence is a quote and then the
9  following sentence says some is a quote and some is
10  not.
11    Q.  Okay.  In paragraph 46 -- and we touched
12  on this a little bit before, you write, quote, The
13  crypto-community was, especially from 2010 to 2014,
14  both fairly tight-knit and quite active on online
15  chat boards and discussion groups, correct?
16    A.  Yes.
17    Q.  What does "tight-knit" mean in this
18  context?
19    A.  That they paid attention to one another
20  and that they were responsive to information posted
21  by each other, were active in Telegram chat rooms
22  and other online forums, and in ta king about
23  bitcoin in particular.
24    Q.  Did you compare the number of people
25  buying cryptocurrency in this time period with a

129

1  number of people participating in chat rooms?
2    A.  No.
3    Q.  And then you also say that they were
4  "quite active."  Is there a standard by which you
5  determined they were quite active?
6    A.  No independent standard, no.
7    Q.  Did you compare it, for instance, to
8  online chat boards for any other type of group to
9  see if they were more or less active?
10    A.  There are not equivalent chat rooms
11  available for assets that are similar.  There aren't
12  similar chat rooms for individual commodities.
13  There aren't similar rooms for anything else to
14  compare to that.
15      The online chat -- the online community
16  that exists with regard to crypto, especially back
17  then, was virtually unique.
18    Q.  And then you write in the next sentence,
19  "Users tended to monitor information about their
20  purchases and investment in BTC closely and
21  actively, in part because of the volatility of the
22  market and in part because of the lack of
23  governmental oversight and official information,
24  coupled with the history of hacks and businesses
25  going offline."  Do you see this?

130

1    A.   Yes.
2    Q.   What's the source for that statement?
3    A.   Again, that's going to be publicly
4  available reports coupled with my impressions of the
5  way that the markets and investors and folks in
6  crypto in particular have acted in other contexts,
7  in other exchanges with other instances.
8    Q.   What do you mean by "tended to monitor
9  information about their purchase and investment in
10 BTC closely and actively?"
11   A.   Well, again, that's based on the number of
12 comments that would be posted when there was a price
13 change, when there was any exchange that was in
14 danger or a hack was announced.  The volume of
15 communication would increase very rapidly,
16 dramatically, with fo ks commenting about it
17 becoming a source of considerable speculation.
18   Q.   How many bitcoins existed in 2013?
19   A.   I don't know.
20   Q.   Do you know what the maximum number of
21 bitcoins will be?
22   A.   I'd have to look it up and make sure ---
23 there's a pre-set number and I forget what number it
24 is I forget if it's a million.  It's a round large
25 number. We haven't reached it yet.

131

1    Q.   The last sentence reads, "Based on this
2  close scrutiny of the bitcoin market and exchange
3  activities, some users even posited that Mt. Gox
4  might be insolvent following the June 2011 Incident
5  before Karpeles and others took measures to cause
6  users to believe that Mt. Gox solvent." Do you see
7  that?
8    A.   Yes.
9    Q.   Okay.  What's the basis for the statement
10 that "some users even posited that Mt. Gox might be
11 insolvent following the June 2011 incident"?
12   A.   There were public comments suggesting it.
13   Q.   And what were the measures that "Karpeles
14 and others took to cause users to believe that Mt.
15 Gox insolvent"?
16   A.   The response of removing items from cold
17 storage and then the September -- I mean, I think it
18 was September -- corrective statements explaining
19 what had happened, that that wasn't an incident that
20 would repeat.  It didn't affect individual users'
21 funds.
22   Q.   Between June of 2011 and September 2011,
23 did Mt. Gox from your research, see any efforts of
24 people who held bitcoin on the exchange to get their
25 assets back?

132

1    A.   Not that I -- I couldn't tell.
2    Q.   And in here you say, "Karpeles and others
3  took measures to cause users to believe that Mt. Gox
4  was solvent."  Who, besides Mr. Karpeles, is
5  included in that statement?
6    A.   I don't know that was based on third party
7  reporting that there were others who were associated
8  with Mt. Gox, whose job it was to confirm that, yes,
9  they moved it off from cold storage and, yes, they
10 have the bitcoin.
11   Q.   So those are other Mt. Gox employee?
12   A.   As far as I could tell from, again, the
13 third-party reports, yes.  That's my reading of
14 reports about what happened.
15   Q.   In paragraph 47 the first sentence reads,
16 "Users could, however, only communicate information
17 that was accessible to them, and they had no way of
18 knowing when trades were made with accounts that had
19 no real backing."
20       The first sentence was sort of a
21 tautology, right?  You can only say what you know.
22 Is that the point of that sentence?
23   A.   That's the point of that half of the
24 sentence, yes.
25   Q.   The first clause in that sentence?

133

1    A.   Yes.
2    Q.   And you say, "they had no way of knowing
3  where the trades were made with accounts that had no
4  real backing, such as those with the Gox Bot,"
5  correct?
6    A.   Right.
7    Q.   Then you write, "Transactions on exchanges
8  including Mt. Gox, where anonymous and legitimate
9  Mt. Gox members could not tell who their exchange
10 partner was."
11       So Mt. Gox operated in the same manner as
12 other exchanges with respect to anonymity of
13 exchange partners?
14   A.   Yes.  Well, there are some exchanges that
15 don't operate that way.  There are some that operate
16 by connecting you directly, peer to peer.  So, they
17 take a fee for introducing you to a potential
18 trading partner and then you do know who you're
19 trading with.
20       But that's not the way most exchanges have
21 operated, and that's not the way that Mt. Gox -- I
22 mean, there's nothing wrong with doing it
23 anonymously, if that's what you're asking.
24   Q.   And then you say, "This has been admitted
25 by Karpeles."  So that comes from Mr. Karpeles'

134

1  deposition, right?
2      A.   Correct.
3      Q.   Then say, "Users of the Mt. Gox exchange
4  would have understood that in general bitcoin
5  exchanges existed (and still continue to exist) to
6  facilitate the exchange of bitcoins between buyers
7  and sellers," correct?
8      A.   Yes.
9      Q.   How do you know what users of the Mt. Gox
10  exchange would have understood in this context?
11     A.   Because there is no other rational reason
12  for an exchange to exist.
13     Q.   I think you say later in your report that
14  the exchange doesn't allow for leverage or margin
15  trading, correct?
16     A.   It was not supposed to, yes.
17     Q.   I mean, there are certainly people who
18  engage in financial transactions who do it
19  understanding that the buyer may not have it yet,
20  correct?
21     A.   Do you mean on Mt. Gox?
22     Q.   No, I mean, in general.  If I'm buying
23  financial product, correct?
24     A.   You can buy on credit, too, I mean, in
25  certain kinds of transactions.  Of course, yes.  I

135

1  just meant that this exchange.
2      Q.   Why would users of the Mt. Gox exchange
3  been limited in that manner?  Why is that what they
4  would have understood?
5      A.   Because that's the only possible reason
6  for a bitcoin exchange to exist to facilitate
7  transactions between buyers and sellers.
8      Q.   Would it have been possible for somebody
9  to say they wanted to buy a bitcoin and have that
10  transaction completed later by somebody looking to
11  sell?
12     A.   Yes, you could post to your account that
13  I'm willing to sell bitcoin at this price and wait
14  until -- and unless somebody is willing to pay that
15  price, your proposed transaction would not be
16  matched.  But the purpose --
17     Q.   Do you think that -- sorry.
18     A.   -- between the buyer and the seller.
19     Q.   Do you think that users of the exchange
20  who were looking to buy or sell would have cared if
21  the counterparty was somebody at Mt Gox?
22     A.   I don't think so.
23     Q.   And then the last sentence says, "Users
24  would have understood that the exchange was supposed
25  to operate in accordance with certain basic

136

1  principles that essentially amount to good faith and
2  fair dealing," right?
3      A.   Yes.
4      Q.   Now, "good faith and fair dealing" is a
5  legal concept, correct?
6      A.   It is a legally phrase and a legal concept
7  used to descr be what is expected of ordinary
8  businesspeople.  It's not just a legal concept.
9  Although it is a legal concept.
10     Q.   What's the difference between the legal
11  concept and applying it in the business of ordinary
12  businesspeople?
13     A.   Hopefully none.
14     Q.   Well, what principles here do you believe
15  did not amount to good faith and fair dealing?
16     A.   That, in fact, some of the transactions
17  that were reported as existing weren't actual
18  transactions.  They were there to create the
19  appearance of high volume and a higher reservoir of
20  bitcoin in Mt. Gox that did not really exist.
21     Q.   And then you write, "In early 2012,
22  Karpeles created Terms of Use for the Mt. Gox
23  exchange, and the original English version was in
24  place for all English users during the entire life
25  of the exchange."  You see that, right?

137

1      A.   Yes.
2      Q.   And you mean that it was in place from
3  early 2012 through the end of the exchange, correct?
4      A.   From when it was created to the end of the
5  exchange, yes.
6      Q.   All right.  And that's from Mr. Karpeles'
7  deposition, correct?
8      A.   That's correct. That's the only source for
9  that information.
10     Q.   And the next sentence is simply you
11  reading the Terms of Use, correct?
12     A.   Yes.
13     Q.   Then the same is true for paragraph 50,
14  correct?
15     A.   Yes.
16     Q.   Why did the Terms of Use factor into your
17  analysis?
18     A.   Because it further confirms what I already
19  had come to conclude. It's a confirmation of
20  ordinary practice and expected practice and what's
21  customary.
22     Q.   Does your analysis change if the Terms of
23  Use are in place or not?
24     A.   The extent of the misstatements and the
25  pattern of misstatements is clearly different if

138

1  don't have the Terms of Use.  I'm not sure that
2  ordinary business -- I don't think that there would
3  have necessarily been a common understanding that
4  Mt. Gox was not trading for itself.  I'm not sure
5  that would have entered the contemplation of
6  everybody who's a participant on the exchange.
7        But by making that an express statement,
8  you bring that to the attention of folks.  People
9  who know that now think that's accurate as well,
10  further bolstering the idea that trades that are
11  taking place are legitimate third-party trades.
12        I don't think my conclusion changes.  The
13  analysis is a little different.
14     Q.  Do you believe that everybody who signed
15  up to use the Mt. Gox exchange after January of 2012
16  read all of the Terms of Use?
17     A.  Absolutely not.
18     Q.  Do you think that all of the people who
19  signed up for the Mt. Gox exchange would have cared
20  about this provision in the Terms of Use when they
21  started trading?
22     A.  No.
23     Q.  Have you looked at or done any studies,
24  between January 2012 and 2014, of what the primary
25  concerns of purchasing bitcoins were?

139

1     A.  No.
2     Q.  Do you believe that purchasers of bitcoins
3  on any exchange, from 2012 to 2014, had the same
4  level of understanding of what it meant to purchase
5  a bitcoin?
6     A.  The same as what?  I'm sorry.  I don't
7  understand.
8     Q.  Sure. The same as each other.
9        There are certain people who have bought
10  bitcoins on exchanges who are more technologically
11  sophisticated in understanding the blockchain than
12  others, correct?
13     A.  Absolutely.
14     Q.  And there are certain people who just
15  heard about bitcoins in the media, wanted to get in
16  on it and just would buy bitcoins no matter what,
17  correct.  Do you agree with that or no?
18     A.  No, I don't think that there are people
19  who would buy bitcoin no matter what.
20     Q.  Okay.  But there are people who had
21  different concerns than others, correct?
22     A.  Yes.
23     Q.  There's certainly people who are more
24  sophisticated under the blockchain who might have a
25  bigger -- who might have more concerns about how the

140

1  exchange itself actually operates as a technical
2  matter, correct?
3     A.  As a technical matter, absolutely.
4     Q.  And some might choose their exchange based
5  on the ease of purchase, for instance, correct?
6     A.  Primarily on that, yes.
7     Q.  And Mt. Gox, one of the reasons why people
8  went to Mt. Gox was because it was sort of the big
9  name in the fields, correct?
10     A.  Yes.
11     Q.  And those people, would you agree with me,
12  would not have been worried about whether or not the
13  Mt. Gox Bot was -- excuse me -- the Gox Bot
14  purchasing -- was engaging in trades or not,
15  correct?
16     A.  They would not have been worried about the
17  existence of the of the bot, per se.  If they had
18  known that the bot was creating the impression that
19  the exchange had more bitcoin than it really did,
20  and that the demand was more continuous, so they'd
21  be able to get it out whenever they wanted was not
22  true, that would have mattered to rational
23  investors.  The bot by itself --
24     Q.  Did you do any research or conduct any
25  studies about how actual Mt. Gox users reacted when

141

1  there were reports in 2013 of users facing
2  significant delays in withdrawing their bitcoins?
3     A.  I read through the -- I mean, this is all
4  after the fact.  But I read through several of the
5  chat board posts describing what individual people
6  had said they had done and said they were trying to
7  do.  I don't know if that's what you mean by
8  conducted research.
9     Q.  Well, I mean, do you have any idea what
10  percentage of people who had their bitcoin held on
11  the Mt. Gox exchange sought to withdraw it after
12  reports of delays in withdrawals?
13     A.  No, I don't.
14     Q.  Do you know if people continued to
15  purchase bitcoins through the Mt. Gox exchange, even
16  after reports of having trouble withdrawing the
17  bitcoins?
18     A.  The major reports were coming from America
19  and withdrawal in American dollars.  I don't know
20  what was reported in other countries and what was
21  available in other languages, so I don't know when
22  that information became available in those
23  communities. So, I don't know.
24        Certainly, the reports suggest that the
25  number of purchasers here in America declined.  But

154

1 about them is in the language of that country. And
2 I don't -- I don't know.
3    Q. Do you know how many exchanges existed
4 during the life of Mt. Gox that an American who only
5 speaks English would be likely to have used during
6 that same timeframe as an alternative to Mt. Gox?
7    A. Oh, there were probably six or seven of
8 them.
9    Q. Okay. Can you name them?
10    A. Well, Bitomat, MyBitcoin, Bitcoinica --
11 let's see. Bitfloor -- those are the first ones
12 that were out there.
13       And then by the end, I mean, there were
14 actually a couple who were even bigger than Mt. Gox,
15 but I'm not sure of which ones they were.
16    Q. Are you aware of any statements by Mt. Gox
17 whereby Mt. Gox or Karpeles himself said that the
18 Mt. Gox exchange would be completely secure?
19    A. Oh, no.
20    Q. Are you aware of any exchange ever making
21 a statement like that about their own exchange?
22    A. I think Quadriga CX made that claim. I
23 mean, that's the one that the guy died in India and
24 it was so secure only he had access to it and now
25 nobody can get it.

155

1       So I think they did make that claim. It
2 wasn't true, but I think they did make that claim.
3    Q. If you look at paragraph 55 of your report
4 where you write, "The pattern of misrepresentations,
5 non-disclosure and concealment was undoubtedly
6 specifically geared at ensuring that the Mt. Gox
7 community of users continued to utilize the
8 exchange. Karpeles acknowledged this directly."
9       This is your conclusion about Mr.
10 Karpeles' intent, correct?
11    A. My last statement, Karpeles
12 acknowledgement, that is my conclusion about what
13 his statement meant, yes.
14    Q. And you're solely relying on his
15 deposition testimony, correct?
16    A. For that statement, yes. That is --
17    Q. Did you consider the -- I'm sorry.
18    A. That is where I saw the -- what I count as
19 an acknowledgment, yes.
20    Q. Okay. Did you consider the remainder of
21 Mr. Karpeles' testimony where he testified that the
22 disclosure would actually hurt the users of the
23 exchange?
24       And if you want to look at Exhibit B, it's
25 page 68, lines 6 through 24.

156

1    A. Hurt the users by closing it down because
2 people would pull out. Which is consistent with
3 what I said. I said that users would continue to
4 utilize the exchange.
5       There are reasons for wanting them to
6 continue to utilize it that weren't all bad, but
7 that is the function that he was talking about, as
8 far as I can remember.
9    Q. Okay. So then we're down to, I think,
10 close to the last section of your report, which is,
11 I think it is the last section, on the closure of
12 Mt. Gox, starting on page 16, paragraph 56.
13       Paragraphs 56 through 62 are just your
14 summaries of reports and other public information
15 from the Internet, correct?
16       And I know that's a lot, so take your
17 time.
18       MR. THOMASSEN: What paragraph to and
19 from?
20       MS. BRENNAN: Fifty-six through sixty-two.
21    A. So, yes. That is based just on my
22 analysis of public reports about what happened.
23 That's what you asked, right?
24    Q. It is. It is. I was trying to short
25 circuit it a little bit as opposed to going

157

1 paragraph by paragraph.
2       But yeah, my belief -- and, again, correct
3 me if I'm wrong, is this is your summary of the
4 closure of Mt. Gox from information that is publicly
5 available primarily on the Internet, correct.
6    A. Yes.
7    Q. And then paragraph 62 is the Crisis
8 Strategy Draft that was uploaded in February of
9 2014. That is a draft for Mt. Gox, correct?
10    A. It is purporting to be for Mt. Gox, yes.
11    Q. In that document you said that "claimed
12 that the company had lost 744,408 bitcoins in a
13 pattern of theft that had been undiscovered for
14 years, right?
15    A. Yes.
16    Q. Do you have any opinion on when Mt. Gox
17 discovered when those bitcoins had been lost -- or,
18 excuse me -- theft had been -- had occurred and when
19 Mt. Gox discovered that?
20    A. Yes.
21    Q. Okay. What's your opinion on when those
22 thefts occurred and when it was discovered?
23    A. My opinion is that Mark Karpeles told the
24 truth and that it goes back to prior to his
25 acquisition of the exchange beginning back in 2011,

158

1  I think he said prior to April or about April.  And
2  then additional thefts since then over a continuing
3  pattern.
4         And that's based on Mark Karpeles'
5  statements. So that's what my opinion is.  I cannot
6  see of a reason why he would have lied about that,
7  so I believe him.
8     Q.  Do you know, at its height, how many
9  bitcoins were held on the Mt. Gox exchange?
10    A.  No.
11    Q.  And then the last paragraph of your report
12 -- excuse me -- the second to last paragraph before
13 you attest to your report, paragraph 63, the first
14 sentence is "No rational investor would have
15 knowingly chosen to put or keep bitcoin or currency
16 on an exchange with a bitcoin or cash deficit."  How
17 do you know that?
18    A.  There's a word missing from that.  It
19 should have been "with such a bitcoin or cash
20 deficit." Obviously, if there's a dollar missing,
21 that's not what I was talking about.
22         But no rational investor would have
23 knowingly chosen to do that.  And that's based on my
24 understanding of how markets and investors behave,
25 and the pattern that is demonstrated in other

159

1  exchanges and confirmed by Karpeles' testimony about
2  what his motivations were and why he didn't disclose
3  these events.
4     Q.  Now, the "rational investor" standard
5  comes from standard corporate transactions, correct?
6     A.  And business practice and -- you know,
7  it's just an ordinarily prudent -- just a rational
8  person, yeah.  It doesn't just come from corporate
9  transactions, but it's there, too.
10    Q.  Sure.  Right.  And by that I meant that's
11 not specific to bitcoin exchanges, correct, that
12 standard?
13    A.  Correct.
14    Q.  If I could ask you, I know I told you I
15 wasn't gonna do this, but I am.  If I could ask you
16 to dig out Exhibit D from the pile of data, which is
17 the Wired article of the Rise and Fall of the
18 World's Largest Bitcoin Exchange.
19    A.  That was the "D" as in dog.
20    Q.  It is.
21    A.  Sorry, it took me a moment, but I have it.
22    Q.  No worries. Okay.
23         In the last paragraph, on the third to
24 last page, the first sentence reads, quote, "Despite
25 its woes, Mt. Gox is still pulling in new customers.

160

1  According to Ver, this is because of its reputation
2  as the world's biggest bitcoin exchange."  Do you
3  see that?
4     A.  Biggest and the best, yes.
5     Q.  Do you disagree with that statement?
6     A.  No.
7     Q.  And do you think that there's a
8  significant number of users of the Mt. Gox exchange
9  who didn't care about any of Mt. Gox's difficulties,
10 no matter what was disclosed?
11    A.  Well, they thought it was the best.  They
12 didn't know what was going on.  They thought it was
13 the biggest and the best, so that's where they're
14 going to put their money.
15    Q.  So even when they knew about certain
16 problems, they still invested on the -- via Mt. Gox,
17 correct?
18    A.  Even when there was publicly available
19 information about a variety of the problems, they
20 put their money there or their crypto there.
21    Q.  I'm sorry, could you read that answer back
22 for me please.
23    A.  Even though there was pub --
24         MS. BRENNAN:  I'm asking the court
25 reporter.

161

1         I'm sorry.
2         THE COURT REPORTER:  Sure.
3         (Whereupon, the answer was published by
4  the reporter.)
5         MS. BRENNAN:  Great. Thank you.
6     Q.  And, in fact, not all investors are
7  rational, correct?
8     A.  That is correct.
9     Q.  Okay.  And the issues that should concern
10 rational investors are likely to have little to do
11 with how the company has functioned to date,
12 correct?
13         MR. THOMASSEN:  Sorry.  Can you ask that
14 again? I don't want to --
15         MS. BRENNAN:  Sure, sure.
16    Q.  Issues that should concern rational
17 investors in the crypto world are likely to have
18 little to do with how well the company has
19 functioned to date, right.
20    A.  I'm talking there about the issuer, the
21 company, the issuer.  Not a company, the exchange.
22    Q.  Okay.  And somebody investing in crypto
23 assets will have different concerns and questions
24 than someone buying a traditional debt or equity
25 security from the company, right?

162

1    A.   Right.
2    Q.   And the degree to which individual
3    investors tolerate risk will also vary widely,
4    right?
5    A.   Yes.
6    Q.   And then in paragraph 63, if we go back to
7    the second to last paragraph, the second sentence
8    reads, "Accordingly, if there had been a disclosure
9    of the fact that there was a bitcoin deficit after
10   the 80,000 BTC theft in March 2011, that was never
11   recovered, users would have demanded a return of
12   their assets long before 2014 and the massive losses
13   that eventually accrued would not have happened."
14   You see that, right?
15   A.   Yes.
16   Q.   Okay.  But there is no demand for return
17   of assets after the June 2011 Incident, correct?
18   A.   Correct.
19   Q.   And you have no opinion on whether there
20   was a regulation that obligated Mt. Gox to disclose
21   the deficit in March of 2011, right?
22   A.   There were regulations that required it at
23   that time.
24   Q.   What regulations are those?
25   A.   The federal securities laws.  At that

163

1    time, bitcoin was not widely dispersed enough to
2    have met the current test for not being a security,
3    and  I think it would have been under Rule 10b-5.
4    Q.   You didn't reference Rule 10b-5 in your
5    Declaration, did you?
6    A.   I wasn't opining as to anything regarding
7    application or potential application of the federal
8    securities laws.  That was not the basis for my
9    opinion.
10   Q.   So you don't have an opinion on whether or
11   not the federal securities laws require disclosure
12   of any of the issues we've discussed, right.
13   A.   I do have an opinion, but it's not --
14   Q.   As a professional opinion that you're
15   going to testify to in this case, correct?
16   A.   I do not.
17   Q.   Do you think an average person could
18   decide whether or not the disclosure of the bitcoin
19   deficit would have been important to somebody?
20   A.   Could an average investor determine if it
21   would have been important?  They could certainly
22   make a determination.  They can certainly have an
23   opinion about that.
24   Q.   What is it about your research or
25   education or knowledge that allows you to say what

164

1    somebody would have thought was important, more than
2    an average person?
3    A.   Not only the background in how securities
4    and capital markets function and how investors
5    function and how regulators handle this over time
6    with the securities context, but the examination of
7    so much material about what has happened with the
8    changing nature of crypto, the changing nature of
9    crypto businesses, the patterns of behavior and
10   business failures with regard to crypto exchanges in
11   particular.
12       That background information is not
13   accessible to the average person.  They don't have
14   the time to read as much information and to sit and
15   think about it as I have had.  That's the blessing
16   of being a law professor.
17   Q.   Well, some of the people who bought
18   bitcoin in 2012 through 2014 aren't academics in
19   cryptocurrency, correct?
20   A.   I would suspect very few academics in
21   crypto were buying back in 2012.
22   Q.   These are people who looked at bitcoin,
23   and for whatever reason decided that they wanted to
24   make an investment into it, just as anybody off the
25   street could buy bitcoin, correct?

165

1    A.   Correct.
2    Q.   And what was important to them was
3    specific to each person, correct?
4    A.   All of the things that were important to
5    them, yes, would have been individually determined.
6    Q.   And an average person who was buying into
7    bitcoin would decide for themselves whether or not
8    certain information was important, correct?
9    A.   Yes.
10   Q.   And, for instance, the disclosure of the
11   fact that there was a deficit could affect a
12   hypothetical buyer's decision solely based on what
13   they know about bitcoin, correct?  Not about what
14   they know about the markets and securities, right?
15   A.   Yes.
16   Q.   They would make that decision in their own
17   determination, correct?
18   A.   Presumably, yes.
19   Q.   In paragraph 63, you write, about halfway
20   through, "Likewise, if Mt. Gox's bitcoin deficit had
21   been publicly disclosed in or around March of 2011,
22   it is my opinion that the exchange would have failed
23   or at the least would not have attracted additional
24   investors in 2011 or the years that followed unless
25   and until the deficits were eliminated and the

166

1  problems that caused the shortfalls are resolved."
2  Do you see that?
3     A.  Yes.
4     Q.  So do you believe that the reason that Mt.
5  Gox failed was because of the bitcoin deficit in
6  March of 2011?
7     A.  No.
8     Q.  Why do you believe that Mt. Gox failed?
9     A.  Because they had a pattern of thefts that
10 took place, and poor security, and poor internal
11 protocols, and kept trying to -- I mean, they spent
12 more time covering things up than fixing things.
13    Q.  But you don't know what percentage that
14 80,000 BTC theft was of the total number of bitcoins
15 that Mt. Gox actually had, right?
16    A.  Correct.  I don't even know if -- I don't
17 know who knows the actual number of bitcoins that
18 Mt. Gox actually had.  I don't know if Karpeles
19 knows.
20    Q.  And then finally, in the last sentence you
21 write "Either way, the losses realized in 2014 would
22 have been avoided."  And is that just because the
23 exchange would have failed earlier -- a closed
24 exchange can't have any more losses?
25    A.  Yes.

167

1     Q.  Okay.  Is there anything else behind that
2  statement?
3     A.  Well, if they had remedied it earlier,
4  then the continued exchange wouldn't have had the
5  losses either.  If they had remedied the problem, if
6  they had really fixed the problem, so that the
7  thefts didn't continue to occur and they had
8  recouped the original loss, that would have worked,
9  too, but that didn't happen.
10    Q.  How would an exchange go about recouping
11 the original loss.
12    A.  Well, what Karpeles tried to do was keep
13 the exchange open long enough to earn enough fees to
14 replace the lost funds.  But the price of bitcoin,
15 ironically, went up too fast for him to be able to
16 do that.
17    Q.  Have you considered at all anything about
18 Mr. Karpeles' trial in Japan in your report?
19    A.  I'm afraid I did not.  I didn't have
20 access to a reliable translation of most of those
21 documents.
22       I read about the results, so I'm sure
23 that's in the back of my mind.  I read about what
24 happened, but that's not something I relied on,
25 specifically.

168

1     Q.  Have you followed at all the civil
2  rehabilitation of Mt. Gox that's occurring in Japan.
3     A.  Yes, to some extent.
4     Q.  Okay.  Have you read anywhere that there's
5  a possibility that people who had bitcoins in the
6  amount that they believed on the exchange may get paid
7  back more than what they initially invested or would
8  have been paid had they withdrew them prior to
9  February 2014?
10    A.  No.  They wouldn't have -- they wouldn't
11 be getting back more than what they would have
12 gotten if they had drawn them at 2014 because the
13 claims were frozen.
14       Before it became a rehabilitation, it was
15 in bankruptcy.  And the bankruptcy trustee froze
16 their claims, so their claims are -- they will get
17 back today what they would have gotten back in 2014,
18 although the price of bitcoin since that time has
19 gone up dramatically, which is why there is excess
20 funds in the account.
21       You won't be getting back the bitcoin you
22 had.  You'd be getting back a dollar amount today
23 based on the price that you would have gotten back
24 then.
25    Q.  Okay.  That's your understanding of what

169

1  may happen in the rehabilitation.
2     A.  Well, depending on the outcome of the
3  CoinLab lawsuit, which is dragging things on, yes.
4  And there may be further adjustments to the payouts
5  based on that as well.  I don't know.  I have not
6  followed that enough.
7        Where I really quit paying too much
8  attention is where it converted from bankruptcy into
9  the civil rehabilitation.
10    Q.  Would it affect your opinion at all if
11 your understanding is not correct in that people
12 would get paid out more than the value of fiat
13 currency on the day that the exchange closed?
14    A.  For interest payments?
15    Q.  And just in general.  If they were going
16 to make more money via civil rehabilitation, would
17 that -- does that have any effect on your opinion?
18    A.  On which part of my opinion?
19    Q.  On whether or not, you know -- on any part
20 of your opinion.  Does that affect your statements
21 at all.
22    A.  If you told me that the civil
23 rehabilitation was going to give people the bitcoin
24 at the highest price, they're going to get paid that
25 much money through the civil rehabilitation, yeah,

170

1  that would change my opinion as to whether or not
2  anybody has suffered damages.
3       It still wouldn't change my opinion as to
4  whether or not it would have been rational to keep
5  your bitcoin there while there was the huge deficit.
6       Q.  Okay.  And I think, we're almost done.  I
7  guess my last of the questions are what did you do
8  to prepare for your deposition today?
9       A.  I scheduled the time and blocked it off.
10  I re-read the articles that I had written, that told
11  you I had written.  I had a one-hour phone call with
12  Ben Thomassen.
13       I reviewed my Declaration.  I went back
14  through my book to see what I had said,
15  particularly, about Karpeles and Mt. Gox in it.  And
16  I think that's it.
17       Oh, I looked over my -- what I had said,
18  the information in my CV.
19       MS. BRENNAN:  Okay.  That's all I have.
20  Thank you very much for your time.
21       MR. THOMASSEN:  Could I just do a few
22  follow-up questions for you, if you don't mind,
23  Professor Goforth?  A few things that I just wanted
24  to clear up.
25  EXAMINATION

171

1  BY MR. THOMASSEN:
2       Q.  One thing you talked about with counsel
3  today was -- this was -- I think it was when we were
4  talking about paragraph 48 of your report.  I don't
5  know that it's important for you to look at it, but
6  that's around the time that I have that it happened.
7       So paragraph 48, I'll just -- I'll read
8  the first sentence of it.  It says "Users of the Mt.
9  Gox exchange would have understood that in general
10  bitcoin exchanges existed (and still continue to
11  exist) to facilitate the exchange of bitcoins
12  between buyers and sellers."
13       Do you see where I read that from?
14       A.  Yes.
15       Q.  And then you go on from there to make more
16  general conclusions about what users of the exchange
17  would have understood?
18       A.  Yes.
19       Q.  And when you were talking about these
20  expectations with Ms. Brennan today, you used the
21  term "ordinary business people."  Do you remember
22  using that term?
23       A.  No, but I easily could have.
24       Q.  Okay.  So you talked about what would have
25  been expected by "ordinary business people."  But I

172

1  don't think you ever got the chance to say what you
2  meant by "ordinary business people" in the context
3  of expectations in paragraph 48.
4       A.  Just ordinary folks who were participating
5  in this business in any way, either as running it or
6  as customers or as people looking at is this the
7  place where I want to park my coin?  Just ordinary
8  folks looking at this business.
9       Q.  Oh, okay.  Yeah, when I think of the term
10  "business people," I think of someone running a
11  business, but that's not what you meant by that
12  term?
13       A.  In this context, I'm sorry.  That is not
14  what I meant.
15       Q.  I didn't think so, but I wanted to make
16  sure that I was understanding you right.
17       And then the last thing, I wanted to give
18  you a chance to talk about was, you were talking
19  with counsel about how when this or that investor
20  was deciding to buy bitcoin or invest on the Mt. Gox
21  exchange, this or that piece of information may or
22  may not have mattered to their decision to invest.
23  Do you generally remember talking about that?
24       A.  Yes.
25       Q.  How do you reconcile that discussion with

173

1  your conclusion at the top of paragraph 63, that no
2  rational investor would have knowingly chosen to put
3  or keep bitcoin or currency on an exchange with such
4  a bitcoin or cash deficit?
5       A.  I can have a lot of different things on my
6  mind when I make a decision of where to put my
7  valuables or what to invest in, where to put my
8  money.
9       I can be interested in what's the risk?
10  What's the potential rate of return?  The ease of
11  use?  Is it trendy?  Is it environmentally
12  sustainable?  I can have, you know, dozens of unique
13  interests.
14       But at the point where you start having a
15  decision, do I invest?  Do I put my money -- do I
16  leave my money or leave my assets someplace where I
17  now have reason to know it's not safe, it's not
18  going to be there, I'm not getting it back, and it's
19  not a friend, it's not a family member, it's not
20  something that I'm doing for a public good.  I'm
21  investing for one of my 85 different reasons.  If I
22  know it's not safe there, it's not rational for me
23  to keep it there, despite the fact that I have all
24  kinds of unique things that might influence my
25  decision to invest in bitcoin to begin with.

174

1          Investing in bitcoin is not the same thing
2 as putting it on and leaving it on a particular
3 exchange.
4      Q.  I understand.  Thanks for that.
5          And when you were ta king with counsel,
6 you said something to the effect of you reached that
7 conclusion based primarily on your understanding of
8 how markets and exchanges operate.  Do you recall
9 generally saying that?  I'm sure I didn't get you
10 word for word?
11     A.  Generally, yes.
12     Q.  Right.  When you talked about that, you're
13 referring there to your -- you referenced, several
14 times today, your 30 years of experience in the area
15 and your several years experience in the bitcoin
16 sector or cryptocurrency sector.  That's what you're
17 referring to there, right.
18     A.  Right. The commodities exchanges,
19 securities exchanges, and crypto exchanges.
20     Q.  Right.  And then today, when you talked
21 about, for example, the articles that you discussed
22 today about the four or so bitcoin exchanges that
23 failed or Mark Karpeles' discussions about what
24 customers would or would not have done had they
25 known certain information, would you say that was

175

1 the basis of your opinion or that was confirmation
2 that your opinion was correct?
3      A.  That was part of the basis -- the failure
4 of the other exchanges is part of the basis of my
5 opinion. Yes, crypto works just the same way.
6 There's not something weird about this that I'm
7 completely missing. So, yes, that is part of the
8 basis of my opinion.
9          Karpeles' testimony, for the most part,
10 was confirmation rather than the basis.  His very
11 candid acknowledgment, yeah, I know, if I tell
12 people they'll pull their money, the exchange will
13 fail, and then people will come after me, and that
14 doesn't serve anybody well.  So, I mean, very
15 candid, and that was confirmation rather than the
16 basis for my opinions.
17     Q.  I got it.
18          And then last, you talked to counsel a
19 little bit about the Mt. Gox bankruptcy and civil
20 rehabilitation procedures in Japan, right?
21     A.  Right.
22     Q.  I assume -- I mean, I wish I would have
23 known if the answer is otherwise.  But I assume you
24 are not an expert in Japanese bankruptcy or Civil
25 Rehabilitation Law, right?

176

1      A.  No, not at all.  Nor do I speak Japanese.
2      Q.  Right.  I mean, I feel like I'm constantly
3 playing catch up with what's going on over there.
4          And you weren't offering any opinion in
5 this case, as to those procedures, the recoveries
6 that people might get as a result of those
7 procedures?
8      A.  Nope.
9      Q.  Or anything in that regard?
10     A.  No.
11         MR. THOMASSEN:  Yeah.  Okay.  I think you
12 clarified the rest during your testimony with
13 counsel.
14         So those were the only points I have
15 wanted to revisit.  And if you have anything more,
16 Bevin,
17 I'll turn it back to you.
18         MS. BRENNAN:  Sure.
19 FURTHER EXAMINATION
20 BY MS. BRENNAN:
21     Q.  You talked about Mr. Karpeles' deposition
22 testimony being solely confirmation, correct?
23     A.  Yeah.
24     Q.  All right.  You have no information about
25 Mr. Karpeles' conduct, factual -- any fact other

177

1 than the complaint and his deposition transcript,
2 other than stuff you read on the Internet, correct?
3      A.  Right.
4      Q.  So to have any understanding of what is
5 even at issue, you went to Mr. Karpeles' deposition,
6 correct?
7      A.  To know for sure what happened, to know
8 when -- when things happened, the factual predicate,
9 I relied on the behavior that he admitted to
10 confirmed my opinion.
11     Q.  Say, for instance, there's nothing in the
12 complaint about the Gox Bot, is there?
13     A.  I didn't read the complaint all that
14 carefully.  I didn't rely on -- I mean, complaints
15 are just one party's story.  So I didn't rely on the
16 allegations in the complaint as being true.  I did
17 rely on what Mark Karpeles reported as the facts of
18 what had happened as true.  So I guess, to some
19 extent, the facts that he sets out, as opposed to
20 his opinions, his motivation, you know, the facts, I
21 guess I did rely on.
22     Q.  Because outside of -- if you didn't rely
23 on the complaint and outside of his deposition
24 testimony, the only other indication you have about
25 Mr. Karpeles' conduct that you are supposedly

178

1  analyzing would just come from Internet articles,
2  right?
3      A.   Right.
4          MS. BRENNAN:  That's it.  Thanks.
5          MR. THOMASSEN:  I'm glad you made that
6  distinction.  I know it's a daily dodger, but I was
7  this opinion which you clarified you were as well,
8  so I appreciate that.  I apologize for interjecting
9  confusion.
10         MS. BRENNAN:  Okay.
11         THE WITNESS:  Can I reserve signature?
12         MR. THOMASSEN:  Yeah.  We'll reserve
13  signature on this.
14         THE COURT REPORTER:  Okay.  Excellent.
15         And let's see if Ms. B, would you like to
16  order the original at this time?
17         MS. BRENNAN:  Yes.
18         THE COURT REPORTER:  Okay.
19         MS. BRENNAN:  And just -- what's your
20  normal turnaround time?
21         THE COURT REPORTER:  Standard is 10
22  business days.
23         MS. BRENNAN:  That'd be great.  That's
24  fine.
25         THE COURT REPORTER:  Okay.

179

1          MS. BRENNAN:  And if I can get a regular
2  and mini?
3          THE COURT REPORTER:  Regular and -- of
4  course.
5          MS. BRENNAN:  Thank you.
6          THE COURT REPORTER:  All right.  Mr.
7  Thomas, did you want a copy, sir?
8          MR. THOMASSEN:  Yes, of course.
9          THE COURT REPORTER:  Okay.  Excellent.
10         MR. THOMASSEN:  And I don't know what your
11  practices are, but we don't -- electronic is fine
12  with us.  We don't need paper copies of anything?
13         THE COURT REPORTER:  Okay.  Etran --
14         MS. BRENNAN:  Yeah.  Same with us.
15         And I think the -- because my assistant
16  sent that the service the exhibits, it's not
17  everything we sent to you guys, but you should be
18  able to if you could attach the exhibits to the
19  electronic copy, just matching up the letters, it
20  should work out, even though they're not sequential.
21  They should have a cover sheet on them that you can
22  match up pretty quickly?
23         THE COURT REPORTER:  Yes, they do.  That
24  was actually the other question I had, counsel.
25         So we only -- because I do know you sent

180

1  us an A through --
2          MS. BRENNAN:  Right.  We sent a lot more
3  than I -- yeah, a lot more than we used.
4          THE COURT REPORTER:  Got it.  We just want
5  to put in the ones we used.
6          MS. BRENNAN:  Correct.
7          THE COURT REPORTER:  Okay.  Not a problem.
8          Off the record at 2:33 p.m.

181

1              CERTIFICATE
2
3      I, Cheyne Lee do hereby certify that I reported all
4  proceedings adduced in the foregoing matter and that the
5  foregoing transcript pages constitutes a full, true,
6  and accurate record of said proceedings to the best of
7  my ability.
8
9      I further certify that I am neither related to
10  counsel or any part to the proceedings nor have any
11  interest in the outcome of the proceedings.
12
13      IN WITNESS HEREOF, I have hereunto set my hand this
14  21st day of July, 2020.
15
16
17
18
19
20  /S/  Cheyne Lee
21
22
23
24
25