# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GREGORY GREENE, individually and on
behalf of all others similarly situated,

                *Plaintiffs*,

v.

MARK KARPELES, an individual

                *Defendant*.

Case No. 1:14-cv-01437

Hon. Gary Feinerman

## REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

I.      GREENE IS AN APPROPRIATE REPRESENTATIVE OF THE PROPOSED
CLASS ................................................................................................................3

      A.      The timing of Mt. Gox's Terms of Use does not render Greene's claims
atypical from other class members' claims ........................................................4

      B.      Greene has no credibility issues .........................................................6

II.     GREENE'S PROPOSAL SATISFIES BOTH COMMONALITY AND
PREDOMINANCE ................................................................................................8

      A.      There is no rule precluding class certification in fraud cases ...........................8

      B.      Karpeles's common conduct supports class treatment here .............................9

      C.      The issue of reliance is subject to common proof ...........................................15

            1.      *Inferences—not assumptions—of reliance are permitted* .........................15

            2.      *The evidence supports an inference of reliance, with or without Professor
Goforth's testimony* .................................................................16

III.    KARPELES FAILS TO REBUT GREENE'S SHOWING THAT A CLASS
ACTION IS SUPERIOR ....................................................................................21

CONCLUSION ..............................................................................................................23

# TABLE OF AUTHORITIES

**U.S. Supreme Court Cases:**

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ...................................................................................... 12

**U.S. Court of Appeals Cases**

*Beaton v. SpeedyPC Software*,
    907 F.3d 1018 (7th Cir. 2018) .................................................................. 8, 13

*CE Design Ltd. v. King Architectural Metals, Inc.*,
    637 F.3d 721 (7th Cir. 2011) .......................................................................... 7

*CGC Holdings v. Broad & Cassel*,
    773 F.3d 1076 (10th Cir. 2014) .................................................................... 16

*In re U.S. Foodservice, Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ........................................................................ 12

*Lawson v. Trowbridge*,
    153 F.3d 368, 376 (7th Cir. 1998) ............................................................... 17

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002) ........................................................................ 8

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) ....................................................................... 13

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ....................................................................... 5

*Torres v. S.G.E. Mgmt., LLC*,
    838 F.3d 629 (5th Cir. 2016) ....................................................................... 21

*ViaMedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ....................................................................... 17

**U.S. District Court Cases**

*Anwar v. Fairfield Greenwich Ltd.*,
    306 F.R.D 134 (S.D.N.Y. 2015) ............................................................ 14, 15

*Audet v. Fraser*,
    332 F.R.D. 53 (D. Conn. 2019) .............................................................*passim*

*Bernal v. NRA Grp., LLC*,
    318 F.R.D. 64 (N.D. Ill. 2016) .........................................................................22

*Ge Dandong v. Pinnacle Performance, Ltd.*,
    No. 10 Civ. 8086, 2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013)...............................*passim*

*Mullen v. GLV, Inc.*,
    330 F.R.D. 155 (N.D. Ill. 2019) .........................................................................8

*Seekamp v. It's Huge, Inc.*,
    2010 WL 980581 (N.D.N.Y. Mar. 15, 2010) ...................................................19
    2012 WL 860364 (N.D.N.Y. Mar. 13, 2012) ...................................................20

*Tomeo v. CitiGroup, Inc.*,
    No. 13 C 4046, 2018 WL 4627386 (N.D. Ill. Sept. 27, 2018) .........................12

**Miscellaneous:**

Advisory Committee Notes to Rule 23—1966 Amendments,
    39 F.R.D. 69 ......................................................................................................8

Fed. R. Civ. P. 23............................................................................................................*passim*

"Japan court backs Karpeles conviction for data manipulation," Yuri Kageyama, ABC News
    (June 11, 2020, 9:10 p.m.), *available at*
    https://abcnews.go.com/Technology/wireStory/japan-court-backs-karpeles-conviction-
    data-manipulation-71211400...........................................................................10

## INTRODUCTION

In opposing class certification, Defendant Mark Karpeles does not quarrel with Plaintiff Gregory Greene's contention that Karpeles engaged in common conduct. In fact, Karpeles concedes that, for most of the proposed class, his conduct *was* uniform. And he concedes that the class's claims are all governed by the same legal rules. Instead, Karpeles contends that this common conduct does not lend itself to class certification because (1) Greene purportedly wasn't subject to that conduct, (2) that conduct is subject to varying interpretations, and (3) there's no direct, specific evidence of reliance in the record for absent class members. None of these arguments can carry the day.

Point (1) is incorrect. Karpeles here is accused of materially misrepresenting the safety, security, and functioning of the Mt. Gox bitcoin exchange by preparing and disseminating a deceptive Terms of Use that he required *all* Exchange users—new and existing users alike—to agree to, and by otherwise concealing security issues and significant asset deficits. Greene was subject to all of this conduct. He reviewed the Terms, and his transaction—a deposit of bitcoins onto the Exchange—was subject to those Terms. He checked his balance periodically to ensure that Mt. Gox still had his bitcoins, and would have removed them had Karpeles ever acknowledged the significant security issues and asset losses that had plagued the Exchange even before Greene decided to join it. Greene is therefore fit to represent a class of users also exposed to and harmed by Karpeles's misrepresentations.

Point (2) is similarly belied by the record. Karpeles himself acknowledged exactly why he took the actions he did: to mislead people into believing the Exchange was running smoothly so it wouldn't collapse and he wouldn't face legal liability. And for whatever nuances there might be with respect to Karpeles's representations and deceptive conduct, none of it comes

close to the truth: which is that Mt. Gox wasn't secure, that Mt. Gox was suffering a severe asset shortage, and that users might be trading with an anonymous bot for fake assets. Karpeles's opposition doesn't even *try* to come up with plausible, non-deceptive explanations for most of this conduct. As to three specific provisions in the Terms of Use, Karpeles does offer the contrary interpretation of his expert, David Pelleg. But Mr. Pelleg doesn't opine that these terms are incapable of materially uniform interpretation. Instead, he says that they clearly have a benign meaning. This evidence fully supports class certification: If a jury were to believe Karpeles's evidence, the result wouldn't be decertification, it would be a verdict in his favor.

As for point (3), Greene has already acknowledged that, as in any class action proceeding on a theory of fraud, there couldn't possibly be direct evidence of reliance by each and every class member. But Plaintiff contends that the evidence in this record would permit a reasonable factfinder to infer, on a classwide basis, that absent class members relied on Karpeles's misrepresentations. Karpeles practically ignores this argument, merely pointing out that Greene's central authority for this proposition comes from out of circuit. But so what? There is no rule in the Seventh Circuit that bars certification of fraud claims, nor does any such limitation appear in Rule 23. Greene's point is that the nature of the misrepresentations here—specifically that they concerned the safety and security of an exchange into which users were placing thousands of dollars in assets—would permit a reasonable factfinder to conclude that every user who put assets on Mt. Gox and left them there had relied on Karpeles's misrepresentations and deceptive conduct. The cases Greene cites support that approach. And the record supports that finding as well, with or without the testimony of Professor Goforth.

Finally, in a supplemental brief Karpeles highlights that the Japanese bankruptcy trustee has submitted a rehabilitation plan for approval, which he says demonstrates that these

proceedings should give way to those that might one day occur in Japan. Greene has always acknowledged that, if the bankruptcy proceedings pay out in full, there may be nothing left for this action. But his point has been that there has never been any assurance that the Japanese proceedings will reach that conclusion. That remains true. While the trustee has submitted a plan for review, creditors do not, at this point, have any details on the nature of that plan, whether it will be approved by the Tokyo courts, whether it will be approved by a majority of Mt. Gox's creditors, or whether—if approved—it will result in meaningful relief. Neither Karpeles nor Greene nor any member of the putative class knows how long any step in the process will take. It is not enough to rebut the otherwise superior nature of class proceedings here.

The motion for class certification should be granted, Greene should be appointed to represent the proposed class, and his lawyers appointed Class Counsel.

## I. GREENE IS AN APPROPRIATE REPRESENTATIVE OF THE PROPOSED CLASS.

Karpeles primarily asserts that Greene cannot represent a class of Mt. Gox users defrauded by Karpeles's conduct. He asserts that any class must be limited to those who joined Mt. Gox after January 20, 2012, when the Terms of Use first were posted to the Mt. Gox website and agreement to them became a condition of using the exchange. (Opp. at 9 ("The January 20, 2012 date … is a hard dividing line[.]").) Because Greene created his account before that date, Karpeles argues that Greene is neither typical nor an adequate representative of the Class. Karpeles also accuses Greene of suffering from credibility issues, which preclude him from proceeding on a representative basis. But the record evidence does not require the Class be limited in the way Karpeles proposes, and any "credibility" issues present here are merely the latest episode in the saga surrounding Karpeles's unfounded and ongoing complaints about the case's central theory of liability.

A. **The timing of Mt. Gox's Terms of Use does not render Greene's claims atypical from other class members' claims.**

Karpeles's central argument—that the date of Terms of Use is a "hard dividing line" that affects Greene's ability to represent the class—overlooks a number of key points. Initially, Karpeles fails to recognize that users who created their accounts before January 20, 2012 and continued using the Exchange nevertheless had to agree to the Terms to continue using Mt. Gox. (*See* Dkt. 510-1 (Karpeles Dep. Tr.), at 98:13-18; dkt. 510-3 (Mt. Gox Terms of Use).) For his part, Karpeles says that he testified that users who signed up after January 20 had to agree to the Terms, and users who signed up before didn't agree to anything. (Opp. at 8.) But he never actually said that, and in any event the Terms themselves, like Karpeles's understanding of and intent behind them, applied to *all* users and established the "conditions" for users' interactions with the Exchange. (Dkt. 510-1, at 96:10-13; 99:10-100:1.) Indeed, once the Terms were in place, Karpeles testified that the Terms applied "to all users who agree[d] to use [Mt. Gox]," apart from the Gox bot and certain users who were not otherwise disclosed publicly. (*Id.* at 99:13-17.) He agreed that the Terms "were not optional for exchange users." (*Id.* at 99:10-12.) Among the users for whom compliance with the Terms was "not optional" was Greg Greene, who joined Mt. Gox in 2011 and then, after the Terms of Use were in place, moved bitcoin onto the Exchange on March 4, 2013. (Dkt. 526-6.)

Moreover, Karpeles's argument pushes against a class definition that is simply not alleged. Here, the proposed class does not include any individuals that only used the Exchange before the Terms of Use were in place. Rather, the proposed class is comprised only of individuals who kept assets on Mt. Gox until its collapse in early 2014—long after the Terms of Use became a requirement to use the Exchange. As Greene has previously explained, Karpeles's fraud not only induced individuals to invest through Mt. Gox, but also (as was the case with

4

Greene) to *keep* assets on the Exchange when they otherwise would have abandoned the Exchange to prevent or at least minimize losses. (*See* dkt. 510-8 (Goforth Decl.) ¶ 63.) Karpeles himself admitted that this was all by design. He actively used the Terms as a way to lure new users to the site. (Dkt. 510-4.) And he also testified that if users knew the Terms' representations were not true—including that the site had suffered multiple security incidents and that Mt. Gox carried an asset shortfall—*existing* users would have left and Mt. Gox would have failed long before the Exchange's collapse. (Dkt. 510-1, at 68:2-69:23, dkt. 467-1 (Karpeles Dep. Tr.), at 64:17-65:8.) Greene falls within Karpeles's intended plan. He first opened his account before the Terms of Use were in place, but continued to use the Exchange in reliance of the Terms' portrayal of Mt. Gox as a safe and secure place to store his holdings. Because all class members necessarily used the Exchange when the Terms of Use were in place and were readily available to all, *when* Greene or any other proposed class member first created his or her account is immaterial.

Given these considerations, Greene is plainly a typical member of the class. "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (quotations omitted). Greene satisfies that test. Like every other member of the putative class, he used the Exchange through 2014 and bases his claim on Karpeles's course of conduct in misrepresenting the safety and security of Mt. Gox, as well as concealing hacks and asset deficits. In short, there is nothing to separate his claim from anyone else.

**B.      Greene has no credibility issues.**

As far as the adequacy requirement is concerned, Karpeles asserts that Greene's credibility prevents him from being an adequate representative. (Opp. at 13-15.) There is no credibility issue here. As he has over the last several months, Karpeles accuses Greene of telling "disparate and changing stories" about the Terms of Use. (*Id.* at 14.) Hardly. Greene alleged in the Complaint that he relied on Karpeles's representations about the safety and security of Mt. Gox. (Dkt. 245, ¶¶ 13-14, 49-50.) He averred the same thing at summary judgment, and then supported his allegations with additional details from discovery. (Dkt. 467-6, ¶ 5; dkt. 490 at 10.)

Karpeles again employs a head-in-the-sand approach to Greene's case, and his latest attempt to construct a counter-narrative falls flat. Although Greene testified at his deposition that he reviewed the Mt. Gox website, including the Terms of Use, and saw representations in the Terms of Use that Mt. Gox would "securely hold" bitcoin for its users, Karpeles again faults him for not recalling specific provisions of the Terms. (Opp. at 14; *see also* dkt. 478 (Karpeles reply in support of motion for summary judgment) at 21-22.) But as Greene noted, he was not provided with a copy of the Terms during the deposition in order to refresh his memory. (Dkt. 467-6, ¶ 3.) He undertook that step himself after the deposition, and did recall relying on specific Terms provisions. (*Id.* ¶ 4.) While Karpeles continues to cry foul, the Court already found nothing untoward about this. (Dkt. 490 at 5-6.)

Karpeles is also incorrect that one of Greene's interrogatory responses is somehow evidence of a "changing" story. (Opp. at 14.) As Greene recently explained, Karpeles asked Greene to produce and identify documents that he reviewed prior to making purchases on Mt. Gox. But Greene didn't purchase bitcoins on Mt. Gox. He bought bitcoin elsewhere and moved it

to Mt. Gox. (*See* dkt. 527, at 10.) His interrogatory response is wholly consistent with his deposition testimony, the declaration he submitted in connection with Karpeles's motion for summary judgment, and his overall theory of class liability.

Likewise, Karpeles's attempt to draw a parallel between Greene and Anthony Motto fails. As the Court recounted in a previous order, at one point in his deposition Motto testified that he was unconcerned about the ability to make a cash withdrawal from Mt. Gox, which the Court held made him unfit to represent a group of investors allegedly defrauded by Mizuho Bank's undisclosed decision to stop processing withdrawals from Mt. Gox's account. (Dkt. 374 at 10-12.) Motto also testified that he would not have deposited any money on Mt. Gox had he known about Mizuho's actions, but the Court found this contradictory testimony problematic for Motto's bid to represent a class. (*Id.* at 13.) By contrast, Greene's testimony contains no such contradiction, as explained above. Neither is Greene's testimony ever at odds with his legal theory: he says that Karpeles's various representations on and about Mt. Gox is what convinced him the Exchange was a safe and secure place to house his bitcoins. Had Karpeles told the truth at any point *after* January 20, 2012, Greene would have withdrawn his assets and would not have suffered a complete loss. And as even Karpeles acknowledges, the same would have been true of any class member: disclosure of the Exchange's asset shortfall or security breaches would have led to the "bank run" that Karpeles feared. (Dkt. 510-1, at 69:11-17.)

As the Seventh Circuit has held, "for an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 728 (7th Cir. 2011). Karpeles's assault on

Greene's credibility falls woefully short of this standard: He does not identify a single piece of evidence that suggests Greene has been anything but an ideal class representative.

## II. GREENE'S PROPOSAL SATISFIES BOTH COMMONALITY AND PREDOMINANCE.

Karpeles next argues that Greene cannot meet either the commonality or predominance requirements. He is wrong.

### A. There is no rule precluding class certification in fraud cases.

Karpeles's principal argument for why predominance is not met here is simply that this is a fraud case, and certification of fraud claims is "preclude[d]" in the Seventh Circuit. (Opp. at 17.) But Seventh Circuit case law contains no such per se rule. In fact, the Seventh Circuit recently reiterated that fraud "theories do not automatically fail the predominance test." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1029 (7th Cir. 2018). Indeed, as the Advisory Committee said when crafting Rule 23, "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action." 39 F.R.D. 69, 103. Thus, "fraud actions must therefore be separated into two categories: fraud claims based on uniform misrepresentations made to all members of the class and fraud claims based on individualized misrepresentations. The former are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) (Sotomayor, J.). Karpeles cites a litany of cases falling into the latter category (Opp. at 16-18), but these authorities do not show that the Seventh Circuit somehow deviates from the general treatment of fraud claims.[1]

---

[1] Nor is there any rule that reliance cannot be inferred on a classwide basis in the Seventh Circuit. In fact, a judge in this district recently certified state-law consumer fraud claims on a similar theory, finding that "[the plaintiff's] claims would permit a reasonable inference of class-wide reliance, and that the issues of reliance and proximate causation therefore do not constitute individualized questions that defeat predominance." *See Mullen v. GLV, Inc.*, 330 F.R.D. 155, 167 (N.D. Ill. 2019). In other words, the

This case plainly falls into the former category because it is based on generalized, uniform misrepresentations. As Greene explained in his opening memorandum, Karpeles directed and participated in the drafting of a Terms of Use for Mt. Gox shortly after completing his purchase of the Exchange. (Dkt. 509, at 3; dkt. 510-1, at 91:9-24.) After the Terms were in place, all users of Mt. Gox (including all class members) were required to warrant that they had read and agreed to the Terms of Use to use the Exchange. (Dkt. 510-3.) There was only one version of the Terms for U.S.-based users (i.e., the members of the proposed class). (Dkt. 510-1, at 95:8-96:13.) Accordingly, whether the Terms contained material misrepresentations made with culpable intent are matters that are subject to generalized proof. Because they and their applicability did not vary between class members (including in how the Terms were presented to each of them), a jury's findings about the truth or falsity of the Terms, whether any misrepresentations were material, and whether Karpeles made them with intent to mislead will necessarily apply classwide. (*See* dkt. 509, at 3-4, 11-13.)

## B. Karpeles's common conduct supports class treatment here.

Karpeles does not contest the notion that he engaged in common conduct toward members of the proposed class. Nor does he quarrel with Greene's argument that, by virtue of the uniformity of the law of fraud, the claims of class members are governed by the same legal rules. (*See* Opp. at 7 n.1.) Instead, he argues that this common conduct doesn't support class certification because class members may have been exposed to varying "mixes" of information, and may have understood that information differently in any event. (*Id.* at 1, 19.) But on this record, Karpeles does not reveal a fatal flaw with the proposed class.

---

absence of on-point precedent from within the Seventh Circuit is a symptom of the unique nature of Karpeles's fraud, not evidence of some kind of insuperable rule against fraud class actions.

As Greene's opening memorandum explains, through the Terms of Use Karpeles promised that users' assets would be held on the Exchange in full, could be recovered on demand, and that all trades on the Exchange would be made with other users and always involve real fiat currency and real bitcoin. (Dkt. 510-3, at 4.) Read as a whole, the Terms of Use presented Mt. Gox as a legitimate and secure place to deposit, store, and trade bitcoins and fiat currency. (Dkt. 509, at 4.) But these representations were false: The Exchange was *already* short bitcoins when Karpeles promised to hold user assets in full, so he could never be sure of the Exchange's ability to respond to withdrawal requests.[2] (*See, e.g.*, dkt. 510-1, at 69:15-21.) As Karpeles himself acknowledged, this asset deficit turned Mt. Gox into something resembling a Ponzi scheme (a "ponzi of its own," as he put it (dkt. 467-12, at GREENE_001256)), which he attempted to hide through, among other things, the Gox bot, which completed trades using fake assets.[3] (Dkt. 510-1, at 78:7-82:7, 239:14-240:7.) The asset deficit grew over time through a series of hacks (*see* dkt. 465, at 2-4, 7-9 (recounting known hacks and asset losses of Mt. Gox)), but Karpeles never acknowledged it, or corrected the misrepresentation in the Terms of Use.

Karpeles's evidence does not show that this common conduct is not amenable to class treatment. Class members may well have had additional information at their disposal. Cryptocurrency-focused websites would have published news about Mt. Gox. Various online fora discussed the goings-on at the Exchange. As Greene discussed in his deposition, Karpeles

---

[2]     Karpeles suggests that Terms "ha[d] nothing to do" with Mt. Gox's already-existing asset shortfall. (Opp. at 3–4.) That can't be true. As Karpeles stresses, Mt. Gox co-mingled its users' holdings (rather than holding them in segregated accounts), which means that a deficit on the Exchange equally affected *every* users' holdings. (Dkt. 510-1, at 105:5-15.)

[3]     This is what led to Karpeles's criminal conviction in Japan—a decision that was upheld earlier this year. *See* "Japan court backs Karpeles conviction for data manipulation," Yuri Kageyama, ABC News (June 11, 2020, 9:10 p.m.), *available at* https://abcnews.go.com/Technology/wireStory/japan-court-backs-karpeles-conviction-data-manipulation-71211400.

himself directly and regularly reached out to the bitcoin community to answer questions about the Exchange and, by painting Mt. Gox as the most legitimate operation in town, draw more business to it. (Dep. of Gregory Greene (Ex. 1) 44:24-45:21.)[4] And as Professor Goforth explains, the bitcoin investing community at the time was tight-knit and information was shared widely within it. (Dkt. 510-8 ¶ 46.) But Karpeles has pointed to no evidence that anyone was aware of Mt. Gox's hacks or asset shortfalls. To the contrary, Karpeles confirmed in his deposition that—apart from the one public hack that he organized a public misinformation campaign around to prevent users from fleeing, (Dkt. 510-8, ¶ 26; dkt. 467-1, at 145:13-147:7)— this information was kept secret. (Dkt. 510-1. at 254:13-255:2.) And Karpeles's own expert emphasized that users would have believed that the Exchange always had sufficient assets on hand to satisfy user demands. (Dkt. 510-9 (Pelleg Dep. Tr.), at 38:9-21, 190:7-193:6.) Likewise, while a handful of users appear to have inferred the existence of a trading bot, (Dkt. 510-1, at 100:14-18), Karpeles points to no evidence that anyone confirmed the existence of the trading bot, much less its function or purpose (i.e., to help cover up an asset shortfall), before the Exchange went dark. In other words, any variance in the mix of information available to class members is immaterial: nothing available to class members would have allowed users to determine that the representations in the Terms, to which everyone had agreed, were not true.[5]

Karpeles also does not point to any varying understandings that would impede class treatment. Karpeles's expert does discuss the provisions of the Terms of Use at issue, but his

---

[4]    References to exhibits refer to exhibits attached to the contemporaneously filed Declaration of Benjamin S. Thomassen.

[5]    In fact, the evidence suggests that most, if not all, additional information would have only *deepened* class members' misunderstandings of Mt. Gox. For instance, Karpeles's decision to move a large amount of bitcoin on the blockchain was intentionally made to hide the Exchange's asset deficits. And the Transparency Reports published apparently at Karpeles's direction also badly misrepresented the security of assets on the Exchange. (*See* dkt. 465, at 7-9.)

discussion goes largely to materiality (an objective question)—not potentially varying interpretations. (Dkt. 526-2 (Pelleg Decl.) ¶¶ 48-50.)[6] He suggests, for instance, that users would not have cared about Mt. Gox's asset shortages so long as "the music were still playing," nor would they have cared about the existence of or possible interaction with an automated trading bot. (*Id.*) These assertions are generalized—Mr. Pelleg discusses bitcoin investors writ large— and thus they support class treatment. *See In re U.S. Foodservice, Inc. Pricing Litig.*, 729 F.3d 108, 121 (2d Cir. 2013) ("most of the remaining proof to which [defendant] points hardly draws into question plaintiffs' Rule 23 showing" because it "is in fact *generalized* proof") (emphasis in original).

In any event, "that the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014). As the Seventh Circuit has said, where establishing the merits of common issues may, like here, be expensive or complicated, courts may make use of "individualized follow-on proceedings" in which "it would be a straightforward matter for each [class member] to present her evidence on reliance and causation." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014). Karpeles pushes back on this point, arguing that individual issues going to liability—as opposed to "ascertaining … class members"—cannot be solved this way. (Opp. at 27 (citing *Tomeo v. CitiGroup, Inc.*, No. 13 C 4046, 2018 WL 4627386, at *11 (N.D. Ill. Sept. 27, 2018).) That's obviously incorrect. *Suchanek* itself notes the possibility that class members would present

---

[6]     Karpeles briefly discusses materiality in his opposing memorandum, but only to fault Greene for citing a securities case to support the notion that materiality, an objective question, is a common issue. (Opp. at 25.) This makes no sense: the securities laws don't change the standard for materiality. Karpeles fails to cite a single case for the notion that materiality is a subjective, and therefore individualized, issue.

individualized evidence of *reliance*. 764 F.3d at 760. And the Seventh Circuit specifically addressed and rejected the argument Karpeles advances in *Beaton*, 907 F.3d at 1029, where it held that class members could attest to individualized, claim-specific issues that addressed whether the defendant was liable to them without depriving a defendant of any due process rights. *Id.* (citing *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015)) (explaining that the defendant "[would] still have the opportunity to challenge the class members' credibility … [including by] obtain[ing] the testimony of a representative sample of the class members and, if necessary, present[ing] evidence contradicting statements found in particular affidavits"). Because of the central nature of the common issues here, and Karpeles's failure to show that individualized issues will be present, much less pervasive, common issues predominate even though the Court may need to use such case-management tools on the back end.

But on the whole, the overwhelming common elements of this case present a clear case for certification. The most persuasive precedent in this regard is *Audet v. Fraser*, 332 F.R.D. 53 (D. Conn. 2019). The case there concerned alleged misrepresentations about the financial security and prospects of fractional interests in cryptocurrency mining operations and an associated cryptocurrency. Much like Karpeles here, the defendants argued that these misrepresentations were not classable because "the mix of information presented to investors was individualized" and "customers had varying degrees of sophistication and engaged in varying due diligence." 332 F.R.D. at 79. The district court rejected these arguments. First, it noted, the critical representations formed a solid basis for the plaintiff's class claims because they "had been made publicly … to all prospective purchasers," including by publication on the Defendant businesses' websites and by their CEO. *Id.* Whether other statements communicated to certain class members (including statements made in various terms of service) partially

13

corrected these representations, the court found, did not demonstrate that common issues (about the nature and significance of the publicly disseminated core statements) did not predominate. *Id.*

In so finding, the court relied on the decision in *Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D 134 (S.D.N.Y. 2015). There, the court found that a class of investors could pursue common-law fraud claims relating to audits that allegedly misstated both the value of certain funds (by inflating the funds' values) and that the audits were conducted in accordance with professional standards (when they weren't). *Id.* at 139, 144. The court agreed with the plaintiffs that reliance on these allegedly misleading statements was a common issue because "'a reasonable factfinder could conclude beyond [sic] a preponderance of the evidence that each individual plaintiff relied on the defendants' uniform representations.'" *Id.* at 144 (quoting *Ge Dandong v. Pinnacle Performance, Ltd.*, No. 10 civ. 8086, 2013 WL 5658790, at *11 (S.D.N.Y. Oct. 17, 2013)). And because these core misrepresentations were uniform and uniformly available, predominance was still satisfied "even if some individual plaintiffs have stated that they did not receive or read audit reports." *Id.* at 145.

Second, regarding the alleged differences in sophistication, expectations, or due diligence, *Audet* found that these were immaterial because no amount of sophistication or research could have debunked the misrepresentations at issue. 332 F.R.D. at 80.

Compare *Audet* to the record here: Much like *Audet*, the alleged misrepresentations were disseminated to everyone. The Terms of Use applied to every transaction on the Exchange, and users who maintained accounts on the Exchange warranted that they had read and agreed to the Terms. More, other representations made by Karpeles or at his direction, which were often made in fora where potential Mt. Gox customers were likely to see them, such as the bitcointalk forum or Mt. Gox's website itself, *confirmed* what was in the Terms (i.e., that Mt. Gox was safely

14

holding user assets and the Exchange was a secure place to transact business), rather than detracting from it. And to the extent the Terms were misleading—in that they papered over hacks, lied about how assets were held, or otherwise—no amount of research or sophistication could have uncovered these issues. As noted above, Karpeles concealed these issues intentionally and never made them public. Because the Terms were uniformly disseminated and available to putative class members, the fact that some users may not have read the Terms does not cause individual issues to predominate. *See Anwar*, 306 F.R.D. at 145.

**C.      The issue of reliance is subject to common proof.**

Karpeles pushes back against the idea that an inference of reliance is appropriate, both as a threshold issue and as applied here. His challenges are ineffective.

*1.      Inferences—not assumptions—of reliance are permitted.*

Karpeles asserts that the issue of reliance precludes class treatment because "reliance cannot be assumed here, under either the facts or the law." (Opp. at 24.) This misunderstands the issue. Greene's contention isn't that reliance should be "assumed" here, but that a reasonable jury could infer reliance from circumstantial evidence. Karpeles also attempts to elide the difference between proving reliance through generalized, circumstantial evidence with a fraud-on-the-market presumption. (*Id.*) But this argument, too, is off-base. In this common-law fraud case, of course, there can be no presumption of reliance. But "the absence of a presumption simply means that the plaintiffs must prove actual reliance; it does not dictate the nature of that proof, *i.e.*, whether it is general and circumstantial or individualized and direct." *Audet*, 332 F.R.D. at 78. And, as Greene set forth in his opening memorandum, courts have found that the issue of reliance is common when the evidence shows that the nature of the misrepresentation is such "that a reasonable factfinder could conclude [by] a preponderance of the evidence that each

15

individual plaintiff relied on the defendants' [uniform] representations." *Ge Dandong*, 2013 WL 5658790, at *11. Such an inference "does not shift the burden of proof at trial." *CGC Holdings v. Broad & Cassel*, 773 F.3d 1076, 1093 (10th Cir. 2014). Greene (and the class) would still need to persuade the jury to make this inference. *See Ge Dandong*, 2013 WL 5658790, at *11 ("This is not, as Defendants contend, 'just a version of the fraud created the market presumption.'"). For present purposes, what matters is whether the evidence would permit a rational jury to draw this inference.

> 2.    *The evidence supports an inference of reliance, with or without Professor Goforth's testimony.*

Given the evidence available and the nature of Karpeles's misrepresentations, Plaintiff may seek an inference of reliance either with the help of Professor Goforth's testimony or on the record evidence alone.

As discussed here and elsewhere, the evidence shows that Karpeles's misrepresentations concerned the safety, security, and basic operation of Mt. Gox. As he admitted in his deposition, Karpeles knew that "trust" between Mt. Gox and its users was "[o]ne [] of the most important points for an exchange." (Dkt. 467-1, at 64:22-24.) And if the public were aware of Mt. Gox's repeated security failures and asset losses, "people wouldn't use Mt. Gox anymore," the Exchange would fail, and, as the head of Mt. Gox and its majority shareholder, he would be embroiled in litigation. (*Id.*, at 64:19-20, 70:2-14.) Given this evidence, a jury could readily reach the same conclusion as Mr. Karpeles: his disclosures, coverups, and half-truths would have made a difference for any user of the Exchange.

Professor Goforth reaches the same conclusion as Karpeles. As she explains, investors who looked to exchanges to help facilitate trades expected these exchanges to act as honest intermediaries—just like users of more traditional exchanges. (Dkt. 510-8 ¶¶ 48, 53; Goforth

Dep. Tr. (Ex. 2), at 28:2-29:11, 40:8-24, 158:18-159:9.) While exchanges promised to help investors with liquidity concerns, that upside was meaningless if the exchange did not complete a trade, absconded with a trader's assets, or—as was the case here—lacked sufficient assets on hand (whether due to theft, data loss, or bad actors) to satisfy users' demands for the return of their bitcoins or fiat currency. As Professor Goforth recounts, even in the early 2010s, when it became clear that a bitcoin exchange was failing to serve as a secure, honest intermediary, users fled the Exchange. (Dkt. 510-8, ¶¶ 28-32.) When Greene reviewed the Terms of Use for Mt. Gox, what he and others learned is that Karpeles, through Mr. Gox, pledged to be an honest intermediary. (Dkt. 510-8, ¶ 53; Ex. 2, at 137:18-21.) Professor Goforth therefore concludes (just as Karpeles did) that users would have abandoned Mt. Gox, just like they had its contemporaries, had they been informed about Mt. Gox's repeated security failures. (Dkt. 510-8, ¶ 63, Ex. 2, at 29:1-11, 30:10-21, 173:5-174:3.)

To be sure, the perspective brought by Professor Goforth's testimony would be *useful* in helping the fact finder reach this conclusion. *See ViaMedia, Inc. v. Comcast Corp*., 951 F.3d 429, 484 (7th Cir. 2020) (citing *Lawson v. Trowbridge*, 153 F.3d 368, 376 (7th Cir. 1998)). In *Ge Dandong*, for instance, the court relied on similar expert testimony when ruling on a motion for class certification. There, a putative class of investors purchased credit-linked notes from several Asian banks. 2013 WL 5658790, at *1. They alleged that certain offering documents misrepresented how the underlying principal would be invested—specifically that instead of investing the principal in low-risk instruments, the principal was inevitably invested in high-risk collateralized debt obligations. *Id.* at *2. Plaintiffs also alleged that the defendant bank that created the CDOs failed to disclose that it had shorted those same instruments, thus taking a position diametrically opposed to that of the plaintiff class. *Id.* The plaintiffs offered an expert

who, relying on his time in legal practice dealing with derivative transactions, provided a general discussion of credit-linked notes and synthetic CDOs, including a primer on industry practice, and then assessed the facts in the case, concluding that the defendants' conduct deviated so far from industry norms that information about the underlying investments "would have been material to any reasonable investor" and that related information omitted from the offering documents "concerned fundamental risk considerations that would have significantly influenced any reasonable investor's decision." No. 10-cv-8086, dkt. 146 (S.D.N.Y. Mar. 22, 2013).

Much like Karpeles's approach here, the defendants moved to exclude this declaration for (1) being irrelevant to class certification, (2) advancing impermissible legal conclusions, (3) being based on insufficient facts, and (4) failing to employ any reliable methodology. The Court rejected all of these arguments, concluding for instance that the expert could rely "on his experience in the structured finance industry," because he explained why that experience allowed him to draw his conclusions from the facts of the case, and that the testimony was "plainly relevant … to the predominance inquiry under Rule 23(b)(3) because it speaks to whether and how investors would have reacted differently if Defendants had provided the omitted information or had they not made the allegedly misleading statements." 2013 WL 5658790, at *14. In certifying a common-law fraud claim, the court, citing to the declaration, noted that had the plaintiff class been fully informed "it stands to reason that Plaintiffs would not have purchased the Notes in the first place." *Id.* at *10.

Here, as in *Ge Dandong*, Professor Goforth's opinion buttresses the record evidence in a way that supports that Greene's fraud claim can be litigated classwide. As described in Greene's opposition to Karpeles's motion to exclude, Professor Goforth's testimony tells the following story:

18

- Participants in bitcoin markets have certain expectations about the conduct of market operators, specifically that they act honestly and forthrightly;

- When those expectations are dashed, participants abandon the market, as had happened on at least 4 occasions before Mt. Gox's February 2014 collapse;

- Not only is it reasonable to assume that Mt. Gox customers expected that Karpeles would act in accordance with principles of good faith and fair dealing, but the Terms of Use essentially confirms that he would;

- If Karpeles acted as he allegedly and admittedly did, that would breach the expectations of Mt. Gox customers, and they would be expected to abandon the market.

(*See* dkt. 514, at 3-4.) In other words, Professor Goforth's testimony emphasizes the importance of the misrepresentations made by Karpeles, and "speaks to whether and how investors would have reacted differently" had they been fully informed. *Ge Dandong*, 2013 WL 5658790, at \*14. Consistent with that testimony, the Court can conclude that the evidence supports a plausible classwide inference of reliance that Greene can reasonably ask a jury to draw.

But while Professor Goforth's testimony would be helpful to the factfinder and, here, would support a decision to certify, it is not *necessary*—primarily because the misrepresentations at issue were so obviously fundamental to class members' decisions to invest. In *Seekamp v. It's Huge, Inc.*, for example, the plaintiffs alleged that certain defendant used car dealers induced them to enroll in an "Auto Theft Security Discount guarantee" program (or "ATSD"), in which the vehicle's VIN was etched onto the driver's-side window. The program was misrepresented as a warranty when in fact it was an ineffective insurance policy because the dealer was not authorized to sell insurance. *See* No. 1:09-cv-0018, 2010 WL 980581, at \*1-2 (N.D.N.Y. Mar. 15, 2010) (describing allegations). To help support their contention that the misrepresentations could anchor their class claims, the plaintiffs proffered an expert who described the history of so-called "etch" policies, reviewed relevant regulations and industry standards for their issuance,

discussed what types of disclosures a reasonable consumer would expect, opined that the defendants did not meet any industry standards, and opined that had proper disclosures been made "most people would not have bought" the "ATSD." No. 09-cv-00018, dkt. 61-14 (N.D.N.Y. Feb. 3, 2011). But despite the availability of this report, the district court did not rely on, or even cite to, the plaintiff's expert testimony when certifying the class, concluding instead that the basic nature of the misrepresentation was itself sufficient to support certification. *See* No. 09-cv-00018, 2012 WL 860364, at *10 (N.D.N.Y. Mar. 13, 2012). The district court acknowledged that class members may have had differing expectations regarding the ATSD, but noted that "it is equally clear that every plaintiff would have relied on the implicit representation of the ATSD's legality and beneficialness in deciding whether to purchase it." *Id.*

Similarly, in *Audet v. Fraser*, the plaintiffs alleged that they were fraudulently induced to invest in certain instruments related to bitcoin mining when the defendants misrepresented these instruments as having a value of at least $20 (described as a "floor") and substantial backing from a reserve fund to guard against risk even though neither fact was true. *See* 332 F.R.D. at 61-62. In support of their motion for class certification, plaintiffs proffered, as relevant here, an expert who provided background regarding blockchain technology and bitcoin mining, and opined from that perspective on the significance of the misrepresentations at issue, concluding "[i]t is my belief that any investor would have considered the misrepresentations … to be material to their investment. No rational investor would have purchased [the instruments] if they knew the truth." No. 16-cv-940, dkt. 96-4 (D. Conn. Sept. 12, 2018). Similar to *Seekamp*, the district court in *Audet* explicitly did not rely on this report in considering class certification, denying a related motion to strike it as moot. 332 F.R.D. at 85. But even without the expert testimony, the court concluded that "the nature of the alleged misrepresentations permit[ed] a

20

common inference of reliance" because the misrepresentations were "critical" to the investing decision. *Id.* at 79-81.

This case is similar. Even putting Professor Goforth's testimony to one side, the evidence would permit a rational jury to draw a classwide inference of reliance. Karpeles himself admitted that he kept troubling information about Mt. Gox's operation quiet because he knew that to speak would cause users to abandon the Exchange. He also used Gox bot, whose operation would appear to violate the Terms of Use, to cover up the asset shortfalls and resulting liquidity issues. (Dkt. 467-1, at 78:8-80:4.) A reasonable jury easily could conclude that users of an exchange would find information about hacks and asset shortfalls critical to the decision of where to leave their assets, such that they relied on that same information being misrepresented. In fact, several courts have reached similar conclusions in the analogous context of Ponzi or pyramid schemes, without relying on expert testimony. *See, e.g.*, *Torres v. S.G.E. Mgmt., Inc.*, 838 F.3d 629, 643 (5th Cir. 2016) (en banc); *Audet*, 332 F.R.D. at 81.[7]

## III.  KARPELES FAILS TO REBUT GREENE'S SHOWING THAT A CLASS ACTION IS SUPERIOR.

Karpeles's arguments for why a class action is not superior here are similarly unpersuasive. Karpeles first highlights the ongoing Japanese civil rehabilitation proceedings, including noting in a supplemental filing that the Japanese trustee recently submitted a proposed

---

[7]  Karpeles's attempt to rebut this showing by pointing to the testimony of Anthony Motto fails. Motto, of course, was deposed by Mizuho Bank, but Karpeles took a second deposition of Motto, roughly six months after Motto moved to voluntarily dismiss his own claims. In this second deposition, Motto testified that he read the Terms of Use before creating his Mt. Gox account, but couldn't remember anything specific about them. He was not given a copy to refresh his memory. At his previous deposition, taken by counsel for Mizuho Bank, however, Motto testified that if any provisions of the Terms of Use were violated that would be "a problem." (First Motto Dep. Tr. (Ex. 3), at 131:16-132:1.) Of course, part of why Greene highlights the terms he does is because *Karpeles* was violating those terms. Motto also flagged as problematic "Mark Karpeles' inability to move funds and not being clear on what was going on was what was harmful." (Ex. 3, at 137:21-25.) That is exactly what Greene's present legal theory attempts to address.

rehabilitation plan for the Tokyo court's review. (Opp. at 27-30; dkt. 529.) Karpeles then engages in his own guesswork about the better-than-imagined recoveries that are "expected" to happen as a result of those proceedings. (*See* Opp. at 28-30.) But as Greene already indicated, there is no concrete basis to expect that outcome and the recent submission of a rehabilitation plan does not change the calculus, given that there are absolutely no details on the nature of the proposed rehabilitation plan and no information provided on timing. Besides, even if the proposed plan (whatever it is) does move forward, it still must be voted on and approved by a majority of Mt. Gox's creditors; if it fails that test (or others), the proceedings will fall apart and revert to bankruptcy proceedings, where Mark Karpeles stands to receive a substantial windfall. But this too is guesswork. The point now is the same as it has ever been: there is no telling what will happen in the Japanese proceedings and, if something good happens, then the Court can revisit whether this proceeding should proceed on a class basis, or at all. (*See* dkt. 509, at 25.) Presently, and for all the reasons previously stated, *this* case represents the best chance class members have at recovering.

Second, Karpeles suggests that individual recoveries here are large enough to incentivize individual suits. (Opp. at 30-31.) One might have expected to see such lawsuits at some point in the last 6 years if that were the case. It is true enough that many putative class members suffered significant losses as a result of Karpeles's conduct. But the risks and expense of complicated international litigation have apparently convinced Karpeles's victims that it *isn't* worth filing individual lawsuits. *Bernal v. NRA Grp., LLC*, 318 F.R.D. 64, 76 (N.D. Ill. 2016) (Feinerman, J.) (finding that "the class members' interests in individually controlling the prosecution or defense of separate actions, … is minimal, given that no class member appears to have brought an individual suit."). That makes sense, given that even though some potential recoveries here are

quite large, so are the litigation costs. It seems unlikely that many or even most putative class members could convince a lawyer to take their case on contingency.

## CONCLUSION

The Court should certify the proposed class, appoint Gregory Greene to represent it, and appoint Greene's lawyers as Class Counsel.

Respectfully submitted,

Dated: January 4, 2021

**GREGORY GREENE**, individually and on behalf of a class of similarly situated individuals,

By: /s/Benjamin S. Thomassen
        One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
Edelson PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian
rbalabanian@edelson.com
J. Aaron Lawson
alawson@edelson.com
Edelson PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9495

*Counsel for Plaintiff and the putative class*