# Exhibit 2






UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY GREENE, individually
and on behalf of all others
similarly situated,

    Plaintiff,

vs.                                  Case No. 14-CV-01437

MARK KARPELES, an individual,

    Defendants.

_____

REMOTE DEPOSITION BY VIDEOCONFERENCE OF

CAROL R. GOFORTH

TAKEN ON
TUESDAY, JULY 7, 2020
9:26 A.M.

GOFORTH RESIDENCE
562 NORTH CEDAR RIDGE LANE
FAYETTEVILLE, ARKANSAS 72704

```
 1            APPEARANCES
 2
 3  APPEARING ON BEHALF OF THE PLAINTIFF CAROL
    GOFORTH VIA
 4  VIDEOCONFERENCE:
 5  BENJAMIN S. THOMASSEN, ESQUIRE
 6  EDELSON, P.C.
 7  350 NORTH LASALLE STREET, 14TH FLOOR
 8  CHICAGO, ILLINOIS  60654
 9  (312) 589-6370
10  (312) 589-6378 Fax
11  bthomassen@edelson.com
12
13  APPEARING ON BEHALF OF THE DEFENDANT VIA
    VIDEOCONFERENCE:
14  BEVIN BRENNAN, ESQUIRE
15  PEDERSEN & HOUPT
16  161 NORTH CLARK STREET, SUITE 2700
17  CHICAGO, ILLINOIS 60601
18  (312) 641-6888
19  (312) 641-6895 Fax
20
21  ALSO PRESENT:
22  Tom Hazelhurst, Naegeli Zoom Technician
23  Roseanne Leverich, Zoom Technician
24
25
```

Page 3

```
 1          EXAMINATION INDEX
 2                                  Page
 3
 4  EXAMINATION BY MS. BRENNAN           6
 5
 6  EXAMINATION BY MR. THOMASSEN       171
 7
 8  FURTHER EXAMINATION BY MS. BRENNAN 176
```

Page 4

```
 1           INDEX OF EXHIBITS
 2  Exhibit                          Page
 3
 4  A    DECLARATION                  13
 5
 6  B    MARK KARPELES DEPOSITION     52
 7
 8  D    ARTICLE ON BITCOIN EXCHANGE  68
 9
10  F    ARTICLE ON BITCOIN HEIST     70
11
12  G    CRYPTO REGULATION            71
13
14  J    ARTICLE ABOUT MOUNT GOX      79
```

Page 5

```
 1    REMOTE DEPOSITION BY VIDEOCONFERENCE OF
 2              CAROL R. GOFORTH
 3                  TAKEN ON
 4           TUESDAY, JULY 7, 2020
 5                  9:26 A.M.
 6
 7       THE COURT REPORTER:  It is my pleasure to
 8  serve as a professional reporter in today's matter.
 9  I would like to stipulate on the record that the
10  testimony will be captured by a professional digital
11  reporter and that all present agreed this method of
12  preserving today's record.
13       The testimony will be transcribed and
14  certified.
15       Ms. Brennan, do you agree?
16       MS. BRENNAN:  I do.
17       THE COURT REPORTER:  And Mr. Thomassen, do
18  you agree, sir?
19       MR. THOMASSEN:  Yes.
20       THE COURT REPORTER:  Thank you.
21       Ms. Goforth, can I please have you raise
22  your right hand.
23       Do you solemnly swear or affirm under
24  penalty of perjury that the testimony about to
25  provide will be the truth, the whole truth and
```

26

1    A. Yes.
2    Q. And upon reviewing Mr. Karpeles'
3 deposition, testimony, was there particular conduct
4 from that deposition that you believed was improper?
5    A. Yes.
6    Q. And what did you determine from reading
7 Mr. Karpeles' deposition was not proper conduct.
8    A. Wow. There was -- he was incredibly
9 candid, in my opinion, about the things he knew and
10 intentionally did not disclose. And the time at
11 which he knew things and the way in which he then
12 publicly described what he knew to be happening when
13 his public description did not match the facts, as
14 he said he knew them.
15        There were multiple times during the
16 deposition when he made reference to specific
17 findings, determination why we are missing this many
18 bitcoin, there was a hack on this day, here's our
19 strategy of not telling fo ks because we don't want
20 them to sue me, and we don't want them to abandon
21 the exchange.
22        So it jumped out to me how often he
23 admitted that that's what he was doing.
24    Q. When you looked at those -- and I know
25 you've summarized them. But when you looked at the

27

1 issues of when, in your opinion, Mr. Karpeles failed
2 to disclose certain information, was there a
3 particular regulation that you believe that Mr.
4 Karpeles violated?
5    A. The opinion that I render is not based on
6 any particular regulation. And I did not and have
7 not taken the time to go back and figure out what
8 regulations would be violated.
9        I'm sorry. Did you say something?
10    Q. No.
11    A. There wasn't a particular regulation in
12 mind.
13    Q. Was there a particular standard in mind
14 when you came to that determination?
15        MR. THOMASSEN: Object to form. I don't
16 know what determination you're talking about.
17        MS. BRENNAN: I'm sorry. What was the end
18 of that?
19        MR. THOMASSEN: You said, when you came to
20 that determination, I just don't know what you're
21 referring to.
22        MS. BRENNAN: I'll clarify.
23    Q. When you came to the determination that
24 Mr. Karpeles failed to disclose certain information
25 that you believe he should have disclosed, what

28

1 standard were you applying to make that analysis?
2    A. What reasonable people would have
3 understood as being part of what was communicated
4 from somebody who was acting in good faith,
5 honestly.
6    Q. And where does that standard come from?
7    A. Where does the standard of reasonable
8 expectations come from?
9    Q. Yes.
10    A. That is the opinion that I rendered. I
11 mean, my opinion is that based on what happened, no
12 reasonable person would have left their bitcoin in
13 this exchange if they had known the truth that was
14 being concealed from them. I mean, that is my
15 professional opinion, so I guess that's my standard.
16    Q. Is that based on any research that you've
17 done?
18    A. Did I research my professional opinion?
19 I'm sorry. I'm not sure what you mean.
20    Q. Sure. I mean, you said that it's based on
21 your standard of what reasonable people would have
22 understood him to -- should have disclosed. Where
23 does that standard come from?
24        Where does your standard of what a
25 reasonable person would have thought come from?

29

1    A. Based on five years of practice involving
2 securities work, 30 years of teaching involved in
3 securities and transactions and market behavior, and
4 based on my understanding and the historical data
5 surrounding what happened in other bitcoin exchanges
6 when the information was honestly disclosed, what
7 happened to those exchanges?
8        And based on Mark Karpeles' statements
9 that, oh, I knew that if I said this, they would
10 leave. They would sue me. They would -- this would
11 crash my exchange.
12    Q. What information about other exchanges was
13 important to that opinion?
14    A. Do you mean other crypto exchanges?
15    Q. Yes?
16    A. Oh, boy. Look, I'm not 100 percent on the
17 names. In 2011, Bitomat -- I think that's the
18 correct name of the exchange -- announced that it
19 had not been able to protect and keep track of its
20 customers assets that caused that exchange to fall.
21        Bitcoinica, MyBitcoin followed in 2011,
22 2012. Also in 2012, there was that Bitfloor.
23        I mean, it is a repeated pattern that
24 where a exchange fails to keep accurate control,
25 fails to demonstrate that they are a safe and secure

Page 30

1 place to put your assets, people will move their
2 assets out of that exchange and put it some -- put
3 them somewhere else.
4    Q.  With respect to the other exchanges, had
5 any of them reported that they had been hacked at
6 any point in time?
7    A.  Yes.
8    Q.  And what happens when any of those
9 exchanges was hacked, from a market perspective?
10   A.  That caused folks to begin pulling their
11 bitcoin out.
12       And I forget which one of them -- one of
13 the cases, there was a promise that they'd fixed the
14 problem.  The withdrawal slowed.  The second hack or
15 the second loss.  And then the fo ks took -- it
16 failed. And that's the one that resulted in private
17 litigation in San Francisco and, you know, forced
18 insolvency of the exchange.
19       So when you have lack of security, a lack
20 of protection for the assets and a lack of candor
21 about what's going on, people pull their assets out.
22   Q.  Now, Mt. Gox did report some hacks, didn't
23 they?
24   A.  Yes.
25   Q.  And you didn't see the behavior that you

Page 31

1 just described when Mt. Gox disclosed other hacks,
2 right?
3    A.  Well, Mt. Gox reported a hack.  They said
4 it was a hack of their assets and they falsely said
5 that no customers' account was compromised.  That it
6 was only their assets that had been lost.  And that
7 they had replenished those accounts -- their own
8 trading accounts -- not trading -- their own active
9 accounts -- their own assets.  So it had been
10 replenished, so that nobody should worry.
11       So, yes, they disclosed a hack but the
12 accuracy of even that disclosure does not appear to
13 have matched what was happening.
14   Q.  Do you believe that any holder of
15 cryptocurrency on an exchange believes that it's 100
16 percent secure?
17   A.  No.  Well, no rational -- no rational
18 investor.
19   Q.  I want to go back to paragraph 1, where
20 you say you've been asked to offer your analysis of
21 this conduct and specifically, quote, including
22 affirmative statements made during the time in which
23 Mt. Gox operated, various decisions not to disclose
24 certain information in a range of actions designed
25 to conceal the true state of the exchange from its

Page 32

1 users.  Do you see that?
2    A.  Yes.
3    Q.  What's your basis for any expertise in
4 decisions not to disclose certain information?
5    A.  Expertise in decisions not to disclose.
6    Q.  Right.  Correct.
7    A.  I don't have any expertise and when to
8 decide not to disclose.
9    Q.  Okay.  Then what expertise do you have
10 with respect to analyzing a range of actions
11 designed to conceal the truth state of the exchange
12 from its users?
13   A.  Honestly, I'm not sure what you're asking.
14   Q.  In your report, you said you've been asked
15 to offer your analysis of Mark Karpeles' conduct in
16 operating the Mt. Gox bitcoin exchange, including
17 affirmative statements made during the time in which
18 Mr. Gox operated.  Do you see that first part?
19   A.  Yes.
20   Q.  What expertise do you have to analyze Mr.
21 Karpeles' conduct specifically regarding affirmative
22 statements made during the time in which Mt. Gox
23 operated?
24   A.  I was not so much hired to analyze what
25 conduct he took as to analyze the consequences of

Page 33

1 the conduct that he took.  And so if my statement is
2 misleading, I'm sorry.
3       But I opined on and what I thought my
4 expertise was being sought for was whether or not
5 his conduct in doing and in not doing these things -
6 - and I don't have -- I don't claim to understand
7 why he did things and why he didn't do things, or,
8 you know, which media he used to accomplish certain
9 disclosures. That's not my expertise.
10      My expertise was in the consequence of my
11 analysis of what that did, what that did to
12 customers, what that did to the environment, the
13 crypto environment.
14   Q.  What do you mean by "what that did to the
15 crypto environment"?
16   A.  The crypto environment, the way in which
17 crypto is -- the bitcoin, the security of bitcoin on
18 the Mt. Gox exchange was understood.  The perception
19 of Mt. Gox as the place to put your bitcoin, the
20 place that is secure and well-run to a perception in
21 the community that, while they don't know what
22 they're doing, they're stealing our money.  They're
23 mismanaged. We're not getting our assets back.
24 What's going on? How long have they known?  That
25 pattern of behavior and reaction from the crypto

34

1 community.
2    Q.  And how did you determine the reaction
3 from the crypto community?  And by that, I mean,
4 what sources of information did you look at?
5    A.  There is -- and it is still active.  There
6 is a particular website that -- and I cited this --
7 and I'm afraid I can't give you the exact name right
8 now, although I could find it in my deposition -- in
9 my Declaration.
10       There is a website that has ongoing dialog
11 and commentary dating back from before the closure
12 of Mt. Gox from Mt. Gox users in the three months
13 leading up to the closure.  I read through a lot of
14 those comments.  That's really what I was focusing
15 on.
16    Q.  Do you look at message boards normally in
17 your research?
18    A.  Only when specific questions come up.
19    Q.  As you sit here today, other than this
20 engagement, do you recall using a message board as
21 support for any of your research?
22    A.  Yes.
23    Q.  When was that?
24    A.  I wrote an article on airdrops, which is a
25 particular kind of dissemination vehicle for crypto.

35

1 And I wanted to see how fo ks were understanding and
2 what they were saying about airdrops.  And I wanted
3 to see how folks were determining which airdrops
4 were legitimate, which were fishing, which involved
5 a scam.
6       So I looked at a number of Telegram
7 accounts and excerpts that were linked in other
8 reports, you know, online posts and medium and
9 similar sources to figure out what folks in the
10 crypto community, again, were saying about these.
11       The other time that I can recall doing it
12 is when I was trying to make sure that I understood
13 the kinds of fraudulent behavior that were currently
14 going on for an article I'm currently writing.
15       And, again, that involves me looking at
16 message boards to figure out who is complaining
17 about stay away from this site, stay away from this
18 ICO, stay away from this.
19       And what sorts of things were tipping them
20 off to the probability that a certain offering was
21 illegitimate.  Things like, yes, they've only got
22 seven likes and it's all from the same source or
23 they've got 85 likes, but it's verbatim with same
24 grammatical errors.  That kind of comment.
25       So those are the ones that I can think of.

36

1 But it was specific issues that I went there for.
2    Q.  Okay.  And you don't know any of the
3 particular posters on those message boards, correct?
4    A.  Almost without exception, they are
5 pseudonymous.  So they use some clever little name.
6 I have no idea who -- I don't have any idea who any
7 of them are, for sure.
8       I've read reports on So-and-So posts under
9 this name, but I don't -- I don't know that to be
10 true.
11    Q.  People who post on message boards self-
12 select and choose to post on them, correct?
13       MR. THOMASSEN:  Object to form.
14    A.  As far as I know, that is correct.  I'm not
15 aware of any message -- any I'm not aware of anyone
16 being compelled.  I mean, it's entirely poss ble but
17 I'm not aware of anybody being compelled.
18    Q.  Do you know of -- do you know what
19 percentage of holders of cryptoassets post on
20 message boards?
21    A.  At what point in time?
22    Q.  Well, let's start with 2013.
23    A.  At that point, crypto was held by
24 relatively few people.  We're talking thousands, not
25 tens of thousands of fo ks -- well, tens of

37

1 thousands, but not hundreds of thousands.  And
2 probably a sizable minority were, if not active,
3 they were engaged.  That was a tighter-knit
4 community.
5       So particularly the people who were in
6 Europe and Americas, I would say, you know -- 20
7 percent as a guess.  That's not under oath, and that
8 is a guess.
9    Q.  You've never done it -- I'm sorry.  Keep
10 going.  I'm sorry.  I thought you were done?
11    A.  I'm sorry.  Now, the percentage would be
12 relatively minuscule.
13    Q.  You've never seen a study that describes
14 what percentage of people participate and
15 investments for 2013, right?
16    A.  I have seen reports, but not any kind of
17 underlying reputable study or survey.  It's just
18 these reports of guesstimates of how many people
19 were -- and that is in large measure what I base my
20 guess on.
21       That's not an expert opinion.  That is my
22 guess.  And it is based on a wide number of people
23 saying that, oh, it was such a tight-knit community
24 back then.  So it is second-hand, definitely.
25    Q.  Who said that it was a tight-knit

38

1 community.
2    A.   Virtually, all kinds of people.  I mean,
3 the folks who I do know who have said it or who have
4 had it reported that they have said it by what I
5 would consider reputable sources include Vitor
6 Butalin (phonetic), the founder of -- or one of the
7 co-founders of Ethereum.  He ta ks about the way in
8 which crypto has evolved.
9        That sort of seems to be conventional
10 wisdom in the message boards and reports and the
11 ongoing articles on crypto about how tight-knit it
12 was when it was starting and how exciting it was
13 that this was going to be a new democratic process.
14    Q.   Have you talked to any of the current or
15 former plaintiffs in this case?
16    A.   No, not to my knowledge.
17    Q.   Do you know if they knew each other prior
18 to this litigation?
19    A.   The plaintiffs?  Yes.
20    Q.   I'm sorry.  I thought there was only one
21 plaintiff now.  Do you mean former plaintiffs?
22        I don't -- no, I have no idea.  I don't
23 even know who the fellow plaintiffs were.  So I
24 can't -- I'm sorry.  I don't know.
25    Q.   Okay.  In your report, if we could go to

39

1 paragraph 9?
2    A.   Yes.
3    Q.   And you say, quote, In preparation of this
4 Declaration, I have relied upon my general knowledge
5 of the law and my specific research into the
6 operation and legal regulation of cryptocurrencies
7 and crypto-based businesses, correct?
8    A.   Yes.
9    Q.   What general aspects of the law did you
10 rely upon?
11    A.   Predominantly the securities and
12 commodities regulation and exchange regulation and
13 requirements.  And then, you know -- so much of what
14 I've researched in crypto, I could read and not
15 understand, except for the fact that I know how to
16 read statutes, and regulations, and rules, and
17 releases, and I know what they mean and what their
18 relationship is to each other.  So there is that
19 tremendous reservoir of just knowing what legal
20 materials are and what they mean.
21    Q.   How about your specific research into the
22 operation and legal regulation of cryptocurrency and
23 crypto-based businesses?
24    A.   I'm sorry.  What about it?
25    Q.   Why did you rely on with respect to that

40

1 portion of the statement?
2        You say that I've relied upon my specific
3 -- if I take out the "general knowledge of the law"
4 part, it would read, I relied upon -- space -- my
5 specific research into the operation and legal
6 regulation of cryptocurrencies and crypto-based
7 businesses.
8    A.   In order to write the first article that I
9 wrote, focusing on crypto, I read more than a
10 thousand posts and shorter articles and every
11 published Law Review article I could find dealing
12 with cryptoassets and crypto-based businesses.
13        So my research for those articles included
14 gaining an understanding and appreciation of what
15 crypto was, how it had evolved, how it had affected
16 markets and participants in the market, how
17 regulators were responding, both at the state level
18 and the national level in the United States and
19 around the world, and how these crypto businesses
20 were responding.
21        That research, which was the predicate for
22 those articles, played into my being able to form an
23 opinion as to the impact -- the consequences of the
24 behavior I analyzed in this case.
25    Q.   Have you done any research into

41

1 characteristics of bitcoin buyers themselves in
2 2013?
3    A.   Yes, in the sense that I have read a lot
4 about who were the most active and the largest
5 public figures in bitcoin.  So reading a lot about
6 the influence of libertarian thought and how many of
7 the major players -- and people who spoke without
8 relying on pseudonyms in articles and other posts
9 and advertisements, and who came up repeatedly as
10 major investors or backers of bitcoin -- what they
11 had said about the environment and the community.
12        So, yes, I did research that revealed
13 patterns of behavior.  If that is what you wanted to
14 know.
15    Q.   How many of those figures -- when you say
16 the major backers who are public figures, how many
17 people is that?
18    A.   So much of what I read was talking about
19 them as a group, that I don't have a specific
20 number.  As far as identifiable people, you know, a
21 handful back then.
22        And then the information about people
23 whose real identities I don't know, but whose
24 pseudonyms were attributed with certain remarks.
25        So I don't know who Satoshi Nakamoto was,

Page 134

1 deposition, right?
2   A.  Correct.
3   Q.  Then say, "Users of the Mt. Gox exchange
4 would have understood that in general bitcoin
5 exchanges existed (and still continue to exist) to
6 facilitate the exchange of bitcoins between buyers
7 and sellers," correct?
8   A.  Yes.
9   Q.  How do you know what users of the Mt. Gox
10 exchange would have understood in this context?
11   A.  Because there is no other rational reason
12 for an exchange to exist.
13   Q.  I think you say later in your report that
14 the exchange doesn't allow for leverage or margin
15 trading, correct?
16   A.  It was not supposed to, yes.
17   Q.  I mean, there are certainly people who
18 engage in financial transactions who do it
19 understanding that the buyer may not have it yet,
20 correct?
21   A.  Do you mean on Mt. Gox?
22   Q.  No, I mean, in general.  If I'm buying
23 financial product, correct?
24   A.  You can buy on credit, too, I mean, in
25 certain kinds of transactions.  Of course, yes.  I

Page 135

1 just meant that this exchange.
2   Q.  Why would users of the Mt. Gox exchange
3 been limited in that manner?  Why is that what they
4 would have understood?
5   A.  Because that's the only possible reason
6 for a bitcoin exchange to exist to facilitate
7 transactions between buyers and sellers.
8   Q.  Would it have been possible for somebody
9 to say they wanted to buy a bitcoin and have that
10 transaction completed later by somebody looking to
11 sell?
12   A.  Yes, you could post to your account that
13 I'm willing to sell bitcoin at this price and wait
14 until -- and unless somebody is willing to pay that
15 price, your proposed transaction would not be
16 matched.  But the purpose --
17   Q.  Do you think that -- sorry.
18   A.  -- between the buyer and the seller.
19   Q.  Do you think that users of the exchange
20 who were looking to buy or sell would have cared if
21 the counterparty was somebody at Mt Gox?
22   A.  I don't think so.
23   Q.  And then the last sentence says, "Users
24 would have understood that the exchange was supposed
25 to operate in accordance with certain basic

Page 136

1 principles that essentially amount to good faith and
2 fair dealing," right?
3   A.  Yes.
4   Q.  Now, "good faith and fair dealing" is a
5 legal concept, correct?
6   A.  It is a legally phrase and a legal concept
7 used to describe what is expected of ordinary
8 businesspeople.  It's not just a legal concept.
9 Although it is a legal concept.
10   Q.  What's the difference between the legal
11 concept and applying it in the business of ordinary
12 businesspeople?
13   A.  Hopefully none.
14   Q.  Well, what principles here do you believe
15 did not amount to good faith and fair dealing?
16   A.  That, in fact, some of the transactions
17 that were reported as existing weren't actual
18 transactions.  They were there to create the
19 appearance of high volume and a higher reservoir of
20 bitcoin in Mt. Gox that did not really exist.
21   Q.  And then you write, "In early 2012,
22 Karpeles created Terms of Use for the Mt. Gox
23 exchange, and the original English version was in
24 place for all English users during the entire life
25 of the exchange."  You see that, right?

Page 137

1   A.  Yes.
2   Q.  And you mean that it was in place from
3 early 2012 through the end of the exchange, correct?
4   A.  From when it was created to the end of the
5 exchange, yes.
6   Q.  All right.  And that's from Mr. Karpeles'
7 deposition, correct?
8   A.  That's correct. That's the only source for
9 that information.
10   Q.  And the next sentence is simply you
11 reading the Terms of Use, correct?
12   A.  Yes.
13   Q.  Then the same is true for paragraph 50,
14 correct?
15   A.  Yes.
16   Q.  Why did the Terms of Use factor into your
17 analysis?
18   A.  Because it further confirms what I already
19 had come to conclude. It's a confirmation of
20 ordinary practice and expected practice and what's
21 customary.
22   Q.  Does your analysis change if the Terms of
23 Use are in place or not?
24   A.  The extent of the misstatements and the
25 pattern of misstatements is clearly different if

158

1  I think he said prior to April or about April.  And
2  then additional thefts since then over a continuing
3  pattern.
4       And that's based on Mark Karpeles'
5  statements. So that's what my opinion is.  I cannot
6  see of a reason why he would have lied about that,
7  so I believe him.
8       Q.  Do you know, at its height, how many
9  bitcoins were held on the Mt. Gox exchange?
10      A.  No.
11      Q.  And then the last paragraph of your report
12  -- excuse me -- the second to last paragraph before
13  you attest to your report, paragraph 63, the first
14  sentence is "No rational investor would have
15  knowingly chosen to put or keep bitcoin or currency
16  on an exchange with a bitcoin or cash deficit." How
17  do you know that?
18      A.  There's a word missing from that.  It
19  should have been "with such a bitcoin or cash
20  deficit." Obviously, if there's a dollar missing,
21  that's not what I was talking about.
22      But no rational investor would have
23  knowingly chosen to do that.  And that's based on my
24  understanding of how markets and investors behave,
25  and the pattern that is demonstrated in other

159

1  exchanges and confirmed by Karpeles' testimony about
2  what his motivations were and why he didn't disclose
3  these events.
4       Q.  Now, the "rational investor" standard
5  comes from standard corporate transactions, correct?
6       A.  And business practice and -- you know,
7  it's just an ordinarily prudent -- just a rational
8  person, yeah. It doesn't just come from corporate
9  transactions, but it's there, too.
10      Q.  Sure. Right. And by that I meant that's
11  not specific to bitcoin exchanges, correct, that
12  standard?
13      A.  Correct.
14      Q.  If I could ask you, I know I told you I
15  wasn't gonna do this, but I am.  If I could ask you
16  to dig out Exhibit D from the pile of data, which is
17  the Wired article of the Rise and Fall of the
18  World's Largest Bitcoin Exchange.
19      A.  That was the "D" as in dog.
20      Q.  It is.
21      A.  Sorry, it took me a moment, but I have it.
22      Q.  No worries. Okay.
23      In the last paragraph, on the third to
24  last page, the first sentence reads, quote, "Despite
25  its woes, Mt. Gox is still pulling in new customers.

160

1  According to Ver, this is because of its reputation
2  as the world's biggest bitcoin exchange." Do you
3  see that?
4       A.  Biggest and the best, yes.
5       Q.  Do you disagree with that statement?
6       A.  No.
7       Q.  And do you think that there's a
8  significant number of users of the Mt. Gox exchange
9  who didn't care about any of Mt. Gox's difficulties,
10 no matter what was disclosed?
11      A.  Well, they thought it was the best.  They
12 didn't know what was going on.  They thought it was
13 the biggest and the best, so that's where they're
14 going to put their money.
15      Q.  So even when they knew about certain
16 problems, they still invested on the -- via Mt. Gox,
17 correct?
18      A.  Even when there was publicly available
19 information about a variety of the problems, they
20 put their money there or their crypto there.
21      Q.  I'm sorry, could you read that answer back
22 for me please.
23      A.  Even though there was pub --
24      MS. BRENNAN:  I'm asking the court
25 reporter.

161

1       I'm sorry.
2       THE COURT REPORTER:  Sure.
3       (Whereupon, the answer was published by
4  the reporter.)
5       MS. BRENNAN:  Great. Thank you.
6       Q.  And, in fact, not all investors are
7  rational, correct?
8       A.  That is correct.
9       Q.  Okay. And the issues that should concern
10 rational investors are likely to have little to do
11 with how the company has functioned to date,
12 correct?
13      MR. THOMASSEN:  Sorry.  Can you ask that
14 again? I don't want to --
15      MS. BRENNAN:  Sure, sure.
16      Q.  Issues that should concern rational
17 investors in the crypto world are likely to have
18 little to do with how well the company has
19 functioned to date, right.
20      A.  I'm talking there about the issuer, the
21 company, the issuer.  Not a company, the exchange.
22      Q.  Okay. And somebody investing in crypto
23 assets will have different concerns and questions
24 than someone buying a traditional debt or equity
25 security from the company, right?

**170**

1  that would change my opinion as to whether or not
2  anybody has suffered damages.
3         It still wouldn't change my opinion as to
4  whether or not it would have been rational to keep
5  your bitcoin there while there was the huge deficit.
6     Q.   Okay.  And I think, we're almost done.  I
7  guess my last of the questions are what did you do
8  to prepare for your deposition today?
9     A.   I scheduled the time and blocked it off.
10 I re-read the articles that I had written, that told
11 you I had written.  I had a one-hour phone call with
12 Ben Thomassen.
13        I reviewed my Declaration.  I went back
14 through my book to see what I had said,
15 particularly, about Karpeles and Mt. Gox in it.  And
16 I think that's it.
17        Oh, I looked over my -- what I had said,
18 the information in my CV.
19        MS. BRENNAN:  Okay.  That's all I have.
20 Thank you very much for your time.
21        MR. THOMASSEN:  Could I just do a few
22 follow-up questions for you, if you don't mind,
23 Professor Goforth?  A few things that I just wanted
24 to clear up.
25 EXAMINATION

**171**

1  BY MR. THOMASSEN:
2     Q.   One thing you talked about with counsel
3  today was -- this was -- I think it was when we were
4  talking about paragraph 48 of your report.  I don't
5  know that it's important for you to look at it, but
6  that's around the time that I have that it happened.
7         So paragraph 48, I'll just -- I'll read
8  the first sentence of it.  It says "Users of the Mt.
9  Gox exchange would have understood that in general
10 bitcoin exchanges existed (and still continue to
11 exist) to facilitate the exchange of bitcoins
12 between buyers and sellers."
13        Do you see where I read that from?
14    A.   Yes.
15    Q.   And then you go on from there to make more
16 general conclusions about what users of the exchange
17 would have understood?
18    A.   Yes.
19    Q.   And when you were talking about these
20 expectations with Ms. Brennan today, you used the
21 term "ordinary business people."  Do you remember
22 using that term?
23    A.   No, but I easily could have.
24    Q.   Okay.  So you talked about what would have
25 been expected by "ordinary business people."  But I

**172**

1  don't think you ever got the chance to say what you
2  meant by "ordinary business people" in the context
3  of expectations in paragraph 48.
4     A.   Just ordinary folks who were participating
5  in this business in any way, either as running it or
6  as customers or as people looking at is this the
7  place where I want to park my coin?  Just ordinary
8  folks looking at this business.
9     Q.   Oh, okay.  Yeah, when I think of the term
10 "business people," I think of someone running a
11 business, but that's not what you meant by that
12 term?
13    A.   In this context, I'm sorry.  That is not
14 what I meant.
15    Q.   I didn't think so, but I wanted to make
16 sure that I was understanding you right.
17        And then the last thing, I wanted to give
18 you a chance to talk about was, you were talking
19 with counsel about how when this or that investor
20 was deciding to buy bitcoin or invest on the Mt. Gox
21 exchange, this or that piece of information may or
22 may not have mattered to their decision to invest.
23 Do you generally remember talking about that?
24    A.   Yes.
25    Q.   How do you reconcile that discussion with

**173**

1  your conclusion at the top of paragraph 63, that no
2  rational investor would have knowingly chosen to put
3  or keep bitcoin or currency on an exchange with such
4  a bitcoin or cash deficit?
5     A.   I can have a lot of different things on my
6  mind when I make a decision of where to put my
7  valuables or what to invest in, where to put my
8  money.
9         I can be interested in what's the risk?
10 What's the potential rate of return?  The ease of
11 use?  Is it trendy?  Is it environmentally
12 sustainable?  I can have, you know, dozens of unique
13 interests.
14        But at the point where you start having a
15 decision, do I invest?  Do I put my money -- do I
16 leave my money or leave my assets someplace where I
17 now have reason to know it's not safe, it's not
18 going to be there, I'm not getting it back, and it's
19 not a friend, it's not a family member, it's not
20 something that I'm doing for a public good.  I'm
21 investing for one of my 85 different reasons.  If I
22 know it's not safe there, it's not rational for me
23 to keep it there, despite the fact that I have all
24 kinds of unique things that might influence my
25 decision to invest in bitcoin to begin with.

Page 174

1    Investing in bitcoin is not the same thing
2  as putting it on and leaving it on a particular
3  exchange.
4    Q.  I understand.  Thanks for that.
5       And when you were talking with counsel,
6  you said something to the effect of you reached that
7  conclusion based primarily on your understanding of
8  how markets and exchanges operate.  Do you recall
9  generally saying that?  I'm sure I didn't get you
10 word for word?
11   A.  Generally, yes.
12   Q.  Right.  When you talked about that, you're
13 referring there to your -- you referenced, several
14 times today, your 30 years of experience in the area
15 and your several years experience in the bitcoin
16 sector or cryptocurrency sector.  That's what you're
17 referring to there, right.
18   A.  Right. The commodities exchanges,
19 securities exchanges, and crypto exchanges.
20   Q.  Right.  And then today, when you talked
21 about, for example, the articles that you discussed
22 today about the four or so bitcoin exchanges that
23 failed or Mark Karpeles' discussions about what
24 customers would or would not have done had they
25 known certain information, would you say that was

Page 175

1  the basis of your opinion or that was confirmation
2  that your opinion was correct?
3    A.  That was part of the basis -- the failure
4  of the other exchanges is part of the basis of my
5  opinion. Yes, crypto works just the same way.
6  There's not something weird about this that I'm
7  completely missing. So, yes, that is part of the
8  basis of my opinion.
9       Karpeles' testimony, for the most part,
10 was confirmation rather than the basis.  His very
11 candid acknowledgment, yeah, I know, if I tell
12 people they'll pull their money, the exchange will
13 fail, and then people will come after me, and that
14 doesn't serve anybody well.  So, I mean, very
15 candid, and that was confirmation rather than the
16 basis for my opinions.
17   Q.  I got it.
18      And then last, you talked to counsel a
19 little bit about the Mt. Gox bankruptcy and civil
20 rehabilitation procedures in Japan, right?
21   A.  Right.
22   Q.  I assume -- I mean, I wish I would have
23 known if the answer is otherwise.  But I assume you
24 are not an expert in Japanese bankruptcy or Civil
25 Rehabilitation Law, right?

Page 176

1    A.  No, not at all.  Nor do I speak Japanese.
2    Q.  Right.  I mean, I feel like I'm constantly
3  playing catch up with what's going on over there.
4       And you weren't offering any opinion in
5  this case, as to those procedures, the recoveries
6  that people might get as a result of those
7  procedures?
8    A.  Nope.
9    Q.  Or anything in that regard?
10   A.  No.
11      MR. THOMASSEN:  Yeah.  Okay.  I think you
12 clarified the rest during your testimony with
13 counsel.
14      So those were the only points I have
15 wanted to revisit.  And if you have anything more,
16 Bevin,
17 I'll turn it back to you.
18      MS. BRENNAN:  Sure.
19 FURTHER EXAMINATION
20 BY MS. BRENNAN:
21   Q.  You talked about Mr. Karpeles' deposition
22 testimony being solely confirmation, correct?
23   A.  Yeah.
24   Q.  All right.  You have no information about
25 Mr. Karpeles' conduct, factual -- any fact other

Page 177

1  than the complaint and his deposition transcript,
2  other than stuff you read on the Internet, correct?
3    A.  Right.
4    Q.  So to have any understanding of what is
5  even at issue, you went to Mr. Karpeles' deposition,
6  correct?
7    A.  To know for sure what happened, to know
8  when -- when things happened, the factual predicate,
9  I relied on the behavior that he admitted to
10 confirmed my opinion.
11   Q.  Say, for instance, there's nothing in the
12 complaint about the Gox Bot, is there?
13   A.  I didn't read the complaint all that
14 carefully.  I didn't rely on -- I mean, complaints
15 are just one party's story.  So I didn't rely on the
16 allegations in the complaint as being true.  I did
17 rely on what Mark Karpeles reported as the facts of
18 what had happened as true.  So I guess, to some
19 extent, the facts that he sets out, as opposed to
20 his opinions, his motivation, you know, the facts, I
21 guess I did rely on.
22   Q.  Because outside of -- if you didn't rely
23 on the complaint and outside of his deposition
24 testimony, the only other indication you have about
25 Mr. Karpeles' conduct that you are supposedly

**178**

1 analyzing would just come from Internet articles,
2 right?
3      A. Right.
4      MS. BRENNAN: That's it. Thanks.
5      MR. THOMASSEN: I'm glad you made that
6 distinction. I know it's a daily dodger, but I was
7 this opinion which you clarified you were as well,
8 so I appreciate that. I apologize for interjecting
9 confusion.
10      MS. BRENNAN: Okay.
11      THE WITNESS: Can I reserve signature?
12      MR. THOMASSEN: Yeah. We'll reserve
13 signature on this.
14      THE COURT REPORTER: Okay. Excellent.
15      And let's see if Ms. B, would you like to
16 order the original at this time?
17      MS. BRENNAN: Yes.
18      THE COURT REPORTER: Okay.
19      MS. BRENNAN: And just -- what's your
20 normal turnaround time?
21      THE COURT REPORTER: Standard is 10
22 business days.
23      MS. BRENNAN: That'd be great. That's
24 fine.
25      THE COURT REPORTER: Okay.

**179**

1      MS. BRENNAN: And if I can get a regular
2 and mini?
3      THE COURT REPORTER: Regular and -- of
4 course.
5      MS. BRENNAN: Thank you.
6      THE COURT REPORTER: All right. Mr.
7 Thomas, did you want a copy, sir?
8      MR. THOMASSEN: Yes, of course.
9      THE COURT REPORTER: Okay. Excellent.
10      MR. THOMASSEN: And I don't know what your
11 practices are, but we don't -- electronic is fine
12 with us. We don't need paper copies of anything?
13      THE COURT REPORTER: Okay. Etran --
14      MS. BRENNAN: Yeah. Same with us.
15      And I think the -- because my assistant
16 sent that the service the exhibits, it's not
17 everything we sent to you guys, but you should be
18 able to if you could attach the exhibits to the
19 electronic copy, just matching up the letters, it
20 should work out, even though they're not sequential.
21 They should have a cover sheet on them that you can
22 match up pretty quickly?
23      THE COURT REPORTER: Yes, they do. That
24 was actually the other question I had, counsel.
25      So we only -- because I do know you sent

**180**

1 us an A through --
2      MS. BRENNAN: Right. We sent a lot more
3 than I -- yeah, a lot more than we used.
4      THE COURT REPORTER: Got it. We just want
5 to put in the ones we used.
6      MS. BRENNAN: Correct.
7      THE COURT REPORTER: Okay. Not a problem.
8      Off the record at 2:33 p.m.

**181**

1              CERTIFICATE
2
3      I, Cheyne Lee do hereby certify that I reported all
4 proceedings adduced in the foregoing matter and that the
5 foregoing transcript pages constitutes a full, true,
6 and accurate record of said proceedings to the best of
7 my ability.
8
9      I further certify that I am neither related to
10 counsel or any part to the proceedings nor have any
11 interest in the outcome of the proceedings.
12
13      IN WITNESS HEREOF, I have hereunto set my hand this
14 21st day of July, 2020.
15
20 /S/ Cheyne Lee